**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA**

MICHAEL DUNN,

    Plaintiff,

       v.

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG, CITY OF
EUNICE, and JOHN DOE,

    Defendants.

Civ. A. No.: 6:21-cv-01535

**EXPERT REPORT OF MARK S. DUNSTON**

NOVEMBER 26, 2025

CONFIDENTIAL

EXHIBIT A

# TABLE OF CONTENTS

I.    QUALIFICATIONS, ASSIGNMENT & METHODOLOGY, AND
      SUMMARY OF OPINIONS ..............................................................................1

      A.    **Qualifications** ........................................................................................1

      B.    **Assignment & Methodology** ................................................................1

      C.    **Summary of Expert Opinions** .............................................................2

            1.    The EPD's Policies and Procedures Fail to Meet Widely Accepted
                  Law-Enforcement Standards ..........................................................2

            2.    The EPD's Disciplinary and Loyalty Policies Enabled Retaliation
                  Against Officers Who Reported Misconduct, Including Lt. Dunn .............2

            3.    The EPD's and the Chief of Police's Retaliation Against
                  Whistleblowers Violates Accepted Policing Standards ..............................2

            4.    The City of Eunice's Oversight Structure Permitted and
                  Perpetuates Abuse ..........................................................................3

            5.    Ongoing Institutional Consequences: The Enduring Impact of
                  Policy Failure, Leadership Breakdown, and Retaliatory Culture ...............3

            6.    Lt. Dunn's Requests for Relief Address the Many of the
                  Accountability and Oversight Concerns that I Identify in this
                  Report ..............................................................................................3

II.   CASE BACKGROUND ................................................................................3

III.  EXPERT OPINIONS .....................................................................................5

      A.    **The EPD's Policies and Procedures Fail to Meet Widely Accepted
            Law-Enforcement Standards** ...............................................................5

            1.    Policies Around the Chief of Police's Authority Provides Him
                  Near-Unlimited Discretion To Punish Officers With No Effective
                  Checks ..............................................................................................5

            2.    The Procedural Orders' Policy for "Conduct Unbecoming an
                  Officer" Is Overbroad in Comparison to Accepted Standards and
                  Allows the Chief of Police to Punish Officers Who Report
                  Misconduct .......................................................................................6

| | 3. | The "Loyalty to the Department" Policy Allows an Environment that Discourages, and Often Punishes, Those Who Come Forward with Issues ...................................................... 8 |
|---|---|---|
| | 4. | The Record Shows that Department Policies About Public Statements and Social Networking Are Applied Inconsistently to Limit Criticism of Leadership ...................................................... 9 |
| B. | | **The Record Shows that the EPD's Policies Enabled Retaliation Against Lt. Dunn and Other Officers Who Reported Misconduct** ...................................................... 11 |
| | 1. | Investigation for Lt. Dunn's Facebook Post ............................................. 11 |
| | 2. | Officer Fontenot's Unofficial Investigation into Lt. Dunn ...................... 12 |
| | 3. | Investigation for Contact with the City Marshal's Office ........................ 12 |
| | 4. | Use of Administrative Authority to Create Hostile Work Environment for Lt. Dunn ...................................................... 13 |
| | 5. | Retaliation Against Other Officers Under the Same Policy Framework ...................................................... 15 |
| C. | | **The EPD's and the Chief of Police's Retaliation Against Whistleblowers Violates Accepted Policing Standards** .................................. 15 |
| D. | | **The City of Eunice's Policies and Oversight Structure Permitted Abuse** ...................................................... 16 |
| | 1. | Concentration of Unreviewed Authority in the Chief of Police ............... 16 |
| | 2. | Failure of Municipal Checks and Civil Service Safeguards ..................... 16 |
| | 3. | Absence of External Accountability and Continuing Risk ........................ 17 |
| E. | | **Ongoing Institutional Consequences** ...................................................... 17 |
| | 1. | Understaffing ...................................................... 17 |
| | 2. | Officers Silenced for Reporting Misconduct Are Less Likely to Report Misconduct in the Future ...................................................... 18 |
| IV. | | **POLICY RECOMMENDATIONS** ...................................................... 19 |

# I.    QUALIFICATIONS, ASSIGNMENT & METHODOLOGY, AND SUMMARY OF OPINIONS[1]

## A.    Qualifications

My qualifications, including an updated curriculum vitae, are provided and attached as Appendix A.

## B.    Assignment & Methodology

I was asked to examine the policies and procedures of the Eunice, Louisiana, Police Department (the "EPD" or "Department"), in order to assess how they compare to accepted best practices for police departments across the country.[2]  These generally accepted standards include mandatory legal responsibilities set by statute and judicial case law and policy and best practices offered by state, national, and international law enforcement associations, and boards.   In particular, I referred to the following widely-accepted sources in the industry, and compared them to policies in place at the Department:

- The International Association of Chiefs of Police ("IACP") is the world's largest professional organization for police leaders, developing evidence-based model policies that promote ethical, transparent, and community-focused policing; its Model Policy Program provides adaptable standards grounded in law and best practices, which emphasize professionalism, integrity, and accountability while protecting officers' constitutional rights, allowing discipline only when conduct or speech demonstrably undermines job performance, departmental efficiency, or public trust.[3]

- The Commission on Accreditation for Law Enforcement Agencies ("CALEA") is an independent accrediting body that establishes national standards for professional excellence in law enforcement, public safety communications, and training; its accreditation program provides agencies with a framework for accountability, transparency, and continuous improvement, focusing on policy development, supervision, and community engagement—requiring agencies to adopt written directives that align with constitutional policing principles, ensure due process in discipline, and promote integrity, efficiency, and public trust.[4]

Comparing generally accepted practice and training in the law enforcement profession is a common and consistently applied method when evaluating claims such as those set forth in Lt. Dunn's Amended Complaint.  I have also relied upon my thirty-eight years employed in law enforcement, my training, experience, and education, as well as my having trained more than forty thousand law enforcement officers and law enforcement executives from every state in the United States, as well as other countries utilizing well known and regarded training programs, and my

---

[1] I reserve the right to supplement this expert report following the completion of the 30(b)(6) deposition of Defendant the City of Eunice.
[2] Appendix B contains a list of materials consulted.
[3] *About, IACP* (Nov. 17, 2025, 11:52 PM), https://www.theiacp.org/about-iacp.
[4] *About the Commission*, CALEA (Nov. 17, 2025, 12:01 PM) https://www.calea.org/about-commission; *What is Accreditation*, CALEA (Nov. 17, 2025, 12:0. PM) https://www.calea.org/what-accreditation.

personal knowledge of the training and operational standards in the law enforcement profession. Therefore, all of my opinions are within a reasonable degree of professional certainty and do not constitute any inference on matters to be decided by the trier of fact.

In addition, I examined the testimony and materials produced in the matter to offer an opinion on the effect the EPD policies have on the Department, its employees, and the subsequent retaliation efforts against Lt. Dunn for having revealed such misconduct in order to inform my opinion.

I am being compensated an hourly fee of $250.00 USD per hour. My compensation is not contingent in any way on the substance of my opinions or the outcome of this litigation.

## C.    Summary of Expert Opinions

Based on my review of the documents in Appendix B, I offer the following opinions, each to a reasonable degree of professional certainty:

### 1.    The EPD's Policies and Procedures Fail to Meet Widely Accepted Law-Enforcement Standards

The EPD's written Procedural Orders are vague, outdated, and noncompliant with nationally accepted standards (IACP, CALEA). Their ambiguity grants the Chief of Police excessive discretion to interpret and enforce discipline, investigations, and performance expectations without oversight. These deficiencies set the foundation for retaliatory misuse of authority and systemic misconduct within the Department.

### 2.    The EPD's Disciplinary and Loyalty Policies Enabled Retaliation Against Officers Who Reported Misconduct, Including Lt. Dunn

The EPD's "Conduct Unbecoming an Officer," "Loyalty to the Department," "Social-Media" and "Public Statements" policies give the Chief of Police unchecked authority to enact and justify any actions. Further, the vague and overbroad wording, combined with the plenary nature of the Chief of Police's authority, allow lawful speech to be treated as insubordination and protected whistleblowing to be punished as disloyalty. Such policies risk fostering a culture that deters officers from reporting wrongdoing.

### 3.    The EPD's and the Chief of Police's Retaliation Against Whistleblowers Violates Accepted Policing Standards

Chief Fontenot's, Lt. Young's and Officer Fontenot's retaliatory actions against Lt. Dunn, such as removing his K-9 assignment, altering his shifts, fabricating investigations, and spreading false accusations, as well as similar actions taken against other officers at the EPD, contradict recognized professional standards of law-enforcement ethics, including IACP Model Policies and the DOJ's Law Enforcement Whistleblower Protection Principles. These actions could be expected to create a chilling effect that endangers transparency, morale, and community trust.

4. <u>The City of Eunice's Oversight Structure Permitted and Perpetuates Abuse</u>

The City of Eunice's charter and administrative structure give the Chief of Police exclusive disciplinary authority, with "no exceptions," and no independent oversight mechanism. This lack of accountability could and did allow systemic retaliation and policy violations to persist unchecked, particularly because widely accepted governance norms for police accountability require dual channels of review: command-level supervision and municipal-level civilian oversight. The City's failure to audit, review, or intervene makes it complicit in the constitutional violations alleged and continues to pose risk of recurrence.

5. <u>Ongoing Institutional Consequences: The Enduring Impact of Policy Failure, Leadership Breakdown, and Retaliatory Culture</u>

The cumulative effect of the EPD's deficient policies, retaliatory leadership, and absent oversight has created lasting, Department-wide harm. Training, supervision, and investigations remain inconsistent and noncompliant with professional standards. A pervasive "culture of fear" discourages reporting of misconduct and drives officer attrition. Cooperation with external agencies has deteriorated due to the EPD's reputation for corruption and retaliation. The morale and operational efficiency of the Department remain compromised, directly endangering public safety. These enduring effects demonstrate that the systemic issues identified in earlier opinions are ongoing and self-perpetuating, absent external reform and independent oversight.

6. <u>Lt. Dunn's Requests for Relief Address the Many of the Accountability and Oversight Concerns that I Identify in this Report</u>

I believe that many of Lt. Dunn's requested reforms would meaningfully address the Department's accountability, transparency, and cultural issues by strengthening how misconduct is investigated and reported, creating independent oversight, and improving day-to-day policing practices. These measures—including periodic public disclosure of complaint data, establishing independent investigative and monitoring bodies, improving record-keeping and supervision, requiring body cameras, and enhancing training in crisis intervention, de-escalation, and officer intervention—would, in my view, directly respond to the organizational and operational problems I identified. Taken together, I believe these changes would significantly remedy the concerns raised in my report.

## II.    CASE BACKGROUND

Lieutenant Michael Dunn ("Lt. Dunn"), a long-serving officer with the EPD, brought this civil rights and whistleblower action alleging retaliation for reporting police misconduct and corruption to external authorities.[5] The Complaint asserts, among others, violations of his First Amendment rights, Louisiana's Whistleblower Statute, and related state constitutional and tort claims, seeking both injunctive and declaratory relief.[6] According to Lt. Dunn, his troubles began in June 2020 when Chief of Police Randy Fontenot ("Chief Fontenot") learned that Lt. Dunn had reported internal corruption and abuse to multiple outside agencies.[7] From that point forward,

---

[5] *See* Am. Compl. ¶¶ 1-12.
[6] *See id* ¶¶ 124-192.
[7] *See* M. Dunn Tr. 52:17-53:1, 368:19-371:5.

Chief Fontenot, Officer Victor Fontenot ("Officer Fontenot"), and Lieutenant Ryan Young ("Lt. Young"), carried out a campaign of retaliation to damage Lt. Dunn's career and reputation, and to drive him from the Department.[8]

Beginning in 2018, Lt. Dunn reported to state, local, and federal authorities a series of serious abuses within the EPD, including excessive force, neglect of inmate medical needs, investigatory leaks, misuse of confidential informants, and financial misconduct.[9] One of the authorities he spoke to was Captain Eric Duplechain of the Louisiana State Police, who told him that only the Chief of Police could formally lodge complaints with the State Police.[10] Shortly after, Chief Fontenot learned of Lt. Dunn's report and threatened "to find out" "anything [Lt. Dunn] tried to report to state police or anything thereof."[11] Lt. Dunn later informed the St. Landry Parish Sheriff of the same misconduct.[12]

After Chief Fontenot discovered Lt. Dunn's whistleblowing, he, Lt. Young, and Officer Fontenot began a sustained campaign to discredit and punish him.[13] This included assigning Lt. Dunn to menial or unsafe duties, initiating baseless internal investigations, spreading defamatory rumors that Lt. Dunn was a "dirty cop," and attempting to involve criminal suspects in fabricating accusations against him.[14] For instance, Officer Fontenot and Lt. Young pressured a detainee, Joshua Dupre, to falsely testify that Lt. Dunn had accepted bribes; Dupre later stated under oath that Officer Fontenot was trying to coerce him into making the claim.[15] Officer Fontenot also allegedly threatened Lt. Dunn with violence, stating he would "put[] bullets in the back of [Lt. Dunn's] head or [his] dog's head"; comments made openly in front of other officers and tolerated by Chief Fontenot.[16] The harassment escalated to punitive work assignments, including eliminating Lt. Dunn's K-9 unit, reducing his pay, and assigning him to grueling night shifts far below his rank and experience level.[17] Despite Lt. Dunn filing internal reports and speaking up about the retaliation, the EPD's policies provided that the Chief of Police was subject to almost no oversight; only escalating to the Eunice Municipal Fire and Police Civil Service Board (the "Civil Service Board"), where Lt. Dunn was repeatedly vindicated, but which provided insufficient protection.[18] Lt. Dunn alleges that these actions caused him significant professional and personal harm, including lost income, career opportunities, and his reputation among colleagues and the community.[19] Lt. Dunn also claims that he experienced anxiety, depression, and safety fears due to threats from his superiors and the public rumors they spread.[20] Lt. Dunn seeks declaratory and injunctive relief declaring the defendants' conduct unconstitutional and unlawful, as well as structural reforms within the EPD.[21] He requests reinstatement to his prior

---

[8] *See* M. Dunn Tr. 368:19-371:5.
[9] *See* M. Dunn Tr. 50:3-51:7; 154:8-156:13; 183:17-184:23; 192:16-193:20; 196:8-197:10.
[10] *See* M. Dunn Tr. 69:6-13.
[11] *See* M. Dunn Tr. 52:17-53:1.
[12] *See* M. Dunn Tr. 159:24-160:11.
[13] *See* M. Dunn Tr. 199:5-18, 368:19-371:5.
[14] *See, e.g.,* M. Dunn Tr. 138:1-23; 240:1-241:11; 258:2-13.
[15] DUNN_0000243-44 (J. Dupre Bond Revocation Tr. 10:5-10, 10:28-11:2, 12:10-13:8).
[16] *See* M. Dunn Tr. 229:15-230:6; V. Fontenot Tr. 143:1-144:15.
[17] *See* M. Dunn Tr. 240:9-11, 121:4-20, 198:20-23, 263:19-164:19, 265:7-25.
[18] D. Thibodeaux Tr. 177:20-178:7, 180:11-17.
[19] *See* M. Dunn Tr. 215:16-216:22, 360:20-361:4, 361:7-13.
[20] *See* M. Dunn Tr. 35:10-24; 72:3-11; 168:17-169:9.
[21] *See* Am. Compl. ¶¶ 193-198.

duties and expungement of retaliatory records from his personnel file.[22]  Lt. Dunn also asks the court to order departmental reforms, including body camera requirements, de-escalation training, a duty-to-intervene policy, accurate payroll monitoring, and establishment of an independent oversight agency to investigate police misconduct.[23]  Additionally, he seeks mandatory public apologies from the defendants and a declaration that he remains an officer in good standing.[24]

The complaint asserts that the EPD's internal policies fostered and enabled this misconduct.[25]  The disciplinary policy vested "final authority" in the Chief of Police with "NO EXCEPTIONS," allowing Chief Fontenot (and any Chief of Police) to weaponize investigations against disfavored officers while protecting loyal subordinates.[26]  Reporting procedures required all misconduct allegations to go through the Chief of Police, giving him unchecked power to suppress internal complaints.[27]  Furthermore, coordination policies among the City, District Attorney, and Louisiana State Police required the Chief of Police's approval before any external criminal investigation—effectively insulating the Department from oversight.[28]  As Lt. Dunn contends, these systemic flaws chilled legitimate whistleblowing and allowed corruption to flourish without consequence.[29]

## III.    EXPERT OPINIONS

### A.    The EPD's Policies and Procedures Fail to Meet Widely Accepted Law-Enforcement Standards

The Department is governed by the Procedural Orders, which were enacted as of January 1, 2015.[30]  The most recent version I reviewed was revised on October 15, 2024.  The enactment, interpretation and enforcement of the Procedural Orders at the Department are at the sole, unfettered discretion of the Chief of Police.[31]  As discussed below, written policies are no better than words on paper when a Chief of Police abuses his or her discretion in enforcing said policies.  Indeed, the routine customs and practices that occur at any department become the true policies governing conduct—and misconduct—at any police department.

1.    <u>Policies Around the Chief of Police's Authority Provides Him Near-Unlimited Discretion To Punish Officers With No Effective Checks</u>

The Procedural Orders state that the Chief of Police is tasked with (a) "the enforcement of all laws and ordinances;" (b) "planning, directing, coordinating, controlling, and staffing all activities;" and (c) "the enforcement of rules and regulations within the Department, for the completion and forwarding of such reports as may be the Department's relations with citizens,

---

[22] *See id.* ¶¶ 164, 192, 195.
[23] *See id.* ¶¶ 196(a)-(j).
[24] *See id.* ¶¶ 194-195.
[25] *See id.* ¶¶ 4-5, 54-56, 185-189.
[26] *See id.* ¶ 54.
[27] *See id.* ¶ 55.
[28] *See id.* ¶¶ 4-5, 65.
[29] *See id.* ¶¶ 4-5, 185-189.
[30] *See* DUNN_0000465.
[31] *See* DUNN_0000472, DUNN_0000494.

the City government, and other agencies."[32]  In addition, the Chief of Police has "final departmental authority in all matters of policy, operations, and discipline,"[33] with "NO EXCEPTIONS."[34]  The import of these policies at the EPD is that they allow the Chief of Police to arbitrarily use his power against EPD officers for whatever reason he chooses, both legitimate and illegitimate.  He has near-unlimited discretion to punish and discipline personnel at the Department, and this unfettered discretion insulates the Chief of Police from internal complaints, while discouraging the reporting of any abuse of power to external authorities.

I reviewed deposition testimony from this action and observed instances when the above-described policies allowed the Chief of Police to wield power against those who raised complaints of misconduct at the Department by selectively enforcing the law amongst EPD officers and civilians, ignoring misconduct at the Department, and targeting employees he dislikes.  For example, officers testified that Chief Fontenot demoted and suspended Lt. Jeremy Ivory on fabricated grounds after Ivory criticized him, falsely claiming prior disciplinary history and later violating Ivory's officer's bill of rights during the hearing, which was overturned by the Civil Service Board.[35]  Lieutenant Donnie Thibodeaux testified that Chief Fontenot retaliated against him for upholding civil service rules by stripping his duties, reassigning him to night shifts with no support, removing his training authority, and moving his office across town.[36]  Both Lt. Thibodeaux and then-Deputy Chief Varden Guillory ("Deputy Chief Guillory") testified that Chief Fontenot targeted Deputy Chief Guillory, having him arrested on false charges two weeks before retirement to damage his benefits and reputation, because Guillory resisted unlawful orders and refused to align with him.[37]  Finally, witnesses testified about how Chief Fontenot retaliated harshly against Lt. Dunn for whistleblowing and speaking publicly about Department misconduct by launching baseless investigations, forcing administrative leave, removing his K-9 unit, and publicly branding him a liar and "dirty cop."[38]

The breadth and ambiguity of the policies outlining the authority of the Chief of Police allowed Chief Fontenot to create the culture of fear and lawlessness within the Department described in the above-cited deposition testimony.

> 2.    The Procedural Orders' Policy for "Conduct Unbecoming an Officer" Is Overbroad in Comparison to Accepted Standards and Allows the Chief of Police to Punish Officers Who Report Misconduct

The Procedural Orders contain a policy for "Conduct Unbecoming an Officer."[39]  That policy differs from the "Unbecoming Conduct" policy set forth in the IACP's Model Policies.[40]

For example, the Procedural Orders' "Conduct Unbecoming an Officer" policy, defines unbecoming conduct broadly as any behavior, on or off duty, that "brings the Department into

---

[32] DUNN_0000472.

[33] *Id.*

[34] DUNN_0000494.

[35] *See* D. Thibodeaux Tr. 222:4-223:23; 227:9-228:8; 229:6-230:5; J. Lee Tr. 15:5-16:13; 90:24-92:18.

[36] *See* D. Thibodeaux Tr. 21:7-14; 30:3-36:23; 83:12-84:10; 114:8-116:22; 159:19-162:22.

[37] *See* V. Guillory Tr. 13:13-20:8; 24:18-25:8; D. Thibodeaux Tr. 238:16-239:23.

[38] *See* M. Dunn Tr. 52:9-58:25; 120:5-121:20; 382:21-386:24; D. Thibodeaux Tr. 193:5-197:4.

[39] DUNN_0000477.

[40] *See* DUNN_0002653 (*IACP Model Policy on Standards of Conduct* § III.B.4.).

disrepute," "reflects discredit upon the officer," "impairs the operations or efficiency of the Department," "detrimentally affects the morale," or "may reasonably be expected to destroy public respect for Eunice Police Officers."[41]  It offers no examples of specific acts, objective standards, or procedural limits, instead granting the Chief of Police full discretion to determine what constitutes conduct unbecoming of an officer.  This policy has remained unchanged from the 2021 iteration of the EPD's Procedural Orders to the current iteration.[42]

The IACP Model Code of Conduct and Ethics defines such "unbecoming conduct" more narrowly: officers "shall not conduct themselves in a manner, on or off duty, that" "casts doubt on their integrity, honesty, moral judgment, or character;" or "impairs the agency's efficient and effective operation."[43]  However, importantly, the IACP guidance advises that it is paramount for the policy to "show a nexus between the conduct and the efficiency of service and be linked effectively to an agency's code of conduct and values," narrowing the interpretation of the standard.[44]  Further, the IACP guidance warns that charges of conduct unbecoming of an officer "should be brought only when there is an articulable reason and rational justification for enforcing the standard," and that "the agency should make every effort to ensure that similar acts of offending conduct by officers are dealt with through similar disciplinary measures."[45]  Further, it states that "to provide officers with the information necessary to make informed decisions on such matters, the agency should provide in-service training on an initial basis upon introduction of the policy and on a periodic basis thereafter."[46]  Thus, while the EPD policy emphasizes protecting departmental image and morale through a subjective standard, the IACP model limits the rule to objectively defined ethical breaches connected to an officer's duties and subjects any enforcement to procedural safeguards.

My review of the record reflects that the broadly worded policy for "Conduct Unbecoming an Officer," particularly when paired with the policy that final disciplinary decision making rests with the Chief of Police, allowed Chief Fontenot to punish certain officers for purported conduct unbecoming an officer, while ignoring or refusing to punish other officers for misconduct that is objectively worse than the actions he has chosen to discipline.  The record indicates that Chief Fontenot used—and abused—this policy by defining any action that he did not agree with as "unbecoming" of the officer.[47]  Chief Fontenot testified that he "agree[d] . . . somewhat" with the statement that the "EPD's functions and capabilities are entirely subject to who the elected chief is" because the mayor is not "involved" with "the day-to-day operations and the policies within the police department."[48]  Mayor Scott Fontenot agreed that the Code of Conduct and Ethics, including this provision for "Conduct Unbecoming an Officer," is "strictly the purview of the [C]hief [of Police]."[49]  Chief Fontenot interpreted the rule's clause prohibiting conduct that "detrimentally affects the morale of the department" to mean that an officer may not criticize a superior officer to a lower-ranking officer, acknowledging that "this policy forbids an

---

[41] Procedural Order #15-7(I)(B)(2).
[42] *Compare* 2021 Procedural Orders #15-7(2) *with* 2024 Procedural Orders #24-7(2).
[43] *See* DUNN_0002653 (*IACP Model Policy on Standards of Conduct* § III.B.4.).
[44] *See* DUNN_0002663 (*IACP Model Policy* § II.A.).
[45] *Id.*
[46] *Id.*
[47] *See, e.g.,* DUNN_0000381, DUNN_0000431.
[48] *See* R. Fontenot Tr. 36:17-37:6.
[49] *See* S. Fontenot Tr. 366:19-367:5.

officer from criticizing the Chief of Police to any other officer below their rank."[50]  He further described the portion of the rule barring conduct that "impairs the operations or efficiency of the department" as "very broad and general," explaining that it covers "any action that the officers would take that would interfere with the safety of other officers [or] the operations of the police department."[51]  When asked which of the five categories listed under the policy, he believed Lt. Dunn's Facebook post violated Fontenot responded, "[a]ll five of them," asserting that the post simultaneously brought the department into disrepute, reflected discredit, impaired operations, affected morale, and destroyed public respect.[52]  This testimony supports my assessment regarding the expansive and discretionary nature of the rule, and how it empowers the Chief of Police to discipline officers for nearly any conduct perceived as undermining Departmental hierarchy, cohesion, or image without any meaningful oversight.

Based on my experience, including as a Chief of Police, such a policy, custom, and practice can negatively affect departments and erode public respect and trust for police departments.  Officers and members of the public lose confidence in the law enforcement institution when there is a culture of retaliation and inconsistency in what conduct is considered punishable.  In addition, in my experience, such a policy, custom, and practice discourages and can prevent police officers from reporting and resolving issues within a department.  In comparison, the IACP model confines discipline to demonstrable, professional misconduct supported by fair process.

3.    The "Loyalty to the Department" Policy Allows an Environment that Discourages, and Often Punishes, Those Who Come Forward with Issues

The Procedural Orders also contain a policy called "Loyalty to the Department."[53]  The policy remains unchanged between the 2021 iteration and the most recent iteration.  The policy prohibits employees from "criticiz[ing] the Department, its policies, or other members or employees by talking, in writing or other expression where such expression is defamatory, obscene, unlawful, and exhibits a reckless disregard for the truth or tends to undermine the operation of the Eunice Police Department."[54] Based on my experience, there are several aspects about this policy that are troubling.  First, police officers generally must be loyal to the *public*—not primarily to the department—and prioritize promoting *public safety*.  The policy reflects that the EPD policy values loyalty over integrity; similar policies have been shown to facilitate misconduct at departments and helps to keep it concealed.[55]  The effect of this policy is particularly concerning here, where it is considered in tandem with the Chief of Police's final decision-making authority over all internal disciplinary actions and misconduct.

Second, although the "Loyalty to the Department" policy states that "[n]othing herein shall prohibit a member from filing a complaint or criticism through proper channels," the record reflects that the Department takes a limited view of which "channels" are "proper."[56]  During his

[50] *See* R. Fontenot Tr. 51:16-53:2.
[51] *See* R. Fontenot Tr. 53:16-54:9.
[52] *See* R. Fontenot Tr. 389:15-18.
[53] Procedural Order #15-7(I)(B)(4); Procedural Order #24-7(I)(B)(4).
[54] Procedural Order #15-7(I)(B)(4); Procedural Order #24-7(I)(B)(4).
[55] *See* DUNN_0003050-51 (UNODC, *Handbook On Police Accountability, Oversight, and Integrity*, 75-76 (2011)).
[56] *See* Procedural Order #15-7(I)(B)(4)(b); Procedural Order #24-7(I)(B)(4)(b).

deposition, Chief Fontenot testified that he understood the proper channels to be "the chain of command" for any disciplinary or policy complaints.[57] Based on my experience and review of relevant literature, such a statement does not counteract the silencing effects of a loyalty policy. A policy that requires loyalty to the department itself strengthens the proverbial "blue wall of silence," and weakens the ability of departments to root out misconduct.[58] That is especially true where, as here, the Chief of Police is the person who defines what the "proper channels" are.[59] In my experience as a Chief of Police law enforcement educator, in this sort of scenario, "loyalty to the department" often becomes indistinguishable from "loyalty to the chief," further perpetuating the risk of abuse of power. The deposition testimony shows that at the EPD, those who questioned Chief Fontenot were disliked by him, while those who followed him without question received better treatment, regardless of whether the conduct at issue was beneficial or detrimental to protection of the public.[60]

By contrast, the IACP Model Standards of Conduct addresses similar considerations in its "Public Statements, Appearances, and Endorsements," section, which limits officers, *when* they are acting as agency representatives, from making public statements that could reasonably be interpreted as adversely affecting morale, discipline, operations, or public perception.[61] Importantly, the IACP model guidance has a separate section with guidance for off-duty speech/First Amendment considerations.[62]

Based on my experience as a Chief of Police and time in law enforcement, the EPD's Loyalty to the Department policy, as written and as it can be interpreted by the Chief of Police, is overly broad and functions less as an ethics safeguard and more as a tool of control. By prohibiting certain types of public criticism of the Department and requiring that even internal complaints be routed through the chain of command, the policy discourages officers from reporting misconduct and shields leadership from accountability. Unlike the IACP model, which balances organizational discipline with transparency and free-speech protections, the EPD rule can be a tool in creating a climate of fear and opacity, where exposing wrongdoing can be cast as "disloyalty." In my experience, this structure not only tends to suppresses legitimate whistleblowing but also enables retaliation against officers who challenge unethical behavior, thereby eroding morale, public trust, and the integrity of police oversight.

        4.    <u>The Record Shows that Department Policies About Public Statements and Social Networking Are Applied Inconsistently to Limit Criticism of Leadership</u>

Procedural Order # 15-7(I)(B)(34) states that "[o]fficers shall not address public gatherings, appear on radio or television, prepare any articles for publication, act as correspondents to a newspaper or a periodical, release or divulge investigative information, or

---

[57] *See* R. Fontenot Tr. 62:18-63:3.
[58] *See* DUNN_0003050-51 (UNODC, *Handbook On Police Accountability*, 75-76).
[59] *See* Procedural Order #15-7(I)(B)(4)(b); Procedural Order #24-7(I)(B)(4)(b); M. Dunn Tr. 212:14-213:5; R. Fontenot Tr. 62:17-66:23, 79:9-22.
[60] *See e.g.,* J. Lee Tr. 42:10-43:4; D. Thibodeaux Tr. 28:2-16, 44:18-45:10.
[61] *See* DUNN_0002670-71 (*IACP Model Policy on Standards of Conduct* § II.D.).
[62] *See* DUNN_0002674-75 (*IACP Model Policy on Standards of Conduct*, Appendix - United States Public Employee First Amendment Rights).

act as a representative of the Department in other matters without authorization."[63]   While the aforementioned policy on public statements is a variation of widely accepted police policies, the Procedural Orders also contain an abnormal and vague social media policy, entitled "SOCIAL NETWORKING."[64]

Specifically, as written, Procedural Order # 15-7(I)(B)(61)(c) bars social media posts that criticize the Department. [65]   It states that "No officer shall relate themselves with other information, opinions or positions that would bring adverse criticism or embarrassment upon the department." In his deposition, Chief Fontenot testified that under the EPD's social-media policy, "a police officer . . .shouldn't be commenting publicly about" departmental matters like "gang activity," and that such speech is not protected by the first Amendment.[66]   He further testified that the policy requires officers to avoid posting or sharing information that "can cause unrest with the public" and might "mak[e] it look like the police department isn't doing their job."[67]   In testimony regarding Lt. Dunn's Facebook post, Chief Fontenot said he disagreed with his investigator's conclusion that the post was protected, explaining that "it's a police officer talking about his own department," and that its content "could have caused fear among the public."[68]   He testified that Lt. Dunn's status as a police officer made the post subject to discipline under the Department's social-media policy because it undermined public confidence in the department.[69]

This Department policy and the deference it gives the Chief of Police is inconsistent with generally accepted social media policies.  For example, the IACP Model Policy affirms among other things that "[p]ublic employees do not forfeit First Amendment rights simply because they are employed by the government."[70]   Further, if a statement deals with matters of "public concern," "then the agency may take action against the employee only if the public concern is outweighed by the interest of the public employer 'in promoting the efficiency of the public services it performs.'"[71]

The social media policy in place at the Department is not based on widely accepted police practices and wrongly prohibits legitimate posts by Department personnel.  Unlike the IACP Model Policies, the EPD's social media policy does not consider the officer's ability to speak on a matter of public concern, and therefore further grants the Chief of Police the ability to punish officers for any information that might make him look bad.

Based on my experience, including as a Chief of Police, as a law enforcement officer, and as a training instructor for many departments worldwide, the policy regime set forth above enables a Chief of Police to abuse power in order remain insulated from scrutiny, liability, and

---

[63] Procedural Order # 15-7(I)(B)(34); Procedural Order # 24-7(I)(B)(34).

[64] Procedural Order # 15-7(I)(B)(61)(a)-(e).

[65] *See* Procedural Order # 15-7 (I)(B)(61)(c); Procedural Order # 24-7 (I)(B)(61)(c).

[66] *See* R. Fontenot Tr. 386:9-17.

[67] *See* R. Fontenot Tr. 386:15-387:10.

[68] *See* R. Fontenot Tr. 384:3-385:23.

[69] *See* R. Fontenot Tr. 385:3-8; 387:3-7.

[70] *See* DUNN_0002674-75 (*IACP Model Policy on Standards of Conduct*, Appendix - United States Public Employee First Amendment Rights).

[71] *Id.*

dissension.  When combined with the disciplinary discretion afforded to the EPD Chief of Police, these policies can be wielded as an effective weapon within the EPD.

**B.    The Record Shows that the EPD's Policies Enabled Retaliation Against Lt. Dunn and Other Officers Who Reported Misconduct**

As discussed above, the EPD's Procedural Orders grant the Chief of Police "[f]inal departmental authority in all matters of policy, operations, and discipline" and there are "NO EXCEPTIONS."[72]  Based on my review of the record in this case and my experience, it is my opinion that this discretion enabled Chief Fontenot to retaliate against Lt. Dunn and other officers by arbitrarily claiming that their lawful conduct, such as engaging in protected speech, were acts of "disloyalty" or "conduct unbecoming" of an officer in violation of the Procedural Orders.  The following are examples of Chief Fontenot's use of the power granted to him by the Procedural Orders to retaliate against Lt. Dunn.

1.    Investigation for Lt. Dunn's Facebook Post

In 2019, Lt. Dunn made a Facebook post, describing a safety issue in his neighborhood and the surrounding blocks, including gunshots, drag racing, drug dealing, and the presence of gang members.[73]  In the post, he identified himself as a police officer and indicated that he wanted to make the public aware of the danger affecting the neighborhood.[74]  His post offered no criticism of the Department, did not discuss policy or police practice, and did not reveal any sensitive investigative information as described in the Procedural Orders.[75]

Chief Fontenot initiated an investigation against Lt. Dunn, citing alleged violations of the social media and "conduct unbecoming of an officer" policies, and alleging that Lt. Dunn's conduct "impair[ed] the efficiency of the department, the officer, or city services."[76]  Lt. Dunn was placed on administrative leave.[77]  When asked to explain why he believed Lt. Dunn's Facebook Post violated the Procedural Orders, Chief Fontenot testified that it was because he received numerous calls from members of the public and from the local media about the post, which drew his attention away from an ongoing investigation.[78]

In my view, reporting a shooting to the public was not a violation of the Department Procedural Orders and would not have violated the policies at my department, nor violated most social media policies found in the law enforcement profession.  The Chairman of the Civil Service Board agreed with this position.[79]

---

[72] Procedural Order #16-7(II)(A)-(C), DUNN_0000492-94.
[73] *See* M. Dunn Tr. 102:19-103:3.
[74] *See* M. Dunn Tr. 103:4-104:8.
[75] DUNN_0000438.
[76] DUNN_0000381.
[77] *See* M. Dunn Tr. 362:22-364:14.
[78] R. Fontenot Tr. 109:24-112:11.
[79] *See* D. Thibodeaux Tr. 179:19-24.

In addition, Officer Tilbury testified that he saw EPD officers post on social media about local crime and those officers were not punished for such posts.[80] This indicates the social media policy was selectively enforced against Lt. Dunn.

### 2. Officer Fontenot's Unofficial Investigation into Lt. Dunn

Officer Fontenot admitted to conducting an "unofficial investigation" into Lt. Dunn, which was approved by Chief Fontenot.[81] In the course of this unofficial investigation, Officer Fontenot attempted to coerce a local resident named Joshua Dupre to falsely say that Dupre was paying Lt. Dunn for information.[82] On October 8, 2020, Dupre testified that Officer Fontenot threatened, via text message and in person, to bring additional, unsubstantiated charges against Dupre if he did not say that he was paying Lt. Dunn to provide information on "what's going on at the police department," even though he never paid Lt. Dunn for information or otherwise.[83] In his words, Dupre was "trapped in the crossfire with the Eunice Police Department."[84] Officer Fontenot testified that both Chief Fontenot and Lt. Young were "aware" of the investigation and that he told Lt. Young that he had information that Lt. Dunn was being paid by two suspected drug dealers in Eunice to keep them "safe."[85]

In my professional opinion, Officer Fontenot's effort to coerce Dupre into falsely testifying that Lt. Dunn had engaged in corrupt practices was unethical, contrary to the prescribed best practices of the law enforcement profession and other nationally recognized policing standards, and potentially illegal.

### 3. Investigation for Contact with the City Marshal's Office

In March 2021, Lt. Dunn and a then-rookie officer were the only two officers on a shift due to sick calls and lack of availability of other officers to provide coverage.[86] Lt. Dunn spoke with Joey Peloquin at the Eunice Marshal's Office about the short-staffing.[87] After that conversation, personnel from the Eunice Marshal's Office volunteered to provide coverage, and Peloquin contacted his boss, City Marshal Terry Darbonne, who then spoke with Mayor Scott Fontenot to get approval, which was granted.[88] Although Lt. Dunn was unaware of what was happening after his conversation with Peloquin, Chief Fontenot initiated an investigation into Lt. Dunn for contacting the Eunice City Marshal's office to request patrol assistance for normal duties without asking for permission from the Chief of Police or Deputy Chief of Police.[89]

In my opinion, Chief Fontenot's conduct is contrary to standard police practices, and it was improper for Chief Fontenot to initiate an investigation into Lt. Dunn for contacting the City Marshal's office in this context. Agencies frequently collaborate to ensure that officers and the

---

[80] *See* T. Tilbury Tr. 159:10-22.
[81] V. Fontenot Tr. 186:7-9.
[82] V. Fontenot Tr. 198:19-199:2.
[83] DUNN_0000043-44 (J. Dupre Bond Revocation Tr. 10:5-10, 10:28-11:2, 12:10-13:8).
[84] V. Fontenot Tr. 199:3-23.
[85] V. Fontenot Tr. 199:3-200:6.
[86] *See* M. Dunn Tr. 213:15-215:15; J. Ardoin Tr. 214:5-220:15, 233:10-234:1; T. Darbonne Tr. 42:13-47:10.
[87] *See* M. Dunn Tr. 213:15-215:15; J. Ardoin Tr. 214:5-220:15, 233:10-234:1; T. Darbonne Tr. 42:13-47:10.
[88] *See* M. Dunn Tr. 213:15-215:15; J. Ardoin Tr. 214:5-220:15, 233:10-234:1; T. Darbonne Tr. 42:13-47:10.
[89] M. Dunn Tr. 214:8-215:4; J. Ardoin Tr. 219:5-21.

community are safe.  In my view, rejecting additional officers from other local departments—and punishing members of his own Department for requesting backup—has several negative effects, as "[c]ommunities with high vacancy rates in their police force see longer wait times in response to calls and fewer crimes solved," resulting in a less safe community.[90]

4.    Use of Administrative Authority to Create Hostile Work Environment for Lt. Dunn

A review of the record reveals instances where Chief Fontenot used his authority to create a hostile work environment for Lt. Dunn.  In my opinion, Chief Fontenot's conduct surpassed what one would expect for a routine personality conflict or difference in managerial discretion—rather, it reflected a sustained campaign of retaliation triggered by Lt. Dunn's protected whistleblowing and refusal to conform to the Department's unlawful practices.  In my opinion, Chief Fontenot's conduct toward Lt. Dunn reflects a deliberate abuse of authority and disregard for professional standards of fairness, safety, and accountability.

For example, shortly after Lt. Dunn reported misconduct to the St. Landry Parish District Attorney's Office and the Louisiana State Police, Chief Fontenot abruptly removed him from his K-9 assignment, a specialized position Lt. Dunn had successfully performed for years, and offered it to another officer.[91]  Chief Fontenot's stated reasons for the termination shifted—from budgetary constraints, to alleged "handler" deficiencies, to claims that the unit was ineffective—each of which the Civil Service Board found to be pretextual.[92]  The Civil Service Board determined that Chief Fontenot's justifications were inconsistent with Department policy and unsupported by any evidence of poor performance. Lt. Thibodeaux, the EPD's Civil Service Board representative, testified that Chief Fontenot's removal of Lt. Dunn's dog was a personal reprisal, as Chief Fontenot admitted he "wanted to get rid of" Lt. Dunn after the external complaints surfaced.[93]

Testimony reflects that Chief Fontenot changed work assignments and pay opportunities to punish Lt. Dunn.  For example, I understand that Chief Fontenot assigned Lt. Dunn to chronically understaffed shifts that endangered Lt. Dunn's safety.[94]  Lt. Thibodeaux testified that each time Lt. Dunn appealed one of Chief Fontenot's actions to the Civil Service Board, Chief Fontenot retaliated by reassigning him to a worse shift—typically the night shift, with only three or four officers, when other shifts were staffed with six officers.[95]  The record bears out this pattern, that when Lt. Dunn appealed one of Chief Fontenot's decisions, shortly thereafter there would be an undesirable shift change, and that Chief Fontenot purposefully staffed Lt. Dunn's shifts with officers who had known disciplinary problems or were personally hostile to him.[96]  Similarly,

---

[90] See DUNN_0002682 (IACP, *The State of Recruitment: A Crisis for Law Enforcement* 5 (2019)).
[91] See D. Thibodeaux Tr. 194:3-196:17; M. Dunn Tr. 55:6-19; 120:5-121:20; 123:11-25; 128:2-130:7; 131:17-133:14.
[92] See M. Dunn Tr. 240:18-246:21; D. Thibodeaux Tr. 143:13-145:8; 194:3-196:17.
[93] D. Thibodeaux Tr. 250:5-8; 409:8-410:2.
[94] See M. Dunn Tr. 210:11-215:15; J. Ardoin Tr. 214:5-220:15, 233:10-234:1; D. Thibodeaux Tr. 141:23–143:12; 191:19–193:4, 207:10–212:2.
[95] See D. Thibodeaux Tr. 141:23-143:12; 191:19-193:4.
[96] See, e.g., M. Dunn Tr. 263:19-267:1; V. Guillory Tr. 91:1- 92:12; 96:16-97:6.

witnesses also testified that Chief Fontenot used shift changes as a punitive tool for "problem officers," ensuring that preferred officers received better schedules and assignments.[97]

Testimony also reflects that Chief Fontenot used pretextual internal investigations in order to harass Lt. Dunn. For example, in 2019, when Lt. Dunn posted on a neighborhood-watch page about gunfire near his home, Chief Fontenot used the post as a pretext for an internal investigation and suspension under the "Conduct Unbecoming an Officer" and "Social Networking" policies.[98] Lt. Dunn's conduct was constitutionally protected speech, and the Civil Service Board later overturned the discipline as baseless.[99] Chief Fontenot continued to scrutinize Lt. Dunn's activities, putting him under investigation for reporting a conversation where threats were made against Lt. Dunn, a tattoo Lt. Dunn had (despite other officers doing the same without issue), and attempting to get more help on short-staffed shifts.[100]

In a similar vein, testimony shows that Chief Fontenot used his authority to demote Lt. Dunn without cause, damaging Lt. Dunn's reputation and prospects for advancement.[101] Lt. Thibodeaux testified that he could not recall a single time where Lt. Dunn was investigated internally where he was found to have committed any wrongdoing, and he always won his appeals to the Civil Service Board.[102] Other testimony reflects that the purpose of Chief Fontenot's actions was to push Lt. Dunn out of the Department.[103]

In addition, testimony shows that Chief Fontenot consistently tolerated and even endorsed threats and harassment toward Lt. Dunn by fellow officers. When Lt. Dunn reported that Officer Fontenot threatened to "break [his] . . . fingers" or "put[] bullets" in either Lt. Dunn or his dog, Chief Fontenot responded by opening an internal investigation into Lt. Dunn instead of Officer Fontenot.[104] Witnesses testified about insults and threats that went unpunished at the EPD. For example, Lt. Dunn testified that, after Chief Fontenot discovered that Lt. Dunn had reported misconduct to outside agencies, he "chew[ed] [Lt. Dunn] out" and said that "anything [Lt. Dunn] tried to report to state police or anything thereof that he was going to find out about it."[105] Lt. Thibodeaux recalled Officer Fontenot telling Lt. Dunn he could "suck [his] left or right nut."[106] Lt. Stephanie Myers testified that Chief Fontenot said he was going to "f***ing kill" Lt. Dunn after learning about the lawsuit.[107] Officer Fontenot confirmed that he stated that Lt. Dunn was "conceived in the cesspool of his mother's womb.[108] Deputy Chief Guillory testified that both Chief Fontenot and Officer Fontenot "discussed shutting [Lt. Dunn] up," which Deputy Chief

---

[97] *See* J. Courville Tr. 18:9-26:5; T. Tilbury Tr. 179:23-180:17; D. Thibodeaux Tr. 188:20-190:12; 191:4-5; 223:10-226:6.

[98] DUNN_0000430.

[99] *See* M. Dunn Tr. 348:2-350:18; 363:19-364:14; D. Thibodeaux Tr. 43:23-44:11; J. Lee Tr. 37:1-13.

[100] M. Dunn Tr. 210:11-215:15; J. Ardoin Tr. 214:5-220:15, 233:10-234:1, 231:10-22; 236:18-2328:4; T. Tilbury Tr. 57:8-58:18; Tr. 70:14-74:1.

[101] . *See* J. Lee Tr. 37:1-13; M. Dunn Tr. 327:20-25.

[102] D. Thibodeaux Tr. 177:20-178:7, 180:11-17.

[103] *See, e.g.*, D. Thibodeaux Tr. 177:20-178:7; S. Larson Tr. 100:2-102:1.

[104] *See* M. Dunn Tr. 229:24-230:7; 231:10-22; 236:18-238:4.

[105] *See* M. Dunn Tr. 52:21-53:1; 53:16-20.

[106] *See* D. Thibodeaux Tr. 262:16-263:24; V. Fontenot Tr. 133:11-137:21.

[107] *See* S. Myers Tr. 100:3-103:1.

[108] *See* V. Fontenot Tr. 164:14-166:22.

Guillory understood to mean killing him.[109]  Despite these extreme threats, I am not aware that Chief Fontenot conducted any legitimate investigation or imposed discipline against those who made them. Instead, he continued to assign the same individuals to work alongside Lt. Dunn without any discipline or censure against such conduct.

5.    Retaliation Against Other Officers Under the Same Policy Framework

Based on my review of the record, the same policies and methods used against Lt. Dunn were employed to control or punish other officers viewed as "disloyal."  For example, Chief Fontenot demoted and suspended Lt. Jeremy Ivory after he posted comments critical of Chief Fontenot; the Civil Service Board later overturned this discipline.[110]  Lt. Stephanie Myers was placed on administrative leave without investigation after raising payroll-fraud concerns, and Chief Fontenot told others that she was "disloyal" and removed her responsibilities.[111]  Chief Fontenot transferred Lt. Thibodeaux to the less desirable night shift, stripped him of training authority, and micromanaged his work after Lt. Thibodeaux enforced the Civil Service Board rules.[112]  Chief Fontenot targeted and criminally charged Deputy Chief Guillory under the guise of "malfeasance" two weeks before his retirement date; that charge was later dismissed.[113]

**C.    The EPD's and the Chief of Police's Retaliation Against Whistleblowers Violates Accepted Policing Standards**

Based on my review of the record and my experience in law enforcement, the nature of Chief Fontenot's conduct toward Lt. Dunn and the lack of protections against such conduct in the Department's policies and procedures are not in keeping with the professional standards of law-enforcement ethics and supervision.  Accepted practice requires that officers who report misconduct or submit complaints are treated fairly.[114]  Instead, testimony in this matter indicates that Lt. Dunn was repeatedly targeted with pretextual investigations, loss of responsibilities, discriminatory treatment, and threats after he reported wrongdoing within the Department and to outside agencies.[115]  Those reprisals—and the absence of corrective oversight—reflect a systemic failure inconsistent with accepted standards.[116]  The EPD's pattern of retaliatory investigations and selective discipline violates these standards.

Based on my review of deposition testimony, the City's policies, and national law-enforcement standards, I conclude to a reasonable degree of professional certainty that Chief Fontenot's retaliatory actions against Lt. Dunn—and the City's failure to prevent them—sharply deviated from accepted professional practice.  Rather than safeguarding a whistleblower who exposed misconduct, the Department weaponized internal processes to silence him.  In my

---

[109] *See* V. Guillory Tr. 132:5-133:12.

[110] *See* J. Lee Tr. 15:1-16:13; D. Thibodeaux Tr. 21:18-23:5.

[111] *See* S. Myers Tr. 26:23-32:10; 247:17-248:20.

[112] *See* D. Thibodeaux Tr. 30:3-33:2; 35:18-36:15.

[113] *See* V. Guillory Tr. 16:17-18:10; 24:18-25:8; 199:13-15.

[114] *See* DUNN_0002789, DUNN_0002802 (Community Oriented Policing Solutions, U.S. Dep't of Justice, *Law Enforcement Best Practices* 92, 105 (2019)).

[115] *See supra* (B)(1)-(4).

[116] *See, e.g.*, DUNN_0002649 (IACP, *Law Enforcement Code of Ethics* (2020)); DUNN_0003062, DUNN_0003097 (UNODC, *Handbook On Police Accountability*, 87, 122); DUNN_0002862-65 (Government Accountability Project, *Breaking the Blue Wall of Silence* 7-10 (May 2022)).

experience, the prevalence of this type of conduct can have a detrimental effect on a police department, placing both officers and the public safety at increased risk.

### D.    The City of Eunice's Policies and Oversight Structure Permitted Abuse

In my opinion, the City of Eunice's customs, policies, and practices enabled, rather than checked, the misuse of authority by the Chief of Police. By delegating disciplinary and operational power to the Chief—with no effective internal or external oversight—the City created an environment where retaliation, selective enforcement, and ethical violations could flourish without accountability.

#### 1.    Concentration of Unreviewed Authority in the Chief of Police

Under Eunice's Procedural Orders, the Chief of Police retains "final departmental authority in all matters of policy, operations, and discipline—NO EXCEPTIONS."[117]  No independent internal-affairs officer, city administrator, or outside review body has authority to override or contemporaneously review disciplinary decisions, unless an appeal is made to the Civil Service Board (see below).  The City's Board of Aldermen and Mayor possess budgetary power but not direct oversight of disciplinary processes.[118]  This configuration limits the practical effect of the Civil Service Board and can insulate the Chief of Police from scrutiny, allowing him to weaponize internal investigations and policy enforcement against perceived adversaries.

#### 2.    Failure of Municipal Checks and Civil Service Safeguards

Although the Civil Service Board overturned multiple retaliatory actions—including Lt. Dunn's 2019 Facebook-post suspension and the 2020 K-9 termination—I understand from the factual record that the Civil Service Board is limited in the protection it can provide.  For one, not every employee at the EPD is covered by Civil Service protections, in which case, actions against them are not appealable.[119]

I understand from review of testimony that Chief Fontenot actively encouraged those at the EPD to follow his rules instead of the Civil Service rules, and much of the potentially appealable conduct is not reported to the Civil Service Board out of fear of treatment similar to what Lt. Dunn received.[120]  Further, there is testimony that, even if Chief Fontenot's disciplinary action was overturned, no action was taken to correct it; for example, when Lt. Dunn succeeded in his appeal to have his K-9 returned, Chief Fontenot sold the dog to another police department, so it was no longer in EPD custody.[121]

In addition, if the Chief of Police is able to have an ally voted onto Civil Service Board, as Chief Fontenot had wanted to do, there would be even less protection for officers.[122]  So while the Civil Service Board has *some* capacity to provide oversight, because of these issues, it is unequipped to effectively combat misconduct in a way that aligns with widely accepted

---

[117] Procedural Order #16-7(II)(A)-(C).
[118] *See* R. Fontenot Tr. 36:21-37:6.
[119] *See* D. Thibodeaux Tr. 299:8-300:8.
[120] *See* D. Thibodeaux Tr. 36:16-38:18; 310:17-311:18.
[121] *See* D. Thibodeaux Tr. 173:19-175:5; 128:16-130:7.
[122] *See* D. Thibodeaux Tr. 56:9-21; 57:18-60:3, 66:13-67:11.

governance norms for police accountability, which require dual channels of review: command-level supervision and municipal-level civilian oversight.

### 3.  Absence of External Accountability and Continuing Risk

I am not aware of any significant changes to the EPD policies and procedures since Chief Fontenot left office. The Procedural Orders still centralize disciplinary discretion with the Chief of Police, and the City has not instituted an independent audit, inspector-general, or civilian complaint process. According to national best practices—such as CALEA Standards 26.1.1 and 26.1.5 and the IACP Model Policy on Internal Investigations (2021)—sustained accountability requires separation between complaint intake, investigation, and final adjudication. Eunice's structure violates that principle. As a result, any future Chief of Police can again wield internal-affairs power to retaliate against officers who report misconduct or express dissent.

### E.  Ongoing Institutional Consequences

As I discuss below, based on my professional experience and my review of the documents and the relevant literature, Chief Fontenot's policy of targeting those who report misconduct has negative effects on Department personnel and the community at large.

### 1.  Understaffing

Several individuals testified that Chief Fontenot's treatment of personnel drove them to leave the Department in search of employment at other police departments.[123] Other testimony revealed that the EPD has had staffing issues overall.[124] Based on my professional experience, pervasive understaffing in a police department can directly and indirectly endanger officers and the community in several ways. First, where a department has consistently understaffed shifts, on-duty officers are left with less back-up, are more likely to experience bodily harm, are less able to effectively investigate crime scenes, and are more likely to use force against persons suspected of committing a crime. Overall, I have found that these factors make the police department as a whole less effective in protecting the public.

Second, to remedy the short staffing, officers are often forced to work longer shifts; this can lead to fatigue and burnout, which can increase the likelihood of dangerous mistakes. In addition, "understaffing and frequent employee turnover drain and limit an organization's capacity to achieve goals" and "uncertainty about occupational identity can cause stress" but "clarity in written policies and stated priorities" can resolve these issues.[125]

Third, studies have shown that municipalities with short-staffed police departments tend to have longer wait times for calls for services and fewer crimes solved.[126] Furthermore, a shortage of on-duty police officers, who are also burnt out and overworked, can "threaten the

---

[123] *See, e.g.*, D. Thibodeaux Tr. 25:6-13, 40:4-17, 47:1-50:19, 69:3-17, 73:1-23, 236:1-237:8; J. Lee Tr. 18:23-19:14; T. Darbonne Tr. 32:21-33:15; S. Myers Tr. 119:8-14; J. Ardoin Tr. 25:22-26:18; V. Guillory Tr. 45:5-12.
[124] *See, e.g.*, T. Tilbury Tr. 207:18-208:3; Ardoin Tr. 212:10-214:4, T. Darbonne Tr. 90:10-12.
[125] *See* DUNN_0002795-96 (U.S. Dept. of Justice, *Law Enforcement Best Practices* 98-99).
[126] *See* DUNN_0002682 (IACP, *The State of Recruitment: A Crisis for Law Enforcement* 5 (2019)).

quality of life" in their communities.  *See id.*  Police officers deposed in this matter have testified that it is their belief that crime in Eunice would decease as a result of increased staffing.[127]

>    2.    Officers Silenced for Reporting Misconduct Are Less Likely to Report Misconduct in the Future

Based on my professional experience, when officers are discouraged from—and indeed targeted for—reporting misconduct, it makes them less likely to report misconduct in the future. Not only that, but it also stops other officers from reporting misconduct at the police department. This silencing is often referred to as the "blue wall of silence," which stands for the proposition that officers will not report misconduct of fellow officers for fear of reprisals from colleagues and supervisors and/or feelings of loyalty towards the perpetrator.  My experience in law enforcement and my review of the relevant literature lead to the conclusion that silencing officers for reporting misconduct, among other things, creates rifts within the police department, prevents misconduct from being investigated, decreases the legitimacy of the police department, and endangers the community.

My review of the deposition testimony in this matter indicates that some of these effects have already taken place at the EPD.  Officers at the Department testified that they do not believe in the internal reporting process, are afraid of reporting, or both.  For example, Lt. Thibodeaux testified that "a lot of people [were] really scared of [Chief Fontenot] because they say, 'I see what [Lt.] Jeremy [Ivory] went through. I see what [Lt.] Dunn went through . . . And I don't what that to happen to be. It's not worth it.'"[128]  This fear of retaliation, legitimized by watching another officer go through it, contributes to an environment where misconduct is not reported at all.[129]

Along these lines, officers testified that Chief Fontenot had "favorites" who received additional perks and unfavored officers who were micromanaged[130] and characterized some officers as "bad apples."[131]  This type of favoritism can create rifts within a police department and discouraging reporting misconduct.

Other testimony revealed that the misconduct at the Department has led to a "low reputation" in the law enforcement community.[132]  In fact, one officer testified that other law enforcement agencies refuse to work with the Department or are "warned" to be careful when working with the Department.[133]  Based on my experience, when agencies refuse to work together it puts officers and community members at risk.  As Marshal Darbonne stated (and I agree), "Everybody is shorthanded.  [Police departments] have to work together as in a circle, and that

---

[127] *See, e.g.*, S. Myers Tr.  163:25-165:2 (testifying that the increased crime rate would drop if more officers were staffed on patrols); D. Thibodeaux Tr. 120:25-121:10; T. Tilbury Tr. 171:21-172:12; V. Guillory Tr. 48:9-18.
[128] D. Thibodeaux Tr. 40:6-11.
[129] *See, e.g.*, D. Thibodeaux Tr. 206:14-17 (testifying that more than half of the officers at the Department have failed to file internal reports due to fears of retaliation); *see also* C. Godeaux Tr. 34:19-22.
[130] *See e.g.,* V. Guillory Tr. 110:13-111:17, 112:13-23; 113:19-21; 146:19-148:5
[131] *See, e.g.*, T. Darbonne Tr. 40:13-41:10; 85:15-86:2
[132] *See, e.g.*, T. Darbonne Tr. 30:6-24; 52:7-53:9.
[133] *See* T. Darbonne Tr. 57:24-58:5; 63:2-23 (listing several police agencies who refused to work with Chief Fontenot and confirming that police officers were inducted to "be very careful while working with [Officer] Fontenot").

circle has to go all the way around with the limited amount of resources that we all have and the limited amount of people that we do have. Police department[s] [are] shorthanded, sheriff's department[s] [are] shorthanded, Opelousas P.D. [is] shorthanded, we were shorthanded. It's very important that we all work together to accomplish the same goal, and that's the protection of the people we serve."[134]

Equally troubling is testimony that some citizens of Eunice do not trust the Department.[135] Based on my experience and review of the relevant literature, a police department with legitimacy issues of this magnitude rapidly loses its ability to secure voluntary cooperation from the community, undermines case solvability rates, and increases both officer-safety risks and public-safety harms—outcomes consistently documented in policing research and in professional guidance.

## IV.    POLICY RECOMMENDATIONS

As part of my assignment, I have been asked to opine on how the Department could change policies to address the issues described herein. Based on my experience as a Chief of Police and law enforcement educator, I believe the relief Lt. Dunn has sought from the court has the ability to alleviate many of the issues that I have identified in this report, particularly when it comes to accountability of the Department and its officers to each other and the public, protection of potential whistleblowers, and fostering a culture that encourages these ethical values.

For example, many of Lt. Dunn's requests would help establish a more robust framework for investigating and reporting potential misconduct, such as disclosure by the EPD on a periodic basis of statistics around the number and type of internal and external complaints of police misconduct that were received, investigated, deemed unsubstantiated, and/or closed during the operative period, the establishment a qualified and independent oversight agency to investigate, mediate, and/or prosecute complaints of Department misconduct, funding and appointing a full-time, paid investigator to the Civil Service Board, and appointing a qualified monitor with the appropriate background to ensure that the changes implemented and provide periodic oversight to assess if the public or the Department would benefit from any other additional changes.

Other of Lt. Dunn's requests for relief are more focused on the day-to-day dealings of a police department, but would similarly support the officers at the EPD and help restore public confidence in the Department. For example, requiring the use of head- or chest-mounted body cameras, instituting updated policies and procedures to ensure accurate records of employee timesheets, establishing mandatory crisis intervention and de-escalation training for all Department employees who respond to mental health emergencies, maintaining and enforcing policies that require mandatory intervention to prevent a fellow officer from use of excessive force or other illegal conduct, revising policies in order to support accurate time sheet entry among

---

[134] *See* T. Darbonne Tr. 172:25-174:3.

[135] *See* V. Guillory Tr. 54:9-17 ("Even if they know who's the triggerman, they're not willing to go to the Eunice Police Department with the information because they don't trust Chief Fontenot." ), 75:12-16 ("If [civilians] would go to Chief Fontenot with information on Victor -- I got a couple of people told me - before that report would be complete, they'd probably take a bullet or their house would be show.")

officers, and ensuring the all the EPD's officers are deployed with sufficient supervision while
they are in the field.

Altogether, I believe the implementation of Lt. Dunn's requests, as described above, would
address many of the concerns I have raised in this report both at the officer-level and at the
procedural level.

/s/_____

Mark S. Dunston
November 26, 2025

# APPENDIX A

**MARK S. DUNSTON**
**PO Box 1706   Ocean Springs, MS 39566-1706    228 348-1189**


**Current Position:**     Chief of Police (Retired), Ocean Springs (MS) PD
                          Ocean Springs, MS  USA


## Professional Associations and Positions:

**International Law Enforcement Educators and Trainers Association *(ILEETA)***
-         Member 2006 – 2010

**American Society of Law Enforcement Trainers *(ASLET)***
-         Member 1988 - 2004
-         State Director (MS) 1990 - 1995
-         Elected to Board of Directors 1995 - 1999

**National Law Enforcement Credentialing Board *(NLECB)***
-         Job Task Analysis Committee 1995 - 1996
-         Test Development Committee 1996

**Police Marksman Magazine National Advisory Board**
-         Member of Board 1991 - 2000

**International Association for Identification *(IAI)***
-         Certified Senior Crime Scene Analyst 1992

**FBI National Academy Associates** 1997 to present

**MS Association of Chiefs of Police** 2007 to 2024
-         Chair, Training Committee 2016 to 2024

**ASIS International** 2010 to present

**American Board for Certification in Homeland Security (ABCHS)** 2012 to present
-         CHS-I Certification

**Texas Commission on Law Enforcement (TCOLE)**
-         PoliceOne Advisory Board Member 2015 to 2019

**International Association of Chiefs of Police IACP 2015 to present**
-         MS State Associations of Chiefs of Police SACOP Delegate 2019 - 2022

## Education and Leadership Awards:

Graduate, 20th Session
Police Executive Research Forum/ Harvard University Kennedy School of Government
Senior Management Institute, Boston, MA 1997

Graduate, 191st Session
FBI National Academy, Quantico, VA 1997

1

Leadership in Criminal Justice Training Award, *PPCT International Trainer Conference, 1998*

## Training and Instructor Certifications:

State of Mississippi, Peace Officer Standards and Training (POST) Professional Instructor Certification History:
- Use of Force/Liability
- Firearms
- Arrest Techniques
- Subject Control/Defensive Tactics
- Impact Weapons
- Criminal Investigations
- Law Enforcement Driving
- Police Officers' Rights

**PPCT Management Systems Instructor Trainer History**
- Use of Force/Subject Control Instructor Trainer
- Impact Weapons Instructor Trainer
- Pressure Point Control Instructor Trainer
- Spontaneous Knife Defense Instructor Trainer
- Violent Patient Management Instructor Trainer
- Close Quarter Combat Instructor

**Firearms and Lethal Force Instructor Training History**
- Federal L.E. Training Center Firearms Instructor, SAPP, FIMWITP
- NRA Firearms Instructor
- Glock Firearms Instructor, Armorer
- NMLETC Firearms Course Developer
- Talon International Applegate Shooting Method Instructor

**Other Instructor Training History**
- TASER Instructor
- Police Defensive and Pursuit Driving Instructor (FLETC)
- Counter Terrorism/Assault Driving Instructor (FLETC)
- Instructor Development (FLETC Behavioral Sciences)
- OC Agent Use of Force Instructor/Trainer
- ASP Instructor, Instructor Trainer 1990-1992
- Monadnock PR-24 Instructor 1986-1989

**Professional Development Training History**
- ASLET Conference 1998-2006
- ILEETA Conference 2007
- PPCT Management Systems International Conference 1993-2002
- MS Assoc Chiefs of Police Training Conference 1996, 2007-2023
- FBINAA Training Conference (MS) 2007-2022
- Chicago Kent Law School Section 1983 Litigation Conference 2008
- TASER Use of Force, Risk Management and Legal Strategies 2011, 2013
- FBINAA International Conf. 2010
- IACP International Conference 2019

## Publications:

### Books and Monographs

- Street Signs © 1992, Performance Dimensions Publishing,  *An identification guide on gangs and criminal symbols.*
- Total Survival © 1993, Performance Dimensions Publishing, *Author of Chapter 15, Reading the Streets*
- Featured author in The Best of The Police Marksman, Vol. II,  © 2002
- Content editor, Sharpening the Warrior's Edge, Siddle , © 1998
- Contributing Editor, On Combat, Grossman, © 2004
- Critical Issues in Use of Force, What Law Enforcement Executives Should Know © 2011 , *Author of Chapter 3 Use of Force Policy*
  IL Law Enforcement Executive Forum and Western IL University
- Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths, and Deaths in Custody © 2018, *Co-Author, Chapter 6, Officer-Involved Incident Investigation Guidelines*

### Video and Televised Training

### Individual Video

- "Gangs and Identification", LE Net, © 1991
- "Street Signs", Performance Dimensions Publishing, © 1992  A*ccompanying video to book.*
- "Officer Survival Tips", Performance Dimensions  Publishing, © 1994
- "Leadership Issues", Performance Dimensions Publishing © 2000

### Law Enforcement Television Network *(LETN)*

- Several training programs for LETN 1994 - 2009
- Use of Force content expert for network 1996 – 2003
- Co-Hosted "Command Center" Management Series 1997- 1999
- Regular panelist, Executive Forum 2000- 2001

### Professional Security Television Network *(PSTN)*

- Gangs and Their Signs, 1994
- Use of Force, 1995
- Security and Security Management Issues, 1994-2000
- Officer Survival Searches and Frisks, 2009
- Officer Survival Handcuffing Tactics, 2009

### PULSE Emergency Medicine TV Network

- Controlling Assaultive Patients 1999

### POLICEONE.COM Video

- Active Shooter Response Preparation and Tactics 2008
- Leadership Paradox 2008
- Use of Force/4th Amendment Issues 2008

**Mass Media Appearances (Content Expert)**

- CBS News Louisville, KY
- CBS News San Antonio, TX
- FOX News Dallas, TX
- Crime Line with Ed Nowicki (Nationally Syndicated Radio Program)

**Research Papers Delivered**

- "Basic Training Needs Assessment" *MS Assoc. of Chiefs of Police 2017*
- "Impact Weapon Training Analysis" *Delivered to MS BLEOST and Academy Directors, 1993*
- "Use of Force Policy Considerations on OC Agent Selection"
   *Distributed by MS Municipal Services Risk Mgt., 1993*
- "Physical Training Standards" *Delivered to MS BLEOST, 1993*
- "Analysis of BLEOST Physical Training Standards" *Delivered to MS BLEOST, 1995*
- "Ground Fighting and Assaults on Police Officers"
   *Delivered to PPCT International Conference, 2000*
- "Ground Fighting and Assaults on Police Officers"
   *Delivered to the ASLET Conference, Orlando, F, 2000*
- "Pursuit Policy in MS Police Agencies, The "Brister Effect", *MACP 2010*

**Periodicals and Professional Journals**

- Several articles on law enforcement topics for:
   - *The Police Marksman Magazine*
   - *Police Magazine*
   - *The Journal of the American Society of Law Enforcement Trainers (ASLET)*
   - *ITOA News (Illinois Tactical Officers Association)*

- Most Recent Publications:
   - Calibre Press Street Survival Textbook, "Critical History", © 2003
   - Police Marksman Magazine, "Ground Assaults on Officers", © December 2004
   - Litigation Body Armor: Developing Sound Pursuit and Use of Force Protocol © 2010

**Internet Publications and Training**

- Training Section for Criminal Justice Training Network *"Search, Seizure and Arrest Issues"* 1998
- Policy Issue for OFFICERNET.COM, "*A Little Policy Never Hurt Anyone*", 2000
- Calibre Press Newsline *"Critical History, A Review of Officer Survival History"* 2003

## Training Conducted:

**Basic Level Law Enforcement Training and Lectures**

- MS State Academy
- University of Southern MS/Harrison Co SO Academy
- Hinds Community College, Jackson, MS
- No. FL Comm. College FL
- Greater Jackson County Law Enforcement Training Consortium
- Palace Casino Resort Security Risk Management, Biloxi, MS

4

- Margaritaville Casino Security, Biloxi, MS
- Approx. 10,000 officers annually for Calibre Press Street Survival Seminar *(2000-2003)*

**Instructor Level Training/Lectures**

*Several, including:*
- National Nuclear Security Administration (United States)
- Cuiaba, Brazil (AG's office, Federal Police, Military Police)
- Rondonopolis, Brazil (AG's office, Federal Police, MP)
- St. Croix/St. Thomas, US Virgin Islands Police
- Hong Kong, China Correctional Services Staff Training Institute
- US Fish & Wildlife, Federal Law Enforcement Training Center
- US Park Service Special Operations Ranger School
- Honolulu PD Academy
- New Orleans PD Academy
- Jefferson Parish, LA Academy
- Jackson, MS PD Academy
- East Texas Police Academy
- United States Armed Forces Units *(all branches)*
- United States Department of Defense
- United States Coast Guard TACLETS, Miami, FL
- Hard Rock Casino Biloxi Security Management/Risk Management
- Minot, ND PD and Surrounding Agencies

**Peer Conference Presentations**

- MS Municipal Risk Management for Law Enforcement Executives Ridgeland, MS 2018
- MS Municipal Risk Management for Law Enforcement Executives Vicksburg, MS 2017
- MS Municipal Risk Management for Law Enforcement Executives Oxford, MS 2017
- MS Assoc. of Chiefs of Police, 2016 Conference, Risk Mgt. for Law Enforcement Executives
- MS Municipal Risk Management for Law Enforcement Executives Grenada, MS 2015
- MS Municipal Risk Management for Law Enforcement Executives Hattiesburg, MS 2015
- Valdosta State University Chiefs' Conference, GA 2014
- CLEAT Leadership Conference, Austin, TX 2013
- Western IL University, Executive Institute, Use of Force Executive Summit 2010
- ASLET 2006, Albuquerque, NM Keynote Speaker
- ASLET 2005, Jacksonville, FL, Served on an expert panel for use of force training issues.
- ASLET 2001, Orlando, FL, Delivered presentation on Officer Survival and Use of Force
- ASLET 1995, Anchorage, AK, Delivered presentation on Survival Learning Theory
- ASLET 1994, Washington, DC, Delivered Stress Response Research Instruction
- MS Assoc. for Professionals in Corrections, 1990 Management of Use of Force
- MS DARE Officers Conference, 1994, Gangs
- PPCT Management International 1995, Stress Response Training Issues
- PPCT Management International 1997, Skills for Performance in Off. Surv. Training
- PPCT Management International 2000, Stress Response Training Issues
- MS Assoc. of Chiefs of Police, 1997, Training on a Budget

## Expert Testimony and Depositions last Four Years:

- King v Beau Rivage Casino
- Paillette v. Morgan City, LA
- Tenessen v. City of Hattiesburg, MS
- Jones v. Fort Meyers, FL

-     Lambert v. Satsuma, AL
-     Renfroe v. Madison County, MS
-     Brooks v Tupelo, MS
-     Booker v Lynchburg, VA
-     DeJesus v Osceola County, FL
-     Coady v James (Tunica County, MS)
-     Linares v. Southaven, MS
-     Trabucco v. Rivera (Desoto County, MS)
-     Brown v. Lynchburg, VA
-     Hardesty v. Papillion, NE
-     Pettinichi v. Naugatuck, CT

## Employment Credentials:

| | | |
|---|---|---|
| - | **March 2015 – September 2023** | Chief of Police<br>Ocean Springs, MS Police Department |
| - | **August 2007 – March 2015** | Deputy Chief of Police<br>Ocean Springs, MS Police Department |
| - | **July 2003 – August 2007** | Captain, Training and Standards<br>Ocean Springs, MS Police Department |
| - | **March 2000 – December 2003**<br>and October 2010 – Dec 2012 | Instructor<br>Calibre Press Street Survival Program<br>Dallas, TX (Corporate Office) |
| - | **April 1998 – March 2000** | Training Coordinator/Trainer<br>Mississippi Police Corps<br>University of Southern Mississippi<br>Hattiesburg, MS |
| - | **September 1996 – April 1998**<br>*(Interim July 2001-September 2001)* | Chief of Police<br>City of Long Beach, MS |
| - | **May 1996 - September 1996** | Director of Training/Content Expert,<br>Law Enforcement Television Network<br>Carrollton, TX |
| - | **October 1991 - May 1996** | Director (Captain)<br>North Mississippi Law Enforcement Training Center<br>Commander, Special Operations Group<br>Tupelo Police Department, City of Tupelo, MS |
| - | **September 1989 - October 1991** | Specialized Training Coordinator and Instructor<br>MS Law Enforcement Officers' Training Academy<br>Jackson, MS |

6

- **November 1988 – Sept. 1989**    Police Officer, HRU Team Member
City of Panama City Beach, FL

- **May 1985 - November 1988**    Police Officer - Police Sergeant
City of Ocean Springs, MS

- **January 1984 - May 1985**    Deputy (Res.) Jackson County SO, Pascagoula, MS

# APPENDIX B

## Materials Reviewed in Preparation of the
## Expert Report of Mark S. Dunston

1   *Dunn v. Fontenot* (No. 6:21-cv-01535) Amended Complaint (dkt. 128)

2   DUNN_0000032-0000049 **(**Joshua Dupre Bond Revocation Hearing Transcript)

    DUNN_0002633 (CALEA Standard 26.1.1)

    DUNN_0002634 (CALEA Standard 26.1.5)

    DUNN_0000381 **(**Eunice Police Dept. Interoffice Mem. Regarding Notice of Investigation
    (September 6, 2019))

    DUNN_0002854 (Government Accountability Project, *Breaking The Blue Wall of Silence:
    The Vital Role of Whistleblower Protections for Law Enforcement Officers* (2022))

    DUNN_0002635  (IACP, Appendices F-G (2011))

    DUNN_0002650 (IACP, *Model Policy on Standards of Conduct* (July 2019))

    DUNN_0002678 (IACP, *The State of Recruitment: A Crisis for Law Enforcement* (2019))

1   DUNN_0002966 (United Nations, *Handbook on Police Accountability, Oversight, and
    Integrity* (2011))

11  DUNN_0002686 (U.S. Dept. of Justice, *Law Enforcement Best Practices: Lessons
    Learned from the Field* (2019))

12  DUNN_0002886 (U.S. Dept. of Justice Office of Community Oriented Policing Services,
    *Standards and Guidelines for Internal Affairs*)

1   DUNN_0002649 (IACP, Law Enforcement Code of Ethics (2020))

1

1   Transcript of Deposition of Chase Godeaux

1   Transcript of Deposition of Donnie Thibodeaux

1   Transcript of Deposition of Jack Ardoin

1   Transcript of Deposition of Jonathan Lee

1   Transcript of Deposition of Joshua Courville

2   Transcript of Deposition of Michael Dunn

22. Transcript of Deposition of Randy Fontenot

23. Transcript of Deposition of Stephanie Myers

24. Transcript of Deposition of Terry Darbonne

25. Transcript of Deposition of Trace Tilbury

26. Transcript of Deposition of Varden Guillory

27. Transcript of Deposition of Victor Fontenot