IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MICHAEL DUNN,<br><br>   Plaintiff,<br><br>   v.<br><br>RANDY FONTENOT, VICTOR FONTENOT, RYAN YOUNG, CITY OF EUNICE, and JOHN DOE,<br><br>   Defendants. | Civ. A. No.: 6:21-cv-01535 |

**SUPPLEMENTAL EXPERT REPORT OF MARK S. DUNSTON**

February 3, 2026

CONFIDENTIAL

EXHIBIT B

I. **QUALIFICATIONS, ASSIGNMENT & METHODOLOGY, AND SUMMARY OF OPINIONS**

    A. **Qualifications**

I refer to the November 26, 2025 Expert Report of Mark S. Dunston (the "Expert Report")[1] and Appendix A to the Expert Report for disclosure of my qualifications and curriculum vitae.

    B. **Assignment & Methodology**

The purpose of this Supplemental Expert Report of Mark S. Dunston (the "Supplemental Report") is to analyze and provide opinions on the testimony elicited during the continued 30(b)(6) deposition of the City of Eunice, held on January 20, 2026 (the "Continued Deposition") to supplement the opinion I provided in the Expert Report. Pursuant to the Stipulation Regarding Expert Disclosures, signed by all parties and filed on January 23, 2026 (dkt. 228) (the "Expert Stipulation"), the parties agreed that Plaintiff could submit a supplemental expert report limited to the Continued Deposition on or before February 3, 2026 and, in response, Defendants could submit a supplemental expert report on or before February 17, 2026, limited to the information in this Supplemental Report.

To form the opinions in the Supplemental Report, I relied on the Continued Deposition and the Expert Report.

As with the Expert Report, I am being compensated an hourly fee of $250.00 USD per hour. My compensation is not contingent in any way on the substance of my opinions or the outcome of this litigation.

II. **SUMMARY OF SUPPLEMENTAL EXPERT OPINIONS**

Pursuant to the Expert Stipulation and based on my review of the Continued Deposition transcript, I offer this Supplemental Report containing the following opinions, each to a reasonable degree of professional certainty. Each opinion shall be considered together with those offered in the Expert Report:

    1. The Chief of Police's nearly absolute authority over the Department, including over internal investigation decisions, combined with the City's limited oversight abilities, enables retaliation and restricts officer recourse.

    2. EPD's vague Procedural Orders, which are subject to varied interpretations and often depend on situational context, further expand the plenary nature of the Chief of Police's authority, resulting in a culture where retaliation can be camouflaged as justified discipline.

---

[1] Unless otherwise noted, the defined terms used herein reflect those defined in the Expert Report.

3. The Chief of Police's testimony supports a conclusion that EPD's Procedural Orders have limited bearing on the Chief of Police and how he makes decisions regarding the Department.

## III. RELEVANT BACKGROUND

For the Continued Deposition, the City designated two witnesses to testify on its behalf: the Mayor of Eunice, Scott Fontenot ("Mayor Fontenot"), and the current EPD Chief of Police, Kyle LeBeouf ("Chief LeBeouf") (together, the "City Designees"). Cont'd Dep. Tr. 162:3-8. The City Designees testified to the current state of EPD under the leadership of Chief LeBeouf, as well as the City's knowledge concerning Lt. Dunn's allegations.

## IV. SUPPLEMENTAL EXPERT OPINIONS

### A. The Chief of Police's Nearly Absolute Authority Over the Department, Including Over Internal Investigation Decisions, Combined With the City's Limited Oversight Abilities, Enables Retaliation and Restricts Officer Recourse.

Both Mayor Fontenot's and Chief LeBeouf's testimony in the Continued Deposition support Opinion Nos. 1, 2, and 4 in my Expert Report, that the combination of the Chief of Police's unfettered authority and the City's insufficient municipal oversight leaves officers vulnerable to retaliation. This systemic problem transcends any particular Chief of Police, because it is written into EPD's policies and the City's structure as a whole. As Chief LeBouef testified, "[t]he chief is the CEO of the department. It's clearly written he has ultimate decision-making authority on everything." Cont'd Dep. Tr. 230:11-16. Chief LeBeouf currently holds this authority, just as Chief Fontenot did before, as will whoever holds the position next. Cont'd Dep. Tr. 230:8-19.

The Chief of Police's unchecked discretion enables retaliation. For example, Mayor Fontenot testified that Chief Fontenot acted within his "discretion" when he terminated the K-9 program and Lt. Dunn's role as a K-9 handler. Cont'd Dep. Tr. 177:10-178:2. During a City Counsel meeting, Chief Fontenot claimed that he "terminated" the K-9 program for "budget reasons," but when Mayor Fontenot "offered to find money," Chief Fontenot "continued to go forward with getting rid of the program." Cont'd Dep. Tr. 178:3-14. As outlined in the Expert Report, Chief Fontenot's justifications that there were budgetary or handler issues were pretextual; he terminated the program to retaliate against Lt. Dunn. Expert Report at 13. Chief Fontenot had the power to get rid of the program "for any reason" with no contemporaneous oversight. *See* Cont'd Dep. Tr. 177:10-17, 177:21-178:14. Chief LeBouef, and any future Chief of Police, could do the same.

The only check on the Chief of Police is when a formal disciplinary action is appealed to the Civil Service Board; otherwise, especially if the Chief of Police is the appointing authority, as he commonly is, the City has minimal oversight into EPD, which "operates independently from other City officials and agencies." Cont'd Dep. Tr. 277:9-24. But the Civil Service Board is an insufficient oversight mechanism. Returning to the prior example, on appeal, the Civil Service Board overturned Chief Fontenot's decision to terminate the K-9 program, but it was too late, because he had already sold the dog. So, while the Civil Service Board awarded backpay to Lt.

Dunn for his K-9 training, it could not reinstate the program itself. *See* Expert Report at 13, 16. As a result, Lt. Dunn lost ongoing and future benefits, to say nothing of the benefits that that the program provided EPD and the City writ large. *See* Expert Report at 13, 16.

Equally problematic is that the Chief of Police decides which formal complaints are investigated and which are ignored. As Chief LeBouef testified, all internal investigations against an EPD officer for violation of policy "have to be authorized by the chief of police." Cont'd Dep. Tr. 224:22-225:20. Throughout the Continued Deposition, Chief LeBouef confirmed that neither EPD nor the City investigated the vast majority of the formal complaints that Lt. Dunn submitted under Chief Fontenot's tenure, including allegations that EPD officers were working outside of their jurisdiction (*see* Cont'd Dep. Tr. 256:13-257:6, 245:8-19), Joshua Dupre's testimony that Officer Fontenot was coercing him to make false statements about Lt. Dunn (*see* Cont'd Dep. Tr. 271:3-12), allegations that Officer Fontenot used excessive force against a civilian (*see* Cont'd Dep. Tr. 252:17-253:2), and allegations that Lt. Young leaked investigatory information to a suspect in violation of EPD policy (*see* Cont'd Dep. Tr. 259:8-14). On the other hand, Chief Fontenot investigated and placed Lt. Dunn on administrative leave for making a Facebook post about a safety concern in his neighborhood. Cont'd Dep. Tr. 220:8-221:7, 242:13-243:6; Expert Report at 11-12. The investigator ultimately determined that there was no violation because Lt. Dunn was exercising his first amendment rights. Cont'd Dep. Tr. 242:13-243:6. Similarly, Chief Fontenot allowed an investigation of Lt. Dunn based on the unsubstantiated claim that Joshua Dupre was paying him for information, even though the state police decided not to investigate because there was nothing corroborating Officer Fontenot's claims. Cont'd Dep. Tr. 193:2-25, 227:25-229:10.

This unfettered authority enables retaliation. When the Chief of Police can turn a blind eye to formal complaints, he can excuse misconduct directed at disfavored officers, such as harassing statements and impermissible investigations.

    **B.**    **EPD's Vague Procedural Orders, Which are Subject to Varied Interpretations and Often Depend on Situational Context, Further Expand the Plenary Nature of the Chief of Police's Authority, Resulting in a Culture Where Retaliation Can Be Camouflaged as Justified Discipline.**

The Chief of Police's expansive authority is exacerbated by EPD's vague Procedural Orders that allow him to further excuse retaliatory conduct directed at disfavored officers while feigning compliance with those same policies. Indeed, Chief LeBeouf's testimony regarding whether certain behaviors or actions would violate EPD's Procedural Orders affirms Expert Report Opinion No. 1, that the Procedural Orders' "ambiguity grants the Chief of Police excessive discretion to interpret and enforce discipline, investigations, and performance expectations without oversight." Expert Report at 2.

When asked whether "making false statements or accusations against a fellow police officer" violates EPD's policies, Chief LeBeouf testified that it "[c]ould" but would "depend on the context" and "the accusation." Cont'd Dep. Tr. 215:21-216:3. Chief LeBouef further testified that neither Chief Fontenot nor any other City employee disciplined any of the officers that falsely accused Lt. Dunn of being corrupt or a dirty cop. *Id.* at 216:4-7.

Similarly, Chief LeBeouf testified that "making threats against a fellow officer" "[c]ould be" against EPD policy "depend[ing] on the circumstances." Cont'd Dep. Tr. 217:12-17. Here, too, he confirmed that the City did not investigate the threats Officer Fontenot made against Lt. Dunn, and neither Chief Fontenot, who had the authority (and obligation) to address threats made between officers, nor the City, implemented any disciplinary or corrective measures in response. *See* Cont'd Dep. Tr. 216:8-16, 218:7-219:3, 265:7-9.

As I opined in the Expert Report, "a culture of retaliation and inconsistency in what conduct is considered punishable" can erode both officers' and the public's confidence in the police department. Expert Report at 8. Chief LeBouef's testimony shows that, no matter who serves as Chief of Police, EPD's vague, discretionary, and overbroad Procedural Orders permit discipline that may seem ostensibly justifiable but is often pretextual and/or inconsistent. In both examples above, Chief LeBouef testified that, despite the Procedural Orders prohibiting officers from making false allegations against or threatening fellow officers, there are, in his view, "context[s]" and "circumstances" where such conduct would not be a violation, and EPD officers could engage in such conduct without risk of recourse. This, in effect, writes a loophole into the Procedural Orders, where the Chief of Police and any of his allies can retaliate against disfavored officers but still remain in compliance with EPD policies.

It is therefore my opinion that, without revisions to eliminate this vagueness from EPD policies, officers are at continued risk of retaliation.

> C. **The Chief of Police's Testimony Supports a Conclusion that EPD's Procedural Orders Have Limited Bearing on the Chief of Police and How He Makes Decisions Regarding the Department.**

Pursuant to my review of the Continued Deposition, I am also of the opinion that there is a culture at EPD, as shaped by the Chief of Police, where the Procedural Orders, as well as accepted training standards, are generally disregarded. This is based upon Chief LeBouef's testimony that (1) he did not have comprehensive knowledge of what conduct is prohibited or protected in EPD's policies; (2) EPD does not have policies concerning certain key conduct, such as protection from retaliation, recruitment and use of confidential informants, and conducting law enforcement activities outside of EPD's jurisdiction, to name a few; and (3) EPD has not updated key policies, including those implicated by Lt. Dunn's valid complaints.

Despite Chief LeBouef's duty to promulgate EPD's Procedural Orders, he was uncertain about whether EPD has policies covering particular behaviors. Cont'd Dep. Tr. 249:23-250:2-4. For example, did not know whether EPD had policies that protect EPD officers from retaliation, stating he would "have to read the policies. [He was] sure it's in there somewhere, may not be though." Cont'd Dep. Tr. 249:23-250:1. When asked about "policies that protect officers from retaliation for reporting misconduct," a central facet of Lt. Dunn's claims, he shifted from stating that EPD does not have policies that protect officers from retaliation to stating that, if such a policy existed, it would be in the code of conduct. Cont'd Dep. Tr. 250:5-251:1. Indeed, the Procedural Orders do not contain any provision that protects against retaliatory behavior, in the Code of Conduct section or otherwise.

Chief LeBouef also testified that the Department had not added or updated the Procedural Orders regarding conduct related to the complaints filed by Lt. Dunn and other EPD officers. For example, Chief LeBouef testified that EPD has not made any updates to the policies regarding investigatory leaks, extra jurisdictional operations, and conduct that discriminates on the basis of race, sex, and other protected statuses. *See* Cont'd Dep. Tr. 275:8-276:3. In the same vein, he testified that EPD has no specific policies, procedures, training programs, or materials concerning the recruitment and use of confidential informants (*see* Cont'd Dep. Tr. 244:25-245:7), and no policies relating to conducting law enforcement activities outside of EPD's jurisdiction (*see* Cont'd Dep. Tr. 245:20-23).

In my opinion, where there is a lack of respect and clear enforcement of a police department's policies and procedures at the top level of the department, it encourages the rest of the department to view the policies and procedures in a similar way. Where the Chief of Police both does not know the policies and procedures and applies them inconsistently, it is difficult for officers to use the policies and procedures to instruct on proper procedure or as protection from workplace harm. Further, policing is a complicated and increasingly scrutinized field across the country, and as our communities and standards change, policies and procedures must do the same. If a department's policies and procedures fall behind, in combination with the other factors, it can compound the issues described above.

## V. POLICY RECOMMENDATIONS

The testimony elicited in the Continued Deposition supports the policy recommendations outlined in the Expert Report as submitted in Section IV.

/s/ *[signature]*

Mark S. Dunston
February 3, 2026

Case 6:21-cv-01535-RRS-DJA    Document 235-3    Filed 02/24/26    Page 7 of 7 PageID #: 4223