*Michael Dunn vs.*

*Victor Fontenot, et al*

*Michael Dunn*

*January 21, 2026*



LORI HEAPHY
&ASSOCIATES LLC
CERTIFIED COURT REPORTERS
www.loriheaphy.com    office@loriheaphy.com
337-233-1655

**EXHIBIT A**

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

MICHAEL DUNN          CIV. A. NO: 6:21-CV-01535

VERSUS                JUDGE ROBERT SUMMERHAYS

VICTOR FONTENOT, RYAN    MAG. JUDGE DAVID J. AYO

YOUNG AND CITY OF EUNICE

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


The deposition of MICHAEL DUNN was taken in the above-entitled cause, pursuant to the following stipulations, before Debbie G. Chaney, Certified Court Reporter, at Becker & Hebert, 201 Rue Beauregard, Lafayette, Louisiana, on the 21st day of January, 2026, beginning at 9:00 a.m.

Page 3

INDEX

|                                        | Page |
| Examination by Mr. Reed                | 5    |
| Examination by Mr. Stamey              | 142  |
| Examination by Mr. Hebert              | 185  |

EXHIBITS

Description

| 1 | Letter regarding Board of Pharmacy Dunn 2633 | 8 |
| 2 | Mr. Dunn's notes, Dunn 1-139 | 48 |
| 3 | First Amended Complaint | 56 |
| 4 | Written statement by Joshua Dupre Dunn 822 | 79 |
| 5 | Plaintiff's Rule 26 Disclosure | 123 |
| 6 | Mr. Dunn's Formal Complaint Dunn 3582-3636 | 185 |
|   | Reference to excerpt from Michael Dunn's deposition, page 187, line 11-17 | 125 |

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF, MICHAEL DUNN:
     MS. CASSANDRA LIU, ATTORNEY AT LAW
     SIDLEY AUSTIN, LLP
     787 Seventh Avenue
     New York, New York 10019
     cassandra.liu@sidley.com

FOR THE DEFENDANTS, RYAN YOUNG:
     MR. JASON T. REED, ATTORNEY AT LAW
     NEUNERPATE
     1001 West Pinhook Road
     One Petroleum Center, Suite 200
     Lafayette, Louisiana  70503
     jreed@neunerpate.com

FOR THE DEFENDANTS, CITY OF EUNICE:
     MR. MICHAEL D. HEBERT, ATTORNEY AT LAW
     BECKER & HEBERT
     201 Rue Beauregard
     Lafayette, Louisiana  70505
     mhebert@lawbecker.com

     MR. JAMES P. DOHERTY, ATTORNEY AT LAW
     BECKER & HEBERT
     201 Rue Beauregard
     Lafayette, Louisiana  70505
     james@lawbecker.com

FOR THE DEFENDANTS, VICTOR FONTENOT:
     MR. JOSEPH B. STAMEY, ATTORNEY AT LAW
     STAMEY LAW FIRM, LLC
     727 2nd Street
     Natchitoches, Louisiana  71457
     joe@stameylawfirm.com
Also Present:
     Mr. Kyle LeBouef, Chief of Police, Eunice

     Mr. Scott Fontenot, Mayor of Eunice

     Ms. Lauren Sylvest, Becker & Hebert

Page 4

S T I P U L A T I O N S


It is stipulated and agreed by and between counsel for the parties that the deposition of MICHAEL DUNN, is hereby taken by counsel for the Defendant, for all purposes, as well as all other purposes pursuant to notice and to the provisions of the appropriate statutes of the Federal Rules of Civil Procedure.


That the witness reserves the right to read and sign the deposition;


That all formalities of sealing, certifying and filing are waived;


That all objections, except those as to the form of the question and the responsiveness of the answer, are reserved until such time as this deposition or any part thereof may be used or sought to be used in evidence;


That, Debbie G. Chaney, Certified Court Reporter officiated in administering the oath to the above-mentioned witness.

Page 5

MICHAEL DUNN, after being first duly sworn, was examined and testified as follows:

THE WITNESS:

I do.

EXAMINATION

BY MR. REED:

Q   Good morning, sir, Jason Reed.  And for the record, I represent Ryan Young.

We're here to complete your deposition that I think was commenced January of 2023.

Fair to say the same ground rules apply?

A   (No response.)

Q   The ground rules for taking a deposition?  I can go over them if you want, but you sat through seven hours of deposition.

A   That's fine.

Q   Sir, what have you reviewed in preparation for today?

A   Nothing.  Nothing.

Q   No documents whatsoever?

A   (Witness shakes head negatively.)

Q   Is that no?

A   No, sir.

Q   Okay.

Page 6

A   I apologize, I need to speak up.

Q   Yes, no problem.

Did you bring any documents with you today?  It doesn't look like you did.

A   No, sir.

Q   Okay.  After the initial deposition, did you review that transcript?

A   For the original one they sent to me to make sure there was any corrections or anything out of place, however long ago that was, yeah.

Q   I think you executed an errata sheet where you caught various typos.

A   I don't recall.  It's been a while.

Q   Okay.  I've got a copy, but it was just typos, so I don't think we need to look at the errata sheet.

A   Okay.

Q   But my question is, other than anything you would have indicated on that errata sheet, did you notice anything else from that transcript you thought was inaccurate?

A   Not that I recall.

Q   Okay.  Do you remember anything, when you read that first part of your deposition, you

Page 7

thought was incomplete, or anything where you couldn't recall but when you were reading it, you recalled some more information?

A   You'd have to be specific on what part.  I can't think of anything off the top of my head.

Q   That's fine.

Have you spoken to anybody in preparation for today's deposition?

A   Other than counsel, no, sir.

Q   Okay.  I want to talk about your current situation with the police department and whether it's changed at all from the first deposition back in January of 2023.  What is your current rank?

A   Lieutenant.

Q   Okay.  At one point your K-9 duties were removed.  What's the status of that?

A   Right now, I'm a K-9 officer.

Q   Okay.  When were you reinstated as a K-9 officer?

A   Just before Mardi Gras.  Give me one second.  I believe the end of February of last year.

Q   Okay.  I want to hand you a document if you don't mind.  You can pass these around.

Page 8

MR. REED:

We'll call this Exhibit Number 1.

(Exhibit No. 1 entered into evidence.)

MR. REED:

Cassandra, do you mind if we just start over because we've got the exhibits that start at Number 1.

MS. LIU:

Sure.

A   Do you want to put one on this one?

BY MR. REED:

Q   Yes, if you don't mind.

All right.  And that's the document, I think your counsel produced a couple of days ago.

A   Okay.

Q   And you've seen this document before?

A   I prepared it.  I believe this is the document I prepared.

Q   You think you prepared this document?

A   I believe so.  It looks like the one I prepared and gave to the chief for --

Q   Okay.  I'm sorry.  I'm looking at this.  You're looking at the actual document?

A   (Indicating).

Page 9

Q   Okay.

A   This is what you gave me.

Q   All right.  And it's signed by whom?

A   Chief Kyle LeBouef.

Q   Okay.  How did it come about that you prepared this particular document?

A   I'm trying to get the police department in line with way laws are for the handling of narcotics and transferring of narcotics for canine usage in training.

Q   Okay.  Have you provided this to the Louisiana Board of Pharmacy yet?

A   Yes, sir.

Q   Okay.  And why are you required to provide this document to the Board of Pharmacy?

A   To be able to acquire a license to handle and transport and storage of illegal narcotics for training purposes.

Q   Okay.  And specifically, it looks like about page -- I'm sorry, line 2, it talks about you're applying for your narcotics license.

A   You said line 2?

Q   Yes, second line.

A   Okay.

Q   When is it you applied for your narcotics

Page 10

license?

A   Which one?  I apologize.  Which one?  There's two of them.  I'm --

Q   Well, tell me about both.

A   Okay.  The first one for the Louisiana Board of Pharmacy, you have to be able to get your certification or your license through the Louisiana Board of Pharmacy, in order to be able to even attempt to apply for the DEA license.  You have to be certified through the State to get your DEA license.

Q   Okay.

A   And I'm currently in the process of -- that's actually, we're trying to go through with that as we speak.

Q   Okay.  Now, tell me about the second license.

A   The DEA license, same thing, just strenuous documentation, how it's going to be handled, where it's going to be stored at, who's all going to have access, stuff of that nature.

Q   Okay.  And what's the status of the second license, is it still in process?

A   Pending, yes, sir.

Q   Okay.  Have you ever, before the licenses that you're currently applying for, have you

Page 11

ever held any kind of narcotics license before?

A   No, sir.

Q   Okay.  Let me make sure I understand the role that you had in narcotics before.  Were you actually in the narcotics department, or what was your role before these issues?

A   I was attached to both, I guess that's the easiest way to explain it.  I was a patrol lieutenant, but I also conducted narcotics investigations and helped out the detective division.

Q   Okay.  And you're allowed to do that without having any kind of narcotics license?

A   I attempted to get it before but they wouldn't let us get it before in the past.

Q   Okay.  And who is "they?"

A   That would be the Chief Randy Fontenot.  Because I -- I made comment that it would be -- behoove of us to make sure we follow the statutes and got a narcotics license.

Q   All right.  I want to talk a little bit more about your relationship with Ryan Young.  Are you currently on the same shift as Ryan Young, or are you guys on different shifts?

Page 12

A   He is a -- let me get the title right, Chief of detectives.  He works, I think, Monday through Friday.  I'm not sure of his hours.  I usually see him when I'm on day shift.

Q   Okay.  And what's your current shift, is it day shift or night shift?

A   We rotate monthly.  So a month of days, a month of nights.

Q   Okay.  What building do you work in, what building does Ryan Young work in?

A   I work in the main building, 300 South Second Street.  That's where my office or the supervisor office is where we handle our stuff.

Ryan has CID, which is behind the DMV.  I mean, he goes back and forth.

Q   Okay.  During the time, you said you're a month day shift, a month night shift.

A   Uh-huh (yes).

Q   During the months that you're day shift, how often do you see Ryan Young during the course of a week?

A   I pretty much see him every day.

Q   Okay.  Do you guys work files together?

A   No.  Or we have -- let me correct myself.

Page 13

We haven't had anything to where we have worked together on cases.

Q. Okay. At some point years ago, Ryan Young was your supervisor, is that accurate, or did I botch that?

A. You have to give me a minute, it's been many years.

Q. Sure.

A. I don't think I worked on his shift while he was on the road before he went into detectives. I think I'm -- I'm not 100 percent certain, but I don't think I ever did.

Q. Okay.

A. I don't think.

Q. So to the best of your recollection, Ryan Young has never been your direct supervisor, correct?

A. To the best of my recollection, no.

Q. Okay. Since the first portion of your deposition, have you had any conversations with Ryan Young about this lawsuit?

A. I'm trying to figure out how to frame it. Basically kiss and make-up, I guess. I don't know how else to put it. I mean, he

Page 14

apologized. I mean, I told him I'm sorry for all the crap we went through.

Q. Okay. When did that conversation take place?

A. I think that was shortly after my shooting in 2000 -- I can't remember the date. It was a shooting I had in Patasa, and he was a witness to it because he seen the whole thing unfold.

Q. Okay. Do you know what year that shooting was? I was going to ask about that later.

A. I believe it's two years. I can't -- I know it was early in the -- no, it's probably going to be a little longer because I think Chief LeBouef had just taken over when that incident took place. It's going to be in the first quarter of his first year, if I remember correctly.

Q. Okay. We'll get into a little bit about the shooting, but --

A. Okay.

Q. -- let's talk about the apology first. Was that an in-person conversation?

A. Yeah, we was talking behind the PD. And he -- basically the way he put it to me, he said I know you filed a lawsuit and I know we're

Page 15

going through some stuff. I just want to let you know that I'm not going to not tell the truth about what happened in your shooting.

Q. Okay.

A. So I mean, I guess -- I guess honestly I was worried about it because, I mean, all the crap I've been through over the years, I mean, I don't trust too many people, so.

Q. Okay. Who was present for that conversation?

A. There was quite a few of us outside, I don't know who all heard what, but I think it was five of us outside. We was in the main parking lot. I believe we were just standing next to the main generator. I just remember we had that conversation, I just can't remember who all was around.

Q. Now, who do you remember other than yourself and Mr. -- or Lieutenant Young?

A. I remember my rookie was there. It was Wesley, he was -- he was close to us. I don't know if he heard what we talked about or not. It's hard to recall because it was a dramatic event that day and we was all outside talking. So I can't remember who all was standing there, I just remember there was

Page 16

probably four or five people standing around.

Q. And you said a Wesley, and I didn't -- was there a Wesley?

A. Wesley Rozas, I'm sorry.

Q. Spell the last name, if you can.

A. R-o-z-a-s. R-o-z-a-s, Rozas.

Q. Okay. Anybody else you can identify by name?

A. Not off the top of my head.

Q. And is Wesley still an employee of the police department?

A. Yes, sir.

Q. Okay. Did you and Lieutenant Young have any conversation about the substance of either lawsuit during that conversation?

A. I don't believe so. I don't believe we talked about any type of details or anything. He just told me not to worry, that he wasn't mad at me or anything like that --

Q. Okay.

A. -- and he was going to treat me fairly.

Q. Okay. And you said he apologized, did I understand that properly?

A. To an extent, you know.

Q. What did he say that you deemed to be an apology?

Michael Dunn - January 21, 2026

Page 17

A   Just basically about what we're going through. He was like -- I wouldn't say, I'm sorry I did this, nothing like that. Just -- I'm trying to figure out how.

Q   Was it more a general apology for the fact you guys are adverse because of this lawsuit?

A   I think that would fairly characterize it.

Q   Okay.

A   I mean, just -- I think that's a fair -- fair assessment.

Q   But he did not apologize about any particular action he was alleged to have taken against you. Is that a true statement?

A   That would be accurate. I don't remember any details. We didn't talk any details, just that we were, you know, apologized we were at odds with each other over the whole situation.

Q   Okay. Any other conversations you've had with Ryan Young about the lawsuit, or about either lawsuit, I should say?

A   Not to my recollection.

Q   Have you had any conversations with Victor Fontenot since your first deposition about either lawsuit?

Page 18

A   Conversations, no. Well, if I see him at Walmart, I was still nice, good morning, hi. You know, if I see him around town, I wasn't rude. That's the extent of our conversation.

Q   Okay. But nothing of substance?

A   No.

Q   When's the last time you've seen Victor Fontenot?

A   That was a few months ago, I passed him at Walmart, told him good morning and I kept walking.

Q   Okay. Any conversations with former Chief Fontenot about the lawsuits since the last time we deposed you?

A   No. We've ran into each other, but no, I haven't talked to him.

Q   Okay. I'm going to ask you this because you were kind of laughing. How did it go when you ran into former Chief Fontenot?

A   I seen a vehicle pulling out of fast food restaurant with no lights on after dark. And I turned around, lit the car up and it happened to be Chief -- or ex Chief Fontenot. I didn't realize he had a new vehicle, didn't know it was him.

Page 19

Q   Okay.

A   So I got out and I told him what was going on, the reason why I stopped him. And I as like, I'm out, I just left.

Q   Okay. You didn't issue him any kind of citation?

A   No, no. No.

Q   Okay. Have you had any conversations with Chief LeBouef, the current police chief about this lawsuit since the last time we visited?

A   We both agreed we're ready for it to be over.

Q   Okay. Anything else you can think of?

A   I told him I was going to try to get with my counselor, whoever, to try to see if we can settle this. But no, I think it's been to no avail as far as I know. I'm not sure.

Q   When was that conversation?

A   I'm not sure.

Q   Was it before or after the settlement conference?

A   Oh, it was before.

Q   Okay.

A   I know it was before that.

Q   So what about after the -- I didn't mean to cut you off.

Page 20

But after the settlement conference, have you had anymore discussions with Chief LeBouef about this lawsuit or either lawsuit?

A   No, sir, I don't believe I have.

Q   Okay. Anyone else with the police department you've had discussions about the lawsuit since the last time you were deposed?

A   General statements to -- I know I told Chase I was coming here today -- Chase Goudeau. I told him I was coming here today. And I probably made a comment to -- I told my shift where I was going. I told them I couldn't be -- you know, couldn't answer any phone calls, they would have to go to the sergeant on duty.

Q   And who is on your shift currently?

A   Currently it would be Stephanie Myers, Chase Goudeau was stepping in for a replacement today. And I'm trying to think of his name, he's new. Speers, Dylan Speers.

Q   Okay.

A   He's on the shift today, so I told them I would be unavailable.

Q   Since the first time you were deposed, have you filed any additional Civil Service

Michael Dunn - January 21, 2026

Page 21

proceedings of any kind?

A    I know I had something pending.  I don't remember if it was before or after when it was resolved.  I -- I can't recall.

Q    What was that one about?

A    You would have to give me a second, it's been a minute.

Q    Sure.

A    I remember it had to do something with taking overtime hours away from me and then giving it to somebody else.  That was part of it.  I know there's other parts to it but I'm trying to recollect what else was in it.

Q    So the one you're talking about, it would be in part based upon what with overtime?  I didn't quite hear it.

A    That I had signed up to work.  They had available slots open and I was going to take a few of the days.  And then as I report to work, I think -- well, if I remember correctly that I was sent home and told I couldn't work the hours and they gave the hours to somebody else of equal or higher rank.

Q    Okay.

Page 22

A    I remember that was part of it, but I know there was more.  I'm trying to recall what that was.

Q    Did you have counseling in connection with that particular issue?

A    Yes, sir.

Q    And who was that?

A    I'm picturing his face, give me a second.  He's here in Lafayette, I remember that.  I just know I'll never hire him again.

Q    It's not Bill Goode, is it?

A    Yes.  There you go.  Thank you.

Q    What become of that particular claim?

A    If I remember correctly, it was basically a draw.  Like the City can't do this, and they weren't going to do anything towards rewarding me or anything because it was basically a draw.  Because I wasn't -- I'm trying to remember.

Basically the City or the police department couldn't take away from people, but I wasn't entitled to any type of compensation due to the fact of being overtime and it was volunteer to go work those slots even though I was already granted

Page 23

the slots.

Q    Who made the determination that you weren't allowed to work the overtime, do you remember?

A    It either had to be the deputy chief or the chief.  That's the only two that would have the authority to keep me from doing that.  And that's -- I'm drawing a blank right now of which one it was.

Q    Who is the current deputy chief?

A    Jeremy Ivory.

Q    You said there was some other portions of that Civil Service proceeding.  As we sit here, do you remember the other portions or other issues?

A    I know I have the documents, but I know it was two separate Civil Service cases that were joined together because they were similar.  I'm drawing a blank, sir.  I apologize, it's been a minute.

Q    Are there any currently outstanding Civil Service proceedings you have?

A    No, sir, I don't think I have anything further.

Q    Are there any outstanding appeals that are

Page 24

pending regarding any prior Civil Service proceeding?

A    No, sir, I don't have anything.

Q    Okay.  Since your first deposition, have you made any complaints to any outside agency about any conduct within the Eunice Police Department?

A    No, sir, I do not believe I have.

Q    Okay.  Same time period, have you filled out any Critical Incident Reports about any issues that you perceive to be going on in the police department?

A    I have.

Q    Okay.  How many?

A    I know the last one I think was five involved in that one.  Before that, I'd be lying to you, I don't recall exactly how many.  Ten plus.

Q    You think you have ten plus Critical Incident Reports you've filled out since the last time we visited?

A    Yes, sir.

Q    All right.  We may get back to those in a little bit, but --

A    Okay.

Michael Dunn - January 21, 2026

Page 25

Q  The first time you were deposed, you were questioned at length about the various complaints you made to outside agencies; state police, FBI, et cetera.

A  Uh-huh (yes).

Q  Have you heard back from any of those entities since the first time you were deposed?

A  No, sir.

Q  Have you made any effort to secure employment outside the Eunice PD since last time?

A  As per conversations of trying to get other employment, yeah.

Q  Okay.

A  As to filling out applications, no, I haven't went that far yet.

Q  Tell me about the conversations.

A  The conversations, main was with Eddie Thibodeaux.  He was talking about running for sheriff.  And he talked about wanting me to come work for him if he won the sheriff's election.

Q  Is that St. Landry Parish?

A  Yes, that's where he currently works at now.

Q  Okay.  And when would that election be, do

Page 26

you know?

A  It would be a couple of years from now, nothing close.

Q  If you are offered that position, would you plan to take it?

A  If it benefits my family, yes.

Q  Okay.  You haven't made that determination one way or the other?

A  Not 100 percent.

Q  Okay.  Any other conversations you've had about other potential employment?

A  Exploring my options on what I can do once all of this is over.

Q  But have you spoken to anybody else?

A  Friends, family, stuff like that, looking at options.

Q  Let me ask you it way.  Have you spoken to any other potential employers?

A  I know I talked to Captain Lalonde.

Q  Who is that?

A  Captain Lalonde, he's with the LSU-E police.

Q  Say the last name again.

A  Lalonde.

Q  Do you know how to spell that for the Court Reporter?

Page 27

A  No, sir.

Q  Okay.  And he's with the University Police Department for LSU?

A  Yes, sir.

Q  Okay.  Were you offered a job there?

A  He told me it's available if I wanted it and he would love to have me over there, but I told him that I'm pretty -- it's a laid back position, not very active.  I'm trying to figure out how to frame it.  Boring.  How about that?  It's a boring position.

Q  Okay.  Any other conversations you've had with perspective employers?

A  With respect to perspective employers, not that I can recall other than the two I've already mentioned.

Q  Okay.

A  Other than that, it was just general conversation with family, friends, thinking about what to do.

Q  Have you filed any other lawsuits since the last time we visited?

A  No, sir.

Q  Have you been named a defendant in any lawsuits since the last time?

Page 28

A  I don't know if it's been filed yet, but I've got word that there's one through the pipeline right now.  I'm not sure if it's ever been filed or anything past that.

Q  All right.  Well, what's the basis of that potential suit?

A  Wrongful death.

Q  Is that the police shooting that you kind of alluded to earlier?

A  No, sir.

Q  Okay.  Just kind of tell me in broad strokes about the wrongful death suit that you anticipate.

A  An inmate died in custody.

Q  What was the inmate's name?

A  I don't recollect it off the top of my head.

Q  Okay.  What was your role in that incident?

A  I was a shift commander the night he passed.

Q  In general, what happened?

A  The gentleman was arrested, suffered from some type of medical condition.  He -- from what I understand after the fact, that he'd -- what do you call it, a hunger strike basically.  He hadn't eaten in days, refused to take his medication in days.  And then we

Page 29

found out that he was septic and some other things, he was hallucinating, and he passed away in our jail.

Q   Okay.  And you were the shift commander you said?

A   At the time when he passed, yes.

Q   Tell me -- well, let me ask first.  How many officer involved shootings have you been involved in?  Is it just the one or is it multiple?

A   Just two.

Q   Okay.  Tell me about the first one.

A   Bryan Britnell, 2017.

Q   What's the name?

A   Bryan Britnell, 2017.

Q   Do you know how to spell the last name?

A   No, sir, not off the top of my head.

Q   Okay.  And this is obviously during your employment with the EPD?

A   Correct.

Q   Okay.  What happened?

A   We had a phone call or a call come into dispatch.  The guy was -- I don't remember all the details, so it's going to be generalized.  You'd have to review my report.

Page 30

If I remember correctly, he had his -- he was threatening to kill his girlfriend or had her hostage at a house off of South 7th Street.  I was a shift commander at that time.  We then went to the intersection of, I believe it was 8th street, 8th Street and Park.  Because the house, we were familiar with it because we've actually -- we had some raids or stuff over there in the past, we were familiar where the house was.  So we didn't want us to be seen yet.

So we started getting our gear together, getting everybody geared up ready to go.  And then we're hearing some -- someone was talking on the radio, we couldn't tell because our radios sucked back then.  We found out we have a car coming towards us that's actually the suspect holding a gun to his girlfriend in the car.

We then approached the intersection, forced the vehicle to stop.  He then pulls the weapon coming out of the vehicle, at which time we started firing at the subject.

Q   All right.  Who actually fired at him?

A   I believe there was four of us that fired.

Page 31

Q   Okay.  Who were the other three, do you remember?

A   Richard Daigle, myself.  It's been some years, so you have to -- I'm trying to recall.  I believe there was two other people, but I can't recall right now who the other two people were.

Q   Okay.  Was the suspect killed?

A   No, sir.

Q   Okay.  What was the nature of his injuries, if you know?

A   If I can remember correctly, he caught some rounds center mass.  One of his ears was also hit.  He was shot in the shoulder.  And I think he had one round in his leg, if I remember correctly.

Q   Okay.  Was there a determination of whether you actually made contact with him with any of your shots?

A   I was told I did.

Q   Okay.  What were you told specifically?

A   That -- that a couple of my rounds went center mass and they didn't hit anything vital to -- to make him expire.

Q   Okay.  Was there a lawsuit in connection with

Page 32

that incident?

A   Not that I'm aware of.

Q   Okay.  Do you know if there is any insurance settlement in connection with that incident?

A   Not that I'm aware of.

Q   Okay.  Was there any kind of internal investigation in connection with the incident?

A   State, outside agency took over and the investigator, which would be state police, Louisiana State Police.

Q   Okay.  Was there any finding of wrongdoing?

A   As far as I know, no.  I told it was a justified shoot.

Q   Okay.  Did you ever have to see any kind of mental health professional in connection with that incident?

A   We didn't have access to it.

Q   Okay.  But in terms of your private access, did you go see anybody?

A   Not that I recall.  Not with that incident, I don't believe.

Q   Okay.  When was the second shooting?  That was more recent?

A   Yeah, that was more recent.  I'm -- I'm

Michael Dunn - January 21, 2026

Page 33

believing it's either two or three years ago. I'm not recalling the exact year. I just remember Chief -- Chief LeBouef had just taken over, so I don't know if that was 2021 or '22. I'm not 100 percent certain.

Q   What happened with that one?

A   From the best of my recollection, we had, it came over the tac channel that there was multiple agencies chasing a felony grade, a felon with multiple warrants. We could hear them on the radio going through different jurisdictions. So I ordered my shift to monitor all access into Eunice in case he came our way, are we going assist taking him out -- taking him down, not out. I said the wrong word.

At some point, we heard on the radio that there was an officer injured, he'd wrecked his car. We didn't know if it was suspect ran him off the road or if he just crashed out. And it wasn't too far from our location. So I got permission, via the radio, to go check on the officer -- injured officer.

So as we're heading that direction, the

Page 34

suspect vehicle passes us. Then we whip around and we are now in pursuit with him. We go down a -- I guess it's a dead end road or a private drive, right there off of -- I can't remember the name of it -- Patasa. We just call it Patasa. I'm trying to think of the name. Oh, Perchville, Perchville Highway.

We get to the end of it, it's a dead end. We -- I get out of the car. I'm coming around the car, around my unit, and the guy floors it coming at me and I discharged my weapon.

Q   Just to jump in. When that happened, who was present, yourself and who else?

A   Myself and my rookie at the time was Wesley Rozas. And I later discovered that Ryan was already pulling in behind us and witnessed the incident.

Q   And to be clear, you're talking about Lieutenant Young?

A   Yes, sir.

Q   Okay.

A   I apologize, Lieutenant Ryan Young.

Q   Okay. And what happened?

Page 35

A   I'm sorry?

Q   What happened?

A   We shot him and he wrecked into a tree, and then --

Q   Let me make sure I'm following you. So the vehicle is driving at you?

A   Yes, sir.

Q   Okay. And you said we shot him, who shot him?

A   I had shot him from the front. And my officer, fearing that I was in danger, shot him through the back of the car.

Q   And that's the trainee?

A   Yes, sir.

Q   Okay. And what happened to the suspect?

A   He fell out the car, said he had been shot. He was then cuffed. And due to the fact of the incident, someone else was already attending to him. Since we knew we was involved in a shooting, we stood off to the side to wait for, you know, to be instructed what to do since we just used deadly force.

Q   Was he fatally wounded?

A   No, sir.

Q   What was his medical outcome, do you know?

Page 36

A   No, sir. I know I got court with him next month in Acadia Parish. The trial has been reset again.

Q   And that's the criminal trial, I would assume?

A   Yes, sir.

Q   Okay. Is there any related civil lawsuit, to your knowledge?

A   Not that I'm aware of.

Q   Do you know if he made any kind of insurance claim in connection with that incident?

A   Not that I was made aware of.

Q   Okay. Was that turned over to an outside agency for investigation?

A   Yes, sir.

Q   Do you know the outcome of that investigation?

A   We were cleared.

Q   Okay. And Ryan Young was a witness to the critical events?

A   Yes, sir.

Q   Okay. Do you know if his statement was taken?

A   I would assume so since he was a witness and he was interviewed by the same detectives we

Michael Dunn - January 21, 2026

Page 37

were interviewed by. I'm assuming. I'm sure he would have. I don't have any personal knowledge of it, but --

Q  Okay. But you've not reviewed that statement or don't know anything about the contents of that statement?

A  Uh-uh (no). No, sir.

Q  Okay. But there was a finding of no wrongdoing, at least, in part, based upon the statement that Ryan Young gave?

A  I'm assuming that and the totality of the circumstances and there was camera footage of the incident when it took place.

Q  Okay. At any point before you filed the, what I'll call the ACLU lawsuit, did you require any kind of mental health care of any form throughout your lifetime?

A  Throughout my lifetime, no. But before I started seeing a counselor.

Q  Before what, I'm sorry?

A  With all this, everything we're discussing here today, I started seeing the counselor during those years.

Q  Okay. And we'll get into afterwards. And I think you spoke to Mr. Hebert about that last

Page 38

time, but we'll talk about how that's changed.

A  Okay.

Q  Just to be clear, before the ACLU lawsuit, you never saw any kind of psychiatrist, psychologist, mental health counselor?

A  It was before -- if I remember correctly, I started seeing a counselor before any of this ever got any traction.

Q  Okay. When is it that you first started seeing a counselor?

A  When I found out they were trying to have me arrested on false charges and I had a mental breakdown, and I ended up --

Q  And which particular incident is it that led to, as you just testified to, a mental breakdown?

A  The Joshua Dupre stuff and realizing that they had already threatened to harm me, or made even the comments they were going to harm me.

Q  Okay. And at that point, you sought counseling? I think we talked about that last time, so let me shift.

A  Okay.

Page 39

Q  Between the last time you were deposed and today, have you had any kind of mental health treatment you relate to these incidents?

A  Mental health as to a psychiatrist or a counselor?

Q  Either.

A  I still see a counselor every so often.

Q  Remind me, who you are seeing?

A  Candase Martel.

Q  Okay. How often are you seeing, is it Ms. Martel?

A  Ms. Martel, yes, sir.

Q  How often are you seeing her?

A  Depending on what's going on, I usually check in with her at least once a month just to keep leveled off.

Q  Okay. Did you ever see Ms. Martel specifically having to do with the officer involved shooting you just described?

A  It was mentioned. I mean, we talked about it because, you know, what is going -- you know, when you're just meeting a counselor or whatever you're going through, whatever is going on with you to explain why.

Q  Okay. Did you see her with any more

Page 40

frequency after the officer involved shooting relative to before?

A  I can't say 100 percent but I know it was pretty frequent back during those years.

Q  After the officer involved shooting?

A  Not -- not in 2017, no, not that one. The other one, yes, I did mention it to her and talked to her during counselor sessions.

Q  Okay. You're talking about the one after Chief LeBouef assumed office?

A  Yes, sir.

Q  Okay. Did she refer you to anybody else in connection with the aftermath of that shooting?

A  After the shooting, I don't believe so.

Q  Have you seen any other mental health professional, other than Ms. Martel, since your first deposition?

A  Since my first deposition? I do not recall if it was before or after.

Q  Who would that be?

A  Eckholdt. I can't think of his first name.

Q  And what kind of health care provider is Eckholdt?

Page 41

A   He is a psychiatrist.

Q   Okay.

A   To prescribe -- if he deems it necessary to prescribe medications.

MR. HEBERT:

Can you spell his name?  Do you know what the spelling is?

A   I apologize, sir, I don't.

MR. HEBERT:

Okay.

A   I know he has a sub office here in the Lafayette area.  I'm trying to think, is it Scott?  No.

MR. HEBERT:

You think it's Eckholdt?

A   Eckholdt.

BY MR. REED:

Q   You said he has a sub office in Lafayette. Where?

A   I believe so.  I've never been to it.  He has an office somewhere down in this area.

Q   Okay.  Where is the office you go to?

A   When I did see him, that would be -- I think he would, I guess, sublease or something, a law office right there on 2nd Street in

Page 42

Eunice, or 2nd Street, and he would see patients there.

Q   What did you see Dr. Eckholdt in connection with?

A   All the stress and everything I was dealing with, and my counselor suggested start trying some type of anxiety medication or something for depression.

Q   And just to be clear, you don't know if that was before or after the second officer involved shooting?

A   It's been some years.  I think it's been some years, I couldn't tell you 100 percent.

Q   Okay.  Did you talk to Dr. Eckholdt about the shooting?

MS. LIU:

Objection.  Don't reveal what you talked to me about with counselor.

A   Okay.

BY MR. REED:

Q   Was part of why you saw Dr. Eckholdt because of the second officer involved shooting?

A   It was talked about but that wasn't the only issue, reason why I was there.

Q   What other issues did you talk to him about?

Page 43

MS. LIU:

Objection.  Don't reveal what you talked to with counsel.

BY MR. REED:

Q   What other issues caused you to see Dr. Eckholdt?

A   Pretty much the reason why we're here today with all the crap I've had to put up with the last couple -- well, what's it's been, eight years now since all of this started.

Q   Is there anything that you needed to see Eckholdt about other than the officer involved shooting and any issues related to these lawsuits?

A   I apologize, one more time.

Q   Is there any other reason you needed to see Dr. Eckholdt other than the officer involved shooting and the issues related to these lawsuits?

A   Just to clarify, I didn't see him just because of the shooting, it was the totality of everything.  But that was the -- everything involving this and we discussed traumatic events.  But, yeah, it came up about the shooting.

Page 44

Q   Have you had any other traumatic events in your life since the last deposition?  For instance, any deaths in the family?

A   Deaths in the family since then?  No, sir. The only -- all I have is my mother and my sister and two nephews.  So, no, I haven't had any deaths since then.

Q   How is your relationship with Chief LeBouef?

A   As far as I know, I mean, I -- we never had a cross word.  We had no issues, as far as I know.

Q   Okay.  We'll get into that a little bit more when we get into your amended complaint.

A   Okay.

Q   I'm going to start skipping around a little bit because I'm kind of filling in the blanks from the first deposition.

But one thing I want you to walk me through is, let's say tomorrow, you thought that there was some misconduct for a police officer, what's the procedure for you to investigate that police officer.

A   If I see some officer doing something he shouldn't be doing, I'm then to file a formal complaint, notify my supervisor.  And

Michael Dunn - January 21, 2026

Page 45

depending on the totality of what it is, if I'm going to send him home or not.

Q   Okay.  So the first step you said to file a formal complaint.  Is that a Critical Incident Report, or what would that be?

A   No, it would be the -- yes, Critical Incident would have took place.

But the first thing we do if it was detrimental, then I would send him home or not send him home.  Then he'd have to report to the chief's office, I believe it's by 8:00 or 9:00 a.m. the next morning, the following morning, and has to have a full report by me about what took place.

Absent of that, I would file a formal complaint or a Critical Incident Form, then submit that through the chain of command.

Q   And let me make sure I'm clear.  You would fill out the Critical Incident Form and send it to whom?

A   Chain of command.  It would go -- it would go to my deputy chief first.

Q   Okay.  And then it would go, presumably, to Chief LeBouef?

A   Yes.

Page 46

Q   You wouldn't be allowed to just start the investigation on your own, correct?

A   I'm sure if it warranted it and I had to make an emergency arrest or something, then there shouldn't be an issue.  Because, I mean, I have arrested an employee within the last three or four years.  I say "employee," it was a reserve.

Q   Okay.  Now, what you just told me, was that for how you would investigate allegations of someone breaking the law?  Is that how you would investigate allegations of violations of internal policies and procedures, or is that -- the steps you just gave me, would that apply equally to both internal policies and procedures and to a potential violation of the law?

A   Give me a second, let me back up a bit.

Generally, if it is a policy violation, the way it would work is the way I explained earlier.  If it's not detrimental or to a safety issue, then I would document what took place on a Critical Incident Form, and then submit it up.

When it comes to criminal violations,

Page 47

it's just been a rule of thumb, if we see something like that, we bring it to our chain of command.  As far as I know, it doesn't, it -- shouldn't keep us from going further with it if we needed to.

Q   Okay.  Let's go to the first half of that.  If you think it's a violation of internal policy, there's no imminent threat of harm, then the proper procedure would be to fill out the Critical Incident Report and, you know, send it up the chain of command?  Is that a fair statement?

A   I believe that would be correct, yes.

Q   I want to talk, last time we talked a lot about your notes and your journal entry, and those were actually made exhibits to the first deposition.

A   Okay.

Q   We may look at those in a little bit, but I think they were Exhibits 5 through 10 from the first set.  And I'll go ahead and hand you.  These are exhibits to the first deposition.

You can just give that to Madame Court Reporter.  Do you mind passing these out?

Page 48

Thank you.

So throughout your first half of your deposition, you referred frequently to my notes.  What's in front of you and what was attached the last time as Exhibits 5 through 10, is that what you were referring to when you said "my notes," or does my notes also encompass something else?

MS. LIU:
So are you going to mark these?

MR. REED:
Yes.  We'll mark those in globo as Exhibit Number 2.

(Exhibit Number 2 Entered Into Evidence)

A   Did you want me to review these?

BY MR. REED:

Q   You're welcome to look as long as you want to.

A   Oh, Okay.

Q   But it should be the exact same ones you reviewed last time.

A   (Witness complies.)
Okay.

Q   All right.  Thanks for taking the time to look at those.

Page 49

So when I reviewed your transcript from your first deposition, you frequently made reference to my notes. What's in front of you, is that what you were talking about when you said "my notes" throughout the first deposition?

A   It would be my journal.

MS. LIU:
Objection to the form.

BY MR. REED:

Q   You said the journal? Is the journal different from your notes?

A   Is this -- you mean that I implied that I wrote down something that I thought was important or significant, that's what I'm referring to as things I documented or wrote down where I could recollect and remember.

Q   So what's in front of you that we've labeled Exhibit 2 to this deposition, what would you call those documents? Is that notes, journal?

A   Notes or journal entry, I refer to them as both.

Q   Okay. Let me make sure I'm clear. Mr. Hebert questioned you, but there's a few

Page 50

gaps I want to fill in or at least get you to help me understand.

A   Okay.

Q   What's in front of you, first of all, is that the entirety of the notes you've taken in connection with any issues involving the Eunice Police Department?

A   What every thing that I would have recorded or written down during this time frame would have been turned over to counsel to be submitted as, what's the word, discovery.

Q   Okay. After you turned the notes in front of you over to counsel, have you continued to keep notes or a journal?

A   In reference to this case?

Q   In reference to any activity with the Eunice Police Department.

A   I know I've wrote myself some reminders and recalled some incidents if things came up.

Q   Okay. Have you written those reminders in the format that you have in front of you that's Exhibit 2?

A   On paper, no. It's electronical on a jump drive or --

Q   Okay. Have you produced those notes to

Page 51

counsel?

A   They didn't involve this case.

Q   Okay. So any notes you've taken since you produced what's in front of you as Exhibit Number 2 wouldn't have any -- wouldn't pertain to this case? Is that a fair statement?

A   For the time frame listed for what was this case, no, I don't have any other notes. I turned everything over.

Q   Perfect.
Now, I want to ask some questions about the notes in front of you.

A   Uh-huh (yes).

Q   Were those compiled contemporaneous with the various issues, or can you explain to me how those notes came to be?

A   I apologize, you said what was the word?

Q   Yes, let me give you a background of where I'm coming from.
I didn't quite follow your testimony the last time --

A   Okay.

Q   -- and I didn't have a chance to ask any questions.

Page 52

My understanding, and you tell me if I'm wrong. Didn't you initially make various notes on different flash drives?

A   Whatever I had at the time to where I could remember to remind myself to go back and to write down what I remembered of the incident, what took place.

Q   But that would have been electronic?

A   That would have been on jump drives or on my work computer.

Q   Okay. And that was my next question.
Where would you have compiled those? Would it all have been at work, some at work, some at home?

A   I'm pretty sure it was both places. I know I wrote down notes. If it was something that was going to be very time consuming, I didn't do it while I was on duty.

Q   Okay. In the aggregate, how much do you think it took you compiling all these notes, any estimate?

A   The notes, depends on what topic we're talking about. Because I know I did some Public Records Requests and some other stuff, so it took time to compile the information or

Michael Dunn - January 21, 2026

Page 53

evidence for the stuff I was trying to prove what was going on. If that's what you're asking. I mean, I'm not quite following.

Q I'm just trying to get an idea of how much time total you dedicated to typing up these notes.

A I don't know. I wouldn't have a -- I don't know.

Q No estimate whatsoever?

A No. I worked on them when I had time.

Q Say it again.

A I worked on them when I had time or when I was away from everybody, because I didn't want nobody reading what I was typing.

Q All right. But you don't have an estimate of the time period it took?

A Not that I -- no, I don't have an estimate.

Q What percentage of the notes were compiled while you were on the clock versus off the clock, do you have any idea?

A If it was something I needed to write down in the notes, I'd put a date and a time and pre-synopsis, hey, I need to go back and talk about this when I had time. I wouldn't do it while I was at work.

Page 54

Q Okay. So you basically almost give yourself a reminder while you're on the clock, and then you're saying when you're off duty, you'd go in and fill in the information?

A That would be accurate, yeah.

Q Okay. So if I'm correct that initially you had these notes on various flash drives.

A Uh-huh (yes).

Q How did it go from that format to the format that's in front of you as Exhibit Number 2?

A How did I go to the format?

Q Did you just cut and paste from the various other sources into what's before you, or did you --

A You mean putting them together? Yeah, I put them together, if it was on different jump drives or something of that nature, yeah.

Q When you put it together, did you edit it in any manner or you just cut and pasted it into a single source?

A Well, I know I made revisions if I noticed typos or stuff like that while I was going through it or reading through it. I know -- if that's what you're referring to, I know I made typo revisions, stuff of that nature.

Page 55

Q Other than typos, when you put it all together, did you change the substance of the notes?

A I know on a copy that I turned in, I changed the substance at the end because I was trying to protect employees from being targeted. I know there was one that I turned in that I excluded their names because I didn't want them to be targeted.

Q The original sources of the notes that you compiled together -- the jump drives if that's what it is --

A Okay.

Q -- do you still maintain those?

A If you mean I have custody of them, yeah.

Q Okay. So you would still have the native documents that were all put together to come up with what's in front of you?

A Yeah, either that or I've already turned them over to counsel. I don't recall. I know I had them. Either I still have custody of them or I've already turned them over to counsel.

Q Okay. I want to flip through, we have already gone through in length your

Page 56

supplemental -- I'm sorry, your First Amended Complaint, but I'm going to go through and try not to retread the same ground. But primarily I'm going to ask questions specific to my client, Ryan Young.

A Okie-dokie.

Do I give these to her?

Q Yes, thank you.

A Do you need to mark this one?

BY MR. REED:

Q Yes, that's a good idea. I wasn't going to but since we're talking about it, we might as well.

MR. REED:

The First Amended Complaint, Exhibit Number 3.

(Exhibit Number 3 Entered Into Evidence)

BY MR. REED:

Q First, just can you verify this is a copy of your amended lawsuit?

A Yes, sir, I believe so.

Q And you were a provided a copy of that lawsuit before filing suit to verify the accuracy of everything contained in the suit? Is that a fair statement?

Page 57

A      (No response.)

Q      Did you review this lawsuit before it got filed?

A      The amended one, yes, sir.

Q      Okay.  And it was accurate and complete to the best of your understanding?

A      To the best of my understanding, yes, sir.

Q      Go to page 5, paragraph 9.

A      (Witness complies.)

Q      And it basically says that --

A      You said page 5, paragraph 9?

Q      Yes, sir.
       It talks about allegations of Chief Fontenot, Officer Victor Fontenot and Lieutenant Ryan Young, quote, Commenced a defamatory campaign intended to tarnish Lieutenant Dunn's reputation by spreading rumors that he is corrupt.
       I want to talk about that specific to Lieutenant Young.  Can you tell me every instance in which you contend Lieutenant Young defamed you or committed defamation against you?

       MS. LIU:
            Objection to the form.

Page 58

A      It's been a while.  I'm trying to recall certain things.  I'm just -- I know they're there, I'm just trying to recall it because it's been awhile.

BY MR. REED:

Q      Take as much time as you need.

A      You said specifically to Ryan Young?

Q      Yes, that's my client so I want to know specifically how Ryan Young or how you claim Ryan Young defamed you.

       MS. LIU:
            Objection to the form.

A      It's been awhile.  I'm trying to recall it.  You'd have to refer to any type of notations I wrote down, it's -- it's been a minute.

BY MR. REED:

Q      So as we sit here, you can't think of a single time that Ryan Young committed defamation against you?

       MS. LIU:
            Objection to the form.

A      It's just all a little fuzzy.  Because it's been so many years, I'm trying to recall specifics, but --

BY MR. REED:

Page 59

Q      So the answer is no, you can't think of a single instance?

       MS. LIU:
            Objection to the form.

A      I can't think of the individual instance.  I know there was, I'm just I'm trying to recall them.  Because there was just -- there was so much going on between all three, I'm trying to remember.  You said specifically him, so I'm trying to go through it.

BY MR. REED:

Q      Can you think of any time that Ryan Young spread rumors that you were corrupt, as alleged in paragraph 9?

A      I mean, I've heard it.  I mean, I know I've heard it.  I'm trying to recall the specific stuff you're talking about.

Q      Okay.  Tell me the first time you heard that Ryan Young spread rumors that you were corrupt.

A      That's what I just answered, I'm trying to recall the specific.  It's been awhile.

Q      So you can't think of a single time, as we sit here, regarding Ryan Young?

A      I don't want to misquote anything.  I can't

Page 60

remember the exact details at this moment.  I'm trying to.

Q      Okay.  Even if it's not exact details, can you tell me even broad strokes of Ryan Young suggesting you were corrupt?

A      I'm recollecting something, it had to do something with the last time I was a candidate, I know it had to do something with that.  I'm trying to recollect what was actually -- transpired.

Q      Nothing important enough for you to remember right now?

A      No, it's not that it wasn't --

       MS. LIU:
            Objection to the form.

A      It's not that it wasn't important.  I mean, we're talking about stuff years ago.  I'm trying my best to recall it.

BY MR. REED:

Q      Same paragraph.  What has Ryan Young done to hinder your career advancement?

A      Hinder my career advancement?

       MS. LIU:
            Objection to the form.

A      Are we talking about just inside of PD or

Page 61

when I'm trying to get different employment.

BY MR. REED:

Q    I'm talking about whatever you meant when you guys filed this lawsuit and, specifically paragraph 9, This campaign continues to harm Lieutenant Dunn by hindering his career advancement, diminishing his job prospects and making him a villain in the eyes of some of his colleagues.

A    As towards Ryan Young, the way I can try to summarize it that Ryan Young was the supervisor of Victor Fontenot.  Any type of orders or anything thereof would have either -- would have came through Ryan Young, so he would have been aware of what's going on.  I'm still trying to recall a specific instance, but it's just a fog right now.

Q    So any such assertion against Ryan Young, as I just read from paragraph 9 of your Amended Complaint, would be because of his role as supervisor of Victor Fontenot?

        MS. LIU:
            Objection to the form.

A    His role?  Can you repeat your question, please?  I'm sorry.

Page 62

BY MR. REED:

Q    So your allegations in paragraph 9 relative to Ryan Young, is that limited to Ryan Young's role as supervisor of Victor Fontenot?

        MS. LIU:
            Objection to the form.

A    No.  Like I said, I know there was other incidences but I'm trying to recall them right now.

BY MR. REED:

Q    What has Ryan Young done to diminish your job prospects?

        MS. LIU:
            Objection to the form.

A    Knowing that they were false IAs and conducting them knowing that they were, lack of a better term, bullshit.

BY MR. REED:

Q    And which one?  Which of the IAs were bullshit?

A    There was several.

Q    Okay.  Tell --

A    That they knew was not justified but they still went though it anyways.

Page 63

Q    Tell me which one is specific to Ryan Young.

A    He was the IA officer in all of them.

Q    Okay.  Tell me which ones you think support the allegations of paragraph 9.

        MS. LIU:
            Objection to the form.

A    There was a time that I caught him changing or altering the times on an Officer Bill of Rights form.  That happened in the squad room at the PD during one of the investigations.

BY MR. REED:

Q    Does that support the assertions that Ryan Young said you were corrupt?

        MS. LIU:
            Objection to the form.

A    Not based off of that what I just stated, no.

BY MR. REED:

Q    Does that support the assertion that Ryan Young committed defamation against you?

        MS. LIU:
            Objection to the form.

A    Not off of what I just stated, no.

BY MR. REED:

Q    Does that support the notion that Ryan Young

Page 64

diminished your job prospects?

        MS. LIU:
            Objection to the form.

A    Changing the time on that, that wouldn't have diminished a job.

BY MR. REED:

Q    You were giving me a list of the various IAs in which Ryan Young was involved that you termed as bullshit.  Can you tell me the next one?

A    They were all turned over, all my case files and everything.  There was several.  There was one I know I got a letter exonerating me after I hired an attorney and started getting into it.  And they gave me a letter saying, oh, it was false, or it wasn't quite right and they dropped the case.

Q    Which IA was that?

A    I don't remember all the details.  I remember it involved Eunice City Marshals and me being shorthanded or being forced to be worked shorthanded.  They heard that we were shorthanded, they volunteered to come help.  I didn't authorize it.  I didn't ask.  I made no communication to have them to come help.

Page 65

And that's what I was accused of, reaching out to an outside agency asking for help. That's the gist of that one.

Q And what was Ryan Young's role in that?  Did he investigate that particular incident?

A My recollection, yes.  He's the IA officer for all of them, I guess, for anything that's turned into the police department now and then.

Q Okay.  Let's go to paragraph 10.  Just take a look.  Is that the reference to the Josh Dupre incident?

A Give me one second.  Okay.  What was your question, sir?

Q Yes.

I just want to kind of get into the Josh Dupre a little bit.

A Uh-huh (yes).

Q I'm not clear on this.  You allege that one or more officers tried to set you up to have Josh Dupre make false allegations.  Is that in sum and substance of your contentions?

A Yes, sir.

Q Okay.  Do you contend that Ryan Young was part of that effort?

Page 66

A From everything we understood, yes.

Q Okay.  I want to make sure that I've got all the sources of that information.  And I read your testimony from last time.  I just want to make sure that I understand it and that I'm not missing anything.

The initial issue came up, was that from a call from the judge or was that during the stop of Josh Dupre?  Which one came first?

A Oh, which one came first?

Q If you know.

A I believe the traffic stop would have happened first.

Q Okay.

A Because there was comment made of what he testified in court.  I believe the traffic stop happened first, if I remember correctly.

Q The traffic stop, it was a stop of Josh Dupre?

A Yes, sir.

Q Who was present during that stop?

A I know -- I know I made notations who all was there.  But from my recollection as we sit here today, I believe Officer Cain.

Q What is Cain's first name?

Page 67

A George.

Q Okay.

A Myself, Victor.  I know there was another officer on scene because somebody cut him off at the roadway.  I don't remember which officer cut him off.  I just remember a unit blocking the roadway.

Q What was said during that stop that gave you red flags that there was an effort to set you up or a possible effort to set you up?

A Joshua Dupre's own statement.  And I thought it was a joke at first.  I mean --

Q Remind me, what did Joshua say?

A That Victor, the only reason why Victor was messing with him because he refused to say that I was a dirty cop, or something of that nature, or accepting bribes, or something -- something close to that.

Q Okay.  Did Joshua Dupre mention Ryan Young's name?

A Some -- I don't know if it was Josh or some -- or Joshua Dupre or who, but somebody told me Ryan was there.  I'm trying to recall who told me Ryan was in the room.  They were investigating and Ryan later admitted that he

Page 68

was part of it and he begged the Chief to turn it over to state police because they didn't feel comfortable investigating.

Q Let me jump in with some questions.

A I'm sorry.

Q Ryan was where?

A Sir?  I'm sorry.

Q I just didn't follow you.  You said you think Ryan was there.  Ryan was where?

A I don't know if he was on the traffic stop. That, I don't know.

I'm talking about during the -- when they -- give me a second.  When they were doing the interview with Joshua Dupre at some location, I guess CID or something, that -- there.

Q Okay.  And who did that interview?

MS. LIU:
Objection to the form.

BY MR. REED:

Q If you know.

A From the best of what I've uncovered with the transcripts and stuff, it was just Ryan Young and Victor Fontenot.

Q And you've read the transcripts of that

Page 69

interview?

A    No.  I read the court transcripts of what was testified to in court.  I didn't read nothing that happened in the office.

Q    Okay.  All right.  Let's go back to the scene of the stop.

A    Okay.

Q    And I just want to be clear.

Did Joshua Dupre say anything to implicate Ryan Young in any wrongdoing?

A    I remember him using the word "they."  I'm trying to recollect if he said -- I know he said Victor's name, that was 100 percent.  But as I said, I thought it was a joke at first until I seen the way Victor reacted to me, like flipped out.  So I thought it was a joke at first.

But as him saying Ryan's name?  He just they're trying to set you up.  I remember they was used a lot.

Q    And was there any indications who he meant by "they," other than potentially Victor Fontenot?

A    The only indication was later -- that I can recollect, the only indication I can remember

Page 70

of later is once I seen the transcripts of who was -- or who was claimed to be all in the room during the interview and what was going on, and then Ryan's own admission that he knew about it and that he wanted -- basically told Chief Fontenot that it should be turned over to an outside agency and not investigated by them.

Q    Okay.

A    And that he did speak to another agency, they said that whatever they had was, there was nothing there.

Q    All right.  You said a couple of times, the transcript.  Are you talking about the bond revocation transcript?

A    The one with Gerard --

Q    Caswell?

A    -- Caswell, Victor, Joshua Dupre.  I can't remember if anybody else was on the transcript.  I mean, that was the transcript I got from the court.

Q    Okay.  And the transcript will speak for itself.  But as we sit here, do you think that anything within that transcript implicates Ryan Young in trying to set you

Page 71

up?

MS. LIU:

Objection to the form.

A    In my opinion of what I read and him being his supervisor and he was a part of the investigation, yes.

BY MR. REED:

Q    What specifically did you read that led you to that conclusion?

MS. LIU:

Objection to the form.

A    Led me that to conclusion?  Because if they knew it was false, then why are y'all even doing that, if he knew it was false allegations.

BY MR. REED:

Q    If they knew what was false?

A    That I was not doing what they said I was doing.  You were trying to convince somebody to do something to me that I wasn't doing, or to try to get information of something I wasn't doing.

Q    Other than the transcript, which you have given me your interpretation of the transcript, other than that, you said that

Page 72

Ryan Young actually made some kind of confession?  Did you say that?

A    What, say it again.

MS. LIU:

Objection to the form.

A    I wouldn't say confession, it's just he admits -- or not admit.  I'm trying to -- that's accusatory.

He was there.  He was present during these conversations, and he said that there was a statement written against me that I was accepting money for keeping them informed about narcotics operations, drug dealers and I was getting paid for it.

BY MR. REED:

Q    What statement was Ryan Young present for?

A    For that interview with Joshua Dupre.

Q    And the fact he interviewed Joshua Dupre, how does that lead you to the conclusion Ryan Young participated in an effort to set you up?

A    Okay.  I'll try to recap it the best I can.  Okay.  If you pull somebody over -- I'm going to use a general statement first and try to piece it together for you.

Michael Dunn - January 21, 2026

Page 73

So if I pull somebody over and I find you with X number of narcotics, I then confiscate the narcotics and I tell you, I'm not going to charge you as long as you do X, that's illegal. So if that already started from the get-go, and now you're trying to get them to give a statement against me, you've already done something illegal already.

And if you're a seasoned lieutenant, or veteran of the police department, you should know you cannot hold a criminal charge over somebody's head to get them to do something. Extortion, that's illegal.

Q   And what basis do you have to say that Ryan Young tried to hold anything over Josh Dupre's head to get information?

MS. LIU:

Objection to the form.

A   Okay. They seize narcotics from him. You can find that in the evidence book. You then see that it's -- I can't remember if it was a reentry or another entry of the same narcotics then being used again for a criminal charge. And that was after the supposed interview to have me set up. So

Page 74

you -- any person could see that, okay, we seized something from him, we wanted something from him, he didn't give it to us and now we're going to X. And then he was arrested for something that he'd already had.

BY MR. REED:

Q   Other than what we talked about so far, do you have any evidence, any other reason to believe that Ryan Young made any effort to set you up in the Joshua Dupre incident?

MS. LIU:

Objection to the form.

And if there's a good stopping point at any point, can we take a break?

MR. REED:

Yes, after we get an answer to this.

MS. LIU:

Sure.

A   I do -- I apologize, can you repeat it one more time, ma'am? I'm sorry.

MR. REED:

Do you mind reading it back?

(QUESTION READ BACK BY COURT REPORTER)

A   In that specific incident, I don't believe I

Page 75

have anything else in that regard, if we're only talking about that one specific incident. Again, I repeated earlier, there is other incidents, not as severe, it's just I'm just having trouble recalling them.

BY MR. REED:

Q   Okay.

MR. REED:

We can take a break.

(SHORT BREAK TAKEN IN DEPOSITION)

BY MR. REED:

Q   All right. Before we went off the record, you said something to at least suggest that you think there's other times Ryan Young may have made an effort to set you up. Can you explain?

A   Efforts to set me up, no. I just know there was other instances where he's talked negative of me where it's affected my job. I'm trying -- I -- you ask me to recall specific incidents, I can't recall off the top of my head. But whatever those incidents were, I would have documented them some type of way.

Q   Just a couple more things on the Joshua

Page 76

Dupre, then we'll move on.

A   Okay.

Q   The conversation you had with Judge Caswell, did Judge Caswell mention Ryan Young's name in any manner?

A   Not that I recall.

Q   Okay. Go to the Amended Complaint, paragraph 17. And basically about three lines in, said they also constitute a civil conspiracy making reference to the named defendants.

And you testified about that quite a bit, but I just want to kind of put a button on that. You told, I think, Lee Ledet, you know, obviously you're not aware of any written document that would support a civil conspiracy. Is there any particular witness you can identify that would support the notion of a conspiracy among the individual defendants?

MS. LIU:

Objection to the form.

A   Can I read paragraph 17?

BY MR. REED:

Q   Sure. Sure.

A   (Witness reads document.)

Page 77

Okay. Do you want me to just read what was in there? There's kind of a lot. You gave me -- I'm trying to recall what you'd asked me.

BY MR. REED:

Q   Yes, if you don't mind.

MR. REED:

Do you mind reading it back, Madame Court Reporter, of if you just want to look at the question.

(QUESTION READ BACK BY COURT REPORTER)

MS. LIU:

Same objection.

BY MR. REED:

Q   Do you understand the question?

A   Not 100 percent.

Q   Yes.

Is there any person, any witness you can identify that would support the notion that there's a civil conspiracy among the named defendants?

MS. LIU:

Objection to the form.

A   I know that they -- after I reached out to state police, state police contacted Ryan

Page 78

Young, Ryan Young then contacted Chief Fontenot to let them know that I was ratting them out about what was going on with another narcotics case, of illegal activity.

I believe Brad -- the guy's first name, I think it's Brad or Brian Guidroz, he was in charge of Troop I investigations. I believe they went and talked to him, or he'd been involvement. Joshua Dupre, and you said other than defendants. Not that I can recall at this time.

BY MR. REED:

Q   All right.

MR. REED:

Before we move on from the Josh Dupre thing, I've marked this exhibit as Number 4. And I'll go ahead and circulate.

(Exhibit No. 4 entered into evidence.)

BY MR. REED:

Q   And I don't have much on this.

But this purports to be a written statement signed by Josh Dupre. I just -- I'll be super brief on this one.

Have you ever seen this written

Page 79

statement before?

A   I do not believe I have.

Q   You said you do not believe you have?

A   No, sir.

Q   Okay. You didn't play any role in gathering this statement?

A   No, sir, I don't believe I did.

Q   I don't have anymore questions about the statement. When you're done --

A   Do you mind if I review it?

Q   Yes. Sure.

A   This is -- (witness reads document.)

Wow.

Q   All right. Go to paragraph 41, which is on page 14 of the Amended Complaint.

A   There was a question you asked me earlier --

MS. LIU:

There's no pending question.

A   No, it was something he asked me earlier, he was talking about evidence or supporting documents, or something of that nature, if I remember correctly.

BY MR. REED:

Q   Sure.

A   Something else just came to mind. There was

Page 80

two cell phones. They were said that the evidence contained, for this, was going to be contained the two cell phones which was in the custody of Eunice Police Department. I know that was another piece of evidence we was trying to get. I don't know if it ever got turned over or not, but --

Q   You're talking about Josh Dupre's cell phones?

A   Yes, because they were seized.

Q   Yes, and I think you testified about that at length in the first deposition.

A   Okie-dokie.

Q   Let's go to paragraph 41, it looks like you allege, On or about April 29 of 2019, you were notified a suspect who called the Eunice Police Department with knowledge of a yet unprocessed warrant. Is that the Ronnie Fontenot issue?

A   Correct.

Q   Okay. Let me kind of get back --

A   I have -- I don't know if there's something I should add to that or not. Can I speak to counsel? There's no pending question, correct?

Page 81

MS. LIU:

We could speak at the break.

A    Okay.  Make a note about Ronnie Fontenot.

BY MR. REED:

Q    Yes.

The initial investigation into Ronnie Fontenot, the one that occurred on or about April 29 of 2019, who was the investigating officer.

A    If I remember correctly, it was me.

Q    Was Christopher Lee involved in some capacity?

A    Christopher Lee?  You mean Jonathan Lee?

Q    Was it Jonathan Lee?

A    I believe that's the only --

MR. HEBERT:

It's Jonathan.

BY MR. REED:

Q    Jonathan Lee.

A    Jonathan Lee.

Q    Okay.  I got the first name wrong.

A    You caught me off guard.  I apologize.  No, it's Jonathan Lee.  It was his case, my bad.

Q    I think that's what you testified to last

Page 82

time.

A    It's been a while.  It was either me or him.  I know I was involved and I knew of it.

Q    So you and Jonathan Lee were both involved.  Whose case it was, you don't quite recall?

A    No.  He's my subordinate, I remember that much.

Q    Okay.  And I think that -- I'm kind of trying to create a time line of events.  But wasn't there a warrant that you executed maybe on a Sunday?

MS. LIU:

Objection to the form.

A    Was a warrant executed on Ronnie Fontenot, yes, but what happened was prior to me getting that warrant signed.

BY MR. REED:

Q    Okay.  Kind of walk me through it.

MS. LIU:

Objection to the form.

A    Best of my recollection, they were having a meeting in the mornings.  They seen that I was applying, or one of us was applying for a warrant for Ronnie Fontenot, and they tipped him off that it was coming.

Page 83

BY MR. REED:

Q    What was present for that meeting?

A    Generally, I don't remember.  Generally, it's going to be Chief Fontenot, the detectives.

Q    What detectives?

A    Whichever ones we had at the time.  I know we had some come and go.  But I know Victor would've been there; Ryan would've been there.  Harlan, he was pretty much at every meeting.

Q    What's Harlan last name?

A    I don't recall.  He's with the Eunice News.  I don't -- I don't know his last name.

I believe that would be it.  There's usually between three and five people in those meetings in the morning.

Q    Okay.

A    To answer your question.

Q    And I'm getting a different impression of the chronology.  Maybe I just misunderstood your initial testimony.

A    Okay.

Q    Did you not testify before that you swore out the warrant on a Sunday?

MS. LIU:

Page 84

Objection to the form.

A    I don't recall.

BY MR. REED:

Q    Okay.  Who filled out the warrant?  Was it you, Officer Lee or a combination thereof?

A    It would've been whoever the case agent was would have filled out the warrant.  And if it would've been a subordinate filling out the warrant, the warrant would have been submitted to me for final approval and being sent to a judge.

Q    Okay.  Do you know what date or even day of the week that the warrant was submitted?

A    It's been awhile.  No, sir.  I can't quite recall.  I just remember there was a reason why it took a couple of days to get it signed.  And before it was even signed, he was already calling the PD wanting to know about his warrant.

Q    Okay.  Before the warrant was submitted, who knew about the warrant other than yourself, Officer Lee, you said Harlan, Victor Fontenot, Ryan Young?  Would anyone else have knowledge of that warrant before it was submitted to the judge?

**Michael Dunn - January 21, 2026**

Page 85

MS. LIU:

Objection to the form.

BY MR. REED:

Q  To your knowledge?

A  No, sir.  We kept it tight lipped because Ronnie Fontenot has friends inside the police department.  So no, we would have kept it tight lipped.  And it would've been submitted with morning paperwork for review for the detectives to look over, and the chief or whomever.  But no, we didn't tell anybody else about it.

Q  How is Harlan involved?

A  He's just in the room.  You asked me who was in the room.  He's a reporter for the Eunice News.  I knew he was there nine times out of ten, typing notes and drinking coffee with the guys or the group.

Q  He would have known about the warrant before it was submitted?

A  I -- I --

MS. LIU:

Objection to the form.

BY MR. REED:

Q  You don't know?

Page 86

A  I can't testify to that part.  I don't know.  I just know he was in the room.

Q  Okay.  How did you become aware there was an issue with the warrant?

A  An issue with the warrant?  You're talking --

Q  At some point you became of the mindset that Ronnie Fontenot was tipped off, correct?

A  Oh, okay.  Now I'm tracking you.  He called.  He called the police department.  And then when I confronted other people that would have known about that warrant even being filed, Ryan admitted that he talked to Ronnie about it.

Q  All right.  At some point, did a Julie with the dispatch warn you that she thought that Ronnie was tipped off?

A  Julie with dispatch?  She works records.

Q  Okay.  I'm looking at --

A  She works records.

Q  -- do you have your journal entries?  I'm looking at --

A  I gave them back to -- which one, sir?

Q  Let me see.  This would be the second set, Exhibit 5.  But there's a Bates label, last two numbers are 13.

Page 87

A  138?

Q  No, I've got a 13.  If it's easier, I can give you my copy.

A  Did I miss it?  Okay.

Q  Paragraph starts on April 29, 2019.  I received a phone call from Julie.

A  Okay.  (Witness reads to himself.)
Okay.

Q  Okay.  Does that refresh your recollection that you heard from Julie?

A  Yes, sir.

Q  Who is Julie?

A  She is the records clerk of the Eunice Police Department.

Q  Okay.  What do you recall about that conversation you had with Julie, apparently on April 29, 2019?

A  After reading this entry that she informed me that Ronnie was calling inquiring about his warrant, and it hadn't been processed yet.

Q  Okay.  Did Julie and you have any conversation about how Ronnie would have gained knowledge of that warrant?

A  We were pissed, how does a suspect know before we even finish a case that he's aware

Page 88

he's going to have a warrant coming down for his arrest?

Q  Did Julie have any theories as to how Ronnie gained that information?

A  According to my notes, she just said someone inside the police department had to tell him.

Q  Okay.

A  And by process of elimination, the only other -- that only people that would've known about said warrant was me, Officer Lee and the people who reviewed the paperwork in the mornings.

Q  And that would be the Chief, Ryan Young, Victor Fontenot, Harlan.
What is Harlan's last name?

A  I don't know, sir.

Q  Okay.  That would be those folks?

A  Yes, sir.

Q  Was there anybody else that could have been in the room during the same time period?

A  I'd have to look back at the employee roster.  I mean, we had other detectives during that time frame come and go, and I can't remember who all was during that specific time frame what other detectives were in service, or

Page 89

working with the police department.

Q How many detectives would y'all have had on staff at that time back in 2019?

A Oh, the most I ever -- I don't know about the time frame. But the most I ever knew, I think we had three detectives.

Q Okay.

A But generally there was just Ryan and one other detective the majority of the time. I know there was a young lady that worked back there for a while. I don't know if it's even during that time frame.

Q Could any other officers been in the room during that conversation?

A Could have any other officer been in the room? Yes. If I was working that day, the answer would be no. But if it was another shift working, then there's a possibility.

Q Okay. Continuing down that first paragraph of Bates Number 13, looks like you received a text from Ryan Young.

A Yes, sir, I see it.

Q Okay. What did that text say, if you recall?

A According to my notes, he just wanted me to call him.

Page 90

Q Do you still have that text exchange with Ryan Young?

A No, it was turned over to counsel.

Q Okay. Did Ryan call you or did you call him, do you remember?

A According to my notes, it said I called him and inquired.

Q By the time you spoke to Ryan Young, had you had any communication with Ronnie Fontenot about this incident?

A Me, personally, no. Best of my recollection, no.

Q Okay. Did you ever speak to Ronnie Fontenot about this incident?

A About this incident, as far as my recollection, no.

Q Okay. Tell me about the conversation you had with Ryan Young.

A Well, according to my notes that during the conversation -- I'll just have to read them verbatim because I don't recall word for word what took place.

I informed Lieutenant Young that someone told Ronnie about the warrant and recorded phone conversations -- or recorded

Page 91

conversation with Lieutenant Young stated something to the effect of I told him, I said you need -- probably need to get an attorney.

Q Okay. Let me go back to my understanding of your testimony last time was you said that Ronnie Fontenot called you because you were a little surprised and probably a little upset that he somehow acquired your cell phone number. Do you remember that now?

MS. LIU:
Objection to the form.

A I remember something along those lines, because my cell number has been passed out to people before.

BY MR. REED:

Q So as we sit here --

A And I blocked his ass.

Q As we sit here, do you remember if Ronnie Fontenot called you about this incident?

A Sitting here right now, I can't recall. I know he has called me and I blocked his number because I was mad because he had had my number. And that's a private number that's not supposed to be handed out to anybody.

Page 92

Q Okay. Do you recall one way or the other, as we sit here, whether you spoke to Ronnie Fontenot about this incident?

A I don't believe I spoke to him. If I did, I probably hung up on him. And I don't recall.

MR. REED:
Anybody got a highlighter I can borrow?

BY MR. REED:

Q I want to hand you the transcript from your original deposition. I'll hand it to counsel first.

A Okay.

Q I'm going to reference paragraph -- I'm sorry, page 187, but you can look at whatever you like. But I'll submit to you it's part of the testimony regarding Ronnie Fontenot the first time.

MS. LIU:
Are you going to mark this?

MR. REED:
Yes, we can.

A I don't recall it. I mean, it's -- I testified to it but I mean, it's been three years.

Michael Dunn - January 21, 2026

Page 93

BY MR. REED:

Q   Okay.  I wasn't planning to use this.  I don't have copies.

Can you read this paragraph starting, I signed?

A   Sure.  (As read:)  I signed off on the report, submitted it which was on --

You're talking just the highlighted portion, or what are you talking about?

Q   No, starting where it says, I signed, and just read that paragraph.

A   (As read:)  I signed off on the report, submitted it which was on Sunday afternoon.  Monday morning, I'm getting woke up by Ronnie Fontenot himself calling me wanting to know why we were filing for his warrants.  First thing I asked is, how in the hell did you get my phone number?

Q   Okay.  Does that refresh your recollection as to whether or not Ronnie Fontenot called you?

A   Yes, sir.

Q   Okay.  As we sit here today, do you now remember that conversations with Ronnie Fontenot?

A   Not in its entirety.

Page 94

Q   Okay.

A   As I stated before, it's been a few years.

Q   What do you remember about that conversation with Ronnie Fontenot?

A   What I just read.

Q   Okay.  When you spoke to him -- let me ask you.

What was your relationship with Ronnie Fontenot from before this particular issue?

A   Other than investigate him, I believe I arrested him for this incident before.

Q   Okay.  Is there any reason he would have had your cell phone?

A   No.

Q   Okay.  When he called you, did you get any explanation for how he got your cell phone?

A   Not to my recollection.  I'd have to review that.

Q   Okay.  When you spoke to Ronnie Fontenot, what did he mention about the warrant?

A   According to the highlighted portion, he wanted to know why I was filing a warrant for him.  Other than that, I do not recall.

Q   Okay.  And you were surprised he knew about the warrant?

Page 95

A   Yeah, it shocked me because I just -- I know I had just signed it or submitted it.  There was no way he should have known about that warrant prior to that early in the morning.

Q   During that conversation with Ronnie Fontenot, did you have any discussion about, hey, how did you learn about the warrant?

A   As I sit here right now, I don't recall.

Q   All right.  What happened next?  Did you get the text from Ryan Young after that or was it before the conversation with Ronnie Fontenot?

A   It'd have to be after, because I don't think they would call me that early in the morning to BS with me.

Q   Is it a safe conclusion that, at that point, you thought an officer or someone present in the room had tipped off Ronnie Fontenot about that warrant?

MS. LIU:

Objection to the form.

A   The people that would have been reviewing that paperwork that morning, yes, sir, someone in the room had to.

BY MR. REED:

Q   Okay.  If the someone that you think tipped

Page 96

Ronnie Fontenot off, if that someone was an officer, would that be a violation of internal policies and procedures?

A   I would believe so.

Q   Would that also be a crime?

A   Depending on what took place and the full context, I would think.

Q   Okay.

A   Because it could hinder an investigation if you tip people off that we're coming with a search warrant or an arrest warrant.  And, plus, that's an officer's safety issue if they know we're coming, I mean, they can get hurt.

Q   So at that point, you had concerns somebody had violated internal policies and procedures, correct?

MS. LIU:

Objection to the form.

A   Yeah.

BY MR. REED:

Q   Okay.  At that point, you had concerns somebody had potentially committed a crime, correct?

MS. LIU:

Page 97

Objection to the form.

A   That would be safe to assume, yes.

BY MR. REED:

Q   Okay.  Did you fill out a Critical Incident Report?

A   I don't remember if I did -- did a Critical Incident Form, I had mentioned it to somebody or not, or I was still trying to figure it out myself because I'm not just going to blame just anybody, I'm going to try to figure out who did it.  Because I can't fill out a Critical Incident Form unless I knew who committed the criminal violation or violation thereof.

So my answer would be, no, right now, I think that would be correct.

Q   Okay.  Did you advise any supervisor that you had these concerns?

A   I don't recall if I did or if I didn't.  But that same supervisor would have been in that same room that had got let out.

Q   If you let a supervisor know about your concerns, is that something important enough you would have put in your journal?

A   I would have --

Page 98

MS. LIU:

Objection to the form.

A   I would have put it in my journal.  And if, again, time lines, at a certain point, I stopped reporting because every time I report something, my life would get worse.  So I know there's a certain point in time, I don't know if it was during this time or not.  Because, like I said, it's been awhile.

BY MR. REED:

Q   Before you spoke to Ryan Young about this incident, did you activate any kind of recording device?

A   At that time, I think I was recording a lot of people because all of the stuff that had been transpiring.  I put a tap call.  I can't remember the name of the app.  It was an app I had paid for and put on my phone to whenever I received a phone call, I could record it.  Because we have a habit of people telling me things and saying that, oh, this didn't happen, or I didn't say that.  So I started recording everything to protect myself.

Q   The conversation you had with Ryan Young, the

Page 99

one about Ronnie Fontenot that you recorded, was that cell phone to cell phone, or just kind of explain, you know, what you were using, what he was using.

A   The app.  I was using an app.

Q   But you were using your cell phone?

A   Yes, sir.

Q   It was an app you put on your cell phone?

A   Correct.

Q   And what's the name of that?

A   I believe it was at tap call or a tap one, or something to that effect.  I'm trying to remember.  I remember they symbol was black with a red dot in the center.  And I had to pay for a monthly subscription.  I think it's tap something.  I don't recall.

Q   And you called Ryan Young's cell phone?

A   According to my notes, yeah, I called him because he told me to call him.

Q   What was your purpose in recording that conversation?

A   From the best of my recollection, at that time I didn't trust any of them after all the stuff that had been transpired.  I made sure I CYA'd my -- I covered my butt.

Page 100

Q   Okay.  But specific to that phone call, what was your purpose in recording it?

A   I recorded everything that had to do with the PD and people that was involved and I thought were targeting me, I got it recorded.

Q   Did you tell Ryan Young you were recording that conversation?

A   No.

Q   So you had suspicion that Ryan Young had either committed a policy violation and/or a crime and you recorded it, correct?

MS. LIU:

Objection to the form.

A   Someone did.  And yes, I did record it.

BY MR. REED:

Q   Okay.  And you did so without filling out a Critical Incident Report?

A   I don't recall.  I don't -- at that time, I don't think I would have filled one out prior to that conversation because I didn't know who had done it.

Q   So how is that not an informal investigation?

MS. LIU:

Objection to the form.

A   Informal investigation?  I seen that as

Page 101

trying to cover my ass because of what was going on inside the PD. I don't think I was trying to -- yeah, I wanted to know who was doing it to where I could report it or to turn it in. But technically --

BY MR. REED:

Q   The call that --

A   -- that would be, I guess so.

Q   The call, had your suspicions been realized, could have implicated Ryan Young in a crime --

A   Okay.

Q   -- you recorded him without his permission, without going through the chain of command. So how is that not an inappropriate informal investigation?

MS. LIU:

Objection to the form.

A   Inappropriate investigation. My understanding of Louisiana law, we're a one party consent state, I don't need another party's consent. Even though it violates department policy and procedure, the law trumps policy.

BY MR. REED:

Page 102

Q   Okay. So you're admitting you violated an internal policy and procedure at a minimum?

MS. LIU:

Objection to the form.

A   Yes. And I think I was investigated for it, too.

BY MR. REED:

Q   And what became of that investigation?

A   The way I just quoted it, it doesn't violate state law. Because if the law -- if something is unconstitutional, then a policy cannot be violated.

Q   Other than anything we've talked about so far, do you have any other information about who may have leaked the warrant to Ronnie Fontenot?

A   That warrant, no.

Q   You think it was somebody in the room at the time, correct, at the time the warrant was executed?

MS. LIU:

Objection to the form.

A   The warrant wasn't executed.

BY MR. REED:

Q   I'm sorry, I completely misspoke.

Page 103

You think it had to be one of the people in the room at the time you decided to submit the warrant, correct?

MS. LIU:

Objection to the form.

A   Correct. Because it hadn't made it to records yet and it hadn't been signed off on it or nothing, so.

BY MR. REED:

Q   Do you have any other evidence that would implicate any particular individual or individuals in that room?

A   Other than the recording, no.

Q   Other than what recording?

A   The recording listed in my notes.

Q   Are you talking about the one with Ryan Young?

A   Correct.

Q   All right. And what is it you contend Ryan Young said that may have implicated him?

A   Ryan Young stated something to the effect of I told him, I said you probably need to get an attorney.

Q   Okay. And did Ryan Young also indicate that was after Ronnie Fontenot reached out to him?

Page 104

A   I don't recall that part of the conversation.

Q   You don't remember one way or the other?

A   Sitting here today, no, sir, I don't. I don't recall.

Q   So the only thing that you can point to that you think may implicate Ryan Young is when he was contacted Ronnie Fontenot who said you might want to get an attorney?

MS. LIU:

Objection to the form.

A   I don't know if he was contacted by Ronnie Fontenot or not. I'm just going off of what my notes indicate that later that day, I received a text from Ryan Young advising me Ronnie Fontenot wanted me to call him. I then called Lieutenant Young.

BY MR. REED:

Q   So either way, what was represented to you was Ronnie Fontenot reached out to Ryan Young, correct?

MS. LIU:

Objection to the form.

A   I don't know if Ronnie reached out to him or not. I don't know who talked to who first. It says -- the message says that Ronnie

Michael Dunn - January 21, 2026

Page 105

wanted me to call him and implicating me to call Ronnie, I'm not going to do that.

BY MR. REED:

Q    Have you ever had any conversation with Ronnie Fontenot about how he learned about the warrant?

MS. LIU:

Objection to the form.

A    Not that I recall sitting here right now.

BY MR. REED:

Q    After your phone conversation with Ryan Young, did you take anymore steps in regard to this incident?

A    Obviously I wrote it down. Again, I think this is during the same time frame that they were, for lack of a better term, messing with me, coming after me trying to get whatever they could on me. So I would report it probably to an outside agency, because I knew Chief Fontenot wasn't doing nothing. From my understanding, he was orchestrating most of this stuff.

Q    You said you would have. Did you actually report the Ronnie Fontenot incident to any outside agency?

Page 106

A    Whatever agencies I turned my notes over to, they would have seen the same note that we're reading right here today. They would have seen the same note.

Q    Okay.

A    I wouldn't have just -- for that one incident, I probably wouldn't have reached out just for an outside agency.

Q    Okay. Going back to the Amended Complaint, paragraph 44.

A    Do you want to hand this back to the --

Q    Yes, please.

Paragraph 44 --

A    Give me one second.

Q    -- it says -- tell me when you're ready.

A    Hold on one second, Buddy. Okay. Do you want me to review it now, or --

Q    Yes. Sure.

A    (Witness complies.)

Okay.

Q    And basically, the assertion is that --

A    Give me one second, Buddy. I'm on the last two sentences. Okay.

Q    Allegation is Victor Fontenot and Ryan Young, quote, regularly hold arrestees in jail or

Page 107

their office for extended periods of time to coerce them into becoming confidential informants.

When do you believe that happened regarding Ryan Young? When do you think he coerced folks into becoming CIs?

A    I'd have to review my notes for the time line. But I know, I can't remember the gentleman's name, black male who was held in our jail for three or four days until they finally released him. That one sticks out in my mind.

Q    When did that happen?

A    That would be in my notes, because I would have recorded that. Because he was in our jail for so long, he would have to go -- if he was in our jail past 72 hours, he would have to go in front of a magistrate for any type of criminal charges, and he never did. And they released him later.

Q    And as we sit here today, you don't remember when it happened and you don't remember the name of the potential informant?

A    I would have written it down.

MR. STAMEY:

Page 108

Jason, would they be in these notes?

MR. REED:

What's that?

MR. STAMEY:

I'm asking you. Would they be in these notes? Do you want to hand him this?

MR. REED:

Yes.

BY MR. REED:

Q    Do you want to look at --

MR. REED:

What exhibit was that, Joe, do you remember?

MR. STAMEY:

I don't know the number. These are his diary notes.

BY MR. REED:

Q    I think it was Exhibit Number 2.

Would they be contained within Exhibit Number 2? Would it be that set of notes?

MS. LIU:

Objection. He'd have to read all of this. Can you point him to a page?

Michael Dunn - January 21, 2026

Page 109

A    Yeah, if you have a certain thing.

BY MR. REED:

Q    They're not my notes, so I'm not familiar with the page.

I'll say, I'll move on.  Mr. Stamey may have some questions about that.

But other than the one instance that you alluded to where you don't know the name of the potential CI, you don't know the date, is there any other instance involving Ryan Young where you think he coerced folks into becoming CIs?

A    From the best of my understanding, he was a supervisor and he was present for -- for all of it, that he was a part of narcotics, he was Victor's supervisor and they worked cases together.

Q    Can you give us any other examples where he was a supervisor, where folks were coerced in to becoming CIs?

A    It would be in my notes.

Q    But nothing you can think of as we sit here today?

A    No, sir.  As I said, it's been a long time, I don't recall certain people's names.

Page 110

Q    Let's go to paragraph 50.

A    Okay.

Q    And it looks like in sum and substance, the allegation there is that Chief Fontenot, in retaliation for efforts to curb the department's spending -- and I'm paraphrasing -- but encouraged officers to target Eunice Aldermen on suspicion of driving while under the influence of alcohol.

Is that basically the allegation?

A    Yeah.  And that should also, from my recollection, should also include the Mayor, because I know they wanted us to target him as well for intoxication leaving the bar at the Dugout.

Q    Okay.  Is that the current mayor?

A    Yes.  Chief -- sorry.

Q    Scott Fontenot?

A    Scott Fontenot.

Q    To your knowledge, were any arrests made of either the Mayor or the council person in connection with these allegations?

A    As far as I know, no.  Because me and my shift, after the comment was made that they would buy us a new Glock or give us a steak

Page 111

dinner if we arrested them when they were leaving a card came or something thereof, we -- we stayed the hell away from it.  We didn't have nothing to do with it.

Q    So the answer is, to your knowledge, no such arrest ever took place?

A    As far as I know, no.

Q    Go to paragraph --

A    And specifically, Ryan Young is the one that made the comment about buying us a new Glock if we did this.

Q    Yes, and you testified at length about that the first time so I don't have anymore questions about that.

A    Okay.

Q    Paragraph 56.

A    Also, something I want to add to that.  They also claimed that there were being narcotics sold out of his tint shop.

Q    I'm sorry, who claimed that?

A    If I remember correctly, it was both Ryan Young and Victor Fontenot was claiming they were -- either him or his employers are selling methamphetamines out of his tint shop.

Page 112

Q    And who is "him?"

A    Mayor Scott Fontenot.

Q    Paragraph 56 says on January 30th of 2019, you filed a report regarding officer's effort to facilitate the escape of a suspect.

And you talked about that in your first deposition so I don't want to get into it a whole lot.  But who was the suspect?  Remind me.

A    Can you give me one second to read it?

Q    Yes, sir.

A    (Witness reviews.)

The one that's coming to mind, it would have been Sonny's son.  What is Sonny's son's name?

Q    Arnold?

A    Oh, Jordan Arnold, thank you.

Q    My question, and hopefully I'll be pretty limited on this topic.

But what was Ryan Young's role in that, if anything?

A    My understanding or my recollection, he authorized, or Chief -- I apologize if I'm wrong.

It was either Chief or Ryan Young would

Page 113

have to authorize that type of operation because he was a patrolman at the time and he would not have the authority to do so.

Q  Who was the patrolman?

A  Victor Fontenot.

Q  As you sit here, you don't know whether it was the Chief, or Ryan Young, or who it was that may have authorized this task?

A  It's blurry right now.  It had to be one of the other.  I don't want to -- I don't want to give bad information.  I can't remember.  It's one or the other or both.

Q  Go to paragraph 85 --

A  85.

Q  -- just a few other mentions of Ryan Young.  Go ahead and review the whole thing, I know you will want to, but I have questions about the last sentence.

A  85, Okay.  (Witness complies.)  Okie-dokie.

Q  Read the last sentence into the record, that's the part I have questions about --

A  The last sentence.

Q  -- starting with Chief Fontenot and Lieutenant Young.

Page 114

A  All right.  It says, (As read)  In early 2022, not long after Lieutenant Dunn's return from medical leave, Chief Fontenot and Lieutenant Young were overheard at the department --

COURT REPORTER:
Excuse me.

A  Oh, I'm sorry.

COURT REPORTER:
Just read a little slower, yes.

A  Slow down.  I apologize.
Do you want me to start back over?

COURT REPORTER:
Yes, that would be good.

A  Okay.  All right.  (As read:)  In early 2022, not long after Lieutenant Dunn returned from medical leave, Chief Fontenot and Lieutenant Young were overheard at the department discussing whether Lieutenant Dunn had mental problems and whether he needed to do an investigation and get rid of him.

BY MR. REED:

Q  All right.  When it says "they were overheard," who overheard Chief Fontenot and Lieutenant Young having such a conversation?

Page 115

A  You'd have to refer to my notes.  I -- I know someone told me and I would have wrote it down because that's very specific, so I would have wrote it down.  Someone informed me of that.
And I believe, if I remember correctly, it's going to be somebody in the back hallway, if I remember correctly, somebody that had access to overhear the conversation.

Q  But as you sit here, you don't know who that person might be?

A  Not off the top of my head as I sit here right now, no.

Q  But just to follow-up on this.  Was -- to your knowledge, was there ever any kind of investigation that had to do with the possibility you had, quote, mental problems, end quote?

A  I mean, they wouldn't have informed me.  They didn't tell me about it.

Q  So you have no knowledge of any such investigation as we sit here?

A  I mean, there was so much they done, no.  I wouldn't -- I wouldn't know about that part.  At least I don't think I would.

Page 116

Q  All right.

A  Because I remember there was another piece of that that they were -- they were informing me that he was either ordered or he was following me around town to see what counselor service I was going to.

Q  Who is "he?"

A  Ryan Young.  That he was ordered to do it, if I remember correctly.

Q  And when did that take place?

A  That's going to be after I found out about the Joshua Dupre incident, I believe, so.

Q  What led you to believe Ryan Young was following you around town?

A  What I was told, that's --

Q  Told by whom?

A  Again, whoever it was, I can't remember who told me.  I would have wrote it down.

Q  So somebody told you that Ryan Young was following you around town, and that's not fresh in your recollection as to who would have told you that?

A  I mean, as best, this time line, that's years ago.  That's over, what, four years.
No, you said 85, so that says 2000... --

Michael Dunn - January 21, 2026

Page 117

late 2021, so four plus years. I mean --

Q    Let's go to paragraph 102, if you would review it.

A    102. 102. 102. (Witness complies.)
     Okay.

Q    All right. The part I want to ask you about towards the end, (As read:) Chief Fontenot then baselessly attempted to have Lieutenant Young arrest Lieutenant Dunn for malfeasance for refusing to speak with Louisiana State Police.
     Were you arrested by the -- in connection with that, were you -- strike that.
     Were you arrested by Lieutenant Dunn or anybody else in connection with that issue?

A    You're talking about Lieutenant Young? No, I was not arrested after I spoke to counsel about what took place, and they sent a letter. If I remember correctly, they sent a letter to them explaining why we didn't show up on a certain day for an investiga... -- or to cooperate with state police, because I wanted an attorney present.

Q    So you're saying your counsel sent a letter?

Page 118

A    If I remember correctly, or they called in by phone, one or the other. I know they told them that we were cooperating, but it had -- he had something going on in court or something, we were going to go on a different date.

Q    And after that was sent to who, to the police department, or who did that go to?

A    It would have went to the Chief of Police.

Q    Okay. After that letter was sent, was any action taken against you?

A    No, sir. As far as I know, no.

Q    Okay. Go to paragraph 112.

A    112.

Q    Tell me once you've reviewed it.

A    Okay. (Witness complies.)
     Okay.

Q    All right. The allegations there, to paraphrase, are basically that Young and Fontenot -- this would be Victor Fontenot -- stated to an employee of the Marshals office they planned to lie under oath at the hearing.
     First, what employee is that of the Marshals office?

Page 119

A    That would have been Deputy Jack Ardoin.

Q    Okay. And I've read his deposition. Basically he said that there was a statement that there's going to be a lot of I don't recalls. Other than that, what indication has Ardoin ever given, to your knowledge, that either Fontenot or Young said they were going to lie?

     MS. LIU:
          Objection to the form.

BY MR. REED:

Q    Let me ask you a better question.

A    Okay.

Q    Tell me any evidence you have or any basis for the notion that either Ryan Young or Victor Fontenot indicated they were going to lime at the hearing referenced in paragraph 112.

A    Best of my recollection, I was sitting in my office. Jack Ardoin -- wherever I was, Jack Ardoin came found me and told me what transpired.

Q    What did Jack Ardoin tell you?

A    What is stated in here, that they were going to lie to the Civil Service hearing.

Page 120

Q    That was his words?

A    That was his words, yes.

Q    Did you attend Jack Ardoin's deposition?

A    I'm wanting to say yes, because I know there was an issue brought up because he was riding with the Chief on the way -- ex-Chief on the way over here. I don't know if I was by zoom or not. But I remember that -- I don't know if I was present or zoom, I don't remember.

Q    Do you remember Jack Ardoin testifying that either Victor Fontenot or Ryan Young indicated they were, quote/unquote, going to lie, close quotes, at the hearing?

A    I don't recall. I think that was back in 2022, I think.

Q    Other than that assertion by Jack Ardoin, the one you just testified to, is there any other basis for your belief that either Victor or Ryan said they were going to lie at that hearing?

A    I believe that with everything else that was going on. I mean, everything else was going down in this same time frame, what was the basis and everything that's in here.

Q    But whether you believed it or not, was there

Michael Dunn - January 21, 2026

Page 121

any other evidence to that effect?

A   To that specific incident, I do not recall there being anything else.

Q   The hearing that's referenced, did that hearing ever even take place?

A   Let me --

Q   And if it helps, if you'll read the second half of the paragraph, it says, (As read:) Rather than proceed with the hearing, the City settled, and it goes on from there.

Does that refresh your recollection as to whether the hearing ever even took place?

A   Yeah, we didn't get to have an evidentiary hearing, it's just the appeal was granted, if I remember correctly.  Because I wanted an evidentiary hearing where we could get to the bottom of it, because I asked -- if I remember correctly, I think I turned in a Critical Incident wanting it investigated.  So I don't believe it was investigated due to the fact that it was settled.  I don't think there was an investigation into what Ryan or Victor, or anybody else, had said.  Because that would have been an open hearing.

Q   All right.

Page 122

A   And if I remember, the closing of that Civil Service hearing, even though I wanted an evidentiary hearing to see what happened, due to the fact that there was whatever had taken place, they granted -- either it was, it says appeal granted.  I don't know if that's exact determination, or terminology.  But basically, if there was any wrongdoing done and they could prove it before the case even went forward, then it would have been dismissed and we wouldn't have got a evidentiary hearing.  Because there was no point in having a hearing because something illegal or something had happened.

Q   All right.  Just, I'm getting towards the end of my questioning.

A   Okay.

Q   But one thing that I glossed over earlier is there's a bunch of testimony about you being removed from the K-9 program the first time you were deposed.  And my question is, would Ryan Young have the ability to remove you from the K-9 program?

A   He was the Chief's right-hand man.  So if anything he said, it would have been said to

Page 123

the Chief.

So as having the physical ability to remove it, no.  But being able to convince another to do it, then he would have had -- he would have had the chance or the opportunity.

Q   So he --

A   But he wouldn't have the power, the authority to have it removed from me because we're the same rank.

Q   All right.  To the extent from which you were moved from narcotics or disallowed from investigating narcotics, would Ryan Young have any ability to make that change?

A   It would be the same statement I stated earlier.

Q   So he could recommend, but he doesn't have the authority to change that, correct?

A   Correct.  That would be the only thing he could do.

Q   I just have a few questions about your Initial Disclosures.

A   Do you want me to hand this to her?

Q   What's that?

A   Do you want me to hand this to her?

Page 124

Q   Yes, please.

I'm trying to find the exhibits which are buried in my stack of paperwork.  I may have used the last one.

MR. REED:

Do you know what exhibit we're on, Madame Court Reporter?

MR. DOHERTY:

Jason, while you're doing the administrative matters here, can we get some clarification of whether the excerpt from the first deposition that y'all referenced was actually admitted as an exhibit?  And if so, what exhibit number.

MR. REED:

I think I failed to do so.

Do y'all want to do the whole deposition, because I think there was just a particular page I referenced.  Okay.

Yes, it was contained within page 187.  So absent objection, we'll just attach page 187, the first deposition, as opposed to the whole thing.

Page 125

MR. STAMEY:

That's fine.

MS. LIU:

Or you can just read out the citation.

MR. REED:

Yes, that's fine with me.

MR. HEBERT:

Either way is fine with me.

MR. REED:

So this would be the first deposition of Michael Dunn, taken January 6 of 2023. And just by reference, it's page 187 was the only thing I questioned him about.

MS. LIU:

And it was, you highlighted lines 11 to 17.

MR. REED:

Yes. Thank you.

I just have a few questions about your Initial Disclosures, which we will make this Exhibit Number 5.

(Exhibit Number 5 Entered Into Evidence)

A All of this here (indicating)?

Page 126

BY MR. REED:

Q I'm sorry, pass those out, if you don't mind.

I'm looking at the witnesses that either you or your attorney identified. Have you seen this document before, to your knowledge?

A I'm sure I would have looked over it however long ago.

Q Okay. There's a few folks here who have not yet been deposed, unless I'm missing something, which is very possible. But one of them is Jeremy Ivory, and you've mentioned his name a couple of times. But who is Jeremy Ivory?

A He is currently the Deputy Chief.

Q What do you think Jeremy Ivory might know relative to the allegations of your lawsuit?

MS. LIU:

Objection to the form.

A The way he was treated, the same type of MO was used against him to have him busted down in rank, which he won his Civil Service case and got his rank back. He'd been privy to other conversation. I remember there was one about the K-9. I can't recall what it was, but he was privy to one of the K-9

Page 127

conversations, about the K-9 program.

What else? He would have known about certain of us being targeted because it wasn't just him. I think four, and a couple other people were involved in that.

What else? What else? What else was he involved in? He would have been close -- I mean, the only other thing I can think of off the top of my head, he would have been closer to these individuals because he's best friends with Ryan Young. He probably would have been privy to some conversations.

And I know he's told me stuff, but I can't recall it right now off the top of my head. And if he would have told me something, I would have wrote it down of whatever took place, I would have written it down.

Q Who is Joshua Courville?

A Joshua Courville was a patrolman assigned to me at one point in time. I think he did a short stint in detectives and I think he went back to the road, and then went to St. Landry Parish Sheriff's Office.

Q Is that where he is currently?

Page 128

A No.

Q Where is he now, do you know?

A I haven't talked to him in --

Q What do you think --

A -- a couple of years.

Q What do you think he might know about the allegations at issue?

MS. LIU:

Objection to the form.

A Things he witnesses. I remember he made comments about illegal searches. And he probably would know some stuff about the CI stuff because he was in detectives for a while. If I remember correctly, he got out because of the stuff he was seeing back there, he didn't agree with.

BY MR. REED:

Q Okay.

A What else he would have recalled? I know there were some things he witnessed. I mean, I can't tell you what they are, I would have wrote them down.

Q All right. I'm just going to streamline it.

Who is Sebastian Noel?

A Sebastian Noel is a school resource officer

Michael Dunn - January 21, 2026

Page 129

at this time.

Q   Was she an -- at any point, was she an employee of the Eunice Police Department?

A   Sebastian, he's still there.  He's been there, what, 19 -- no.  Yeah, I think 19 years now.

Q   Okay.  What do you think Sebastian Noel might know?

MS. LIU:

Objection to the form.

A   I'm trying to remember if he was in detectives or juvenile officer at that time.  I wrote him down for a reason.  Whatever that reason was, I would have noted it.

BY MR. REED:

Q   Who is A.J. Frank?

A   A.J. Frank was a detective with us for a while, they then -- I know he had a write-up coming, or a Critical Incident Form coming against him, they told him he needed to quit instead of being investigated.  I think he went to Basile PD.  I think that's where he still currently works.

Q   Okay.  Who is Austin Doucet?

A   Austin Doucet was a patrolman assigned to my

Page 130

shift.  I know there was something he seen or heard, he told me about it and I wrote it down.

Q   Don't know what it as we sit here?

A   Again, it's been several years.  I'd have to review my notes, the entirety of them to tell you what it was.

Q   Who is Nichole Dupre?

A   Nichole Dupre is a jailer at the Eunice Police Department.

Q   Who is Grant Clancy?

A   Grant Clancy, he -- I don't believe he was assigned to my shift.  He was a patrolman.  And now I think he went to Broussard.  Then from Broussard to Lafayette PD.  I believe that's where he still works, last time I talked to him.

Q   Okay.  I'm just going to skip around.  I have a few other things, it'll be kind of out of order.

A   Okay.  Okay.

Q   But you said for an extended period of time that you recorded all telephone calls; is that correct?

MS. LIU:

Page 131

Objection to the form.

A   If it involved the defendants and what was going on, the police department personnel, yes.

BY MR. REED:

Q   Okay.  And that would include conversations with other law enforcement officers?

A   If I activated the app, then yes.

Q   Okay.  Do you still maintain those recordings?

A   I turned everything over.

Q   Did you ever -- well, let me ask you.  You said if you activated the app.  Was it on a case by case basis, or would you always activate the app for conversations with other law enforcement officers?

A   No, I wouldn't activate it all the time.  It was the ones that were targeting me that specifically I made sure I recorded those, because I -- they got -- I got tired of they saying a conversation didn't happen, so that's why I started recording.

Q   And those recordings you still maintain or did you give them to counsel?

A   I gave them all to counsel.

Page 132

Q   During what time period were you making those recordings?

A   You'd have to take -- check the date on the last one that I submitted that was turned over to counsel.  I don't recall the exact date.  Because they would have been time stamped, date and time stamped on each recording.

Q   One of the claims you're making is for legal fees in connection with the ACLU lawsuit.  Is that accurate, you're claiming attorney's fees?

A   Is that privileged or can I answer that?  I don't know.  I honestly don't know.

MR. HEBERT:

It's in the lawsuit.

MS. LIU:

You can answer to the best of your ability.

MR. REED:

Yes, the lawsuit speaks for itself.

MS. LIU:

But not what we talked about.

A   It's listed in there.

Michael Dunn - January 21, 2026

Page 133

BY MR. REED:

Q   Okay.  Do you have a contract or any kind of written agreement with your attorneys?

MS. LIU:

Objection.  Objection to the form.

A   I would assume so, yes.

BY MR. REED:

Q   Do you know one way or the other?

A   I would have had to sign something for legal representation, that's how it worked for every attorney I've ever had.  So it would be some type of document.

Q   Okay.  Do you have any recollection of the specifics of the documents you have with your current law firm?

MS. LIU:

Don't talk about -- Objection.  Privileged.  Don't talk about the substance of what is in the engagement letter.

A   Could you repeat your question?

MR. REED:

Are you instructing him not to answer?

MS. LIU:

Page 134

Yes, as to the substance.

BY MR. REED:

Q   The agreement you have with your current attorneys, is there an agreement to pay your attorneys on an hourly basis, on a contingency fee basis, do you know?

A   Kearney is not here to answer with his stuff.  I know last time the question similar was asked to me, he told me not to answer that question.  But that was Kearney.  I don't know about with y'all (indicating).  I don't know.

MS. LIU:

Yes.

MR. REED:

You're instructing him not to answer?

MS. LIU:

Well, I mean, we're pro bono, obviously, so, that's all.

MR. STAMEY:

I'm sorry, say that again.

MS. LIU:

We're pro bono.  That's all we can say.

Page 135

MR. REED:

Okay.

MR. STAMEY:

Is that a stipulation that y'all are handling this on a pro bono basis?

MS. LIU:

We are pro bono counsel, yes.

MR. STAMEY:

Okay.  Thank you.

BY MR. REED:

Q   Is there any agreement for you to pay, in connection with the ACLU lawsuit, to pay any hourly rate to any law firm?

A   Not that I'm aware of.

Q   Okay.  Is there any agreement with any law firm in the event of financial recovery by you that that particular law firm will receive any part of that recovery?

MS. LIU:

Objection.  To the extent it touches on anything in our engagement letter, I would instruct you not to answer.

A   I'd have to refer -- again, he's not here today, I don't know why, but he told me not

Page 136

to answer a similar question last time I was here.

BY MR. REED:

Q   And that's specific to the Dunn 1 lawsuit?

A   If it was monetary or whatever, financial or stuff, he told me not -- instructed me not to answer last time he was here.

Q   Okay.  Setting aside --

A   I believe it was that gentleman (indicating) who had asked me that question, I think.

Q   Yes.

Setting aside any agreement with Kearney for the ACLU lawsuit, is there any agreement any law firm will recoup a portion of any monies you may recover?

MS. LIU:

Objection.  Same objection.  I would instruct him not to answer as to the terms of our engagement.

BY MR. REED:

Q   Has any third party, to your knowledge, paid any portion of your attorney's fees?

A   I don't know.

Q   Have you received any invoices or bills for any attorney's fees in connection with either

Michael Dunn - January 21, 2026

Page 137

of these two lawsuits?

A  No, I do not believe so.  I don't recall anything, ever getting anything like that.

Q  Okay.  How many depositions have you attended, either in person or by zoom, in this matter?

A  Including me sitting here today?

Q  Well, setting aside your personal depositions.

A  Victor's.  I don't know if it was by zoom or not with Jack Ardoin.

Q  Victor's was in person?

A  I believe, yeah, because I remember him getting upset and pushing his chair or something.  So yes, I was in person for that one.

Honestly, I stopped listening to them because it -- it hurt to hear some of the stuff that was being said, so I just stopped altogether.  I don't know the last one I listened to.  I just stopped listening to this stuff.  I stopped coming because I'm tired of hearing people, their -- some of them are just flat out lies, I just got tired of hearing it.  I don't want nothing to do

Page 138

with it anymore.

Q  To the extent that you participated or observed some of the depositions on zoom, were any of those depositions during your time at work for the Eunice Police Department?

A  While I was on duty?

Q  Yes.

A  I had it playing on audio while I was driving around.  I know I did that one day, but then I turned it off because I got upset because of so much crap I was hearing, so I just turned it off.

Q  How many --

MR. HEBERT:
I apologize, you had it playing on the what?

A  The audio.  I wasn't watching it, I was just listening to it as I was driving around.

MR. HEBERT:
All right.  Thank you.

A  Okay.

BY MR. REED:

Q  How many depositions did you listen to on zoom while you were on the clock for the

Page 139

Eunice PD?

A  Other than the one that I'm referencing right now, that's the only one that comes to mind.  I think I listened to it until about noon, if I remember correctly.

Q  And which deposition was that?  You may have said.

A  I'm not sure.

Q  Okay.  You've issued various Public Records Requests in connection with some of your allegations; is that correct?

A  Yes.

Q  Okay.  Other than Public Records Requests, have you informally gathered any documents from either the City of Eunice, or the Eunice Police Department, to utilize in support of your prosecution of this case?

MS. LIU:
Objection to the form.

A  I believe that answer would be yes.  I mean, you have to give me specific which one you're talking about, but I know I've gathered information.

BY MR. REED:

Q  Okay.  What have you done on an informal

Page 140

basis to gather information for prosecution of this case?

MS. LIU:
Objection to the form.

A  I know there was a police report.  Just whatever I've turned over.  To answer your question, whatever I've turned over for those documents, formal documents.

BY MR. REED:

Q  Any idea how much time you spent gathering documents for prosecution of this case?

A  No, sir.

Q  Any idea how much time you spent on the clock gathering documents for prosecution of this case?

A  I mean, if I knew about something happening while I was at work, I would have documented it or looked it up, but generally what I did was when I was off.  So I know I would have -- if something would have happened, I would have wrote it down or researched it right then and there as soon as I heard about it.  But if I would have been typing notes or something like that, I wouldn't have been doing it on the clock.  I'm sure I have, but

Michael Dunn - January 21, 2026

Page 141

I don't know how much.

Q    No estimate of how much time you spent on the clock doing those activities?

A    No.  And as I stated, if I would have heard something or something had taken place, I would have looked it up or researched it to validate that it was either valid or not valid, and I would have moved on.  And I would have wrote a note and I would've went back and did it when I had time.

Q    Okay.

MR. REED:

I may have a few more questions, but at this point, I'll pass the witness.

Do y'all want to take a little break?

(LUNCH BREAK TAKEN)

EXAMINATION

BY MR. STAMEY:

Q    Lieutenant Dunn, I'm Joe Stamey.  We're on the record again and continuing with your deposition which began earlier today.

I will likewise be asking you some questions.  If you have any issues with the

Page 142

question I ask or the way I phrased the question to you, stop me and let me know and I'll be happy to repeat it.  I want to be sure we're singing off the same sheet of music.  Okay?

A    Yes, sir.

Q    If I ask you a question and you proceed to answer it, I'm going to assume you understood me and answered accordingly.  Okay?

You understand, of course, at the completion of this, you are going to be given a copy of the transcript.  You're going to go through the same process you went through before, you get to review it and make sure that you can note any of your concerns, including spelling even with regard to that transcript, before it becomes official.  But you have limited time to do that.  Coordinate that please with the Court Reporter.  All right?

A    Okay.

Q    Okay.  A couple of initial questions are kind of general in nature.

As a Eunice Police Officer, how many encounters do you usually have with the

Page 143

public on an annual basis?

MS. LIU:

Objection to the form.

A    I don't know how to qualify that.  I mean, it's daily, hourly.

BY MR. STAMEY:

Q    Okay.

A    It's a lot.

Q    Over the course of a year, hundreds of encounters.  Would you agree with that?

A    If not more.  I mean, it's a lot.

Q    It could be thousands?

A    Depends on call volume, depends on what's going on, how many contacts happen a day.

Q    Okay.  The City of Eunice has had its challenges with drug problems in its town, have they not?

MS. LIU:

Objection to the form.

A    Yes, sir.

BY MR. STAMEY:

Q    You consider it a serious problem in Eunice with regard to the drug problems?

A    Yes, sir.

Q    You also have gang activity in Eunice?

Page 144

MS. LIU:

Objection to the form.

A    I'm not too sure about anymore.  I know specifically from around '16 to about '18 or '19ish, we had some juvenile gangs and some of that stuff, because I know I investigated a couple of them myself.

BY MR. STAMEY:

Q    Certainly during the course of this -- of your concerns, if you will, which you have made known to us and to the City, those gangs were actively in business, if you will, during those time periods, 2016, 2019 or so as you indicated, correct?

A    If I --

MS. LIU:

Objection to the form.

A    If I had my time line right, I believe that to be so.

BY MR. STAMEY:

Q    Okay.  Do you consider these circumstances with the challenges with drug, drugs and gangs in Eunice to be dangerous activities for a police officer to have to encounter?

A    My personal opinion, I mean, I would agree

Michael Dunn - January 21, 2026

Page 145

with you.  But I mean, it's pretty much everything we do has a tendency to have -- domestics --

Q   Is there a heightened level of dangerousness, if you will, or concerns when dealing with drug claims or drug crimes?

A   Sounds fair.  Fair characterization.

Q   All right.  Along with these encounters that you have with the public, how many resulted in actual formal investigation into possible criminal activity?

MS. LIU:
        Objection to the form.

BY MR. STAMEY:

Q   And I'm talking about over the course of a year, for example.

MS. LIU:
        Same objection.

BY MR. STAMEY:

Q   Sure.

A   Again, depends on sometimes the circumstances.  I mean, it depends on what contacts I have, the investigation.  I can't put a number on it.

Q   Again, it was a significant problem in

Page 146

Eunice, particularly during the years 2016 through 2020?

A   I believe it still is.

Q   Okay.  Very good.
        And in connection with those encounters involving investigations of potential criminal activities, you would agree that this was a frequent issue, particularly involving drug incidents or even gang activity for a period of time.

MS. LIU:
        Objection to the form.

A   You're just talking about numbers.  I know I was -- I think I was averaging one to two search warrants every two to three weeks of raiding of houses and I was doing it by myself.

BY MR. STAMEY:

Q   Okay.

A   So I don't remember the exact --

MR. REED:
        Mr. Dunn, now that I've moved down here, it's a little hard to hear you.
        Can you speak up just a little bit?

A   Yes, sir.

Page 147

BY MR. STAMEY:

Q   Of those hundreds of encounters that led to investigations over the course of a year, did many of those then result in a formal arrest of these individuals --

MS. LIU:
        Objection to the form.

BY MR. STAMEY:

Q   -- in which criminal activity was set forth in a formal charge?

A   I can just refer to me.  I mean, I know I was in charge of the investigatory team for -- shoot, I'm trying to remember what year it was -- I want to say 2016, maybe 2017.  And I think we made 108 arrests within 45 days.  I mean, that was -- but that was specifically targeted towards gang activity and narcotics.  Other than that, I can't really give you a number.  The only reason why it sticks out in my head because we had a pretty decent investigatory team.

Q   Okay.  Let me show you what has been -- well, first of all, let me show you these series of documents.  These are documents that you submitted to the City Council of the Town of

Page 148

Eunice, or the City of Eunice, on or about July -- in July of 2021 or 2020; is that correct?

A   I don't know the exact date.  I'll have to refer to you.

Q   Okay.

A   I see the date that's written on here.  But I remember presenting it to the Mayor in a, I believe it was a black binder that big, and I handed it to him during a council meeting.

Q   Okay.

A   I didn't go through them all yet.

Q   No, no, I understand.

A   Okay.

Q   I just wanted to -- this is a document that was --

A   I recognize the first page.

Q   -- produced to us.
        And that's your signature on -- those were signatures contained?

A   Yes, that's my signature.

Q   Those are your signatures?

A   Yes.

Q   These is a document, a series of documents that has previously been identified in your

Page 149

earlier deposition testimony.

My question is: For example, let's take this one which is part of the series of these records.

On the very first line, first sentence of that paragraph, it's got a number for the incident report.

MS. LIU:

Are you going to mark this as an exhibit?

MR. STAMEY:

I'm just asking in general right now, this part of this.

MS. LIU:

Just for the record, we're looking at Bates Number 3598.

A    Say again your question, I apologize.

BY MR. STAMEY:

Q    Yes.

There's an incident report number. What -- that number, would you break down what that number means?

A    You're talking about this one right here (indicating) --

Q    Yes.

Page 150

A    -- 0619-8960, correct?

Q    Okay. Yes, sir.

A    That would be one of the reporting systems we was using during that time. I don't remember which reporting system this is because we switched three, four times.

Q    Does that first series of four numbers, does that refer to a month and day, or day and month in that order? I may have it backwards, it may be month and day.

A    No, I'm trying to recall. I know it's significant to it and I'm trying to remember why, because we haven't used that system in awhile.

I would -- I believe what you said is correct, it refers to a month. And it might by year instead of a date. I think that's a year.

Q    Okay.

A    Where is says 19, I think it's a year.

Q    Fair enough.

A    I think.

Q    Okay. So for example, 0619, that would refer to a report prepared June of 2019?

A    If my memory serves me correct, that would be

Page 151

correct.

Q    Okay. And then the next four numbers in that example, what are those numbers? What is the significance of those numbers?

A    I believe that would just be the sequence of it at that time. So I'm just guessing. We would have started with -- your first four numbers is, if I remember correctly, is going to be your month and year. Your next four is just how many reports have been generated or how many things have been done since that system was enacted.

So if I had to -- if I remember correctly, so that would be report number 8,960, or incidents, I believe.

Q    That was my understanding. I just wanted to make sure you and I were on the same page.

So literally going back to an earlier incident report that you have referenced, if it mentions, for example, a date in '17 -- well, let me give you this one.

Again, just trying to just strictly looking at the -- my interest is confirming how we keep up with our reports.

MS. LIU:

Page 152

Now we're looking at Bates Number 3626.

BY MR. STAMEY:

Q    Yes.

In the middle of the page, there's another incident report number.

A    If we're reading the same one, you're talking about 0519-8805.

Q    Yes, sir.

A    So that would be not June. I'm having a brain fart. It would be the month before June. I'm just -- May. Yes, May.

Q    Okay.

A    So that would be May of 2019, and that would be report 8,805.

Q    Got it.

So literally one way for us to find out about the frequency of incidents in town is to look at these numbers and see how they've grown from when you first maybe began your work as an officer leading up to another given specific point in time. And we can kind of subtract out the two to see how many events have resulted in a formal report.

MS. LIU:

Page 153

Objection to the form.

A   Yes and no.

BY MR. STAMEY:

Q   Why no?

A   The no would be if I'm investiga... -- let's say a case was turned over to me and another officer started it, it would not generate under, let's say my name.  It would still under their name, unless I would have done a supplemental or I would have done something else to it.

Because going back to the juvenile gang stuff, most of the cases that I was investigating were generated by other officers and I compiled them, did my investigation.

Q   Okay.  But in the one you just looked at, the 0519-8805, that does refer not to anything regarding you in those number sequences, that's a number assigned to that incident by the City of Eunice, correct?

A   (No response.)

Q   You don't have a special number just for your incidents, correct, that you investigate, that identifies you personally in that report

Page 154

number.

A   (No response.)

Q   Your badge number is not on that report or anything of that nature, correct?

A   If I would have generated it.

Q   Does that number have anything to do with any identification of your personally?

A   I wouldn't know unless I read the case.

Q   Fair enough.

The bottom line is, you have a significant number of interactions, incidents that are investigated, and then incidents that result in formal criminal charges being made throughout the City of Eunice every year, do you not?

MS. LIU:

Objection to the form.

A   Some of them don't -- just to answer your question, not all of them result in a formal arrest.  I mean, if we generate a report and there's not enough evidence to proceed forward but we still did a report, if that answers your question.

BY MR. STAMEY:

Q   I understand.

Page 155

But still, we're talking about a significant number of incidents, not just by you but by all the officers each year, correct?

MS. LIU:

Objection to the form.

A   You're talking about the 8,000 number, then that would be how many reports are generated.  So yes, that would -- it might not be a significant number depending on what the -- what the cases were.

BY MR. STAMEY:

Q   Okay.

A   There should be a way to break it down, I think, to individual stuff.

Q   Well, that's my point.

A   Oh, okay.

Q   We can literally take -- if someone wants to do the specific research, they can take that number and give us a report on an annual basis for exactly how many incidents are assigned report numbers to each year; isn't that true?

A   Okay.

Q   Correct?

Page 156

A   I believe that to be correct, yes.

Q   Okay.  Do you keep up or do you know if the City of Eunice keeps up with any crime statistics for the City of Eunice?

A   I believe so.

Q   And who is the person responsible for preparing that information?

MS. LIU:

Objection to the form.

A   I would just have to assume.  I would think records.

BY MR. STAMEY:

Q   Okay.  Do you have anything to do with the preparation of annual crime statistics in the City of Eunice?

A   I did at one point in time to specific things that were being asked, but not for the totality, no.  I think the answer would be no.  But I know I did help with statistics before, I just don't remember exactly what.

Q   Okay.  You haven't kept up with that information beyond just whatever you were asked to do for types of crimes, is that what you're telling me?

A   If I was asked to research something, then

Michael Dunn - January 21, 2026

Page 157

yeah.

Q    Okay.  With regard to investigations that you've conducted, and I don't want to tread back over too much that Jason just asked you about.  But you have produced documents, have you not, to your attorneys from the City of Eunice Police Department?

A    If you're referring to police reports, electronic ones, yes.

Q    Is that correct?

A    Uh-huh (yes).

Q    Have you prepared or able to prepare a list of all City of Eunice records which you have submitted to your attorneys over the years?

MS. LIU:
Objection to the form and to the extent it touches on any conversations with counsel, I would instruct you not to answer.

BY MR. STAMEY:

Q    Oh, I'm just interested in information that should have been referenced in your Initial Disclosures anyway.  So how do I get that?

MS. LIU:
You're welcome to ask your

Page 158

questions.

BY MR. STAMEY:

Q    Okay.  So with regard to a list -- I mean, we'll say -- call it a list now, a listing of all of the records you produced to your counsel since the beginning of your relationship with your counsel, do you keep a record of those submissions?

A    I've turned --

MS. LIU:
Objection.

A    I turned everything I have over to them.

BY MR. STAMEY:

Q    Okay.  Have you been requested specifically -- I don't want to know what you were asked specifically to produce.  But have you had specific requests from your counsel to provide them with certain records from the City of Eunice Police Department?

MS. LIU:
Objection to the form.  I would instruct you not to answer based on privilege.

BY MR. STAMEY:

Q    Just asking if the request has been made, not

Page 159

what's in the records.

MS. LIU:
Objection.  I think that touches on discussions with counsel.  I would instruct you not to answer.

MR. STAMEY:
I'm trying to determine if he's conducted his own investigation outside of proper discovery to produce documents from the City of Eunice.

MS. LIU:
Well, your question was, have you had specific requests from counsel.  That touches on privileged communications.  So if you want to ask another question.

BY MR. REED:

Q    Well, let me ask you very specifically.  Have you produced records to your counsel that involve City of Eunice police records that you were asked to produce?

MS. LIU:
That you were asked to produce by the defendants, is that what you're getting at?

Page 160

MR. STAMEY:
Asked to produce.  Trying to see what he's compiled or collected.

MS. LIU:
Again the same instruction.  If it involves any communications with counsel, do not answer that question.

BY MR. STAMEY:

Q    Have you compiled or collected any records of the City of Eunice Police Department which you have accumulated for purposes of use in any of your lawsuits?

A    I wasn't collecting them for the purposes of a lawsuit.  I was collecting them for purposes of protecting myself and making sure files didn't disappear.

Q    Did you submit those records to your counsel?

A    Records that I did collect were turned over to counsel.

Q    All of them; is that correct?

A    Yes, sir.  I apologize.  Yes, sir.

Q    Okay.  So during the course of your investigations, have you produced additional records that you were asked to submit by your attorneys that constituted City of Eunice

Page 161

Police Department records?

MS. LIU:

Objection to privilege.

Instructing you not to answer.

MR. STAMEY:

I'm trying to determine if there have been any actions taken by Officer Dunn to obtain records outside of the normal and proper discovery process.

And if you would like to answer that question instead, I'll be happy to let you answer.

MS. LIU:

I'm not the one being deposed here. I'm trying to protect privilege.

MR. STAMEY:

Okay. Then I need an answer. Are you instructing him not to answer?

MS. LIU:

I'm instructing him not to answer based on privilege.

MR. STAMEY:

Very good. We'll make note and take appropriate action.

BY MR. STAMEY:

Page 162

Q    Did you acquire any of these records as part of a formal investigation that you were asked to conduct by anyone associated, that would constitute a supervisor with the City of Eunice Police Department?

A    As I stated earlier, I collected these files to protect myself and from them disappearing. I have tended to go to my supervisors and they have screwed me over and tried to go after me. So I kept stuff from disappearing and stuff that would protect me.

Q    Okay. Can you give me a list of all records that you believe have disappeared but for the fact that you kept a copy of it?

A    Everything I have was turned over to counsel.

Q    Okay. I'm just asking you as we speak right now. You just said you were concerned that something might go up missing -- come up missing, that's why you had to make copies or obtain copies.

So I'm asking you now, can you identify for me any records that were actually found to be missing and that you literally have the only copy of that document?

A    I wasn't the one that had the copy of it. It

Page 163

would be Shane Larson, he did give deposition testimony over that document because it's went missing two to three times with the DA's copy. It's a DUI arrest, I believe, that he kept a copy of that one.

Q    Anything else?

A    Not that I have in my custody. Everything was turned over.

Q    In connection with any recordings that you made of any other person, officer or otherwise, associated with the City of Eunice Police Department, did you conduct those or make those recordings with the approval of any of your supervisors?

A    As I again stated, state law says I don't have to have their permission.

Q    No, no. I'm asking you if you were doing that with the permission, first of all, of any supervisor with the City of Eunice Police Department.

You can explain your answer if you wish, but I just need to know yes or no. Did you record any conversations with the specific approval or knowledge of any of your supervisors with the City of Eunice Police

Page 164

Department?

A    No.

Q    What was the purpose of you making these recordings of other officers?

A    As I stated earlier, we have people that have changed their testimony, have changed what they said. And during that time frame, they were also changing what they said or did not say to me, so I recorded to cover -- to cover my ass.

Q    Okay. Did you ever submit information associated with those recordings, or your investigation of those in connection with those recordings, to any supervisor with the City of Eunice?

A    Well, I disagree with the characterization of investigation. I'm trying to protect my own ass.

Q    Did you ever submit the information, including the recordings or any of part of the recordings, to anyone associated with the City of Eunice Police Department?

A    If I turned them over to them?

Q    Yes, sir.

A    I know I made a comment about it. I don't

Michael Dunn - January 21, 2026

Page 165

know if I ever turned it over.  Because, again, it's the same thing, every time I complained about something, it would get turned against me.

Q  Okay.

A  So I don't -- I don't recall who I gave it -- if I gave it to anyone.

Q  Do you deny that you ever provided any recorded information to anyone else with the City of Eunice Police Department?

MS. LIU:
Objection to the form of the question.

A  I believe there was one, I believe I let the Mayor listen to it.  One -- it was a recording of something.  I can't remember exactly what it was.  You'll have to give me a minute, but I could have swore I let him listen to one of them.

BY MR. STAMEY:

Q  What was your purpose of letting the Mayor listen to it?

A  Where he could see what the hell was going on inside the police department.

Q  Did you -- so you submitted it to the Mayor,

Page 166

not to protect yourself, but just to let the Mayor know what was going on?

A  I was trying to record it to somebody to try to fix what was going on.  I know I let him listen to it.  Did I give him a copy of it? I don't think I did.

Q  So some of the recordings you made was to try to, as you just said, fix things that were going on; is that correct?

A  Yeah.

Q  Okay.

A  That's been my whole purpose.

Q  All right.  So this -- if you don't call it an investigation, what would you call it?

A  CYA.  They're trying to get me, so I'm going to make sure I cover my butt.

Q  But then you used it, did you not?

MS. LIU:
Objection to the form.

A  When no one else would listen to me, no one else would help me, then I did what I had to do to protect myself because they were trying to fire me or have me arrested.

BY MR. STAMEY:

Q  All right.  Have you submitted any of these

Page 167

recordings to any other agency or to any other -- or to anyone associated with this lawsuit?

MS. LIU:
Objection to the form.

BY MR. STAMEY:

Q  Let's break it down.
Have you submitted any of the recordings or the information contained in those recordings to any other agency?

A  I do not believe I gave them a copy.  I told them that I had it if they were actually going to do an investigation.

Q  Did you reference anything about this recorded information to anyone associated with the FBI?

A  Yes.

Q  Did you -- did you provide any information associated with these recordings or reference any of that information to anyone associated with the state police?

A  I remember I gave one of them a jump drive.  If they had recordings on it, I don't recall.  I just know I gave them a jump drive with the information because they came to my house.

Page 168

Now, with state police -- I'm sorry, I was just trying to clarify something.

Q  That's okay.

A  But with state police, they wouldn't give me a time or date, so I wouldn't have -- I don't think I gave them anything.

Q  Okay.

A  They refused to talk to me.

Q  Did you submit anything associated with any of the recordings you made of any other officer with the City of Eunice Police Department to anyone with the sheriff of St. Landry Parish?

A  I know I was talking to the Sheriff Bobby Guidroz, and there was something he seen.  We was going through some notes and stuff of what I had.  And he was talking about things he heard was illegal and he was going to do an investigation and requested -- requested. I don't know what all he copied or what he'd done, but he did have the jump drives.  So I don't know what all he copied.  Because he was going to get with the district attorney's office to do an informal investigation because he had heard about the corruption and

Page 169

knew about certain facts.

Do I remember what these certain facts were? He mentioned them, I don't recall. I just remember the conversation we had in his office.

Q    In connection with the Civil Service hearings, did you produce any of the information that you obtained through the recording of other City of Eunice police departments to anyone in that process?

MS. LIU:

Objection to the form.

BY MR. STAMEY:

Q    Sure.

A    I'm trying to recall.

Q    Pardon me?

A    I'm trying to recall. I'm just thinking.

If there would have -- I don't know if I did or if I didn't. But if there would have been a formal investigation, it would have been investigated and a recording was a part of that investigation, and I would have turned it over. But I don't remember it ever getting that far.

Q    Did you ever discuss the information from

Page 170

your recorded tapes of anyone associated with city of -- police department with Eunice, with anyone associated with the Civil Service investigation?

MS. LIU:

Objection to the form.

A    I don't know if an investigation was done on certain things. I know I talked to our Civil Service board rep at the time. Did we go into detail, I don't know what all we discussed. But as far as I know, I didn't turn anything over to them.

BY MR. STAMEY:

Q    Did you provide any City of Eunice police records from any investigation to anyone associated with the Civil Service investigation?

MS. LIU:

Objection to the form.

A    I turned in -- one that I can recall, I know I turned in over one that was involving a rape and mishandling of evidence. And the Civil Service Board found them in violation and ordered them to be punished, but I don't think they were ever punished.

Page 171

BY MR. STAMEY:

Q    During the Civil Service proceedings, did you ever speak to any Civil Service Board members outside of the hearing about any matter that was going to be coming before them?

A    I know I probably made a joke about, hey, I turned in some stuff that needs to be investigated that the Chief isn't. I made a joke about that. But as of the material?

MR. HEBERT:

May I ask, is the witness reading a real-time transcript of the depo? Because if it's something else he's using to refresh his memory, we are going to want that.

MS. LIU:

It's the real-time.

MR. HEBERT:

That's fine.

A    I am just reviewing what he said.

MR. HEBERT:

That's fine. No problem.

A    Because I want to make sure I understood him correctly.

MR. HEBERT:

Page 172

Understood. Not a problem.

A    I know we've made comments about stuff that's going on inside the department. But actual investigations, that would be improper and that would get something thrown out, so we wouldn't talk about specific investigations. Or if anything they were conducting, because that would get it thrown out by the Civil Service law.

BY MR. STAMEY:

Q    Okay. So you're stating under oath at this time that you never had any conversations with any member of the Civil Service Board about any matter that was pending before the Civil Service Board outside of the hearing?

MS. LIU:

Objection to the form.

A    That's kind of broad, man. I'm trying to -- anything? I mean --

BY MR. STAMEY:

Q    You just acknowledged that would be inappropriate if you did, isn't that true?

A    If it involved an ongoing investigation, yes.

Q    Okay.

A    But as of talking about investigations. If I

Michael Dunn - January 21, 2026

Page 173

was interviewed, I would have gave specifics. I think at least two I was interviewed on about what took place, whether that was something that was turned in. But that's not outside, that's them conducting an investigation. Outside? I don't believe so. I don't think I have.

Q How are things different today with the current Chief as compared to your service under Chief Fontenot? Has Chief LeBouef made changes in the operations of the Eunice Police Department compared to what was being done under Chief Fontenot?

MS. LIU:

Objection to the form.

BY MR. STAMEY:

Q Well, after all, you said that you wanted to see things get fixed. Have things gotten fixed?

MS. LIU:

Objection to the form.

A Yes and no. And I'm unaware of what he actually knows of what hasn't been fixed or what has transpired. I don't know if he knows or not. So that's -- has he fixed

Page 174

things? Yes. Are there still things going on? I don't know if he's aware of them or not.

BY MR. STAMEY:

Q Have there been improvements?

A There have been improvements. I'm not going to lie about the improvements. But beating somebody up on a traffic stop and laughing and cutting up about it and it's on camera, nothing got done, I don't know if he's aware of it or not. And I tried to report it but my direct supervisor knew about it. So I don't know what happened.

Q How many times has such an event or similar event occurred since Chief LeBouef took over?

A I know one for sure because it's very vivid in my mind because I was shell shocked by it. And the officer stood in front of somebody's car they ordered to leave, they said something smart ass to them. He then blocks the car from leaving. He then walks to the passenger's side of the car, rips the subject out of the car, slams him up against it, threatening to beat the shit of him.

Q Is this all the same incident?

Page 175

A Oh, yes.

Q So one incident?

A This is the one that's coming to mind right now, this one I'm trying to describe.

Q Can you think of any others?

A And let's see what else. As to which police brutality?

Q As to anything you want to see fixed.

MS. LIU:

Objection to the form.

A Anything I want to see fixed. Again, I'm going to refer to I don't know how much the man knows, but policy needs to be enforced.

BY MR. STAMEY:

Q Can you give me specific incidents?

A Most recent one is every time I turn around, there's a lieutenant -- I mean, my rank means nothing. They keep going over and above my head with everything that gets issued to my shift until something screwed up happens, then all of a sudden, it's my problem. Chain of command is not followed.

I know personally I had to get on one of my patrolmen not wanting to document a domestic. I don't know how rampant that is.

Page 176

That, I don't know. I worry about my shift and that's it.

After all this, I try to keep my head down, out of sight and out of mind. I just -- I don't want to talk about the incidents anymore. I don't want to keep track of them no more because I'm not going through all of this again.

Q You've asked the ACLU on your behalf to ask the federal judge to make numerous changes to the way the City of Eunice Police Department conducts its business, have you not?

MS. LIU:

Objection.

BY MR. STAMEY:

Q I'm just asking in general.

Is that correct?

A Yes, sir. Because I wanted to see things change for the betterment of the City and the police department, not just me personally.

Q Okay.

A Try and use what I went through to benefit somebody else.

Q Okay. And despite the improvements that you've acknowledged that have occurred,

Michael Dunn - January 21, 2026

Page 177

you're still unsatisfied with the way things are at the City of Eunice Police Department?

MS. LIU:
Objection to the form.

A   There are some things that need to be fixed, in my opinion.

BY MR. STAMEY:

Q   And again, anything other than these two incidents you just discussed?

A   One is hearsay. I can't prove it, other than if y'all -- if we get them in here and get them to testify to it that they keep saying that I'm mentally unstable, and I'm a problem child, and I'm this and that to new recruits. And after I get through, the new recruit comes to my shift, he tells me who said it. And said, I'm sorry, they told me this and I believed it, but I see that it's not true. I've been told that by at least four employees, new ones who have no dog in this fight.

Q   All right. Well, we know -- this is recent things that are occurring?

A   Yes.

Page 178

Q   Well, we know Chief Fontenot and Victor Fontenot are no longer there. So this is somebody else that is doing that now?

MS. LIU:
Objection to the form.

A   Yes.

BY MR. STAMEY:

Q   Do you know who he is?

A   Well, according to what they're telling me, this is just hearsay, it's Jeremy Ivory.

Q   Anyone else?

A   They've made comments that Ryan said some things, they didn't give specifics. I don't ask, I keep my head down and go about my damn business.

Q   Anything else?

A   Anything else needs to be fixed?

Q   Anything that someone has said --

A   Oh.

Q   -- that has impacted your reputation, in your opinion, to be able to perform your work at the City of Eunice Police Department?

A   My characterization of it would be I've been ostracized out to a corner. Other than that, I mean, most of the time, I get left alone.

Page 179

Q   Do you know if the lawsuit itself created any problems with your reputation --

A   problems with your reputation --

MS. LIU:
Objection.

BY MR. STAMEY:

Q   -- just the filing of the lawsuit?

MS. LIU:
Objection to the form.

A   Of course.
And if I could have done it any other way or got it out, I would have. But no one wanted to listen to anything I had to say, or either pass the buck to somebody else, oh, it's not my problem.

BY MR. STAMEY:

Q   Okay. And it's your belief that the second lawsuit was necessary because of the same reasons or for some other reasons?

MS. LIU:
You're referring to the current lawsuit, correct?

BY MR. STAMEY:

Q   In other words, you filed one lawsuit and then --

A   Yes.

Page 180

Q   -- you filed a second lawsuit through the ACLU, correct?

A   Yes, sir. I did file two separate suits, yes, sir.

Q   And you're saying the second lawsuit was necessary in order to make sure all of your points were being heard?

A   It's not my points are being heard, it's to get the problem fixed, that was the whole reason for it.

Q   All right. You don't think the first lawsuit was going to address any of those problems?

MS. LIU:
Objection to the form.

A   It was very specific about violating my rights. That was very specific. Because I didn't know who else to reach out to, so I reached out to an attorney, he gave me his advice. I followed it because I'm not an attorney.

BY MR. STAMEY:

Q   Okay.

A   So whether that was right, wrong or improper, I do not know. I followed my counsel's advice.

Page 181

Q   Has the general knowledge about your claims that you're concerned about increased since the filing of the second lawsuit by the ACLU?

MS. LIU:

Objection to the form.

A   I'm not -- I'm not quite understanding what you were --

BY MR. STAMEY:

Q   Yes. You said that you acknowledged that the lawsuits has increased awareness of your dissatisfaction, in essence. I'm paraphrasing here. Dissatisfaction with the City of Eunice Police Department. Did that increase following the lawsuit filed by the ACLU?

MS. LIU:

Objection to the form.

A   Are you talking about people telling me things or --

BY MR. STAMEY:

Q   Yes, sir.

A   I mean, on -- I mean, I've heard different things from different civilians, if that's what you're asking. I mean, it goes both ways. Some people agree with it, some people

Page 182

don't.

Q   You made some allegations that you have trouble -- you're concerned about being able to get a job down the road because of all of these circumstances. Is that because of the lawsuits and the notoriety that those lawsuits brought, or something else?

MS. LIU:

Objection to the form.

A   I mean, actually, in my mind, it's going to be both, because either you're going to believe -- believe it or you're not going to believe it. People have a predetermined -- what's the word I'm looking for?

Some people are going to respect what I did, some people are just going to see me as a rat and they don't want nothing to do with you, because I didn't go along with the program, or I didn't -- the blue wall of silence, hey, I f'd up but you hadn't -- you can't say nothing.

So I mean, it's -- it all goes back to individual's personal preference. Some people like it, some people appreciate it, some people don't like it. If that answers

Page 183

your question.

BY MR. STAMEY:

Q   Okay. In connection with the amended lawsuit, Amended Complaint of the second lawsuit filed by the ACLU, and even with regard to the original, did you sign a verification or an Affidavit to either the original or Amended Complaints indicating that the allegations contained in those, the Original and Amended Complaints, are true and correct, to your knowledge, information and belief?

A   I'm not sure if it's called an Affidavit or not. I mean, but as you stated earlier, whenever the deposition stuff comes to me or I have to review it, I mean, to the best of my knowledge, it's correct.

Q   I'm talking about the Complaint itself, the lawsuit, did you sign any verification that everything in there is correct?

A   I would assume so.

Q   You're guessing?

A   I don't know what -- you're saying Affidavit, I don't know if it's an Affidavit or not. I don't know. I know I've signed the

Page 184

documents, if that answers your question. I don't know the exact title of it. But it's acknowledging I believe this to be true.

MR. STAMEY:

I'm going to pass the witness. Thank you, sir.

MS. LIU:

Before you go, I would want that entered into as an exhibit that you showed the witness.

MR. STAMEY:

Sure.

What exhibit will this be?

COURT REPORTER:

6.

MR. STAMEY:

I'm going to get you a clean copy.

(Exhibit No. 6 entered into evidence.)

MR. HEBERT:

I am just going to stay right here if that is Okay with you.

A   I've just got to make sure I speak up for you then. Is that loud enough for you down there?

Michael Dunn - January 21, 2026

Page 185

MR. REED:

Yes.

A    Okay.

EXAMINATION

BY MR. HEBERT:

Q    So Officer Dunn, we met before.  Of course, I was the one that had the opportunity to spend the most time with you at the last deposition.

But again, my name is Michael Hebert.  I'm the lawyer for the City of Eunice in this matter.

A    Yes, sir.

Q    Because I'm going last, I'm going to sort of necessarily kind of bounce around a little bit.  I kind of apologize for that in advance.  I'm kind of batting cleanup on some of these other things.  I also had some other follow-ups that I wanted to ask you.

First of all, I understand from your previous deposition that you've been a lieutenant with the Eunice Police Department since 2016, right?  Does that sound right to you?

A    I believe so, yes, sir.

Page 186

Q    Okay.  There's not been any time from 2016 to the present that you had a rank lower than lieutenant; is that right?

A    They attempted but I fought and won, so.

Q    What was -- describe the attempt.

A    They tried to terminate me.  Terminated me.

Q    Okay.  That's -- that's nothing different from things we've already talked about, correct?

A    No, I think we've already discussed most of those topics.

Q    Okay.  So during your entire employment tenure with the Eunice Police Department, you've held the rank of lieutenant, correct?

A    My entire tenure, no.

Q    Yes, sir.

A    No, I was a police --

Q    You started -- no, you started as a sergeant, that's --

A    No, sir.

Q    No, you started -- I'm sorry.  Hold up.

Then you went to sergeant.  Then you got promoted in 2016 to lieutenant.  Accurate?

A    If I remember correctly, I was a patrolman from 2010 to approximately 2012, got the rank

Page 187

of sergeant.  And then 2016, was promoted to lieutenant.

Q    Yes.

A    If I remember correctly.

Q    Bad question.  Thanks for that clarification.

The notes that we have talked about before, there were -- there were several exhibits that were attached to the round one of your deposition, I think Exhibits 5 through 10, and we talked about some of those today.  We've marked some them with different numbers.

But I just want to ask first kind of some general questions.  I think -- I think you cleared this up but I want to make sure it's absolutely clear.  The defendants have every note that you have taken that pertains, in your mind, to one of your allegations in this lawsuit.  Is that accurate?

A    Anything I obtained was -- yeah, I believe that to be accurate, yes, sir.

Q    Okay.  But my understanding is that you are still keeping notes but they don't have anything to do with this lawsuit; is that right, or the allegations in this lawsuit?

Page 188

A    I started but I stopped.  I'm not going through all of this again.  I don't want to even worry about keeping notes anymore, I just try to stay to myself.

Q    When did you stop?

A    It wasn't long.

Q    Okay.

A    I just wasn't going to go through all of this again.

Q    Okay.

A    Because -- because this is -- this whole situation has made me feel, I can't open my mouth, I got to be quiet.  And I'm just, I'm not worried about it no more.

Q    Yes.

A    It doesn't do any good to report because it's nothing -- how long have we been doing this?  Seven years?  I'm just --

Q    Is your answer finished?  I just want to -- I don't want to --

A    I apologize, I just -- (Witness gets emotional.)

Q    When we took your deposition in January of 2023, you were still in the note -- you were still taking notes at that time, correct?

Page 189

A    (Witness gets emotional.)

Q    Do you need a break?

MS. LIU:

Do you want to take a break?

A    Just a minute.  I apologize.

BY MR. HEBERT:

Q    Do you need a break?  No?  You're good?

MS. LIU:

Why don't we take five?

MR. HEBERT:

That's fine.

(SHORT BREAK TAKEN IN DEPOSITION)

BY MR. HEBERT:

Q    Back on the record.

A    I apologize.  I just --

Q    Hey, no apology necessary.

The question that I was asking you I think pertained to when exactly you stopped taking notes.  And I think the exact question I was asking you was, at the time of your previous piece of this deposition, January the 6th of 2023, my understanding is you were still note taking during -- at that period, correct?

A    I believe so.  I mean, whatever I would have

Page 190

wrote down, I would have turned over to counsel.

Q    Okay.  So Mr. Stamey asked you some questions, kind of general questions about things at the Eunice Police Department.  You agree with me generally that things are better at the Eunice Police Department now that Chief LeBouef has taken over as chief?  You would agree with me about that, better than they were when Chief Fontenot was there?

A    Anything could have been better than then.

Q    So that would mean the answer would be yes, right?

A    (Witness gets emotional.)

Yes.  I apologize.

Q    Okay.  None of the notes that have been produced to us say anything about Chief LeBouef, or his acts, or his omissions, or his conduct, would you agree with me?

MS. LIU:

Objection to the form.

A    I don't think I have anything concerning Chief LeBouef.

BY MR. HEBERT:

Q    Okay.  You were asked earlier today about a

Page 191

few health care professionals that you've seen.  I wanted to ask you for an update on one that hasn't been mentioned, plus I wanted to follow-up on a couple of others.

Is your -- you told us last time in your previous deposition that kind of your GP, your regular family doctor, was Dr. Rainey, at Rainey Family Medicine; is that right?

A    That's my general physician, yes, sir.

Q    Yes.

Is he still?

A    Yes, sir.

Q    Okay.  Have you been to Dr. Rainey for anything that you would attribute to something that you've sued about here since the time of your last deposition --

MS. LIU:

Objection to the form.

BY MR. HEBERT:

Q    -- in January of 2023?

MS. LIU:

Objection to the form.

A    Since my last deposition if I said anything about this?

BY MR. HEBERT:

Page 192

Q    Yes, sir.

A    I don't believe.  I don't believe I have, because the medication and stuff they had me on, I haven't taken that in years.

Q    Okay.

A    I'm off of all of it.

Q    You had told us in the previous deposition at one time that you had been prescribed an anti-depressant.  But that was -- are you off of that now?

A    I'm not on any type of prescribed medication for a good long time now.

Q    I want to --

A    Now, what you were talking about, I think that was my deposition was they gave me something because I hadn't slept for like three or four days.  Because when they threatened to arrest me and all this other stuff, they gave me something to help me sleep.  That was a one-time thing.

But then I was prescribed some other things for anxiety and stuff like that during this time frame and I'm off of all of that.

Q    I think Candase Martel at one point had given you a diagnosis of depression or depressive

Michael Dunn - January 21, 2026

Page 193

disorder.  Do you remember saying that?

A   I believe so.

Q   Okay.  I wanted to see if we could clear up, also, the name of that new doctor that you mentioned.
    During your deposition, we were trying to sort of Google who that might be.  And there's a doctor in this area named Dr. Christopher Eckholdt, E-c-k-h-o-l-d-t. Does that sound like who you're seeing?

A   I can't remember his first name right now, Bud.

Q   Okay.

A   I'm sorry.  I don't remember it.
    I just know I met him at doctor -- no, doctor.  Brown, attorney Brown.  What's Brown's first name.  That's the office he uses to see patients.

Q   Where?  What town is attorney Brown's office in?

A   In Eunice, I apologize.  I think it's on 2nd Street.

Q   Okay.  It looks like Dr. Eckholdt has an office here in Lafayette.  Have you ever been to Lafayette to see him?

Page 194

A   No, sir.

Q   And he has -- you called him a psychiatrist, but has he written you any medications?

A   Yes, sir.  He was the one that prescribed the medications, if I remember correctly.  Either he prescribed them or he told Dr. Rainey to prescribe them.  I don't remember which.  But they did prescribe the medications for anxiety, depression and stuff of that nature, whatever year it was.

Q   Okay.  Are those the same ones that you testified about a second ago that you're no longer on?

A   Rainey had given me something because I hadn't slept for like three or four days because of the incident.  He gave me something to help me sleep.  Then, after that, I don't think I was on anything.
    No, I'm not correct in that.  I think he prescribed me Buspar.

Q   Buspar?

A   Yes, that's it.  I was taking it for a while and then changed a couple of different medications see if anything would help.  And I just -- I've been off of them I think two

Page 195

or three years now.

Q   So this is like two or three years ago we're talking about?

A   I would think so.  It's been awhile since I've been on type of any medication.

Q   Have you seen Dr. Eckholdt in the last two years?

A   I know I haven't seen him in a year.  I don't know about the two-year thing.  I would have to think.  Close or shortly maybe a little longer, I'm not sure.  It's been awhile.

Q   And you said you're still seeing Candase Martel now from time to time, correct?

A   Yes, sir.

Q   She's a counselor?

A   Yes, sir.

Q   I think you said once a month now.

A   It depends.

Q   Is it sort of as-needed, or you have a regular standing appointment?

A   As-needed or whenever -- how do you describe it?  It helped in the past so it's just something I continue to do.  If I'm having a bad day or something like that, just, you know, a follow-up, talk about it, get

Page 196

suggestions, is there any type of -- oh, what's the word -- techniques, manage stress better, stuff like that.  I mean --

Q   All right.

A   -- pretty much it.

Q   Did you see Candase Martel after either of your officer involved shootings that we discussed earlier?

A   Over the shooting itself?

Q   Yes, sir.

A   No.
    Has it been mentioned?  Yes.  But the first shooting, best way I know how to characterize it is, as a general rule of thumb in law enforcement, if you try to seek counseling or anything thereof, you're about to get nailed, you're about to get fired so you didn't reach out to nobody.  You kept that shit to yourself.  Excuse my French.  You keep that to yourself.  You don't tell nobody.  You don't tell anybody what's going on and nor did the City offer anything.
    So, I mean, the first one, no.  Has it been mentioned, has it been talked about?  Yes.  But no.

Page 197

Q   Okay.  And so that part that it's been mentioned or it's been talked about, I need you to elaborate on that.  Who mentioned it or talked about it?

        MS. LIU:

            Objection.  Don't reveal conversations with counsel.

BY MR. HEBERT:

Q   Anybody other than lawyers that represent you?

A   Ask your question again.

Q   Has anybody other than lawyers that represent you suggested that you should go to -- that you should have gone to a psychologist after those officer involved shootings?

A   If a lawyer suggested it, no.  I took it upon myself.

Q   Okay.

A   When I started seeing a counselor, I took it upon myself.

Q   Okay.  The -- so back to --

A   Because --

Q   Go ahead.

A   -- like my first year, they didn't even give me days off.  I was back to work the next

Page 198

damn day.

Q   All right.

A   So I mean, I don't know how to describe it.  I mean, that's not the way I thought it was supposed to work.  You're supposed to have time to adjust from it or stuff like that.  But no, I was back at work the next day.

    Now, my last one, I think Chief had given me, if I'm correct, I think it's four weeks off, I believe.  I know he gave me some time off.  It was me and Officer Rozas, he gave us some time off.

Q   The first shooting happened in 2017, I think you said, is that accurate?

A   I'm almost positive, yes.

Q   All right.

A   I believe it was '17.

Q   I didn't --

A   I know school was in session, because we was worried about one of the schools.  I know school was in session.  So it had to be either the late part of the year or the first part of the year school was in session.  So '17, I believe is correct.

Q   I didn't fully understand the facts of that

Page 199

incident and specifically why the officers shot.  Can you -- can you -- do you mind walking me through those facts again?

A   Do you want me to start from the beginning or --

Q   Yes, sir.

A   -- like from earlier?

Q   Yes.  This is what I remember that someone -- a suspect was observed in the car with a gun to his girlfriend's head.

A   Yes.

Q   That's what I remember, but I don't remember the rest of the details.  Can you please just elaborate on that?

A   I'll recall it the best I can, but the police report would be a more accurate reflection.

    But from what I can remember, the car was coming forward.  We approached the intersection.  There was at least eight to 12 of us that approached the intersection.  After the suspect took the weapon away from his girlfriend, he's then coming around.  We could see his revolver coming up through the glass.  He's then coming out the door of the glass, as he's getting almost leveled off at

Page 200

us, we opened fire.

Q   Okay.  And not just you, but some other officers that were there also at the same time --

A   From my recollection, only three officers discharged their weapons.  Everybody else hid.

Q   Okay.  Was that shooting investigated by any outside agency?

A   State police, yes, sir.

Q   And they determined it was a justified shooting?

A   Yes, sir.

Q   All right.  What I didn't understand now a second ago, and it's probably my fault for this jumping around business.

    But after this 2017 shooting, did you see Candase Martel, or any other health care professional, for anything that you attribute to the shooting incident?

A   Not to my recollection.  The time I remember seeking counsel, or counselor, was when the incident when they were threatening to arrest me and to hurt me.

    Now, that was when I -- I was severely

Page 201

depressed and everything else because I'm afraid I'm about to go to jail for something I didn't do. And I remember it was -- I think it was shortly thereafter, because I was -- I wanted to kill myself than go to jail for something I didn't do. When I had that thought, I started seeing a counselor.

Q Was that Candase Martel?

A (Witness nods affirmatively.)

Q Okay. Yes?

A I started seeing somebody else first. I don't remember her name, name of the business. But she closed or went to Lafayette or somewhere down in this area. She informed me that she was leaving and coming somewhere down here, another job opportunity. And then I reached out and met with Candase. I don't remember the name. I apologize.

Q All right. So to clear this up and then I'll leave it alone.

You didn't see Candase Martel or any other psychologist, or psychiatrist, or counselor, after either of the officer involved shootings for anything related to

Page 202

those shootings; is that right?

A Specifically for the shootings, no. The first one, no, I didn't see anybody.

Q Okay.

A Because, again, my excuse is because it's frowned down upon in law enforcement so I didn't reach out to anybody.

The second one, of course after the incident took place, I mean, I went and talked to her. But it wasn't just about the shooting, it's everything was going on at the time.

Q Okay.

A And I know this -- I don't know if that's privileged or not. This whole thing has been talked about. So I mean, it's --

Q So with regard to the second officer involved shooting, which was fairly -- it wasn't that long ago, right? It was fairly recent in the last two years?

A No, it was way longer. I think it was -- of course, I can't ask him. I believe it to be his first quarter of his election.

Q Okay.

A Because I remember he made a comment to me,

Page 203

he was like, aw, shit, I ain't been in office but such and such and you're already shooting somebody.

Q I think he took office in 2023, is that right, January of '23? So that would give you a marker for when it would have happened?

A So it would have been, I believe, in February.

Q Of '23?

A So it was shortly after he took office.

Q Okay.

A And --

Q Go ahead.

A -- I want to make a comment about that. You're talking about things going on inside the PD. That an officer admitted, because they heard it was me got in a shooting, turned around and drove the other damn direction.

Q What did you hear about that?

A He bragged about it, that he was going to drive the other direction because it was me.

Q Who? Who?

A Didn't even show up on the scene because it was me.

Page 204

Q Who was that?

A Noel. He drove the other direction. He made comments to other employees.

Q And last name?

A Sergeant Noel.

Q Oh, Sergeant?

A Sebastian Noel.

Q Sergeant Noel.

A That he didn't want nothing to do with it, he was going to go the other direction.

Q How long ago did that happen?

A The day of the incident.

Q Okay. Oh, the same, the shooting incident in 2023?

A (Witness nods affirmatively.)

Q All right.

A And I got more support from outside agencies than people I work with. (Witness gets emotional.)

Q The --

A I'm sorry I'm getting emotional, it's just --

Q That's all right.

So the officer in custody -- I mean, the prisoner in custody situation that you described earlier today that you're hearing

Michael Dunn - January 21, 2026

Page 205

there that might be some kind of a wrongful death claim, where did you get that -- where are you getting that information from?

A   I was provided I guess a letterhead from that attorney's law firm, from Chief LeBouef, giving me a head's up that, hey, this is probably coming down the pike, for lack of a better term.

Q   All right.  Do you remember who the lawyer was or law firm was?

A   No, I do not.

Q   All right.

A   I believe -- the only thing I think recall, I think they're from Shreveport.  I think, but that's about the only thing I really remember.

Q   I forgot to ask you this previously with regard to these two officer involved shootings.  This may or may not be related.
    But in your previous deposition, you described a circumstance in which you had been involved in which someone was, in your view, attempting a suicide by cop.

A   Britnell.

Q   Is this a different -- is this a different

Page 206

situation or it's the same situation?

A   This is Bryan Britnell, in 2017.

Q   Okay.  That's all the same situation?

A   Because he -- there was -- if I remember correctly, there was a 911 recording said, y'all are going to have to kill me.
    And then while we were in the courtroom while he was going through bond something, I don't remember all the details, but he even said in open court that we were going to have to finish the job.

Q   Okay.

A   But he -- if I'm -- I believe I was informed that he'd actually passed away in prison.

Q   Thank you.  I thought those were the same --

A   I believe he's gone.

Q   -- but I wanted to make sure that was clear.  All right.  Thank you.
    So the issue with the prisoner in custody who died, my understanding is that the prisoner had some medical conditions that were unknown to you, or to the others on shift, and they worsened to the point where he wound up passing away from those.  Is that basically accurate?

Page 207

MS. LIU:
    Objection to the form.

A   I'm not being sarcastic.  I don't know if y'all want me to answer those questions because I know if there's going to be a deposition or anything thereof.  But no, I do not agree how that guy died in our custody.  There were some situations that should have been addressed and I tried to address them.  But I don't know where the ball got dropped.  So I don't know if I should talk about it or not.  I'm not being sarcastic.  I'll answer your question, but --

BY MR. HEBERT:

Q   I appreciate it, yes.  Yes.

A   I don't know how far you want me to go down that rabbit hole.

Q   Is it your understanding there's going to be claim that there was deliberate indifference to this prisoner's medical needs?

    MS. LIU:
        Objection to the form.

A   I'll try to summarize it unless you ask me to go into further detail.  If I would have known what I knew after the fact, that man

Page 208

should have been in the hospital.  I don't know if you want me to keep going with that or --

BY MR. HEBERT:

Q   No, that's fine.
    But you didn't know -- your position is, you didn't know enough at the time to know that he needed to go to the hospital?

A   According to the policy the way things --

    MS. LIU:
        Objection to the form.

A   My apologies.
    The way things should have been handled, it should have been handled completely different and I should have known.  I should have been briefed on those details because I am in charge of that jail when no one else is around.
    That is my responsibility and it should have been passed on to me by the supervisors.  The fact that it wasn't -- it could have been handled differently.  And we might not be in that situation today if we would have done things the right way.

BY MR. HEBERT:

Michael Dunn - January 21, 2026

Page 209

Q  All right.

A  I don't know who to point a finger at and I really just --

Q  But you feel like that there's an internal issue at the police department that contributes to this issue?

A  To that specific issue, yes. It could have been prevented. And that's why, I don't know how far you want me to go on record with this.

Q  No, that's fine. Hey, you're answering my questions. I mean, I'm not -- I don't know any issue with the responsiveness of your answers so far.

A  I'm not trying to throw nobody under the bus either. I'm just --

Q  That's fine.

And there's nothing in the notes that you produced that pertained to this incident, correct?

A  Produced to who?

Q  All the notes that we've talked about today, that they were Exhibits 5 through 10 of the previous deposition, and some of them were marked today as well, nothing in those notes

Page 210

about this incident, correct?

A  Not that I'm aware of, sir, no.

Q  Okay. You said previous --

A  Can I make a --

Q  Go ahead.

A  I'm reluctant to some things because, again, I'm not trying to go through all of this ever again. So I'm trying to do my job and do what's necessary and that's it.

Q  You've mentioned this morning that your view was that the police department's policy that prohibits recordings in the police department was unconstitutional. Can you tell me your basis for saying that?

MS. LIU:

Objection to the form. Misstates testimony.

A  Can I recall the exact RS number or anything like that, no. I just know at one point in time we were researching it when I had other counsel that that was not improper. Because if anything it's governed, or as state law says something is prohibited, you cannot lessen what the state law says. You can't restrict something a law allows me to do by

Page 211

policy.

And I know that was discussed with another counsel for the Civil Service hearing or something thereof, because --

BY MR. HEBERT:

Q  Did that -- go ahead. Sorry.

A  Because they threatened to go after me for doing that when they've done the same thing to me.

Q  Was that topic discussed in open session at a Civil Service meeting? Is that what you're saying?

A  I don't believe it was. I believe it was just something I was talking about with one of my counsel, attorneys, counsel, whatever.

MS. LIU:

Don't testify to discussions with counsel.

BY MR. HEBERT:

Q  Yes, I don't want to know the -- obviously you can tell from what's going on here that we don't want to know what you say to your lawyers or what they say to you, so I'm looking for stuff outside of that.

A  Okay.

Page 212

Q  But did you conduct your own research also as to the legality of the police department's policy?

A  If I have a question about something and nobody can answer that question, of course I'm going to research it myself.

Q  Okay.

A  Or I'm going to reach out to someone that has, or something to understand it, or to, hey, is this legal, is this not legal? Kind of like the unlawful orders, you tell me to do something that I'm not supposed to do and if I do it, I get in trouble.

Q  I understand.

A  I don't know how else to characterize it.

Q  Okay. So the characterizing the PD policy is unconstitutional, is that the conclusion that you drew from your research?

MS. LIU:

Objection to the form.

A  And with my counsel, yes.

BY MR. HEBERT:

Q  Okay.

A  And if I remember correctly, the counsel now works for the City, if that helps.

Page 213

Q   Who is it?

A   Aaron Green.

Q   I didn't understand this earlier, so I apologize if it's a bit of a repeat.
     Do you or do you not have a contract with the Sidley Law Firm to provide legal services to you?

     MS. LIU:

          Objection.  You can answer as to yes or no, if you know, but don't reveal the substance of the agreement between us.

A   I would -- I would assume yes.  Because, I mean, they're representing me, I had to have signed something.

BY MR. HEBERT:

Q   And I don't want you to assume.  I just want to know if you have a piece of paper, a contract between yourself and the Sidley Law Firm.
     I don't need know what's in it.  I just want to know if you have one.

A   I'm -- I'm sure I do.  I don't know if it's electronic or actual paper form, that I do not remember.

Page 214

Q   Yes.  Paper was bad, was an old-fashioned way of expressing.

A   Sorry.

Q   I just wanted to know, you know, if you have a document between yourself and the Sidley Law Firm for them to represent you in this case.

A   I would say yes.

Q   All right.  Just because of your previous answers when I ask you when you say, I would say yes, do you know -- do you know one way or the other?  It seems like you're making an assumption, but I don't want to put words in your mouth.

A   It was over whether it was paper or electronic.  Like if I physically have custody of it, that was where the hesitation came from.  Because it's like, oh, shit, where is it at?  Is it in the filing cabinet, or did I sign it electronical or paper.  That's what the hesitation was for.

Q   All right.  The -- before -- before you had the contract with Sidley, you told us -- you told us in your previous deposition that you had made a contact to the ACLU and filled out

Page 215

a form, like a complaint form on their website.  Do you remember saying that?

A   If I remember correctly, that's how it works.  If you needed to file a complaint or whatever with the ACLU, you would fill out whatever documentation and submit it to them.

Q   So how long after that did you have a contract with the Sidley Law Firm?

A   I'm -- I'm not sure, sir, to be honest, whether it was a week, two months, six months.

Q   And that's -- go ahead.

A   It feels like it was relatively soon.  I can't recall.  I'm sorry, y'all.  I can't recall.

Q   Can you tell me whether it was within a month?  You can't tell me?

A   Under six months.

Q   Under six?

A   Maybe I'd feel comfortable saying that one, because I don't recall.

Q   All right.

A   I just don't feel like it was a year.  I don't feel like it was two years or anything like that.  It seemed relatively quick, or

Page 216

within six months.

Q   Do you have a copy of the complaint form that you submitted to the ACLU?

A   It was all electronical, no.

Q   And they never -- you never got anything -- you never got an actual copy of whatever you submitted because it was all like -- was it like a fill-in the blank sort of thing on-line, is that what it was?

A   I hate to say I don't recall, I don't.

Q   All right.  So after you filled out the complaint form, the ACLU reached back out to you at some point?

A   I don't know if it was the ACLU had reached out or if it was the attorneys.  I can't remember.  It's a little of a blur.  Because I remember it being an out-of-state number.  I done forgot what state.  And I called the representative of the ACLU and like, this is in Louisiana, am I supposed to be talking to whomever?  I don't know if it was the ACLU representative, someone in that, I don't know.  I just remember getting a phone call.

Q   All right.  From an ACLU representative?

A   I believe so.

Michael Dunn - January 21, 2026

Page 217

Q   Okay.  And so the substance of that communication was what?

MS. LIU:

I'm just cautioning you, don't reveal if it's privileged information.

A   I don't know if it's not --

MS. LIU:

But you can speak generally as to the nature.

A   I'm drawing a blank.

BY MR. HEBERT:

Q   Okay.

A   There's so much crap that happened in that short time frame, I just remember it was a nightmare.

Q   After you -- after you submitted your complaint to the ACLU --

A   Uh-huh (yes).

Q   -- did you get back from them any kind of an e-mail, or paper mail, or anything like that, acknowledging receipt or indicating what the next steps would be?

A   To the best of my recollection, the answer would be no, because I remember hearing from -- if I remember the conversation

Page 218

correctly, they hired, or somebody was going to represent me or something.  I don't remember the context of the entire conversation.  I remember that part.

Q   Is that the same call you referenced a second ago after you filed the complaint form, you got a call from somebody with an out-of-state number, is that the same call?

A   I don't believe so.  I believe it was a couple of different calls.  Because I remember when I got that, I was worried about it being some reporter or somebody trying to get information out of me.  And I did not want to do that.  So I called them to make sure.

If I remember correctly, I called to make sure is this number -- you know, who is this person, or what this number is, or something thereof.

Q   That's all you got?  Just before I move on, I want to --

A   I'm sorry, man.  I'm trying my best to recall it.

Q   No, that's fine.

All right.  Has there ever been a time

Page 219

in the course of this litigation where you have attempted to terminate any of your legal representation?

MS. LIU:

Objection.  Calls for privileged information.  Don't answer the question.

BY MR. HEBERT:

Q   Has there ever been a time in this litigation when you attempted to terminate the lawsuit?

A   To terminate, no.  To try to come to some reasonable understanding and fix what was going on, I've made numerous attempts.  Like, hey, man, let's come to the table and do something.  I mean, I'm tired of this.  This is -- this -- I'm tired of arguing.  I'm tired of having to relive this every time I come here.  I want it fixed.  But I'm not going to just lay down and just say, hey, you know what, I'll give up.  No, I'm not going to give up.  Something needs to be done.  It needs to be fixed where this never happens to anybody ever again.  So if that answers your question.

I'm willing to do what I've got to do to fix the issue.  But I know I've tried.  I've

Page 220

tried reaching out to people, like, hey, let's fix the problem.  But some things people budge on, some things they don't.  So I don't know what else to tell you.

Q   In your previous deposition, you told us that some of the notes that you made that you've produced to us were made while you were at the Eunice Police Department.  Do you remember that?

MS. LIU:

Objection to the form.

A   I apologize.  Can I just read it real quick?

BY MR. HEBERT:

Q   Yes.

A   (Witness complies.)

Q   Just to help you out, page 62 of your previous deposition, I asked you on line 10, did you type some of these while you were at the Eunice Police Department, and you said yes.  And then we proceeded to talk about computers.  And you said, we don't have any individual assigned computer, you just use whichever one is available.

MS. LIU:

Do you want to show him the

Page 221

transcript?

BY MR. HEBERT:

Q  I'm happy to show you.

A  Well, I can stop because he already asked me that question.  The answer is yes.  I don't know how long I did it or the time.  Because he asked -- I believe -- I believe it was Stamey, correct?

Q  No.  I think what he asked you was, were you on the clock?  Which is my next question to you.

You used a computer at the Eunice Police Department, but you were not on the clock, is that -- is that how this lines up?

A  No.  No.

Q  Okay.

A  If I was on duty and something arose, or something draws my attention, as of my rank, I can look into certain things, to what -- because I -- it's my job to make sure somebody is not doing something they're not supposed to be doing.  And I did that for a time.

Now, when it got to a point to where no one was listening to me, or accepting my

Page 222

complaints, or doing anything thereof, then I started doing it when I was off.

Q  So the things that you would have typed on your computer while you were at the Eunice Police Department pertained to things that were going on at the time while you were on duty, but then they also somehow made it into your notes?

MS. LIU:

Objection to the form.

A  Made it to my notes?

As I testified earlier, if something took place that was going to be time consuming or it would have been on the clock, I would have made a note, hey, incident number, or something thereof, go back and do X, Y and Z.  And then when I had time on my off time, I would go back and fill in or look into what I was doing.

BY MR. HEBERT:

Q  So most of what you would have typed while you were at the Eunice Police Department would just have been a note to yourself to go back and make a more detailed note later such as what's been produced to us?

Page 223

A  At a certain time.  Originally, which is a part of my rank and my Civil Service law is to report stuff and to investigate stuff that happened on shift or policy violations.  I would do that.  Once they stopped accepting them, throwing them in the trash, or whatever happened, then I started doing it the way we just described.

Q  Okay.  You had reports that were thrown in the trash?

A  I had write-ups thrown in the trash, or Critical Incident Forms thrown in the trash.

Q  Who threw them in the trash?

A  The Chief.  Chief Fontenot.  Not -- my apologies.

Q  Okay.  Not Chief LeBouef?

A  No, not Chief.

Q  He hasn't thrown a Critical Incident Report in the trash of yours --

A  Not that I'm aware of.

Q  -- since he's been there?

A  Right.

Q  All right.  I want to -- I want to go through -- I forgot what exhibit this is, but your First Amended Complaint.  And I need

Page 224

some help what exhibit that is.

MS. LIU:

Okay.  It's Exhibit 3.

BY MR. HEBERT:

Q  Exhibit 3.

A  Do you want me to go through it?

Q  And I want to direct your specific attention to paragraphs 195 and 196, pages 49 and 50.

A  I apologize, sir.  I was going through this, I wasn't listening.

Q  Take your time.

A  What did you want me to look at?

Q  Paragraph 195 and 196 of your Prayer.  Are you with me?

A  You're talking about the stuff requested?  Okay.

Q  Yes, sir.

Down at the bottom of page 49, there's just one line there, asks that -- you were asking that the Court, quote, order the City of Eunice to -- then I'm going to flip the page.  And the first one says, (As read:) Assign Lieutenant Dunn to any departmental duties comparable to the rank of a lieutenant of the Eunice Police Department, including

Michael Dunn - January 21, 2026

Page 225

but not limited to reinstating Lieutenant Dunn to handle narcotics investigations.

And I want to separate that into two pieces and ask you about the two pieces. First of all, the asking the Court to assign you to duties comparable to the rank of a lieutenant. You've been a lieutenant since 2016, right?

A   Yes.

Q   So you're asking the Court to order that you have departmental duties comparable to the rank of lieutenant. You have those duties now, do you not?

A   No.

Q   Well, let's hear about that. What do you mean?

A   That's what I described earlier about the chain of command. People going -- my lower subordinates are being ordered by people above me to do things on shift without authorizing it through me or even discussing it with me. That's one issue.

Q   Before you move on, tell me what that would have to do with your duties. That has to do with obeying the chain of command. But what

Page 226

would that have to do with assigning certain duties to you?

MS. LIU:
Objection to the form.

A   As a part of my duties is to be responsible and to command my shift.

BY MR. HEBERT:

Q   Okay.

A   And if you're taking that away from me and you're commanding them behind closed doors, or by other ways, then you're circumventing -- basically, I'm just a glorified patrolman. So I don't know how else to --

Q   I understand.

But you would characterize that, what you -- jumping rank and failing to follow the chain of command, you characterize that as one example of taking lieutenant duties away from you, is what I'm understanding; is that right?

A   That would be one of them.

Q   Okay. Give me another one, if you have some other ones.

A   An example. Generally, just a general statement is when you take away or limit the

Page 227

actual authority that I'm supposed to have and either take it yourself or give it to somebody else. And one that really irks my nerves is when you have a patrolman come and try to give me orders, oh, such and such told me to tell you to do this. Well, that should have came from my chain of command, not a patrolman. That would be one issue.

Q   Okay.

A   I'll think on it some more.

But as I stated earlier, I've gotten to a point to where I just let it be. I don't complain no more, I just say -- at least for the last two months, I know I haven't opened my mouth one bit. I just keep my mouth shut and move on.

Q   Is it your position that those things you just described are still going on currently today?

A   (Witness nods affirmatively.)

Q   You're shaking your head yes --

A   Yes. I apologize.

Q   -- but the Court Reporter can't pick that up.

A   Yes.

Q   Okay. All right. The other part of this

Page 228

where it says, Reinstating Lieutenant Dunn to handle narcotics investigations.

So the word "reinstating" would indicate that at one time you handled narcotics investigations; is that accurate?

A   Handled and involved with, because of my expertise in the matter. I mean, what I've been trained to do for narcotics related investigations.

Q   Okay. The -- you're -- you're now a K-9 officer again, right?

A   Yes, sir.

Q   And the dog you have is a detection dog, maybe he's a dual purpose dog, but he's a narcotics detection dog, among other things, right?

A   He's dual purpose, yes, sir.

Q   So at least from that perspective, you -- you know, you, through your role as K-9 handler, are involved in certain aspects of narcotics investigations. You would agree with that?

MS. LIU:
Objection to the form.

A   That's a yes and a no.

BY MR. HEBERT:

Michael Dunn - January 21, 2026

Page 229

Q   Well, let's -- let's hear it.

A   We can break it down.

Q   Yes.

A   Can I go out and start my own investigation if I have the opportunity or whatever have you? Yes, I have the K-9, I can do that. But just in the last three months, there's been at least 10 to 15 narcotics operations I've begged to help with, to help to rid the drug problem. And I have yet to be allowed, be a part of, know what's going on, nothing. What the reasoning behind it being, I don't know.

Now, I have e-mails, I have called them, I have told them, hey, I'm willing to help because this is -- this is what I do, this is what I'm good at. Search and seizure, search warrants, stuff like this, and I have a dog. My own department hasn't used me once.

Q   Okay. Other than --

A   So.

Q   I'm sorry.

Other than your role as a K-9 officer, is this intended to mean anything else when it says handle narcotics investigations?

Page 230

What if anything else does that pertain to?

MS. LIU:

Objection to the form.

A   What does it entail? The investigation of and to help with narcotics related matters, so.

BY MR. HEBERT:

Q   You want -- you want the Court to order a work assignment where you would -- you would be allowed to handle narcotics investigations, right?

MS. LIU:

Objection to the form.

A   The only thing I want is be able to help clean up the streets. And it just seems like the more I try, the wall I run up against. That's all I want is go out there and do my damn job.

BY MR. HEBERT:

Q   Okay. Well, this actually says specifically you want the Court to order that you be reinstated to handle narcotics investigations, so that's what I'm asking you about --

A   It's what I'm good at.

Page 231

Q   -- narcotics investigations specifically as opposed to cleaning up the streets generally.

A   Narcotics investigations and all of my training over the years is what I'm good at. Why not use me for something I'm actually good at? And that's -- I don't know how else to describe it.

Q   And Lieutenant Dunn, you may have an excellent point, but isn't that within the discretion of the Chief of Police to deploy personnel in the way that he sees fit?

A   I would agree with you, but the only thing I would have that is, why don't you want my expertise? Why don't you want my help? Why am I being ostracized and put off to the side?

Q   Well, and -- and --

A   I hear what you're saying. But again, if you have something that's available to you that knows what it is supposed to be doing, whether it be me or whoever else, you would want to use that person to pick every little piece of information that person knows to better the city, better the department.

Q   And point well taken.

Page 232

Even if it's bad judgment on the part of this Chief, the former chief, whatever, to not have you, an experienced officer on narcotics investigation, why should a United States federal judge order that the City of Eunice put you on narcotics investigations?

MS. LIU:

Objection to the form.

A   The City spent a ton of money training me on how to do these type of investigations. Why are you going to waste that asset? I don't know how to answer your question. I honestly don't know how to answer your question. All I can say is you just got an asset that you're not using. So I don't know how else to answer that question.

BY MR. HEBERT:

Q   Okay. The individual or individuals who did not call you for -- I think you said 10 to 15, I forgot how many.

A   I'm just guessing.

Q   I know -- of some narcotics calls --

A   Uh-huh (yes).

Q   -- to assist, do you attribute that to somebody, in particular, or are you just

Michael Dunn - January 21, 2026

Page 233

saying that -- that, you know, the department ought to be calling you for those things?

A    In my mind, there's an underlying issue that I'm not being made aware of, or they just don't want me at all, or they're trying to force me out the door by not letting me do X, Y and Z, or whatever have you.  I don't know.  I do not know.

But it doesn't make sense to me as a supervisor, and I've ran 20 logging crews when I worked for RoyOMartin, why you would not take an asset and use it.  It makes no sense to me.

So I do not -- that's the best I got.  So I believe there's something else going on, whether it be a trust issue, whether it be you don't want me around, or you don't want me involved in shit, just freaking tell me where I can plan my life out accordingly where I can do whatever I got to do.

Q    To that point, why haven't you left the department?

MS. LIU:

Objection to the form.

A    I'm trying to clear my damn name.  I'm trying

Page 234

to have something to say, hey, I didn't do what they said I did, or I'm not a dirty cop, or I'm not this or I'm not that, something.  Because, I mean, from my experience and everybody I know, you think they're going to hire somebody that has a pending lawsuit.  I believe -- he'd (indicating) actually made a comment earlier, I'm not going to hire somebody that has a pending lawsuit against somebody.  That is the general consensus of everybody I've talked to.

BY MR. HEBERT:

Q    I didn't hear this morning that you've made any actual applications for employment at other departments.  Did I get that wrong?

A    No.

MS. LIU:

Objection to the form.

A    Have I filled out an actual application to go through employment?  No.  Because I am -- one, I've been with the City so long, I'm vested now, so I'm kind of stuck.  I have four years, seven months and some change left the first I can get the hell out of here.

BY MR. HEBERT:

Page 235

Q    Are you in the MPER, Municipal Police Employees Retirement system?

A    Yes.

Q    You could transfer to have service credits to another department, couldn't you?

A    And go in as an entry level making less pay that I'm making now.  And not all departments -- like the one I did look at was Carencro.  They have a different type of retirement.  I'm not sure how all of that transpires.  But I've been here 15 -- going on, yeah, 15, going on 16 years.  I've already vested so much, I'm just -- I feel like I'm stuck right now until I can make it to one of those points.

Q    I understood you to say this morning that you had a conversation with a fellow who is thinking about running for St. Landry Parish sheriff, that he would hire you if he won.  And other than that, though, I didn't hear any other conversation with another department about -- about moving or taking another job.  Am I correct about that?

MS. LIU:

Objection to the form.

Page 236

A    I mentioned LSU-E to one of y'all.  I can't remember who I was talking to.

BY MR. HEBERT:

Q    You did mention LSU.  I'm sorry, you did.  Other than those two?

A    Again, it's planning whether I'm going to make an exit, when I'm going to make an exit, when is the best time.  Because right now, I would be losing to leave.  I would be losing retirement.  I would be losing money on the table.  It's -- if we would reverse this to maybe when all this started and I would have been cleared or whatever, I would have been gone a long time ago --

Q    Okay.

A    -- instead of dealing with all of this.

Q    Paragraph 196, I want to go down and take a look at now.

A    Where?  I'm sorry.

Q    Of your First Amended Complaint.  Sorry.

A    You said 196?

Q    Yes, sir.

The -- this is a list of things that you're requesting that the Court order the City of Eunice to do.

Michael Dunn - January 21, 2026

Page 237

A   Uh-huh (yes).

Q   The first one, A, says, (As read:)  Issue and require the use of head mounted body cameras or video recording eyeglasses by all Eunice police officers.

Now, since the time that Chief LeBouef has become Chief now, the Eunice Police Department has dash cams and body cams, correct?

A   Correct.

Q   Not -- they don't have head mounted body cameras or video recording eyeglasses, but what -- is that a material difference to you or --

A   It's not a material difference to me.  I am ecstatic that we've got cameras now.

Q   Correct.

A   But policy is still not being followed. There's shit still happening that should be corrected.  That's my opinion.  That's what I see.  I wear my camera.  I -- religiously. Sometimes it might not get turned on right then in the middle of a fight or when my guys are fighting with somebody because it slips my brain, but the moment I get a chance.  If

Page 238

you hit Code 3 on your lights, your stuff automatically turns on.  So --

Q   As far as what's stated --

A   -- the cameras are awesome, but if it's not going to be enforced, then it's for naught.

Q   As far as what's stated in the lawsuit to issue and require the use of body cameras or video recording cameras, I mean, that's -- you would consider that to have been already done, except for you say the non -- non-compliance with the body cam policy?

MS. LIU:
Objection to the form.

BY MR. HEBERT:

Q   They did issue body cameras, correct?

A   Correct.

Q   So -- and you said in your previous deposition that the reason that you wanted that is if you need -- some stuff needs to be documented.  Whatever goes on on scene needs to be documented.  You can do that just as well with a body cam as you can with the video eyeglasses, can't you?

A   I agree with that.

Q   Okay.  Number C says, (As read:)  Require the

Page 239

Eunice Police -- sorry, I talked fast again, didn't I?

C says, (As read:)  Require the Eunice Police Department to revise its policies to mandate that officers intervene to prevent the use of excessive force or other illegal conduct by fellow officers.

A   Uh-huh (yes).

Q   The Eunice policies have already been revised since Chief LeBouef has come in to provide for exactly that, would you agree with me?

A   He has updated them.

Q   To provide -- to provide for officers intervene to prevent the use of excessive force, right?

A   Yes, sir.

Q   Okay.  D says, (As read:)  Issue and implement mandatory policies and procedures to ensure that employees of the Eunice Police Department submit accurate records of daily hours worked.

Go ahead.

A   When we get done with that, I need to go back to the one you just talked --

Q   To the one -- to the one --

Page 240

A   About the policy.  Again, you can have it on paper, unless it's enforced or manda.. -- or actually followed, then it's pointless.

Q   (As read:)  Require the Eunice Police Department to revise its policies.

The policies have been revised, correct?

A   They have been revised.

Q   All right.  (As read:)  Institute and implement mandatory policies and procedures to ensure that employees of the Eunice Police Department submit accurate records of daily hours worked.

That's already within the policies, correct?

A   Again, in policy but still not being followed.

Q   Not being followed?

A   And I actually was asked to do an actual investigation.  I did the investigation.  I gave them my findings, and told not to look any further.

Q   Who told you not to look any further?

A   Deputy Chief Jeremy Ivory.

Q   How long --

A   He said he would handle it.

Michael Dunn - January 21, 2026

Page 241

Q  How long ago was that?

A  Within the last six months.

Q  What was the issue?

A  Records wasn't matching with a certain K-9 handler. And he asked me to look into his records, his time submitted and stuff. And there were some severe irregularities. And I produced them and everything -- he said he was going to handle it. I left it at that. I quit worrying about it after that. And I kept being informed that even though I'm a lieutenant, I can't issue anybody orders, I can't tell anybody anything within the K-9 division. So what they do is their business.

Q  Who else is in the K-9 division besides you?

A  Sergeant Chase Goudeau, Officer Wesley Rozas and Officer Brian Wildes.

Q  Somebody told you you can't issue orders to them?

A  Yep.

Q  Who told you --

A  That I'm not a K-9 supervisor. Which doesn't matter if I'm a K-9 supervisor or not, if I see somebody doing something they shouldn't be doing, I'm still a lieutenant, I can issue

Page 242

orders if I need to.

Q  Who told you that you couldn't issue orders to them?

A  Jeremy Ivory, he said it was not my responsibility or my job.

Q  Okay.

A  So I --

Q  How long ago did that happen?

A  Within the last six months.

Q  Okay. I didn't see either of those incidents in any of the notes that you produced, so that --

A  It goes back to what I stated earlier, at a certain point, I just -- I'm not going through all of this again, so I just stopped worrying about it. I say what I got to say, do my job and what I think covers my job and I'm done.

Q  Okay. So the way this started off is you wanted to make sure that you documented everything to protect yourself. But some time since your last deposition in January of 2023, you decided to just stop doing that; is that right?

A  It's been nothing but hell for me, and it's

Page 243

been nothing but hard on me. I do what I have to report, I say it and I move on. I'm done with it. I'm just -- this -- this whole situation has taught me, keep your head down, keep your mouth shut. It is just not worth it.

Q  So the answer to my question is that --

A  Sorry.

Q  -- sometime after January of 2023, you decided to change what you've been doing before, which was to document everything to protect yourself, and you just decided to stop doing that at some point. Yes?

A  To clarify. As far as I know, I have nothing moving towards me, nobody is trying to arrest me, nobody is trying to do anything I didn't do, so it's not affecting me. I follow the policies that you see a problem, you report it to your supervisor. That's as far as I go with it anymore.

Q  I appreciate your explanation. Just -- and you're welcome to explain your answer, but I first need you to answer.

A  Okay. I missed it.

Q  The question is, at some point after your

Page 244

deposition in the previous part of your deposition on January the 6th of 2023, you decided to change your prior practice of documenting everything to protect yourself and just quit documenting things.

MS. LIU:
Objection.

BY MR. HEBERT:

Q  Is that accurate?

MS. LIU:
Objection to the form.

A  Close. I mean, I --

BY MR. HEBERT:

Q  What's wrong? What's inaccurate about it?

A  In a way, I just kind of gave up. I just, what's the point? So I don't know how else to answer your question.

Q  So you stopped documenting things?

A  Just -- no, if it happened at work and I had to, it got documented and turned over. I don't keep track of nothing no more. It's not worth my time or effort. Because if nobody is going to listen to me, nobody wants to hear anything I've got to say, then -- and I'm over here in a corner or island by

Michael Dunn - January 21, 2026

Page 245

myself, I'm just going to stay on the island by myself.

Q   Okay.  These last two things that we talked about, one was with regard to investigation of hours worked, and the other one about being told that you can't give orders to the K-9 division, were those -- were either of those documented somewhere?

A   Nope.  I just -- it is what it is and moved on.

Q   All right.  Turn to page 51, Subsection I, asking the Court quote, (As read:)  Order that the City, quote, deploy Eunice police officers with appropriate and adequate supervision.

What would you intend for the guidelines to be for appropriate and adequate supervision?  What does that mean?

A   I believe when all of this was originally going on, we were working with one, two people on the road when we by ourselves.  And we had shifts with no supervisors working.

Q   Understaffed --

A   Understaffed.

Q   -- horribly.

Page 246

A   Oh.

Q   Yes.

A   I can tell you, and it is a horror story.  We had a murder with only one person on duty.  And that was -- sad part, we were ordered that we couldn't go help.  But I disobeyed order and I went anyways.  A man lost his life on 2nd Street because we was understaffed because of this -- some of this BS.  Because they had an ax to grind with some of us, they forced us to work like that.

Q   Chief testified yesterday on behalf of the City that when he took office, the PD had 13 opened officer positions, and now they only have three opened officer positions.  So --

A   I'm not --

Q   -- would you -- would you agree that a great deal of the short staffing problems that existed under Chief Fontenot's tenure have now been addressed?

MS. LIU:

Objection to the form.

A   It's not necessarily -- that is a point, yes.  The other issue is you have supervisors out there that don't know their ass from a hole

Page 247

in the ground.  I keep cussing, I'm sorry.  They don't know what they're doing.  They're making mistakes.  They're out there, they need to be adequately trained or they need the experience.

Because that's one thing I disagree with the Civil Service system, you might be able to pass a test but you don't know what the hell you're doing.  They need to have the proper training to know what they're doing on the street.  And that's the only thing I have a problem with the way the testing is because somebody might be a good test taker, but don't know how to do their job on the street.  And that's an issue for me.  And there's people that don't know how to do their jobs, or -- in my opinion.  I mean, that might be fine for him, but it's just my opinion.

Q   All right.

A   Now maybe not so much now.  I mean, time has passed.  I mean, we have a -- I think we have a pretty good group of supervisors, I think, now.

Q   Now that Chief LeBouef has taken over?

A   I believe so, because, I mean, they --

Page 248

they've got experience on the street now, they're doing better.  But I mean, at that time when this was occurring, we had people out there didn't know -- didn't know what the hell they were doing with rank.

Now, I don't hang out with nobody anymore.  I don't worry about other shifts.  I worry about my -- this is what I got to worry, this is my responsibility.  I don't worry about looking nowhere else.  I mean, if somebody asks me a question, I'll be more than happy to help them if they need something to learn or they need help.  I stay to myself.

Q   You testified earlier that there were still some things that needed to be fixed in the department, but you didn't say what they are.  What are they?

A   I started, but then the line of questioning changed.

Q   All right.

A   I already told you about the Mardi Gras incident.  That one -- that one bothers me that an officer is allowed to do that and there was nothing done.  That he got ripped

Michael Dunn - January 21, 2026

Page 249

out of a car, hadn't committed a crime, hadn't done nothing, just because he called the officer -- I can't remember what the word was -- a derogatory word, he rips him out of the car and threatens to beat the hell out of him. That's a problem. Was it on camera? It should have been, we was all wearing cameras. But when I go try to report it, they're laughing and cutting up about it. So what's the point of me even opening my mouth. Oh, here's something else he's ratting out about. I turned right around and walked off. Because obviously the man that did it bragged about it, so to the supervisors, you don't need me no more.

Q   And to our previous point, that -- what you just described is not documented anywhere, is it?

MS. LIU:

Objection to the form.

A   As far as I know, no. It's fresh in my mind. I mean, I'm not going to forget it. It was Mardi Gras last year.

BY MR. HEBERT:

Q   Okay.

Page 250

A   And Mardi Gras is right around the corner again, so I wonder what's going to happen this time.

Q   All right. So what else needs to be fixed, in your view?

A   I know -- me and the Chief, the current Chief have had this discussion, and it's just a difference of opinion. I think the policies are too vague. The reason why I feel they're too vague, I have no issue, I like him as a person. I'm not saying he's the problem. But what if we get another Randy Fontenot? That policy being so vague can be interpreted any way they wish, to punish who they want or exonerate who they want. That's why I do not like vague policies because they can be interpreted by so many different ways and whoever is reading them.

It's not you got to do X, Y and Z. Well, if I did X, Y and Z, then I'm covered by policy. If it's too broad or vague, then it can be up to interpretation to anybody. So if they don't like you, oh, yeah, you violated this policy. Which, I mean, I think I've -- in my mind I think I've proven that

Page 251

already, but it is what it is.

And it has to be followed. If we're not going to follow policy, I believe they become null and void. From my understanding of Civil Service law and my counsel, that once a policy has been not followed for so long, it's -- it's nonexistent, it doesn't belong there anymore because it's just not being followed.

Q   I want to -- now I want to follow-up on that.

A   Sure.

Q   Your understanding of the law is that if a policy is not being followed, then it is --

A   It's unenforceable.

Q   -- it's nullified?

A   It's unenforceable.

MS. LIU:

If you got any of this understanding from counsel, then don't answer it, please.

A   Oh. I can refer back to Civil Service cases in the past. If I have Employee A doing X, Y and Z, which violates policy. Employee B -- but I let him get away with it.

Employee B did the same policy

Page 252

violations but I'm trying to throw the book at him, it's going to get thrown out unless if they can show that that policy has not been followed and continuously violated, then you don't -- Chief LeBouef doesn't stand a chance to discipline an employee if that policy is continuously violated and never disciplined, never disciplined, oh, okay, well, this date this officer pissed me off, I'm going to hit him for his violation. But if they show a documentation that it's been violated, violated, violated, it's going to get thrown out.

BY MR. HEBERT:

Q   Since the time that you became a lieutenant in 2016, has there been -- has the police representative on the Civil Service Board always been Donnie Thibodeaux, or was there somebody else?

A   To what point? I apologize.

Q   2016 to the present, was there ever -- was the police rep anybody other than Donnie Thibodeaux?

A   Yes.

Q   Who preceded him?

Michael Dunn - January 21, 2026

Page 253

A    Donnie Thibodeaux was the Civil Service representative. But from my understanding and appreciation what took place, there was a campaign against him to get him out of that position because of -- they called him corrupt and he was fixing or rigging Civil Service investigations or something, that he was basically going against the City just for the hell of it and was rigging stuff. And that was the rumor that was going around. And now Lieutenant Doyle is now the Civil Service rep.

Q    When did that happen?

A    In the last two years.

Q    Okay.

A    And as officer --

Q    Police officers vote on the police rep, right?

A    Correct. And there was an active campaign inside the police department to make sure Donnie didn't get that position.

Q    Okay. Before Donnie got replaced, as you just described, from 2016 up to that time, was it always Donnie Thibodeaux?

A    As the representative?

Page 254

Q    Yes.

A    Yes.

Q    Okay.

A    From the best of my recollection.

Q    You made a comment today for the first time that I wanted to explore that had to do with a conversation that you either were involved in or overheard where an allegation was made by a police officer that meth was being sold at the Mayor's private business --

A    Yes, sir.

Q    -- right?

    How long ago was that?

A    Oh, that's been a minute. That's been probably around the same time all of this started. And there should be also a comment or a notation in my notes, they also accused the Mayor of selling fake football tickets and some other crap. I mean, I didn't believe it. But it was around the same time frame. You'd have to review my notes because I know I made a comment about it, because -- and then plus them trying to get us to arrest him for driving while intoxicated and other things, it was around that same time frame.

Page 255

Q    You made a note about the meth in your --

A    I actually forgot about it. And then when we was talking about it, it was just a memory jog.

Q    Okay. I mean, if you -- if you had believed that to be true at the time, I mean, you -- or any of those officers listening to that and believed that to be true at the time, you would have had some duty or obligation to go investigate it, right?

A    Yeah, we had --

    MS. LIU:

        Objection to the form.

A    We had nothing other than a rumor that that was going on. There was no substantial claim, no nothing. I had never seen anything, nothing that caught my attention.

BY MR. HEBERT:

Q    Okay.

A    I mean, he's the Mayor. I don't think he's doing meth at the shop, I mean.

Q    Yes.

    Well, I mean, including you, I mean, you didn't investigate it, did you?

A    Say investigate. Someone makes a comment or

Page 256

someone says, hey, this is going on at this drug house, I'll make a couple of passes, I'll look around, nothing is catching my attention, nothing is screaming this is true and I have nothing to go off of, then no.

    I mean, do you call that an investigation? I don't -- but I mean, I don't know how else to describe it. I don't think that's an official investigation or unofficial. It's just --

    I'm trying to think of another example.

Q    I think you gave -- I'm with you.

A    Okay.

Q    I'm good.

    So, but the bottom line is, nobody in that conversation, all police officers apparently took that scuttlebutt seriously enough to go do anything about it? Because it was just rumor, as you said --

    MS. LIU:

        Objection to the form.

BY MR. HEBERT:

Q    -- right?

A    I can't remember. You'd have to ask the Mayor. I don't remember. I can't remember

Michael Dunn - January 21, 2026

Page 257

if it was one of his employees or what it was. Meth was discovered at the shop. But I think he -- I believe he called me if I remember correctly. One of the employees had a bag of meth under the counter or something, it was for personal use, I'm guessing.

Q    How long ago was that?

A    That's been a minute. It's been some years. I mean, I can't give you the exact date. I just -- I remember the conversation briefly.

Q    Before or after this rumor, scuttlebutt conversation that we --

A    The selling of meth was before. Now, they said it was, don't quote me, I don't remember his name, it started with a T. They said he was the one supposedly selling it out the shop. It started with a T, I think.

Q    Wait, this is the rumor part that happened?

A    Yes.

Q    Okay. One thing --

A    I can't remember his employee's name. I can picture his face, but I can't remember his name.

Q    One thing I didn't understand is, were you a party, were you physically present while that

Page 258

conversation was ongoing, or did somebody tell you about it later?

A    Talking about him having meth at the shop?

Q    Yes. Yes, sir.

A    I was privy to that conversation.

Q    Okay.

A    That was Victor and Ryan when all of this stuff was being brought up.

Q    Okay.

A    And I believe that was the same time frame the fake football tickets came up or something else.

Q    So --

A    It's been awhile, man. I'm telling you it's been a couple of years, things are a little blurry.

Q    Rumor -- rumor in this conversation about the meth, and then meth is found on an employee at the shop, but that's still -- that's not enough to trigger an investigation?

A    I'm not sure this --

    MS. LIU:

        Objection to the form.

A    That was during the time frame when everything was taken away from me. I wasn't

Page 259

a part of narcotics anymore. Because Victor is the one that mentioned it that I needed to keep an eye on whatever that employee's name was, and that's when I was still in narcotics working, helping with narcotics.

And then once I got removed from it, I just washed my hands of it. So I mean, it was just something they were talking about. And they he was -- he lived on, it's just outside the city. Not Sharon Street. It's just north of town, that's where the man lives. I can't remember his damn name. He was supposedly the one selling it. I wasn't in narcotics. That's their problem.

BY MR. HEBERT:

Q    So the finding of the meth happened during the period of time you were still taking notes, right?

A    I'm pretty sure it was during that time frame.

Q    There's nothing in your notes about the fact that somebody found some meth at the shop and nobody went to investigate?

A    He found it. He's the one that called us. He's the one that found the bag of meth at

Page 260

his shop.

Q    And my question -- my question, though, is, there's nothing in your notes about meth having been found at the Mayor's shop and nobody went to investigate it. Like that wasn't a beef that you put in your notes that you had with anybody?

A    As I stated earlier --

    MS. LIU:

        Objection to the form.

A    -- it was something as we were talking, I recollected. And if it's not in my notes, it's not in my notes.

BY MR. HEBERT:

Q    Okay.

A    It's just something I recollect. I don't remember everything. A lot of -- a lot of stuff happened. I wrote down what I thought was important.

Q    And --

A    And that I probably dismissed it because, I mean, I didn't believe it, I didn't see nothing to substantiate it. So why would I want to make a note that the Mayor is doing something, or his employee is doing something

Michael Dunn - January 21, 2026

Page 261

that I didn't see to be truthful. So if that answers your question.

Q  It does. And the whole thing -- the whole thing started with this rumor that all the officers were in the conversation that they had a few years earlier about somebody supposedly selling meth at the Mayor's shop?

A  I don't see it as a rumor. The way it was approached and Victor telling us. You know, he's the narcotics detective, he's the one that knows all this stuff. All this stuff is going on, so I mean, if he said it, I mean, you would think there's something to it. But we never seen anything to it.

Q  Well, you're the one who called it a rumor earlier --

A  I don't --

Q  -- that's why I used the word.

A  I felt it to be bullshit because I think they were mad at the man.

Q  Okay.

A  I didn't see anything to substantiate what I heard.

Q  All right.

A  And if I would have, I would have acted on

Page 262

it. I didn't see anything to substantiate it. I didn't see any odd people going to his shop. I didn't see people going in for five seconds and making a drug deal. I didn't see all of that. So I feel it's BS.

But I do distinctly remember that, if I am correct, Mayor Scott Fontenot had discovered one of his employees had some on his person, or under the desk, or something at the office. It was a little small bag and it was turned over to the police department.

Now, I was a part of narcotics. I had not part. I don't know if anybody got arrested. I don't know what took place after that. I just remember getting a phone call, or me and him having a conversation, I'm not 100 percent certain. I just know he's the one that reported it.

Q  And the person -- you added a detail here at the end that I wanted to explore.

A  Sure.

Q  The person, the conversation about somebody selling meth out of the mayor's shop --

A  Uh-huh (yes).

Q  -- your testimony is the person who said that

Page 263

rumor in the conversation was Victor Fontenot?

A  Yeah, he was the one that was talking about it.

Q  That's what I think I heard you.

A  Yeah, he was the one talking about narcotics being sold out of the Mayor's tint shop.

Q  All right.

MS. LIU:
Sorry. Do you have a lot longer or could we take a break?

MR. HEBERT:
We can take a break. The question of whether I have anything else.

(SHORT BREAK TAKEN IN DEPOSITION)

BY MR. HEBERT:

Q  Mr. Dunn, I'm still looking at paragraphs 195 and 196 of your Complaint. Starting with 195, I just want to go through these A through D, and then 196 A through G. And with each of them, I have the same question.

And are these things that the federal court is being requested to order the City of Eunice to do, are they your idea, did they come from you, or did they come from

Page 264

elsewhere?

MS. LIU:
Objection.

MR. HEBERT:
And that's my -- that's -- so I just want to make take these one at a time and understand that the objection be generally continuing as to all these individual items.

A  Do you want to wait until we go after each individual one?

BY MR. HEBERT:

Q  Yes, sir.

A  Okay.

MS. LIU:
I guess a standing objection. And instruction, if it comes from counsel, then don't provide the answer.

A  Okay.

BY MR. HEBERT:

Q  But we want to know that it came from counsel, but you don't have to tell us that -- forget that. You answer and the will figure it out.

A  Okay.

Page 265

Q    All right.  (As read:)  A, Assign Lieutenant Dunn to any departmental duties comparable to the rank of a lieutenant at the Eunice Police Department, including but not limited to reinstating Lieutenant Dunn to handle narcotics investigations.

Your idea?

A    Yeah.  I mean, that was the best I can come up with because I'm -- because I know this question has came up before.  I don't know how else to -- I think Mr. Stamey was asking me some questions.  Instead of, I think finances and other things have came up, I didn't do this to benefit me.  I tried to do it to the benefit of the City.  And that's where I see me being most beneficial and that's what I was good at so, why won't you let me do it?  Whether it happens or not, I mean.

Q    Okay.  Did you have any assistance from the ACLU in putting together these lists of things for the Court to order?

MS. LIU:
Objection.  Privileged.  Instructing you not to answer.

Page 266

MR. STAMEY:
There's a difference between counsel and the ACLU?  I just want to make sure.

MS. LIU:
ACLU is counsel.

MR. STAMEY:
You're --

MS. LIU:
They signed --

MR. STAMEY:
ACLU is not on the pleadings, are they?

MS. LIU:
They signed the Complaint.

MR. HEBERT:
They did.

MS. SYLVEST:
Yes, they did.

MR. STAMEY:
Yes, but are they on the pleadings as a named party?  That's the ACLU law firm, but they are not a party, correct?  And they are not a privileged entity as it relates to any communications.

Page 267

MS. LIU:
They're a counsel of record.  We -- our position is that any communications with ACLU in connection with this lawsuit is privileged.

A    I think --

MR. STAMEY:
Is there a difference between ACLU and the ACLU employed lawyer?

MS. LIU:
It is -- it is privileged communications.  That's our position.

MR. STAMEY:
Let me study that then.  Go ahead.

MR. HEBERT:
And let's clarify this for the record and then I'll move on.  It may cut my questions a lot shorter.

But counsel of record on the Amended Complaint are two lawyers for ACLU Foundation of Louisiana and the Sidley firm.  And it's not clear to me that ACLU Foundation of Louisiana would be a provider, an attorney, to provide legal services because their attorneys

Page 268

are signatories to the Complaint.  Our position would be, and then we'll move on, make our positions clear for the record, that communications to the ACLU, unless -- unless these lawyers for the ACLU were also involved in the communications would not be privileged.

A    If --

MS. LIU:
I --

A    If I can talk to you and probably clear this up.  It's easy.

MS. LIU:
We can speak privately.  But we would obviously disagree with that position.  We can speak.

A    I think I can answer what he's asking without --

(SHORT BREAK TAKEN IN DEPOSITION)

MS. LIU:
So I think to clear it up, you may want to ask him on the record how many times he has talked with the ACLU, but he will not reveal the substance of those conversations.  How many times he

Page 269

has talked directly with the ACLU.

MR. HEBERT:

Okay. And I mean, and yes, when would be another, would be another important thing, but okay.

MS. LIU:

Sure.

A    Okay. What's your question, sir?

MR. HEBERT:

Can you read back the last question asked? I think it was about a lawyer argument after the objection.

(QUESTION DULY READ BACK)

BY MR. HEBERT:

Q    So Lieutenant Dunn, how many times have you spoken to the ACLU?

A    To the best of my knowledge, I've only spoken to a representative or person there twice and that was years ago when all of this first started.

Q    Okay. One of those was the call that we already talked about in your deposition, right?

A    (Witness nods affirmatively.)

Q    Yes? Say yes out loud.

Page 270

A    Yes. That would be a yes, because it was a number I didn't recognize and I was making sure this is legit.

Q    Okay. How long after that call was your second communication with the ACLU?

A    There was one prior to that. You asked me earlier if I had a receipt or --

Q    An e-mail?

A    -- an e-mail or something. I just remember receiving a phone call that, you know, they received my complaint and they were looking into the matter or whichever have you.

Q    And that was before --

A    That was before.

Q    -- the call that we talked about earlier in your deposition?

A    Correct. To the best of my recollection, yes, it was prior to that. It happened after I filed my complaint. Is there an actual form or electronic e-mail, no, I just remember getting a phone call.

Q    And that call was to you from the ACLU?

A    From a representative from the ACLU, I believe from Baton Rouge.

Q    Okay. And then you had a second call with

Page 271

someone?

A    I called them, because I didn't recognize the number and I didn't want to -- because I know there's a lot of reporters that were trying to get a hold of my number, or trying to schedule interviews with me. And no, I wasn't talking to no reporters. So I did make sure I wasn't getting, lack of a better term, catfished. So I wanted to make sure it was legit whatever number was calling me.

Q    Was the person who you communicated with the second time the same person that you communicated with the first time?

A    I'd be lying, I don't know.

Q    You don't know?

A    I don't recall, man. But that's years, a good minute.

Q    Do you know whether they called from the same office or location?

A    No, sir. The only thing I can tell you, it was a female. I mean, I know it was a female voice I was speaking to on the phone, I remember that much.

Q    Okay. So the best of your knowledge and recollection, you had two contacts only with

Page 272

the ACLU, both by telephone only?

A    Correct. Best of my knowledge, yes, sir, that was it, just by telephone.

Q    All right. And at some point after that, you got a lawyer? You talked a good bit about that earlier.

A    Yeah.

MS. LIU:

Objection to the form of the question.

A    Who's representing me now.

BY MR. HEBERT:

Q    All right. And so about how long after your last call with the ACLU did you get a lawyer?

A    I remember from my testimony earlier, I said it was within six months, I believe, or within a short time frame.

Q    Okay.

A    It felt like it was a short time. I don't recall the exact day, week.

Q    Okay. During -- during that six-month period, were you already writing up some things that you thought ought to be required by the Court in a lawsuit?

A    Originally was the idea is what I thought

Page 273

would fix the department and fix the problem that we faced. I was coming up with ideas to, what could I possibly do?

Q And you started doing that -- you started doing that even before you got -- you got a lawyer?

A I was thinking that when all of this -- from the first time I started noticing problems, like, what can I do to help fix the problem? What can I do to fix this? What can I do to fix that? So yes, I had some ideas of my own.

Q And did some of those ideas make it into this list in paragraphs 195 and 196?

A Yes, sir.

Q All right. So now let's go through them one at a time. Can you tell us which one of them -- which ones of these are your idea?

A Okay.

Q Okay. We already talked about A --

A Uh-huh (yes).

Q -- I believe. So I'm looking at 195A.
Now, 195B, (As read:) Expunge from Lieutenant Dunn's personnel records any and all notations, complaints and/or related

Page 274

references to any baseless internal investigations or other actions taken by defendants as retaliatory measures against Lieutenant Dunn, including without limitation, Defendant Officer Fontenot's baseless investigation into Lieutenant Dunn during the period of June 2020 to March 2021.
Is that one of the ideas that originated with you?

A Yeah. They just helped me put it, I guess, in a different format, but those are my ideas. That was my idea. Because there was an ongoing issue with we have one personnel file over here that contains X, and then the Chief of Police, or whoever else, is having a secondary file with a bunch of baseless stuff. And then you never know when it goes in your folder, when it gets taken out, you don't know.
And if somebody does a Public Records Request, they could slip something in and you have no way of retracting it other than if it's baseless. It's not supposed to be in there if it's baseless or unfounded.

Q All right. The reference to Officer

Page 275

Fontenot's baseless investigation into Lieutenant Dunn during the period of June 2020 to March 2021. Is that -- what incident is that referring to?

A That's when they were -- just that one part right there is when they was trying to say I was a dirty copy and accepting bribes.

Q That's the Joshua Dupre incident?

A And there was another one that was in my file about the KC Hall incident. Which I was cleared from that one because it violated my first amendment rights. So that was supposed to be taken out of my file, but it was still there the last time I checked.

Q So C, 195C says, (As read:) Declare that Lieutenant Dunn is an officer in good standing and has not been under any legally justifiable or proper investigation conducted by the Eunice Police Department since June 9th of 2020.
Did that idea originate with you?

A That was when I requested something, and, you know, something -- what am I going to show a potential employer, or how am I going to show somebody that I didn't do all these baseless

Page 276

claims. Because law enforcement is a small community. So whatever rumors this person said, this person said, it's a small community, it's shared throughout. So I at least had something like, hey, he didn't do what they said he did. And that would maybe ease a potential employer's mind, maybe that might help me with something else down the road.

Q All right. But, in fact, you've now been provided with 195C, right? You have a writing stating that you're an officer in good standing and that you've not been disciplined during your time with the department. You have such a writing, don't you?

MS. LIU:
Objection to the form.

A Not to the extent that clears me from all the allegations I've been accused of.

BY MR. HEBERT:

Q Okay. Well, those -- I think those -- maybe those are two different things. But we talked about this morning, and I don't remember the exhibit number, there's a letter

Michael Dunn - January 21, 2026

Page 277

that the Chief -- you wrote for the Chief and the Chief agreed to sign it --

A    Uh-huh (yes).

Q    -- so that you could get your required narcotics certifications that says you're an officer in good standing. We talked about that. Do you remember that from this morning?

A    Yes, sir.

Q    Secondly, do you remember at the settlement conference that we had here with the Magistrate, that the City of Eunice offered to provide a letter that states that you have been an officer -- you're an officer in good standing and you have not been disciplined during the time of your employment?

MS. LIU:
    Objection. Talking about settlement discussions on the record.

MR. HEBERT:
    I think that it is -- it's not offered to prove liability, it's offered for a different purpose.

MS. LIU:
    You can answer.

Page 278

A    I know it was discussed. I know that counsel was going back and forth. But from what I heard that there's been no movement on that topic at all. So I haven't asked any more questions thereof.

    But just because -- again, he's a Chief right now, I'm in good standing with him. I wasn't in good standing with the Chief prior to this. I have nothing to clear me of all of this crap.

    Again, this is still a pending lawsuit. Who in their right mind would hire somebody that has a pending lawsuit against the City? Is he a liability? Is he this? Is he that? There's nothing clearing me. That's why I'm ready for this to be over. That's why I'm ready to move on. Either I stay with the police department or I go somewhere else. I'm ready to move on. I'm tired of reliving this.

BY MR. HEBERT:

Q    So what's your position on the letter that was offered by the City that stated that you were an officer in good standing and that you haven't been disciplined during your tenure

Page 279

with the department? Is that insufficient?

A    In my opinion --

MS. LIU:
    Objection to the form.

A    In my opinion, yeah, it's insufficient. It doesn't cover that I didn't do what they said I did. Oh, I'm in good standing. Here's the thing, you pick up the phone, call this Chief, hey, man, yeah, I gave him a letter just to get him the hell out of my hair. I know that's happened. I've seen it happen. I'm not saying he did it, but I've seen it happen before. I want something that is detailed to say I didn't do something.

BY MR. HEBERT:

Q    What -- okay. You want a letter that doesn't just say that you're in good standing and that you haven't been disciplined during your tenure with the department. You want to go one by one through each allegation that you contend has been levied against you and state that those allegations were not founded?

MS. LIU:
    Objection to the form. We're getting into settlement discussions. I

Page 280

mean, we've given you the letter that we find sufficient.

BY MR. HEBERT:

Q    And the City gave its response and I'm asking you about the City's response.

A    I thought that was insufficient.

MS. LIU:
    To the extent it touches on conversations with counsel, don't answer that question.

BY MR. HEBERT:

Q    Do you have anything else to say about that, other than conversation that you had with your lawyer?

A    Just the earlier response I gave, it's insufficient, in my opinion.

Q    All right. Moving on to subparagraph 195B, (As read:) Acknowledge and publicly apologize for the retaliatory actions made against Lieutenant Dunn which have impeded Lieutenant Dunn's ability to seek future employment and tarnished Lieutenant Dunn's moral character and reputation were, in fact, retaliatory and unlawful.

    Did that idea originate with you?

Michael Dunn - January 21, 2026

Page 281

A   (Witness nods affirmatively.)

Q   You have to answer out loud.

A   Yes, sir.  I'm sorry.  Yes, sir.

Q   Okay.  And have you had an opportunity to read any of the Court's rulings in this case?

A   You said rulings.  You didn't say --

Q   What?  What?

A   At a certain point in time, I've kept up with everything.  But once I got to a certain point, for certain things that was in filings, I just stopped keeping track of it because I --

Q   Okay.

A   I stopped keeping track of it because it was -- I felt some of it was underhanded and I didn't appreciate it, so I just -- I'm not going to keep involving myself in that.  I'm not an attorney.  No, I'm not going to keep track of it anymore.

Q   What did you think was underhanded?

A   Just some of the wording I found, some of the fightings -- filings rubbed me the wrong way.  It upsetted me.  I just -- again, just like with the depositions, I just stopped

Page 282

following along after a while.  I just -- I'm not going to keep putting up with it, keep listening to it.

Q   Okay.  Have you seen the Court's ruling in any of the motions that were filed by Randy Fontenot about whether a public apology should be required?

A   I don't know if that's a privileged conversation or not.  I know I had found some --

Q   I just want to know if you've seen it.  I'm not asking if you talked to your lawyer about it or what your lawyer said about it.  I just want to know if you've seen it or you've read it.

A   Yes.  I disagree with it, because the other Courts have also made the same ruling in the other states and you see it.  I found court cases where it's happened before and where it has been ordered.

But from my understanding and appreciating what they've said here is that it can't be done.  Well then why am I seeing other courts doing this?

Q   You went and did some legal research to see

Page 283

if there were other cases where courts had ordered a public apology?

A   Yes.  And I've also researched other cases similar to mine trying to find something similar.  Am I the only person stupid enough to try to do this?  But no, obviously there's a few people that do it.  I know there's one just out of Houston.  There's another one just came out of Seattle.  There's another one that came out of -- I know there's another one here in Louisiana but I can't remember what year it was, or it's not that recent.

Q   Did you do that research before or after you came up the idea for the public apology?

A   No, it was after they said they didn't agree with it because I know I've seen it.

Q   Okay.  After you were informed of the Court's ruling?

A   Yeah, they disagreed with it.  And I had seen -- I know I've seen it before, so I did some research on it before.

Q   Okay.  196A, (As read:)  Asking the Court to, quote, issue and require the use of head mounted body cameras or video recording

Page 284

eyeglasses by Eunice police officers.

Again, did that idea originate with you?

A   Yes, because I believe in cameras, I believe in recording.

Q   Okay.  Cameras -- cameras, generally, I get it.  But did the idea of the cameras being head mounted or being video recording eyeglasses, did that idea originate with you?

A   That was mine.  Because back in 2000, between '14 and '16, I believe, I had an Axon Flex head mounted camera and it had a tilt to it, or a slight canted to it.  So even if I'm looking down the barrel of my firearm, if I'm pointed at somebody, it sees exactly what I'm seeing.  That's why I was so enthused with that particular model because you -- because what we have today, depending on where an officer puts his stuff on his chest -- so if I do this (indicating) and I hold my firearm out, now my camera is obscured, it can't see details that's going on.

That's why I preferred these, which I'm happy we just got a damn camera, to be honest with you.

Q   Okay.

Michael Dunn - January 21, 2026

Page 285

A    We have a camera.  I'm happy that part.

Now, about the enforcement of it, that's a whole other topic.

Q    196B, (As read:)  Require crisis intervention and deescalation training for all Eunice police officer -- I'm sorry, Eunice Police Department employees who respond to mental health emergencies.

Did that idea originate with you?

A    Yes.

Q    All right.

A    Do you want me to elaborate, or --

Q    Sure.  Certainly.

A    Because I've seen too many incidences where somebody was suffering from a mental breakdown, or they're mental subject and they have mental issues to where they've tased them, they beat them up thinking they're something else and they're not.  They're just -- they're a mental subject and it was handled severely wrong.

Q    All right.

A    And we don't have any -- I even went back and looked at POST.  I just got through doing my POST training.  I don't see anything in there

Page 286

that even covers those topics.  And that's required training.  Well, no, let me rephrase.

POST is required.  Stuff that's on POST, I don't think see anything on POST to cover these topics.  The only thing that was on there was communicating with the deaf and a two paragraph section in use of force, part 2, talking about a mental subject.  It was two paragraphs.

Q    Okay.

A    That's the only thing I remember after just completing POST training yet again.

Q    And POST is the statewide standard --

A    Standard.

Q    -- for law enforcement officers?

A    Correct.

Q    Right.

A    If it's there, I missed it.  And I've asked several people, hey, did you see something I missed?  I didn't see it.

Q    All right.  196C says, (As read:)  Require the Eunice Police Department to revise its policies to mandate that officers intervene to prevent the use of excessive force or

Page 287

other illegal conduct by fellow officers.

Did that idea originate with you?

A    I maintain the exact incident caused me to have that thought.

Q    What is it?

A    The one that occurred in front of my house when they skull dragged somebody and slammed him into the concrete in handcuffs.

Q    All right.  Is that Kenneth Charles?

A    Yes.

Q    Okay.  196D, (As read:)  Institute and implement mandatory policies and procedures to ensure that employees of the Eunice Police Department submit accurate records of daily hours worked.

Did that originate with you?

A    Yes, sir.

Q    All right.  E, (As read:)  Fund and appoint a full-time paid investigator to the Eunice Civil Service Board.

Did that originate with you?

A    Yes, it did.  I don't know if that's the answer to the problem or not, but that was what I thought would help.  If we're not going to get an outside agency to help us

Page 288

investigate stuff, then have somebody independent that's going to look at this without an agenda, that's going to be objective, that doesn't have sway one way or the other independently.  That's what that's for.

Q    Okay.

A    Whether it looks like that in that context, that's what I was going for.  Somebody independent that doesn't have a bias.

Q    Is it your understanding that the Eunice Fire and Police Civil Service Board could not do that right now if they wanted to?

A    As the board sits right now, my opinion, the answer is no.

Q    Okay.  What constraints do you, in your view, does the Eunice Fire and Police Civil Service Board have toward doing that themselves?

A    What restraints?

Q    What gets in the way of them being able to do that themselves?

A    None of them have been properly trained in Civil Service law except for I think one.  The rest of them don't know Civil Service law at all.  I mean, you can see that in some of

**Lori Heaphy & Associates, LLC**
**337-233-1655**
**285..288**

Michael Dunn - January 21, 2026

Page 289

our filings, or responses you get while you're in the board meeting, or you're in some type of a hearing, they don't know the law.  They need to be trained.

Q   Well, that aside, I mean, if they understood the law, they -- they could do this on their own and appoint their own full-time paid investigator, couldn't they?

A   Well, if they appoint -- maybe I misunderstood something you said.

     But some of them don't understand the laws.  They go off of whatever an attorney tells them whether they agree with it or not.  They, okay, attorney says this, whether -- I don't know how to answer your question.

Q   Okay.  Let -- I understand your point about that you contend they don't really understand Civil Service law.  That point aside --

A   Okay.

Q   -- is it your position that the Civil Service Board does not have the authority to hire its own investigator right now?

A   As far as I know, the answer would be no.

Q   Okay.  And what information do you have that you're relying upon to say that?

Page 290

A   Because if it costs any excess money, they're going to have to have approval from the board -- the city council, or someone, to be able to fund that.  I don't think they can do it on their own.  I know they have probably a certain monetary issue for hiring attorneys and stuff of that nature, but to hire somebody to investigate something, no.

     But the cheapest fact and the easiest fact was to have an outside agency looking at something that can't just -- can't be looked with a non-biased eye.  You have to get somebody else to do it that couldn't be biased.

     But that also raises another thing.  All the biases you could see just in this case and every time I try to reach out to these agencies and they turn right back around and call who I'm trying to report.  So it's -- I don't know what the right answer is, to be honest with you.  I thought this was the right answer, that's why I put it down.

Q   All right.  196F says, (As read:)  Eliminate all fees charged for the furnishing of copies of Public Records Requested pursuant to the

Page 291

Louisiana Public Records Act, Louisiana Revised Statute 44:1 et seq, in the custody of the City of Eunice or the Eunice Police Department.

     Did that originate with you?

A   Yes.  And there was a specific incident that sparked me trying to do something of that nature.  I don't know if it's possible or not.  But there was an incident to where I was trying to show the pay -- the payroll fraud that was going on.  It would have cost me just shy of $4,000 to get the public documents I needed to prove what was going on.

Q   Okay.

A   And I couldn't afford that.  So there was nothing I could do to facilitate or to push that any further, because I don't have that kind of money.

Q   Okay.

A   And any Joe Blow -- I'm a police lieutenant and I've been here 15 years.  I see how much hell I'm having trying to get something done.  Joe Blow sits on the street doesn't stand a chance.  That was the reason why I came up

Page 292

with that.

Q   Okay.  Are you aware that the public records law allows the City of Eunice to charge for responding to Public Records Request for the documents they have to produce?

     MS. LIU:

          Objection to the form.

A   I have been informed of that, that the wording of it or the fee part, there's an issue with it.  I'm not an attorney.  I don't know.

BY MR. HEBERT:

Q   All right.  196G says, (As read:)  Require the Chief of Police to disclose to the public on a quarterly basis the number and substance of internal and external complaints of police misconduct that were received, investigated, deemed unsubstantiated and/or closed by the Eunice Police Department.

     Did that idea originate with you?

A   Yes, sir.

Q   Okay.  Was it based upon some other policy or some other case or lawsuit that you've seen?

A   No, sir.  That came out of the only people that got publicized about what was taking

Michael Dunn - January 21, 2026

Page 293

place inside the police department was myself and Stephanie Myers. Everything else, you never heard about it, you never seen it.

The only two people that got publicly talked about with their write-ups, the complaints, disciplinary, anything, was me and Stephanie Myers. But you had all these other write-ups, all these other decisions made where people done things they shouldn't have done, and it never made it to the light of day, in my opinion.

Q 196H, (As Read): Establish a qualified and independent oversight agency to investigate, mediate and/or prosecute complaints of Eunice Police Department misconduct, including but not limited to complaints of excessive use of force, discrimination based on race, gender, religion, national origin, age or disability, incidents involving death or serious injury, witness or evidence tampering, falsifying reports, bribery, sexual misconduct, use of drugs or alcohol while on duty and/or inmate abuse.

And did that idea originate with you as well?

Page 294

A Not in that context. I was helped with the wording.

Q Okay. I didn't -- I haven't seen anything in your lawsuit that deals with or claims to deal with discrimination based on race, gender, religion, national origin, age or disability. Did that part of this come from you?

A Yes, there was talked about. Now, the age and religion, I probably had some help with that. But the discrimination, I know I talked about it in my last deposition on how the Chief of Police, with witnesses, told him about using the "N" word and being derogatory to African-Americans, and the employee that was targeted, that was talked about.

Q All right. Anything else related to discrimination?

A Not as I sit here right now that's jogging my memory of it.

Q All right.

A But I'm sure there's other issues.

Q 196I, (As read:) Deploy Eunice police officers with appropriate and adequate supervision.

Page 295

Did that idea originate with you?

A Yeah, you had actually asked me earlier about that and I tried to capitalize what I -- tried to explain what I meant by it is we have a training issue. We have people out there doing things that they don't know the law, they don't know what's going on. They need to make sure they know what the hell they're doing.

Q All right. Do you feel like even POST is inadequate for that purpose?

A In my opinion, yes, I feel it's very inadequate.

Q Okay.

A I don't think it covers enough bases. No, I don't think it's adequate enough. And I wish the State would do better, but that's just my opinion.

Q How, in your view, would somebody go about getting POST to add some additional training modules to what you have to --

A Above my pay grade, sir. I'd have to defer it to the man right there (indicating).

Q All right. Because doesn't every -- every commissioned officer has to do what you just

Page 296

did, what is it, yearly?

A Yearly.

Q Yearly go through POST and get that training, correct?

A I'll give you an example. I've been here, I can't quite remember exactly how long we've been doing POST on the computer, the modules haven't changed. I know all the answers. I know the ending to every one of them because they're the same exact training every year. Nothing has changed. 15 minutes of this, 30 minutes of that, it's the same exact answers.

I don't know what else to tell you. Because, I mean, you skip to the end, you don't -- you already know all the answers because you watch the same exact video every year.

Q And regardless of whatever viewpoint we might hold about how adequate the POST training is, the idea of POST is that there's some kind of uniformity across the State for standards for police officers, right?

A The bare minimum.

Q Somebody shouldn't be allowed to carry a gun and be authorized to make arrests unless they

Michael Dunn - January 21, 2026

Page 297

can at least go through those minimum POST requirements, correct?

A  Very minimum.

Because if --

Q  All right.  196 --

A  I want to expand upon that.

Because if that statement was true, we wouldn't be -- some of the things I brought forward, things that I've shown that's happened or tried to show that's happened, well, then that shouldn't have happened if that was adequate enough.  So obviously there's bigger things at play.  Either it's a training issue, it's a supervisory issue, people that shouldn't be cops issue.  I mean, it's -- it's not just simply, it's we watch this little bit and we're top cop number one, no.  Because we --

Q  Don't --

A  -- we wouldn't be facing the issues we're facing today if that was adequate enough.

Q  Bottom line in your view, POST training is inadequate?

A  In my opinion, yes.

Q  All right.  196J, (As read:)  Install a

Page 298

qualified monitor to oversee and report to the Court on implementation of the policies and procedures included herein, including through periodic and regular reviews and audits of the Eunice Police Department's practices.

Did that idea originate with you?

A  The content of it, yes, I just had help with the wording.

Q  Okay.  Did you -- did you do some kind of investigation and research to see if there was some other jurisdiction where monitors like this or the oversight agency that we talked about in H already existed or had been ordered by a Court?

A  From my recollection, there has been in other states.  I'm not sure about Louisiana.  I know I have researched it.

But my theory behind it was if you shine a big enough spotlight on it, all the problems that we're looking at today or what I found should disappear.  Because if you put a big enough spotlight on it, nobody's going, oh, shit, everybody is watching, I can't do this, I can't do that.  And if I know I can

Page 299

get away with it, they're going to test it, if that makes sense to you.

Q  It does.

Did you ever see the ACLU's website post about this case that they had for some period of time on their website?

A  On this case?

Q  Yes, sir.

A  I mean, you Google my name, I'm the third one that pops up.  That was another thing about employment, somebody Googles my name, I'm the third one, boom, Lieutenant Dunn did this.

Q  My question to you is, have you ever seen the Facebook -- not Facebook -- the post that was on the ACLU's website about this case?  I think it's since -- it's either not there anymore or it's been moved.  But did you ever see it while it was up?

A  Just whatever I seen on social media or somebody tagged me.  And I don't know -- I didn't go to their exact website and look at it.  I just -- people tagged me in it, and again, it's fresh, painful, I didn't want nothing to do with it.  I tried my best just to stay to myself.

Page 300

Q  So you did not -- you've not seen the post?

A  I'm sure I have as of it being shared or something on like Facebook or Instagram.  It's been shared.  I'm not going to go back and read the damn thing.  Because I did see the news feed and I cut that off.  Oh, the ACLU is only when you go and you don't have evidence.  Whew, I clicked it off.  I'm not watching all that crap.

Q  Were you aware that the ACLU had posted on its website that this case is an example of their efforts at police reform across the country?

MS. LIU:

Objection to the form.

A  As I stated earlier, I didn't go back and read the stuff.  Like I said, once things are painful, bringing up painful memories when all this went on, I tried my best to distance myself from it.

BY MR. HEBERT:

Q  Okay.

A  I don't want nothing else to do with it.

Q  Before you were represented by lawyers in this case, did either of the ACLU

Michael Dunn - January 21, 2026

Page 301

representatives tell you that they thought this would be a good case to support their police reform efforts?

MS. LIU:

Objection to the form.

A    Can I speak of what we actually discussed in the phone call or --

MS. LIU:

No.

BY MR. HEBERT:

Q    Well, if you weren't represented by counsel, then I disagree with that.

MS. LIU:

If you spoke with counsel about this case, whether or not there was a formal engagement letter or anything signed under the law, that's privileged.

A    Well, it goes back to the first phone call.

I mean, the gist of what I remember, they said I apologize you're going through it, and we're proud that somebody is actually going to try to take a stance.

BY MR. HEBERT:

Q    Is that all you remember about it?

Page 302

A    That's about the gist of it, because I just -- because there's, thank you for trying to be -- thank you for trying to do the right thing, which it's been what I thought I was doing.

MR. STAMEY:

Was it a lawyer or non-lawyer?

MR. HEBERT:

Right.  No.  Yes.

A    I don't know if she was a lawyer or not.

BY MR. HEBERT:

Q    Okay.

A    I don't know.  I honestly don't know.

Q    The question that might not have been on the record was whether it was a lawyer or a non-lawyer who was communicating with you.

A    I don't know.

Q    Okay.  Have you ever given thought to running for Chief of Police in Eunice?

A    After what this, I might change my mind later down the road.  I'm honestly thinking of getting the hell out of law enforcement completely because it's been nothing but a nightmare.

This -- I have had jobs where I've had

Page 303

millions of dollars of equipment under my supervision.  This job has been nothing but a nightmare.  I love what I do.  But here, I don't know.

Again, I'm not saying he's (indicating) done anything wrong, but what happens if we get another Randy Fontenot?  I don't know if I can take that chance because I want that to stop.  I don't ever -- I don't want anybody to go through what I went through.

Q    Right.

A    It's not fair.

Q    Give me a minute, I might be finished.

(SHORT PAUSE IN DEPOSITION)

MR. HEBERT:

Thank you, Mr. Dunn.  That's all the questions that I have for you.  Appreciate your time.

MR. REED:

I'm good.  Do y'all want to read and sign?

MS. LIU:

Yes, that's fine.

(DEPOSITION CONCLUDED AT 3:20 P.M.)

Page 304

REPORTER'S PAGE

I, Debbie G. Chaney, Certified Court Reporter in and for the State of Louisiana, (CCR #90023), as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434 (B) of the Louisiana Code of Civil Procedure, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)";

That "[sic]" denotes when a witness stated a word or phrase that appears odd or erroneous to show that it was quoted exactly as it stands.

DEBBIE G. CHANEY, CCR

Page 305

CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, Debbie G. Chaney, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that MICHAEL DUNN, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing three hundred three (303) pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board; that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

This the 2nd day of February, 2026 at LAFAYETTE, LOUISIANA.

_____
DEBBIE GIDDINGS CHANEY, CCR
LOUISIANA CERTIFICATION NO. 90023