The Deposition of

# MICHAEL DUNN

In the Matter of

# MICHAEL DUNN

## vs

# RANDY FONTENOT, ET AL

Taken On

# JANUARY 06, 2023



**EXHIBIT B**

**1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

MICHAEL DUNN            *  CIVIL ACTION NO. 6:21-cv-01535

VERSUS                  *

RANDY FONTENOT,         *  JUDGE ROBERT R. SUMMERHAYS
VICTOR FONTENOT,
RYAN YOUNG, AND THE     *  MAG. JUDGE DAVID J. AYO
CITY OF EUNICE

* * * * * * * * * * * * * * * * * * * * * * * * * *

The Deposition of MICHAEL DUNN, taken in connection with the captioned cause, pursuant to the following stipulations before Lenora St. Pierre, Certified Court Reporter, at the offices of Becker & Hebert, 201 Rue Beauregard, Lafayette, Louisiana, on the 6th day of January, 2023, beginning at 9:15 a.m.

**2**

APPEARANCES:

FOR THE PLAINTIFF, MICHAEL DUNN:

    PETER J. MARDIAN, ESQ.
    FRANCESCA E. BRODY, ESQ. (VIA ZOOM)
    SIDLEY AUSTIN (NY)
    787 7TH AVENUE
    NEW YORK, NEW YORK 10019
    EMAIL: PMARDIAN@SIDLEY.COM

    KEARNEY SONIAT DU FOSSAT LOUGHLIN, ESQ.
    ATTORNEY AT LAW
    602 BOULDER CREEK PARKWAY
    LAFAYETTE, LOUISIANA 70508
    EMAIL: KEARNEY.LOUGHLIN@GMAIL.COM


FOR THE DEFENDANT, CITY OF EUNICE:

    MICHAEL D. HEBERT, ESQ.
    BECKER & HEBERT
    201 RUE BEAUREGARD
    LAFAYETTE, LOUISIANA 70508
    EMAIL: MHEBERT@LAWBECKER.COM


FOR THE DEFENDANT, CHIEF RANDY FONTENOT:

    LEE J. LEDET, ESQ.
    KAITLIN A. WALL. ESQ. (VIA ZOOM)
    ERLINGSON BANKS, PLLC
    301 MAIN STREET, SUITE 2110
    BATON ROUGE, LOUISIANA  70801
    EMAIL: LLEDET@ERLINGSONBANKS.COM

**3**

APPEARANCES:

FOR THE DEFENDANT, VICTOR FONTENOT:

    JOSEPH B. STAMEY, ESQ.
    STAMEY LAW FIRM, LLC
    727 2ND STREET
    NATCHITOCHES, LOUISIANA 71457
    EMAIL: JOE@STAMEYLAWFIRM.COM

FOR THE DEFENDANT, RYAN YOUNG:

    JASON T. REED, ESQ.
    NEUNER PATE
    1001 W. PINHOOK RD., SUITE 200
    LAFAYETTE, LOUISIANA  70503
    EMAIL: JREED@NEUNERPATE.COM

ALSO PRESENT:
    RANDY FONTENOT, DEFENDANT
    VICTOR FONTENOT, DEFENDANT

**4**

S T I P U L A T I O N

It is hereby stipulated by and among counsel for plaintiff and counsel for defense that the deposition of

MICHAEL DUNN

be taken before Lenora St. Pierre, Certified Court Reporter, by counsel for the defense for all purposes, pursuant to notice and to the provisions of the appropriate statutes of the Federal Rules of Civil Procedure.

The parties hereto waive all formalities in connection with the taking of said deposition, except the reading and signing thereof, except the swearing of the witness and the reduction of the questions and answers to typewriting.

* * *

**5**

                        INDEX

EXAMINATION BY MR. HEBERT    . . . . . . . . . . . . . .  8

EXAMINATION BY MR. LEDET     . . . . . . . . . . . . . 293

EXHIBITS INTRODUCED BY MR. HEBERT    . . . . . . . . .  6

EXHIBITS INTRODUCED BY MR. LEDET     . . . . . . . . . .  7

**7**

EXHIBITS INTRODUCED BY MR. LEDET:

C-1     EUNICE PD SHIFT LOG (DUNN 204)     . . . . .316

C-2     FACEBOOK POST (DUNN 165-166)     . . . . . .323

C-3     EUNICE PD 8/25/19 OFFENSE REPORT (DUNN 810-
        813) . . . . . . . . . . . . . . . . . . . . 330

C-4     EUNICE PD 8/24/19 CALL LOG (DUNN 205-207)   334

C-5     EUNICE PD FACEBOOK POST(DUNN 169-170)       344

C-6     PERSONNEL ACTION FORM (DUNN 729)        . . 346

C-7     ACKNOWLEDGMENT OF RECEIPT OF NOTICE OF
        INVESTIGATION (DUNN 1185)       . . . . . . 349

C-8     EMAIL TO DUNN FROM TONY KENNEDY RE:
        RETURN TO WORK ADMINISTRATIVE LEAVE (DUNN
        1186)  . . . . . . . . . . . . . . . . . . 351

C-9     PROCEDURE ORDER #15-7 CODE OF CONDUCT
        AND ETHICS (DUNN 186)    . . . . . . . . . 355

C-10    EUNICE PD INTERNAL INVESTIGATION INCIDENT
        DATE 8/25/19 (DUNN 176-181)      . . . . . 356

C-11    CRITICAL INCIDENT FORM (DUNN 87-88)    . 391

C-12    CRITICAL INCIDENT FORM (DUNN 81-84)    . 394

C-13    CRITICAL INCIDENT FORM (DUNN 141-143)    398

C-14    CRITICAL INCIDENT FORM (DUNN 95-97)     . 400

**6**

EXHIBITS INTRODUCED BY MR. HEBERT:

NO. 1    2/21/22/ RETURN-TO-WORK SLIP
         (CSB 459)    . . . . . . . . . . . . . . .   21

NO. 2    5/10/22 LETTER TO CSB FROM
         MICHAEL DUNN (CSB 456-457)    . . . . . .   22

NO. 3    PERSONNEL ACTION FORM    . . . . . . . . .   25

NO. 4    EXERT FROM DR. RAINEY MEDICAL RECORDS
         (DUNN 1389)    . . . . . . . . . . . . . .   28

NO. 5    DUNN JOURNAL NOTES (DUNN 1-23)    . . . .   60

NO. 6    ADDITIONAL DUNN NOTES (DUNN 24-28)    .   90

NO. 7    ADDITIONAL DUNN NOTES (DUNN 29-31)    .   92

NO. 8    ADDITIONAL DUNN NOTES (DUNN 116-118)    .   93

NO. 9    ADDITIONAL DUNN NOTES (DUNN 138-139)       94

NO. 10   ADDITIONAL DUNN NOTES (DUNN 148-153)       94

NO. 11   UPDATED FACEBOOK POST    . . . . . . . . .   97

NO. 12   PROCEDURAL ORDER #18-2
         (CSB 435-438)    . . . . . . . . . . . .   108

**8**

MICHAEL DUNN, after having been duly sworn, was examined and did testify as follows:

EXAMINATION BY MR. HEBERT:

Q   Mr. Dunn, good morning.  We met shortly before the deposition.  My name is Michael Hebert.  I represent the City of Eunice in the lawsuits that you have filed that are pending in the Western District of Louisiana.

We're here today to ask you some questions about the allegations that you've made in those lawsuits, some claims and to understand what you know and what you may not know about, you know, some of the background.

MR. HEBERT:

First of all, Zoom participants, can you hear us okay?  I'm a little farther from the microphone than Mr. Dunn.  Can you hear me okay?

MS. BRODY:

If you are any quieter, the answer would be no.  But I can hear you okay.

MR. HEBERT:

All right.  Understood.  I'll talk louder.  My wife says I talk too loud, so

**9**

I'm probably following the wrong instructions here.

MS. BRODY:

I appreciate it.

MR. HEBERT:

All right.

MR. HEBERT:

Q    So is this your first deposition?  Have you given one before today?

A    Yes.

Q    Like --

A    Auto accidents.

Q    All civil cases or criminal cases?

A    Civil.

Q    All right.  So you know the basic procedure and, you know, we have a court reporter down here taking down everything that we say, and you probably have seen this before in your experience, but the ultimate product of today is a transcript that all the lawyers can refer to afterwards.

So because the court reporter is taking down everything that we say, it's important that you and I observe a few rules that we normally don't observe in normal conversation.

**10**

So I'll just quickly go through some of those.

First of all, there will be several occasions today when before I finish my question, you will already know what I'm trying to ask you.

A    Okay.

Q    And if we were in normal conversation, you would start trying to answer.  It's important that you not step on my question, and I will also do my best not to step on your answers, and we both let each other complete what we have to say, and then the court reporter can take that down, you know, cleanly so that all the lawyers can read it later.

The court reporter cannot pick up grunts, and nods, and "uh-huh's" and "huh-uh's," so you know, there may be some times when I may ask you to give a more verbal response, yes, no, I don't know, whatever it is.

And by the way, if I -- if at any time during the deposition I bring to your attention that you and I are not observing those rules, it's not to give you a hard time, it's just to make sure, again, that we continue to stay on the straight and narrow with regard to the

**11**

transcript.

A    Yes, sir.

Q    I will do my best to take responsibility for making sure that we're properly communicating, and by that, I mean that if I ask you something that doesn't make sense to you, or I haven't spoken clearly enough or loudly enough, if I use some terminology that you're not clear about, please stop me and correct me, because I don't want you to try to, you know, guess or speculate at what I'm trying to say.

If you don't understand, if you'll let me know, I'll be happy to do my best to clear that up.

A    Yes, sir.

Q    It's not an endurance test.  So, you know, if you need to take a break at some point, you say the word and we'll do our best to accommodate that.

It may be that if I have asked you a question and you haven't answered it yet, I may ask that you answer that question before we take the break, but other than that, you know, if you need to get up and stretch, if you need to go to the restroom, or whatever, you know,

**12**

you say the word, and we'll do what we can to accommodate you.

A    Yes, sir.

Q    Fair enough?

A    Yes, sir.

Q    Okay.  Easy questions first.  Please give me your full name and where you live.

A    Michael Lynn Dunn, 411 North Second Street, Eunice, Louisiana 70535.

Q    All right.  And how long have you lived at that address?

A    I believe I purchased my home the end of 2012, if I remember correctly.

Q    All right.  From what you have produced in discovery and what you've answered -- what you've alleged in your lawsuit, it's my understanding that you have worked at the Eunice Police Department since about 2010; is that correct?

A    August 23, 2010.

Q    So it sounds like most of that time you lived at the same address, which is the address you just gave me, correct?

A    No, sir.  I also lived -- I don't remember the quite numerics.  I think it was 225 LSU-E

**13**

Drive.

Q  LSU-E Drive?

A  Correct.

Q  Also in Eunice, Louisiana?

A  Yes, sir.

Q  What were the periods of time that you worked there?  I mean, that you lived there, sorry.

A  I believe about a year, until I was trying to find a house in Eunice to live, to move to.

Q  So what -- give me approximate year or years that you lived there.

A  2010, '11.  I originally lived at -- the address has changed twice over the years, because of 911 re-addressing.  It used to be -- either it was 1018 East Fifth, and it was 911 East Fifth.  I don't remember which one was which.  In Oakdale, Louisiana.  That's where I was originally from.

Q  In Oakdale?

A  Yes, sir.

Q  All right.  And I'm sure you're POST-certified, correct?

A  Correct.

Q  Where and when did you get POST-certified?

A  I went to ALETA in Lafayette, Louisiana, which

**14**

is a POST accredited training course.  I don't know the exact date I went.  I believe it was six months after hire.  I don't know the exact date.

Q  Right.  And the Eunice Police Department was the first and only police department where you ever worked as a POST-certified police officer, correct?

A  That is correct.

Q  All right.  We have in response to some of your prior interrogatories in this case, kind of your job history, and I just want to breeze through that very quickly, make sure that I understand it, and there's nothing in there that maybe we need to clear up or correct.

A  Okay.

Q  So my understanding is that going back to 2002, that you worked from June of 2002 to September of 2005 at Buddy's IGA as a stocker in Oakdale, correct?

A  That would be correct, sir.

Q  All right.  Then August of 2005 to February of 2007 you worked at Forest Associates in Huntsville, Texas as a forest technician, correct?

**15**

A  That's where the office was located.  The property that I was overseeing was located in Beaver, Louisiana.  Beaver Creek area.

Q  Got it.  Then from 2005 to 2009 you worked for Roy O. Martin Lumber Company, also as a forest technician, correct?

A  That is correct.

Q  All right.  Then you worked for about a month, from March to April of 2009, at Pine Prairie Correctional Center, correct?

A  That is correct.

Q  All right.  And that -- it doesn't appear from that, the nature of that job, that job required you to be POST-certified, correct?

A  No, it did not.

Q  You were a jailer, essentially?

A  There was actually something that needs to be added to that.

Q  Sure.

A  The company transferred me.  It shows that I only worked there a month.  The company transferred me to their sister company, because they didn't want to lay me off and certain employees off.

    They transferred me to our sister company,

**16**

which was located in Basile, Louisiana.  Southern Louisiana Correctional Facility.

Q  Okay.  So this was a -- it's a private prison?

A  Correct.

Q  What was the name of that private prison company?

A  The one I just named.  It's Louisiana -- it's on my resume.  I don't remember the exact wording of it.

Q  All right.  And then, from -- so this is the same employer, I guess.  From April 21, 2009 to June 11, 2010, you worked at the South Louisiana Correctional Center at Basile, and that's what you were just explaining to me, correct?

A  Correct.  It's the same company, just different name, and they transferred us to the other location.

Q  I understand.  And then from there, since that time, you went -- you've worked at the Eunice Police Department in various capacities, correct?

A  Since August 23, 2010, yes.

Q  Right, okay.  And you -- did you have to be POST-certified before you were hired on, or did

**17**

you hire on and then you went to the academy?

A   Hired on, then went to the academy.

Q   All right.

A   After completing FTO field training.

Q   Got it.  And what is the length of a police employee's working test period, or probationary period in Eunice?

A   It depends.

Q   Okay.  For you, my -- I'm not asking you to be a lawyer, but my understanding of the law is it could be as little as six months or as much as a year.  So what was it for you?

A   It depends on the status of how you were hired, you know, from either being a recruit or a probationary officer.  And then once you go from recruit to probationary, that is when your time limit starts for the six month or the year probation.

Q   And so, how long was yours?

A   That was 13 years ago.  I don't remember.  There should be action sheets documenting it.

Q   Understood.  So you started off as a -- under the position of police officer, being supervised by Donnie Thibodeaux and Sergeant Mike Perry, correct?

**18**

A   Yes.  But I also switched shifts before.  So I mean, that's not my only supervisors I had during that time frame, but that's the ones when I first started, yes.

Q   All right.  And you were -- it appears you were promoted to sergeant in September of 2012, correct?

A   I believe that is the correct date, yes.

Q   All right.  Then promoted to lieutenant, January of 2016; is that accurate?

A   Yes.

Q   All right.  During the time that you've been a lieutenant, how many lieutenants have there been in the Eunice Police Department?

A   You might have -- you might have to rephrase the question.  You're talking about how many has came and gone, or how many we have now, or?

Q   How many -- yeah, good -- good point.  How many lieutenant positions have there been during the time that you've been a lieutenant, whether they've been filled or not?

        MR. MARDIAN:

            Objection, form.

A   From the best of my recollection, originally there was only five lieutenant slots, but

**19**

additionals were created later.  I don't remember the date or time that they were created later.

MR. HEBERT:

Q   All right.

A   But from what -- my understanding, my recollection, I believe there was only a total of either four or five slots originally.  More were created in the future.

Q   All right.  During the time that you've been a lieutenant in the Eunice Police Department, not name-wise, but position-wise, what has been the chain of command between you and the chief of the Eunice Police Department?

A   Can you repeat the question one more -- make sure I understood it?

Q   Yeah.  The chain of command between you and the chief of the Eunice Police Department, what are the positions between you and the chief in the chain of command?

A   Oh, deputy chief.

Q   Only?

A   Yeah, that's the only person between us.

Q   Okay.  How many deputy chiefs -- how many deputy chief positions have there been at the

**20**

Eunice Police Department since the time you've been a lieutenant?

A   Since I've been a lieutenant, two.

Q   Two, okay.  So if we were to try to trace this out in an organizational chart, there'd be a number of lieutenants, and then two deputy chiefs, and then the chief in the organizational chart?

A   No.  I think I may -- either I misunderstood your question, or the -- what you asked.  You asked how many deputy chiefs there were.  There was two during my time frame as a lieutenant.  There's only one at a time.

Q   Got it.

A   If that answers your question.

Q   It does, definitely.

A   Okay.

Q   Thank you for the clarification.

A   Okay.

Q   All right.  And you're currently on full-duty status?  No issues with your duty status?  I mean, you're not -- you're not under any limitations as to what you can do as a Eunice police officer, as far as you know?

        MR. MARDIAN:

**21**

Objection, form.

A    No.

MR. HEBERT:

Q    All right.  There was a time -- there was a time in 2021, I think, that you were on leave from the Eunice Police Department, correct?

A    You'd have to go through my medical records, see the exact date.  That sounds correct.

Q    Okay.  I'll show you a document, and I'm handing a copy to your counsel as well.  I'm going to mark for attachment as "Exhibit 1" to the deposition.

That's a return-to-work slip, correct, dated February 21, 2022?

(EXHIBIT NO. 1 ATTACHED)

MR. MARDIAN:

Objection, form.

A    Okay.  Yes, sir.

MR. HEBERT:

Q    Do you recognize this document?

A    I recognize the -- the doctor.  I know I was on sick leave during this period, but I do not believe that I returned back to work on the 23rd.  I don't believe this is correct.

Q    All right.

**22**

A    What do you want me to do with this?

Q    Just -- you can hand it to the court reporter.  Thank you.  I'm going to show you a document.  I'm handing a copy to your counsel, that I've marked as "Exhibit Number 2," which is Civil Service -- it's Bates stamped Civil Service Board 456 and 457.  Documents that were obtained in this litigation through some subpoenas penned to the Civil Service Board.  I'm going to give you a moment to look that over.

(EXHIBIT NO. 2 ATTACHED)

A    Uh-huh (yes).

Q    I'm going to have a couple of questions to ask you about it.  So you take your time and just let me know whenever you've had an opportunity to review it.

A    (Witness reviews documents.)

Q    Did you get a chance to review it?

A    Yes, sir.

Q    I couldn't tell from looking at these documents exactly what the nature of this controversy was, and I'd like you to explain it to me, but it appears to have something to do with the date of your return to work; is that correct?

**23**

A    Yes, sir.

Q    Can you explain to me the nature of this controversy as you're trying to relate it to the Civil Service Board here?

A    I do have to ask my counsel one question, because this is actually an active case.  I don't know if I can talk about it or not.  This is an active field of civil service at this time.  And my attorney -- I have other attorneys that's handling this case as we speak.

Q    Is that Mr. Green?

A    No.  Mr. Bill Goode.

Q    Bill Goode?  Okay.

A    Yes.  I don't know if I --

Q    All right.

A    -- can talk about this.  I don't care, but I don't want to do anything my attorney told me not to do.  This is an active case, which I -- he's not here.

Q    Oh, that lawyer.  I thought you meant Peter.

A    No.  He's -- there's a lot of things going on, so.

Q    All right.  Let's -- I tell you what, let's reserve those questions --

**24**

A    Yeah, that's fine.

Q    -- maybe for another time.

A    Yeah, that's fine.

Q    Maybe we could talk to Bill about that issue, but I do -- I just want to --

A    That's fine.

Q    I want to ask you this one question.

A    Well, maybe I might be able to answer if you ask.  I'll try.

Q    Sure.  Sure.  A minute ago when I showed you that return-to-work slip, you said you didn't think that was accurate.

A    I didn't believe it was correct.  I believe it was my --

Q    Yes.

A    -- correct word I used.

Q    Sure.  Same.  Yeah, then -- I'm sorry, I didn't mean to misstate what you said there.

A    That's fine.

Q    So is that one of the claims that you're also asserting here, that that return to work statement is inaccurate?  Is that what -- part of what you're claiming to the Civil Service Board here?

A    That my PDF form was inaccurate.

**25**

Q    What's a PDF form?

A    The form that they fill out that shows when you've -- not at work, when you return to work. Like you've been promoted, terminated, you're out on sick leave for a certain amount of time. They do a PDF form. I don't know the exact name of the form that they fill out and turn it in to the Civil Service Board.

Q    All right.

A    That answer your question?

Q    I think so. I'm going to show you a document, and tell me if that is the form you're referring to.

A    Uh-huh (yes). I'll try my best to answer your question. I just --

Q    I appreciate that.

A    It is an active case.

Q    I appreciate that. Show you and your counsel a copy of a personnel action form dated February 23, 2022. Have you seen this before?

        (EXHIBIT NO. 3 ATTACHED)

A    Yes, sir.

Q    It says down at the bottom, "Employee's sick leave has been terminated and employee is back at work." You see that statement?

**26**

A    Correct.

Q    Is this the same subject matter that we've been talking about with regard to the -- you know, you saying that this is the personnel action form you were referring to a moment ago that you said is inaccurate?

A    Correct.

        MR. MARDIAN:

            Objection, form.

        THE WITNESS:

            Oh, I'm sorry.

MR. HEBERT:

Q    All right. So that's related to the claim that you're also currently asserting before the Civil Service Board with Mr. Goode?

A    Correct.

Q    All right. I understand.

        MR. LOUGLIN:

            Is this going to be an exhibit?

        MR. HEBERT:

            Yes. It's Exhibits 1, 2, and 3 for attachment.

MR. HEBERT:

Q    I don't -- I don't need to attach this to the deposition and, you know, this is Dunn 1389,

**27**

and it's the last page of -- I'm going to give your counsel a copy as well.

        MR. MARDIAN:

            Is this an exhibit or not?

        MR. HEBERT:

            It -- I mean, it depends on how he answers the question, but because -- I made the comment because it's marked "Highly confidential" down at the bottom. Then I'm saying I don't necessarily need to attach it as an exhibit. But I may, depending on the nature of his answer. He didn't write this, so -- but I wanted to ask him some questions about it.

        MR. MARDIAN:

            Well, if you're showing him the document, you should mark it as an exhibit.

        MR. HEBERT:

            That's fine. Fine with me.

MR. HEBERT:

Q    One moment here. All right. I'm handing you a document I've marked "Exhibit 4." Handing a copy to your counsel. This is Dunn 1389, and it's an excerpt from the medical records from Dr. Rainey's office.

**28**

You didn't write this, of course, but this is a document dated February 22, 2022 that says down at the bottom, someone else talking about you, saying, "Patient reports that the clearance from his therapist has been revoked due to workplace issues."

        I know that you didn't write this, but do you know what this is referring to?

        (EXHIBIT NO. 4 ATTACHED)

        MR. MARDIAN:

            Objection, form.

A    (Witness reviews document.) Based on the date, I believe it's with regards to what we had already talked about.

MR. HEBERT:

Q    The return-to-work slip, and the -- and the personnel action form that we just marked as exhibits? Is that what you're talking about?

A    I believe so, based on the date. That's the only thing I would think this is for.

Q    All right. Do you remember making a call to Dr. Rainey's office around February 22, about the return to work issue?

A    I'm not sure --

        MR. MARDIAN:

**29**

Objection, form.

A    I'm not sure the exact time, but I know I did notify my doctor's office that they refused to accept me to come back to work.

MR. HEBERT:

Q    You notified your doctor's office that --

A    They refused to accept my doctor's excuse to allow me to come back to work, yes.

Q    All right.

A    I notified my doctor.

Q    And when you say "they," who are you referring to?

A    Chief Randy Fontenot.

Q    All right.  So what happened with regard to your return-to-work status after that?

A    You'd have to refer back to the document.  They wouldn't let me come back to work, so I stayed home.  And I kept asking to come back to work, and I was finally allowed to at a certain point.

Q    That's what I'm trying to get to.  How -- what happened to what -- by which you were allowed to return to work?

A    In the documents you already seen that I submitted to Civil Service Board.  Just a --

**30**

I'm trying my best to --

Q    No, you're fine.

A    Okay.

Q    Yeah, you're fine.  So --

A    You'd have to go back to the exhibit to -- I mean, it's -- it's documented what all what took place, what transpired.  I documented everything.

Q    So you're working -- you're working now?

A    Uh-huh (yes).  Yes, sir.

Q    And you have a pending appeal to the Civil Service Board that has to do with your return-to-work issue?

A    No.  This one has already been cleared up.

Q    All right.

A    But it's still an active part of my other appeal.  Actually, I have two appeals open right now.

Q    Okay.  Tell me about that.

A    I can't.

Q    Well, just -- what -- okay.

A    It's -- my actual appeal that has been filed is public record, and you would have obtained those from the Civil Service Board.  I can't go into details, because they are open cases.

**31**

Q    All right.

A    Now, because -- I can answer certain things.  If you ask me a certain question, I'll try my best to answer it, but I can't go into details of my defense.

Q    Part of the civil service appeal as you understand it is -- has a part of it the fact that you were originally not allowed to return back to work?

MR. MARDIAN:

Objection, form.

A    Can you say it one more time?

MR. HEBERT:

Q    Part of your civil service appeal has in it the fact that you weren't originally allowed to return back to work?

A    The one that you showed me is strictly just me trying to get the factual basis of my return-to- work status fixed.  That was that.  The other two appeals that's a part of it just as a evidential thing.

Q    All right.  I understand.  But the issue is resolved that -- your return-to-work issue is resolved, but it's part of this other civil service appeal is just one -- a circumstance

**32**

that you recited in the appeal?

MR. MARDIAN:

Objection, form.

A    The matter of --

MR. STAMEY:

Before we go any further, let me confirm something.  Was the witness sworn in before we got started?

MR. LOUGHLIN:

Yes.

COURT REPORTER:

Yes.

MR. STAMEY:

Okay.  I wanted to make sure.  I didn't recall seeing that.  Thank you.

A    Can you please repeat the question one more time?  I want to make sure I fully understand it.  It was a little lengthy.

MR. HEBERT:

Q    It was.  I think -- I think -- I tell you what, I'm going to withdraw the question, because it's -- it's a little confusing and also, I think you wound up answering it in an answer that --

A    If I did, then --

**33**

Q  -- so I really -- I'm okay.

A  Okay.

Q  Have you seen a psychologist named Candase Martel?

A  Yes.

Q  Okay.  Is she with Counseling Center of South Louisiana?

A  That's correct.

Q  I saw a reference to that in Dr. Rainey's -- in Dr. Rainey's notes.  When you go to Rainey Family Medicine, is it typically Dr. Rainey himself who sees you, or is it someone else?

A  Dr. Rainey himself.

Q  All right.  And are you still going to Candase Martel?

A  I've had to -- I've actually had a meeting with her a few weeks ago.  Due to the extensive hours we've been putting on place to work I haven't been able to meet with her.  We actually had planned on meeting this -- this month.

Q  All right.  Do you attribute your -- whatever the conditions are for which you're seeing Candase Martel to have anything to do with any of the claims you've asserted in this lawsuit,

**34**

or these lawsuits?

    MR. MARDIAN:

        Objection, form.

A  Yes.

MR. HEBERT:

Q  Okay.  Tell me about that.

A  After I found out that members of our police department was trying to falsely accuse me of committing crimes and have me arrested, yeah, it broke me.  I needed -- I needed to talk to somebody.  And I was able to show evidence showing that they were trying to have me set up, that I didn't do anything wrong, which I think we've already covered that in other depositions.  It was actually false and wasn't true that I did anything wrong.

Q  All right.  And you have return appointments with Candase Martel now?

A  Not at -- we don't have a scheduled time yet.  We was waiting for the new chief to take office to where he can set my schedule the way he wants to see, or re-structure his department the way he sees fit.  Then once I have a set schedule, then I would set a date to go back and see her.

**35**

Q  It looks like from the medical records of Dr. Rainey that one of the issues that you were presenting to him was the fact that your work schedule was causing you some medical difficulties; is that -- is that accurate?

    MR. MARDIAN:

        Objection, form.

A  It's accurate, but that's not everything.

MR. HEBERT:

Q  Okay.  Well, explain it to me and tell me -- and give me whatever I'm missing, please.

A  Work schedule, depression, anxiety.  I mean, you'd have to look at my -- I mean, I know he took accurate records, so you'd have to -- because he told me he was going to keep accurate records, because he said he understood what was going on.

    He actually -- he believed there was other things going on in Eunice, so he wanted to make sure he treated me right.  He was sorry that I was suffering from these conditions.  He was going to try this -- try his best to help me.  So you'd have to reflect my medical records to have the most accurate assessment.

Q  And there was a -- at some point in your

**36**

medical records, Dr. Rainey actually had diagnosed you with suffering from depression and prescribed you some medication for that, correct?

A  That is correct.

Q  Are you still on that?

A  No.

Q  What was it he had prescribed for you?

A  You'd have to check my medical records.  I mean, they're -- I couldn't pronounce them even if I tried.

Q  All right.

A  I know he prescribed me different things to try to treat certain issues at that certain time.  Once he felt that I didn't need them, he -- we stopped taking them, and now I'm just on one as a light anxiety medicine.  I'm guessing that's what it's called, but -- starts with a E.  I'm still currently getting that every month.

Q  All right.

A  Everything else, I'm off of.

Q  All right.  Did he or Candase Martel ever make a recommendation at any time that you go to an in-patient facility for any length of time?

    MR. MARDIAN:

**37**

Objection, form.

A   After a couple of sessions with Ms. Candase, she felt that she could assist me in coping with whatever's taking place, and she didn't think I needed psychiatric help.  She thought it was just acute stress of a certain situation, or something that was only temporary.  That was her assessment to me.

MR. HEBERT:

Q   All right, thank you.  Do you know what the Lawrason Act is?

A   Lawrason?

Q   Yeah.

A   Yes.

Q   I guess -- I know you're not a lawyer, but I'm assuming working for the Eunice Police Department for 12 years you have some kind of knowledge of just the fact that there's something called the Lawrason Act, and a few ideas about how it might work.

A   Okay.

Q   Accurate?

A   I'm aware of it, yes.

Q   I partially ask because the Lawrason Act was referenced in your Complaint, and I know that

**38**

you didn't write the Complaint.  I assume you didn't write the Complaint.

But I want -- I want to just get a general idea about what you know about the Lawrason Act and how it applies to the functioning of the City of Eunice government.

MR. MARDIAN:

Is that -- I'm not sure that's a question.

A   My response would be at this -- I mean, yes, I'm aware of --

MR. MARDIAN:

If that's a question, objection, form.

A   Okay.  You're referencing it was something that I claimed.  We're talking about a five to a seven-year span of stuff that's going on, and you're going to -- I'm willing to answer the question.  Going to have to be a little more specific to what case you're talking about, to where if I know I'm talking about active appeals or stuff that's already been cleared up or done.

So are you just asking me just to explain what I know about the Lawrason Act?  I'm --

MR. HEBERT:

**39**

Q   I'm asking you to explain what you know about the Lawrason Act.

A   To my understanding from what reviewing of it I've done, I don't know the -- all the legals terms that was in it.  It's basically it sets a standard to who does what, what their responsibilities are.

That would be the conclusion, without looking at the document and certain sections you're talking about.  I mean, that was my general understanding of it.

Q   There's a footnote 3 in your -- your Complaint in this case.  It says, among other things, "The Board of Aldermen is Eunice's governing and legislative body and has the power to, among other things, adopt, enact, and enforce ordinances, as well as create, abolish, merge, or consolidate any department."

Do you in the course of your employment with the City of Eunice as a police officer, do you have direct dealings with the Board of Aldermen?

A   I have.

Q   Tell us, generally, the type of interactions that you're required to have as part of your

**40**

employment with the Board of Aldermen.

A   It wasn't a part of my employment.  There's no rules or regulations saying I can't speak to my governing body.  Before all this happened, I attempted to go to the City Council and the mayor to explain to them what was going on, to keep this from happening.

Q   When you say "this," you mean --

A   This lawsuit.

Q   -- the lawsuit?

A   Yes.  And the actions I had to take to get up to this point.

Q   Tell me -- tell me about your interactions with the mayor and City Council that you just described.  I made -- I'm sorry.  I made a technical error.  I just want to make -- clear it up for the record.  I might accidentally say "City Council" from time to time.

A   Right.

Q   The City Council Board of Aldermen, --

A   Correct.

Q   -- talking about the legislative body --

A   Correct.

Q   -- of the City of Eunice.

A   I understand.

**41**

Q   I just wanted to clear that up.  Sorry.
A   We're talking about a lot of information.  Do we want to talk about a certain -- each individual person, or do we want to talk about it as a whole?  Because we're talking about a lot of information.
Q   I'm following up on your comment that you went to the mayor and the Board of Aldermen to try to prevent these lawsuits from happening.
A   Correct.
Q   So in a general sense, what do you mean when you say that?
A   General sense --
        MR. MARDIAN:
            Objection, form.
A   What I've been trying to explain, I know I can't meet with them all at one time, because then it would be some type of public hearing or meeting.  So I made contact with -- I believe it was the mayor first, explained to him what I felt was going on, and my complaints and everything.  He actually pulled in Nootsie Sattler, and he talked to Nootsie.
Q   Who is Nootsie Sattler?  One of the --
A   He is --

**42**

Q   -- members of the Board of Aldermen?
A   Correct.  I believe so.
Q   All right.
A   They agreed that I needed to speak to each individual person.  I let them know about the complaint.  They had shared their opinions that they believed some of it was true.  Actually, one did threaten to fire me.
Q   Who?
A   That was Ernest.  He said if I opened my mouth, or I let any of this come out, he was going to have me fired.  I remember that.
Q   Who --
A   Ernest Blanchard.  I remember that.  All everyone else we talked to about some -- mainly same things we're going to probably here -- talk about here today.
Q   All right.  How long ago did that happen?
A   You would have to reflect my notes when I met with them.
Q   All right.
A   I don't recollect the exact date and time.
Q   Did you have a lawyer when you did it?
A   The lawyer for civil service appeals, but not for this, no.  Not to the best of my knowledge.

**43**

Q   When did you first engage a lawyer for the matters about which we're here today?
        MR. MARDIAN:
            Objection.  Calls for privileged information.  I instruct the witness not to answer.
        THE WITNESS:
            Okay.
A   We're here --
        MR. HEBERT:
            To be clear, the witness is instructed not to answer a question about when he engaged counsel on the grounds that it's privileged?  Is that -- I want to make sure that that's the basis of the instruction.
MR. HEBERT:
Q   That was -- that was my intended question, if that wasn't clear.  I want to be clear, I don't want to know any contents of any communications you had with any lawyer, but that question asks for when you first engaged counsel on this matter.  That's all.
A   Which matter are we here for?  That was going to be my question.  Are we here for both or one?  I don't know.

**44**

Q   Let's start with the lawsuit by which -- in which you're represented by the American Civil Liberties Union and the Sidley law firm.  Let's start with that one.
A   Okay.  Want to repeat the question, where I make sure -- now that we know what we're talking about?
Q   The question is only and is limited to when did you first engage them?
        MR. MARDIAN:
            You can answer.
A   When I first engaged them?  You'd have to look at my notes and the -- I don't know the exact date and time.
MR. HEBERT:
Q   I don't see -- I don't think we have any notes to indicate when you first engaged --
A   That's going to be privileged -- well, I don't know if it's privileged or not, but there's a record of it.
        MR. MARDIAN:
            If you can recall the time that you were engaged in our firm, you can answer.  If you do not recall, then that can be your -- that would be your answer.

**45**

A    2021.  I mean -- what month?  I know in my notes I documented when the ACLU contacted me back.  Do I know the exact date when I sat down with them?  No.  It was after that.  I don't know the exact date, because, I mean like I said, some of it was privileged, so they -- I didn't keep notes of privileged information --

MR. HEBERT:

Q    Understood.

A    -- before I turned it over.

Q    When you contacted the ACLU, you were not represented by the Sidley law firm at that time, correct?

A    No.

Q    Is that right?

A    That is correct.

Q    Okay.  So when did you contact the ACLU?

A    It should be in my notes when I contacted the ACLU, because I -- I sent them over a copy of my notes.

Q    When did you engage Mr. Loughlin?

A    Some time after they attempted to get me to resign for a Facebook post.

Q    That was -- if I were to tell you that's in 2019, does that sound about right?

**46**

A    Without looking at my documents, I'd have to agree with you.  I don't know.

Q    If your Facebook post was in 2019, does that give you a --

A    Yeah.

Q    -- guidepost as to when you --

A    It would have been after.

Q    -- engaged Mr. Loughlin?

A    It would have been a couple of months after, probably.

Q    Just so you know, you and I just did that thing that we talked about at the beginning of the deposition where you knew my question and you started answering.  So just --

A    Sorry.

Q    Yeah, it's all right.

A    Yes, sir.

Q    So did -- the conversations that you described that you had with the mayor and members of the Board of Aldermen, were they before or after you engaged the Sidley law firm?

A    Before.

Q    Conversations that -- the same conversations was before or after you engaged Mr. Loughlin?

A    I believe before.

**47**

Q    All right.  How did you come to contact the ACLU?

A    How did I come to contact?  Can you rephrase?  I mean, that's a little -- it's a little broad.

Q    Sure.  In answer to one of my questions a minute ago, you said you responded to the A -- you said something about the ACLU getting back to you.

A    Uh-huh (yes), I did.

Q    And so, maybe it was an assumption on my part, but I took from that that you initiated a contact with the ACLU at some point; --

A    I did.

Q    -- is that correct?

A    That is correct.  I did.

Q    So I want to know approximately when that was.

A    I don't recollect the exact date.  There should be some type of record of it.  There is, but I don't know the exact date without looking at something.

    Because again, we're talking about five to -- anywhere between five to seven years' worth of information.  I'm trying my best to answer your question.

Q    Was it -- it wasn't five or seven years ago

**48**

    that you contacted the ACLU, right?

A    No, sir.  That wasn't what I was implying.  What I was implying is certain questions you're asking me is from a wide time span.  That's why I'm trying --

Q    I understand.

A    -- my best to tailor it to a certain area, and I can try my best to narrow down my response to give you a correct answer.

Q    Okay.

A    Do I need to give this to --

Q    Yes.  Please hand it to the court reporter.  I'm going to hand you a copy of your Complaint in the AC- -- I'll call it "the ACLU case."

A    Okay.

Q    I have some questions about various paragraphs in the Complaint, or I will.  So for easy reference, I'm just going to have -- I'm going to keep a copy in front of you.

    MR. HEBERT:

        Counsel, I have a spare if you want one.

MR. HEBERT:

Q    So I may have some questions about various allegations --

**49**

A    Sure.

Q    -- in your paragraph and -- I mean, your Complaint.  I thought it would be easier if I just kept -- put one in front of you, rather than --

A    Is this for me?

Q    Yes, sure.  Just use it as a reference here.

MR. MARDIAN:

The one you've handed us is not the ACLU Complaint.  This is also -- this is not the ACLU Complaint.

MR. HEBERT:

It is the ACLU Complaint.

A    I don't know if you -- do you want to go --

MR. MARDIAN:

This -- when you say "ACLU Complaint" -- you're right.  I apologize.  I was thinking of Facebook in my mind for some reason.  I apologize.

MR. HEBERT:

Sure.  No, no problem.  No problem.

MR. HEBERT:

Q    So I'm going to ask some questions -- what's the matter?

A    Just where I can -- if you don't mind.

**50**

Q    How's that?

A    That's fine.  Good, yes.

Q    All right.  So starting with paragraph 3 of your Complaint, it begins with the sentence, "In 2018, after nearly a decade at the department, Lieutenant Dunn felt that the system he believed in was breaking down."  You see that right there?

A    That one sentence?  Yes, sir.

Q    Yes.  So going back to some of the things that we talked about before, you had been at the department since 2010, --

A    Correct.

Q    -- correct?  Was there something in particular that happened in 2018 that caused you to believe that the system was breaking down?  What happened in 2018?

A    It's not necessarily just 2018.  It's been for a while, but that was when I just finally -- just off that one sentence would be when -- 2018.  It's not necessarily just 2018.
It's collective of everything up until that -- probably until that date or that point that the system, in my opinion, was breaking down, because we had officers out there conducting

**51**

illegal searches, making false arrests, doing things of that nature, and nothing was being done to stop it.
And to me, that's -- that's a system break down.  I mean, that's not the way law enforcement's supposed to work.  It's not the way the justice system's supposed to work.

Q    I understand that -- I understand it's your position.

A    Right.

Q    Just I'm --

A    Maybe I -- okay.  Rephrase that.  I'm --

Q    No, it's okay.  Let me back up and ask you a couple of --

A    Okay.

Q    -- preliminary questions.  You had a chance to read over this Complaint before it was filed, right?

A    Yes.

Q    And as far as you know, I mean, there's nothing in this Complaint that you take issue with, or you believe is inaccurate?

A    To the best of my recollection, that's correct.

Q    All right.  So the first sentence of paragraph 3, the reason that I asked the question is

**52**

because at least me, got the impression from reading that sentence, that 2018 was a tipping point for you with regard to something going on in the Eunice Police Department; is that wrong?

A    No.  That would be correct.

Q    Okay.

MR. MARDIAN:

Objection, form.

A    That would be correct, because they found out that I was the one talking to other agencies about the illegal stuff going on inside of our police department.

MR. HEBERT:

Q    Who found out?

A    Chief Randy Fontenot and a couple of detectives.

Q    How did they find out?

A    A state police officer called him personally and let him know that I reported him.

Q    How do you know that?

A    Because he called me, chewing me out, saying that anything I tried to report to state police or anything thereof that he was going to find out about it.

Q    Who chewed you out?

**53**

A    Chief Randy Fontenot.

Q    All right.  Did you then -- so to the best of your knowledge, the way that Chief Fontenot found out that you had made these reports was through --

A    State police.

Q    Just --

A    Oh, I'm sorry.

Q    It's all right.  Let me finish.

A    Uh-huh (yes).

Q    Was through the investigator at the Louisiana State Police who contacted Chief Fontenot?  That's your understanding?

A    No.

Q    Okay.  Tell me.  Correct me.

A    I contacted them, let them know what was going on.  They turned around and called Ryan Young.  Ryan Young calls Chief Fontenot, and then Fontenot calls me yelling at me because I told on them.

Q    All right.

MR. STAMEY:

Out of abundance of precaution, when you say "Fontenot," if you will identify which Fontenot you're talking about.

**54**

THE WITNESS:

Good point.

MR. HEBERT:

Q    Right.  A lot of Fontenot's in Eunice, right?

A    Yeah, there is.  I do apologize.

Q    Yeah.

A    We all go by last-name basis in the department, and I apologize.  I'll try to clarify the record.

Q    It's like calling somebody Hebert in Lafayette.  You know, you have --

A    True.

Q    So there's another allegation in your Complaint at some point that the district attorney gave some kind of a notification to Chief Fontenot.  Do you remember that allegation?  I could find it in the Complaint.

A    No.  I know exactly what you're talking about, yes.

Q    Okay.  Well, tell me how you're aware of that.

A    I went to the DA's office over a case that was tampered with.  I went to the prosecuting district attorney, or the ADA.  She agreed with me that something illegal had transpired, she believed.

**55**

She was going to bring it to her boss, which was -- I'm trying to think of his name.  He's not the current district attorney.  Give me one second --

Q    Taylor?

A    No.  Charles Cravins.  She went to Charles Cravins, I think it was either that day or the next day.  They show up at my house, confiscating my equipment, taking my dog.

Q    Who did?

A    Deputy Chief Daigle, came to my house, confiscated my dog and all this other stuff.  And while I was talking to Terry Darbonne, he explained it to me that -- I told him exactly what I did, and he said, "Well, that makes sense why Charles Cravins was at Randy's office at 7:00 in the morning after you made your complaint," after Charles Cravins refused to speak with me.

Q    All right.  I appreciate your answer.  There were a number of names of people in there that I need you to back up --

A    Sure.

Q    And I'm going to try to cover some of those.

A    Sure.

**56**

Q    There's some references in some of your discovery to an ADA named Alisa Gothreaux?

A    That is correct.  That was --

Q    Is that -- when you said "she," and you're talking about the ADA, is that the person you're talking about?

A    That would be correct.

Q    G-O-T-H-R-E-A-U-X.

A    Yeah, I can't spell it.

Q    Yeah, it's like Gothreaux.  So you're -- and you said that when you spoke to her, she agreed with you that there was some illegal activity going on?  Is that what you said?

A    That is correct.  With the case we were talking about presently, that she believed something -- she believed that it was criminal offense, and she was going talk to her boss.

Q    And with that, you were talking about the tampering issue?  That's what you went to her about?

A    Correct.  Falsifying a police report changed the outcome of it to keep somebody from going to jail.

Q    And she -- your understanding is that she went to the person who was DA at the time, who was

**57**

Mr. Cravins?

A   She said she was, and there was another person in the room with me when that conversation was had.

Q   Who's that?

A   Dane Wilson.

Q   Who's Dane Wilson?

A   Dane Wilson was a patrolman with the Eunice Police Department.

Q   All right. And so -- now, I'm going to try to break down your answer --

A   Okay.

Q   -- into a couple of pieces so we can talk about each one of those pieces a little bit.

A   Sure.

Q   There was some point in time at which you were informed that Mr. Cravins was in Chief Fontenot's office --

A   That is correct.

Q   -- at 7:00 a.m., right?

A   I believe that was the right time.

Q   And who told you that?

A   Terry Darbonne.

Q   All right. And who's Terry Darbonne?

A   Eunice City Marshal.

**58**

Q   All right. And he said to you something like that would explain why --

A   Why they had a meeting so early in the morning while no other police department personnel were present.

Q   All right. And then you -- in your answer, you were informed some other kind of way that Chief Thibodeaux was made aware of your complaint of -- I'm sorry, Chief Fontenot, was made aware of your meeting with Alisa Gothreaux, and I didn't understand that other part.

Was there some other way that you contend that Chief Fontenot was made aware? Maybe I didn't understand it.

A   There was -- I know later down the road it was confirmed that -- I even went to Barry Soileau. Barry Soileau went to Charles Cravins' office trying to talk to him while he had me on the cell phone, and he still again refused to talk to me, and when I was telling him, "This is Brady evidence. You have to accept this."

Q   Who's Barry Soileau?

A   He's also -- I don't know his full title, but I think he's a ADA for the misdemeanor side here -- there in Eunice.

**59**

Q   All right.

A   I don't know his correct title. I mean, I just know he works for the DA's office.

Q   Everything that we're describing, did it happen in 2018?

A   You'd have to look in my notes for the timeline, dates talked about. I'd have to look at my notes to give you exact timeline of who I talked to, when I talked to them.

Q   Okay. Stepping back, looking at the bigger picture, back to my original question about what kinds of things happened in 2018 that led you to say that -- in this lawsuit that the system was breaking down, we've talked about your interaction with Alisa Gothreaux, and were there some other similar kinds of incidents around 2018?

A   My best recollection, there was a lot. We're going to have to -- you're going to have to get into each individual thing. I mean, some things are intertwined. Some things stand alone.

So I mean, we're talking about a time span from -- I'm believing for sure when everything started coming -- probably the end of 2017 up

**60**

until now, a lot of things just -- you're going to have to go to each individual incident.

I don't know exactly what 2018 is referencing in here, but there has to be something in my notes the reason why I would use that date.

Q   Mr. Dunn, I'm going to show you a document I've marked for attachment as "Exhibit 5." It's Dunn 1 through Dunn 23.

(EXHIBIT NO. 5 ATTACHED)

A   Am I done with this?

Q   You can hand that to the court reporter, please, sir.

A   Okay.

MR. HEBERT:

Off the record.

(OFF THE RECORD)

MR. HEBERT:

Q   So, Mr. Dunn, take a moment, if you would, to look through this document, and my first question's going to be do you -- simply, do you recognize this document?

A   (Witness reviews document.) Yeah, I recognize the document. Hold on one second.

Q   Go ahead.

**61**

A    (Witness reviews document.)  Do you want me to read the whole thing, or --

Q    No.  Just -- do you recognize as this being some notes that you prepared yourself?

A    That's correct.

Q    All right.  And it begins with the heading, "My journal notes over the years."  Do you see that?

A    Yes.

Q    So my first question to you is, describe for us in general terms, and then I'll ask you some particular questions, like your process for keeping these notes?

A    Process for keeping --

Q    In other words, what -- and let me ask you some -- give me some particulars.

A    Okay.

Q    Where -- how and where were they kept?

A    How and where they were kept?  They were kept with a personal jump drive.

Q    All right.  Did you type them up on a computer, or a laptop, or where did you -- where did you type them up?

A    The reason why I was on a jump drive where I can type it to any computer I was at.

**62**

Q    All right.  Where is that jump drive now?

A    At my home.

Q    You have a computer at your house?

A    Yes.

Q    Did you type some of these notes on the computer at your house?

A    I do not -- that's a new computer.  It's a new laptop I bought.  So on the computer I have now, no.  The other one crashed.

Q    All right.  Did you type some of these while you were at the Eunice Police Department?

A    Yes.

Q    All right.  Did you have your own computer at the Eunice Police Department, or did everybody rotate around?

A    I know we had, I believe, three computers in the squad room, and we have two computers in the supervisor's office.  I mean, we don't have a individual-assigned computer.  You just use whatever one's available.

Q    When did you first start keeping these notes?

A    Generally, what I would do whenever something of importance would happen, I would make an entry, and it wasn't titled or anything.  It would just be a entry, "Hey, remind myself to

**63**

talk about this.  This is what happened today."  I mean, I don't know exact dates and times I actually started.  But I -- usually when I did a note, I would reference the date and time when the incident took place.

Q    The reason that I ask -- to your point, the reason that I ask is, the second paragraph -- well, I guess if you consider "My journal notes over the years" as paragraph 1, we'll call it the third paragraph.  But the paragraph about the K-9 Unit there, seems to be talking about an incident that happened in 2015, --

A    It did.

Q    -- right?

A    It did.

Q    Am I right, that's what that -- that's you're talking about there?

A    Yes, sir.

Q    Okay.  So were you -- did you start keeping these notes way back in 2015?

A    No.  I was keeping notes prior to that.

Q    All right.  So is the 2015 note -- the note about the dog in 2015, is that something that you wrote around the time it happened, or was it later?

**64**

A    I made a notation about it in my records, and then I just put all my records together when I was compiling my complaint.  This is just a collection of my notes.  It's all in one nice little stack.

Q    So were they all originally just kind of separate entries, and you put them all together in one document?

A    Correct.  Where it'd be easier to follow along.  I mean, to me, anybody that was reading this, I mean, here it is.

Q    Where are all those separate entries?

A    They're going to be on a course of different jump drives over the years.  When you asked me this question, this is -- I know which jump drive this is on.  The other ones, I have probably about ten, 15 of them.  I had hard drives -- external hard drives.  We're talking up to 2010.

Q    Was it your general practice that when something happened that you thought out to be recorded, that you would make a note of it, and put it on one of those jump drives?

A    Once I became a supervisor, yes.

Q    Which is -- that's when you became a

**65**

lieutenant?

A   Yes.  And also when I was a sergeant as well, because I was instructed -- whenever I started my original training officer was telling me -- telling me about some things I had seen, things that was going on, and he said, "That's why I tell you to keep notes of what takes place."

Q   So if we could turn to Dunn 23, the very last page?

A   23?

Q   Yes.

A   It's cut off.  Oh, just the last page?

Q   The very last page, yeah.

A   Okay, cool.  One second.  One second, I'm getting there.

Q   The last paragraph there says, "Please keep in mind, officers are scared of being blacklisted and fear retaliation from R. Fontenot.  Even after officers have left for another department, R. Fontenot has called their new place of employment to have them disciplined or threatened.  I am sure there are more that will be willing to speak up, but I cannot remember everyone that has come and gone over the

**66**

years."

A   Okay.

Q   And that's the end of your -- of these notes, correct?  That's the end of the notes in --

A   For that one -- this one thing we're talking about, yes.  Those are the notes.

Q   Do you have -- have you continued to make notes as things happened in the Eunice Police Department since this document was created?

A   The answer would be yes.

Q   All right.  Have you made those notes at various times while you were at the Eunice Police Department?

A   That is correct.

Q   All right.  Have you used your Eunice Police Department computer to make some of those notes?

A   That's correct.

Q   All right.

A   And I need to correct the record on that.

Q   Go ahead.

A   You said my department computer.  We have five. I've worked on all of them, --

Q   Sure.

A   -- if that answers your question.

**67**

Q   On a computer at the Eunice Police Department?

A   Yes.  That would be correct, yes.

Q   That's a better question.  You're right.  Thank you.  Okay.  We talked about approximately when you contacted the ACLU a minute ago, but we didn't really talk about why.  Can you explain to me what led you to contact the ACLU?

A   Sure.

        MR. MARDIAN:

            Just to clarify, I object to something that calls for privileged information.  You can disclose reasons that led you, but don't disclose communications you had with the ACLU.

A   Long story short, I believe when I first started reporting the stuff that was going on inside the agency, I knew it's a small, close-knit community, and I knew if I went to the DA's office first, my biggest fear which is the retaliation, everything else would take place.

        So my first place that I went or talked to was the AG and the IG's office.  Originally, it was anonymous.  I didn't want to give my name. After some time went by, I figured look, nobody's going to take this serious unless you

**68**

put a name with it in an official written complaint.

        I was in contact with FBI agent.  I believe his first name is Darren, but his last name is Kelly.  You'd have to reflect my notes to get his full name.  He actually came to my residence, looked into some things.

        He informed me that I had to go to state police or I had to go to district attorney's office.  I explained him my fears.  Time had went on.  Communications back and forth.

        He got back with me, said there was some criminal violations, and he said there was a few federal, but he wanted me to continue to keep gathering information to provide him to see if there's anything he could do.

        As time went forward, he told me that his supervisor informed him there was not enough federal violations, that I would have to go to a state or a local level.

        At some point in time, I attempted to go back to state police, even though they informed my boss that I was talking to them already.  I attempted to.  They said that I would have -- according to their policy, and this is the

**69**

conversation I had.  I believe his name is Eric Duplechain, which is in my notes.

Q  State police, you talking about?

A  Yes.

Q  Go ahead.  I'm sorry.

A  I believe his name's Eric Duplechain, but based on the way their policies are written the chief himself would have to authorize the investigation into his own department.  Well, we already knew how that was going to turn out, so I finally reached out to the ADA's office, and they said they didn't want to have no part of it.

So after every mechanism there is to at least look into what's going on has failed me, I turned to the ACLU.

Q  I was trying to make a list of the folks --

A  I'm sorry.

Q  No.  No --

A  I was talking too fast?

Q  No, not at all.  No, we're fine.  But I was -- I was trying to make a list of the agencies that you contacted.

A  You want me to read it?

Q  I got the attorney general's office, and you

**70**

said the IG, the inspector general, which is, I guess, who -- who was that specifically?

A  That was years ago, when I first reached out to them.

Q  Like --

A  And they -- they expressed how hard it was to go against an elected official to do anything.  It was like, "Look, you're going to have to go either contact state police, or go to a federal level."  So I just stopped talking to them.

Q  You said years ago.  Give me a time frame about when that was.

A  I believe the first time I remember speaking to me, there's different time frames.  When I was doing it anonymously, we're talking probably, I don't know, early '14, '15, somewhere in this ballpark.

Because I was wanting just for someone just to say, "Hey, we got a complaint to look into what was going on," to where some of the crap would stop.  And that's why I wanted to stay anonymous, because the one thing you don't do in law enforcement is you don't talk about what other police officers are doing.  Because after that, your career is done.  So that's why I

**71**

tried to do it anonymously at first.

Q  Got it.  And then you went to Agent Kelly at the FBI?

A  I contacted the FBI.  I told them I didn't want nobody out of the Lafayette office.  I wanted to speak to somebody a little farther away, just to keep from them finding out I was the one talking.  So Agent Kelly came to my residence.  He accepted some information from me.

I don't remember all what I gave him.  He said he'd be back in touch with me.  We exchanged numbers.  We talked a few times here and there.  Told me what he's seen, how he felt.  Told me, you know, "We don't have enough yet, but I see -- I see what you're talking about, but we don't have enough for the FBI to actually take over the investigation."

Time rocked on there.  Like I say, some of this stuff is intertwined between who I've been talking to, who has been doing what.  I know Agent Kelly came back to my house a second time after I learned that there was threats made against my life or against making bodily harm towards me, and also the fact after I learned

**72**

they were trying to have me falsely accused of being a dirty cop and had me arrested.

I know he came back to my house after that.  And that was when I told him, "What do I do?  I'm scared.  I'm scared."  I said, "I'm about to lose everything I have because of what -- what I tried to do the right thing, and I need help."  He said -- and he got on the phone with his supervisor.  I wasn't privy to the conversation with him and his supervisor talking.

And his supervisor said, "Look, you have criminal violations.  But this is not our cup of tea."  I can't remember the word he used.  He said, "You have enough.  You'll have to get state police or the local DA's office involved."  Then I expressed my fears.

I said, "The moment I go to them and tell them everything, it's going to be hell for me."

Q  Okay, thank you.  So if you went to the IG or the AG around the 2014, 2015 time frame, how long or when in relation to that did you go talk to the FBI?

A  FBI was -- you'd have to look at my notes.  Yeah, I even have it listed in there when I

**73**

contacted Agent Darren Kelly. It should be dated.

Q  Okay. And then Louisiana State Police, you described that was the Duplechain person?

A  No. I contacted him before that. The time before that is when they called my boss and let them know I was talking about things that they shouldn't be doing.

Q  Right.

A  So I wasn't going to reach out to the same --

Q  All right.

A  I wasn't going to reach out to the same department that let him know that I was trying -- what I was trying to do. I'm not going to reach out to the same group. So I reached out to -- I called the main headquarters and asked to speak to somebody of rank, and I got Captain Eric Duplechain.

Q  So that was the second time you had attempted to get some relief from the state police? There was the earlier time was the time that got reported to Chief Fontenot?

A  Correct. Why would I do it again?

Q  Yeah. And then, the last one that you mentioned was an ADA. Was that the Alisa

**74**

Gothreaux incident or was that something different?

A  Again, that's why I expressed earlier, if you have a certain question about a certain incident, that's what I need to talk about. Because we're talking about things that intertwine, different people, talking different situations happened all at the same time. When I talked to Gothreaux -- however you pronounce her name.

Q  Gothreaux.

A  Alisa Gothreaux.

Q  Alisa.

A  It was over a certain particular incident. That was it. Nothing further went past that. And as the conversation evolved, "Hey, is there any other things going on?" both me and Dane agreed, "Yes, there's other things going on we don't agree with. This is this, this is this." We didn't go into specifics. "Can I talk to somebody?" I said, "You can talk to whoever you want." I didn't -- because she actually asked to speak to one of my attorneys at the time.

Q  It's still Alisa Gothreaux we're talking about?

**75**

A  Yes. Just that conversation, yes.

Q  All right. So you had more than one contact with somebody in the DA's office?

A  Uh-huh (yes).

Q  All right. Don't forget you --

A  Yes, sir. I'm sorry. Yes. Yes, sir.

Q  Okay. So who was the -- who was the DA during those contacts, if you can remember?

A  It changed. Certain -- that's why I'm saying, we'd have to go back to certain incidents. One -- some of the incidents occurred under Charles Cravins. Other incidents occurred under Chad Pitre.

Q  All right.

A  So, yeah, that's what I'm saying, we have to go over each where I can get you the correct information.

Q  That's fine.

COURT REPORTER:
What was the name you said before? Pitre?

THE WITNESS:
Chad Pitre.

MR. HEBERT:
P-I-T-R-E.

**76**

THE WITNESS:
He's a new ADA -- new district attorney.

MR. HEBERT:

Q  So you went to the ACLU after you'd been unsuccessful trying to get relief from the DA's office, state police office, the attorney general's office, the inspector general's office, and the FBI?

A  That's mischaracterized, sir. I wasn't trying to get relief for me. I was trying to get what was going inside the department fixed. I could fight my own battles through civil service. I was trying to get the other stuff stopped.

Q  And that was my -- sorry, that's my --

A  Oh.

Q  No. Look, it's fair, man. That's my -- my shorthand use of the term "relief," --

A  Got you, okay.

Q  You know, you -- I mean, you can call me on it, fine. What I meant was what you said. The things that you were trying to get fixed, you weren't able to get them fixed after going to the state police, the DA, the attorney general, the inspector general, the FBI, and did I say

**77**

state police?  Yeah.

A  Yeah.  And all of them told me --

Q  Correct?

A  -- the same story.  Yes.  Everybody gave me the same exact reason why they wouldn't handle it.  Because this is a political nightmare.  They said that no matter what happens it has to originate with the local ADA, or the chief himself has to authorize the investigation because of policies and procedures at their own departments.

    That's the -- I was being -- excuse my French.  I was being a smart-ass.  I said, "How the hell can I get a man that is part of this to investigate himself?"

Q  All right.  Those things -- all those things that we just described are what ultimately led you to contact the ACLU, correct?

A  That is correct.

Q  All right.  Now --

A  And that's what I'm referring to as the justice system breaking down.  The mechanisms failed.

Q  Got it.  So you had a lawsuit filed over the Facebook post issue with Mr. Loughlin, August the 27th of 2020?  You're aware of that?

**78**

A  Okay.

Q  So was it after the filing of that lawsuit that you contacted the ACLU?

A  What I could recollect from -- and again, you'd have to look at my notes and time stamps.  I remember I contacted ACLU after some of the stuff, and it was -- it was some quite time before I ever heard anything back from them.

    I don't remember the exact date and time they contacted me back.  There was a -- oh, I kicked somebody.  I'm sorry.

Q  That's fine.  It was me.  It's fine.

A  There was a substantial time.  I say "substantial."  I mean, it could have been two months.  It could have been six months.  I don't quite recall.  I remember I filed the complaint.

    I also filed the complaint with -- oh, also with the Department of Justice off of their website.  I filed with that as well, and actually it's in my notes, the case file numbers.

Q  All right.

A  They eventually contacted me back, asked me questions which I can't -- I don't know if I

**79**

can go into detail, but --

Q  That's fine.  That's fine.

A  -- long story short, they said, "Do you have proof?  You know, this is a -- this is pretty" -- I don't remember which word they used.  "This is a pretty serious claim."

    MR. MARDIAN:
        Don't expose the contents of your conversations with ACLU.

MR. HEBERT:

Q  You've answered my question.

A  Oh, okay.

Q  I think you've answered my question, yeah.

A  All right.

Q  So when you -- when you made your first contact to the ACLU, was it a call to New Orleans, or was it a call to DC, or was it a call to some other place?

A  It wasn't a call.  I believe it had to be filed.  They wouldn't -- they didn't accept phone calls.  I think it was an actual complaint form on the website that I filled out, I believe.

Q  All right.

A  And then they contacted me back my phone, if I

**80**

remember correctly.

    MR. HEBERT:
        Can we take five here?
    MR. MARDIAN:
        Yes.
        (OFF THE RECORD)

MR. HEBERT:

Q  Mr. Dunn, you're ready?

A  There was something that -- while we was on break that I recalled.  You asked me a question who all I spoke with.  There is one other person that I did -- did not mention, that I recollected while we was on break.

Q  What person -- what kind of -- what --

A  Part of the city government.

Q  Help me understand what you're trying to --

A  The city attorney.

Q  -- respond to.

A  The city attorney also was notified as well as what -- you asked me the question -- if I remember your question correctly, you asked me who all did I speak with.

Q  Yes.  Yes.

A  So he's actually a part of the city government.  I forgot to mention, it slipped my mind, that I

**81**

hadn't spoke about him yet.  I also spoke to him, too.

Q   Got it.  Thank you for that addition.

A   But I do need to add that -- what happened in that conversation.

Q   Okay.  Before you go there, the city attorney has changed a time or two, I think.

A   Stan Feucht.

Q   Stan Feucht, okay.  All right.  Now, you were going to tell me about the conversation.  Go ahead.

A   Yes.  And it actually should be characterized in my notes.  Stan Feucht, I had also reached out to him as well, because I mean, I let everybody know what was going on, once the cat was out the bag, they knew I was the one talking.

I even told Stan some of the things that's going.  And some of the things I'm about to say is vulgar, because he cussed me out on the phone.  He told me I needed to keep my fucking mouth shut.  That if I couldn't learn to look the other way or get along with Chief Randy Fontenot, I needed to fucking quit.  That's exact wording.

**82**

Q   When did that happen?

A   During the same time frame that I'm reaching out to the council members and the mayor.  Because the mayor said he was going to include Stan Feucht in those conversations.  I said, "Don't worry about it.  I've -- his office is right across the street from my house."  I said I was going to talk to him.

Q   Okay.  My recollection of what you said before might be wrong, and I welcome you to challenge it, but I understood you to say that you weren't really sure exactly when those contacts were with the mayor and the council; is that right?

A   I don't know exact dates.  It should be characterized in my notes.  I don't know the exact dates.  I just know it was in the same time frame when I'm talking to the city council and them, that he's a part of the government, so I wanted to clarify the record.  He's a part -- and I did talk to him as well.

Q   All right.  When you say "notes," just to make sure we're understanding what we're talking about, we had previously talked about Exhibit 5, a list of running notes that you had made.

**83**

Are there some other notes, when you say "your notes," that you're referring to?

A   Yes, sir.

Q   What other notes would those be?

A   Other notes of incidents that took place, conversations, which was turned over to counsel.

Q   Okay.  So you kept -- the set of notes as Exhibit 5, I'm understanding it was kind of a running set of notes that you had that you put on a flash drive at kind of as things would happen, correct?

A   Correct.

Q   And then there's -- but there's some other notes of some other kind that you've provided to your lawyer; is that right?

A   That would be correct.

Q   But do they also recite events that happened similar to what's in Exhibit 5?

A   Dates and times of incidents.

Q   All right.  So we say things that are in your notes.

A   I'm talking collectively.

Q   Okay.  So --

A   This is not the only note, if that answers your

**84**

question.

Q   All right.  Are there -- so is there more than the set of notes that are identified as Exhibit 5 and whatever notes you've provided to your counsel?  Are there other notes?

A   That is correct.

Q   So there's -- there's more than two -- I'm going to call them sets -- there's more than two sets of notes, right?

A   At a certain point in time, once I obtained counsel, I don't know, when a incident would take place I would just articulate it.

Q   What do you mean "articulate it"?

A   What happened.

Q   You would write down what happened, --

A   Yes.

Q   -- so that you would remember it?

A   Not only to remember, but to notify counsel what took place.

Q   All right.

MR. STAMEY:

Point of information.  Counsel, have you produced all of these notes to defense counsel as either part of your initial disclosures or other discovery responses?

**85**

MR. MARDIAN:

It's our understanding that we've produced documents.  We produced all documents responsive to the defendants' document requests.  If you identify specific deficiencies in those productions, we're happy to consider them and take them under advisement.

But it's our understanding and as shown in the productions themselves, there are, in fact, notes in addition to Exhibit 5 that have been produced.

MR. STAMEY:

Well, I call for production of those other notes that would be responsive to the Court's order for your initial disclosures or in response to production, and prepared for these depositions, including this deposition, in reliance that we already had all those documents and information.

So if there's something else that hasn't been produced, we call for production of that at this time.

MR. MARDIAN:

And again, it's our position that we

**86**

believe everything responsive to your request and responsive with the Court's order, have been produced.  If you identify deficiencies in that production, we're happy to consider it and take it under advisement.

MR. STAMEY:

I don't know how to respond to that other than what your client has just stated, that he has provided you other written notes, which he has just acknowledged, recite or reflect his thoughts and impressions about events that have occurred while he has been an officer for the town of Eunice, that are associated with his complaints.

MR. MARDIAN:

No, that was not his testimony, and the extent that he is in possession of additional notes that are responsive to your document request, we are -- we will consider and review those notes, and if they are, in fact, responsive we will produce them.  But up until this point, the defendants have not identified any

**87**

deficiencies in our productions.

We've made multiple representations that we believe those productions are complete, and we continue to maintain that representation.  To the extent there are additional notes, we will consider and produce them if they're responsive to your request.

MR. STAMEY:

One more follow-up.  Have you referenced the existence of these other notes before your client just testified about those other notes?

MR. MARDIAN:

I am not sure I understand that question.

MR. STAMEY:

Have you in any response, whether it be the initial disclosures or your discovery responses, have you referenced that there are additional notes that you are either withholding for privilege, or for other reasons?

MR. MARDIAN:

You have our discovery responses to the

**88**

extent they include that information.  You can review them as well.

MR. STAMEY:

I've reviewed it, and I don't recall seeing any indication that any notes that have been produced about your client's contemporaneous recollections of events that have not been produced, or are being withheld for some reason, and we would like to have those notes that we can properly question your client.

MR. MARDIAN:

And as I said multiple times, we have represented and we believe to be the case that we have produced documents responsive to the defendants' document requests.  Until today, there has been no identified deficiency in our production since the summer of last year.

To the extent you believe there are deficiencies, and it sounds like you do, on account of additional notes that you believe were given to us that have not been produced, as I've said multiple times now, we will take that under advisement,

**89**

consider whether they are, in fact, responsive to defendants' request, and if they are we will produce them. But, I mean, that's all that I can tell you sitting here today.

MR. STAMEY:

No problem. But I want to make it clear for the record that we reserve our right to continue to question your client in a subsequent deposition following production of those notes.

MR. MARDIAN:

And we would ask for the same courtesy with respect to your client, who we've sought documents from that are outstanding, given that we've already deposed him.

MR. STAMEY:

Well, I made my record. Thank you.

MR. REED:

Hey guys, let's take five.

(OFF THE RECORD)

MR. MARDIAN:

I'd just like to clarify once we're on the record. To clarify a response to Mr. Stamey's question, we have produced all

**90**

notes. To the extent that Lieutenant Dunn made additional notes, we'll supplement them. But as of today we have, in fact, produced all.

MR. STAMEY:

Okay, very good. Thank you.

MR. LEDET:

That's all we ask.

MR. HEBERT:

And we're going to -- hopefully I'm about to clarify some of that as well.

MR. HEBERT:

Q   So I'm going to show you now, Mr. Dunn --

A   Do I give this over, or do I keep it?

Q   You can hand that to her, please.

A   Okay. In the event that something else is referenced, can I look back at stuff that's already been exhibits?

Q   Sure. So I'm going to show you -- I'm handing to your counsel a document I've marked as "Exhibit Number 6," consisting of -- now I'm giving you my only copies, but if you don't mind, have a look at that.

(EXHIBIT NO. 6 ATTACHED)

A   Yeah.

**91**

Q   Consisting of Dunn 24 through Dunn 28, if you have a look at that and tell me if those are some additional notes that you made of the type that we have talked about that are Dunn Exhibit Number 5. Take your time.

A   (Witness reviews documents.) And your question was if I recognize it?

Q   Yes. Are those your notes?

A   It appears to be so, yes.

Q   To the best of your knowledge, were those notes made in the same manner that you testified with regard to Exhibit Number 5, that they were put on a hard drive at some various times and then compiled later?

A   Either it was in email form or a jump drive.

Q   Tell me about how -- if it was done in email form, how would that work?

A   It was --

MR. MARDIAN:

You can answer his question, but don't disclose any -- the contents of your communications.

A   Communications with my counsel.

MR. HEBERT:

Q   Okay. All right. Understand. But these are

**92**

notes that you would have made of events some time around the time that they occurred, and then put them either on a jump drive or emailed them some place?

A   Rephrase -- well, can you repeat it one more time, make sure I --

Q   Those are -- those are notes that you made around the time that the events described in the notes happened, and then you either put that on a jump drive or you emailed it some place after --

A   I believe that is correct, sir, the way you're stating the question.

Q   All right. "Exhibit 7," consisting of Dunn 29 through Dunn 31. Same questions.

Are those some additional notes that you prepared in the same manner that you just testified with regards to Exhibits Number 5 and 6?

(EXHIBIT NO. 7 ATTACHED)

A   Give me one second.

Q   Take your time.

A   (Witness reviews documents.) Glancing over this document, it appears this is something I created, yes.

**93**

Q   All right.  In the same manner and same fashion that you described with regard to Exhibits 5 and 6, --

A   Yes.

Q   -- meaning --

A   That I typed them?

Q   Yes.

A   Yes.

Q   Meaning either put it on a flash drive or put it in an email?

A   Correct.

Q   All right.  I am showing you "Exhibit 8," consisting of Dunn 116 through 118.  Same exact questions with regard to those notes.
     Take your time to look over them, and then tell me if those were also prepared by you in the same fashion that you described as Exhibits 5, 6, and 7.
          (EXHIBIT NO. 8 ATTACHED)

A   (Witness reviews documents.)  This appears to be a document that I created that was sent to counsel.

Q   All right.  "Exhibit 9," consisting of Dunn 138 and 139.  Same questions.
     Are those notes prepared by you and in the

**94**

same fashion that you described in Exhibits 5, 6, 7, and 8?

A   (Witness reviews documents.)
          (EXHIBIT NO. 9 ATTACHED)
          MR. LEDET:
               I'm sorry.  I was looking for the Bates number.

A   Yes, I believe -- yes, sir.  Yes, to answer your question.

MR. HEBERT:

Q   Your notes prepared in the same fashion as the prior sets of notes that we've previously talked about Exhibits 5, 6, 7, and 8?

A   To the best of my recollection, yes, that is my notes.

Q   All right.  And "Exhibit 10," consisting of Dunn 148 through 153.  Same question.
     Are these also notes prepared by you in the same fashion that we just described Exhibits 5, 6, 7, 8, and 9?
          (EXHIBIT NO. 10 ATTACHED)

A   (Witness reviews documents.)  This -- from this pair of notes, this was actually addressed to another attorney that's not in this room, to the best of my recollection.  This was a

**95**

statement to him in a case that I had with the Civil Service Board.

Q   Is that Mr. Goode?

A   No.

Q   Is it Mr. Green?

A   Yes.  Give me one second, make -- look a little further into it.  (Witness reviews documents.)  This is also shared with another attorney of mine which is in the room.  Without reading the full context, yes, I prepared this, to the best of my recollection.

Q   All right.  Can I see this, man?

A   Oh, sure.  I left them in order.

Q   Thank you, appreciate that.  Just one minute here.  Now, I have mis-marked the exhibit that I was about to -- so if you give me just one moment, I will re-mark it.  All right.
     I think you still have the Complaint in front of you, Mr. Dunn.  I have a couple of questions about -- going back to the Complaint.  If you have a look at paragraph 6.  Page 3 of your Complaint.  Let me know when you're there, please.

A   Okay.  Give me one second to review it.

Q   Take your time.  If you let me know when you've

**96**

reviewed it, --

A   Yes, sir.

Q   -- questions about it.

A   (Witness reviews document.)  Okay.

Q   All right.  Have you --

A   I reviewed it.  Yes, sir.

Q   And this paragraph, in general, deals with a Facebook post that you wrote in 2019, correct?

A   The only thing it -- okay.  Yes, sir.  It says, "While off duty in 2019," yes, sir.

Q   This is also -- this is also the topic of your other lawsuit that was filed in August 27, in which Mr. Loughlin represents you, correct?

A   I don't know the date he filed that, but he did file one on my behalf, yes.

Q   The Mr. Loughlin lawsuit, --

A   Correct.

Q   -- which I'll call --

A   Loughlin.

Q   So I'm going to show you a document I've marked as "Exhibit 11," that was attached to your answers to interrogatories in Mr. Loughlin's lawsuit.
     Is this the Facebook post that is the subject of the Loughlin lawsuit, and also in

**97**

this paragraph 6?

(EXHIBIT NO. 11 ATTACHED)

A  And you said this was produced by Mr. Loughlin?

Q  Yes, sir.  Or -- yes.

A  Well, in totality I don't know what Mr. Loughlin produced, but I know in regards to reviewing my civil service record when I was fighting this civil service case, they had different screen shots of my post.

So one of them was an original post, and one was an amended post.  So this appears to be the amended post, --

Q  Because it says --

A  -- because it says "update."  That's what I'm referring to, so --

Q  All right.

A  So I want to make sure -- this is the amended one that you handed me.  This is not the original.

Q  I appreciate the clarification.  Is it fair to say that the original post stopped right before the word "update;" is that accurate?

A  You actually handed me this one, too.  I don't know if you meant to.  This is the City's response or something, put on Facebook.

**98**

Q  I didn't necessarily --

A  Oh, there you go.

MR. LOUGHLIN:

Well, for my clarity, is that all of -- all of Exhibit 11 then, with your response as well?

THE WITNESS:

Yeah, because I think he might have gave you the police department's response as well, accidentally.

MR. LOUGHLIN:

Well, it can be.  I just want to know what it is.

MR. HEBERT:

Q  It can be.  Let's include it all.

A  Okay.

Q  We'll talk about the police department's response in just a minute.

A  Cool.  All right.

Q  That was all produced -- and I pulled that all from the answers to interrogatories in --

A  This is all the same.

Q  -- Mr. Loughlin's case.

A  Exhibit number has to be --

Q  Yes.

**99**

A  Oh, but you -- okay.

Q  Please.  Sorry.

A  All right.  You --

Q  Just a clarification.

A  Yes, sir.  And you said after the -- you believe -- rephrase the question, because --

Q  You said that your original post was amended, or changed, and so is it correct to say that your original post stopped right before the word "update"?

A  I believe that would be correct.

Q  Okay.  And so, the -- going back to paragraph 6 of your Complaint, among other things it says that you wrote this while you were off duty in 2019?

A  That would be correct.

Q  And so, having talked to a lot of police officers about what off duty means, I just want to make sure what that means to you, when you say you were -- what do you rely upon to say you were off duty at the time?

A  When I am no longer being paid by the police department.  I am not in uniform or any capacity thereof, taking official police action, which would mean me being compensated

**100**

with some type of pay.  I was off duty, but not being compensated.

Q  That means -- do you as a lieutenant, do you have any involvement in the staffing aspects of the Eunice Police Department as far as determining who's placed on shifts, or what shifts they're on?

MR. MARDIAN:

Objection, form.

A  It's a yes-and-no answer.  I'll try my best to explain.

MR. HEBERT:

Q  Sure.

A  At certain -- in certain given times we were given that authority, and then in certain given times that authority was taken away from us, and we were just given who we were given.  We didn't have any say so.

Q  All right.  So 2019, how was it decided who got put on a particular shift in the Eunice Police Department?

A  Oh.

Q  Look, I meant -- I'm asking a more specific question.  At the time of this Facebook post, how was it decided who got put on a particular

**101**

shift?

A    I'm trying to answer your question quickly. I'm trying to recall. That's -- I'm not a hundred percent certain, sir. It's 2019. I'm sure I don't remember quite who -- I don't believe we -- my answer would be I don't believe I had the authority at that time.

Q    All right. And different police departments do this different ways, so I might not be using property terminology when I ask you this next question.

But in your position as lieutenant, were you also a shift supervisor?

A    According to policy I was a shift commander, yes.

Q    Shift commander, okay.

A    Yes.

Q    So whatever shift you were -- would have been assigned to at a particular time, you would be the commander of that shift?

A    That would be correct.

Q    All right. So tell me -- tell me generally what prompted you to write this Facebook post.

A    Generally?

Q    Yes, sir.

**102**

A    Are you discussing what my frame of mind -- I don't know what you're -- I'm trying -- you're saying generally.

Q    Yes.

A    It's kind of broad. So are you talking about my frame of mind at the time?

Q    Yeah. Let me back up.

A    Okay. I'm just trying to clarify you saying generally. That's all.

Q    This dealt with an incident at the K.C. Hall on North Second Street, right?

A    Correct.

Q    Okay. And you start out your Facebook post by saying, "What I have to say is for public concern and outweighs me as an individual," and then you begin to talk about the K.C. Hall incident right after that, right?

A    Yes, sir.

Q    So what are you -- what was the public concern issue that you're referring to there, where you say that it outweighs you as an individual? What were you trying to convey?

A    Exactly what's in the message, that there was a -- there was a problem that jeopardized safety just in my -- not just in my neighborhood, but

**103**

the surrounding streets or blocks, about the shooting, the drag racing, the drug dealing, all the gang members I've seen there.

Q    All right. And then, if you turn to the second page of -- at least as it printed out, I'm calling it a page. Of course, we know --

A    It's about this page.

Q    -- paper page, yeah. Paper of Exhibit 11.

A    Where it starts, "And now"?

Q    Yes, sir. Third paragraph.

A    Third?

Q    In that paragraph, you identify yourself as a police officer, correct?

A    As a police officer. Not where I worked. Correct.

Q    Yeah. "But living here for eight years and police officer for nine years," right? That's what I'm referring to, but --

A    That's correct. Yes.

Q    All right. And the -- going down to the update section, there's a section in there that said, that reads -- I'm just going to read it. The easiest thing is for me to just read it.

A    That's fine.

Q    "As I previously stated, I do not have the

**104**

right to free speech unless the public interest out" -- it says "outweight," but I think you meant "outweighs my own," and you put, parenthesis "(civil service law and policy). I said what needed to be said to make the public aware of a problem and danger that affects my neighborhood yet again. Other than that, I can't say much else."

My question to you is, this information and this -- what you're saying here that says "I do not have the right to free speech unless the public interest outweighs my own." Where -- how did you -- how did you come to that understanding? What's the source of that information?

A    Based on my own training, knowledge, and experience, and studying the civil service law on my job.

Q    Was there some particular research that you did, or some legal authority that you looked at, or -- I'm not sure what you mean when you say that.

A    Generally, just me being the type of officer I am. I always research everything. I research the new case laws, things that's changed,

**105**

things that need -- that's updated.  The laws that's been ruled -- deemed unconstitutional or differences in case laws.

I mean, you have to be a little more specific.  If you're talking about just this, it's -- I mean, it's part of civil service law. As a civil service employee, I do not have the right to free speech, and if I say something that is only for my own individual purposes or gain, then it would be deemed a violation of civil service law.  If that answers your question.

Q   I think it does.

A   Can I add to that?

Q   Sure, go ahead.

A   Basically, with our department there's not a -- we do do some type of training, you know, whether on the POST website, and I believe the correct name is Target Solutions for some other stuff.

We don't do a whole lot of legal update, so usually -- the way I was trained, you take it upon yourself.  If anything changed, you do research.  I mean, we do a lot of research. Especially with the individual cases and stuff

**106**

of that nature.

Q   Had you done any of that kind of research before you -- between the time you wrote your first Facebook post and the time you wrote your update?

A   No, that's pretty much knowledge of stuff that I knew, if I'm remembering correctly.

Q   Why did you feel it was necessary to update your post to put that information in?

A   Because my phone was blowing up, and I already heard my boss was pissed at me, and I was going to get called into the office over it, and they were going to come after me.  I believe it was Sergeant Brickley that called me.

Q   Sergeant Brickley?

A   Either he was a lieutenant or sergeant at the time.  You'd have to ask Chief Fontenot.  There was a certain time that Lieutenant -- either he's Lieutenant Brickley or Sergeant Brickley. I can't remember all the times that the names switched, because of promotions or demotions. If you hear -- I'll just refer to him as Brickley, if that saves the issue.

Q   How did you acquire the information that he was pissed at you?

**107**

A   On scene.  On scene, and I think we had a phone conversation about it.

MR. STAMEY:
I'm sorry.  "He" was Brickley --
THE WITNESS:
Brickley.  Yes, I apologize.
MR. STAMEY:
-- in your question?
MR. HEBERT:
Yeah.  That --

A   I believe it was Brickley.  I'm not -- I'm not a hundred percent certain, but I believe it was Brickley, I believe.

MR. HEBERT:

Q   All right.  So when you say "on scene," while police are responding to the K.C. Hall incident?  Is that what you're talking about?

A   Yeah.  A officer cried for help, so hell yes, I went out my house and went helped him.

Q   I'm trying to get the timeline straight in my head, because at the time you did that you hadn't already posted, had you?

A   The post was done several hours prior to anything ever taking place.

Q   All right.

**108**

A   Does that answer your question?

Q   I think it does.

A   Okay.

Q   So your post was before you went out and responded to that officer?

A   That is correct.

Q   All right.  I'm going to come back to Exhibit 11, --

A   Sure.

Q   -- but I want to show you -- in the context of what you're saying, I'm going to show you a document that I've marked as "Exhibit 12."
(EXHIBIT NO. 12 ATTACHED)

A   Sure.

Q   Because you talked about various rules and policies.  I'm going to show you, --

A   Sure.

Q   -- this is Exhibit 12.

A   Uh-huh (yes).

Q   Have you seen this before today?  Procedural Order 18-2?

A   (Witness reviews document.)  18-2, shows a date of enactment of 11/18.

Q   And for the record, it's Civil Service Board 435 through 438.

**109**

A  You lost me there, sir.  Repeat that?

Q  I'm sorry.  I was just -- for the record --

A  Oh.

Q  -- I'm putting the page numbers in the record.

A  Without reading the whole thing, yes, this is the policy of the Eunice Police Department.  Yeah, I believe this is correct.

Q  It's the social media policy of the Eunice Police Department, correct?

A  Correct.

Q  All right.  If you turn to Civil Service Board 437, it's also --

A  Which page?  I apologize.

Q  In the Civil Service Board 437.

A  Oh, page 144?

Q  Yes.  Same one that says page 144 on the document.  Are you there?

A  Yes, sir.

Q  You see there's sort of a gray highlighted area under A-1, that is, "Department personnel are free to express themselves as private citizens on social media sites to the degree their speech does not impair working relationships of this department"?

   Do you see that -- that highlighted

**110**

   paragraph there?

A  That is correct.

Q  Had you been aware of that policy at the time that you made the Facebook post?

A  I would assume so.

Q  All right.  So going back to Exhibit 11.  I apologize for the skipping around.

A  That's fine.

Q  If you go to page 3, paper page 3.

A  Paper page 3.

Q  And again, this was the way this was produced to us --

A  That's fine.

Q  -- in your response -- in your answers to interrogatories in Mr. Loughlin's lawsuit.  It begins with "The Eunice Police Department" at the top.  Make sure we're on the correct page.

A  One second.  I think I got mixed up.

Q  Probably did.

A  Yeah, I did.  It's my bad.

Q  I did, too.

A  Give me one second.  This is mine.  This is -- okay.  So it would be this title, sir?

Q  Yes, sir.

A  All right.

**111**

Q  All right.  What is the first time that you ever saw this post from the Eunice Police Department?  Was it the same night that you posted your post, or was it later?

A  You'd probably have to reflect my notes.  I don't remember -- it had to be later, because after my post.  It had to be after my post.  I'll say that much.

   Do I know exactly what date and time?  I know it was shortly thereafter.  Was it that night or the next day?  I don't recall, unless it's documented in my notes.

Q  There's a reference in here also to Lieutenant Brickley that you mentioned him earlier, correct?

A  Correct.

Q  All right.  And so to get the timing straight of Exhibit 11, your -- your post that's reflecting Exhibit 11 was posted before the incident that occurred at the K.C. Hall in which you assisted Lieutenant Brickley?

A  I didn't assist Lieutenant Brickley.  I assisted officer Cody Miller.  He was the original officer that cried for help, saying, "shots fired."

**112**

Q  All right.

A  That was the officer I assisted.  The rest came later.  I don't know who got there what time.  I just remember Cody was the one I was backing up.

Q  Did you make any kind of response or reply to the Eunice Police Department Facebook post?

A  Not that I recall.  I remember reading it.  I remember being ticked off about it, because it was not a accurate reflection of what actually took place.

Q  So your paragraphs -- we're going to attach Exhibits 11 and 12 to the deposition.  I don't think I need those again immediately, so if --

A  I'm just trying to follow where you're at.  That's it.

Q  I know.  So if I made you make a mess in front of you, you can --

A  No, I got -- I'm good.

Q  -- move those now, --

A  I'm good.

Q  -- because I don't think I'm going to be asking you much about them immediately in the next few minutes.

A  Okay, cool.  So just give everything to this

**113**

lady?

Q  Yes, please.  So going back to --

A  This isn't marked.  Does it matter?

Q  You can leave that.

A  Oh, okay.

Q  I'll ask you to refer to that from time to time.

A  That's all right.

Q  Going back to paragraph 6 of your Complaint, among other things, it says that in response to your Facebook post, Chief Fontenot put you on administrative leave.  Do you see that?

A  Yes.

Q  Again, having deposed a lot of police officers, administrative leave means different things to different police officers.  So I want to understand what that means to you, the way it's stated in paragraph 6 of your Complaint.  And I'll have a specific follow- up, --

A  That's fine.

Q  -- but let me -- just tell me, just get your take on it.

A  All right.  The only thing I'm going to reference is what is applied to our department as Civil Service Department.  There are

**114**

different types of leave.

Administrative leave does stand for several different things that could be -- the best of my recollection there is two times of administrative leave.  I'll go through the first one.

One is pay without leave, and one with pay.  There are other types of leave.  I don't know the titles of them off the top of my head without reviewing civil service law, but that's my understanding.

Q  That's fair.

A  There's two types of leave according to what I believe you asked of me.  Two types.

Q  That's exactly why I'm asking you, because at least my definition of administrative leave is leave with pay, but is that wrong?  Is that what happened to you in this case or not?

A  To answer the first part of your question, there are two types, with pay and without pay administrative leave.  To answer your question, I was on leave with pay pending investigation.

Q  Got it, okay.  So your paragraph 6 of your Complaint goes on to say, "Public outcry followed and the Eunice Board of Aldermen

**115**

revoked Chief Fontenot's previously unchecked authority to hire, fire, and suspend officers."  You see that in paragraph 6?

A  Yes, sir.

Q  Okay.  So I am aware of a 2019 action of the Board of Aldermen by which they gave -- they --

A  Took it away.

Q  I'll say took back, whatever.

A  September 10.

Q  The appointing -- appointing authority responsibilities went back to the mayor and the Board of Aldermen.  Is that -- is that your understanding?

A  My understanding, it went back to the mayor and one other alderman.  I don't think it went back to the entire board, but again, that's theatrics.  I don't know exactly who all got power.  I know it's not the entire board.

Q  In any event, it was removed --

A  Revoked.

Q  -- from the chief?

A  Correct.  And sorry I cut you off.

Q  That's all right.  Appreciate that.  So -- and your understanding is that that action was a response to you being placed on administrative

**116**

leave; is that right?

A  Repeat the question one time.

Q  That the Board of Aldermen taking back the appointing authority responsibilities from the chief was a response to you being put on administrative leave?  A reaction?

A  That would be correct.  And if I tell you the name that did, it's actually one of your clients that told me that.

Q  Okay.  Who -- okay.

A  Mayor Scott Fontenot.

Q  Okay.

A  Mayor Scott Fontenot said he received numerous calls about it being -- I will try to keep it PC as possible -- B.S.  That I was put on administrative leave for trying to get something done about what was taking on at K.C. Hall, and they actually made the comment that was the biggest City Council meeting they have ever had, because so many citizens was upset of what transpired.

Q  All right.  And so, ultimately when the disciplinary authority got removed from the chief, was your administrative leave rescinded?

A  I'm trying to remember the chain of events.  At

**117**

this time, I can't recall exactly who rescinded it, but I know I was brought back to work. I don't know if it -- the post is in -- when was the post? I can give you an accurate --

Q August of 2019.

A August. I believe, if my memory serves me correct, I was only out two weeks, or approximately two weeks on administrative leave. This is before -- I don't know -- I don't remember if he lost his appointing authority ability on or before I came back to work. I honestly can't recall. I know it's close. I just can't recall.

Q I'm not asking you to be a lawyer, but I want to -- this -- well, part of why I'm asking you this question is that I have seen other Civil Service Boards take the position that if someone is placed on administrative leave with pay, they don't have the authority to hear an appeal of that.

A That is incorrect.

Q That's what -- it is incorrect that that's an incorrect position?

A Correct. If you read the actual Officers' Bill of Rights, it notates any type of adverse

**118**

action taken against an officer that he feels to be disciplinary action can be appealed with the Civil Service Board.

Q Okay. So I think you -- I appreciate that, but you're sort of anticipating my question. But did --

A I thought I was answering --

Q It's okay. Because I was going to ask you if you have any recollection as to whether your administrative leave got appealed to the Civil Service Board, and if so, if they acted on it?

A I believe there was a totality of six or seven different appeals. You have to give me a second to recollect. I know of -- I can't remember exactly how many. You'd have to speak to my -- or get my file from my old attorney, Mr. Aaron Green.

I know some of the ones the City just dropped against me, because they already seen that there was no criminal viol- -- not criminal. There was no policy violation thereof, and so they dropped the charges through civil service. There were some that I filed away. I can't recollect. Repeat your question one more time to make sure.

**119**

Q Did your --

A I'm sorry I have to keep asking the question. I want to make sure I get it right.

Q No. Look, you don't have to apologize. Did your placement on administrative leave for the FB post get appealed to the Civil Service Board, and if it did, did they take it and act on it?

A I remember it was, but I don't remember if we went all the way or the City dropped it. I can't recall at this time, but there is a documented history if it was or if it was not. It would be in the civil service records if it was, because it's public record.

Q Turning to paragraph 8 of your Complaint, and I'll give you a chance to review it and then I'll ask you a few questions about it, if it's okay?

A Yes, sir.

Q Let me know when you -- when you've read it.

A Will do. (Witness reviews document.)

MR. HEBERT:

Off the record.

(OFF THE RECORD)

MR. HEBERT:

**120**

Q Have you reviewed paragraph 8?

A I'm on the last sentence.

Q Take your time.

A Okay, ready.

Q The part of paragraph 8 that I want to direct us to specifically is the termination of the canine program.

Do you see that in the second -- in the second sentence? "In June 2020, Chief Fontenot terminated the department's canine program, causing Lieutenant Dunn to suffer loss of hours in compensation." You see that?

A That's correct.

Q All right. I saw, and I was asking you about it earlier, and I'm happy to pull it out, but I mean, I don't need to, but if you'd like to look at it I'm happy to show it to you, but you had -- your first notation in Exhibit 5 was about a 2015 incident involving the canine program?

A Yes. That was a different dog.

Q Okay. So there have been two different times when there was a canine program at the Eunice Police Department while you were there; is that right?

**121**

A  That would be correct.

Q  You were involved in both of them?

A  Yes.

Q  And the -- what I get from paragraph 8 of your Complaint, and a couple of others we'll talk about in a minute is that your -- you believe that Chief Fontenot terminated the canine program as retaliation to you to, among other things, cause you a reduction in your pay?

A  With the second time it was terminated.  Not at -- I can't think of any reason for the first one.

Q  Yeah, okay.  And I'm talking about the second one.  You're right.

A  Okay.

Q  Am I correct though, that's -- you believe that was an event of retaliation?

A  The second event, --

Q  Yeah.

A  -- with K-9 Robin, yes.

Q  All right.  Where did Robin come from?

A  Little Rock, Arkansas Training Academy in Little Rock, Arkansas.

Q  What kind of dog was it?

A  Belgian Mal.  Malinois, the full name.

**122**

Q  I understand.  Were you -- did you undergo some training with the dog, specific dog, before the dog was deployed?

A  Yes.

Q  All right.  Where did you do that training?

A  Multiple locations.  The original training location would be at Little Rock Training Academy, which consisted of two weeks.
    You cannot graduate unless you was able to perform the response -- not responsibilities, the -- getting ahead of myself.  One second.  There's different programs out there, like NNDA, drugs for different things.
    They have different levels of rules and regulations that you have to accommodate during your training to pass.  If you do not pass, you do not graduate.  So -- and it took me about two weeks.  It was a two-week program.

Q  Was Robin trained as a drug dog, bomb dog, both?  How does that work?

A  He was a dual-purpose canine, trained in the detection of the odors of narcotics.  I'd have to go through my records to remember exactly how many he was trained in.  He was also trained in bite and apprehension.  He was also

**123**

trained in searching, tracking of suspects.

Q  All right.

A  And to further that answer, that was the initial training.  Follow training was done with other canine handlers of different agencies done at different venues, like LA K-9, and different place agencies.
    So I don't remember all of them, but I could name a list if you need it, of what I do recall, who all I trained with.

Q  And what ultimately happened to Robin?

A  What ultimately happened to him?  He's work -- I don't remember the name of the agency he's working at, but he's at a sheriff's office up north towards Shreveport.

Q  And is there still to this day no canine program?

A  Under the new administration that took place on the 1st, there will be a new canine program initiated soon.

Q  But right now there's not?

A  No.  I'm working on re-establishing the program.  I was tasked with helping re-establish the canine program in the Eunice Police Department.

**124**

Q  All right.  In order to establish the canine program that Robin was in, the Eunice Police Department had to solicit some donations to kick that off, right?

        MR. MARDIAN:

            Objection, form.

A  I was told -- I don't remember all the conversations and which one took place, so I'll just give a general.  I know with Chief Fontenot we talked about due to the level of narcotics in the town we were going to get another dog.
    We didn't have the funding in our present police budget.  So I can't remember -- I believe it was my idea, I believe, me and Chief Fontenot had several conversations about it and how we would attain it, you know, the different type of grants, different type of way to raise funding.
    I also applied for grants at Walmart.  They do their local grant, and it's anywhere between, I think, 500 to $2500, because that was also used to purchase the dog.
    I don't remember if seizure money was taking place or not.  I know there was some

**125**

seizures, but I don't know if we used seizure money or not.  And we did elicit from the public to assist us with attaining funds to purchase a dog and the equipment, and the -- there was conversations with the mayor, and we told him how much money we raised.

I can't remember without my notes in front of me, but we raised a couple thousand dollars and he said, "You know what, we're going to match that funding.  We're going to get this program up and going."

MR. HEBERT:

Q   When was Robin acquired?

A   I believe June of '17, I think.  I believe so. June of '17.  I believe.

Q   Do you recall making some presentations with the chief to solicit some donations for the canine program?

A   There was one event that I spoke publicly about with Chief Fontenot.  He asked me to go to -- I believe it was the Rotary Club.  I can't quite remember.

I know we went to Nick's on Second Street where the meeting was taking place, and I prepared a brief speech that he looked over, he

**126**

said looked good, and I gave a presentation.

Q   All right.  If you'd flip over to paragraph 10 for just a minute.

A   Ten?

Q   Yeah.  I'll give you a chance to review that.

A   (Witness reviews document.)  Okay.

Q   Okay.  Now, I apologize for this but, you know, there's some flipping around necessary.  If you could go to paragraph 89 of your Complaint.  Go ahead.

A   I do have a question before we get started, when you was talking about where the dog was. There's a reason why that dog is where he is. Because the dog was supposed to be mine, but it's with another agency instead of me.  So I don't know how we need to go talk or -- the dog's supposed to be mine but he's not with me.

Q   Well, we'll -- I was actually about to ask you some questions about that in that, --

A   Okay.

Q   -- but I --

A   Okay.  Okay, that's fine.

Q   If you would, flip over to paragraph 89, which is related to what we were talking about here.

A   Okay.

**127**

Q   And take your time, just have a --

A   I've already read it, sir.

Q   Okay.  I gather from paragraph 10 and 89 that the City of Eunice in some way settled this canine dispute with you while it was in front of the Civil Service Board.  Is that -- is that your understanding?

A   It's a yes-and-no response, and I'll be glad to explain it.

Q   Please do.

A   They offered a settlement with me that I agreed to the settlement, but they didn't honor the settlement.  They screwed me over, and I will go ahead and explain that part, and I brought it to -- my concerns to my attorney, which is Aaron Green, and he told me, "Look, just" --

MR. MARDIAN:

Don't disclose confidence between --

THE WITNESS:

Oh.

MR. HEBERT:

Q   Yeah.

A   Okay.

Q   It's all right.

A   That's part of these part.  Let me think how to

**128**

rephrase it.  I was told to leave it alone.

Q   Okay.  Well, let me break that down.  What was your understanding of the terms of the settlement?

A   Terms was I was going -- I got my back pay, and I was going to be given custody of the dog.

Q   All right.

A   That was the agreement.

Q   And so what is your understanding of what ultimately happened that you said they didn't follow through?

A   What ultimately happened, and this is according to someone else that probably has to be deposed, is -- I'll think of his name -- LeBlanc.  Paul LeBlanc.

So he -- just -- I believe it was two weeks, maybe three weeks prior to me getting my civil service case settled, the chief called him and told him he wasn't going to pay the dues, and to sell the dog.

Even though that I was going to win my civil service appeal, they sold the dog even though he was supposed to be awarded to me.

Q   All right.  And Paul LeBlanc told you that?

A   Yes.

**129**

Q All right. What did you do -- when you heard that they were going to sell the dog, what did you -- did you take some action to try to --

A Didn't know about it at the time.

Q Are you saying that the dog was sold and on its way somewhere else when you found out that that had happened?

A When I won my case and had my paperwork to go take -- see if my dog, or the dog that was awarded to me, I found out about the conversation he had with the Chief of Police. Because my dog was no longer in the custody of him. He sold him to another police department.

Q Got it. For whatever reason, and I don't want to know -- I don't want to -- I don't want to know communications with your counsel, but there's not been any action taken to enforce the terms of the settlement as you understood it?

A My attorney, who works now for the city, didn't want to do anything.

Q How long was it between the time that this settlement was entered into and the time that the dog was gone to the other agency?

A I'm not sure. I don't know the exact time

**130**

frame. But the original way that I found out that the dog was with someone else before I even got my paperwork from the city, the new handler was best friends a person that I'm friends with, and when I seen the dog, I was like, "That's Robin. How the hell did you get him?"

And I don't know if it's still attorney/client privilege. He's no longer my attorney. I don't know how to answer the question without talking what I talked to him about.

MR. MARDIAN:

Don't disclose contents of your conversations with prior counsel.

THE WITNESS:

Okay.

A Give me a second to figure out how I'm going to phrase or answer your question.

MR. HEBERT:

Q Sure. While you do that, I'm going to go grab the menu -- the lunch menu.

A Oh, okay, cool. I'm just being honest, that's going to be a tough one to answer without saying what I talked to my counsel about. Give

**131**

me one second.

(OFF THE RECORD)

A I'm trying.

MR. HEBERT:

Q That's all right. May I ask you a question? Is the issue that you don't know how to answer because to answer would reveal privileged communications? Because I don't want to hear privileged communications. I'll move on if that's all you got.

A It would, sir. But like that's why I made it known he's no longer my attorney, but I don't want to violate him either. So I'm trying to figure out how to answer the question to the best of my ability, and -- it was within days or was it -- I believe it was two days.

I seen that they had custody of the dog. I had already heard word through other people that he'd gotten rid of, but I didn't want to believe it, because I knew it was illegal, because you cannot -- because the dog didn't belong to the police department anymore.

That dog belonged to the City of Eunice, and if he got rid of it without doing the proper channels, that to me is malfeasance in

**132**

office, because that was a tool that was to the city, and he sold it without authorization. And I didn't want to believe it.

So once I finally got my custody paperwork, which I can't talk about how that conversation came up, because that was with my other attorney, once I had physical possession of the paperwork that said, "Hey, the dog is yours. Go pick it up," I go straight down there to pick him up and that's when I get the full story of what took place.

Q So when you say "your custody paperwork," what is that?

A From Stan Feucht, the city -- or whoever represented the city for that civil service hearing, they prepared the documents which was given to that attorney, which then presented to me, "Do you agree to the terms?" Once I agreed to them it took them a day or so to prepare the documents. I don't know exact timeline.

Q I see.

A They prepared the documents, got them to me. Once I had physical custody of those documents, I went to go see about the dog.

Q I see. Can you -- you may have said this, but

**133**

if you did, I missed it.

A   Okay.

Q   Can you either tell me or remind me of the name of the agency to whom the dog was transferred?

A   I don't know, but I can find out that answer. If you do need it, I know who to -- I can contact somebody.  He knows where that gentleman works, and I could find out the name of that agency.

Q   Some place in the Shreveport vicinity?

A   It's north -- it's a parish sheriff's office. I know it's up in north Louisiana.  I know that much.  The handler's name is Shane Faulker, if I'm pronouncing it correctly.

Q   Were you required to have any kind of particular insurance or anything before the dog would be transferred to you, or it's just a straight up transfer, as far as you remember?

A   You'd have to review the document, sir. Because attorneys prepared it.  I don't know.

Q   All right.  And as far as you know, whatever those deal documents were, were they prepared by Mr. Feucht and Mr. Green?

A   After the Civil Service Board's ruling, they agreed to prepare certain documents.  I was not

**134**

privy to that conversation.  All I know, I was shown the final product.

Q   All right.

A   Do I remember what was in it?  No.  Without looking at it.  There's something else I need to say, but it was what the attorney said.  I can't --

Q   No, that's --

A   -- repeat it, so -- it's --

Q   All right.

A   -- in further answer to your question, but I can't, so.

Q   That's fine.  Going back to the Complaint, paragraph 9, if you'd take a look at that, please.

A   (Witness reviews document.)

Q   Just let me know when you're done, because I'm going to send you over to another paragraph when you're done reading that.

A   Okay.  I'm done with it, and which paragraph we're going to now?

Q   All right.  Paragraph 70.

A   (Witness reviews document.)  Okay.  Where do you want me to hold the page up?

Q   Well, probably, because I --

**135**

A   I'll use my --

Q   My first question to you is, paragraph 9 and paragraph 70 describe the same -- the same incident?

A   It references them, but there's other things that you're talking about -- are you talking about in the first sentence, about the defamation campaign?

Q   Yeah.  I'll tell you, --

A   It talks about two --

Q   -- fair --

A   -- different things.

Q   Fair comment.  I would say -- let me clarify that question.  Paragraph 9 says, "Among other things," -- I'm quoting starting with the second sentence, "in October 2020, a defendant in a criminal case testified that Officer Fontenot and Lieutenant Young had asked him to falsely claim he's paying bribes to Lieutenant Dunn."

"The defendant testified that 'Officer Fontenot threatened me, telling me that I need to give him some information on Dunn so they can get rid of his ass, his butt, or whatever, something like that.'"

**136**

And I'm going to stop there, paragraph 9. Go -- now, flip to paragraph 70.  Is what I just read in paragraph 9, is that the same incident that's referred to in paragraph 70?

A   (Witness reviews document.)  To answer your question, there was two different incidents in a short time span involving Mr. Dupre.  I don't believe both of them are exactly identical, but they're in connection with each other is -- if that answers your question.

Q   So what I read from paragraph 9, and then the entirety of paragraph 70, they both deal with this person, Joshua Dupre?  Although it may be more than one incident; is that right?

A   In its entirety, the last paragraph specific -- let me --

Q   70.

A   70.  Specifically talks about that case or that incident with him.  When you're going back to paragraph 9, we're talking about that incident and others.

Q   All right.  I understand.

A   Okay.

Q   So --

A   I apologize if I'm not following what you're

**137**

saying.

Q   No, it's fine.

A   I'm trying my best.

Q   No, that's fine.  You're not -- no, you're fine.  So what do you know about what, if anything, that was done to investigate any allegation that you were taking bribes from Mr. Dupre?

A   That is going to be broken up over -- I can explain it, and I fully intend to, but we're going to talk about different sections and different periods of time.

Q   Okay, sure.

A   So some things might be a backflash, something might be some of those attained later.

Q   Fine, sure.

A   Okay.  All right.  So re-state your question.  Where do you want me to start?

Q   My question is, what do you know about -- about what, if anything, was done to investigate the allegations that you were taking bribes from Joshua Dupre?

A   All right.  I'll try my best to -- hopefully I don't miss anything.  I'm trying to remember where everything started.

**138**

I remember hearing people I've made contact with on the road, people I've arrested, things that have happened in nature, and people are telling me, "Hey, Victor's been asking us a ton of questions saying you're a dirty cop, you're corrupt, you know.  He's trying to get you.  He says he's a better narcotics officer than you," and just different things.  I really didn't pay that much attention to it.

Q   Just people on the street?

A   Just people on the street.  I didn't really pay much attention to it.  Just people start shit -- oh, I'm sorry.  I didn't mean to cuss.  People start crap all the time.

So, I mean, I dismissed it.  Rocked on there, as time went on, and this is when after at some point, they found out that I was in the process of filing lawsuits, and telling on --

Q   Who found out?

A   The defendants.

Q   Can you be more specific?

A   Chief Fontenot -- Randy Fontenot, Victor Fontenot, Lieutenant Young.  I remember -- I can't remember who started the conversation.  I can't remember who called who first.  It was a

**139**

conversation with Judge Gerard Caswell.

Q   Judge Gerard Caswell?  Okay.

A   Correct.  I can't remember who called who first.  We were talking about something.  It was something work-related, and then I don't remember how the conversation turned, but this is -- I'm trying to rephrase the best -- what he said to the best of my recollection.

He said, "You've pissed off a lot of people."  He said, "You ever heard the story of Ira Richard?"  I said, "I've heard rumor of it, you know, people passing and" -- from what I understand the story of Ira Richard is somebody that, again, just --

Q   I-R-A, Ira?

A   I don't know.

Q   Oh, okay.

A   I don't even know the person.  This is way before my time.  I think '80s, '90s.  I don't know.  I mean, I've heard the story from several different people and it's changed each time.  So I basically would classify it as a rumor.  I don't know.

From my understanding, from what I recall from people telling me about the story is that

**140**

Ira supposedly was either going to turn on somebody or do something of that nature.  He was then executed somewhere, I believe either Happy Hill or Gulleyville area, and I believe from the way the story went, it was a unsolved murder by the Eunice Police Department, and it involved high-level officials inside of our own local government, or politicians.

Q   This is the judge -- this is Judge Caswell relating this story?

A   No.  He asked me if I knew the story.  I'm telling you what I've heard about the story from different individuals.  I don't know what the true story was.  He didn't elaborate.

Q   Okay.

A   He said, "You need to stop doing what you're doing.  You're going to get a bullet in the back before this is over."  And that was pretty much the gist of the conversation.

He wouldn't have relied any other information.  He wouldn't go into detail about anything.  That was what he had told me.  He said, "If you don't stop what you're doing, you're going to get a bullet in the back."

And if you reflect my notes, I think I put

**141**

it in there, that I didn't know if this was a threat or a warning.  I didn't know which one it was.

Q  Help me understand what this has to do with Joshua Dupre.

A  I was going into detail of how things transpired.

Q  Okay.  So when did this happen?

A  This happened before the Joshua Dupre incident. This is post them finding out it was me talking about what they were doing inside the police department, what was going on.  All right.

From there I'm -- you asked me how I found out and different things.  This -- this is one piece that ties into something later, if you'll let me --

Q  Sure.

A  -- get to that point.

Q  Go ahead.

A  All right.  From there, the next thing that I can recall that comes to mind, I was shooting the breeze with the mayor.  We was -- I forgot what the conversation topic was.  We were just BS'ing, lack of a better term.

And he said, "So I shouldn't say this but

**142**

I'm going to tell you anyways.  Randy came here bragging he was about to arrest you."  He said, "There's an investigation into you right now, and they're going to try to arrest you, saying you're a dirty cop."  Okay.

Now the conversation with Judge Caswell, now all the stuff I'm hearing on the street. Now, okay, all this is starting to come back to my mind, okay.  This is a -- in my mind, Judge Caswell was warning me about what was about to happen.  He couldn't tell me, I'm guessing.

I'm just assuming.  I don't know where his frame of mind was.  But now I took his statement as a warning.

Now I have the mayor admitting that I'm under investigation, and he said, "Yeah, this" -- and I'm trying to paraphrase what -- not paraphrase.  I'm trying to quote what he said. He said, "Yeah, he came in here bragging he's about to get your ass."  Okay, red flags up. The next thing that happens from there --

Q  I want to hear your explanation, but can you -- can you give me an idea of the time frame between Judge Caswell's comments and the mayor's comments?

**143**

A  That's what I'm trying to explain.  This is all mingled together.  I don't know what started -- what exactly happened before the other.  I'm just giving you what I remember.

Q  Okay, go ahead.

A  And it should be notated in my notes on what actually transpired and the timeline thereof.

Q  Got it.

A  All right.  From there I remember, and of course, like I was saying, when I'm saying red flags are up, okay, now I'm paying attention.

Now I've done heard it from two high-ranking officials -- in my opinion, high-ranking officials.  Okay, either my life's in danger, or I'm in trouble for something, okay.

So my -- lack of a better term, Spidey-senses are tingling, something's not right.  So as time progressed, another incident that comes to mind in progression of what I'm trying to explain to you, is Officer Victor Fontenot called over the radio, said he was trying to catch up with a vehicle.

I don't remember exactly which street he said he was on, but I know I was close.  I was on Magnolia Avenue on the east side.  All

**144**

right.  When he called out said he was trying to catch the vehicle, I believe -- I can't recall.  You'd have to reflect my notes.  I believe he said he was in pursuit of a vehicle, trying to catch up for it.  Said it was a person he had warrants on if I remember the radio admission correctly.

Then he comes right back over the radio, says he lost the vehicle.  I'm already on Magnolia Avenue.  I see the vehicle.  It comes out -- I can't tell you exactly which street. It should have been either St. George or Saint -- come on, brain, work with me.  What's the name of the other street.  It's right next to St. George.

Well, anyways, I see the vehicle come out in the roadway.  I'm headed in that direction. Well, Victor already said he lost the vehicle, and then here's Victor, right behind the vehicle.  Now I'm confused.  Why the hell did you say you lost the vehicle, and now you're behind it and I'm watching you.

So the whole shift, we're going to assist him.  We stop the vehicle.  I think we stopped it at MLK and -- yeah, MLK and Magnolia, right

**145**

there at the intersection, because he -- I believe it was a pickup truck. Had stopped it because Officer George Cain I believe is the one that cut the vehicle off. Either that or Joey Fontenot.

Anyways, one of them cut the vehicle off. I'm getting out my car. George Cain was on the -- I believe on the right side of me and we're walking up, and this gentleman, which -- who I recognized as Joshua Dupre, is just yelling and screaming at one of the defendants, Mr. Fontenot -- Victor Fontenot.

And he called him every expletive in the world. As we're still walking up, he said, "You dirty" -- I can't remember every word he used, and it was a lot of explicatives. I'm not going to go that far. Basically, he insinuated what was already in my notes from what he had said on that traffic stop, saying, "I'm not going to do what you want me to do, blah, blah, blah, blah," and we didn't -- no names were mentioned, no nothing, other than him yelling at Officer Fontenot.

And me and Cain are looking at each other like, "What the hell is this?" you know. We're

**146**

still walking up to it, and all of a sudden Josh Dupre turns around and points at me, "Yeah, they want me to set your MF'ing ass up." I'm laughing about it, because I thought he was lying at first.

I didn't think too much about it, but then when I seen the expression and the body posture change of Detective Fontenot, I knew right then, "Okay, there's something to this."

He started stuttering. He started, you know, trying "Oh, no, he's lying. He's always trying to do this. He's always trying to do this," and now I'm thinking about all these other conversations I had with all these other people.

I said, "All right. Something's going on here with this traffic stop. I don't fully understand it." So I made notations in my notes.

At some point, I don't remember if it was the DA's office, a member of the DA's office, or one of the other district judges had contacted me and said, "I can't say too much," or they.

I can't remember if it was he or they. It

**147**

should be in my notes who contacted me. Contacted me, said, "We hear about what's going on. People talk," and he said, "You need to go get the transcript from this court hearing and this date. It's imperative that you get it, because they're trying to set you up saying you're a dirty cop."

Q   Who told you that?
A   It's going to be in my notes who called me. I don't quite recollect. Either it was one of the judges or it was one of the district attorneys, because they were present in the room when all of the transcripts were supposed took place. Okay.

Now, at this point in time, this is killing me mentally. I'm like, "I haven't done anything wrong. Why the hell am I being investigated for something I'm not doing?"

So, sure enough, I think it was my -- I can't remember if it was my day I was working. I know I was off duty. I don't know if I was working days or nights. I know as soon as I got through that conversation the next morning I'm at the district attorney's office -- no, correction. I'm at the courthouse.

**148**

I go in there and I request a copy of the documents. I have no idea what's in them. So I pay for them. I can't remember how much the documents. I paid. They said they'd be ready in a little while. "We've got to make copies," or something of that nature. They had notified me the documents are ready. I went downstairs, back to my truck, read the documents, and full disclosure, I started fucking crying, that my own damned department is accusing me of being the damn very cop and I'm not. I hope that answered your question.

Q   Do you need a break?
A   Just give me a second. Whew, okay. Go ahead.
Q   You're good? So the quotes in paragraph 70 and 71 of the Complaint, --
A   Okay.
Q   -- are those quotes from the transcript that you went and got from the courthouse?
A   Let me read them. (Witness reviews document.) I've got to take a break.
Q   Sure.
A   You need the answer to the question further, or --
Q   No, go ahead. Go ahead.

**149**

(OFF THE RECORD)

A    There's something I need to add to the record about the questions you asked me about the Josh Dupre thing before I go any farther.

MR. HEBERT:

Q    About the Joshua Dupre?

A    Yes.  The question you asked me about how did --

Q    Which was how did you come to -- yes.

A    You actually asked me a question in between.  Asked me what the relevance was what I was talking about with Judge Caswell.

Q    Yes.

A    There is a further relevance into that.  Once I obtained the court documents, I realized Judge Caswell was the sitting judge when that incident took place.  It was in his courtroom.  And I'm just speculating, that is why he probably called me, maybe warned me.  I don't know.

Q    All right.

A    He just didn't tell me what took place.

Q    Was he the judge of Eunice City Court at the time?

A    No.  He's a district judge, 27th Judicial.

**150**

Q    That's right.  I'm sorry.  What am I saying?  Yeah.  I knew that, okay.  All right.  Do you know who the ADA was on that case?  Do you remember from the transcript?

A    Without reviewing it, no.  I don't know who was there.

Q    All right.  You still have that transcript?

A    I turned that over.

Q    To?

A    Request from y'all for production of documents, I produced, to answer your question.

Q    You turned it over to one of your lawyers?  Is that what you're saying?

A    Yes, to produce to y'all.

Q    To be produced to us?

A    Yes.

Q    All right.

A    I do not believe I still have a physical copy.  I turned everything over.

Q    Have you talked to Mr. Dupre directly about this issue?

A    Directly?  Other than the traffic stop, I didn't even talk to him out there.  I just -- I think the only response I had, "Oh, yeah, right."  I think that's the only response I had

**151**

to him.

I know I was at 24/7 truck stop some time after, and his wife or girlfriend at the time approached me about it.  I said, "First, look, I don't want to talk about it.  They already accused me of all these atrocious things.  I don't even want to have nothing to do with y'all."

Q    Dupre's girlfriend?

A    Girlfriend.  I don't remember her name.  It's going to be in one of my note logs somewhere.  She's saying -- she was -- tried to keep talking about the situation, and she informed me, "Look, all the evidence you need is in the phones."

I said, "Well, I will" -- brief, it's a privileged conversation.  I let people know that I needed -- that that's where they said possibly evidence would be located, was in those phones.

Q    Whose phones?

A    Joshua Dupre's phones, which were seized by Detective Fontenot.

Q    All right.  I want to move on to some other things you've cited in your Complaint.  Do you

**152**

still have the Complaint in front of you?

A    Sure do.

Q    Okay.  Turn to paragraph 33, please.  And are you there?

A    No, I -- you did pose a question before I left the room, and I don't know if I answered it, because I asked you if I needed to answer before I left the room.  Because you did ask me a question about the transcript part itself, and --

Q    How'd you get it?  I think I asked you how you got the transcript.  Did I ask you that?  Was it --

A    That might be it.  I don't know if you finished the question or not.

MR. MARDIAN:

I believe it was whether the quote is from the Complaint was from the transcript.

MR. HEBERT:

Q    Yes.  Was the -- is the quote from the transcript?  That was the question.  And the answer's yes to that?

A    I believe so.  I mean, it's --

Q    We'd have to see the transcript --

A    Correct.

**153**

Q   -- to compare it.
A   Correct.  And you said 39?
Q   33.
A   33, okay.  One second.
Q   You there?
A   Yes, sir.  I'm reading.  (Witness reviews document.)
Q   All right.
A   Okay.  Short, yes, sir.
Q   Yeah.  It says, "Certain Eunice police officers regularly abused their power and mistreat suspects through the use of excessive force and then falsify reports to cover up use of force or otherwise failed to investigate report or intervene in incidents involving excessive use of force," right?
A   Correct.
Q   And then, if you look at paragraph 34, 35, 36, it has three situations, and then 37 says, "These are just examples," right?  Take your time.
A   (Witness reviews document.)  So we're talking about paragraph 34 and 35, correct?
Q   34, 35, 36.
A   36.  (Witness reviews document.)  Okay.

**154**

Q   Those are -- 34, 35, and 36 are just -- you intend those just to be examples of what you're talking about in 33, right?  Where you say, "Certain police officers regularly abuse their power and mistreat suspects through the use of excessive force, et cetera," correct?
A   Correct.
Q   All right.  Who are those police officers that regularly abuse their power you talk about in 33?
A   Some incidents -- wait.  Okay.  So we're going to be talking about chief himself has personally asked me to falsify a police report.  That's -- as far as I know, he hasn't falsified a report himself.  He has asked me to do it and other officers.
    I know Officer Fontenot has falsified a report.  I know Tony Kennedy has falsified a police report, tried to get us to falsify.  I fought against that one.  Richard Daigle.
Q   Who's --
A   He was our old DC before Tony Kennedy.  Richard Abadie.  I would have to review all my notes to remember everything, and there's so many incidents.  The names come to mind off the top

**155**

of my head.
Q   All right.  What was the nature of the falsification you were directed to do?
A   Change a crash report to reflect what actually did not happen.  Go into detail?
Q   Am I -- maybe I'm misinterpreting 33.  I thought this was directed to falsifying reports to cover up excessive force.  Is that -- did the crash report relate to that?
A   It says, "Otherwise failed to investigate report intervening incidents involving excessive force, et cetera."  Okay.  So we're talking about just excessive force.
Q   Well, I'm asking you the question.
A   I'm rephrasing.  I'm reading.
Q   Okay.
A   First example comes to mind, after you corrected me on my reading of this, would be a female that was arrested.  We was ordered to arrest her.  I refused.  Judge agreed with me, said we don't have proper probable cause to arrest her.
    They arrested her, left her in jail for a total of eight days even after probable cause had already been rejected.  Within 48 hours of

**156**

probable cause shall be submitted.  If it's not, they have to be released on their own cognizance.  The probable cause was rejected.  They then tried to get another detective to re-write my own probable -- well, no, not mine.  Officer George Cain's probable cause, to re-write it to take out Brady evidence that was submitted in the probable cause, and to re-submit it.
    Judge again rejected it.  Left the female in our custody for seven to eight days, when they knew they had no legal standing to hold that female in our jail.
Q   What was her name?
A   It's in my notes.  I'm picturing her face.  I can't think of her name, but it is in my notes.
Q   How long ago was that?
A   Again, it's documented in my notes.
Q   All right.
A   I have dates and times.
Q   All right.  That's not one of the examples that's in 34, 35, and 36, right?  That's something else?
A   No, that's something else.  And if we're going -- you want to go into each example?

**157**

Q  I will -- I will eventually, yeah.

A  Okay.

Q  I didn't know if there was anything else that gives you --

A  There's others.  There was one where a report was not even completed with -- give me a second.  I'll think of his name.  Hopefully his name will come back to me shortly.

But it was a incident to where police -- actually -- that's actually an example you said you wanted against that lady, other examples.

I know I've reported police using OC on prisoners, not completing proper documentation of thereof, and they had no legal justification to do it in the first place, because they were in a restraint chair.  They were laughing at --

Q  What's OC?

A  OC is Oleoresin Capsicum.  It's a pepper spray.

Q  Oh, all right.

A  They would use it on inmates that were restrained in a restraint chair.

Q  Who'd you report that to?

A  At that time, it was the deputy chief doing it, and they all laugh and cut up about it.  I didn't go directly to that man about it,

**158**

because there ain't no way he didn't know, because they laugh and cut up about all the crap they're doing --

Q  Who was deputy chief when that happened?

A  Daigle.

Q  All right.  Let's talk about these specifically enumerated things.  In 34, "Lieutenant Dunn was informed by fellow officers that on or about May 30, 2019, a Eunice police officer forcefully grabbed a restrained suspect by the neck and forced him to the ground in response to a verbal provocation from the suspect."

Tell me who informed you of that.

A  Sergeant Chase Godeaux.

Q  Chase who?

A  Chase Godeaux.

Q  How does he spell his last name?

A  G-O-D-E-A- -- E-A-U-X.

Q  G-O-D-E-A-U-X, got it.  Okay.  What did he tell you about it?

A  He told me while he was on scene, it was dealing with the Arnolds.  Again, you'd have to reflect my notes for the full recollection of what I transcribed of what he told me.

But from what I can recall at this time,

**159**

Sonny Arnold accused Victor of being a dirty cop, and saying that "That's BS.  You should have -- I've been giving you stuff," and I believe -- I can't remember what the item was.

You'd have to look in my notes.  Said, "I've been" -- let me slow down.  He made the provocation or the statement that Victor was supposed to be protecting him, and he had been giving him things of value to protect him, and he said it was BS.

He shouldn't be doing this.  Called him something else, some derogatory words, something thereof.  At that time, Victor then grabbed -- this again, I'm not there.  This is what Chase is telling me.

Chase then tells me that he then grabbed Sonny by the back of -- back of the neck and throws him to the ground.

Q  And Sonny's name again is what?

A  We call him Sonny Arnold.  I don't remember his full name, but he is listed in my notes what his full, correct name is.  We always called him Sonny.

Q  All right.  And you -- it says you informed outside authorities about this incident.  Who

**160**

did you inform and what did you say?

A  It would be in my notes, whoever I talked to.  I know I had made a comment to -- hell, I know I'd been talking to a couple of guys at St. Landry.  I've even talked to the sheriff himself.

Q  When you say "St. Landry," what are you --

A  St. Landry Parish Sheriff's Office.  Because the sheriff -- that's probably a later conversation.  I'll wait until you get there, but I'll get into it.

I know I spoke to them about it.  I probably updated the FBI, Agent Kelly.  Every time a use-of-force incident came up, I would call Agent Kelly.

Q  Did you give them any documents related to 34, what's in paragraph 34?

A  He did come to my house a second time.  I don't remember exactly what date he came.  I know I gave him more documents when he came --

Q  Who did?

A  back to my --

Q  I'm sorry, I interrupted you.  Who?

A  Agent Kelly.

Q  Okay.  All right.

**161**

A    When he came back to my house the second time, I know he accepted documents and stuff from me.

Q    Where'd you get the date, May 30, 2019?

A    May 30, 2019?

Q    Where'd you get the date of that?

A    When -- that is the date of the incident when -- for example.  That was when Chase had told me the incident took place.

Q    All right.  Go to 35.  "Similarly, on or about November 22, 2019, Lieutenant Dunn witnessed an officer repeatedly punch a suspect who was in hand constraints and appeared disoriented, and drag him approximately 9 feet on the asphalt to a patrol car."

Can you explain what occurred there and what you did about it?

A    Give me one second.  This does involve my family, so give me one second.  This is the name that I was telling you I can't recall at this very moment.  I know it's documented.  It's recorded.

I can't think of his name right now.  Kenneth Charles.  That's it.  My wife awakens me, saying somebody's hitting my car, my police unit.  I was working nights at the time.  I was

**162**

on the couch.  Wife wakes me up.  I walk outside.

I see a black male doing this (indicating), to the side of my car.  First analogy, "Okay, something's wrong.  I'm not going to deal with this by myself.  I'm off."  I called the police department.

Cody Miller, Dane Wilson, Deputy Chief Kennedy.  No, correction.  It wasn't Kennedy.  It was Daigle.  I do remember seeing a marshal unit there, and there was another party that I -- for the life of me, I cannot remember who it is.  I just know the -- I can describe the car in a minute.

I'm in my pajamas, or in a T-shirt.  I walk downstairs as they are all getting there, because I wasn't going to approach him by myself.  He's still doing this (indicating) to the side of the car.  Just a thousand yard stare, straight ahead.

You know, first initial thing, "Okay, this guy must be on something," so I'm like that, first initial.  Either -- you have to look at my notes.  It was Cody or it was Daigle had a can of OC in their hand, and as they're going

**163**

up to deploy it, I see a lanyard on the man's chest.  It's a medical device, okay.  This could be a medical emergency.

I just say, "Hey, look.  He's got a medical lanyard."  So they stop what they were doing.  Cody touches Mr. -- whatever I just said his name was -- Charles.

Q    Kenneth Charles, --

A    Kenneth Charles.

Q    -- you said his name was.

A    Correct.  Kenneth Charles.  Mr. Charles.  He taps Mr. Charles and it's like Mr. Charles snapped out of his trance.  Cody, you know, talking to him and everything, said "I'm going to put you in hand restraints for our safety."

The guy was not being belligerent.  I don't even remember him saying anything.  He just -- just came to.  I think he had said, "Yes, sir" or something to that effect.  It's in my notes, the full disclosure what took place.  This is just my recollection.

Cody then says, "Man, I feel weak."  He starts falling back.  Said, "It must be fentanyl."  Okay, well, this is the time that everybody's scared of this fentanyl crap that

**164**

just came out.  We had dogs dying, officers over dosing just by touching it, breathing it.

So I know I have a -- it was for the dog, but I can use it for a human if needed for emergencies.  It was a tube --

Q    Narcan?

A    It is along the lines.  It's named something else than what I had.  I can't remember the name of it, but it was a syringe type.  It's not the injectable through the nasal passages.  It had to be given with a syringe.

My wife is outside.  This -- of course, my wife and my kids are outside at this time, looking at what we're doing.  I think my daughter was 4 at the time.  My wife's pregnant.

I yell at her to get my keys, or either I went to go get my keys.  Again, look at my notes.  And when Cody fell out, Daigle rushed him, slammed him against the car and called him the N word, and started hitting him.

That's when Officer Fontenot joined in.  I know he threw at least one punch.  They slammed him to the ground.  At this time, he's already in handcuffs.  I'm still trying to worry about

**165**

Cody.

I yell at my wife to get in the house, because me and my wife have already had the conversation about them threatening to hurt me or the dog.  So I'm yelling at my wife, because if they even think she's going to talk, I'm scared what the -- what they're going to do to her.  So I tell her to get her ass in the house.

I get to my unit.  I unlock the door, get the syringes out.  By that time, a marshal unit had pulled up.  They're throwing Cody in the car.

Q   A marshal unit?

A   A marshal unit.  Eunice City Marshal.  They're throwing him in the car.  They rush him to the hospital.  An old Crown Vic, white with blue striping, pulls up facing northbound in front of my house.

I do not remember who the officer was that's driving the car.  They dragged him by the -- either the back of their neck, or his handcuffs to the car, slammed him into the car, then pulls him in from the other side of the car and takes him to the jail.  Now, Victor, by

**166**

this time he had already broken contact with him and found something on his person that was some type of a powdery substance.

It had got on him and Dane Wilson.  Whoever it was in the Crown Vic transported Mr. Charles to the police department.  Victor collected evidence, got inside of his unit, said "I got this," and he rolls out.

Dane's still standing in my front yard, shell shocked.  He had been with us a few months.  Just standing there with a blank stare on his face.

My wife asked him if he's okay.  We could see he had something on his uniform.  My wife goes in the house, gets one of my uniforms, brings it to him, said, "Hey, you need to go ahead and change out," just in case it was fentanyl.

And there was a conversation between me and Dane, so basically, "What the hell did I just watch?  That ain't right."  I told him I'd take care of it, and I -- I did report it.

Q   Who'd you report it to?

A   Reported to the FBI.  Reported to the mayor, the city -- everywhere to -- everybody I've

**167**

been talking to already, I've already reported to them.

Then, get back to the office.  Again, notes, exactly timeline.  It was the day thereafter.  Find out that his family came up there wanting to know why he had so many marks, bruises or cuts, whatever, and they talked to the same person that beat the hell out of him.

Said, "No, nothing happened.  He fought with us."  That's a damn lie.  He didn't fight, not one instant.  So I find out later that they actually took the gentleman to the hospital, dropped him off, left him there.  Had him -- I believe they said they were going to OPC him because he was crazy.

And back to -- of course, I'm going to have to show this incident took place.  There's no police report.  No use-of-force report.  No arrest report.  No evidence log, no nothing.

The only thing that shows that incident took place is the people who was on scene and the fact that there is a radio log.  I'm sorry.  I'm --

Q   You've seen the radio log?

A   Yes.  I have a copy of it, and I did obtain it

**168**

and then turned it over to y'all.

Q   Okay.  You anticipated one of my questions, I think.

A   I'm sorry.

Q   No, that's all right.  No.  You anticipated one of my questions.  I just want to go back to it.

A   Sure.

Q   Sure you answered.  I understood you to say that you reported this incident to the mayor, the council, and to the FBI, and you may have said someone else?

A   I believe my -- what I had stated, I reported it to everybody I had already been talking to already, what took place.

Q   I believe you had a list though, and I'm -- I want to make sure --

A   I'm not saying a list.  I'm just -- I can't remember who all I talked to.  I know I've -- can see it in my notes.  I even was reluctant to talk to certain individuals about reporting this, because again, I've already been threatened over this -- this incident.  I've been punished with this incident.  This has happened.

What the hell's going to happen to -- okay,

**169**

an investigation does, and people start going to jail, what the hell's going to happen to me?

Q   All right.

A   So there was -- and it's even in my notes, I delayed in reporting it to the mayor or to certain individuals.  It's in my notes.  Because I was scared of what was going to happen to me, because in my mind, they should have went to jail.  I'm --

Q   Were any of those reports in writing?

A   Yes.

Q   All right.  Is this part of what you put in your Complaint to the -- or you -- I guess I don't have a better word for it.  Complaint to the DOJ, this incident?

A   One of them.

Q   Department of Justice?

A   This is one of the incidents I reported to the Department of Justice.  And they gave me a case file.  I don't know if it's under investigation or not.  I had had word that there is a criminal investigation going, but they're not going to talk to me about it, because -- I don't know.

    I just -- I'm under the impression the last

**170**

time I spoke to individuals that there is some type of investigation ongoing at this time.  I do not know any further than that.

Q   Who told you that there is an investigation?

A   The DA's office, and the last time I spoke to Agent Kelly, and he said he couldn't confirm or deny.  They were saying that they didn't have enough evidence for them to take it, but it was being looked into.

Q   All right.

A   So I took it at face value, and left it alone.

Q   Got it.  So moving on to 36, "On or about February 28, 2021, Lieutenant Dunn observed an officer punch an individual who was under arrest and restrained in the booking area of the Eunice Police Department."

    It says, "Lieutenant Dunn reported the incident and wrote up the officer pursuant to department policy, and then during the course of Lieutenant Dunn's investigation into the misconduct he learned that a second officer had choked the inmate during the skirmish," and I'll -- you're welcome to read the rest of it.  Just --

A   Oh, I know it by heart.  Go ahead.

**171**

Q   Okay.  So tell me the background of that event and what happened.

A   Sheriff's office, Devin Johnson, or is it Gaspard?  I think it's Johnson, was having a fight with a individual behind the police department.  They had him under arrest for a warrant.

    Again, this is my recollection.  There are documents I did produce as the write-up, everything that transpired with the investigation.  But from my recollection, we go outside to assist them guys, and it's just beyond belligerent, kicking, all this good stuff.

    We finally get him inside the PD.  We shackle him down to the bench.  By this time, there was other members of the sheriff's office present.  I remember Shane Larsen was there.  I think he was a captain at the time.  That's going to be somebody y'all have already interviewed.

Q   Shane Larsen?

A   Larsen.

Q   I'm only asking because --

A   Larsen.

**172**

Q   -- at times -- at times you're speaking a little fast, so --

A   I need to slow down.

Q   -- it's all good, but I just want to make sure I'm --

A   I'm going to slow down.

Q   -- gathering what you're -- understanding what you're saying.

A   Yes, sir.  Shane Larsen was also there.  I think he was either the lieutenant or a captain with St. Landry Parish at this time.  That's somebody y'all have already deposed.  He was there.

    There was another -- I believe there was another member of the sheriff's office there, but I don't think they had a part to play in it, and we were actually I believe doing shift change at this time, so there was an abundance of EPD officers there.  Cody was getting into a heated altercation with this guy on the bench.  I'm standing at dispatch.

    We already ran him out of the room once.  "Like, hey, man, it ain't worth it.  I mean, just let him talk his crap.  Get in here."  Because he -- I think he was a sergeant at the

**173**

time.  Yes, he was the sergeant assigned to my shift.  Told him to get back into dispatch.

I was standing there talking to the dispatcher.  I hear a commotion, and I look up at the camera, and I see Cody beating this guy.  Rush in there.  One of us had to forcefully restrain Cody and pull him off the subject.  This guy was fully shackled.

Cody is a good friend of mine, but he made his bed.  He had to lie in it.  I wrote him up, and I gave him full disclosure, "In my opinion, you should be arrested for what you did."

I then called Tony Kennedy, and then I also called Chief Fontenot.  Chief Fontenot came directly to my office.  I was upset, because I mean, yes, it is one of my friends had just committed a heinous act upon an inmate.  And he asked me, he said, "I see you're obviously upset."  I said, "Yes, I am upset, but I have to do what I have to do, because he hurt somebody."

So I prepared the documents.  I believe he said he was going to get state police to come in and investigate.  While doing the initial of my investigation to present to Chief Fontenot,

**174**

I learned that Cody was involved in another physical altercation with a different inmate.  It was him and Jody Andrus.

This time all the witnesses, which was Officer Trace Tillsbury, and I believe Officer Courville.  Again, Noah Courville.  You would have to look in my notes for reflection.  I believe those are the two officers that came forward and said that they had to forcefully pull Jody Andrus off the inmate, that he had already choked to the point of incapacitation.  Cody also helped pull Jody off.

Q    This is a different person?

A    This is a whole different inmate.  And this happened approximately two hours before my -- I'm guessing.  Again, you'll have to look at the notes.  Happened just prior to my arrival at the Eunice Police Department.

Q    I ask you that question because paragraph 36 indicates that the choking happened to the same person.  But it's two different people?

A    Yes, it's two different people.

Q    All right.

A    Yeah, my notes it's two different people.

Q    All right.

**175**

A    All right.  I then prepare my documentation to present to Chief Fontenot for the critical incident form saying what evidence or statements I gathered at this time.  I find out state police is involved in the investigation.

Q    Of the choking?

A    Of both inci- -- well, it was supposed --

Q    The punching --

A    -- to be both incidents.  When state police came to my office, I don't remember exactly what day.  Again, it's in my notes.  Came to my office, they only questioned me about one incident, and I referred -- "What about the other incident?"

Well, this is the same group of people that told Randy I was the one that reported him.  So I don't feel like talking to these people.  I said, "I want my attorney present.  I don't want to talk to y'all without my attorney present.  Even though I'm the one that filed all the paperwork, I gave you everything you needed to do your job.  I don't want to talk to you, unless I have my lawyer present."  Well, they got pissed off and left.

Q    This is state police people?

**176**

A    Correct.  The same division that said I was -- called Young and Randy, saying I was ratting them out for what they were doing, what I tried to report them for.

Q    I want to hear the rest of your story, but I also want to make sure that I'm keeping up, because --

A    Oh, okay.

Q    -- in my --

A    I can pause.

Q    -- experience it's kind of the same little group of state police officers that go around and investigate these complaints of excessive force.  Was it -- do you remember, was it -- do you remember who it was?

A    It was their -- their group leader was the same one that called him about me.  So no, I didn't want to have nothing to do with him unless I had to without my attorney present.

Q    The only -- Troop I?

A    Troop I, yes.

Q    Troop -- okay.  All right, go ahead.

A    Their office is I believe in Breaux Bridge.  No.

Q    No, it's in Lafayette.

**177**

A   You go past Lafayette --

Q   Oh, you mean, the investigator's office?

A   Yes.  Office, yes.  It's past Lafayette.

Q   I'm sorry.  Go ahead.

A   Where was I?

Q   I had interrupted you, but you were telling me about --

A   No, that's fine.

Q   They got pissed off and left is where you left --

A   Correct.  Time rocked on there.  I found out through other officers and what was going on Jody was never investigated.  The reason why they didn't investigate him, because he was not a police officer.

He's a reserve officer.  He still follows under the same colors we do, even though he's mentally handicapped.

Anyways, from there Tony Kennedy calls me to the side of the road one day and gave me a heads up that Randy was trying to convince Lieutenant Young to have me arrested for malfeasance in office for refusing to go to state police for the investigation.

I never refused.  I only asked for my

**178**

attorney to be present.  They would not give me a date for me and my attorney to be present.  So Tony gave me the heads up.  He said, "Look, he's trying to have you arrested for this, because you refuse to cooperate with the investigation."

I said, "That's a damn lie."  I said, "All I asked was give me a date to where me and my attorney could be present."  They would not give me a date to come with my attorney.

Then once I found out about this, I then contacted my attorney.  Dammit, I'm sorry, I did it again.  My attorney made contact with him to let him know we were still fully cooperative.

Q   Who was that attorney?

A   That would be Bill Goode.  That we were wanting to cooperate, but nobody would give us the opportunity.

Q   All right.

A   And after that, that was --

Q   So, okay.  There's -- and I appreciate your answer.  You told me a little more than what I appreciate is in paragraph 36, so then I want to try to break that down a little bit.

**179**

My read of paragraph 36 is that it says, "During the course of Lieutenant Dunn's investigation into the misconduct, he learned that a second officer had choked the inmate during the skirmish," but what really happened is there was another inmate, another incident, and there was a choking incident, and that -- that was a choking, not a punching?

A   Correct.

Q   And that one, the state police did not --

A   I don't even know if it was turned over to them, to be honest.

Q   Okay.  All right.  But the state police came and investigated the punching incident, and Cody got disciplined for that as well, correct?

A   No.  That is not correct.  Let me correct the record.  When I prepared my documents, it contained both Cody and Jody.

Q   All right.

A   So I couldn't understand in my mind why only one person would be investigated when my -- my stuff had both incidents listed.

Q   I mean, 36 says what it says, but my read is it doesn't say what you just said, --

A   I'll just clarify.

**180**

Q   -- it has more than what you've just said.  So 36 says, "The department reported the first officer's conduct to the Louisiana State Police and he was disciplined," and so that's a reference to Cody and the punching?

A   Correct.

Q   Okay.  Then it goes on to say --

A   Can I finish the answer?  There's more to that.  Can I answer it?

Q   Go ahead.

A   Okay.  State police cleared him of any wrongdoing, supposedly.  This is just --

Q   Cody?

A   -- what I've been hearing.  Yes.  They said he didn't do anything wrong, but he was still demoted, suspended, talked about anger management.  Because Chief Fontenot even asked me, "Does Cody need anger stuff of it?"  I agreed with him.  "Hell, yes.  He needs some type of anger management," because I think he was going through a bad divorce or something at the time.

Give me a second.  I lost my train of thought.  Oh, back at -- all right.  As I continued talking to people, and you can see in

**181**

my notes, at one point in time to protect Jody, the guy refused to -- nope, I got the -- I quoted wrong.

The guy that put -- Cody beat up, they pulled him out the back, took him to the bank in a unmarked police vehicle to allow him to withdraw funds to bond out in agreeance to not file charges against Cody Miller.  Tony Kennedy's the one that took him to the bank.

Q   That's the guy that got choked?

A   That's the guy that got punched.

Q   The guy that got punched, all right?

A   Correct.

Q   So is it wrong in paragraph 36 that says, "The department reported the first officer's conduct to the Louisiana State Police and he was disciplined"?

A   He was just -- it is correct in its phrasing, but it was he was disciplined by Randy Fontenot, the City.  Not by state police.

Q   All right, got it.  And then it goes on to say, "However, the second officer's name was withheld from the report and he was not disciplined."

But what you're saying is, that really more

**182**

accurately would be -- the officer that was involved in the other choking incident, his name was withheld, and he was not disciplined?

A   It wasn't withheld.  I put everything in there.  They just didn't do anything with it.  If that answered your question.

Q   So what's this reference to something -- a name being withheld, and who withheld the name?

A   Which sentence are you talking about, sir?  Where I can --

Q   The last sentence of 36.

A   What that's referencing is that again, my original document had both officers listed.

Q   All right.

A   When the disciplinary or whatever took him down from the other way, why was only one officer the only one named, when there was actually two officers named with incidents?

Q   I understand.  Two incidents, two officers.  Only the first incident and the first officer --

A   Something was done about.

Q   -- that name got full --
                (OFF THE RECORD)
MR. HEBERT:

**183**

Q   Okay, I understand.  And so, what happened here, did you report this to either FBI, DOJ, any of the other people that you've listed previously?

A   I'm trying to recollect.  I know it was, but again, you'd have to look at my notes, see who all I talked to.  I know I reported it.

Q   All right.  Moving on to paragraph 39, describes an incident in or around August 2018.  It says, "Chief Fontenot ordered Lieutenant Dunn to release an inmate who had swallowed broken glass in the Eunice jail, rather than having jail staff take the individual to the hospital for treatment."

Can you describe what occurred in that incident?

A   Yes, sir.  From what my recollection there is -- the police report was attached, turned over to y'all, and the documentation of my notes of what transpired that day.  This is from my recollection.

At Walmart, there was a theft that had occurred.  Officer Fontenot's the one that made the -- Detective Fontenot, Officer Fontenot is the same person.  We're talking about Victor.

**184**

Made the arrest of the individual.

You'd have to read the police report, the list of charges.  It was felony charges on the report.  He gets to the police department.  Somebody, I do not now who, did not do a proper search of the suspect and did not remove everything from him.

I can't recollect other than from my notes who actually discovered that he was chewing on a -- we believe a crack pipe.  He then swallows the glass.  I was ordered to release him, because we didn't want to incur the medical bills.

I informed him I was not going to release the subject, because he is a inmate, and he is a inmate in our custody, and he's going to go to the hospital.  Well, after the refusal and heated conversation in the hallway between the secretary's office and his, I later found out that subject was -- was taken to the hospital, because I ordered it, but then somebody went behind us and went release the subject, after he had been formally arrested by us.

Q   Who was it?

A   I don't know.  I wasn't there at the hospital.

**185**

Q    Okay.

A    After he was released from our custody, -- give me a second.  After he was released from our custody, no charges, no warrant, no nothing.  I mean, the guy was under arrest.  He needed medical attention.  It was refused.

I'm the one that made sure he got to the hospital.  I didn't take him, but I'm the one that gave the order take him to the hospital.

Q    All right.  39 says among other things, that you later learned that another officer had obeyed Chief Fontenot's orders to release the inmate.  Who was that other officer?

A    You'd have to look at my notes.  I can't recollect right now.  You'd have to look at my notes.

Q    All right.  And it says you informed outside authorities.  Who were those outside authorities that you informed?

A    I know I did.  You'd have to reflect my notes.

Q    Whatever the notes say or don't say about that, that would be -- okay.

A    I know it was reported.  Because, again, any type of neglect of that or any type of excessive force, it was reported.

**186**

Q    All right.

MR. HEBERT:

Do y'all want to break for lunch?

Food's here.

(OFF THE RECORD)

MR. HEBERT:

Q    So Mr. Dunn, turning back to the Complaint, sort of where we left off, I want to direct your attention now to paragraph 41, which reads, "For example, on or about April 29, 2019, Lieutenant Dunn was notified that a suspect had called the Eunice Police Department with knowledge of an as yet unprocessed warrant that Lieutenant Dunn had submitted the day before."

"Lieutenant Dunn later learned that another lieutenant had informed the suspect about the warrant."

What are the issues there?  Can you give some more details about that incident?

A    We were working a case of -- either it was theft -- no, no, criminal damage of property or some type of a fraud that was occurring at Ronnie Fontenot's diesel shop, which is near the intersection of Twelfth and 190.

**187**

We had been receiving several complaints of that person around that business, damaging people's vehicles, putting water in gas tanks, and stuff of that nature.

Officer Lee was working a case.  I believe he had enough probable cause for an arrest for Mr. Ronnie Fontenot.  Officer Lee, you know, completed the paperwork, got the warrants ready and everything.  Still had to be sent to a judge.

I signed off on the report, submitted it, which was on a Sunday afternoon.  Monday morning I'm getting woke up by Ronnie Fontenot himself calling me, wanting to know why we were filing warrants for his arrest.  First thing I asked him, "How the hell did you get my phone number?"

Q    Who's this person that called --

A    Ronnie Fontenot.

Q    Who?  Okay.

A    The suspect.

Q    All right.

A    Got my personal cell phone number, calling me.  I played stupid, tried not to let anything loose, you know, trying -- any details of the

**188**

case.  I then called Lieutenant Young.

Q    Who did?

A    Me.  I called --

Q    Oh, you did?

A    -- Lieutenant Young.  At this time, with everything that was transpiring, I put a recording device on my phone, recorded the phone conversations.

During the phone conversation when I asked him about who tipped off Ronnie Fontenot, his statement was, "Well, I told Ronnie he needed to get an attorney."  So why the hell are you talking to my suspect, telling him what he needs to do legally?  And there -- that was produced to y'all, the recoding thereof, of him talking about what he -- conversation he had with Ronnie Fontenot.

I then re-asked the question again, to try, you know, get him to go farther into detail, then he claimed he didn't -- he didn't warn him about the warrant.

The funny thing is, whenever Sunday afternoon there's no administration around.  There's no -- nobody there to look over the reports.  That -- I -- that paperwork, normally

**189**

everybody gets there between the hours of 7:00 to 8:00, people get there.

They're generally the same people in the meetings in the morning.  Somebody in that meeting tipped Ronnie Fontenot off.

Q    All right.

A    There was no possible way he knew about that warrant, because it had not been processed or shown to a judge yet.

Q    So are you surmising that the person you spoke to on the phone, I've already forgotten his name, that --

A    Ronnie Fontenot.

Q    No, the police officer.

A    Lieutenant Young.

Q    Lieutenant -- he always --

A    One of the defendants.

Q    Lieutenant Young, okay.  That are you surmising from that that he -- he's the one who tipped him off, but he didn't -- just didn't tell you that in the telephone conversation?  Is that what you just --

A    He did at first, and then when I re-asked the question he then said he didn't.  You have to listen to the recording.  It was recorded and

**190**

submitted.

Q    All right.  Paragraph 40 says you have reason to believe that, in addition to what we just talked about in 41, that you have reason to believe that Eunice police officers regularly leak information about ongoing police investigations to civilians and suspects, and will protect friends and family members.

Other than what you just related to me that it deals with paragraph 41, what other reason do you have to believe that?

A    They had one incident, this is a couple of years ago.  It is very detailed.  I did a report narrative and all that on that, which was submitted.

We did a traffic stop on a individual being known to traffic decent amounts of narcotics in the city, mainly crystal meth.  I spotted the vehicle leaving a known narcotics house.  Sergeant Godeaux wasn't too far away.

I called him on the radio, telling him about the car and the suspect.  He does a traffic stop on the vehicle.  Vehicle comes to a stop in Word of Ministry parking lot.  Not was back then, but I don't think it's Word of

**191**

Ministry then.

So we just called it the old Walmart parking lot back then.  So soon as we get up to the car, Chase informs me -- either Chase informed me or I was there with him.  Again, I'm trying to recall the best of my ability.  That the subject claimed that he was kin to the deputy chief, and said that he would come sort out the situation.

At that time, Deputy Chief Tony Kennedy was on sick leave for two days.  There's a reason for why I'm saying that.  But anyways, during the course of the traffic stop, the subject was trying to make a phone call.  Before we could get the phone, he snaps the phone in half and breaks the Sims card.

Not -- within a few minutes later, Tony's passing on the highway.  That's against policy.  You're not supposed to be in your car, not supposed to do anything if you're on sick leave.

So I made the comment, he's already indicated that a family member is going to assist him in his investigation.  We need to hurry the hell up and get this over with and

**192**

get the hell out of here.  And there was another agency involved, which was Coushatta Police.

They later that same night got enough information to go raid a location that he came from in Kinder, Louisiana.  I forgot how many ounces of crystal methamphetamines they produced, and we were also in contact with -- it's a task force called the CAT Team, with Louisiana State Police and DEA agents.

They were also involved in this case, and they actually took over.  After I processed the arrest and everything, they actually took over the suspects and actually completed more investigations that I'm not privy to.

Q    All right.  Paragraph 40 goes on to say, "On information and belief Chief Fontenot is aware of the officer leaks."  How do you know that?  What's the information upon which you relied to base that belief?

A    We had one --

Q    That's all right.

A    We had one of our officers resigned, which is one I planned on calling as a witness.  He resigned after -- he was also in narcotics

**193**

division.

His name is Kevin McFarland.  Works for Lafayette Police Department, here.  He said that he was working a case, and he had photographic evidence that there was several large bags of crystal methamphetamine inside of -- they live on Tate Street.

I can't think of the suspect's name, but I could take you to the house.  It's on Tate Street.  Said he submitted the search warrants and everything.  He had to get everything approved through Chief Fontenot.

Chief Fontenot told him to hold off, didn't want him to kick in the door.  What we say kick in the door, raid the house until the next day.  By the time he gets there, all the evidence is gone.  He claimed that the reason why he resigned from his position, because he believed Chief Fontenot was tipping people off, because used to be somebody on probation with him.  Another incident --

Q    That's McFarland who gave you that information, correct?

A    Yes.  That's Kevin McFarland.  He's a canine handler -- he's a canine handler now for

**194**

Lafayette Police Department.  You're asking for more examples?  Is that what you asked?

Q    It says, "On information and belief Chief Fontenot is aware of the officer leaks."  So I want to know what information you have upon which you base that belief.

A    There was one day that Detective Fontenot had came into my office.  This is when we were still on -- we're still on speaking terms.  He still asks me for opinions and advice every now and again.

But one day he came in the office, and he approached me, it's like, "Somebody's leaking information."  I said, "I agree.  There's no way that these cases keep bombing the way they are.  Evidence going missing, or suspects not going" -- and we have evidence to show the stuff was there.

And he sat there and asked did I believe it was Tony Kennedy that was leaking the information?  I said, "I have suspicions.  I can't prove nothing.  If you've got something, run with it.  Go to Randy, tell him what you got."

Because, I mean, he's our deputy chief.

**195**

"You go to Randy, tell him what you got."  That's from one of the own defendants even claiming there was leaking information.  Let's read it again.

St. Landry Parish Sheriff's Office, they actually contacted me because they were mad because one of our other officers had completed a search warrant and wanted them to help execute the warrant.  Defendant Fontenot later admitted, and I actually wrote him up for it, admitted that he tipped off Jordan Arnold that we were coming with a search warrant, and where he would be hidden where we couldn't find him.  Or I wasn't even there.  That was the sheriff's office that went and kicked in the door.

Let's see.  I can tell you this incident.  This was one we didn't tell anybody.  We kept this to ourself.  We didn't tell anybody we was executing the search warrant, and we got our butts reamed because we wouldn't tell anybody we was executing a search warrant.

But when we did, we recovered I believe it was 11 stolen weapons, a murder suspect, and the actual attempted murder weapon, and we didn't breathe it out because we knew somebody

**196**

was leaking information inside the department.  We just didn't know who.

We couldn't say definitely.  We had evidence right then and there, during that execution of that search warrant who was doing it.  We know we got a leak, we just don't know who's doing it.

Q    All right.  Paragraph 43 says, "One officer regularly holds arrestees in jail for -- his office -- or his office for a stated period of time.  He coerced them into becoming confidential informants."  Who's that officer?

A    Which paragraph are you reading again?  I'm sorry.

Q    43.

A    43.  (Witness reviews document.)  One officer, and that's the most recent one, would be Detective Fontenot.

Q    All right.

A    Others have done it, but that's the most recent.

Q    Well, the sentence there is intended -- they refer to Detective Fontenot?

A    Yes.

Q    Yes?

**197**

A    (Witness nods head.)

Q    Okay.  The next sentence, "Certain officers enlist individuals on probation as informants for narcotic -- narcotic violation and criminal activities."  Who -- what officers are those?

A    Lieutenant Young and Detective Fontenot.

Q    All right.  And it says -- the last sentence says, "Chief Fontenot is aware of these illegal tactics, but he refuses to do anything to stop or discipline the offending officers."
     How do you know that Chief Fontenot is aware of it?

A    I told him to his face, in his office, when I got pulled in over something else, and I just let it all out.

Q    How long did these incidents occur, that are described in 43?

A    Recently.  I haven't seen anything in the last few weeks.  They've been ongoing for the last couple of years.  Because whenever someone gets arrested, they are physically arrested.  They're not to be released for any circumstances, there are avenues that you go to release people.
     So you arrest them, hold them against their

**198**

will, leave them in jail for a few days, and then when they finally agree to your terms, "Oh, you can go, but if you don't do what I tell you to do, I'm going to come back and get you with this warrant for the drugs you had."
     And since the question has came up, there is evidence of it.  Go look at the evidence log book.  It can be proven easily.

Q    What are you talking about?

A    That somebody that was arrested, they went back 30 days later, entered the evidence, and cut a warrant for his arrest.  It's plain as day.  You can look at the evidence log yourself, and go back and review the report.

Q    Who is that person?

A    Detective Fontenot.

Q    No, who was the arrestee?

A    Joshua Dupre.  The same one they tried to use to try to say I was a dirty cop.

Q    Paragraph 44 says among other things that Chief Fontenot stripped you of your duties on narcotics investigations.

A    Yes.

Q    And according to paragraph 44, that happened in 2019, correct?

**199**

A    You want me to read the entirety --

Q    Sure.  Take your time.

A    -- real quick?  (Witness reviews document.)  Okay.  What was your question again, sir?

Q    The stripping of the duties on narcotics investigations, the way I'm reading this paragraph 44, that happened in 2019, correct?

A    It would have happened the day after I reported them to the state police the first time when they -- when they called Randy and told him that I ratted them out.
     I was -- that's when my duties were stripped of me, and told me I had to -- any narcotics- related incidents, I was no longer allowed to participate in.  If I did come across narcotics, I had to report to Detective Victor Fontenot.  That came from both Deputy Chief Richard Daigle, and Chief, himself.

Q    All right.  And so, paragraph 44 begins, "In 2019, comma," so -- and it describes everything.  So I'm asking you if that happened in 2019?

A    I would assume so.

Q    All right.  What was your rank when you got removed from the narcotics investigation?

**200**

A    Lieutenant.

Q    All right.  And when the last sentence in 44 says, "Lieutenant Dunn has informed the FBI, Louisiana State Police, St. Landry Parish district attorney, mayor of Eunice, and the Eunice Board of Aldermen of these incidents," is that referring to just what's in 44, or all -- or all the stuff that we just talked about in --

A    The question you asked earlier, who all I report to, that's just a list of all the people I've reported information to.

Q    All right.  And again, you know, in terms of figuring out exactly when you reported what to whom, that would be something you would say, "Go look at my notes" --

A    Yeah, if you --

Q    -- "and it'll be in my notes"?

A    Yeah.  Because, I mean, you're going to have to look at my notes for exact dates and times.

Q    All right.  Paragraph 45 says, "Chief Fontenot has instructed favorite employees to fraudulently record overtime in the timesheet designation of special detail, even when there's no documentary record of their work."

**201**

There's a -- there's a footnote that says, "The term special detail refers to a vague category of discretionary spending by the Chief of Police which Chief Fontenot has the authority to allocate and approve."

I take it all that information came from you to put in the Complaint right here, correct?

A No.

Q Well, what --

A The original thing that originally took place was when he first took office. He wanted people in detectives. It was only 80 hours a week. They were going to be losing pay. The people I remember in the room from when he first took office was the chief. Tony Kennedy was the actual chief of detectives as the time. Donnie Thibodeaux was also in the room.

There was a few other people. I remember specifically it was us four in that room. Stated that basically just add a couple extra hours to our paycheck to where you could make up the difference. That was the agreement they first had when he first took office.

As time went on and I started digging into

**202**

things, they called it special detail. There was no proof they were ever at work. There's nothing on the radio logs, no nothing other then their time cards saying, "We worked X amount of hours."

Q Who are these favorite employees that you're referring to in this paragraph?

A There was more in the past. You'd have to go through the entire thing, but here recently it would be Lieutenant Young and Detective Fontenot.

Q All right. You say the recent past, like --

A There's other detectives that's been through that division that's done the same damn thing.

Q Okay. If we went back let's say three years, would there be more people on that list?

A Yeah.

Q Who would they be?

A One would be Darian Guillory, which she actually tried to commit fraud by cashing her check twice. The mayor wanted her -- and this is the mayor's words, not mine, said he wanted her arrested, but Chief didn't want him to because it would bring ill will or ill repute to the department that we have to arrest one of

**203**

our own for theft.

Let's see. She also did that. Let's see who else is coming to mind. You can ask -- if you get a list and you bring the -- if you talk to the people who are detectives, they're going to tell you exactly the same thing I told you, unless they want to try to cover it up, too. But there are some that are willing to admit to it to this day.

Q All right. 47 talks about a decision to eliminate the deputy chief position because of significant over spending, mostly on overtime. And then it quotes something that one of the aldermen allegedly said at the meeting.

Help me understand what that has to do with the favorite employee misuse of funds issue that you alleged in the previous paragraph.

A Because it's -- you had the deputy chief, if I remember the post correctly, I think it was above $80,000 he made in a year. You know, that's almost unheard of.

I think our sergeant's salaries are like 26, 28, and you've got a deputy chief that made over $80,000 in a year. There's no paperwork showing he's at work other than he said he was

**204**

at work. There's no radio log of him say he was in service. There's no calls of service. There's no nothing.

And the -- the Board of Aldermen, they even asked me questions when they were trying to do an investigation, because they said they also believed, and this is from mayor and Nootsie, saying they believed there was discrepancies in the spending of the Eunice Police Department and they were looking into the matter. They asked me my opinion. I gave them what I knew.

Q All right.

A They said it needed to come to an end, because a deputy chief should not be making that kind of overtime or money.

Q So you went to the mayor and/or the Board of Aldermen, and they expressed a desire to address the issue?

A No, sir. That was a conversation where they came to me and asked me questions.

Q And in that conversation, they expressed a desire to address the issue, --

A Correct.

Q -- correct? All right.

A And according to what I think Scott had told

**205**

me, if I had quoted him correctly, they were going to try to get somebody to go over the books and the time cards.

Q    All right.

A    I don't know if he ever did or if he didn't. Never followed up.

Q    All right.  And then according to paragraph 48, the Civil Service Board also got involved, and they also took some action with regard to some of the allegations that you are making here, correct?

A    They actually did their own thing.  That was just something that I obtained from a -- I believe it was public records request.  I obtained the information that the Civil Service Board was able to prove that they were giving people days off -- paid days off instead of using their vacation or K time, which is against civil service law.  They did their own investigation, their own thing.  I just found out after the fact.

Q    All right.  And so, do you know what the civil service -- once the Civil Service Board made those findings, do you know what they did with those findings?

**206**

A    They issued -- from what I can recall, they issued a order to either the chief or the mayor himself, ordering the employees -- correction.

The Civil Service Board submitted letters to surrounding agencies, asked them to come in to conduct a criminal investigation.  I don't know if anything ever became of it or anything thereof.

Next, I know the Civil Service Board ordered that either the mayor or the chief force the employees to pay back the money that they wasn't entitled to.  Far as to the best of my knowledge that still hasn't happened to this day.

Q    The part that hasn't happened is employees haven't --

A    Is employee --

Q    -- paid the --

A    -- giving back the money that they wasn't entitled to.

Q    Don't forget, you and I need to be careful not to talk at the same time.  But okay, I understand.

Turning to paragraph 49, and I want to -- I want to read that one.  It says, "On

**207**

information and belief in retaliation for the efforts to curb Chief Fontenot's spending, Chief Fontenot ordered Eunice police officers to target the Eunice aldermen by, for example, waiting outside restaurants they are known to frequent in order to stop them on suspicion of driving under the influence of alcohol.  On information and belief, the primary motivation for these stops is to tarnish the aldermen's reputations and intimidate them."

So to unpack that, first of all, what information do you have that makes you believe that the chief ordered Eunice police officers to target the aldermen, to wait outside restaurants in retaliation for their efforts to stop his spending?

A    We were in the supervisor's office, myself, Sergeant Godeaux, Joshua Courville, Nicholas Cooley.  I think there might be another person in the room.  I'm not recollecting at this time.

Lieutenant Young came into the office.  He just came out of Randy's office.  They were, lack of a better term, complaining about the city not giving them what they asked for and

**208**

all this other stuff, and said it's messed up that our own mayor can go get drunk on Second Street and act a, lack of a better term, an ass, and if he's going to do that, we'll just try to set him up when he's coming out of the bar to arrest him, and we were offered that, "I tell you what, I know y'all like DUIs.  If you'll do it, I'll get you a brand new GLOCK."

Q    All right.  And who said that?

A    Lieutenant Young.

Q    All right.  Anything else?

A    There was additional conversation that they had.

Q    Who had?

A    Our admin, our detective division.  I don't know who authorized the investigation, but Ryan was bragging about they were going to try to arrest the mayor for selling fake football tickets, Saints tickets.

Q    I'm sorry.  Who was bragging?

A    Young.  Lieutenant Young, was bragging about it.  He was making false -- I don't know the context of what his whole thing he was getting at, but he said the tickets were fake.  That's what I understood.  And they were investigating

**209**

him for making fake football tickets and trying to sell them.

Q   Okay.

A   That's the only other thing I could think of where they targeted -- or that I became aware of in targeting Scott Fontenot.  It's Mayor Fontenot.

Q   All right.  So paragraph 49 deals with aldermen and deals with waiting outside restaurants to stop them on suspicion of driving, and I want to make sure I didn't miss anything.  You talk about the mayor, --

A   Leaving the bar, not city restaurants.

Q   -- and you talk about fake football tickets, but not about aldermen or about --

A   They was saying if we can get anything on anybody, but they specifically, Scott's name was mentioned.  This is who we want to catch leaving the Dugout on Second Street, or Nick's.

Q   All right.  And just to be clear before we leave this, I mean as far as -- if we talk to the other officers who were present when that conversation was had, that said "We'll give you a brand new GLOCK if you'll do the stop," you -- I mean every -- they would say there's no

**210**

doubt in their mind that was a -- that was not a joking conversation?  That was a dead-on serious conversation?

A   I've already called them as witnesses.  Yes, sir.

Q   All right.  Remind me of who -- their names again, or did you say them all?

A   Yes, sir.  The ones I recollect in the room, myself, Sergeant Chase Godeaux, Sergeant Nicholas Cooley, and Officer Joshua Courville.

Q   Got it, thank you.  All right.  Turning to paragraph 53, there is a quote here in one of the procedural orders, and I'm looking at the beginning of line 2 of paragraph 53 is quote here.

It says "Final departmental disciplinary authority responsibility rests with the Chief of Police.  Everything involved in this procedural order," and there's an explanatory phrase there, "regarding disciplinary action will be directed to the chief's office, noting emphatically no exceptions."

A   Can I have a chance to read it?

Q   Oh, sure.  Take your time.  Sorry, go ahead.

A   (Witness reviews document.)  All right.  What

**211**

page was it on?  I closed the packet.  What paragraph are we on?

Q   Oh, paragraph 53.

A   I finished reading.  You can go ahead, sir.

Q   So my question is direct- -- is very kind of high level, but what -- what is it in your view is improper or inappropriate about these statements in the procedural order?

A   You said there were several.  Which statement -- you want to -- which statement you want to talk about?

Q   The ones I read to you.  It says, "Final" and --

A   I got it.

Q   Yeah.

A   (Witness reviews document.)  Now, what is wrong with it?  It's just based off his own conclusions whether we violated policy or not.  If he thinks it's a policy of violation, he has the power to discipline us.  Call for a moral decision.

Q   Well, I didn't get to the moral part down there, but I just -- "Everything in the procedural order regarding disciplinary action will be directed to the chief's office with no

**212**

exceptions."

I mean, isn't that generally the case in every police department?

A   It's supposed to be.

MR. MARDIAN:

Objection, form.

A   That's supposed to be exception.  It's also covered by the Lawrason Act that he's supposed to conduct any and all investigations upon receiving a formal complaint, written, which has not happened.  So he's in violation of his own policy and in the Lawrason Act.

MR. HEBERT:

Q   Well, my question to you though is, I mean, are you aware of a police department that doesn't require that disciplinary actions be brought to the attention of the Chief of Police?

A   I would assume that would be correct, but I only work for Eunice.  I believe that would be the case, that's you're supposed to submit it through the proper channels to get to the Chief of Police, but if the Chief of Police is the one that's doing it, who are you going to complain to?  You're going to ask him to do an investigation on himself?

213

Q   I thought -- I thought this pertained to departmental disciplinary authority and responsibility?

A   To me, it encompasses more than just that in my opinion of reading this

Q   Okay.  I understand.  And you're answering my question, which is what do you -- what do you think is improper about this?  And I understanding that --

A   Improper, if he -- if he's seen -- because he's even tried to do this to me, which we've already -- I've won that civil service case. This is improper.  You can't do this, which social media policy is one of them.

    This one, another one would be -- another incident would be the one time we were shorthanded one night, and again, I'm the one that got the blame for it.  It was Officer Clancey that talked to Deputy Chief -- or Deputy -- I don't know his full title.  Joey Pelican.

    Talked to Joey Pelican like, "Look, man, we're shorthanded.  We asked for help.  Nobody wants to help us."  Joey Pelican takes it upon hisself to contact his boss, which was Terry

214

Darbonne.  Terry Darbonne then contacts the mayor.

    I'm oblivious to any of this, but I'll get to that point in a second.  So they authorize Morris' office to come out to assist us with backup.  I don't remember exact date and time. It's shortly thereafter.

    I'm written up for not -- for asking another agency for assistance.  That's what I was written up for.  Even though he had already had a conversation with Terry Darbonne, Terry Darbonne admitting he is the one that did it, not me, and said, "You know, I'm still going after him.  I'm still going to do it."

    And that -- I appealed that one, or we was in the process of that, and they finally dropped the case against me because it was BS. I'm drying up, thirsty.  It was BS.

Q   Who wrote you up?

A   I believe it was either Chief Fontenot himself, or he ordered D.C. Kennedy to do it.  I can't remember.  You'd have to look up at the write up to actually -- but it says in there that he was instructed to do it.

    Even though there's evidence to show that I

215

did not do it, you're still going to take it upon yourself to punish me for something I didn't do, and continue an investigation that keeps me under IA.

    If I wanted to go to another police department, I can't leave anywhere as long as I'm under IA.  There's two options I have. Quit and get reported to the POST commission and possibly get my POST rejected, or fight it until the end, which that's what I basically have to do, because if I don't protect myself this -- if any of this sticks, it's going to follow me for an entire career.  It's going to follow me until the day I get out of law enforcement.

Q   To that point, you have a couple of allegations in your Complaint where you say that you applied for a job or jobs at other agencies, and could not go forward with the application because of something that you had pending, or under investigation, so I'd like you to give me the details of that, please.

A   I might have answered the question before you asked it, and it was along those lines.  I'd actually went -- I got to a point to where I

216

was -- I was tired of fighting, and I just like, you know, I'm not going to keep living like this.

    Scott LeBlanc with Coushatta Police offered me a job to come work in the narcotics division over there, because we had been working together for several years.  While I'm in the process, I was supposed to go over there and fill out the paperwork.  By that time, I'm being placed under investigation.  For which one, you'd have to look in my notes which investigation actually happened that time.

    I was under investigation, I believe, before it was concluded six to eight months. Well, by the time -- you know, I asked him, "Can I still have the job?"  He said, "No, we can't hire you while you're under investigation.  Either you're going to have to resign, or you're going to have to win your case, or whatever the outcome of your case is." By the time I finally won my case, the job was filled.

Q   All right.

A   And then, the stigma between a lawsuit being filed, and all the fighting and all the

**217**

negative stuff that other agency has heard about me, nobody wanted to hire me.  There are only one person that wanted to hire me in that time frame, which was Bobby -- Sheriff Bobby Guidroz.

Q   All right.

A   Now, I -- now presently, I have been offered another job to go work for the DA's office, and it's under consideration.

Q   Okay.  As what?

A   As an investigator.

Q   All right.  So I guess you've had some interactions with Mr. Pitre about that?

A   No.  His -- his ADAs are the ones that approached me about they want -- that they were going to go to him about hiring me, because they liked the way I testified, the way I conduct my investigations.

Q   All right.  And who are the -- who are the ADAs that said they were going to go talk to him?

A   The last one I remember speaking to that offered me the job most recently was Katie.  Katie Ryan.

Q   Katie Ryan?

A   Correct.

**218**

Q   All right.  Were there others?

A   Someone else had mentioned to me, he's a male, approximately -- I think it's Marcantel, I think is his name.

Q   Okay.  So the -- you talked specifically about the Coushatta Tribe job.

A   That's --

Q   And then you indicated sort of that there might have been some other jobs for which you were rejected, but I wasn't real clear on that, so if there were others, can you list those for me?

A   No.  There was no others.  That's -- it was plain that I would not get hired anywhere else until I cleared my name.  So I didn't even -- I didn't even attempt to, because that is the standard with any other agency.  They -- I will not be hired while under active investigation.

Q   I understand.  So based on what happened with Coushatta, you didn't apply elsewhere because you figured you were going to have the same outcome?

A   That is correct.  Did I fill out applications?  Yes.

Q   Where?

**219**

A   I actually filled out one for St. Landry, but I never turned it in.

Q   St. Landry SO?

A   Yes.  Because I was going to go through the same process.  You're under investigation, you're not going to get hired until it's cleared.

Q   All right.

A   But I actually spoke to Hunley before.  I think he's Major.  I don't know his title, but I think it's Major Hunley.

Q   Lafayette?

A   No, with St. Landry Parish Sheriff's Office, and during that conversation it's basically the same thing.  As long as you're under IA, don't even try.

Q   You reminded me of a question I meant to ask you very early on here.  What is your understanding of the IA function of the Eunice Police Department?  And by that I mean, does the Eunice Police Department have a formal internal affairs division?

A   Formally?  No.

Q   Because you just used the term IA, and it got my attention, and I wanted to follow up on

**220**

that.  Like when you say "IA" in the context of the Eunice Police Department what are you talking about?

A   Internal investigation.

Q   Okay.  You're not talking about internal affairs division?  You're talking about internal investigation?

A   Internal investigation.  Matter of fact now, to clarify that when I say "IA," I am talking about internal investigation.

Q   Got it.  I understand.  Turning to paragraph 55 of your Complaint, you say there that on January 30, 2019, you filed a report detailing an officer's efforts to facilitate the escape of a suspect in the police department custody who was a known flight risk.  Who was that suspect?

A   Jordan Arnold.

Q   Jordan Arnold?

A   Uh-huh (yes).

Q   Okay.  Who was the officer who tried to facilitate?

A   Detective Victor Fontenot.

Q   What is your understanding of what was done to facilitate the escape?

**221**

A    I did a critical incident form demanding an investigation into that fact, because in front of me and other officers that was a part of the SRT team, he openly admitted, "Oh, what's -- it's okay if he gets away. It's okay. I need him on the street. I need him out there. It's okay. We're going to get away with it." So I go to chief Fontenot. I voice my concerns, because it was a tactical nightmare where they wanted to do the exchange at, and I said I didn't want no part of it. "No, you're going to do it. Okay."

So I got back with my guys. We set up a plan. We did recon, make sure wasn't no civilians in the area. The guy that he was looking for never showed up, which is somebody that ripped him off, I think for 300 or $350 during a narcotics buy.

Same situation. He arrests them. He agrees to work for him, so he let him out, jacks him for his money and then he wants to try to get him in jail.

From there, I was later called -- after I completed the write-up I was pulled into the office by Richard Daigle, and I believe Tony

**222**

Kennedy was also in the room. They played a recording to where Jordan Arnold had openly admitted that Detective Victor Fontenot was going to drop him off at a pre-disclosed location just outside the jurisdiction, and that was recorded. And the person that had that recording was Richard Daigle. Because it was a recorded phone out of the Eunice Police Department when that call was made. I didn't listen to it in its entirety. I heard enough, and I got mad and walked out the room.

Q    And that's all -- that's all part of what was in the report that you submitted on January 30, 2019, as stated in paragraph 55?

A    The critical incident form that I filled out? I believe it contained that last part about what Richard Daigle told me. If that was before or after, I'm not sure. I know I was pulled into the office after I turned in the critical incident form.

Q    All right. Paragraph 56 says, "On November 20, 2019, you filed a report detailing officer's failure to comply with the Louisiana Statute requiring mandatory reporting for allegations of domestic abuse or battery after responding

**223**

to a domestic disturbance complaint."

What officer failed to file that mandatory report?

A    Over a several year span, I can name several. The one that's coming to mind, the first, God rest his soul, would be Eliza Joseph. He was notorious for it. We would have to go back and do follow-up investigations when he refused to do an investigation into domestic abuse.

I recall one from E Street. I don't know the address. There was one on Sherry or -- yeah, Sherry Street. Let's see. I know there's more. I'm just trying to recall them. But officers of our department, certain ones, such as -- I think A.J. Frank was one of them. Let's see who else.

Q    I think you're trying to answer my question, but I want to make sure --

A    Oh.

Q    -- that you understand. The question is, what incidents were in your report of November 20, 2019 that you describe in paragraph 56? Maybe that's what you were just answering, --

A    Okay.

Q    -- but I want -- it seemed like you were just

**224**

listing stuff that you remembered, whether it was in your report or not. I might be wrong, but --

A    Okay. Let -- okay.

Q    If you could please clarify that, --

A    Yes, sir.

Q    -- I would appreciate it.

A    I did turn in a critical incident involving one of those incidences where we were called after the fact, because officers didn't do their job and do the reporting.

We watched a video of the suspect throwing the female across the room and slamming her against a wall, and she claimed the officers did absolutely nothing to assist her. Everything was recorded. And you could -- it even had audio. It was all there.

So we couldn't understand why nothing had been done. And he committed, I think, two or three acts of domestic abuse battery in less than a week, and no one has done a report. So we went back, took over the investigation.

I submitted -- the lady complained to me what took place, which is in my opinion, if you don't do the reporting when the law says you

**225**

shall do some, is malfeasance in office.

So I figured -- I filled out the paperwork, submitted it. Don't know what happened after that. I turned it over to Richard Daigle, I believe.

Q Okay. So the reference in paragraph 56 to the incident being superficially investigated and quickly dismissed by Chief Fontenot and not disciplining the responsible officers, --

A Those --

Q -- how does that match up with you saying you don't remember what happened to it?

A Nobody got disciplined. So, I mean, I don't know what happened with the case, but nobody got disciplined, so I mean, it's safe to assume nothing had -- done.

Q I understand. All right. Paragraph 57 deals with a report you filed on December 3, 2019 detailing policy violations committed by officers investigating a rape, including the improper storage of DNA evidence in the locked trunk of a vehicle.

A I do -- I do have something to add to that. Do you want to go back or go --

Q As to what?

**226**

A The last question you just asked me about that paragraph 56.

Q About the super- -- the allegation of the superficial investigation --

A There was -- there was something I wanted to add.

Q -- of the failure to report? Yes, go ahead.

A All right. There's been multiple critical incidents filed with the Eunice Police Department that have not been investigated. By Lawrason Act and our own policy shall be investigated. So just wanted to add that part in there.

There are -- because I did a public records request to look at the officers that I knew that were written up to go back through their personal action -- their jackets of things they've -- commendations or disciplinary actions. There's nothing there. And I know I completed them, because I still had copies of them.

Q Okay. You made a public records request to whom for what?

A Chief Fontenot, or the secretary, asking for a public record request to access the officers'

**227**

what we call jackets. Their disciplinary action histories, stuff of that nature. And anything that disciplinary action would have been taken would be contained in that file.

Q All right. Is it your understanding that that would also -- even if it's contained in the file that it would also be public record?

A Should be. That is public record. That's why I did a public records requests. An officer's disciplinary action file is public record, and you have to do a records request to review it.

Q That's your understanding?

A Yes.

Q Okay. All right. Now, back to 57. You filed a report about policy violations committed by officers investigation a rape, including improper storage of DNA in a locked trunk of a vehicle. So what were you reporting exactly?

A I'll start from the beginning. We get a call to go to AMC, that a woman reported that she had been raped. Myself and Officer -- I think he was a officer at the time -- Officer Miller went. The woman was beside herself.

I mean, you could tell she was under the influence of something, and she had made the

**228**

statement that she had been raped. Her car was outside. The person that was with her -- you'd have to look at the report for the full details, but I know we got -- we was able to get into the car.

Once we got into the car, we found her panties. Her panties still had semen over -- in them. We collected it, did a interview with the suspect that was with her, which it was later determined he was actually the suspect that raped her.

We called -- either I called dispatch or I called over the radio, asking for the detectives to come there, because per policy any serious, major crime such as rapes, murders, attempted murders, we're supposed to call out detectives.

So I called them to come over there, and somehow in the conversation I was told that they wasn't F'ing coming, they were busy, blah, blah, blah, blah. I don't remember the entire conversation.

I then call either the deputy chief or the chief detective, and he ordered them to come to our location. They get there, we turn over the

**229**

case, we turn over the evidence, like, "Hey, this is what we got.  We're going do a supplemental report," and so forth.

I later discovered that one of the detectives had left the DNA evidence inside of her car, back and forth to work.  Never was secured properly, during the hot months of the summer.

In my opinion, one, you have mishandling of evidence, so even if we had anything or could prove anything, there went the case.  Also the fact that it was locked in a hot car all -- for that extended amount of time could have contaminated the sample or made it inviable.

I wrote them up over it, turned it in. There was people in the meeting.  Again, look at my notes who actually informed me.  They were laughing and cutting up, calling me an idiot and all this other crap because of the write up, and allowing the same detectives that I wrote up to read it.

I believe this is the same time frame -- or this came later.  We'll get into that in a second.  Came later that a officer recorded this conversation, and during this same

**230**

conversation, Detective Fontenot had made several comments towards me that he was going to, I believe, "Break my mother fucking fingers.  Catch me on a call alone." Either he was putting bullets in the back of my head or the dog's head.  I never got to listen to the recording myself.

The officer was scared to bring me the -- Stephanie Meyers was scared to bring me -- or let me listen to the recording, because she knew everything was going on.  She was scared I was going to lose my temper.

So she brought the recording to Scott Fontenot, I believe, first, let him listen to it, and then she brought the same recording to Donnie, because Donnie is a good friend of mine, and he -- he was the one that broke the news to me.

Q    This is the recording of breaking fingers and bullets in the head, and --

A    Correct.

Q    Okay.

A    This is the same time frame that this is going on.

Q    All right.

**231**

A    I wasn't later -- told this until later down the road, and I submitted another request for an investigation that didn't go anywhere.

Q    On the taped comments?

A    Correct.

Q    Okay.  Before we get to that, which I think is paragraph 58.

A    Oh.  The rape.

Q    58.

A    And that was what happened in between.  All right.  From there, I found out about everything that was said in there.  I submitted another write-up in that one of how the chief and all these people were allowed to trash talk and curse and say all these vulgar, vile things about another supervisor in front of the chief himself and these other people, and they're laughing and cutting up about it.  So I submitted that one.

I got placed under investigation for that. They -- Ryan -- I believe Ryan Young was the one conducting the investigation.  They gave both Victor and Darian a verbal reprimand for the things they did at the hospital, the mishandling of the case and all this other

**232**

stuff, but they wanted to discipline me because I thought the case was still salvageable.

They said they wasn't going to investigate, and if I wanted to do anything I would be the one to have to doing it, so according to my duties and responsibilities as a lieutenant, I called where we believe the rape had actually occurred at, based off of the evidence we collected.  Actually occurred outside of our city, which occurred in Acadia Parish.

I contacted Acadia Parish, and then I get my -- my butt reamed for it.  And then I get placed under investigation for it.  They're trying to throw the book at me but give them a verbal reprimand for screwing up a whole dern rape case.

Q    So you filed a complaint to --

A    Multiple.

Q    -- the Civil Service Board about --

A    No.  To the defendant.  Chief Randy Fontenot.

Q    I'm reading paragraph 57, --

A    Oh, I'm sorry.

Q    -- and it says, "Lieutenant Dunn subsequently filed a complaint with the Civil Service Board which investigated the incident and concluded

**233**

that the officers had violated the law and that a verbal reprimand was insufficient punishment for misconduct."

A   That is correct. That happened at a later date when they refused to do anything about my complaints. I then submitted it to the Civil Service Board, and I even showed the mayor a copy of my complaint. They investigated it and found out that they had -- they did something wrong. They gave whatever punishment it was. Still hasn't been enforced to this day.

Q   So the way this reads, and I want to make sure I'm reading -- the way I read it, I want to make sure that it's what happened.

Because you went into some detail about several other situations, several other complaints, and I want to stick to the compromising of the DNA evidence for right now.

A   Okay. And that -- just where I can clarify, as I explained at the beginning of this deposition, some of these things are intertwined. So it's going to be hard to unbox everything at one time.

Q   Well, let me try.

A   Okay. I'll try my best.

**234**

Q   So the way that I understand paragraph 57 is you were not satisfied with the -- the depth of the investigation of this compromising of DNA evidence, so you made a complaint with the Civil Service Board and they investigated it?

MR. MARDIAN:
Objection, form.

A   It wasn't just the complaint of that. It's just the gross handling of every IA that we do. So I started turn- -- if I got a complaint now, since they just want to cover everything up, I just started submitting stuff to the appointing authority at that time, which was the mayor and the Civil Service Board.

MR. HEBERT:
Q   Well, let's stick to paragraph 57 for right now.

A   I was answering the question, or thinking I am.

Q   Okay. It says you filed a complaint with the Civil Service Board, and I'm taking from the rest of the paragraph that the complaint had to do with what you thought was inadequate investigation and inadequate discipline for the -- compromising the DNA evidence in the rape case? Am I reading that right?

**235**

A   That would be correct. If that -- that part.

Q   Okay. And then the Civil Service Board picked that up and investigated it themselves, --

A   Uh-huh (yes).

Q   -- and according to this, concluded that the officers that were involved, and I take it that means the officers involved in handling the rape case, right, had violated the law? That's -- it says officers involved --

A   The persons that was written up, which was Detective Fontenot and Detective Darian Guillory. Not all officers, because that would include me and Cody.

Q   So is it -- whoever let the DNA evidence sit in their trunk for five days had violated the law? Is that what that's -- is that what that is intended to mean?

A   You're talking about a certain clause in the complaint itself. The complaint itself in its entirety, there had to be some type of violation of actual law and policy and procedure.

There was not just that one thing about DNA evidence. There was multiple things included or added into the official complaint, turned

**236**

into the Civil Service Board and the mayor.

Q   But it's part of what the Civil Service Board investigated. According to paragraph 57, the Civil Service Board concluded that the verbal reprimand given to the person who messed up the rape investigation was not sufficient discipline?

A   That was their findings, yes.

Q   Did they try to increase the discipline to that person?

A   I'm assuming. I don't know. I just know -- the only part that I do know, they issued -- again, same thing with the payroll issue, they issued orders for the action to be taken, and action was never taken.

Q   All right. What was the action they directed be taken?

A   I don't know. I just know it wasn't done.

Q   Okay. So 58, and I think you were telling me about that just a minute ago, that you found out about a taped conversation in which you said that Stephanie Meyers had that had Officer Fontenot saying that he would break your fingers and put two bullets in your head?

A   You've had to look at the write-up, but the

**237**

full context, she actually sat down with me and helped me write that write-up to give me the actual -- because I put in parenthesis what was said, because it was her recording.

So she actually helped me write it so exact the things was there, turned in the -- turned in the complaint, and then later I did a public records request again to look at the files to see if there was ever an investigation, because I never heard anything else about it.

Nope.  I have to correct myself.  I was interviewed by Lieutenant Ryan Young.  When he started trying to ask me questions the only thing that he gave a dern about asking is who told me?  How did I find out?  That's the only thing they wanted to know.

And basically, I told him, "You were -- I have evidence to prove that you were in the room when all this happened.  You're your own witness.  You already know all the information."  And we concluded at that.

Q  And I think --

A  Because I wasn't going to release the name of the person that had it at that time, because I knew they were going to get targeted.

**238**

Q  And I think you said already it was Stephanie Meyers?

A  Yeah, it's already out.  So yeah, that's why I said no.

Q  So this is one of two public records -- because you talk about different public records requests that you've made?

A  I did -- I believe it was only one public records request I did to look at the jackets, and I waited until I -- all these write-ups that I did, to see if anything was going to do.

I waited until the date of conclusions and all that, that from my understanding, once a written complaint is filed, you have 15 days to start an investigation.

From there, you have 60 days, but it's been recently changed, I believe, to either 75 or 90 days to complete an investigation.  From there, is a pre-disciplinary hearing.

From there, the findings or anything thereof is then placed in the person -- the person that received the disciplinary action, in their file.

So I waited until all the time limits had expired, filed a public records request to go

**239**

through the files to obtain whether an investigation was done or not, or any disciplinary action was done.

Q  When was that -- when was the public records request made?

A  It's dated.  I know he has a copy of it, because he kept it.  I know I turned it over as evidence as well.

Q  All right.  You were just -- you were just going through something really quickly with your eyes closed, and it sounded like to me that you were reciting your understanding of the requirement --

A  Correct.

Q  -- Police Officers' Bill of Rights; is that correct?

A  No.  The way that -- the way an investigation is supposed to be conducted, per OSE's website.  That is instruction.  They got an instruction manual on how to do it step by step by step.

Q  Meaning Office of the State Civil Service Examiner?

A  Correct.  It's on their website on how to do a proper investigation.  So you can't tell me they don't know how to do it.

**240**

Q  All right.  I want to -- I'm going to do my best to summarize some -- the categories of retaliation that I've heard that you've alleged in your Complaint that we talked about earlier.

So I'm not holding you to them, but I want you to help me work through these and see if you think I'm really kind of missing the boat here.

So as part of -- as part of what you claim you were retaliated against for the -- the reports that you made and the other conduct that we talked about, you -- you had your K-9 Unit eliminated, right?  That's one thing, --

A  Okay.

Q  -- right?  Yes?

A  Yes.

Q  You were removed from --

A  I would like to add one part, too, about --

Q  Sure.

A  -- the elimination.

Q  Please do.

A  It is actually recorded of him admitting the reason why he got rid of the dog, and the civil service -- not the civil service, the actual chambers when they were trying to do away with

241

the canine division when the city elected to take the dog back from the city, I had already had a meeting with the mayor, and the reason why they were going with a line of questioning was try to entrap him to make him admit the reason why he was doing it, and he finally at the end that he tried to say it was a handler problem.

If it was a handler problem, that is a disciplinary action. I should have been written up for it.

Q   So what chambers?

A   That was -- and it was in the recordings I've already submitted to the council -- the --

Q   The Board of Aldermen meeting?

A   Yes.

Q   It's a council meeting?

A   Council meeting, yes. That was what I was looking for, council meeting.

Q   So if we go look at the recordings of the council meeting where there was elimination of the K-9 Division was discussed, if we listen we will ultimately find something that the chief said that he -- where he --

A   It's at the very end, right before he stopped

242

talking.

Q   Okay. And --

A   I don't know the exact timeline, but you -- of the actual time stamp, but yes, it is there. I did submit it as evidence.

Q   And are you -- okay. And I'll go back and listen to it. Of course, whatever it says, it says. But what you're telling me today is that --

A   I'll go through the conversation. The first thing the mayor asked, --

Q   Let me finish my question. It's okay.

A   Oh. Okay, go ahead.

Q   So what you're telling me today is that it will indicate that the chief states that the reason that he wanted to eliminate the K-9 Unit is because it was directed at you for things that you did?

A   It's not going to be that plain. So that's why I was going to explain it in its entirety.

Q   All right. Well, good. Please.

A   First thing the mayor does is -- and a couple of the other aldermen, "Why are we getting rid of the dog? Oh, the dog isn't working. The dog isn't doing this. The dog is," I believe

243

the word rusty came up.

"Not doing -- the dog's not doing his job. Why isn't the dog doing his job? Maybe it wasn't proper" -- and you'd have to listen to it in its entirety, but I'm just giving you a recap of what took place. And then he kept saying it's a budgetary issue. It's a budgetary issue. Scott himself had said on the stand --

Q   Scott, the mayor?

A   Mayor. "How much money do you need to keep the program going? Oh, I don't want the program. Well, you just said it's a budgetary issue, so now you don't want the program. Why don't you want the program? Oh, it's failing. It's not doing this. It's not doing that."

Then Chad -- oh, I don't think it's Chad, but it's one of the council members. He's sitting second from the end next to Germaine. He asked, "So what's the problem?" and then he finally at the end of the conversations you'll see recorded says, "Well, is it a handler problem? Yeah, it could be." That's the wording that was used, or close there to context of.

244

So he finally admitted at the end it could be a handler problem. If it is a handler problem, then I should have been disciplined, a proper investigation been done. So if it was a budgetary issue, why is everybody offering you money and you're refusing it?

Q   I understand. Okay.

A   All right. Now we can go back to --

Q   No, so -- so in addition to that, and I know that you'll disagree with this, but in addition to that weren't there also some claims during that meeting that the unit was ineffective, or the unit was -- had not -- had not produced results?

A   Yes, sir.

Q   Wasn't that also a claim?

A   (Witness nods head.)

Q   Yeah? Correct?

A   That is correct, because I was ordered --

Q   And you took issue with that?

A   I do, because I was ordered not to take part in any narcotics investigations, so --

Q   All right. I saw something else though --

A   How can I be effective if they're going to keep me from doing my damn job?

**245**

Q  Something else about the dog tires out or something like that?  Was that --
A  Oh.
Q  What's that about?
A  You'll see it in my canine records that, you know, he is a Belgian Malinois.  He's a fast dog.  If we have a track that's over, let's say, half a mile long or longer, and while we're tracking, the dog's going to wear out if we're going through rice fields or stuff like that.
   The dog is a -- it's a animal.  It's going to tire out at a certain time.  There's no pre-determined time, so when the dog gets tired, the dog gets tired.  I mean --
Q  Is that it?  I mean, that's --
A  The best I can articulate it at this time.
Q  Okay.  So this --
A  And yes, that was also mentioned in the recording, so you must know what I'm talking about.
Q  Okay.  So was this the same meeting that the outcome of it was that there was supposed to be an agreement to where you would get the dog, but the city didn't follow through on that

**246**

agreement, or did that happen -- that happened in the Civil Service Board, not at the Board of Aldermen, correct?
A  That's way down the road, yes.
Q  Okay.  So what was the outcome of this meeting, the Board of Aldermen?
A  That the council, they knew I had an active appeal about the investigation, that I'd hired an attorney to represent me.
   I provided them with the document that -- the appeal letter that was going to be presented, or was presented to the Civil Service Board.
   Upon reading that, they made the determination they were going to table the dog, the getting rid of it until the outcome of that investigation.
Q  Got it.  Who was your civil service lawyer at that time?
A  Aaron Green.
Q  All right.
A  Oh, there -- I do wish to add something to that.
Q  Go ahead.
A  My father had just passed away that week.  Same

**247**

week all this is going on.  I was told to take an extra couple of days off to bury my father.
   I know policy says I'm only supposed to have a certain amount of days for grievance.  I told the man I appre- -- Chief Fontenot, I told him I appreciate him giving an extra day, but then I get a call from one of the council members say he hurry up and put getting rid of the dog on the agenda while I was out of town, and said I needed to return to Eunice fast to where I could voice my concerns or my complaint thereof at the council meeting.
   So while I'm trying to bury my daddy, they're trying to screw me over on the back side.  Can I take a break?
      MR. HEBERT:
         Sure.
            (OFF THE RECORD)
MR. HEBERT:
Q  So, Mr. Dunn, you have your Complaint still in front of you, sir?   Is it around there?  Okay.  Can you turn to page -- I'm sorry, not page, paragraph 96, please.
A  96.  All right, one second.  (Witness reviews document.)  Okay.

**248**

Q  Did you have a chance to read it?
A  Yes, sir.
Q  I forgot that I also wanted to direct your attention to paragraph 94, which says, "Lieutenant Dunn informed the Office of the Louisiana Attorney General, the FBI, the St. Landry Parish District Attorney's office, the Louisiana State Police, and the office of the sheriff of St. Landry Parish about misconduct pervasive in the Eunice Police Department."
   So the -- in addition to that, I guess you would add that you -- at various times you talked to the mayor and the Board of Aldermen of the City of Eunice about the issues, right?  Because I think you mentioned that before?
A  That's actually listed in here that I had reported it to the Board of Aldermen and mayor before.  It's in another paragraph we talked about earlier.
Q  Right.  So I want to just clarify that.  In addition to those, I saw a discovery response that indicated that you had talked to Billy Nungesser, --
A  Oh, yes.
Q  -- the lieutenant governor?

**249**

A    The lieutenant governor.  I did.

Q    And you also spoke to someone in the governor's office?

A    I did not speak to anybody in the governor's office.  I speak to -- Winegesser, if I'm saying it -- pronouncing it --

Q    Nungesser.

A    Nungesser.

Q    The lieutenant governor?

A    Yes.

Q    Tell me about that encounter.

A    He asked -- he asked me to -- I explained to him what was going on.  Told him what was going on and basically he asked me, "What can I do to help you?"  I said, "If you could help shake the tree to get these police agencies to -- a full disclosure, get off their ass and do their job."

Q    All right.

A    And he said that he would look into the matter.  I do not believe I contacted him again, because at that point, I think somewhere in between that's when the ACLU got involved, somewhere in that -- that ballpark.

Q    All right.

**250**

A    I believe so, if that's correct.

Q    And so, going back to paragraph 96 where we were, it says, "Lieutenant Dunn contacted these agencies and officials on his own initiative and as a private citizen and not as part of his official duties."  That's -- that's not really accurate, is it?

MR. MARDIAN:

Objection, form.

A    Whenever I had meetings with these other agencies, I was off duty.

MR. HEBERT:

Q    Well, I thought -- you've mentioned repeatedly in the deposition that, "I felt like I had a duty as a police officer to take this forward and do ABC."

So at least some of the reports and the contacts that you made were in the course of your official duties; isn't that true?

A    Course of official duties?

MR. MARDIAN:

Objection, form.

A    Repeat the question.  Make sure I understand.  You said official duties.  Can you repeat, please.

**251**

MR. HEBERT:

Q    For example, the messing up of the rape case and your efforts to have that properly prosecuted, that's in the course of your official duties, isn't it?

A    If it was a part of my official duty, which I was the person involved in that rape case, so that was my official duty.  Anything that it was witnessed or anything thereof that was not an actual case that I was working was reported off duty, to clarify your question.

Q    All right.

A    If it happened during the scope of my official duties, it was handled in my official duties.  Of other things was reported while I was off duty where they couldn't try to use it against me or target me for anything else.

Q    So the information that you acquired in order to make these contacts was acquired by you through your official duties as a police officer?

MR. MARDIAN:

Objection, form.

A    Through my employment?  Yes.  And actually after the direction of the FBI Agent Kelly

**252**

asked me to continue collecting information for him.

MR. HEBERT:

Q    In the course of while you were acting as a police officer for the City of Eunice, --

A    Correct.

Q    -- correct?

A    Yes.  Another agency asked me to continue to collect information for them for investigation.

Q    So I think you accidentally answered one of my next questions, which is your --

A    Telling the truth is not an accident, but go ahead.

Q    Well, what makes you say -- you think I was accusing you of not telling the truth, sir?

A    That the way you phrased this is trying to say, "Well, you're doing this during this time.  You're doing this," so yes, I took that as you're trying to indicate I did something or I mischaracterized something in this suit.  So, I answered the question.

Q    Your definition of making a contact as a private citizen is if you make that contact while you were off duty as a police officer?  Is that what you're saying?

**253**

A   I'll repeat it again.  If the incident took place while I was in my official capacity while I was at work, if the incident happened with me, involved me, I handled it through my official capacity as a lieutenant.  In the event of things I witnessed, I reported those off duty.

Q   And those things that you reported while you were off duty, that's -- in your mind, that's the same thing as you reported them as a private citizen?  Is that what you're saying?

A   I believe that would be the context, because I'm not getting paid by the police department. I'm off duty.

Q   So the answer is yes?

A   It would be both.  I'm still a police officer, no matter what, because I am hired by this agency.  But during my off hours I can do certain things that I can't do at work, like drink a beer or watch TV.  I mean, there's a -- there's a clear distinction between when you're on duty and off duty.

Q   Including with regard to making reports of alleged police misconduct?  There's a distinction between on duty and off duty, in

**254**

your mind?

A   What I did where they couldn't use it against me is I did some of those items while I was off duty.  Because you seen, just like they tried to write me up for the Facebook post, I did that off duty.

Q   So when you said you wanted them to not be able to use it against you, you mean that you wanted -- you didn't want them to be able to say you shouldn't be doing -- making these complaints while you're on duty, because it's outside the scope of your job duties?

MR. MARDIAN:
        Objection, form.

A   No.  They were -- just like with the other day when I was sitting in on one of the depositions -- well, I wasn't sitting in, I was actually listening to the deposition.  My deputy chief pulls me to the side and said, "I'm" -- they want me disciplined because I'm listening to the deposition and not doing my job, which is the same thing if I'm listening to the radio going off, or listening to music on the radio. But he wanted me -- Chief Fontenot called Tony Kennedy while in this -- while in the

**255**

other meeting the other day, wanted me punished for listening to these depositions, if that answered your question.  That did occur, and you can call Tony in here and ask him to testify to it.

Q   So I'm going to try to kind of nail this down as specifically as possible.  So this sentence that says, "Lieutenant Dunn contacted these agencies and officials on his own initiative as a private citizen and not as part of his official duties."
        In your mind, the meaning of that is that you contacted these agencies and officials while you were off duty?

A   As I previously stated, and I will try it again.  Maybe it was a miscommunication.  Like the rape, I was a part of that investigation. I took it upon myself to contact that other agency to report it, because that involved me.
        When all these other -- and I wouldn't say all, but other allegations, I waited until I was off duty, or I had the day off to sit down and have a however long conversation with these other agencies.
        I wasn't going to do that while I was at

**256**

work, because then I had to listen to the radio.  I have to do my job.  Does that answer your question?

Q   So those contacts that you just described, the ones where you were off duty, or the ones that are talked about here when you say you did them on your initiative as a private citizen, right?

MR. MARDIAN:
        Objection, form.  Calls for a legal conclusion.

A   I'm trying my darndest to answer your question, but obviously I'm not.  Not all things that were reported was when I was off.  I just explained, if it entailed me being a part of it, I did my part as a supervisor, or police officer in the matter.  Other things that happened or were reported to me, or anything that was discovered, I waited until I was off duty to report those incidents.
        You will have to go through each incident if you wish, to ask me was I on or off duty when I reported it.  I can do that.

MR. HEBERT:

Q   Not necessary.

A   Okay.

**257**

Q   So back to the -- earlier, before we took a break, we were talking -- remember I said I was trying to do my best to summarize categories of retaliation.

A   Okay.

Q   Do you remember that conversation? And then we -- we took a break and we got -- and then we kind of got off, and then I just went down a little --

A   We talked about the canine was the last thing we talked about.

Q   Talked about the K-9 Unit and we talked about removing you from narcotics investigations --

A   That came up in that conversation, yes.

Q   -- as another one. So that's two. Then we've talked about false claims that were made about you with regard to being either corrupt or taking bribes, which --

A   Okay.

Q   -- which I -- in my mind is sort of another category. Did you kind of --

A   What you mean, another category?

Q   Of retaliation. Like it's not the same as removing you from a narcotics investigation, --

A   No, they --

**258**

Q   -- it's something else entirely, right?

A   The way I would classify it is now you're trying to take -- you're trying to ruin my life, because I thought I was doing the right thing by reporting what was actually going on.

Now you're trying to ruin my entire reputation, ruin my life, keep me from the way I provide for my family by claiming I was this dirty cop, with no standing or no evidence, which was admitted by one of the only defendants. There was absolutely no evidence of. So why'd you drag -- not you, but why was my name dragged through the damn mud?

Q   And so, kind of related to that, which I, in my mind is kind of another category, like these -- go ahead.

A   Not to cut you off, but I was even pulled into the office before this lawsuit was filed, asking me not to file it and he -- and the chief himself said, "I didn't believe the allegations, but Victor said that they -- they were there. But, you know, you think you can make this lawsuit go away?"

Well, three days later they get the lawsuit. I mean, I -- it was already in the

**259**

process. And they pulled me in trying to convince me not to file the lawsuit against them, because it was me, Ryan Young, Tony Kennedy, Randy Fontenot. I think it was five of us.

It's in -- I do have a detailed note of who all was in the room. And again, I was still being accused of doing dirty things. I threw my phone at him, said, "If you want my damn phone you can go through it. If you believe I'm guilty of something, here."

I offered them to go through my bank accounts, my phones and everything. And then he accused, "Oh, you've got a burner phone you're using." And then, "You want to hit me, don't you? You want to hit me, don't you?" Trying to antagonize me to commit a violation. He wanted me to hit him.

Q   This is right before the lawsuit was filed?

A   Three days prior to the lawsuit, "Hit me." And then later found out they already knew about the lawsuit was already in the process.

Q   Did they at that time accuse you of some -- of some additional improper conduct?

A   Yeah. They kept -- well, they kept harping on

**260**

the Joshua Dupre thing. Well, actually just one person. And then I got pissed off, slid my chair back, said, "Well, I'm not talking to y'all no more. Y'all not going to keep being" -- lack for a better term, "berated and treated like crap."

So when I get up to walk out the room, Chief Fontenot asked me to stop. Then Young said, "Just tell him the damn truth." So, "Can you please sit down?" I sat back down, they went through the thing and Victor still accused me of doing dirty things.

And I said, "The hell with it," and I got up and left the room. And the whole point of the conversation was getting me not to file the lawsuit. And I'm sorry I'm getting agitated, but I'm having to re-live this every damn day. And then I get like I'm the bad person, because I tried to fix what's going wrong with my department, where I worked.

Q   So I was about to ask you about -- and I think you were clarifying the -- or adding to the issue about the false claims of corruption, and claiming you were a dirty cop.

Then kind of a fourth category in my mind

**261**

was like baseless allegations of investigations of your conduct.  That there's no -- that there was no reason to.

A   One second.  All right.  Can you please repeat your question, please.

Q   Let me step back for a minute.  What I was trying to do is take the allegations of your lawsuit and sort of -- in my mind, sort of categorize them into some categories of retaliation.

A   Correct, okay.

Q   The kinds of retaliation.  And we've already talked about eliminating the K-9 Unit.

A   Correct.

Q   We talked about removing you from narcotics investigation.  We talked about false claims of you being corrupt, taking bribes, or being a dirty cop.

A   Okay.

Q   And then I was -- I was asking -- I was about to ask you about a fourth category, at least in my mind, that attempting to investigate you for things that -- for which there's no -- there's no basis?

A   And that's been proven, I mean, that you see

**262**

that through the civil service things, and --

Q   Okay.  I understand.  I'm not asking you to dispute it.  I'm just trying to -- I'm trying to lay out broad-brush categories of like retaliation.  So --

A   Okay.

Q   -- I want to --

A   The way I categorize it, and I'm sorry to cut you off.  The way I categorize what's here.  The way I characterize it is I had been written up for the stupidest things there actually are.

And I've been accused of lying and doing all this, nefarious stuff, and I'm lying and this.  If I lied, why the hell didn't I get investigated?  They wrote me up for everything else under the sun.

I wanted an investigation done.  How many times have I filed critical incident forms, asking for investigations, just to show what's actually going on.  So if I lied, why wasn't I written up for it?

MR. REED:

I'm going to object to his non-responsive, and it's not an answer, it was a question.

**263**

A   I thought I answered it, because I've been written up for erroneous things all the time, and I've defeated every last damn one of them.

MR. HEBERT:

Q   Which was the fourth category in my mind, it's like -- like baseless allegations of your conduct, basically?

A   Correct.

Q   Okay.  So I mean, generally, does that sort of capture all the buckets of different kinds of retaliation?  We talked about the K-9 Unit.  We talked about the narcotics --

A   It's not everything.

Q   -- investigation.  We talked about the falsely -- falsely claiming you're a dirty cop, and we talked about investigating you for no reason.

A   There's more.

Q   Okay.  Tell me some more.

A   I'll give you a prime example, all up until the day he -- his last day as the police chief.  I have three people on my rotation, just to give you an example.

We have a weekend.  An entire weekend, you have a day and a night shift, both consisting of 12-hour shifts.  We're expected to have

**264**

three people, three to cover day and night shift all the way until the end.

I've asked for help since, I believe, August.  "Give me somebody to help me," while the other shift has six.  Why does my shift have three?  So we're having to work 18, 24 hour shifts in a row.

How are you supposed to maintain that?  That's continued retaliation in my mind.  That's been up until this point.

Q   The way that he put you on work shifts, and the excess work hours?

A   And I begged for some -- them to give me some extra help.  Now yes, some people do come out and help us, but we're so shorthanded, we're still forced to work a 18, and sometimes, like this past one, for New Years, I had to work a 24-hour shift because everybody refused to come out.

And the new chief, or he wasn't chief at the time, calls Randy, tell him the situation.  I believe in the first conversation says, "No, I'm not going to worry with it," and the second conversation, "Yeah, you're going to be the new chief, go ahead."

**265**

So they called out the Marshal's Office to help us, and thank God they did, because they had a man pull a knife on just me and Noel, because that was the only two people working. And that is a officer safety issue. But -- I'm getting ahead of myself. Go ahead.

Q   It looked like -- it looked like the working hours and like the toll that you felt that was taking on you was maybe one -- that was one of the things you might have brought up with Dr. Rainey; --

A   That is one of the things, --

Q   -- is that right?

A   -- because they forced me to go to nights, forced me to go to another rotation, knowing for almost seven or eight years, I was on a certain rotation where I could see my wife. You purposely moved me to the other rotation, and I didn't get to see my wife for almost four months, and I complained.

I asked the man -- I even gave it to him in writing, "Please put me where I can see my family. Oh, that's just the way it is." That was his response, and walks and grins and gets back in his car.

**266**

So I'm suffering, trying to see where I can spend time with my family. "Oh, no. You've got to" -- you made sure I was on the opposite rotation on nights.

And what I find so funny, and now he's even asked me this question, "Why didn't you sue for money?" I don't want no damn money. I want to fix the problem. What am I gaining from all this? I'm not gaining anything.

Q   I want to talk to you about the fix in just a minute, but I -- but I don't want to -- I want to make sure that -- you need to take a break?

A   Just -- I'm listening.

Q   Okay. I want to make sure I capture all, because I'm glad you corrected me. You added what I would call another category of retaliation, which is the working hours issue. So before I -- before I move on, were there any other -- is there anything else to that you wanted to add?

A   Full disclosure, I'm a little irritated at the moment. I'm pretty sure there is, I just can't think of it at the moment. If there is, it's notated in my notes.

Q   All right. You're good to keep going right

**267**

now?

A   (Witness nods head.) Let's go.

Q   So you described earlier a situation in which you brought some of these complaints to the attention of the Board of Aldermen and the mayor, and we talked also about the issue where you -- when they put you on administrative leave, and their response was to take away the chief's disciplinary authority and appointed authority, right?

A   Yes, sir.

Q   And then, you brought the various issues to the Civil Service Board several times, and as far as I can tell, most of which you requested from the Civil Service Board was granted to you, as far as the ones that are -- that have already been closed; is that -- is that inaccurate?

A   That is inaccurate.

Q   Can you tell me -- can you clarify that for me?

A   The notes section that you provided me earlier. My notes. You asked, I think it was seven? Hold on a second. Exhibit 5, was provided to the mayor and the Board of Aldermen.

Asked them what we're going to do. He tried, himself, to get the DA's office to come

**268**

to investigate it, because he had actually received complaints from other citizens that -- he said he believed me, because some of the stuff was in my notes, he stated, or heard about from other people.

He didn't disclose who those people were. He said he was going to reach out to the district attorney himself.

Q   Is "he" the mayor?

A   Yes, Scott Fontenot.

Q   Okay.

A   As time went on, he debated whether to turn it over to the Civil Service Board or not, but he said the Civil Service Board cannot investigate criminal matters or do any disciplinary thereof. Scott calls me back into his office.

Again, you'd have to look at my notes exact date and time. He said basically there's nothing he can do. He's done everything he can. Nobody's helping, and he said, "The best avenue to go is file a lawsuit against the city. I'll do what I can to help you."

Q   All right. So when I -- when I asked you a minute ago, maybe it wasn't a good question, but I thought what I asked you was most of the

**269**

complaints about the issues going on with the Eunice Police Department, that you brought to the Civil Service Board, you -- the Civil Service Board has granted the relief that you were requesting? And you said that's not right.

A   That is not completely correct, because there was discussions I wasn't privy to or wasn't a part of. There was discussions that Scott had, I believe, with a member of the Civil Service Board. They were talking about if they wanted to investigate it that way or not.

And from what my understanding was, that they wasn't going -- the Civil Service Board wasn't going to -- they were still debating what Scott wanted to do, from my understanding of it.

Whether we're going to -- whether they were going to go criminal with it, whether they were going to turn it over to the Civil Service Board. You'd have to talk to Scott himself, or members of the Civil Service Board, figure out what they decided from that point.

But from the conversation that me and Scott had, nothing else was going to be done. He

**270**

told me to file a lawsuit to where we could get this out in the open.

Q   Who told you about the conversation between the mayor and the Civil Service Board member?

A   The mayor.

Q   All right. So paragraph 102 of your Complaint, you have that in front of you?

A   Paragraph 102?

Q   102.

A   Okay.

Q   It begins by saying, "The individual defendants acted in concert to intentionally violate Lieutenant Dunn's First Amendment rights."

I know you didn't write this Complaint, but the individual defendants in this case are -- that does or does not include the City of Eunice, as far as you know?

A   It says Randy Fontenot, Victor Fontenot, Ryan Young, City of Eunice, and John Doe.

Q   So the -- what is it -- what is it that the city did to act in concert, meaning together, with anybody else to intentionally violate your First Amendment rights?

A   If you refer back to something you said earlier, the Lawrason Act. The Lawrason Act

**271**

does not just apply to Chief of Police. It applies to -- it actually lists different people in the Lawrason Act.

And the fact that I went to him, and he made no effort other than just telling me to file a lawsuit to have them request state police to come in, request the FBI to come in and do an investigation. To me --

Q   "Him" is the mayor?

A   The mayor. He just threw his hands up and said he just -- he couldn't do nothing more, because he was tired of fighting with the chief.

Q   I misunderstood maybe something you said before, that he said he'd try to bring it to the district attorney's office. Is that incorrect?

A   That was his allegation. That's his allegation. That was his statement. I don't know if he did or if he didn't. That's what he told me.

Q   All right.

A   Now, if he did, then power to him. I don't know if he did or if he didn't.

Q   So -- and just -- in spite of the fact that the Board of Aldermen took away the chief's

**272**

disciplinary authority in 2019, you would still say they acted in concert with the other defendants in this case --

A   Concert?

Q   -- to deprive you of your First Amendment rights?

MR. MARDIAN:
Objection, form.

MR. HEBERT:

Q   I know you didn't write the word in concert, but let's say together. Let's substitute the word together --

A   I'll phrase it this way. They had an obligation to do a job and they didn't do it, and --

Q   The city?

A   In my opinion, yes. But wait -- it's just like if I have a patrolman, and let's just say a patrolman is doing something he's not supposed to do, and I was aware of it and he still did it, and I allowed him to do it, I am still just as liable for what he did, because I allowed it.

Q   So the --

A   They -- to answer your question, this was -- it

**273**

jogged my memory.  The response was they were -- from what Scott had mentioned to me, that he was worried about that he was warned there was going to be legal action taken against him claiming that he was interfering with the chief's day-to-day operations, and he was scared to make any move, that the chief was going to sue him.  So --

Q  That's in the Lawrason Act, too, right?

A  About the suing part?

Q  No.  About the day-to-day operations of the chief.

A  Yes.  The day-to-day operations, yes.  It is in there.  I believe so.

Q  So --

A  Basically, I was on my own after that.  He just told me, "This is what you're going to have to do.  You're on your own."

Q  So the city's responsibility in this is that --

A  It took no legal action to help me.

Q  -- the mayor -- let me finish.

A  Oh.  I'm --

Q  Is that you brought it to the attention of the mayor and as far as you know, he didn't go escalate it and take it anywhere else, like the

**274**

DA's office or the Civil Service Board, for example?

        MR. MARDIAN:

            Objection, form.

A  No.  The Lawrason Act, he has the same duties and responsibilities to a certain degree that's classified in the Lawrason Act as the Chief of Police.

    He has a duty to act and a responsibility to do certain things.  I don't know the exact quoting in there, but that was my understanding of reading the Lawrason Act.

MR. HEBERT:

Q  The Chief of Police works for the city, so the city's going to be responsible for whatever the Chief of Police is doing?  That's your view point?

        MR. MARDIAN:

            Objection, form.

A  That's part of it.  Not in totality, no.

MR. HEBERT:

Q  Okay.  But that's part of it?

A  That's part.  Because he is a -- a part of the city, I guess, lack of a better term.  He's a part of the city because he's the Chief of

**275**

Police of the Eunice Police Department.

Q  Uh-huh (yes).  Okay.  So if you will turn -- and there's no -- there are numbers, actually.  Turn to paragraph 156 of your Complaint, page 37.  Tell me when you're there.

A  You said 156?

Q  Yes, sir.  Just tell me whenever you get there.

A  Okay.  I'm there.  Let me read it.

Q  So a minute ago you were talking about some conversation that you had with someone about "Why haven't you asked for money in this lawsuit?"  You remember, we were just talking about that?

A  (Witness nods head.)

Q  Yes?

A  Yes.

Q  So this is a list of some of the things that you are asking for, correct, 156?  Asked for a court order requiring some of these, correct?

        MR. MARDIAN:

            Objection, form.

A  For the department.  Not for myself.  I'm trying to do this to where we can get some respect back at our department.  I want body -- or I want cameras for all of us.

**276**

MR. HEBERT:

Q  Right.

A  Tracking devices for all of us, to where this'll never happen again.

Q  Yeah, you just want to get this fixed, correct?

A  I'm not asking for financial gain myself, if that answers your question.

Q  No, you already -- you already said that, and I'm not asking it again.  I'm asking -- I'm looking at the things that are requested in paragraph 156.

A  Okay.

Q  A says, "Issue and require the use of head mounted body cameras or video recording eye glasses by all Eunice police officers."  Help me understand how that addresses the issues and the complaints that we've talked about today.

A  There's no way to hide it anymore.  I mean, it's all recorded.  I mean, you have all your officers fitted with equipment.  Write in the policy that every time they go on a complaint or they're dealing with a suspect, turn it on.

    There will be no more -- you would hope to God not.  There wouldn't be no more excessive force claims.  There wouldn't be this.  Yes, we

**277**

still see them on the news.  But that should help curb it, if not eliminate it.

Q    All right.  B, "Require crisis intervention and de-escalation training for all Eunice Police Department employees who respond to mental health emergencies."

What does that have to do with the issues that we've talked about today?

A    Might go in a little bit farther, and you're probably going to ask the question later in details with it, but give you an example.  2017, I believe it was October or November.

We had a person call the police department, or it was 911, claimed he wanted to commit suicide-by-cop.  We knew the subjects.  We went to go deal with the problem.  We knew where the house was.  It was right next to an elementary school.

While we're getting ready to set up a pair to go towards the house, we was unaware he had already got into a vehicle and was approaching our location.  Upon approaching our location, he drew a firearm within open fire striking the subject.

They made no, nothing for any of us

**278**

involved in that officer-involved shooting, get any type of counseling or anything thereof.  There was nothing to help us with anything.  We had one meeting in the city council chambers with the entire group.  "How do you feel?"  You think we're going to sit there and talk about it in front of everybody?  Nothing else.

But I was ordered I had to stay at work instead of allowing to be going home to rest or whatever after this shooting, because we're so shorthanded, I have to stay at work.

But now, I'm shorthanded but can't get help.  It doesn't make sense to me how -- well, I'm getting there again off topic.  I'm sorry.

Q    Okay.

A    So we're talking about crisis intervention.  That's one.  Whenever we have a serious instance, we should have some type of mechanism in place where officers have an avenue to talk to -- if they need help, to get it.

Q    All right.  I respect that, and I understand that.  I --

A    Well, maybe I'm missing your point.  I'm sorry.

Q    No, no.  I will say to you that I didn't see anything in the Complaint about mental health

**279**

emergencies, and I also interpreted this paragraph 156-B to be dealing with mental health emergencies of people you encounter on the streets, not officers' mental health emergencies.

A    Kenneth Charles.

Q    Am I wrong about -- am I wrong about that?

A    Kenneth Charles.

MR. MARDIAN:

Objection.

THE WITNESS:

I'm sorry.

MR. HEBERT:

Q    Am I wrong about that interpretation that --

A    No, that's -- entirely that's what I was meaning by -- by both sides.  Both for people on the street and us, because most of us don't know how to deal with mentally challenged people.

I mean, that's the way I see it when I see some of these guys out there doing things.  They don't know how to handle the situation.

Q    There's an entry in your medical records from Dr. Rainey about some incident, a shooting that you had been involved in or something, --

**280**

A    Uh-huh (yes).

Q    -- that you felt created you some issues?  Is that the same, the suicide-by-cop situation you were just talking about?

A    It's the same incident, but I wasn't the one that said that.  It was actually my wife had told the doctor that, because she believed that was what my problem was.

Q    All right.  I understand.

A    But if we want to go in the medical records, I'd be more than happy to explain them.

Q    No, that's fine.  I'm just trying to figure out the relationship between 156-B and the allegations --

A    Right.

Q    -- of your Complaint that you're talking --

A    It's meant to be for both sides, to answer your question.  For both law enforcement and the suspects we're dealing with, because if they would have understood like I had mentioned and you see in my statements and all the other information I've brought forth, that I seen a medical lanyard on this guy's chest.

That should have been a clue that there may be something more, may be some type of mental

**281**

health issue. It was later determined yes, he does suffer from mental health issues.

And furthermore, he got the hell beat out of him, for lack of a better term, and he was arrested, but there's nothing to show he was arrested. Everything's gone. No report, no nothing. So why treat somebody like that when you could handle it differently? But, go ahead.

Q   And 156-C asks that the Court require the Eunice Police Department to revise its policies to mandate that officers intervene to prevent the use of excessive force, or rather illegal conduct, by fellow officers, and I think that's self-explanatory, and you just talked about some excessive force incidents earlier today.

Was there anything else about excessive force that you thought would be appropriate to add?

A   As to Section C?

Q   Yes.

A   I believe the whole dern policy needs to go -- going through. That's just my personal opinion. I believe the whole policy needs to be revisited to make sure that the

**282**

constitutionality and the way things are presented, make sure that they're -- it needs to be looked at. But that is the main point, to make sure -- but that what it's stating is to talk about excessive -- make sure you make it mandatory.

Q   All right. 156-D, you report that here in order to institute and implement mandatory policies and procedures to ensure that employees of the Eunice Police Department submit accurate records of daily hours worked.

Is that directed to anything other than that special detail and the favorite employees situation that we just -- we talked about earlier in your Complaint?

A   It's more of a broad statement that to where we can show accountability that an officer actually was at work and he did work. Not just saying I did, and there's no evidence of that.

There needs to be some type of accountability and transparency to show that these officers are actually at work, and not sitting at their home, or one incident that comes to mind, he got paid for it, but he was having lunch with his wife in a whole other

**283**

town. So you get paid to go have lunch with your wife two hours away?

Q   I understand. 156-E, you ask the Court to comply that city fund and appoint a full-time paid investigator to the Eunice Civil Service Board.

Is that because you feel that some -- that the Civil Service Board could have more effectively investigated some of the complaints that you've submitted to them?

A   To be more effective, yes. Because obviously, the complaints were not being investigated, and if they had somebody to investigate them, we might not be here today.

Q   All right. 156-F, you ask the Court to require that the city eliminate all fees charged for the furnishing of copies of public records. You requested pursuant to Louisiana Public Records Act, Revised Statute 44:1, et seq., in the custody of the City of Eunice or the Eunice Police Department.

What does that have to do with the allegations in your lawsuit?

A   Just like when you was asking me questions earlier about what I did on or off duty. Could

**284**

I have obtained some of these records by based off of my rank or my position in the police department? Yes.

But I went through the avenue of paying for the records, by going through a public records request as a private citizen. Just a year's worth of time cards or accounting records would cost me over $1,000, just to prove my point that I've been trying to prove -- or not -- what the -- to prove what I've been talking about.

So I was trying to go a different avenue instead of say, the abuse of my office, which probably would have been the term used, to access these same files. I paid for them out of my own pocket.

That -- and somebody that's trying to prove what's going on, they shouldn't have to come out thousands of dollars just to get public records. That's ridiculous.

I think I -- there's a receipt where they quoted me, I think it was -- I know it was over $1,000 where they quoted me just to look at certain file -- or to obtain copies of certain files, and I couldn't afford that. So they

**285**

said, "Well, you can view the files," so I viewed the files.

Q All right. Are you aware that public records allows the charging of a fee for copies of public records?

A No. I mean, I'm pretty sure there's something, but I mean, I don't know it off the top of my head.

Q All right. 156-G, you ask the Court to require the Chief of Police to disclose to the public on a quarterly basis the number and substantive internal and external complaints of police misconduct that were received, investigated, deemed unsubstantiated, and/or closed by the Eunice Police Department.

That's just -- again, I take it you're seeking transparency on all these issues that you've alleged in your Complaint that you feel is not there now?

A It's pretty good -- pretty good anal- -- yes. That's what I'm trying to get at. I want transparency. Because it wouldn't be compiling -- or even if something has been filed, okay, it was unsubstantiated. Still, there's a record that the complaint was filed. Something

**286**

did take place or didn't take place. There's still some type of transparency to document what's going on instead of throwing it in the trash.

Q All right. Are you familiar with any of the laws related to what's public and not public with regard to internal investigations of officers and officer misconduct?

MR. MARDIAN:
Objection, form.

A Once the case has been concluded, at some point it turns into public record. I don't know the exact moment, but I know -- because any like pay history, disciplinary actions taken against officers, that's all public record.

Now, the actual during the investigation, I'm not -- I wouldn't think it would be public record at the time because it's still ongoing.

MR. HEBERT:

Q All right.

A That would be -- if that answers your question.

Q Yep, fine. So 156-H, you ask the Court to establish a qualified and independent oversight agency to investigate, mediate and/or prosecute complaints of the Eunice Police Department

**287**

misconduct, including but not limited to complaints of excessive use of force, discrimination based on race, gender, religion, national origin, age or disability, incidents involving death or serious injury, witness or evidence tampering, falsifying reports, bribery, sexual misconduct, use of drugs or alcohol while on duty and/or inmate abuse.

I understand what's being requested there, but my specific question to you is, I didn't see any allegations in your Complaint about discrimination based on race, gender, religion, national origin, age or disability.

Is there something -- is there something related to that topic that I've overlooked that we didn't talk about?

A Well, I said earlier, when you have one of your -- when we was talking about a earlier complaint with Kenneth Charles, when you've got officers screaming the N-word while he's beating the hell out of somebody, I consider that a race issue.

Q All right. So that's -- that --

A That's just one incident, and I'm pretty -- if you go through my notes, you will see that I'm

**288**

pretty sure almost everything got covered. I don't know about religion. I will give you that one. I don't know about if anything was done off of religion.

Q So you feel like if we go back and look through your notes, we'll find some incidents that you would consider to be discrimination based on race, gender, national origin, age or disability?

A (Witness nods head.)

Q Yes?

A I would think that would be accurate.

Q All right. What do you envision this independent oversight agency to look like?

A First initial thoughts would be like I've seen at other police departments, or seen at other -- like in other states or something. They have the independent review board to like just say it's -- it's similar to what you see on the Civil Service Board, but it would be before that. It would be a complaint is filed.

You have a civilian, maybe somebody of -- of business stature or something thereof. A competent business person that's trustworthy, a representative of the police department, and

**289**

whoever the third party may be.

I mean, I really didn't give that much thought who the third party would be. I'm just giving you a three person board. Maybe somebody appointed by the council themselves to be on the board.

Q   Okay. Have you --

A   Complaint is filed --

Q   Go ahead.

A   The complaint is filed. It would be in correlation with the attorney -- the internal investigation. They would review the findings, and now instead of you have this one person at the head of it saying, "Oh, I believe this is a violation," now you have three individual people, including a civilian, reviewing this complaint saying, "This should be the punishment," or "This didn't happen," or "This didn't" -- you know, just to review the complaint before something is finalized.

Q   All right. I should have asked you this earlier. We're talking about discrimination, it triggered this question.

Have you filed any EEOC charges as a result of any of the allegations --

**290**

A   What's EEOC? Can you --

Q   Equal Employment Opportunity Commission in charge of discrimination. Claim that you were discriminated against during your employment with Eunice?

A   Me being discriminated based off of -- I wasn't discriminated against race or gender or anything that way. I was discriminated against because I reported -- so no, I didn't file anything with them.

Q   All right. Anything that --

A   No.

Q   156-I, you ask the Court to order that the city deploy Eunice police officers with appropriate and adequate supervision. What -- I'm not clear exactly what's meant by that based on -- you know, compared to the current situation, and how that -- how would you envision that that would be enforced? What would the standard be?

A   I would kind of fall into G and H, but also that they're properly trained before they go out on the street. We have people that didn't even complete FTO. We have people that's failed the academy. They're still on the road.

**291**

They did not go through any proper training. They were just thrown on the road. And actually, your defendant actually flunked out -- I don't know if he flunked or quit out of two academies before he actually passed one. Still hasn't gone through any formal FTO training.

There needs to be some type of supervision to make sure people are trained before they hit the street, to keep other lawsuits from happening.

Q   Who -- and so, would that be -- you envision that would be something the Court would decide what's appropriate and adequate, or who would decide that?

MR. MARDIAN:

Objection, form.

A   I honestly don't know who'd decide that. That's probably above my pay grade. That's just what I envision, and it needs to happen to make sure that we have a adequately trained police force.

MR. HEBERT:

Q   And J says, "Install a qualified monitor to oversee and report to the Court on

**292**

implementation of the policies and procedures included herein, including the periodic and regular reviews and audits of the Eunice Police Department's practices."

Is that -- you envision that's something different from what's in H, the independent oversight agency? Is that a different --

A   It could quite possibly be the same board, or it could be someone else, depending on how -- how it's -- comes together. I mean, again, this is just my thoughts on what I thought would fix the problem.

Q   All right. How did you come up with these ideas? Did you do some research? How did you -- how did you come up with these ideas for this relief?

A   Some of them were all my own ideas, and other ones are going to be actually I -- actually I got help, and it would be a privileged conversation, because it was with my counsel.

Q   Okay, fair enough.

MR. HEBERT:

Can we just take a quick break here? Let me confer with my defense counsel -- co-counsel here.

**293**

(OFF THE RECORD)

MR. HEBERT:

I'm standing, because I'm done asking questions, so I'm going to go sit at the end of the table. So just I'll pass you on to these other lawyers, who will also have some questions for you. Thank you very much.

THE WITNESS:

Yes, sir.

EXAMINATION BY MR. LEDET:

Q Mr. Dunn, my name's Lee Ledet. I represent Chief Randy Fontenot in both cases, Dunn versus City of Eunice, et al, 20-01063, called the Loughlin lawsuit, and then the second lawsuit, which is Dunn v. Randy Fontenot, et al, 21-01535, which we call the ACLU suit, which --

A Okay.

Q -- we talked about today. So I've got a couple of -- I've got a few questions for you, --

A Sure.

Q -- that I'm going to overlap -- and I don't plan on covering the exact same things, so we'll just go ahead and get -- get rolling.

First things first, is Chief Fontenot still

**294**

chief at Eunice PD?

A No. I think if I know the -- believe his term ended at midnight on January 1.

Q Okay. And did --

A Well, in between 31st and the 1st. I believe so.

Q So who's the chief now?

A It would be Chief Kyle LeBouef, the chief-elect.

Q And I'll start first where you left off.

A Okay.

Q You testified with Mr. Hebert about no financial gain from these lawsuits. I mean, you did file two suits, correct?

A Yes, correct. We were talking about this one. I didn't ask for any money in this one.

Q Okay. For the ACLU suit?

A Correct.

Q But you did ask for attorney fees, correct?

MR. MARDIAN:

Objection, form.

A I'm not getting any attorney's fees. I mean, that's not me getting anything. That's what I'm trying to get at is, I'm not getting anything, financial gain, out of this.

**295**

MR. LEDET:

Q So your testimony is that if you're awarded attorney's fees, you wouldn't receive a dime of it?

MR. MARDIAN:

Objection, form.

A No, I wouldn't think so.

MR. LEDET:

Q Okay.

A I mean, that's my interpretation. I'm not an attorney, but far as I know I don't get anything. And that was one of the things that I was very specific about, because it's going to hurt the city worse. I just -- why put the -- no. I didn't want anything, --

Q Okay, so --

A -- except to fix the problem, as I stated earlier.

Q Right. And so, back to the first Dunn suit, the Loughlin suit, you're seeking damages in that case?

A I will explain myself with that one. Well, no, I can but I don't know -- I'd have to talk to Mr. Loughlin. I can't explain why that transpired the way it did, but I --

**296**

THE WITNESS:

It's a conversation between me and you. I don't know if you want me to talk about it or not.

MR. LOUGHLIN:

No.

THE WITNESS:

Okay.

MR. LEDET:

Q I don't want to hear any conversations between you and your attorneys.

A That would answer your question on why I did, but I --

Q Well, do you request damages in the first lawsuit, the Loughlin lawsuit?

A According to the lawsuit, yes.

Q Have you requested attorney fees in the first lawsuit?

MR. MARDIAN:

Objection, form.

A The same answer as the other one. I didn't think I was getting anything for attorney's fees. I thought that was them. I don't know -- understand me getting any financial gain from that.

**297**

MR. LEDET:

Q   But my question -- you didn't answer my question.  Did you request attorney's fees in the first suit?

A   I guess the answer would be yes to that, because that's attorney's fees, I guess.

Q   Thank you.  You weren't provided a copy of the first lawsuit, the Loughlin suit.  So I'm going to hand you a copy of it now.

A   Cool.

THE WITNESS:

You need a copy?

MR. MARDIAN:

Do you have another?

MR. LEDET:

No.  I do -- I do have some annotations on it, but they're not mine.  I just kind of marked through it if you want to look at it.  I mean, --

MR. MARDIAN:

That's fine.

MR. LOUGHLIN:

I'll look -- I'll follow along --

MR. MARDIAN:

Yeah, if you want to give to --

**298**

MR. LEDET:

Also, Mr. Hebert has some in the back.

MR. HEBERT:

Yeah, sure.

MR. LEDET:

Q   Do you need time to review it?  I mean, do you recognize that as the lawsuit that you filed?

A   I'm skimming through.  Give me one second.  (Witness reviews document.)  This appears to be the one that Mr. Loughlin prepared.

Q   Okay.  I'm not going to go through every single allegation.

A   That's fine.

Q   I'm going to -- I'll just ask you -- I'm going to point to you, similar to what Mr. Hebert did, and point you to some paragraphs I'm going to ask you some questions about.

A   I do have one question.

THE WITNESS:

What's this?  I don't recognize -- I'll show you.

MR. LEDET:

And for the record, he's showing his lawyers what, the civil cover sheet?

A   Yeah, I don't -- I don't know what that is.

**299**

MR. LEDET:

Q   So, I'll take that.  I mean, it's --

A   I'm just saying I didn't recognize it.  I don't know what it means.

Q   Sure.

A   That's why I was asking.

MR. LEDET:

For the record, he's handing me the civil cover sheet in the case number 6:20-CV-01063.  And I'll remove it from the document.

A   Oh, okay.  I just didn't know what it was, sir.

MR. LEDET:

Q   It's not important.  In any event, I'm going to go ahead and jump to paragraph 9, if you could follow with me, and the allegations speak for themselves, and -- but, so is your testimony today that you were off duty on July 21, 2019?

A   From my recollection, yes.

Q   Did you go on any call-outs on that day?

A   Call-outs?

MR. MARDIAN:

Objection, form.

A   The only thing I've been called -- no, I don't think -- no, I didn't have a dog at that time,

**300**

so I wouldn't have been out on a canine call-out.  Was I called out by the police department?  No.

MR. LEDET:

Q   Okay.  And on the next page, you can go to paragraph 11 of the Loughlin petition, or Complaint.  It says, "Dunn called the Eunice Police Department and reported the incident, but did not see any police car responding.  No Eunice Police Department officers spoke to Mr. Dunn about this report."

Are you referencing the K.C. -- the first K.C. Hall incident?

MR. MARDIAN:

Objection, form.

MR. LEDET:

Q   Correct?

A   I believe that is referencing the first call that I made, or the second.  I think there was three individual incidences, but only two with gunfire.

Q   So do you know when the report was prepared in connection with the first K.C. Hall incident?

MR. MARDIAN:

Objection, form.

**301**

A    There was no report.  They didn't even come.

MR. LEDET:

Q    So is your testimony that Eunice PD did not respond to the first K.C. Hall incident?

MR. MARDIAN:

Objection, form.  Mischaracterizes the testimony.

A    No one arrived.  I got dressed and went and took care of it myself, since no one would come.  I went back to the office to figure out who was supposed -- who was assigned to come.  You'd have to look at the call log that does the officer's badge number on there.  I then also, I think it was the next day or thereafter, I actually complained to Chief Fontenot.  I was like, "BS that my own department wouldn't even come to my complaint."

MR. LEDET:

Q    Okay.  So you said you -- did you lodge a complaint in connection with the first K.C. incident?

A    Lodge a complaint?  Written, no.  I went to the man himself and explained to him what my problem was and nobody came.  This is the same time that people were not backing me up on

**302**

calls and other things, and now I'm feeling the police department won't even answer a call of service to my own damn house.

Q    Did you call 911?

A    No.  I called the police department.  I had it saved in my phone on speed dial.

Q    Okay.  And you called the chief directly?

A    No.  I spoke to him personally, face to face.  I called the police department and spoke to a dispatcher that night.  And then I actually met him at Northside Veterinary Clinic in the parking lot, explained what was going on.  I asked him to reach out to the people of the K.C. Hall, see who they could talk to about -- I mean, they needed security, or do something about the -- the events going on outside, because I mean, it's -- and that's when he told me he was going to -- I can't -- you'd have to read my notes that I took that day that I wrote down of it.  He had made a comment back to me.  I can't remember exactly the wording made, but I didn't take that he was going to do anything about it.

Q    Yeah, I read your notes.

A    Okay.

**303**

Q    In paragraph 13, you say --

A    13.

Q    And you allege that, "Dunn reported the reckless driving and gunfire that occurred at the K.C. Hall and in front of Dunn's residence to Randy Fontenot."  Is that what you just testified to?

A    Yes.  I did -- that's where I went to -- met him in the parking lot and talked to him.

Q    What did you expect him to do?

A    To get with his guys to make sure they answer calls for service.  Even though I work there, I'm still a citizen.  You know, I pay taxes, too.  They should come to -- when we call for help, they should come.

Q    Okay.  Paragraph 14, it said, "In response, Fontenot" --

A    There's the response.  I'm sorry.

Q    "In response, Fontenot laughed and said, 'I guess you did not catch them?'"

A    That was the response I was trying to recall, but it's right here.

Q    Okay.  So did you believe that the chief wanted you to catch them?

A    Well, I mean --

**304**

MR. MARDIAN:

Objection, form.

A    I believe his comment was just dismissing me complaining.

MR. LEDET:

Q    Okay.

A    If that answers your question.

Q    Well, I'll ask you about your beliefs.  So did you have the authority to apprehend any of the people that night?

A    If I could have -- if I could have got dressed faster, yes.

Q    Would you have had the authority to arrest any of the offenders at the K.C. Hall that night, on the first K.C. incident?

MR. MARDIAN:

Objection.  Calls for a legal conclusion.

A    I believe so, yes.

MR. LEDET:

Q    On July 21, 2019, did you have the authority to go to the K.C. Hall and arrest someone of a crime if you saw the crime take place?

MR. MARDIAN:

Same objection.

**305**

A    Can you repeat the question, make sure I understood it?

MR. LEDET:

Q    Okay. You said -- you mentioned -- you testified earlier that, "Hey, if I could have gotten dressed fast enough," you could have done something.

A    If I could have caught them, I would.

Q    And you would have had the authority to catch them?

A    Yes.

MR. MARDIAN:

Objection. Calls for --

A    And it goes back into the earlier conversation with -- I'm sorry, I forgot his name, the other attorney. We were talking about when you're on or off duty. I still have a duty to act in certain situations.

If somebody's got a felony warrant and I see them, if I have the tools and the means to do it, I'm supposed to arrest them. As I just -- in my earlier testimony I said if I got dressed fast enough.

I still have to have the tools to be able to go do it. I still need my handcuffs. I

**306**

still need my gun. I still need all my stuff. So I was getting dressed to go handle it.

MR. LEDET:

Q    And did you send up going out there and handling it on July 21, 2019?

A    By the time I was able to get out the door and get there, and I realized that no police are coming, I went over there to speak with the per- -- there was only, I think two people there left, and I think they were the ones that rented it out, and I was trying to figure out who all was involved and everything, but they didn't cooperate from the best of my recollection.

Q    Okay.

A    And then from there, I drove to the police department to discover who was actually supposed to come to my complaint, and then I went home.

Q    What vehicle did you use to drive to the police department?

A    My police unit. I logged myself on duty at that time. Because I'm not -- once I get in that police unit, I'm going to tell them I'm in my police unit.

**307**

Q    So on July 21, 2019?

A    If that was the day of the incident, then yes.

Q    Yeah. And for reference, I'm talking about the first K.C. incident.

A    Correct.

Q    Okay. Were you in your uniform when you drove to the police station?

A    I believe I was in my Class B's. Consists of kind of like a nice polo shirt, and I think I had my green tac pants on, I think. I know I had -- and I had my gun and my handcuffs with me, my radio.

Q    Did you have your badge on your person?

A    Yes. Badge on my uniform already. It's embroidered.

Q    Oh, I understand.

A    Okay. Class A's, they have lapels and medal. Badges, lapels, name insignia. Class -- my Class B uniforms have, it's embroidered everything, so it was nothing I had to attach to my uniform. It has police on the back in reflective.

Q    Okay, thank you. And my understanding, based on the allegations, that Chief referred you to a person by the name of Cal at the K.C. Hall?

**308**

A    I believe it was Cal. I believe that was the name. I think he runs Bayou State Homes, I believe, if I remember saying this correct. I think he runs or owns Bayou State Homes. That was the person I was in contact with. Him and his wife are the ones, I believe, that rent out the K.C. Hall.

Q    What day did you contact Mr. Cal?

A    I just know I did. It was thereafter the conversation with Chief, I believe. And asked them if there was anything they could do about supplying security, doing a screening, or doing something about the situations.

Q    Who did you call? Did you call Cal while you were on duty?

A    I don't remember, because I mean, that's -- it's a couple of years ago. I don't recall.

Q    Did you introduce yourself to Cal as a Eunice PD officer.

A    Well, I told him where I work, yes.

Q    Did you call Cal on behalf of the Eunice Police Department?

A    No. I called him and told him what took place, and I also talked to the city attorney as well, because he runs it as well, or has some type of

**309**

form of running it as well. Stan Feucht.

Q   And you made a request from Mr. Cal, did you not?

A   A request?

Q   Yeah. According to -- it says in paragraph 16, if you follow me, you spoke to Cal making complaint about the events and asking him to have police security at the K.C. Hall on events to help curtail criminal acts.

A   That was what -- not to that specific specification, but I've already to you -- that was what I told you earlier, sir, that I asked him to change the policy where it provides security.

Q   And what was Cal's response?

A   He said he would look into the matter about updating the form when people are coming to rent it. I know he told me that much.

Q   And backing up a bit, you mentioned that you -- following the first K.C. incident in July, you went to the police department? Remember that?

A   After I left the K.C. Hall, yes.

Q   Okay. And then -- and you had testified that you had asked somebody why they didn't respond to your complaint, or something like that?

**310**

A   No. I went and pulled the radio log, which is typed, to see who actually was supposed to come.

Q   Who was supposed to come?

A   You'd have to reflect the log. The one that I turned in is highlighted, and my -- either -- I think it was Tony Kennedy, I think. You'd have to review the log. It is highlighted, the time I called.

Q   Okay. Yeah, I have a copy of it.

A   Cool.

Q   So -- and again, I mean, you know this was going -- it was actually a second K.C. Hall event, was there not?

A   I believe there was a total of three, but only two with shots fired.

Q   So we'll move on to the second episode, second incident, paragraph 17 of this Complaint. The allegation is that on August 24, 2019 Dunn received a call from another officer who told Dunn of a tip that there would be a shooting at the K.C. Hall that night, and there's additional language in the paragraph, but you see where I'm talking about?

A   One second. (Witness reviews document.)

**311**

Q   So who gave you that tip?

A   Give me one second to finish reading it. I want to make sure I answer your question --

Q   Sure.

A   -- in totality. Okay. I'm ready. What was your question?

Q   So who gave you the tip referenced in paragraph 17?

A   I'm believing it was two shifts, because the information was obtained during the day shift, if I remember correctly. Then you had the night shift come in. I know I had spoke with either Lieutenant or Sergeant Brickley.

        I know I had spoken to him, and there was someone else I had spoken to that was telling me -- because they actually found Facebook posts about some of this incident, and I actually believe one of the -- one of the videos talked about "It was going down in E town. Come meet me over here."

        You'd have to listen to the recording, but it was talking about a shooting that would occur at the K.C. Hall.

Q   Okay. And the people that you spoke to were Brickley and others, were Eunice Police

**312**

Department employees?

A   Correct.

Q   Do you know if these officers gave any of your neighbors any of these tips?

A   No. They -- I'm pretty sure I'll get a little bit farther into you question and that can be explained, but no, they didn't talk to my neighbors or anybody.

Q   And based on the information you received, the on-duty supervisor was aware of the information?

A   Yep. And they also responded prior to that night and realized that they were charging door fees and other things, which they -- they should have shut down the party, and plus, there was no security.

        And all the people out in the middle of the street, but they just the contin- -- they told them to take the sign down and continue with their festivities.

Q   So I asked you about on-duty supervisor and you said yes, correct? About the -- where that information --

A   Yes, he was aware.

Q   Then you expanded on that. Where did you

**313**

receive the information you were just testifying about?

A   That came from Lieutenant or Sergeant Brickley. I'll just say Brickley. Brickley, because he's the one that responded to it.

Q   Did you have any first-hand knowledge of these activities that the responding officer did?

A   Just off the Facebook post, the videos that were shared with the rappers that were coming, and actually there was a video posted inside of a twerking party going on. I remember that. You're talking about if I knew about the -- talking about the cover fee? Is that what you're asking me?

Q   Yeah. The information that you became aware of.

A   Well, the information about the cover fees and all that came -- it was actually, I believe, posted on social media and Brickley had confirmed that was actually what was going on, they was charging a door fee to come in, go inside.

Q   Brickley told you that?

A   When we talked on the phone. I expressed to him, because I had actually called him earlier

**314**

in the night talking about -- when I passed, I was -- I went to some fast food restaurant, go get food, and when I was coming back by I seen known gang members of GFL, always involved in the shootings, and we've been dealing with them, I believe since 2016, some of the juveniles.

And then you could see the -- the hand-to-hand transactions, so it was a -- believe it to be a tan Buick constantly making the block. You see him pull up. You see the runs -- the kids running and reach their hand inside the window and they'd take off. I reported all that activity.

Q   Okay. And I'll jump ahead to paragraph 19, and it says -- the pertinent part is, "Dunn saw the cars of known drug dealers," which you just touched on?

A   Correct.

Q   Okay, so -- now, how did you know they were known drug dealers?

A   Some of them I've arrested. Some of them we had investigations with in the past.

Q   That's from working as a Eunice Police Department officer?

**315**

A   Yes.

Q   I'm going to go back to paragraph 18. And it says, "Later that night," and you're referencing August 21, 2019?

A   Later that night, yeah, we're talking about the same incident, yes.

Q   So it says, "Dunn saw several cars speeding to and from the K.C. Hall, running stop signs and playing extremely loud music." I'll stop there.

Did you go on duty at any point during August 24, 2019?

A   No. I actually had a couple of people that I've worked with in the past, I asked them to monitor the area.

Q   And so, it says, "Dunn called on duty officers to monitor the area." Is that what you're referring to? Who'd you call?

A   I called -- I believe he was a sergeant at the time, Cody Miller. I asked him if he could just please, you know, at least be visible to maybe that some of the stuff would be curtailed.

Q   Did he make himself visible?

A   Yes.

**316**

Q   I would like to refer you to what I'll mark as -- we talked about this before. I'll mark it as "Exhibit C-1," Chief 1, to make it different from -- for the record, --

(EXHIBIT C-1 ATTACHED)

MR. LOUGHLIN:
To make it confusing. You don't want to be -- is that a 13?

MR. LEDET:
I'm going to miss 13. I'll never hit 13.

MR. LEDET:

Q   Could you take a look at that for me, please.

MR. MARDIAN:
Just to clarify, there one for the three of us.

MR. LEDET:
No. There's a copy for you as well.

MR. MARDIAN:
Okay, thank you.

A   (Witness reviews document.)

MR. LEDET:

Q   And let me know when you've had a time to review it.

MR. LEDET:

**317**

And for the record, this is -- I'm sorry.  This is Dunn -- let me make sure I've got the record, because --

MR. MARDIAN:

It looks like it's 204, in the bottom right.

MR. LEDET:

I think it's -- but I think it's City of Eunice 204.  Yeah, City of Eunice 204.  I've got it written down.

MR. MARDIAN:

Oh, we're -- it's like stamped twice or something.

MR. LEDET:

Yeah.  Because I know I don't have copies for all you guys.

A  I was just going to tell you I reviewed it.  I'm sorry.

MR. LEDET:

Q  So you reviewed it?  So do you recognize this document?

A  I recognize it to be a -- the cover sheet of our radio logs and personnel on duty.

Q  And what's the date on Exhibit C-1?

A  It says the 24th through the 25th, 5:00 P to

**318**

5:00 A.

Q  All right.  Would that cover the time period in question for the K.C. Hall incident, number 2?

A  I believe so.  Yes, sir.

Q  And the shift hours noted?

A  Shift hours noted.  Where --

Q  On Exhibit C-1, top left?

A  Okay.  Shift hours, top left.  Talking about personnel on duty?

Q  Yeah, on top.  Way at the top, the shift hours.

A  Shift hours, 5:00 P to 5:00 A.

Q  All right.  So that would cover from 5:00 p.m. on the 24th through 5:00 a.m. on the 25th?

A  That would be correct, sir.  This would be the night shift.

Q  Do you recognize who the log was approved by?

A  Lieutenant Robert Brickley, 364.

Q  Was he the supervisor on duty?

A  Yes, sir.

Q  And referring again to Exhibit C-1, there's a list of personnel on duty.  Do you see your name there?

A  I sure do.

Q  Were you on duty on that night at any point?

A  I went on duty whenever Cody Miller called for

**319**

emergency assistance.

Q  Okay.  And I'll --

A  Because I -- he was there by himself, so I went -- I was going to assist.  I believe it was 60 to 80 people out in the middle of the street.  People running everywhere, so I went to back him up.

Q  On behalf of the police department?

A  That, and the officer's safety, yeah.

Q  In your uniform?

A  I knew I had my ballistics on, which had the police badge on the back.  I had -- because the shots, I slipped on my -- my ballistic armor, which does have police written on it.

Q  And then it has -- did you have your service weapon with you?

A  They're all my own personal weapons, but I had an AR-15 and my pistol.

Q  So you brought a AR-15 out there?

A  You never know what you're going to walk into, sir.

Q  So, I'm sorry.  I don't mean to trip you up.  Is that a yes or a no?

A  Yes, sir.

Q  What caliber is the AR?

**320**

A  5.56.

Q  And is that your personal weapon?

A  When I first started, we had to purchase our own weapons.  So yes, they are my own personal weapons, approved through POST to use.  I did qualify with them at that -- maybe I'm getting ahead of myself, but --

Q  No, understood.  So you possess an AR-15, correct?

A  Yes.

Q  That you use in the course and scope of your employment with the police department?

A  That is correct.

Q  And you're authorized to use it?

A  Correct.

Q  Okay.  The remarks at the bottom says that -- it says, "Lieutenant Michael Dunn, two hours call out."  And what does that depict?

A  That means that I went in service, because I let them know that I was in service assisting Officer Miller.

Q  And so, how long were you in service that night?

A  According to this, two hours.

Q  You were being paid for that service?

**321**

A    I'd have to reflect my time card.  I'm pretty sure I did, but I've have to reflect my time card to give you an accurate answer.

Q    Understood.

A    Sometimes if it take a few minutes to do something, like I had to go correct a report, or they had a question or something, or they wanted me to review something, if it took me five, ten minutes, I didn't log it.
     I mean, sometimes I didn't log my time.  Now, you'll see that I was at work, but I didn't put it on my time card if it was a few minutes.

Q    I understand.  So who was the first person you called on the night of August 24, 2019 about the K.C. incident?

A    The second one?

Q    Yes.

A    Okay.  First person I called, we heard the shots fired, me and my -- you know, we're in the house.  I hear the shots fired.  I'm running to the door.  I'm on the -- I'm calling dispatch and she's advising me Cody yelled "Shots fired," and needs backup, so at that point in time, full disclosure, since we had

**322**

information that there was possibly going to be a shooting, my gear was by the door, just in case.  And I hurried up and slipped it on and ran out the door.

Q    Do you remember the time of the call?

A    No, sir.  You'd have to reflect the call log.  Because it wasn't a call.  It was a radio transmission.  Cody had screamed it over the radio.

Q    Got you.

A    There was no phone call to the best of my -- until me calling, "Hey, what the hell?" and she said, "Cody's asking for help."  I said -- and I hung up and out the door I went.

Q    So Cody made the call for shots fired?

A    Over the radio, yes.

Q    And I'll direct your attention to what I'll mark as --

A    And to further expand on that, because I was accused of lying, that I -- you know, I reported false information.  I didn't report anything that night.
     I called to inquire what -- you know, "What's going on?  I heard shots fired.  I see Cody running down the street.  What the hell's

**323**

going on?  Cody needs emergency backup."  I don't know if I took my phone with me or threw it on the couch, but I ran out the door.
     That's -- I'm just letting you know, I was placed under investigation for that, and nobody followed up to get statements from Cody that he's the one that actually called, not me.

Q    Okay.  I'll direct your attention to what I'll mark as "Exhibit C-2."
     (EXHIBIT C-2 ATTACHED)

A    Do you want me to give any of this to the lady?

Q    You can keep them in front of you.  Yeah, you can -- I would -- yeah, for C-1 you could -- you could -- I would give it --

A    C-1, okay.

Q    I would give it to the court reporter here.  A version of this has been introduced, but just to kind of make my record clear, I'm showing you what has been marked as Exhibit C-2, and it's Bates labeled Dunn 165.  So we got this from you via discovery.

A    Okay.

Q    Do you recognize this as the Facebook post that you made on the evening of August 24, 2019?

A    Yes, sir.  This is not the original post.  But

**324**

again, like -- I'm just clarifying for the record, this is the updated post.  It's not a copy of -- because there was a picture floating around, or during the IA investigation of the original post without the updates.  So there is another photo.  I'm just letting you know.

Q    I understand.  And I think you testified that you made an original post, --

A    Correct.

Q    -- then there was an update?

A    Correct.

Q    This Exhibit C-2 contains the original and the update?

A    Correct.

Q    Are there any additional posts that you made on August 24, 2019?

A    Best of my knowledge, I might have shared on TikTok or something, but other than that, no.

Q    Certain of that?

A    About this.

Q    Yeah.  And I'll clarify.  Nothing additional in connection with this K.C. event?

A    To the best of my recollection, no, at the time.

Q    That's all I'm going to ask you about that one.

**325**

A    Okay.  Can I give it to --

Q    But -- let me make sure.  And again, you indicated that you responded to -- you eventually responded to the call, correct?

A    To the second incident?  Yes.

Q    Paragraph 20, you talk about the Facebook post?

A    20.

Q    And it contains your allegations about the Facebook post that I just showed you in C-2?

A    Can you give me just one second to read it, before I answer.

Q    Sure.

A    (Witness reviews document.)  Okay.

Q    So, again in your own words, your testimony today, what was the purpose of the Facebook post?

A    Purpose of the Facebook post was to notif- -- I mean, we had the community watch page, and where -- I don't forgot what year that that came up with.  I believe it was -- his last name's Andrus.

COURT REPORTER:
His last name?

THE WITNESS:
Alex Andrus.  I'm sorry.

**326**

COURT REPORTER:
Anders?

THE WITNESS:
Alex Andrus.

A    Alex Andrus created this community watch page where you post the community and the surrounding area with posts, any type of suspicious activity, or criminal activity, to notify other people in the community if they see certain things or if they're aware of what's going on to contact their local law enforcement agency.  Maybe I got off topic, but I think I answered your question.

MR. LEDET:

Q    Okay.  Yeah, because I had asked you about what was the purpose of --

A    That was the purpose.  And that's -- so I just explained why it was on the community watch page itself.

Q    Understood.  Now again, you testified that you had responded to the incident --

A    The second incident?

Q    I'll call it the second K.C. incident.

A    Yeah, where I can keep track.

Q    The second incident, --

**327**

A    Yes, sir.

Q    -- on behalf of the police department.

A    To my -- and I'm not trying to be sarcastic.  I'm just -- I'm regurgitating what my testimony was.  I responded on behalf of officer safety and the police department, and Officer Cody Miller, yes.  That is the full statement.

Q    With your badge and uniform?

A    I don't know if I had my badge on the second incident.  I know I had my ballistics on with police on the back.  I don't have an embroidered badge on the ballistics.

Q    Sure.  And the AR-15?

A    Correct.

Q    So did the -- my next question is -- well, did the Eunice Police Department investigate the second K.C. incident?

A    No.  Not in my opinion.

Q    Okay.  Why is that your opinion?

A    All right.  I think this is going to be a lengthy conversation.  Lieutenant Jeremy (inaudible) later informed me that Brickley was bragging after the Facebook post was had, that he was going to be able to get my bars, because Randy was going to demote me.  Randy Fontenot.

**328**

I'm sorry I didn't use his full name.  They did no investigation.  All they did was run people out the street, and then claimed, "Oh, it didn't happen.  It was a window break."  You have all my neighbors writing statements, which they refused, and I even asked him to go to my neighbors.  Get what they seen.  Get what they heard.

There was actually witnesses outside when the shots fired, which was two houses down from me, refused to go get statements.  I went and provided them statements, gave it to them, and asked them to please fill it out when the police -- when the officer -- well, when Brickley refused to go back and speak to the witnesses.

Because there was actually having a bridal shower two houses down from my house.  And then when the victim -- or, well, that's the wrong characterization.  The witnesses and other people involved that wrote statements to what they seen contacted the police department, the police department -- I forgot who they said it was they talked to, refused to accept the statements.

329

By this time, I'm already under investigation. And they sent it by certified letter to make sure that they got those statements, which those statements still didn't show up in any of my investigation. I have copies of them though. So that's why I say that they did not do a proper investigation, because they didn't even look into the matter.

Q    So you said when you responded to the second K.C. incident, you were -- responded in part to protect another officer, correct?

A    Correct.

Q    Well, did you believe you were protecting the public as well?

A    Of course. Well, I'm sorry, that came out sarcastic. I believe -- yes. It is my job to protect not only just the officers, but the citizens as well.

Q    And you can be sarcastic --

A    I wasn't trying to be. It might came off wrong.

Q    I've got questions to ask, so it doesn't hurt my feelings.

A    Okay.

Q    Did the Eunice Police Department prepare a

330

report in connection with the second police -- the second K.C. incident?

A    They did, and according to the information I received, it was per order of the Chief of Police.

Q    So Chief Fontenot ordered that a report be made?

A    Yes.

Q    I've only got two of this one, so if you want to look at this. This I'll mark as "Exhibit C-3."

                (EXHIBIT C-3 ATTACHED)

A    (Witness reviews document.)

Q    And it is Dunn, so this is from your production, 810.

A    I wish they would use space and make it easier to read.

Q    And just to warn you, I don't plan on getting into the weeds of it. I'm just --

A    Oh, I was just reviewing it. I'm almost finished it. I got to figure -- oh, God. A few minutes to read the -- okay, go ahead. I'll just review it if you're going to question.

Q    Generally speaking, do you recognize Exhibit C-

331

3 as a Eunice Police Department offense report?

A    It is.

Q    And do you recall producing this with your discovery responses?

A    Yes, sir.

Q    So, how did you obtain a copy of this document?

A    Logging into -- I think it's called Quick PD, and printing it.

Q    Do you know when you retrieved it?

A    After it was completed. It wasn't completed. You'd have -- it might be on it. Give me one second. It wasn't completed the day of the incident. It was actually completed some time later. Give me one second.

      It shows the initial was created at 8:30. So we're at six days later, and he did it as a supplemental six days later. So it wasn't the same day, but it is a general report.

Q    But do you recall retrieving this, the date?

A    Yes.

Q    And do you recall the date you retrieved it?

A    After it was completed. Something shortly thereafter.

Q    All right. Are you --

A    Because they had already publicly called me a

332

liar. So I already knew that I was going to have to defend myself, so I was collecting information for my defense.

Q    So you were authorized to retrieve -- retrieve this document?

A    I'm a lieutenant. I can pretty much access anything.

Q    At any time?

A    Generally, the only time I access information is when I'm on duty.

Q    All right. Question about C-3. Well, what's the date of the offense listed?

A    The date of the offense listed says the 25th.

Q    And the time of the offense?

A    Time of the offense it says at 0026.

Q    So that's 26 minutes after midnight?

A    Correct.

Q    All right. And the location of the offense?

A    Didn't notice that, but it says 300 South 2nd Street. That is not correct.

Q    It's not?

A    No.

Q    Is that not the K.C. Hall?

A    No. K.C. Hall is going to be in the 400 block of North 2nd Street, because I live at 411. So

**333**

I'm pretty sure it's going to be either 400 or 401.

Q   All right.  Does this reference events in the second K.C. Hall incident?

A   Not accurately.

Q   Okay.  But does it -- that wasn't my question.  Does it reference the events of August --

A   It talks about it, yes.

Q   All right.  Can you -- is this report prepared in connection with the second K.C. Hall incident?

A   That would be correct.

Q   Going almost halfway down the page, officers involved in the call, and you're listed as one of the officers involved?

A   Correct.

Q   All right.  So that corroborates your testimony that you responded to the scene?

A   Correct.

MR. MARDIAN:
      Objection, form.

MR. LEDET:

Q   All right.

A   Because I actually already told you that in the actual -- the sheet.  Yeah, I -- yeah, I

**334**

already explained myself on that one, or it did come out.

Q   Okay.  And it says badge number 350?

A   That is my badge number.

Q   All right.  Is that also your call time?

A   Either 350, 5-0, or 50.  I mean -- yeah.  Are you talking about when somebody's call me on the radio, or talking about just for report writing preferences?  I want to make sure.

Q   Both.

A   On the radio, if people call, that was a -- that would be calling me by a different number on there.  Usually either 350, 50, 5-0.  For official documents it shows 350.

Q   Did you have any input into this report?

A   No.

Q   All right.  But you were, again, at the scene?

A   Yes.

Q   All right.  I'll show you what I'll mark as "Exhibit C-4."

(EXHIBIT C-4 ATTACHED)

A   Pass?

Q   Sure.  I doubt I'll come back to it.

A   Okay.

Q   This is Bates labeled City of Eunice 205.

**335**

MR. LEDET:
      And a copy for you guys.

MR. LEDET:

Q   Do you recognize this document?

A   Yes, sir.  This would be the sheets preceding the other sheet.  You already showed me the other exhibit.  I think 3, 2.

Q   And do you recognize this as a call log?

A   This is a call log.  Yes, sir.

Q   And you referenced me the call log, correct?

A   Yes, sir.

Q   All right.  So looking at this call log, and the date of the call log?

A   It shows the 24th.

Q   All right.  So if you turn to page 2, --

A   I do -- I have to correct that.  On the first page it says 24th, going into the 25th.

Q   Thank you.

A   Okay.

Q   Because I'm going to ask you about page 2 on the 25th.

A   Oh, okay.

Q   The first entry --

A   And there is an actual error on the back page.

Q   What, an error?

**336**

A   An error.  A clerical error.  They put the 24th instead of the 25th.

Q   A clerical error?

A   Uh-huh (yes).

Q   Does that happen from time to time?

A   Yeah.  I mean, we try to catch as many mistakes as we can.  I mean, because we proof read reports, call logs, arrest reports, jail -- jail paperwork.

Q   Have you made any clerical errors?

A   Yes, sir.

Q   Okay.  So going to page 2, I'm looking at the first entry.  "0026," the time, "unit 392, K.C. Hall, shots fired."  So my question is, what's a civilian time for 0026?

A   That would be 12:26.

Q   So which officer is 392?

A   That would be Cody Miller.

Q   Okay.  And so, what did Cody Miller do -- what does this reflect that he did on that date?

A   That means some type of way the dispatcher, and who I later found out was over the radio, stated he called for shots fired, and she logged it.

Q   All right.  And going down at 0032, it says,

**337**

"Unit 350, 10-8 assisting units."  Is 350 you?

A   That is me.

Q   All right.  So did you respond at 0032?

A   There or about, because -- and we've actually had this problem before, talking about clerical errors.  We have two computers set up in dispatch.

One computer has one time.  One computer has a different time.  Then we have a clock on the wall has a different time.  I would say I was -- within minutes I was already out the oor.  Of course, I'm putting on my gear.  So if that's totally accurate, I couldn't say.

Q   All right.

A   I just know it was close.

Q   Sure.  To the best of your recollection?

A   Best of my recollection.

Q   And what does 10-8 mean?

A   10-8 means I'm in service.  When I was on the phone -- well, maybe I'm getting ahead of myself, but while I was on the phone I told her, "I'm going."  That means I'm -- I'm in service.

Q   All right.  So who did you tell that to?

A   Whoever the dispatcher was.  Should be on the

**338**

sheet.

Q   Okay.  But prior to the 10-8, you were not on duty?

A   No.  I was trying to sleep.

Q   So at 0:32, you went on duty?

A   Yes.

Q   All right.  On August 25 --

A   According to this, yes.

Q   Well, do you -- do you have a personal recollection of going out at that time?

A   Not at the -- maybe I'm just being too technical.  Not at the exact time.  That's why I referred to we have different times.  My phone might have a different time.  It's going to be close.  That's what I was getting to.  You're talking approximately about that time.

Q   Okay, I got you.

A   Maybe I'm getting too technical.

Q   No, we can get technical.  So according to police dispatch records at 0:32, 350, Michael Dunn, went 10-8 to assist units?

A   That's correct.

Q   And there's some additional entries that reflect 350, which is Michael Dunn.

A   (Witness reviews document.)

**339**

Q   At 0:43, --

A   That's --

Q   -- it says "350, 421 North 2nd, caller advised subject trying to break in the Flower House."

A   That is not an actual reflection of what had taken place.  They -- since I was already on the scene, my neighbor actually witnessed whatever she witnessed, and they assigned that to me, since I was already on scene.

They called me and said, "Hey, this is what's going on."  That's not me reporting it.  That's just my badge number assigned to that -- that part.

Q   Okay.  So someone assigned that to you?

A   Correct.  The dispatcher had to, because she's the one that prepares this.

Q   So did you respond to that call?

A   Yeah.  It was just right there.  We're talking about maybe 150 yards between the K.C. Hall and maybe a little bit farther between that and the Flower House.  We're talking about one block.  Let's just refer to one block.

Q   Understood.  So in looking at C-4, what was the result of that call?  The Flower House call?

A   From what I remember when I got to the Flower

**340**

House, there was a car parked to the side.  A female -- it was a couple of black females that were there.

From what I recollect, I know one was ducked down.  She said she thought maybe her car had been hit or something in the gunfire.  We didn't see any damage to the Flower House.  We didn't see -- I don't recollect any damage to the lady's car.

Well, the young lady.  She was very young.  I don't know if she was 18 or not, but once we seen that she wasn't injured, wasn't nothing with the car, we let her go and we started dealing with the crowd again.

And if I remember correctly, I think it was -- it's my next door neighbor's the one that called in the complaint.

Q   So did you leave the K.C. Hall to respond to the Flower House call?

A   I never made it inside the building at K.C. Hall, because we had people everywhere.  People running, screaming.  So no, I never made it actually inside of the building.  I was always in the street trying to clear the street and help whatever else is going on.

**341**

Q   So did you leave the parking lot area of the K.C. Hall to respond to the Flower House call?

A   I was in the middle of the street.  There is no -- there is no official parking for the building itself.  They have parking at Picou's across the street.  You can park along the side of the roadway, which that's where a lot of vehicles were.

     And they also used the church, which is a block away.  They use that area for parking as well.  So I was in the street pretty much the entire time.

Q   All right.  Looking down on -- down the page on C-4, it says, "2:28, 350 10-7."

A   Okay.

Q   What does that mean?

A   It means I am no longer in service.

Q   Did you take yourself out of service?

A   (Witness nods head.)

     COURT REPORTER:

          Yes?

MR. LEDET:

Q   Is that --

A   Yes.  I'm sorry.  I apologize.

Q   Thank you.

**342**

A   But yes, I did.  I have to catch myself.

Q   All right.

A   Yes.  I logged myself out of duty.  I didn't have anybody to report to, because I mean, you had one lieutenant on duty.  According to this, he was a lieutenant at the time, and plus I'm being a lieutenant.

Q   So in conjunction with C-4, while present in the vicinity of the K.C. Hall, did you investigate anybody there?

A   My main concern at that time was to make sure there's nobody injured.  We cleared the street, because like again, there was -- felt like 60 to 80 plus people everywhere.  People running, people screaming.

     So, I mean, my main thing was safety at that point.  I wasn't worried about looking for a bullet hole in a wall.  I'm trying to make sure nobody's injured and nothing else is going on.

Q   Did you observe anybody injured?

A   Not to my knowledge.  I did not.  I don't know if anybody -- anybody else found anything, which I don't think so.

Q   Did you take any statements from anyone that

**343**

was present on that night?

A   No.

Q   Did you make any arrests?

A   No.  And to add to that, after the case agent, which was Lieutenant Brickley, had generated a report, I asked him my neighbors, they wanted to write statements to what they witnessed and seen, and just -- I'm guessing, whatever they witnessed, and he refused to go.  So that's when I collected statements swearing to their testimony.

Q   And did you submit your own statement to Brickley?

A   I tried.  He didn't want to hear it.

Q   Well, what kind of statement was it?

A   I didn't write it.  He just didn't want to hear what I had to say.

Q   Well, did you prepare a witness -- written statement?

A   I didn't.  The only thing I would have done is, I would have went back in his own report.  When we -- if a officer generates a report, I log in under my credentials and badge number.  I go into his narrative, and it will be called a supplemental narrative, and I could have added

**344**

it there.

Q   Did you log in and submit a supplemental narrative?

A   No, sir.

Q   Why not?

A   Because I was already being accused of lying, so I just didn't push the issue.

Q   But you had the ability to submit a supplemental narrative?

A   I could have.

Q   Okay.  I'll show you now what's "Exhibit" -- I'll mark --

A   That's --

Q   Yes.

A   I just want to make sure before I get rid of something.

Q   No, it's all good.  "C-5."  And I don't have a lot to ask, but this is Bates labeled Dunn 169.  And I'll just, you know, say generally that it's the Eunice Police Department Facebook post.  And looking at paragraph 22 of your Complaint, --

     (EXHIBIT C-5 ATTACHED)

A   I do have something to add when you get finished.  I'm sorry.

**345**

Q    Okay.  Looking at paragraph 22 of your Complaint, is this the Facebook post that you're referencing?

A    Let me look at it a second, please.  (Witness reviews document.)  Yes.  That's -- I'm admitting that I've read the cause.  Now, what was your question?

Q    So is this the Facebook -- the Chief Fontenot Facebook post that you're referencing in paragraph 22 of your Complaint?

A    Correct.

Q    That's all I have on that.

A    I just have to expand on that, because this Facebook post was made before the police report was ever generated of Lieutenant Brickley. Just FYI.

Q    Okay, thanks.

A    Though I don't see how a proper investigation was done if the report wasn't even completed yet, and you're already saying that I lied and there was no evidence.  So I just wanted to add that part.

Q    Yeah.  I'm not sure what that -- that's coming from.  My question was --

A    If I -- I said I was expanding --

**346**

Q    -- about the Facebook post.

A    -- upon my answer.  That was it.  It wasn't the question you asked me.

Q    All right.  And then, also in paragraph -- well, we'll look at that Exhibit C-5.  Is there any reference -- I'm sorry, did you give it back already?

A    Yes, I -- yeah.  C-5, cool.

Q    It's the chief's Facebook post.  Are you mentioned specifically by name in that post at all, in C-5?

A    Let me read it real quick.  (Witness reviews document.)  I do not see my name listed.

Q    Okay, thanks.  Moving on.  I'll mark as "Exhibit C-6," it's Dunn 729.  I'll try not to cover the Bates label.  And take a look at this.
        Do you recognize this document?
            (EXHIBIT C-6 ATTACHED)

A    (Witness reviews document.)  I recognize it is a personal action form.

Q    And who's it issued to?

A    I don't know who it's issued to.  I see my name on there.

Q    Well, did you take this picture?

**347**

A    Somehow I obtained this.  It might have been in my box.  I know usually after they approve these through the Civil Service Board they usually put a copy in our box.

Q    And what's the employee's name listed?

A    Mine.

Q    And is that your correct date of birth?

A    Mine.  Yes, sir.

Q    And what's listed as -- on number 4, the effective date of action?

A    8/27/19.

Q    So were you placed on administrative leave with pay on August 27, 2019?

A    According to this form, that seems to be correct.

Q    All right.  Do you dispute the accuracy of the form?

A    It's been a -- it's been a minute.  You'd have to go back and review what day I was actually called in his office and placed on administrative leave.

Q    Okay.

        MR. LOUGHLIN:

            May I see the exhibit?

        MR. LEDET:

**348**

        Here you go.

A    I did articulate what date I was called into the office, and I was actually placed on administrative leave.  I'm not sure if that's the actual day or not, but I have reference in my notes.

MR. LEDET:

Q    But you do -- you do testify -- acknowledge that you received a copy of this?

A    Correct.

Q    And this is generated by the Municipal Fire and Civil Service Board?

A    It is filled out by, I believe, Ms. Sherry, or the chief himself.  It has been submitted to the Civil Service Board who then rules on it, and then places it into our files.

Q    Do you recognize the signature of the appointing authority who executed this document, C-6?

A    The appointing authority?  That's Chief Fontenot's signature.

Q    Okay.  Looking at paragraph 4 of your -- 24 of your Complaint.  I'm sorry.  The allegation is that "On September 6, 2019, Fontenot," meaning Chief Fontenot, "notified Dunn, permanent civil

**349**

service employee, that Fontenot was investigating Dunn over Dunn's August 24, 25, 2019 Facebook post about the K.C. Hall." See that?

A   Yes, sir.  I see it.  I'm just reading it.  (Witness reviews document.)

Q   Okay.

A   Okay.

Q   I'll show you "C-7."  This is Dunn 1185.  And do you recognize this?

(EXHIBIT C-7 ATTACHED)

A   And that is my signature, and this is an acknowledgment of receipt of notice of investigation, a copy of officer -- rights of law enforcement officer investigation.  That is my name and my signature.

Q   So you acknowledge receiving that notice of investigation referenced in paragraph 24?

A   Yes, sir.

Q   Okay.  And you received that on 9/6, correct?

A   It was actually -- I don't -- I don't remember this.  I don't know why it's got a line through it, but that appears to be my initials above that.  I think that's my initials.  I can't say a hundred percent.  Because usually when I

**350**

initial it's MD with a circle.

Q   I got you.

A   But I see what you're talking about.

Q   Is that a clerical error on the date?

A   I'm guessing.  I can't remember.  It's been a minute.

Q   I got you.  I got you.  So that was what, the acknowledgment?

A   Yeah.  They provided me with basically an officer bill of rights, explained to me what my rights are.  That's what this would be a receipt for.

Q   All right.  You acknowledge receiving the notice of -- receiving all the notice of --

A   Oh, yeah.

Q   -- rights and stuff?

A   Uh-huh (yes).  But I had already been sent home by this time.

Q   All right.

A   You want me to give it to her?

Q   Yes.

A   Okay.

Q   I'll mark this as "Exhibit C-8."  This is Bates labeled Dunn 1186.  So this is another thing that we got from you via discovery.  Do you

**351**

recognize this email?

(EXHIBIT C-8 ATTACHED)

A   (Witness reviews document.)  Yes.

Q   Who's it from?

A   It is from Tony Kennedy.

Q   And what was Tony Kennedy's position at the time of this email on September 6, 2019?

A   I believe he would be the deputy chief.  Either that or he was still the chief of detectives and in charge of the IA investigation.  Because actually, if you read at the bottom -- I should have kept reading, it actually says chief of detectives.

Q   Oh, okay.  Thank you.

A   I missed that myself.

Q   And what's the date of the email?

A   It is the 6th of September, 2019.

Q   So what day, to your personal recollection, were you taken off administrative leave with pay?

A   Whenever they told me I could return back to work, but I'd only be the supervisor of Shift B.  I was actually over two shifts and investigative team.  So they removed me from my normal rotation and put me back on that one.

**352**

Q   And so, to answer my question, when you say "this date," you mean September 9, 2019?

A   This is the date that it was --

MR. MARDIAN:

Just to clarify, it says September 6.

THE WITNESS:

No, it says the 9th here.

MR. MARDIAN:

Thank you.

A   That's why I'm getting kind of confused, because one says the 6th, one says the 9th.  Now I see the initials.  I believe that I would have been able to return to work on the 9th.  Whatever my next scheduled day would be the day I actually physically came back to work.  So if it would have fell on that rotation that I was off the next two days or day, then yes, I wouldn't have actually physically returned to work until that day.  But this is when I was told I could come back to work.

MR. LEDET:

Q   Okay.  And based on the personnel action form that we looked at, you were notified that you were placed on administrative leave with pay on August 27, correct?

**353**

A    Again, I'm --

MR. MARDIAN:

If you need to look back --

A    No, it's not that form.  It's the actual day to -- the recording I spoke of earlier.  Whatever the day of that recording was, was the day I was sent home.  If that was the 27th, I'm not sure.

MR. LEDET:

Q    Again, but we looked at these documents, so we'll just keep moving.

A    Okay.

Q    And do you recall returning to work on September 9, 2019?

A    I'd have to check my time cards to see exactly what day I reported back to work.

Q    Okay.  And which one did I label that one?

A    This is C-8, sir.

Q    C-8.

A    Pass?

Q    Yes.  Also in paragraph 24, and I'll just read it.

A    24, okay.

Q    "Fontenot" -- Chief Fontenot -- well, when you say Font- --

**354**

A    It would be the chief.

Q    Let me just read it.  I'll get ahead of myself. "Fontenot alleged that Dunn's Facebook post violated Eunice Police Department procedures, Order 15-7, code of conduct, and ethics B.2, conduct unbecoming of an officer.  Three, impairs the operation efficiency of the department, the officer or city service."

My question to you is, are you referring to Chief Fontenot?

A    And I looked on the -- "Therefore, Fontenot placed Dunn on administrative leave because of Facebook post."

Q    Sure.  That's on -- that's on paragraph 25. I'm looking at paragraph 24.

A    Oh -- that is my mistake.

Q    So are you referring to Chief Fontenot?

A    Yes.

Q    And based on these allegations, you're not disputing that the procedural order referenced in paragraph 24 existed?

A    The procedure order that he wrote me up for was in existence?  From the best of my knowledge it was in existence, I think 11 of 2018.

Q    Okay.  So was it --

**355**

A    There was a social media policy, and I don't see where I was written up for social media violation.  I was written up for conduct unbecoming and what you already referenced, impairs the effectiveness of the police department, officers or city service.

Q    Well, have you had an opportunity -- were you aware of the policy referenced in paragraph 24?

A    Yes, sir.  I'm aware of it.

Q    And it's -- because, I mean, just to -- it's not the social media policy, correct?

A    No, sir.  And that -- I'm getting ahead of myself.  I was -- when I first got this, my first thing was, "Well, why didn't he write me up for social media violation, and write me up for this?"  But --

Q    While I'm here, I got it, I'll show you what I'll mark as "C-9."  Is this the policy referenced in paragraph 24 of your Complaint?

(EXHIBIT C-9 ATTACHED)

A    (Witness reviews document.)  I don't see any amendment dates on it, so I'd have to assume this is the correct one.  So, yes.  I know there's been a bunch of changes and I try to keep track of it, but -- and I did see this.

**356**

The most current policy and procedure manual when all this got started.  But yeah, I was submitted with a copy of that as well, the most current one.

Q    I got you.  And then, for the record, C-9 is Bates number City of Eunice 186 that you're looking.  The last thing I have for you on this one, in this line of questioning, is what I'll refer to as "C-10."

It's City of Eunice 176.  Have you seen this document before?

(EXHIBIT C-10 ATTACHED)

A    (Witness reviews document.)  Yeah, I've seen it before.  I can't remember if I got it through discovery or a public records request.  I honestly can't remember.

Q    Okay.  Did you ever receive a copy of it from the Eunice Police Department?

A    To the best of my recollection and full disclosure, any of my civil service cases and I asked for, even in writing, for documentation to prove my innocence, they refused to turn anything over to me, except for one case.

Q    Well, does this reflect the Facebook investigation?

**357**

A    Yes.

Q    Was there any -- based on this documentation, was there any action taken against you for the Facebook post?

MR. MARDIAN:

Objection, form.

A    I know I'd lost hours when it goes to canine training, and I specifically asked to make up my training.  They refused to allow me to make up my training, because I have to keep a minimum standard with training.

This is when I had K-9 Robin.  I believe so, if I have my dates correct.  I have to maintain four hours per week for purpose for the dog, and that was the hours that I was talking about that I lost.  So yes, it was a disciplinary against me.

If they would have let me make up the hours, it wouldn't have been a problem.  But I have to make up the hours.  I did them on my own, but I should have been compensated for them, because I wasn't going to fall out of compliance.

MR. LEDET:

Q    I'll get more specific for you.

**358**

A    Okay.

Q    Let's look at page 1 of "C-10."  What's the incident date noted on page 1?

A    You're talking about -- from right here?

Q    I'm sorry, on page -- the first page.

A    Oh, okay.  What's in bold black is 8/25 of '19.

Q    And as you testified, that's the day you made your Facebook post?

MR. MARDIAN:

Objection, form.

A    Whatever's on the form.  It was either the 24th or the 25th, I believe.  I don't know exactly without looking at the actual post itself again.

MR. LEDET:

Q    Well, have you reviewed C-10?

A    Not in its entirety.  Would you like me to?  I mean, --

Q    So -- well, it may not -- you may not need it to answer my questions.

A    Okay.

Q    Is this the internal affairs investigation report prepared in connection with the Facebook post?

A    That's what it looks like to me, sir.

**359**

Q    And if you go to the last page of C-10, whose signature is on the bottom of the last page?

A    That would be Lieutenant Tony Kennedy.

Q    Was he deputy chief at the time?

A    No, sir.  At that time, according to his email, he was still chief of detectives in charge of my internal investigation.

Q    So if you look at the second paragraph from the bottom on the last page, what was the conclusion made by Lieutenant Kennedy?

A    That I didn't commit any violations.  That's in the first sentence.

Q    And if you look at the first page of Exhibit C-10, what do the notes in the first page indicate?

A    Says -- the handwritten note, sir?

Q    Yes.

A    It says, "No action taken because investigation did not -- did not complete and turn investigation to me within the required 60 days," I believe that's what it says.  And I can't make out the first -- I think that's 11/7 of '19.  And I believe that is Randy Fontenot's signature there, I think.

Q    And the date of the signature?

**360**

A    I believe it's 11/7 of '19.

Q    So my question is, was any action taken against you in connection with this investigation?

A    I've testified to that already.  They refused to allow me to make up my hours I missed with canine training.

Q    Is that in here anywhere?

A    I'd have to read it.

MR. MARDIAN:

You need to take the time to read it.

A    Okay.  I'll go ahead and just read the whole thing.  (Witness reviews document.)  Okay.

MR. LEDET:

Q    So my question to you is, is there any reference in here about docking your canine training hours?

A    In this right here itself?  No.

Q    Correct.

A    It's --

Q    So C-10.  Again, I think you testified earlier that the canine issue with your hours occurred in the summer of 2020?

A    No.  During --

MR. MARDIAN:

Objection, form.

**361**

A    During this incident while I was on administrative leave, I lost hours to train with the canine.  Compensable hours to train the canine.

MR. LEDET:

Q    And looking at C- --

A    Just to further evolve, you was asking what was the actions taken against me.  They publicly called me a liar.  They never retracted that statement.

Even though this thing says I did nothing wrong, they never retracted anything.  I mean, that damaged my reputation in the community.

Q    Who publicly called you a liar?

A    I believe it was in the newspaper and the Facebook post itself says, "The officer that reported it" -- you'd have to read the context of the actual Eunice Police Department Facebook post, saying I was incorrect, and I  -- the actual wording is in there.

Q    Sure.  It's part of the record.

A    Uh-huh (yes).

Q    Your name's not mentioned in it, correct?

A    It's -- right, but I'm the only person that posted.

**362**

Q    And you weren't the officer -- you weren't the only officer that responded either, were you?

A    In the post it talks about the officer that posted, if I -- if I remember correctly.

Q    And I understand that you've got beliefs, and I'm just going --

A    That's fine.

Q    -- to go through here.  So is today -- your testimony today that you appealed the Facebook investigation to the Civil Service Board?

A    I appealed the actions taken against me, and which will be documented in Aaron Green's notice of appeal to the Civil Service Board.

Q    So the records that I have with respect to the Civil Service Board appeals that you made, are going to show me the appeals that you actually made?

A    Yeah.  They'll have the title of Aaron Green.  Now, I know there's one I filed on my own behalf before I actually had retained an attorney.  I don't remember which one that is.

Q    Okay.  Do you recall appealing disciplinary decisions in connection with your Facebook post --

A    I believe --

**363**

Q    -- to the Civil Service Board?

A    I believe so.

Q    That's my question.

A    Again, years ago.  I'm trying my best to recollect which case is which.

Q    So moving on to paragraph 25.  It says, "Thereafter, Fontenot placed Dunn on administrative leave because of Dunn's Facebook post."  All right.

But again, we testified as the date of your leave?

MR. MARDIAN:

Objection, form.

A    In accordance with the recording that I have, that I recorded Chief Fontenot and everything was said during the meeting when I was placed on administrative leave.

MR. LEDET:

Q    Sure.  Were you placed on administrative leave again --

A    When I refused to resign, he told me either I resign or I was going to be placed on administrative leave, and I said, "I'm taking administrative leave."

Q    So what's the date of this incident?

**364**

A    When I was called in the office and placed on administrative leave over this one.

Q    The second K.C. Hall incident?

A    The Facebook post.

Q    All right.  So just to make sure that I'm gathering all the information, all right.  You gave testimony about when you were placed on administrative leave with pay.  Do you recall that?

A    That day.  Yes, I do.  And what I'd stated is I don't remember exactly what day.  You've have to review the recording to see what day it was and the actual notes that I made about that incident.

Q    Sure.  We went through the exhibits.

A    Okay.

Q    And I also showed you the email about the returning to work, correct?

A    Right.  But I didn't see my notes from that incident.  I knew I had typed notes and it was turned over, so --

Q    Yeah.  I'm not -- didn't show you your notes.  I'm showing you the evidence in the record.

A    I'm just stating where the answer would be, but okay.

**365**

Q    But they're also in the exhibits that I showed you, correct?

A    I cannot --

MR. MARDIAN:

Objection.  Asked and answered.

A    -- confirm that is the exact date I was placed on administrative leave without reviewing my notes.

MR. LEDET:

Q    Okay.

A    I articulated what day I was placed on leave, and it's easy to find that answer in the notes and in the date of the recording.

Q    Okay, so --

A    I don't recollect the exact date.

Q    I got you.

A    Okay.

Q    And then you testified that your recollection is that you appealed the findings to the Civil Service Board?

A    If I -- again, this is years ago.  I'm trying to remember what case is which.  From what I remember, once I was placed under investigation, the process was being done, at some point is when that city council meeting

**366**

that I was talking about to where he had his powers revoked.

Once his powers revoked, I believe the new appointing authority, which would be the mayor, or the city council, whoever was a part of that committee, dismissed the charges against me, because they didn't agree with it.

Q    Do you have a copy of those findings?

A    If I did, I already turned it over.  There was a letter from the appointing authority dismissing one case for me.  If it's that one, I -- I don't remember.  There was so much going on.

Q    Sure.  I'm asking you about --

A    But I know it was.

Q    -- the Facebook case.

A    And I'm trying my best to answer.  Either it was that one that they dismissed, or I did appeal it.  It's one of them.  There was -- I was placed under investigation so many times it's hard to keep track.  Which --

MR. MARDIAN:

We've been going over an hour.  I don't know if it makes sense to take a break?

A    And which is why I keep notes, because you

**367**

can't remember everything.  So that's why I kept documenting notes of what took place.

MR. MARDIAN:

Would you like to take a break?

MR. LEDET:

Do you need one?  I'm not going to stop you from one, but --

THE WITNESS:

Sure.

MR. STAMEY:

You're almost done, Lee?

MR. LEDET:

Oh -- no.

MR. STAMEY:

Where are we on time?

MR. LEDET:

A little over six.

COURT REPORTER:

Six hours, eight minutes.

MR. LEDET:

I mean, we could take a break.  We can discuss whatever we need to discuss.

(OFF THE RECORD)

MR. LEDET:

Q    All right.  Back on the record.  And I'm going

**368**

to -- like I just mentioned off the record, I'm going to start discussing the ACLU Complaint, which I believe you have in your hand, 15- --

A    This is the Loughlin one, and the ACLU is the one I gave her already.  You want me to get it back?

Q    Yeah.  We'll go ahead and --

MR. LOUGHLIN:

There's another copy right here.

MR. LEDET:

Q    Get a copy of --

A    Okey-doke.

Q    -- the ACLU Complaint, just so you have that.

A    Got you.

Q    And I wanted to ask you a little bit about -- if I jump to -- I want to jump to paragraph 67 of the ACLU, and I guess I can give Sidley Austin's credit for it, too, the Complaint.

The allegation is that "Starting in the summer of 2020, Chief Fontenot, Lieutenant Young, and Officer Fontenot undertook concerted retaliatory campaign against Lieutenant Dunn."  Now, my question to you is, that's the allegation.

Is that your testimony today, that the

**369**

retaliatory acts in the second case began in June of 2020?

A    Second case of this?

Q    The ACLU case.  The allegation is that retaliation commenced in the summer of 2020.  Did you read that in paragraph 67?

MR. MARDIAN:

Objection, form.

A    Well, let me read it, the whole thing real quick.  (Witness reviews document.)  It's my understanding of reading this and you're saying starting in the summer of 2020, we're talking about since post-lawsuit.  There was other retaliation before that, which I've already testified to some with the other attorney, but this is just talking about this was a campaign just to try to get -- we're talking about the official/unofficial investigation of me being a crooked cop.

We're talking about -- I'm seeing here at the bottom, it says, "Mayor Fontenot told Dunn we were engaged in a lawsuit.  If you," the mayor, "and the city council would have taken -- wouldn't have taken my damn power away, I would have gotten rid of Lieutenant Dunn or the

**370**

problem a long time ago."

So this is more encapsulating post lawsuit, I believe the first one.

MR. LEDET:

Q    Yeah.  I know there's two lawsuits.

A    Yeah, I'm -- okay.  Post this one, okay.  The first one was filed --

Q    All right.  So I've pointed you to the allegations.  So I'll ask you --

A    Okay.

Q    -- the question, with respect to the second case, when do you believe the retaliation commenced?

A    I'll rephrase what I've already stated.  The retaliation has gone on for years even prior to this.  This is just, when you're talking about just in here, this is when I -- this is basically when they said he was getting involved in the lawsuits being filed, the second lawsuit.

This is the retaliatory campaign come against me once they found out about the second lawsuit, that what I was trying to accomplish, and that's when you see the note at the bottom, "If you wouldn't have took my damn powers away,

**371**

I would have got rid of him a long time ago."

I was being retaliated way before the lawsuit was ever filed.  And then, it got worse after the first one, and it got worse after the second one.

Q    This is a question not related to anything in there.

A    Okay.

Q    Have you recently told anyone at the city that you were going to dismiss this ACLU case?

A    That was not my wording.  Both -- I remember he asked me a question about it.  He said he was going to get with his attorneys.  I'm assuming that's you, because you said you represent him.

Chief Fontenot asked me if there was any way, you know, we could reconcile, fix the problem, and my answer -- because he said, "Man, the" -- either it was me or him that mentioned the legal fees.

He said, "Man, we're looking at pushing a lot of money.  Is there any way we can resolve this issue?" and my answer was "Yes, fix the problem."  The mayor has even asked me the same question, and I have no problem with fixing a problem.  I'm just not going to simply dismiss

**372**

it just to not fix anything.

Q    Have you discussed this with the new chief?

A    He actually asked me about it.

Q    What was -- what did that discussion entail?

A    He said he had been following it.  He read the -- he -- I can't remember which one came up first.  He was talking about the Facebook post.  He said, "Look, I don't think you did anything wrong."

That was that part, and then he asked me the same question, "Is there any way that this matter can be resolved?" and I said, "I'm pretty damn sure it can be resolved.  That problem has to be fixed."  He said, "Well, everything that I read in your filing," he said, "I'm willing to do that already."  I said, "Well, then I'll let my attorneys know."

Q    I got you.  And so, I'm not going to ask you about what you said to your attorneys.  So have there been any additional discussions with anybody from the city?

A    Not to my recollection.  That would be the most recent one, when Chief LeBouef asked me about it.  Because -- and just for clarification, they -- they keep making this comment that the

**373**

ACLU is just after money, after money, after money, and I was like, it doesn't make any sense to me if they're willing to do away with it. But, that was what they feel.

Q  Who's "they"?

A  Chief Fontenot has made that statement. Chief -- Mayor Fontenot has also made it, and Chief LeBouef has also made the same comment, "The ACLU is only doing this to make money off the city." I'm just -- you asked me a question. I'm just replying what I -- I was told.

Q  Sure. So those -- you've had some discussions about the case with now your current chief?

A  Correct.

Q  When's the last time you've talked to the mayor about it?

A  Recently. I'd have to check my phone log. I know he -- there was a shooting he called me about that we talked -- I don't think we talked about the lawsuit.

   And he asked another question, and basically the only thing I regurgitated to him and with both parties that Chief LeBouef asked me about trying to dismiss the issue, and Mayor Scott trying to dismiss the issue, and back and

**374**

forth. I told them both parties had asked me about it.

Q  So specifically, have you made any representations to the mayor that you would dismiss the case --

A  If the problem was fixed. And I told him -- you know, I'm not setting in the word dismissed. That I don't believe. I said we would be able to settle the issue by fixing the problems.

Q  And have you made those same representations to Chief LeBouef?

A  Yes. And also, and full disclosure, to that man. That man and Lieutenant Young.

Q  So when you say "that man," you're pointing --

A  Well, the defendants.

Q  So you're talking about -- you pointed at Chief Fontenot?

A  Yes.

Q  Or former Chief Fontenot?

A  Correct.

Q  And you pointed at Officer Victor Fontenot?

A  Victor Fontenot, and Lieutenant Young, who is not here. I also said the same thing to him. Because everybody thinks this is about money.

**375**

That's what I keep hearing, and it's not, for me.

Q  Well, do you know whether at this point the former chief has the authority to fix your problems?

A  The former chief? Oh, Chief Fontenot? It was filed during his administration. As of today, he can't fix them. Far as I know, he can't.

Q  Let's go to paragraph 90, in cause of action, count 1.

A  I was yawing at the same time. What did you say, sir?

Q  Paragraph 90.

A  Paragraph 90.

Q  Cause of action, count 1. And I mean, I'm just -- you touched on this a little bit before, and I'm looking at paragraph 94, about --

A  94.

Q  -- you informing entities which you've testified to discussing some things.

A  Multiple times, yeah.

Q  So as far as your belief, is your belief that your duty as a law enforcement officer to report misconduct within your department to third parties?

**376**

MR. MARDIAN:
       Objection, form.

A  Not only would it be my duty, but anybody with any type of moral fiber in seeing this type of behavior, hell yes.

MR. LEDET:

Q  Was it part of your oath of office?

A  Yeah.

Q  Okay. And is reporting misconduct a part of your job duties?

A  Each --

MR. MARDIAN:
       Objection, form.

A  Each level of promotion goes to a different level to what you would actually handle or do.

MR. LEDET:

Q  So are you required by law to report misconduct that you observe?

MR. MARDIAN:
       Objection, form.

A  I will say this. I have the duty to do it. I can't think of a actual reference, any law or any statement says, you know, I have to do it. I just -- that's my duty.

MR. LEDET:

**377**

Q   So are you required by the ethics of your profession to report misconduct?

A   Yes.  That's what I was getting at, but okay.

Q   Are you required by oath of -- by your oath of honor that you took to report misconduct?

A   To uphold the laws and constitution of the state, yes.

Q   Okay.  So on the next page, and looking generally at count 2, civil conspiracy and violation of 42 U.S.C. Section 1983 individual defendants.  So -- and you testified that one of those claims is against Chief Fontenot, correct?

A   (Witness reviews document.)  Okay, I read it.  Now, what was your question again, sir?

Q   So, yeah.  I was just pointing you in that direction.  So like my question -- my first question was, that claim is asserted against Chief Fontenot and the other individual defendants, correct?

A   I believe so, sir.  We have some -- I'm not an attorney and I'm trying to interpret it, but I believe you're correct.

Q   Okay.  I understand.  Did you observe Chief and any of the other defendants enter into an

**378**

agreement to violate your First Amendment rights?

MR. MARDIAN:

Objection.  Calls for a legal conclusion.

A   Me physically seeing them together concluding?  The answer would be no.  But, based off the totality of all the evidence and stuff that was taken and collected, it shows that there was some type of collusion between the three parties.

MR. LEDET:

Q   Now, have you seen -- do you have a written -- have you come across a written agreement between Chief Fontenot and the other individual defendants of -- to violate your rights?

A   That would be stupid.

MR. MARDIAN:

Objection, form.  Calls for a legal conclusion.

A   That would be easy evidence, but no.

MR. MARDIAN:

Let me finish.  Objection, form, and calls for legal conclusion.

MR. LEDET:

**379**

Q   Have you had that as part of your evidence, an agreement between he and others?

MR. MARDIAN:

Object -- same objections.

A   No.

MR. LEDET:

Q   No?  Okay.  Have you seen any video where they agreed to collude?

MR. MARDIAN:

Same objections.

A   I tried to obtain it, but they refused to give it to me, because the briefing room is recorded, and I did a records request, and my attorney did, to obtain the video to show them all passing around the -- what I've already testified to.  So yes, I tried to obtain the evidence, but they refused to give it to me.

MR. LEDET:

Q   Okay.  So my question was, is do you have evidence of an agreement?

MR. MARDIAN:

Same objections.

A   The answer is no, and I told you where the evidence was they refused to give me.

MR. LEDET:

**380**

Q   The conspiracy -- the alleged conspirators, were they all Eunice Police Department employees?

MR. MARDIAN:

Objection, form.  Calls for legal conclusion.

A   Based on everything I -- no.  They elicited third parties to help in that aid, from my understanding of the court transcripts and other things that's already been talked about today.

MR. LEDET:

Q   So is Chief Fontenot employed with the City of Eunice when the events that give rise to this suit took place?

A   He was the chief.  I don't know if -- how that works with an elected official.  I do not know.  I know he's elected police chief, and he was the chief at the time these alleged incidents took place.

Q   Was Victor Fontenot a Eunice police officer when the events giving rise to this lawsuit took place?

A   Correct.

Q   Was Ryan Young a City of Eunice police officer

**381**

when the events giving rise to this lawsuit took place?

A   That would be correct.

Q   Was Mayor Fontenot the mayor of Eunice at the time the events giving rise to this lawsuit took place?

A   Yes.

Q   So listed witnesses, who is going to testify that there was an agreement between Chief, Victor Fontenot, Lieutenant Young and the mayor to conspire to --

MR. MARDIAN:
        Objection.  Calls for a legal conclusion.  Calls for speculation.

A   You'd have to repeat the question, sir.

MR. LEDET:

Q   My question is, who do you have that will testify that there was an agreement between Chief Fontenot, Victor Fontenot, Lieutenant Young and Mayor Fontenot to conspire to violate your rights?

MR. MARDIAN:
        Objection.  Calls for a legal conclusion.

A   If your question is that narrowly tailored at

**382**

one person could do that, the answer would be no.  But the witnesses I have already documented that need to come forward, I've (inaudible) that together.

MR. LEDET:

Q   Turning to count 3 on page 28, that's the next page.  This is about the defamation claim that you've alleged against Chief Fontenot and Officer Fontenot.

So in paragraph 7, the allegation is that Chief Fontenot told Lieutenant Dunn's fellow officers that Lieutenant Dunn is a corrupt officer who is brainwashing everyone inside of the department.

So as far as fellow officers, who are you talking about?

A   Lieutenant Ivory was one.  I know Kennedy had regurgitated the information to me.  Let's see who else.  I'd have to look in my notes who all I listed.

But -- and also, I see this phrase "corrupt who is brainwashing everyone inside the department," that's actually recorded as well, by the way.  It was said to my face by the chief himself.

**383**

Q   Yes, but my question was who did you send that -- who did he say that to "his fellow officers"?  You said Ivory and Kennedy.  Anyone else?

A   And I said that you'd have to check my notes for the rest of the people that I listed that I'd use as witnesses for that, because I mean, it's a lot of people.

Q   So it's --

A   I know at one time I kept track of it.  I think we've had 150 people come throughout our department, so --

Q   Well, as we sit here today, do you recall any additional specific people that he told that to?

A   That is the two people that come to mind at the top of my head.  Again, it would be in my notes or something thereof who I talked to.

Q   As you sit here today, do you recall the date that this communication was made?

A   It's been going on for a while.  I mean, there's no specific -- this one, when I talk about the recording, there is a specific date, because it's recorded.

All this other time I've had Officer

**384**

Clancey.  That was another one that just came up.  Austin Doucet, Cody Miller, Jonathan Lee.  Jonathan Lee actually prepared a letter to the conversations he had.  That was also turned over as evidence.

Let's see who else.  I'm sure there's more, but that's what I have at this time.

Q   Okay.  Do you have any recordings of these statements?

A   As I stated earlier, I know Lee provided me with a statement.  That was turned over.  Everybody else, they just said to give them a subpoena and they'd come here and say what they have to say.

Q   All right.  And it has -- of the people that you just identified, are they all Eunice Police Department employees?

A   Not anymore.  They were at the time of the occurrence when they were listed in my notes.  But most of them are with other agencies already.

Q   Thanks.  That was my question.  So were you present at any point when Chief allegedly made these comments?

A   Yes, sir.  It was recorded, and Tony Kennedy

**385**

was in the room when he said it to me, and then I know Officer Grant Clancey and a couple of other people have talked about coming back to tell me how many times that either Victor or somebody else has made the comment about me being dirty, corrupt, and all these things I've been saying are lies, and stuff of that nature.

Q  Were you --

A  That I, in fact, was the dirty one, or something of that effect.  I don't remember the exact conversation, but I told -- I told them that I would call them as witnesses in this case.

Q  Did you ever personally hear Chief Fontenot tell a fellow officer that you were corrupt?

A  Yes, sir.  Again, the recording.  Because Tony Kennedy's sitting right next to me when he said I was corrupt.  So yes, there was at least one right there in the same room that I was in.

Q  Now, you mention a recording, but were you there?

A  Yes.

Q  So what's the recording have to do?

A  The recording is the proof that that was what was said and what happened.  The incident was

**386**

recorded.

Q  Oh, so you're saying there's a recording of this --

A  Him saying this, yes.

Q  Okay.  With you present?

A  With me present.

Q  Did you ever personally hear Chief Fontenot say that you were brainwashing anyone -- everyone inside of the department?

A  No disrespect intended, I just answered that question, sir.

Q  Yeah.  Well, my question was -- before was about the statement of the corrupt officer.

A  It was in the same recording.

Q  Okay.  The next allegation that Chief Fontenot spread the lie that Dunn is a dirty cop to other officers inside of the department, Mayor Fontenot and the Eunice board of aldermen?

A  Yes.  I testified to that earlier.  Because Scott is the one to inform me that he is the one that went to him and told him if they -- they were about to arrest me for being a dirty cop, or was about to get my ass, or something to that effect.

Q  So the mayor's telling you this?

**387**

A  Uh-huh (yes).

Q  Were you present for any of these conversations?

A  (Witness shakes head.)

Q  Is that a no?

A  No.  I'm sorry.  No.

Q  It's okay.  You've been doing good with it. And did you hear Chief make this statement?

A  No.

Q  So even if it was made, what injury have you sustained if that is, in fact, true?

    MR. MARDIAN:
        Objection, form.  Calls for --

A  Injury?

    MR. MARDIAN:
        -- a legal conclusion.

MR. LEDET:

Q  Yeah.

A  I've lost -- I mean, just inside of the department there's still some officers that don't trust me.  Other agencies.  I mean, it damaged my reputation.

    I mean, I don't even get to work narcotics cases anymore.  I mean, some people trust me. Some people don't, and I mean it has hindered

**388**

some of my investigation, or investigatory abilities and relationships of other agencies.

    And it's going to make it -- it's basically a double-edged sword.  One, if I don't defend myself, my name is corrupted, and then as soon as I do this, well what chief would want to hire me if you're going to sue your own department?  I mean, it's kind of like a double-edged sword.  I can't win either way. So yes, it has damaged me both ways, from actually being said and me trying to defend myself, so --

Q  So you believe filing these lawsuits has damaged you?

A  Yes.

    MR. MARDIAN:
        Objection.

A  That's my opinion.

MR. LEDET:

Q  Turning to count 4 on page 29.  Similar questions to what I asked before.  The claims against Chief Fontenot and Officer Fontenot, civil conspiracy.

    Did you observe Chief Fontenot and Victor Fontenot enter into an agreement to -- to make

389

false statements against you?

MR. MARDIAN:

Objection.  Calls for a legal conclusion.

A   No, sir.

MR. LEDET:

Q   All right.  Do you have in your possession a written agreement between Mr. Fontenot and Chief Fontenot about an agreement to violate your rights?

MR. MARDIAN:

Same objection.

A   If I did, we probably wouldn't be here today, so no.

MR. LEDET:

Q   So again, who do you have that will testify that an agreement does, in fact, exist?

MR. MARDIAN:

Same objection.

A   The same answer I gave earlier.  I have a list of witnesses I plan to call forward that each had their own individual role to play, to basically what they witnessed, what they heard and what they witnessed.

MR. LEDET:

390

Q   Yeah.  And I've seen that, but I'm saying as it relates to you.  Who specifically is going to testify as to an agreement between Chief and Victor Fontenot to violate your rights?

MR. MARDIAN:

Objection.  Calls for a legal conclusion.

A   Again, the same answer I gave earlier.  It will not be one person.  It will be a totality of the persons together.  That was my testimony from earlier.  Not just one person.  So the answer would be no, not just one person can do it.

MR. LEDET:

Q   Okay.  So who are those people?

A   The list I presented that's already been turned over.

Q   So those folks on that list, somebody in there -- if there is somebody who can testify as to an agreement to commit a legal act, it will be one of those?

MR. MARDIAN:

Objection, argumentative.  Asked and answered multiple times.

A   As I stated before, each person had their own

391

things they witnessed, their own things they have -- they are going to testify to.  And in conclusion would bring you to the -- any reasonable man to believe that collusion had taken place.

MR. LEDET:

Q   I'm going to show you what I'll mark as "Exhibit C-11."

Well first off, I'm going to paragraph 121 that discusses count 5, Louisiana whistle blower statute claim, paragraph 121.

(EXHIBIT C-11 ATTACHED)

A   (Witness reviews document.)  Okay.

Q   At the bottom of paragraph 121 it says, "Eunice Police Department and/or reported various" -- I'm sorry.  "Lieutenant Dunn used channels to file several critical incidence reports with the Eunice Police Department and/or reported various external authorities, filing violations of state law, including but not limited to," and it's got sub-parts.

A   Okay.

Q   So I want to show you what's -- well, I'll first direct you to paragraph 121-A, a violation of Louisiana Revised Statute

392

Annotated 14:122.2, threatening a public official law enforcement officer.

And if you would, if you'd look at C-11, and I apologize, that's the copy, so if you can share it.

A   Sure.

Q   This is Dunn 87.

A   (Witness reviews document.)  Okay.

Q   So hold tight for a second.  121-A, the violation threatening a public official, what date did that occur?

A   I would have to believe -- talking about actual threats would be August 27 of '19, --

Q   So in looking at --

A   -- according to this.

Q   Okay.  And you're looking at C-11?

A   Correct.  Yes, sir, C-11.

Q   And I can probably go about it better.  So is C-11, is that -- is that incident referenced in 121-A?

A   Yes.

Q   So when did the threatening of the public official occur?

A   Based on my reading, the critical incident was prepared that the original incident took --

**393**

that incident particularly took place on August 27. Or actually, this probably to answer your own question about the collusion between them trying to target me, because there is a recording.

Q  Well, I haven't asked that. I asked you --

A  Well, that's actually expanding on what you asked me earlier. You asked me if there was a way to prove it, and this actually would -- to me it would answer your question earlier.

Q  Okay. I'll put it in the record. So if you'd answer my question, what's the date that the threatening of the public official occurred?

A  And I'm repeating myself again. August 27, 2019, according to this form is when the date that these statements were made.

Q  And you're looking at C-11?

A  Correct.

Q  And what date did you report?

A  It's August 27 of 2019 is the day of the incident. Date of report was 12/6 of '19.

Q  And did you submit this report, C-11?

A  Yes, I did.

Q  Who did you submit it to?

A  Lieutenant Tony Kennedy, --

**394**

Q  Okay.

A  -- according to this.

Q  And paragraph 121-B, you allege a violation of Louisiana Revised Statute Annotated Section 14:130.1, obstruction of justice, when you reported that police officers had negligently mishandled a rape case. You recall the date of that incident?

A  I'd have to reflect my notes.

Q  Well, I'll show you what I'll mark as "Exhibit C-12." Did you prepare a critical incident report in connection with that incident?
          (EXHIBIT C-12 ATTACHED)

A  Correct. And that's what I testified to earlier. I did do a critical incident to it.

Q  Well good. I'll show you what's marked as Exhibit C-12, Dunn 81.
          (EXHIBIT C-12 ATTACHED)

A  Keep or pass?

Q  You can pass that. Do you recognize this document?

A  Give me one -- yeah, I recognize the document. Give me one second to briefly look over it. (Witness reviews document.) Yes.

Q  So is this a critical incident report that you

**395**

can prepare in connection with the rape investigation?

A  That, and along with other policy violations and other things which is documented in the context of the form.

Q  But is that the incident reflected in C-12? Is that what you're talking about in paragraph 121-B?

A  (Witness reviews document.) Yes, sir.

Q  And based off of C-12, what date did the incident occur?

A  It's listed as 8/27/2019 as the date of the incident. Okay.

Q  And what date did you report the incident?

A  What date did I report the incident? It's showing 12/3 of 2019. That is not correct, or I guess a clerical error, because I know I filed it, because I remember Deputy Chief Richard Daigle said it was ill advised for me to turn it in, because things would happen to me.

Q  Okay. So do you recall the date that you turned it in?

A  You want me to review it? I might have actually left a note in here for that.

**396**

(Witness reviews document.) I honestly believe that's just a clerical error. I believe it was turned in after everything transpired, and I'm sure that -- but give me one second.

     Let me look at the last paragraph to make double damn sure. (Witness reviews document.) I prepared the form, but I don't know exactly what day I turned it in.

Q  And for the record, as far as C-12 goes, what is the date located on the form as it being made?

A  It says the date is 12/3.

Q  And you believe that that's incorrect?

A  It possibly may be, because I know there was -- you've already presented me one. There's two -- there's two, obviously.

     Because I've asked for different things to be investigated in both the cases. The one where I actually had the full disclosure from the person that recorded it, and I sat down with her and wrote what she was telling me was in the recording.

     That was a whole separate incident, and I know that one was done in December. Now, the actual write-up for the mishandling of the rape

**397**

case was done shortly thereafter the mishandling of the rape case.

Q So based on your recollection, you think you submitted it before the date reported on the --

A I believe so. I honestly believe that may be a clerical error, because I did write them up shortly thereafter.

Q After the rape incident?

A Correct. And after everything that transpired, yes.

Q Understood. And I might have asked this, and I'm sure I'll get an objection. So is C-12, does this report concern the allegations alleged in paragraph 121-B?

A I believe so. And as I've already previously testified, I believe there may be an error with the date on this one. The other one that I've just told you about, I believe the date is correct. One was filed in August. One was filed in December.

Q Well, let's move on to paragraph 121-C, which alleges a violation of Louisiana Revised Statute Annotated Section 14:111, assisting escape, okay?

A Okay.

**398**

Q Do you have a recollection, as you sit here today, what time you reported that violation?

A I reported it to him -- I testified earlier that I told Chief Fontenot as the thing was transpiring that I didn't like the -- what took place. After the totality of the circumstances, I believe it was maybe the day thereafter I did complete a critical action sheet like this, and turned it in.

Q And I'll show you what I've marked as "Exhibit C-13."

(EXHIBIT C-13 ATTACHED)

A Keep or pass?

Q Is this the critical incident form that you're referencing in connection with the allegations of assisting escape?

A (Witness reviews document.) Now, there is a possibility that -- I don't know which forms you have, at a certain time when they refused to do investigations.

I did re-submit the forms to the appointing authority. I gave him copies of all that during a open meeting. That might be the reason for the dates changed. Because I re-submitted them to the appointing authority.

**399**

Because I did give a copy, or the original copies were submitted through my chain of command through deputy chief, the chief, and then once nothing transpired, that's actually in this email, because it is reported.

You can see me hand the mayor a black folder containing critical incident forms to be investigated. So it might be why the dates might be different. But -- your question, sir. I'm sorry.

Q Yeah. So as far as Exhibit C-13 goes, did you prepare this report?

A It looks to be the one I prepared, sir.

Q And what's the date of the report, that's on the report?

A It says date of incident is 1/26 of '19. Date turned in is 1/30 of '19.

Q And as far as -- is C-13, does this report concern the alleged violations of law alleged in paragraph 121-C of your Complaint?

A Correct. And I did testify to some of that earlier, by the way, --

Q Certainly.

A -- that we've talked about.

Q Yeah. I'm not going to ask you about the facts

**400**

you already testified to.

A Cool. Pass or keep it?

Q Yeah. 121-D, you allege a violation of Louisiana Revised Statute Annotated Section 21:40, law officers duties. This is when you reported the -- allegedly reported the engaging in domestic violence, but officers did not arrest?

A Correct.

Q So again, you kind of know the drill. Did you prepare -- you independently recollect the date that this occurred?

A Yes, sir. And I was asked that question earlier. I did. I did prepare one, and I was asked details about it.

Q And I'll show you what I'll -- what's marked as "Exhibit C-14," and let me know if you -- do you recognize this document?

(EXHIBIT C-14 ATTACHED)

A (Witness reviews document.) It appears to be the one that I turned in through my proper channels inside the agency. Yes, sir.

Q And you testified this -- well, who was the officer that you filed this report against?

A Sergeant Elizah Joseph.

**401**

Q    And you mentioned him earlier?

A    Yes.  He's deceased now.

Q    And the date of the incident?

A    11/17 of '19.

Q    And what was the date of the report?

A    It was officially turned in on the 20th.

Q    And so, does this C-14 concern allegations of violation of the law alleged in paragraph 121-D?

A    (Witness reviews document.)  This would be an example of D, yes.  But I believe there was more allegations, or more things in my notes of other officers not doing the same thing.  But this is one documentation showing that.

Q    So I don't recall you testifying to the additional wrong doings with respects to different domestic violence complaints.  Are there any?

A    I did.  I said there was other officers did the same thing, not following up on domestic calls.  That was my testimony from earlier.  And we have to get called back to the residence, handle the situation.

       There is one, I don't think I wrote him up for it, because this is by the time all this is

**402**

all going on, too.  We actually responded to another domestic case where Detective Fontenot was there and didn't do anything.  That is also in my notes.  That's with the Bradfords, I believe, if I have the name correct.

Q    Paragraph 122, you allege Chief Fontenot ignored the reports and failed to conduct a proper investigation.  And you said -- so the allegation is proper investigation.  So my question is, were there investigations?

A    As I testified earlier, some things were looked into.  Other things was thrown in the trash.  There would -- a proper investigation was not done according to the way it's supposed to be by the OSC.

Q    Yeah.  And you mentioned that before.  And that's based on public records requests that you made?

A    No.  That's on the actual site, what I'm referencing with OSC.  It's on the website.  And that's where we obtain the critical incident forms from there.

Q    Yes.  So my question is, so how do you know that there were no -- I mean, is that your opinion that they're improper?  I'm guessing

**403**

that it's --

A    No.  It's not -- not only my opinion of it.  It's several people's opinion.  Even the Civil Service Board has already ruled that in several cases.  And also the fact that when I testified earlier, I did a public records request to review everybody's personal action sheets, and their -- their jacket that I called it earlier, and there was nothing in there.

       It is required that if there is any type of investigation it should be in there.  There damn sure was in my file when they tried writing me up, which is another thing.  Once it -- once something has been deemed that it didn't happen, it's not supposed to be in your file.

Q    Paragraph --

A    Well, mine's still there.

Q    Paragraph 123 discusses -- is the allegations of you reporting the misconduct to entities that we've -- you've testified about.

A    Okay.

Q    My question for you is, to your knowledge, has the Office of Louisiana Attorney General issued a finding that the acts alleged in paragraph

**404**

121 violated state law?

A    An actual form, no.  I don't --

Q    To your knowledge, has the FBI issued any findings that the acts alleged in paragraph 121 violated state law?

A    Other than -- not an official paper, other than what's -- FBI Agent Kelley stated to me over the phone that there was.  But no official paperwork.  So the answer would be no.

Q    That's my question.  Has the St. Landry Parish District Attorney's office issued any findings that the acts alleged in paragraph 121 violated state law?

       MR. MARDIAN:
            Objection.  Form, foundation.

A    That would be the people that I was referring to earlier that there was a possibility of the actually ongoing criminal investigation at this time, and I don't know.  So no.

       The answer to your question is no, but that was the ones that was going to be doing the criminal investigation, the best of my memory.

MR. LEDET:

Q    Well, thanks for answering my question.  Has the Louisiana State Police, to your knowledge,

**405**

issued any findings that the acts in paragraph 121 violated state law?

A   No, sir.

Q   And has the Office of Sheriff of St. Landry Parish, to your knowledge, issued any findings that the acts alleged in paragraph 121 violated state law?

A   It's going to be the same with the district attorney's office, because they are in talks with the sheriff's office. I don't know -- I do not have an official form, but they are the ones that are talking about the criminal investigation. I don't know where they're at at this time, if they even did anything.

Q   Have you sent any of your CIRs to the entities listed in paragraph 123?

A   CIR. Critical incident -- okay.

Q   I'm sorry.

A   No, that's fine.

Q   That's my notes.

A   That's my brain. That's what we call it, too. It just took me a second. No. They actually -- other than what I've already testified to about the FBI accepting documents from me, I know the AG had gotten some at some point.

**406**

State police even refused to even look at the evidence. The first district attorney refused to look at the evidence.

Bobby Guidroz was actually the one that actually started reviewing some things. He said he was going to get with the district attorney -- the new district attorney.

We had a meeting with him, and in that meeting it was Chad Pitre, Nootsie Sattler, I believe Shane Frye, because it was in his office. There was another city official there, I believe, and Terry Darbonne, and there was somebody else sitting to my immediate left, I believe Mike Lege.

We all had a meeting with him, if they were -- about if they were going to take any type of criminal charges and tell him what's going on, and he -- at first, and during that meeting, he didn't want to have anything to do with what he says a political nightmare.

He says, "Well, this sounds like this is just political." I said, "Well, I didn't know violating the law was political," and I walked out the room.

Now, I became aware of new knowledge that

**407**

Chad Pitre has flagged certain cases for investigation. Because I have been asked about those cases.

Q   So to your knowledge, has there been any criminal charges levied in connection with the acts alleged in paragraph 121?

A   Not presently.

Q   Any arrests made in connection with the acts alleged in paragraph 121?

A   Not --

MR. MARDIAN:
Objection.

A   -- presently.

MR. MARDIAN:
Form, foundation.

MR. LEDET:

Q   Okay. And to your knowledge, is -- are there any -- were there any convictions regarding the allegations of paragraph 121?

A   Not at this time.

Q   You mentioned in the subsequent paragraph, paragraph 124, that you were removed from narcotics investigations?

A   I testified to that earlier. I was told I was no longer allowed to do them.

**408**

Q   So that's what I'm trying to understand. The initial allegation was that -- if I look back at your Complaint, that you were employed in narcotics investigations from 2016 to May of 2019.

A   Try that one more time. I'm --

Q   Paragraph 28, I think it's in -- yeah, paragraph 28.

A   Because I remember earlier I testified to the distinction between what my duties were and what an -- you know, narcotics division, canine --

Q   Paragraph 28, "Until May 2019, Lieutenant Dunn was in charge of narcotics investigations."

A   Am I looking at the wrong one, or -- all right. Where are you at, sir?

Q   Paragraph 28.

A   28, right here. January 26, okay.

Q   Yeah, it's the second line from the bottom of the paragraph.

A   Okay, got you. All right. I'm with you now, okay.

Q   So were you in charge of narcotics investigations until May of 2019?

A   I don't know the exact date, because what had

**409**

taken place, I was, because I was the only one doing anything with narcotics. They didn't have a actual narcotics -- labeled narcotics officer, and I was the lieutenant and running K-9, and conducting the narcotics investigations.

I informed Chief Fontenot that it was getting kind of hard for me to keep up, and that he needed to, if he could, find somebody that would go into narcotics, and I would assist them.

Q   Yeah. So the allegation was until May of 2019 you were in charge of narcotics investigation. So did you stop at that point?

A   May is when I was told I was no longer -- I believe, if I'm correct, is when I was told I was no longer allowed to participate. Before that, I believe Detective Fontenot had actually -- was put in as the narcotics detective, so I took a back step and actually just did the canine part and assisted him.

Q   And then when you say "May," May of 2019?

A   Correct.

Q   All right. And then -- but after that, that was when you took the primary roles of canine

**410**

handler, correct?

A   I was primary role in everything, to be honest. I mean, it was -- I think we had a kind of like an exodus at that time. We were a little shorthanded, and I took on multiple roles, and we had a rash of shootings, burglaries and all that, and actually Chief Fontenot asked -- he came to me if I had any ideas or suggestions how to fix the problem.

I gave him what suggestions I had. He allowed me to put a little team together. I believe it was two teams. I was in charge of one. We made multiple arrests, cleaned up the problem, and actually he -- I still remember what he said.

He said, "This was not a popularity contest, but I have to give an aware for supervisor of the year for everything that happened back in 2017." So --

Q   Well, I'll ask this just to streamline and move on.

A   Okay.

Q   The allegation is that, and I'll read it from paragraph 28. "Until May 2019, Lieutenant Dunn was in charge of narcotics investigations.

**411**

Until June 2020, Lieutenant Dunn was canine handler and ran the department's canine program."

A   That would be correct. Correct.

Q   Okay. All right. Now I'm jumping all the way to the back. Paragraph -- paragraph 128. And I just want to point to the alle- -- specific allegation that says "The individual defendants have displayed a pattern of deliberate repeated harassment from June 2020 to present."

So my question is, is that your testimony? Is that when the retaliation occurred in this case?

A   As I testified earlier, it's been ongoing ever since they found out that I was the one telling on them. Once the lawsuits came into play, it got worse. I thought it would kind of ease up or something. No, it got worse.

Q   All right. And I realize that there's allegations about -- let's see. General question. In the context of this case, has the chief taken any action against you outside of his role as Chief of Police?

MR. MARDIAN:
    Objection, form, foundation. Calls for

**412**

a legal conclusion.

A   In my opinion the answer would be yes, because if he was actually acting in the scope of his duties and not -- if he would been in accordance with the law, the Lawrason Act and other things, your answer would be yes.

But when he stepped outside of those, it's now personal. Just like if an officer did something so outrageous or did something to violate policy -- killed somebody and they violated a policy, now you're looking at losing the qualified immunity, if that -- that's where I'm going with it. Just -- he has certain laws that govern what he does.

If he violates those, then it would be the same as if I violated the law, and I lose my qualified immunity, which make him as a individual in his individual capacity other than the actual Chief of Police.

MR. LEDET:

Q   Yeah. And I don't need to go get into a discussion about course and scope and conflation with official capacity claims, but --

A   I tried to answer it.

**413**

Q   Yeah, I know.  And my question is, I mean -- I mean, in --

A   I believe my answer was no.  If he was in accordance with laws, the answer would be yes.  But in this case, no.

Q   So like in, for example, paragraph 129, or 128, "Displayed extreme and outrageous conduct with the intention of effected -- inflicting severe emotional distress."

A   Correct.  That's not part of the -- oh, shit, sorry.

MR. MARDIAN:
        What is the question?

MR. LEDET:

Q   I thought he was answering.

A   I thought it was a question.  My bad.

Q   Well, I mean, do you believe that any of this activity occurred outside of the scope of his role as Chief of Police?

MR. MARDIAN:
        Objection, form, foundation.  Calls for a legal conclusion.

A   You're saying if any of this -- repeat it one more time.  I want to make sure I get it right.

MR. LEDET:

**414**

Q   If it was your belief that any of this activity has occurred outside of the scope of his duties as Chief of Police?

A   I do.

MR. MARDIAN:
        Same objections.

A   I do.

MR. LEDET:

Q   So has the chief -- as far as the allegations contained in this Complaint, I mean, has he ever come to your house and done anything to you?

A   Interesting that you brought that up.  No, and there's a brief example.  My unit is no longer parked on my property.  It stays on the street.  Because I had two officers come to my house without permission and went in my backyard, and I told them if they ever come on my property again, then I would have a problem.
        They didn't have a legal right to be there, so I do not allow anybody in uniform to come to my house unless they're a friend.

Q   Did Chief Fontenot ever come to your house?

A   No.  That was after I had already issued that to the deputy chief not to return to my

**415**

residence.

Q   Did Chief Fontenot make any threats to you, you know -- you know, threaten bodily harm to you outside of the office?

MR. MARDIAN:
        Objection, form.

A   Outside of the office?  No.  But inside the office, I don't think it was bodily harm, but it would be something characterized something else, but inside the office, yes.

MR. MARDIAN:
        Can we get a time on the record?

COURT REPORTER:
        Seven hours, 59 seconds.

MR. LEDET:
        On the nose, huh?

THE WITNESS:
        Wow.

MR. LEDET:
        Well, I'll state for the record that I'm not done with the examination of the witness, and it's my position that the -- that the record should be kept open to continue at a later date.

MR. STAMEY:

**416**

        How much more do you have, Lee?

MR. LEDET:
        I've got a good bit more.  Probably an hour.  So -- and then --

MR. MARDIAN:
        Just not --

MR. REED:
        Yeah, I've probably got a couple of hours, at least.

MR. MARDIAN:
        Well, it's unlikely we are going to agree to that.

MR. STAMEY:
        I have considerable time.  I can't give you an estimate, but I will benefit from having some of these questions asked that might upon further reflection allow me -- whittle mine down a little bit.

MR. MARDIAN:
        I mean, I think, you know, we're willing to give you 30 minutes.  We're not going to agree to indefinite periods of time, or several hour periods of time.  You've had seven hours and that's been exhausted.

**417**

MR. STAMEY:

For the record, we have two separate lawsuits.  For the record, we have four individual defendants in connection with these two separate lawsuits.

For the record, I haven't had a chance to ask the first question, and my client has rights, and I intend to seek relief from the judge if you're not going to voluntarily work with us for additional time on another day to conclude this deposition.

MR. LOUGHLIN:

Are y'all looking for another seven hours?  I mean, what do you -- what are we talking about?

MR. STAMEY:

I hope not.  But I will in good faith look at what's been done to try to reduce mine as much as possible.

MR. MARDIAN:

Yeah, if I could -- so a few things.  The cases are consolidated, but that does require certain efficiencies be taken on your part because -- and that's part of the

**418**

reason to consolidate it.  The fact that you haven't yet asked a question is a decision of you're all --

MR. STAMEY:

No, no.

MR. MARDIAN:

-- decision, right?

MR. STAMEY:

Absolutely not.

MR. MARDIAN:

Okay.  And like that's not true, we're not willing to work with you.  We are willing to work with you.  A limited period of time, 30 minutes, but you had seven hours.  That's been exhausted.

Maybe we're not going to be able to come to ground on this now, but I mean, if it's 30 minutes, I think we're going to stay so we don't have to come -- so that we all don't have to come back down here.  But --

MR. STAMEY:

There's no way I can --

MR. REED:

You're talking about 30 minutes each,

**419**

or 30 minutes in the aggregate?

MR. MARDIAN:

Total.

MR. STAMEY:

There's no way.

MR. REED:

So I get ten, he gets ten, and then he gets ten?

MR. MARDIAN:

Well, you-all had seven, and you could have divided that.  That would --

MR. REED:

I didn't have seven.  I mean, we've got separate clients.  I can't tell them to stop asking questions.

MR. MARDIAN:

You could have cross-noticed the deposition.

THE WITNESS:

That's why I'm not an attorney.

MR. MARDIAN:

You could have come to some resolution to this before.  We noticed it.  We made the representation with the Court that this was a notice on behalf of all of the

**420**

defendants.  I think that was everyone's understanding.  Regardless of whether it was or it wasn't, you had seven hours, and that's been exhausted.

Simple -- we're willing to work with you, but we're not going to agree to another seven hours.  I mean, you don't -- each of your clients don't get seven hours with Lieutenant Dunn.

MR. STAMEY:

For the record, this is not a lawsuit or series of two lawsuits involving isolated claims which all damages flow from.  You have set forth in two lawsuits numerous complaints, numerous -- based on numerous incidents for which you have sought multiple relief in both cases.

MR. MARDIAN:

And that's true for many lawsuits.  In many lawsuits where the deposition is contained to seven hours.

MR. STAMEY:

This one is very unique compared to the typical suit, and the contemplation of a seven-hour limitation does not limit these

**421**

circumstances, and it's why the Court gives discretion to come before the Court to ask for relief for additional time.  And I would like to work with y'all to figure out a reasonable time so that we can get together again.

We know you're coming back to take more depositions.  You'll acknowledge that.  So my submission would be that on one of these other return dates we use some of those additional dates to work on completing these depositions.

MR. MARDIAN:

Okay.  Well, we're not -- definitely not agreeing to split this across multiple additional days.  So, just from the same page, to the extent we're coming back for additional limited time, it's going to be at one time, and I -- and I can't remember.  I lost my train of thought.  Something --

MR. STAMEY:

Well, I'm trying to cooperate with you and think outside the box such that it won't impact you having to dedicate a series of additional dates designed to

**422**

focus on completing this deposition.

We can tag it on the back of another day, for another day, I'm willing to try to work on those parameters as well.

MR. MARDIAN:

Okay.  And if you were to do that for one additional tacking on, either before or after, what is the total amount of time that you think you would need to finish all in for all of you?

MR. STAMEY:

Minimum four hours.

MR. MARDIAN:

Minimum?

MR. STAMEY:

Minimum.

MR. LEDET:

Just for me, I just need an hour more.

MR. LOUGHLIN:

If we're talking minimums, we're not going to get anywhere.  Because if it's another seven, then why was it consolidated to begin with?

I don't have an issue with more time. I understand the circumstances of four

**423**

lawyers, but I mean, I think we need a maximum if we're going to agree.

MR. STAMEY:

Well, give us a moment.  Let's see if we can come up with some guidance for y'all.

(OFF THE RECORD)

MR. STAMEY:

Lee needs an hour, and Jason and I on behalf of our two individual clients together would agree cap hours at four hours, and we'll work on how we divide that up in advance.

MR. REED:

Certainly.

MR. MARDIAN:

Understood.  Because I think it's our position that the seven hours have been exhaustive.  We're going to work with you. I think it's unlikely we're going to reach an agreement tonight, and I don't think anyone wants to stay to negotiate that.

So how about we plan to have a call next week, where a time that we all can get on the same page to come to a reasonable

**424**

number of hours.

MR. STAMEY:

Well, if we can come -- yeah, --

MR. MARDIAN:

A reasonable amount of time to avoid (inaudible) with the Court, and if we can't, we can't, but I think we can reserve that negotiation for another time.

MR. STAMEY:

Well, one thing the judge made it clear, I think we'll agree.  He doesn't want us to just do this via telephone call. If we can't agree to it, we're going to literally have to file cross motions or something to that effect.  He won't --

MR. MARDIAN:

We can cross that bridge when we get to it.

MR. STAMEY:

All right.  Then for the record, this deposition is adjourned today, and we will agree to try to formulate a plan that is mutually agreeable to all parties for additional time to conclude the deposition of Mr. Dunn.



**425**

DEPOSITION CONCLUDED AT 6:15 P.M.

**426**

REPORTER'S PAGE

I, Lenora St. Pierre, Certified Court Reporter in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or the Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this proceeding was taken, do hereby state on the Record:

That due to the spontaneous nature of the interaction and discourse of the proceeding, double-dashes (--) have been used to indicate pauses, changes of thought and/or talkovers; that such is the universally accepted method for a court reporter's transcription of a proceeding; that double-dashes (--) do not indicate that words or phrases have been left out of the transcript;

And that the spelling of any words and/or names which could not be verified through reference resources have been denoted with the parenthetical phrase "(spelled phonetically)."

_____
                Certified Court Reporter

**427**

CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this certificate.

I, Lenora St. Pierre, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that MICHAEL DUNN, after having been duly sworn by me upon authority of R.S. 37:2554, did testify on the 6th day of January, 2023, at Lafayette, Louisiana, as hereinbefore set forth in the foregoing 426 pages; that this testimony was reported by me in the stenomask reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is true and correct to the best of my ability and understanding; that the transcript has been prepared in compliance with the transcript format guidelines required by statute and rules of the board; that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana

**428**

Code of Civil Procedure Article 1434 and rules of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter; that I am not related to counsel or to any of the parties hereto, I am in no manner associated with counsel for any of the interested parties to this litigation, and I am in no way concerned with the outcome thereof.

This 24th day of January, 2023, Lafayette, Louisiana.