IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA


MICHAEL DUNN

vs.                                Civ. A. No.
                                   6:21-cv-05135

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, AND JOHN
DOE

* * * * * * * * * * * * * * * * * * * * * * * * * * * *




VIDEOTAPED DEPOSITION OF
RYAN YOUNG

March 27, 2025


Held at Neuner Pate
1001 W. Pinhook Road, Suite 200
Lafayette, Louisiana  70503






Reported by:

Rita A. DeRouen, CCR, RPR
(CCR #2014018)
(RPR #006908)

MAGNA
LEGAL SERVICES

EXHIBIT D

## Page 2

APPEARANCES:
REPRESENTING THE PLAINTIFFS:
   SIDLEY AUSTIN, LLP
   787 Seventh Avenue
   New York, New York  10019
   212.839.5300
   BY:  CASSANDRA LIU, ESQ.
   cassandra.liu@sidley.com
   BY:  JAMES HORNER, ESQ.
   jhorner@sidley.com

          - AND -

   KEARNEY LOUGHLIN, ATTORNEY AT LAW
   602 Boulder Creek Parkway
   Lafayette, Louisiana  70508
   337.534.8803
   BY:  KEARNEY LOUGHLIN, ESQ.
   kearney.loughlin@gmail.com
   (Via Zoom)

REPRESENTING THE DEFENDANT CITY OF EUNICE:
   BECKER & HEBERT, LLC
   201 Rue Beauregard
   Lafayette, Louisiana  70508
   337.233.1987
   BY:  DANIEL GAUTHIER, ESQ.
   dgauthier@lawbecker.com
   (Via Zoom)

REPRESENTING THE DEFENDANT VICTOR FONTENOT:
   STAMEY LAW FIRM, LLC
   727 Second Street
   Natchitoches, Louisiana  71458
   318.951.1024
   BY:  JOSEPH B. STAMEY, ESQ.
   joe@stameylawfirm.com
   (Via Zoom)

## Page 3

APPEARANCES:  (CONTINUED)
REPRESENTING THE DEFENDANT RYAN YOUNG:

   NEUNER PATE
   1001 West Pinhook Road, Suite 200
   Lafayette, Louisiana 70503
   337.272.0348
   BY:  JASON REED, ESQ.
   jreed@neunerpate.com


Also Present:
   Andy Grover, Videographer
   Mayor Scott Fontenot
   Lauren Sylvest, Becker & Hebert (Via Zoom)

   Reported by:

   Rita A. DeRouen, Certified
Court Reporter No. 2014018
   in and for the State of
Louisiana

## Page 4

          I N D E X

                                        Page
Stipulation                              6
Reporter's Page                         210
Reporter's Certification                211

  EXAMINATION
    By Ms. Liu                           8
    By Mr. Reed                         206
              * * * * *
          List of Exhibits

Exhibit #1
     (Personnel File of Ryan Young,           40
     CityofEunice_Dunn_0001809 - 2095)

Exhibit #2
     (Critical Incident Form - Police,        80
     12/06/19, CityofEunice_Dunn_0000156 -
     157)

Exhibit #3
     (Employee Investigation Authorization,   91
     8/30/19, CityofEunice_Dunn_0001657 -
     1661)

Exhibit #4
     (Critical Incident Form - Police,        91
     8/26/19, CityofEUnice_Dunn_0002214 -
     2233)

Exhibit #5
     (Interoffice Memorandum, re:  Notice of  99
     Investigation, 3/19/21, DUNN_0000624)

## Page 5

EXHIBITS:  (CONTINUED)
Exhibit #6
     (Transcript of Probation Revocation      120
     Hearing, 10/08/20,
     CityofEunice_Dunn_0003515 - 3549)
Exhibit #7
     (Recording No. 5, Conversation Between   158
     Michael Dunn & Ryan Young)

Exhibit #8
     (First Amended Complaint)                177
Exhibit #9
     (Answer to the Plaintiff's Supplemental  195
     Complaint)

Exhibit #10
     (Short Message Report, DUNN_0001977 -    202
     1980)

Exhibit #11
     (Text Messages)                          206



Page 6

S T I P U L A T I O N

It is stipulated and agreed by and between counsel that the testimony of the witness, RYAN YOUNG, is hereby being taken pursuant to Notice under the Federal Rules for all purposes permitted under law.

The witness reserves the right to read and sign the deposition. The original is to be delivered to and retained by CASSANDRA LIU, ESQ., for proper filing with the Clerk of Court.

All objections, except those as to the form of the questions and/or responsiveness of the answers, are reserved until the time of the trial in this cause.

* * *

Rita DeRouen, Certified Court Reporter in and for the State of Louisiana and Registered Professional Reporter, officiated in administering the oath to the witness.

Page 7

THE VIDEOGRAPHER:

We are now on the record. This begins Videotape Number 1 in the deposition of Ryan Young, taken in the matter of Michael Dunn vs. Randy Fontenot, et al.

Today's date is March 27, 2025. The time is 8:58 a.m. This deposition is being taken at the offices of Neuner Pate in Lafayette, Louisiana at the request of Sidley Austin LLP.

My name is Andy Grover; I'm the videographer. The court reporter is Rita DeRouen. We're with Magna Legal Services.

At this time, would counsel please introduce yourselves for the record.

MR. REED:

Y'all want to just do it on the record as opposed to going through the table?

MR. HORNER:

Sure.

MR. REED:

Save some time.

Page 8

MR. HORNER:

Sure.

THE VIDEOGRAPHER:

Would the court reporter please swear in the witness.

RYAN YOUNG, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LIU:

Q. Good morning, Mr. Young.

A. Good morning.

Q. My name is Cassandra Liu, and I'm an attorney at Sidley Austin. I represent Plaintiff Michael Dunn in a lawsuit that he filed against you, the City of Eunice, and Victor Fontenot. With me today is my colleague, James Horner.

Have you ever been deposed before?

A. Yes.

Q. I know you might have heard all of these rules before. I just want to start with some of the ground rules for today so it will make things go smoother.

Do you understand that you're testifying under oath and that your answers will be subject

Page 9

to the penalty of perjury?

A. I do.

Q. When I ask questions today of you, if you don't understand a question, please ask me for clarification; otherwise, I'll assume you understood the question.

Is that all right?

A. Understood, yes.

Q. And we have a court reporter today whose job is to take down everything that is said. To make her job easier, I'm going to ask that we don't do any crosstalk. So please let me finish my questions before you answer, and I'll try to do the same.

A. Okay.

Q. And the court reporter cannot pick up gestures, like head nods, so please provide verbal answers to my questions.

A. I understand.

Q. If any of the attorneys object to my questions, you must still answer the question unless you are instructed by your attorney not to answer.

Do you understand that?

A. I understand.



Ryan Young

March 27, 2025
Pages 10 to 13

Page 10

Q.   And if at any time you want a break, please let me know, and if there's a question pending, I just ask that you answer that question before we go on a break.

A.   I understand.

Q.   You mentioned you were deposed before?

A.   Yes.

Q.   How many times were you deposed before?

A.   Three or four in my career.

Q.   And in what type of proceedings were those?

A.   Mostly in reference to traffic crashes.

Q.   And so you were deposed in your capacity as the investigating officer?

A.   Once as a witness and the rest of the times as either investigating or assisting officer.

Q.   What was that time that you were deposed as a witness?

A.   I witnessed an individual on a bicycle being struck by a vehicle.

Q.   You were not a party to that incident?

A.   No.

Q.   Have you ever testified at a trial or other court proceeding?

Page 11

A.   Yes.

Q.   How many times?

A.   I have no idea over the 27 years. Numerous times.

Q.   And were those in your capacity as a police officer?

A.   Yes.

Q.   Were you ever a party to any other lawsuit aside from this case?

A.   There was an incident many years ago where an individual had claimed some -- a claim against the City.  I don't know for sure if I was listed in that lawsuit.

Q.   And what was the claim in that case?

A.   He was claiming that he was a victim of excessive force, which ultimately was investigated by the Federal Bureau of Investigation and found to be non-sustained.

Q.   And you were involved in that case how?

A.   I was one of the assisting officers who made the arrest.

Q.   Aside from this lawsuit, were you involved in any other lawsuit, and this one that you just talked about?

A.   Not to my knowledge.

Page 12

Q.   What, if anything, did you do to prepare for today's deposition?

A.   I met with my counsel and discussed some of the --

Q.   I don't need to know what you discussed with your counsel.

A.   Yeah, just some of the facts about...

Q.   Did you do anything else to prepare for today's deposition?

A.   Nothing specific, no.

Q.   How many times did you meet with counsel in preparation for today's deposition?

A.   I think twice.

MR. REED:
It's whatever you recall.

A.   Okay.  I think it was twice.

BY MS. LIU:

Q.   And when was this?

A.   We met yesterday, and then we met -- I had a deposition that was scheduled, but then it got canceled and rescheduled.  I think we had spoke by phone before that one.

Q.   Was anyone else present when you spoke to counsel?

A.   No.

Page 13

Q.   Have you spoken to anyone else about today's deposition?

A.   Not in an official capacity.  I told my daughter if she needed anything today, I wouldn't be available.

Q.   Did you speak to Randy Fontenot or Victor Fontenot?

A.   No.

Q.   Have you spoken to anyone at the City, including the mayor, who's sitting here today?

A.   No.  I mean, my dispatcher knows that I will be out of the office today because of doing a deposition, but they don't -- I didn't discuss anything with them.

Q.   Have you spoken to Michael Dunn about today's deposition?

A.   No.

Q.   Did you review any documents in preparation for today's deposition?

A.   I did review one document in reference to a telephone call.

Q.   Did that document refresh your recollection on the events?

A.   Yes.

Q.   And what was that document?



Ryan Young

Page 14

A.  It was a transcript of a recording that Michael Dunn had recorded a telephone call between himself and I.

Q.  Did you bring any documents to today's deposition?

A.  No.

Q.  And have you attended any deposition in this case or reviewed any of the deposition transcripts?

A.  No.

Q.  Have you talked to anyone else about their depositions in this case?

A.  No.

Q.  Can you briefly describe your educational background.

A.  I have a high school diploma, attended the Louisiana POST police officer academy, graduate -- I mean, certified police officer, and continuing education as a police officer since.

Q.  When did you first join Eunice Police Department?

A.  In September of '98.

Q.  And aside from -- you've been working for the Eunice Police Department ever since then?

A.  Yes.

Page 15

Q.  Did you work for any other law enforcement agency before that?

A.  No.

Q.  And have you had any other jobs besides working for the Eunice Police Department?

A.  Yes.  Previous to that I was in sales for an auto recycling business.

Q.  When I refer to EPD, you understand that to mean Eunice Police Department?

A.  Yes.

Q.  When you first joined EPD, what was your rank and position?

A.  I was a patrol officer.

Q.  What were your job responsibilities as a patrol officer?

A.  General patrol, protection, service, traffic enforcement, investigating crimes.

Q.  How long can you spend as a patrol officer?

A.  I was promoted to sergeant via promotional exam and also by an open position.  It was about three years after.

Q.  What were your job responsibilities as a sergeant?

A.  Same responsibilities, along with

Page 16

intermediate supervision of subordinates.

Q.  At some time were you promoted after that?

A.  Yes.

Q.  What were you promoted to?

A.  Police lieutenant with the civil service test and an open position.

Q.  And when was that?

A.  I don't recall exact date, '04, '05.  A long time.

Q.  And have you been serving as a lieutenant ever since then?

A.  Yes.

Q.  What job duties do you perform as a lieutenant?

A.  Those same duties, also first-line supervision of subordinates.

Q.  Are there particular duties that you perform as a lieutenant that you -- that officers of lower rank do not perform?

A.  We're all police officers.  So a lieutenant can do the same job that a basic patrol officer can do as far as responding to calls of service and protection.  The lieutenants -- the road lieutenants run a shift of a group of people,

Page 17

men and women, three, four, five, depending on how many's on that shift.  And they kind of assist with overseeing the jail when there's no jail staff available.

Q.  Have you ever been asked to perform duties that are below the rank of a lieutenant?

A.  Like I said before, all duties of a lieutenant encompass everything that a patrol officer does and more.  Just because you gain rank doesn't mean your responsibilities lessen.

Q.  Uh-huh.  At some point did you take an extended leave due to an injury?

A.  I did.

Q.  And when was that, approximately?

A.  I think it began early July of 2018.

Q.  How long did you take leave for?

A.  And I returned April of 2019.

Q.  Before your leave, what was your role with the EPD?

A.  I was a shift lieutenant for patrol.

Q.  During your leave, did you have conversations with Randy Fontenot about your role upon your return?

A.  About what?

Q.  Your role upon return.



Ryan Young

Page 18

A.   No, not while I was gone.

Q.   You did not speak to Randy Fontenot at any time during your leave?

A.   Oh, we spoke, yes.  But I was not sure if and when I was going to return due to the injury.

Q.   What did you speak about?

A.   I don't recall exactly, just general conversation, how things were going at the police department, you know.  I mean, it was my place of employment.  Just because I was injured didn't mean I didn't care what was going on.

Q.   And upon your return, what was your role?

A.   When I did return, I asked to be removed from the patrol division because I still did not have complete range of movement in my arm, and as a patrol officer, you carry a sidearm and, of course, equipment.  And I had strength, but I felt that I might be -- what's the word I'm looking for -- at a disadvantage if I was still on patrol.

Q.   And so what role did you take on after that?

A.   So I asked to be put in investigations as an intelligence officer.

Page 19

Q.   And what responsibilities do you carry out as an intelligence officer?

A.   We didn't have a dedicated division for that.  So basically it was gathering information from different sources, passing it onto patrol, to other investigators, to other agencies.  I would gather information from other agencies to disseminate to our department.

Q.   At some time did you become the chief of detectives?

A.   Yes.

Q.   And when was that?

A.   I don't recall the date.

Q.   Approximately how long have you been serving as chief of detectives?

A.   Three years or so.

Q.   And what does the chief of detectives do?

A.   He oversees the detective division, any detectives that work crimes against persons, property, the juvenile division.  He also investigates crimes as well.

Q.   Did you have a predecessor as the chief of detectives?

A.   Yes.

Page 20

Q.   Who was that?

A.   Tony Kennedy was the former chief of detectives.

Q.   And did that role pass on to you when he was promoted?

A.   Yes.

Q.   Who do you report to as the chief of detectives?

A.   The deputy chief of police and the chief.

Q.   And in your term as chief of detectives, who has been the deputy chief of police or police chief?

A.   Tony Kennedy and Jeremy Ivory.

Q.   And the chief of police was Randy Fontenot and then now Kyle LeBouef?

A.   Correct.

Q.   Does your role as chief of detectives include internal investigations?

A.   Yes.

Q.   How many detectives do you oversee as chief of detectives?

A.   Right now, one.

Q.   Who is that?

A.   Detective Jessica Tezeno.

Page 21

Q.   And prior to that, did you have more detectives under your supervision?

A.   Yes.

Q.   How many?

A.   At one time, I had four.

Q.   What are the job duties of a detective?

A.   They investigate crimes initiated by the -- well, not crimes initiated by the patrol division, but reports of crimes that the patrol division takes, certain cases get passed on to detectives, more serious offense cases.

Q.   So is a detective distinct from being a patrol officer?

A.   It's a different title, but the job duties are the same as far as gathering information, solving crimes, rendering aid when needed, protecting the public.

But the detective division usually concentrate on one set or -- one set of cases, you know, or a single case, something that's more -- that takes more importance than, you know, a stolen trash can or a stolen weed-eater.

Q.   Is there a particular criteria in order to be selected as a detective?

A.   I don't think so.  I think based on


MAGNA
LEGAL SERVICES

Page 22

probably experience and willingness to get the job done.

Q.   Does a detective have to be a particular rank or experience before -- as a patrol officer before they're selected as a detective?

A.   No.

Q.   Was Victor Fontenot at one point a detective under your supervision?

A.   Yes.

Q.   Do you recall the time period in which that was happening?

A.   After I returned.

Q.   So this was around April 2019; is that what you said?

A.   Not immediately.  I was not his supervisor immediately.  So no, not in April of 2019.

Q.   When did he become a detective?

A.   I guess I could have been classified as a detective at that point, but I was not the chief of detectives.

Q.   Understood.

Do you know the plaintiff, Michael Dunn?

A.   Yes.

Q.   How long have you known Lieutenant Dunn?

Page 23

A.   Since he became employed with the Eunice Police Department.

Q.   Do you recall when that was?

A.   No.

Q.   How much interaction do you have with Lieutenant Dunn in your responsibilities at EPD?

A.   We discuss if there's cases that his shift passes on, you know, to detectives.  We discuss general law enforcement stuff from time to time.

Q.   Do you run different shifts from Lieutenant Dunn?

A.   So he's in a patrol division, which they work a rotating days/nights schedule.  And we work primarily through the -- Monday through Friday.

Q.   At one point you supervised Lieutenant Dunn; is that right?

A.   Many years ago.

Q.   How would you describe your relationship to Lieutenant Dunn?

A.   Can you rephrase that, please.

Q.   How would you describe your relationship with him?

A.   At work?

Q.   Sure.

Page 24

A.   At what point, when I was supervising him or now?

Q.   Well, why don't we start with when you were supervising him.

A.   He was a patrol officer on my shift.  I don't recall if he was a sergeant when he was on my shift.  I mean, he would do his required work.  Sometimes I did not have to input much information to him and guidance and sometimes I would, depending on what the case was.

Some things he was more knowledgeable about, some things he wasn't, being he was a newer officer.

Q.   And has your relationship at work changed with him since he was no longer under your shift?

A.   Once he was not under my command and he assumed his own role as a supervisor of his own shift, when I was still in patrol, we -- unless certain incidents crossed over from one shift to the other or I had information, we didn't have much of a relationship.

Q.   What's your relationship with him like now?

A.   Well, I mean, it's kind of touchy.  I'm

Page 25

in a lawsuit, you know.  I don't dislike the man, but I just don't agree with some of this.

Q.   What's your opinion of him as a police officer?

A.   I guess that's subjective.  I mean, opinions, everybody has an opinion.

Q.   What's yours?

A.   I think he can do the job, that's not a question.  I just sometimes don't agree with how he does the job.

Q.   In what ways?

A.   Just my -- my opinion.  A lot of officers do not know how to communicate, not saying that Michael Dunn doesn't.  Each individual officer has their own personality and how they interact with people.

So, again, I think he can do the job, that's not a question.  I just -- maybe his personal character is what I don't agree with sometimes.

Q.   Do you think Michael Dunn is an honest man?

A.   I don't think he's ever put anything in a police report that was false.

Q.   Do you think he's ethical?



Ryan Young

Page 26

A. I've never seen him do anything unethical.

Q. And outside of work, do you have any type of relationship with Lieutenant Dunn?

A. He will call me from time to time on weekends when I'm off and his shift's working to discuss police matters, but outside of that, no.

Q. In your job at EPD, do you have to work with other law enforcement agencies?

A. Yes.

Q. Which ones?

A. I've worked with law enforcement agencies as close as Basile to as far away as Dixie County, Florida.

Q. Do you work with any of the more local law enforcement agencies?

A. Yes, I've worked with numerous agencies local to Eunice.

Q. Like the St. Landry Parish Sheriff's Office?

A. Yes.

Q. The City Marshal's Office?

A. Yes.

Q. Louisiana State Police?

A. Yes.

Page 27

Q. Let's start with the St. Landry Parish Sheriff's Office. Can you describe the relationship that you have working with them?

A. It's a professional relationship that they'll call for assistance with certain things sometimes. It's a better relationship with some members than it is with other members. Some of those other members are no longer there. I mean, it's very subjective.

Q. And on what occasions would you have to work with them?

A. Just recently, we -- I say "we" -- our agency assisted them in a homicide investigation where the potential victim was potentially located in our jurisdiction.

Q. How frequently do you have to work with the St. Landry Parish Sheriff's Office?

MR. REED:
   Are you talking about him specifically or are you talking about the Eunice Police Department?

BY MS. LIU:

Q. You specifically.

A. It all depends on different cases. Sometimes they'll call and ask me about certain

Page 28

people, and I'll call and ask them about certain people.

Q. So would you say --

A. It's -- I'm not going to say it's on a weekly basis, but it's not on a -- it's more frequent than every six months. It varies.

Q. Is there a particular person that is the contact person for the sheriff's office?

A. No one in particular.

Q. Is there anyone that you work with more often than not?

A. Usually more of their CID division, criminal investigative division.

Q. Are there particular people there?

A. Donald Thompson. Tony Kennedy is employed with them now. A couple of the other guys, I can't remember their names right off the bat.

Q. With the Eunice City Marshal's Office, can you describe the relationship that EPD has with them?

A. The relationship with the marshals themselves is fine.

Q. Does EPD have to work with the marshal's office?

Page 29

A. They don't have to, but they choose to. I mean, they work with us, we work with them. It interacts together. Their primary duties is they're officers of the court and enforce the court rules, security, and the court orders.
   But they do assist us for major incidents, traffic crashes. I mean, just everybody works together.

Q. Is there a particular person at the marshal's office that you work with?

A. I work with all of them. The marshal in charge of the other marshals is Joey Peloquin.

Q. Is there anyone else before that?

A. How far do you want to go back? Years ago there was Robert Johnson. There's been numerous marshals over the years.

Q. And what about the Louisiana State Police, do you work with them frequently?

A. Yes.

Q. For what purposes?

A. I worked with the intelligence division gathering information on outlaw motorcycle bikers. I've worked with the insurance fraud division. I've worked with criminal investigations. I've worked with narcotics. I've worked with some of



Ryan Young

Page 30

the road troopers.

Q. Are you aware of Lieutenant Dunn contacting any of these agencies to discuss issues at EPD?

A. I'm unaware.

Q. Pardon me?

A. I'm unaware.

Q. You're not aware that Lieutenant Dunn has contacted some of these agencies to discuss issues at EPD?

A. I am unaware.

Q. Have you talked to anyone at these agencies about Lieutenant Dunn?

A. Yes.

Q. Who?

A. Walter Mire.

Q. Who is he?

A. He is a sergeant with Louisiana State Police. At the time that I talked to him, he was assigned to the DEA task force as a supervisor.

Q. And why were you talking to him about Lieutenant Dunn?

A. Because an arrestee made claims to agents with DEA about Lieutenant Dunn. So I was not in the room at that time and neither was

Page 31

Officer -- or Sergeant Mire. But I informed him of what he had previously told myself and Detective Fontenot -- and when I say "he," I mean the arrestee -- so he wouldn't be surprised if these guys came out and...

Q. Who was the arrestee here?

A. Joshua Dupre.

Q. And he made claims about Lieutenant Dunn; is that your testimony?

A. Yes.

Q. And what were those claims?

A. He claimed that he was paying Lieutenant Dunn for information regarding law enforcement.

Q. What does that mean?

MR. REED:

Object to form.

BY MS. LIU:

Q. What did you understand Mr. Dupre to mean when he claimed that he was paying Lieutenant Dunn for information regarding law enforcement?

A. He stated that he was paying Lieutenant Dunn a thousand dollars a month for information regarding law enforcement raids or anything like that.

Q. And when -- when did you receive this

Page 32

information from Mr. Dupre?

A. Mr. Dupre was arrested on outstanding warrants for distribution of narcotics. During the arrest, he began stating that he had information, he wanted help, he didn't want to go back to jail. So he was debriefed. And during the debriefing is when he volunteered that information to myself and Detective Fontenot.

Q. So you heard directly from Mr. Dupre making these claims about Lieutenant Dunn?

A. Yes.

Q. And when was this?

A. I don't remember the date.

Q. Do you remember the year?

A. I don't remember.

Q. Do you remember the month?

A. It was -- no, I do not remember.

Q. Who else, if anyone, was present when Mr. Dupre made these claims?

A. Myself and Detective Victor Fontenot was present.

Q. And prior to this arrest, did you hear any other allegations about Lieutenant Dunn receiving payments?

A. No.

Page 33

Q. So after you heard these allegations from Mr. Dupre, what did you do about that?

A. I notified Chief Randy Fontenot of the allegations made.

Q. And what was Chief Fontenot's reaction to that?

A. I think he was a little bit shocked. And he basically asked what he should do or what I thought he should do. And I said, Well, you might want to have an outside agency conduct an investigation.

Q. What was your reaction when you heard these allegations made by Mr. Dupre?

A. I was kind of shocked.

Q. Why was that?

A. Because he made allegations against a police officer.

Q. When you told Chief Fontenot that he might want an outside agency to conduct an investigation, what happened after that?

A. I believe he tried to contact Louisiana State Police. But I was not present for that.

Q. And at some point, you said you talked to Walter Mire?

A. The day that Mr. Dupre made the



Ryan Young

Page 34

allegations, Mr. Mire and the two agents with DEA were coming to the police department for -- I believe for other reasons.

And when they came to our office, Detective Fontenot, who was still speaking with Officer Dupre -- Mr. Dupre was attempting to give him information about other drug dealers. So he asked him if he wanted to talk to the DEA, who might have more influence, to see if he could get any help if he provided good information to them.

So they walked in, and he began giving the information about the drug dealers, and he also relayed the information about what he had told us about Lieutenant Dunn.

So while they were discussing that, I told Detective Mire, If your guys come out telling you, Hey, this guy is saying there's a dirty cop, this is what happened, this is what it's about. Because I didn't want him to be shocked.

Q. Who were the two other agents, do you remember?

A. Nate, I do not recall his last name, and a Williamson.

Q. So the DEA was not there -- they were there for other purposes; is that right? They

Page 35

were not there specifically --

A. If I recall correctly, they came for other purposes, to meet with us for a different case. But being that they were there and Mr. Dupre was basically begging for help not to go back to jail, he was going to relay information about drug dealers outside of our jurisdiction to them.

Q. And did the DEA act upon the knowledge that Mr. Dupre gave to the best of your knowledge?

A. I'm not sure.

Q. So you don't know if the DEA investigated any of the allegations made by Mr. Dupre?

A. As far as I know -- allegations, which allegations, about Lieutenant Dunn or about the other drug dealers?

Q. About Lieutenant Dunn.

A. As far as I know, there was no investigation done at all.

Q. Have you talked with anyone else at the State police about Lieutenant Dunn?

A. I think when I -- or when I talked to Chief Fontenot about having an outside agency conduct the investigation, I named Eric

Page 36

Duplechain, who was a captain of the troop, as a point of contact for him to contact, but I didn't talk to Eric about it.

Q. To the best of your knowledge, did Chief Fontenot talk to Eric about it?

A. I'm not sure.

Q. And aside from this conversation with Mr. Mire, did you talk to him about Lieutenant Dunn on any other occasions?

A. Yes. Once this news of the lawsuit was out, we discussed that. You know, he asked me why is he suing y'all. Just general conversation.

Q. Okay. And what was that conversation on?

A. I don't recall everything. That he was suing us because of whatever was listed in the suit that was publicized on TV and the news and everywhere else.

Q. What's your relationship with Mr. Mire?

A. He's a friend of mine. He was actually my training officer at Eunice Police Department when I first started, and he later left to join the Louisiana State Police.

Q. Do you have a personal relationship with him?

Page 37

A. Yes.

Q. What is that relationship like?

A. We are friends.

Q. Are you aware that he was deposed in this action?

A. Yes.

Q. Did you talk to him about his deposition?

A. No.

Q. So is it your testimony that aside from the conversation when Mr. Dupre was arrested and conversations you had following the filing of this lawsuit, you have not talked to Mr. Mire about Lieutenant Dunn on any other occasions?

A. I have not discussed this case with Detective Mire outside of those conversations.

Q. Did Detective Mire ever tell you that Lieutenant Dunn had contacted the State police about issues at the Eunice Police Department?

A. I don't recall that.

Q. Did anyone else at the State police ever talk to you about Lieutenant Dunn contacting the State police about issues at EPD?

A. I don't think so.

Q. You're aware that EPD has a policy



MAGNA
LEGAL SERVICES

Ryan Young

Page 38

manual; is that right?

A. Yes.

Q. I believe you call them procedural orders?

A. That's what they're labeled, yes.

Q. And as an EPD officer, you're required to know about these procedural orders; is that right?

A. Yes.

Q. And to follow them?

A. Yes.

Q. Within EPD are there rules or customs that people follow that aren't written down?

A. I don't get what you -- like anything in specific?

Q. Are there things that everyone knows what to do even though they're not in the procedural orders?

MR. REED:

Object to form.

A. The procedural orders is a guide for general good conduct and I guess good moral compass.

BY MS. LIU:

Q. Have you ever been disciplined by the

Page 39

EPD?

A. Yes.

Q. When?

A. I do not recall the date.

Q. How many times have you been disciplined by EPD?

A. I was written up for failing to complete training while I was on sick leave; and I was written up for, I guess, showing a coworker something that was on the internet for everyone to see rather than reporting it straight to the chief of police at the time.

There was a couple of police officers that had friendly ribbing between them where they would joke with each other and it went back and forth. And I typed in one of them's name to see if I could find a picture, and I was going to Photoshop the other one's face on his body.

And when I typed it in, an article came up with the officer's picture of some allegations made against him from where he was from. And it was quite shocking at the time. And my sergeant was standing on the side of me. And I was kind of flabbergasted, so I was like, Look. And she saw it. And once we reported it to the chief of

Page 40

police, I was written up for letting her know about it instead of contacting him in the middle of the night. It was...

Q. Who was the coworker?

A. Richard Abadie. He's no longer there.

MS. LIU:

I'll mark this -- I'm going to hand you a document that I'm going to mark as Exhibit 1.

(Exhibit 1 was marked.)

BY MS. LIU:

Q. And you'll see the -- on the bottom right-hand corner there's a number starting with the CityofEunice_Dunn. That's what we call a Bates number.

A. Okay.

Q. It's just to mark documents that have been produced in this litigation. And I'll represent to you that this document was produced by the City of Eunice in this litigation.

And if you can flip to the page that ends at 1854 for this document. And for the record this is CityofEunice_Dunn_001809.

Mr. Young, is this the written document that you received in relation to the incident that

Page 41

you were talking about with Richard Abadie?

A. If this is what was in my file, then yes. I never saw the document. I just know I was written up.

Q. And if you go to 1855, there's a signature there.

Is that your signature?

A. Yes.

Q. So do you recall if you received this document at any point?

A. I don't recall getting the document. I probably was aggravated that I was getting written up for something so trivial. I probably just signed it.

Q. But you don't dispute that this is an accurate document?

A. If this was in my personnel file for the City of Eunice, then that -- and Officer Abadie's name is in there, Sergeant Sonnier, and basically what I told you just prior to this document being shown to me is in there, then, yes, it is accurate.

Q. And on this page 1855 it states that you were found in violation of department policy at that time; is that right?



MAGNA
LEGAL SERVICES

Ryan Young

Page 42

Q.   Do you see that?

A.   Yes.

Q.   And the specific policy that you were found in violation of is this policy about professional conduct.

Do you see that?

A.   Yes.

Q.   And here it says, "Employee shall not criticize or ridicule the Department or its policies, City officials, or other employees by speech, writing, or other expression.  This includes, but is not limited to, expressions which are defamatory, obscene, unlawful, undermine the effectiveness of the Department, interfere with the maintenance of discipline, or are made with reckless disregard for the truth."

Do you see that?

A.   Yes, I do.

Q.   So it is a violation to make defamatory, obscene statements about another officer; is that right?

A.   I think that's subjective, but...

Q.   What about it is subjective?

A.   I didn't make any obscene statement about this officer in particular.  This

Page 43

information was on the internet for the world to see.

Q.   But it is a violation to make defamatory or obscene statements about another officer; is that right?

A.   According to Ronald Dias, who was the chief of police at the time, I guess it was.

Q.   And is that still the EPD policy, that it is a violation to make defamatory, obscene statements?

A.   I'm not sure.  I'd have to review the current policy.

Q.   And if you look down here still on 1855, it states that the -- sorry, on 1854, the last paragraph there states that the chief of police at that time found that you did not utilize your good judgment.

Do you see that?

A.   I do see that.

Q.   And you were counseled about this incident; is that right?

A.   Basically told me he was writing me up for not going to him and going -- letting the female sergeant see what I had discovered.

Q.   So do you think it's right to spread

Page 44

embarrassing information about your fellow officers?

MR. REED:

Object to form.

A.   I didn't spread embarrassing information about that officer.  Whoever put it on the internet, I would say, would be the culprit.

BY MS. LIU:

Q.   Do you think it is right to do that though?

MR. REED:

Object to form, asked and answered.

A.   I guess it falls in the freedom of speech.

BY MS. LIU:

Q.   Do you think it's right to spread false information about your fellow officers?

MR. REED:

Object to form.

A.   I don't think it's moral to spread information that's not true.  I don't think it's in good morals.

BY MS. LIU:

Q.   Have you ever done that?

A.   Probably in a joking way.

Page 45

Q.   Can you explain?

A.   There's nothing in particular that sticks out, but police officers constantly joke with each other.  I don't -- nothing specific comes to mind.

Q.   You can put that exhibit away.

How would you describe your relationship to Victor Fontenot?

A.   A professional relationship in the past.  He's no longer employed there.

Q.   Do you have a personal or social relationship to him?

A.   No.

Q.   When was the last time you talked to him?

A.   He contacted me about three weeks ago to pass on some information he heard about a possible fentanyl overdose.

Q.   Have you talked to him about this lawsuit?

A.   No.

Q.   When Officer Fontenot was at EPD, how much interaction did you have with him?

A.   I guess a daily basis, being we worked the same type schedule and we shared offices in



Page 46

the same building.

Q.  What did you think of him as a police officer?

A.  As a police officer or as a detective?

Q.  Both.

A.  As a police officer, Victor was learning the -- or gaining experience into law enforcement. He seemed to be doing a well -- a good job, he was doing well.  He had a very good rapport with a lot of the people that we dealt with.

Q.  And as a detective?

A.  As a detective, he was ambitious and passionate about his narcotics investigations.

Q.  Does he have a reputation within the law enforcement community?

A.  Can you be more specific?  A reputation how?

Q.  Does he have a positive or negative reputation within the law enforcement community?

A.  I --

MR. REED:

Object to form.  Sorry.

A.  He's worked with a lot of agencies as well.  I think most agencies have positive things to say about him, with the exception of just --

Page 47

he's kind of like a rough stone that needs a little polishing around the edges.  So some of the finer details he probably needed to be versed on a little bit better.

BY MS. LIU:

Q.  What does that mean?

A.  Just details that would come from working with a more experienced person or details that would -- or things that would be garnered from a longer time working in a position.

Q.  You said most agencies have positive things to say about him.  Are there negative things that you've heard about him from other agencies?

A.  I haven't heard anything negative from other agencies.

Q.  Are you aware of negative things that other agencies might have to say about Officer Fontenot?

A.  No.

Q.  Are you aware of any law enforcement agencies expressing whether or not they would like to work with Officer Fontenot on cases?

A.  If they would like to or dislike to?

Q.  Both.

Page 48

A.  I do not believe St. Landry Parish Sheriff's Office wanted to work with Detective Fontenot.

Q.  Why is that?

A.  I believe it's based off of things that Lieutenant Dunn conveyed.

MR. REED:

Object to form.  A little late but object to form.  Go ahead.  I'm sorry.

A.  I believe it's things that Lieutenant Dunn may have conveyed to them.

BY MS. LIU:

Q.  And what -- what is that?

A.  I don't know.

MR. REED:

Same objection.

BY MS. LIU:

Q.  And what are the things that Lieutenant Dunn may have conveyed to them that would have made them not want to work with Officer Fontenot?

MR. REED:

Object to form, speculation.

A.  I don't know.

BY MS. LIU:

Q.  I'm just trying to understand why you

Page 49

have heard that the St. Landry Parish Sheriff's Office does not want to work with Victor Fontenot?

MR. REED:

Object to form.

A.  I don't know.

BY MS. LIU:

Q.  What is the basis of your belief of that?

A.  The unwillingness to share information about violators that are in their jurisdiction that also operate in our jurisdiction.

Q.  So has anyone at the sheriff's office talked to you about Officer Fontenot?

A.  No.

Q.  Are there any other agencies that have expressed not liking to work with Officer Fontenot?

MR. REED:

Object to form.

A.  Not to my knowledge.

BY MS. LIU:

Q.  Are you aware of any internal investigations into Officer Fontenot's conduct at EPD?

A.  I had to conduct some investigations on



Page 50

Officer Fontenot.

Q.  How many times?

A.  Twice.

Q.  Which incidents do you recall?

A.  One where he was involved in a single-vehicle crash, and another one where he was written up for making some comments.

Q.  And the single-vehicle crash, can you explain what happened there?

A.  Detective Fontenot, along with other officers and members of the marshal's office, were attempting to conduct a traffic stop on an individual, and Detective Fontenot struck a concrete barrier, damaging the unit during that process.

MR. REED:

Guys, did we lose Joe Stamey?

THE VIDEOGRAPHER:

He's not on.  Do you want to go off the record?

MR. REED:

Yeah, let's go off the record.

THE VIDEOGRAPHER:

We are off the record.

(A break was taken.)

Page 51

THE VIDEOGRAPHER:

We are back on the record.  The time is 10:05.

BY MS. LIU:

Q.  Mr. Young, before we took our break, we were talking about an investigation that you did of Detective Fontenot related to a vehicle crash.

A.  Correct.

Q.  And you were explaining what was happening in that investigation.

A.  I was explaining what the investigation was about.

Q.  Sure.

A.  Yeah.

Q.  And you got cut off, I think, at that time.  Can you explain what that investigation was about?

A.  So Detective Fontenot struck a curb with his issued police unit, resulting in damage to the vehicle.  He was subsequently -- an investigation occurred to see if he was operating the vehicle in a reckless manner, whatever caused it, the crash.

And an investigation was conducted, and he was found to be in violation of whatever the procedural order was, I don't recall it off the

Page 52

top of my head.

Q.  And as part of your investigation that you -- you discovered that he actually lied about the cause of the accident; is that right?

MR. REED:

Object to form.

A.  I don't think he lied.  I think his judgment or his view of what happened was his own personal view.  He made a comment about someone cutting him off.

BY MS. LIU:

Q.  Uh-huh.

A.  The investigation revealed that his perception of what happened was different than what happened.  And in a situation where your adrenaline is pumping, you get tunnel vision.

So I can't sit here and say exactly what he saw or didn't see.  But ultimately I found that he violated whatever that procedural order is, and the subsequent was that he was disciplined for it.

Q.  So it's your testimony that you don't think he was being dishonest when he reported what happened?

MR. REED:

Object to form.

Page 53

A.  It's my testimony that I don't believe he lied to cover up anything.  I think his perception of what happened was different than what was later determined to have happened.

BY MS. LIU:

Q.  How would you describe your relationship to Chief Fontenot?

A.  Professional.

Q.  Do you have a relationship with him outside of work?

A.  I've attended a couple of suppers, cooking -- cookout -- not cookout, but a lot of older police officers from our department, other departments, on occasion he's had -- hosted dinners at his house that we've all attended.

Q.  When was the last time you talked to him?

A.  Probably a month ago.

Q.  What was that about?

A.  I saw him and told him hello.  He was at the police department visiting with someone.

Q.  And have you ever talked to him about this lawsuit?

A.  Not in detail.

Q.  What did you talk to him about about



Page 54

this lawsuit?

A.   Just in general, that the lawsuit is still ongoing, when do you do your deposition, blah, blah, blah, you know.

Q.   Have you discussed the substance of the lawsuit with Chief Fontenot?

A.   What was listed in the lawsuit that we were served in the beginning, you know, that's the only time we discussed it.

Q.   How much interaction did you have with Chief Fontenot when he was the chief of police?

A.   How much interaction?

Q.   Yes.

A.   We would meet in -- in the mornings and go over paperwork.  Some days we would go to lunch, a group of officers would go to lunch.  Keep him updated about cases periodically.  But my office was in a separate building across town.

Q.   And was that in your role as chief of detectives?

A.   Prior to that and during that.

Q.   Did your relationship with Chief Fontenot change at any point in time while he was at EPD?

MR. REED:

Page 55

Object to form.

A.   Not that I'm aware of.

BY MS. LIU:

Q.   Has he ever commented on your job performance as a police officer or lieutenant?

MR. REED:

Object to form.

A.   He's given me props for some of the cases that we've worked and some of the convictions that we've gotten.

BY MS. LIU:

Q.   Has he commented otherwise?

MR. REED:

Object to form.

A.   Not that I recall.

BY MS. LIU:

Q.   What's your opinion of Chief Fontenot as chief of police?

A.   When Chief Fontenot took office, that was the fourth chief that I worked under.  I told him that I probably wouldn't agree with every decision he made, but I would be loyal to the department.  I think, in certain aspects, he was a good chief; I think, in other aspects, that he could have been a better chief.

Page 56

Q.   In what aspects could he have been a better chief?

A.   I think if he would have been more in tune with his officers and stood -- stood by them in certain aspects.

Q.   What does that mean?

A.   I mean, it -- I think if he would have fought for us harder with the City council and pay issues, equipment issues, I think we might have been in a better position.

Q.   What's your impression of Chief Fontenot's approach to law enforcement?

MR. REED:

Object to form.

A.   I think Chief Fontenot's approach was based off of his experience as a police officer prior to my experience as a police officer.  I think he was probably stuck more in the older days of law enforcement than the modern times of law enforcement.

BY MS. LIU:

Q.   And so how would you describe his approach to law enforcement?

A.   I think he was approaching it as if it was back when he was a police officer, in the

Page 57

older days, so more nonchalant.

Q.   Would you agree with that approach?

A.   I think certain situations -- every situation is different, so every approach is different.

Q.   Can you describe what you mean by "nonchalant" approach?

A.   So in the older days of law enforcement, there was still the same crimes of today, but some of them weren't as prevalent.  Eunice has a gang problem that didn't exist when he was a police officer.

Just like most every small-town city in America and small city that have gang problems, these gangs are more well equipped than law enforcement these days as far as for guns and whatever they do.  And I think that he might have been oblivious to that in the beginning.

Q.   Have you ever heard Chief Fontenot discuss a gray area of law enforcement?

A.   Not -- not in any particular instance, no.

Q.   But you seem to have an impression of him discussing a gray area of law enforcement.

A.   There are certain gray areas of law



Page 58

enforcement.  Certain laws and the way they are worded with "shall" and "will" versus laws that are worded with "may," meaning certain laws allow an officer to have discretion and some do not.

Q.   And how have you observed Chief Fontenot navigate this gray area that we discussed?

MR. REED:
Object to form.

A.   I never really saw Chief Fontenot navigate anything as an administrator.  As an elected chief, he was more administration than an actual investigator investigating crimes.

BY MS. LIU:

Q.   Has he ever provided instruction to EPD officers about how to navigate in gray areas?

MR. REED:
Object to form.

A.   Not that I'm aware of.

BY MS. LIU:

Q.   Since Chief Kyle LeBouef took over, have there been changes at EPD?

A.   Yes.

Q.   What types of changes?

A.   We've hired people, we've gotten different equipment, we've got a pay increase.

Page 59

Q.   Anything else?

A.   I'm sure there's other things that I can't remember.

Q.   Do you think these changes are positive or negative?

A.   Positive.

Q.   Why is that?

A.   It boosts morale, definitely provides officers with some of the tools needed to assist them in doing their job, and definitely puts more money in their pocket.

Q.   How would you describe the morale of EPD between Chief Fontenot and Chief LeBouef's terms?

A.   I think the morale was down prior to Chief LeBouef taking over.  A lot of officers were leaving for higher-paying jobs.  So we were very shorthanded.

Q.   Are you aware of other reasons for officers leaving at the time Chief Fontenot -- during Chief Fontenot's term?

A.   Some officers left to take positions with other agencies to better their chances of advancing, but the majority stipulated it was because of the pay.

Q.   What do you mean by "better their

Page 60

chances of advancing"?

A.   For instance, leaving to come to work for Lafayette Police Department and then later apply for Louisiana State Police.  It's common knowledge that Lafayette loses a great percentage of officers to State police.

Q.   And you said that morale was down.  Was there any other reason for morale being down during Chief Fontenot's term?

MR. REED:
Object to form.

A.   I can't speculate why each individual's morale was down or who exactly's morale was down, but the general reason was lack of manpower, lack of pay raises.

BY MS. LIU:

Q.   Does EPD have an internal affairs department?

A.   Not a department, but I am tasked with most of the internal -- internal affairs investigations unless the chief deemed someone else to do it, which I haven't seen.

Q.   So generally you would do the internal investigations?

A.   Generally, yes.

Page 61

Q.   Is there anyone else that would assist you?

A.   No.

Q.   Are there other officers that you're aware the chief has designated to do internal investigations?

MR. REED:
You're talking about the current chief?

MS. LIU:
Chief Fontenot.

A.   I think Detective Kennedy did them when he was chief of detectives.  Typically that responsibility falls on the chief of detectives.  So I did not start them until I was chief of detectives, but I am unsure about the one with Victor when he made the comments.  I don't know if I was chief of detectives at that time, I don't recall.

BY MS. LIU:

Q.   Okay.  How many internal investigations do you conduct roughly?

A.   I've probably done ten.

Q.   In your approximately three years as chief of detectives?



Ryan Young

Page 62

A.  Yeah, something -- including the one on Victor, if I wasn't the chief of detectives, about ten.

Q.  Understood.

Has he ever asked Officer Fontenot to -- I'm sorry, rephrase.

Has Chief Fontenot, to the best of your knowledge, ever asked Officer Fontenot to conduct an internal investigation?

A.  Not to my knowledge.

Q.  Would that be proper, if he asked Officer Fontenot to conduct an internal investigation?

MR. REED:

Object to form.

A.  It would not be out of his ability, but I have not known Chief Fontenot to ask anyone to do an internal affairs investigation, with the exception of Tony Kennedy, who was the chief of detectives under Chief Fontenot.

BY MS. LIU:

Q.  And does an officer have authority to conduct an internal investigation without the chief's authorization?

A.  I would say no.

Page 63

Q.  Have you ever asked Officer Fontenot to help you with any internal investigation?

A.  No.

Q.  Do you still conduct internal investigations under the current chief?

A.  Yes.

Q.  Can you walk me through the process to conduct an internal investigation?

A.  Typically a critical incident is submitted to the deputy chief and chief of police on whichever individual by whichever individual writes the critical incident.  The incident is reviewed by the chief and it's determined whether further investigation is required.

If further investigation is required, acknowledgement of authorization to conduct the investigation is drawn up, that is signed by the subject of the investigation, and at that time, that subject is provided with a copy of their officer bill of rights.  The investigation then begins.

Once the investigation or investigator is finished with his investigation, his findings are submitted back to the chief of police, who then consults with the appointing authority, and

Page 64

it goes from there.

If there's any disciplinary action, there's a predisciplinary hearing where the appointing authority and the chief is present, and the accused is welcome to be present to present any other facts or plead their case.  And I don't typically attend those.

Q.  You said the -- if there's further investigation required, then the acknowledgement is done by the subject of the investigation?

A.  No, the chief submits a letter stating that he's authorizing myself or whomever to conduct an investigation, and that letter -- a copy of that letter is presented to the individual with an acknowledgement of their -- notifying them of their investigation, which they sign a copy, which is submitted back.

Q.  So the subject of the investigation is always notified that he is being investigated?

A.  If he's an employee, yes.

Q.  And that's actually a -- you said they're given a bill of rights as well?

A.  Police officer's bill of rights, yes.

Q.  Are there any instances in which the subject of the investigation is not notified about

Page 65

the investigation?

A.  If it's an internal investigation, they have to be notified.

Q.  By law?

A.  Yes.  It's in the officer bill of rights.

Q.  Are you aware of any unofficial investigations?

A.  No.

Q.  Is that allowed?

A.  No.

Q.  Would it be a violation of EPD policy for an officer to conduct an unofficial investigation?

MR. REED:

Object to form.

A.  I don't think there's anything in the policy and procedure manual that discusses unofficial investigations.

BY MS. LIU:

Q.  Because that's not a thing, right?

A.  Because it's not something that is done.

Q.  What, if anything, do you do to document your investigation?

A.  Interviews are recorded with audio and



Ryan Young

Page 66

video. Any witness statements obtained is submitted with the case file. If there's any video or audio from an outside source that is able to be obtained, it is also submitted.

General evidence. Whatever evidence is available is submitted with the internal affairs investigation.

Q. Do you generally write notes about the interviews or evidence that you're reviewing?

A. I write a summary narrative of the entire investigation.

Q. And that's to provide to?

A. The chief of police.

Q. And you would make sure that the summary of the evidence -- or the summary narrative is accurate and --

A. Yes.

Q. -- complete?

A. Yes.

Q. Do you make a recommendation about the discipline imposed?

A. I do not.

Q. Do you make a recommendation about whether or not, in your view, EPD policy is violated?

Page 67

A. I do not.

Q. So you just present the facts?

A. That's it.

Q. Do you recall an incident involving Officer Cody Miller? First of all, do you know Officer Cody Miller?

A. Yes. He's no longer with the department.

Q. Do you recall investigating Officer Cody Miller around April of 2021?

A. Yes.

Q. What was that investigation?

A. It was a critical incident that was submitted in reference to Officer Miller striking an arrestee.

Q. Who submitted that critical incident?

A. I believe it was Lieutenant Dunn, Michael Dunn.

Q. And what were the allegations made?

A. That he struck an arrested person who had spit in his face.

Q. Was any other agency involved in this investigation?

A. Yes.

Q. Who was that?

Page 68

A. Louisiana State Police.

Q. Why were they involved?

A. I conducted the internal affairs investigation to determine if he had violated policies. Louisiana State Police was conducting an investigation to see if there was any criminal violations.

Q. What was the outcome of your internal affairs investigation?

A. I notated what violations it appeared that Officer Miller violated and submitted my completed internal affairs investigation.

Q. Did you determine whether or not he violated EPD policy?

A. I determined that he did, in fact, strike the individual who spit in his face, which was considered conduct unbecoming an officer. I think that's what it was. I'd have to look back at it, but I think that's what it was.

Q. And the Louisiana State Police investigation, what was the outcome of that, if you know?

A. The investigator that was assigned the case contacted me several times and stated that he attempted to conduct an interview with Lieutenant

Page 69

Dunn and was unsuccessful in conducting that interview with Lieutenant Dunn. And I believe he told me it was because Lieutenant Dunn wanted to check with his legal staff.

During that process, I conducted an interview with the arrested person that was struck, who during our investigation -- or our interview admitted that he was wrong for spitting on the officer and deserved what he got and that he did not want to do anything about it and did not want to file any charges on the officer.

A recording of that was forwarded to State police investigator. And due to not having cooperation from Lieutenant Dunn and the fact that the gentleman made the statement he did not want to pursue anything, they closed the case on the criminal side.

Q. What did you do with the information that the State police gave you about Lieutenant Dunn allegedly not wanting to speak with them?

A. I informed Chief Fontenot that he did not want to speak with them -- or that he told them that he needed to consult with his legal team.

Q. And what was Chief Fontenot's reaction



Ryan Young

March 27, 2025
Pages 70 to 73

Page 70

to that?

A. I don't recall.

Q. Was it compulsory for Lieutenant Dunn to speak with the State Police?

A. I don't know how often he spoke with the State Police.

Q. Was he required to, to speak to the State Police in relation to this incident?

MR. REED:

Object to form.

A. Typically, someone who submits a complaint, they are interviewed to verify the information that they submitted is, in fact, correct, how they obtained this information.

When police officers go to court in regular proceedings, their reports are considered hearsay. So that report, until you can document where the information came from, is this accurate that you submitted, typically yes, they do -- whoever submits the critical incident will speak to the investigator.

BY MS. LIU:

Q. Okay. You say typically. I'm asking whether or not he was required to?

MR. REED:

Page 71

Object to form.

A. I would say yes, it should be required to.

BY MS. LIU:

Q. By -- is that by law or policy?

A. I don't know of any law. But if you make an allegation or a complaint, you should be able to explain to the person tasked with investigating that complaint why you made that complaint.

Q. It's your understanding -- at this point, had Lieutenant Dunn filed his lawsuit against the City and you?

A. I'm not sure. I don't recall.

Q. So to clarify, you don't know of any law or policy that required him to speak to the State Police after making the initial critical incident?

A. No, I don't know of any law, no policy.

Q. Did Chief Fontenot discuss with you his thoughts on Lieutenant Dunn's refusal to speak to the State Police when you told him?

A. I don't remember.

Q. Do you remember if he had a positive or negative reaction to that?

A. I don't remember.

Page 72

Q. Did Chief Fontenot ever ask you to investigate or arrest Lieutenant Dunn for refusing to speak with the State police?

A. No.

Q. Are you aware of any finding of wrongdoing by Lieutenant Dunn in connection with this incident involving Officer Miller?

A. No, I'm not aware of anything.

Q. Do you -- you spoke about the incident involving Officer Fontenot and making comments?

A. Yes.

Q. And that was an incident involving Officer Darrian Guillory as well?

A. Yes.

Q. Tell me about that investigation.

A. Lieutenant Dunn submitted critical incidents on Detective Fontenot and Officer Guillory for making comments that I guess he found offensive.

Q. That started with an incident involving a rape kit and mishandling of evidence; is that right?

A. It started with an unknown incident that Lieutenant Dunn became involved with at the hospital in Eunice, which I think he thought may

Page 73

have been a rape but ended up being a consensual sexual encounter between two individuals under the influence of methamphetamine.

Q. Okay. What -- what were Lieutenant Dunn's concerns about that incident as reported to you?

A. He was concerned that Officer Guillory had the rape kit in her vehicle rather than in the police department evidence locker.

Q. And what were your findings as to what happened with that rape kit?

A. The female individual that the kit was obtained from was unconscious when the kit -- or impaired to the point where she was kind of out of it when the kit was obtained.

But she later told the story that her and the male subject were consuming methamphetamine, they got in a position where they began having sex, and there was no rape involved; it was all consensual.

Q. Did you agree with the handling of the rape kit being in the vehicle rather than the police evidence locker?

A. No, I don't. But every situation is different.



Page 74

Q. And then what led to the comments that were made by Officer Fontenot and Officer Guillory?

MR. REED:

Object to form.

A. Lieutenant Dunn submitted a report on that incident. And we were reading the report, and there was some verbiage in the report that we found some humor in. And it kind of just went from there.

We kind of laughed about it. And I think I made a comment about -- I said -- I don't remember exactly how things went. But at one point they started to maybe discuss the dog, the K-9 dog, and I said something about, Wouldn't it be funny if they took the dog from Dunn and gave it to Victor?

BY MS. LIU:

Q. I'm sorry, who's "we" in this?

A. I think Victor Fontenot and Officer Guillory were present. One of our former deputy chiefs was present. He was -- I say he was present; he was between that room and his office, back and forth.

Chief Fontenot was in the room, but he

Page 75

was reading reports, so I'm not sure if he actually heard what we were talking about. I mean, when he would read reports, it's like he tuned everything else out, he would just be concentrating on what he was doing.

Q. And where was this room?

A. The briefing room.

Q. Is there audio or video recordings in that room?

A. At the time, I do not know if anything was still properly working or not in there. They are now.

Q. How long was this conversation that you had with Officer Fontenot and Guillory?

A. I have -- it was -- you know, we usually, in their reviewing paperwork, 10 to 15 minutes in the morning maybe, and the conversation about that might have been three or four minutes.

But I think Lieutenant Myers, Stephanie Myers, was also present.

Q. Anyone else that was present?

A. Not that I can remember.

Q. Was Lieutenant Dunn present?

A. No.

Q. Do you recall anything specific about

Page 76

what Officer Fontenot said in that conversation?

A. When we read the report, we started laughing about the comments that -- I say "comments" -- the verbiage that Lieutenant Dunn had in his report based off of how he began that incident, how the incident started.

And then, like I said earlier, something about the K-9 came up and I made a comment about it would be funny if they took the dog from him and gave it to Victor. And I don't remember exactly how it went.

I'd say, He might turn that dog loose on you, Victor. And Victor said that he would put two in the dog's head before it got to him.

Q. What does that mean?

MR. REED:

Object to form.

A. It means if in actuality a K-9 dog was going to attack him, I guess he would have defended himself against it. But the statement was made in a joking manner.

BY MS. LIU:

Q. And by defending himself, what did you mean?

MR. REED:

Page 77

Object to form.

A. I guess, if he had to, he would have fired two rounds in the dog's head. But it was said in a joking manner, because no one in that room could possibly believe that what we were talking about was going to happen.

BY MS. LIU:

Q. Why did you think it would be funny if Lieutenant Dunn's K-9 was taken away from him?

A. Would I think it was funny?

Q. Why did you say that statement?

A. It was just a joke to tease Victor and just make a joke.

Q. Do you recall Victor saying anything else?

A. He said some -- I don't know at what point, but he said something about that Lieutenant Dunn could lick his nuts, specifically his left one.

Q. Anything else?

A. Not that I remember.

Q. Do you recall anything that Officer Guillory said?

A. Something about, Fuck him and his wife.

Q. Do you recall if Officer -- I'm sorry,



Page 78

Chief Fontenot said anything during that conversation?

A.   I don't recall him saying anything.

Q.   I believe you said the deputy chief was also there, correct?

A.   He was in and out of the room between his office -- his office was directly across the very narrow hallway.  So I'm not sure if he was in the room when it was said about taking the dog, but I know at one point he joked with Victor and just put two bullets on the table, just playing with him.

Q.   Was that in reaction to the comment by Officer Fontenot about putting two in the --

A.   Yeah.

MR. REED:
Object to form.

A.   But the former deputy chief was a jokester.

BY MS. LIU:

Q.   And who -- who is the former deputy chief?

A.   Richard Daigle.

Q.   You also said Lieutenant Myers was present?

Page 79

A.   Yes.

Q.   Did she have any reaction to the comments being made?

A.   Lieutenant Myers was sitting at another table with a laptop and some documents.  I didn't particularly look to see what her reaction was.  So I don't know.

Q.   Do you recall if Chief Fontenot said anything about putting Dunn under investigation?

A.   I don't recall that.

Q.   As in you don't recall whether or not he said that or he didn't say that?

A.   I don't recall that he said that at all.

Q.   Do you think these statements were appropriate statements to make about another officer?

MR. REED:
Object to form.

A.   I think those statements were made in a joking manner.

BY MS. LIU:

Q.   Do you think they were appropriate?

MR. REED:
Object to form.

A.   I think they were made in a joking

Page 80

manner, and sometimes jokes are not appropriate, sometimes they are.  I think it was just a few officers just clowning around.

BY MS. LIU:

Q.   Do you think any of these statements violate EPD policies?

A.   I don't think that they, in that matter -- in this instance, being that they were in private amongst themselves, not in the general public -- probably was not the best thing to say, but it was said.  And whether it constituted a violation of the policy was up to the chief and appointing authority.

Q.   I'm going to hand you a document that I'm going to mark as Exhibit 2.

(Exhibit 2 was marked.)

BY MS. LIU:

Q.   And this is two pages.  It's CityofEunice_Dunn_0000156 to 157.  And is this the critical incident report that Lieutenant Dunn submitted regarding these comments?

A.   Yes.

Q.   If you look at the second paragraph under "Description of incident," you'll see in that paragraph it says, "Chief R. Fontenot

Page 81

said, We putting him under investigation for interfering with an investigation."

Do you see that?

A.   Yes.

Q.   Do you recall if Chief Fontenot said that?

A.   I did not hear that.

Q.   Do you know what, if any, investigation Lieutenant Dunn would be investigated for for interfering with?

MR. REED:
Object to form.

A.   I don't recall.

BY MS. LIU:

Q.   And then if you look further in that paragraph it says, "Some of the statements made in front of several witnesses by V. Fontenot are as follows."

Do you see that where that sentence starts?

A.   Yes, I do.

Q.   And then it says, "I'm going to break his motherfucking fingers."

A.   I see that.

Q.   Do you recall Victor saying that?



Ryan Young

March 27, 2025
Pages 82 to 85

Page 82

A.  I did not hear Victor say that.

Q.  Following that it says, "He was conceived in the cesspool of his mother's womb."

Do you see that?

A.  I do.

Q.  Do you recall if Victor said that?

A.  I did not hear Victor say that.  I did later ask him and he stated he said that.

Q.  Okay.  So you don't recall everything that he said?

A.  I didn't hear him.  I have substantial hearing loss on my left side.  Victor always sat to the left of me.  And a lot of times I have to read lips to make out words.  I did not hear him say that.  If it was said and other people were talking, I didn't pick up on it.  But he did confirm he said that.

Q.  So there are statements that may have been said by people in that room that you may not have heard?

A.  That's correct.

Q.  And that could include statements by Chief Fontenot as well?

MR. REED:

Object to form.

Page 83

A.  That is correct.

BY MS. LIU:

Q.  Further in this sentence there's a quote, "I'm going to fuck him up when I catch him alone on a call."

Do you see that?

A.  Yes.

And I also did not hear that.

Q.  Are you aware of whether or not Victor admitted to stating any of these statements aside from the one that we talked about?

A.  The one he admitted to me was the cesspool of his mother's womb.

Q.  But he didn't talk about the other statements?

A.  I didn't ask him about any of those other ones.  I just said, You really said that?  And he said yeah.

Q.  Why did you not ask him about the other statements?

A.  It was -- I don't know.  But when I saw that, I had never heard anything like that before, so I just -- that's what I asked.  You know, from anyone, not there, but anywhere in the world in any insult that I've ever heard, I've never heard

Page 84

anybody say something like that.  So I was like...

Q.  That was a creative one?

A.  Yeah.

Q.  And here there's a reference to you making a comment about K-9 Robin being given to Victor Fontenot to punish me, referring to Lieutenant Dunn?

A.  I didn't say to punish him.  I remember saying that it would be funny if they took the dog from Dunn and gave it to Victor.

Q.  And in response, Officer Fontenot said, I'll put two in his head before he gets in my unit?

A.  Yeah.

Q.  And you understood him to be referring to the K-9?

A.  Absolutely.

Q.  Have you otherwise suggested to anyone about taking Officer -- Lieutenant Dunn's K-9 away from him aside from this comment?

A.  Suggested, no.

Q.  Have you ever said that to anyone?

A.  No.  I said at the time, and so had other officers, that it didn't pay for us to have a K-9 if it was never being used in our

Page 85

department.

Q.  Who did you say that to?

A.  I don't remember.

Q.  Just -- ever say that to Chief Fontenot?

A.  I don't know if I said it directly to Chief Fontenot.  But numerous officers had the same sentiment.

Q.  What other officers had that sentiment?

A.  I don't recall who all was there at the time, but the dog seemed to be used more for other agencies than for our own agency.

Q.  And what -- just to clarify, was this during this conversation that we discussed the report?

A.  No, it was not at this particular time.  It was just in general.

Q.  Have you ever discussed with Chief Fontenot about the K-9 program at EPD?

A.  Not -- I had no involvement in the K-9 program.

Q.  But you've never expressed to him about the usefulness or lack of usefulness of the K-9 program?

A.  I may have said that it's not -- the ends doesn't justify the means.  I do recall a



Page 86

time where they -- and I don't know if it was to Chief Fontenot, but they got a bill in from the veterinarian, I don't remember exactly what the amount was, but it was for banana cream.

And I made the comment about, Why are we buying banana cream for the dog? And I said, Seems like a useless expense for something that doesn't get used.

Q. Have you ever used the K-9 for your investigations?

A. We -- myself and Detective Fontenot attempted to use it on a traffic stop, and Lieutenant Dunn did not take the dog out the car.

Q. Why was that?

A. The traffic stop was conducted on a Jeep that had no top or doors. The narcotics were located on the floorboard in plain view. The suspect admitted to us that the narcotics were what he suspected they were.

We asked Lieutenant Dunn if he wanted to run the dog on the vehicle. I'm sure the dog did not understand the human language, so the dog could not understand the conversation that there was drugs located on the floor. And he said he was not running the dog being that they were

Page 87

already located.

I was giving him the opportunity to run the dog to see if it would alert so that he could log it down as training or positive alert or whatever they do. I'm not a K-9 officer. But he did not run the dog.

Q. Okay. But for investigative purposes, there was no need to run the dog, right?

A. The dog is trained to alert at the odor of certain narcotics. Looking at the narcotics in the bag, which I did not personally smell, I could be mistaken of what they actually were.

The dog is trained to alert to certain scents. So it would have been beneficial to us if the dog would have been used on the vehicle.

Q. Even though the suspect admitted to you that the narcotics were what you suspected they were?

A. Suspects lie to police all the time.

Q. They would tell you that they were narcotics if they weren't?

MR. REED:

Object to form.

A. Suspects tell us things all the time, they give us false information. But it would have

Page 88

been more clarification or more positive identification short of sending that narcotics to a criminal lab for a scientific analysis.

BY MS. LIU:

Q. In order to get a conviction, you would still have to send the narcotics to a lab, right?

A. Yes, yes.

Q. Have there been any other instances in which you used the K-9 for your investigation?

A. I do not believe that we utilized that K-9 on other investigations. I have since used other K-9s, mainly for building searches, clearing structures. But I think that was the only time we utilized Lieutenant Dunn's dog.

Q. So what do you think of the overall K-9 program?

A. I think it can be useful if they are utilized as intended. They cost a lot of money. They require a lot of training and upkeep. And they can be very beneficial if they are used.

Q. Has Chief Fontenot ever discussed with you Lieutenant Dunn's performance as a K-9 handler?

A. I think he made comments that Lieutenant Dunn wasn't utilizing the dog and the dog either

Page 89

stayed in the kennel or at home.

Q. How many dogs at that time were available in the K-9 program?

A. I think that was the only one.

Q. You mentioned other dogs. Is that acquired since then?

A. Yes.

Q. We'll turn back to Exhibit 2. In the third paragraph on 156 it states that, "I was informed Chief R. Fontenot, nor other ranked employees, did not make any attempt to stop this behavior among others."

Do you see that?

A. Yes.

Q. Is that accurate?

MR. REED:

Object to form.

A. I'm not sure.

BY MS. LIU:

Q. So did anyone try to stop the comments being made at the time?

A. I didn't hear the comments of the fingers and the cesspool or fucking him up on a call at that time. The only comments I had heard were the ones previously discussed that Officer



Page 90

Guillory and Victor had made about that other rape incident, about the licking of the testicle, and the fuck him and his wife.

So, I mean, it was said, that's what I heard. No one stopped that. But I didn't hear these other comments, so I can't say if that last paragraph is true or not.

Q. And in that paragraph, it makes reference to a person named Harlan Kirgan.

A. Kirgan.

Q. Do you know who that is?

A. Yes. He's the editor of the local newspaper who, at the time, would come in the mornings, not every morning but some mornings, to review the radio logs.

And he would display certain calls in the newspaper, not details of the call, but just to let the general public know, you know, the type of calls the police department was responding to, what was going on. But I don't know -- I don't recall if he was in there or not.

Q. And you said that -- previously that you thought these jokes were fine because there were no members of the public there; is that right?

A. We weren't out in public. And I didn't

Page 91

necessarily say they were fine, I just -- they were jokes that -- people say jokes all the time. People say things all the time.

Q. I'm going to hand you what I'm going to mark as Exhibit 3.

(Exhibit 3 was marked.)

BY MS. LIU:

Q. For the record, it's CityofEunice_Dunn_001657 to 1661. And this is the critical incident report filed by Lieutenant Dunn against Officer Darrian Guillory; is that right?

A. Yes.

(Exhibit 4 was marked.)

BY MS. LIU:

Q. I'm also going to hand you this document which is marked as Exhibit 4, and it is CityofEunice_Dunn_0002214 to 2233.

And if you'll turn to -- on Exhibit 4, this is also the critical incident form that was filed against Officer Fontenot by Lieutenant Dunn; is that right?

A. Yes.

Q. And this was the critical incident form that you were reviewing during that conversation where you were talking -- that we were discussing

Page 92

with Exhibit 2; is that right?

A. This one is in reference to the Cody Miller incident, Exhibit 4, is what it says here -- oh, I'm sorry.

Q. Do you want to take a chance to review?

A. I do. I see what you're -- it's the same thing. Yes, same thing. I'm sorry, I saw Cody's name on it and I thought about our previous conversation.

Q. Uh-huh.

A. Okay. Do you have a question?

Q. So these were the critical incident forms that you were reviewing at the time that we had the discussion in relation to Exhibit 2; is that right? I'm just trying to establish --

A. I believe, yes, that they were.

Q. And you said there was verbiage that you found was humorous in Lieutenant Dunn's report; is that right?

A. Yes.

Q. Can you point out the verbiage that you found was humorous?

A. In the incident report that he did, not in this particular critical incident. In his officer report about the alleged rape --

Page 93

Q. Okay.

A. -- is what I was referring to.

Q. Okay. Understood.

MS. LIU:

It's been an hour.

MR. REED:

Yeah, we can take a break.

THE VIDEOGRAPHER:

We are off the record. The time is 11:12.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record. The time is 11:22.

BY MS. LIU:

Q. If we can go to Exhibit 4 and turn to page 2229, this is the summary narrative that you wrote with respect to this investigation; is that right?

A. Yes.

Q. Actually, if we can go to 2230. And you see at the bottom you state that you determined that both Victor Fontenot and Darrian Guillory had violated Eunice Police Department Policy and Procedure 15-7, Code of Ethics, and 4.21,



Page 94

Relations with Other Members.

Q. Do you see that?

A. Yes.

Q. You didn't find that anyone else violated EPD policy in connection with this incident; is that right?

A. I was not authorized to investigate anything else, and these were the subjects that the critical incident was submitted on.

Q. And if we go to 2232 as well as 2233, this is the statement that was submitted by Lieutenant Dunn to you; is that right?

A. Yes.

Q. You see on 2233 you signed there at the bottom. That's your signature, right?

A. Yes.

Q. So in the first part of this statement, in the second paragraph, Lieutenant Dunn wrote, "I inform you I am under investigation for Chief Randy Fontenot for alleged violations of the Eunice Police Department's social media policy and interfering with a police investigation."

Do you see that?

A. I do see that.

Q. Do you understand -- what do you

Page 95

understand him to mean by investigating him for interfering with a police investigation?

MR. REED:

Object to form.

A. I mean, the words are pretty self-explanatory. He's stating that he is under investigation, per Chief Randy Fontenot, for alleged violations of the Eunice Police Department's social media policy and interfering with a police investigation.

BY MS. LIU:

Q. Do you know which police investigation he's referring to?

A. I do not.

Q. Did you conduct this internal investigation?

A. I did not.

Q. Do you know who conducted the investigation?

A. I do not.

Q. Were you aware of this investigation at all?

A. No, I was not.

Q. So you interviewed Lieutenant Dunn in connection with your investigation to Officer

Page 96

Fontenot and Officer Guillory, right?

A. I believe that I began to attempt to speak to him and he provided me with this statement in lieu of an interview.

Q. Okay. And when you received this statement, you read it?

A. Yes.

Q. And you saw that Lieutenant Dunn was talking about being investigated, right?

A. That's what it says, yes.

Q. And you didn't do anything to figure out what he was being investigated for; is that right?

A. No, I did not.

Q. It says, "According to Chief R. Fontenot, the events he is using against me for interfering with a police investigation is contained in the critical incident forms you are requesting me to speak about."

Do you see that?

A. Where is that on there, what paragraph?

Q. It's in that same paragraph.

A. Oh, same paragraph. Yeah, I see that.

Q. You see that?

So you don't understand what Lieutenant Dunn is talking about here?

Page 97

A. I had no knowledge of an investigation that he was under for the violation, so I don't know what evidence he was talking about was supposedly contained in the critical incident form.

Q. Okay. Are you aware at any point whether or not Lieutenant Dunn was under investigation for violation of a social media policy?

A. I am not aware of that.

Q. So this is the first time you're hearing about that?

A. I know that there was some discussion about it, about the social media, but I am unaware that he was under investigation.

Q. What was --

A. I did not conduct an investigation.

Q. What was the discussion about the social media that you're referring to?

A. That he had posted something on Facebook about an incident at the KC Hall, I think.

Q. Do you know anything else about this Facebook post?

A. I don't have Facebook, so I didn't see the post. Supposedly there was -- just from what



Page 98

I was told, not by Lieutenant Dunn, but there was something about a disturbance at the KC Hall and someone may have had a firearm.

Q.  Who told you that?

A.  I don't -- I don't remember.

Q.  Would it have been -- did you have any discussions about this Facebook post with Chief Fontenot or Officer Fontenot?

A.  No, not that I remember.

Q.  You say you didn't have Facebook.  Do you have any other social media?

A.  I have Instagram.

Q.  Are you aware of what the EPD social media policy is?

A.  Not completely, being that I typically don't use social media.

Q.  Do you post on Instagram?

A.  Pictures.

Q.  Are you aware of what you are allowed to post and what you're not allowed to post?

A.  I mean, I don't post anything that could be interpreted as offensive, derogatory, or criminal.

Q.  Are you allowed to post about the Eunice community?

Page 99

A.  I'm assuming you are.

Q.  Are you aware of other officers posting on their social media?

A.  I'm sure they do, ma'am.  I don't have social media -- Facebook, so I don't see.

Q.  But no one has shown you their Facebook posts?

A.  They may have shared something that someone else posted outside of law enforcement that, you know, was newsworthy, humorous, just general -- general items, but not on a regular basis.

Q.  Are you aware of anyone else being investigated for posting on social media?

A.  No, I'm not.

Q.  And you have never conducted an investigation into anyone for posting on social media?

A.  I have not personally.

Q.  You can put this away.

(Exhibit 5 was marked.)

BY MS. LIU:

Q.  I'm going to hand you what I'm marking as Exhibit 5.  And this is DUNN_0000624.  This is a notice of investigation to Lieutenant Dunn about

Page 100

contacting the Eunice City Marshal's Office to request patrol assistance --

A.  Yes.

Q.  -- without asking the deputy chief or Chief Fontenot for permission.

Do you see that?

A.  Yes.

Q.  And you were assigned to this investigation?

A.  Yes.

Q.  Tell me about that investigation.

A.  I was given this as a notice of investigation, authorization, to determine if Lieutenant Dunn had contacted the marshal's office to request for patrol assistance without notifying the deputy chief or the chief of police.

When I began the investigation, I spoke to one of the marshals, who stated that they had volunteered to assist Lieutenant Dunn in his shift.  And when that information was relayed to Chief Fontenot and Deputy Chief Kennedy, the investigation was concluded, they stopped it.

Q.  So what was the alleged wrongdoing here?

A.  That he did not request or consult with them before asking the marshal's office for

Page 101

assistance.

But once it was relayed to them that he did, in fact, not ask them for assistance, that they volunteered, then it was withdrawn.

Q.  And so did you do anything to conduct an investigation or was it withdrawn before?

A.  I think it was withdrawn.

Q.  Did you write a report or narrative for this?

A.  I may have written a small summary, but I don't recall.

Q.  To the best of your knowledge, is there any other documents relating to this investigation aside from this memo?

A.  Not that I can remember, no.

Q.  And so there was no finding of wrongdoing by Lieutenant Dunn in this incident?

A.  It didn't -- it didn't continue, so the investigation was just withdrawn, being that that information came to light that they volunteered and he didn't ask.

Q.  And it was withdrawn because there was no basis for investigating?

A.  I assume, yes.

Q.  Have you conducted any other



Ryan Young

Page 102

investigations against Lieutenant Dunn?

A. Not that I can recall.

Q. Are you aware of any other investigations against Lieutenant Dunn conducted by other people?

A. Yes, but not for internal affairs or anything relating to -- anything initiated by any member of the Eunice Police Department.

Q. What other investigations are these?

A. So Lieutenant Dunn was involved in a -- or assisted in an incident while on duty. He was involved in an officer-involved shooting. And that investigation was conducted by Louisiana State Police.

Q. When was this?

A. I don't recall the dates. But it was after the lawsuit was filed.

Q. And Lieutenant Dunn was not the officer that was involved in the shooting; is that right?

A. Yes.

Q. Can you tell me about that incident?

A. There was an incident that occurred in another jurisdiction with an individual. A police chase was initiated. During the police chase, that individual caused at least one, possibly

Page 103

more, law enforcement officers to wreck and receive bodily injury.

He came into our jurisdiction. Lieutenant Dunn pursued him down a dead-end roadway with me directly behind Lieutenant Dunn. Lieutenant Dunn exited his patrol car ordering the suspect to stop, who was still in a vehicle.

Lieutenant Dunn had a trainee with him at the time who was riding with him. And Lieutenant Dunn was ordering the suspect to stop at gunpoint. The suspect accelerated toward Lieutenant Dunn, who then open-fired to defend himself.

The vehicle was struck several times by gunfire. The vehicle crashed. I could hear Lieutenant Dunn. I was waiting -- I did not pursue all the way down the gravel road because I knew it was a dead-end.

And when I saw the car spin around, I figured it was coming back toward me, so I stopped my patrol car. And the shooting occurred, the car crashed into a tree line.

I could hear Lieutenant Dunn yelling verbal commands. I exited my police unit. I ran approximately 100 to 150 yards to Lieutenant Dunn.

Page 104

I finished removing the subject out of the car, placed him in the handcuffs, assessed his wounds, and assured Lieutenant Dunn that I was there.

Q. What was the result of the investigation by the Louisiana State Police, if you know?

A. I do not know any official results.

Q. Do you know if that investigation is ongoing?

A. I am not sure of any official results. We did unofficially hear that he was clear of any wrongdoing.

Q. And by "he," you mean Lieutenant Dunn?

A. Lieutenant Dunn, I'm sorry, yes. But nothing official.

Q. Are you aware of any other investigations against Lieutenant Dunn aside from this one?

A. No, I'm not.

Q. Do you know an individual named Joshua Dupre?

A. Yes.

Q. We talked about him earlier.

A. Yes.

Q. Who is he?

Page 105

A. He's the individual that is involved in the illicit sale of narcotics.

Q. Do you know where he is now?

A. No.

Q. So what are your interactions with Mr. Dupre?

A. We -- myself and Detective Fontenot placed him under arrest for a warrant that Detective Fontenot had obtained after making a narcotics purchase from him.

Q. Did you have any interactions with Mr. Dupre prior to arresting him?

A. In the 26-plus years of my employment with the City of Eunice, I'm sure I did. I do not recall what they were.

Q. Did you place him under arrest at any prior time aside from this incident involving Officer Fontenot?

A. I don't recall, ma'am.

Q. Do you recall when this incident occurred with Mr. Dupre when you arrested him?

A. I don't remember the dates.

Q. Do you remember the year?

A. No, I do not.

Q. Were you chief of detectives at that



Ryan Young

Page 106

time?

A.  I don't recall.

Q.  But Victor was working as a detective at that time, right?

A.  Yes, he was.

Q.  Tell me what you can remember about the arrest.

A.  We saw him drive up into his mother's yard in an automobile.  We removed him from the automobile, placed him under arrest.  And he began to state that he didn't want to go back to jail, he wanted to talk, he had information.  So we brought him to the office to do a debrief.

Q.  And then what happened at the debrief?

A.  The debrief is when he voluntarily made the allegations against Lieutenant Dunn.

Q.  These were the allegations we discussed earlier in the day today, right?

A.  Correct.

Q.  Was that prompted by anything?

MR. REED:

Object to form.

A.  We were questioning him of knowledge of dope dealers who -- I guess you would call the bigger fish.  And he volunteered the information

Page 107

about us having a dirty cop and made the claim of paying Lieutenant Dunn for information.

Q.  And this was in an interview taking -- that took place at the police station?

A.  It was at the criminal investigative division office.

Q.  Is that interview recorded?

A.  No, it was not, unfortunately.

Q.  Do you typically record interviews with suspects?

A.  We do have the capability now of recording all of our interviews.  At that time, we did not have audio or video at that office.

That office was previously a school for disabled children that the City acquired, and half of the building was turned into the department of motor vehicles and a food bank, and our portion became the detective offices.

They were in the process of attempting to build an interview room that would have had those, you know, video and audio recordings, but we did not at that time.

Q.  And at the time before you got the video and audio capabilities, did you typically interview suspects in an unrecorded environment?

Page 108

A.  Suspects were interviewed in different places.  If possible, we interviewed them at the police station.

But due to the operations of dealing with people who give up narcotic information, a lot of people don't want to be labeled as a snitch, and if it was done at the police department, numerous inmates could have seen the individual walk in, trustys may have seen it.

And we were trying to alleviate any kind of danger coming to Mr. Dupre from word getting out that he may have provided us with information or cooperated with law enforcement.

Q.  Do you know if anyone took notes during that interview?

A.  I'm not sure if Detective Fontenot took notes.  But Joshua Dupre provided a written statement.

Q.  What did the written statement say?

A.  Without it being in front of me, I don't recall exactly what it was worded.  But the gist of it was what we discussed previously about him paying Lieutenant Dunn.

Q.  Did he provide a written statement about other information he gave you?

Page 109

A.  I'm sorry, what was that?

Q.  Did he provide a written statement about other information that he gave you about other drug dealers?

A.  I don't recall what all was on the statement, but I don't believe he -- he didn't provide separate statements.  So whatever was on that statement was what he provided.  I don't recall.  It's been quite some time since I saw him.

Q.  Why did he provide you a written statement about -- why did he write a written statement?

A.  He was asked if he would provide a written statement, which he agreed.

Q.  And why did you ask him to provide a written statement?

A.  Because we had no audio or video surveillance.

Q.  Do you know if, prior to this interview, Mr. Dupre made any other statements about Lieutenant Dunn?

A.  I'm unaware.

Q.  Do you know if Victor has contact with confidential informants?



Ryan Young

Page 110

MR. REED:

Object to form.

A. Victor does have contact with confidential sources.

MR. REED:

Are you talking about now or back when he was an employee?

THE WITNESS:

Oh, when he was an employee. I'm unaware of what he does now.

BY MS. LIU:

Q. This interview with Mr. Dupre, at what point did the DEA get involved?

A. After he made the allegations against Lieutenant Dunn, I believe my phone rang, and I stepped out of the room. And it was Detective Mire with State Police letting us know that they had just got into town.

As I previously said, I think they were there for something else. They met us at the office. He was in there still talking with Detective Fontenot, "he" being Joshua Dupre.

When the DEA agents got there, I asked if they wanted to talk to him, if he had any kind of information for them for bigger fish, and they

Page 111

went in there. And Victor told me that he also relayed that same information about Mr. Dupre to them.

Q. Do you know if the DEA has notes or video recordings or anything in connection with that interview?

A. I have no idea.

Q. Have you ever found any evidence to corroborate Mr. Dupre's allegations against Lieutenant Dunn?

A. I did not look into any evidence to corroborate. When I received that information, I notified Chief Fontenot of the allegation made against one of his officers. And when he was kind of like, What should we do? I said, Well, maybe you have an outside agency do an investigation. And that was it.

Q. So you never followed up with Chief Fontenot about what he did about this information?

A. He stated that -- actually, after a court proceeding with Mr. Dupre, there was no more talk about the investigation.

Q. What was this court proceeding with Mr. Dupre?

A. Detective Fontenot had to -- or was

Page 112

subpoenaed to testify in a bond revocation hearing for Mr. Dupre. And during the bond revocation hearing, the judge on the bench made Detective Fontenot divulge sensitive information that -- about the claims Mr. Dupre made.

Q. What is that sensitive information?

A. About -- I wasn't present for that, but there are court minutes available.

Q. Okay. But what -- what were you referring to when you were talking about sensitive information?

A. So again, I wasn't present. But it was reported that Mr. Dupre was asking about his cell phone that Detective Fontenot had seized as potential evidence in a narcotics case.

And the judge was discussing with Detective Fontenot the reasoning for the phone. I think Mr. Fontenot had to divulge that the phone may be used for other evidence, being that there were allegations of possible police misconduct.

And he tried to -- Detective Fontenot tried to discuss with the individual in private rather than open court, but that did not happen.

Q. Okay. And what about this court proceeding or the things that were discussed in

Page 113

the court proceeding made the investigation stop?

MR. REED:

Object to form.

A. I don't know exactly what was discussed. I don't have a copy of the court minutes and I was not present.

BY MS. LIU:

Q. Well, you said that after this court proceeding there was no more talk about the investigation.

Was that because of something that happened at the court proceeding or was that just the end of the investigation?

MR. REED:

Object to form.

A. I know Mr. Dupre, during that court proceeding, reversed everything that he had told Detective Fontenot and I.

BY MS. LIU:

Q. What do you mean by that?

A. He alleged that he never said anything about Lieutenant Dunn. Again, I did not read the court minutes, this is what Detective Fontenot relayed to me, that Mr. Dupre basically, as forthcoming as he was during the debriefing that



Page 114

we did with him, he completely shut down and did not discuss any of that with the judge.

Q.   That's what Detective Fontenot told you?

A.   Correct.

Q.   When you say Mr. Dupre was forthcoming during the debriefing, how can you tell?

MR. REED:

Object to form.

A.   He voluntarily produced that information to us.

BY MS. LIU:

Q.   Do you think he was honest during that debriefing?

A.   There were some details that he provided that led me to believe that he knew more details about Lieutenant Dunn than just knowing that he was a police officer.

Q.   What were those details?

A.   He described the type of vehicle that Lieutenant Dunn drove at the time as a silver 5.0, which 5.0 is a slang term for a Mustang regardless if it has a V8 engine or not.  It was just a slang term.

Q.   Any other details?

A.   I think he stated that they met at a

Page 115

water tower outside of Eunice.

Q.   And it's no secret what vehicle Lieutenant Dunn drives, right?

MR. REED:

Object to form.

A.   No.

BY MS. LIU:

Q.   Is there any other details that you remember Mr. Dupre telling you about?

A.   Nothing that I can remember.

Q.   Do you recall Officer Fontenot telling you anything else about that court proceeding?

A.   I don't remember.

Q.   Did you ever review the transcript of the court proceeding?

A.   No.

Q.   And previously you said that you didn't investigate whether there was truth to the allegations made by Mr. Dupre, but are you aware of any other evidence corroborating the allegations?

A.   No.

Q.   Are you aware that Victor was conducting an unofficial investigation on Lieutenant Dunn based on the statements that Mr. Dupre made?

Page 116

MR. REED:

Object to form.

A.   I am unaware that Victor was conducting any investigation, whether official or unofficial, on the things that Mr. Dupre said.

BY MS. LIU:

Q.   You're aware that Victor Fontenot testified in this proceeding, correct?

A.   Yes.

Q.   And he testified -- if he were to testify that you were aware of his investigation, would that be a lie?

MR. REED:

Object to form.

A.   I think there is a misplay on words.  Detective Fontenot said to me, What if I receive anything else?  And I told him to keep himself a daily journal; in case anything came more to light, then he would have notes.  I would not consider that an investigation.

BY MS. LIU:

Q.   And when did you tell him this, to keep a daily journal?

A.   After he informed me of the court proceedings and that we were aware that there was

Page 117

no starting of any investigation by any outside agency.

Q.   Do you remember when the court proceedings were?

A.   They would have been in the 27th Judicial in Opelousas, Louisiana.

Q.   Do you remember when?

A.   No.

Q.   As far as you're aware, did Chief Fontenot ever authorize an investigation by Officer Fontenot into Lieutenant Dunn?

A.   Not to my knowledge.

Q.   Did you have any communications with Officer Fontenot or Chief Fontenot or anyone else about these allegations related to Lieutenant Dunn?

A.   No.  I spoke to Chief Fontenot in person.  I informed him of that in person.

Q.   Did you have any other communications with anyone about these allegations?

A.   Not that I -- no, not that I can recall.

Q.   As part of this litigation, were you asked to preserve your documents?

A.   Yes.

Q.   And were you asked to search your



Page 118

documents?

A. Yes.

Q. Did you perform a search of your documents?

A. I did, and I also provided my attorney with my departmental email address and password so that they could search for anything that they felt was relevant to -- relevant to this case.

Q. Did you perform any searches of your cell phone?

A. Yes.

Q. And you produced any documents that you felt were relevant to your attorney?

A. Yes.

Q. Did you perform any searches of your personal email?

A. I did not use my personal email for departmental stuff.

Q. And when -- when we're talking about the text messages, was that on your work or personal phone?

A. On my personal phone.

Q. Do you have a work phone?

A. No.

Q. Did you perform any searches of

Page 119

hard-copy files or electronic files?

A. I'm sorry?

Q. Did you perform any searches of hard-copy files?

A. In what aspect? Like "hard-copy," what do you mean?

Q. Like paper documents.

A. No, I did not.

Q. Do you keep paper documents about the things that we've talked about so far?

A. No. All documents were either turned over to the chief of police -- the investigative documents, I keep none of those. I do have copies of the summary narratives that I type, but those are the same copies that are in here.

Q. And those would be on your computer at work?

A. Yeah.

MS. LIU:
So why don't we do the lunch break now.

MR. REED:
Sure.

THE VIDEOGRAPHER:
We are off the record. The time is

Page 120

11:59.

(A break was taken.)

THE VIDEOGRAPHER:
We are back on the record. The time is 12:54.

(Discussion off the record.)

BY MS. LIU:

Q. I'm going to mark -- I'm going to give you this document and mark it as Exhibit 6.

(Exhibit 6 was marked.)

BY MS. LIU:

Q. This is the transcript of the proceedings on October 8 related to Mr. Dupre.
Do you see that?

A. Yes.

Q. And I believe you testified you've not seen this transcript?

A. That is correct.

Q. But you are aware of what Officer Fontenot told you about this hearing, correct?

A. Some of the details, yes.

Q. And you'll see -- you can take a moment to look through it, but you'll see that Mr. Dupre testifies before the court.

A. What page does that --

Page 121

Q. And this would start on page 8.

A. Okay.

Q. And take your time to read it, if you'd like.

A. Okay.

Q. So you'll see statements about another officer on page 8 starting -- Mr. Dupre testifies before the court, correct?

A. Yes.

Q. You'd expect Mr. Dupre to testify truthfully before the court?

MR. REED:
Object to form.

A. I don't know what Mr. Dupre would testify to. I mean, he's an alleged dope dealer and a convicted criminal.

BY MS. LIU:

Q. Okay. Starting on page 9, do you see around line 7 Mr. Dupre is answering a question, it says, "This matter that's going on, like, I'm trapped in the crossfire with the Eunice Police Department"?
Do you see that?

A. Yes.

Q. Do you have any idea what he's talking



Ryan Young

Page 122

about there?

MR. REED:

Object to form.

A.  No, I do not.

BY MS. LIU:

Q.  A couple lines down starting with line 15, he's -- Mr. Dupre is asked a question about, "Is it true that you've had some recent interactions with the detective on both of these matters?"

And a little bit later, on line 22, he confirms that this is relating to Victor Fontenot.

Do you see that?

A.  Yes.

Q.  And so on line 28 he asks, "What specific issues are you having with Detective Victor?"

And Mr. Dupre answers, "All right.  This is what's going on.  My name got drawn in, something with Officer Dunn, something about I'm paying Officer Dunn."

And you'll see on the next page, starting on page 10, he's referring to Michael Dunn; is that right?

A.  Correct.

Page 123

Q.  And Mr. Dupre continues on line 5, "Yes, he got a lawsuit right now on Eunice Police Department for falsely using his name or whatever.  So ever since, somebody told Detective Victor that I'm paying Officer Dunn money for information, which I'm not.  I don't know where they get that from.  And this is how it all started."

Do you see that?

A.  Uh-huh, yes, I do.

Q.  Do you know what he's talking about there?

MR. REED:

Object to form.

A.  It appears he's talking about the allegations he informed myself and Detective Fontenot, that he was paying Lieutenant Dunn.

BY MS. LIU:

Q.  And here he says he's not?

A.  Correct.

Q.  And on page 9 he talks about he's got text messages on his phone?

A.  Page 9.

Q.  I'm sorry, page 10, line 9.

A.  Okay.

Q.  He talks about text messages on his

Page 124

phone?

A.  Yes, I see that.

Q.  Do you know what happened with Mr. Dupre's phones?

A.  I believe that they were sent for a forensic evaluation.

MR. REED:

Cassandra, let me just clarify one thing.  It says, "I've got text messages in my phone, in one of my phones."

But subject to that.

MS. LIU:

Thank you, yes.

BY MS. LIU:

Q.  Do you know what happened with his phones?

A.  I believe that they were sent for forensic investigation, so a phone dump.

Q.  So meaning like the data from the phone --

A.  Correct.

Q.  -- was downloaded?

A.  I believe.

Q.  Who performed that?

A.  At the time, it probably would have been

Page 125

Louisiana State Police.

Q.  And what would -- typically, what would they do with a data dump from the phone?

A.  They would provide the data collected from the phone on a jump drive or a CD drive if they were able to get through the phone's encryption and protection features.

Q.  And they would provide that to who?

A.  The submitting officer.

Q.  So that would be -- who would that be in this case?

A.  It would be Detective Fontenot.

Q.  And typically what would a detective at EPD do with that data dump?

A.  That would have been attached to the case file.  The data would have been analyzed for evidence that would corroborate the charges against that individual, photographs that would depict illegal activities of the narcotics, just general -- general evidence.

Q.  They would analyze the data on the phone?

A.  If they were allowed to get in the phone, yes.

Q.  And what happens in this kind of case



MAGNA
LEGAL SERVICES

Ryan Young

Page 126

file of the disk or the drive?

A.  It would have been stored with the felony case of the arrested individual, which is scanned into police records, but it is forwarded to the 27th Judicial.

MR. REED:

Let me just -- not to interrupt, can I make a continuing objection?  If you're asking him what the State Police did that is somewhat speculative.  But just a general objection along that line.

MS. LIU:

Sure.  I think I'm asking about what EPD did with the disk that State Police would have given him.

MR. REED:

I may have misunderstood.

BY MS. LIU:

Q.  Was that your understanding of what we were talking about?

A.  If there was a disk that was recovered -- I say "disk."  If there was data that was recovered from the phones and placed on either a disk or an external USB drive, it would have

Page 127

been returned to the officer to be stored with the case file at Eunice Police Department.

MR. REED:

Same objection, just the speculative nature.

MS. LIU:

What's speculative about that one?

MR. REED:

He's saying if this happened, and I just think that this is a whole lot of speculation.  There's a lot of, if this happened, if it didn't happen.  So I just want to be clear that I'm objecting to speculation.

BY MS. LIU:

Q.  Okay.  And can you clarify, do you know for a fact what happened with the case file in Mr. Dupre's case?

A.  I do not know if the phone was actually able to be downloaded.

Q.  And who would know that?

A.  At the time, the only person that I'm aware of with State Police that was doing the phone dumps was Frank Garcia.  He has since retired from Louisiana State Police.

Page 128

Q.  Who is he?

A.  Frank Garcia.

Q.  Correct, who is he?

A.  He was an IT investigator with State Police.  They're -- the programs required to get into some of these phones is very expensive and very continuously changing.  So there's very limited people that have access to those machines and programs to download these phones.

Q.  So sitting here today, you are not aware of EPD possessing data from Mr. Dupre's phone?

A.  I did not see any -- anything that would have been possibly recovered from his phone, no.

Q.  Do you know where the physical phones are today?

A.  No, I do not.

Q.  And do you know where the case file for Mr. Dupre is?

A.  27th Judicial should have a copy of it.

Q.  Does EPD retain a copy of it?

A.  A digital copy.

Q.  And where would that be?

A.  In the police records.

Q.  Who's in charge of keeping these police records?

Page 129

A.  There's three individuals that work in police records, but Julie Shaw is the one that deals with felony cases.

Q.  Which would be Mr. Dupre's case?

A.  Correct.

Q.  Looking back at Exhibit 6 on page 10, starting with line 28, Mr. Dupre testifies, "Detective Victor, he's threatening me, riding along my house every day."

Do you have an understanding what that phrase means, "riding along my house"?

MR. REED:

Object to form.

A.  I do not understand what he meant.  I mean, I understand what he's trying to say, but I do not have any knowledge of what he's alleging.

BY MS. LIU:

Q.  In your understanding, what is he trying to say?

MR. REED:

Object to form.

A.  I mean, he's saying that he's riding by his house every day.  I mean, we drive by a lot of people's houses during the course of a day.



Ryan Young

Page 130

BY MS. LIU:

Q. Uh-huh.

A. Some houses are located on main travel routes that are frequent for police officers.

Q. Do you have any recollection of where Mr. Dupre lived?

A. I believe he lived with his mother at the corner of Fuselier and Perrotti Street.

Q. And Mr. Dupre continues, now on line 29 of page 10, "Man, I'm talking about I got text messages in my phone from him telling me he was going to put these new charges on me, for me not to get out, that I have a hold on me, that he's coming with new charges of possession with intent is nine-tenths of the law.

"I ain't had nothing on me when he stopped me, so I don't know where they -- where they getting possession."

Do you see that?

A. Yes.

Q. Do you have an understanding of what he's talking about when he says Officer Fontenot was threatening him?

MR. REED:

Object to form.

Page 131

A. No, I do not.

BY MS. LIU:

Q. And then moving on to page 11, we're at line 14, Mr. Dupre testifies, "He really thinks that I got some information that may -- some information about me paying Dunn money because, like, they got some altercation going on in the Eunice Police Department right now."

Do you understand what he means by altercation going on in the police -- Eunice Police Department?

MS. LIU:

Object to form.

A. I do not understand what he meant or what he means.

BY MS. LIU:

Q. Was there any altercation going on at the Eunice Police Department?

A. Not to my knowledge. I mean, there may be disagreements between individuals, but altercations, no.

Q. Mr. Dupre continues, "Like Victor, Ryan Young, and the chief, they all beefing with Dunn. And I'm in the middle of it, like I'm on Dunn's side."

Page 132

Do you have an understanding what he means by "beefing with Dunn"?

MR. REED:

Object to form.

A. I guess he's alleging that we are at odds with Lieutenant Dunn.

BY MS. LIU:

Q. And were you at odds with Lieutenant Dunn?

A. I was not at odds with Lieutenant Dunn. We may not have seen eye to eye on things, but I was not at odds with Lieutenant Dunn.

Q. Was Officer Fontenot at odds with Lieutenant Dunn, to the best of your knowledge?

A. They had disagreements at times.

Q. What types of disagreements?

A. I can't remember what the particulars are. I know at one point they did sit down and discuss their disagreements, and I thought that that was the end of it. But I have no idea what Mr. Dupre is talking about here.

Q. When you said "they did sit down and discuss their disagreements," who are you referring to?

A. I'm sorry, Detective Fontenot and

Page 133

Lieutenant Dunn.

Q. Were you present for those discussions?

A. Yes.

Q. Who else was present, if anyone?

A. I think it was during a supervisor's meeting where officers with the department, the rank of sergeant or higher, attended. And it was after the meeting. But I don't recall who all was present.

Q. And when was this?

A. I don't recall.

Q. Was this before or after Lieutenant Dunn filed the lawsuit?

A. So it was, I believe, before he filed the lawsuit that we're here for today. The lawsuit that Mr. Dupre is referencing earlier in this, I have no knowledge of.

Q. Okay. And what was discussed during that meeting between Officer Fontenot and Lieutenant Dunn that you were present for?

A. I don't remember the exact words. Basically they were just trying to air out their problems with each other and, for lack of a better term, shake hands and bury the hatchet.

Q. What was the nature of the disagreements



MAGNA
LEGAL SERVICES

Ryan Young

Page 134

they had with each other?

A.  I don't recall all of their -- their problems started during the time that I was out on my medical leave.

Q.  Do you recall any of the issues that were discussed during that meeting?

A.  No.  It's been too long.  I don't remember.

Q.  Was Chief Fontenot present for that meeting?

A.  I don't recall if he was present during their discussion at the end, but normally the chief was present for the supervisor meetings.

Q.  And what was the purpose of you being present; were you participating in that discussion or were you just there?

A.  I was just there.  It was as if we were conducting a meeting here, the subject of the meeting was finalized, and then they just went into individual discussion at the table.  You know, people were still present in the room.  But I don't recall who was there.

Q.  So you were not actively participating in that discussion?

A.  I don't recall if I said anything or

Page 135

not.

Q.  Do you know what happened between Detective Fontenot and Lieutenant Dunn after this discussion?

A.  No.

Q.  Earlier we were talking about people who were at odds with Lieutenant Dunn.  Was Chief Fontenot at odds with Lieutenant Dunn, to the best of your knowledge?

A.  I guess they had disagreements that you could be considered at odds with each other over.

Q.  What types of disagreements did they have?

A.  I mean, some of them I have no idea, I was not privileged to because it didn't involve me.  Possibly over his social media -- whatever the investigation was over the social media.  I know that they had a civil service hearing or something that that was brought up in.

Q.  This is the KC Hall Facebook posting that you discussed earlier?

A.  Yes, yes.  But I was not present for that incident.

Q.  Were there any other disagreements between Chief Fontenot and Lieutenant Dunn to the

Page 136

best of your knowledge?

A.  I can't be sure.

Q.  Has either of them talked to you about the disagreements between those two?

A.  Directly, I don't -- I don't recall.

Q.  What about indirectly?

A.  I mean, Lieutenant Dunn may have said something about Randy or Chief Fontenot, but I don't recall.

Q.  And what was the nature of what Lieutenant Dunn said about Chief Fontenot?

A.  I don't remember.

Q.  Was it positive or negative?

A.  It was probably not positive.

Q.  Does Chief Fontenot, is he at odds with anyone else, to the best of your knowledge, at EPD?

A.  I'm sure at times he had disagreements with other officers or other supervisors about things that transpire.

Q.  Anyone specific?

A.  I can't be sure.

Q.  And what types of disagreements would those be?

A.  I can't speculate.  But maybe how a

Page 137

shift was conducted or a situation was handled or a response time.  I'm not really sure.

Q.  Do you think Chief Fontenot had favorites?

A.  I believe that there are people that he probably relies on more than others.

Q.  And who would those be?

A.  I know he relied on me for a lot of things.

Q.  What about Detective Fontenot?

A.  He relied on Detective Fontenot to locate and identify narcotics violators in the City and try and lessen the drug problem.

Q.  Any others that he favored or relied on?

A.  He relied on Officer Joey Fontenot to conduct a lot of traffic investigations, traffic studies, and some like -- I don't know what the term is, rapport -- like Officer Fontenot would ride a motorcycle, so he would attend a lot of the parades and festivities and stuff for other jurisdictions and, in turn, they would provide officers to do the same for our city.

I'm sure he relied on Detective -- correction, Deputy Chief Richard Daigle to basically run his department.  That's what a



Ryan Young

Page 138

deputy chief's job is designed to do.

At times he relied on the Deputy Chief Tony Kennedy to do the same, his secretary to keep things straight, and his shift supervisors to keep his patrol officers.

Q.   Were there any particular officers that Chief Fontenot did not like?

A.   I don't know who he liked or did not like, ma'am.

Q.   Did you get an impression of whether or not he didn't like any particular officers?

A.   He probably didn't like any of us at one time or another, but no one in particular.

Q.   What was your impression of the relationship between Lieutenant Dunn and Chief Fontenot?

A.   It was -- that's hard to describe.  I guess I would say that they were both kind of stubborn in certain aspects toward each other's decisions or way of going about things.  Sometimes had a difference of opinion.

Q.   Would you describe it as they were beefing with each other?

A.   I wouldn't use that slang term.  I mean, they were both adults, and adults don't always

Page 139

agree, but I wouldn't call it beefing, I would call it more of a difference of opinion or perception.

Q.   So we'll go back to Exhibit 6 on page 11, picking up on line 18.  Mr. Dupre testifies, "So he threatened me, telling me I need to give him some information on Dunn so that they can get rid of his ass, his butt, or whatever, something like that.  Man, I ain't got no -- I don't know what you all talking about.  I ain't never paid this man."

Do you see that?

A.   Yes, I do.

Q.   Do you have an understanding of what he means by threatening him?

MR. REED:

Object to form.

A.   No, I do not.

BY MS. LIU:

Q.   Any -- do you have an understanding of what he means when he's talking about "so they can get rid of his ass, his butt, or whatever"?

MR. REED:

Object to form.

A.   No, I do not.

Page 140

BY MS. LIU:

Q.   Did you ever threaten Mr. Dupre?

A.   No, I did not.

Q.   Did you ever press him for information about Lieutenant Dunn?

A.   The only time I talked to Mr. Dupre was when we did a debrief after his arrest on a warrant for distribution when he voluntarily provided the information to myself and Detective Fontenot alleging that he was paying Lieutenant Dunn for information.

Q.   Are you aware of whether Officer Fontenot ever threatened Mr. Dupre?

A.   No, I'm not aware.

Q.   Have you ever tried to get rid of Lieutenant Dunn from the Eunice Police Department?

A.   If I ever tried to?

Q.   Have you?

A.   No.

Q.   Are you aware of anyone else wanting Lieutenant Dunn to leave the Eunice Police Department?

A.   Wanting him to leave?

Q.   Or get rid of him.

A.   No.

Page 141

Q.   When we talked about the nature of Lieutenant Dunn and Chief Fontenot's disagreements, were those professional disagreements or personal disagreements?

A.   I would assume that they were professional, being that they were at work.

Q.   Was there personal animosity between them, would you say?

MR. REED:

Object to form.

A.   I can't be sure.

BY MS. LIU:

Q.   What's your impression of it?

A.   I don't know what each opinion -- what each of them's opinion of the other one opinion is.

Q.   Turn to page 15 on Exhibit 6.  You'll see on page 9, this is the Court asking, "In 2020, in July of 2020, Mr. Dupre was arrested by Detective Fontenot?"

Does that refresh your recollection on when you arrested Mr. Dupre?

A.   If that was --

MR. REED:

You said page -- are you talking



Ryan Young

Page 142

about page 15, line 9?

MS. LIU:

Correct.

MR. REED:

Okay.

BY MS. LIU:

Q.  I'm sorry, your answer was?

A.  If that was the date of his arrest for the incident where he was debriefed, then I guess that's the date.

Q.  But you don't -- this does not independently refresh your recollection?

A.  No, ma'am.

Q.  And on page 15, line 17, the defendant, which is Mr. Dupre, describes, "The arrest was for truancy.  They arrest me.  They ain't even bring me to the police station, they brought me to their station, and they straight went in my head like, I know you paid Dunn."

Do you see that?

A.  Yes, I do.

Q.  Did you say anything like that to Mr. Dupre?

A.  No, I did not.

Q.  Did Officer Fontenot say anything like

Page 143

that to Mr. Dupre during the debriefing?

A.  Not to my knowledge.

Q.  And then starting on line 24, the defendant, Mr. Dupre, testifies, "The narcotics station, like, over there by the DMV."

Do you think he's referring to the CID office?

A.  Correct.

Q.  And he's saying, "They brought me straight over there and they pressed me, like I know you paid Dunn money.  You know they ain't never said nothing about no charges or nothing. And, you know what I'm saying, he straight up said, Really, why don't you let me go if I could bring him some information on Dunn, which I don't have no information."

Do you know what he's referring to there?

A.  It appears that he's claiming that we brought him to our office, didn't inform him of his charges that he was arrested on, but we brought him there because he requested to talk to us to try and provide information that could help him not to go back to jail.

We debriefed him trying to figure out

Page 144

what information he was ready to disclose about potential drug dealers, and he voluntarily told us about Lieutenant Dunn.

Q.  And so he was providing information to you because he didn't want to go back to jail?

MR. REED:

Object to form.

A.  Yes.  He was becoming a snitch.

BY MS. LIU:

Q.  And you found that information to be trustworthy?

A.  All information that is given by CSs, or CIs, however you want to refer to them, is a starting point.  It's no different than Crime Stoppers.  Crime Stoppers receive tips all the time, but it is for each individual investigator to corroborate that information with actual facts.

Q.  You can put this exhibit aside.

Are you aware of anyone requesting the recordings of Mr. Dupre's calls from the jail?

A.  I'm not -- I'm not aware.

Q.  Have -- are you aware of anyone ever requesting recordings from the jailhouse at EPD?

A.  Yes, for numerous cases.  But I have no knowledge of anyone requesting his specific calls.

Page 145

Q.  And what would be the purpose of requesting recordings from the jailhouse?

MR. REED:

Object to form.

A.  You sometimes get suspects that admit to participation in crimes that you can follow up on. They also admit to where they possibly concealed items, or just numerous investigative things from those jail calls.

BY MS. LIU:

Q.  Have you ever requested recordings from the jail?

A.  From our jail, from Rapides Parish jail, from St. Landry Parish jail.  Yes.

Q.  Are you aware of whether or not Chief Fontenot has ever requested recordings from the jail?

A.  I have no idea.

Q.  Have you ever listened to recordings from the jailhouse of Mr. Dupre?

A.  No, I have not.

Q.  Have you ever called Lieutenant Dunn a dirty cop or corrupt or anything similar to that?

A.  I may have said in conversation that we had an individual stating that we had a dirty cop



Ryan Young

Page 146

and pointed out to Dunn.  When I got that information from Mr. Dupre, I immediately told Chief Randy Fontenot of what was being said, that he was alleging that Dunn was a dirty cop.

Q.  Have you ever called Lieutenant Dunn a dirty cop in any other context?

A.  No.

Q.  Do you believe Lieutenant Dunn to be a dirty cop?

A.  I do not know if Lieutenant Dunn violated any of the allegations -- or did any of the allegations that Mr. Dupre alleged.  I have not seen Michael Dunn do any of the things that Mr. Dupre alleged.

Q.  And do you believe Lieutenant Dunn to be a dirty cop?

A.  At this point, I do not.  There's no evidence to substantiate.

Q.  Have you heard of anyone call Lieutenant Dunn a bad apple in the department?

A.  Yes.

Q.  Who have you heard call that?

A.  I think Chief Fontenot made that comment.

Q.  Who did he make that comment to?

Page 147

A.  I don't recall.

Q.  You were clearly present when he made that comment, right?

A.  Yes.

Q.  Was anyone else present?

A.  I'm sure that there were, but I don't remember who.

Q.  And when you heard that, what was your understanding of what he was trying to say?

MR. REED:
Object to form.

A.  I think he meant that he was acting like a bad apple at that point in time.

BY MS. LIU:

Q.  What does "bad apple" mean?

MR. REED:
Object to form.

A.  It means what it means, a fruit that -- I mean, I definitely don't want to refer to Lieutenant Dunn as not up to taste or color, but that is somewhat different than the rest of them, may not have -- if you have four bottles of water just like this and the label on one of them is missing or partially blurred, it's different than the other ones, right?

Page 148

BY MS. LIU:

Q.  Did you understand Chief Fontenot to be expressing dislike of Lieutenant Dunn?

MR. REED:
Object to form.

A.  I don't think he disliked Lieutenant Dunn personally.  I think it was, as I testified earlier, they sometimes did not see eye to eye on certain aspects.

BY MS. LIU:

Q.  Have you ever suggested that Lieutenant Dunn had mental problems?

A.  No.

Q.  Have you heard anyone else say that about Lieutenant Dunn?

A.  I know that Lieutenant Dunn took a leave of absence, and I think it was due to some personal issues that was affecting his mental ability to perform his job at that time.

Q.  And so have you heard anyone else say that Lieutenant Dunn had mental problems?

A.  No.

Q.  Are you aware of Chief Fontenot having a hit list?

A.  No.

Page 149

Q.  Do you know what that means?

A.  Yes.

Q.  What does it mean?

A.  Would be a list of people that you had a vendetta against or that you did not want to be part of your organization.

Q.  And were there particular people that Chief Fontenot did not want to be part of the EPD?

MR. REED:
Object to form.

A.  I have no idea.

BY MS. LIU:

Q.  Did he ever tell you about people he didn't like at the department?

A.  He never told me of anyone he did not want there.

Q.  Are you aware of anyone that Chief Fontenot had a vendetta against at EPD?

MR. REED:
Object to form.

A.  I know of people he had disagreements with.  "Vendetta" is a different word than "disagreement."

BY MS. LIU:

Q.  So aside from, I believe you named


MAGNA
LEGAL SERVICES

Ryan Young

March 27, 2025
Pages 150 to 153

Page 150

Lieutenant Dunn, anyone else that he had a disagreement with?

A. He's had a disagreement with myself, Lieutenant Kennedy, Lieutenant Donnie Thibodeaux, Lieutenant Myers, Lieutenant Ivory. I'm sure he's had a disagreement with pretty much every person at the department at some point or another.

Q. What was the disagreement between you and Chief Fontenot?

A. I think we were in a disagreement about our interpretation -- his interpretation versus my interpretation of some law; I don't remember which one it was.

Q. When was this?

A. I don't remember.

Q. Was this before or after your leave?

A. I don't remember.

Q. How was that resolved, if at all?

A. We talked like men, explained each of our sides, and we respected each other for our variance of opinion and moved on with our life.

Q. What was the nature of the disagreement between Chief Fontenot and Lieutenant Kennedy?

A. I don't know.

Q. You knew that they had a disagreement?

Page 151

A. Yeah.

Q. Is Lieutenant Kennedy still at the EPD?

A. No. He retired.

Q. When did this happen?

A. I don't remember his retirement date. Shortly after Chief Kyle LeBouef took office.

Q. What was the nature of the disagreement between Chief Fontenot and Donnie Thibodeaux?

A. I don't know.

Q. Was it professional or personal?

A. I would say professional.

Q. Is Donnie Thibodeaux still at EPD?

A. Yes.

Q. What was the nature of the disagreement between Lieutenant Myers and Chief Fontenot?

A. He -- that one I am familiar with, he had the dispatcher contact Lieutenant Myers to handle a lobby complaint. She refused to do the lobby complaint stating that it was not in her job description.

I believe that that information was relayed back to Chief Fontenot, and then he exited his office and spoke to her personally. She continued to refuse the order to do the lobby complaint, which ultimately resulted in an

Page 152

internal affairs investigation, a demotion, and a civil service hearing.

Q. And what was the result of the civil service hearing, if you know?

A. She was originally demoted to the rank of officer, but it was -- the Court reinstated her to sergeant.

Q. Is Lieutenant Myers still with EPD?

A. Yes.

Q. What is the nature of the disagreement between Jeremy Ivory and Chief Fontenot?

A. It started with something with a unit, a police unit that he was trying to get a replacement or a repair or something for one of his patrol officers that the -- there was some problem with the car or it was going out of service, needed another car. I don't remember the exact specifics.

It ended up there was something with Lieutenant Myers, if she was in charge of the cars at that point. And Lieutenant Ivory made a comment that he was disciplined for by calling Lieutenant Myers the Wicked Witch of the West.

Q. And what was the issue between Jeremy Ivory and Chief Fontenot?

Page 153

A. Because of that comment, some type of investigation occurred that I did not conduct, I was not privileged to. And he was accordingly disciplined.

Q. Is Jeremy Ivory still with the EPD?

A. Yes, he is.

Q. Are you aware of anyone saying that they would like the bad 20 percent to quit EPD?

A. I've never heard that statement before.

Q. Are you aware of Chief Fontenot wanting anyone to quit EPD?

MR. REED:
Object to form.

A. I think at one point he wouldn't have minded if Lieutenant Dunn resigned.

BY MS. LIU:

Q. Did he express that to you?

A. Yes.

Q. What did he say specifically?

A. It wouldn't hurt his feelings if he left.

Q. And to the best of your knowledge, did he take any action to prompt Lieutenant Dunn to resign?

A. Not to my knowledge.



Page 154

Q. Have you heard anyone make threats against Lieutenant Dunn or his family aside from the statements by Officer Fontenot that we discussed earlier today?

A. No.

Q. You have not -- have you heard of anyone saying that it was time for Lieutenant Dunn to die?

A. No.

Q. Have you ever heard of anyone saying that they want to shut Lieutenant up -- Lieutenant Dunn up or put a bullet in his head?

A. Definitely not.

Q. When did you first hear about this lawsuit?

A. At some point Lieutenant Dunn told me that he was having to do it, and the only reason I was named in it was because I was Victor's supervisor. I don't know the date.

Q. Was this before or after he filed the lawsuit?

A. I don't know exactly when the lawsuit was filed, so I don't know if it was already set in motion. But it was prior to me being served with the lawsuit.

Page 155

Q. Okay. Did Lieutenant Dunn or you discuss anything else related to the lawsuit?

A. I don't believe.

Q. Was anyone else present in that conversation?

A. That day, no. But he has repeated to me several times that the only reason that I was listed was because I was Victor's supervisor. And I know that there was other people present when he's told me that, I just don't remember who or when.

Q. Do you recall a meeting between you, Lieutenant Dunn, Chief Fontenot, and Officer Fontenot in and around the time that this lawsuit was filed?

A. Unless it was the meeting that I previously described as the supervisor's meeting that went into them trying to hash out their differences, I don't recall a different meeting.

Q. Was there ever a meeting at Chief Fontenot's house?

A. Yes.

Q. What was that meeting?

A. When I told Chief Fontenot the allegations made by Mr. Dupre, he asked me, What

Page 156

do you think I should do? I informed him I would contact an outside agency. I don't know if he did or at what point.

And then he asked to meet at his house. I went in. He said, Do you think that Joshua Dupre would speak to us about the incident? I said, I don't know. He asked if I could make contact with Mr. Dupre so that Mr. Dupre could call him.

I went to Mr. Dupre's mother's residence. He was not present. I left a telephone number with his sister. He called me 20 minutes later. I told him that Chief Fontenot would like to speak to him about the incident.

And he informed me that he didn't want to talk to nobody, he had nothing to say. And I have never spoken to Mr. Dupre again, and I have not had any meeting about that incident with the chief or anyone since then.

Q. Do you recall any other meetings at Chief Fontenot's house?

A. Not that I was present for.

Q. Do you recall any meeting in which Officer Fontenot told Lieutenant Dunn that he was not -- he was no longer investigating Lieutenant

Page 157

Dunn on these allegations?

A. I don't recall that.

Q. And so if Officer Fontenot testified about a meeting in which he told Lieutenant Dunn that and Officer Fontenot testified that you were present, that would not be accurate?

MR. REED:

Object to form.

A. That may have been during that bury-the-hatchet meeting after the supervisor's meeting, but I didn't hear that.

BY MS. LIU:

Q. Did you or anyone else that you're aware of ever try to persuade Lieutenant Dunn to not file this lawsuit?

A. No.

Q. Or withdraw this lawsuit?

A. No.

Q. And so I believe you testified a little bit earlier about who you've spoken to about the lawsuit.

Just for clarity of the record, have you spoken to either Randy or Victor Fontenot about the lawsuit?

A. Not in discussion about -- basically



MAGNA
LEGAL SERVICES

Ryan Young

Page 158

have -- you know, it was more like, When do you go, I haven't been notified, I haven't been deposed.  Just small general stuff.

Q.   But not about the substance --

A.   No.

Q.    -- of the allegations?

A.   No.

Q.   And aside from that conversation with Lieutenant Dunn that you testified about, have you talked to him about the substance of the litigation?

A.   No.

Q.   And other than the -- and other than your counsel, have you spoken to anyone else about the substance of the litigation?

A.   No.

Q.   Do you have the transcript?

A.   I do.

Q.   So I'm going to mark that as Exhibit 7.

(Exhibit 7 was marked.)

BY MS. LIU:

Q.   And this is a transcript that you reviewed in preparation for this deposition that your counsel prepared; is that right?

A.   Correct.  That's correct.

Page 159

Q.   Can you tell me what this conversation was about?

A.   Contacted Lieutenant Dunn to discuss being contacted by an individual by the name of Ronnie Fontenot.  Ronnie owns a diesel performance mechanic shop in Eunice.  Ronnie is -- or has a lot of complaints involving his business as far as worthless checks issued by his business, failing to perform work on vehicles, requesting money from customers and not ordering parts, failing to return parts.  Just numerous complaints.

And one of those complaints was evidently being investigated by an officer who was assigned to Lieutenant Dunn's shift, Officer Lee.  I think his first name was Jonathan, but I don't remember.  I never really worked with the man.

And Ronnie called me and was basically, Hey, this Officer Lee, he won't return my calls, I have possible evidence that exonerates me from the allegations made, and basically talked to me about it.  And I informed him to maybe contact Lee's supervisor, which would have been Lieutenant Dunn.

And after I got off the phone with Ronnie, I called Lieutenant Dunn to tell him what was going on, and this is a transcript of that

Page 160

conversation.

Q.   Why did Ronnie Fontenot call you when he had these issues?

MR. REED:

Object to form.

A.   Honestly, I do not know.  I do know that numerous officers have had to deal with Mr. Fontenot over the course of months and years, and he sometimes gets stuck on a particular officer for everything that goes wrong in his life.

He'll call and call and call, and then if he doesn't like what he hears, he'll move on to another officer.  And he's done that to -- Lieutenant Dunn included.

BY MS. LIU:

Q.   And did you have any interactions with Mr. Fontenot in or around that time that you received the call that he was -- so that he was pestering you with it?

A.   No.

Q.   So he just called you up randomly for it?

A.   He --

MR. REED:

Page 161

Object to form.

A.   I've been a police officer a long time.  He knows me.  Not in a friend environment but as someone who's been there.  And he contacted me.

BY MS. LIU:

Q.   And you referred to -- you referred him to --

A.   Lieutenant Dunn.

Q.   Lieutenant Dunn.

Okay.  So if you turn to page 2 of this transcript, this is the second paragraph in red, and Lieutenant Dunn there describes the timing in which he got the warrant?

A.   Uh-huh.

Q.   Do you see that paragraph there?

A.   I do.

Q.   And he says that "He signed the warrant yesterday afternoon at 4:00 o'clock and the judge signed it right before 5:00 o'clock.  Ronnie knew about the warrant at 9:00 o'clock this morning and was calling up at the office trying to get information about his warrants.

"He specifically asked about issuing the warrant -- issuing the worthless check warrant that nobody knew about.  I just signed it



Ryan Young

Page 162

yesterday afternoon."

Q. Do you see that?

A. Yes.

Q. What was your understanding of what Lieutenant Dunn was saying here?

MR. REED:

Object to form.

A. Basically he's saying that a warrant was submitted at 4:00 o'clock, he approved it, and the judge signed it before 5:00 p.m., and that Mr. Ronnie Fontenot knew about the warrant by 9:00 o'clock the next morning.

BY MS. LIU:

Q. And a couple of lines down, Lieutenant Dunn says, "Yeah, but no one -- that warrant wasn't even official turned in yet."

Do you see that?

A. Yes, I do.

Q. Do you have an understanding of how Ronnie Fontenot knew about the arrest warrants?

A. I have no idea.

Q. Did you tell him about the arrest warrants?

A. Absolutely not.

Q. Were you aware of the arrest warrant

Page 163

before Ronnie Fontenot called you?

A. I absolutely was not.

Q. So you learned about that arrest warrant on the phone call with Ronnie?

A. On the phone call with Lieutenant Dunn.

Q. So when Ronnie Fontenot called you, you did not discuss an arrest warrant?

A. I didn't know about an arrest warrant and he did not divulge that to me.

Q. Do you remember what time of the day this phone call with Lieutenant Dunn and you took place?

A. Probably I think around 5:00 o'clock or shortly after 5:00 o'clock. Because Ronnie had called me around 4:00 o'clock, I think I was on the phone. I called back. I don't think I got an answer. A little phone tag.

And then he called me back and we spoke. And then immediately after we spoke, I called to speak to Lieutenant Dunn.

Q. And how long was that phone conversation between you and Ronnie Fontenot?

A. I don't know, five to ten minutes.

Q. Aside from advising Mr. Fontenot to talk to Officer Lee's supervisor, did you tell him

Page 164

anything else?

A. When he was discussing the fact that he had some text messages that -- about the individual coming to pick up his parts, I told him -- and the worthless check warrant, I told him maybe he needed to consult with his attorney, not because he had a warrant, because I had no idea he had a warrant, but because of, if you've got evidence to exonerate you from a crime, maybe your attorney can help the officer with his investigation if he brought him the stuff.

If he wasn't going to return his calls, maybe the officer -- I mean, the attorney could have said, Hey, look, my client has this. And the attorney that he is referencing or that is referenced here, Donnie -- his name is Donald Richard. And at one time, he was an ADA for district court.

Q. Okay. Are you aware of any instances in which the existence of an arrest warrant was leaked to a suspect?

A. No.

Q. Are you aware of any instances in which the existence of EPD police operations was leaked to a suspect?

Page 165

A. In years past, yes.

Q. What were those instances?

A. Potential narcotics raids. Nothing to do with Lieutenant Dunn, Detective Fontenot, or any member who is currently there. There was a female dispatcher that is deceased now that gave up some information many years ago.

MS. LIU:

Should we take a break?

MR. REED:

Sure.

THE VIDEOGRAPHER:

We are off the record. The time is 1:59.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record. The time is 2:07.

BY MS. LIU:

Q. Mr. Young, are there boundaries that define the EPD's jurisdiction?

A. Yes.

Q. And what are those?

A. The corporate limits of the City of Eunice.



Ryan Young

Page 166

Q. Have you ever conducted police activity outside of EPD's boundaries?

A. Yes. I've assisted the sheriff's office after being requested numerous times outside the City.

Q. Are those the only instances in which you conducted police activity outside of EPD's boundaries?

A. I have never conducted any type of enforcement activity outside the City limits of Eunice without any request for mutual aid.

Q. And typically how would that request come through?

A. A lot of times the sheriff's office will call and ask us to respond to an address, usually just outside of City limits, for disturbances, alarm calls when they're not on scene or there will be a delay until they get there.

Q. Do you recall a narcotics investigation that was outside of EPD's boundaries around May of 2019?

A. I recall that we were working in conjunction with State Police and DEA on an individual who conducted illegal narcotic sales outside the City, inside the City, and also

Page 167

transported narcotics to and from, meaning to the City and from the City of Eunice.

Q. And so were you operating outside of EPD's boundaries for that investigation?

A. We conducted surveillance on the individual outside of the City at his residence until he entered into the City of Eunice, but we took no enforcement action.

Q. When you say "we," who are you talking about?

A. Myself and Detective Fontenot.

Q. Do you recall Lieutenant Dunn ever being involved in that investigation?

A. If he was involved, I did not have knowledge of it.

Q. Was this the incident we're talking about where he brought the K-9 to the car, or was this a different incident?

A. There was an incident where we surveilled the courier from the suspected driver's house. Once he entered the City limits, a traffic stop was conducted on him, and he did, in fact, have those narcotics.

We did call Lieutenant Dunn and his K-9 to the scene. Again, the vehicle was of open-air

Page 168

construction, Jeep, no doors, no top. Narcotics were laying in plain view on the passenger floor board. We asked Lieutenant Dunn to run his dog on the car, or the vehicle, and he did not.

Q. And so the traffic stop took place within City limits; is that right?

A. Correct.

Q. Are you aware of Lieutenant Dunn raising any issues with this investigation to anyone?

A. I think he spoke to St. Landry Parish Sheriff's Office.

Q. And what is the basis of that belief?

A. I think St. Landry Parish Sheriff's Office was conducting their own investigation into that individual that they did not share with us but only maybe with Lieutenant Dunn.

Q. And how do you know that? Did someone tell you?

A. Someone told me.

Q. Who told you?

A. I don't remember.

Q. Was that someone at the sheriff's office?

A. I don't remember.

Q. Do you remember why you were being

Page 169

informed of this?

MR. REED:
    Object to form.

A. No.

BY MS. LIU:

Q. Are you aware of what issues Lieutenant Dunn raised to the sheriff's office?

A. I know that he alleged that Detective Fontenot conducted a traffic stop outside of the City limits at some point during the duration that I was out on sick leave.

Q. This was a different incident from the incident that we were talking about?

A. Correct.

Q. Do you know anything else about what Lieutenant Dunn may have raised to the sheriff's office?

A. No.

Q. Do you know if an investigation was conducted about Lieutenant Dunn's allegations of Detective Fontenot?

A. I do not know.

Q. This was a time where you were out --

A. I was out.

Q. -- on sick leave?



Ryan Young

Page 170

Aside from that, do you know of any other issues Lieutenant Dunn raised to the sheriff's office?

A.   I'm unaware of them, if they were.

Q.   Do you know if Lieutenant Dunn raised any issues with the State Police?

A.   I'm unsure.

Q.   Specifically, do you know if Lieutenant Dunn raised any issues about that traffic stop that you and Detective Fontenot were involved in?

A.   I don't know.

Q.   Are you aware of whether, at some point, Chief Fontenot no longer permitted Lieutenant Dunn to work on narcotics investigations?

A.   Yes.

Q.   When was that?

A.   I don't know the date, but I do remember him stating that Detective Fontenot would be conducting the narcotics investigations.  Some clarity on that was that he would be the one to start narcotics investigations.

If an officer during the course of his regular job duties and calls arrested someone, say, for shoplifting and they had narcotics on them, did not mean that that officer could not

Page 171

charge that person with the shoplifting and the narcotics; or if officers went to a house for a disturbance, like a domestic, and ended up making an arrest and there was narcotics in an ashtray, that they couldn't make an arrest on the suspected marijuana.

It meant narcotics investigations that that was the specific focus point were to be conducted by Detective Fontenot.

Q.   What prompted that instruction from Chief Fontenot that Detective Fontenot would work on narcotics investigations?

MR. REED:

Object to form.

A.   He was the narcotics detective.

BY MS. LIU:

Q.   And prior to that, was there someone appointed to work on narcotics investigations?

A.   Prior to Detective Fontenot, I think it was Detective Robert Brickley, who was working narcotics investigations.

BY MS. LIU:

Q.   Did other officers assist or participate in narcotics investigations?

A.   Yes, as -- I mean, it was not uncommon

Page 172

for Detective Fontenot to ask a patrol officer to keep an eye out for a certain vehicle or certain license plate or a certain suspect.

Not only were -- Detective Fontenot was investigating these narcotics complaints, but the majority of these narcotics complaints involved the gangs that I talked about earlier and were the source of a lot of our gun violence at the time.

So Detective Fontenot, it was not uncommon for him to ask the other members of the patrol division or whatnot to keep an eye out on this guy or -- you know.  So I guess they were -- technically they were assisting him.

Q.   Did Lieutenant Dunn participate in narcotics investigations prior to this instruction from Chief Fontenot?

A.   Yes.

Q.   And after that, he was no longer permitted to participate; is that right?

A.   He was no longer permitted to begin the investigations solely based off of narcotics.

Like I said earlier, had he made a traffic stop for a DWI or whatever and there was drugs in the car, you know, he could have made the arrest and charged the individual with those

Page 173

violations.

Q.   Are you aware of any investigations by EPD into Mayor Scott Fontenot?

A.   None.

Q.   Are you aware of any investigations by EPD into any members of City council?

A.   None.

Q.   Have you discussed or suggested anyone investigate the mayor or members of City council?

A.   I have not suggested anybody investigate the mayor or the City council.

Q.   Have you ever told officers to wait outside restaurants to arrest people for DUIs?

A.   I made a comment in reference to the former mayor prior to Scott Fontenot, who was Rusty Moody, who would sit and drink pretty heavily at a restaurant after council meetings.

And I guess that was just my way of blowing off steam.  But we had very little cooperation from the council and the mayor under Mr. Moody's tenure, and we did not -- did not care for him much as a mayor because he didn't seem to be very pro police.

Q.   And so what comment was that that you made in relation to the former mayor?



Ryan Young

Page 174

A. I stated something, I believe, that maybe he'll worry about the police if he gets arrested for DWI after leaving the restaurant, or DC's. But it was just a statement.

Sometimes you get frustrated when you are working with subpar equipment for pennies on the dollar, putting your life on the line, and they don't seem to care.

Q. Did you ever offer a Glock to any officer who arrests the mayor?

A. Absolutely not. I collect guns, I don't sell guns and give them away.

Q. You ever discuss or suggest to anyone about investigating the mayor for selling fake football tickets?

A. So it was reported to us by an individual that Mayor Scott Fontenot was, in fact, selling fake tickets. That person claimed to even know the female that was assisting in printing of those tickets, but never produced a said ticket or any evidence to even begin an investigation of fraudulent tickets.

Q. So was there any investigation into Mayor Scott Fontenot?

A. Never.

Page 175

Q. Do you ever use confidential informants for your investigations?

A. Yes.

Q. Are there rules for who can be recruited as confidential informants?

A. Yes.

Q. What are those rules?

A. Typically anyone who's on active supervised probation or parole cannot be used as a confidential source or confidential informant due to the probation officers and patrol officers not wanting those individuals to be subjected to the lifestyle that possibly got them where they were.

Q. And so have you used anyone who's on active probation or parole as a confidential informant?

A. I have not.

Q. Do you know anyone who has done that?

A. I think Detective Fontenot was given some authorization by a City probation officer to use someone who was on active probation.

Q. Do you know who that is, the confidential informant?

A. No.

Q. Now, are there rules on how you can

Page 176

recruit an individual to be a confidential informant?

A. Most confidential informants are motivated by a couple different things. Some want assistance with charges that they have, some are money motivated, and some just want to be maybe a police officer or a citizen who just makes a difference; they wanted to be a police officer but they didn't, so they are doing the best they can by giving the actual police officers information.

There's different types of confidential informants and reasons that they are motivated to be.

Q. Are you permitted to force someone to be a confidential informant under coercion?

A. No.

Q. Have you ever done that?

A. No.

Q. Are you aware of anyone doing that?

A. No.

Q. Have you read the amended complaint in this case?

A. Not in its entirety.

Q. You're aware that an amended complaint has been filed, correct?

Page 177

A. I've only been served with one.

(Exhibit 8 was marked.)

BY MS. LIU:

Q. I'm going to mark as Exhibit 8 a copy of the amended complaint in this case.

MR. HORNER:

Mr. Stamey, would you mind muting, we're getting some feedback from you.

Seems quieter, so...

MR. REED:

Better.

BY MS. LIU:

Q. So you have never reviewed this complaint in full?

A. I have not received a copy of the amended one, and the initial one that I received I did not get through it in its entirety.

Q. Okay. You are aware that you submitted an answer to this amended complaint, correct?

A. Yes -- was that for this, the answers?

Q. I can show you the answers.

A. But that was for the amended?

Q. You submitted an answer to the complaint as well as the amended complaint.

A. Okay, okay.



Page 178

Q.   I'll represent that to you.
A.   All right.
Q.   Would you like time to read through it, or I can go over it --
A.   No, this is --
Q.   -- and ask some questions?
A.   Yeah.
Q.   Can you turn to paragraph 4 of the amended complaint.  It reads, "For example, Eunice Police Department policies are so vaguely written that the chief of police can find a basis to discipline anyone without good cause while at the same time allowing him to let those who commit misconduct go unpunished."
     Do you think that's true?
A.   The chief of police is not the disciplinary.  The appointing authority is the one that is the actual disciplinary.
Q.   Do you think the Eunice Police Department policies are vaguely written?
     MR. REED:
        Object to form.
A.   I think some of the policies in the past probably needed to be updated, which they have been since Chief LeBouef has taken over.

Page 179

BY MS. LIU:
Q.   So when you're referring to "policies in the past," you're referring to policies that were under Chief Fontenot?
A.   Or previous administrations.  I mean, I've been under five chiefs, and a lot of them have not changed since I've been there.
Q.   Continuing on in this paragraph 4 it states, "Moreover, it is the practice of the St. Landry Parish District Attorney to require approval from Eunice chief of police to investigate any criminal misconduct reported at the departments."
     Do you see that?
A.   Uh-huh.
Q.   Do you know if that's true?
A.   I have no idea.
Q.   Continuing on in paragraph 4 it states, "Likewise, upon information and belief, it is the practice of the Louisiana State Police to investigate officer complaints only if such complaints originate from a department's chief of police."
     Do you see that?
A.   Uh-huh.

Page 180

Q.   Do you know if that's accurate?
A.   I have no idea.
Q.   In paragraph 5, it states, "In June 2020, Chief Fontenot learned that Lieutenant Dunn had reported Chief Fontenot's and the Department's misconduct to outside authorities.  On information and belief, Chief Fontenot was so informed by the District Attorney himself."
     Do you know anything about that?
A.   No.
Q.   Are you aware of Chief Fontenot learning any information from the district attorney about Lieutenant Dunn?
A.   I am unaware, totally unaware.
Q.   Okay.  Can you turn to paragraph 12.  It states, "Former Department Deputy Chief Varden Guillory testified that Chief Fontenot employed a pattern of targeting people that he didn't like for personal reasons."
     Do you know if there's any truth in that?
A.   No, I don't.
Q.   You're unaware of whether or not Chief Fontenot had a pattern of targeting people he didn't like?

Page 181

A.   That is correct, I am unaware.
Q.   If you can turn to paragraph 31 -- I'm sorry, paragraph 30.  The last sentence in paragraph 30 states, "From 2019 to 2022, the Eunice Police Department experienced an exodus of officers who were unwilling to subject themselves to Chief Fontenot's selective law enforcement policies."
     Is that accurate?
A.   I don't -- I don't think that is accurate.  I think that the pay was the main exodus reason.
Q.   But you would agree that there was an exodus from the Eunice Police Department in those years?
     MR. REED:
        Object to form.
A.   There was a substantial loss of the workforce.
BY MS. LIU:
Q.   And by that, what do you mean by "substantial"?
A.   Where it normally was four to five officers per shift, there were some shifts that only had two officers.  A lot of officers left for



Page 182

Q. positions at other agencies that paid higher.

Q. And what, if any, effect did it have on the operations of the police department?

A. The department, I believe, was unable to provide a level -- adequate level of security to the public due to being shorthanded and understaffed, and the officers that remained there pretty much worked extra hours to cover the shortages.

Q. Paragraph 31 starts with, "Chief Fontenot repeatedly compelled lieutenants and sergeants who disobeyed him to do entry-level work below their rank."

Is that accurate in your opinion?

A. No. As I testified earlier, just because a law enforcement officer gains a title such as sergeant, lieutenant, captain, major, it does not lessen their ability to be a police officer or their responsibilities. They actually gain more responsibilities.

So a captain or a deputy chief still has the power to make a simple arrest for something such as shoplifting or littering or whatever it may be or to take a citizen complaint, such as a stolen lawnmower.

Page 183

Q. Are you aware that the civil service board investigated this issue and found that employees were performing duties outside of their classification?

A. I was aware that the civil service board and the -- an individual from the State civil service testified in front of the civil service board that an officer does not shed responsibilities as they increase in rank but they gain responsibilities and that asking a police officer of any rank to do a basic report for a civilian is something well within their job duties.

Q. In paragraph 31, the second sentence is, "Meanwhile, Chief Fontenot rewarded loyal officers with supervisory responsibilities for which they were unqualified."

Do you see that?

A. Yes.

Q. Is there any truth to that?

A. No. To become a supervisor at the department, first of all, you -- there must be a vacant spot available; you must have a qualifying score, civil service test score; and you must be a person of seniority, meaning you have to have the

Page 184

A. most time to be placed in that spot. So it cannot just be a person taken from the jail and put as a lieutenant over investigations.

Q. Right. That should not happen, right?

A. It does not happen.

Q. If you turn to paragraph 34, and this paragraph describes an incident that Lieutenant Dunn reported involving Officer Fontenot in and around May of -- May 30, 2019.

And the allegation is that Officer Fontenot grabbed a restrained suspect by the neck and forced him to the ground.

Are you aware of this incident?

A. No.

Q. In paragraph 35, it describes an incident in November 22 of 2019 where Officer Fontenot allegedly punched a suspect.

Are you aware of this incident?

A. No, I'm not. But it says here that Lieutenant Dunn witnessed the incident, and then it says no on-duty officers reported the excessive use of force.

Q. Okay. But you have no knowledge of this incident in your personal --

A. No.

Page 185

Q. Paragraph 36, this incident talks about an incident in which Lieutenant Dunn observed an officer punching an individual under arrest in the booking area.

Are you aware of this incident?

A. That is the incident involving Officer Cody Miller that we previously discussed before lunch.

Q. Was there a second officer involved in that?

A. There was a jailer, a reserve officer who was working as a jailer.

Q. And who was that?

A. Officer Jody Andrus.

Q. And in the report to the Louisiana State Police, was the jailer's name mentioned?

A. I don't know.

Q. Is the jailer related to the deputy chief, do you know?

A. Yes.

Q. What was the relation?

A. I think that says nephew.

Q. Did you file the report with the Louisiana State Police?

A. No. I think that when Detective -- I'm



Ryan Young

March 27, 2025
Pages 186 to 189

Page 186

sorry, Chief Fontenot authorized the investigation, for me to conduct the investigation in reference to the internal part, that he contacted the State Police too, but I'm not positive. But I did not contact the State Police to do the criminal investigation.

Q. And did you do any investigation related to Jody Andrus?

A. I did an internal affairs investigation on him as well.

Q. And what was the result of that investigation?

A. I'd have to look back at it. But I think there was -- I found a violation of one of the policies. I don't have it. I'd have to look back at it. But, again, I made no recommendation for it. I typed up my summary report and submitted it to the chief of police.

Q. Are you aware of any other instances of excessive use of force by EPD that's not mentioned in these three paragraphs?

A. I mean, there's always going to be somebody, you know, Oh, I need to go to the hospital, I fell when I was running away from the police and scraped my knee, or he landed on top of

Page 187

me and it scraped my knee. But no official complaints by anyone that I'm aware of.

Q. Going to paragraph 39 of the amended complaint it describes an incident in which Chief Fontenot ordered Lieutenant Dunn to release an inmate who had swallowed broken glass in the Eunice Jail.

Are you aware of that incident?

A. That occurred while I was out, so I'm not aware of that at all.

Q. So you have no personal knowledge about that incident?

A. No.

Q. If you go to paragraph 44, the second sentence there states, "For example, Officer Fontenot and Lieutenant Young regularly hold arrestees in jail or their office for extended periods of time to coerce them into becoming confidential informants."

Do you have a reaction to that?

A. That's an absolute untruth.

Q. So you have never done that, to hold arrestees in jail or your office for extended periods of time for purposes of turning them into confidential informants?

Page 188

A. Absolutely not. I have walked away from people who wanted to become confidential informants because they wanted something that I could not give them.

Q. Turn to paragraph 46. And this discussed the misuse of department funds. The second sentence there describes Chief Fontenot's practice of instructing favorite employees to fraudulently report overtime using the time sheet designation of special detail.

Do you see that?

A. Yes, I do.

Q. Are you aware of anyone recording their time as special detail?

A. I'm sure that somewhere it was listed special detail, but not because Chief Fontenot instructed anyone to record their overtime -- to reward them and to fraudulently record overtime.

For example this weekend, we have an event that officers are required to work overtime, and on the time sheet it's going to put "special detail, festival." So -- but to reiterate, I have never been made aware of Chief Fontenot instructing favorite or unfavorite employees to fraudulently record overtime.

Page 189

Q. Okay. The term "special detail" is used in time -- time sheets?

A. It can be, yes.

Q. Are you required to provide a documentary record of the times that you work?

A. We have a time sheet that is submitted every two weeks that is for patrol. It would be approved by their lieutenant, and for administration and records, it would be approved by the deputy chief.

Q. And what is the term "special detail" used for? You said for festivals, for example.

Are there other times?

A. Mardi Gras. We just got finished with five days of Mardi Gras special detail. Hurricane, special detail. In -- what year was the train derailment? We had a major train derailment in the city, for two weeks anything over your normal hours was a special detail. Train derailment or hurricane. I mean...

Q. So usually it's for some special -- kind of unusual events that's outside of the regular norm?

A. That or if they -- we get a lot of calls -- and this is an example. Say if we're



Ryan Young

March 27, 2025
Pages 190 to 193

Page 190

getting a lot of gunfire calls in a particular area of town, we may have a group of individuals go out one night to do crime suppression, try and stop people, flood the streets, get guns off the streets, you know, arrest outstanding warrants. I guess it could be considered a special detail.

Q. Paragraph 46 continues, "Chief Fontenot permitted favorite employees to leave work early and claim they are still working, resulting in payment of unearned compensation."

Do you know if that has occurred?

A. I don't know that that has occurred at all.

Q. And then it states that he paid favorite employees for time spent commuting.

Do you know of any instances of that?

A. I don't know. I know that it was in the past for cadets attending the law enforcement academy, if the academy started at, example, 7:00 a.m. and lasted 'til 5:00 p.m., that they used to only be paid from 7:00 a.m. to 5:00 p.m.

But there was a ruling by maybe the Labor Department or something where they had to be compensated for travel time.

So I just recently got back from Live

Page 191

Oak, Florida, where I had to go and testify. And, I mean, obviously, I was paid to travel to Live Oak, Florida and not just for the amount of time that I sat testifying.

Q. This also states, "Chief Fontenot also approved expenditure of department funds for officers to travel to out-of-state training programs."

Do you know anything about that?

A. There have been out-of-state training programs that officers have attended. Some of them may have been free in Louisiana but maybe not at that time.

Q. Have you ever been asked by Chief Fontenot to invent reasons to write up officers?

A. No, never.

Q. Are you aware of anyone else being asked by Chief Fontenot to write up officers with false reasons?

A. No.

Q. Turn to paragraph 66, and there it states, "Within an hour of Lieutenant Dunn first reporting misconduct to Louisiana State Police regarding improper police conduct being executed outside of Eunice, he received a call from Chief

Page 192

Fontenot, who threatened he would be sure to find out anything Lieutenant Dunn had reported.

"Upon information and belief, Chief Fontenot was alerted to Lieutenant Dunn's report by Lieutenant Young, who, in turn, had been told the same by someone at the Louisiana State Police."

Do you know anything about that allegation?

A. Let's see. It says that Lieutenant Dunn received a call from Chief Fontenot, who threatened that if he would be sure to find out anything Lieutenant Dunn had reported -- that he would be sure to find out anything Lieutenant Dunn had reported.

Upon information and belief, Chief Fontenot was alerted of Lieutenant Dunn's report by Lieutenant Young, who, in turn, had been told by -- been told of the same by someone at State Police. I don't know what that means.

Q. Okay. Have you ever been told -- if you go to paragraph 65, it describes Lieutenant Dunn contacting Captain Eric Duplechain of the Louisiana State Police.

Do you see that?

Page 193

A. Okay, yes.

Q. And then paragraph 66 refers to Chief Fontenot finding out about this call or this report to Captain Eric Duplechain.

Does that follow?

A. Yes, I understand. I never received a call about that. I don't know what that means, I don't.

Q. So you have never been told by Eric Duplechain or anyone else at the State Police about Lieutenant Dunn contacting them?

A. No.

Q. If you turn to paragraph 85, the last sentence there is, "In early 2022, not long after Lieutenant Dunn returned from field leave, Chief Fontenot and Lieutenant Young were overheard at the department discussing whether Lieutenant Dunn had mental problems and whether they needed to do an investigation and get rid of him."

Do you see that?

A. Yeah, I see that.

Q. Is that true?

A. I don't recall that being true.

Q. Did you ever say that, those comments?

A. I don't recall saying those comments. I



Ryan Young

Page 194

recall us earlier talking about Lieutenant Dunn taking time off due to his personal issues and something about it was affecting his ability -- mental ability to, I guess, be safe at the job and not be preoccupied with whatever decisions and problems he was going through.

Q. Do you have a recollection of discussing that with Chief Fontenot?

A. No, I do not.

Q. On paragraph 95, it describes a conversation between another lieutenant and Lieutenant Dunn about Chief Fontenot combing through Lieutenant Dunn's case files to locate any evidence of purported misconduct.

Do you know anything about that?

A. No, I don't.

Q. It states, "Chief Fontenot conducted an investigation into Lieutenant Dunn's prior case work since June 2020 without informing Lieutenant Dunn of the nature of the investigation or following other procedures dictated by Louisiana statute."

Are you aware of any such investigation?

A. No, I'm not.

(Exhibit 9 was marked.)

Page 195

BY MS. LIU:

Q. I'm going to hand you Exhibit 9 now. And this is the answer to the amended complaint.

So have you seen this document, the answer to the amended complaint?

A. Yes.

Q. This was filed on your behalf by your attorney?

A. Yes.

Q. And you reviewed it and ensured that it was accurate?

A. Yes.

Q. And you see, starting here on page 1, there's a list of affirmative defenses?

A. Yes.

Q. Do you understand what that means?

A. Explain it to me, please.

Q. Well, affirmative defenses are defenses that you assert, right?

A. Okay.

Q. Can you flip to the second page where it talks about the fourth affirmative defense. And there it reads, "Legitimate, non-discriminatory, non-retaliatory reasons existed for all personnel actions with respect to the Plaintiff, which are

Page 196

the subject matter of this lawsuit."

Do you see that?

A. Yes.

Q. What are the legitimate, non-discriminatory, non-retaliatory reasons you are stating here?

MR. REED:
Object to form, calls for a legal conclusion.

BY MS. LIU:

Q. You can answer.

A. I did not -- I was in no position to inflict any disciplinary action against Lieutenant Dunn at any time for any of the allegations that he has made.

I was not a supervisor of Lieutenant Dunn that could discipline him in any form. I had no discretion in his job duties. And I was tasked with investigating the critical incidents he submitted on other employees, which I did, and completed reports and submitted them for the chief and the appointing authority to make decisions on.

Q. Is that the full basis of what you're saying here in the fourth affirmative defense?

MR. REED:

Page 197

Object to form.

A. Yes.

BY MS. LIU:

Q. For the sixth affirmative defense it states, "Ryan Young specifically denies ever having subjected the Plaintiff or having caused the Plaintiff to be subjected to a deprivation of any constitutionally secured right or rights, privileges, or immunities specifically denying that the Plaintiff is entitled to any relief whatsoever."

What is the basis of this affirmative defense?

MR. REED:
Object to form, calls for a legal conclusion.

A. So, again, as I stated earlier, I was in no position to deprive Lieutenant Dunn of any of the constitutional rights or privileges whatsoever.

BY MS. LIU:

Q. If you look at the ninth affirmative defense, it states, "Ryan Young pleads in the alternative, that some of all of the Plaintiff's alleged injuries were caused or contributed to by



Ryan Young

Page 198

the Plaintiff's own conduct, acts, or omissions or by the conduct, acts, or omissions of third parties or other -- or entities other than Ryan Young for whom Ryan Young has no responsibility or liability."

Q. Do you see that?

MR. REED: Object to form, legal conclusion.

BY MS. LIU:

Q. What is the basis of this defense?

A. I completely agree that Lieutenant Dunn's own acts had nothing to do with any of my responsibility. I did not force him to do any of those things, I did not suggest to him to do any of these things, and I did not prohibit him from doing any of these things.

Q. What are the acts of Lieutenant Dunn that you're discussing?

A. Filing complaints, making allegations, things that he -- any conduct that he may have done that he feels caused him to be retaliated against.

Q. If you go to the tenth affirmative defense, it reads, in the second line there, "Ryan Young pleads that the same action would have been

Page 199

taken for reasons that were lawful and not related to the Plaintiff's alleged protected status."

Q. Do you see that?

A. Yes.

Q. What do you mean by this?

MR. REED: Same objection.

A. Again, I mean, I -- I really don't know how to answer that one. But I didn't make him do any of these things. And whether I was tasked with conducting investigations that he had written people up on, I think, if it wouldn't have been me, it would have been whoever was in my place. When I reported the alleged allegation that was made against him, I did so to my supervisor, which was the chief of police, just like he is making allegations against us defendants.

BY MS. LIU:

Q. The 11th affirmative defense, "Ryan Young pleads that the Plaintiff's claims fail because any actions taken in regards to the Plaintiff were based on reasonable factors, were made in good faith and for good cause and without malice, were motivated by legitimate

Page 200

considerations, were unrelated to the Plaintiff's alleged purported protected status, and were at all times motivated solely and required by legitimate, non-discriminatory reasons, and no action was taken with malice or in reckless disregard of any federally protected rights or other rights."

Q. Do you see that?

A. Yes.

Q. What reasonable factors are you talking about?

MR. REED: Same objection.

A. So my reporting of the alleged allegation made against Lieutenant Dunn was not done in malice. It was done as a veteran supervisor of the police department. It was my duty to report that to my supervisor; whether he did anything with it or not, I did what I was required to do. It was not done to inflict any hard times on Lieutenant Dunn.

BY MS. LIU:

Q. Are there any other legitimate considerations that you haven't discussed already?

MR. REED:

Page 201

Same objection.

A. Not at this time.

BY MS. LIU:

Q. Go to the 21st affirmative defense, it's on page 5. And it says, "At all times Ryan Young acted in accordance with established policies, procedures, and practices."

What policies, procedures, and practices are you referring to there?

MR. REED: Same objection.

A. I acted within the laws of the State of Louisiana and the policies and guidelines of the Eunice Police Department.

BY MS. LIU:

Q. And going back to the 14th and 15th affirmative defense, in there you state that you assert that the sole and proximate cause of any injury to the Plaintiff was the Plaintiff's own fault in the 14th affirmative defense. In the 15th, you say that the sole and proximate cause of any injury to the Plaintiff was the fault of a third party or parties for whom Ryan Young had no control or were not responsible for.



Page 202

What do you mean by sole and probable cause -- proximate?

MR. REED:
Same objection.

A. So in the 14th, any action that the defendant, Mr. Dunn, feels he received was from his own doing.

And in the 15th amendment -- 15th affirmative defense, the third party, I guess, would reference to Mr. Dupre's allegation that he freely and voluntarily gave to Detective Fontenot and I of the allegations he made against Lieutenant Dunn.

(Exhibit 10 was marked.)

BY MS. LIU:

Q. This is -- I'm going to hand you Exhibit 10.

MR. REED:
Do you mind if we take five? I just need a bathroom break.

MS. LIU:
Sure, no problem.

THE VIDEOGRAPHER:
We are off the record. The time is 3:03.

Page 203

(A break was taken.)

THE VIDEOGRAPHER:
We are back on the record. The time is 3:06.

BY MS. LIU:

Q. So I just handed you Exhibit 10. You see on the first page there's a phone number that's attached to Lieutenant Young.

Is that your phone number?

A. Yes.

Q. In the -- if you want to look at it, it appears to be a conversation, a text conversation, between you and Michael Dunn; is that right?

A. Yeah, I believe that's -- I believe that's his telephone number. I have it saved. I don't remember it right off the bat.

Q. Do you recall this text conversation?

A. Let me read. Oh, yes.

Q. This is an accurate conversation of a text conversation between you and Michael Dunn?

A. Yes.

Q. If you go to Dunn's message at 7:25 p.m., do you see that?

A. Uh-huh, yes.

Q. In that last sentence in that text

Page 204

message he states, I also -- also, I recorded the interaction with source without him knowing just in case it's bullshit, like the crap with Joshua Dupre and that fiasco.

Do you see that?

A. Yes.

Q. Do you know what he's referencing?

MR. REED:
Object to form.

A. I think he is referencing that he recorded the conversation with the source.

BY MS. LIU:

Q. Okay. Do you know what he's referencing in terms of, quote, the crap with Josh Dupre and that fiasco?

MR. REED:
Object to form.

A. Obviously it's what we've been talking about for most of the day in the allegations that Mr. Dupre made against him.

BY MS. LIU:

Q. If you go to Michael Dunn's first message, he talks about -- he says, "I'll try and get in touch with you. I either need to speak with you or Victor. Something came up with

Page 205

investigation due to the outcome of the meeting another day."

Do you know what meeting he's referencing?

MR. REED:
Object to form.

A. I don't recall, but it may be the supervisor's meeting.

BY MS. LIU:

Q. Does it --

A. And it may have been the meeting where -- where Chief Fontenot stated that Detective Fontenot would be conducting all of the narcotics investigations.

Q. Okay. This is not the thing -- I think you used the term bury-the-hatchet discussion you were referencing earlier?

A. It may be. I don't remember the exact dates on that supervisor meeting.

Q. And this document doesn't refresh your recollection in terms of when that meeting might have taken place?

A. No, it doesn't. It's been a long time.

Q. I'll hand you what has been marked as Exhibit 11.



MAGNA
LEGAL SERVICES

Ryan Young

Page 206

(Exhibit 11 was marked.)

BY MS. LIU:

Q.  I want to represent to you these are text messages that were provided by you or your lawyer in this litigation.

A.  Right.

Q.  And if you'll review these text messages, are these an accurate representation of the text messages between you and Michael Dunn?

A.  Yes.

MS. LIU:

That's all the questions I have.

MR. REED:

Does anybody on the phone have questions?

I've just got about five minutes of follow-ups.

THE WITNESS:

Sure.

EXAMINATION

BY MR. REED:

Q.  See if you can find Exhibit Number 4. And I'll represent to you that's the critical incident report about the allegations of the contaminated evidence in the rape case.

Page 207

A.  Okay.

Q.  When you testified a few hours ago, I guess it was this morning, you said you found some of the assertions the plaintiff made to be humorous.

A.  Yes.

Q.  I don't think you ever specified.  What is it you found humorous?

A.  What is in this critical incident is not what I found humorous.  I was referencing Lieutenant Dunn's initial police report regarding that alleged rape that he was involved with.

Q.  Okay.  And what was funny about that?

A.  In his supplemental narrative, he had put that -- and I don't remember exact verbatim, but he had went to the hospital I think to go meet his wife, who was employed there and at work, and an individual approaches him in the parking lot and hands him a pair of women's panties and stated something to him, I don't recall.

And later on in his report that -- he put that he researched on WebMD how long it took semen to go from a globular state to a liquid state, excuse me.  And he put that in the report, and something about based off of his knowledge and

Page 208

experience.

So I read that he researched on WebMD how long it took semen to go from a globular state to a liquid state and based off his experience. So I made the comment that I hope he wasn't basing his experience of women's panties with semen in it.  That's what I found funny.

Q.  Okay.  But it was nothing about the rape or the botched rape or anything else?

A.  No, not at all.

Q.  You said you made a joke about, Man, I hope Victor Fontenot doesn't get the plaintiff's dog.

Do you remember that?

A.  Yes, or something to the effect that it would be funny if they took the dog and gave it to Victor.

Q.  Was that meant as a joke?  Was there anything serious about that at all?

A.  No, it was a joke.

Q.  Did you have any role in overseeing who had responsibility for the K-9 program?

A.  Never.

Q.  Did you ever indicate to the person who runs the K-9 program that dogs should go from the

Page 209

plaintiff to Victor Fontenot?

A.  Never.

MR. REED:

That's all the questions I have.

THE VIDEOGRAPHER:

This concludes the deposition.  We are off the record.  The time is 3:14 p.m.

(END OF TESTIMONY AT 3:14 P.M.)



Ryan Young

### Page 210

REPORTER'S PAGE

I, RITA A. DEROUEN, Registered Professional Reporter (RPR #6908) and Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)";

That (sic) denotes when a witness stated word(s) that appears odd or erroneous to show that the word is quoted exactly as it stands.

RITA A. DEROUEN, RPR, CCR

### Page 211

REPORTER'S CERTIFICATE

I, Rita A. DeRouen, Registered Professional Reporter (RPR #6908) and Certified Court Reporter (Certificate #2014018) in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that on March 27, 2025, in the above-entitled and numbered cause, the deposition of RYAN YOUNG, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 210 pages;

That this testimony was reported by me in stenographic shorthand, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board;

That I have acted in compliance with the prohibition on contractual relationships, as

### Page 212

defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I am not of Counsel, nor related to any person participating in this cause, and am in no way interested in the outcome of this event.

SIGNED THIS 8TH DAY OF APRIL, 2025.

RITA A. DEROUEN
Registered Professional Reporter
Certified Court Reporter

### Page 213

WITNESS CERTIFICATION

I, Ryan Young, the undersigned, do hereby certify that I have read the foregoing deposition taken on March 27, 2025, and it contains a true and accurate transcript of the testimony given by me:

(   )  No corrections.

(   )  With corrections as reflected on the Errata Sheet(s) prepared by me and attached hereto consisting of _____ pages.

_____
Ryan Young

_____
Date

