IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA


MICHAEL DUNN

vs.

                               Civ. A. No.
                               6:21-cv-05135

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, AND JOHN
DOE

* * * * * * * * * * * * * * * * * * * * * * * * * * *


VIDEOTAPED DEPOSITION OF
RANDY FONTENOT

January 30, 2025


Held at Eunice City Hall
300 E. 2nd Street
Eunice, Louisiana   70526


(Beginning at 9:11 a.m.)


Reported by:

Rita A. DeRouen, CCR, RPR
(CCR #2014018)
(RPR #006908)



EXHIBIT E

Randy Fontenot                                                                          January 30, 2025

Page 2

APPEARANCES:

REPRESENTING THE PLAINTIFFS:

SIDLEY AUSTIN, LLP
787 Seventh Avenue
New York, New York  10019
212.839.5300
BY:  PETER J. MARDIAN, ESQ.
pmardian@sidley.com
BY:  CASSANDRA LIU, ESQ.
cassandra.liu@sidley.com

          - AND -
KEARNEY LOUGHLIN, ATTORNEY AT LAW
602 Boulder Creek Parkway
Lafayette, Louisiana  70508
337.534.8803
BY:  KEARNEY LOUGHLIN, ESQ.  (Via Zoom)
kearney.loughlin@gmail.com


REPRESENTING THE DEFENDANT CITY OF EUNICE:
BECKER & HEBERT, LLC
201 Rue Beauregard
Lafayette, Louisiana  70508
337.233.1987
BY:  JAMES DOHERTY, ESQ.  (Via Zoom)
jdoherty@lawbecker.com

Page 3

APPEARANCES:  (CONTINUED)
REPRESENTING THE DEFENDANT CITY OF EUNICE:

STAN FEUCHT, ATTORNEY AT LAW
440 N. 2nd Street
Eunice, Louisiana  70535
337.550.1115
BY:  CHARLES STANISLAUS FEUCHT, ESQ.
stan@feuchtlaw.com

REPRESENTING THE DEFENDANT VICTOR FONTENOT:
STAMEY LAW FIRM, LLC
727 Second Street
Natchitoches, Louisiana  71458
318.951.1024
BY:  JOSEPH B. STAMEY, ESQ.
joe@stameylawfirm.com


REPRESENTING THE DEFENDANT RYAN YOUNG:

NEUNER PATE
1001 West Pinhook Road, Suite 200
Lafayette, Louisiana 70503
337.272.0348
BY:  JASON REED, ESQ.
jreed@neunerpate.com

REPRESENTING THE DEFENDANT RANDY FONTENOT:
ERLINGSON BANKS, PLLC
301 Main Street, Suite 2110
Baton Rouge, Louisiana 70801
225.218.4446
BY:  KAITLIN A. WALL, ESQ.
kwall@erlingsonbanks.com

Page 4

APPEARANCES:  (CONTINUED)


Also Present:
    Don Grover, Videographer
    Lauren Sylvest, Becker & Hebert (Via Zoom)
    Scott Fontenot


Reported by:
Rita A. DeRouen, Certified
Court Reporter No. 2014018
in and for the State of
Louisiana

Page 5

                  I N D E X

                                              Page
Stipulation                                      8
Reporter's Page                                391
Reporter's Certification                       392

EXAMINATION
    By Mr. Mardian                              11
    By Mr. Loughlin                            380
              * * * * *
          List of Exhibits

Exhibit #1
    (Procedural Orders of the Eunice Police      39
    Department, CityofEunice_Dunn_0000823 –
    981)
Exhibit #2
    (Eunice Police Department Internal          107
    Investigation, Incident Date 8/25/19,
    CityofEunice_Dunn_0000176 – 210)
Exhibit #3
    (Collection of Documents, CSB0000853 –      141
    894)

Exhibit #4
    (Critical Incident Form – Police,           161
    12/06/19, CityofEunice_Dunn_0000156 –
    157)
Exhibit #5
    (Statement by Jonathan Lee, DUNN_0000126)  178


MAGNA
LEGAL SERVICES

Randy Fontenot                                                                January 30, 2025

Pages 6 to 9

Page 6

EXHIBITS:  (CONTINUED)

Exhibit #6
        (Emails and attachments,              198
        CityofEunice_Dunn_0002252 - 2293 )

Exhibit #7
        (Collection of Documents,             216
        CityofEunice_Dunn_0003498 - 3514)

Exhibit #8
        (Transcript of Probation Revocation   233
        Hearing, 10/8/2020, and Transcript of
        Bond Revocation Hearing Continued from
        October 8, 2020,
        CityofEunice_Dunn_0003515 - 3549)

Exhibit #9
        (Statement by Victor Fontenot,        291
        CityofEunice_Dunn_0001645 - 1656)

Exhibit #10
        (Short Message Report, Dunn_0001943 - 316
        1944)

Exhibit #11
        (Short Message Report, Dunn_0002086 - 320
        2087)

Exhibit #12
        (Short Message Report, Dunn_0002076 - 325
        2077)

Page 8

S T I P U L A T I O N

    It is stipulated and agreed by and between counsel that the testimony of the witness, RANDY FONTENOT, is hereby being taken pursuant to Notice under the Federal Rules of Civil Procedure for all purposes permitted under law.

    The witness reserves the right to read and sign the deposition. The original is to be delivered to and retained by PETER J. MARDIAN, ESQ., for proper filing with the Clerk of Court.

    All objections, except those as to the form of the questions and/or responsiveness of the answers, are reserved until the time of the trial in this cause.

                        * * *

    Rita DeRouen, Certified Court Reporter in and for the State of Louisiana and Registered Professional Reporter, officiated in administering the oath to the witness.

Page 7

EXHIBITS:  (CONTINUED)

Exhibit #13
        (Short Message Report, Dunn_0002161 - 326
        2162)

Exhibit #14
        (First Amended Complaint)              340

Page 9

THE VIDEOGRAPHER:
    We're now on the record.  This begins Video File Number 1 in the deposition of Randy Fontenot in the matter of Michael Dunn vs. Randy Fontenot, et al., in the Western -- USDC, Western District of Louisiana, Number 1:21-cv-1436 RCL (sic).
    Today's date is Thursday, January 30, 2025.  The time on my camera is 9:11.
    This deposition is being taken in Eunice City Hall at the request of the plaintiff -- I don't know who that is.
    And the videographer is Don Grover and the court reporter is Rita DeRouen.  We're both with Magna Legal Services.
    At this time, would counsel please introduce themselves.
MR. MARDIAN:
    Peter Mardian from Sidley Austin, LLP, on behalf of Plaintiff, Lieutenant Michael Dunn, along with my colleague, Cassandra Liu.
MS. WALL:



Page 10

Kaitlin Wall on behalf of Randy Fontenot.

MR. REED:

Jason Reed for Ryan Young.

THE VIDEOGRAPHER:

And by Zoom?

MR. DOHERTY:

James Doherty representing the City of Eunice.

MR. LOUGHLIN:

Kearney Laughlin on behalf of Michael Dunn.

MR. REED:

And Joe Stamey will be walking in. He's got Victor Fontenot.

THE VIDEOGRAPHER:

And Lauren Sylvest?

THE COURT REPORTER:

She's a paralegal.

MR. DOHERTY:

Lauren is a paralegal with my office.

THE VIDEOGRAPHER:

Got it. All right. And would the court reporter please swear the witness.

Page 11

RANDY FONTENOT, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MARDIAN:

Q.  Good morning, Chief Fontenot. My name is Peter Mardian. I represent Lieutenant Michael Dunn in this litigation that he's filed against you, the City of Eunice, Victor Fontenot, and Ryan Young.

I have a few questions for you today, the first of which is, have you ever been deposed before?

A.  Yes.

Q.  About how many times?

A.  Two, maybe three.

Q.  And in what types of proceedings?

A.  It was all in civil cases.

Q.  And what were the nature of those cases?

A.  I don't remember. I think one of them may have been for a traffic accident. The others, I'm not sure if it was criminal or traffic -- civil, I'm not sure.

Q.  And about how long ago were they?

A.  Oh, that was probably 25, 30 years ago.

Page 12

Q.  Both of them?

A.  Yeah.

Q.  Have you ever testified at trial before?

A.  Yes.

Q.  And was that always provided in your capacity as a police officer?

A.  Yes -- no. One -- one civil case -- two civil cases, one of them that wasn't related to my job.

Q.  And are those the same civil cases that you mentioned where you were deposed?

A.  No.

Q.  So what were the nature of the cases where you testified at trial?

A.  One of them was a traffic accident. That was a civil case. That was related to my job. The other one was my sister's divorce.

Q.  You've attended several depositions in this matter, correct?

A.  Yes.

Q.  Could you ballpark for me about how many that is?

A.  Ten, 12 maybe. I'm not sure.

Q.  Do you know if you've attended every deposition in this matter?

Page 13

A.  No, I did not.

Q.  Do you know which ones you did not attend?

A.  Tony Kennedy's for sure I did not attend. I think, if I'm not mistaken, that's the only one I missed.

Q.  You've probably heard this many times by now, but just for the sake of clarity, I'd like to go over some of the ground rules for today.

First, do you understand that you are testifying under oath?

A.  Yes.

Q.  And you understand, therefore, that your answers are subject to the penalty of perjury, correct?

A.  Yes.

Q.  I will try my best to ask you clear questions, but if you do not understand one of my questions, I'd please ask you to clarify. If you do not ask me to clarify, I'm going to understand that you understood my question.

Is that fair?

A.  Yes.

Q.  If an attorney here objects, you understand that you still must answer my question



Page 14

unless you are specifically instructed not to, correct?

A. Yes.

Q. If at any time you need to take a break, please ask for one. I just ask that you don't request a break while a question is pending.

Is that okay?

A. Yes.

Q. And that rounds that out.

What, if anything, did you do to prepare for today's deposition?

A. I reviewed some documents, some documents that were presented as evidence or whatever during discovery in this case.

Q. Which documents?

A. I went over letters from the Civil Service Board, I went over some of the transcripts from depositions, a couple reports that were filed.

Q. Do you remember the substance of the letters to the Civil Service Board that you just referenced?

A. Yes.

Q. And what were they about?

A. Those were the letters that were sent to

Page 15

different agencies where the Civil Service Board wanted these agencies to, I guess, conduct criminal investigations against me.

Q. And do you recall which agencies those were?

A. Sheriff Bobby Guidroz; the mayor; and the Board of Aldermen for the City of Eunice; Michael Waguespack with Louisiana Legislative Auditor; Chad Pitre with the 27th Judicial District Attorney; and Jeff Landry, Louisiana Attorney General.

Q. And where did you get those documents?

A. They could have been copies that were presented at hearings or could be some that -- I really don't remember. These are copies I had at my house that I made copies of this morning.

Q. Understood.

Do you know if those were ever given to your lawyers to be produced in this litigation?

A. I'm pretty sure they were.

Q. And at the back, are those your handwritten notes?

A. Yeah, that is a note I made to myself this morning.

Q. And those are about your review of those

Page 16

documents?

A. No. This is just something I made a note of to myself to remember about this because I had forgotten about this at one point.

Q. But are those notes about the substance of this case or are they, you know, a grocery list or something like that?

A. Well, it's all stuff that came up during depositions.

Q. You've taken notes throughout the depositions in this case, correct?

A. I've taken a couple of notes maybe, not many.

Q. And have you kept those notes at your --

A. No, I did not.

Q. You've discarded them?

A. No. I turned all my notes over to the attorneys representing me at the time of the hearing, or the depositions.

Q. Understood.

Did you meet with your attorneys before today's deposition?

A. No, I did not meet with her. I spoke with her on the phone.

Q. How many times?

Page 17

A. Probably, about today's deposition, maybe three, four times.

Q. And was anyone else on the phone when you had those discussions?

A. No.

Q. What is your understanding of the nature of Lieutenant Dunn's lawsuit against you, the City, Victor Fontenot, and Ryan Young.

A. You're asking for my opinion about it?

Q. Your understanding of what the nature of the allegations are.

MS. WALL:

Objection to the form.

A. I -- I know he's made a lot of assumptions about things that have happened in the police department or things that he saw or thinks he knows about it.

And appears that he's kept a lot of notes over a long period of time that he compiled and he apparently thought was things that he didn't like about the policies of the police department and the way that I was running the police department.

BY MR. MARDIAN:

Q. Have you ever spoken with Victor



Randy Fontenot

Page 18

Fontenot about this litigation?

A. I don't remember speaking to him about this in particular, no.

Q. Have you ever spoken with Ryan Young about this litigation?

A. We've probably spoke about it when the suit was first filed because we were both listed as defendants. But as far as once depositions were started and talking about the depositions and evidence that was offered, no.

Q. When you talked to him when it was initially filed, do you recall the substance of any of those discussions?

A. No, I don't.

Q. Have you ever spoken with Mayor Scott Fontenot about this litigation?

A. I don't believe I did.

Q. Have you ever spoken with Lieutenant Dunn about this litigation?

A. Yes.

Q. When was that?

A. Probably not long after the suits were filed.

Q. And do you recall what you discussed?

A. Yes. We were sitting in the briefing

Page 19

room at the police department, and we were going over some of -- you know, discussing different things that he didn't like about what was going on in the department.

And, you know, it was just a general discussion about, Hey, look, we need to work together here, we need to -- for the good of the department, for the good of the City, for morale of the department, so we need to try to come to an agreement and work things out.

And he discussed not wanting to go through with the lawsuit and he'd like to drop it all. He's told me that more than once, that he'd like to drop it but the attorneys wouldn't allow him to.

Q. You mentioned the morale there. How would you characterize the morale of the Eunice Police Department?

MS. WALL:

Objection to form.

A. Well, because of the issues between me and a couple of the officers and those officers being supervisors within the department and some of the things that they were telling the officers, I think they were responsible for disrupting the

Page 20

morale and bringing the morale down within the department.

BY MR. MARDIAN:

Q. Which officers were responsible for disrupting the morale?

A. Lieutenant Dunn, Lieutenant Thibodeaux, the two of them, at one time Lieutenant Jeremy Ivory. Those are the main ones.

Q. What has Lieutenant Dunn done to lower the morale of the Eunice Police Department?

A. Anytime another -- and having gone through this when I was a police officer in the past, anytime there's a problem between a police officer and the chief or ranking officers within the department, it trickles down to the lower-ranking officers.

Especially when the officer talking is a lieutenant and he's talking negatively about the chief and trying to convince other officers that they -- that the chief is doing things wrong, should be doing this, shouldn't be telling them to be doing this, this is what civil service says and you need to follow that, you don't need to follow the chief's orders, those kind of things.

That will bring the morale down because

Page 21

the officers are put in a position between their chief and their immediate supervisor or a supervisor of rank above them basically interfering with the commands of the chief, and that brings down your morale.

Q. Can you recall any specific instances in which Lieutenant Dunn engaged in that behavior?

A. The best answer I can give you for that is if you look at his complaints and the number of officers that he's had come up here and testify in depositions.

And when they were asked what they knew -- what they witnessed, and they all said they didn't witness these acts happening, and when they were asked where they heard about this happening, it all came to Lieutenant Dunn.

Go back to those depositions and Dunn's reports and you'll get that question answered.

Q. If in those depositions the individuals were able to recall misconduct that they witnessed at EPD, that would be evidence, in your opinion, that that was not an example of Lieutenant Dunn bringing the morale down, correct?

MR. REED:

Object to form.



Randy Fontenot

January 30, 2025
Pages 22 to 25

Page 22

A.  Wait, can you repeat that.
BY MR. MARDIAN:
Q.  Fair.
Your understanding, sir, is that the instances in which Lieutenant Dunn was bringing down the morale, you cited deposition testimony where other officers could not recall specific incidences of misconduct, right?
MS. WALL:
Objection to form.
A.  Incorrect.
BY MR. MARDIAN:
Q.  So I'll ask -- let's just start over.
Can you identify a specific instance in which Lieutenant Dunn brought down the morale of the department?
MS. WALL:
Asked and answered.
A.  I'd have to go back to the deposition. That was the depositions and what was said at the deposition that brought down the morale.
But the deposition is where the evidence came out that Lieutenant Dunn was telling officers negative stuff about me and the way I ran the department.  Those are the things that brought the

Page 23

morale down.
BY MR. MARDIAN:
Q.  And can you name an example of that?
A.  Well, multiple officers and individuals testified in their depositions that the only evidence that they had or knew of any misconduct by me was what Lieutenant Dunn had told them but they had never witnessed.  So specifically, I'd have to go back to the depositions of those several officers.
Q.  Okay.  So sitting here today, you cannot think of an example?
A.  Well, an example is when Lieutenant Dunn would tell officers that I was violating civil service policy or law or rules, that I was violating policies of the department, that I was committing criminal acts, that I was involved with payroll fraud.  And the list goes on.
So those are some specifics that he spoke with of the officers and told the officers that I was doing, and those officers testified to that in their depositions.
Q.  You mentioned Donnie Thibodeaux as another officer who was bringing the morale down of the department.

Page 24

What has he done to bring the morale down?
A.  Same thing.  Telling the officers that I was violating civil service law, that I didn't have the authority to do the things that I was doing, which he apparently doesn't understand the authority of an elected police chief or a manager of anything, really.
Constantly telling officers that they didn't have to comply with my unlawful orders, which -- and when I say "my unlawful orders," I'm talking about the way he classified them as being unlawful, not that they were, that's the way he classified them.
And whenever he talks to officers about stuff like that, that brings down the morale in the department.
Q.  And you also mentioned Jeremy Ivory. What did he do to bring down morale in the department?
A.  Well, Jeremy Ivory had issues with Lieutenant Stephanie Myers at one time.  And during that time, I had taken disciplinary action against Jeremy -- against Lieutenant Ivory, and he was doing the same thing.

Page 25

He had a group of officers that followed him, and that group of officers were talking, you know, negatively about me and within the department, and which that brings down morale of the officers too.
Q.  When did you first join EPD?
A.  First, May 24, 1982.
Q.  And was that your first experience in law enforcement?
A.  Yes, it was.
Q.  What did you do when you first joined?
A.  I was a patrol officer.
Q.  And then were you promoted?
A.  Yes.
Q.  When was that?
A.  1980 -- 1987, promoted to sergeant.
Q.  And how long were you a sergeant?
A.  Two years.
Q.  What happened after those two years?
A.  I was promoted to lieutenant.
Q.  How long were you a lieutenant?
A.  From 1997 until 19 -- no.  1989 -- yeah, 1989 to 1998, I was lieutenant.
Q.  And then you were elected chief in 2015; is that right?



Page 26

A.  I was -- yeah.  I took office January 1 of 2015.

Q.  So what did you do between 2015 and when you stopped being a lieutenant?

A.  I worked for Eunice City Court as a probation officer, I worked for the 33rd District Court as a probation officer, the Oakdale City court, all at the same time.  I was doing that while I was working for the police department as well on my days off.

Then in 1998, I bought a share in a business with my dad -- well, my dad -- I bought his partner out in the lumberyard, hardware store.

In 2003, I came back full-time with Eunice City Court as a probation officer and court administrator, and I held that job until I was elected chief of police.

Q.  While you were employed by EPD, were you ever disciplined?

A.  Yes.

Q.  And how many times?

A.  Twice.

Q.  What was the nature of the first time?

A.  The first time was I was terminated because I had high blood pressure.  The Civil

Page 27

Service Board overturned that termination, reinstated me, but suspended me for 30 days because they didn't like the way I answered one of the attorney's questions at the civil service hearing, is what I was told by one of the board members after the hearing.

And then, plus, 30 days just happened to be the time that I was out without pay, and that way the City didn't have to pay me backpay.

The second time was a written reprimand that I received from the chief for -- I think I gave an inmate, a trusty, a key to the jail to bring back to the dispatcher.  And I let the dispatcher know he's coming with that key, to be watching for it.

And that was a mistake, I shouldn't have done that.  And the chief gave me a written reprimand for that.

Q.  What's your opinion of Lieutenant Dunn?

A.  I think Lieutenant Dunn is basically a good guy, but I believe he's received some poor advice and information during his employment with the police department.

And I believe he misinterprets a lot of stuff or he sees part of something that's going on

Page 28

and makes assumptions as to the conclusion or what has been happening.  He finishes the story himself without knowing all of the facts and he jumps to those conclusions and goes from there with it.

Q.  Why do you think that he's received some poor advice and information during his employment with the police department?

MR. REED:

Object to form.

A.  Speaking with Lieutenant Ivory, who worked with him at the prison before he came to the police department, Lieutenant Ivory tells me that Lieutenant Dunn has changed since he started working at the police department, that he wasn't -- as a matter of fact, Lieutenant Ivory takes credit for recommending Dunn's employment with the Eunice Police Department.

And he's told me that Dunn was not the same person at the prison that he is now.  And I think it has a lot to do with some of the training that he received as a new officer with the department.  He trained under Lieutenant Thibodeaux.

BY MR. MARDIAN:

Q.  And so when you mentioned the poor

Page 29

advice and information, is that Lieutenant Thibodeaux's training that you're referencing?

A.  That's part of it, yes.  Because I've noticed several officers -- during my tenure as chief, I've noticed several officers who were trained by Lieutenant Thibodeaux come out with some of the misinformation and a different way of looking at things and interpreting laws that Lieutenant Thibodeaux had -- you know, kind of interpret laws and look at things the same way Lieutenant Thibodeaux does, which I don't agree with.

Q.  Can you give me an example of that?

A.  Well, one example, a discussion I had with Lieutenant Thibodeaux before I was chief.  We were in the dispatcher's office and we were talking about towing vehicles for not having proof of insurance.  And I don't know why we got into that, but it was a friendly conversation.

And we were just having a discussion about it because I disagreed with some of the vehicles that he was having towed.  And I wasn't his boss at the time, we were just discussing it on a friendly basis because we knew each other.

And I said -- I told him, I said, You



MAGNA
LEGAL SERVICES

Randy Fontenot

Page 30

shouldn't be towing all the -- Oh, yeah, but the law says you shall tow. And it says -- and I said, Yeah, it says that in the first part, did you read this last paragraph of the statute?

He said, Well, I don't need to, it says right here that I -- it says that you shall tow if they cannot produce proof of insurance. I said, Down here it says that if they can satisfy the officer that you do have insurance and there's reason to believe that you do have insurance, then you don't have to tow it.

He read -- he said, Oh, I never read that in there before. So -- and I noticed that he does that with civil service law, he does that with the criminal laws, criminal statutes, traffic, and the officers that train under him basically, too. I've seen a lot of that doing the same thing.

Q. What is your opinion of Lieutenant Dunn's job performance as a police officer?

A. He did his job for the most part. I mean, I didn't -- I think he wanted to do the right thing. I didn't agree with everything that he did. I had some issues with some of the investigations and some of the reports that he

Page 31

did. But I think he wanted to do the right thing; again, he was just misguided and interpreted things in a strange way.

Q. What investigations were you referencing in that answer?

A. Well, one of them was a -- what he called a rape case when he called out investigators. He made assumptions that this lady was raped when he got called to the emergency room. The lady was unconscious at the time at the emergency room.

He started questioning people about her condition. I hate to go into it all. But he goes into detail about her panties, what he saw on her panties. And he made the assumption, because all this was there, that she was raped.

He started calling other agencies after my detective said, Wait, we can't do anything with this right now, we need to speak to the witness when she's awake, conscious, we need to get a statement from her.

And then he called other agencies, other parishes out of our jurisdiction and said, Look, I have evidence that this lady was raped in your jurisdiction but the chief doesn't want to do

Page 32

anything about it. He started calling other agencies and telling them that.

Well, come to find out a couple days later, the lady contacted the police department, the victim, and said, I heard y'all were looking for me. Well, yeah, we want to talk to you about this incident where you were apparently raped. She said, I wasn't raped.

And all that's in the report, and that report has been entered into the record already here in other depositions, I believe, but -- or through discovery.

So he jumped the gun, came to some conclusions, and made some assumptions about what happened. And when we concluded our investigation, his assumptions weren't correct, he had just, without having all the facts, made his own assumptions about what had happened and went to other agencies to complain about us not turning it over to him. And he went to different agencies and different jurisdictions.

Q. Do you believe that Lieutenant Dunn is honest?

A. I -- I like to double-check everything he says.

Page 33

Q. So is that a no, you do not believe that he's honest?

A. I believe he honestly believes what he says, but whether or not it's the truth, I can't say it is.

Q. Do you believe that Lieutenant Dunn is ethical?

A. I don't know. There were questions about that.

Q. Lieutenant Dunn was promoted to lieutenant in 2016, correct?

A. I don't know. I'd have to see a personnel action sheet. I can't say for sure.

Q. Do you recall if he was promoted to lieutenant while you were chief of police?

A. I don't remember. It's possible.

Q. What are the chief of the Eunice Police Department's main job responsibilities?

A. To govern the police department, manage the police department, set policy within the department, oversee the officers for the protection and service of the City and its citizens.

Q. And were those the main job responsibilities of the chief of the Eunice Police



Randy Fontenot                                                    January 30, 2025
                                                                 Pages 34 to 37

Page 34

Department for the entirety of the time while you were chief?

A.  Yes.

Q.  Is setting EPD policy solely the responsibility of the chief of police?

A.  It's not the sole responsibility of the chief to set policy.  There's other responsibilities.

Q.  Understood.

But is it solely the responsibility of the chief, meaning the chief and the chief alone, set policy for EPD?

A.  Yes, the chief has the final -- I mean, I can get recommendations from others, but the chief has the final say in the policy.

Q.  You attended the deposition of Mayor Scott Fontenot, I believe you said earlier, correct?

A.  Yes.

Q.  And you, therefore, heard him testify that he doesn't, quote, want to deal with the police department.

Do you agree with that characterization?

MS. WALL:

Objection to form.

Page 35

A.  Yes.

BY MR. MARDIAN:

Q.  And you also heard him testify, quote, You don't want to get in the chief's business.  Let them do their job, that's what they were elected to do.

Do you recall -- or, excuse me, do you agree with that testimony?

A.  Yes.

MR. REED:

Object to form.

A.  As he has said -- he's said many times to me those two statements.

BY MR. MARDIAN:

Q.  And you also heard Mayor Fontenot testify that the appointing authority does not exercise oversight over EPD.

Do you agree with that characterization?

MS. WALL:

Objection to form.

A.  Not the day-to-day operations of the Eunice Police Department.

BY MR. MARDIAN:

Q.  There's no oversight of the day-to-day operations by the appointing authority, correct?

Page 36

A.  Correct.

Q.  You also heard Mayor Fontenot testify, quote, I'm the mayor, I don't have anything to do with the police department.

Do you agree with that characterization?

A.  He doesn't have anything to do with the day-to-day operations of the police department, correct.

Q.  And you heard him testify that EPD's functions and capabilities are entirely subject to who the elected chief is.

Do you agree with that characterization?

MS. WALL:

Object to the form.

A.  State that again.

BY MR. MARDIAN:

Q.  That EPD's functions and capabilities are entirely subject to who the elected chief is.

A.  I agree with that somewhat.

Q.  What part of it do you not agree with?

A.  There are a lot of factors.  I mean, the mayor and the council provide the budget for the police department, they have a lot to do with the employees of the police department as far as being the appointing authority.

Page 37

So the mayor and the council are involved in those ways.  I mean, he's not completely removed from issues within the police department.  But the day-to-day operations and the policies within the police department, yeah, the mayor doesn't get involved with.

Q.  And you heard the mayor testify that EPD's code of conduct is strictly the purview of the police chief.

Do you agree with that characterization?

MS. WALL:

Objection to form.

MR. MARDIAN:

Please let me finish.

MS. WALL:

Objection to the form.  You're asking compound questions.  You're asking two questions at once.

MR. MARDIAN:

You can object to form under the Federal rules.  And you need to wait for me to answer my question -- ask my question before you object, that's all I'm saying.



Randy Fontenot

Page 38

BY MR. MARDIAN:

Q. You can answer.

A. Okay. Now if you'll repeat the question.

Q. Understood.

You heard the mayor testify that EPD's code of conduct is strictly the purview of the police chief.

Do you agree with that characterization?

MR. STAMEY:

Objection to the form of the question.

A. No, I don't agree with it.

BY MR. MARDIAN:

Q. What do you -- why do you not agree with it?

A. Because as I said, the mayor represents the appointing authority for the police department, and in that capacity, they -- he has a lot to do with the discipline and the code of conduct in the department.

I mean, he's the one that enforces the rules in a sense, based on the recommendation of the chief.

Q. So who sets EPD policy?

Page 39

A. The police chief does.

Q. And so then you said that the mayor can enforce that; is that correct?

A. In the form of disciplinary action based on the recommendation of the chief.

Q. Can the chief take any disciplinary action without the approval of the mayor?

A. No, not at this time.

Q. And that's because the appointing authority was shifted from the chief to the mayor in 2019?

A. Right after it was shifted from the mayor to the chief when a new state statute was approved by the legislature.

Q. Is EPD's code of conduct written down?

A. Yes.

MR. MARDIAN:

I'd like to mark as Exhibit 1 Tab 31.

(Exhibit 1 was marked.)

BY MR. MARDIAN:

Q. Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. This is the procedural orders of the

Page 40

Eunice Police Department.

Q. And is that the EPD code of conduct?

A. It is included in these policies, yes.

Q. So are the materials in this document, can we safely refer to that as EPD policy?

A. Yes.

Q. Is there any EPD policy that is not included in this document?

MS. WALL:

Objection to form.

A. No.

BY MR. MARDIAN:

Q. Do you know who authored this document?

A. Yes.

Q. Who is that?

A. I did.

Q. And when did you author it?

A. Probably in December of 2014, just before I took office.

Q. How would you refer to this document, just so we can use the same language going forward?

A. The procedural orders.

Q. So you'll see in the lower right -- and you probably already know this because you've

Page 41

attended other depositions -- but there's a number listed. We refer to that as a Bates number.

And I'll use it to direct you to the various documents that we'll look at today, starting with, if you flip to the second page, which should be ending 824, do you see at the bottom that there are -- that it states, "Established 2015," and then there's various revisions?

A. Yes.

Q. And that comports with your understanding that this was written in 2015, as you just said, right?

A. Correct.

Q. Do you know, sir, if this was ever revised after December 2020?

A. Yes.

Q. When?

A. October of 2015, December of 2015, September of 2016, December of 2016, May of 2017, November of 2017, December of 2018, April of 2019, June of 2020, September of 2020, and December of 2020.

Q. And I apologize if I asked the wrong question. But after December of 2020, do you know



Page 42

if it was ever revised again?

A. I don't think -- if it had been, it would have been listed under the revisions.

Q. Understood.

If you turn the page to the one ending with Bates number 825, do you see procedural order 15-1?

A. Yes.

Q. And do you see that it reads, quote, "The purpose of this procedural order is to cancel all rules, regulations, policies, procedural and general orders issued prior to 1 January 2015 in the Eunice Police Department"?

A. Yes.

Q. And did you write that?

A. Yes, I did.

Q. Why did you write that?

A. Because we were coming into a new administration, we were going to have new policies, and that paragraph has been in every set of general and procedural orders that I've seen within the Eunice Police Department from my -- from May of 1982 through now.

It's also -- so I copied -- basically copied that wording and just changed the date in

Page 43

it.

Q. And so did you take any of the prior procedural orders and reimplement them in 2015?

A. Yes.

Q. Did you reimplement all of them?

A. No.

Q. How did you determine what to reimplement and what not to?

A. I reviewed the entire policy of the Eunice Police Department prior to that. I reviewed the policy from the police department when other chiefs were in office. I reviewed the State police policies.

And I combined -- I took a little bit from all of those and implemented them in these policies. I took out policies that I did not agree with, that I did not think that the police department should be going with.

You know, different administration, I have a different way of doing things than the prior chief did.

Q. Can you recall any that you -- of the policies of the prior chief that you disagreed with?

A. Oh, not specifically right now. That

Page 44

was too long ago.

Q. And then if you turn to the next page ending 826, you'll see a continuation of procedural order 15-2.

And do you see the section entitled "Issuing Authority," about halfway down the page --923

A. Yes.

Q. -- and do you see that it reads, quote, "Procedural orders may be issued only by the chief of police"?

A. Yes.

Q. "Departmental procedural orders are issued by the chief of police to announce department-wide policies and procedures which are applicable for the indefinite future."

Do you see that?

A. Yes.

Q. Can you explain to me what this means?

MS. WALL:

Objection to form.

BY MR. MARDIAN:

Q. Can you explain to me what you understand this to mean?

A. Well, this means that the police chief

Page 45

sets the policy for the police department, and no other officer or employee of the police department can do it without the chief's express consent. And the indefinite future means until they've been changed, there's no definitive expiration date on them.

Q. Are all employees of EPD required to follow EPD procedural orders?

A. Yes.

Q. And would you describe everything in this document as a procedural order? That was a bad question.

You'll see, as we've just noticed, that certain of the titles have procedural order numbers, 15-2, 15-7.

Is everything in this document something that falls within one of those procedural orders?

A. Yes.

Q. And then next you see there's a title "Special Orders," and it's in the same section right after where we were just looking.

A. Yes.

Q. And it reads, quote, "Special orders for the department will be issued only by the chief. Supervisors may issue special orders for the men



Page 46

assigned to their command upon the chief's approval."

Q. Do you see that?

A. Yes.

Q. And why did you have this included in the procedural orders?

A. Special orders might pertain to a specific incident, a certain time period. For instance, if we have a parade coming up, there may be a special order issued for the officers, you know, where they're going to -- what intersections they're going to work, what they're going to do.

Special orders could also be issued for a set amount of time, where there's a definite termination. And they're not -- they're not indefinite.

Q. Are there any types of orders issued by the chief other than procedural orders or special orders?

A. Well, there could be, yes.

Q. And that was a bad question.

Are there any policies of EPD that are not special orders or procedural orders?

A. No, not that I can think of.

Q. Can you turn to the page ending with

Page 47

Bates stamp 830. And you'll see this lists the command officer's responsibilities and authorities, and it begins with the chief of police.

Do you see that?

A. Yes.

Q. And it reads, quote, "Authority of the chief of police is the chief executive officer of the department and the final departmental authority in all matters of policy, operations, and discipline."

Do you see that?

A. Yes.

Q. Why did you include that in the procedural orders?

A. Because that is the chief's authority and duty. And, again, this was copied from prior procedural orders.

Q. And so you agree with that characterization, right?

A. Yes.

Q. And then do you see in the next section, subsection B entitled "Responsibilities," not the first but the second sentence reads, quote, "The chief of police is responsible for planning,

Page 48

directing, coordinating, controlling, and staffing all activities of the department for its continued and efficient operations.

"He is also responsible for the enforcement of rules and regulations within the department for the completion and forwarding of such reports, as may be the department's relations with citizens, the City government, and other agencies."

Q. Do you see that?

A. Yes.

Q. Do you agree with that characterization?

A. Yes.

Q. Can you turn to the page ending 835. And this you see is procedural order 15.7, right?

A. Yes.

Q. About halfway down the page you'll see subsection 2 entitled "Conduct Unbecoming an Officer."

Do you see that?

A. Yes.

Q. And the first one reads, quote, "Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the department. He/she

Page 49

shall not conduct himself/herself in a manner that is unbecoming to an officer."

Q. Do you see that?

A. Yes.

Q. And then subsection B defines what unbecoming conduct is, right?

A. Yes.

Q. The first of those is conduct that brings the department into disrepute, right?

A. Yes.

Q. What is conduct that brings the department into disrepute?

A. That would be conduct that was -- shed a bad light on the department because of its officer's actions or activities that may reflect badly on the department because he is a member representing that department.

Q. An officer following these procedural rules has to decide before engaging in a specific act whether that act will violate these rules, right?

MS. WALL:
Objection to form.

A. Yes.



Randy Fontenot

January 30, 2025
Pages 50 to 53

Page 50

BY MR. MARDIAN:

Q. And how is an officer to determine before engaging in any specific act whether it will, quote, bring the department into disrepute?

MS. WALL:

Objection to form.

A. He should be well aware of the policies of the department and know what's expected of him, be of high moral integrity. And as has been said many times, is police officers are held at a higher standard than civilians. We expect you to be the top of your game.

BY MR. MARDIAN:

Q. Romanette iv reads that unbecoming -- "Unbecoming conduct is also conduct that detrimentally affects the morale of the department's personnel."

Do you see that?

A. Yes.

Q. What is conduct that detrimentally affects the morale of the department?

A. The conduct I explained earlier is part of it. An officer's actions which reflect badly on the department or on the officer itself can lower the morale of the department.

Page 51

Officers speaking negatively about their supervisors to other officers could fall under that, or anything that you do that affects the morale of the department.

Q. So does this procedural order forbid an officer from criticizing a superior to another officer?

A. Not this one in particular.

Q. Well, why not?

A. Because it just doesn't say that in there.

Q. Yeah, but it does say that an officer cannot engage in conduct that's unbecoming of an officer, right?

A. Right.

Q. And that includes conduct that detrimentally affects the morale of the department, right?

A. Correct.

Q. And you mentioned that conduct that detrimentally affects the morale of the department is conduct where an officer criticizes a superior to another officer, right?

A. To a lower-ranking officer, yes.

Q. So this conduct forbids an officer from

Page 52

criticizing a senior officer to a junior officer, right?

MS. WALL:

Objection to the form.

A. There's another policy specifically for that.

BY MR. MARDIAN:

Q. There may be, but my question is about this policy.

A. Well, that policy would fit in with this one. So, yeah, the two would go hand in hand.

Q. Okay. So the answer is EPD procedural orders prohibit an officer from criticizing a senior officer to a junior officer?

A. From criticizing the decisions or the actions that that officer, that senior officer, is responsible -- the ranking officer has made, decisions that he's made in the performance of his duties.

Q. And the chief is the ultimate ranking officer at EPD, right?

A. Yes.

Q. So this policy forbids an officer from criticizing the chief of police to any other officer, right?

Page 53

A. To any lower-ranking officer. To any officer below their rank.

Q. Understood.

MS. WALL:

I'm going to need a break in a second because I have to use the restroom.

MR. MARDIAN:

That's fine. We can take a break.

THE VIDEOGRAPHER:

Off the record at 10:01.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record at 10:17.

BY MR. MARDIAN:

Q. So returning to the policy for conduct unbecoming of an officer, do you see that romanette ii -- or, excuse me, iii reads that "Conduct unbecoming of an officer includes conduct that impairs the operations or efficiency of the department, the officer, or City service"?

A. Yes.

Q. What do you understand that to mean?

A. Well, any action that the officers would take that would interfere with the safety of other

MAGNA
LEGAL SERVICES

Page 54

officers, the operations of the police department, interfere with any investigations or -- it would be those types of incidents or actions.

Q. So, excuse me, actions that interfere with investigations or impair the safety of officers is what this is talking about?

A. That and -- it could -- each case is on an individual basis. It could be a lot of stuff. It's very broad and general.

Q. Understood.

And then romanette v reads, "Conduct that may reasonably be expected to destroy public respect for Eunice police officers and/or confidence in the Eunice Police Department."

Do you see that?

A. Yes.

Q. And what do you understand that to mean?

A. Basically the same thing. Any type of conduct -- any of the conduct that we discussed above that would cause the public to think less of the police officers or the police department, to have a negative view of the police officers or police department.

If an officer takes part in any activities or any actions that would cause this,

Page 55

that would be something that would fit under this policy.

Q. And so this also could capture a pretty broad set of conduct, right?

A. Yes.

Q. If you turn the page, you'll see subsection 4 entitled "Loyalty to the Department."

Do you see that?

A. Yes.

Q. And it reads, quote, "An employee shall not publicly criticize the department, its policies, or other members or employees by talking, in writing, or other expression where such expression is defamatory, obscene, unlawful, and exhibits a reckless disregard for the truth or tends to undermine the operation of the Eunice Police Department."

Do you see that?

A. Yes.

Q. So what is a defamatory expression?

MS. WALL:
Objection to form.

A. It's an expression that defames.

BY MR. MARDIAN:

Q. So it has a legal connotation in your

Page 56

understanding?

A. It's not necessarily just in the legal dictionary. It could be in -- any dictionary will describe defamatory.

Q. Understood.

But is it your understanding that conduct that is -- it meets the legal threshold of defamation --

MS. WALL:
Objection to form. I'm sorry.

MR. MARDIAN:
Please let me finish.

MS. WALL:
I'm sorry, I thought you were finished.

MR. MARDIAN:
Fair enough, yeah.

BY MR. MARDIAN:

Q. But conduct that meets the legal expression of defamation is what is forbidden here?

MS. WALL:
Objection to form.

A. No.

Page 57

BY MR. MARDIAN:

Q. It could be stuff that does not meet the legal threshold?

A. Correct.

Q. Like what?

MR. REED:
Objection to form.

A. Anything that would be defamatory. I mean, I don't know how to answer that question.

BY MR. MARDIAN:

Q. What is "obscene expression"?

MR. REED:
Objection to form.

A. That could be language, it could be physical. Anything that would be seen as obscene by any normal person.

BY MR. MARDIAN:

Q. And that's kind of my question, is what is "obscene expression"?

MR. REED:
Objection to form.

MS. WALL:
Objection to form.

A. It could be a number of things as well.



MAGNA
LEGAL SERVICES

Page 58

BY MR. MARDIAN:

Q. So you and I could agree that there's certain language that is racist or sexist that we would classify as obscene, correct?

MS. WALL:

Objection to form.

A. Maybe. Your -- what you may see as obscene may not be the same thing that I would see as obscene. We could have different opinions on that.

BY MR. MARDIAN:

Q. This policy, though, governs employees of EPD, right?

A. Yes.

Q. And so if someone is being disciplined because their expression was found to be obscene, someone has to make a determination that the expression was, in fact, obscene, right?

MS. WALL:

Objection to form.

A. Yes.

BY MR. MARDIAN:

Q. And so that's -- I'm trying to figure out, you know, if I were an officer at EPD, how I would determine whether an expression is obscene

Page 59

and, therefore, forbidden by this policy or is not.

And I understand you're saying we may have a difference of opinion. But someone is going to make that decision, right?

MS. WALL:

Objection to form.

A. I would expect the officers to read this and use some common sense in their actions.

BY MR. MARDIAN:

Q. Okay. So in common sense, racist expressions are obscene expressions, right?

A. Well, they're racist expressions. Not everybody would maybe label it as obscene.

Q. So certain racist expressions are not obscene?

MS. WALL:

Object to form.

MR. REED:

Objection.

MR. STAMEY:

Object to the form of the question.

A. I didn't say that.

BY MR. MARDIAN:

Q. Okay. So I'm trying to understand.

Page 60

I'm trying to create a spectrum of where I can understand we cross the line between obscene expression and not obscene expression. And I was using racist language as an example that I thought we could agree is obscene expression.

Can we agree on that?

A. I don't know what you're going to see as obscene or not.

Q. Fair enough.

There are certain words that people can use that people would classify as racist words, right?

A. Correct.

Q. Okay. And we could agree that that would qualify as obscene expression?

MS. WALL:

Objection to form.

A. Again, I cannot say what you would consider an obscene expression, whether racist is or not.

BY MR. MARDIAN:

Q. But you were the chief of police for seven years of EPD, right?

A. Right.

Q. So you had to make certain

Page 61

determinations over whether certain expressions were obscene or not, right?

MS. WALL:

Objection to the form.

A. I don't think that issue ever arose while I was chief, that I had to make that decision based on this policy.

BY MR. MARDIAN:

Q. Okay. If someone came into your office and said, I heard this other individual use the N-word, would you agree that that would be an example of an obscene expression that would violate this policy?

MR. STAMEY:

Objection to the form of the question.

MS. WALL:

Objection to form.

A. Not in the sense that you would maybe. But there's racist language and there's obscene language. There's racist actions, there's obscene actions. Those are not necessarily the same to me.

BY MR. MARDIAN:

Q. Okay. If I were to come into your



Page 62

office and I was looking for guidance on this policy and I asked you, Chief Fontenot, can you just help me understand what obscene expression that's forbidden by this policy is, what would you tell me?

MS. WALL:

Objection to the form.

A. I would tell you that if you were a police officer, not to engage in any communication or activity that would be considered obscene. There is an obscenity law definitely. That would fit into it, but not be a necessity for a violation of this policy. It could be something that's not unlawful but would be a violation.

BY MR. MARDIAN:

Q. Understood.

Moving on to subsection B, do you see that it reads, quote, "Nothing herein shall prohibit a member from filing a complaint or criticism through proper channels"?

A. Yes.

Q. What are the proper channels that are being referenced there?

A. It depends on the complaint. It depends on the situation. There would be different

Page 63

channels. But for disciplinary actions or for policy violations within the department, the proper channel would be the chain of command.

Q. Okay. So this is saying any officer can file a complaint or can criticize another officer to their superior officer; is that right?

MS. WALL:

Objection to form.

A. Well, that's partially right.

BY MR. MARDIAN:

Q. How is it wrong?

A. Well, it's -- the way you said it is not all-inclusive of what this actually means.

Q. Okay. So what is all-inclusive of what this means?

A. Without reading anything else into it, "Nothing herein shall prohibit a member from filing a complaint or criticism through the proper channels."

There are proper channels. The officers read the -- you've got to take these policies in its entirety, not pull a section of it out and say, Well, look. Same thing with law. You can't just pull one section out of the law and say, This is what the law says and this is all that applies

Page 64

and this is it.

You've got to read it in its entirety and you have to know what is -- you know, you can't try to pin me down on one little statement and say, Well, this is how it's going to always apply no matter what. There's a lot of other things to take into consideration.

Q. What are those other things to take into consideration?

A. The facts of the case. The facts of the situation. The incident that's taking place. The comments that are made. Interrogations. Complaints that you've received. Other policies that may describe a different situation or have an alternative method.

Q. Can any officer bring a complaint directly to the chief of police within the proper channels?

A. They can get it to the police chief through the proper channels.

Q. So I'm just trying to understand whether certain conduct qualifies as being correctly within the proper channels or not.

Is that understood?

A. All conduct can be brought properly,

Page 65

through the proper channels.

Q. So if I as a junior office, like officer-officer, not in the more general sense, see what I think is misconduct and I report to a lieutenant, can I take what I saw and bring it directly to you as the chief? Would that qualify as being within the proper channels?

MS. WALL:

Objection to form.

A. As the officer?

BY MR. MARDIAN:

Q. As the officer going around to the lieutenant.

A. No, there's more to the process than that.

Q. Okay. Can you explain that for me?

A. The first thing is it has to be reported to the immediate supervisor. If the officer is not satisfied or feels that the complaint has been handled or looked into by the immediate officer, he can request permission from that immediate supervisor to go to the next rank higher.

If that supervisor denies that request, then the officer can submit a letter and/or request it in writing to his supervisor and the



Randy Fontenot

Page 66

next higher rank that he has an issue that he'd like to discuss with that next-ranking officer.

And then it would be the decision of the next-ranking officer whether or not he's going to hear it or whether or not he's going to refer it back to his subordinate and have that subordinate take care of it. Kind of like a court going to an appellate court going to the Supreme Court.

Q. Understood.

So the chain -- excuse me. So the proper channel is for the officer to report the misconduct to their immediate supervisor, correct?

MS. WALL:

Objection to form.

A. In the beginning.

BY MR. MARDIAN:

Q. And then it's the immediate supervisor's responsibility to make a decision whether or not the conduct warrants further escalation or investigation or some other action, right?

MS. WALL:

Objection to form.

A. At that stage, yes.

BY MR. MARDIAN:

Q. And if the junior officer were to go

Page 67

outside of the chain of command and bring it not to their immediate supervisor but some other supervisor, such as the chief of police, that would not be within the proper channel; is that right?

A. Correct.

Q. And I know we used this phrase, "chain of command." I assume we can agree that's simply the Person A reports to their immediate supervisor, Person B, who reports to Person C; that's the chain of command, right?

A. Yes.

Now, let me be clear, if the officer or the complaint from the junior officer is about his immediate supervisor, then I wouldn't expect him to go to his immediate supervisor and complain to him to take action against himself. There's another procedure for that.

Q. Understood.

So that's an exception to the rule?

A. Yes.

Q. Can you think of any other exceptions?

A. There possibly could be. You'd have to be more specific and I could answer whether it would be an exception or not.

Page 68

Q. You see subsection 5 is entitled "Lawful Orders," right?

A. Yes.

Q. And it says, "A member shall promptly obey and execute any and all lawful orders of a superior officer."

Do you see that?

A. Yes.

Q. And so I think we can probably agree that just means, you know, the junior officer has to do what the senior officer says, right?

MS. WALL:

Objection to form.

A. If it's a lawful order and within the authority, yes.

BY MR. MARDIAN:

Q. And the next sentence sets forth what a lawful order is, right?

A. It basically gives an example of what a lawful order could be, yes.

Q. Okay. If you go to the next page, you'll see subsection 8 entitled "Interference."

Do you see that?

A. Yes.

Q. And subsection D reads, quote, "Member

Page 69

shall not undertake any investigation or other official action not part of their regular duties without obtaining permission from their superior officer unless the exigencies of the situation require immediate police action."

Is that right?

A. Yes.

Q. And what do you understand that to mean?

A. That means that if the investigation or action does not come as part of their regular duties, in other words, if they're going to assist another agency or another department with -- another division within our department, they have to first get the consent of their immediate supervisor before getting themselves involved with those outside investigations or other actions.

Q. And you see that this refers to, quote, "any investigation," right? In the first line.

A. Well, it does say any investigation, not part of their regular duties.

Q. My question is: Do internal EPD investigations fall within this rule or are they outside of it?

A. Internal investigations are conducted only with the consent of the appointing authority



Randy Fontenot

January 30, 2025
Pages 70 to 73

Page 70

or the -- they have to authorize those investigations.

Q. And that's, after 2019, was the mayor, correct?

MS. WALL:

Objection to form.

A. Yes.

BY MR. MARDIAN:

Q. So any internal EPD investigation --

A. Well, I take that back. I don't know that the mayor has to authorize it. He has to authorize -- the investigation can be done. The chief authorizes the investigation or the deputy chief can authorize the investigation.

And the investigative report is presented to the mayor as a representative of the appointing authority. And then based on the chief's recommendation, the mayor will make a decision on whether or not action or what type of action will be taken.

Q. Okay. Any intentional investigation at EPD must be authorized by either the chief or the deputy chief; is that correct?

A. Or it could be by a lieutenant, a supervisor within the department.

Page 71

Q. So the lieutenant can authorize an internal investigation into another EPD employee without authorization of the deputy chief or the chief?

A. If it's with an officer or employee under his command.

Q. Okay. Could a lieutenant enlist an officer under his command or her command to investigate another officer under his or her command?

A. If both officers are under the command of that lieutenant, yes. But that's not recommended.

Q. But they can under EPD policy, correct?

A. They could.

Q. And that investigation would be referred to as an internal investigation, right?

A. If it's involving another employee within the department, yes.

Q. And these procedural orders have specific guidelines about EPD internal investigations, right?

A. Yes.

Q. So if you flip pretty far ahead to the page ending 955, we'll take a look at that policy.

Page 72

So do you see at the bottom of the page subsection C entitled "Internal Investigation Policy"?

A. Yes.

Q. Okay. And do you see that reads, quote, "The chief of police will direct the officer assigned to the internal affairs section or any other member of the department the responsibility of completely investigating all aspects of complaints made against members of the department by the public, other police officers, or any other source"?

Do you see that?

A. Yes.

Q. So it says the chief of police will direct the officer assigned to the IA section.

What is the IA section?

A. Internal affairs section.

Q. Is that a specific individual at EPD?

A. Not specifically. It could be anybody that the chief deems appropriate to do the investigation.

The police department doesn't have a set -- or didn't have a set internal affairs section at that time. Normally the chief directed the deputy chief to conduct the investigation or

Page 73

the chief of detectives to do the investigation.

Q. While you were chief between 2015 and 2022, was Lieutenant Ryan Young the chief of detectives?

A. Part of the time, yes.

Q. Which time specifically, do you recall?

A. That would be the time from the point when Tony Kennedy was promoted to deputy chief, I think that's when Lieutenant Ryan Young took over as chief of detectives.

Q. And was there always a deputy chief while you were chief?

A. Yes.

Q. The role existed for the entirety of that period?

A. Yes.

Q. So before we looked at this policy you were telling me that any officer, any superior officer, that is, could authorize an internal investigation.

This says that the chief of police will direct the officer assigned to the internal affairs section or any other member of the department the responsibility for completing the investigation. And so I'm just trying to



Randy Fontenot

Page 74

reconcile those two.

If the chief of police has to direct the investigation, how can any investigation be authorized without the chief of police's approval?

MS. WALL:

Objection to form.

A.  Well, as a supervisor, if an officer on his shift or under his command does something, it becomes his obligation to investigate the actions of that officer.  Then he would submit that information to the police chief through the proper channels, through the deputy chief.

And then the chief would review that and determine whether or not further investigation is needed.  Because once you get past that initial investigation or determine whether or not a violation or something occurred that shouldn't have, then it has to go to the chief to look at the disciplinary action, if any is warranted, or what other action should be or if additional investigation is needed.

And you have to keep in mind, all of this has to be done and documented in a certain way so that it doesn't violate the rights of the police officers involved.

Page 75

BY MR. MARDIAN:

Q.  And one of those rights is notifying the police officer that he or she is under investigation, right?

A.  Correct.

Q.  So you've talked in there about the initial investigation.  I understand how, if an officer sees something that seems questionable, you know, they'll do some diligence to see if there's any issue.

That would be the initial investigation you're talking about, right?

A.  Yes.

Q.  Okay.  But then -- we talked earlier and you said that a superior officer could also enlist the assistance of a junior officer to help with the investigation.

Would that also qualify as the internal investigation, or by that time would you expect the chief or the deputy chief to have signed off?

MS. WALL:

Objection to form.

A.  It -- it depends.  You have internal affairs investigations and you have criminal investigations.  If that officer was involved in a

Page 76

criminal incident, criminal activity, then that investigation can be done completely separate from the internal affairs investigation, and then the bill of rights of the police officers doesn't apply the same as it does for the internal affairs investigation.

BY MR. MARDIAN:

Q.  When you saw a criminal investigation, is that a criminal investigation that's conducted by EPD or some other entity or both?

A.  Could be either.

Q.  So what's the difference between a criminal investigation and an internal investigation?

A.  Well, an internal investigation is what could lead to possible disciplinary action.  A criminal investigation could lead to possible criminal charges, an arrest.

Q.  Okay.  And a criminal investigation, you were saying, does not require the authorization of the chief of police or the deputy chief?

A.  No.

Q.  And any officer can conduct a criminal investigation?

MS. WALL:

Page 77

Objection to form.

A.  They can conduct a criminal investigation, but if you're going to be investigating another employee of the department, you should go through your proper chain of command to make sure that the two investigations don't get mixed up, because you've got to do them completely separate.

One police officer can't do the criminal investigation and at the same time do an internal affairs investigation.  That's why it needs to go higher up to try to work out.  And the chief can designate who's going to do which investigation or how it's going to be conducted, not to violate the police officer's bill of rights.

BY MR. MARDIAN:

Q.  Understood.

So for a criminal investigation, you would expect that to reach the chief to determine, you know --

A.  Any investigation of any employee should reach the chief.

Q.  Gotcha.  Okay.

On subsection 2, do you see that it reads, quote, "The responsibility of making



Page 78

decisions concerning disciplinary action or drawing conclusions from facts obtained lies solely with the chief of police"?

A. Yes.

Q. You mentioned earlier that the mayor has certain involvement in disciplining members of EPD, right?

A. Yes.

Q. So was this provision no longer operative after the appointing authority was switched to the mayor?

A. No, that -- that provision has not changed.

Q. So it's still the case that the responsibility of making decisions concerning disciplinary action or drawing conclusions from facts obtained lies solely with the chief of police?

A. Yes. When it comes to internal affairs investigations.

Q. And then subsection 3, do you see that it reads, quote, "Whenever the chief of police designates the internal affairs section to conduct an internal investigation, or any other member of the department in which the chief of police

Page 79

designates to conduct the internal investigation, the person conducting the internal investigation is acting under the direct orders of the chief of police, carrying out his wishes relative to the matter in question?"

Do you see that?

A. Yes.

Q. And what do you understand that to mean?

A. I want to go back to your last question. I want to make something clear, because I feel you don't understand how it works.

The police chief makes the decision on whether or not -- and he has the final decision on whether or not to recommend disciplinary action against an officer. The police chief goes to the mayor with that recommendation.

The mayor cannot just come into the police department, and he doesn't want to come into the police department, and make the decision of whether or not that officer should be disciplined. He only acts on -- based on the recommendation of the police chief.

Q. Understood.

A. He cannot -- the mayor or the council can't come in and take disciplinary action against

Page 80

police officers unless the chief recommends it. So that's why it's worded that way, that the chief will make the final decision on whether or not disciplinary action is recommended.

Q. Understood. Thank you for that clarification.

Take a second to read subsection 3, if you want. I'm just curious what you interpret it to mean.

A. Okay. What's your question?

Q. So what's your interpretation of this provision?

A. This means that, as with any supervisor or anybody in a management position, when they assign somebody to a particular duty or task, that that person should go out there and perform that task as if he were the manager and doing it as the manager or supervisor would perform the task.

Q. So he's performing the task as if he were the manager, right?

A. Yes, he should.

Q. Are they supposed to operate as if the manager's authority had been delegated to them?

MS. WALL:

Objection to form.

Page 81

A. No. He's working -- he's completing a task that was -- the task itself was delegated, not the authority.

BY MR. MARDIAN:

Q. Understood.

And then do you see, sir, the last sentence reads, quote, "In a sense, their investigation is conducted as if the chief of police himself were actually conducting the investigation"?

A. Yes.

Q. Do you agree with that?

A. Yes. And taken in whole with the rest of this, again, they're conducting the investigation to determine the facts and to fairly make sure that everything is done justly and the facts are all gotten either way, whether in favor or against the officer or the employee, to make sure that -- you know, because the chief wants to get down to the facts, he wants to find out the truth of the matter.

And any officer that's assigned to that task should be conducting that investigation as if the chief were actually doing it to get to the truth of the matter.



Page 82

Q.   On the next -- or, excuse me, for the very next section, do you see the section titled "Findings"?

A.   Yes.

Q.   And do you see subsection 1 reads, quote, "One of the following findings will be included in the report on the citizen's complaint against a member employee"?

Do you see that?

A.   Yes.

Q.   So it says citizen's complaint.  So does this only apply to if a citizen brought a complaint to EPD, or would it also apply if one officer raised a complaint about another officer?

A.   This would apply either way.

Q.   On the next page, you should see -- or excuse me, the very next section, rather, you should see a section entitled "Moral Obligations."

Do you see that?

A.   Yes.

Q.   And I'm going to ask you about the -- a few sentences towards the bottom of this paragraph.  Feel free to read the entire thing if it's helpful for context.

But my question is:  If you see towards

Page 83

the bottom it says, quote, "Anytime a police officer makes it necessary for the chief of police to make a moral decision pertaining to his or her practices, whether on duty or off duty, shall be done on a one-to-one basis in strictest confidence to all concerned.  No action will be taken unless the problem cannot be resolved with all means at our disposal."

Do you see that?

A.   Yes.

Q.   What do you understand that to mean?

A.   Well, this, again, can mean a lot of things.  But police officers are expected to behave in an ethical and moral manner, to be -- so they can be viewed in a positive light by the public, so that they can be trusted, so that the citizens or the community would think that they're an ethical officer and they follow a good code of moral conduct.

And if it's issues concerning any of the examples given above, like community service, religious obligation, compassion to a fellow man, then the chief would talk to this person on a one-on-one basis and try to resolve that issue so that that officer is not viewed negatively by the

Page 84

public.

One example of that, if you want an example, would be the mistreatment of a homeless person on the side of the road, treating them badly, disrespecting them, those types of things.

I mean, he may not actually be committing a crime or anything like that, but he's disrespecting a member of the public and it shines a bad light on that officer.  So that's the type of issues that this would be talking about.

Q.   If an officer disrespected a member of the public, could that officer be subject to discipline?

A.   Yes.

Q.   What if the officer disrespected a fellow officer, could that officer be subject to discipline?

A.   Yes.

Q.   Now I want to flip back up to the page ending 850 and ask you about Section 2, "Action Upon Receipt of a Complaint."

Do you see that?

A.   Yes.

Q.   Do you see the first section reads, "All alleged or suspected actions of department

Page 85

personnel involving the commission of a crime, misconduct, malfeasance, or violation of any departmental rules or orders must be reported to the chief of police for possible investigation."

Do you see that?

A.   Yes.

Q.   And what do you understand that to mean?

MR. STAMEY:

Objection to the form of the question.

A.   I think that's self-explanatory.  Yeah, be more specific in your question, I mean, it's self-explanatory.

BY MR. MARDIAN:

Q.   Okay.  So just for clarity, if one officer suspects that another officer has engaged in the commission of a crime, malfeasance, misconduct, or violation of any departmental rules or orders, that officer is obligated to report it to the chief, correct?

A.   Not quite.  Not directly to the -- when we say report to the chief of police, the report will eventually make it to the chief of police, but it has to follow the proper channels.

Q.   So whereas this says that it must be



Page 86

reported to the chief of police, you're saying that that's not actually what's expected of the officer?

A. Well, you have the chain of command that needs to be followed.

Q. So if I were an officer --

A. Now, it will get reported to the chief, but that's -- it just cuts through and says it's going to be reported to the chief.

Q. If an officer reports it to their direct supervisor, say that's a lieutenant, and the lieutenant decides there's nothing more we need to do here, this is not worthy an investigation, does that information reach the chief of police?

A. The lieutenant -- depending on the circumstances and the severity of the circumstances, that lieutenant can make a decision on how to run his ship, kind of like the chief can on how to run his department.

In some instances, the lieutenant should file a report, and that report should make its way to the chief for the chief's review.

Q. And so if the lieutenant elects not to conduct any further investigation, the lieutenant is still obligated to report everything that was

Page 87

seen to the chief?

A. That's not what I said. Because he could look at it and see that there's no basis for the complaint, there's no evidence submitted to support the complaint or the allegations, and he could say, I have nothing to investigate, this is a closed deal.

And that may not be necessarily written down. It may not be reported to the chief because there's no basis to follow up on.

Q. Okay. In that instance, then, then the information does not reach the chief of police, right?

MS. WALL:
Objection to form.

A. It may not.

BY MR. MARDIAN:

Q. Okay. That would be a violation of this policy, right?

A. No, it wouldn't.

Q. Because in that instance, the alleged or suspected malfeasance or violation of the law is not being reported to the chief of police for possible investigation, correct?

A. Now, wait, you're talking about

Page 88

malfeasance and stuff. That's not what I was talking about.

Q. But that's what this says, right, malfeasance?

A. Where are you at now?

Q. Section A.

A. Okay. Yeah, there you are looking at some serious allegations. So that would be eventually reported to the chief.

Q. To take a step back, all of my questions have been about this provision. This provision says "All alleged or suspected actions of departmental personnel involving commission of a crime, misconduct, malfeasance, or violation of any departmental rules or orders must be reported to the chief of police."

That's what it says, right?

A. Well, maybe it should say "substantiated."

Q. But that's not what it says, sir, correct?

A. If you were a police officer and somebody came to me and said you went out there and you held somebody up at gunpoint and you came back in here, and we don't have any witness, we

Page 89

don't have any victim, we don't have any gun on you, there's no evidence to substantiate or back up what allegation has been made, that's finished.

I'm not going to investigate any further because there's no evidence presented that would support the allegation made. That's not necessarily going to get to the chief of police.

Q. And it's your testimony, sir, that in -- that circumstance does not violate this procedural order?

MS. WALL:
Objection to form.

MR. STAMEY:
I'll join in that objection.

A. What circumstance? Be specific.

BY MR. MARDIAN:

Q. The one you just described. The exact circumstance you just described.

A. That if you were a police officer and somebody accused you of holding somebody up and there's no evidence, that may -- we would probably consider that was a prank call or complaint.

Q. And if the intermediate officer, the lieutenant, did not report it to you, it's your testimony that would be compliant with this



Randy Fontenot

Page 90

procedural order, right?

A. Yes. I don't expect them to report something that they can't prove or don't even have any evidence that it actually happened.

Q. Subsection 1 then reads, "All cases involving possible criminal charges, brutality charges, and/or dismissal must be investigated by internal affairs."

Do you see that?

A. Yes.

Q. And do you understand this to mean that any possible criminal charges, brutality charges, and/or dismissal must be investigated by a member of internal affairs, just as it says, right?

A. Yes. But it doesn't mean that there's going to be a full-fledged investigation. Because once that report gets there and there's no basis for the allegations or to support the allegations, it's going to be closed and no investigation is going to be done.

What can you investigate if there's nothing to investigate? If you have no evidence, how can you investigate it?

Q. I want to ask you about disciplinary action, which is on I believe the next page, 851.

Page 91

A. Uh-huh.

Q. Do you see that in the first Section A entitled "Purpose," the second sentence reads, quote, "Any member or employee violating his oath and trust by committing an offense punishable under laws or statutes of the United States, the State or local ordinances, or who violates any provision of a departmental order, including the rules and regulations of the department, or who disobeys any lawful command or who is incompetent to perform his duties is subject to appropriate disciplinary action"?

Do you see that?

A. Yes.

Q. And then subsection B lists the responsibilities for such conduct, right?

A. Yes.

Q. Okay. And there are six different forms of it, right?

A. Yes.

Q. And so my question here is, you see dismissal is listed as one of them?

A. Yes.

Q. In -- after the appointing authority was transferred from the chief to the mayor, did the

Page 92

chief still have the ability to dismiss someone from the department?

A. He had the authority to recommend and the obligation to recommend that dismissal to the mayor.

Q. Is that true for all six of these?

A. Oral reprimands do not need to be approved by the mayor. The rest of them are.

Q. And as you were saying earlier, the mayor cannot impose any of these penalties unless the chief recommends it, right?

A. Yes.

Q. When you were chief, how many times, if you could ballpark it, would you recommend to the mayor one of these forms of discipline that was not an oral reprimand?

MS. WALL:

Objection to form.

A. I don't know. Several.

BY MR. MARDIAN:

Q. And of those several, do you recall how many times the mayor took your recommendation?

A. I believe most of them he did.

Q. Then you see the next section is "Departmental Authority to Discipline."

Page 93

Do you see that?

A. Yes.

Q. And it reads, quote, "Final departmental disciplinary authority and responsibility rests with the chief of police. Everything involved in this procedural order will be directed to the chief's office, no exceptions."

Do you see that?

A. Yes.

Q. And is this saying that, you know, final recommendation on these disciplinary actions rests with the chief, no exceptions?

A. When there is an investigation done or there is, again, something to support the allegations. Basically, it's saying that if there is substantial evidence to support the allegations made against the employee, then the chief will decide what recommendation, if any, to make to the mayor or the appointing authority.

If there's no basis to support the allegation or no evidence to support the allegations, then it may not come to the chief for a decision on that. The officers could come and tell the chief, Chief, there's no evidence to support the claims.



Page 94

Q.  Is the chief the only one at EPD who can recommend discipline to the mayor?

A.  Yes.

Q.  If the chief recommends one form of discipline, can the mayor say, I don't agree with that but I'll impose this other form?

A.  Yes.

Q.  Switching gears a little bit, if you go ahead a few pages to the one ending 859, do you see Section 9, "K-9 Team"?

A.  Yes.

Q.  Do you see that it reads, Policy, quote -- or, excuse me, quote, "Policy, because of a superior sense of smell and hearing and potential aggressiveness, the trained law enforcement K-9 is a valuable supplement to law enforcement power"?

A.  Uh-huh, yes.

Q.  So it's the stated policy of EPD that K-9s were a valuable supplement to law enforcement power, right?

A.  This policy was written by Lieutenant Dunn.  He knows -- and I -- because he was the K-9 handler at the time, he had all the training in that.

I reviewed this policy, I adopted it as

Page 95

part of our policy based on his recommendation. So if you're going to ask me questions about what each one of these things mean and what I understand it to mean, you would probably need to talk to Lieutenant Dunn and get his interpretation on that because he's the one that wrote it and he knows the intent of these policies.

Q.  That's helpful.  Thank you.

My only real question, though, is you adopted this policy, right?

A.  Yes.

Q.  And so it was the stated policy of EPD that K-9s were a valuable supplement to law enforcement power, right?

A.  Yes, in Lieutenant Dunn's words.

Q.  And yours because you adopted them, right?

A.  Yes, I guess you can go there.

Q.  If we go ahead a few pages to 868, this is about uniforms and compensation of K-9 handlers.  And this provides that K-9 officers will receive additional compensation because they are K-9 officers, right?

A.  For their duties as a -- for the additional duties as a K-9 officer, yes.

Page 96

Q.  And then if you flip ahead to 875, you'll see a section entitled "Special Section." And subsection 2 reads, quote, "Any public official, outside agency, or organizations contacting, calling, and/or questioning employees shall be instructed by the employee they are to receive their information through the office of the chief of police unless otherwise notified by the office of the chief," and then it provides an exception.

Do you see that?

A.  Yes, uh-huh.

Q.  What did you understand this provision to mean?

A.  Well, if an outside agency is going to come in and start questioning or receiving information from any of our officers based -- it could be for investigations, internal policies or whatever, that the officer being questioned or approached should direct that person to contact the chief.

Q.  While you were chief, were you ever contacted by outside law enforcement agencies?

A.  Yes.

Q.  Were you contacted in this capacity,

Page 97

where they're seeking certain information about EPD?

A.  I'm trying to understand exactly what your question is on that one.

Q.  Fair enough.  I'll rephrase.

First let's take a look at A.  A reads, "At no time will any police investigative file or internal investigative file be permitted to be reviewed unless permission is granted through the chief of police or his designated representative."

Do you see that?

A.  Yes.

Q.  And that means essentially that if an outside organization wants to look at an internal investigative file, they have to receive the chief's permission, right?

A.  Yes.  Because many of these files are confidential.

Q.  Understood.

Did you ever receive a request from an outside agency to review an internal investigative file?

A.  To review a file?  I -- I don't -- maybe if you'd be more specific about which file you're talking about.



Randy Fontenot

Page 98

Q.   Did an outside law enforcement agency ever contact you at EPD regarding alleged misconduct within EPD?

A.   Do you have a specific incident that you're looking at?

Q.   I'm just wondering --

A.   Apparently you have something that you --

Q.   No.  I'm trying to get your best recollection, sir.

So my question is:  Can you recall anytime where the Louisiana State Police or the Office of Inspector General or any other outside law enforcement agency --

A.   Yes.

Q.   -- contacted you regarding misconduct of the EPD?

A.   Yes.

Q.   What can you tell me about that?

A.   Lieutenant Dunn reported the misconduct of an officer against an inmate, and we did do an internal affairs investigation on that complaint filed by Lieutenant Dunn.

I asked the State police to investigate for any possible criminal activity of that officer

Page 99

based on that incident, and we -- they did the investigation.

Part of their investigation, they wanted to interview Lieutenant Dunn because he was the person who reported it, made the complaint.  They requested that he go in so they could interview him to get, you know, his side of the story.

And Lieutenant Dunn refused to do so.  He was the one that made the complaint and he refused to cooperate with the investigation.

Q.   Was the subject of that investigation Officer Miller?

A.   Yes.

Q.   And that involved Officer Miller allegedly punching an inmate; is that correct?

A.   Yes.

Q.   Was Officer Miller disciplined for that?

A.   Yes.

Q.   What was the discipline, if you can recall?

A.   He was demoted.

Q.   Other than that instance, can you recall receiving an inquiry from an outside law enforcement agency regarding potential misconduct at EPD?

Page 100

A.   I did get inquiries from outside agencies about the rape investigation.  I think we discussed that earlier.  That Lieutenant Dunn assumed this woman was raped and he went to these other outside agencies telling them that we weren't doing anything about it and we were mishandling their evidence.

And, actually, we couldn't even determine where this case -- this alleged rape happened and what jurisdiction.  And he went to three different jurisdictions, I believe, and those agencies contacted me about his conduct by going to them to report this when it should have come through us, through me.

Q.   The two instances you described, the Cody Miller incident and the alleged rape incident, do you view those as Lieutenant Dunn operating within the proper channels?

A.   No.

Q.   Why not?

A.   He -- for one, he wasn't the investigator assigned to that rape case, he wasn't the initial officer taking the complaint.  Actually, the initial officer was Officer Cody Miller.

Page 101

And he went -- without having all of the facts and without being involved in the entire investigation, went to other agencies that he shouldn't have done.

And before something is -- you know, another agency is contacted about an investigation that we're working on, or if you're going to notify another agency of something, first you have to have your facts straight; and, secondly, you should communicate with your supervisor or chief before doing that.

And on the other one, I mean, he filed the complaint.  He refused to cooperate with the investiga -- a criminal investigation by the State police.  He refused to cooperate.  A police officer should not refuse to cooperate in a criminal investigation.

Q.   You had said that he should have had his facts straight.  I just want you to assume for the purpose of this question -- assume that he did.  I want to ask you about the second thing you mentioned.

A.   Well, I can't assume that he did because I know for a fact he didn't.

Q.   Fair enough.



Randy Fontenot

January 30, 2025
Pages 102 to 105

Page 102

Let's say an identical officer, theoretical officer, Lieutenant, you know, Elliott Dunn had the same situation but had the facts right, would it be appropriate, in your view, for that officer to go to the outside agency without first talking to the chief?

MS. WALL:
Objection to form.

MR. STAMEY:
Objection to the form of the question.

A. Again, that's a hypothetical example. We should be looking for facts about particular stuff right here, huh.

BY MR. MARDIAN:

Q. Sir, you wrote this policy book, right?

A. Yes.

Q. You literally wrote the book on it, right?

A. Yes.

Q. You have to interpret in your day-to-day business whether individuals are compliant with the policy, right?

A. Yes.

Q. So you can opine on whether certain

Page 103

conduct falls within or outside of the policy book, right?

A. When I am supplied or furnished with the facts and the details of an incident, then I can apply the policy. But on hypotheticals, it's hard to apply a policy on a what-if or a maybe.

Q. Okay.

A. I don't take discipline on a what-if or a maybe. I take disciplinary action or recommend disciplinary action on a factual basis.

MR. MARDIAN:
Okay. I'm going to switch topics. I'm happy to keep going. It's been about an hour. I'm happy to take a break.

THE WITNESS:
Yes, I'm ready for a break.

MS. WALL:
Yeah.

THE VIDEOGRAPHER:
Off the record at 11:15.

(A break was taken.)

THE VIDEOGRAPHER:
We are back on the record at 11:30.

Page 104

BY MR. MARDIAN:

Q. EPD investigated Lieutenant Dunn in connection with a Facebook post that he made in August 2019, correct?

MS. WALL:
Objection to form.

A. Yes.

BY MR. MARDIAN:

Q. And you directed that investigation, correct?

A. What do you mean, "directed"?

Q. You authorized that investigation, correct?

A. Yes.

Q. Why did you authorize that investigation?

A. Because we have policies against certain social media posts and communications, and what I read in that post I thought was a violation of our policies.

Q. As part of that investigation, Lieutenant Dunn was placed on administrative leave, correct?

A. I know he was placed on administrative leave, I think it was for that, yes.

Page 105

Q. And that investigation is placed in his file at EPD, right?

A. It should be, yes.

Q. And, therefore, the fact that he was placed under investigation is also in his file, correct?

A. Should be, yes.

Q. Have you ever hired officers at EPD?

MS. WALL:
Objection to the form.

A. I recommended their hiring, yes.

BY MR. MARDIAN:

Q. And that could be officers from -- with prior law enforcement experience, right?

A. Yes.

Q. Have you ever sought the files they had at their other law enforcement agencies in determining whether to hire them?

MS. WALL:
Objection to form.

A. Usually I had my deputy chief do a background investigation, and if that -- that would be to get any information that we could. Some of these personnel files are kind of confidential and not -- not all agencies are



Randy Fontenot

Page 106

willing to just give that information out.
BY MR. MARDIAN:
Q.   Are some willing to give it out?
A.   Usually that's done with a telephone interview with the supervisor or with the chief from those departments.
Q.   Have you ever been a part of any of those telephone interviews?
A.   I'm sure I have.  Yes.
Q.   Can you recall ever discussing a potential hire's personnel file?
MS. WALL:
Objection to form.
A.   I can't recall that.
BY MR. MARDIAN:
Q.   Do you ever recall considering whether the potential hire had been investigated before?
MS. WALL:
Objection to form.
A.   Nothing comes to mind right now.
BY MR. MARDIAN:
Q.   So you wouldn't have found it relevant if they had been investigated at their prior -- by their prior employer?
MS. WALL:

Page 107

Objection to the form.
A.   That would have been relevant, yes, depending on the type of investigation or what it was about.
MR. MARDIAN:
I'm going to mark as Exhibit 2 a document bearing Bates stamp CityofEunice_Dunn_0000176.
(Exhibit 2 was marked.)
BY MR. MARDIAN:
Q.   And certain of the documents will have two numbers listed in the lower right.  I'm generally going to be directing you to the higher of those two numbers.
Does that make sense?
A.   Yes.
Q.   So this one that was the 176.  And I apologize for any confusion.
MS. WALL:
Are we done with this for now?
MR. MARDIAN:
For now, yeah.
BY MR. MARDIAN:
Q.   Sir, have you seen this document before?
A.   Yes, I have.

Page 108

Q.   What do you understand it to be?
A.   That is my handwritten notes about the status of this internal affairs investigation.
Q.   And so did you write, "No action taken because investigator did not complete and turn investigation into me within the required 60 days"?
A.   Yes.
Q.   Do you have any understanding of why the investigator didn't turn the investigation into you within 60 days?
MS. WALL:
Objection to form.
MR. REED:
Same.
A.   I don't remember.
BY MR. MARDIAN:
Q.   Is that a common occurrence?
A.   No.
Q.   I want to go down to the page ending 182, which is entitled "Interoffice Memorandum," the subject of "Notice of Investigation."
Do you see that?
A.   Yes.
Q.   And this is a memorandum that you wrote

Page 109

to Lieutenant Dunn; is that right?
A.   Yes.
Q.   And in the first paragraph, you notify him that you're initiating an investigation involving the Facebook post in August of 2019; is that correct?
A.   Yes.
Q.   And you write in the third sentence, the third line, "The Facebook post caused numerous individuals and local media to contact Chief of Police Joseph R. Fontenot, whom had to deviate from his duties to handle calls from the media as well as the public."
Do you see that?
A.   Yes.
Q.   And then it continues, "This is a violation of Eunice Police Department Procedures Order 15-7 Code of Conduct and Ethics B.2 conduct unbecoming of an officer (iii) impairs the operation or efficiency of the department, the officer, or city service."
Do you see that?
A.   Yes.
Q.   Okay.  So taking those in reverse order, you say that it violated procedural order 15-7



Randy Fontenot

January 30, 2025
Pages 110 to 113

Page 110

because it was conduct unbecoming of an officer that impaired the operation of the -- or efficiency of the department, the officer, or city service, right?

MS. WALL:

Objection to the form.

A.  Yes.

BY MR. MARDIAN:

Q.  Do you understand that to be the complete reasons why you investigated Lieutenant Dunn in connection with this Facebook post?

A.  That's the reason that was listed on there.

Q.  Do you recall any other reason that you investigated him?

A.  No.

Q.  And then the prior sentence we looked at says that you received numerous calls regarding what he had posted about, right?

A.  Yes.

Q.  And what can you tell me, what do you recall about those calls that you received?

A.  I apparently received some phone calls. I don't remember specifically from who.  But the way this is worded in here, I received phone calls

Page 111

from individuals and the local media because of the post referenced in this incident.

Q.  Do you recall about how many calls you received?

A.  I do not.

Q.  It says that those calls took you away from your duties.

Do you see that?

A.  Yes.

Q.  How so?

MS. WALL:

Objection to form.

A.  Well, by answering those calls, we were in the middle of an investigation, and I guess those calls were -- I was taking those calls and it was interfering with my ability to be involved with the investigation during that time.

BY MR. MARDIAN:

Q.  Do you recall for how long?

A.  I do not.

Q.  Is it part of the chief of police's job responsibility to interact with the citizens of Eunice?

A.  Yes.

Q.  Does that include speaking to them on

Page 112

the phone?

A.  Yes.

Q.  And does that include responding to their requests regarding, you know, the state of affairs of Eunice?

A.  Yes.

Q.  So why did these calls in particular draw you away from your duties?

A.  It drew me away from the duties involved with the investigation that was ongoing at the time, simple as that.

Q.  So you didn't have time to do both, is that the concern?

MS. WALL:

Objection to the form.

A.  When you're in the middle of something and you have something else distracting you, it can be a bother.

BY MR. MARDIAN:

Q.  You were in the middle of investigating the underlying allegations in Lieutenant Dunn's Facebook posts, correct?

A.  I've been getting some phone calls and voicemails and stuff.  Is this interfering with the deposition, me looking at this while I'm doing

Page 113

the deposition right now?

Q.  If you need to take a phone call, I'm happy to take a break if that's what you request.

A.  I'm making an example.  You know, the phone can interfere with the things that you're doing at the time.

Q.  And so in your example, we could have taken a break, you could have taken your phone call, and then we could have continued the deposition, right?

A.  There we could have.

Q.  So my question was, you were investigating the underlying allegations in Lieutenant Dunn's Facebook post, right?

A.  That night, no.

Q.  Okay.  Well, let's take a step back.

So here it says that you had to deviate from your duties to handle the calls.

A.  We were there handling another complaint.  We weren't there because of his Facebook.

Q.  Okay.  And what was that complaint?

A.  That complaint was about the crowd at the KC Hall that night where somebody pushed a table through a door, broke a glass.  Some people



Randy Fontenot

Page 114

in the neighborhood took that for gunshots.

And we were doing that investigation at the time. All that was going on and I was receiving calls about a Facebook post that Dunn had made in the interim.

Q. And his Facebook post was about that same incident at KC Hall, right?

A. Exactly.

Q. So my question is: Why would calls from the public about that same incident interfere with your investigation of that incident?

A. Because the Facebook post, which had misleading information, false information, was causing me to have to answer the phone and distract me while we were trying to conduct another investigation where people were saying -- Dunn, one -- saying shots were being fired. And because of his post on Facebook, we were being distracted from that.

Q. Okay. And so it was a distraction.

Is there any other reason it took you away from your duties?

A. Well, we could have been doing better things in the City of Eunice instead of having to investigate a Facebook post.

Page 115

Q. But I thought you just said you weren't investigating the Facebook post?

MS. WALL:

Objection to the form.

A. I wasn't at that time, but eventually we did have this investigation about the Facebook post.

BY MR. MARDIAN:

Q. Okay. If you see in the next two paragraphs down, the bold regarding Tony Kennedy --

A. Okay.

Q. -- do you see that it reads, "I have authorized Lieutenant Tony Kennedy, D.C. Richard Daigle to conduct the investigation. Our target is to complete this investigation no later than 60 calendar days, September 6th, 2019.

"If we feel necessary, we will ask the Municipal Fire and Police Civil Service Board to extend this time for an additional 60 calendar days."

Do you see that?

A. Yes.

Q. Did you or EPD ever seek an additional 60 days to complete the investigation?

Page 116

MS. WALL:

Objection to the form.

A. No. Because that request has to be made before the 60 days are up, and I did not know that I was not going to be receiving the report late.

BY MR. MARDIAN:

Q. If they -- well, withdrawn.

A. Had I known, I would have requested the extension.

Q. Understood.

Let's flip to the page ending 191, which is the Facebook post itself.

This is the Facebook post that Lieutenant Dunn made regarding the KC Hall incident that we've been discussing, right?

A. Right.

Q. After he made this post, you posted on Facebook about his post, right?

MS. WALL:

Objection to form.

A. I'm trying to remember if I did or not. I don't remember if I did.

BY MR. MARDIAN:

Q. You don't recall if you posted on Facebook that the posts on Facebook are not based

Page 117

on factual information found in the police reports, logs, and officer accounts?

MS. WALL:

Objection to the form.

A. I'm trying to refresh my memory on that. I do see a post that appears to be from me through the Eunice Police Department page, but it's got other stuff written over it, so I can't read all of the content clearly.

BY MR. MARDIAN:

Q. Okay. So you don't recall posting on Facebook and questioning the factual accuracy of Lieutenant Dunn's Facebook post; is that correct?

A. Well, I'm looking at this and it does show that I did post a response.

Q. I understand that you say that you posted a response.

My question is: Do you have any understanding of whether that response questioned the factual accuracy of Lieutenant Dunn's Facebook post?

MS. WALL:

Objection to the form.

A. I don't recall. I'd have to read the post.


MAGNA
LEGAL SERVICES

Page 118

BY MR. MARDIAN:

Q.  Okay.  So going back to his post, if you flip back to it.

A.  190 --

Q.  Yeah, there it is.

Did you have any issue with the factual accuracy of any of the information included in his post?

MS. WALL:

Objection to the form.

A.  Yes.

BY MR. MARDIAN:

Q.  And what did you believe was not factually accurate?

A.  From the investigation and the evidence that was presented, or at the scene, the part about "A crowd of people began shooting.  Unknown if they are shooting at me or in the air."

We found no evidence and no witnesses that were there at that crowd that heard anybody shooting or seen anybody shooting.

Q.  Anything else?

A.  I questioned the part about the "Two different gangs.  One is at the KC Hall now in town threatening to have a shootout.  Luckily got

Page 119

a tip about it."

I don't know what tip he's got or who he informed of that -- if he got that kind of information, I don't know who he informed if he was off duty.

Q.  Do you have any reason to doubt that that's accurate?

A.  I don't have any reason to doubt that it's not accurate or that it is.

Q.  So you have no reason to doubt that it's accurate, right?

A.  No.  I mean, I just don't have anything to support his allegations or his statement.

Q.  Anything else in this post that you did not believe was factually accurate?

MS. WALL:

Can I clarify?  I don't know -- are you asking then or now?  Like are you asking him what does he now think that -- like what he thinks now or at the time?  Because I'm not even sure.

BY MR. MARDIAN:

Q.  Well, I was asking about the time.  But if you were asked -- that was the intention, to ask you at the time what you found to be factually

Page 120

inaccurate?

A.  The fact that -- well, not the fact, but the statement he made about shots being fired, I don't have any evidence to support that statement.  The officers on the scene that were there that witnessed it -- one was Officer Miller again.

The officers that were investigating it, the witnesses that were at the scene, nobody supported or corroborated the statement that Lieutenant Dunn made in this post about the shooting.  We could find no evidence of any shooting.

Now, later, at a council meeting, a lady came and stood up here holding a Ziploc bag of something with some spent casings claiming that those were retrieved -- and this was Dunn's neighbor -- that those were retrieved at the scene.

But I don't know, that council meeting was a couple weeks after this incident.  But nobody bothered to call the police and say, Hey, we have this.  Instead, she took the evidence, if that was actually evidence -- there's no documentation, it wasn't properly handled, there's no chain of possession -- and then claimed in the

Page 121

council meeting that this was evidence of a shooting that night when we could find no casings, the police could find no casings, and she never reported finding those casings to the police department.

She waited to come to the council meeting and hold up some casings and alleged that they were the casings from that night.  There's no proof to back that up either.

BY MR. MARDIAN:

Q.  Did EPD take those casings?  Was there any further investigation as to what she said?

A.  No, no, because we had no evidence to support what she was saying.  She was -- anybody could have walked in with anything and said, Hey, this is from the crime scene that I took two, three weeks ago and never told anybody about, but this is evidence.

We can't use that.  That can't even be submitted as evidence because there's no chain of possession, no documentation.  Where did she find it?  There's no documentation of where it was when she picked it up.

Q.  Understood.

Other than the shots fired at the time,



Page 122

did you doubt the factual accuracy of anything else in the post?

A.  Well, based on what he claimed about the shots fired and some of the other complaints he's made and other reports I've seen him -- that he's written or allegations that he's made, I questioned quite a bit of it because I don't know how trustworthy or how dependable his view of the facts really are.

Q.  But is there anything specifically in here that you questioned, or you just questioned everything that he alleged because that's the conclusion you drew about him generally?

MR. REED:

Object to form.

A.  Let me find it again.

MR. STAMEY:

I'll join in that objection to form.

A.  Specifically, "Opened door to see multiple cars doing donuts and racing up and down the street."  If that street was crowded, they didn't have much room to do donuts if there were that many people around like he said.

"Racing up and down the street."  He's a police officer.  Why didn't he do something about

Page 123

it?  Why didn't he call the police department and report it at the time it was happening and not wait until this post was made?

He did file a complaint with the KC Hall's overseers and accused them of all kind of things when they had no idea of what was happening there that night, so I can't disagree with that.

"Upon getting dressed to handle the problem," I'm not sure which problem he was trying to handle at the time.  I'm assuming because of the cars going up and down the street because he's talking about that, or maybe it could be the person that was shooting up in the air.

He learned that there were several gang members there that he's known through his employment.  Apparently, if he knew who was there, he might have had a suspect.  But he didn't submit any names of any suspects there who might have been doing the shooting or who we could talk to about that.

"Every weekend since there's been either shots fired, fighting, drag racing, and loud music."  I don't know of any incident and I don't remember of any incident that he called the police

Page 124

department to report any of these violations.

"The stench of marijuana can be smelled blocks away."  He's a K-9 officer.  He was the drug dog handler.  If he thought there was marijuana or illegal drugs in the area, he could have called and gotten assistance, gotten permission to go and do an investigation on that and look for those drugs.  He didn't do that.

Again, he talks about different gangs there all the time.  "Now, tonight, again there are two different gangs.  One at the KC Hall now in town threatening to have a shootout."  I don't know anything about that.  I'm not sure what night he's referring to there, maybe that night.

He's filed several complaints, which I don't know of the complaints he's talking about.  But I want to say I would disagree with that statement.  And his reason for this post was "to inform the public of an unsafe condition and pray this changes soon before someone loses their life."

How did he think that this post was going to somehow inform the public and change things?  He is the police officer.  He sees activity taking place that's illegal, it's his

Page 125

duty and responsibility to see to it that something happens, not go to the public and make a complaint to the public for them to act on it.

Well, I gave you some examples.

BY MR. MARDIAN:

Q.  Did you ever speak with Lieutenant Dunn about any of that?

MS. WALL:

Objection to the form.

A.  I may have.

BY MR. MARDIAN:

Q.  You don't specifically recall speaking with him?

MS. WALL:

Objection to the form.

A.  I spoke with Dunn on multiple occasions, whether specifically about this, I don't recall at this point.

BY MR. MARDIAN:

Q.  So the answer is no, you do not recall speaking with Lieutenant Dunn about the Facebook post, right?

A.  At this time, I don't recall specifically about this post.

Q.  Lieutenant Kennedy concluded that



Page 126

Lieutenant Dunn did not commit any violation of EPD policy with respect to this Facebook post, correct?

A. Did he?

Q. That's my question to you.

A. I don't remember what he reported. I know the investigation came in late and I couldn't take any disciplinary action.

And once it got to that point, it was just became basically irrelevant because we couldn't do anything because the -- and for one, I kind of let that go because, one, we didn't do it in a timely manner, which is the police department's fault. So we weren't able to recommend any disciplinary action or take any disciplinary action against Lieutenant Dunn because of his police officer's bill of rights and the time limits that restricted us from taking any action after that point.

And also the fact that the chairman of the Civil Service Board had already began looking for reasons to counteract whatever our investigation found and he was representing Lieutenant Dunn during the investigation, sat with Lieutenant Dunn during the interview, which, as a

Page 127

board member, shouldn't have been happening.

As a matter of fact, that's basically on the same page that you've got copied to the front, but in the back it has the rest of the story. And that's CityofEunice_Dunn_ 000210, using the high number.

And I made a note to that fact, that the Civil Service Board was biased and was going to rule against us anyway. So it didn't pay for us to continue with any other action because I seen where that was going.

Q. That has nothing to do with what Lieutenant Kennedy found, that Lieutenant Dunn had not violated EPD policy though, right?

A. No, it has everything to do with this investigation.

Q. What reason do you have to believe that the bias of the Civil Service Board influenced Lieutenant Kennedy's conclusion that Dunn had not violated EPD policy?

MR. REED:

Object to form.

MS. WALL:

Objection to the form.

A. I never said that it did.

Page 128

BY MR. MARDIAN:

Q. So the portion you were just discussing about that you wrote, the handwritten notes at the back of this document, that has nothing to do with Lieutenant Kennedy's conclusion that Dunn had not violated EPD policy, right?

MS. WALL:

Objection to the form.

MR. REED:

Object to form.

A. The two are not connected.

BY MR. MARDIAN:

Q. Understood.

If you turn to page -- the page ending 181, which is towards the beginning, you see in the middle of the page the conclusion that Lieutenant Kennedy reaches is that Lieutenant Dunn didn't commit the above violations.

Do you see that?

A. I see that.

Q. And then he continues, "He was (sic) stated his concern as a citizen and didn't have any intents to bring Chief Joseph Fontenot and unwanted pressures from the media or concerned citizens. As a police officer or not all citizens

Page 129

of the United State had the 1st Amendment right (Freedom of Speech).

"My only suggestion is Lieutenant Dunn should have discussed his concerns with Chief Fontenot and see if a solution could have been reached." (As written in exhibit.)

Do you see that?

A. I see that.

Q. Do you have any reason to question the validity of these conclusions?

A. That is --

MR. STAMEY:

I'm going to object to the form of the question.

MS. WALL:

Me too.

A. That is Lieutenant Kennedy's opinion. But the report comes to me and I review the facts from the investigation. The -- that's his opinion. I don't agree with it.

BY MR. MARDIAN:

Q. And is that for the reasons you stated when you walked through the post explaining the issues you had with the post?

A. No. The findings and the post are two



Randy Fontenot

Page 130

separate things.

Q. Fair enough.

My question is: Why don't you agree with Lieutenant Kennedy's conclusion -- or, excuse me.

At the time, why did you not agree with Lieutenant Kennedy's conclusion?

MR. STAMEY:

Objection to the form of the question.

A. I'm not sure exactly what Lieutenant Kennedy -- was it Lieutenant Kennedy or Deputy Chief Kennedy at the time? I don't know. But I'm not sure exactly what he based his opinion on. But I think it has something to do with his interpretation of the First Amendment right and how that interacted with this incident.

BY MR. MARDIAN:

Q. And you disagreed with that interpretation?

A. Yes.

Now, if you read, he also suggested that Lieutenant Dunn should have discussed his concerns with the chief to see if a solution could have been reached before making the post.

Page 131

Q. Lieutenant Dunn filed a federal lawsuit in connection with this incident, correct?

MS. WALL:

Objection to form.

MR. MARDIAN:

What is the basis?

MS. WALL:

I'm preserving my objections, all objections. All of these questions have been compounded or in some way long-winded. And I don't even -- I don't even know how you're keeping up, quite frankly, with what the question is.

MR. MARDIAN:

What is the basis for your objection to my question?

MS. WALL:

Because I'm preserving all objections.

MR. MARDIAN:

I understand.

MS. WALL:

And I can do that.

MR. MARDIAN:

Page 132

And my question is: What is the basis for the objection?

MS. WALL:

And I don't have to answer you. Because I am preserving all objections. I just told you. Asked and answered again.

MR. MARDIAN:

So the preservation will be there was no basis for the objection?

MR. STAMEY:

And I'm going to object to the form of the question, and if you need me to give you a reason, I can.

MR. MARDIAN:

Okay, great. What is it?

MR. LOUGHLIN:

I'd like to know a reason. What's wrong with the question?

MS. WALL:

Who's speaking?

MR. STAMEY:

It assumes a legal --

MR. LOUGHLIN:

This is Kearney Loughlin.

Page 133

MR. STAMEY:

This assumes a legal conclusion of this witness, and he's not an attorney. You're asking him about a filed lawsuit and very broad allegations that could be contained in such a claim or suit.

MR. LOUGHLIN:

I'd like to hear the question read back, because I think it was just about "Mr. Dunn filed a federal lawsuit about it," question mark. Something like that.

MR. STAMEY:

It was a follow-up question.

MR. LOUGHLIN:

Can we hear the question read back?

THE COURT REPORTER:

Yes. One sec.

Question: "Lieutenant Dunn filed a federal lawsuit in connection with this incident, correct?"

MR. LOUGHLIN:

Okay. Now, what's wrong with the form of that question?

MR. STAMEY:



Randy Fontenot

January 30, 2025
Pages 134 to 137

Page 134

There was a follow-up statement besides just that.

MR. LOUGHLIN:

Well, is there anything wrong with -- before we get to anything else, is there something wrong with the form of that question so that Mr. Mardian can correct the form if there is a problem?

MR. STAMEY:

I did not object to that particular question.

MS. WALL:

I did.

MR. LOUGHLIN:

And what's the basis of the form objection?

MS. WALL:

I'm not revoking it. If you want to file a motion, you can do that. If you want to call the court, you can do that. But I'm going to keep my objection on the record. But thank you.

MR. LOUGHLIN:

You can have your objection. But the reason that form objections are not

Page 135

reserved the way every other one is, is so that form can be corrected by the questioner.

So if you're not going to say what it is, that waives the form objection.

MS. WALL:

Wait, so should we be saying --

MR. LOUGHLIN:

If you have some other objection, those are reserved anyway.

MR. REED:

So, Kearney, are you asking us to make speaking objections every time? It sounds like you are.

MR. LOUGHLIN:

Yeah, absolutely I am. Because I'm asking for the basis of the form objection. Sometimes the basis is obvious. To me, this isn't obvious at all. I don't see anything wrong with the form of that question.

MR. MARDIAN:

I am not requesting speaking objections. Under the Federal Rules, you can object to form. I can then ask

Page 136

you what the basis for that objection was so that I can restate the question.

If you don't give me a basis, then the objection is waived.

MS. WALL:

No.

MR. LOUGHLIN:

I'm not asking for speaking objections either in some blanket way. I'm asking for explanation of this particular form objection.

What is objectionable to the form of the way the question's been phrased so that --

MR. FEUCHT:

Well, I think it leaves it open as to who filed it, Kearney. Maybe Dunn didn't file it in person, in proper person, did he? It leaves some room there.

MS. WALL:

We've got two lawsuits.

MR. LOUGHLIN:

Is that the level of pedantry we're getting into, whether he had a lawyer or

Page 137

whether it was e-filed or whether somebody brought it to the courthouse?

MR. FEUCHT:

It's been that way the whole time, Kearney. It's no different today.

MR. MARDIAN:

This has devolved. Our positions are stated. Let's move on.

BY MR. MARDIAN:

Q. Do you have any understanding, sir, of whether Lieutenant Dunn filed a federal lawsuit in connection with the Facebook post we've just been discussing?

A. Was that the first -- Dunn -- what we call Dunn 1, the first lawsuit that...

Q. I'll represent to you that of the two suits, it was the first filed.

A. I'm no longer a part of that suit. Those charges -- I was dismissed from that suit.

Q. Fair enough. That wasn't my question. My question was: You do understand that he filed that lawsuit, right?

A. I know he filed a lawsuit. I'm not sure the specifics on that lawsuit, they kind of got blurred with me.



Randy Fontenot

January 30, 2025
Pages 138 to 141

Page 138

Q. But you do remember, at a certain point in time, Lieutenant Dunn sued you in federal court, right?

A. Yes.

Q. Okay. Did you have any reaction that you can recall when you were served with that lawsuit?

A. I don't remember actually being served with it. I don't remember the moment I was served with it, so I can't tell you how I reacted. I can guess I probably wasn't happy.

Q. I'm not asking you to speculate. You don't have any specific recollection --

A. No.

Q. -- of any reaction to that lawsuit?

A. No.

Q. Do you recall speaking with anyone other than your lawyers about that lawsuit?

A. No, I don't -- well, let me take that back. I've spoken with Dunn about that, and that's when probably multiple times he's told me that he'd like to just drop it and have all this go away.

Q. Other than Lieutenant Dunn, have you spoken with anyone else about this lawsuit?

Page 139

A. Not that I can recall.

MR. MARDIAN:

Okay. I'm going to change topics. I'm happy to break for lunch whenever the witness and you prefer. I'm happy to keep going. But just to bring it out there for whenever you guys want to, that's fine with me.

MS. WALL:

Do you want to break for lunch? Let's break.

THE WITNESS:

Okay.

THE VIDEOGRAPHER:

Off the record at 12:01.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record at 1:19.

BY MR. MARDIAN:

Q. Chief Fontenot, the lawsuit that we talked about previously that we called Dunn 1, did you ever discuss that with Mayor Fontenot?

A. Not that I remember.

Q. Earlier today you mentioned a rape case that had been investigated by Lieutenant Dunn.

Page 140

Do you recall that?

A. Yes.

Q. That involved Officer Darrian Guillory; is that right?

A. Yes.

Q. Who is that?

A. She was a police officer. I want to say at the time she was assigned to the detective section.

Q. At the time of the alleged rape?

A. Yes.

Q. Lieutenant Dunn filed a critical incident report regarding that incident, correct?

A. I think he did.

Q. What is a critical incident report?

A. It's basically an officer's report or complaint of something that he feels there may have been improper procedures or a complaint against another officer basically.

Q. Earlier we discussed from the policy handbook that an officer can pursue complaints through the proper channels.

Do you recall that?

A. Yes.

Q. Is filing a critical incident report

Page 141

pursuing a complaint through the proper channels?

A. If it's done correctly, yes.

Q. So if it's done correctly, it's compliant with EPD policy, right?

A. Yes -- well, yeah, if it's done correctly.

Q. Sitting here today, do you recall having any issues with a critical incident report that Lieutenant Dunn filed in connection with the alleged rape that we've been discussing?

A. I'd have to see the report.

MR. STAMEY:

Objection to the form of the question.

MR. MARDIAN:

I'm going to mark as Exhibit 3 a document bearing Bates stamp CSB0000853.

(Exhibit 3 was marked.)

BY MR. MARDIAN:

Q. Sir, I'll represent to you that this is a collection of documents, and I'll point you to different ones.

As with any document, you're happy to peruse it to the extent that you wish, but for present purposes, I will direct you to the



Page 142

document ending in 857 in the lower right.

A.  CSB857?

Q.  Correct.

Sir, do you recognize this document?

A.  It is a critical incident form.

Q.  Do you have any recollection of ever previously reviewing this document?

A.  I remember seeing the information in this document and reading this before.

Q.  And do you have any recollection of the alleged rape that underlies this critical incident report?

MS. WALL:

Objection to the form.

A.  I have a recollection of the incident.

BY MR. MARDIAN:

Q.  Do you have any recollection of Lieutenant Dunn raising concerns with the way that Detective Guillory handled the evidence from this case?

A.  I do remember he had an issue with it.

Q.  So I'll direct you to the page ending 859.  And do you see in the third paragraph it reads, quote, "I asked about the evidence.  Officer D. Guillory stated that she still has the

Page 143

evidence in her vehicle and did not turn it over to MPD yet."

Do you see that?

A.  Yes.

Q.  It is a violation of EPD policy to keep evidence in one's vehicle, right?

MR. REED:

Object to form.

A.  I'd have to refresh myself with the policy.

BY MR. MARDIAN:

Q.  So happy to do that.  We can pull up Exhibit 1 from this morning, which is the policy.  And if you can turn to the page ending 899.

Do you see there's a Section D, "Evidence"?

A.  Yes.

Q.  Do you see that it says, subsection 6, quote, "Evidence shall never, under any circumstances, be left in a police vehicle, department mailbox, or taken home"?

A.  Yes.

Q.  And it's your understanding that this was the policy that was in effect at the time, right?

Page 144

A.  I would think so, yes.

Q.  And to the extent that Officer Guillory kept the evidence in her vehicle, that violated this policy, correct?

A.  If she had evidence -- evidence of a crime, that would be a violation.  Like I said, we had no crime; we had an allegation.  An assumption was made that a crime was committed, but there was no evidence to even suggest that a crime was committed, and the alleged victim even said there was no crime.  So there was no evidence to a crime.

Q.  Apologies, I'm not entirely understanding that answer.

So are you saying that what was in Officer Guillory's car was not evidence?

A.  There was no crime for it to be evidence of.

Q.  So it's not that what was in the -- if there had been a crime, it would be your opinion that whatever was in her car would have been evidence?

MS. WALL:

Object to the form.

MR. REED:

Page 145

Object to form.

A.  There was no evidence of a crime.  There was personal property taken, and that personal property was kept.  We had no evidence that a crime was committed or existed.

BY MR. MARDIAN:

Q.  So subsection 1 provides the definition of evidence, right?

A.  What page was that again, 899?

Q.  899.

A.  Yes.

Q.  And it says, "Evidence is any and all items recovered from a suspect victim log and placed into the evidence box," right?

A.  Right.  But this evidence, or this -- this stuff in her car was not placed in the evidence box.  So according to this definition, it was not evidence.

Q.  So if someone recovers something from an alleged crime, they can't immediately place it in the evidence box, right?

A.  It would depend on the circumstances.

Q.  Well, where is the evidence box?

A.  It's in the police department, or it was in the police department at that time.



Page 146

Q.  So whatever is recovered has to be transported there, right?

A.  Eventually.

Q.  Eventually?

A.  There's no timeline of when it has to be done.  In a reasonable amount of time.

Q.  And as you said earlier with respect to the shell casings from the KC Hall incident, it's important that materials recovered be placed in the evidence box in a reasonable period of time, right?

A.  Evidence, yes.

Q.  Because if they're not, things can happen to them, which undercuts any investigation, right?

A.  Correct.  But this evidence remained within the custody of -- well, I say "this evidence."  This property remained in the custody of the officer who could establish a chain of possession.

Q.  So you referred to this before as personal property, not evidence, right?

A.  That's what it was at the time.

Q.  So why was one of your officers holding the personal property of a citizen of Eunice if it

Page 147

wasn't evidence?

A.  Because it was given to her when she took the investigation or started investigating.

Q.  What is your basis for that?

A.  I don't know.  You'd have to ask the officer that gave it to her.

Q.  So it's your sworn testimony today, sir, that whatever was recovered by Officer Guillory was not evidence under EPD policy, correct?

MS. WALL:

Objection to the form.

A.  We had no evidence that a crime had even occurred.

BY MR. MARDIAN:

Q.  If you go back to the critical incident form, which is Exhibit 3, the same page we were looking at ending 859, do you see towards the bottom there's a paragraph that begins "On 8/19/2019"?

A.  Yes.

Q.  And do you see it reads quote, "On 8/19/2019 I received a phone call from other employees that informed me both V. Fontenot and D. Guillory made several comments after being informed of the email I sent to D.C. Daigle during

Page 148

the morning meeting."

Do you see that?

A.  Yes.

Q.  And then it continues towards the end of this paragraph, "V. Fontenot supposedly stated, quote, He can lick my nuts, closed quote.  D. Guillory supposedly stated, Fuck him and his wife."

Do you see that?

A.  Yes.

Q.  Those statements are not statements becoming of an officer, correct?

A.  I didn't hear these statements be made.  These are just statements that Dunn placed in his report.

Q.  But you would agree with me that the statements, if they were made, would violate EPD policy, right?

A.  Well, it depends who those statements were made in front of and who they were made to.

Q.  So you're saying --

A.  And what context they were made.

Q.  So you're saying it can be conduct becoming of an officer to say "Fuck him and his wife" in certain contexts?

Page 149

MR. REED:

Object to form.

A.  I didn't say that.  I answered your question.

BY MR. MARDIAN:

Q.  I'm just trying to understand your answer.  Your answer was that it depends on context, right?

MR. STAMEY:

I'm going to object to the form.

A.  It depends on context and the other things that I said.  You can't take part of what I said and just say this is it.

BY MR. MARDIAN:

Q.  So the statement "Fuck him and his wife" could be conduct becoming of an officer in certain contexts, that's your testimony, right?

MR. REED:

Object to form.

A.  No, that's not my testimony.

BY MR. MARDIAN:

Q.  So it doesn't depend on context?

A.  That's not my testimony either.

MR. STAMEY:

Object to the form of the question.



Randy Fontenot

January 30, 2025
Pages 150 to 153

Page 150

BY MR. MARDIAN:

Q. So the statement that Officer Guillory allegedly made does violate EPD policy, right?

A. I don't know that Officer Guillory made that statement, and I would have to investigate that if that were the case to determine in which context it was made, why that statement was made, who was present when that statement was made. I don't have that information in front of me, so I can't tell you.

Q. Well, an investigation into that was completed, correct?

A. The investigation into the entire allegation was -- I don't know if it was completed. Let's see.

Q. Can you turn to the page ending Bates stamp 870.

A. Okay.

Q. Do you see that this begins, quote, "On August 30, 2019, I was contacted by Chief Randy Fontenot in reference to conducting an internal affairs investigation into employee Darrian Guillory and Victor Fontenot"?

Do you see that?

A. Yes.

Page 151

Q. And if you flip down to 874, do you see that this is signed by Lieutenant Ryan Young?

A. Yes.

Q. And then if you go to 873, you see there's an entry for September 9, 2019, right?

A. Yes.

Q. Okay. If you go about two-thirds of the way down on the right side you'll see a sentence that begins, "She was also asked." Let me know when you find that.

A. Where was this at, what part?

Q. It's about two-thirds of the way down, it begins in the middle of the line, and it says, "She was also asked." I'll try to point you to it.

A. Okay, here. About the email?

Q. No. Here we go, right there.

A. Oh, okay.

Q. Do you see that it reads, quote, "She was also asked if she made the comment, Fuck him and his wife, closed quote. Darrian freely admits to making that statement and also said it could have been made whether -- it could have been made where other employees could have possibly heard her"?

Page 152

Do you see that?

A. Yes.

Q. Do you understand this was in the report written by Lieutenant Ryan Young?

A. Yes.

Q. Do you have any reason to question the truthfulness of this report?

A. No.

Q. Okay. So can we establish that Darrian Guillory did, in fact, say this and said it -- can we establish that Darrian Guillory did, in fact, say this?

MR. REED:

Object to form.

A. Yes.

BY MR. MARDIAN:

Q. And she admits that it could have been in a location where other people heard her, right?

A. According to this report.

Q. Okay. And you would agree with me that that qualifies as conduct unbecoming of an officer, right?

A. It would be, yes.

Q. Okay. Was Ms. Guillory ever disciplined for making that statement?

Page 153

A. It appears she was.

Q. You counseled her, right?

A. No.

Q. You don't recall counseling her about that statement?

A. No, I do not.

Q. Did you counsel her about the materials that she recovered from the alleged rape?

A. I don't remember that, but if -- we can cut through all the questions and go to page 868, and you'll see where my handwritten notes on this says that verbal counseling was conducted by supervisors prior to the completion of the critical incident report. Any further disciplinary action would be unwarranted.

Q. And that was provided by you, right?

A. I wrote that, yes.

Q. Okay. And is it your understanding that that covered solely the statement that Darrian -- that Officer Guillory made?

A. No, that's not my understanding.

Q. So what is your understanding of what the counseling was?

A. My understanding is that the officer was counseled for whatever the critical incident



Page 154

covered and for her actions, whatever they may have been. I'd have to read the entire report to tell you exactly what that was and what the findings were. I didn't read the report, I just read what you pointed out to me.

I can review this entire report and get a -- put it all in context for myself to be able to answer that question.

Q. Instead I'd like to direct you to the page that ends 871, and specifically the last paragraph on this page towards the bottom. Four lines up you should see a sentence that includes "Chief Fontenot asked Darrian."

Do you see that?

A. Yes.

Q. It says, "Chief Fontenot asked Darrian where the evidence was located, and she stated she still had it in her possession."

Do you see that?

A. Yes.

Q. So at least at this time you considered the materials in her car to be evidence, right?

A. Well, that's what it was referred to.

Q. And that's because it was evidence, right?

Page 155

MR. REED:

Object to form.

A. Well, when we're talking about evidence, it's because they took it -- it was taken first as evidence, handed to Officer Guillory. And whether it's called evidence or property, the fact is that Officer Darrian had it. I do not consider it evidence now after the investigation because there was no crime committed.

BY MR. MARDIAN:

Q. Before a determination is made of whether a crime has been committed, materials recovered from an alleged victim are considered evidence, right?

A. If the victim complained of a rape and she had clothing on, it would have been collected as evidence. Here, we had no victim making a complaint. We had someone, an officer, taking a person's property from her while she was unconscious at a hospital and he determined it was evidence of some crime that never happened.

Q. That Officer Guillory then kept in her vehicle for over two weeks, right?

A. I don't know how long she kept it.

Q. The paragraph continues, "Chief Randy

Page 156

Fontenot gave a verbal counseling to all present that the evidence in future cases, even those for other agencies, should not be held if that agency cannot immediately take possession and instead should be logged."

Do you see that?

A. Apparently we were in a room -- according to Lieutenant Young's report, we were in a room, and there were multiple people in there. And not all of them were identified, or some of them may have been identified.

And it looks like it was a general discussion and verbal counseling was given to all present, not just them, that -- in future cases, and we discussed about what could happen or what should happen with evidence.

It doesn't particularly mean that she acted improperly. It doesn't particularly mean that we're referring to this property as being evidence of a crime. All it says is we had a general discussion for future cases how evidence of a crime should be handled. It doesn't say that this is specifically about what Officer Darrian had.

Q. Understood.

Page 157

If you flip to the next page, 871, the first full paragraph --

MS. WALL:

Do you mean 872?

MR. MARDIAN:

Yes. Thank you. 872.

A. Oh, okay.

BY MR. MARDIAN:

Q. Sorry about that.

The first full paragraph, about seven lines from the bottom, there's a sentence that begins on the right side of the page, "I asked him to elaborate."

Let me know when you are there.

A. Okay, I'm there.

Q. And the report continues, quote, "I asked him to elaborate on what he said, and he said that Dunn, quote, Could suck on his left nut or maybe his right one. But he did own up to saying he made an obscene statement."

Do you see that?

A. Yes.

Q. And do you understand from this paragraph that "he" is referring to Victor Fontenot?



Randy Fontenot

Page 158

A. Yeah, it appears so.

Q. And so Lieutenant Young found that Officer Fontenot's statement was obscene, correct?

A. Yes.

MR. REED:

Object to form.

BY MR. MARDIAN:

Q. And that would violate EPD policy, correct?

A. Like I explained to you earlier, what one might call obscene and another are two different things, it's two different opinions. Somebody can be obscenely overweight, that doesn't mean that they're being obscene in a sense.

I mean, but, yeah, I guess he maybe considered that to be an obscene statement. But I don't know who he said this in front of, if he said it in front of a ranking coworker or a coworker of the same rank.

Like I explained earlier in our policy, that wouldn't necessarily be a violation of our policy. I mean, officers like Lieutenant Dunn and Lieutenant Thibodeaux like to claim First Amendment rights. I mean, you can state your opinion on things.

Page 159

So he may have made that -- I don't know who he made the statement in front of. I don't think it was in the public where it would have brought a bad -- you know, a bad reputation, bad light on the City or the department or the officers. I think this statement may have been made to another officer.

Q. EPD policy prohibits officers from behaving disrespectfully or in a threatening manner or insulting manner to their fellow officers, correct?

A. Correct. But this wasn't made directly to Lieutenant Dunn, this statement. So that policy doesn't apply.

Q. Are EPD officers subject to drug tests?

A. Yes.

Q. What happens if an officer fails a drug test?

A. Well, that goes back to the City policy. And I'd have to review the exact policies because I don't remember -- I don't remember if we've had an officer fail a drug test while I was chief.

Q. Do you recall if Officer Guillory ever crashed her vehicle?

A. Yes.

Page 160

Q. Do you recall if she was subject to a drug test after that?

A. I would have to review the records, but it is policy of both the City and the police department that if you're involved in a crash involving one of the City's units, that you are required to take a drug test.

Q. But you have no independent recollection of her taking one?

A. I don't recall right now. I'd have to go back and review the records.

Q. Do you recall if she was ever let go from EPD while you were chief?

A. I don't remember if she was let go or if she resigned. I'd have to look at her personnel action sheets or her personnel file.

Q. But you do recall there was a point at which she left?

A. Yeah. She's no longer with the police department.

Q. Do you recall a time where she came back to EPD?

A. It seems like there was a separation in service at one point, but I don't remember the circumstances.

Page 161

Q. Fair enough.

MR. MARDIAN:

I'm going to mark as Exhibit 4 the next document, Tab 29.

(Exhibit 4 was marked.)

BY MR. MARDIAN:

Q. Do you recognize this as another critical incident report?

A. Yes.

Q. And do you see in the first paragraph under "Description of Incident" it refers to "On August 26, 2019, I, Lieutenant Michael Dunn, completed critical incident forms on both Victor Fontenot and Darrian Guillory for policy violations which were submitted to Deputy Chief Daigle"?

Do you see that?

A. Yes.

Q. Do you have an understanding of whether that form that Lieutenant Dunn is referring to here is the one we were just looking at?

A. What you mean, the one we were just looking at? I'm looking at it now.

Q. I'm sorry, yeah. So you're looking at one, and the one here is referring to another one



Page 162

that he had filed, right?

A.  Okay, what's your question now?

Q.  So the first paragraph, Lieutenant Dunn refers to another critical incident form that he filed with respect to Victor Fontenot and Darrian Guillory.

Do you see that?

A.  Yes.

Q.  Do you have an understanding that that form he's referring to there is the same form that you and I were just looking at a few minutes ago?

A.  No, I don't understand that.  There's nothing here to reference to that.

Q.  Fair enough.

So if you go back to the exhibit you just had in front of you and go to page 880, do you see at the top that it lists the date of this report as August 26, 2019?

A.  Okay, yes.

Q.  And this report, the one we were just talking about, was about Darrian Guillory and Victor Fontenot, right?

A.  Yes.

Q.  Okay.  So now going back to Exhibit --

A.  This form refers to Officer Darrian

Page 163

Guillory, not Victor Fontenot, according to the names at the top of the critical -- the report dated August 26, 2019.  It's for Officer Darrian Guillory.  It doesn't mention Victor Fontenot there.

Q.  And do you have an understanding that that's because Lieutenant Dunn submitted the same report about Guillory and Fontenot?

A.  Do you have one that has Lieutenant -- I mean, Officer Victor Fontenot on it?

Q.  I'm not sure whether one was produced or not, but we can move --

A.  But by the date, I'm assuming he's -- I'll have to assume that he's referring to that particular report, which is Officer Darrian Guillory.  It doesn't mention Victor Fontenot as the subject of the report.

Q.  Okay, fair enough.

So if you go back to Exhibit 4, you see the second paragraph reads, quote, "On August 27, 2019, I was informed Chief Randy Fontenot, in front of several witnesses, allowed both D. Guillory and V. Fontenot to read the critical incident forms against them."

Do you see that?

Page 164

A.  I do.

Q.  Do you have any recollection of permitting either Darrian Guillory or Victor Fontenot to read the critical incident forms against them?

A.  I do not.

Q.  And then it continues, quote, "During this time, D. Fontenot threatened to do bodily harm to me and the police K-9 Robin when he gets the chance in front of Chief R. Fontenot."

Do you see that?

A.  Yes.

Q.  Do you have any recollection of that occurring?

A.  No.

Q.  Continue --

A.  I found out about it.  I mean, I've read it in reports, I've read it.  But at that time, no.

Q.  It continues, "Chief R. Fontenot said, We putting him under investigation for interfering with an investigation."

Do you see that?

A.  Yes.

Q.  Do you recall saying that?

Page 165

A.  I do not recall saying that at this point.

Q.  Do you recall saying anything similar?

A.  No, I don't recall this -- any of the stuff from that day that he's talking about there.

Q.  It continues, "Some of the statements made in front of several witnesses by V. Fontenot are as follows, quote, I'm going to break his mother fucking fingers."

Do you see that?

A.  Yes.

Q.  Do you have any recollection of Victor Fontenot saying that?

A.  I read about it, but I don't remember being in a room where Victor said that.

Q.  It continues, quote, "He was conceived in the cesspool of his mother's womb."

Do you see that?

A.  I do.

Q.  Do you have any recollection of Victor Fontenot saying that?

A.  I've heard that he made this comment, or read it, but I don't recall being in the room or there when this statement was made.

Q.  It continues, quote, "I am going to fuck



Page 166

him up when I catch him alone on a call."

Do you see that?

A. Yes.

Q. Do you have any recollection of Victor Fontenot saying that?

A. Same response.

Q. And then it continues, "When Lieutenant Ryan Young made the comment about the K-9 Robin being given to Victor Fontenot to punish me, Victor Fontenot stated, I'll put two in his head before he gets in my unit."

Do you see that?

A. I do.

Q. Do you have any recollection of Victor Fontenot saying, "I'll put two in his head before he gets in my unit"?

A. Only from what I've read and been told, I remember that statement.

Q. If Victor Fontenot admitted to making certain of these statements, you would have no reason to question whether or not they were, in fact, made, right?

A. I can't testify to what Victor Fontenot is going to say. I don't know.

Q. And for that reason, you can't question

Page 167

or dispute that what he's admitting to saying is accurate, right?

MS. WALL:

Objection to the form.

A. That who's admitted to saying?

BY MR. MARDIAN:

Q. Victor.

A. I don't know that he did admit to it.

MR. STAMEY:

I'll just make my objection continuing.

BY MR. MARDIAN:

Q. But if he admitted to making certain of these statements, you have no basis to dispute whether he, in fact, made them, right?

MS. WALL:

Objection to the form.

A. I don't know what Victor said or is going to say. And I can tell you what I know. I don't know --

BY MR. MARDIAN:

Q. And you -- what you know is you have no independent recollection of these statements being made, right?

A. Correct.

Page 168

Q. You don't know that they were, in fact, not made, right?

MR. REED:

Object to form.

A. Correct.

BY MR. MARDIAN:

Q. I'm happy to go through them one by one, but is it your opinion that any of these statements violate EPD policy?

MS. WALL:

Objection to the form.

A. On the back of this report, in my handwriting, and I'll read it, "No further action taken. Lieutenant Dunn does not name witnesses. The comments he refers to were made in the briefing room, according to his description, and were made not in public, just officers blowing off steam" -- that was in quotes -- "among coworkers. No threats or comments were made to Lieutenant Dunn.

"Lieutenant Dunn does not list specific policies that were violated, and I don't know of a specific policy violation in this case that warrants disciplinary action against Officer V. Fontenot. It is expected that officers will at

Page 169

times blow off steam. I encourage this in the briefing room, as was done here, as to not take frustrations out in public.

"The reason I removed microphones from the briefing room was for this purpose. Lieutenant Dunn was not present, was not disrespected directly, nor threatened."

And I signed that statement.

BY MR. MARDIAN:

Q. And so Victor Fontenot was not disciplined on account of any of these statements, correct?

MS. WALL:

Objection to the form.

A. I have no proof that he made these statements or violated any policy.

BY MR. MARDIAN:

Q. So the answer to my question is he was not disciplined, right?

A. No disciplinary action was taken based on this critical incident report.

Q. And part of the reason for that is because, as you just read, it was your opinion at the time that Lieutenant Dunn did not name any witnesses, correct?



Page 170

MS. WALL:

Objection to the form.

A.   Well, don't take part of it.  There's -- the whole thing goes into that.  I didn't make that decision based on that one sentence.

BY MR. MARDIAN:

Q.   But it was part of the decision, right?

A.   It was part of the decision, yes.

Q.   And so the line that you were drawing is whether or not witnesses could corroborate his allegations, right?

MS. WALL:

Objection to the form.

A.   No, that's part of it.

BY MR. MARDIAN:

Q.   Do you know if EPD conducted any investigation to determine whether these statements were, in fact, made?

A.   I don't know.  I don't think so.

Q.   So, then, how could you come to the conclusion that there wasn't any corroborating evidence?

A.   Well, the police -- I'll give you an example.  We get complaints all the time, allegations made against members of the public.

Page 171

But if there's no evidence to support the statements being made, then we don't do an investigation if there's nothing to investigate.

If we don't have evidence to support the allegations or that a crime had been committed, we're not going to investigate.  Same thing with this.  If you don't give me a basis for the investigation -- and it goes back to when -- read the deposition from Sheriff Bobby Guidroz when Lieutenant Dunn went to him.

Read the deposition from the inspector general's office, their agent.  Both of them, when Lieutenant Dunn went with them -- to them with allegations, neither one of them did an investigation because he could not provide evidence to support his allegations.

And both of them testified that they tried -- they told Lieutenant Dunn, Get the evidence to us and we'll do an investigation, and he never returned with the evidence.  Same thing here.  If I don't have the evidence, I don't have the basis to support the allegations, I don't have anything to investigate.

Q.   You attended the deposition of Victor Fontenot in this litigation, correct?

Page 172

A.   Yes, I did.

Q.   Do you recall him admitting to making certain of these statements?

A.   No, I do not recall his exact statements.

Q.   You don't recall him admitting that he did make the statement about Dunn being born in the cesspool of his mother's womb?

A.   I don't recall him making that particular statement or stating it in the way you just framed it.

Q.   But you would agree with me that if you had done an investigation at the time, you would have uncovered that he did, in fact, make that statement, right?

MS. WALL:

Object to the form.

MR. REED:

Objection to form.

MR. STAMEY:

I'll join in that objection.

A.   If I had witnesses to corroborate the allegations, we may have.  But it doesn't mean that there would have been any disciplinary action, or it wouldn't mean that he -- I would

Page 173

have come to the conclusion that he violated any of our policies.

BY MR. MARDIAN:

Q.   You never asked Victor Fontenot if he made any of these statements?

A.   I don't remember.

Q.   You also -- withdrawn.

Do you recall Officer Fontenot admitting that he said that he would put two, not in Dunn's head, but in the head of his K-9?

A.   If I recall him admitting that?

Q.   Yeah.  Do you recall that from his deposition?

A.   It may have been brought up, but I don't remember in what context it was brought up or how.

Q.   And so I'm assuming you didn't talk to him about that at the time of this incident, right?

A.   I don't remember.

Q.   You also write in your summary here that there were no threats or comments made to Lieutenant Dunn, right?

A.   Correct.

Q.   And so part of your decision was that he specifically wasn't there to hear them, right?



Page 174

A. That's according to Lieutenant Dunn's report or complaint. It appears that he was not there, that he was told that these comments were made, but he doesn't say who told him, and I don't know who did tell him.

Q. It can violate EPD policy for someone to make an obscene or threatening statement even if the subject of that statement is not there to witness it, right?

A. It may or it may not.

MR. STAMEY:
Objection to the form of the question.

BY MR. MARDIAN:

Q. But it may, right?

A. Or it may not.

Q. You also say here that you encourage this in the briefing room, right?

A. I encourage officers to blow off steam. I didn't say I encouraged them to criticize or make threatening comments to other officers or anything like that. I encourage them to blow off steam.

Q. So are there any of the statements listed here in Lieutenant Dunn's report that you

Page 175

consider, quote, blowing off steam?

A. When an officer is upset, there's no telling what he's going to say. And a lot of it could be blowing off steam, just running off at the mouth with no meaning intended.

Q. So when you wrote that it's expected that officers will at times blow off steam, were you referring specifically to the comments that Lieutenant Dunn put in this report?

A. No.

Q. And when you say you encourage this in the briefing room, you were not referring to the comments that Lieutenant Dunn made here?

A. Correct.

Q. So why did you feel the need to put that in your report?

A. Because it's related. Lieutenant Dunn is saying that Officer Victor made these comments in the briefing room.

I, my first day as police chief, ordered the removal of the microphones that were recording conversations in the briefing room, and I told the officers and informed them that the microphones -- I think I did it in an email, if I'm not mistaken.

I said, The microphones have been

Page 176

removed from the briefing room, and this is for your privacy so that you can go and have discussions in there with other officers, so that you can blow off steam.

I would prefer you talk bad about me in the briefing room in the privacy of the police department instead of doing it in public.

So I had the microphone removed specifically so the officers could talk about me and blow off steam and cuss me out in the briefing room and not worry about being recorded so that I could hear it and come back after them later.

I wanted them to understand, you're free to talk in the briefing room, you say whatever you want about me there, just don't put it in the public.

Q. Just so the record is clear, you, at the time, did not consider the alleged statements in Lieutenant Dunn's report to be, quote, blowing off steam; is that right?

MS. WALL:
Object to the form.

A. I did not say that.

BY MR. MARDIAN:

Q. So let me just ask you, the statements

Page 177

that were in --

MR. STAMEY:
I'll object to the form of the question.

BY MR. MARDIAN:

Q. The statements that are alleged in Lieutenant Dunn's report, at the time that you wrote this, did you consider those statements to be, quote, blowing off steam?

A. I really didn't form an opinion on that at the time because I didn't have the evidence or the witnesses or the information needed to do a good investigation to find out whether these statements were actually made or not.

Q. Do you know Officer Jonathan Lee?

A. Yes.

Q. Who is he?

A. Officer Jonathan Lee, he was an officer with the police department for a short period of time while I was chief.

Q. Do you understand -- have any understanding of why he left EPD?

A. No, I do -- I don't recall. I remember he did leave. I was disappointed that he was leaving. I don't remember if I ever got a reason



Page 178

for his departure or not.

Q. Why were you disappointed that he was leaving?

A. Because I liked Jonathan Lee. He was a good officer, I believed.

Q. Did you have an exit interview with him before he left?

A. I don't remember.

Q. Do you recall whether he wrote down the reasons for why he was leaving?

A. I don't remember that.

MR. MARDIAN:

I'm going to mark as Exhibit 5 a document bearing Bates stamps Dunn 000126.

(Exhibit 5 was marked.)

BY MR. MARDIAN:

Q. Chief Fontenot, have you seen this document before?

A. It does look familiar.

Q. You attended the deposition of Jonathan Lee in this litigation, correct?

A. I believe I did.

Q. Do you recall seeing this document at that deposition?

Page 179

A. No, I don't -- I vaguely remember the deposition at all.

Q. It begins, quote, "On Tuesday, September 24, 2019, I, Jonathan Lee, went to the Eunice Police Department to obtain my last paycheck and was met by Chief Randy Fontenot, who asked to speak with me in his office."

Do you see that?

A. Yes.

Q. Do you have any recollection of that meeting?

A. Vaguely.

Q. It says, "Chief Fontenot asked why I left the department and advised I seemed different in the last two weeks of my employment. I advised Chief Fontenot that I left the department for numerous reasons, but would be happy to explain them all if he wished. Chief Fontenot replied he wished to know all the reasons for my departure."

Do you see that?

A. Yes.

Q. And then it continues, "I advised Chief Fontenot the main reason for my departure was due to the treatment of Lieutenant Michael Dunn and former Lieutenant Jeremy Ivory."

Page 180

Do you see that?

A. Yes.

Q. Does that in any manner refresh your recollection as to this discussion you had with Officer Lee?

A. Not particularly that sentence.

Q. And then it continues, "Chief Fontenot advised the matters pertaining to Lieutenant Dunn and former Lieutenant Ivory was none of my concern due to me still being a rookie and not knowing, quote, what goes on behind closed doors," closed quote.

Do you see that?

A. Yes.

Q. Do you have any recollection of advising Officer Lee that the circumstances surrounding Lieutenants Dunn and Ivory was none of his concern?

A. I vaguely remember that conversation.

Q. What do you recall about it?

A. I do remember speaking with Officer Lee about this, and I did tell him, Look, this is between two lieutenants and the chief. You're a patrolman, which is two ranks below the lieutenant.

Page 181

And apparently Lieutenant Dunn and Lieutenant Ivory were telling Officer Lee things that they should not have -- according to our policies, they should not been discussing with Officer Lee.

Q. Do you recall any of those things?

A. The way he was talking about -- well, just in general, Lieutenant Dunn. He didn't like my treatment of Lieutenant Dunn and Lieutenant Ivory. I'm not sure what specifically he was talking about there.

But there's no reason for a lower-ranking subordinate to have any concern or any knowledge about what happens between ranking officers and the chief. There's no reason for that.

And that's where the morale of the department -- when these higher-ranking officers are talking to subordinates about issues like this, that's what destroys the morale of the police department.

So Lieutenant Dunn and Lieutenant Ivory, by having this discussion -- or these discussions with Officer Lee or possibly other subordinates, they were jeopardizing the morale of the police



Page 182

department.

Q. So in your previous answer you said, "Apparently Lieutenant Dunn and Lieutenant Ivory were telling Officer Lee things they should not have."

My question is: Do you recall any of those things they were telling Officer Lee that they should not have?

A. Not specifically.

Q. It continues, "Chief Fontenot advised Lieutenant Dunn and former Lieutenant Ivory were corrupt officers who were brainwashing everyone inside of the department, including myself."

Do you recall telling Officer Lee that Lieutenant Dunn was a corrupt officer?

A. I do not.

Q. Do you recall telling Officer Lee that Lieutenant Ivory was a corrupt officer?

A. I do not.

Q. Do you recall telling Officer Lee that Lieutenant Dunn was brainwashing everyone inside of the department?

A. I do not.

Q. And do you recall telling Officer Lee that Lieutenant Ivory was brainwashing everyone

Page 183

inside of the department?

A. I do not.

Q. It continues, quote, "Chief Fontenot advised Lieutenant Dunn and former Lieutenant Ivory were the last two individuals within the department who he wants fired so that the department will be good again."

Do you see that?

A. Wait, where was that again?

Q. The next sentence.

MS. WALL:

It's like three -- three or four down in the second paragraph. And can you repeat the question?

A. Repeat the question again.

BY MR. MARDIAN:

Q. Of course.

Do you see it's -- that the report continues, quote, "Chief Fontenot advised Lieutenant Dunn and former Lieutenant Ivory were the last two individuals within the department who he wants fired so that the department will be good again"?

A. I see that.

Q. Did you advise either Lieutenant --

Page 184

excuse me.

Did you tell Officer Lee that Lieutenant Dunn or Lieutenant Ivory were two individuals in the department that you wanted fired?

A. I don't recall that.

Where did this come from? This is not a police department report. It doesn't look like it's involved with any police department investigation. It doesn't appear that this is something that was submitted with his resignation letter or as a resignation letter.

Q. You have no reason to doubt the veracity of the statements included in this document, correct?

A. I have no reason to accept any of this as written because I don't know any of the history of this, I don't know what this is about, where it came from, or even if Officer Jonathan Lee wrote this. It's got his name down there but no signature. I don't know where this come from.

Q. Do you recall from Officer Lee's sworn deposition in this case that he testified that the reasons listed in this are the reasons that he left EPD?

A. Like I said, I vaguely remember his

Page 185

deposition. I don't remember the content of his deposition.

Q. So you have no reason to doubt that that testimony is, in fact, accurate, correct?

A. I have no reason to support it either.

Q. You have no reason to doubt his sworn testimony that he wrote this less than a week after he resigned from EPD, correct?

MS. WALL:

Object to the form.

A. This is not a sworn testimony.

BY MR. MARDIAN:

Q. That wasn't my question.

My question was: You have no basis to dispute his sworn testimony that he wrote this within a week of resigning from EPD, correct?

MR. REED:

Object to form.

A. I can't answer to that. I don't know. I don't have the facts.

BY MR. MARDIAN:

Q. So the answer is no, you can't dispute it?

A. No, I didn't answer no. I said I have -- I can't answer it. I cannot say yes or no.



Randy Fontenot

Page 186

Q. Okay. Just going to the original question, did you tell Officer Lee that Lieutenant Dunn and Lieutenant Ivory were two individuals in the department that you wanted fired?

A. I answered that question.

Q. Do you have any recollection of saying that?

A. I answered that question.

Q. And I'm asking it again.

Do you have any --

MS. WALL:

Object to the form. Asked and answered.

BY MR. MARDIAN:

Q. And I'm asking the question again.

Do you have any recollection of telling Officer Lee that you wanted either Lieutenant Ivory or Lieutenant Dunn fired?

A. I have no recollection.

Q. Did you tell Officer Lee -- withdrawn.

Do you have any recollection of telling Officer Lee that Lieutenant Dunn and Lieutenant Ivory were the sole reason for the department's low morale?

A. That statement sounds familiar, but I

Page 187

can't say that I actually told him that. But it sounds like something I might have said.

Q. Later in the paragraph, about halfway through, there's a sentence that begins, "Chief Fontenot then stated he was, quote, old-fashioned."

Let me know when you see that.

A. In the second paragraph?

Q. Yeah. The large one. And it's right in the middle.

A. Yes, I see that.

Q. It says, quote, "Chief Fontenot then stated he was, quote, old-fashioned in the way he runs the department."

Do you see that?

A. Yes.

Q. Do you have any recollection of telling Officer Lee that you were old-fashioned in the way that you run EPD?

A. No.

Q. Do you have any recollection of telling anyone ever that you are old-fashioned in the way that you run the department?

A. No. I'm not saying I never said it, but I don't have any recollection.

Page 188

Q. Fair enough.

The next sentence reads, quote, "Chief Fontenot stated, I do not accept insubordination and believe in punishing those who disobey me and policy."

Do you see that?

A. Yes.

Q. Do you have any recollection of telling that to Officer Lee?

A. No.

Q. Do you have any recollection of ever telling anyone at EPD anything along those lines?

A. No.

Q. It continues, quote, "Chief Fontenot advised Lieutenant Dunn and former Lieutenant Ivory are the two main officers within the department who refuse to obey his orders and policy."

Do you see that?

A. Yes.

Q. Do you have any recollection of telling that to Officer Lee?

A. No. Like I said, I vaguely remember this, the meeting with Officer Lee, and I don't remember what all was discussed in that meeting.

Page 189

Q. It continues that you said, quote, "Because they can't listen, I will not stop and will do whatever it takes until they are both gone."

Do you see that?

A. Yes.

Q. Do you have any recollection of ever saying that to Officer Lee?

A. No.

Q. Do you have any recollection of ever saying anything similar to Officer Lee?

A. No.

Q. And do you have any recollection of saying anything along those lines to anyone at EPD?

A. No.

Q. It continues, quote, "Chief Fontenot stated Lieutenant Dunn also committed policy violation by contacting another law enforcement agency and bad-mouthing the Eunice Police Department about a rape case."

Do you see that?

A. Yes.

Q. Do you have any understanding of the rape case that is referenced there?



Page 190

A.  I can only assume, but that sometimes gets you in trouble.

Q.  And if you were to assume, it would be the rape case regarding Officer Guillory that we were discussing earlier, correct?

A.  Yes.

Q.  It continues, quote, "Chief Fontenot advised Lieutenant Dunn also grossly mismanaged the aforementioned rape case and was incredibly lazy with the incident."

Do you see that?

A.  Yes.

Q.  Have you ever claimed that Lieutenant Dunn grossly mismanaged the rape case?

A.  I don't recall saying that.

Q.  But you did have issues with the way that he handled the rape case, right?

A.  I'm not saying I disagree with that statement, I'm just saying I don't recall saying it.

Q.  Fair enough.

What about the portion, quote, that he was incredibly lazy with the incident, do you have any recollection of saying that Lieutenant Dunn was incredibly lazy with the rape incident?

Page 191

A.  No, that I don't recall at all.

Q.  The next paragraph, do you see it begins, quote, "I advised Chief Fontenot another reason I left the department was due to Detective Darrian Guillory being rehired and moved to detectives after her quitting a month prior due to her failing a drug screening for marijuana"?

A.  Yes.

Q.  Do you have any recollection of Officer Guillory failing a drug screening?

A.  I don't remember.  It's possible.  I'd have to look at the personnel file.

Q.  It continues, quote, "Chief Fontenot chuckled at this statement and brushed it off as me not knowing what happens, quote, behind closed doors and the matter not being any of my business."

Do you see that?

A.  Yes.

Q.  Do you have any recollection of saying that?

A.  Well, it doesn't say that I said that. That's his statement of his opinion of how he thought I was looking at things.  It doesn't say that I said that.

Page 192

Q.  Do you have any recollection of saying anything along those lines?

A.  No.

Q.  Does it sound like something you would say?

MR. REED:
Object to form.

A.  Not -- not like that.

BY MR. MARDIAN:

Q.  The last paragraph reads, quote, "I advised Chief Fontenot that he was the main reason for the many officers leaving the department due to his lack of care and concern for his officers, his nepotism, and lack of true leadership ability."

Do you see that?

A.  Yes.

Q.  Do you have any recollection of Officer Lee telling you that?

A.  It seems like he did say something like that before he left my office.

Q.  It continues, quote, "I advised Chief Fontenot that the department was years behind in technology, lacked needed training, and lacked proper pay for its officers, but still -- would

Page 193

still have more employed personnel had it not been for his record of harassment on his own officers."

Do you see that?

A.  Yes.

Q.  Do you recall him telling you that?

A.  I do remember him saying something along those lines.  He was making a statement based on what he was being told by Lieutenant Dunn and Lieutenant Ivory.

And he was a rookie officer and he hadn't -- I mean, he was way out of line to come to a nearly-40-year veteran in law enforcement when he only had a few months in law enforcement and start making allegations such as that in a department that he was just recently hired at not long before.

Q.  Do you recall asking him for the basis of any of these allegations?

A.  No, I don't recall that.

Q.  Do you recall saying anything in response to him?

A.  No, I do not recall saying anything in response.  He didn't report that I did, so maybe I didn't.

Q.  Did you recall taking any action to



Randy Fontenot

Page 194

investigate whether what he's saying is true?

A.   Well, I don't know what he's talking about nepotism, but I see no reason to investigate that.  I had none of my relatives working there.

Q.   Do you recall in his deposition that he testified that by nepotism he included both family and friends?

MS. WALL:

Objection to the form.

A.   I don't recall that.

BY MR. MARDIAN:

Q.   Other than nepotism, did you consider investigating any of these allegations?

A.   Like specifically?

Q.   Any of the ones listed here.

A.   There's really -- he was -- I guess I would have to investigate myself because he's talking about me doing all this stuff.  I wasn't going to investigate myself.  I had no reason to do that.

Q.   Do you recall an incident involving Officer Lee responding -- or withdrawn.

Do you recall -- withdrawn.

Are you friends with anyone in Eunice that manages a trailer park?

Page 195

A.   Which trailer park?

Q.   I'm not sure.  Any.

A.   I'm friends with a lot of people in Eunice and a lot of people manage a lot of different businesses.  A trailer park, I -- I know of a couple of trailer parks and, yes, I know the people that own them or manage them, and a lot of those people are my friends, yeah.

Q.   Does EPD ever handle evictions from trailer parks?

A.   No -- well, I say that.  We might assist with them.  But that's the marshal's office, that's their job.

Q.   Do you have any recollection of working with Officer Lee with respect to evicting the guest of a tenant at a trailer park in Eunice?

A.   Wait, say that again.

Q.   Do you have any recollection of working with Officer Lee to evict the guest of a tenant at a trailer park in Eunice?

A.   If I worked with Officer Lee?

Q.   (Attorney nodded head.)

A.   I don't recall that.

Q.   Do you recall ever directing Officer Lee to evict the guest of a tenant at a trailer park

Page 196

in Eunice?

A.   I don't recall that.

MR. REED:

Do you mind if we take a five-minute break?

MR. MARDIAN:

Yeah, let's take a break.

THE VIDEOGRAPHER:

Off the record at 2:25.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record at 4:33 -- 2:33.

BY MR. MARDIAN:

Q.   In July of 2020, you terminated the K-9 program at EPD, right?

A.   I don't remember the date, but, yes, I did terminate it, probably around that time.

Q.   Did you have any problems with the K-9 program?

A.   I had issues with it.

Q.   What were those issues?

A.   I had issues with the locations being made.  I had issues with search warrants being executed on houses and the K-9 was brought in to

Page 197

search for narcotics and the K-9 not finding narcotics and the officers coming right behind the dog and finding the narcotics with the K-9 not alerting on it.

I had issues with the K-9 being sent out of town and was being used more on out-of-town cases while we were paying overtime to the officer; being used out of town, out of our jurisdiction, which I don't mind helping other jurisdictions, but the dog was being used more in other jurisdictions than it was within our own jurisdiction.

Q.   Why was that a concern to you?

A.   Which part?

Q.   The second part, that it was being used in other jurisdictions.

A.   It was a concern to me because we were paying Officer Dunn quite a bit of overtime for using the dog in other jurisdictions when the dog wasn't being used much in Eunice for drug cases.

Q.   You would agree with me, though, that it was being used to locate drugs in certain instances, right?

A.   It was being used in an attempt to locate drugs.  But I'm trying to think of a case



MAGNA
LEGAL SERVICES

Randy Fontenot

Page 198

where we actually found drugs with the dog. I don't recall any right now.

MR. MARDIAN:

I'm going to mark as Exhibit 6 a document bearing Bates stamp CityofEunice_Dunn_0002252.

(Exhibit 6 was marked.)

BY MR. MARDIAN:

Q.   And, sir, I'll represent to you that this is a collection of documents that were produced by the City of Eunice in this litigation. And I'd ask you to turn to the page ending 2284.

MR. REED:

Do you have one for me?  Thank you.

A.   22 --

BY MR. MARDIAN:

Q.   -- 84.

Do you see this is a K-9 deployment report?

A.   Yes.

Q.   And what is a K-9 deployment report?

A.   That's a report that Lieutenant Dunn would fill out I guess whenever the K-9 was used.

Q.   Do you see on the second page there's an entry in this K-9 deployment report?

Page 199

A.   Second page of this one?

Q.   Yeah, sorry, the next page ending 2285.

A.   Okay.  What was the question?  I'm sorry.

Q.   Yeah.  Do you see in the middle of the second paragraph there's a sentence that begins, K-9 Robin's breathing and body posture also changed?

A.   Yes.

Q.   And it reads, "K-9 Robin's breathing and body posture also change as we neared the closet, but he went back to the dresser.  It was later discovered that officers located crystal meth and smoking devices where K-9 Robin alerted."

Do you see that?

A.   Yes.

Q.   And then it continues, "It was later discovered officers located a bag of marijuana on the top shelf of the closet where K-9 Robin showed interest."

Do you see that?

A.   Yes.

Q.   Do you have any reason to doubt the accuracy of those statements?

A.   No.

Page 200

I do note, though, that this was not a -- like I said, it's not a Eunice Police Department investigation.  This was out of our jurisdiction in assisting with the City Marshal's Office.

Q.   Do you see the next page, there's an entry at the bottom that begins, "On March 19, 2020"?

A.   Yes.

Q.   And it says, "I observed K-9 Robin's body posture and breathing change from slow to fast and gave his final response in two locations, a bag of clothing at the foot of the bed on the north wall and the TV stand next to the shower. After search was conducted, officers located crystal meth underneath the TV."

Do you see that?

A.   Yes.

Q.   So in that instance as well, the K-9 assisted the officers in recovering narcotics, right?

A.   Yes, apparently so.

Q.   Do you have any reason to doubt that if we looked at other K-9 deployment reports, we would see similar reports?

Page 201

A.   I have no idea what his other reports would show.

Q.   And as we discussed this morning, at the time it was the policy of EPD that K-9s were helpful in EPD conducting its work, right?

A.   That was Lieutenant Dunn's words in that policy.

Q.   Which you adopted, right?

A.   Yes.

Q.   Do you have any recollection of calling Lieutenant Dunn a, quote, shitty handler?

A.   No.

Q.   Do you have any recollection of saying anything similar to that?

A.   No.

Q.   Did you ever tell anyone that you had a, quote, handler problem?

A.   The only discussion I remember similar to that was at one of the City council meetings when one of the councilmen, one of the council people, asked me if I had a handler problem or if it was a dog problem or whatever it was.

And then she went on to make another comment.  And I informed her, You just answered your own question.  I didn't make the statement.



Randy Fontenot

Page 202

She did. That's the only conversation I remember similar to that.

Q. So you don't recall ever telling anyone that you had a handler problem?

A. I don't.

Q. At this time -- withdrawn.

At the time that you terminated EPD's K-9 program, Lieutenant Dunn was the only K-9 handler, correct?

A. Yes.

Q. And --

A. That was the second time we terminated that program.

Q. And you surplussed the K-9, right?

A. I -- no, I don't have that authority. I recommended to the council that it be declared surplus.

Q. And that means sell the dog; is that right?

A. Not necessarily. It just means that it's not of value to the City any longer and they declare it surplus. And it's up to the City council to decide what they want to do with the dog from there.

Q. And so in pursuit of surplussing the

Page 203

dog, you reached out to other police agencies to see if any of them wanted to buy it, right?

A. I don't remember if I did that or not.

Q. If you turn to the page ending 2273.

MS. WALL:
Are we going back?

MR. MARDIAN:
Yeah, it's up.

BY MR. MARDIAN:

Q. Do you see at the top of the page there's an email on June 11, 2020 from you to Ronnie Murray?

A. Yes.

Q. Who is Ronnie Murray?

A. I must have known at the time, but I don't know. "Pdpdchief." He's a chief of some police department somewhere, I'm assuming.

Q. Do you see a few emails down there's an email signature which lists him as the chief of police at Plain Dealing Police Department?

A. Yes.

Q. So you were emailing the chief of the Plain Dealing Police Department regarding surplussing the dog, correct?

A. Yes.

Page 204

Q. And you wrote, quote, "I am taking the dog out of service, budget cuts and issues with handler," right?

A. Yes.

Q. Why did you write "issues with handler"?

A. I don't remember.

Q. Why did you write "budget cuts"?

A. Because my budget had been cut that year and I was trying to figure out ways to maneuver within that so that I could stay within the budget and still manage the police department.

Q. Do you have any recollection of what the cost of the K-9 program was?

A. I don't remember.

Q. Do you have any recollection of what the budget of EPD at that time was?

A. Oh, no, I don't.

Q. Would you be surprised to learn it was about $2 1/2 million?

A. That sounds about right.

Q. Do you have any recollection of the percentage of EPD's budget that was devoted to the K-9 program?

A. No. I don't know if that was specifically itemized within the budget.

Page 205

Q. And in your email to Chief Murray you didn't mention anything about the dog being used in other jurisdictions, right?

A. No.

Q. If you flip down to the page ending 2276.

A. Okay.

Q. Do you see that on September 21, 2020, you sent an email to Ronnie Murray where you wrote, "The council still has not made a decision, although I have dismantled the program"?

A. Yes.

Q. So after you dismantled the program but before the council made the decision, was Lieutenant Dunn still using the K-9?

A. I'm not sure. I'd have to look at the dates of everything to compare. Apparently he was not using the K-9 at this time because I show it was being housed at LA K-9, Louisiana K-9.

Q. And do you have any understanding of whether EPD was still paying for the K-9 while it was being housed at this other location?

A. I think the way I understood it, my understanding, was that Lieutenant Dunn had made arrangements with LA K-9. Because before that the



Randy Fontenot

January 30, 2025
Pages 206 to 209

Page 206

dog was housed at a local vet, and Lieutenant Dunn had made arrangements with LA K-9 that he was supposedly going to hold him at no charge to the City, to the best of my recollection.

So the council moved the dog from -- or they authorized the removal of the dog from the vet here to LA K-9, where the last I heard, the dog was still -- last I heard, the dog was still there. I don't know if it's still there or not now, what happened to it.

Q. You continue, quote, "One councilwoman wants to wait on a civil service determination even after I informed the council the Civil Service Board has nothing to do with the K-9 program."

Do you see that?

A. Yes.

Q. Do you know why you said that?

A. Probably because that's what was happening at the time.

Q. Ronnie Murray replies to you, "Chief, I was just letting you know I'm still interested and I understand the issues you're having. I have the same issues at times, but the good thing is we are not civil service and I can usually reason with my

Page 207

council sometimes."

Do you see that?

A. Yes.

Q. Do you have any understanding of why he wrote that?

MR. REED:

Object to form.

A. Probably in response to the email I sent him above.

BY MR. MARDIAN:

Q. Do you have any understanding of what he meant, that "the good thing is we are not civil service"?

A. Oh, definitely.

MS. WALL:

Object.

MR. REED:

Object to form.

BY MR. MARDIAN:

Q. And what is that?

THE WITNESS:

Somebody objected?

MS. WALL:

Yes.

A. Many municipalities in the state are

Page 208

having issues with their local Civil Service Boards. There's even been -- through the Louisiana Chief's Association, there's been an effort to do away with Civil Service, or at least to modify it greatly.

The legislature even appointed -- which I sat on this committee. The legislature created a committee to meet and discuss and look into ways that the Civil Service could be modified or changed if it needed to be done with a report to be made back to the legislature because it was an issue with so many municipalities within the state.

Q. At the time that you were chief of police, did you think that the Eunice Civil Service Board should have been amended or changed?

A. I believe that the civil service laws needed to be changed.

Q. What about them did you think needed to be changed?

A. Some of the wording and -- there's one part of the statute that pertains to the disciplinary action of officers that -- it sets up a very specific guideline and timeline of how investigations are supposed to be handled, what

Page 209

happens to the investigation, where it goes from there.

And it was very complicated. As a matter of fact, I made the comment that it was easier to get a murder conviction on someone than it was to get a written reprimand on a police officer upheld by the Civil Service Board, because if you made one small error -- and a lot of the Civil Service Boards or their members would misinterpret the laws or have their own opinion about what the law was trying to say, which wasn't necessarily in agreement with what the intent of the law was.

And if you made -- and if they felt that you made one small error, then you could not take any disciplinary action against the officer at all. Anything that you did as far as disciplinary action was null and void because you made one tiny error that you weren't allowed to rectify, which -- and a lot of these errors could be rectified.

And Civil Service, the way that law was written and the way our board interpreted that, they would not allow you to rectify anything to fix the issue.



MAGNA
LEGAL SERVICES

Randy Fontenot

January 30, 2025
Pages 210 to 213

Page 210

A police officer could actually murder someone, and if you made one small -- in a criminal court, there's ways to rectify certain things like that; if an error was made or a judgment was made, you can rectify it. But with Civil Service, there was none of that.

So if a police officer could have gotten convicted for a murder, I mean convicted for murder, but if that particular error was there or some type of error was done in the way it was investigated, you couldn't terminate the officer. He was still out there patrolling your streets as a convicted murderer.

That was one of the problems. And there were many other things in the way the laws were worded and written and -- that made it difficult for police chiefs to actually do their job. It tied their hands a lot. And a lot of the municipalities felt that way.

Q. Lieutenant Dunn petitioned the Civil Service Board for certain conduct that EPD engaged in with respect to him, right?

MS. WALL:
Objection to the form.

A. He -- I think he made several appeals to

Page 211

the Civil Service Board for different things.

BY MR. MARDIAN:

Q. One of those involved the K-9 program. Do you recall that?

A. I'd have to see that again. I mean, like I said, he's filed so many complaints and so many appeals, it's hard to keep up with what was what and what was actually appealed and what wasn't.

Q. Going back to the K-9 program, one of the reasons you gave the other chief of police that you were emailing was the budget, right?

A. Yes.

Q. Do you recall in his deposition that Mayor Fontenot testified that he had said in a public meeting that they could have found the budget if they needed it?

A. I don't recall how the mayor said it or what he said.

Q. At the time that you decided to terminate the K-9 program, did you ask the mayor or the City for additional funds to pay for the K-9 program?

A. We had discussions about the budget. Now, if I asked about funds specifically for that,

Page 212

I don't recall.

Q. The EPD eventually brought back the K-9 program, right?

A. Not under my administration.

Q. Do you have any understanding of whether it exists today?

A. I think it does. But Lieutenant Dunn is not one of the handlers. He's got four others, I believe.

Q. Do you know why EPD brought back the K-9 program?

MR. REED:
Object to form.

A. I don't know. You'd have to ask Lieutenant LeBouef.

BY MR. MARDIAN:

Q. And do you know why Lieutenant Dunn is not currently a handler?

MR. REED:
Object to form.

A. I'm not going to assume. You'd have to ask Chief LeBoeuf.

BY MR. MARDIAN:

Q. You've never discussed this with Chief LeBouef?

Page 213

A. I did not.

Q. You're aware that while you were chief, people raised issues regarding EPD's spending, right?

A. I've had some police officers make some allegations, and I had a couple of council members that we had discussions about the -- not so much the spending in general for the budget but for the overtime.

Q. There was an investigation by the Civil Service Board into alleged payroll irregularities at EPD while you were chief, correct?

A. Well, it wasn't a legal investigation, but they did it. They formed a committee to make up some stuff.

Q. Well, what's your basis for concluding that they, quote, made up some stuff?

A. Well, a lot of that stuff in there is not factual. I mean, it's based on information that they -- they got some of it from Lieutenant Dunn, some of it I guess from Lieutenant Myers. I don't know where all they got their information.

But that was -- the Civil Service Board, to my understanding, has no right to investigate or no authority to investigate an elected police



Randy Fontenot

Page 214

chief. They have no investigative authority as far as forming a committee and going out and questioning people.

That's where they misinterpret -- what I think they misinterpret the law. The law says they can do investigations into complaints filed with them. But their meetings are all supposed to be held in public, they're supposed to be noticed. They have to have public hearings. They interview without being a party to an actual internal affairs investigation.

But once you become a party to an internal affairs investigation, we have a court ruling that you shouldn't even be sitting on the board in judgment of that case. So they had no authority to go and investigate the management of the police department or me and then come back and say that the chief is doing all this stuff. They can't do that.

Q. Setting aside whether you believe they have the authority to do that, do you have any reason to believe that the investigation they conducted was improper?

A. It was. Very improper.

Q. Why?

Page 215

A. For the reasons I just stated. They had no authority to do that, they had no legislative responsibility or authority to conduct that type of investigation.

Q. But what about their findings?

A. Their findings are irrelevant to me. Their findings are assumptions with no proof, no basis.

Q. So you don't know whether they looked at underlying documents and time records to make the conclusions that they did, right?

A. I know they collected a bunch of stuff. But they don't know the facts behind it and why those documents and stuff are like that. They do not know the purposes of those documents and why it was done the way it was.

And, again, it was an invalid investigation. They had no authority to do it. So it's irrelevant what their findings were.

MR. MARDIAN:
I'd like to mark as Exhibit 7 --
This is a collection of documents produced by the City of Eunice bearing Bates stamp 0003498.
(Exhibit 7 was marked.)

Page 216

BY MR. MARDIAN:

Q. The first email here was sent from Mayor Fontenot to you on March 11, 2021, correct?

A. Yes.

Q. And do you see that Mayor Fontenot emailed you, quote, "I'm emailing you for clarification of our elective duties based on the telephone conversation in which we had on Wednesday, March 10, at 6:19 p.m.

"You stated that there was a shooting and that you had no additional officers available to assist the two patrolmen you had on duty. You stated to me, quote, What should I do? I can't call in officers because of my budget and I do not want to answer to the legislative auditors if I go over budget."

Do you see that?

A. Yes.

Q. Do you recall having that conversation with Mayor Fontenot?

A. I do.

Q. What can you tell me about that conversation?

A. Just what it says.

Q. So you guys had a disagreement about

Page 217

whether EPD had the budget to pay for officers to respond to incidents, right?

A. I don't know if you're going to call it a disagreement -- well, I guess it was. And it wasn't specifically with the mayor, it was with the entire council.

Because we were having discussions, and some of the council members -- the mayor never really did, but some of the members were on me big time about the overtime budget. And I was trying to explain to them certain aspects of how the budget for salaries and overtime came together and how I really wasn't over budget.

Even though they allotted me a certain amount for overtime, I was going way over on that, but on the regular salary budget I was way under. So kind of -- I stayed within the budget provided to me by the City overall.

And at that point they were, you know, on me about the budget and the overtime. And I was at my hunting camp with the lease when this happened and -- when I got that phone call. And I communicated with the mayor and asked him, What do I do? How do I address this? Do I have authority to spend overtime money to get officers out there



Randy Fontenot

January 30, 2025
Pages 218 to 221

Page 218

to do the investigation, to help out?

And he got kind of upset with me. And I understand. I was kind of upset with the whole situation.

Q. So what did he tell you?

A. He told me to do what I had to do. He said, Don't put me -- basically, I think at one point he said, Don't put me in the middle of this, you trying to make a point, or something like that.

Q. In the email he then quotes an email from Lieutenant Kennedy.

Do you see that?

A. That's -- the mayor quoted -- sent this and quoted it?

Q. Yeah.

Do you see that it says, "The suspension of overtime was due to an order in which you gave Lieutenant Kennedy by email to your department at 9:53 a.m. on March 10, 2021."

Do you see that?

A. Yes.

Q. And you see it says, "The email reads, quote, As per Chief Fontenot, effective immediately, there will be no more overtime."

Page 219

Do you see that?

A. Yes.

Q. Did you order that there will be no more overtime?

A. Yes.

Q. And why did you do that?

A. Because the council, or some of the council members, were giving me a hard time about the budget for overtime. So I told the officers -- or I had the officers told that we would not give -- in other words, we were not going to hire officers and pay them overtime just to come out and patrol, we'd have to work it out.

Q. Then returning to the same email, the mayor continues, "I stated in our telephone conversation yesterday and in the past during meetings between the two of us that I would support a budget amendment if you went over budget. I will not, however, support wasteful spending.

"You have been given overtime without hesitation during the first nine months of the fiscal year, and now since the council has questioned this, you immediately put a stop to all overtime. You are putting your officers at risk

Page 220

and the general public."

Do you see that?

A. Yes.

Q. Do you recall him stating that to you in the telephone call that you had?

A. I do remember getting this email and that statement being in the email. And the telephone conversation, we -- yeah, I don't remember him verbatim, this being said. But, yes, that sounds like something we discussed in the telephone call.

Q. Do you see that the last paragraph of this email ends, "I refuse to play politics when it comes to City business or anything else. I will not accept responsibility for your -- any of your actions. I'm going to forward this email to each council member for their knowledge. I hope there's some clarification."

Do you see that?

A. Yes.

Q. Did you ever speak with Mayor Fontenot about that?

A. After this email?

Q. Correct.

A. I may have. I don't recollect any

Page 221

specifics.

Q. Do you see that you replied to him the next day, "Let's meet. We have too much to discuss, and texting is no way to handle business"?

A. Yes.

Q. You don't have any recollection of actually meeting to discuss?

A. We probably did because the mayor was always -- whenever I was ready to meet with him, he was always ready to meet. We never had a problem with that.

Q. Did you ever change -- withdrawn.

So as of this email, there was no more overtime at EPD, correct?

A. At the time of that email, it had been suspended. Now, it did come back.

Q. Why did -- when it came back, I assume that was your order; is that right?

A. Yes.

Q. Why did you bring it back?

A. Because we needed the overtime to properly cover the City. And that's the point I was trying to make with the councilmen that we were arguing about the overtime. And I knew I was



Randy Fontenot                                                          January 30, 2025
                                                                       Pages 222 to 225

Page 222

way over budget in overtime, and I knew that the budget would be amended at the end of the fiscal year because it had been done every year prior to that.

The mayor has never complained about the overtime or the money spent on the salaries of police officers. He always supported it. And it was just a couple of councilmen that were having issues with it.

Q. Did that include the salaries of police officers in the K-9 unit?

A. Well, that was discussed at one time. I don't know if it was during this period.

Q. But the mayor never raised to you specifically concerns with spending on the K-9 program; is that correct?

A. No, he never did.

Q. Returning to this email we were just looking at, do you see it continues, quote, "The problem is lack of communication, at least with me. Now, I know why you have plenty communications with misleading troublemakers whose interests are selfish and not in the interests of the City."

Do you see that?

Page 223

A. Yes.

Q. Who are the misleading troublemakers whose interests are selfish and not in the interest of the City that you were referring to?

A. There were certain officers who would go to the mayor and other City councilmen and Civil Service Board members and continuously make allegations such as the allegations in this -- in all this other stuff from the Civil Service Board reports and Lieutenant Dunn's lawsuits, all those type of allegations.

They consistently, constantly go to the mayor, the councilmen, and Civil Service Board board members and bombard them with all these allegations, and it was getting to be a problem. And I believe that's what caused communication issues between me, the mayor, and the council. And I think the mayor even alluded to that during his deposition.

Q. Who are the officers that you're referring to?

A. I will be specific. Lieutenant Stephanie Myers, Lieutenant Donnie Thibodeaux, Lieutenant Jeremy Ivory, and Lieutenant Michael Dunn.

Page 224

Q. A few pages down ending Bates stamp 3500, do you see what appears to be a screenshot of a text message?

A. Yes.

Q. Do you have any understanding of whether this is a text message from your phone?

MS. WALL:
You said 3500? And that's the top one?

MR. MARDIAN:
(The attorney nodded head.)

A. I don't know where this email -- EPD admin, I don't know where that came from. But it was emailed to me.

BY MR. MARDIAN:

Q. And the image, do you know if that's a text message that was sent from Mayor Fontenot to you?

A. Oh, yeah, okay, I see that now. Yes, it appears to be.

Q. And you communicate on your cell phone for EPD -- withdrawn.

At the time you were chief of police, did you communicate on your cell phone for business purposes?

Page 225

A. Yes.

Q. Do you know if your cell phone was ever collected and reviewed in connection with this litigation?

A. No.

Q. Did you ever provide your cell phone to your attorney so that they could collect the information on it?

A. No.

Q. In this text message it says, "I am responding to our conversation we just had on the telephone. You stated that you had another shooting in town and you needed advice on what to do as far as calling out officers."

Do you see that?

A. Yes.

Q. Do you understand that to be a portion of the same discussion you were having via email with the mayor?

A. It appears to be, yes.

Q. And the text continues, "You just stated that you have stopped" -- "you had stated that you had stopped all overtime as of today. I'm advising you now that you are not over your overall budget and you should utilize funds."



Randy Fontenot

January 30, 2025
Pages 226 to 229

Page 226

Do you see that?

A.   Yes.

Q.   And then you can see it's cut off, but it continues on the next page, that "you should utilize funds that are available to function properly."

Do you see that?

A.   Yes.

Q.   And earlier you were saying that generally, if you went to the mayor for additional funding, you could receive it.

Is that a fair characterization of your testimony?

A.   Yes.

Q.   And that's shown in this text message, right?

A.   Right.

Q.   Sir, was Lieutenant Dunn ever on narcotics duty at EPD?

A.   He may have assisted with some narcotics investigations, but I don't -- I don't remember him ever being a narcotics officer, dedicated narcotics officer under my administration.

Q.   Do you have any recollection of removing Lieutenant Dunn from having narcotics

Page 227

capabilities?

A.   No.  But I know where this is coming from.  I didn't remove him from his authority to investigate narcotics cases.  I told him at one time that he needed to stay out of narcotics investigations that were being investigated by other officers of the department or other agencies.

Q.   And why did you tell him that?

A.   Because he was injecting himself in investigations that he had no business being in. He was making complaints about the officers -- the detectives doing surveillance outside the City limits -- well, he wasn't complaining about them doing surveillance.

He was making complaints about officers trying to make a drug buy out of City limits and trying to make an arrest or a raid outside the City limits when that wasn't the case.  He didn't know all the facts of the case.

He saw one part of it, made an assumption from there, and made a complaint that these officers had been working outside their jurisdiction and they had no authority and they were breaking the law and all this.

Page 228

I knew what was going on.  And the officers were acting within their authority and they were working in conjunction with other agencies and they had my authority to do that.

And that -- that particular investigation that I'm talking about did lead to a major narcotics arrest as the suspect came across the State line, and he was arrested in Calcasieu Parish with a lot of drugs.  And that was the investigation they were working on with the DEA, and I think the State Police were involved in that one also.

And I did tell Dunn at one time during this period to lay off of the narcotics investigations that are being handled by other agencies or other officers within our department, to stay out of it.  He had his own duties, and that wasn't, at the time, part of it.

Q.   You mention there that in that specific instance, the officers were operating outside of EPD jurisdiction, right?

A.   No, I didn't say -- well, I didn't say they were operating outside.  I said they were conducting surveillance outside of their jurisdiction.  But they weren't taking any legal

Page 229

outside that would have been outside of their jurisdiction.  All they were doing was surveillance, and you can do that.

Q.   Do you need -- under EPD policy, do you need approval to conduct surveillance outside of EPD jurisdiction?

A.   You should have approval from your supervisor.  Sometimes during an investigation, if it's a hot investigation or there's a pursuit-type deal, it might not be feasible for them to get approval before doing it.

But that's when they have to use their judgment and do what's -- do what they think is reasonable and allowable, and -- but if it's -- if you have time and it's feasible to get permission from a supervisor before doing it, yeah, you should do it.

Q.   There are certain circumstances in which it is against EPD policy to conduct EPD business outside of EPD jurisdiction, right?

A.   Well, if you're trying to take legal action outside of your jurisdiction and you don't have authority, or if you're doing something outside your jurisdiction and you didn't get permission first, again, depending on the



Page 230

circumstances, it could be against -- a violation of EPD policy.

Q. And what determines whether or not you have authority?

A. Well, if you're going to make an arrest outside of your jurisdiction, you probably need to have -- well, you can't arrest somebody if you don't have a commission or arrest powers in that jurisdiction.

But if it's in a pursuit, you can do it. If you pursue them from the City limits out into that other jurisdiction, you can effect the arrest. If you're with another law enforcement agency or officer who has jurisdiction, you can assist in making arrests. So those are some of the exceptions to that.

Q. While you were chief at EPD, are you aware of any instances in which an officer engaged in improper EPD business outside of EPD's jurisdiction?

A. I can't recall anything right now, no.

Q. What is your opinion of Officer Victor Fontenot?

A. He's a rugged fellow. He's -- he's different, but I think he's a good person. He

Page 231

wants to do. He wants to do the right thing. He seeks advice. Sometimes he gets a little overzealous and you've kind of just got to watch him.

But I never had any issues -- well, I never really had any issues with the performance of his duties.

Q. You said he's different. How is he different?

A. He's -- he'll say things, tell you stuff that -- you know, he'll just be blunt about stuff. He's going to let you know -- for one thing, we pick at him all the time about this, he never got offended, I mean he knew it was a joke, but he swears the earth is flat, and we joke with him about that and pick at him. He never gets offended though. He's different in that way.

Q. Do you believe he's honest?

A. I believe he is.

Q. Do you believe he's ethical?

A. I think he is.

Q. Has a member of an outside jurisdiction ever told you that they will not work with Officer Fontenot?

A. I have not been told that myself, no.

Page 232

Q. Has a member of an outside law enforcement jurisdiction ever told you that Officer Fontenot does things that are illegal?

A. No.

Q. Has a member of an outside law enforcement organization ever told you that Officer Fontenot works with informants that have been convicted of felonies?

A. I didn't need nobody to tell me that. Most informants are convicted felons. The law-abiding citizens don't know what the criminals are doing. That's where we get our information, from other criminals.

Q. Do you know anyone by the name of Joshua Dupre?

A. Yes.

Q. Who is that?

A. He's an element of our society. He's been arrested -- I think he's probably a convicted felon. We've had multiple investigations involving him.

Q. Do you know whether Officer Fontenot ever arrested Mr. Dupre?

A. I'm not sure. He probably did. I want to say he may have. I'm not sure. I'd have to

Page 233

look at the records.

MR. MARDIAN:

I'll mark as Exhibit 8 a document produced by the City of Eunice bearing Bates stamp 0003515.

(Exhibit 8 was marked.)

BY MR. MARDIAN:

Q. I'll represent to you that this is a transcript of a probation revocation hearing that was produced by the City of Eunice in this litigation.

A. Okay.

Q. Do you see, sir, that this is a transcript of proceedings that were held in a criminal matter on October 8, 2020?

A. Yes.

Q. And do you see that the subject of that matter was Mr. Dupre?

A. Yes.

Q. Can you turn to page 8 of the document, which ends 3522. And do you see from the top, sir, that this is a correspondence between the Court and Mr. Dupre?

A. Yes.

Q. And so you understand that this is



Page 234

Mr. Dupre's testimony before the Court, correct?

A. Yes.

Q. And it would be your expectation that Mr. Dupre was testifying honestly, correct?

MR. REED:

Object to the form.

A. I can't say that.

MR. STAMEY:

Objection to the form of the question.

BY MR. MARDIAN:

Q. Do you have any reason to doubt that he would be testifying honestly?

A. I can't give you my opinion on his testimony one way or the other.

Q. So the answer is you don't have any reason to doubt it, correct?

MR. REED:

Object to form.

A. No, that's not my answer.

MR. STAMEY:

Make my objection continuing.

BY MR. MARDIAN:

Q. Do you see at line 7 Mr. Dupre testifies, "This matter that's going on, like I'm

Page 235

trapped in the crossfire with the Eunice Police Department"?

A. I must be on the wrong page.

Q. Sorry, I may have flipped to the next. It's page 9, Bates-stamped 3523.

A. Okay. Line 7?

Q. Correct.

He writes -- or, excuse me, he testified, quote, "This matter that's going on, like I'm trapped in the crossfire with the Eunice Police Department."

Do you see that?

A. Yes.

Q. Do you have any understanding of what he was referring to there?

A. I don't know what he's talking about. I mean, I'm not in his head.

Q. And then at line 15 do you see there's a question from the Court that is, quote, "And isn't it" -- excuse me. This is not from the Court, this is from his -- one of the attorneys.

It says, "And isn't it true -- is it true that you had some recent interactions with the detective on both of these matters?"

And he replies, "Yes, sir."

Page 236

A. I see that.

Q. And then do you see the attorney asks at line 24, "Detective Fontenot, correct?"

And he replies, "Yes, Victor."

A. I see that.

Q. And then he -- the testimony continues, and at line 30, Mr. Dupre testified, "All right, this is what's going on. My name got drawn in, something with Officer Dunn. Something about I'm paying Officer Dunn."

Do you see that?

A. Yes.

Q. Do you have any understanding of what Mr. Dupre was testifying to there?

A. I have an opinion about what I think he's talking about.

Q. And what is that?

A. There was a statement made by Mr. Dupre that he was paying Lieutenant Dunn I think like a thousand dollars a month for information.

Q. And where was that statement made?

A. I think it was made at the -- at our CID office for the police department, I think that's where it was.

Q. And did EPD do any investigation to

Page 237

determine whether that was a truthful statement or not?

A. No. I think the State police may have been involved in that one.

Q. Was that something that EPD solicited the State police's assistance on?

A. The information was turned over to the State police, and they were asked to look at it to see if there was any validity to the allegations being made by Mr. Dupre.

Q. Do you know who turned over the information to the State police?

A. I don't remember right now. But it was with my approval, because I did discuss it with I think Lieutenant Young because he was the chief of detectives for us. And if I'm not mistaken, I think the State police were at the office when that statement was made. I'm not sure though, but it was my understanding that they were there.

Q. Do you know if the State police ever reached a conclusion to that investigation?

A. I don't know how deeply they got involved in the investigation or if they ever -- but I know no -- I don't believe any action was taken on that information. Maybe they couldn't



Page 238

validate it, they couldn't corroborate the statement or anything. I don't know what the case was. You'd have to ask them.

Q. You never followed up with them?

A. I did follow up with them, but the information was very -- it just -- nothing ever developed of it. Nothing ever happened with it that I know of.

Q. So just so that I'm clear, EPD provided certain information to the State police, right?

A. Right.

Q. And then it's your understanding that the State police conducted an investigation, right?

A. Right.

Q. And then at a certain point you followed up to see what the progress on that investigation was; is that right?

A. I did -- yes.

Q. And it's just that you don't recall what they told you?

A. I don't remember exactly what was told. But I know nobody was ever charged criminally and there was no disciplinary action taken, so I'm assuming there was no evidence to substantiate the

Page 239

allegations that were being made.

Q. Apart from the State police investigation, did EPD conduct its own internal investigation?

A. No, not that I -- not that I remember.

Q. Okay. So returning to the court transcript that we were looking at, you see on the next page ending 3524 the attorney asks, "Who is Officer Dunn?" And the Court replies, "Lieutenant Mike Dunn with the Eunice Police Department."

Do you see that?

A. Yes.

Q. So is it your understanding that when Mr. Dupre referred to "Dunn" in this testimony, he was referring to Lieutenant Michael Dunn?

A. Yes.

Q. At line 28, do you see that Mr. Dupre testified, quote, "Detective Victor. He's threatening me, riding along my house every day. Man, I'm talking about -- I got text messages in my phone from him telling me he was going to put these new charges on me for me not to get out and that I have a hold on me. That he's coming with new charges, a possession with intent is nine-tenths of the law, sir."

Page 240

Do you see that?

A. Yes.

Q. Do you have any understanding of what Mr. Dupre was talking about here?

A. No.

Q. You don't have any understanding of why he said that Detective Victor Fontenot was threatening him?

A. I have no -- no understanding of this at all.

Q. You don't have any understanding of what he meant by Victor Fontenot was, quote, riding along his house every day?

A. I don't know what he's talking about.

Q. You don't know what he meant about the text messages in his phone telling him that he was going to be -- going to put these new charges on Mr. Dupre?

A. I don't -- it sounds like a criminal trying to get out of a probation violation.

Q. When was the first that you had heard of the proceeding that this transcript is from?

A. Shoot, I don't remember when I first heard. But I didn't know this was happening when it happened, so it was sometime later that I

Page 241

learned of this, and I don't even remember when that was.

Q. So you saw at the top this was in October of 2020.

Do you recall that?

A. Yes.

Q. And you did learn about it eventually. Today is not the first time that you're hearing of that, correct?

A. No, I've heard of this -- I don't even remember ever reading this transcript before, but I've heard of this hearing, yes.

Q. And this hearing was discussed in Officer Fontenot's deposition in the summer of 2022.

Do you recall that?

A. No.

Q. You don't recall sitting and listening to his testimony about this very transcript?

A. I remember sitting in his deposition, but I don't remember the content of the testimony.

Q. And so you don't, therefore, understand whether that was the first time that you heard about this transcript, correct?

A. I don't know.



Randy Fontenot

Page 242

Q.  So it could have been before, it could have been after?

A.  Yeah.

Q.  On page 3525, do you see at line 12 the attorney says, "Wait, hold on.  What does the detective -- what does he want you to do?  What is he looking for you to do?"

Do you see that?

A.  Yes.

Q.  And do you see that Mr. Dupre testified, quote, "He really thinks that I got some information that make -- some information about me paying Dunn money, 'cause like they got some altercation going on in the Eunice Police Department right now."

Do you see that?

A.  Yes.

Q.  Do you have any understanding of what he was discussing -- referencing there?

A.  About paying Dunn the money?  Yeah, apparently he's talking about the statement he wrote.

Q.  And that's the same statement that you were referring to earlier in connection with the State police investigation, right?

Page 243

A.  Yes.

Q.  And then Mr. Dupre continues, quote, "Like Victor, Ryan Young, and the chief, they all beefing with Dunn; and like, I'm in the middle of it, like I'm on Dunn's side.  So he threatened me, telling me I need to give him some information on Dunn so they can get rid of his ass, his butt, or whatever, something like that."

Do you see that?

A.  Yes.

Q.  Do you have any understanding of what Mr. Dupre was testifying to there?

A.  Apparently something that somebody told him.  I don't know how he could know anything about any conflict between Victor, Ryan, or me or Dunn if somebody didn't tell him that.  And if he says he's on Dunn's side, apparently Dunn must have been talking to him.  I don't know.

All I know is that he made this statement against Dunn when he was in trouble with Victor.  Apparently, like criminals do a lot of times, they like to throw things out there.  Hey, look, I know you're getting me on this, but I've got information for you; if you help me out with these charges, I'll give you this information;

Page 244

thus, the statement from him about Dunn being paid.

Then later I do remember this.  They got Dupre again.  Victor is there again.  Dunn drives up.  Again, Dupre is in trouble with the law, so he's trying to get himself out of trouble again.  He hollers at Dunn, Hey, Dunn, they trying to make me say things about you.

So he's trying to maneuver his way out of problems and he's pitting the police against each other, which is what criminals do a lot of times when they find themselves in a bind, they try to throw you off course and give you something else that they think you might want to hear.

Q.  You suggested in that answer that Lieutenant Dunn was speaking with Mr. Dupre; is that correct?

A.  Somebody was.

Q.  But you have no basis to draw that conclusion, correct?

A.  Just Dupre's testimony here.

Q.  But he doesn't say that he was speaking with Lieutenant Dunn, correct?

A.  No.  He says he has information that he's getting from somebody.

Page 245

Q.  He does say that Victor was threatening him, correct?

A.  He says that.

Q.  And so it stands to reason that he was talking to Victor, right?

A.  Stands to reason --

MR. STAMEY:

Object to the form of the question.

A.  Stands to reason that he's stating that Victor was talking to him.

BY MR. MARDIAN:

Q.  Do you have any reason to doubt the accuracy of his statement, that Victor, Ryan Young, and the chief were all beefing with Dunn?

MR. REED:

Object to form.

A.  Again, that's his testimony, that's his opinion.

MR. LOUGHLIN:

Same objection.

A.  I can't deny or confirm or agree with or anything with this.  I don't know.

BY MR. MARDIAN:

Q.  In 2020, would you say that you were beefing with Lieutenant Dunn?



Page 246

A. I don't know. 2020, what was going on then?

Q. So your answer is you don't know?

A. What do you mean by "beefing"?

Q. I'm asking you.

A. Well --

Q. Would you say that --

A. Well, we weren't eating steaks together.

Q. You've never heard someone use the word "beefing" before?

A. I've heard it. It's not part of my vocabulary. I don't use that word.

Q. You've never heard someone use it to describe having an altercation or a disagreement with someone else?

A. Okay, that's where you're going. Okay. Yes, I have heard it used like that.

Q. So assuming that that's the way he was using it here, would you agree that in 2020 you were beefing with Lieutenant Dunn?

A. I'll agree that he said that.

Q. That's not my question. My question is: Would you agree that in 2020 you were beefing with Lieutenant Dunn?

A. I had issues with Lieutenant Dunn and

Page 247

the way he was investigating some cases, the assumptions he was making, the reports he was writing. I don't know if I'd call that beefing.

Now, we didn't argue, per se. We may have had discussions. I didn't agree with a lot of the stuff he was doing. He didn't agree with the stuff I was doing. If you want to call that beefing. But that doesn't really fit the definition that you just gave me.

Q. So you would agree that while you were chief of police, you and Lieutenant Dunn had disagreements; is that fair?

A. I had disagreements with many officers.

Q. One of which whom was Lieutenant Dunn, correct?

A. Yes.

Q. Would you say that you agreed with him more than you disagreed with him?

MR. REED:
Object to form.

A. I don't know. We had a lot of disagreements, but we had a lot of agreements as well.

BY MR. MARDIAN:

Q. But you took issue with many things that

Page 248

he did, right?

MS. WALL:
Object to the form.

A. I took issue with his reports, some of his investigations, and his interpretations of certain policies and laws.

BY MR. MARDIAN:

Q. Did you ever take issue with Officer Fontenot's reports?

A. I probably did.

Q. But sitting here today --

A. I can't remember anything specifically.

Q. Did you ever take issue with Officer Fontenot's investigations?

A. I may have had questions about some or had talked to him about some, possibly. I can't remember anything specific again.

Q. But having questions about an investigation is distinct from taking issue with the investigation, right?

A. Well, not -- no, I can have an issue with it and still question it, and to me it's about the same. If I have an issue with it, that means I might not agree with it or I might agree with it but I want you to do it a different way or

Page 249

I prefer it done a different way.

Q. So when you said that you had issues with Lieutenant Dunn's investigations, that just meant you had certain questions about them?

A. I had questions about it and -- and -- yeah.

Q. But you never thought they were being done incorrectly?

A. Well, no. I wouldn't have had questions if I thought they were being done incorrectly or correctly.

Q. Okay. So you also then thought that some of Officer Fontenot's investigations were being done incorrectly?

MS. WALL:
Object to form.

MR. REED:
Object to form.

A. No, I didn't say that.

BY MR. MARDIAN:

Q. Okay. Then let me ask you. Did you ever have -- did you ever believe Officer Fontenot's investigations were being done incorrectly?

A. I can't think of any that I would have.



Page 250

Q.  Did you ever have issues with Officer Fontenot's interpretation of policies and laws?

A.  No, not that I can remember.

Q.  Do you have any understanding why Mr. Dupre testified that Ryan Young was trying to, quote, get rid of his ass?

MR. REED:

Object to form.

A.  I don't know.

BY MR. MARDIAN:

Q.  If you skip ahead to the page ending 3528, do you see that the attorney asked Mr. Dupre, "So, long story short --" and Mr. Dupre replied, "Officer Dunn filed a lawsuit on the City of Eunice, and when I seen that in the newspaper, I said, aw, it's about to go down.  I know he about to mess with me, and bam, there it is.  He came met me the other day."

Do you see that?

A.  Yes.

Q.  Do you know where he's -- know who he's referring to when he says I know "he" about to mess with me?

A.  No.

Q.  If you look at the previous page -- and

Page 251

you're free to look at any portion of this -- but is it your understanding that by "he" he's referring to Officer Fontenot?

A.  I have no understanding about who he's referring to.

Q.  So you don't have any understanding why he said -- why Mr. Dupre said "Officer Dunn filed a lawsuit on the City of Eunice, and when I seen that in the newspaper, I said, aw, it's about to go down.  I know he about to mess with me, and bam, there it is.  He came met me the other day";  is that right?

MR. REED:

Object to form.

A.  I don't know how you get that he's referring to Officer Fontenot in that.

BY MR. MARDIAN:

Q.  You have no reason to doubt what Mr. Dupre is testifying to here is accurate, right?

MR. REED:

Object to form.

A.  I can't say either way.  I have no idea what he's talking about.

Page 252

BY MR. MARDIAN:

Q.  You would agree with me that if what Mr. Dupre said here was accurate, it would present serious concerns about Officer Fontenot's fitness for office at EPD, right?

MR. REED:

Object to the form.

A.  No, I'm not going to agree with you on that.

MR. STAMEY:

Object to form.

BY MR. MARDIAN:

Q.  So if Officer Fontenot had been threatening a member of the public, that would not present a concern with his fitness for office?

A.  Give me a specific case and I can answer that question.

Q.  So there are certain instances in which an officer is permitted to threaten a member of the public?

MR. REED:

Object to form.

A.  I never said that.

BY MR. MARDIAN:

Q.  Well, you asked for a case, right?

Page 253

A.  You're asking me to agree with your opinion and some hypothetical.  I'm not going to do that.

Q.  No.  I'm asking you if Officer Fontenot had threatened a member of the public, if that would be in keeping with EPD policy?

MR. REED:

Object to form.

MR. STAMEY:

Same objection.

A.  You want me to answer a question about something that doesn't exist.

BY MR. MARDIAN:

Q.  Well, Mr. Dupre, in sworn testimony, said here that Victor Fontenot did threaten him.

We can agree on that, right?

A.  What -- show me where he said that.

Q.  On 3525, line 18 to 19.  "So he threatened me."

A.  I don't know who he's talking about there.

Q.  Well, the question is about the detective, right?  You see that?

A.  What does the detective -- going back to line 12?

Randy Fontenot

January 30, 2025
Pages 254 to 257

Page 254

Q. Yeah.

A. Okay. I don't know what detective he's referring to right there.

Q. Earlier we clarified that that was Detective Victor Fontenot, right?

A. I don't know. Let's go back and see where it says that and if they're talking about that.

Q. Okay. Line 30 -- page 3524, the page right before, line 28. You see it says, "Detective Victor," right?

A. There he does say that, yes.

Q. In fact, there it says, quote, "Detective Victor, he's threatening me."
Do you see that?

A. I see that.

Q. And so you agree that what this document shows is that Mr. Dupre, in sworn testimony, said that Victor Fontenot was threatening him, right?

MR. STAMEY:
Objection to the form of the question.

MR. MARDIAN:
What is the basis?

MR. STAMEY:

Page 255

Speculation and repetitive nature of your questioning.

MR. MARDIAN:
Okay.

A. I can't agree with it. He said that in court. Doesn't mean I agree with it.

BY MR. MARDIAN:

Q. And because he said it in court, it was subject to penalty of perjury, right?

A. Yes. Doesn't mean he wasn't lying.

Q. You learned about this transcript at a certain point over the past few years, right?

MR. REED:
Object to form.

A. Repeat that question.

MR. MARDIAN:
What is the basis for that objection?

MR. REED:
The last few years, is that the last two years? The five years?

MR. MARDIAN:
The witness can --

MR. REED:
I'm just making an objection for the

Page 256

record.

MR. MARDIAN:
Okay.

A. And my answer to that question worded that way is no.

BY MR. MARDIAN:

Q. You never learned of this transcript, is your testimony?

A. Not four or five years ago.

Q. Okay. Let's break it down.
At some point you did learn about this; you testified to that previously, right?

A. I did learn about the transcript, yes.

Q. And you at least learned about it when we deposed Victor in summer of 2022, right?

A. I don't remember if it was brought up, it probably was, I just don't recollect that.

Q. Okay. So if it was brought up and it was an exhibit to his deposition, you would agree with me that you were sitting there, you heard the testimony about these -- this legal proceeding, right?

MS. WALL:
Objection to form.

A. I was at Victor's deposition. I heard

Page 257

at that time what was being said. I don't remember all the context.

BY MR. MARDIAN:

Q. You were the chief of police at that time of EPD, correct?

A. In 2020?

Q. 2022.

A. Yes.

Q. Did you take any action with respect to Victor Fontenot after his deposition regarding this transcript?

A. No.

MR. MARDIAN:
Should we take a break?

MS. WALL:
Yeah.

THE VIDEOGRAPHER:
Off the record at 3:43.
(A break was taken.)

THE VIDEOGRAPHER:
We are back on the record at 3:55.

BY MR. MARDIAN:

Q. Chief Fontenot, do you ever delete text message communications from your phone?

A. Now, yes.



Page 258

Q.  And do you ever delete text message communications regarding your work?

MS. WALL:

Objection to the form.

A.  My current job?

BY MR. MARDIAN:

Q.  Are you currently retired or employed? I don't know if I've asked you that.

A.  Well, I'm retired from the City, but I am also employed full-time.

Q.  And you testified earlier that you had phones (sic) regarding your role as chief of EPD on your personal phone, right?

MS. WALL:

Object to the form.  Can you rephrase.

A.  Yes, please.

BY MR. MARDIAN:

Q.  Earlier we were talking about if you ever texted for work purposes.

Do you recall that?

A.  Yes.

Q.  We were looking at a text between you and the mayor about the budget.

Do you recall that?

Page 259

A.  Yes.

Q.  And you had mentioned that you used your phone to communicate with the mayor about EPD, right?

A.  Yes.

Q.  Did you ever text officers at EPD?

A.  Yes.

Q.  And any of those communications, do you have any recollection of deleting any of those?

A.  No.  I had to keep all that.  That was all public record.  My phone was a public phone, it was the City's phone.

Q.  Okay.  And so the texts between you and the mayor, that was on the City's phone?

A.  Yes.

Q.  And --

A.  That's the only phone I had at the time.

Q.  Gotcha.

And when you retired from EPD, did you give that back to the City?

A.  I got a new phone.  I kept the phone number, but I did get a new phone.

Q.  Do you know what happened to the phone you used while you were chief of police?

A.  I think it went back to AT&T, if I'm not

Page 260

mistaken.

Q.  So did you have like a bring-your-own-device policy at EPD?  By that I meant did you have a phone that, you know, you got from AT&T and then you used that for work purposes and for personal purposes?

MS. WALL:

Object to form.

A.  Yes, I only had that one phone.

BY MR. MARDIAN:

Q.  Okay.  And you now have a different phone, right?

A.  Yes.

Q.  Okay.  So the first phone that you had at EPD, you gave that back to AT&T?

A.  I think so, yes.  Something happened to it.

Q.  Do you know if, when you gave it back, if you transferred the data from your old phone to your new phone?

A.  My contacts and stuff, yes.

Q.  Did you transfer your text messages?

A.  I think I did.  But all of the text messages on that phone, that was all given to my attorneys when this all first came up, when this

Page 261

lawsuit started.  They made me send everything I have on my phone to them.  So that should be -- y'all should have records of that.

Q.  So how did you do that?  How did you send them your text messages?

A.  Oh, I don't know.  But it was a process, and I had a hard time with it because I wasn't used to doing that.  I had that and emails that I sent to them.  I know I spent hours.  I might have sent it -- I might have copied it, sent it -- I don't remember how I did it.

I don't remember if I did screenshots of it and then emailed it or -- I'm not sure how I did it.  I'd have to go back and look at all that.

Q.  Earlier we saw a screenshot on an email.

Do you recall that?

A.  Yes.

Q.  Do you think that's what you did, you put the screenshots in an email and then you sent it?

A.  That may be what I did, because I think that would probably be the easiest way I would know how to do it, especially when there was so many emails and text messages involved.

Q.  And you did it yourself; is that right?



Randy Fontenot                                                    January 30, 2025
                                                                 Pages 262 to 265

Page 262

A.  I probably enlisted the help of somebody else in the department that had more knowledge in electronics and stuff than I did.

Q.  And how did you determine what to send to your lawyers?

A.  I sent everything -- they told me what to send.

Q.  Okay.  I don't need to know your communications with them.

A.  No.

Q.  But you had a communication with them and then sent them specific information; is that fair?

A.  Right.

Q.  Earlier today you brought out some documents that you brought with you.

Do you recall that?

A.  Yes.

Q.  And you -- correct me if I'm wrong, but you looked at those yesterday or the day prior in preparation for today's deposition, right?

A.  Yes.

Q.  Okay.  So we will request that you provide us those documents so that we can take a look during the break.

Page 263

MS. WALL:

He can.  During the break or you're going to do it now?  What break?

MR. MARDIAN:

The next break we take, we'd like to take a look at the documents so we can ask him about them.

MS. WALL:

Okay.  But you can look at them now and see if they're relevant.  They're very short.  They're very short.

MR. MARDIAN:

Okay.  So happy to...

MS. WALL:

Yeah.

(Witness provided documents.)

BY MR. MARDIAN:

Q.  Thank you.

Okay.  Now, returning to this transcript we were looking at, if you flip ahead a few pages --

MS. WALL:

I'm sorry, are we still in the Walt -- I mean, the Buddy Dupre thing?

MR. MARDIAN:

Page 264

Correct.

BY MR. MARDIAN:

Q.  -- to the page ending 3533.

And do you see, sir, that this is a transcript of a bond revocation hearing that was continued from October 8, 2020?

A.  Yes.

Q.  And do you see two pages in, on 3535, that Detective Victor Fontenot was called as a witness?

A.  Yes.

Q.  Do you know why he was called as a witness?

MR. REED:

Object to form.

A.  No.

BY MR. MARDIAN:

Q.  Did you ever ask him?

A.  No.  I don't even recall this bond revocation hearing.

Q.  If you go to 3536, do you see at the top of the page the Court says, "All right.  Did you seize a phone from him at that time?"

A.  Yes.

Q.  And do you see right above that there's

Page 265

a reference to the defendant, Joshua Dupre?

A.  Yeah.

Q.  So do you understand that the court is asking Officer Fontenot about Mr. Dupre's phone?

A.  That's what it appears to be, yes.

Q.  And Officer Fontenot replies that he seized two phones, right?

A.  Yes.

Q.  And the Court says, "And they were seized pursuant to a warrant?"

Do you see that?

A.  Yes.

Q.  Officer Fontenot replies, "No, sir."

A.  Yes.

Q.  And the Court says, "So they were taken into his personal belongings custody, right?"

A.  Yes.

Q.  And Detective Fontenot replies, "They were taken in and were going to be presented as evidence.  Warrants were going to be --"

And the Court says, "No, no.  How were they taken in without a warrant, is my question?"

And there's no response from Victor Fontenot.

Do you see that?



MAGNA
LEGAL SERVICES

Randy Fontenot

January 30, 2025
Pages 266 to 269

Page 266

A.  Yes.

Q.  And you see the Court says, "I didn't sign a warrant for them and I wasn't on the bench at the time of the arrest."

Do you see that?

A.  Yes.

Q.  And so then Victor Fontenot says, "Right."

And the Court says, "So under what authority did you take the phones?"

And there's no response.

Do you see that?

A.  Yes.

Q.  Do you recall that we discussed this testimony at Officer Fontenot's summer 2022 deposition?

A.  I do not recall this specifically.

Q.  Sitting here today, do you find it concerning that there's been two questions to the court to Detective Victor Fontenot for which he had no response?

A.  Yeah, he had no response.  I don't know what his answer would have been.  I'm not familiar with this at all.

Q.  As chief of EPD, when your officers go

Page 267

into court, you expect them to respond candidly and truthfully to the court's questions, right?

A.  Yes.

Q.  And do you see on the next page, or before that, the Court says, "I simple (sic) need to know."

And on the next page Detective Victor Fontenot replies, "I guess we didn't have the authority."

Do you see that?

A.  Yes.

Q.  That is a -- it is a violation of EPD policy to take an individual's property without authority, right?

A.  Yeah, you have to have some type of authority to take their property or to seize it.

Q.  And so if an officer takes property without proper authority, that violates EPD policy, right?

A.  It would be a violation, yes.

Q.  And it would be subject to discipline, right?

A.  Possibly so, yes.

Q.  It also would violate the individual's Fourth Amendment rights, right?

Page 268

MS. WALL:

Objection to the form.  You can -- I mean, you can answer.

A.  I mean, I'm not knowing all of the circumstances of this incident, but possibly so.

BY MR. MARDIAN:

Q.  Well, you understand here that Officer Fontenot has told the Court that he did not have authority to seize Mr. Dupre's two phones, correct?

A.  I see that.

Q.  And, therefore, you would understand that Officer Fontenot violated Mr. Dupre's Fourth Amendment rights under the constitution, correct?

MR. REED:

Object to form.

MS. WALL:

Object to form.

A.  That's not for me to decide right there.  That's for the Court to decide.  He was in a court hearing, not an internal affairs investigation at this point.

BY MR. MARDIAN:

Q.  Did EPD ever instruct its officers on citizens' Fourth Amendment rights?

Page 269

A.  They go to the police academy.  They have training in that.  And there's continuing education training as long as -- and that's covered in a lot of trainings.

Q.  And that's covered in a lot of trainings because you don't want your officers violating citizens' Fourth Amendment rights, correct?

A.  Correct.

Q.  And do you ever instruct on those trainings?

A.  I'm not an instructor.

Q.  But if an officer were to come to you and seek guidance on a search and seizure and whether it was proper, would you be able to provide any?

MS. WALL:

Object to the form.

A.  I could provide guidance.  I'm not an attorney, I don't give legal advice.  But I could provide guidance as far as policy.

BY MR. MARDIAN:

Q.  And some of that guidance could be, if you want to seize an individual's personal belongings, you have to have authority to do so, correct?



Randy Fontenot

January 30, 2025
Pages 270 to 273

Page 270

A. Yes.

Q. And so you could come to a conclusion as to whether Officer Fontenot violated Mr. Dupre's Fourth Amendment rights, correct?

MR. REED:

Object to the form.

MS. WALL:

Object to the form.

A. I'm not going to come to that conclusion. For one, Joshua Dupre is not suing me for violation of his civil rights. I mean, what does this have to do with the lawsuit? I don't understand it.

BY MR. MARDIAN:

Q. Fair enough.

It would also violate Mr. Dupre's right under the Louisiana State constitution for his -- to have his property seized without authority, correct?

MR. REED:

Object to the form.

MS. WALL:

Object to the form.

A. I'm not privy to all of the facts of this case.

Page 271

BY MR. MARDIAN:

Q. But you are privy to the fact that Officer Fontenot, one of your employees, testified in court that he had no authority to conduct a seizure that he conducted, correct?

A. He testified to that. But I'm not going to give you a legal opinion, I'm not going to give you a judgment. That's for a judge to do. I'm not -- I don't have all of the facts before me.

You can take statements out of context, you can take a piece of a statement and try to make something of it. I don't have everything before me, and I'm not trying to make a judgment on this particular case because I knew nothing about it, I have nothing to do with it.

Q. Did you ever discipline Officer Fontenot for his conduct here?

MS. WALL:

Objection to the form.

A. I never knew this occurred.

BY MR. MARDIAN:

Q. You never knew it occurred?

A. I haven't seen this transcript until now, that I can remember. I don't ever remember seeing this before.

Page 272

Q. You don't recall discussions about this during Officer Fontenot's deposition?

MS. WALL:

Object to the form.

A. I don't. I don't remember what all was discussed. I know there was a lot of stuff pertaining to the lawsuit. I've attended a lot of depositions since. Who said what in what deposition without having it transcribed and presented to me, I can't tell you.

BY MR. MARDIAN:

Q. But you attended Officer Fontenot's deposition, right?

A. Yes, I did.

Q. You sat there and you listened to the testimony, correct?

A. I did.

Q. And so if, in fact, it was -- this transcript was discussed, you have no reason to dispute that you, in fact, heard testimony regarding this transcript, correct?

MR. REED:

Object to form.

A. I don't know. I don't know if I heard this.

Page 273

BY MR. MARDIAN:

Q. Would it concern you if you did hear this and then did not implement any disciplinary conduct for Officer Fontenot?

MR. REED:

Object to form.

A. The judge heard this. The judge never brought it to my attention.

BY MR. MARDIAN:

Q. Is it your opinion, sir, that judges are to bring to your attention everything that goes on in their courtrooms?

A. Not everything. But I think if it's something that involved me or something that I should know about, that they would bring it up.

Q. Do you see later down the page the Court says, "All right. The Court finds that they were not taken pursuant to lawful authority. As a result, I'd like to return them to the defendant"?

Do you see that?

A. Yes.

Q. And just to confirm, Officer Fontenot was never disciplined for any of this conduct described in this transcript, correct?

MS. WALL:



Randy Fontenot

January 30, 2025
Pages 274 to 277

Page 274

Object to the form.

A.  Not that I know of.

BY MR. MARDIAN:

Q.  You didn't discipline him, correct?

A.  I did not.

Q.  If we go ahead to the page ending 3540, I have a question for you about what's written at the end.

But first, do you see that this entire paragraph is from what the Court was saying?

A.  Yes.

Q.  And do you see the last sentence, four lines up, it says, "Now that you're under oath, let me ask you, did you ask Judge Meche not to revoke that bond in the 19-M-1788-C docket number?"

A.  Yes.

Q.  Do you see Detective Fontenot replies, "No, sir"?

A.  Yes.

Q.  And you see the Court replies, "You're sure about that?  You're under oath.  I'll bring Judge Meche in here if I need to."

A.  Yes.

Q.  And then Officer Fontenot replies, "Did

Page 275

I ask him not to revoke?"

And the Court says, "Not to revoke the bond of the previous arrest."

Do you see that?

A.  Yes.

Q.  And you see that Officer Fontenot then says, "Yes, sir, I did."

A.  Yes.

Q.  So do you understand, sir, or --withdrawn.

Do you have any prior recollection of reviewing this transcript?

A.  No.

Q.  Do you understand, sir, that Officer Fontenot initially said that he did not revoke the bond or did not advocate that the bond be revoked, but then after the Court pressed him on it and was going to bring in another judge to corroborate whether that occurred, he changed and said that he had?

A.  Well, I see where he asked the judge for confirmation, like did I ask him not to revoke.  And then he responded, Well, if the judge said I did, I guess I did.  That's what I'm getting out of this.  I don't know.  I wasn't there to witness

Page 276

that testimony, so I don't know how it went down.

Q.  And I'm assuming, when you heard about this during Victor Fontenot's deposition, it didn't concern you then either, correct?

MS. WALL:

Object to the form.

A.  Well, you're assuming I heard it.  I never said I did.

MR. REED:

Same objection.

BY MR. MARDIAN:

Q.  If you sat in the room during that deposition, there's no reason to doubt that you, in fact, heard it, correct?

MS. WALL:

Object to the form.

MR. REED:

Object to the form.

A.  Yes, there's a reason to doubt that I heard it.

BY MR. MARDIAN:

Q.  What's that?

A.  I could have been looking at my phone.  I could have been answering my email.  I could have stepped out for a minute.  I could have -- a

Page 277

lot of reasons.  There's a lot of times I was getting actually bored in some of those depositions, and I didn't pay attention to everything that went on.

Q.  Understood.

If you move ahead to page 3546, do you see the larger paragraph at the bottom?  The Court says, "And I take my job extremely serious.  Something is not passing my smell test."

Do you see that?

A.  Yes.

Q.  And at the bottom it says, "Sounds to me like he was being milked for something that he wasn't giving, and all of a sudden, as a result of that, here comes the October arrest.  That's what it smells like."

Do you see that?

A.  Yes.

Q.  Sir, does it concern you at all that a court told one of your officers that what he was telling him, quote, did not pass the smell test?

MR. REED:

Object to form.

A.  That's a judge's opinion.  I don't know what was going on in the judge's mind.  Again, I



Randy Fontenot

Page 278

don't know all of the facts of this right here. So I can't say one way or the other what the judge is thinking at that time.

BY MR. MARDIAN:

Q.   And you never disciplined Officer Fontenot in connection with any of that conduct either, correct?

A.   No.  I didn't know about it.

Q.   Did Officer Fontenot ever bring any of this to your attention?

MS. WALL:

Object to the form.

A.   Not that I recall.

BY MR. MARDIAN:

Q.   You had mentioned earlier that Mr. Dupre had made some statement implicating Dunn in improper conduct.

Do you recall that?

A.   Yes.

Q.   And you referred to the Louisiana State Police, an investigation involving conduct between Lieutenant Dunn and Mr. Dupre.

Do you recall that?

A.   Yes.

Q.   So Mr. Dupre was the subject --

Page 279

withdrawn.

Mr. Dupre was involved in that investigation, correct?

A.   Well, he was the subject of the investigation.

Q.   He and Lieutenant Dunn were the subjects of that investigation?

A.   Yes.

Q.   So Mr. Dupre and the information that he was providing you were important to that investigation, right?

A.   Mr. Dupre wasn't in -- giving me any information.  I didn't talk to him.

Q.   He talked to Victor?

A.   He spoke to Victor.

Q.   And then Victor told that to you, right?

A.   I don't remember if it was Victor -- I think it was probably Ryan that told me about it, being Victor's supervisor, he came to me.

Q.   And after they came to you and brought accusations of Lieutenant Dunn engaging in illegal conduct, you never thought to talk to Mr. Dupre about it?

MS. WALL:

Objection to form.

Page 280

A.   I'm not going to interfere with an investigation that I've asked the State police to take care of.

BY MR. MARDIAN:

Q.   But was it even an investigation at that point?

A.   The information was turned over to the State police.  It was their decision to make on whether they were going to do the investigation or not based on the information that they had provided to them.

Q.   So Officer Fontenot brought certain information to you, and you decided at that point to pass it along to the Louisiana State Police; is that right?

MS. WALL:

Object to the form.

A.   Lieutenant Ryan Young brought certain information to me.  Lieutenant Ryan Young and I discussed it and thought it would be best to have the State police investigate it.

BY MR. MARDIAN:

Q.   And you didn't think it was important enough to talk to Mr. Dupre about?

A.   I thought it was important enough for

Page 281

the State police to be notified and for them to look at it.  I was not going to speak to Mr. Dupre and interfere with an investigation that the State police may be handling.

Q.   When did it become an investigation?

MS. WALL:

Object to the form.

MR. REED:

Object to form.

A.   You'd have to ask the State police when and if they did an investigation and when it started.

BY MR. MARDIAN:

Q.   Well, you just said that you weren't going to interfere with an investigation, right?

A.   Or a possible investigation.  I wasn't going to interfere with something that I was referring to the State police.

Q.   And why would talking to Mr. Dupre have interfered with that investigation?

A.   Because it's not common practice, it's not good practice, for more than one person at separate times to investigate a suspect or interview a suspect about a case.  It's just not the right thing to do, especially multiple



Randy Fontenot

Page 282

agencies.

Q.  Did you believe that Lieutenant Dunn was engaging in the improper conduct that you understood Mr. Dupre to have been accusing him of?

A.  I couldn't develop an opinion on that until I had information such as an investigation from the State police.

Q.  At that time, when the State police was conducting its investigation, was Lieutenant Dunn employed by EPD?

A.  Yes, he was.

Q.  Was he working at EPD?

A.  Yes, he was, as far as I know.

Q.  When --

A.  I think he was.

Q.  When Lieutenant Dunn posted the Facebook post in August of 2019 that we looked at this morning, he was placed on administrative leave, right?

A.  Yes.

Q.  Why was he not placed on administrative leave for the investigation you referred to the Louisiana State Police?

MS. WALL:

Object to the form.

Page 283

A.  Because we did not have -- I did not have enough information to make that decision to place him on administrative leave or, at that time, to conduct an internal affairs investigation.

I was not going to start an internal affairs investigation until after a criminal investigation had been complete.  And one reason is because if we do an internal affairs investigation, that information cannot be used in a criminal investigation, but yet, when a criminal investigation is done, that information can be used in an internal affairs investigation.

So I always prefer, and it was my -- my own policy basically or -- to conduct a criminal investigation first, and if anything developed out of that, we would take that information and we would use that to assist us in gathering information for the internal affairs investigation and possible disciplinary action.

BY MR. MARDIAN:

Q.  Can an officer who's under criminal investigation be placed on administrative leave?

A.  Yes.

Q.  So why didn't you do that here?

Page 284

A.  Because at the time I did not have enough information to start that.  And once we place them on administrative leave, our time limits are constrained.

Civil service law says that we have to complete the investigation -- we have to start an investigation, and complete it.  And once we place them on administrative leave, the investigation --

THE COURT REPORTER:

Can you slow down.

THE WITNESS:

I'm sorry.

A.  The investigation has to be completed within a certain amount of time, and that has to start once he's placed on administrative leave.

So it would be wise not to put him on administrative leave if the public wasn't necessarily in danger or the officer was not necessarily in danger until the criminal investigation was complete, then we would start our internal affairs investigation, if evidence was there to.

BY MR. MARDIAN:

Q.  What did you understand the Louisiana State Police to specifically be investigating?

Page 285

A.  The allegations made by Joshua Dupre.

Q.  And what were those allegations?

A.  That he was paying Dunn for information.

Q.  Information on what?

A.  Information on search warrants, when there may be warrants where he was going to be searched, his house was going to be searched; information on narcotics investigations so that he would know when the police might be watching him or coming after him.

Q.  If those allegations were true, that would seriously hinder EPD's ability to do its job, right?

A.  Oh, definitely.  And I can give you one example where we did have a warrant to search Joshua Dupre's residence and Lieutenant Dunn was called to come out with the dog.  Lieutenant Dunn was seen -- he came to the police department was seen on the phone just moments before the search warrant was executed.

And when they arrived at the residence, the piece of furniture that was listed in the search warrant as being inside the residence where the drugs was hidden was placed in the back yard and no drug -- now, how he knew they were coming



Randy Fontenot

January 30, 2025
Pages 286 to 289

Page 286

to search that piece of furniture and to get it out the house and remove the drugs from it before the police got there, I don't know. But it happened pretty quickly.

But he had that particular piece of furniture moved out of the house after the informant left the house. And it just so happened that that happened right after Dunn was notified to come out with the dog, and he was seen on the phone with somebody before they left to execute the warrant.

Q. You understand that Officer Fontenot investigated whether Mr. Dupre was paying Lieutenant Dunn, correct?

A. Wait, repeat that.

Q. Do you have any understanding of while -- of whether Officer Fontenot completed his own internal investigation into whether Mr. Dupre was paying off Lieutenant Dunn?

A. I don't see how that's possible.

Q. You have no understanding of that unofficial investigation that Officer Fontenot testified to having completed?

A. We have no unofficial internal affairs investigations. Civil Service wouldn't allow

Page 287

that.

Q. So if Officer Fontenot was, indeed, engaged in such an unofficial investigation, that would violate EPD policy, correct?

A. Well, I don't know that he did.

Q. If he had, it would violate EPD policy, correct?

MS. WALL:
Object to the form.

A. Definitely.

BY MR. MARDIAN:

Q. And it's your testimony that you have no reason to believe that he was doing that?

A. I'm not aware that he did it, and I have -- yeah, you're right, I have no reason to believe that he did.

Q. And it's your testimony that you didn't hear him testify to that during his summer 2022 deposition; is that correct?

A. I don't recall hearing that.

Q. Officer Fontenot testified in his deposition about a meeting that took place at your house regarding allegations that Lieutenant Dunn was being paid off by Mr. Dupre.

Do you have any understanding of the

Page 288

meeting that Officer Fontenot was referring to?

A. Yes.

Q. And can you describe what took place at that meeting.

A. I don't remember if Officer Fontenot was there, but I do remember Lieutenant Young being there. And he came and met me at the house, and that's when he informed me of this statement that Joshua Dupre wrote.

Q. And what -- do you recall what you said in response?

A. I don't remember exactly what was said, but we discussed that. We discussed how to handle that, what -- what we should do. And I think that's when we decided we needed to contact State police. And I thought it would be best to let the State police investigate that.

Q. Was Lieutenant Young part of that discussion?

A. He was the one that came to my house and talked to me. I don't remember if Victor was there.

Q. I apologize, I may have misheard you.

So you recall a meeting between you and Lieutenant Young, but you may -- you don't recall

Page 289

a meeting with Victor?

A. I don't remember if Victor was there or not.

Q. Okay. Do you know who reached out to the State police?

A. I think I'm the one that reached out to them. Usually in something like that it would be me that would reach out to them and ask them to investigate because, one, I have to -- for one, once we do that, I have to submit a letter.

The sheriff or the State police, when I ask them to investigate something like that, they usually require that I send a letter to them asking them to investigate.

Q. Do you recall sending them a letter in this case?

A. No, I don't. I may have, but I don't remember if I did or not.

Q. If you had, would it likely be at EPD today?

A. It should be. There should be a copy of it probably with that report.

Q. And earlier we were talking about Officer Fontenot's seizure of Mr. Dupre's two phones.



Randy Fontenot

January 30, 2025
Pages 290 to 293

Page 290

Do you recall that?

A.  Yes.

Q.  Do you have any understanding of where those two phones are today?

A.  I have no idea.

Q.  Officer Fontenot testified that they were at a location I believe called CID.

Do you know what that is?

A.  Yes.

Q.  What is that?

A.  That's the -- an office of the police department.  It's at another location.  It's not here.

Q.  Is evidence housed in that location?

A.  Yes, some evidence is housed there.

Q.  Do you have any sense of how long it's kept there?

A.  The evidence?

Q.  (The attorney nodded head.)

A.  It depends on the case and where they are with the investigation and I guess what type of evidence it is.

Q.  And what happens when an investigation is closed?

A.  In reference to?

Page 291

Q.  Just generally.  If an investigation is closed, do you retain the evidence, or what happens to it?

A.  We cannot release the evidence without a court order or a letter from the district attorney authorizing the release.

Q.  And who has access to the evidence that's housed at CID?

A.  That would be the investigating officer who has it stored there.

MR. MARDIAN:

I'm going to mark as Exhibit 9 materials that are produced by the City of Eunice bearing Bates stamp 0001645.

(Exhibit 9 was marked.)

BY MR. MARDIAN:

Q.  Take as long as you want to take a look at this.  My question first will be if you have any recollection of seeing this document before.

A.  The first two sentences, the first part, is cut off.

Q.  Yeah.

A.  Just after reading the first page, I don't know that I've ever seen this report before or not.  But the circumstances are familiar -- I'm

Page 292

familiar with.

Q.  And can you explain that to me, how you're familiar with the circumstances?

A.  Well, some of this was the -- I want to think that part of this is about the search warrant, the execution of the search warrant of Joshua Dupre's residence, the trap house, where the furniture was removed.  I didn't finish reading it, but it looks like it's about that.

Q.  Fair enough.

And you see in the first line that it was written by Detective Victor Fontenot, right?

A.  Yes.

Q.  And as you just testified, it references certain of the conduct that we were just discussing regarding Mr. Dupre's allegations of Lieutenant Dunn being paid off, right?

A.  Okay, that's referenced in here?

Q.  Well, you had connected Mr. Dupre and the trap house and the moved furniture to Lieutenant Dunn previously, right?

A.  Yes.

Q.  And that's being described here.  You see that?  That's what you --

A.  In the fourth paragraph.

Page 293

Q.  And if you --

A.  And I'm saying I think that's the same -- I'm thinking this might be the same incident.

Q.  Fair enough.

And you see at the top that this was dated March 27, 2020.

Do you see that?

A.  Yes.

Q.  And that's describing a phone call that Officer Fontenot had received, right?

A.  Right.

Q.  And then if you go to the page ending 1650, do you see the third paragraph references March 29, 2020?

A.  Yes.

Q.  And that appears to be a separate entry that Victor has listed.

Do you see that?

A.  Yes.

Q.  And then do you see the second paragraph on the bottom says, "Both J. Hill and J. Dupre advised they both pay Dunn for protection from narcotics detectives."

Do you see that?



Randy Fontenot

Page 294

A. No.

Q. Second paragraph from the bottom, first sentence -- I'm sorry, from the bottom.

A. Oh, okay. Yes.

Q. And do you understand, sir, that this is related to the allegations we've been talking about before, that Mr. Dupre was paying off Lieutenant Dunn?

A. That would be my understanding.

Q. Okay. And then you see in the next paragraph a reference to April 8, 2020, that another CI had called Detective Fontenot.

Do you see that?

A. Yes.

Q. And then if you go to the next page, 1652, do you see, second paragraph from the bottom, there's reference to April 9, 2020?

A. Yes.

Q. And Detective Fontenot had again made contact with that confidential informant.

Do you see that?

A. Yes.

Q. And then the next page, second paragraph, you see that Victor Fontenot again made contact with the reliable informant on April 10,

Page 295

2020.

A. With another reliable informant, yes.

Q. And then two paragraphs down there's reference to April 14, that Victor had received another call from a confidential informant.

Do you see that?

A. Yes.

Q. And then there's another reference to April 11 in the next paragraph.

Do you see that?

A. Yes.

Q. And then do you see on the next page, second paragraph from the bottom, there's reference to July 22, 2020, that arrest warrants were granted for Mr. Dupre on two separate incidents.

Do you see that?

A. Yes.

Q. So do you have any reason to doubt that this document, in some manner, reflects Detective Fontenot's notes about the relationship between Mr. Dupre and Lieutenant Dunn?

A. Yes, it does appear to be some documentation by Officer Fontenot about his communications with some CIs where Lieutenant Dunn

Page 296

was mentioned apparently quite often.

Q. And did you ever instruct Officer Fontenot to record his conversation -- withdrawn.

Did you ever instruct Officer Fontenot to summarize his conversations with Mr. Dupre in a written format like this?

A. No. It's common practice to document your communications with your CIs so that you can have a record of it. I mean, it's just good practice to do that. You want to have that record of communication.

Q. So that would be standard practice for any communications with a confidential informant?

A. It should be, yes. And that's why it's marked confidential. These are confidential notes of the investigating officer.

Q. Do you know who the confidential informants that Victor Fontenot was working with on this?

A. No, I do not.

Q. If you go back up to the page ending 1650, do you see at the very bottom it states, "On April 8, 2020, this CI called me and asked if there was a sudden shift change that was to take place on April 10 because Joshua -- J. Dupre had

Page 297

asked the CI that he was getting a, quote, unquote, big shipment of illegal narcotics delivered to 220 Childs or 151 Childs Street on April 9, 2020, just in time for the Easter weekend.

"I think went to the police department and observed the overtime sign-up sheets that were placed on the dispatch wall. I observed that Lieutenant Dunn had taken vacation scheduled for April 9, 2020 through April 11, 2020, and that Lieutenant Kennedy had signed up to take his place."

Do you see that?

A. Yes.

Q. Do you have any independent recollection of the weekend of April 10 and 11, 2020?

A. No. But I vaguely remember something about this. But...

Q. What's that vague recollection?

A. I just -- this is very familiar to me, this information about the big shipment and the Dunn -- and Dunn taking the time off or something. I do remember some discussion about this and the sign-up sheets. But like I said, vaguely, I do vaguely remember that.

Randy Fontenot

January 30, 2025
Pages 298 to 301

Page 298

Q.  So --

A.  And I remember the discussion being something about Dupre was worried because Dunn was not going to be working that weekend, so it kind of -- the assumption was kind of made that he's worried about Dunn not being there, so his protection is going to be gone for the weekend. He's expecting this big --

Q.  And what's your basis --

A.  Like I said, it's an assumption.

Q.  So you didn't have any discussions with anyone about this?

A.  I'm sure I had some discussions about this probably because of the content of this.  I probably did discuss this with my detectives.

Q.  Do you have any -- can you tell me whether that discussion took place before or after this was referred to the State police?

A.  This part wasn't referred to the State police.

Q.  And so can you help me understand the distinction there, what was and what was not referred?

A.  The part where Dunn -- this could have been -- become involved with the investigation, it

Page 299

could have came out.  But what was referred to the State police was the fact that Joshua Dupre made the statement that he was paying Dunn and he wrote that statement down, and we provided the State police with that statement.

Q.  And what we're looking at in this document is related to that same conduct, right?

A.  Well, yeah, this document kind of supports the allegations that Joshua Dupre was making.

Q.  And it's my understanding, and you can tell me if you don't have any independent basis one way or the other, that this is Officer Fontenot's summary of Officer Fontenot's following up an investigation into this same conduct. Do you know whether that's the case or not?

A.  No, no, this is not -- this is notes that Officer Fontenot took of communications that he had.  It doesn't mean that he was performing an actual investigation of an actual crime or event at this time, or incident.  He was taking notes of a conversation he had with an informant.

Q.  Did he ever discuss these communications with the confidential informant with you?

Page 300

A.  This one I'm thinking he may have because I remember it.  He didn't always discuss his stuff with me.  Sometimes he did if he felt it was important and I needed to know; other times he wouldn't.

Q.  And at this -- well, I guess you don't really know if at this time Lieutenant Dunn was under investigation by the Louisiana State Police; is that correct?

A.  I don't know.

Q.  Did you ever take additional information about Lieutenant Dunn to the Louisiana State Police beyond the initial statement?

A.  Not that I remember.

Q.  Can you think of any reason why you wouldn't have?

A.  I didn't have it.  I'm not sure what you're asking me.

Q.  I'm just trying to understand.  So Victor is writing down -- or Officer Fontenot is writing down communications that look to be suggesting improper conduct. We can agree on that, right?

A.  He's writing down information that an informant gave him or told him, that's what he's

Page 301

doing.

Q.  That's suggesting that he's paying off Lieutenant Dunn to protect him in his narcotics dealings, right?

A.  No, he didn't suggest that in this call. As a matter of fact, it wasn't Joshua Dupre apparently that contacted Victor on this.  Victor is talking to another CI here.

Q.  We looked at some additional portion of these notes where he does suggest that Mr. Dupre is paying off Lieutenant Dunn, that's -- we looked at language like that, right?

A.  I guess you could draw that conclusion.

Q.  And I'm trying to understand why that information wasn't then passed along to Louisiana State Police?

A.  I don't know.  Maybe it was.  I don't know.  I didn't -- I wasn't the only one communicating with the State police at that point.

Q.  So it's possible that Officer Fontenot would have been communicating with the police at the same time?

A.  It's possible.  I'm not saying he was, I'm not saying he wasn't.  I don't know.

Q.  Would that have been in compliance with



Page 302

EPD policy?

A.  If he had his supervisors and he was cooperating with a State police investigation, especially on something that -- evidence that he presented to them, yes, that would be in compliance.

That would be like Dunn should have cooperated with them whenever they wanted to speak to him about Officer Miller's infractions.

Q.  This morning we looked at a policy about if an outside organization seeks information about an internal individual's employment or internal files, they need the chief's permission.

Do you recall that?

A.  Wait.  Repeat that.  What's the question?

Q.  Yeah.  I thought that we discussed this morning that there's a policy at EPD that if an outside organization solicits an individual's personnel file, they do need the chief's authorization for that to occur.

Do you recall that?

A.  When they make that request.  Usually it would go to my secretary and my secretary would come to me with the request and I would tell her

Page 303

whether or not this was information that we would release.

Q.  And you don't recall that ever occurring with respect to Lieutenant Dunn in this Louisiana State Police investigation; is that correct?

A.  I don't recall that.  But at that point, Lieutenant Ryan Young was the supervisor of the detective section.  He was the chief of detectives.  He had my consent, my blessings, to do what he needed to do to cooperate with the State police in any investigation.

So he may have been doing this and didn't inform me of every piece of evidence that he submitted to them.

Q.  What do you mean that he had your blessing?

A.  In other words, he had authority from me, he would have consent from me to do it.

Q.  Without expressly receiving it from you, he could act --

A.  He could act independently pretty much with this investigation because I'd instructed him to communicate the information and the facts to the State police that he had so that they could make a determination.

Page 304

And in most cases, my chief of detectives, he would come to me with a lot of stuff, but there were some things that he would act independently because he was the chief of detectives, that was part of his job, to work with outside agencies.  So you could say he had an ongoing consent.

Q.  Did you ever seek audio recordings of phone calls that were made out of any jails?

MS. WALL:
Objection to the form.

A.  Like which jail?

MS. WALL:
Like inmates?

BY MR. MARDIAN:

Q.  Like any.

A.  I reviewed our jail recordings several times.

Q.  What about outside jurisdictions, would you ever ask for recordings from their jails?

A.  In cooperation with the sheriff's office I believe I did once or twice obtain recordings from them pertaining to an investigation.  I don't remember specifically, but it seems like I have done that before.

Page 305

Q.  Was it common or was it only once or twice?

A.  No, I wouldn't do that all the time.  It was just if it was relevant to an investigation we were doing.

Q.  I'm just trying to ballpark how often it would occur.

A.  Not often at all.

Q.  Okay.

(Discussion off the record.)

BY MR. MARDIAN:

Q.  I want to go back to Exhibit 7 for a second.

MS. WALL:
Which one is that?

MR. MARDIAN:
It's the one where the first page is an email with the subject "Police overtime."

BY MR. MARDIAN:

Q.  And if you flip to the second-to-last page ending Bates stamp 3513, do you see at the top is an email from you to Eddie Thibodeaux?

A.  Yes.

Q.  Who's Eddie Thibodeaux?



Randy Fontenot

Page 306

A.  He was the deputy chief with the St. Landry Parish Sheriff's Office.

Q.  And do you see that you wrote, quote, "Per our conversation earlier, we need the recordings of phone calls made from the parish jail by Joshua Dupre on Friday, October 9, between 10:00 and 11:30.  Thank you."

A.  Yes, yes.

Q.  Do you have any recollection of this conversation you had with Eddie Thibodeaux?

A.  No.

Q.  Do you have any recollection of why you were soliciting the phone calls made from the parish jail?

A.  We were probably interested in who he was communicating with and what he was saying pertaining to an investigation.

Q.  Do you have any recollection of what investigation that was?

A.  I do not.  But it obviously involved Joshua Dupre.

Q.  And we looked earlier at the transcript from the Mr. Dupre bond revocation hearing.

Do you recall that?

A.  Yes.

Page 307

Q.  And that hearing, the first one, had taken place on October 8, 2020.

Do you recall that?

A.  I'll take your word for that.

Q.  So this was only four days later, right?

A.  It would have been, yes, if that's correct.

Q.  And your request was for his phone calls the day after that hearing.

Do you recall that?

A.  I requested phone calls between the hours of 10:00 and 11:30 on October 9.

Q.  Which would have been the day after the bond revocation hearing, correct?

A.  If the bond revocation hearing was October 8.

Q.  And this was an uncommon request, as you testified before, right?

A.  When you say "uncommon request," I didn't mean that it was something that was out of the ordinary; I meant that it wasn't -- I didn't commonly request it on a regular basis.  It was something I may have done occasionally.

Q.  You didn't do it commonly, so it was uncommon?

Page 308

A.  I didn't do it on a regular basis all the time, but I did not mean -- let me make myself clear.  I did not mean to insinuate that this was an irregular or uncommon type of request, out of the ordinary.

Q.  Candidly, I'm not following that, but it's your testimony.

Do you see that you receive a reply from Gary Morgan on October 13 saying he has all calls made October 9, right?

A.  I see that Eddie Thibodeaux received that from -- yeah, it was sent to me as well, yes.

Q.  And then on October 13, Gary Morgan says, "Phone calls are being downloaded now and will be available for pickup shortly."

Do you see that?

MS. WALL:
What page is this?  I'm lost.

THE WITNESS:
Yeah, I don't see that.

MR. MARDIAN:
3513, bottom of the page.

A.  Oh, okay, yes, I see that.

BY MR. MARDIAN:

Q.  And then do you see the next page, same

Page 309

day, October 13, you forward this message to Victor Fontenot and Ryan Young?

Do you see that?

A.  Yes.

Q.  Do you know why you were forwarding this information to them?

A.  Not specifically.  I assume they were working on something, fact gathering, and they needed the information.

Q.  That could have been fact gathering regarding allegations that Mr. Dupre was paying off Lieutenant Dunn, correct?

MS. WALL:
Object to the form.

A.  It could have been fact gathering for anything.  I don't know what it was for.  I don't remember.  I don't remember doing that.

BY MR. MARDIAN:

Q.  And notwithstanding that you sought all of Mr. Dupre's phone calls for October 9, 2020, it's still your testimony that you never had any understanding of the testimony he had provided only the day prior on October 8, 2020; is that correct?

MS. WALL:



Page 310

Object to the form.  Please rephrase.

A.   Yes, please.

BY MR. MARDIAN:

Q.   Notwithstanding that you sought out Mr. Dupre's phone calls for October 9, 2020, it's still your testimony that you had no interest in the testimony that he was providing in court only the day before; is that still your testimony?

MS. WALL:

Object to the form.

A.   I don't know.

MR. STAMEY:

I'll join in the objection.

MR. REED:

Same.

A.   I don't know what was going on in court at that time.  I wasn't there.  Some of this stuff I didn't find out about until much later.

BY MR. MARDIAN:

Q.   At this time, though, Mr. Dupre had given a sworn statement that he was being paid off by Lieutenant Dunn, correct?

A.   He did at one time give that statement, yes.

Page 311

Q.   And you thought that that was a serious concern, correct?

A.   Yes.

Q.   And that's why you gave it to Louisiana State Police, correct?

A.   Yes.

Q.   And it's your testimony that your request of his phone calls on a specific day could have had nothing to do with that whatsoever?

A.   No, that's not at all what I said.

MS. WALL:

Objection to the form.

BY MR. MARDIAN:

Q.   So it could have a lot to do with this same investigation that was being run by EPD, correct?

A.   I don't know right now what that was about.

Q.   Okay.  Was Lieutenant Dunn ever informed that Officer Fontenot was summarizing conversations about Lieutenant Dunn and confidential informants?

MS. WALL:

Object to the form.

MR. REED:

Page 312

Same objection.

A.   Those are confidential conversations between Officer Fontenot and his informants.  He would not have shared that with anybody.

BY MR. MARDIAN:

Q.   Did you ever tell Lieutenant Dunn that you had referred Mr. Dupre's statement to the Louisiana State Police?

A.   I don't remember.  I mean, we weren't doing an internal affairs investigation at that time, so I wouldn't have discussed that case with him.

Q.   Do you recall during Officer Fontenot's deposition that he testified that the first he told Lieutenant Dunn of this investigation was when it had been completed?

A.   Repeat that, please.

Q.   Yeah.  Well, do you have -- do you recall Officer Fontenot testifying that the first he ever told Lieutenant Dunn about this investigation regarding Mr. Dupre was when the investigation had been completed?

A.   No.

Where did he testify to that at?

Q.   During his deposition.

Page 313

A.   Okay, I don't -- I don't recall.

Q.   And I'm assuming you, therefore, don't recall that he testified that this took place at a meeting that you had called?

A.   I don't -- I don't know.

Q.   Do you recall ever having a meeting with Lieutenant Dunn and anyone else where you talked to Lieutenant Dunn about the referral of Mr. Dupre's statement to the Louisiana State Police?

A.   We talked this morning about having meetings multiple times with Lieutenant Dunn on different occasions about different issues, but this in particular, I do not remember having a conversation with Lieutenant Dunn about.

Q.   And I'm assuming you, therefore, don't recall Officer Fontenot testifying that that meeting took place within one week of Lieutenant Dunn filing this federal lawsuit; is that correct?

A.   I don't.

Q.   Do you recall having any meeting with Lieutenant Dunn about this lawsuit?

MS. WALL:

Object to form.

MR. STAMEY:



Page 314

I'm going to object to the form too. It's been asked and answered.

MS. WALL:
Yeah.

A. We've had meetings that the lawsuit was discussed, usually brought up by Lieutenant Dunn saying he felt he needed to file the lawsuit to protect himself.

I assumed at that point that he was trying to say that he was protecting himself from disciplinary action. And as long as he had this lawsuit hanging over us, we couldn't take disciplinary action against him because he'd add to the lawsuit that we were harassing him. I felt that that's what he was talking about when we had those discussions.

And he also said multiple times that he wanted this to just go away. At one point he even told me, You'll be receiving a call from my attorney within two hours telling you that all of this is being dismissed.

BY MR. MARDIAN:

Q. You said that you assumed a lot of that, correct?

A. Huh?

Page 315

Q. You said that you assumed the reasons why you believe he told you that information, right?

MS. WALL:
Object to the form.

MR. STAMEY:
Same objection.

A. I did say I assumed that's why he wanted to protect himself and he was using the lawsuit as a vehicle for that.

BY MR. MARDIAN:

Q. So you have no independent basis for that, right?

A. No, just based on what he says and his actions.

Q. Did you have any meeting with Lieutenant Dunn to discuss the federal lawsuit before it had been filed?

A. No. I didn't know the federal lawsuit was being filed until I got a call from Channel 10 after it was filed.

Q. Do you recall having any specific reaction to the lawsuit?

A. Well, I wasn't happy. But I was on the way to meet my mom at the hospital --

Page 316

MR. STAMEY:
Object to the form of the question.

A. I was on the way to the hospital to meet my mom when -- I said Channel 10, it might have been Channel 3 -- one of the TV stations called me for a comment about the lawsuit that I knew nothing about.

BY MR. MARDIAN:

Q. I want to hand you a document that I'm marking as Exhibit 10.

(Exhibit 10 was marked.)

BY MR. MARDIAN:

Q. This is a message that you sent Lieutenant Young and Lieutenant Dunn on May 28, 2021.

Do you see that?

A. You talking about on page 1944?

Q. Correct.

MS. WALL:
Object to form.

A. I see a message with my name on it that says "We will have a meeting Tuesday in the briefing room."

On that, I don't see where it was sent to or who it was sent to.

Page 317

BY MR. MARDIAN:

Q. Do you see on the first page there's a listing of individuals that includes Lieutenant Kennedy, Lieutenant Young, Lieutenant Dunn, and you, Randy Fontenot?

A. I see that. But it's blank after that, so I don't know what that message was.

Q. Okay. If I represent to you that that is the list of individuals who received this text message, you don't have any reason to dispute that, correct?

A. I don't know if these individuals all received this text message or not. They're not connected. They're on separate pages and there's nothing to show that they're connected.

Q. Okay. Do you have any recollection of sending this text message?

A. No.

Q. Do you have any recollection of the meeting that's referenced there?

A. You're going to have to be more specific on what that meeting was about or what was discussed.

Q. Well, it was a text message from you, sir.



Page 318

My question is:  Do you have any recollection of what you were referencing in that meeting?

MS. WALL:

Object to the form.

A.  I don't remember what we discussed at 2:30 p.m. on June 1 in the briefing room.

BY MR. MARDIAN:

Q.  So you don't recall if that meeting did or did not take place?

A.  I don't recall.

Q.  And you don't have any understanding of whether it was in connection with the federal lawsuit that Lieutenant Dunn has filed; is that correct?

A.  I don't know.  If somebody could provide me with some minutes of the meeting or some notes from the meeting, I might be able to tell you. But I don't know what this is about at all.

Q.  Do you --

A.  I sent a message to somebody saying that we were going to have a meeting.

Q.  Do you recall taking notes at this meeting?

A.  I don't remember the meeting.

Page 319

Q.  Do you generally take notes during meetings?

A.  My secretary takes notes during the meetings.

Q.  During all of your meetings?

A.  Most of them.  It depends on what it's about and what we're discussing and who's involved.

Q.  Do you recall having any meetings where you discussed referring Mr. Dupre's statement to Louisiana State Police -- withdrawn.

Did you have any meetings that your secretary attended and took notes at where you recall referring Mr. Dupre's statement to Louisiana State Police?

A.  I don't recall a meeting like that.

Q.  Do you recall having any meetings that your secretary attended and took notes at where you discussed disciplining Lieutenant Dunn?

A.  I don't recall anything specific like that.

MR. MARDIAN:

I'm going to mark as Exhibit 11 Tab 9.

(Exhibit 11 was marked.)

Page 320

BY MR. MARDIAN:

Q.  Do you see on the first page it lists Michael and Randy Fontenot?

Do you see that?

A.  Yes.

Q.  And do you see on the second page there's a message from you sent April 30, 2021 that reads, "I have placed in your box the letter of notification that the investigation is complete and complaint unsubstantiated"?

A.  Yes.

Q.  Do you have any idea what the investigation referenced here is talking about?

A.  No.  I do remember, vaguely again, remember this email, and -- but I don't remember which investigation it referred to.

But all of the investigations would be documented, and if you can find one around that date that was closed, it wouldn't notify -- it would indicate on that complaint or investigation that it was unsubstantiated.

Q.  And that would include internal investigations, right?

A.  Yes.

Q.  Would it include unofficial internal

Page 321

investigations?

MR. REED:

Object to form.

A.  I don't have unofficial internal investigations.

BY MR. MARDIAN:

Q.  In his deposition, Officer Fontenot testified that he was completing an unofficial investigation -- conducting an unofficial investigation into Lieutenant Dunn.

MS. WALL:

Object to the form.

A.  I'm not aware of that and I can't testify to that because I --

MR. REED:

Same objection.

THE WITNESS:

Sorry.

A.  I have no knowledge of that.

BY MR. MARDIAN:

Q.  If he were completing an unofficial internal investigation, would that be a violation of EPD policy?

MS. WALL:

Object to the form.  Asked and



Randy Fontenot

January 30, 2025
Pages 322 to 325

Page 322

answered.

MR. MARDIAN:

He can answer.

MS. WALL:

No, no, I'm instructing him not to. At this point, we're just going around in circles. He talked about this for --

MR. MARDIAN:

You have no basis to instruct the witness not to answer on that objection.

MS. WALL:

Okay. Well, you can call the court, you can motion it. I am telling him now. We've done this. We've circled this drain. We've done this like, I don't know, 30 minutes earlier. So I am instructing him.

So just don't answer.

MR. MARDIAN:

That's entirely improper.

MS. WALL:

Okay. Well, you can talk to the court about it if you have an issue. But we can't sit here all day going over the same things that he's already

Page 323

testified to. We talked about this for like 20 or 30 minutes earlier.

MR. MARDIAN:

That's fine. You still have no basis under the Federal Rules to instruct him not to answer.

MS. WALL:

Okay. Well, I'm instructing him. I'm instructing him not to answer.

MR. MARDIAN:

We will hold the deposition open and we will call him back.

MS. WALL:

Okay.

BY MR. MARDIAN:

Q. I assume you're taking your attorney's instruction?

A. Oh, definitely.

Q. Have you ever threatened Lieutenant Dunn?

A. No.

Q. You've never threatened him with disciplinary action?

A. I'm not going to say "threatened." That might be a word he would use. But if we had

Page 324

discussions and we were discussing actions and what maybe would be improper, I may have told him that he could be facing disciplinary action if he was conducting himself improperly or violating any of the policies. I might have had that conversation with several officers.

Q. Do you ever specifically recall having that conversation with Lieutenant Dunn?

A. No. You're going to have to be more specific. I don't know.

Q. Do you know someone by the name of Christopher Ortergo?

A. Yes.

Q. Who is that?

A. He is an officer that worked with us for a while that had some severe physical disabilities, and we did have to terminate him because of those disabilities. He was unable to pass physical agility.

Q. How would you describe your relationship with him while he was employed at EPD?

A. I think we had a decent relationship while he was employed.

Q. Do you think he was honest?

A. I didn't have that much -- a lot of

Page 325

these officers I did not deal with on a daily basis. It's hard for me to form an opinion on their honesty and stuff if I don't deal with them on a daily basis. I only dealt with them occasionally.

Q. Understood.

MR. MARDIAN:

I'm marking as Exhibit 11 -- 12 a collection of text messages between Lieutenant Dunn and Mr. Ortergo.

(Exhibit 12 was marked.)

A. Okay.

BY MR. MARDIAN:

Q. Do you see at the bottom of the second page, Bates stamp 2077, there's a message from Mr. Ortergo sent on May 7, 2021?

A. Yes.

Q. And do you see that he wrote in that message, quote, "I don't know how you're doing it, staying there when that man would love nothing more than to take out (sic) back and put a bullet in the back of your head"?

A. Yes.

Q. Do you have any understanding of who Mr. Ortergo was referring to there?



Randy Fontenot

January 30, 2025
Pages 326 to 329

Page 326

A.  I have no idea.

Q.  Have you ever suggested that you wanted to take Lieutenant Dunn out back and put a bullet in his head?

A.  No.

Q.  Have you ever said anything similar to that?

A.  No.

Q.  I'm going to mark as Exhibit 12 -- 13 --

A.  And I definitely would not have said something like that to Officer Ortergo because, again, he was a rookie officer and he -- I very seldom had communication with him.  I wouldn't say that kind of stuff to him.

Q.  Understood.

(Exhibit 13 was marked.)

BY MR. MARDIAN:

Q.  This is another text communication between Lieutenant Dunn and Mr. Ortergo.  And directing you to the 8:45 p.m. message on June 8, 2021, do you see in the second line Mr. Ortergo writes, "I'm fairly sure I was on Randy's hit list too, and it was either because of a case that I did or because he felt that I was supporting you."

Do you see that?

Page 327

A.  Yes.

Q.  Do you have any understanding of what he's referencing there?

A.  I have no idea.

Q.  Have you ever told anyone that you have a hit list?

A.  No.

Q.  Do you have a hit list?

A.  No.  Never did.

Q.  Has anyone ever accused you of having a hit list other than Mr. Ortergo?

A.  Lieutenant Dunn.

Q.  Anyone other than them?

A.  Not that I know of.

Q.  Have you ever referred to Lieutenant Dunn as a dirty cop?

A.  I don't remember.

Q.  So you could have?

A.  I could have.

Q.  Do you have any recollection of who you could have told that to?

A.  The only person I can think of would probably be the mayor.

Q.  Have you ever referred to Lieutenant Dunn as a bad apple?

Page 328

A.  No, not that I recall.

Q.  Do you ever recall saying that Lieutenant Dunn is lazy?

A.  No.  I don't think he's lazy.

Q.  Do you ever recall saying that he was consistently absent from work?

A.  No.

Q.  Have you ever referred to a gray area of law enforcement?

A.  Yes.

Q.  And what is that?

A.  Well, like a judge has discretion in his court, police officers have to use a lot of discretion when deciding whether or not to make an arrest.

And sometimes you can do an investigation, decide not to make an arrest, even though there could be probable cause for the arrest, but other extenuating circumstances could exist as well.

So a police officer has a lot of discretion.  Like when they make a traffic stop, they have discretion on whether or not to write you a ticket, you know.  They use discretion like that.  And that's a gray area.

Page 329

Sometimes, say, if somebody is driving without a driver's license and you stop them, they shouldn't be driving, do you let them go or do you let them call somebody to come pick them up and bring them home, or maybe you could even bring them home and give them a ride instead of -- and let them park their car instead of having it towed.

You know, there's a lot of discretion with police officers, and that's their gray area between arrest, not arrest, you know.

Q.  The chief --

A.  You probably have enough to make an arrest but maybe you don't, there's a gray area.

Q.  I didn't mean to interrupt you.

The chief of police has discretion over whether to discipline or not discipline officers, correct?

A.  Yes.  And the extent of the discipline and type of discipline, yes.

Q.  And does the chief -- or when you were chief, did you have to undergo a similar analysis as to what you were just describing like with a traffic ticket, you have discretion and you have to consider circumstances and then come to a



MAGNA
LEGAL SERVICES

Page 330

conclusion?
   A.   As far as recommending disciplinary action to officers?
   Q.   Correct.
   A.   Yes.
       And that's why a lot of time disciplinary action was not taken against Dunn when we had investigations done, because sometimes I felt it fell in that gray area and didn't warrant disciplinary action.
   Q.   And those are special internal investigations?
   A.   Yes.
   Q.   Like what?
   A.   I'd have to go pull all his investigations and look at which ones.
   Q.   They would be in his personnel file though?
   A.   Yes.  Because -- actually, I can think -- with the investigations, the only thing I can think of, which really isn't considered disciplinary action, is his leave of absence or -- with -- with pay.  That's the only disciplinary action I can ever think.  And that's not even considered disciplinary action because it's

Page 331

pending an investigation.
       Police officers who -- and then he was placed on leave when he was involved -- again, that wasn't disciplinary action either, it's common practice.  He and other officers were placed on leave when they were involved in the shooting of a suspect on Park Avenue one day.
   Q.   Do you have any understanding of whether Lieutenant Dunn has reported alleged misconduct at EPD to outside law enforcement agencies?
   A.   I know from this lawsuit.  After this lawsuit came out, I learned that he had discussed this with the sheriff and other agencies.  I think he even went to the State police.  And I think he was involved with the -- the letters that were all sent by the Civil Service Board to all different agencies.
   Q.   Are these those letters that you brought with you?
   A.   Yes.
   Q.   When is the first that you learned -- withdrawn.
       Have you learned that Lieutenant Dunn reported alleged misconduct to the office of inspector general?

Page 332

   A.   I learned that I believe after the lawsuit was filed.  Basically, whenever I was notified that they were -- and actually, I thought it was the FBI coming for the deposition when it was members from the inspector general's office.
       I thought it was FBI agents that were coming to testify or be deposed that day, and it was -- that's when I found out the inspector general's office was involved.
   Q.   Did you learn when the lawsuit was filed or sometime after that?
   A.   About the inspector general's office?
   Q.   Yes.
   A.   I don't know if the first I didn't hear about that was the day they were deposed, the agent was deposed.
   Q.   What about the FBI?
   A.   I knew the Civil Service Board had.  But as far as for Dunn, I didn't -- I didn't know of anything until after I started reading some of this stuff and we started having depositions, that's when a lot of stuff was brought to light to me.
       There was a lot of stuff going on within the department and with Dunn that I was not aware

Page 333

of until I read that lawsuit and we started taking depositions.  It was very eye-opening.
   Q.   Did you do anything in response to learning that Dunn had reported alleged misconduct to the office of inspector general?
       MS. WALL:
           Object to the form.  Do anything?
       MR. MARDIAN:
           Yeah.
       MS. WALL:
           He wasn't even employed there.
   BY MR. MARDIAN:
   Q.   Do you have an understanding of what the phrase "do anything" means, sir?  If someone asked you, Did you do anything in response to that, you have an understanding of what that means, right?
   A.   I attended the deposition and listened to it because I found out I think that day.
   Q.   So the only thing you did in response to learning about the office of inspector general report that Lieutenant Dunn made was attend the deposition?
   A.   Yeah, I was there for the deposition.  I thought it was FBI agents coming, so I just -- that's all I know about it.



MAGNA
LEGAL SERVICES

Randy Fontenot

January 30, 2025
Pages 334 to 337

Page 334

Q.  And same question about the FBI, did you do anything in response to learning that Lieutenant Dunn had reported alleged misconduct to them?

A.  No.  There was nothing I could do.

Q.  Did you learn that Lieutenant Dunn had reported alleged misconduct to the St. Landry Parish District Attorney's Office?

A.  I'm trying to remember what the facts were.  I know there was an incident with the St. Landry Parish -- St. Landry District Attorney's Office, but I don't remember what incident it was about or if it was Dunn that made the complaint to them.  But I did find out about somebody going to the district attorney and filing a complaint.

Q.  Do you recall when you learned that?

A.  When I received a call from the D.A.'s office and he -- he was just telling me, Chief, somebody in your department is trying to cause you some trouble to get you in trouble.  That's about all I remember about it right now.

Q.  You said you received a call from the D.A.'s office.  Was it from the D.A. him or herself?

Page 335

A.  It was from Charles Cravins.  I don't remember if he was D.A. at the time or if he was still assistant D.A.

Q.  And do you recall when about this was?

A.  No, I don't.

Q.  Do you recall if it --

A.  I was still in office, I remember that, but that's all.

Q.  Do you recall if it was before Dunn filed this second lawsuit?

A.  No, I don't know.  I don't remember.

Q.  Do you recall when you first learned that Dunn had reported alleged misconduct to the Louisiana Attorney General's Office?

A.  I think I learned that when I was served with a copy of the lawsuit.

Q.  And did you do anything in response to that?

A.  No.  There was nothing I could do.

Q.  Do you recall when you first learned that Lieutenant Dunn had reported alleged misconduct to the Lieutenant Governor's office?

A.  I don't remember when I learned that.  But that was way, way late in the game when I found that out about the Lieutenant Governor.  I

Page 336

want to say that was probably when I -- after I was served with the lawsuit as well.

Q.  And what about the Louisiana State Police, do you recall when you learned that he reported alleged misconduct to them?

A.  I think all of these I read about in the lawsuit.

Q.  Except for the Mr. Cravins one?

A.  Yes.  And that one was a call from him.  So I don't -- but I don't remember when that call was made.

Q.  And last one, the St. Landry Parish Sheriff's Office, do you recall when you learned about Dunn reporting misconduct to them?

A.  Probably the same time, when I read the lawsuit.

Q.  And do you recall if you did anything in response?

A.  To what?

Q.  To learning that he had reported alleged misconduct.

A.  You say a written response?

Q.  Sorry.  Did you do anything in response to learning that --

A.  Oh, no.  Nothing I could do.

Page 337

MR. MARDIAN:

Okay.  Why don't we take a break.

THE VIDEOGRAPHER:

Off the record at 5:15.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record at 5:26.

BY MR. MARDIAN:

Q.  Chief Fontenot, do you recall when you first met Lieutenant Dunn?

A.  No.  I was probably working for City court at that time, but I don't recall the first meeting.

Q.  This morning when I asked you about your opinion of him, I believe you said something, in sum and substance, of he tries to do the right thing, sometimes you and he have disagreements about the interpretation of the law, things of that nature.

Do you recall that?

A.  Yes.

Q.  Do you have any sense of when you formed that opinion of him?

A.  About the -- I don't know.  It was just progressive over a period of time.



Page 338

Q.  Did it start after you became chief or before?

A.  It was a while after -- well, what do you mean?  Which --

Q.  I'm trying to get a sense of -- you have an opinion of him about his interpretation of the law, how he can assume things, you said.

A.  Right.

Q.  And I'm trying to understand when that opinion was formed.

A.  That formed over a period of time as I kept getting these complaints that he was filing against other officers, some of his reports that he was turning in I started -- and it just -- it just developed over time.  I was chief -- I might have been in my second term become this all started going south, I guess you could say.

Q.  And when did your second term begin again?

A.  Let me see.  2020 -- no, 2019.

Q.  Understood.

Did you ever correct Lieutenant Dunn's individual police reports?

A.  If I corrected them?

Q.  (The attorney nodded head.)

Page 339

A.  I might have suggested that he make some corrections to it, but I don't go and change a police officer's report.

Q.  Whose responsibility is it to advise an officer that certain things in their report need to be corrected?

A.  His immediate supervisor.

Q.  And were you ever Lieutenant Dunn's immediate supervisor?

A.  That would have been the deputy chief.  While he was a lieutenant and when he was -- like I said, we talked about this earlier too, I don't remember when he was promoted to lieutenant.

But while he was sergeant, the lieutenant would have been his immediate supervisor.

Q.  Do you have a sense of how frequently you would advise him to make changes to his police report?

A.  No, I really couldn't tell you.

MR. MARDIAN:
I'm going to mark as Exhibit 14 the amended complaint that Lieutenant Dunn filed in this litigation.
(Exhibit 14 was marked.)

Page 340

BY MR. MARDIAN:

Q.  Have you seen this document before?

A.  I'm pretty sure I've read it, or at least gone through parts of it.  Yeah, I doubt I read it word for word --

Q.  Understood.

A.  -- the different areas.

Q.  I want to walk through certain of the allegations with you.  So if you could turn to page 3, paragraph 4.

Do you see the second sentence says, "Moreover, it is the practice of the St. Landry Parish District Attorney to require approval from Eunice's chief of police to investigate any criminal misconduct reported at the department."

Do you see that?

MS. WALL:
Which page?  3?

MR. MARDIAN:
Paragraph 4 on page 3.

A.  Yes.

BY MR. MARDIAN:

Q.  Do you agree with that statement?

A.  I mean, it's not meant to agree with that.  I mean, that's Dunn's words.

Page 341

Q.  Fair enough.  But is it your understanding, sir, that it is the practice of the St. Landry District Attorney to require approval from Eunice's chief of police to investigate any criminal misconduct reported at the department?

A.  I don't know where he got that information.

Q.  So that doesn't comport with your understanding?

A.  That's -- I've never had that type of a discussion with anybody.

Q.  Do you see the next sentence reads, "Likewise, on information and belief, it is the practice of the Louisiana State Police to investigate officer complaints only if such complaints originate from a department's chief of police"?

A.  Yes.

Q.  Is it your understanding that that's what happens in practice, that they will only investigate officer complaints if they originate from the chief of police?

A.  Usually the State police will require --

MR. STAMEY:
Objection to the form of the



Page 342

question.

A.   Usually the State police will require a letter from the chief of police to initiate an investigation, and the chief has to request an investigation.

BY MR. MARDIAN:

Q.   If you flip ahead to page 5, paragraph 9, the second sentence reads, "This campaign continues to harm Lieutenant Dunn by hindering his career advancement, diminishing his job prospects, and making him a villain in the eyes of some colleagues and residents of Eunice, which also has the consequence of making Lieutenant Dunn's job more dangerous and threatening his physical safety."

(Feedback from Zoom.)

MR. MARDIAN:

Can we mute.

THE VIDEOGRAPHER:

I'm going to mute him.

BY MR. MARDIAN:

Q.   Do you have any basis to believe that Lieutenant Dunn has been made a villain in the eyes of any of his colleagues?

A.   No.

Page 343

Q.   What about residents of Eunice?

A.   This is one of Dunn's assumptions.  He believes this occurred.

Q.   I understand.

I'm trying to get your sense of whether you agree that it has occurred, if you have any reason to believe that it's occurred?

A.   No.

Q.   Okay.

A.   No, I deny that.

Q.   If you go to page 10, paragraph 30 at the bottom, do you see in the middle there's a sentence that begins, "In August 2019"?

A.   Uh-huh, yes.

Q.   Actually, I don't want to ask you about that one, sorry.

I want to ask you -- the next sentence, it says, "In response, Chief Fontenot told the local news that, quote, Not all police officers would agree with my way of law enforcement, closed quote, and speculated that, quote, everybody has committed some kind of violation and would appreciate a break and a warning."

Do you see that?

A.   Yes.

Page 344

Q.   Do you recall saying that to the local news?

A.   I may have said that.

Q.   Do you know what you meant, that everybody has committed some kind of violation and would appreciate a break and a warning?

MS. WALL:

Object to the form.

A.   I discussed that earlier.  You know, you get pulled over for a traffic violation, you would appreciate a break sometime.

BY MR. MARDIAN:

Q.   And do you know why you said that in response to Officer Cooley's statement in the prior sentence?

MS. WALL:

Object to the form.

A.   No, I didn't make that response in response to Officer Cooley's statement.  I made that response to the media, you said.

BY MR. MARDIAN:

Q.   Okay.  Do you know why you said that to the media?

A.   I don't remember.  Probably they asked me a question about something, I don't know.  And

Page 345

I may not have even said that that way.  I don't know.

Q.   Do you have any recollection of a police incident involving a man named Kenneth Charles?

A.   Is that the complaint that Lieutenant Dunn called about a man kicking his unit in front of his house?

Q.   It was the incident that occurred in front of his house, yeah.

A.   I do have some recollection about that.  A lot of the details may be kind of vague because that was a while back.

Q.   Do you recall what took place?

A.   I can remember it was -- I think Lieutenant Dunn had called in a complaint about this guy that was kicking a car in front of his house or something like that.

I don't know if one of the officers didn't -- if it's the same incident, one of the officers ended up at the emergency room, thought he had come into contact with fentanyl.

Q.   Do you have any recollection of Lieutenant Dunn raising concerns about the police conduct that took place during that arrest?

A.   I'd have to be refreshed on that.  I



Page 346

don't remember.

Q.   Is it compliant with EPD policy to drag a victim -- excuse me, to drag a citizen across the floor?

A.   Well, it may happen in some cases.  It depends on the circumstances and what's going on at the time.  If we're trying to arrest somebody and the house is on fire, yeah, we're going to drag them out if we have to, if he doesn't -- can't move.

Q.   If the individual is being restrained and they're on the floor, is there any justification for dragging them across the floor?

A.   I'd need a whole lot more detail about what was going on and what happened to answer that question.

Q.   Other than a fire, can you think of any instances in which it would be justified?

A.   I don't know.  I'm -- give me some details.

Q.   If you go to page 13, paragraph 38, do you see the second sentence reads, quote, "On more than one occasion, Chief Fontenot released critically injured inmates rather than incur medical bills, putting their lives in danger"?

Page 347

A.   Yes.

Q.   Do you have any recollection of releasing critically injured inmates from the Eunice jail?

A.   They were transported to the hospital.

Q.   Do you have any recollection of releasing them instead of transporting them to the hospital?

A.   No.  We'd always transport them to the hospital.

Q.   Do you have any recollection of an instance where an inmate was eating broken glass in the Eunice jail?

A.   Yes.

Q.   And what happened to that individual?

A.   He was transported to the hospital.

Q.   He was transported; he was not released?

A.   I don't think he was released from the jail.  He was transported to the hospital.

Q.   Do you specifically remember seeing him being transported?

A.   No.  I wasn't there at the time.  I didn't see it.

Q.   So someone told you about it?

A.   Yeah.  And I think there were reports on

Page 348

it.

Q.   Do you recall who told you?

A.   No.

Q.   Do you recall who wrote the report about it?

A.   No.

Q.   Has the City marshal, Terry Darbonne, ever told you that he does not trust Officer Fontenot?

A.   He may have.

Q.   If the City marshal doesn't work with one of your officers, could that create problems with your ability to carry out EPD work?

A.   I can still perform my duties; he might have a hard time performing his.  I mean, that's his opinion if he doesn't like one of the officers.  Some of the officers might not like him.

Q.   If you -- if Terry Darbonne had told you that he had concerns with Victor Fontenot, would you have investigated those concerns?

A.   If you provide me with some facts or some allegations (sic) and some evidence to substantiate the concerns.  Just because he has concerns -- I mean, you know, I don't do my job

Page 349

and investigations based on assumptions alone.

You know, I guess that's one difference between me and Dunn.  He makes assumptions; I don't act on assumptions.  I need more evidence to back up what I'm going to say and do.

Q.   And just so we're clear, do you have a specific recollection of Terry Darbonne telling you that he doesn't trust Officer Fontenot?

A.   Not a specific one.

Q.   It sounds like you are remembering something, I'm just trying to get at what that is.

A.   He may have.  And I'm not saying he didn't.  I just don't have a specific recollection.

Q.   When you were chief, would you have preferred for Lieutenant Dunn to leave EPD?

A.   Why would I prefer that he leave?

Q.   I'm just asking if you did or didn't.

A.   I don't think that would -- that answer would require me to form an opinion and give you an opinion.

Q.   I'm asking -- I'm sorry, sir.  I'm asking, while you were chief, if you ever held that opinion?

A.   At some times life might have been



Randy Fontenot

Page 350

easier without him at the police department.

Q.   Did you ever have -- attempt to have Lieutenant Dunn arrested?

A.   No.

Q.   Has a member of a separate law enforcement agency ever called you to discuss Lieutenant Dunn?

MS. WALL:
Objection to the form.  When?  Like now?  Then?

A.   Yeah, I -- I talked this morning about receiving calls from other agencies concerning the rape case.

And Lieutenant Dunn was going to these outside agencies when he still didn't know if we even had a crime committed or what jurisdiction was even responsible for the investigation.

And he was going to these different jurisdictions saying that there was a crime committed in their jurisdiction and we weren't doing anything about it or giving them the information or whatever that case was.  So, yes, they -- other agencies contacted me about that.

BY MR. MARDIAN:

Q.   Has another agency contacted you about

Page 351

potentially hiring Lieutenant Dunn?

A.   I don't recall anybody calling me about that.

Q.   Have they ever contacted you about whether, in your opinion, Lieutenant Dunn was an effective police officer?

A.   I don't remember having that discussion with anybody.

Q.   When the agencies that you just mentioned called you about the rape case, what did you do in response to receiving that phone call, if anything?

A.   I don't recall exactly what I did.  I mean, I'd have to go back and look at reports.  Maybe in the personnel file I might have something that would refresh me.  I don't know.

Q.   If they -- they were raising -- withdrawn.

When they called you, they were raising some sort of concern with Lieutenant Dunn reaching out to them; is that fair?

A.   Well, they were calling to let me know that one of my officers was contacting them about a case and making these allegations that our department wasn't doing what it should be doing

Page 352

about the case.

Q.   And that was about the same time as the alleged rape had taken place?

A.   Yes.

Q.   Did you subject Lieutenant Dunn to any investigation as a result of that?

A.   I think we discussed all that this morning already, and that's already in the record.

MS. WALL:
Yeah.

BY MR. MARDIAN:

Q.   And I'm entitled to ask you a question and get your answer, sir.

MS. WALL:
We did this for like an hour.

MR. MARDIAN:
I have limited time.  Your objections should be limited to form. He can answer the question that I've asked unless you're instructing him not to answer.

MS. WALL:
I'm about to instruct him not to. We did this for an hour earlier.

MR. MARDIAN:

Page 353

And, again, you have no basis under the Federal Rules to make that objection.  So we will call him back.

MS. WALL:
My objection is that it's harassment of the witness, it's asked and answered. We've got to move on.  We talked about this for an hour.

MR. MARDIAN:
You cannot dictate what I ask questions about, respectfully.

MS. WALL:
I can, respectfully.

MR. MARDIAN:
No, you cannot.

MS. WALL:
We did this already.

MR. MARDIAN:
Are you instructing the witness not to answer the question?

MS. WALL:
Do -- whatever you just said, say it again.

A.   I don't remember what I just said.  I don't remember what the question was now.



Page 354

BY MR. MARDIAN:

Q. Did you subject Lieutenant Dunn to any investigation as a result of the phone call you had with the other agency about the alleged rape incident?

A. Can we go back and look at my answer from earlier to refresh my memory?

MS. WALL:

Y'all provided it earlier.

BY MR. MARDIAN:

Q. Can you not, sitting here today, recall whether you subjected him to any investigation or not?

A. I remember testifying about this this morning, but I had paperwork in front of me and it kind of refreshed me. It's probably still in here. If you want to sit here and wait, I can go through it.

BY MR. MARDIAN:

Q. I'll move on.

A. You don't want me to answer that question?

Q. Not if it's going to take you time to look through all the documents.

A. Okay.

Page 355

Q. Because if you can't answer whether you investigated him or not, then it sounds like you don't know.

A. I answered the question this morning.

Q. I'd like to move ahead to the end of the complaint starting on page 50. I'll represent to you, sir, that this is the relief that Lieutenant Dunn has requested in this litigation.

Have you ever seen these requests before?

A. Yes.

Q. I'd like to walk through them.

First, he's asking that the City assign him any departmental duties comparable to the rank of lieutenant at EPD, including, but not limited to, reinstating his ability to handle narcotics investigations."

Do you, sitting here today, have any reason to believe that Lieutenant Dunn should not be reinstated to a rank comparable to a lieutenant and given the ability to handle narcotics investigations?

A. What I see here is Lieutenant Dunn asking the court to order the police department to assign him to specific duties, which is kind of

Page 356

ridiculous.

Q. That's not an answer to my question. Can you please answer my question.

A. Okay. What was the question again?

Q. Do you have any reason to believe that Lieutenant Dunn should not receive the relief that's requested in subsection A?

A. Yes.

Q. What is that?

A. Maybe the chief doesn't want him in that position or doing that, the current chief.

Q. Other than that, do you have any reason to believe that he should not be reinstated and being able to -- and allowed to handle narcotics investigations?

A. Maybe after all the stuff that came out after this lawsuit, he's not really the person to be handling narcotics investigations.

Q. So you said "maybe." So you don't have any independent basis to argue that he shouldn't be allowed to?

A. Just like the allegations in this complaint.

Q. The answer is no then, correct?

A. I have my opinion, which was good a

Page 357

while ago.

Q. Subsection B is that, two, he requests that the City expunge from his personnel records any and all notations, complaints, and/or related references to any baseless internal investigations or actions taken by Defendants.

Do you have any reason to believe that the City should not do that?

A. Yes.

Q. And what is that?

A. It's contrary to civil service law.

Q. And how so?

A. We have to keep records of all these things. If we don't, then it's violating his rights.

Q. If the Civil Service Board finds that an investigation is baseless, it's your understanding that there's still no reason that it can be expunged from someone's personnel file?

A. Well, if you expunge it from their file, you're even showing that the finding would be -- I mean, it shows that the investigation was baseless or whatever. So why would you want to get rid of that?

Q. Going down to paragraph 196, do you see



Page 358

that subsection B reads, "Require crisis intervention and deescalation training for all EPD employees who respond to mental health emergencies"?

Do you see that?

A.   Yes.

Q.   Do you have any reason to believe that the City of Eunice should not be required to do that?

A.   They're already doing that.

MR. REED:

Object to form.

BY MR. MARDIAN:

Q.   It's your understanding, sir, that they're currently doing that?

A.   Yeah.  It's always been a requirement to receive deescalation training.

Q.   Subsection C is, "Require the EPD to revise its policies to mandate that officers intervene to prevent the use of excessive force or other illegal conduct by fellow officers."

Do you have any reason to believe that the City should not order that?

A.   I'm not sure what the policies are now, but when I was chief, that was already in the

Page 359

policy.

Q.   Subsection D is, "Institute and implement mandatory policies and procedures to ensure that employees of the EPD submit accurate records of daily hours worked."

Do you have any reason to believe that that should not be implemented by the City?

A.   That's already implemented.  That's part of law as well.

Q.   Notwithstanding the payroll irregularities that the Civil Service Board found?

MS. WALL:

Object to form.

A.   They didn't find any payroll irregularities.  They made allegations, but they didn't find it.  If they'd have found the payroll irregularities, all of these agencies that they reported it to, somebody would have done it.

And I was questioned by an auditor on behalf of the legislators -- legislative auditors, and he found no basis to continue with that investigation or that allegation.

BY MR. MARDIAN:

Q.   The next is, "Fund and appoint a full-time paid investigator to the Eunice Civil

Page 360

Service Board."

Do you have any objection to the City implementing that?

A.   Yes.

Q.   And what is that?

A.   The Civil Service Board should not be involved in the investigations like that.  That's not their authority or their duty or responsibility.

Q.   You talked about that earlier today. And correct me if I'm wrong, but it's your understanding that they don't have the authority to do those investigations, correct?

A.   Correct.

Q.   Do you have any particular issue with any way that they carry out those investigations other than not having the authority?

A.   Well, those that were doing the investigating -- investigating have nothing -- they're not trained in that.  They did not receive any training in conducting investigations.  They had no business doing that type of an investigation.

And, again, nobody was informed of their -- or provided with their bill of rights

Page 361

during that investigation, none of them were informed of their -- Civil Service Board was violating their own rules.

Q.   Sorry, which investigation were you referring to?

A.   The same one you were talking about.

Q.   The payroll irregularities one?

A.   Yes.

Q.   Okay.  So other than the payroll irregularities, do you have any issue with the Civil Serv -- way the Civil Service Board has carried out any other investigations?

A.   I'm not aware of any other investigations.

Q.   The next relief that Dunn requests is, "Eliminate all fees charged for the furnishing of copies of public records requested pursuant to the Louisiana Public Records Act."

Do you have any objection to the City implementing that reform?

A.   Yes.

Q.   And what is that?

A.   Louisiana Public Records Act.

Q.   But do you have an objection to any waiver of the fees that are charged to use that



Page 362

act?

A. Well, that's not my decision to make.

Q. Fair enough.

But I'm asking if you have any issue or any objection to the City doing that?

A. Whether I object or not, it doesn't matter. I can't make that decision.

Q. So it sounds like you don't have an objection?

A. I can't make that decision.

MR. REED:

Object to form.

BY MR. MARDIAN:

Q. The next request is to "Require the chief to disclose to the public on a quarterly basis the number and substance of internal and external complaints of police misconduct that were received, investigated, deemed unsubstantiated, and/or closed by the EPD."

Do you have an objection to the City implementing that?

A. Yes.

Q. And what's that objection?

A. That's ridiculous. And all of these demands are one police officer that doesn't agree

Page 363

with policy and doesn't want to follow the current policies of the department, and he's trying to get a court to require all this ridiculous stuff.

Much of -- well, some of it's already being done. I mean, it's just -- he's trying to get all that fit to suit him.

Q. But do you have any specific objection to this relief that we're talking about here in subsection G?

A. Yeah. Some of this stuff should be confidential. And why release it to the public on a quarterly basis the number of internal and external complaints? We report that to the proper authorities. And criminal -- all criminal stuff is reported to the FBI and compiled and made public record every year.

Q. The next request for relief is subsection H, "Establish a qualified and independent oversight agency to investigate, mediate, and/or prosecute complaints of EPD misconduct."

Do you have any objection to that?

A. Yes.

Q. What's that?

A. We don't need that. Again, that would

Page 364

be the creation of another bureaucracy. We do have the State police and FBI that were other agencies that can investigate these type of complaints if they're made properly. I don't see why you would need to create some other agency just for that purpose.

Q. Are officer disciplinary records a matter of public record?

A. The disciplinary action is, but the investigations involved in them are not necessarily public record.

Q. So if an officer is investigated and the chief declines to recommend to the mayor to impose any form of disciplinary relief other than a verbal reprimand that we talked about earlier, the public will never know that the officer was investigated; is that correct?

A. It's possible.

Q. If the information was leaked?

A. But the people who need to know, the public that could be party to the investigation, they would know. Those are the ones that need to know.

Q. What do you mean by that?

A. If they were a party to the incident or

Page 365

the investigation, they would know that it's being investigated and they would probably know the outcome of the investigation and what action was taken.

Q. But other members of the public who weren't directly involved, they would never learn; is that correct?

MS. WALL:

Objection to the form.

A. They may or may not.

BY MR. MARDIAN:

Q. How would they learn?

A. Newspaper articles.

Q. But how would the newspaper learn?

A. They'd come to the public hearings. If the -- if there's a Civil Service hearing, that's all public, open to the public.

Q. But if there's an internal investigation and it doesn't reach the Civil Service Board, they don't know about --

A. They may not need to know because it may be baseless. So you wouldn't want to start putting out, So-and-so made a complaint against this officer and -- you know, you start doing that, then you start developing doubt of the



Randy Fontenot

Page 366

officers from the public.  It just -- that would destroy the morale of the police department.

Q.  But isn't there a threshold before which something becomes an investigation, it has to meet a certain threshold of evidence or something like that before an investigation begins?

A.  Yes.

Q.  And so if it reaches that threshold, the public doesn't have an interest in knowing about it?

A.  Once the investigation is complete and it goes before the Civil Service Board, the Civil Service Board is a public hearing, it's open to the public, and people -- anybody -- public notices are put out.  Anybody can attend.

Q.  Are the chief of police's recommendations to the appointing authority regarding disciplinary action, are those recommendations made public?

A.  They're part of the record.

Q.  The record at the Civil Service Board hearings?

A.  Yes.

Q.  Is there a Civil Service hearing on every recommendation that the chief makes to the

Page 367

appointing authority regarding disciplinary matters?

A.  No.

Q.  So there could be instances in which it's not part of the Civil Service Board hearing public record, right?

A.  No.  All disciplinary action comes before the Civil Service Board.  It's discussed in the open meeting.  So all disciplinary action except oral reprimands are discussed in the open meetings of the Civil Service Board.

Q.  So if you recommend disciplinary action and the mayor elects not to implement it, is that discussed at the Civil Service Board hearing?

A.  No, because there's no personnel action sheet and there's no action taken.

Q.  In subsection J, Lieutenant Dunn requests "The installation of a qualified monitor to oversee and report to the court on implementation of the policies and procedures included herein."

Do you have any objection to that?

A.  Yes.

Q.  And what is that?

A.  Well, for one, for the court to be able

Page 368

to install a qualified monitor, the judge or the court would have to make a determination that all of these allegations are factual and that Dunn was discriminated against or whatever, and that's not the case.

So there's no reason for any of these recommendations or orders or injunctions to be made because the judge is not going to find that there's any factual evidence in any of these allegations to where it would come to the point where we'd have to make a ruling on all of these.

Q.  You elected not to run for re-election in 2021, correct?

A.  Actually, I pretty much made that decision in 2019, maybe.

Q.  Why did you make that decision?

A.  One, I was going to be finished with my DROP, because I planned it to do my three years on DROP.  I had 28-plus years credited time with the retirement system.  And I was at an age and a time where I could retire and start drawing a retirement check.

Q.  So after you were re-elected, you never had any inclination to seek election after that?

A.  I -- at one point I was going to seek

Page 369

re-election.  I was waiting for someone to announce to run that I thought would be a good candidate.

There were two that were going to run that I didn't think were going to be good candidates for chief of police position, so I was going to run again and try to retain that position only for that reason.

But when Chief LeBouef told me that he was going to run or interested in running, that was my way out.  Because I had been after Eddie Thibodeaux to run in my place, and he -- his wife didn't want him to, he didn't want to do it.

And I'd even talked to the -- Chief LeBouef's wife one time here at City Hall and asked her, Hey, maybe you need to talk to Kyle about running for chief because I'm ready to retire, but we need a good candidate to come in.  And when he decided to do it, that was my opportunity to back out and retire.

Q.  Who were the two candidates that you did not prefer?

A.  One was Andrepont, I don't remember his first name.  I don't think he had -- he didn't have any law enforcement experience.



Page 370

And the other one I believe was -- I think it was Varden Guillory. He was deputy chief for me at one time and under the prior chief he was deputy chief. And I don't think he could have won the -- well, he didn't win. But those were the two running.

Q.   Why don't you think he could have won?

A.   Because of his reputation within the town -- in the town, in the City.

Q.   What's his reputation?

A.   He's an overzealous police officer. He's been -- as a matter of fact, he was arrested for basically destroying evidence in an investigation, trying to prevent a suspect's statement from being entered into our evidence, and I'd asked the sheriff to investigate it.

The sheriff's office did an investigation, and they arrested him and charged him with malfeasance in office.

THE VIDEOGRAPHER:

I need to go off the record for just a minute. Off the record.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record at 6:05.

Page 371

BY MR. MARDIAN:

Q.   How would you describe Lieutenant Dunn's reputation in the community?

A.   I'm not really sure about in the community because I don't really talk about Lieutenant Dunn to the public or anybody.

MR. MARDIAN:

I have nothing further, subject to holding the deposition open to the instruction not to answer.

MS. WALL:

Yeah, the court -- you'll have to file a motion with the court and then if the court says that he has to answer. But, if anything, I think -- I have a strong feeling they would probably make him just answer the question. But, yeah, if the court orders that we open it for that, that is fine.

MR. DOHERTY:

Kaitlin, before we go through all that, can we get the question read back and revisit whether he should or could answer the question now and just be done?

Page 372

MS. WALL:

Sure.

MR. MARDIAN:

Fine with me. I don't know if it's easy for you to find it on realtime somehow.

(Discussion off the record.)

THE COURT REPORTER:

Question, "If he were completing an unofficial internal investigation, would that be a violation of EPD policy?"

MS. WALL:

And the second part of that was -- should we look back at this and see if there's even a reason to do this, as it's already been answered? Is there a way that --

MR. MARDIAN:

You instructed him not to answer that question.

MS. WALL:

Right.

MR. MARDIAN:

I don't want to sit here and see if he answered it previously. I just want

Page 373

him to answer that question. Because I think that's what was being suggested by the individual on Zoom.

Can we just have him answer that question, even if he answered it previously, and get his answer on the record and then move on?

MS. WALL:

Sure.

THE WITNESS:

Okay. The question again?

THE COURT REPORTER:

Question, "If he were completing an unofficial internal investigation, would that be a violation of EPD policy?"

A.   An unofficial internal investigation would not be considered an internal investigation because it's unofficial. That would just be an inquiry maybe to see if there was anything that would lead to an internal affairs investigation.

So no, that may not necessarily lead to a violation of policy. It depends on the officer and what he's classifying it as. It may have a different meaning than what I would classify it as.



Randy Fontenot

January 30, 2025
Pages 374 to 377

Page 374

In other words, if the officer was doing an inquiry, which they are allowed to do into a complaint to see if there's even any basis for a complaint or an allegation, and Civil Service even allows for this before starting an investigation, where you're basically looking for facts to see if there's facts that would require an investigation be done.

Some officers may consider that an uninformal (sic) or unofficial investigation. But it's just -- I wouldn't see it that way. So if it's that case, then no, it would not be a violation of policy; as a matter of fact, it would be expected before you start a full-fledged investigation to look into the facts of the case.

MR. MARDIAN:
Nothing further.
THE VIDEOGRAPHER:
That's it?
MS. WALL:
Yes.
MR. LOUGHLIN:
I have a few questions.
MS. WALL:
I'm sorry, what? Who is talking?

Page 375

MR. LOUGHLIN:
This is Kearney Loughlin. I had a few questions, if y'all don't mind. It wouldn't -- not going to take long.
MS. WALL:
Okay. And what -- Kearney, you're questioning him as, what, Dunn's attorney in the first lawsuit that he's been dismissed from?
MR. LOUGHLIN:
Yes.
MS. WALL:
Okay, no. He's dismissed --
MR. LOUGHLIN:
I can't question a witness?
MS. WALL:
Yeah, absolutely, if you were to notice his deposition.
MR. LOUGHLIN:
So showing up at a deposition, I don't have a right to ask any questions without noticing it?
MS. WALL:
No, yeah, that's pretty much exactly right.

Page 376

MR. LOUGHLIN:
Well, I'll take that to the court. I don't think that's the case at all. The person who -- if you haven't noticed the deposition, you don't get to ask questions; that's your position?
MS. WALL:
What? I'm saying, yeah, you -- he's dismissed from your lawsuit, okay, and you want to ask him questions about your lawsuit?
MR. LOUGHLIN:
They have people that are not even parties to the lawsuit that I've asked questions of and that have given depositions. So whether someone is a party to a lawsuit is irrelevant. I've got about five or six questions that will take five or six minutes, if that.
MS. WALL:
No. No. No. You can motion the court and you can ask them. But, yeah, you've asked other witnesses who don't have counsel, who aren't represented. So, no, it's absolutely different.

Page 377

And whether or not they didn't care, whether or not they should know if they care, I don't know. I don't know who you're talking about.
MR. LOUGHLIN:
So your position is I cannot ask a question of a witness?
MS. WALL:
No, my position --
MR. LOUGHLIN:
And he can't even be a witness in that lawsuit presumably, right?
MS. WALL:
In your lawsuit?
MR. LOUGHLIN:
Yes.
MS. WALL:
I have no idea. Are you going to name him as a witness?
MR. LOUGHLIN:
I haven't the slightest idea. I wanted to -- we're taking his deposition right now. The two cases were put together for discovery purposes --
MS. WALL:



Page 378

You're not, Kearney --
MR. LOUGHLIN:
-- not at my request, but at everybody else's request.
MS. WALL:
He's been dismissed from your lawsuit.  So no.
MR. LOUGHLIN:
And therefore -- and therefore, I'm not allowed to ask a question of somebody who's not a party to the lawsuit; is that what you're saying?
MS. WALL:
You are if they're a witness, a named witness, and you've noticed it properly, absolutely.
MR. MARDIAN:
So is it --
MR. LOUGHLIN:
That's not the law.  That's not in Federal Rules of Civil Procedure.  That's not the local rule.  I don't know where that's coming from.
MS. WALL:
I don't even understand what

Page 379

context -- you're saying you're going to ask him questions as a witness because you just showed -- because --
MR. LOUGHLIN:
I'm at a wit -- I'm at a deposition that has been noticed in a case which has been -- I'm a part of because it was put together against my wishes for discovery purposes, and now I want to ask a few questions of that witness, and you're saying, A, because he's not a party to one lawsuit --
MS. WALL:
To your lawsuit.
MR. LOUGHLIN:
-- I can't ask him questions.
MS. WALL:
To your lawsuit that you want to ask questions about.  Yeah, no.  I don't understand why -- you want to ask him questions as a witness.  Did you notice it?
Every time I show up and we haven't cross-noticed something, Amit says, No, you haven't cross-noticed it every time.

Page 380

I don't know if you haven't been there.
MR. LOUGHLIN:
I don't say that.  I couldn't care less if it's cross-noticed or not.
MS. WALL:
Well, I'm just saying -- no.  I mean --
MR. LOUGHLIN:
I thought y'all were cross-noticing things so that we wouldn't get to the seven-hour mark and you don't have any time, so you can say, Well, hell, I noticed it too.
MR. REED:
Kaitlin, subject to objection, can he ask his questions just to move on?
MS. WALL:
Sure, Kearney, you can ask your questions.
MR. LOUGHLIN:
Thank you.  I have only a few.
EXAMINATION
BY MR. LOUGHLIN:
Q.  If we can go back to the very beginning of the day, we talked about procedural order

Page 381

number 15, the code of conduct and ethics.
Do you remember that, Chief Fontenot?
A.  I remember discussing that, yes.
Q.  Okay.  I think you said that you put together these rules and you retained some rules that were already in place when you first became chief; is that about right?
A.  Yes.
Q.  Procedural order number 15, the code of conduct and ethics and the conduct unbecoming an officer in particular, is that a rule that was already there that you retained, or is that something that you added yourself?
MS. WALL:
Form.
A.  What page is that on?
BY MR. MARDIAN:
Q.  I don't have the document.  But it's -- it's on page 13 of the document I'm looking at.  It's procedural order number 15-7, the code of conduct.  The stuff that had to do with the Facebook post.
A.  Okay.  Some of this -- I don't remember if it was in the prior administration's procedural order.  But the administrations before that, it



Page 382

was in those procedural orders when I was a police officer, and I think I copied most of that from those orders.

Q. Okay. So was this an order -- was this a provision that was in force when you took over and you kept it, or was it something that you instated or reinstated even if it had been a rule before? And I'm talking specifically about the conduct unbecoming an officer provision.

A. I don't remember if it was in the policy of the chief before me. But it was in a policy of prior chiefs, and I remember getting it from that policy manual.

Q. Okay.

A. It could have been -- it could have been policy with the prior chief as well, I just don't remember.

Q. I understand.

On the KC Hall incident, you said there was a crowd there, some people pushed a table through glass, and other people took that as being a gunshot.

Is that about right, what you said?

MS. WALL:

Objection to the form.

Page 383

A. Lieutenant Dunn claimed it was a gunshot and --

BY MR. LOUGHLIN:

Q. Okay.

A. -- and I don't know -- all the other witnesses we spoke to didn't say -- they didn't think it was a gunshot.

Q. So when you said some people took that as a gunshot, you're talking about Dunn?

A. Yes.

Q. That's not other people said, Oh, I thought I heard a gunshot?

A. Well, Dunn and I think his neighbor, Ms. Lore, that came to the council meeting, I think she was alleging that it was a gunshot as well.

Q. Okay.

A. But she -- I don't think she was outside when it happened, it just sounded like a gunshot.

Q. And your testimony earlier was that the neighbor's allegations that it was a gunshot and her showing shell casings, that didn't come up until after the fact; is that what you said?

MS. WALL:

Objection to the form.

Page 384

A. Correct.

BY MR. LOUGHLIN:

Q. On -- we talked about Lieutenant Kennedy's conclusion about the Facebook post, that it was protected by the First Amendment.

Do you remember talking about that?

A. Yes.

Q. And you said that you disagreed with Kennedy's interpretation in that respect?

A. Yes.

Q. Well, what was Lieutenant Kennedy's conclusion with respect to the First Amendment and its application to the Facebook post that you disagreed with?

A. Well, he felt that the Facebook post was protected by the First Amendment and I didn't because of his status as a police officer and the content of the Facebook post.

Q. His status as a police officer, meaning what? Just the fact that he was a police officer?

A. Yes.

Q. Does it mean anything else when you said "his status as a police officer"?

A. No.

Q. And turning to the content of the

Page 385

Facebook post, what about the content made it not protected by the First Amendment?

A. It's a police officer talking about his own department, and he was mentioning stuff that -- the way the post was constructed, he was -- basically could have caused fear among the public and putting information that wasn't quite accurate.

Q. Is there anything else about the content of the Facebook post that you said was -- that you believe was not protected by the First Amendment?

A. I'd have to look at the --

MS. WALL:

Objection to the form.

A. I'd have to look at the Facebook post again and review it.

BY MR. LOUGHLIN:

Q. Okay.

MS. WALL:

What exhibit, Kearney, and what page?

MR. LOUGHLIN:

I don't have the exhibit. I'm looking through my notes.

MR. MARDIAN:



Page 386

I can pull it up. One second.

THE WITNESS:

I think it was one of the first ones.

MS. LIU:

It should be Exhibit 2.

A. Okay, I'm looking at it.

BY MR. LOUGHLIN:

Q. And just on the contents of the post, if you can just tell me what portion, or if it's all of it, what portion of the contents you believe were not protected by the First Amendment?

MS. WALL:

Objection to the form.

A. Well, he's putting information that there's several gang members there. That can cause unrest with the public if they see stuff like this, Hey, look, we've got gang activity going on.

He's talking about shooting, cutting up in the streets, which we had no evidence was taking place -- that that was taking place. He's putting false information out there, which is not protected by free speech. And he talks about every weekend there being shots fired and stuff.

Page 387

He's putting a lot of misinformation out there. And because of the fact that he is a police officer, he shouldn't be commenting publicly about stuff like this, especially stuff that's under current investigation, and making it look like the police department isn't doing their job.

He's calling the -- I mean, he's discrediting the police department, his own department, by making these types of statements.

BY MR. LOUGHLIN:

Q. Anything else that's not protected by the First Amendment?

MS. WALL:

Objection.

A. I'm going to say the whole thing, the whole thing.

BY MR. LOUGHLIN:

Q. To finish up, going back to the conduct unbecoming an officer in the rules, I believe the only part of the rule that you said the Facebook post violated was that it would impair the operations of efficiency of the department, the officer, or City service; is that right?

MS. WALL:

Page 388

Objection to the form.

A. I don't know if I said that was the only violation. That's the only one that was probably mentioned as a violation.

BY MR. LOUGHLIN:

Q. Looking at the rule and given what you just said about -- about the issue you take with the Facebook post, can you tell me which portions of the conduct unbecoming an officer provision it violated in addition to that?

A. Do you realize that when I'm doing an investigation on an officer and I'm trying to make a decision on whether or not we're going to take disciplinary action or not, that I sit down for hours reviewing the policies, reviewing the facts presented to me, the reports, and I look at everything for a long time making notes and just deciding what violations there could be?

For me to sit here and go through it in just a couple minutes like this and say, This is a violation, there's a violation here, this is another violation it could possibly be, it takes me hours to do that kind of stuff.

Q. I'm only asking you to spend a couple of minutes. So we're talking about (b) of the rules,

Page 389

2, "Conduct unbecoming an officer," lower case b, "Unbecoming conduct is that conduct which," and then it lists Roman numerals I through V, five different categories of conduct.

Do you have that in front of you?

MS. WALL:

You're asking him to go through and interpret each of them now? We've got, what -- we're four minutes away from seven hours in. No. I mean, Kearney.

MR. LOUGHLIN:

We're about three minutes into my questions.

BY MR. LOUGHLIN:

Q. I really just want to know which of those Roman numeral I, II, III, IV, V, Dunn's Facebook posts violated?

A. All five of them.

MS. WALL:

There you go. I mean, like you're asking him to draw legal conclusions too?

A. And there could be other violations in other parts of the policy manual I'd have to review too.



Randy Fontenot

January 30, 2025
Pages 390 to 393

Page 390

MR. LOUGHLIN:

That's all I have.  Thank you.

THE VIDEOGRAPHER:

All done?

MS. WALL:

I'm going to leave it open so if I want to come back and ask questions later, but just -- I'll leave it open for that and then if they have rebuttal questions, but it can only be open subject to that, me having any questions to follow up with.  But it is late.

THE VIDEOGRAPHER:

That concludes the deposition for today.  The time is 6:23.  We're off the record.

(END OF TESTIMONY AT 6:23 P.M.)

Page 391

REPORTER'S PAGE

I, RITA A. DEROUEN, Registered Professional Reporter (RPR #6908) and Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)";

That (sic) denotes when a witness stated word(s) that appears odd or erroneous to show that the word is quoted exactly as it stands.

RITA A. DEROUEN, RPR, CCR

Page 392

REPORTER'S CERTIFICATE

I, Rita A. DeRouen, Registered Professional Reporter (RPR #6908) and Certified Court Reporter (Certificate #2014018) in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that on January 30, 2025, in the above-entitled and numbered cause, the deposition of RANDY FONTENOT, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 391 pages;

That this testimony was reported by me in stenographic shorthand, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board;

That I have acted in compliance with the prohibition on contractual relationships, as

Page 393

defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I am not of Counsel, nor related to any person participating in this cause, and am in no way interested in the outcome of this event.

SIGNED THIS 11th DAY OF FEBRUARY, 2025.

*Rita DeRouen*

RITA A. DEROUEN
Registered Professional Reporter
Certified Court Reporter

