Scott Fontenot                                November 20, 2024

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA


MICHAEL DUNN

vs.                          Civ. A. No.
                             6:21-cv-05135

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, AND JOHN
DOE

* * * * * * * * * * * * * * * * * * * * * * * * * *




VIDEOTAPED DEPOSITION OF
SCOTT FONTENOT

November 20, 2024


Held at Becker & Hebert, LLC
201 Rue Beauregard
Lafayette, Louisiana  70508



(Beginning at 9:20 a.m.)




Reported by:

Rita A. DeRouen, CCR, RPR
(CCR #2014018)
(RPR #006908)

**MAGNA** ▶
LEGAL SERVICES                    **EXHIBIT F**

Page 2

APPEARANCES:
REPRESENTING THE PLAINTIFFS:

SIDLEY AUSTIN, LLP
1501 K Street NW
Suite 600
Washington, D.C.  20002
BY:  AMIT BHATLA, ESQ.
abhatla@sidley.com
        - AND -
KEARNEY LOUGHLIN, ATTORNEY AT LAW
602 Boulder Creek Parkway
Lafayette, Louisiana  70508
337.534.8803
BY:  KEARNEY LOUGHLIN, ESQ.
kearney.loughlin@gmail.com

        - AND -
SIDLEY AUSTIN, LLP
787 Seventh Avenue
New York, New York  10019
212.839.5300
BY:  LIA M. HIGGINS, ESQ.
lhiggins@sidley.com
BY:  ALEXANDRA BIELER, ESQ.
abieler@sidley.com
(Via Zoom)

REPRESENTING THE DEFENDANT CITY OF EUNICE:

BECKER & HEBERT, LLC
201 Rue Beauregard
Lafayette, Louisiana  70508
337.233.1987
BY:  MICHAEL D. HEBERT, ESQ.
mhebert@lawbecker.com
BY:  JAMES DOHERTY, ESQ.
jdoherty@lawbecker.com

Page 3

APPEARANCES:  (CONTINUED)
REPRESENTING THE DEFENDANT CITY OF EUNICE:

STAN FEUCHT, ATTORNEY AT LAW
440 N. 2nd Street
Eunice, Louisiana  70535
337.550.1115
BY:  CHARLES STANISLAUS FEUCHT, ESQ.
stan@feuchtlaw.com

REPRESENTING THE DEFENDANT VICTOR FONTENOT:
STAMEY LAW FIRM, LLC
727 Second Street
Natchitoches, Louisiana  71458
318.951.1024
BY:  JOSEPH B. STAMEY, ESQ.
joe@stameylawfirm.com


REPRESENTING THE DEFENDANT RYAN YOUNG:

NEUNER PATE
1001 West Pinhook Road, Suite 200
Lafayette, Louisiana 70503
337.272.0348
BY:  COLLYN DUBOSE, ESQ.
cdubose@neunerpate.com

REPRESENTING THE DEFENDANT RANDY FONTENOT:
ERLINGSON BANKS, PLLC
301 Main Street, Suite 2110
Baton Rouge, Louisiana 70801
225.218.4446
BY:  KAITLIN A. WALL, ESQ.
kwall@erlingsonbanks.com

Page 4

APPEARANCES:  (CONTINUED)


Also Present:
    Andy Grover, Videographer
    Lauren Sylvest, Becker & Hebert
    Michael Dunn
    Randy Fontenot


Reported by:


Rita A. DeRouen, Certified
Court Reporter No. 2014018
in and for the State of
Louisiana

Page 5

                    I N D E X

                                               Page
Stipulation                                       8
Reporter's Page                                 371
Reporter's Certification                        372


EXAMINATION
    By Mr. Bhatla                                10
    By Mr. Loughlin                             363
                    * * * * *
            List of Exhibits


Exhibit #1
    (CityofEunice_Dunn_0000823 - 981)            46
Exhibit #2
    (CSB_0000959 - 1035)                         63
Exhibit #3
    (Notice of a Rescheduled Special Called      80
    Public Meeting/Hearing, CSB_0000541 -
    551)
Exhibit #4
    (Letter from Lt. Thibodeaux to Mayor         99
    Fontenot, with attachments, CSB_0000853 -
    893)
Exhibit #5
    (Interoffice Memorandum, 4/22/21,           122
    CityofEunice_Dunn_0001758 - 1808)



MAGNA
LEGAL SERVICES

Scott Fontenot                                          November 20, 2024
                                                        Pages 6 to 9

Page 6

EXHIBITS:  (CONTINUED)

Exhibit #6
     (Notice of Appeal to the 27th Judicial      150
     District Court, CSB_0000465 - 470)

Exhibit #7
     (CityofEunice_Dunn_0002097 - 2251)          156

Exhibit #8
     (Short Message Report, DUNN_0002119)        204

Exhibit #9
     (Letter from Vilar to Civil Service         240
     Board, 9/18/19, DUNN_0000425 - 426)

Exhibit #10
     (Written Finding of Fact, DUNN_0000368 -    243
     369)

Exhibit #11
     (Written Finding of Fact, DUNN_0000427 -    257
     429)

Exhibit #12
     (Letter from Vilar to Civil Service         268
     Board, 6/19/20, DUNN_0000067 - 68)

Exhibit #13
     (Letter from Thibodeaux to Mayor Scott      278
     Fontenot and Board of Alderman, City of
     Eunice, 5/13/21, DUNN_0000711)

Page 7

EXHIBITS:  (CONTINUED)

Exhibit #14
     (Letter from Board Member Garrett Daville   286
     and Board Member Keith Vidrine to
     Chairman and Members of Eunice Municipal
     Fire and Police Civil Service Board,
     4/15/21, with attachments, DUNN_0000666 -
     684)

Exhibit #15
     (Letter from Thibodeaux to City of          291
     EUnice, 3/3/21, with attachments,
     DUNN_0000295 - 310)

Exhibit #16
     (First Amended Complaint)                   327

Page 8

S T I P U L A T I O N

     It is stipulated and agreed by and between counsel that the testimony of the witness, SCOTT FONTENOT, is hereby being taken pursuant to Notice under the Federal Rules for all purposes permitted under law.

     The witness waives the right to read and sign the deposition. The original is to be delivered to and retained by AMIT BHATLA, ESQ., for proper filing with the Clerk of Court.

     All objections, except those as to the form of the questions and/or responsiveness of the answers, are reserved until the time of the trial in this cause.

                         * * *

     Rita DeRouen, Certified Court Reporter in and for the State of Louisiana and Registered Professional Reporter, officiated in administering the oath to the witness.

Page 9

THE VIDEOGRAPHER:
     We are now on the record.  This begins Videotape Number 1 in the deposition of Scott Fontenot taken in the matter of Michael Dunn vs. Randy Fontenot, et al., being heard before the U.S. District Court for the Western District of Louisiana, Docket Number 1:21-cv-01436.
     Today is November 20, 2024, the time is 9:20 a.m.  This deposition is being taken at Becker and Hebert in Lafayette, Louisiana at the request of Sidley Austin.
     My name is Andy Grover, I'm the videographer.  The court reporter is Rita DeRouen.  Appearances by counsel will be noted on stenographic record.
     Will the court reporter please swear in the witness.
     SCOTT FONTENOT, having been first duly sworn, was examined and testified as follows:



Scott Fontenot                                                      November 20, 2024
                                                                   Pages 10 to 13

Page 10

EXAMINATION

BY MR. BHATLA:

Q.  Good morning, Mayor Fontenot.

A.  Good morning.

Q.  My name is Amit Bhatla, I know we've met.  I represent Lieutenant Michael Dunn in the lawsuit he's filed against the City of Eunice, Randy Fontenot, Victor Fontenot, and Ryan Young.

Can you please state your full name for the record.

A.  Scott Fontenot.

Q.  Is it all right if I call you Scott?

A.  Yeah.

Q.  Have you ever been deposed before?

A.  No, sir.

Q.  Have you ever testified at a trial or another proceeding?

A.  Yes.

Q.  Can you tell me about that.

A.  I was running for mayor and they had an ethics board, I guess, claim against me to prohibit me from running for office, and so I had to testify in District Court on that.  And we won.

Q.  What was the nature of the complaint?

A.  There was a law that pertained to the

Page 11

appointment of when I was prior -- I was -- prior to the appointment of mayor, I was on the City Council, I was acting as interim mayor -- well, I was acting as mayor pro tem; the Council appointed me to interim mayor.

The claim was that the appointment was not done properly.  That was brought forth to the ethics board actually by an opponent of mine.  And the ethics board claimed that the appointment wasn't done correctly.  We had done everything properly, we thought, on our end according to our attorney, the City attorney and Secretary of State's office.

So we went to district court and we won.  We went to the appellate court, we won.  They even had a supreme court -- I don't know what they call it, they had a -- I guess -- I'm not sure the word I'm looking for.  They determined that we were good.  So...

Q.  Did you testify in all of those proceedings?

A.  I did in district court.  I don't think I had to in the appellate court.  I was in attendance; I don't think I had to testify.

Q.  When you say "the ethics board," what is

Page 12

that?

A.  It's the Louisiana State Ethics Board.  It's a board that, I guess, oversees elected officials and public employees.  They take complaints in any type of matter.

Q.  Are there any individuals from Eunice on the board?

A.  No.  It's all people from across the state of Louisiana.  I'm really not sure how the board is made up.  Most of them are government -- governor appointees, I believe.

Q.  Now, you've attended several of the depositions in this case, right?

A.  Yes.

Q.  Have you spoken to any of the people who were deposed about their depositions?

A.  No.

Q.  Did you talk to anyone in Eunice about any of the depositions you witnessed?

A.  No.

Q.  So you've probably heard this many times by now, but just for clarity I'd like to go over some ground rules with you to make sure we're on the same page about the answers that you will provide in response to the questions that I will

Page 13

ask.

First, do you understand that you're testifying under oath?

A.  Yes.

Q.  You understand, then, that your answers are subject to the penalty of perjury?

A.  Yes.

Q.  I'll try to ask you clear questions, but if you don't understand any aspect of my question, I ask that you clarify -- you ask for clarification; otherwise, I'll assume you understood the question.

A.  Sure.

Q.  Do you understand that?

A.  Yes.

Q.  I ask that you please provide verbal answers to all questions because the court reporter won't be able to pick up any nods, anything like that.

Do you understand that?

A.  Yes.

Q.  If your counsel objects, as long as the objection isn't based on privilege, you must still answer the question.

Do you understand that?



Scott Fontenot

November 20, 2024
Pages 14 to 17

Page 14

A.  Yes.

Q.  If at any time you'd like a break, please ask for one.  But if there's a question pending, I ask that you please answer the question before we go on break.

Do you understand that?

A.  Yes.

Q.  What did you do to prepare for today's deposition?

A.  Specifically, I mean, I met with the team of attorneys that's representing the City and just went over a couple of things.  That's about it.

Q.  Who specifically did you meet with?

A.  I'm not sure.  I don't remember their names.  I've been meeting with so many people.

MR. HEBERT:

James Doherty and myself.

MR. BHATLA:

Anyone else?

MR. HEBERT:

And my paralegal, Lauren Sylvest.

THE WITNESS:

I'm sorry.

MR. HEBERT:

Page 15

You're fine.

THE WITNESS:

I apologize.

BY MR. BHATLA:

Q.  No worries.

How many times did you meet with them?

A.  I met with them yesterday briefly and this morning.

Q.  How long was your meeting with them yesterday?

A.  About 30 minutes.

Q.  How long was your meeting with them today?

A.  I didn't even meet with all of them.  Probably like five minutes just sitting around waiting for everybody to get in here.

Q.  Did you review any documents in anticipation of today's deposition?

A.  I did.

Q.  Did you bring any documents or notes with you to the deposition?

A.  No, I didn't.

Q.  Did any of the documents you looked at refresh your recollection of the events that are discussed in the documents?

Page 16

A.  I mean, there's been so much information throughout this process.  It did bring something back I guess, you know.  This has been going on for a while.  So I'm not even sure how many years it's been going on.

Thank you.

Q.  How was your recollection refreshed?

A.  I guess going back to the beginning when all this initiated.  I'm trying to remember, because there's been -- there's multiple cases and things that are going on between, I guess, this particular incident and other incidents that we've had to deal with and the City still continues to deal with.  So I'm not sure.

Do you want to repeat that question.

Q.  Sure.  Just specifically, as to what events was your recollection refreshed?

A.  Yeah, I think it's just from what this boils down to, to be honest with you.

Q.  Can you explain further?  What do you mean, what it boils down to?

A.  The accusations by Lieutenant Dunn against Randy Fontenot and others at the police department.

Q.  What accusations?

Page 17

MR. STAMEY:

I'm going to object to the form of the question.  Subject to that objection, you may answer if you can.

A.  I think specifically in this, accusations by Lieutenant Dunn of mistreatment as being an officer, maybe reporting some things that wasn't looked at.  You know, that's -- I'm not sure if that's everything, but that's what I kind of remember.

Q.  What do you mean by things that weren't looked at?

MR. STAMEY:

Same objection, making it continuing.

A.  Well, you know, I think about everything, and I would think when Lieutenant Dunn would make claims that there were wrongdoings by the others in the police department and that it wasn't being looked at -- I don't know specifically.

There are multiple occasions of Lieutenant Dunn making accusations of multiple things.  So it's hard to really pinpoint what it was.



Scott Fontenot

Page 18

Q.  What do you mean when you say events that weren't looked at?

A.  I guess a complaint, a verbal complaint that Officer Dunn would make.  I don't know if there was any existence of a written complaint on certain instances.

Q.  And when you say those complaints weren't looked at, you mean they weren't investigated?

A.  Isn't that what we're here for?  I mean, that's --

Q.  I'm just looking for a yes or no.  Is it correct that when you say that complaints weren't looked at, you mean they weren't investigated?

MR. HEBERT:
Object to the form.  I think -- is the question whether -- whether the allegations brought to him by Mr. Dunn were that complaints were not investigated, is that the --

MR. BHATLA:
I'm just trying to understand Scott's response.

A.  Well, I mean --

Page 19

BY MR. BHATLA:

Q.  When you -- sorry, I'll rephrase the question.

When you said that things, quote, weren't looked at, that means they were not investigated, right?

A.  I can't -- I can't say that because I'm not in charge of the internal investigations in the police department.  I don't see those things.  If a verbal complaint was made, I don't know the procedure on how you act on that.  I'm not a police officer.  If a written complaint was made, then I would think things would be looked at.  I don't know.

Q.  You don't know if things that were in written complaints were investigated?

A.  No.  I have no recollection of -- now, if it's a written complaint, you would have to follow a process, yes.  Now, if it's a verbal complaint, I don't know what their procedure is.

I don't know the procedure in the police department when it comes to officer complaints, whether it's from the public or another officer.

Q.  What is your understanding of the allegations that Lieutenant Dunn has made in this

Page 20

case?  Were they verbal complaints or written complaints?

A.  In the form of written, I mean, if it's a journal, he had a journal.  But a formal written complaint would be totally separate.  I don't know if he ever filed that other than I guess with the court.  I mean, I don't know.

Q.  You don't know if Lieutenant Dunn ever filed a written complaint on any issue?

A.  To the police department, I'm not sure.  I don't think so.  And I could be wrong.  Look, like I said, I don't -- I don't get into the internal investigations part of that.  So if he was -- ever made a formal written complaint to the police department, unless it was further investigated, I wouldn't know about it.

Q.  You said earlier that this case relates to accusations by Lieutenant Dunn of mistreatment as being an officer.

What is your understanding of that?

A.  Well, I mean, it was known, he would tell everybody that he felt like he was being treated unfairly by the chief of police.

Q.  In what way?

A.  I guess he just had personal feelings

Page 21

that way.  To see any, you know, action taken against him through the department, I didn't see that.

MR. BHATLA:
Can we go off the record?

THE VIDEOGRAPHER:
We are off the record.

(A break was taken.)

THE VIDEOGRAPHER:
We are back on the record.  The time is 9:40.

BY MR. BHATLA:

Q.  Scott, how would you describe your relationship with Lieutenant Dunn?

A.  Just known him over the years.

Q.  Do you two socialize?

A.  No.

Q.  Do you two ever talk by phone?

A.  Occasionally, if there's an incident that he may need assistance on.

Q.  Like what?

A.  If there's a burglary or something in my area, he may call me to check my cameras or something at my house.

Q.  Any other reasons for Lieutenant Dunn to



MAGNA
LEGAL SERVICES

Scott Fontenot

Page 22

call you?

A. No.

Q. Do you two ever exchange text messages?

A. We have in the past.

Q. What do you normally talk about?

A. Same thing, either be on the lookout for this person or that in your neighborhood or -- and in the past he's texted me things that were probably a little more than that, I would say.

Q. What do you mean by that?

A. I mean, I'd have to go back and look. We text a lot, you know. Just different things, I guess. I would say -- I can look to refresh my memory, you know. I don't delete my texts. So...

Q. Do you ever talk about the Eunice Police Department in your messages with Lieutenant Dunn?

A. I'm sure he has.

Q. Have you ever talked about Randy Fontenot in your text messages with Lieutenant Dunn?

A. I'm sure he has talked about him, yes.

Q. What do you recall about those conversations?

A. Like I said, I don't really recall anything. I can go back and look.

Page 23

Q. Have you two ever talked about Lieutenant Ryan Young?

A. No.

Q. Have you two ever talked about Officer Victor Fontenot?

A. I believe he may have mentioned that before, whether it was verbally or in a -- I don't know if it was in a text, I don't think so.

Q. What do you recall about that conversation?

A. Officer Dunn didn't have a good view of Victor Fontenot.

Q. Why is that?

MR. STAMEY:
Objection to the form of the question. Subject to that objection, you may answer.

A. I guess, you know, they worked together, so maybe there was observations when they worked together that he felt he could have been better at.

BY MR. BHATLA:

Q. Better at doing his job, in terms of Victor Fontenot?

MR. STAMEY:

Page 24

Objection to the form of the question. Subject to that objection, you may answer.

A. I'd probably agree with that, yeah. I mean, he was a supervisor in the department, so you almost want to kind of maybe not criticize people, but you see that they're doing wrong, if you think they're doing wrong, I guess you try to address it or correct it or bring it up.

BY MR. BHATLA:

Q. Did Lieutenant Dunn ever try to correct issues with Officer Fontenot's performance?

A. I have no idea of that.

Q. What is your opinion of Lieutenant Dunn's abilities as a police officer?

A. He seems like a capable police officer.

Q. Do you think Lieutenant Dunn is honest?

A. I would hope so.

Q. You don't have an opinion as to whether he's honest or not?

A. I don't know him good enough.

Q. Based on your experience with him thus far, would you characterize Lieutenant Dunn as an honest person?

MR. STAMEY:

Page 25

Object to the form of the question.

MR. HEBERT:
Join.

MR. STAMEY:
Subject to that objection, you may answer.

A. It's hard to tell. I mean, I can't just read somebody if I don't spend enough time with them, you know. So I can't give that opinion yes or no, that would be unfair to them.

MR. HEBERT:
Can we go off the record for a second?

THE VIDEOGRAPHER:
Off the record.

(A break was taken.)

THE VIDEOGRAPHER:
We are back on the record. The time is 9:45.

BY MR. BHATLA:

Q. Based on your experience with Lieutenant Dunn, do you think he's an ethical person?

A. I think he's a police officer. So it goes back to what I said about his honesty, you know. I believe he would be, I hope he would be.



Scott Fontenot

Page 26

Q.  Do you think Lieutenant Dunn is a good police officer?

A.  Yes, I said that earlier.

Q.  What's your understanding of Lieutenant Dunn's lawsuit against the City of Eunice, Randy Fontenot, Victor Fontenot, and Ryan Young?

MR. HEBERT:

Object to the form to the extent it calls for a legal conclusion.

A.  Can you repeat the question again.

BY MR. BHATLA:

Q.  What's your understanding of Lieutenant Dunn's lawsuit against the defendants in this case?

MR. HEBERT:

Same objection.

A.  As a question to answer like what we hope the outcome will be or what this is all about?

BY MR. BHATLA:

Q.  No, I'm just trying to get your understanding of the lawsuit, the allegations at play.

A.  I mean, my understanding is that this came about because Lieutenant Dunn wanted to see

Page 27

changes in the police department.  And then it got to this point where we're here and the ACLU is trying to, you know, I guess fight to see those changes happen.  That's what I feel like this is all about.

Q.  You encouraged Lieutenant Dunn to file this lawsuit, right?

A.  I didn't encourage him.  I told him to do what he had to do.

Q.  When did you say that to Lieutenant Dunn?

A.  I don't recall exactly when.  It was probably after he went to every law enforcement agency they had on the planet.

Q.  What do you mean by that?

A.  According to Lieutenant Dunn, he went to the Louisiana State Police, he went to the City marshal's office, he went to the district attorney's office, he went to the sheriff's department, even called the FBI.  I said, Hey, do what you got to do.  I don't know what else to tell you.  I'm not the one with a badge.  I'm the mayor.

Q.  When you say Lieutenant Dunn went to those agencies, what do you mean?

Page 28

A.  I mean, according to everything I heard in testimony from everybody else and from the things I hear around the City, that he went to those places.  And I even encouraged him when he came to me one time and says, Hey, I have all this stuff.  I said, I can't help you, I'm not a police officer, go talk to someone else, go talk to someone who can help you.

Q.  Help him with what?

A.  With whatever complaints he had.

Q.  What's your understanding of those complaints?

A.  I mean, I think there was somewhere he felt like -- if I had some notes I could kind of recall.  Like I said, it's been so many things that's happened over the years in the police department, it's hard to really pinpoint.  I think just being mistreated in the police department, you know, was really one of them.

Q.  What's your understanding of that mistreatment?

A.  He felt like he was targeted.  I mean, he openly said that to many people, not just myself.

Q.  What do you mean by "targeted"?

Page 29

A.  That he felt like the chief was out to get him.

Q.  The chief being Randy Fontenot?

A.  Yes.

Q.  Why was Chief Fontenot out to get Lieutenant Dunn?

MR. STAMEY:

Object to the form of the question.

MR. HEBERT:

Join.

A.  I have no idea.  That would be a question for them, I guess.

BY MR. BHATLA:

Q.  Did you review the complaint that was filed in this case?

A.  I probably have at one time or another.

Q.  Do you recall details of the complaint?

A.  Without looking at it, I don't.

Q.  What did Lieutenant Dunn say to those other agencies you mentioned?

A.  I have no idea.

Q.  What is your understanding of what Lieutenant Dunn was reporting to those agencies?

A.  I really don't know what he reported to the agencies.  If he told them the same thing that



Scott Fontenot                                                    November 20, 2024
                                                                 Pages 30 to 33

Page 30

he told me, I have no idea. I didn't see any physical reports of any of that.

Q. How did you become aware that Lieutenant Dunn reached out to those agencies?

A. Well, it was known. I mean, people were talking about it, everybody in City Hall.

Q. Who does that include?

A. Terry Darbonne for sure, because he knows everything that's going on in the building.

Q. And who is Terry Darbonne?

A. He's the Eunice City marshal.

Q. Anyone else?

A. I'm pretty sure everybody who works there. I mean, it's true.

Q. Do the folks in City Hall know the nature of Lieutenant Dunn's allegations in his complaint?

A. I don't know. I really don't know.

Q. Have you ever spoken with Lieutenant Dunn about this lawsuit?

A. Yes.

Q. What did you discuss?

A. I mean, not that long ago he told me in the hallway and told Stan Feucht, the City attorney, that he wished it would just all go

Page 31

away, that he couldn't drop it, it's too far.

Q. When was this conversation?

A. It's been within the last, say, nine months at least, I would think. He was training an officer, Wesley Rozas. Yeah, it had to be within the last, I'd say, nine months or so.

Q. You said Lieutenant Dunn came to you with the allegations of mistreatment and you said you couldn't do anything; is that right?

A. I told him I wasn't the person he needed to come with the complaint with to (sic), that he needed to go to someone who could actually take action.

Q. When was this conversation?

A. Oh, shoot, I don't even remember. It's been years.

Q. What specifically did Lieutenant Dunn discuss with you at that meeting?

A. I don't recall specifically, exactly what he discussed. I hear a lot of complaints about a lot of different things, it doesn't matter what it is. And if I can't handle it, I always try to guide them to somebody who can.

So it's hard for me to pinpoint what it was, because even just yesterday I probably had

Page 32

somebody that came to me for something and I pointed them in the right direction. And I don't remember what it was because I just went on to the next issue.

Q. Have you discussed this lawsuit with anyone from the Eunice Police Department other than Lieutenant Dunn?

A. I don't think so.

Q. How would you describe the morale at the Eunice Police Department over the past two years?

A. You talking about like the last calendar years or just the last two years in general?

Q. Last two calendar years.

A. It's been -- it's been different.

Q. In what way?

A. Well, we gave them a raise. The police department got a raise, so they were happy about that. There's a new chief. Anytime there's a new person in charge, you know, whether it's a new coach on the football team, everybody gets excited. We've invested in some equipment.

So, yeah, I would say the morale has gotten better, I would say that, yeah. And they're not being worked overtime, because now with the raise we're getting a full staff. So...

Page 33

Q. Who is the new chief of police?

A. Mr. Kyle LeBouef.

Q. Who did he replace?

A. He replaced former Chief Randy Fontenot.

Q. Do you think the Eunice Police Department was well run under Chief Fontenot?

A. I think Chief Fontenot had a tough task, and I think he did the best that he could with what he had.

Q. Do you think the department was well run during his tenure as chief of police?

A. I mean, that's a hard question to answer. I mean, we had a lot of things that went on in the City. Does it all boil down to the police department? It's hard to point a finger at it.

Q. Is the department better run now under Kyle LeBouef than it was under Chief Fontenot?

A. It's a different type of leadership. Anytime you have a full team on the field, you're better off than when you only got half the team, and I would say that it's shown.

Q. Can you clarify? What do you mean by full team versus half team?

A. The police department is at full staff



Scott Fontenot

Page 34

for the first time in probably 20 years.

Q.  Why is that?

A.  I think, number one, I mean, the pay was an issue.  I think the change in leadership.  You had, you know, people who maybe wanted to explore different career options and come from other departments.  We got new equipment.

A lot of things like contributed to us getting the police department back to where we hoped it would be.  The City of Eunice invested a lot of money in the last two calendar years in the police department, like a ton of money.  We had to.  We had a public safety issue.  We invested in it, we tackled the problem of crime.  It's gotten better in that sense.

Q.  Can you explain what you mean by you had a public safety issue?

A.  I mean, just like everywhere in the country, you had a lot of drugs and killings and gun violence.  And everywhere you turn it was defund the police.  And it was just not a good time to be a police officer.  And the criminals ran rampant.  We know it was a national trend.

So obviously, you know, when I ran for re-election as mayor, I think -- thankfully I went

Page 35

unopposed, but my goal was to tackle crime.  And former Chief Randy Fontenot chose not to run for office again.  And when I met with the candidates who decided to run for chief of police, I told them I was committed to public safety because that was our number-one issue in town.

And we tackled it and we handled it and the officers are happier.  And -- it takes a toll on officers when they working 18-hour shifts, you know, and you're getting a couple hours off, you got to go back to work.  It's not like that anymore.  They're getting their rest.

Officer Dunn says he's tired because he probably worked last night.  He just said that in the hallway.  But I don't think they're worked as much as they were, and their paychecks are just as good if not better.

Q.  What is your understanding of why Chief Fontenot decided not to run for re-election?

A.  I have no idea.  Him and I never had that conversation.

Q.  Are you familiar with the Eunice Police Department budget?

A.  Yes.

Q.  How much oversight do you have into the

Page 36

budget for the Eunice Police Department?

A.  I prepare the budget and City Council adopts it and we provide it to the police department.

Q.  You prepare the budget yourself?

A.  Yeah, me and the financial adviser.

Q.  Do you recall what the Eunice Police Department's budget was this past year?

A.  Specifically, no, I don't.  I know that we gave them a $400,000 increase in the budget to cover raises, but I also reduced some overtime expenses.

So -- now, we also invested, you know, money that's not directly in their budget, money that was allocated just to the general capital outlay expenses of the city; buying police cars, buying body cameras, buying Tasers, buying any type of equipment, that's going to come out something totally separate from the budget we already give the police department.

Q.  Roughly how much is the annual budget for the Eunice Police Department?

A.  Man.

MR. HEBERT:

Now.

Page 37

A.  Now, yeah, it's probably -- shoot, man, about -- close to 3 million, I would think.

BY MR. BHATLA:

Q.  And roughly how much was the Eunice Police Department budget under Randy Fontenot in his last year as chief?

A.  It was less than this.  I'd have to look specifically.  I'm not sure.  It was probably another -- we did the raise on the brand-new fiscal year of 2023, so that started June -- July 1.  And so that was the first -- that was halfway through the new chief's first year, new Chief LeBouef.

So that only -- now, let me go back, time out.  Now you're getting me all confused, man.  We did the pay increase halfway through the budget year to where we only took a hit halfway through that year.  So, yeah, Randy's budget was probably 300,000 less, I would think.  And because we got to factor in what we're going to save on overtime and stuff like that.

Q.  Why do you think Randy Fontenot wasn't able to tackle crime in Eunice with a $2.7 million budget?

A.  I don't know.  I don't have an answer



Scott Fontenot                                                              November 20, 2024
                                                                           Pages 38 to 41

Page 38

for that.

Q.  Do you think Randy Fontenot could have spent the Eunice budget for the police department better?

A.  It's a tight budget to begin with and not a lot of wiggle room in it, to be honest with you.  It's hard whenever you don't have a full staff.  And we were just struggling with getting a full staff.

Q.  Did you think Randy Fontenot was using Eunice Police Department money properly in all instances?

A.  I don't think there was anything improper.  So...

Q.  There was nothing improper or you can't recall if there was anything improper?

A.  I don't recall anything improper that was done.  Everything is -- every expenditure is signed off on and I have to sign off on and we get audited every year.  So...

Q.  Can you think of any instance when you saw a mistake by an EPD police officer?

A.  I'm not sure.  Can you maybe elaborate more on that question?  What type of mistake?  Or just...

Page 39

Q.  Can you think of any instances where a police officer behaved in a way that violated EPD policy?

A.  Not unless it was brought to me on a, you know, personnel action form, which is disciplinary action, I wouldn't know of anything.

Q.  What disciplinary actions can you recall?

A.  I mean, it's hard to pinpoint, to be honest with you.  That's all public record.  I mean, anytime the chief had an issue with an officer in the police department and we were the appointing authority, we had to go through the process to review the complaint form.

I can't remember anything specifically we did with -- I'm dealing with two separate ones right now with the police department and fire department.  So it's hard to pinpoint exactly what I seen five years ago.

Q.  What is the current disciplinary action you're looking at for the police department?

A.  We had an instance where an officer was tardy for work, and we had a predisciplianry hearing and the -- he got a verbal -- or written reprimand, I believe.

Page 40

And then the other issue with the fire department was -- and I'm not sure if the investigation has been initiated yet, so I'm not going to discuss that.

Q.  I'd like to turn to discuss your background.  When were you first elected mayor of Eunice?

A.  I was elected March of 2016.

Q.  Is that your only employment?

A.  No.

Q.  You also run a window-tinting business?

A.  I own a car stereo and automotive accessory business, yes.

Q.  Do you have any other employment?

A.  I've got a couple pieces of rental property.

Q.  What did you do before you were elected mayor?

A.  I was full-time automotive accessory-type mechanic.

Q.  What are the main responsibilities of the mayor of Eunice?

A.  I mean, just the day-to-day operations of the city.  We've got many departments we've got to oversee.  We've got to balance our budget,

Page 41

maintain a budget, and just -- everybody thinks the mayor can do anything, so they call me for everything.

Q.  What are the differences between the mayor's office and the City Council?

A.  It's two different distinctions.  I was on the City Council, I didn't say that.  Before I was mayor, I was on the City Council.  I was elected to the City Council in 2010.  I served a term and was re-elected.  And then the following year is whenever the mayor had passed away and I went into the role as being the mayor.

But the difference between that is, I mean, the City Council, I mean, they make the laws, they the ones who I guess -- they don't oversee any day-to-day operations of the City.  The only actual authority they have in anything regarding employees is whenever we -- I say "we," whenever the City and the City Council is the appointing authority; they just oversee the hiring and firing of civil service employees, which is police and fire.

Other than that, I mean, I let my City councilmen have a little leeway in their job.  I was on the City Council before and I know it's



Scott Fontenot

Page 42

tough sometimes just to get things done.  A person calls in a complaint, you know, there's a culvert that's clogged up, a lot of the City councilmen call and let the supervisor know, the supervisor can go knock that job out; where in reality, they don't even have that authority to do that, they can't direct employees to do things.  I let them do that.

Now, when it comes down to big-money-spending jobs, absolutely they want to get approval.  But we work together in that sense.

Q.  If I talk about aldermen and alderwomen, those are the members of the City Council?

A.  Yes.

Q.  What is the chief of police's job responsibilities?

A.  Well, specifically in Eunice, the chief of police is elected.  And the responsibilities of being elected chief is you handle the day-to-day operations of the Eunice Police Department and I think anything else associated with that.  You've got to uphold the laws and all the other things that comes with that position.

Q.  Have those job responsibilities changed in any way over the last five years?

Page 43

A.  According to the Larson Act, I don't think so.

Q.  What do you mean by "according to the Larson Act"?

A.  The Larson Act is a state law that separates the duties of elected officials that clearly states the duties of a mayor that's elected, the chief of police that's elected, and so on.  And I don't think that law has changed.

Q.  How often do you interact with the chief of police at the Eunice Police Department?

A.  As little as possible, to be honest with you.  I want them to be able to do their job.  Now, if they need to come for anything -- I say "they," I'm speaking about the chief of police, Randy Fontenot and Kyle LeBouef.  If they need something, they can come on over to my office or call me or text me and we'll handle our business.

But I don't want to deal with the police department.  I'm elected as mayor.  So -- and, you know, a little more background on myself, my dad was the chief of police in Eunice from 1998 to 2010.  And I just knew by spending time with him that you don't want to get in the chief's business.  Let them do their job, that's what they

Page 44

elected to do.  If the people don't like it, then make a change.

Q.  When Randy was chief of police, how often did you talk to him about police business?

A.  Probably at least once a week, I would think, a couple of times a month depending on what was going on.  It may have been more.

Q.  How often do you interact with Chief Kyle LeBouef about police business in Eunice?

A.  About the same, about the same.

Q.  Are there policies that govern conduct at EPD?

A.  Yeah, I'm pretty sure they have their own policy in place.

Q.  Who -- sorry, did you have anything further to say?

A.  No, sir.

Q.  Who sets the policies that govern EPD conduct?

A.  I'm assuming it's the chief.  You know, the police department and civil service is a whole weird, tangled web.  It's -- I'm not sure how their policies affect civil service policy.  So I don't know anything about that.

Q.  If I were to try to find those policies,

Page 45

where would I look?

A.  I would probably say ask the secretary to the chief, and if she doesn't give it to you, make a public record request.

Q.  Those policies are written down?

A.  I guess.

Q.  Are any not written down but, nonetheless, expected to be followed?

A.  I don't think -- I don't think so.  That wouldn't be fair.

Q.  Do you know how those policies are communicated to EPD personnel?

A.  No.

Q.  Do you ever review EPD policies?

A.  No.

Q.  Does the City Council?

A.  I don't think so.

Q.  Does anyone besides the chief review the EPD policies?

A.  I'm not aware of anyone.

MR. BHATLA:

I'm going to mark as Exhibit 1, this is -- make sure I have it.  This is the document produced at Bates stamp City of Eunice_Dunn_823.



Scott Fontenot

November 20, 2024
Pages 46 to 49

Page 46

Now, I've only printed six copies of each document, so, you know, one for the witness, one for myself, and four for opposing counsel for each defendant.

(Exhibit 1 was marked.)

MR. HEBERT:

Okay.

MR. BHATLA:

So if you could just hand this down.

BY MR. BHATLA:

Q. So I'm going to hand you what I've just marked as Exhibit 1. And I'll just explain for you -- are you familiar with Bates numbers at the bottom right-hand corner of the document?

A. I just familiarized myself with it, so, yeah, I guess.

Q. I'll just let you know that this Bates code here at the bottom here, also called a Bates number, is representing which party produced the document. It provides an alphanumeric organization system. So this document was produced by the City of Eunice.

A. Okay.

Q. Do you recognize this document?

A. I don't have a copy of it in my desk.

Page 47

Q. Do you recognize what it is?

A. Just by looking at it, it pertains to a police department. I mean, I didn't go through it.

Q. If you look on the first page, do you see Number 15-3 in the table of contents, City of Eunice Employee Policies?

A. Yes.

Q. And then do you see the next item, 1-54, Organizational Structure of the Eunice Police Department?

A. Okay, yeah, I see that.

Q. Is this the Eunice Police Department policy?

MR. STAMEY:

Objection to the form of the question.

MR. HEBERT:

Joined.

A. I mean, it looks like it.

BY MR. BHATLA:

Q. Do you know if this document was prepared and maintained in the regular course of business of the Eunice Police Department?

A. No, I have no idea.

Page 48

Q. Do you know if the Eunice Police Department's regular practice is to have their records prepared and reduced to writing?

A. I don't know.

Q. Can you turn to the second page. Do you see at the bottom it says, "Established 2015"? Is that a yes or no?

A. Yes.

Q. And do you see at the end it says, "Revisions through December 2020"?

A. Yes.

Q. Do you know if there have been any updates to the Eunice Police Department policy since December 2020?

A. Chief LeBouef I think wanted to maybe do something based on some new equipment we received. I don't recall. That might have just been a general conversation between him and I, or I might have overheard him say that when we were talking about getting equipment.

Q. Do you know if Chief LeBouef prepared a new set of department policies?

A. I do not know that.

MR. BHATLA:

I'll call on the City to produce the

Page 49

updated EPD policy if Chief LeBoeuf did actually prepare an updated version, or the City should produce the most up-to-date version of the Eunice Police Department policies.

MR. HEBERT:

Understood.

BY MR. BHATLA:

Q. So please turn to the third page here with the number ending 825 in the bottom right-hand corner.

Do you see -- do you see that procedural order 1-51 reads, quote, "The purpose of this procedural order is to cancel all rules, regulations, policies, procedural and general orders issued prior to 1 January 2015 in the Eunice Police Department"?

A. Yeah, I see that.

Q. Who determined that all of the prior policies were canceled?

A. Well, I mean, according to the date that it would have been, if I'm not mistaken, that would -- that would have been Chief Randy Fontenot's first day in office. So I would think the chief of police.



Page 50

Q. What is the significance of that change?

A. He implemented his own policies, changed what the prior administration had in place. I'm sure that's something that each administration does. It may not be, I'm not sure.

Q. Was the mayor's office consulted regarding the change?

A. No, sir. I was -- at the time, I was not the mayor.

Q. Was the City Council consulted regarding the change?

A. That I do not recall either.

Q. Please turn to the next page, Bates ending 826. This is a continuation of Procedural Order 1-52. Do you see the section entitled Issuing Authority?

And do you see that it reads, "Procedural orders may be issued only by the chief of police. Departmental procedural orders are issued by the chief of police to announce department-wide policies and procedures which are applicable for the indefinite future"?

Do you see where it says that?

A. Yes.

Q. Was the City Council consulted regarding

Page 51

this change?

A. Not that I know of.

Q. Are you aware if the mayor's office was consulted regarding this change?

A. I have no idea.

Q. Do you have an understanding of what procedural orders are?

A. Can you give me a definition?

Q. I'm asking for your understanding.

A. I mean, it's an order on how you operate, I guess.

Q. Do you see that it next reads, under Special Orders, "Special orders for the department will be issued only by the chief. Supervisors may issue special orders for the men assigned to their command upon the chief's approval"?

A. Yeah, I see that.

Q. Was the City Council consulted regarding this change?

A. Not to my knowledge.

Q. Do you know if the mayor's office was consulted regarding this change?

A. Not to my knowledge.

Q. At this time, as of December of 2020, did the mayor's office exercise oversight over the

Page 52

Eunice Police Department?

A. We're not allowed to.

Q. What does that mean?

A. Go back to the Larson Act. It clearly states what the mayor's authority is, what the City Council's authority is, and what the chief's authority is, and we follow the law all the time. He's the chief, he runs his department, he does what he needs to do inside that department.

Until it needs Council action or mayor's action to the appointing authority, we give him his budget, he does what he has to do, and that's it.

Q. So the appointing authority exercises oversight over the Eunice Police Department?

A. Not oversight. I think the appointing authority is -- anytime there's a disciplinary action or issue in the police department, the chief will have to initiate investigation and so on. The appointing authority, I guess, either accepts the recommendation of the chief and so on and moves on. The appointing authority can't go in and tell the police department what to do.

Q. But you just said the chief of police has to present disciplinary action to the

Page 53

appointing authority, right?

A. Part of the process with civil service is that, yes.

Q. Can the appointing authority reject the disciplinary action that the chief imposed upon an employee?

MR. STAMEY:
Object to the form of the question.

A. I think, based on facts presented, the City Council can vote however they want to vote on any issue.

BY MR. BHATLA:

Q. But specifically to my question, the appointing authority can overturn disciplinary action taken by the chief of police against an employee, correct?

MR. STAMEY:
Same objection.

A. I guess, based on facts presented, they could vote any way they decide to vote on any issue.

BY MR. BHATLA:

Q. I'm speaking about one issue, Scott.

A. Okay.

Q. Does the appointing authority have the



Page 54

ability to overturn disciplinary action taken by the chief of police against an employee at the Eunice Police Department?

MR. STAMEY:

Make my objection continuing.

A.  I believe they could, and so could the Civil Service Board.

BY MR. BHATLA:

Q.  And the appointing authority is also responsible ultimately for hiring and firing decisions at the Eunice Police Department, correct?

A.  Correct.

Q.  You said the mayor's office prepares the budget for the fiscal year, correct?

A.  Yes.

Q.  That includes the budget for the Eunice Police Department?

A.  Every department in the City, the whole budget.

Q.  Once the budget is put in place, can the mayor's office control the use of that budget?

A.  No, not in the police department.  Any other department, we can tell them what to spend their money on and what not to spend their money

Page 55

on, but not the police department.

Q.  Once the budget for the fiscal year has been set, the mayor's office no longer has any control over that budget for the fiscal year for the police department?

A.  We can amend the budget if there's a need.  Sometimes you have to do that because different expenditures occur throughout the year, and you have to stay within 5 percent of your budget.

Q.  How often has the City Council amended the budget in the middle of a fiscal year?

A.  Every year.

Q.  Has the -- I'm sorry, I'll withdraw.

Who is responsible for amending the budget?

A.  I'll present as mayor the amended budget for the unit, City Council will approve it.  And I I'm not working with a financial adviser, I'm not doing all that on my own.  That's way bigger than my job.

Q.  How often have -- has the City Council amended the budget with respect to the Eunice Police Department's budget?

A.  I think they've done it every year as

Page 56

far as I've been following the City Council.  I've been going to meetings before I was on the City Council.  They amend it every year.  And that includes the police department.

Q.  What do those amendments usually entail?

A.  Probably overtime.  And, I mean, and the reason for that is the way the City budgets overtime, they budget it low in the police and fire, and that's just a budgetary reason on how they can take a fund and pay for emergency services at the end of the year, and they deem overtime as emergency.

Q.  Generally when the budget has been amended, it has been to increase the Eunice Police Department budget?

A.  I think it's just to justify your cost of overtime based on it being an emergency on short staff.  When you're running short staff, that's an emergency.  You've got to have people on the road.  And that's where the amendment comes in.  There's not enough money in that budget to just go do what you want, it's just not.  There's no room to wiggle in our budget.

Q.  Does the mayor's office review EPD spending?

Page 57

A.  Every Council meeting, myself and the Council is presented with current expenditures and the budget for every department.

Q.  How often does the Council meet?

A.  Once a month, second Tuesday of every month.

Q.  Does the City Council have the authority to amend the complaint and cut EPD funding?  I meant the budget, I apologize.

A.  City Council can't cut it.  They can vote against the budget.

Q.  So the City Council can't amend the budget to cut EPD funding?

A.  I would have to cut the budget as the mayor, they would have to vote on it.  They have no authority to cut the budget.

Q.  So the mayor's office has the authority to propose cuts to the EPD budget?

A.  Yeah.  And if I'm not mistaken, we actually increase funding every year in the police department unless, you know, there was savings that we just kind of assumed, which is very seldom.

Q.  What does the City do if it takes issue with the way EPD is spending money?



Scott Fontenot

Page 58

A. We don't -- I see every single purchase that goes through the police department and every other department in the city, every purchase order has to have my signature on it. They spend their money just like every other department, follow the procedure.

Q. When Randy Fontenot was chief of police, did you ever disagree with him on the way he spent EPD funds?

A. I mean, I can't pinpoint a specific time. I don't recall.

Q. The only control the City Council has over the budget is to vote on your proposed budget; is that correct?

A. Yes.

Q. Are you familiar with an entity called the Eunice Municipal Fire and Police Civil Service Board?

A. Yes.

Q. What is it?

A. It's exactly what you said, is they're a board appointed by the City Council. They work with the Louisiana State Examiner's Office. They hear disciplinary actions, if any, regarding police and firemen that are civil service.

Page 59

They approve -- they do the test -- they put out the test where you take your civil service exam. They approve the test scores. They kind of finalize -- add the final rubber stamp on the hiring and firing. They send all the information to Baton Rouge. I don't really know exactly what the Civil Service Board entails, to be honest with you.

Q. What is the Civil Service Board responsible for in terms of police officers at Eunice?

A. They can -- if there's a disciplinary action that goes before the board, they can either approve it or reject it.

Q. How --

A. Done a lot of that in the past.

Q. Sorry, I didn't mean to cut you off. Please go ahead if you have more.

A. No. I just said the Civil Service Board has done a lot of that in the past, was reject action by the City Council.

Q. Can you recall any specific examples of that?

A. There's many. We had a demotion of a police officer, demoted from lieutenant to police

Page 60

officer, and City Council took action, took the chief's recommendation, demoted the police officer. The police officer fought that at the Civil Service Board. The Civil Service Board ruled in her favor. That thing is still ongoing. So that's one instance.

Q. Who was that officer who was demoted?

A. I guess it's okay for me to say, you know, I mean, everybody knows it. Stephanie Myers, she's an -- Officer Myers. I don't know what she is, to be honest with you. She could be lieutenant, sergeant. We don't know, it's up in the air.

Q. Who was demoted -- or excuse me, I'll withdraw. Who demoted Stephanie Myers?

A. It was the chief's recommendation to demote her.

Q. And who was the chief at the time?

A. Randy Fontenot.

Q. Do you have an understanding as to why Chief Fontenot decided to demote Stephanie Myers?

A. Because she didn't follow direct order from the chief to take a complaint from a citizen.

Q. What was the nature of the complaint?

A. It was a lobby complaint. I'm not sure

Page 61

what it was.

Q. What is your understanding of why the Civil Service Board overruled Randy Fontenot's decision?

A. They felt like the punishment was justified, I believe, but maybe the severity of it was not, although the State examiner testified at the civil service hearing that it could have been cause for termination, her actions.

Q. Did you form an opinion as to whether the chief's recommendation was appropriate?

A. We talked about it.

Q. What did you discuss?

A. We talked about what she didn't do and the severity of the case. We even talked about termination. But we considered the fact that she had been a police officer for many years and didn't have anything on her record, took that into consideration, and demoted her two spots.

Q. Randy Fontenot consulted with you before demoting Stephanie Myers?

A. No, not before.

Q. Randy Fontenot demoted Stephanie Myers and then discussed it with you?

A. No. He was forming his recommendation



Scott Fontenot

November 20, 2024
Pages 62 to 65

Page 62

on what he wanted to bring to the appointing authority, and we talked about that just in general conversation. He brought his -- his recommendation after doing the internal investigations and everything else like that. After, myself and the City Council reviewed all documents related to the case. At the meeting, the Council took action.

Q. I'm just trying to understand the timeline. Had Stephanie Myers already been demoted by the time the issue was brought to your attention?

A. No, I don't think so.

Q. Did you agree with Randy Fontenot's proposal to demote Stephanie Myers?

A. Yeah.

Q. And this was discussed in your conversation with Randy Fontenot before Randy Fontenot took disciplinary action against Stephanie Myers?

A. No. I didn't have a vote on the Council. I mean, I agree with it now.

Q. That wasn't my question. I'll just -- I'll repeat the question.

The demote -- your conversation with

Page 63

Randy Fontenot regarding disciplinary action against Stephanie Myers took place before she was demoted?

A. I'm not sure. It may have and it may have not, I really don't remember.

Q. So you can't recall the exact timeline of the disciplinary action?

A. I don't recall the timeline of our discussion, should I say.

Q. You can set this document aside for now.

(Exhibit 2 was marked.)

BY MR. BHATLA:

Q. I'm handing you what's marked as Exhibit 2. This is a document that was produced using the Bates code CSB_000095. And I'll ask that you ignore this ACLU number, that's an errant number. But for the purposes of our conversation, I'll be using the CSB Bates Number.

(Discussion off the record.)

BY MR. BHATLA:

Q. Scott, can you please turn to the page ending at the bottom Number 981, so the CSB number ending 981.

A. Yeah, I gotcha.

Q. Do you recognize this document?

Page 64

A. Yes.

Q. What is it?

A. It's a resolution by the City Council. It says, "To revoke resolution designating chief of police as appointing authority of the Eunice Police Department and returning the title of appointing and governing authority of the Eunice Police Department to the Eunice mayor and board of aldermen and alderwomen."

And it also goes on to say, "In accordance with Louisiana Larson Act and Revised Statute 33:423.

Q. So I'd like to ask you some questions about that, but first I just want to understand. Was this document prepared in the ordinary course of your business with the City Council and the mayor's office?

A. As far as just the resolution itself?

Q. Yes.

A. The City clerk prepared that, just like any other resolution.

Q. So this is an ordinary part of your business with the City of Eunice?

A. With Council action, yes, sir.

Q. Is it the City of Eunice's regular

Page 65

practice to have these type of resolutions prepared and reduced to writing?

A. If the Council takes official action, it has to be.

Q. And was this document, the resolution, prepared by an employee who had personal knowledge of the events?

A. It's not a question for me to ask. I'm not sure. The City clerk prepared this. She sits in all the Council meetings. So I'm pretty sure she had knowledge of many things.

Q. And was this document prepared at or near the time of the resolution's passage?

A. She probably had it pre-prepared -- well, I mean, looking at it now with the votes on it, no. I mean she could have had it pre-prepared and finished it that night. I know my signature didn't get on it 'til the next morning, if anything.

Q. So that raises my next question. So at the bottom it says -- there's a signature line, Scott A. Fontenot, Mayor.

Did you attend this meeting?

A. Yes, I was there.

Q. What do you recall about the meeting?



MAGNA
LEGAL SERVICES

Scott Fontenot

Page 66

A.  I have to go back and look at everything else that was on the agenda, but -- do you have information that was on the rest of that agenda or no?

Q.  That's all right, we can move on.

Do you recall signing this resolution?

A.  Yes.

Q.  And do you have any reason to doubt -- do you have any reason to doubt that this is, in fact, the version of the resolution that was ultimately passed?

A.  I'm not sure what was filed.  It looks like it's something that would have been passed.  I'd have to see what's been filed.

Q.  What is a resolution?

A.  It's action by the Council.  It's to ratify their action, I guess.

Q.  Does it have the force of law?

MR. HEBERT:

Object to form, calls for a legal conclusion.

A.  I mean, in this particular incident, it seems like it would.

BY MR. BHATLA:

Q.  Does the mayor's office typically treat

Page 67

resolutions like this one as laws?

A.  Yeah, I mean, any resolution by Council, I mean, most of them it's -- it's City business, it's something that you have to do.  Nobody -- you can't just create a resolution and sign off on it.

Q.  You have to do -- you have to comply; is that right?

A.  Yes.

Q.  You read this before, but I want to bring your attention back to the resolution.  Do you see it reads, "A resolution by the Eunice Board of Aldermen and Women to revoke resolution designating the chief of police as the appointing authority of the Eunice Police Department and returning title of appointing and governing authority of the Eunice Police Department to the Eunice mayor and board of aldermen and alderwomen in accordance with Louisiana Larson Act and Revised Statute 33-423."

What is the governing authority?

A.  City Council, I'm assuming, myself.  I don't know the definition of that offhand.

Q.  What are its powers and responsibilities?

A.  You'd have to refer to the Larson Act.

Page 68

Q.  And what is the appointing authority?

A.  In this case?  Because according to court hearing we heard the other day, appointing authority is different in different areas.  Could be the mayor, could be the Council, it could be both.

Q.  What is the Larson Act?

A.  It's a State law that separates the duties of the elected officials.

Q.  What was the significance of making this change?

A.  Well, at the time, the appointing authority was granted to the chief of police, and that was done through an act in the State legislature that authorized the City of Eunice only -- they named the City of Eunice -- to act if the board of aldermen or women and the mayor wanted to grant the appointing authority to the chief of police, we were allowed to.

And at some point -- I'm trying to think of the timelines.  The Council had given the authority to Chief Fontenot, and he held that authority I'm not sure how long.  And eventually the Council acted to take that authority back.

And if I do recall correctly, there was

Page 69

a Council meeting, people had came and expressed some concerns about different incidents or things.  And we just felt like, to be transparent as a council and as a mayor, that if any actions were going to be taken toward the police officer, that we would just pull that authority back and act like we had been doing since the civil service had been created in the City of Eunice, and so we did that.

And that was to ease, you know, I guess issues that may arise in the future or with the public's outcry.  And even some police officers had reached out to Council members themselves and suggested that, and that's what we did.

Q.  To make sure I understand you correctly, Chief Randy Fontenot was given appointing authority status, and then that was taken away by this resolution; is that right?

A.  Correct.

Q.  You said there was a meeting where individuals expressed their concerns about Chief Randy Fontenot being the appointing authority?

A.  I'm not sure if they expressed it directly at that, but I do remember a full house at one of the Council meetings.  And I don't



Scott Fontenot                                                    November 20, 2024
                                                                 Pages 70 to 73

Page 70

remember if that was the same meeting or not.

Q.   What did people say about -- I'll withdraw the question.

What concerns did people express about Chief Fontenot having the power of the appointing authority?

A.   Man, look, this is a lot of he said and she said.  But I guess they were getting information from officers and they were making calls to Council members and saying, We don't think it's fair that he has all the authority to take action the way he does.

And we said, Well, he was the chief for five years -- or four years prior and the Council and mayor was appointing authority, we gave it to him.  People want transparency.  We go ahead and take it back.  The thing to do in a small town is try to listen to the people who elect you; I guess that's what the Council did.

Q.   Do you recall who the individuals were who were making these calls to Council members?

A.   I do not recall that.

Q.   What information were they receiving from officers that prompted them to call the Council?

Page 71

A.   I do not recall.

Q.   Do you recall when Randy Fontenot was given appointing authority at Eunice Police Department?

A.   It was sometime in the beginning of his second term as chief of police.

Q.   Approximately what year would that be?

A.   Probably 2015 or 2016, somewhere around there.

Q.   So Randy Fontenot was given appointing authority --

A.   And, look, it could have been longer than that.  I just -- I know that in the first term he didn't have the appointing authority.

Q.   What prompted concerns about transparency?

A.   I got my dates wrong.  Go back to the dates of the appointing authority, what I said, 20 -- yeah, I was thinking of -- I forget what year we in sometimes, it goes by so fast.  I would think -- yeah, I would say 2016 or '17 he had appointing authority.

Go ahead with the other question.

Q.   So just to follow up on what you just said, so Randy Fontenot had appointing authority

Page 72

from about 2016, 2017 to September 10, 2019?

A.   Yeah, for some reason it doesn't sound that long, but it was around there, yeah.

Q.   And to make sure, you see in this resolution where it says, "Be it resolved, the above resolution was declared adopted on this, the 10th day of September, 2019"?

A.   Yes.

Q.   That was the day that Randy Fontenot officially lost his appointing authority?

A.   I would think so.  I mean, the vote was taken and action was ratified by the Council.  I would think so, yes.  I mean, that's a supporting document.

Q.   You said that you acted out of concerns for transparency.  Who raised concerns about transparency of Chief Fontenot having appointing authority?

MS. WALL:
Objection to form.

A.   I don't think it was directly regarding him and appointing authority.  That's just how I operate, I'd rather just be open with people about anything.  So instead of causing a big fuss and a mess that everybody's talking about in town, let's

Page 73

just fix this.

Q.   Was Randy Fontenot not being open with everyone?

A.   I can't answer that.

Q.   Why then, after two or three years, did the Council feel the need to revoke his appointing authority?

A.   Because there was pressure by citizens and officers.

Q.   What drove the officer' concerns?

A.   Allegations of mistreatment, being bullied.

Q.   Being bullied by Randy Fontenot?

A.   I mean, that's what it says.  Or that's what I've heard.  I don't know whether that was in the last depositions we sat through.

Q.   Who are the officers who made those complaints?

A.   Stephanie Myers was one.  She said she was harassed because Chief was being racist towards her because she was Puerto Rican.

Q.   Who else?

A.   I didn't sit through any of the other -- most of the depositions.  I remember Varden Guillory, former police officer, was saying that



Scott Fontenot

Page 74

too in his deposition.

Q.  I'm asking in the context of the decision to revoke Randy Fontenot's appointing authority.  Who were the officers who were raising concerns that prompted this resolution?

MS. WALL:

Objection to form.

A.  I mean, number one was Officer Dunn, he expressed those concerns verbally.  I ran into Stephanie Myers at a local restaurant one day, she said the same thing.  And I'm assuming there were others who had expressed their concerns.

And they could have expressed it to -- we have five members on the board of aldermen and alderwomen, and without them in full support, the resolution would have never happened.  So obviously they were getting calls too.

Q.  Calls from Eunice police officers?

A.  From anybody.

Q.  But those calls included Eunice police officers?

A.  That's a question for them.

Q.  Did you receive any outreach from Eunice police officers seeking to remove Randy Fontenot's appointing authority?

Page 75

A.  They didn't seek to remove his appointing authority.  I think they just said that something needs to be done.

Q.  Something needs to be done about what?

A.  About how he's treating them.  And it was done.  He come to me and told me that.  Stephanie Myers said the same thing.

Q.  Just for clarity, "he" was treating them.  Who is "he"?

A.  Chief Randy Fontenot was treating them unfairly.

Q.  "Them" being Eunice police officers you mentioned?

A.  Yeah.

Q.  So before this resolution passed, what were the mayor's responsibilities as they relate to EPD?

A.  I mean, just give them their budget, let them do -- I believe the Council would still have to ratify a decision by the chief.  We would handle the whole investigative part, I believe. I'd have to think.

As far as -- I don't have anything to do with the police department whenever we weren't the appointing authority other than giving them their

Page 76

budget.

Q.  So looking back at this resolution, do you see it says, "A verbal vote thereon was as follows," and there are five names listed under the yeas; is that correct?

A.  Yes.

Q.  And there are no names listed under the nays; is that right?

A.  Yes.

Q.  So the resolution passed unanimously?

A.  Yes.

Q.  Did you discuss the resolution with the City Council before it was adopted?

A.  I don't think specifically, not on how they were going to vote.

Q.  To make sure I ask this, this resolution was adopted, right?

A.  Yes.

Q.  And this resolution, then, governed who was the governing and appointing authority for the Eunice Police Department?

A.  Yes.  And it went back to the way it was prior to the City Council granting that appointing authority to the chief of police and the Eunice Police Department, and that was Randy Fontenot.

Page 77

Before that it was the way it is today, the way it was right after this.  It had been like that forever.

Q.  Your name isn't listed among the voters. Does the mayor ever vote on a resolution?

A.  The mayor doesn't have a vote on the City Council on anything unless it's a tie breaker.  That's seldom, very seldom.

Q.  Do you have any understanding as to why the five aldermen and women decided to vote for this resolution?

A.  I can't answer that for them.

Q.  And it was Randy Fontenot's conduct that led to this resolution being passed?

A.  Can you say the question again.

Q.  And it was Randy Fontenot's conduct with respect to those Eunice employees that led to this resolution being passed?

A.  I wouldn't agree to that.

Q.  You just testified that officers were complaining that Randy Fontenot was mistreating and bullying them, correct?

A.  That's what they were saying.

Q.  Did you have any reason to doubt those statements by those Eunice police officers?



MAGNA
LEGAL SERVICES

Page 78

A.  I don't believe everything everybody tells me.

Q.  Did you have any specific reasons to doubt the statements that those Eunice officers were making to you regarding Randy Fontenot's conduct?

A.  I was hearing one side of the story.

Q.  Did you ever discuss those concerns with Randy Fontenot himself?

A.  No.

Q.  You didn't feel like there was a need to maybe address the issue to help the department function more effectively?

A.  I can't get involved in the day-to-day operations of the police department.  I let the chief handle that.  They are police officers. They know their rights.  They can go to another law enforcement agency.  They can do whatever they want, file a complaint, file a complaint with their own police department.  I'm the mayor; I don't have anything to do with the police department.

Q.  But the Eunice Police Department is a part of the City of Eunice, right?

A.  Absolutely.

Page 79

Q.  And you didn't think it would be helpful to reach out to Randy Fontenot and try to resolve the issue?

A.  Number one, I'm not going to get involved in the he said/she said match.  I'm not going to fight for something that's not my fight. If there was an issue, they can be adults and handle it on their own; if not, I guide them to the proper authority.  I've got enough to deal with rather than being a referee all day long.

Q.  Did you agree with this resolution at the time it was passed?

A.  I did, because I felt like we had done this before.  It worked for four years prior with Randy Fontenot as chief of police, it had worked with every other chief of police prior to that. Hey, let's go back.  I'm not opposed to making change.  And we went back and it worked and it's still working.

Q.  And the power of appointing authority has never been returned to the chief of police, right?

A.  No, not in the City of Eunice.

Q.  Was this decision driven, in part, by Randy Fontenot's mishandling of a disciplinary

Page 80

investigation that resulted in Jeremy Ivory's demotion?

MR. STAMEY:
Objection to the form of the question.

A.  I don't think so.  I don't recall that.

BY MR. BHATLA:

Q.  You can set that document aside for now.

MR. HEBERT:
Can we take five sometime in the next few minutes?  Whenever is a good time for you.  Is this a good time right now?

MR. BHATLA:
Sure.  Why don't we take it right now.  Let's go off the record.

THE VIDEOGRAPHER:
We are off the record.  The time is 10:55.

(A break was taken.)

THE VIDEOGRAPHER:
We are back on the record.  The time is 11:09.

(Exhibit 3 was marked.)

Page 81

BY MR. BHATLA:

Q.  Scott, I'm going to hand you what's been marked as Exhibit 3.  This is a document that was produced at CSB_0000541.

So do you recognize this document?

A.  No.

Q.  Have you seen any documents like this before?

A.  Yes.

Q.  What are they, these documents, typically?

A.  Exhibit 3, first page, is a notice of a special meeting or hearing.  It's from the Eunice Police and Fire Civil Service Board.

Q.  Are you familiar with the policies and procedures of the Civil Service Board?

A.  Not really.

Q.  That's all right.  Can you turn to the page ending in Bates 544.  Do you see where it says in the first full paragraph on this page, "At this time, Chairman" -- sorry, the second full paragraph, "At this time, Chairman Thibodeaux stated the purpose of tonight's hearing, Officer Jeremy Ivory appeal hearing concerning his suspension for seven calendar days."  Effective



MAGNA
LEGAL SERVICES

Scott Fontenot

Page 82

date of action was June 3, 2019.

Do you see that?

A.   Yes.

Q.   And do you see that it goes on to say that Officer Ivory filed his appeal in a timely manner, within 15 days of receipt of the reason for the disciplinary action?

A.   Yes.

Q.   So Randy Fontenot was still the appointing authority at the time of the disciplinary action, right?

A.   Yeah, according to the last resolution we looked at.

Q.   And do you see that it goes on to say, quote, "For the record it was stated that Police Chief Randy Fontenot was the appointing authority for the City of Eunice Police Department at the time of the disciplinary action"?

A.   Yes.

Q.   This means Randy Fontenot had the authority to suspend and demote Jeremy Ivory, right?

A.   Yes.

Q.   Now, if you could turn to the page ending in Bates 546.  Do you see in the last

Page 83

paragraph where it says, quote, "A motion was made by Garrett Daville, seconded by Mr. Andrew Hickerson, Jr., and carried that the appointing authority did violate Officer Jeremy Ivory's police officer's bill of rights"?

A.   Yes.

Q.   What is the police officer's bill of rights?

A.   I'm not sure exactly what it is.  It's something that they receive and they -- they should know, I guess.

Q.   And this statement in the board's minutes means that the board found that Randy Fontenot, acting as the appointing authority, violated Jeremy Ivory's rights, correct?

MR. HEBERT:

Object to the form.

A.   It says the demotion was made and the appointing authority did violate Jeremy Ivory's police officer's bill of rights, it says that on this paper.

BY MR. BHATLA:

Q.   And do you see it goes on to say, quote, "It is the further decision of the board to reverse the disciplinary actions of the appointing

Page 84

authority and return Officer Jeremy Ivory to prior status of police lieutenant and restore any losses -- any lost benefits," excuse me, "including attorneys' fees, upon application"?

A.   Yes.

Q.   So the Civil Service Board overruled Randy Fontenot's disciplinary action against Jeremy Ivory?

MR. HEBERT:

Object to the form.

A.   That's what it says right here.  It says the appointing authority.  It doesn't name Randy Fontenot on that statement there, but prior it does.

BY MR. BHATLA:

Q.   And against Randy Fontenot's advice, the Civil Service Board reinstated Jeremy Ivory to his full position?

MR. HEBERT:

Object to the form.

A.   I don't know if it was his advice.  He presented them the investigation that was complete.

BY MR. BHATLA:

Q.   How often does the Civil Service Board

Page 85

overturn a disciplinary action taken by a police chief.

A.   It's happened before.

Q.   Did this occur frequently under Randy Fontenot?

A.   I think it occurred as much as him as it did with the prior chief of police, Ronald Dies, and I was on the City Council.  And I couldn't tell you anything that happened before then because I wasn't involved in the City in the capacity I am now.

Q.   Looking a little bit before that final paragraph on this same page, it says here that -- if you look at the paragraph starting with "Mr. Landry stated," do you see where it says, quote, "Mr. Landry stated that the Police Chief Randy Fontenot testified that Officer Jeremy Ivory's interrogation in both investigations were not recorded in full"?

A.   Yes.

Q.   And do you see where it says in that last sentence of the paragraph, "In addition, Chief Fontenot also indicated that some interviewed witnesses' statements were also not recorded in both investigations"?



Scott Fontenot

Page 86

A.   Yes.

Q.   Do you think that's appropriate conduct by the chief of police when handling an internal investigation?

MR. HEBERT:

Object to the form.

A.   I didn't conduct the investigation.  I can't tell you how the recordings went.  And, I mean, going on to read this, it's obvious that the reason the action was taken by the appointing authority -- well, by the board was because it goes on to say, "Mr. Landry reads for the record that according to LA RS 40:25313, there shall be no discipline, demotion, dismissal, or adverse action of any sort taken against a police officer or law enforcement officer unless the investigation is conducted in accordance with the minimum standards provided for this section."

So it looks like, to me, and if -- I didn't get to that meeting, but it was reversed on a technicality, which a lot of it was.

BY MR. BHATLA:

Q.   Do you see where it says in this paragraph, starting with "At this time," it says, quote, "At this time, Mr. Aaron Green then

Page 87

addressed the board asking for a complete nullity on the basis of Louisiana RS 40:2531B(3).

"All interrogations of any police employee or law enforcement officer in connection with the investigation shall be recorded in full. The police employee or law enforcement officer shall not be prohibited from obtaining a copy of the recording or transcript of the recording of his statements upon written request."

Do you see that?

A.   Yes.

Q.   And this is Louisiana state law, right?

A.   Absolutely.

Q.   So -- sorry, go ahead.

A.   It's starting to bring a lot of this back to me.  I mean, if I remember correctly, the City of Eunice was losing left and right on technicalities in every civil service hearing it seemed like, whether it was a police or fire.

And then we took it upon ourselves to hire Mr. Green, who's a specialist in civil service law, to help us guide investigations to where they're done properly before they get to the board to where, when they get to the board, everything is done correctly and the board can

Page 88

make a conscious decision on facts presented, not, you know -- you know, half put together cases.  I mean, and I think that's what was happening.

Q.   So Randy Fontenot violated Louisiana statute -- Revised Statute 40:2531B(3) by not recording Jeremy Ivory's interrogation in full or those of witnesses, right?

MR. HEBERT:

Object to the form of the question.

A.   I don't know what happened in that investigation.  I mean, I don't know.  I wasn't there.

BY MR. BHATLA:

Q.   Based on this document, the board found that there was a violation by Randy Fontenot of that cited statute, right?

MR. HEBERT:

Object to the form.

A.   That's what this letter states.

BY MR. BHATLA:

Q.   Do you think that's appropriate conduct by the chief of police to not know what's required by Louisiana State statute?

A.   I don't know the backside of that story. If I recorded somebody in an investigation and my

Page 89

phone died and I lost the recording, am I going to be held to that same law if my phone malfunctioned?

Q.   Do you think a chief of police should be prepared to ensure that officers are following the law when conducting an internal investigation?

A.   I think anybody who's conducting an investigation should know what they're doing.

Q.   Did Randy Fontenot know what he was doing if he did not get these interrogations recorded?

MR. HEBERT:

Object to the form.

A.   I can't answer that.  I don't know.  I don't have all the factors in front of me.  I see a ruling from a Civil Service Board hearing; there's nothing more to that.

BY MR. BHATLA:

Q.   What more do you need?

A.   Why was it not recorded in full, what was the reason?  And there's no -- you just have statements -- I don't have anything else to support these statements, so I can't make an assumption.

Q.   Do you think there are special



Scott Fontenot

Page 90

exceptions in the law?

MR. HEBERT:

Object to the form.

A. There's no special exceptions in any law. The law's the law, man.

BY MR. BHATLA:

Q. Let's turn back to the page ending in Bates 544. Do you see in the first full paragraph on this page where it says, "At this time, board members now considered requests for board investigations into two incidents concerning police employees misconduct.

"Lieutenant Dunn submitted copies of two critical incident forms. One date of incident on August 13, 2019, involving Officer Darien Guillory; two, date of incident on August 13, 2019, involving Officer Victor Fontenot."

Do you see that?

A. Yes.

Q. August 13, 2019 was when Chief Fontenot was still the appointing authority, right?

A. Yes.

Q. Are you familiar with the events that gave rise to these two critical incident forms that were submitted by Lieutenant Dunn?

Page 91

A. I'm not.

Q. What is a critical incident form?

A. It's part of the process in order to initiate, I guess, an investigation.

Q. Is a critical incident form basically a form of complaint against a Eunice employee?

A. I'm not sure exactly the intent for a critical incident form. I think it could be for any -- anything that happens within the police department. I'm not sure.

Q. Do you recall you testified earlier that you're not aware if Lieutenant Dunn provided any written complaints of misconduct at the Eunice Police Department?

A. I was not aware that he made any directly to the police department.

Q. Aren't these critical incident forms submitted within the Eunice Police Department first?

A. I don't know if that was the case here or not. I don't know if it was directly sent to the Civil Service Board or the police department. I don't see those forms. I was not the appointing authority at the time. I have no recollection of that.

Page 92

Q. Have you seen critical incident forms since you became the appointing authority?

A. Yeah, I think during the process of the investigation of -- whether it's a police or fireman, they'll have that information in the packet, yes.

Q. So Lieutenant Dunn -- I'll withdraw the question.

Based on this description in the minutes, Lieutenant Dunn did submit written complaints about fellow Eunice Police Department officers to at least the Civil Service Board, right?

A. That's what it says here, yes.

Q. What's the appropriate process for handling a critical incident form?

A. In what capacity?

Q. Within the Eunice Police Department, what's the appropriate process for handling a critical incident form?

A. I guess they have to address it like any other complaint that comes into the police department. You have to -- you have to address it, you can't just let it go away.

Q. By "address it," what do you mean?

Page 93

A. Look into it.

Q. Investigate the facts that are set forth in the critical incident form?

A. Yes.

Q. Is the chief of police responsible for investigating a critical incident form?

A. I think him and whoever he would designate, yeah.

Q. Is the appointing authority responsible for investigating a critical incident form?

A. I don't know, man. You're getting me really confused here because I don't know if it's the appointing authority who creates the critical incident form or if it's the officer making the complaint. I'm really confused right now.

Q. How long have you been in the Eunice City government?

A. Too long. No, I'm just kidding. 14 years.

Q. In those 14 years, you're not sure how critical incident forms are addressed by the appointing authority?

A. You could probably ask the same question to any City Council member and they don't have a clue on that. That's not something we deal with



Scott Fontenot

Page 94

all the time. That's why we hired a special attorney to help us with this stuff.

Q. Is the appointing authority responsible for handling disciplinary action for officers of the Eunice Police Department?

A. Yes.

Q. And that disciplinary action can result from a critical incident form being filed; is that right?

A. I would think, yes.

Q. And you are the appointing authority?

A. Now I am, me and the City Council.

Q. Despite that, you don't know how critical incident forms are treated by the appointing authority?

MR. STAMEY:
    Object to the form of the question.
MR. BHATLA:
    Please let me finish my question.
MR. HEBERT:
    Join.
MR. STAMEY:
    It's been asked and answered.

A. Look, there are times where, as the appointing authority -- so the critical incident

Page 95

form -- this is so damn confusing, I'm going to tell you, because it's been back and forth so much. If you go on the State examiner's website on the State of Louisiana -- and I don't think y'all understand the whole separation of duties and that's why you keep asking these same things over and over.

You go on the State examiner's website, you start to initiate the investigation. I'd have to go -- it's a step by-step process. They literally have to have it step by step it's so freaking complicated.

And, yes, I do understand what needs to be done, but in order to do it properly, I can't testify without even having a special attorney to help me guide us through this thing, because if not, we get stuck in a technicality like every other thing the Civil Service Board had overturned.

If you go back, almost everything they overturned was based on a technicality. I don't expect any mayor in Louisiana to know all that. I'm just saying, that's my view on it.

BY MR. BHATLA:

Q. But it is your --

Page 96

A. I know enough. But what you're asking me, I can't give you a definite answer on right now at this time.

Q. If you could turn back to the page ending in Bates 544. Do you see that the paragraph we were looking at, the first full paragraph on this page, it says, quote, "A motion was made by Garrett Daville, seconded by Jermaine West, and carried to form a committee to investigate these alleged misconduct incidents.

"The two members of the board who volunteered to serve on this committee are Garrett Daville and Andrew Hickerson, Jr. Mr. Chairman advised these two committee members that they have 60 days to complete their investigation and to report their findings to the board," end quote.

Do you see that?

A. Yes.

Q. And these, quote, "alleged misconduct incidents," end quote, are referring to the two critical incident forms filed by Lieutenant Dunn, right?

A. According to what it says right here, yes.

Q. Is it common for the Civil Service Board

Page 97

to form a committee to investigate a critical incident form by itself?

A. I never heard of them doing that.

Q. What is your understanding of why Lieutenant Dunn submitted critical incident forms to the Civil Service Board?

A. Obviously he was advised by someone to do that.

Q. What makes you think Lieutenant Dunn was advised to do that?

A. How else would he know?

Q. Why do you think the board decided to form a committee to investigate these critical incident forms?

A. They're just carrying out the duties of what they, I guess, think they should do.

Q. But you're not aware of any other committees they formed to investigate critical incident forms other than this incident?

A. I don't ever recall them investigating anything else, period.

Q. Why do you think they decided to investigate these forms, then, in this instance?

MR. HEBERT:
    Object to form.



Scott Fontenot

November 20, 2024
Pages 98 to 101

Page 98

A.   I don't know an answer for that.  Was it because everybody else didn't want to listen to it?  I don't know.

BY MR. BHATLA:

Q.   Do you think it's because Randy Fontenot did not take appropriate action in investigating those critical incident forms?

MR. HEBERT:

Object to the form.

A.   My question would be was it brought to Randy Fontenot.  I don't know if it was brought to Randy Fontenot or not.  Do you have that answer?

BY MR. BHATLA:

Q.   We can cover that.  Do you think it had anything to do with -- I'll rephrase.

Do you think the submission of the critical incident forms to the Civil Service Board had anything to do with it being Lieutenant Dunn who made the report?

A.   I mean, I would think they would act if any officer would go.  If they were taking action on this, it would only be fair to do that with everyone else.

Q.   You can set that aside for now.

MR. BHATLA:

Page 99

And I'll ask counsel to refrain from laughter during this deposition.

(Exhibit 4 was marked.)

BY MR. BHATLA:

Q.   I'm handing you what was marked as Exhibit 4.  This is produced as CSB_0000853.

Do you recognize this document?

A.   Yeah, I think so.

Q.   What is it?

A.   It's a document from the foreman -- from the Civil Service chair, Donnie Thibodeaux, stating that at a board meeting held on September 30, 2019, a Civil Service Board official received a request for the board to investigate incidents concerning two police employee misconduct.

"By motion of the Board, a committee was formed to investigate possible violations of civil service rules."

It goes on to say, At the board meeting held February 6, 2020, the committee reported its findings to the Board.  A motion was made and seconded to accept the investigation as being satisfactory as completed by the Board.  Discussion, motion made, seconded, and recommended

Page 100

to the court.  Indicates civil service violations.

And it goes on to state, Victor Fontenot, violation of LRS 33:2568A (3) and (5), "The commission or omission of any act to the prejudice of the department contrary to the public interest or policy.  Conduct of a discourteous or wantonly offensive nature toward the public or another municipal officer or employee or any dishonest, disgraceful misconduct."

And it goes on to talk about Officer Darrian Guillory.  Do I have to read all this?

Q.   No.  My question is just what is it.

Is it fair to say this is a letter to you by the chairman of the Eunice Civil Service Board?

A.   Yeah, that's what it is.

Q.   Was this document prepared and maintained in the ordinary course of Eunice Civil Service Board proceedings?

MR. HEBERT:

Object to the form.

A.   I'm assuming, I guess.

BY MR. BHATLA:

Q.   Is it regular practice for you to receive letters in writing from the Eunice Civil

Page 101

Service Board?

A.   I mean, the only thing that we get from the Civil Service Board is a letter informing us of when they're going to have a meeting or when they're going to advertise for test scores.  I don't know.  I mean, I never get anything like this.

Q.   Do you see that this first paragraph on the first page references a board meeting held on September 30, 2019?

A.   Yes.

Q.   Did you attend that board meeting?

A.   No.

Q.   Do you see that after the third paragraph it reads, "After a discussion, a motion was made and seconded to recommend that the report conducted by the Eunice Police Department indicates civil service violations," and then it identifies Officer Victor Fontenot?

A.   Yeah, I see that.

Q.   What do you recall about the civil service violation by Officer Victor Fontenot?

A.   I don't recall anything.

Q.   Do you see it goes on to mention civil service violations by Officer Darrian Guillory?



Page 102

A. Yeah.

Q. What, if anything, do you recall about the civil service violations with respect to Darrian Guillory?

A. I don't recall anything regarding the civil service violations. I do recall -- just reading through this, I remember the incident, if I'm not mistaken, is involving an alleged rape and the mishandling of evidence, if I'm not mistaken.

Q. Mishandling of evidence by Officers Fontenot and Guillory?

MR. STAMEY:

Objection to the form.

A. I don't know exactly who. I just know that it sat in the trunk of this girl's car and maybe Officer Guillory, and then she had to maybe bring it to Mamou PD. And this is all stuff that I got from Officer Dunn stating this to me. It's probably before any of these complaints were made.

BY MR. BHATLA:

Q. What did you do when Lieutenant Dunn brought this incident to your attention?

A. Just told him he needed to let somebody else know.

Q. But you didn't take any action in

Page 103

response to Lieutenant Dunn telling you about this incident?

A. I don't know what action I could have legally taken.

Q. As of September 30, 2019, you were the appointing authority, correct?

A. Yes.

Q. And as appointing authority, you had the authority to discipline Officers Fontenot and Guillory, right?

MR. STAMEY:

Objection to the form of the question.

MR. HEBERT:

Join.

A. I don't know if I could just discipline them without an investigation being opened up by the police department.

MR. BHATLA:

Counsel, I ask that you please let me finish the question before objecting.

BY MR. BHATLA:

Q. Do you know if the police department opened an investigation into the alleged incident?

A. That I do not recall.

Page 104

Q. Do you recall if the police department ever provided you with a proposal for disciplinary action against either officer based on this incident?

MR. STAMEY:

Object to the form of the question.

A. I don't recall, no, I don't recall.

BY MR. BHATLA:

Q. Do you see in this last paragraph where it says, quote, "The appointing authority is hereby instructed by this board to review and oppose -- impose the appropriate discipline in accordance with the rights afforded to these employees under civil service rules," end quote?

A. I see that.

Q. Why were you instructed to impose discipline?

MR. HEBERT:

Object to the form.

A. I mean, I don't know why we were. It's very confusing to have the Civil Service Board imply actions that we take. It's -- I've never seen this before, so I'm not sure where the next action would have been.

Page 105

BY MR. BHATLA:

Q. The Civil Service Board found civil service violations committed by Officers Fontenot and Guillory, right?

A. According to this document you just gave me, yes.

Q. And the Civil Service Board said that appropriate discipline should be imposed on those two officers, right?

A. That's what the Civil Service stated. But my question is: Did the Civil Service Board perform a total investigation? Did they investigate all parties involved or was it just one person's statement?

I mean, it looks like it was investigated by the police department based on some of these letters attached. Looks like Ron Young investigated it and some others.

Q. Let's turn back to Exhibit 4 briefly -- excuse me, Exhibit 3. This is the document, again, that was produced CSB_0000541. If you can turn to the page ending in Bates 544.

In the first full paragraph we already looked at, it says that two members of the board formed an investigative committee to investigate



Scott Fontenot

November 20, 2024
Pages 106 to 109

Page 106

the incidents involving Officers Fontenot and Guillory, correct?

A. Correct.

Q. Does that refresh your recollection as to whether this incident was investigated?

A. I don't recall. I mean, I wasn't -- at the time of this specific meeting, I wasn't the appointing authority, it was Chief Fontenot. So it may have went through his office. He may have done the whole process. I don't remember.

Q. Let's turn back to Exhibit 4, the one I just handed you, CSB_0000853. Do you see the second paragraph, quote, "At a board meeting held on February 6, 2020, the committee reported its findings to the board. A motion was made and seconded to accept the investigation as being satisfactory. That was submitted to the board by the Eunice Police Department," end quote?

Does that refresh your recollection as to whether these incidents were investigated?

A. It looks like it was, according to this, yeah.

Q. As the appointing authority you were, quote, "instructed by this board to" -- end quote, to impose discipline on those two officers, right?

Page 107

A. According to this letter, yeah.

Q. Did you impose any discipline on those two officers?

A. I didn't. I mean, I didn't know what our authority was to do that. We had just switched to appointing authority from the chief to the Council and the mayor. There's a lot of things going on at the time.

The police department didn't go forward with their disciplinary action at the time with Chief Randy, and so then the Civil Service Board took action.

Q. Well, the Civil Service Board instructed you to take action, right?

A. Yeah, they took action, I guess, during their investigation and made their own determination to impose us to do something.

See, what it looked like me to is a lot of BS going on behind the scenes and it's trying to involve certain people to make things happen, me being that certain person.

Q. Did you agree with the results of the investigation? I'll withdraw the question.

Did you review the findings from the investigation?

Page 108

A. I'm sure I have at one point, I did.

Q. Did you agree with those findings?

A. I'd have to go back and refresh my memory on that before I can say yes or no.

Q. So you don't recall if you agreed with the findings or not?

A. No, I don't. I don't --

Q. Did you conduct your own investigation?

A. No, not that I recall.

Q. But you took no disciplinary action even after the board's investigation?

A. No disciplinary action was taken against Officer Victor Fontenot or Darrian Guillory based on what this Civil Service Board presented, what you're saying was the appointing authority, which was myself and the City Council.

Q. Yourself, the appointing authority, did not impose discipline?

A. The appointing authority is the City Council and the mayor. You've got to get this right.

Q. And the appointing authority, the City Council --

A. Nothing happened.

Q. Do you see at the top of this letter it

Page 109

says -- it's addressed to, quote, "Mayor Scott Fontenot, Appointing Authority, City of Eunice"?

A. Okay, it could be Mayor Scott Fontenot, appointing authority could be the City Council or they could be calling me that. Nobody can give a determination on what it is or not.

Q. The City Council is not mentioned here, right, this is addressed to you?

A. The City Council is the appointing authority, I've heard that in a court case last Friday.

Q. Scott, I'm going to ask that you please answer my questions with a yes or no.

A. I'm giving you an answer.

Q. Is the City of Eunice -- excuse me.

Is the City Council addressed in this letter?

A. It doesn't say City Council. It says "appointing authority," which they refer to the City Council as the appointing authority such as they do me.

Q. And to your knowledge, the appointing authority, having received this letter, did not take disciplinary action on those two officers?

A. No disciplinary action was taken to my



Scott Fontenot

Page 110

knowledge.

Q.   All right.  Can you turn to page ending in page Bates 856.  Do you see that the subject line here says, "Notice of investigative ruling"?

A.   Yes.

Q.   And who is the author of this memo?

A.   Chief Randy Fontenot.

Q.   Do you see here in this first paragraph it says, quote, "The investigation of August 13, 2019 incident has been concluded.  It is my finding that appropriate counseling with Detective Darrian Guillory has been done to correct the violations that were reported.  I also find that any further disciplinary action would be unwarranted," end quote.

A.   I see that.

Q.   Do you know if this is the same incident that is referenced in Lieutenant Donnie Thibodeaux's letter to you that we just looked at?

A.   I have no idea.  There are multiple incidents regarding that officer.  She wrecked a couple of police cars.  So I don't know what it could be.  Like I said, there was so much going on.

Q.   Are you aware of a, quote, "special

Page 111

detail," end quote, at the Eunice Police Department at any point in time?

A.   I mean, what's the definition of a "special detail"?

Q.   I'm just wondering if you recall any unit at the Eunice Police Department that went by that term or umbrella?

A.   I don't think so.  I never heard that one.

Q.   Was there a special detail at the Eunice Police Department that was responsible for inflating the hours they had worked?

MR. DOHERTY:
     Object to the form.
MR. HEBERT:
     Object to the form.

A.   I don't know, man.  I really don't know.

BY MR. BHATLA:

Q.   Are you aware of an incident where Officer Darrian Guillory tried to cash a check twice?

A.   Yeah, I was aware of that.  So she -- and I'm not sure who made -- you know, wherever -- that may have been the HR girl.  She was -- I don't know if she was presented two checks or if

Page 112

she did a mobile deposit.  I think she did a mobile deposit and then she tried to go cash it.

Now, that's all I know about that.  I know that she didn't, in the long run, keep the money.  I don't know if she didn't pay it back.  I really don't remember.  I do remember an incident regarding that though.

Q.   Do you recall if Officer Guillory was disciplined for that action?

A.   I don't recall.  I don't know -- I don't know what their findings were on that.  I really don't remember.

Q.   When you became the appointing authority, did Randy Fontenot ever prevent you from disciplining an officer?

A.   I don't think so.  I mean, we base -- look, it's so complicated, man.  You should -- you should learn this.  You can make a lot of money doing this.  There's not many attorneys fool with this.  I'm sitting in a room full of attorneys, and no disrespect to anybody in here, but it would be hard to understand this civil service stuff even if you studied it all day long.

Unless the police department -- even if we the appointing authority, unless they start an

Page 113

internal investigation, typically it doesn't get to us.  So it's hard -- and I know you asking these questions, it might seem frustrating, but some of this stuff I just don't know because I've never seen it.  I do recall --

Q.   You've never seen what?

A.   Well, you talked about the incident with Darrian Guillory and the check.  And I've heard about it, my HR girl told me.  But I never saw, you know, the physical, you know, disciplinary action going forward.  I don't recall that.

Q.   Have you, as the appointing authority, ever issued disciplinary action against a Eunice Police Department employee?

A.   Not -- not -- not to initially start the investigation, no, we haven't.  I don't think we even can.

Q.   I'm not talking about an investigation. I'm asking, once you became the appointing authority --

A.   Impose disciplinary action?

Q.   -- did you ever impose disciplinary action against a Eunice Police Department employee?

A.   If you call a disciplinary action prior



Scott Fontenot                                                      November 20, 2024
                                                                   Pages 114 to 117

Page 114

to an investigation, them you lose on a technicality, so you lost. You already go to the Civil Service Board and they already know, you lost.

Q. How about after an investigation was conducted, as the appointing authority, did you ever impose a disciplinary action against a Eunice Police Department employee based on that investigation?

A. Yes. The employees have all their rights in the world to be heard at a hearing, be heard during an investigation, the whole nine yards. It's a lengthy process, and you literally have to do everything step by step. If you miss a dot or crossing the T, if you miss that, you lost. I'm serious. It's serious stuff. That's why we hire -- we pay so much money a year. And I love Stan, he's a great attorney, but I --

MR. HEBERT:
    Is that on the record?
THE WITNESS:
    Yes, it's on the record.
A. But I don't expect him to understand civil service law. We had -- we hired the guy who kept coming to our Civil Service Board meeting and

Page 115

kicking our butt. What best thing to do, instead of keep getting our butt kicked, let's get the guy on our team and help us to where, if there is a true incident, that the officers aren't getting unfair treatment through whoever's in charge or by the board ruling on a technicality.

You could have a serious incident that involves an officer that really needs disciplinary action taken, probably termination, and they'll get overturned on a technicality. I've seen it. I've seen it in our local board.

BY MR. BHATLA:
Q. You mentioned Stan. You're referring to Stan Feucht, who is an attorney for the City of Eunice, correct?
A. Yes, sir.
Q. And you testified just now that you don't expect him to understand civil service law; is that correct?
MR. STAMEY:
    Object to the form of the question.
MR. HEBERT:
    Objection.
A. I don't expect him to understand it 1000 percent to the T. Nobody -- I wouldn't expect

Page 116

anybody in this room to.
BY MR. BHATLA:
Q. Who in the City of Eunice should understand civil service law if they're supposed to enforce those laws?
A. Oh, man. I don't know. That's why we've got to find help. I mean, go ask the same question in Crowley or Opelousas. They don't know. Trust me, they don't know. They don't have the attorney we have.
Q. I apologize, go ahead.
A. I'm just saying, we had to spend money to make sure that whatever is being done is being done right. We don't want to take a risk of not doing any of this correctly. And I think this all boils down to the reason why y'all even here in the first place.
Q. So over the past 14 years you've been involved with the City of Eunice government, you don't have an understanding of how civil service law works?
MS. WALL:
    Objection.
MR. HEBERT:
    Object to the form.

Page 117

A. I do to probably the best of any person in my position in the state, yeah. But I'll be honest with you, I don't know everything about it. I don't want to know everything about it because it's so complicated. I don't have time to figure that out. That's why I hire somebody to do it.
BY MR. BHATLA:
Q. Should the chief of police who enforces these laws be familiar with them?
A. I think he should understand them as much as y'all expect me or anyone else expects me to do it. But that's why we hired a special attorney to help us. And I wish I would have known that. If I would have known about this 14 years ago, I would have encouraged the mayor back then to do this.

If I would have known about this when I got on as the mayor -- because we've never had issues with the Civil Service Board and all this going back and forth. If I'd have known about it, I would have hired somebody to help us who specializes in this because you need it. I'm telling you, you need it.
Q. Why did these issues with the Civil Service Board suddenly come up in so much



Scott Fontenot

Page 118

frequency?

A.   I really don't know the answer to that.

Q.   When did the Civil Service Board issues start to become more frequent?

A.   I think it started even with the chief of police prior to Randy Fontenot.  We had issues in the civil service hearings, and some things were getting overturned on a technicality.  The City of Eunice had a long-time City attorney for years and years and years.

When the new administration came in 2010, when I was on the City Council, that attorney had left.  We hired another attorney.  He helped in City government, but he didn't specialize in civil service; it was hard for him, it was confusing for him also, and he was a seasoned attorney.

Q.   I'm asking for an approximate date when you think the Civil Service Board hearings became more numerous and complex, a rough year.

A.   It's been within the last 14 years I would say.  I mean, like I said, my dad was the chief of police.  They had civil service hearings.  When he worked in the fire department, he was on the Civil Service Board.  If he was here today,

Page 119

I'd ask him those questions.

But it was never like it was.  And I don't know if that's because of who was on their Civil Service Board who knew laws better, can guide our employees a certain way.  I don't know why or when it all started, but I can tell you we had instances dating back to 2010.

Q.   When did the City hire the civil service specialist you mentioned, Aaron Green?

A.   I'd have to -- we lost one of them cases.  I don't know.  I talked to him afterwards.  And it might have been he was representing -- we had an incident with the fire chief, and it was probably after that I said, You know what, I'm tired of giving you money -- we were paying him anyway because we had to pay the attorney fees, so why don't you just get on our team and we'll pay you like that.

Q.   What's the approximate year or date, to the extent you can recall, that you hired Aaron Green for the City?

A.   Michael Dunn could probably answer that better than I can because I don't think they were too happy about that.

THE WITNESS:

Page 120

Sorry, Mike.

A.   I would -- man, it's been a couple of years, man, I'm not sure.  At least three years, I would think, or longer.  I don't know if -- it's been at least three years, yeah, because Randy Fontenot was the chief of police.

And I'm going to tell you right now, the chief that we have now, Mr. Kyle, you know, he fell into a good situation, you know.  He's got a -- he's got, you know, an attorney that can help guide the entire process from start to finish, and that's kind of what we were lacking.

And no offense to anyone who was guiding the process, because you almost have to figure it out on your own.  And I feel sorry for the other towns that maybe don't have the opportunity to go and hire a specialist, because it's tough, man.

You can read case law after case law in the state and you're going to see discrepancies in cases where people are -- you know, their disciplinary action is overturned based on a technicality.  So...

Q.   You alluded to this already, but Aaron Green used to represent Eunice employees, including police officers, at the Civil Service

Page 121

Board hearings; is that right?

A.   Yes.

Q.   Does that create a conflict of interest if he moves on to now represent the City against potentially those same officers?

MR. HEBERT:

Object to the form.

A.   I mean, that's on him.  I don't think so.

BY MR. BHATLA:

Q.   Has the City prevailed -- I'll withdraw the question.

Has the Eunice Police Department prevailed in more Civil Service Board hearings as a result of your hiring of Aaron Green?

A.   I don't know if you'd say prevailed.  I don't know how you determine who wins or loses in those situations.  I think he's helped us make sure that when it gets to the Civil Service Board, that you're going to look at facts presented and not look for where you screwed up the investigation, I think that's where it helps us a lot.

Q.   Have Civil Service Board appeals by Eunice police officers declined in number since



MAGNA
LEGAL SERVICES

Scott Fontenot

Page 122

Kyle LeBouef became the chief of police?

A. Well, appeals, absolutely. I mean, I don't know if there's a -- any appeals that has happened, to be honest with you. There hasn't been much disciplinary action taken.

Q. Why do you think that is?

A. I have no idea.

Q. I'm handing you what's been marked as Exhibit 5.

(Exhibit 5 was marked.)

BY MR. BHATLA:

Q. This was produced by the City of Eunice at Bates CityofEunice_Dunn_001758.

Do you recognize this document?

A. I recognize the name on the top. I can go through it. Yes, I remember this document.

Q. Is this an interoffice memorandum that was authored by you?

A. Yes.

Q. And the memo was sent to Sergeant Cody Miller of the Eunice Police Department?

A. Yes.

Q. And do you see the subject says, quote, "Notice of disciplinary action," end quote?

A. Yes.

Page 123

Q. Was this document prepared and maintained in the ordinary course of your responsibility as mayor?

A. Well, once you're the appointing authority, this falls under the steps to initiate the notice of disciplinary action. Like I said, this is all under the guidance of our attorney, Aaron Green.

Q. Was Aaron Green hired by the date that's listed here, April 22, 2021?

A. He had to have been, I would think. It looks like something that he helped me prepare.

Q. And was it your regular practice to have these kinds of notice of disciplinary actions prepared and put into written form?

A. Yeah. I mean, if one -- this has to come from the appointing authority.

Q. And was this document prepared by you?

A. That's what it says right here on the paper, yes.

Q. And you had personal knowledge of the information contained within this document, right?

A. Yeah, because we had a pre-disciplinary hearing on it, you know. So we were presented facts in a pre-disciplinary hearing which was

Page 124

March 30. This date of the letter was April 22. So, yeah, I had all the information presented to me.

Q. And so this memo was prepared around the time of that initial investigation?

A. As part of the step of the process.

Q. You see in this first paragraph it says, quote, "Following a pre-disciplinary conference which was held on March 30, 2021, we have evaluated all available information and determined that disciplinary action is appropriate," end quote.

Do you see that?

A. Yes.

Q. Did you write those words?

A. Yeah.

Q. Why were you the one evaluating all available information and determining that disciplinary action is appropriate?

A. We were the appointing authority at the time.

Q. What, if anything, was the Eunice Police Department's involvement in this investigation?

A. Well, there was an incident that happened. It was obvious it happened. It was an

Page 125

officer who struck an inmate with a closed fist. So someone saw it, so they opened an investigation. The police department started an investigation and we got to this point.

Q. Who brought this incident to your attention?

A. I don't recall without looking into the report.

Q. Did Lieutenant Dunn raise this issue to your attention?

A. I mean, he may have. But, I mean, I don't think he was the one who started the investigation.

Q. Was Randy Fontenot involved in this investigation?

A. He may have assigned someone to do it. I do know it did go to State police because it involved an officer and an altercation with an officer. So my number-one thing was let's get it to the State police, let's let them do the investigation.

And when they came back, they found no wrongdoing. I still felt like we had to demote the guy, I mean, you know.

Q. If you turn back to the first page with



Page 126

Bates ending 1758, do you see on the second paragraph it says, "On March 2, 2021, we initiated an investigation into an event involving you which occurred on February 7, 2021. Our investigation has provided information to support the following," end quote?

And then it sets forth, "Sergeant Cody Miller struck an inmate with a closed fist."

Do you see that?

A.   Yeah, I see that.

Q.   Does this refresh your recollection as to whether you initiated an investigation into this incident?

A.   It's hard to say.  I mean...

Q.   But it says here, quote, "We initiated an investigation," end quote.

Did you write those words?

A.   With the help of my attorney.

Q.   Who is "we" referring to here?

A.   I have no idea.  I guess the -- myself and the appointing authority.  It doesn't say.  I don't know.

Q.   Who reached out to the Louisiana State Police for their investigation?

A.   The police department.

Page 127

Q.   Who at the police department?

A.   I have no idea.

Q.   And when you say "the police department," you mean the Eunice Police Department?

A.   Eunice Police Department.

Q.   You testified earlier that, quote, "My number-one thing was let's get it to the State Police," end quote.

So did you drive the decision to have the State police investigate this incident?

A.   I just suggested that.  And I think they felt the same way.  It was only fair.  I mean, how can you justify that without letting the top police agency conduct an investigation?  I think that, you know, gives the public a little sense of security knowing who's protecting and serving them.

Q.   Why did you get involved in this investigation?

A.   I was the appointing authority.

Q.   You testified earlier that you don't have time to manage the police department and all of the conflicts and that you did not take disciplinary action against Victor Fontenot and

Page 128

Officer Guillory.

So why did you decide to get involved here?

A.   Well, I think we're going to go back.  Here at this time we had a specialist that we hired, civil service attorney, who helped us guide through these things, okay?  Because without that, I could initiate an investigation, it would have been wrong, and then the Civil Service Board would have done what they had to do.  So at this time, we have a person hired to help us, and that's what they done.

Q.   So in those other cases, when Lieutenant Dunn raised concerns with you with other officers, you didn't want to investigate because you'd think you'd get the investigation wrong?

A.   I wouldn't say that, no.  You know, I find it odd that, you know, there's criminal allegations that are being brought forth by a police officer who can clearly go to another law enforcement agency or another law enforcement officer to initiate these complaints, but yet you're going to come to the mayor with that, which I find is absurd.

Well, all that was was trying to involve

Page 129

me into this big tangled thing of webs, all right?  That's all it was.  And we can go on.  Let's keep asking questions, I got all day.  But you're not going to stick me in a lie.  And we can let it all out.  Let's do it.

Q.   I guess I'm just trying to understand, if you're the appointing authority and an officer of the Eunice Police Department brings a criminal violation to you, do you have no obligation to look into it even though you're the appointing authority?

A.   At this time right now, knowing --

MR. HEBERT:
Object to the form.

A.   Knowing what I know now, I would hand it over to the attorney who specializes on this.  At the time, I didn't have somebody on staff to do that.

BY MR. BHATLA:

Q.   You have an entire police department to investigate issues with police officers committing criminal violations, correct?

MR. STAMEY:
Objection to the form of the question.



Scott Fontenot

Page 130

A.  It seems like it.  That's part of the job.  I don't know what else they going to do.

BY MR. BHATLA:

Q.  So when issues of misconduct were brought to you by Lieutenant Dunn, you didn't think to have the police department investigate it even when you were the appointing authority?

A.  Okay, so let's go back to when these allegations -- which allegations?  Because you're going in circles here.  You got ten different stories, I need to figure out which one we're talking about.

Q.  I want to finish this exhibit, but we'll go through that.

A.  Okay.

Q.  So do you know if Eunice Police Department policy requires that the mayor or police chief request an external agency to investigate an issue before that investigation can be opened up?

A.  I have no idea.  I don't know of that in the City policy.  The City of Eunice handbook, it's not in there.

Q.  Let's turn back to the memorandum that you wrote.  Do you see in the third paragraph, as

Page 131

we mentioned, it says, quote, "Sergeant Cody Miller struck an inmate with a closed fist in the face after the inmate spit twice in Sergeant Miller's face," end quote?

Do you recall any other details about this incident?

A.  The inmate also told Sergeant Miller in this report that he had hepatitis.  What I recall, apparently the guy was detained, and Officer Miller and him were in the same area, and the guy got in Officer Miller's face, spit on him, and Officer Miller reacted and hit the guy.

I mean, look, you put me in that position, I don't care who you are, I'm going to do the same thing.  But as a police officer, you're kind of held to a higher standard.  And, I mean, that's whenever it was brought to us, that we just said, you know, let the State Police look into it.

I didn't even know if they would look into it, to be honest with you, because they mostly investigate shootings and officer-involved shootings.  So -- but they took it, they looked at it.  Typically it would probably go to the sheriff's department or something like that.

Page 132

I don't know who was available to initiate these investigations.  Sometimes other agencies get involved in investigations whenever it involves one of your own.  I mean, that's just a typical thing to do.  I don't know.

Q.  As you wrote in the first paragraph, quote, you determined -- you, quote, "determined that disciplinary action is appropriate," end quote.

How did you reach that determination?

A.  Because I felt like, regardless whatever the State police came with, I mean, you still have to hold yourself to a higher standard.  And, I mean, that's what it is.

And, look, let's go back to 2021.  They would have burned units down to the ground if we let a police officer go and beat somebody up and not do nothing about it.

Q.  So you're --

A.  I don't know if you paid attention to what was going on across the country.  But, I mean, we took action, the appropriate action, which I felt was appropriate.

Q.  You felt that police officers in the unit should be held to a higher standard?

Page 133

A.  I think police officers anywhere.

Q.  Was Randy Fontenot involved in your decision to make this determination?

A.  We probably discussed it.

Q.  Do you recall anything about that discussion?

A.  No, I don't.

Q.  Was it one discussion?  Was it multiple?

A.  It was probably just what we talked about when they did the investigation.

Q.  Was anyone else at EPD involved in this investigation or the determination?

A.  I don't recall.  I don't think so.

Q.  And this determination was solely in the appointing authority's power?

A.  Yes.

Q.  Can you turn to the page ending in Bates 1765.  Do you recognize this document?

A.  I mean, not offhand, but I recognize -- I mean, it's obvious it's a critical incident form.

Q.  Who is the employee named in the critical incident form?

A.  Cody Miller.

Q.  Who is the supervisor listed on this



Page 134

form?

A.  Lieutenant Michael Dunn.

Q.  Who wrote the critical incident form?

A.  Looks like Lieutenant Dunn.

Q.  And this critical incident form details the incident where Sergeant Cody Miller struck an inmate, correct?

A.  I'm reading it now.  Yes.

Q.  And so Lieutenant Dunn submitted an internal written complaint about Sergeant Cody Miller's conduct to the Eunice Police Department; is that correct?

A.  That's what it looks like right here, yeah.

Q.  So this is another written complaint that Lieutenant Dunn submitted?

A.  These are things that, as the mayor or the City Council, whether he submits this to the police chief or police department, whoever the supervisor is, we don't see that.

Q.  If you turn to the page ending Bates 1766, do you see here in the second-to-last paragraph it says, quote, "While speaking with officers about the incident and what transpired, it was discovered another incident occurred prior

Page 135

to this incident.

"I was told Sergeant J. Andrus had forcefully choked an inmate unconscious and Sergeant C. Miller and Officer T. Tilbury had to pull Sergeant J. Andrus off the inmate," end quote.

Do you see that?

A.  Yeah, I see that.

Q.  Are you aware of the event this paragraph is referring to?

A.  I'm not.

Q.  This is another incident where an officer struck an inmate, correct?

A.  That's what it says right here.

Q.  Did you ever investigate this incident?

A.  No.  I mean, I never saw this right here.

Q.  Did you ever impose disciplinary action against Sergeant J. Andrus for this incident?

A.  No.  And there's nothing to follow the trail with to even impose disciplinary action.

Q.  This was an official document that was submitted to the Eunice Police Department by Lieutenant Dunn, right?

A.  I guess it is.  I mean, you --

Page 136

Q.  And this was clearly in the City of Eunice's possession because they produced it in this litigation, right?

A.  It's obvious it is.  I mean, I don't know.  I don't have that document.

Q.  Did you receive this document during the course of your investigation into Sergeant Cody Miller?

A.  I'd probably have to go back three years in my mind.  But I'm not sure.  If it's in their investigation, it was probably in there.  I don't know.

Q.  Who is responsible for providing you with the information for an investigation as the appointing authority?

A.  The ones conducting the investigation.

Q.  So to your knowledge, Sergeant J. Andrus was not disciplined for this incident documented by Lieutenant Dunn?

A.  I know for a fact he was never disciplined, not -- I mean, for anything.

Q.  And do you see the next paragraph here where it says, quote, "After ample time and no response from DC T. Kennedy, I then contacted Chief Randy Fontenot and briefed him on what

Page 137

occurred," end quote.

Do you see that?

A.  Uh-huh.

Q.  Does this mean Lieutenant Dunn reported the event of Sergeant Miller's conduct to T. Kennedy and Chief Randy Fontenot?

A.  That's what it says on this form.

Q.  And DC, what does DC stand for?

A.  Deputy chief.

Q.  So Lieutenant Dunn reported to Deputy Chief Tony Kennedy and Chief Randy Fontenot?

A.  I take a lot of these reports with a grain of salt and I'm going to tell you why, because we had a report once that was made on an incident that happened downtown.  And I'm going to put this on record.

Had a guy that was getting arrested, and he goes out and says -- and the report -- Officer Dunn makes the report that the guy was above the law and he was going to get out of it because he knew the State representative and the mayor.

And Officer Dunn apparently had that report.  That's not what was submitted to the D.A.'s office.  But what was supported -- what was supplied to the D.A.'s office with that



Scott Fontenot

Page 138

investigation didn't have our names in it.  So I would see this one report that had things stating what I said in it and things that weren't.

So when it comes to documents and things, unless it's official and been submitted, I don't know what I'm reading.  I don't know what's true and what's not.  And I still have those two forms at my office, I held onto that.  Actually, that's not the same -- that's nothing to do with this, but I just wanted to let y'all know.

Q.  Having reviewed this critical incident form, do you have any reason to doubt what's written here?

A.  I mean, it's somebody's statement.

Q.  Does anything described in the statement appear false or improper to you?  Feel free to take a look to review if you need to.

A.  False or improper in which manner?

Q.  To your best judgment.

A.  Of how the report was written or the actions that people are being accused of?

Q.  What's described in this critical incident form, do you have any reason to believe it's false or inaccurate?

A.  It's hard to make that judgment.  I

Page 139

mean, I -- reading a document.  I read a lot of stuff, man.  I don't know.  What answer are you looking for?  I mean, I don't get this, I really don't.

Q.  Let's shift gears slightly.

A.  Please.

Q.  You have experience with Sergeant Jo -- J. Andrus; is that right?

A.  He works for the police department -- well, he worked -- I think he might have been a reserve officer doing jailer duties.

Q.  Does he still work at the Eunice Police Department?

A.  No.

Q.  What happened?

A.  He's no longer at the police department.

Q.  What's the reason for that?  Was there any disciplinary action taken?

A.  I'm not sure if disciplinary action has been taken on him.  There was an incident that -- there was a domestic incident that happened a while back while he was still contracted out, I think, working as -- or he might not have even been working for the police department, he might have been just an auxiliary police officer, and he

Page 140

was arrested for something and held.  So...

Q.  Who was the arresting officer?

A.  Shoot, I have no idea.  I mean, I'm sure it was somebody in the Eunice Police Department.  It happened inside the City limits.

Q.  Are you aware that it was Lieutenant Dunn who arrested Sergeant Andrus?

A.  I was not aware of that.

Q.  Do you know if police officers -- I'll rephrase.

Is it a crime for a police officer to lie on an official internal form like a critical incident form?

MR. HEBERT:

Object to the form.

A.  I'd have to read the law, but I'm sure it would be.  You hear a lot of lies.  But somebody putting it on paper, I don't know.

BY MR. BHATLA:

Q.  How did you learn about the events surrounding Sergeant Cody Miller's striking an inmate?

A.  I don't recall how I was made aware of that.  I don't know if it was whenever the initiation of the investigation started, or it

Page 141

could have been Michael Dunn.  I don't remember.

Q.  You relied on Lieutenant Dunn's statements as a witness when reaching your determination to take disciplinary action, right?

A.  I watched a video.

Q.  Did you rely on testimony by Lieutenant Dunn in making your determination that disciplinary action against Sergeant Miller was appropriate?

A.  I mean, after watching the video, it was obvious the guy acted totally out of his role as a police officer, in my opinion.  And the State police done their investigation.  But I think it was obvious watching the video.  I didn't have to watch anybody -- read anybody's statement.

But he makes a statement in here that it's obvious that the guy did do that.  Now, what happened prior to the incident that occurred in the booking area, I didn't see the rest of that video.

Q.  With respect to that, you would have had to rely on eyewitness testimony, right?

A.  It would be great if we had body cameras or anything like that back then.

Q.  So you had to rely on eyewitness



Page 142

testimony from officers who were present for that circumstance, right?

A. Yeah.

Q. And Lieutenant Dunn was one of those eyewitnesses?

A. Yes.

Q. Just to make sure I understand correctly, you don't recall how this incident was brought to your attention, right?

MR. HEBERT:

Objection; asked and answered.

A. Yeah, I mean, I don't recall how that was. I mean...

BY MR. BHATLA:

Q. Is there a mechanism in place for you to be informed when incidents like this occur, an official mechanism?

A. I mean, if an investigation is going to initiate, absolutely. The person initiating, whether it's the police chief or fire chief, they going to get with the appointing authority. So that's what happens, they let us know, we get with the attorney, we do the whole thing.

Q. So you rely on the police department to inform you when officer misconduct occurs?

Page 143

A. The elected chief of police, absolutely.

Q. What if the chief of police decides to not tell you about an incident, do you have any recourse to find out about it?

A. How do I know about it though?

Q. Exactly, that's my question.

A. I don't know if it's credible. We're going in circles here.

Q. I think we're on the same page actually.

A. Yeah, I mean, I don't know. It would be great. But I guarantee, there's no other mayor in the state -- I don't know where you live at, but here, man, they have to have freaking seminars to show how to have relations between the chief and the mayor. This is at the annual conference. I'm serious.

So he's in his own zone. He's got so much to deal with and so am I. And I say "him," I'm looking at Chief Randy Fontenot, former chief, in here. I -- look, I'm the mayor of a town of 10,000 people. You would think we have a staff of people; we don't. We wear many hats.

We've got so much going on, man, especially if you take your job seriously. I could sit back and do nothing. But I don't know

Page 144

everything that goes on day to day in the police department. I do not want to know. If I wanted to know that, I'd run for chief of police.

When it comes down to things that need my action, absolutely they come to me. Now, if they decide to withhold information, that's on them. I can't stop that. I can't go in to interfere in that, and I'm not; frankly, I'm not. Until somebody tells me I have to, I'm not.

Q. So if the chief of police doesn't tell you or the investigating officer doesn't tell you about a complaint, you have no official means of learning about it?

A. I don't know where I even fall into that. Where do I fall into this role? There's got to be a separation of duty. If they want me to be a chief of police, then hell, get rid of the damn elected chief, put an appointed chief, then I can do everything that y'all expecting me to do.

I don't understand where these questions are going to.

Q. Just to be clear, you do have the authority to take disciplinary action as the appointing authority, right?

MR. HEBERT:

Page 145

Object to the form.

MR. STAMEY:

Object to the form of the question.

A. I would think, if once -- once these -- initiated they investigation. Like I said, when it comes down to this, you know who I'm going to rely on? The guy I'm paying a lot of money to to guide us on all this stuff. Because I can't give you those answers. I'm not going to give you those answers. I'm not going to give you the wrong answer. You're making me want to say something that's totally out of place. I'm not saying it.

BY MR. BHATLA:

Q. How will the guy you've hired be able to help you if neither you nor him is aware of events occurring at the department?

A. Shit, man, I mean, just grab it out the cloud. I mean, you can't find --

MR. FEUCHT:

Sorry, Counsel, that was funny.

A. If we don't know about it, how do we do anything, okay? Now -- once anything's been brought to us, it doesn't matter what it is. It could be the smallest incident, even if it might



Scott Fontenot

Page 146

not have been serious, I'm calling the attorney, Aaron Green.  I'm not fooling with this no more because I don't want to be back in here doing all this nonsense.

MR. STAMEY:

I'm sorry, I was distracted.  What did you just say?

THE WITNESS:

I said I'm tired of sitting here doing all this nonsense.

MR. STAMEY:

I'm sorry.  Thank you.

BY MR. BHATLA:

Q.   Since you've been the appointing authority, how often have critical incident forms been brought to your attention?

A.   Every time there's an investigation.

Q.   And who is usually the one bringing those critical incident forms to your attention?

A.   Could be in a freaking manila folder sitting on my box at the desk.  Could be the chief, could be the secretary, could be whoever; it's just there.  Then I call and say, What's this about?  We go on.

Q.   Is there an official policy on the books

Page 147

that says EPD must inform you of any critical incident form?

A.   I don't know.

Q.   Don't you think there should be a mechanism out there to bring these issues to your attention?

A.   Seems like there would be.  I mean, there might be one in place.  I don't know.  I don't -- I haven't gone through -- you gave me the police policy thing; that thing is pretty long.  So I don't know.  We got our own policies we deal with.

Q.   Is a kind of reporting mechanism for these critical incident forms, you know, making something official, is that something the City has considered?

A.   I mean, it's public record.  Everything is public record.  So I don't know what -- any step further you need to go with that.

Q.   Can you think of any incident involving officer misconduct at EPD where it was too late for you to do anything about it?

A.   No.

MR. BHATLA:

All right.  Why don't we break for

Page 148

lunch.

THE VIDEOGRAPHER:

We are off the record.  The time is 12:27.

(Mr. Michael Dunn left the proceedings.)

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record.  The time is 1:34.

MR. DOHERTY:

Is Lieutenant Dunn coming again?

MR. BHATLA:

He is not.

BY MR. BHATLA:

Q.   Scott, did you speak to anyone during the break?

A.   I had lunch with Stan.

Q.   Did you discuss your testimony with Stan?

A.   He just said I was doing a good job.

Q.   Did you talk about any of the substance that we discussed today?

A.   No.

Q.   Did you talk to anyone else during the break?

Page 149

A.   I briefly talked to my attorneys right here, just for a second.

Q.   Did you discuss any nature of this deposition?

A.   They just felt like it was going good, just explaining to me what they felt like the direction this was going.

MR. HEBERT:

Beyond that, I would instruct you not to reveal the contents of any privileged communications.  You weren't quite doing it yet, but I didn't want you to go there.

A.   No, I mean, nothing more than, You're doing a good job.

BY MR. BHATLA:

Q.   Great.  I like to hear that.

A.   And so are you.

Q.   Thank you.

A.   Nobody probably told you that yet today.

Q.   I appreciate you thinking about me.

MR. HEBERT:

We were thinking it, Amit.

MR. BHATLA:

Thank you.  I appreciate the



Scott Fontenot

November 20, 2024
Pages 150 to 153

Page 150

affirmation, everyone.

(Exhibit 6 was marked.)

MR. BHATLA:

With that note, I'm handing you what I've marked as Exhibit 6. This is the document produced by the Civil Service Board at CSB_000 -- four zeros and then 465.

BY MR. BHATLA:

Q. And I'll ask you to turn to the page ending in page 468. Do you recognize this document?

A. Yes.

Q. What is it?

A. It's a resolution by the City of Eunice, Board of Aldermen and Alderwomen, designating Mayor Scott Fontenot to serve as appointing authority in all matters concerning civil service employees except hiring and discharge.

Q. Was this document prepared and maintained in the regular course of business for the City of Eunice?

A. Yes.

Q. Is it the City of Eunice's regular practice to have records of these resolutions

Page 151

prepared and reduced to writing?

A. Yeah, I mean, it's part of the minutes and it has to be kept.

Q. Was this record prepared by an employee who has personal knowledge of the information contained in the resolution?

A. I'm sure the City clerk.

Q. The City clerk has personal knowledge?

A. Well, she's the one who sat in the public meeting, took the minutes of the meeting, and created this resolution.

Q. And was this record of the resolution prepared at or -- at or near the time of the events described here?

A. Yes.

Q. Thank you.

A. And the reason for this was -- must have had -- hired our attorney that advises us on civil service matters, and I believe he advised the City Council and myself to put this resolution in motion to, I think, avoid any confusion in the future of who the appointing authority would be, if I'm not mistaken.

Q. And is that your signature at the bottom of the resolution?

Page 152

A. Yes.

Q. Did you attend this special session that's mentioned in the resolution?

A. Yes, yeah.

Q. What do you recall about that session?

A. Just under the advisement from the attorney, just to name me as the designated person to serve as appointing authority. That's all it really was. I don't think there was any more discussion about that.

Q. Did the attorney speak at the special session and provide that advice?

A. I don't think he was there. I don't think he was there, no.

Q. So this resolution -- I'll withdraw. When did your civil service attorney provide you the advice to pass this type of resolution?

A. Well, I'm assuming that's the timing of this. I can't -- I'm not 100 percent correct, because I don't know if there would be any other reason for us to go forward and have this resolution made unless there was advisement from, you know, the attorney.

I'd have to go back and see when we

Page 153

started paying him for his service. But it seems to me that could be correct because it's within three years. So...

Q. To be clear, you were already the appointing authority before this resolution, right?

A. Well, the prior resolution that we talked about was -- designated the mayor and board of aldermen and alderwomen the appointing authority. So yeah, technically.

I think this was to clear up any confusion that may come before the Civil Service Board or any other board, appellate court, or whatever somebody may, you know, contest. It's to clear up anything that may hang on a technicality, that's pretty much all this is.

Q. So this was just basically a renewal of the decision to make you the appointing authority?

MR. HEBERT:

Object to the form.

A. Yeah, I think it's just to help clear up some things in case it goes any further than the board of aldermen and alderwomen. And that was just by suggestion of the attorney that we use for civil service.



Page 154

BY MR. BHATLA:

Q.   And do you see in the text of the resolution it says that you have appointing authority, quote, "except hiring and discharge," end quote?

What does that --

A.   So it takes the full council's approval, which would take a quorum, to either confirm the hire or discharge of a civil service employee.  So in any other matter, I guess it's my signature to initiate investigation and all those other things involved is where this resolution comes into play.

Q.   And you now have sole authority on taking -- imposing disciplinary action as the appointing authority; is that right?

A.   That's what it says, yeah.

Q.   Are hiring -- or have hiring and discharge decisions always been left to the City Council?

A.   Yes.  And, I mean, look, it goes on.  When you read the rest of the resolution it says, "Whereas designating the mayor as appointing authority in all matters, excluding hiring and discharge, will streamline the process of promotion, demotion, and discipline."

Page 155

Sometimes you hire an officer provisionally to get them started in the process to get them on the force, and that happens almost every hire before they actually get fully approved by the board of aldermen and alderwomen in a public meeting.  So...

Q.   So you have sole authority as the appointing authority as a result of this resolution to consider -- issue the promotion, demotion, and discipline?

A.   Yes.

Q.   Thank you.

And this resolution was passed on October 15, 2021; is that correct?

A.   Yes.

Q.   Thank you.  You can set that aside.

Did the chief of police have hiring and discharge power when he was the appointing authority?

MR. HEBERT:

Let me object to the form.  I think it calls for a legal conclusion.  But go ahead.

A.   I would think so.  It still may have to have the City Council ratify the decision.

Page 156

There's been so much back and forth that I don't -- it's hard to remember how the process has been, to be honest with you.  But it seems like even if the chief was acting as appointing authority, seems like it would go before the board.  I could be wrong.

(Exhibit 7 was marked.)

BY MR. BHATLA:

Q.   I'm about to hand you what's going to be marked as Exhibit 7.  This is a document produced by the City of Eunice at Bates Number CityofEunice_Dunn_0002097.  And once you have this document, I'll ask you to please turn to the page ending in Bates 2236.

Have you reached that page?

A.   Yes.

Q.   You'll see that the next few pages appear to be screenshots of text messages.

Do you recognize these?

A.   I know the name on the top, so it might be my messages.

Q.   Is "Dunn EPD" how you refer to Lieutenant Dunn in your phone?

A.   Yeah, it's like that right now.

Q.   Do you know if these messages were

Page 157

collected from your phone?

A.   I mean, we were subpoenaed to get any messages and all that, so I'm pretty sure it's on there, probably still on there.  Yes.

Q.   Do you see -- just for the record, it looks like you're checking your phone.  Can you confirm, then, that "Dunn EPD" is how you have Lieutenant Dunn listed in your phone?

A.   Yes.

Q.   And do you have any reason to doubt that these are your text messages?

A.   Well, the messages that are -- that looks like it was -- almost looks like it's Officer Dunn sending messages to me.

Q.   Do you recall sending and receiving text messages?

A.   I see where he texted me that.  Texted me something on March 11, March 12, March 13.  I respond to it.  I mean, it was in my phone.  I might have read it, I don't remember.

Q.   All right.  If you could turn now to the page ending in Bates 2239.  2239.

A.   Okay.

Q.   And let me know when you're there.

A.   Okay, I'm here.



Scott Fontenot

November 20, 2024
Pages 158 to 161

Page 158

Q. Do you see the message exchange on this page with Lieutenant Dunn?

A. Yes.

Q. Do you have any reason to doubt that this is an accurate copy of the text message exchange you had with Lieutenant Dunn?

A. I mean, that's what was in my phone.

Q. What was this conversation about?

A. On March 30, 2021?

Q. Yes.

A. Dunn asked the question, "Is it true he got called out last night?" And he must have been referring to Chief Randy. And I said, "The sheriffs made a few remarks." And then he commented back, "It's almost over. And FYI, I am going to go on record next month about Randy wanting y'all targeted and who he was using to attempt to get dirt on y'all." And I just gave him a thumbs-up on the message itself, I never responded to it.

If I recall correctly, we had a municipal meeting amongst all the elected officials in the parish and it was in Cankton, Louisiana. And they were talking about law enforcement agencies throughout the parish. And

Page 159

the sheriff got up and spoke about, you know, how most agencies are easy to work with and some aren't. Now, who that was directed to, he didn't say specifically. So...

Q. It looks like Lieutenant Dunn said here, quote, "I am going to go on record next month about Randy wanting y'all targeted and who he was attempting to get dirt on y'all," end quote.

What did you understand Lieutenant Dunn to mean when he said "Randy wanting y'all targeted"?

A. I'm assuming he's talking about me and the City Council. I mean, I didn't know who he was referring to, he didn't specifically say it. And I don't know if that's just a scare tactic. I mean, I'm 42 years old, you could dig up anything you want on me, I ain't scared about it.

Q. You liked the message, right, that's what the thumbs-up means?

A. I just liked it like, I got it, you know what I mean? I didn't mean like, Oh, great, you know what I mean? If you go through most of the messages, that's what I did to like half the messages, because half the time I don't feel like texting nobody back. And some of the time I

Page 160

wasn't even commenting back at all.

Q. So just looking through these messages, if you go back to page 2236, it looks like Lieutenant Dunn sent you one, two, three, four, five, six, seven -- eight messages spanning from page 236 to 238, but you didn't like any of them, right?

A. Yeah, that's what it looks like.

Q. But you did like the message about where Lieutenant Dunn said that Randy wanted y'all targeted?

A. Yeah, I mean, I probably liked it sarcastically, I guess. I mean, I don't know.

Q. Did you believe what Lieutenant Dunn was saying here?

A. Honestly, I didn't know what to believe anymore.

Q. Did you believe that Randy wanted you targeted and was trying to get dirt on you?

A. What I really believed was that there was, you know, issues between them and they were trying to get me and the Council involved and that's probably why we're all here. That's what I really believe.

And that was his way to start things up

Page 161

and create a rift between the chief and I, knowing that we have to work together, or just make us -- you know, intimidate us in a way where -- you're going to target us, I've heard that before with the other mayor. They're going to catch him, go have a drink after the meeting. I've been hearing that for years.

Q. So you didn't believe that Randy was trying to target you?

A. No.

Q. Did you ever express that to Lieutenant Dunn?

A. That I didn't believe him?

Q. Yeah.

A. I didn't really have to tell him what I believed and what I didn't believe.

Q. But instead, you just liked his message?

A. Yeah.

Q. Do you recall ever discussing this further with Lieutenant Dunn?

A. No, not that.

Q. Please turn to the page ending in Bates 2241. This is another text exchange with Lieutenant Dunn, right?

A. Yeah.



Scott Fontenot

November 20, 2024
Pages 162 to 165

Page 162

Q. You don't have to read the messages out loud, but just looking at the messages on this page, do you have any reason to doubt that this is an accurate copy of your text message exchange with Lieutenant Dunn?

A. No, it's all -- if you got this from me, then it's accurate.

Q. Do you recall this conversation with Lieutenant Dunn that occurred in August 31?

A. Let's see. So Dunn says, "Letting you know they're not messing with me at the moment but they back screwing with employees again, so don (sic) be surprised when more claims start happening in the next few weeks." I respond, "I'm glad for you, but that sucks."

Q. I want to stop you right there, I apologize. But I want to ask you about Lieutenant Dunn's first message here.

What did you understand him to mean?

A. I mean, we'd have to go back on any of the messages he sent me. You know, Dunn would send me long novels of messages sometimes, and sometimes I would read them and sometimes I wouldn't.

Obviously, he was letting me know that

Page 163

they were messing with him prior to this, and all he's saying is, Hey, they're not messing with me right now.

Q. Who did you understand "they" to refer to?

MR. STAMEY:
Objection to the form of the question.

A. I guess anybody who would have been screwing with him.

BY MR. BHATLA:

Q. Did you understand him to be referring to Randy Fontenot?

A. I mean, I could assume that, you know, based on prior allegations. But, I mean, I'm really not sure, I can't say that for a fact.

Q. Did you understand this to mean Victor Fontenot, to include Victor Fontenot in the word "they"?

A. I don't know.

MR. STAMEY:
Objection to the form of the question.

A. I mean, it could have been anybody, you know. You know, there was division amongst the

Page 164

department. I mean, it was obvious. It's obvious in all this testimony. You had one side and another side.

So whoever was "they," it could have been anybody. It's hard to determine that. I can't just sit out here and claim who was on one team or the other. I wasn't involved in neither team.

BY MR. BHATLA:

Q. When Lieutenant Dunn says "they're not messing with me," what did you understand him to mean when he said "messing with me"?

A. I guess screwing with him. I don't know.

Q. He also says "screwing with employees."

A. Yeah.

Q. So what do you understand those two to mean? Is that harassment?

A. I mean, you never went to work and somebody screwed with you? I mean, that's kind of -- I guess that could have been some form of harassment, I mean, I'm not sure. But there's policies and procedures in place to make complaints about that if you're being harassed at work.

Page 165

I just dealt with a City employee who was being so-called bullied, and it didn't turn out good for the guy who didn't report it, you know, I wrote him up and we took care of that. But, I mean, there's a proper way to go about it rather than going crying to the major in text messages.

MR. BHATLA:
Counsel, I'll make this objection for the second time on the record. I don't -- you may find my questions humorous, but I ask that you please not interrupt the testimony with laughter or commentary.

MR. STAMEY:
I'm going to object to that characterization, but subject to that we will note your response.

BY MR. BHATLA:

Q. Scott, in response to Lieutenant Dunn's message, you responded, quote, "Glad for you, but that sucks," end quote.

Why were you glad for Lieutenant Dunn?

A. I'd be glad for anybody. I mean, look, it could be somebody I don't know, if they getting



Page 166

messed with or whatever. I mean, I was just trying to encourage him in any way I could, Hey, I'm glad for you, man, you know, happy for you.

As you can see, it was a very short sentence. I'm glad for you and I said it sucks I guess for the other people.

Q. If Lieutenant Dunn was just any other officer, any other person, why did you feel the need to respond?

A. I'd have responded to him or anybody else.

Q. You had no issue --

A. You can't just leave somebody unread on that, that's kind of messed up.

Q. When you said "that sucks," what is "that" referring to?

A. I guess messing or screwing.

Q. So why does it suck?

A. Nobody wants to get screwed with, man. I mean, I don't know. I mean, that's just what I texted him back, maybe just as some type of encouragement. I mean, there was really no substance behind that.

Q. Do you see that Lieutenant Dunn messaged you afterwards saying, quote, "Back to messing

Page 167

with Donnie and Steffy and a few others," end quote?

Whom do you understand Donnie to refer to?

A. Donnie Thibodeaux.

Q. The Lieutenant Donnie Thibodeaux of the Eunice Police Department?

A. I would assume that's who he was responding to in that message, especially since he's talking about Steffy, which would be Stephanie Myers of the Eunice Police Department.

Q. And what did you understand Lieutenant Dunn to mean by "messing with Donnie and Steffy"?

A. I mean, I didn't know exactly what he meant, to be honest with you. I mean...

Q. What did you understand him to be referring to?

A. I guess just -- I don't know. I was going to say the terminology, but that's probably not right in this setting. But he was just screwing with somebody. I mean, I don't know what that could be. I mean, you ever felt like you went somewhere and somebody just kept screwing with you?

Q. In this context of employment, what do

Page 168

you understand it to mean? Does it mean retaliation?

A. I really don't know because I wasn't there. I mean, I --

Q. Lieutenant Dunn goes on to say, quote, "And the word I got through the grapevine, they bragged to a business owner and he was not going to stop until they got me, and that was two weeks ago." He goes on to say, "That came from the business owner's own mouth." The end of his message.

Now, what did you understand those two messages to mean?

A. Got word from the grapevine, it was bragged to a business owner he was not going to stop until they got me, and that was two weeks ago. That came from a business owner. I really didn't even know what he was speaking about, to be honest with you. And I just said, "He needs to stop." I guess --

Q. Who is "he" in your message?

A. I don't know. He said "he" in his message, so I just put he needs a stop on his. I really don't know. I'm really just trying to end the conversation because I don't want to talk to

Page 169

the guy.

Q. You had no idea who the "he" was that Lieutenant Dunn was referring to?

A. No. Because it was all "he" and "they."

Q. At the time of you receiving this message, who did you understand "he" to mean?

MR. HEBERT:

Objection; asked and answered.

A. Whoever he was referring to. I have no idea. I just put the same thing he put.

BY MR. BHATLA:

Q. Was Lieutenant Dunn referring to Chief Randy Fontenot here?

MR. HEBERT:

Objection; asked and answered.

A. He didn't say that. He didn't say it in the message. I mean, it could have been multiple people. Because I still don't know who "they" were. I'm just --

BY MR. BHATLA:

Q. "He" could refer to multiple people?

A. I guess. He says "they" and he says "he." Look, we're going to nitpick a text, man. I understand you're trying to get some answers out of me, but there ain't no answer right here.



Page 170

Q. Scott, to be honest, I think you're stretching the bounds of truth here.

MR. HEBERT:

Objection.

A. Well, you can think what you want.

MR. HEBERT:

If you have a question, ask a question.

BY MR. BHATLA:

Q. At the time this message was sent, who did you understand this conversation to be referring to?

A. I don't recall. I'm just saying, I don't know. And we can go back on all the other messages and see if there was ever -- he named anyone.

Q. I'll ask you to turn back to page 2241.

A. Okay.

Q. Who has the ability to mess with employees at the Eunice Police Department?

MR. STAMEY:

Objection to the form of the question.

MR. HEBERT:

Joined.

Page 171

A. I don't think anybody has the ability to mess with somebody. Nobody should be messing with anybody at work. Just go to work and do your job.

BY MR. BHATLA:

Q. Can a supervisor mess with an unfavored employee?

A. I think anybody could mess with anybody. Not supposed to.

Q. What did you understand Lieutenant Dunn to mean when he said, "He was not going to stop until they got me"?

A. I mean, I don't know what he meant by that.

Q. What did you understand "got me" to mean at the time?

A. I mean, the text message is at 7:30 at night, man. I probably just half-ass read his message sent and sent something back, didn't put any thought to it, to be honest with you. That's the truth.

Q. Do you have any reason -- I apologize, go ahead.

A. No, that's the truth. I mean, I don't know what else.

Q. Do you have any reason to believe that

Page 172

Lieutenant Dunn's messages are false or inaccurate?

A. You want me to be honest with you? I don't know what to believe.

Q. That wasn't my question. I'm asking you, do you have any reason to believe that these messages are false or inaccurate?

MR. STAMEY:

Objection to the form of the question.

MR. HEBERT:

Join.

A. I don't know what to believe, man. I mean...

BY MR. BHATLA:

Q. So the answer is no, you have no reason to believe --

MR. HEBERT:

Objection.

BY MR. BHATLA:

Q. -- that there is false or misleading --

MR. HEBERT:

Objection; that's not his answer.

MR. BHATLA:

Please allow me to finish the

Page 173

question, Counsel.

MR. STAMEY:

Let's take a break, go off the record. Let him answer his question and then let's take a break.

THE WITNESS:

We don't have to take a break, we can keep going.

MR. STAMEY:

No, no. The lawyers have to have a conference. So finish your question -- I mean answer.

A. I mean, I can't say what I felt at that specific time. Like I said, I mean, I'd like to go through -- there's many messages that Dunn had -- Dunn would send me that -- how do I know it's true or not? I don't know. I try to take all the facts, don't matter what it is.

I'm not going to sit there and -- I can't -- I can't say something that I don't know. I mean, I just -- I'm not going to.

MR. STAMEY:

All right. Let's take a quick break. And could the lawyers have the room, please.



Page 174

THE VIDEOGRAPHER:

We are off the record.  The time is 2:01.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record.  The time is 2:04.

BY MR. BHATLA:

Q.   Can you please turn to the page ending in Bates 2242 -- I'm sorry, could you please return to -- I forgot one point, return to page 2241, the previous page.

After you texted Lieutenant Dunn, quote, "He needs to stop," end quote, Lieutenant Dunn responded, quote, "I figured I'd just give you a heads-up," end quote.

What did you understand Lieutenant Dunn's message to mean?

A.   That he was just putting it out there, what he knew.

Q.   Based on these text messages, did you take any action with respect to the Eunice Police Department or the Eunice Civil Service Board?

A.   No.

Q.   All right.  Now if you could turn to the

Page 175

page ending in Bates 2242.  Is this another text exchange between you and Lieutenant Dunn?

A.   Yes.  It's a continuation from the prior text, just a different day.

Q.   This day is now Wednesday, September 22, and it looks like a message from Lieutenant Dunn to you where he says, quote, "I'll just try and give you a call and give you a heads-up that I was informed this morning they're bragging about the meeting they're going to have with you next week.  Just be careful, as (sic) only thing I was going to tell you in case they try to record you."

Do you see that message?

A.   Yes.

Q.   And you gave that message a thumbs-up, right?

A.   Yes.

Q.   And then you responded to Lieutenant Dunn's message saying, quote, "I forget to give you a call back," end quote?

A.   Yes.

Q.   What did you understand Lieutenant Dunn's message to mean?

A.   Apparently that someone was trying to have a meeting with me and they were going to

Page 176

record me.  If I told him anything -- if we talked on the phone or not, I don't remember if we did, I told him anybody could come in my office and record at any time, I don't care.  I don't really recall what that was about.

Q.   Do you have any recollection of what meeting he's referring to in this e-mail?

A.   I have no clue.

Q.   Do you have any understanding what "they" means in Lieutenant Dunn's message?

A.   No, I don't.  If anything, I mean -- I'd have to go back all the way through the messages and figure out who he's referring to.  I'm not sure.  You know, here's something else.  There's another scare tactic thing.

The first message was, Oh, they trying to set y'all up or dig into something.  Oh, okay.  Well, now they're going to record you.  I mean, what you trying to do, act like you on my side and trying to look out for me or something?  That's what it seems like.  I could give two craps about that.

Q.   Do you think Lieutenant Dunn wasn't trying to look out for you?

A.   I don't know if he wasn't looking out

Page 177

for himself the whole time.

Q.   What makes you think Lieutenant Dunn was trying to look out for himself and not for you?

A.   Trying to get everybody he could involved in some of this mess, that's what it looks like.  I mean, the longer we go, the more it looks like to me, that's my personal opinion.

Q.   Let's go back to page ending in Bates 2239.  This is earlier in the conversation than what we just looked at, correct?

A.   Yes.

Q.   And you see here in the message that you had thumbs-upped that Lieutenant Dunn specifically mentions Randy.

Do you understand that to be Randy Fontenot?

A.   Yes.

Q.   And Lieutenant Dunn says, quote, "I'm going to go on record next month about Randy wanting y'all targeted," end quote.

Do you under -- do you see that?

A.   Yeah, I see that.  Well, he said that -- "who he," but, yeah, referring to Randy, obviously.

Q.   And so despite this reference to Randy,



Scott Fontenot

Page 178

when Lieutenant Dunn refers -- uses the word "he" in subsequent messages, you did not understand that to mean Randy Fontenot?

MR. HEBERT:

Objection; asked and answered.

Third time.

MR. BHATLA:

This is a different question.

MR. HEBERT:

I disagree.

A.  Well, if you look at the prior message to that one, the first message was, "Is it true he got called out last night?"

BY MR. BHATLA:

Q.  Well, I'm asking about subsequent messages.  Subsequent messages when Lieutenant Dunn used the word "he," you did not understand that to refer to Randy?

A.  So that was on what day?  Let's see, March 30.  And the next time he texted me about anything referring to "he" was, what, a whole four months later.  I mean, that could have been anybody.

Q.  Let's turn to page ending in Bates 2444 -- sorry, 2244.  Is this another text

Page 179

exchange between you and Lieutenant Dunn?

A.  It's a text from Lieutenant Dunn on December 7.  Now, December 17 was a message between him and I.

Q.  Lieutenant Dunn's message on December 7, it reads, quote, "FYI, Randy is trying to fire a dispatcher because he called her and told her not to log or respond to the Eunice City Marshals because Randy stated, quote, They don't work for us, they are not to use our radio channel or pull what they say on the log, end quote.

"Terry Darbonne confronted Randy about it, but he denied it.  Now Randy wants an IA done to punish the dispatcher for repeating what he said, but it was not her that told Terry about," end quote.

I want to unpack this, but do you see that's what the message says?

A.  I see it.

Q.  Do you have any recollection of the circumstances surrounding this incident that's reported by Lieutenant Dunn?

A.  I do not.

Q.  Do you have any understanding of who the dispatcher was that he mentioned here?

Page 180

A.  I do not.

Q.  What, if anything, was your reaction to the end of the message where he says, quote, "Now Randy wants an IA done to punish the dispatcher for repeating what he said, but it was not her that told Terry about," end quote?

A.  I didn't respond to him, so I really don't remember even -- he obviously texted me that, but I don't remember.

Q.  What does "IA" mean?

A.  I'm assuming it's internal affairs or -- I don't know what IA would be.

Q.  To your knowledge, was there ever an internal affairs investigation into a dispatcher?

A.  I really don't recall.  At the time, I was dealing with my dad, who passed away, so like that shit was like a -- I don't remember that.

Q.  I'm sorry to hear that.

Assuming what Lieutenant Dunn has said in this message was true, would an IA investigation into the dispatcher be appropriate?

A.  I guess, I don't know.

THE WITNESS:

Can I get a break for a second?

MR. BHATLA:

Page 181

Yes.

THE VIDEOGRAPHER:

We are off the record.  The time is 2:12.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record.  The time is 2:16.

BY MR. BHATLA:

Q.  Did you ever tell Lieutenant Dunn that you didn't appreciate his text messages or that you didn't want him to text you about stuff going on at EPD?

A.  No.

Q.  Why not?

A.  I mean, I don't want to be, you know, that disrespectful to him.  I mean, I've got the same phone number since high school, anybody can text me.

Q.  You testified earlier today that you don't want to get in the middle of EPD affairs.

Why not tell that to Lieutenant Dunn?

A.  I mean, I don't know if I should have to.  I mean, he should take it upon himself in a professional setting that he follow the chain of



Scott Fontenot

Page 182

command, and going all the way to the mayor is not following the chain of command.  So I wasn't going to discourage him, you know, and be ugly about it.  He's a citizen.  He's a constituent of mine.  I have to serve him like I serve everybody else.

Q.   How did you know that Lieutenant Dunn did not follow the chain of command?

A.   I mean, if he's just texting me with all his bogus claims, in my opinion, and not going through the proper channels.  And maybe he did, but...

Q.   So you don't know if he raised these issues with Randy first?

A.   I don't know.

Q.   And you just characterized these claims as bogus.  What basis do you have to say that?

A.   Present the facts.  I mean, present proof.

Q.   But have you seen any documentary evidence disputing anything Lieutenant Dunn says in those messages?

A.   I haven't seen supporting evidence.

Q.   And my question is:  Have you seen any evidence that disproves anything Lieutenant Dunn said?

Page 183

A.   I haven't seen either.

Q.   So you don't know if his claims are bogus or not?

A.   That's my personal opinion, I guess.

Q.   What is that opinion based on?

A.   Hearing multiple sides of the story and making my own assumption from my own personal opinion, which I just shared for you on the record.

Q.   Which sides of the story did you listen to in making that opinion?

A.   Every single person who wanted to talk.

Q.   Can you identify those individuals?

A.   I mean, it could have been -- you could name almost everybody in the police department probably, because everybody had something to say.  It was water cooler talk.  It's -- wasn't official, Oh, here, I've got to make a claim, a statement.  No, it wasn't like that.

Q.   Can you identify for the record a single statement made by any individual at the Eunice Police Department that disproved anything Lieutenant Dunn said to you in those text messages?

A.   Not offhand.  I mean, no.

Page 184

Q.   Did you individually talk to every employee at the Eunice Police Department regarding Lieutenant Dunn's claims?

A.   No, absolutely not.

Q.   At the beginning of this deposition you testified that you did not discuss Lieutenant Dunn's lawsuit with members of EPD.  Are you now retracting that statement?

A.   No.

Q.   So then which one is it, did you discuss Lieutenant Dunn's claims with EPD personnel or not?

MR. HEBERT:
Object to the form.

A.   So I have discussed things or listened to people tell me, should I say.  Because what I do a lot, I listen, okay?  And there are multiple times when people will say different things.  It didn't matter if it was a secretary in my office, if it was the City marshal, or whoever the heck it might be.

Because we live in a small town and everybody was talking.  It was in the newspaper.  It was on social media.  It was all over.

Page 185

BY MR. BHATLA:

Q.   I understand.  I'm --

A.   So no, I didn't discuss Michael Dunn specifically with anyone particularly in the police department unless there was some type of investigation that would have maybe pertained to him.

Q.   I'm trying to understand.  You say you were listening to people in the context of my question.

What did the -- what did your secretary have to say about Lieutenant Dunn's claims, if you were listening to her?

A.   Well, she just like anybody that would say she saw something on social media or hear somebody say something.  People congregate in my front office and they'll talk and they'll discuss things openly.  And they may have said, Oh, did you hear this?  Did you hear that?  I hear that crap all day long about everything.

Q.   What did the --

A.   Does that mean I discussed that with people?  No, absolutely not.  I don't -- I don't -- I don't buy into gossip and I don't feed into that.  I listen to what people got to say.  In my



Scott Fontenot

November 20, 2024
Pages 186 to 189

Page 186

job, you have to be fair. I listen to everything. I make my own assumption. I have my own personal opinions. That's on everything.

Q. While you were listening, what did you hear that made you think Lieutenant Dunn's claims might not be accurate?

A. Just different stories from the different individuals claiming this was true or this wasn't true.

Q. Did you do any investigation to verify if those allegations were true?

A. I didn't have to.

Q. You formed an opinion without doing an investigation?

A. It's my personal opinion.

Q. Your personal opinion as to whether Lieutenant Dunn's claims in this lawsuit have merit?

A. It was my personal opinion. It's totally different than what these claims are.

Q. Now I'm going to shift gears and talk about the allegations that are set forth in the complaint related to Lieutenant Dunn experiencing, for example, employment retaliation.

Did you ever hear from anyone in the

Page 187

Eunice Police Department that Lieutenant Dunn's claims were not accurate?

A. The claims pertaining to this lawsuit?

Q. Correct.

A. Can you state exactly which claims you're talking about?

Q. I gave the example of the First Amendment free speech claim in the context of his employment.

Did you hear anything while you were listening from anyone at the Eunice Police Department that Lieutenant Dunn's First Amendment free speech retaliation claim has no merit?

A. I don't think so.

MR. STAMEY:

Objection to the form of the question.

A. I mean, I don't think so.

BY MR. BHATLA:

Q. Did you hear anything from anyone at the Eunice Police Department that suggested to you that Lieutenant Dunn's defamation claim had no merit?

A. I don't think so.

Q. Did you hear anything from anyone at the

Page 188

Eunice Police Department or any other citizen of Eunice that would make you doubt the merits of Lieutenant Dunn's civil conspiracy claim?

MR. HEBERT:

Object to the form.

A. The specific claim, probably not. I mean...

BY MR. BHATLA:

Q. Did you hear anything from anyone in the City of Eunice or otherwise that would make you doubt the merits of Lieutenant Dunn's claim for violation of Louisiana State Whistleblower Statute?

MR. HEBERT:

Objection to form.

A. I don't think so. I mean, so, you know, when I said, you know, he had some bogus claims, I wasn't talking particularly to this case. I mean, Lieutenant Dunn's been an officer for as long as I've been on the City Council.

BY MR. BHATLA:

Q. So what claims would you characterize as bogus?

A. Like I said, there's a lot of things being said by different people. And people can

Page 189

make a claim about Dunn and claim he's the best officer in the world, and some might claim he's not.

And, you know, based on my personal observation, I like Michael Dunn. I think he's very capable to be a great officer. I have a problem with someone constantly feeding a bunch of crap, in my opinion. It's just -- I don't know where I'm going at with this.

All I'm saying is I like to be truthful with people, and I like to be truthful with me (sic). And if there's anything that ever can contradict that, then you're going to walk a thin line with me and I'm going to watch your every freaking move.

Q. Sitting here today in this deposition on the record, can you identify for me specifically any claims that you think Lieutenant Dunn has made that are bogus?

A. Well, it brings me back to a report that was made at an incident where there was a fight outside of a bar downtown. And the police report that was made by Lieutenant Dunn had my name in it, saying that the guy who was getting arrested knew the mayor, knew the State representative, and



Scott Fontenot

November 20, 2024
Pages 190 to 193

Page 190

he was going to have their job. That was in the report. Chief Randy Fontenot gave me that report.

When I confronted Michael Dunn about it -- because I kept it in my back pocket for a while because I didn't appreciate that. And I asked him about it, and he came out with a whole 'nother report, the report that was actually filed and didn't have that in it. So at that point, I didn't know who the hell to believe about anything.

Q. When did this occur?

A. I have the report. I kept it in a certain space. Seen it the other day. It was probably right when I became mayor, probably around 2016 or so.

Q. Who was the arrestee at the time?

A. I believe it was Mitch, Mitchell Miller, he was the one who got arrested.

Q. And Mitchell Miller was the one who claimed that he knew you, correct?

A. According to one report I saw, yeah.

Q. Did you ever bring your concerns to Lieutenant Dunn after you received the final report?

A. Well, Lieutenant Dunn showed me his

Page 191

final report, which is what he said was submitted to the D.A.'s office, which didn't have our name in it. So like I said, at that point, I didn't know who the hell to believe, so I have to protect myself and just listen to everybody. That may have made me throw a flag up with Michael Dunn, I don't know. But like I told you, that's how I am. That's how I was raised.

Q. Are you aware that Chief Randy Fontenot made Lieutenant Dunn change the report to remove your name from it?

MS. WALL:
Object to form.

A. I have no idea about that.

BY MR. BHATLA:

Q. If Lieutenant Dunn was threatened with punishment if he did not change the report, would that change your opinion?

A. I mean, if he was threatened with punishment, that's crazy. That's just -- would that change my opinion of him on that particular incident? Maybe so, I don't know.

Like I said, listen, I like Michael Dunn, I think he's a fine guy, I think he's very capable. But when we get ourselves into all this

Page 192

stuff and I listen to all the testimony and I listen to everyone's stories, a lot of it is what it is, it's a story.

Q. I appreciate that. And I want to probe a little bit further.

When Lieutenant Dunn brings these issues directly to you over text message, you don't appreciate it; is that fair to say?

A. I wouldn't say that. Like I said, anybody can text me about anything. I don't know if it's a draw to get me drawn into this crap.

Q. You keep referring to "crap." Can you expand? What does that mean?

A. Stuff, like just stuff. I don't mean like bad -- it's just a term.

Q. Can you clarify, maybe provide a little more specifics?

A. Oh, man, I got a bunch of crap to do today. That means I'm overloaded with work.

Q. So Lieutenant Dunn was putting a lot of work on your plate?

A. I wouldn't say work. I didn't -- I was saying he was filling me with a bunch of crap to either lure me in to whatever was going on --

Q. So you --

Page 193

A. -- whereas there were other avenues and other alternatives to go. Why come to me? Why text me at 7:30 at night with this long-ass thing? What are you doing? Are you fishing for something? Because you're just waiting for that bait.

Q. Is it your position that you're not in the chain of command for EPD?

A. Do we have a copy of the Larson Act? Can we get that? I would love to read that.

Q. I don't have a copy, but I'd ask that you answer my question.

MR. HEBERT:
Just do the best you can. We know you're not a lawyer.

A. I'm the mayor, man. I'm the mayor of a town that has an elected chief.

BY MR. BHATLA:

Q. You are the authority and final say over promotion and demotion and discipline, right?

A. Well, then they shouldn't be interfering. They should follow the process just like everything else. Don't interfere and text message this mayor and this and that when it could be pertaining to you in an investigation. That's



Scott Fontenot

Page 194

totally wrong. That's totally wrong. It doesn't matter who you are.

That's like me having to go see a judge on a traffic citation and I'm texting the judge. That's crazy. You're not supposed to do that. That's what he was doing. He was not only doing that to me, he was doing that to every councilperson. And those are people who are going to make decisions in some of these cases. And that's not fair. And I don't care who you are and who you represent, that's unethical.

Q.  If the person in your chain of command refuses to listen to your concerns about misconduct at the department, do you think Lieutenant Dunn should have just dropped the issued and not raised it with you or the City Council?

A.  No.  He do what I told him to do, go to a higher authority, go to the district attorney's office, go to the sheriff's department.  If these are legitimate criminal complaints, go there.

Q.  How are you not a higher authority when you're the appointing authority?

A.  Because I don't have law enforcement capabilities, sir.

Page 195

Q.  But you have the discipline authority against Eunice Police Department officers, and if they conduct misconduct, you would punish them, right?

A.  And typically, probably 99.9 percent of the time, that does not happen anywhere in the state.  Show me proof where that has happened.

Q.  I'm just trying to make sure.  If Randy Fontenot did not address an issue of employee misconduct raised by Lieutenant Dunn, you are saying that you have no responsibility to address that concern?

A.  Through a text message, no.

Q.  How else should Lieutenant Dunn contact you?

A.  He shouldn't contact me directly.

Q.  So that means that the issue of misconduct should get swept under the rug?

A.  No.

Q.  What other mechanism is there if you are the final authority on disciplining officers for misconduct?

A.  I don't think I'm the final authority. I think you've got to have a little teeth in it before we start digging into something.

Page 196

Q.  If you're not the final authority, who is?

A.  So are we acting on a text message?  So we're not going to act on everybody's text message who works for the City and is a civil service employee; that would be absurd.

Q.  As the appointing authority who has sole authority on promotion, demotion, and discipline, as you've testified, do you have no responsibility to address issues of employee misconduct by police officers?

MR. HEBERT:
Object to the form.

A.  I do have a responsibility when it's brought to me formally.

BY MR. BHATLA:

Q.  What does that look like?

A.  That's the same thing, anything else that comes to me with, it has to be through a PAF, personal action form, or something of that nature.

Q.  Is that set forth in the EPD policy?

A.  I don't know, I mean, I didn't look through it.

Q.  Is that set forth in City of Eunice policy?

Page 197

A.  We don't have anything in our policy that pertains to anything regarding incidents and complaints regarding the police department.

Q.  So this is an unofficial policy then that you've described?

A.  I have no idea.

Q.  Have you made this clear to Lieutenant Dunn and other employees at the police department, that any such concerns need to be brought forward formally to you?

A.  I probably have.

Q.  You've communicated that to the entire Eunice Police Department?

A.  No.

Q.  Who have you communicated it to that --

A.  I probably told Don or someone that.

Q.  You've probably told; you don't recall?

A.  No.  What I told him was, Go talk to another law enforcement agency.  I mean, what are you looking for out of me?  Let's go back to the questions.

Q.  Let's take the Sergeant Andrus example.

A.  Okay.

Q.  If Sergeant Andrus committed misconduct by striking an inmate and Randy Fontenot did not



Page 198

report that to you, would you expect Lieutenant Dunn to report that to you directly or would that be improper?

A.  I don't know what the route would be, because that right there is malfeasance in office. They should report to someone else.  Somebody could have came in and probably had an assault charge on the guy.  The inmate could have made a claim.  There's so many things that could have happened right then and there.  You don't go straight to the mayor with that.

Q.  Do you understand, though, that this is the whole point of Lieutenant Dunn's lawsuit, is that Randy Fontenot did nothing in response to his complaints, and when he went to higher authorities, he was retaliated against?

MR. HEBERT:
Object to the form.

A.  I mean, if that was the case, then it's screwed up.  I mean, I mean...

BY MR. BHATLA:

Q.  Don't you agree, then, that things should change --

MR. HEBERT:
Object to the form.

Page 199

BY MR. BHATLA:

Q.  -- in Eunice?

A.  If that's the way things were operating, then absolutely.  I mean, every police department should operate fairly regardless.  And I can tell you this, we're going to touch base on the Eunice Police Department.

Changes have been made since Randy Fontenot hasn't been the chief of police, and it's not just because he's not the chief of police. The new chief of police wants to implement different changes, all right?  We've got body cams.  We invested so much money, man.  Like --

Q.  Do you think the body cameras were a good idea?

A.  Absolutely.  It protects the officer and it protects the public.  I mean, that's a no-brainer.  That's what they're intended to be used for.

Q.  Do you understand that Lieutenant Dunn in this lawsuit, as one of its prayers for relief, requested that the department --

A.  Yes.  And I was always for body cams, that's why we bought them.  I told the chief, What do you need?  I mean, I don't think anybody,

Page 200

myself particularly or the chief now, I don't think anybody wants to deal with any of this in the future and would love to correct any suggestion there is to make this operate more efficiently.

Q.  Why did it take so long for the department to get body cameras?

MR. HEBERT:
Object to the form.

A.  I don't know.  I don't -- I don't make those purchase decisions or those operating decisions in the police department.  All I can do is support it financially.

BY MR. BHATLA:

Q.  Do you think there was money in the budget under Randy Fontenot to purchase body cameras and equip officers with cameras?

A.  No, it wasn't specifically in the budget, but if he needed it, we would have made sure we could have made it happen.

Q.  Did Randy Fontenot ever request funding for body cameras from the City Council or your office?

A.  I don't think so.

Q.  Why do you think that is?

Page 201

A.  I don't know.  I really don't know.  And it could have been a cost, because it's very costly.  I mean, we -- for the longest time -- and we go back to before I was mayor, The City don't have money for this, the City don't have money for that.  They were rolling one police car 24 hours a day.

Randy came from that age of the police department.  I'm talking about Randy Fontenot.  He worked during the '80s, through the '90s, where they didn't have nothing, all right?  My dad was the chief of police.  They worked through crap -- they had one computer.  It was tough, man.  And they started to build things up.

He was probably scared to go ask for something, you know what I mean.  It's funny, because the department heads are scared to come ask for anything.  It's the weirdest thing in the world.  It's like I'm the principal or something. Like just come ask; if we can help, we're going to help you.

So he may have been -- didn't want to come ask.  I don't know why he didn't ask for that.  I know Chief LeBouef isn't scared to ask for anything.



Scott Fontenot

Page 202

Q.  Why would Randy be afraid to ask you for something?

A.  I find the fire chief is afraid to ask for things sometimes.  I don't know.  I don't know.  I don't know.  I can't answer that.  And I don't think it's a personal thing, I think it's just --

Q.  Is it bad leadership to not ask you for funding that would improve the department and improve safety in Eunice?

A.  No, I don't think it's bad leadership.

Q.  I want to -- sorry, go ahead.

A.  We all want everything.  If it was up to every chief of police who gets elected, they would love to have the highest paid police department, brand-new police cars, the whole shebang; but it don't work like that.

I don't -- if he would come to ask for something, we would definitely look into it and work on it.  I don't recall him come and ask me for body cams.

Q.  And I want to continue --

MR. HEBERT:

Just a second.

(Mr. Hebert left the proceedings.)

Page 203

BY MR. BHATLA:

Q.  I want to go back to my line of questioning earlier just to confirm.

Did you hear anything from any individual in the City of Eunice or see any documentary evidence that would disprove Lieutenant Dunn's claim for intentional infliction of emotional distress?

A.  No.

Q.  Have you heard any statements by individuals in Eunice or anyone else or any documentary evidence that would disprove Lieutenant Dunn's claim for false light invasion of privacy?

A.  What was the claim pertaining to, the invasion of privacy?  I don't recall.  I'm just asking, what is that for?

Q.  That would relate to statements made regarding false statements made regarding Lieutenant Dunn's character; for example, claims that Lieutenant Dunn is a dirty cop or a corrupt officer.

Have you heard those rumors in Eunice?

A.  Maybe.

Q.  When can you recall hearing them?

Page 204

A.  Probably when the newspaper came out with a big ol' federal lawsuit against the City, that's the only thing I can think of.  I don't go to coffee shops, I don't go to barbershops, but I do hear people talk.  And I can't pinpoint who may have said that.

Q.  But people talking, meaning they may have been calling Lieutenant Dunn -- they were calling Lieutenant Dunn a dirty cop or a corrupt officer?

A.  I don't know specifically dirty or corrupt.  They might have just said he might have been no good or something like that.  I mean, people say that about me, I'm a piece of crap or whatever.  But people have their own opinions.  I don't believe it.

(Exhibit 8 was marked.)

BY MR. BHATLA:

Q.  Let's go back to the exhibit we were just discussing, Exhibit 7, City of Eunice 2097.  I apologize, not this document.

I'm handing you what's been marked as Exhibit 8.  This is a document produced by Lieutenant Dunn at DUNN_0002119.  So I'll represent to you that this was produced by

Page 205

Lieutenant Dunn.  And do you see on the first page there's a number listed here?

This first number in bold, 1(337)305-3159, is that your phone number?

A.  Yes.

Q.  And the "Michael" here, do you understand that to refer to Michael Dunn?

A.  I guess that would be his number.

Q.  If you could flip to the back page, do you recall having this text exchange, text message exchange with Lieutenant Dunn?

A.  I'm assuming that was probably an incident where there was an officer out by himself and there was a -- maybe a shooting.  The reason why I remember that, because it was around my birthday.  So apparently Dunn must have reached out to the marshal's office.  I think that was for backup because they only had one guy on the shift at the time, if I'm not mistaken.

And I'd have to go look on the calendar, because I remember talking to the chief, we had a Council meeting that Tuesday night, if it's the same time, and we had a -- I talked to the chief the next night regarding the incident.  And then they had pulled back on overtime and he wasn't --



Page 206

he didn't have anybody else to go out, if that's the same thing.

Q. Do you have any reason to doubt that this is an accurate copy of your text message exchange with Lieutenant Young around March 19, 2021?

A. I guess not. I mean...

Q. So Lieutenant writes here, quote, "Just wanted to thank you and Terry for last night. I could not live with myself if something would have happened to Clancy," end quote.

"Clancy" refers to an EPD officer on patrol the night before, correct?

A. Okay, yeah, that had to be Grant Clancy.

Q. Grant Clancy.

And "Terry" is Terry Darbonne of the Eunice City Marshal's Office, correct?

A. Yes.

Q. Do you recall what the circumstances were of this event?

A. If it's the same thing, I think that's what it was, you had a shooting. And if I recall correctly, the chief called me that night and says, you know, What do we do, cut back the overtime? I can't send somebody out.

Page 207

I said, Do what you need to do, I mean, send somebody, get somebody out there, assist the officer. From that point, I don't know, I guess Terry was called out himself too or maybe the marshal's office. Maybe Joey with the marshal's office went out, if I'm thinking of the same thing.

Q. And do you see Lieutenant Dunn's next two messages? The first, quote, "An FYI. I was informed Randy is coming after for talking to Terry," end quote. And then he says, quote, "FYI, just found out they're trying to write me up and discipline for it now," end quote.

What do you understand these messages to be referring to?

A. I guess for talking to Terry.

Q. Lieutenant Dunn was written up for speaking with Terry?

A. To my knowledge, I don't think so. I'm not sure.

Q. You wrote here, in your next message, quote, "What's the reason?" end quote.

Why did you ask that?

A. He said, "They're trying to write me up." I said, "What's the reason?"

Page 208

Q. Who did you understand "they" to mean, "they're" trying to write me up?

A. I mean, if he's referring to the prior message, he was talking about Randy.

Q. So to your knowledge, Lieutenant Dunn is saying Randy intended to write up Lieutenant Dunn because he reached out to Terry Darbonne to get coverage for Officer Grant Clancy, who was on patrol by himself?

A. That's what these messages seem to imply.

Q. Does Lieutenant Dunn's subsequent messages where he says first, quote, "For talking to Terry, saying that my whole purpose I called Terry cause a problem," end quote; and the second he said, quote, "He's trying to find something in policy that fits, and I haven't found anything yet, but I'm reviewing it again," end quote, these were in response to your message asking, quote, "What's the reason?" end quote.

A. Yeah.

Q. What did you understand Lieutenant Dunn's messages to mean?

A. According to the response, doesn't mean much at all. He just says "For talking to Terry,"

Page 209

then he says "They're trying to find something in the policy." I don't know what he could have done wrong.

Q. So do you think Lieutenant Dunn did the right thing by reaching out to the Eunice City Marshal's Office to get support for Officer Clancy?

A. I don't know how it works. I mean, Lieutenant Dunn is a lieutenant, you know. Should he have reached out to the deputy chief or the chief of police first? He may have had to do that according to their procedure manual. I don't know. I mean, I'm not opposed in any situation to get any help if it's an emergency. I'm not sure what their procedure was though.

Q. Did you give permission for the marshals to come assist and help with staffing?

A. If I do recall correctly -- and Terry may have called me that night or Joey. Joey's the deputy chief for the marshal's office. And they may have asked that, Hey, if we go out and help the PD, will you help us with our overtime when it comes down to our budget? And I said, Absolutely. Because I knew that the police department was shorthanded. And, I mean, at the



Scott Fontenot

Page 210

time -- you know, Eunice is a big land mass. It's like -- to have one or two officers patrolling the whole town is not safe.

Q.  To your knowledge, is it against EPD policy to contact another local law enforcement agency for assistance?

A.  I don't think so.  I mean, how did he request assistance, would be my question.  Did they request assistance over the radio or did he just call it in?  I don't know how that works.  I would think that if you're on the scene or you get to an emergency situation you can call for backup over your police radio.  I don't know if that was done or if he just picked up the phone and called the marshal.  I don't know.

I know that in the fire department -- and I worked at the fire department -- once you got on scene and you need to call for aid, you can call for aid, you know.  That's a mutual aid agreement you have with people.  So I don't know how that works in the police department field.

Q.  Would it make a difference as to whether it's proper if he had done it over the radio versus over the phone?

A.  That's a good question.  Over the radio

Page 211

is a better choice because it's all documented, you know, in case you have to go back on transcripts.  I'm sure you can do that with phone messages too.  I don't know.  We reaching on this one right here.

Q.  Are you aware that Lieutenant Dunn actually was disciplined for contacting Terry Darbonne in this instance?

A.  I don't recall if he was or not in this specific one.

Q.  Do you think it would be improper for Lieutenant Dunn to have faced discipline for reaching out?

A.  I mean, if he violated something in the policy, possibly.

Q.  To your knowledge, there's nothing in the policy that would prevent Lieutenant Dunn from reaching out?

A.  I haven't read that deep into the policy, so I can't answer that question.

Q.  Do you think that, in general, if other departments have availability, it's good for the different law enforcement agencies to help each other out?

A.  Oh, yeah.  We do it all the time, you

Page 212

know.

Q.  You can set that aside for now.

Have you ever witnessed Randy Fontenot discipline Lieutenant Dunn?

A.  I don't think so.

Q.  Have you ever witnessed Randy Fontenot unfairly discipline any officer of the Eunice Police Department?

A.  No, sir, not in my own two eyes.

Q.  Are you aware of any unofficial investigations conducted by an EPD officer against Lieutenant Dunn?

A.  Any unofficial investigations?  Not to my knowledge.

Q.  Are you aware that Victor Fontenot testified in his deposition that he engaged in an unofficial investigation of Lieutenant Dunn?

A.  I don't think I sat through that deposition.  I'm not sure.  I don't recall that.

Q.  Were you aware of this unofficial investigation at the time it was happening?

MR. DOHERTY:

Objection to the form.

A.  Can you -- I don't recall Victor Fontenot investigating Dunn.  If you get more

Page 213

specific, I may be able to recall something, but I don't recall.

BY MR. BHATLA:

Q.  If an officer was running an off-the-books investigation into another officer, do you think that's appropriate?

A.  I mean, it all depends, I guess, you know, who was assigned to do the investigation.  Did the chief assign a certain person to investigate a certain incident?  I don't know.

Q.  Do you have any understanding as to whether EPD policy sets forth a specific procedure for investigating a Eunice Police Department officer?

A.  I do not know that.

Q.  Do you know if an officer is allowed to be investigated by another officer without the investigative officer receiving a copy of the police officer's bill of rights?

A.  That I do not know either.

Q.  What oversight does the mayor's office have over any EPD investigation?

A.  None.

Q.  Even as the appointing authority, do you get to influence the way EPD does its



Scott Fontenot                                                November 20, 2024
                                                             Pages 214 to 217

Page 214

investigation?

A. No, I don't think we should be influencing that whatsoever. We have to be fair and impartial. They do their investigation, we look at all the facts, and we determine the type of disciplinary action that's taken.

Q. If you think the investigation is incomplete, would you go forward to complete the investigation yourself or would you instruct EPD officers to complete the investigation?

A. I hope they do it right to where we don't lose on a technicality at the Civil Service Board. So I don't know. I mean, it would have to be correct, you know. Particularly now, we have help to make sure it's done right, you know.

Q. Do you review findings from investigations before you issue disciplinary action?

A. Oh, yeah, we have to look at all the facts presented.

Q. Have you gone back to the Eunice Police Department after receiving an investigation and told them that this was insufficient to provide dis -- to support disciplinary action?

A. I don't think so. I don't think that's

Page 215

ever happened.

Q. How often have you followed the chief of police's recommendation with respect to taking disciplinary action while you've been the appointing authority?

A. Quite often, I would think.

Q. Do you recall any instances where you took disciplinary action that was contrary to the chief of police's recommendation?

A. I don't know.

Q. If the chief of police initiates an investigation against an officer, do they have to tell you?

A. I think it's part of procedure when they open up the investigation, yeah.

Q. What procedure is that?

A. I'd have to go back to the State examiner's website and see how that initiates the process. But I know once -- I don't even know what the report is called off the top of my head. I'm trying to think of what it would be. Like I said, there's a process that's followed. I don't know what else.

Q. And this is a process you've followed for years now?

Page 216

A. Yeah, I mean, listen, we do our 100 percent best to follow the law in any disciplinary action, and if there was some times where either the process was messed up because a step was skipped or not done properly or, like you said earlier a recording wasn't there, yeah, absolutely, we want to make sure we do it right.

Nobody -- I know on my end, as the appointing authority, we don't take things lightly. We do everything by the book. And there are some things that maybe we needed some help on, and that's when we hired the attorney. I mean, without him, I guarantee you we would have had other instances where we would have lost, I'm just saying.

It's complicated; very, very complicated. I would not expect -- if I were to die today and have a new mayor come in tomorrow, they better hope and pray that attorney still wants to work for the City, because they're going to be screwed. They're not going to know how to do any of this, nobody does. I'm dead serious. Find me a mayor that knows how to do it, I'll hire him as my assistant.

Q. Why do you think there's only one

Page 217

attorney that you found in all of Louisiana that understands civil service laws?

A. There's multiple attorneys. I have confidence in this guy because he's kicked our butt many times.

Q. But there's nothing unique about these laws, right? In theory, any lawyer should be able to understand these laws and opine on them; is that fair to say?

A. I think anybody is capable to learn anything. If I was an attorney, I know I would try to maybe get into that because it's very few who do it and you've got a large field that you can play in.

That's why there are so few, because it's not easy. And I'm not saying no one in here could do it. It's so complicated. The guy who's helping us has fought for civil service boards on their behalf, which he still does, he's a representative of local civil service boards and he's fought them. And they may have someone better than him, and I'm sure they do.

Q. What is it about the civil service laws that makes them so complex?

A. I wish I knew those answers, man, I



Page 218

really do.  I think a lot of things can contradict themselves when you're talking about civil service law and City policies, so it's very complicated.

Even the judge in which we had a district court hearing on the Stephanie Myers case Friday admitted at how complicated civil service law can be and has been.  And he served as assistant district attorney for nearly 30 years and he's a judge now.  And I have a ton of respect for that man.  And for him to say that, I knew that we made the right decision to pay somebody to help us.

Q.  How many attorneys does the City of Eunice have?

A.  We have one City attorney, which is Stan Feucht, and I hired Aaron Green as a part-time basis to help us with the civil service stuff.

Q.  How long has Stan been with the City of Eunice?

A.  Stan was with us -- we had a City attorney, Mr. Vernon McManus, which was -- turned 80 years old and he went to go enjoy time with his family.  At the time, Stan was serving as assistant City attorney just to help us with things and just kind of get his feet wet.

Page 219

So Stan's been the sitting City attorney for five years, I would say, at least, six.  It's been a little while.

Q.  Did you ever ask Stan to familiarize himself with civil service law so he could adequately advise you?

A.  Every day.  Every day.

Q.  Why did Stan not read up on the laws?

A.  He did.  He did.  He did read up on the law.  Stan -- and I can answer that.  Stan read up on the laws.  And he's done as much research and he done way more than he would have got paid for in a year to look into this stuff.

He even took it upon himself to reach out to a neighboring city attorney who deals with the civil service because the entire town is civil service.  Thank you, Jesus, that not all my employees are civil service.  But they reached out to him for advice, and even he was not a seasoned vet.

So Stan -- just like any other City attorney, if I were to come in with a whole new administration, hire a new City attorney, that new City attorney is not going to know it either.  It's just -- it's not common, man, it's really

Page 220

not; I wish it was.

Q.  I'm just trying to understand, was it impossible for the City to comply with civil service laws before you hired Aaron Green?

A.  I don't think it was impossible, but I think at how the local Civil Service Board was operating, nitpicking every single investigation that went through there, that it would have been impossible to get any fair treatment if we didn't hire this attorney.

Q.  But that's the nature of the law, right?  You have to comply with the law, especially when you're potentially infringing people's rights, their right to freedom, by charging them with a crime?

A.  Absolutely.  And that's why we took it upon ourselves to spend this extra money and hire this guy that wasn't in our budget to make sure that everybody had fair treatment regardless of who they are.

Q.  So do you think the City realized that it lacked expertise in civil service law and, therefore, needed Aaron Green to appropriately address Civil Service Board hearings?

A.  No.  I think just going forward, to

Page 221

build the trust back between the officers and the department and the City and everything, yeah, we needed somebody in that capacity to make sure things were done properly and correct.  And there are some things brought up that probably shouldn't take disciplinary action, and he can say, No, man, you don't need to do this.

Q.  And before Aaron Green came to the City of Eunice, do you think police officers, chiefs of police, were taking disciplinary action that was contrary to the law?

MR. DOHERTY:

Object to form.

A.  I'm not sure if it was contrary to the law, I just know that when actions were taken, we were doing our best to address the hearings with our local attorneys and we were going against people who knew every aspect of civil service.

And like I go back, the guy we hired was someone who would represent these other folks who would come in our city and tell us what we weren't doing right, where, if we would have done it right, we probably wouldn't have been in that position.

And I don't think it was anyone in



Scott Fontenot

Page 222

particular's fault. The civil service law is so complicated and there has been so many cases throughout the state they just thrown out on technicalities. Go back and look it up, I'm telling you. More and more cases are overturned on a technicality based on that rather than facts.

BY MR. BHATLA:

Q. So then why, in your 14 years of tenure in City government, did you wait 11 or so years before you hired Aaron Green?

A. Because I never got to the point where we had to. It never got to the point where we had to.

Q. But you were lose -- you told me you were losing on technicalities as early as 2016, 2017. Did that not prompt you to take some sort of action to repair or boost your knowledge of civil service laws?

A. Never -- never -- never really took it under consideration to take it to that level. We thought that we could get better and work on it. We had the State examiner come in. We had the people from the State come in and show us what to do, how to do it.

And the lady who was a State examiner

Page 223

had come from another department in the state, so she still didn't totally understand what her role was.

Q. Aaron Green has been with the City for roughly three years now, you said?

A. Yes.

Q. In that time, have you asked Aaron Green to update the City of Eunice's policies to make sure they explicitly conform with civil service laws?

A. You know, the City of Eunice, our policy, we don't have anything to do with that. Maybe that's something that the chief of police could ask them. That's me -- they were going back as far as me impeding on the duties of the chief of police.

Q. Why hasn't anyone asked him in the last three years?

A. I don't know.

MR. STAMEY:

Can you repeat that?

THE WITNESS:

The question was why haven't we had Aaron Green update our policies --

MR. BHATLA:

Page 224

In the three years he's been here.

THE WITNESS:

-- in the three years he's been here.

A. I don't know that there was a request to. I'm not -- I can't request him to update anything in the police department.

BY MR. BHATLA:

Q. Who made the request? Are you saying there was a request made or there was not?

A. Not to my knowledge.

Q. Why do you think Chief Randy Fontenot, when he was chief and losing all these Civil Service Board appeals, didn't talk to Aaron about updating the department policies?

MR. DOHERTY:

Object to form.

A. I don't know why. And to be -- touch on Randy Fontenot, Randy Fontenot didn't have a say-so of who all was going to hire Aaron Green or not.

BY MR. BHATLA:

Q. But once Aaron Green was hired, Randy Fontenot, to your knowledge, did not ask Aaron to help him update EPD policy to make sure officers

Page 225

complied with civil service laws?

A. I don't know about that.

Q. To your knowledge, has Kyle LeBouef asked Aaron Green to help update EPD policy to avoid conflicts with civil service laws?

A. To my knowledge, I don't think so. I'm not sure.

Q. I want to --

A. I don't get into the day-to-day operations of the police department.

Q. I want to shift gears slightly.

Have you ever been accused of drinking and driving?

A. By who?

Q. By anyone.

A. No.

Q. Are you aware that Donnie Thibodeaux testified in this case under oath that Ryan Young has said that you drink and drive?

A. I was not aware of that.

Q. Do you have any understanding of why Ryan Young would say that?

MR. DUBOSE:

Object to form.

A. Because probably does it himself.



Scott Fontenot

November 20, 2024
Pages 226 to 229

Page 226

BY MR. BHATLA:

Q.   Do you have a window-tinting business?

A.   Absolutely.

Q.   Have you ever accused -- have you ever been accused of putting an illegal amount of window tint on someone's car?

A.   Yeah, they say that all the time.

Q.   Who says that?

A.   Whoever.

Q.   Are you aware that Donnie Thibodeaux testified under oath that Ryan Young has said that you put an illegal amount of tint on window -- window tint on cars?

MR. DUBOSE:
Object to form.

A.   I was unaware of that.

BY MR. BHATLA:

Q.   You said Ryan Young probably drinks and drives himself.  What made you say that?

A.   Well, he said that about me.

Q.   Do you think he actually does drink and drive?

A.   I don't know.  I don't know Ryan like that.

Q.   Do you have any understanding as to why

Page 227

Ryan Young would say that you put an illegal amount of window tint on cars?

MR. DUBOSE:
Object to form.

MR. DOHERTY:
Object to the form.

A.   I don't know, man.  That dude has been having a personal problem with me for a long time, and I don't know what it is.  I wish I knew what it was so we could fix it, but at this point I really don't care.

BY MR. BHATLA:

Q.   What do you mean by "problem"?

A.   He's always talking mess like that to people, where he --

Q.   About you?

A.   Yeah.

Q.   Why do you think that is?

A.   Because people tell me.

Q.   Sorry, why do you think Ryan Young is talking to people about you and spreading rumors about you?

MR. DOHERTY:
Object to the form, calls for speculation.

Page 228

MR. DUBOSE:
Object to form.

BY MR. BHATLA:

Q.   I'll rephrase.

A.   Nothing --

Q.   I do --

A.   My dad -- he worked for my dad.  I don't know if it was something personal against that.  I don't know if he's jealous because I'm -- when I started my business I was a young entrepreneur, I've been successful.

People can say all these bad things they want about me; prove it.  I'm a good man.  I'm a family man.  I've led the City.  I became mayor at a young age.  I think it's a jealousy problem, to be honest with you.  I don't know what else it is.

I don't know if it's somebody just trying to pull the wool over his face to make him hate me.  I really don't care, to be honest with you.  And as a matter of fact, you know, people say, Oh, yeah, you tint windows illegally.

Let me tell you something, there's a fine you get to do that.  I have a business.  I've been in business for 20 years this year.  And people can say what they want.  I've never been

Page 229

fined one time for applying illegal window tint on any vehicle.

Now, they've had people who worked for me in the past that stole from me that I had to fire and get arrested because they were stealing from me and doing drugs, and they have a business under their carport that has no business license that does illegal tinting.  Now, who the hell you think is spreading rumors like that?  And I wouldn't be surprised if Ryan Young don't sit around and get his windows tinted over there.  So...

Q.   Are you -- sorry, go ahead.

A.   Go ahead, man.  It is what it is.  Keep the questions coming, I love this.  Tell me more of what they said.

Q.   I have one more for you.

Are you aware that Lieutenant Dunn testified that Ryan Young claimed he would try and arrest you for selling fake tickets for the New Orleans Saints?

MR. DUBOSE:
Object to form.

A.   I have season tickets.  I can pull up my tickets on my phone right now.



Scott Fontenot

Page 230

BY MR. BHATLA:

Q.  Do you have any understanding as to why Ryan Young would say that?

MR. DOHERTY:

Object to form.

MR. DUBOSE:

Object to form.

A.  I have no idea.

BY MR. BHATLA:

Q.  Have you ever had reason to believe Randy Fontenot favored some officers and disfavored others?

A.  I don't think so.

Q.  Have you ever had reason to believe Randy Fontenot declined to discipline someone at the Eunice Police Department whom he favored?

A.  Not to my knowledge.

Q.  Do you have any reason -- have you had any reason to believe Randy Fontenot was harsher in issuing punishment to those he disfavored?

A.  I don't know.  I don't think so.

Q.  Have you witnessed actions by Randy Fontenot that were retaliatory towards Lieutenant Dunn?

A.  I haven't witnessed any actions

Page 231

personally, no.

Q.  Are you aware of any actions by Randy Fontenot that were retaliatory towards Lieutenant Dunn?

A.  Not to my knowledge.

Q.  Have you heard things from officers besides Lieutenant Dunn about Randy Fontenot that gave you concerns about Randy's fitness to be chief of police?

A.  No.

Q.  For someone outside of the Eunice Police Department, what's the process for them to make a complaint about a police officer?

A.  I'm assuming you go to dispatch or whoever would be supervisor on charge -- on scene and ask them file a complaint against a police officer and they can give you a form.  I think that's how the procedure works.

Q.  And does someone at the police department then investigate that reporting on that form?

A.  I would assume they would.

Q.  Is the police department required to inform you, as the appointing authority, that there's an ongoing investigation based on an

Page 232

external complaint?

A.  If it's just from the public on a police officer, I think, until it gets to the point where it needs to come to the appointing authority, I won't know about it.

Q.  So if the police department decides there was no violation, you probably wouldn't hear about that complaint unless someone reached out to you directly?

A.  That could be correct, I would think.

Q.  To your knowledge, has Lieutenant Dunn ever been placed on administrative leave due to a disciplinary action taken by Randy Fontenot?

A.  He may have.

Q.  Do you recall any specifics?

A.  Was it the one with the Facebook post? I mean...

Q.  What do you remember about that?

A.  I just know that there was an incident at the KC hall and Officer Dunn made a post on social media about something.  I don't know if it was detrimental to the department.  And I don't know if he was -- he may have been written up for that.  But I just know they had a big ol' ruckus at the Council meeting for that.  So -- some

Page 233

neighbors had went.

Q.  And do you recall that Lieutenant Dunn was disciplined by Randy Fontenot for making that Facebook post?

A.  I don't recall if he was on that or not. He may have, I'm not sure.

Q.  When we -- when I asked you about administrative leave, the Facebook case immediately came to mind.  Why was that?

A.  I'm just trying to think of anything -- if he could have been written up for something. For some reason, that comes to mind.  I don't know why.

Q.  Do you recall if Lieutenant Dunn appealed the disciplinary action he received as a result of that social media post?

A.  That's what I'm trying to remember, even if he was disciplined for that.  Was he?

Q.  (Attorney nodded head.)

A.  Okay, so he was, yeah.

Yeah, I believe he did have an appeal.

Q.  Do you recall if that appeal was successful?

A.  I'm not sure.  I don't remember attending that appeal hearing, so I don't



Scott Fontenot

Page 234

remember. I'm sure it was.

Q. Did you think that the discipline against Lieutenant Dunn for making that Facebook post was appropriate?

A. What was the discipline again?

Q. Lieutenant Dunn was placed on administrative leave. Did you think that was an appropriate response?

A. Well, I think pending the investigation. I don't see why that would be a problem. I don't know what their social media policy was. So I would like to have facts in front of me before I start giving you my personal opinion on it.

Q. Are you familiar with the social media policy at the Eunice Police Department?

A. Now or then or when?

Q. Then, and then now?

A. Not really. We don't even have one. Actually, the City of Eunice doesn't have one. And I want to update our policy manual for 2025, and that's one thing we want to add into it. So I'm probably going to get that from them and the fire department.

MR. BHATLA:

Should we take a short break? Maybe

Page 235

ten minutes.

THE WITNESS:

It don't matter to me.

THE VIDEOGRAPHER:

We are off the record. The time is 3:14.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record. The time is 3:30.

BY MR. BHATLA:

Q. Scott, are you familiar with the K9 unit at EPD?

A. K9 program?

Q. Yes.

A. Yes.

Q. What can you tell me about it?

A. Currently?

Q. Yes.

A. Currently we have three K9s, one for each shift.

Q. How many officers are authorized to be a part of the K9 program at EPD?

A. I think right now we've got three handlers. I'm not all sure who is capable to be a

Page 236

handler. But right now each officer who has a dog has to have those credentials in order to handle the K9.

Q. Lieutenant Dunn is currently one of those K9 officers, right?

A. I believe so. He had a K9 in the past.

Q. Was there a period where Lieutenant Dunn was not a K9 officer?

A. Yes.

Q. What can you tell me about that?

A. Well, currently he's not a K9 officer. The reason for the -- I guess him not being a K9 officer at the time was because the program was discontinued by the chief.

Q. I'm sorry, just to clarify, you testified earlier that you believe so, that Lieutenant Dunn is currently a K9 officer, but then you said he's not.

Could you clarify, is Lieutenant Dunn currently a K9 handler or officer for EPD?

A. He may have the training to do it. He's just a lieutenant right now. I don't think he has the official title as, you know -- I don't know what they would call them, K9 cop. I don't know what the designation would be for the -- I guess

Page 237

you call them the handler.

Q. Currently Lieutenant Dunn is not a handler?

A. He doesn't have a dog or a unit, like a police unit to carry the dog. He doesn't house a dog, he doesn't do any of that. There's three separate officers, each have their own.

Q. Got it.

And he was previously a K9 officer until Randy Fontenot discontinued the program?

A. Yes.

Q. Why was the program discontinued?

A. The chief had said that the dog was ineffective, if I recall correctly, or may have been budgetary reasons. I would have to go back and see exactly what it was.

Q. Since you've brought the program back, have you found it to be effective?

MR. DOHERTY:

Object -- hold on, let me object to the form of the question. I'm not sure he's the one that brought the program back.

A. Yeah, it's hard for me to give that determination because I don't -- I don't deal with



Scott Fontenot

November 20, 2024
Pages 238 to 241

Page 238

the day-to-day operations of the police department. So I know that they're there.

BY MR. BHATLA:

Q. Since the program has been reinstated, in your opinion, has the program been effective?

A. It's really hard to make that determination because we don't get a printout report of statistics of what these K9s are actually doing. You know, we see them out in the community, you know, going to the schools and doing programs like that.

But as far as apprehension or, you know, discovery of drugs, I don't see those specific reports, so I don't know.

Q. EPD used to have one K9 and one K9 handler, right, before the program was discontinued?

A. Yeah, for some reason I'm thinking we had two at one time maybe.

Q. What --

A. Go ahead. For some reason I think we had two, might have went down to one. I know it went down to none. And then we went -- we started building back up just more recently.

Q. Why do you think the program was

Page 239

reinstated and has ramped up to three units?

A. That's something that Chief Lebeouf really wanted to see get done, the new chief. He started his career at the Eunice Police Department and he ended up being a K9 handler at one time, and he wanted to bring the program back. So we went ahead and brought the program back. Then he wanted to expand the program.

And then he wants -- Hey, look, if we can get one on each shift, it would be great, to where if there's an incident where you have to do apprehension or, you know, go sniff around for drugs or whatever, you don't have to call that man in who's not on shift, you got one on each shift ready to go. And that was the purpose for that.

Q. What were your thoughts on Chief Lebeouf's proposal?

A. I'm 1000 percent behind it. I mean, anything we can do to equip the police department, regardless of who the chief is, I'm going to support it.

Q. And do you think the K9 makes Eunice safer?

A. Yeah.

(Exhibit 9 was marked.)

Page 240

BY MR. BHATLA:

Q. I'm handing you what's been marked as Exhibit 9. I'll represent to you that this was produced by Lieutenant Dunn at DUNN_0000425.

Do you recognize this document?

A. Yes.

Q. What is it?

A. It's a notice of appeal to the City of Eunice Civil Service Board by Michael Dunn.

Q. Can you turn to the second page ending in 426. Do you see that you're listed -- that you're copied on the -- as one of the recipients of this letter?

A. Yes.

Q. Did you receive this letter?

A. I'm sure I did, yes.

Q. Did you review this letter?

A. Yes.

Q. Do you see on the first page, the third sentence of the first paragraph reads, quote, "Please be advised that pursuant to the Municipal Fire and Police Civil Service Law, Louisiana Revised Statute 33:2531, et seq., Lieutenant Dunn hereby appeals the disciplinary action taken against him with regard to a failure to pay

Page 241

Lieutenant Dunn wages earned in accord with City of Eunice policy for hours spent participating in K9 training," end quote?

Do you see that?

A. Yes.

Q. Do you have any recollection of these allegations at the time this was submitted?

A. If I recall correctly, the chief cut the program out, and that was it. Looks like Lieutenant Dunn had filed this with the Civil Service Board, but I don't even know if actual disciplinary action had been taken officially, you know, through the proper procedure or steps.

I don't know if there was even disciplinary action to consider here. I don't know how you consider that disciplinary action.

Q. Do you see in the second paragraph -- or sorry, let me go back to the first paragraph. The paragraph continues on to say, quote, "There was no investigation. Lieutenant Dunn was simply not paid monies owed, which is a disciplinary action and properly appealable to this board," end quote.

Do you see that?

A. Yes, I read it.

Q. Do you have any reason to believe that's



Scott Fontenot

Page 242

incorrect?

A.  Possibly.  And --

Q.  Why?

A.  If I recall correctly, disciplinary action -- my view is show me the disciplinary action.  I don't know if there was any other than what he says, was Lieutenant Dunn only learned of the City's reduction of his pay when he received his paycheck.  And I guess that's what he considered disciplinary action, was taking a dog away.

Q.  Just to be clear, this is not about the removal of the K9 program, this is about pay for K9 training and that Lieutenant Dunn was not paid for his training.

MR. DOHERTY:
Object to form.

BY MR. BHATLA:

Q.  Does that -- does that refresh your recollection?

A.  I think the training -- or K9 training consists of the extra pay you get when you handle the dog off duty, if I'm correct.  I don't know if that's true or not.

Q.  We can move -- we can address that in a

Page 243

moment.  But I wanted to ask you, do you think it's significant when it says here, quote, "There was no investigation"?

A.  I read that.  But where was the disciplinary action?  I don't see that.  I just see Exhibit 9 with an appeal to the Civil Service Board.  And I don't recall an actual disciplinary action by the police department or chief of police regarding that.

(Exhibit 10 was marked.)

BY MR. BHATLA:

Q.  I'm handing you what's been marked as Exhibit 10.  Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's a written finding of fact from the Eunice Municipal Police and Fire Civil Service Board.

Q.  And do you see here in the title, it is -- the title is, quote, "Hearing of Appeal by Permanent Police Lieutenant Michael Dunn," end quote?

A.  Yes.

Q.  And do you see that it's dated February 6, 2020?

Page 244

A.  Yes.

Q.  And in the second paragraph do you see where it says, quote, "By notification of disciplinary action dated September 10, 2019, Police Lieutenant Michael Dunn was deprived of $187 on his payroll check, representing eight hours of training he was due," end quote?

Do you see that?

A.  Yes.

Q.  Does that help refresh your recollection as to whether the action described in the previous exhibit, Exhibit 9, was a disciplinary action?

A.  There's no disciplinary action I see.

Q.  Is it your understanding that the second paragraph written by the Civil Service Board is not describing a disciplinary action?

A.  They're describing a, you know, payroll check that was deprived of $187.  He was due for training.  But I don't see disciplinary action.

Q.  Do you agree, though, that the Civil Service Board has characterized that reduction of pay as a disciplinary action in this document?

A.  I think the Civil Service Board was acting the way they felt like acting and they were taking anything like this and doing what they

Page 245

wanted to do.  There's no -- there's absolutely no disciplinary action to form an appeal.  How do you appeal something that's not there?  Where is the disciplinary action?

Q.  Is it your understanding that under civil service law, reducing pay is not a disciplinary action?

MR. DOHERTY:
Object to form.

A.  I'm not that familiar with civil service law, not the whole law.  So I don't know.

BY MR. BHATLA:

Q.  Is reduction of pay a disciplinary action?

MR. DOHERTY:
Object to form.

A.  I don't know what reduction in pay would be classified under.  If you worked your hours, then you should be paid.  I mean, that's a dispute that can be fixed with payroll.

BY MR. BHATLA:

Q.  Do you understand that the nature of this dispute is that Lieutenant Dunn claims he was not paid $187 for eight hours of training that he worked?



Scott Fontenot                                      November 20, 2024
                                                    Pages 246 to 249

Page 246

A.   Well, was he not paid because the program was discontinued?  Was he trying to get paid for something that wasn't there?

Q.   Do you see in the second paragraph it says the payment that Lieutenant Dunn is appealing, the lack of payroll he received, should have corresponded to eight hours of training he performed, K9 training?

A.   But was that --

MR. DOHERTY:

Hold on.  Objection.  It doesn't say "K9."

A.   It says training.  And it says on his payroll check representing eight hours of training he was due.

It would be a violation of law if we paid someone for eight hours of work that they didn't do either.  So...

BY MR. BHATLA:

Q.   Looking at Exhibit 10 still, do you see at the very bottom it describes a section that's titled Finding of Fact?

A.   Yes.

Q.   Do you see the last paragraph on this page it says, quote, "For the record, Chairman

Page 247

Donnie Thibodeaux read a letter dated January 15, 2020, addressed to Eunice Municipal Fire and Police Civil Service Board from the City of Eunice appointing authority Mayor Scott Fontenot.

"This letter is" -- quoting from Mayor Fontenot now.  "This letter is to inform you that the City of Eunice Appointing Authority will not be sending a representative to the appeal hearing that the board granted Lieutenant Michael Dunn on September 30, 2019.

"The authority -- appointing authority will stipulate to the facts of the case that Lieutenant Michael Dunn's police officer's bill of rights were violated during and after the investigation, including not giving Lieutenant Dunn the minimum standards required under Louisiana Revised Statute 40:2531 during the initial interview and that the investigation was not completed in 60 days, as required."

I'll end the quote there for now because I want to ask you about that section.  What do you understand this section to mean?  I'll withdraw the question.

Do you recall submitting a letter to the board containing this information, this text?

Page 248

A.   I believe so.

Q.   And do you understand stipulating to the facts, meaning agreeing with the facts presented by Lieutenant Dunn?  I'll withdraw the question.

Do you see "stipulate to the facts of the case that Lieutenant Michael Dunn's police officer's bill of rights were violated," end quote?

What do you understand that to mean?

A.   Well, based on the finding of facts from the Civil Service Board, that he wasn't given proper appeal to the disciplinary action.

Q.   And this was you who wrote this in a letter to the Civil Service Board, right?

A.   If I recall correctly, yeah.

Q.   And you told the board you would stipulate to Lieutenant Dunn's rights being violated, right?

A.   I think at that point it was because it was past so many days on the part where we can challenge.  I'd have to go back and understand why the action was taken to begin with in our case, because there was a reason why.

Q.   And so you agreed, based on the circumstances of the case, Lieutenant Dunn's

Page 249

rights had been violated during the appeal?

A.   I mean, the thing is, you go on and read, it says they order that the appointing authority reverse any adverse action of any sort whatsoever taken against Michael Dunn.  I don't think any action was taken against him.  There was none.  All we did was nullify, Hey, let's just pay him and move on, what I see here.

Q.   Well, do you see below that paragraph there's a title, quote, Decision of the Board?

A.   Uh-huh.

Q.   And do you see that it says, quote, "It is further ordered that Lieutenant Michael Dunn receive his backpay of $187, representing the eight hours of training he was deprived due to the violation," end quote?

Do you see that?

A.   Yeah, I see it.

Q.   So the board characterized the $187 that Lieutenant Dunn was deprived of as a violation, right?  Is that right?

A.   The violation was not giving him his money, is that what they determined?  Is that what you're asking me?



Page 250

Q.   Is that your understanding?

A.   That's what it says here, yeah.

Q.   And it further says, quote, "It is further ordered that the appointing authority be ordered to pay attorney fees as authorized by Louisiana Revised Statute 33:2501.1 to Officer Michael Dunn," end quote.

Is that right?

A.   Yeah.

Q.   Do you know how much those attorneys' fees were?

A.   I'm not sure.

Q.   Do you know who made the decision to deprive Lieutenant Dunn of his pay for that training?

A.   I'm not sure.

Q.   I want to go back to Exhibit 9.  The Civil Service Board having characterized this as a violation, do you think it's significant that Lieutenant Dunn's counsel alleged that there was no investigation?

A.   What's the question again?

Q.   In Exhibit 9, Lieutenant Dunn's counsel reports that there was no investigation related to Lieutenant Dunn being deprived of pay.

Page 251

A.   Okay.

Q.   Do you find that significant?

A.   I want to -- I mean, my question is who was made aware of this?  Did it go straight to the Civil Service Board?  Did he make a supervisor aware?  Did he make the chief aware?  I don't know.

Q.   Looking at the second page, again, of Exhibit 9, it looks like Randy Fontenot, yourself, and one Vernon McManus were all copied on this letter, right?

A.   Yes.  He was the City attorney at the time.

Q.   Is it normal for a disciplinary action to be taken without an investigation?

A.   I mean, no.  I mean, it would get thrown out the first second you walk in the door to the Civil Service Board.

Q.   Can you require -- or I'll withdraw.

Can you recall any instances where a Eunice police officer was investigated or -- excuse me, was disciplined without an investigation?

A.   No.

Q.   So you see it goes on to say in the

Page 252

second paragraph, quote, "The appointing authority failed to furnish Lieutenant Dunn with a statement in writing of the action and the complete reasons therefore," end quote.  And it cites a Louisiana Revised Statute there.

Do you see that?

A.   Yeah, I read it.

Q.   And on September 7, who was the appointing authority?

A.   It was -- man, I would think it was Chief Randy Fontenot.  I would have to go back and link this together.

Q.   Why do you -- or do you have any understanding as to why Randy Fontenot failed to furnish Lieutenant Dunn with a statement in writing of the action and the complete reasons therefore?

A.   I'm not sure.

Q.   I'm going to turn back to Exhibit 10.

A.   That's what's confusing to me.  I go to Exhibit 10, it's that letter from the City of Eunice appointing authority to Mayor Scott Fontenot.  So that's where I'm -- I'm trying to determine who was the appointing authority in this timeline of events.

Page 253

Q.   If I were to represent to you that the appointing authority resolution we discussed this morning was on September 10, 2019 --

A.   Okay.

Q.   -- does that refresh your recollection?

A.   Yes, yes.

Q.   Do attorneys' fees awarded by the Civil Service Board come out of the City of Eunice's budget?

A.   All attorneys' fees related to the City of Eunice comes out the City of Eunice's budget.  So yes.

Q.   Do you think having to pay out attorneys' fees is an efficient use of City money?

A.   Absolutely not.  We spend a lot of it, especially on this stuff.

Q.   Who pays for the Civil Service Board's meetings?

A.   The City of Eunice.

Q.   Is it fair to say that an improper disciplinary action can cost the City of Eunice both in terms of Civil Service Board costs and potentially attorneys' fees?

A.   A lot of things can cost the City money, especially rulings on the Civil Service Board



Scott Fontenot

November 20, 2024
Pages 254 to 257

Page 254

which they put their personal opinions in place instead of facts. So, yeah, I mean, it's -- this is all City money right here.

We were in district court the other day. We had City attorney, attorney we hired, we had the Civil Service attorney. We're paying all these people. It's the stupidest thing in the world. I'm a taxpayer and that's why I think it's the stupidest thing in the world. I know that's y'all job, and I respect that, but...

Q. How many attorneys is the City paying for in today's deposition?

A. I don't even --

MR. STAMEY:
Object to the form of the question.

A. Well, I mean, I think we're paying a company out of Baton Rouge, risk management, to represent us, and I guess it's a group. So everybody's paying for it, I guess. I'm not really sure. It's a lot though.

BY MR. BHATLA:

Q. Do you think the expenditure on this deposition or any other deposition in this case is an efficient use of the City's money?

A. If you find wrongdoing, absolutely.

Page 255

Q. What wrongdoing has there been in this case?

A. There's a lot of accusations. So...

Q. What does Lieutenant Dunn stand to gain from filing this lawsuit?

MR. STAMEY:
Object to the form of the question.

A. I don't know.

BY MR. BHATLA:

Q. If you don't know, why do you think Lieutenant Dunn filed this suit?

MR. STAMEY:
Same objection.

A. I have no idea.

BY MR. BHATLA:

Q. Do you know if Lieutenant Dunn is seeking monetary damages in this lawsuit?

A. He's told me personally he's not. He wanted to see policy changes, he wanted to see things change. Everything he said he wanted to see change is actually happening, and not because he wanted to see it changed, it's because the new chief decided to implement things in his program that he wanted, which was different from the prior chief. Each chief has their own opinion on how

Page 256

they want to run their department.

Q. But do you know for sure that these changes would have been made without Lieutenant Dunn's lawsuit?

MR. DOHERTY:
Object to form, calls for speculation.

A. It all depended on who the chief of police was going to be. Man, you could get a chief of police in there -- all you have to do is have a high school diploma, be 18 years old, and not have a felony, and you can be a chief of police in a town in Louisiana.

BY MR. BHATLA:

Q. Do you think Lieutenant Dunn's lawsuit had any impact on the City of Eunice getting body cameras integrated for its police officers?

A. I don't think specifically to him and this case at all. I think it was something needed. It's new technology. I support that. But if someone operates a different way -- people fight crime different ways than others.

Q. I'm going to hand you what's been marked as Exhibit 11.

(Exhibit 11 was marked.)

Page 257

BY MR. BHATLA:

Q. And this is a document that I'll represent to you was produced by Lieutenant Dunn at Bates Number DUNN 0000427.

So I'll represent to you that this contains the same written findings of fact that we just looked at, but I'll ask you to please turn to page ending in Bates 429.

Do you recognize this document?

A. No.

Q. What does it look like to you?

A. It's a letterhead from the Eunice Police Department.

Q. Who's the author of this letter?

A. Chief Randy Fontenot.

Q. And what's the date of this letter?

A. March 6, 2020.

Q. Have you seen this letter before?

A. I don't recall.

Q. Do you understand this letter to be in response to the written findings of fact that we just looked at from the Civil Service Board?

A. It looks like it's -- yes.

Q. Do you see that at the end of the first paragraph Chief Fontenot wrote, "No disciplinary



Scott Fontenot

November 20, 2024
Pages 258 to 261

Page 258

action was taken"?

A. Yes.

Q. Do you agree with that characterization based on the decision the Civil Service Board made?

A. Which sentence are we talking about?

Q. Just if you agree that -- with Randy Fontenot's statement here that no -- that, quote, no disciplinary action was taken?

A. Based on -- I don't know -- are we going back to disciplinary action? I didn't see a form actually complaining about a disciplinary action, although Michael Dunn made an appeal to the Civil Service Board, and that's the complaint that we received.

Q. And so I want to direct your attention to the second sentence of the second paragraph where he says -- I apologize, the third sentence where Randy Fontenot states, quote, "I also am not in agreement with the appointing authority's decision to stipulate and recommend action to the Civil Service Board because the appointing authority lacked knowledge of this case because they neglected to consult with me," end quote.

Page 259

What's your reaction to that statement?

A. I mean, that's his personal opinion. Obviously it's his personal opinion. And if I'm recalling correctly, I was advised by our attorney at the time, Mr. McManus, to go ahead and pay him and be done with it.

Q. And you were the appointing authority at this time this letter was sent, the letter is dated?

A. I think so. I'd have to go back and see the timeline of events, but...

Q. Do you agree with Randy Fontenot's characterization that you, quote, "lacked knowledge of this case," end quote, because you neglected to consult with him?

A. I don't know if I'd say we lacked knowledge in the case. Did I consult correctly with him? I don't really remember on that, to be honest with you. If I recall correctly, Mr. McManus said you might just want to pay him and move on, because in the long run it was going to cost us more than $178 (sic).

Q. Do you see the last sentence Randy Fontenot wrote where he says, quote, "I feel the appointing authority may have acted solely on

Page 260

biased and partial information," end quote?

A. I mean, it almost just seems like he said we saw one side of the story, which...

Q. Do you agree with that characterization that Randy Fontenot put in his letter?

A. I didn't act solely based on that. I took the advice from the City attorney also. But at the end of the day, like I said, it was easier to pay the money that was owed to Michael Dunn.

Q. Did Randy Fontenot bring these concerns to your attention?

A. No, he didn't, not to my knowledge. There was no formal disciplinary action taken other than, I guess, cutting his hours. Like I said, we go back, that could be a payroll issue, man. Go talk to your supervisor, whoever is turning those timesheets into HR.

We get people, sometimes their check is short and they'll go and figure it out and get it done right if he felt like he was being disciplined. But according to the chief, he didn't work.

Q. Do you see, though, in the first sentence of this paragraph, the second paragraph, Randy writes, quote, "Lieutenant Dunn was placed

Page 261

on administrative leave with full pay and was not deprived for pay for training that he was due because he had not earned that pay," end quote?

A. Yeah, I see that.

Q. What does that mean, to your understanding?

A. Same thing I said a while ago, he didn't work it. He -- I guess he put the time on his time card and they took it off. I'm really not sure exactly what that was.

Q. Have you -- can you think of any other instances where Randy Fontenot disagreed with decisions that you made?

A. I mean, there was probably some. I don't know specifically. When you're dealing in a high-intensity job as a chief of police and the mayor, sometimes you will disagree on some things and you move on to the next. So I can't pinpoint anything exactly, to be honest with you. Nothing stands out to me.

Q. All right. So after this dispute about Lieutenant Dunn's pay as a K9 trainer, the K9 program was shut down.

Did the City have any say in that decision?



Scott Fontenot

Page 262

A.  Now, was the K9 program shut down prior to his so-called disciplinary action?

Q.  This is related to K9 training, and so whenever the K9 program --

MR. DOHERTY:

Again, I want to object to that characterization.  Nowhere in Exhibit 10 or 11 is the word "K9" used as an adjective for training.

BY MR. BHATLA:

Q.  That's fine.  If there's ambiguity, I'm fine to leave it as is.  So I will not characterize it as K9.

At whatever time the K9 program was terminated, did the City have any say in that decision?

A.  No, we didn't.  The chief -- go back to the Larson Act -- he controls the day-to-day operations of his department.  He can assign people to different duties and such as long as it's within their classification.  If he wanted to get rid of a K9 program, he could.  If he wanted to create a SWAT team, he could.

So the City Council or myself can't say, No, you can't do that.  I did tell him how I'll

Page 263

support a K9 program.  But that was his choice to go away with it.

Q.  And can you recall what justification Randy Fontenot gave for ending the program at the time?

A.  Oh, man, I don't know if it wasn't the cost of it, either the cost of the program or maybe the dog wasn't as effective as it was before.  I'm really not sure what it was.  I know that he just didn't want to go with it.  And I don't think he needed a specific reason, he could just end it if he wanted.

Q.  And at the time, Lieutenant Dunn was the only K9 handler, right?

A.  I believe so.

Q.  Do you have any reason to believe that Lieutenant Dunn was a poor K9 handler?

A.  No.

Q.  Did Randy Fontenot ever tell you that Lieutenant Dunn was not a good K9 handler?

A.  No.

And I'm going back, I'm thinking about K-9s.  We had another K9 -- we had two at one time.  We had this officer who was at the police department, and I don't know if the officer ended

Page 264

up leaving the department or what, but we ended up discontinuing that K9 particularly.  And when the City surplussed it, I think it did go back to the handler, if I'm not mistaken.

So, yeah, at one time we were only down to only Michael Dunn as the only one who was trained to handle the K9.

Q.  Do you know if there was a City Council meeting about the K9 program around June 2020?

A.  I think it came up for discussion in the meeting.

Q.  Did you attend that meeting?

A.  Yes.

Q.  How often do you attend City Council meetings?

A.  I've never missed a meeting since I've been elected to office.  I missed one special meeting that was called while I was on vacation just to handle small business.  That might have been this year.  But I've always been to every City Council meeting.

Q.  What was the discussion at the City Council meeting about the K9 program?

A.  I want to think the chief had brought up maybe discontinuing the program and surplus the

Page 265

dog, that's what it was.  Because anything that's of value to the City, whether that's a K9 dog or police unit or such, you have to surplus it in a public meeting.  And I believe that was to terminate the program and surplus the dog, if I'm not mistaken.  I'd have to read the minutes of that meeting.

Q.  Do you recall at that meeting Lieutenant Dunn handing you a black folder containing complaints about Randy Fontenot and others at the Eunice Police Department?

A.  Maybe.

Q.  Do you recall whether Randy Fontenot ever asked you about the contents of that folder?

A.  I don't think so.  I'm trying to remember if he -- Lieutenant Dunn handed me -- I don't know if it was at that meeting or when, but I remember him handing me something.

Q.  Do you recall what was in that folder?

A.  I guess his journal, all his complaints about every incident that he decided to take note of.

Q.  Did you review the contents of the folder?

A.  The first two pages, and then I gave it



Scott Fontenot

November 20, 2024
Pages 266 to 269

Page 266

to my City clerk.

Q.  What happened to it?

A.  I guess she still has it.

MR. BHATLA:

I call on the City to produce the contents of that folder in the possession of the City clerk.

MR. DOHERTY:

I have no idea what it is.  What kind of documents are you suggesting were in it?

MR. BHATLA:

Based on the testimony, it's a black folder containing Lieutenant Dunn's notes regarding --

MS. WALL:

He said journal.

MR. BHATLA:

Sorry, journal regarding complaints about individuals.

MS. WALL:

We already have his journal.

MS. SYLVEST:

It was already produced in discovery.

Page 267

A.  Yeah, it was a big ol' thing that the clerk gave to whoever had asked for information.

BY MR. BHATLA:

Q.  Okay.

A.  A lot of those things were potential criminal stuff.  And like I told him from the get-go, go talk to another law enforcement agency, another law enforcement officer.  And when I told him those things and no action was taken, I didn't know what to believe.  I gave it to the clerk, I said, Hang onto this.

Q.  We talked about Lieutenant Dunn appealing the termination of the K9 program.  You testified previously that you were sure that Lieutenant Dunn's appeal was successful.

What made you say that?

A.  Appeal which decision again?

Q.  With respect to termination of the K9 program and loss of pay related to that.

A.  Yeah, I mean, I think that -- I think the action of the City paying his backpay didn't have anything to do with the K9 program itself.

Q.  I was confused.  I'll withdraw the previous question.  You can strike that.

I'll just move forward to Exhibit --

Page 268

what I'm marking as Exhibit 12.  This was a document produced by Lieutenant Dunn at DUNN_0000067.

(Exhibit 12 was marked.)

BY MR. BHATLA:

Q.  Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's a notice of appeal to the Eunice Civil Service Board regarding Lieutenant Michael Dunn with the City of Eunice.

Q.  Do you recall receiving this letter?

A.  At some point, yeah.

Q.  If you turn to the second page, do you see that you're copied as one of the recipients of the letter?

A.  Yes.

Q.  Does that refresh your recollection as to whether you received this letter?

A.  I mean, absolutely.  It looks like I got it.  I don't remember reading it all at this point.  I can read it now.

Q.  That's all right.  I do want to walk through it so we can -- you can read it as we go along.  I specifically want to turn your attention

Page 269

to the second paragraph on the first page.

Do you see where it reads, quote, "Lieutenant Dunn unlawfully received a reduction in pay of approximately $473.20 per month related to his position as a K9 officer.  There was no investigation.  Lieutenant Dunn did not receive written notice of the action taken as mandated by applicable law," end quote?

Do you see that?

A.  I see it.

Q.  Do you have any reason to doubt the truthfulness of that statement?

A.  I don't have reason to doubt that.  Looks like the attorney who was representing Michael Dunn is the attorney who's helping the City now.

You know, they so complex and knowing the civil service law that if you have the smallest issue, they going to find a way to beat it.  And obviously this is -- this was one part of it.  And I think the City knew they were going to take the loss, and that's why the -- our City attorney just said pay him, be done with that.

Q.  Do you see that it says "Lieutenant Dunn did not receive written notice of the action as



Scott Fontenot

November 20, 2024
Pages 270 to 273

Page 270

mandated by applicable law"?

Why do you think that happened?

A. It just goes back to me -- I mean, I'm trying to understand -- look, this frustrates me, because we can beat around the bush and talk about all this stuff in here, but in reality, there was really no disciplinary action taken other than withholding funds because he didn't work. And so the attorneys that he hired, which is our attorney now, they found something and went with it.

Q. Do you see in the second paragraph it goes on to state, quote, "Further, on information and belief, this action was taken by the chief of police for the Eunice Police Department in retaliation for reporting his suspected criminal violations and that of other officers," end quote?

Do you see that?

A. I see that.

Q. What reporting do you understand this to refer to?

A. I have no idea. Maybe going to the State police or whoever else he went to, I guess.

Q. When you say "he" went to the State police, you mean Lieutenant Dunn?

A. Lieutenant Dunn.

Page 271

Q. And what did he go to the State Police about?

A. Multiple allegations, according to his journal.

Q. Do you recall if there was a specific incident that prompted Lieutenant Dunn to contact the Louisiana State Police?

A. I don't know about a specific incident. I just think that no one was hearing what he had to say, and so he went to every avenue there was available.

Q. Do you have any understanding as to whether Lieutenant Dunn contacted the State police out of concerns of public safety?

A. That I do not know.

Q. Within a year of this letter, Lieutenant Dunn had filed critical incident forms regarding misconduct by at least Darrian Guillory -- Darrian Guillory and Victor Fontenot, right?

A. I think so, yeah.

Q. Could Randy Fontenot have taken this action in retaliation for Lieutenant Dunn filing those critical incident forms?

MR. DOHERTY:

Object to form.

Page 272

A. I can't answer that question.

BY MR. BHATLA:

Q. The paragraph then goes on to say, quote, "Lieutenant Dunn further showed that he has unlawfully been the target of harassment and intimidation by the chief of police due to his reporting of the suspected criminal violations noted above. This recent disciplinary action is just the latest example," end quote.

Do you see that?

A. Yes, I see it.

Q. Have you formed any opinions as to the veracity of the statement?

A. It worked out well for Officer Dunn to have his attorneys put that into this letter because you're bringing it up right now. So, you know, was the chief targeting him or not? I don't know.

Q. Did you form an opinion with respect to the truth of this statement?

A. I don't really have an opinion on that.

Q. Do you have any reason to doubt this statement?

A. I don't know.

Q. All right. We can set this aside for

Page 273

now.

Can you please turn your attention back to what was marked as Exhibit 7, Bates Number was CityofEunice_DUNN_0002097. And once you have that, can you please turn to page 2126.

Do you recognize this document?

A. Yes.

Q. What is it?

A. It says it's a consent judgment, Lieutenant Dunn versus City of Eunice.

Q. And if you turn to the second page, Bates ending 2127, is that your signature on the bottom?

A. Yes.

Q. And do you see that with your signature you were authorizing payment and backpay to Lieutenant Dunn of $4,779.32?

A. Yes.

Q. Why did the City authorize this payment?

A. I'm assuming it was under the advisement of the City attorney, or our attorney who was working for us at that time.

Q. So going back to that first page, Bates ending 2126, do you see that the third paragraph reads, quote, "And now, therefore, the



Scott Fontenot

Page 274

law and evidence being in favor thereof and for reason this day orally assigned," end quote?

Do you have an understanding as to what that means?

A. I mean, evidence provided was in favor of Michael Dunn.

Q. Do you know what evidence is being referred to in this?

A. I have no idea.

Q. Do you know what law is being referenced?

A. No.

Q. Did you discuss this consent judgment with the City Council before signing?

A. Probably not. I mean, unless -- well, you know, they probably had to take action to Council, I'm assuming, to reinstate him. This was a couple years ago. So if the Council took the appropriate action, then they would obviously know.

Q. All right. Can you move ahead now to page ending in Bates 2139. Do you recognize this document?

A. Yeah, it's a personnel action form.

Q. What is that?

Page 275

A. I guess that's how you initiate anything, or if there's a change in status of an employee, that's what it is, if you get somebody hired on or any type of change of status, you've got to sign -- you've got to start this personnel action form.

Q. So is this type of document prepared and maintained in the regular course of business in the City of Eunice?

A. Yeah, so, I mean, these documents are filled out and signed and turned in, and once they're turned in, go to the Civil Service Board.

Q. Is it the City of Eunice's regular practice to have these records reduced to paper -- reduced to writing?

A. I think by civil service law you have to.

Q. Was this form prepared by an employee who had personal information about the action being taken?

A. The person who signed it, that's Randy Fontenot's signature.

Q. And was this information in this document prepared at or around the time that the action took place?

Page 276

A. I can't answer that. I'm not sure.

Q. Do you see on the second page, ending in Bates 2140, the effective date of action?

A. 9/9/2019.

Q. And who is the signatory of this form?

A. That's Randy Fontenot, former chief.

Q. And do you see that it reads, quote, "Appointing authority did not complete an internal investigation into alleged violations, however, it was determined that employee did not pose a detriment to the safety of the department or the public. Administrative leave with pay is terminated and employee returns to active duty pending the outcome of the internal investigation," end quote?

A. Okay.

Q. Do you know what this is in reference to?

A. No.

Q. Do you have an understanding if it says, quote, "The appointing authority did not complete an internal investigation," end quote, how was it determined that the employee did not pose a detriment to the safety of the department or the public?

Page 277

A. I have no idea.

Q. All right. You can set that aside.

I want to shift gears to another topic. Do you understand that Lieutenant Dunn has separately filed a lawsuit against the City of Eunice and Randy Fontenot regarding discipline he faced due to a Facebook post?

A. Yes.

Q. Does the April 15, 2021 consent judgment we just looked at have anything to do with that lawsuit?

A. I don't think so.

Q. What is your understanding of the other lawsuit that's been filed in federal district court?

A. I don't know anything about the lawsuit, to be honest with you. There's so many of them. It seems like we've got dealing with police issues. So I don't know which one is what, it's all confusing.

Q. Have you ever spoken with Randy Fontenot about that other case?

A. I don't think so.

Q. Has Randy Fontenot ever said to you that he wants to get rid of Lieutenant Dunn?



Scott Fontenot

Page 278

A.  He's never told me that.

Q.  In your experience, have there been instances where EPD has misused funds that it was appropriated?

A.  No.

Q.  Are you aware of any investigations regarding use of the budget by the Eunice Police Department?

A.  What type of investigation?  Anything?

Q.  Any investigation conducted by any entity regarding how the EPD used its funds that are allocated.

A.  No.  Other than the annual city budget, no.

Q.  Has anyone ever raised concerns to you about how EPD funds are being spent?

A.  No.

(Exhibit 13 was marked.)

BY MR. BHATLA:

Q.  I'm handing you what's been marked as Exhibit 13.  This is a document that was produced by Lieutenant Dunn at Bates Number DUNN_0000711.

Do you recognize this document?

A.  Yeah, I believe so.

Q.  What is it?

Page 279

A.  It's a letter from the chairman of the Civil Service Board.

Q.  And who is it addressed to?

A.  To the Mayor and Board of Aldermen, City of Eunice.

Q.  Do you recall receiving this letter from Donnie Thibodeaux?

A.  I believe so.

Q.  What is your opinion of Donnie Thibodeaux?

A.  What is my opinion of Donnie Thibodeaux?

Q.  Yes.

A.  I mean, he's been an officer who's worked at the police department for a long time.  Seems pretty straightforward.

Q.  Do you find him to be honest?

A.  I guess, for the most part.  I don't know him on a personal level, I just know him on a professional level mostly.

Q.  Do you find him to be fair as chairman of the Civil Service Board?

MR. STAMEY:

Object to the form of the question.

A.  As a mayor and us fighting against them sometimes, no.  I'm just being serious.  I do

Page 280

think they all have good intent, but sometimes personal feelings get involved.

BY MR. BHATLA:

Q.  Was the Eunice Civil Service Board well-served by having Donnie Thibodeaux serve as chairman?

MR. STAMEY:

Objection to the form of the question.

A.  I respect the service that he did; I mean, I don't have any complaint of it.

BY MR. BHATLA:

Q.  Are members of the Civil Service Board paid for their work?

A.  They should be, but they're not.

Q.  Have you ever spoken with Randy Fontenot about Donnie Thibodeaux?

A.  No, not anything specifically.

Q.  Did Randy Fontenot ever tell you to get rid of Donnie Thibodeaux?

A.  No.

Q.  Are you aware of Randy Fontenot ever saying that he would fire Donnie Thibodeaux if he could?

A.  I don't think so.

Page 281

Q.  Are you aware that Lieutenant Thibodeaux testified that Randy told you that he would like to fire Donnie Thibodeaux?

A.  I thought I -- I don't know if I sat in Donnie's deposition.  I don't remember that.

Q.  You did attend the deposition.  But do you recall any details from the deposition?

A.  Not specifically, to be honest with you.

Q.  So turning to this exhibit, do you see where it says in the first paragraph, quote, "Please be advised that on or about February 25, 2021, a request was made for an investigation by the Eunice Municipal Fire and Police Civil Service Board concerning possible payroll irregularities involving employees of the Eunice Police Department.

"Pursuant to that request, an investigation was conducted and a report was submitted at the regularly scheduled public meeting on April 15th, 2021," end quote?

Do you see that?

A.  Yes.

Q.  Do you recall the investigation that Donnie Thibodeaux references here?

A.  Can you say that one more time?  I was



Scott Fontenot

Page 282

reading this thing. Go ahead.

Q. Do you recall the investigation that Donnie is referring to in this letter?

A. Not really.

Q. Do you know who made the request for an investigation that is referenced in this letter?

A. I'm not sure, no.

Q. Have you heard anything about alleged payroll irregularities -- I'll withdraw the question.

At the time, were you aware of concerns regarding payroll irregularities at the Eunice Police Department?

A. I think they had a council member who had questioned the overtime expenditure in the budget. So I'm not sure if that had anything to do with this or not.

Q. Do you consider overtime to be a payroll irregularity?

A. I mean, unless something looks out of the ordinary, unless it's humanly impossible to work the amount of hours you're putting down on your time sheet. I'm not sure. I just know that the police department was severely understaffed. You had some people working a lot of

Page 283

hours, and you would think that it would be humanly impossible, but you would see these same guys working. So it was -- I'm not sure what they're pointing at in this investigation.

Q. And as of February 25, 2021, the date that's identified in this letter, who was the chief of police at the time?

A. Chief Randy Fontenot.

Q. Do you see that the second paragraph continues to say, quote, "The Board made a determination that the investigative report did indicate violations of civil service rules and, further, that the investigation should be referred to the appropriate agencies for determination as to any possible violations of law," end quote?

Do you see that?

A. Yeah, I see that.

Q. Do you recall receiving this determination?

A. Man, I really don't.

Q. Do you recall receiving this investigative report?

A. For some reason, I do not remember that.

Q. Even though it says in the subsequent line, quote, "Attached hereto is the complete

Page 284

investigative report for your review," end quote?

A. And I may have gotten it; I may have just turned it over to the City attorney or the attorneys. I don't remember.

Q. Do you recall ever reviewing the investigative report?

A. I'd have to see it to refresh my memory. That was four years ago, three years ago.

Q. Do you have any recollection of what violations of civil service rules were found?

A. I don't.

Q. Do you have any recollection of whether the investigation was referred to the appropriate agencies for determination as to any possible violations of law, as Donnie suggests in this letter?

A. I do not. I don't even know who the appropriate agencies would be. I'm really drawing a blank here for this.

Q. If there were payroll irregularities at EPD, do you know which entity would be responsible for investigating that?

A. Shoot, man. I mean, we have auditors, City auditors, who come in and do an annual audit. I mean, I don't know who else would go in and

Page 285

start looking at payroll irregularities. I'm not sure who does that.

Q. Could the St. Landry Parish District Attorney's Office come in to determine if there were any violations of law?

A. I don't know. I don't know what their scope of work is.

Q. Do you know if this investigative report was ever shared with the St. Landry Parish D.A.'s Office?

A. I have no idea.

Q. What was your reaction to this conclusion at the time?

A. I'm really drawing a blank on the whole deal, to be honest with you. So I don't remember what my reaction was then because I hardly remember it now. I wish we had a copy of the report.

Do you have that?

Q. Yes. And I just -- I have one more question before we get to that.

Who at EPD is responsible -- ultimately responsible at the top regarding payroll and any payroll irregularities?

A. I would probably think the deputy chief



Scott Fontenot

Page 286

is the guy who's going to be turning that stuff in, or the supervisor on each shift. It would be the lieutenant and then go to the deputy chief. If I'm not mistaken, the deputy chief signs off on that. I could be wrong. Or it could be the chief.

(Exhibit 14 was marked.)

BY MR. BHATLA:

Q.   I'm handing you what's been marked as Exhibit 14.  This has been produced by Lieutenant Dunn.

MR. LOUGHLIN:
Is this 14 or 15?

MR. BHATLA:
14.

MR. LOUGHLIN:
14?

MR. BHATLA:
I still have my 15 sticker.

MR. LOUGHLIN:
Gotcha.

BY MR. BHATLA:

Q.   And this was produced at DUNN_0000666. Do you recognize this document?

A.   Not really.  Let me go through it and I

Page 287

can -- I'm starting to -- this had to have been either whenever I closed the building for the City -- so they have certain days that are considered police and fire civil service holidays. And sometimes you have employees who work in the City Hall building, they don't work -- so the police department and the City Hall is all in one building.  Police records is in the second floor of City Hall and such.

Sometimes we'll close the building for, you know, the day after Thanksgiving or something like that.  And that's not a holiday.  And if I'm not mistaken -- and I have to go through this again -- maybe some of those employees who were working on the second floor took that as a holiday pay because we were closed.

But let me just kind of go through this, I don't know if that's exactly what this is.  I think that's what I remember.  Let's see.  So apparently someone was paid 16 hours under hours worked, that was Hurricane Delta.  Death in the family for aunt.  Yeah, I kind of remember some of this stuff now, yeah, kind of going through it.

Q.   So have you seen this document before? Does this refresh your recollection of having seen

Page 288

this document?

A.   I don't remember seeing this, to be honest with you, I really don't.

Q.   Do you see on the first page in the subject line it says, quote, "Investigation into Eunice Police Department's payroll irregularities," end quote?

A.   Yes.

Q.   Do you understand that this is the investigative findings from the letter we just reviewed in Exhibit 13?

A.   Yes.

Q.   Do you see at the top that it states it's from board member Garrett Daville and board member Keith Vidrine?

A.   Yes.

Q.   Who are they?

A.   Members of the City Civil Service Board.

Q.   And do you see that it's written to the chairman and the members of the Civil Service Board?

A.   Yes.

Q.   Do you see the first paragraph describes, quote, "At the Civil Service Board meeting on February 5, 2021, Chairman Donnie

Page 289

Thibodeaux stated that he received information that there were several instances of payroll irregularities involving employees of the Eunice Police Department," end quote?  And then it goes on to describe that there was an investigation performed by the two board members.

Do you have any recollection of this investigation?

A.   Not really.

Q.   Please turn to the page ending in Bates 668.  Do you see the section titled Findings of the Committee?

A.   Yes.

Q.   Do you have any reason to doubt the truthfulness of these findings?

A.   No.

Q.   Do you have any reason to doubt the accuracy of the conclusions in this report?

A.   Not according to this.

Q.   And then if you turn to the page ending in Bates 670, do you see the heading Conclusion?

A.   Yes.

Q.   Do you see where it says, quote, "It is our opinion that these actions did violate Civil Service Board rules, City of Eunice Policies and



Scott Fontenot

November 20, 2024
Pages 290 to 293

Page 290

Ordinances. These actions may also be unlawful and/or unethical under Louisiana State law," end quote?

Q. Do you recall --

A. Yes, I do see that. Sorry.

Q. Do you recall this conclusion?

MR. STAMEY:

Objection to the form of the question.

A. I mean, I don't. I really don't recall the whole letter, to be honest with you.

BY MR. BHATLA:

Q. Do you recall what your reaction was at the time that this investigative report was sent to you?

A. I don't.

Q. And so this report says that there were payroll irregularities under Chief Randy Fontenot's tenure that violated civil service rules and potentially were unlawful under Louisiana State law, correct?

A. Yes.

Q. So is it your understanding, then, that the Civil Service Board found a misuse of Eunice Police Department funds in this investigation?

Page 291

A. Yeah, that's what it stated in the letter, their opinion stated that.

Q. So do you recall at the end of the cover letter we looked at at Exhibit 13, Donnie Thibodeaux suggested that the investigation be referred to the appropriate agencies for determination of any possible violations of law?

A. Yeah, I see that in his letter here.

Q. And to your knowledge, was that ever referred for investigation?

A. To my knowledge, I'm not sure. I'm really not sure, to be honest with you.

Q. So to your knowledge, no entity looked into potential violations of law found by the civil service lawyer?

A. Today I can't answer that. I have no idea.

Q. You can set that aside for now.

(Exhibit 15 was marked.)

BY MR. BHATLA:

Q. I'm handing you what's marked as Exhibit 15. This is a document produced by Lieutenant Dunn at DUNN_0000295. I will represent to you that those are e-mails Donnie Thibodeaux received in response to a request pursuant to Louisiana

Page 292

public records, which you can see on the first page.

I'll ask you to turn to the page ending in Bates 296. Do you see at the top there's an e-mail by someone named Chad Andrepont?

A. Yes.

Q. Do you know Chad Andrepont?

A. Yes. He's a City Council member.

Q. Do you see there's a message below from Scott Fontenot to Chad Andrepont?

A. Yes.

Q. Did you write this message?

A. I sure did.

Q. Is that e-mail, eunicelamayor@hotmail.com, your e-mail?

A. Yes.

Q. Do you recall why you sent this message to Chad Andrepont?

A. I sent that message to each Council member individually to let them know the email exchange between the chief of police and I that happened the day prior.

Q. Do you recall --

A. Or maybe I messaged the chief. I'm not sure when the email was sent.

Page 293

Q. Do you recall sending this e-mail?

A. Yes.

Q. Why did you send it?

A. I think it was back talking about the incident when they had -- and it could be wrong, could have been Clancy who was out there on the streets by himself and they had a shooting. The Council meeting before was whenever they were questioning the chief on overtime based on his budget.

The e-mail -- and it goes on to say the e-mail that was sent from the chief talks about there's no more overtime and then all that. But I remember sending the e-mail.

Q. And this is your e-mail that you wrote to Randy Fontenot that's towards the bottom of the page, right?

A. It's about midway in the page.

Q. I'll agree with your characterization.

And do you see that you wrote, quote, "I am e-mailing you for clarification of your elective duties based on the telephone conversation in which we had on Wednesday, March 10 at 6:19 p.m.," end quote?

Do you see that?



Scott Fontenot

Page 294

A.  Yes.

Q.  Do you recall having that phone conversation with Randy Fontenot?

A.  Yeah.

Q.  What do you recall about the call?

A.  It was a Wednesday afternoon.  He called me.  And then I didn't answer right away, and then he called again right there.  I was away from my phone.  We were at a gathering with some friends that afternoon.

So I answered the phone and I go outside and the chief was telling me that there was a shooting in town and he didn't know what to do, he only had one officer.  So he was asking me what to do.  So I just told him, You're the chief, do what you need to do, send an officer, do what you have to do.  He was worried about the overtime.

And I told him, quite frankly, the hell with overtime, do what you need to do to protect that officer and protect the public, and that was it.  So my response the next day was just to e-mail the chief what we had talked about and put it on record.

Q.  Did you talk about anything else on that phone call?

Page 295

A.  No.  It was a quick phone call.

Q.  And so you had stated that in this email continuing, quote, "You stated that there was a shooting and that you had no additional officers available to assist the two patrolmen that you had on duty.  You stated to me, What should I do?  I can't call an officer because of my budget and I do not want to answer to the legislative auditors if I go over budget," end quote.

Who are these legislative auditors?

A.  That's the State legislative auditors.  You've got to keep your budget balanced, you know.  The chief is subject to his budget.  If he goes over 5 percent and it's not amended, he's going to have to answer to the Louisiana legislative auditors.

And I think that was him coming off of a meeting where he felt like he was scrutinized on overtime.  And he was putting the ball back in my court.  And I told him what I thought he should have done.  I may have even told him in our conversation on the phone, Spend it and we'll amend it.  I mean, just -- let's take care of what's now.

You know, I think that's what he meant

Page 296

when he said he didn't want to go over his budget.  And, you know, it goes on.  I said, "The suspension of overtime is due to an order in which you gave Lieutenant Kenny by e-mail to your department."

And I just forwarded an attached e-mail that was sent from Chief Fontenot to the department earlier that day.

Q.  I want to just check on the legislative auditors.  During Chief Randy Fontenot's tenure, did legislative auditors ever come to audit EPD?

A.  They didn't have to.

Q.  I want to continue to the last paragraph you have on this page.  You said -- and I'm starting in the middle of the first sentence here.  Quote, "I would support a budget amendment" -- actually, I'll withdraw the question.

The final paragraph on this page states, quote, "I stated in our telephone conversation yesterday and in the past during meetings between the two of us that I would support a budget amendment if you went over budget.  I will not, however, support wasteful spending," end quote.

What wasteful spending were you

Page 297

referring to here?

A.  I think we were just going back to the conversation that we had at the meeting the night before when Council was being critical of the overtime, it boils down to that.

It goes on to say, "Hey, you have given overtime without hesitation during the first nine months and now, since the City Council is questioning this, you immediately put a stop to all overtime."  And I went on to say, "You're putting your officers at risk and the general public."

Like all I meant was, hey, yeah, they might have questioned it last night, but take care of what you need to take care of.  I don't -- you know, the wasteful spending, I mean, that just could go anywhere in any department.  I don't support that anywhere.

Q.  You have this reference in the subsequent line, "As you mentioned, you have given overtime without hesitation during the first nine months of the fiscal year.  And now, since the Council has questioned this, you immediately put a stop to all overtime," end quote.

So the reference to wasteful spending



Scott Fontenot

November 20, 2024
Pages 298 to 301

Page 298

here, is that related, at least in part, to overuse of overtime?

A.   I think it could have been towards that, yeah.  And because that was the topic of the meeting the night before and it was fresh in my mind.  And I think that was the whole reasoning of him putting a stance at that moment not to send anyone else out and to call me -- okay, so let's go back.

You have the chief of police who's acting as chief of police calling the mayor asking the mayor what to do.  He was concerned about his budget obviously because they were asking him about it in the Council meeting.  And I told him, Just do what you have to do.

But I explained to him that I won't support wasteful spending, and that's anywhere.

Q.   What was your understanding of how Randy Fontenot was assigning overtime to officers during the first nine months of that year?

A.   Well, it really did seem like a lot, and it was.  But it did have a -- something to do with the staffing.  As far as certain ones, that was a question that was brought up in the Council meeting the night before, was that certain

Page 299

employees seem to have more overtime than others.  But those certain employees were actually working that overtime.

So what I was doing here in this e-mail was to literally protect myself, because it felt like no telling where this was going to go, and if someone would have got killed that day, whether it was a civilian or a police officer, I wanted to make sure that I wasn't going to get stuck in the middle of this crap.

I go on to talk about the Louisiana Revised Statute 33:321 to 436, commonly known as the Larson Act.  There's a clear definition of the separation of duties of the mayor and elected chief.  The mayor's duty is to supervise and direct administrative and operation of municipal departments other than the police department with an elected chief.

I mean, and then they go -- it tells you more.  But I just wanted to make that clear.  The rest of the e-mail, that was my personal opinion put in there.  I told the chief -- and I was upset at the time, and we probably got upset at each other sometimes here and there, which is fine.  We're adults here, we can still get along at the

Page 300

end of the day.

I said, "I refuse to play politics when it comes to City business or anything else.  I will not accept responsibility for any of your actions.  I'm going to forward this e-mail to each Council member for their knowledge.  I hope there is some clarification."

And that was just to let him know that I was going to let the Council know what had happened.  And we moved on to the next issue we had to deal with and we continued to work together.

Q.   Was there anything else that you had in mind when you were referencing wasteful spending?

A.   Not really.  That there's just not a whole lot of money in the police department to wasteful spend.

Q.   And your statement about putting your officers at risk and the general public was related to not having enough officers on patrol?

A.   I think just the staffing part.  I mean, you have an incident where there's a shooting.  Call for back up or get out there yourself.  I don't have a badge.

Q.   Do you know if certain officers had more

Page 301

overtime than others and who those officers were that had more overtime?

A.   I mean, some of the ones that they brought up in the Council meeting I remember, yeah, you had some.  There were some of the supervisory officers that were -- they were working on the roads.  You had Tony Kennedy, he was a deputy chief.  But Tony was always working.  I don't think I've ever seen Tony out of the uniform.

You know, Jeremy Ivory, he worked a lot, man.  Same thing, though; if you listen to the police scanner, Jeremy was always on the radio.  So, I mean, you had the ones that worked a lot, I guess if they chose to work, you know.  You need some people, and, hey, look, I'm here.  Some people probably chose not to work and get that extra overtime.

Q.   Is it fair to say EPD was dealing with a variety of issues at this time, including staffing, payroll irregularities, and misuse of overtime?

A.   They were dealing with staffing issues.  The rest of it, I mean, according to these investigations and opinions from the Civil Service



Scott Fontenot

November 20, 2024
Pages 302 to 305

Page 302

Board, yeah, they were dealing with that.

Q. Do you know if there's a policy at EPD that governs overtime?

A. I'm not really sure, to be honest with you.

Q. Do you recall if at the time there was any policy governing overtime for EPD officers?

A. I don't -- I don't think so. I know that the City's policy is that you have to approve overtime with your supervisor.

Q. Do you know how proper overtime use is enforced at EPD?

A. I don't.

Q. Do you have any reason to believe that overtime was selectively granted to certain employees over others?

A. I just think whoever decided to come in and take the call, that's what I believe.

Q. And Randy did not discuss with you before canceling overtime for all EPD officers, correct?

A. No.

Q. Have you ever told Randy Fontenot to take away overtime from EPD employees?

A. There were probably discussions in the

Page 303

past, like, Hey, man, you know, look at your budget. I know the chief would always look at his budget, he would be concerned about his budget.

And like I said earlier in the day today, that overtime isn't budgeted properly, I would say, because we deem some of it as emergency just to pull off of another fund. So we might have discussed it in that manner, nothing more.

Q. Have you had disputes with Randy about the EPD budget?

A. I don't think so. He was pretty fair when it came down to budget. He was pretty understanding. He worked for the City long enough to know that the City didn't have a lot of money.

Q. Are you aware of any incidents where Chief Fontenot refused to approve overtime when there weren't enough patrol officers on the streets?

A. I mean, other than in this specific instance, I'm not sure.

Q. And I want to turn to the page ending in 297 again. You wrote, quote, "I refuse to play politics when it comes to City business or anything else. I will not accept responsibility for any of your actions. I'm going to forward

Page 304

this e-mail to each Council member for their knowledge. I hope there's some clarification," end quote.

What did you mean that you refused to play politics?

A. That's what people do, they play politics, you know. When the light's on them, they want to cast it on somebody else sometimes. So I was just putting it out there that I'm not going to play politics, I don't do that.

Q. Was Randy playing politics?

A. I don't think so. Like I said, I think he was frustrated from the night before and he called me. He had an incident, so he wanted to put the light on me at that point I think. And I think I might have gotten upset when I wrote this e-mail. Just like he was upset the night before when he came across -- probably the way he did when he called me that night. Because it wasn't a general conversation, it was a good conversation.

But I felt like I had to just let him know that and then put it on record. And I respect the chief, and I always have respected every elected official. But I, for one, am a public servant; I'm not a politician. I don't

Page 305

play the games; I've got a job to do.

Q. Why did you write, "I will not accept responsibility for any of your actions"?

A. Because if somebody would have got killed, that wasn't on me.

Q. That would have been on Randy?

A. Oh, shit. I hope -- I mean, if somebody were to point the finger, Scott, why you didn't do nothing? The cops couldn't get out there, y'all wouldn't let them have anybody out. What do I do? I'm not the chief. I can't decide who's going to work. I can't order them to go work. And that's what I meant right there.

Q. So the actions you're referring to is not having enough officers on the street because of lack of overtime?

A. I guess. I mean, I just wasn't going to be responsible for any of his actions in his -- to respect his job. I wasn't going to do it. And that's why I defined the definition of duties.

THE VIDEOGRAPHER:

Mr. Bhatla, we'll need to change tapes in one minute.

MR. BHATLA:

Okay, thank you. Why don't we take



Scott Fontenot

Page 306

a break then.

THE VIDEOGRAPHER:

We are off the record, the time is 4:59.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record.  The time is 5:08.

BY MR. BHATLA:

Q.   Scott, did you ever reach out to the St. Landry Parish D.A.'s Office to investigate violations of Lieutenant Dunn's rights?

A.   No.

Q.   Have you ever received outreach from concerned citizens about Lieutenant Dunn's treatment at the Eunice Police Department?

A.   I may have from his neighbor maybe through a Facebook message, I'm not sure.

Q.   What were those messages?

A.   I think it was just in support of him just as a character witness and things like that, wasn't nothing more than that.

Q.   Do you recall any particulars about what those messages said about Lieutenant Dunn's character?

Page 307

A.   I don't really recall specifically what those Facebook messages were, I just know they were in support of Officer Dunn.  And that was by his next-door neighbor.

Q.   Are these Facebook messages that were sent directly to you or in a Facebook group?

A.   I think it was sent directly to me.

Q.   Do you recall what his neighbor said about his ability as a police officer?

A.   I don't think they talked specifically about his ability.  Like I said, it was all just encouraging messages about Officer Dunn, if I remember correctly.

Q.   And did you receive it from others as well?

A.   Not that I recall.

Q.   Are you aware that Lieutenant Dunn reached out to external agencies about alleged misconduct occurring at the Eunice Police Department?

A.   I was made aware through prior depositions of others.

Q.   Do you know which agency he reached out to?

A.   I think he reached out to every agency

Page 308

in the book.

Q.   Did you encourage Lieutenant Dunn to reach out to those agencies?

A.   When he came with his initial complaints I did.  You know, I felt like he needed to take it to a higher authority if he wasn't getting any traction within his own department.

Q.   Are you aware that these agencies told Lieutenant Dunn that the matter had to be referred to them by the mayor or the chief of police for them to investigate EPD?

A.   No, I wasn't told that.

Q.   Did Lieutenant Dunn ever come to you and ask that you refer a matter at EPD for investigation by an external authority?

A.   No.

Q.   No, or do you recall?

A.   No, he never asked me to do it on my own.

Q.   Are you aware that Lieutenant Dunn reached out to the St. Landry Parish D.A.'s Office about alleged misconduct at EPD?

A.   I'm not sure if he reached out to them or not.  I know I advised him to reach out to anybody he could.

Page 309

Q.   Did you have a meeting with the St. Landry Parish D.A. and Lieutenant Dunn regarding his alleged allegations of misconduct at EPD?

A.   No, I did not.

Q.   Do you know if the D.A.'s office took any action in response to Lieutenant Dunn's complaints?

A.   I'm not sure.

Q.   Are you aware that Lieutenant Dunn reached out to the St. Landry Parish Sheriff's Office about the alleged misconduct at EPD?

A.   I'm not aware of that.

Q.   Do you have any understanding of what action the sheriff's office took in response to Lieutenant Dunn's complaints?

A.   No.

Q.   Are you aware that Lieutenant Dunn reached out to the Louisiana State Police regarding alleged misconduct at EPD?

A.   Yeah, I'm aware of that.

Q.   Do you have any understanding as to what the result was of Lieutenant Dunn's discussion?

A.   I don't know if Lieutenant Dunn didn't say something to the effect that before he made it



Scott Fontenot

Page 310

back to Eunice, the police department already knew he went to the troop.

Q.  What makes you say that?

A.  Lieutenant Dunn said that.

Q.  He said that to you?

A.  He said it to me or he said it in that letter or his journal, one of the two.

Q.  Do you have any reason to doubt his statement?

A.  I don't know.  I can't really answer that.  I mean, we all human.  Somebody may have called and said that somebody was there, I don't know.  I wouldn't doubt it.  I don't know if that's part of their process.  I would think that that's internal stuff.  I don't know.

Q.  And do you know what's the significance of that reporting to the Louisiana State Police making it back to the Eunice Police Department?

A.  I have no idea about that.

Q.  Are you aware that Lieutenant Dunn has alleged that he was retaliated against once the Eunice Police Department learned that he had reported to the Louisiana State Police?

A.  I wasn't aware that he was retaliated against specifically for that or anything else.

Page 311

Q.  Do you have any reason to doubt Lieutenant Dunn's allegations?

MR. STAMEY:

Object to the form of the question.

A.  I mean, it's -- that's his own observation, I guess.  I can't answer that for him.

BY MR. BHATLA:

Q.  Are you aware that Lieutenant Dunn reached out to the Louisiana Attorney General's Office about alleged misconduct at EPD?

A.  I may have heard that, I'm not sure. I'm not sure if he did or not.

Q.  Are you aware that Lieutenant Dunn also reached out to the Louisiana Lieutenant Governor's Office for the same?

A.  I didn't know that.

Q.  Did you know Lieutenant Dunn reached out to the Louisiana Inspector General's Office regarding the same?

A.  No.

Q.  Did you know that Lieutenant Dunn reached out to the FBI regarding the same?

A.  I think I had heard that.  I didn't know how true it was.

Page 312

Q.  What was your reaction to Lieutenant Dunn making these reports to external agencies?

A.  I felt like that if he had a case on something, that somebody was going to sit there and listen to it.  At that point, that was between him and those agencies.

Q.  Did you know that -- did you know whether those agencies had authority to investigate EPD just based on Lieutenant Dunn's word alone?

A.  It seems like somebody would.  If a citizen or someone has a general complaint about something, whether it's an officer or just a citizen, and they scared like Dunn claims he is of retaliation, somebody out there has to hear this complaint, and that somebody ain't the mayor of Eunice, I'm just telling you.

It seems to me -- and I don't know because I've never had to take a complaint to any of these folks and I hope I never have to.  But it seems like somewhere along the line, somebody has to listen.

Q.  Why do you think Lieutenant Dunn went through so much effort to spread the word about alleged misconduct at EPD?

Page 313

MR. DOHERTY:

Object to form.

A.  I think he was adamant about, you know, proving what he felt was going on.

BY MR. BHATLA:

Q.  And what he felt was going on was abuse of inmates and other allegations contained in this complaint in this lawsuit, correct?

MR. DOHERTY:

Object to form, calls for speculation.

MR. STAMEY:

Objection to form.

A.  It was a bunch of -- I'm not going to say.  It was a bunch of different accusations.  I think the one we had made -- when I was made aware of the police brutality, we took the appropriate action.  So anything else that, you know, he may have felt wasn't fair, he should have had a right to be heard; I think anybody should.

BY MR. BHATLA:

Q.  When Cody Miller struck that inmate, you took action to discipline him; is that right?

A.  Absolutely.

Q.  And that was an instance of police



Scott Fontenot

November 20, 2024
Pages 314 to 317

Page 314

brutality?

MR. STAMEY:

Object to the form of the question.

A. Well, I don't know if you'd consider it police brutality because the State Police cleared him of any wrongdoing after their whole investigation. I'm thinking it was an incident at work where you had an altercation between someone who was in custody and assault of the officer.

I don't think -- like I said, I don't think he should have did what he did. I don't think anybody would have done anything differently in that case. I think everybody would have probably reacted the same. But we took action on it, I mean, and that was the bottom line.

BY MR. BHATLA:

Q. You said you watched the video when Sergeant Cody Miller struck the inmate; is that right?

A. Yeah.

Q. Did you watch the full video?

A. I mean, I watched the video of the guy being detained in the little area which they were and him give the guy a nudge.

Q. You had testified earlier that you did

Page 315

not finish the video; is that accurate?

A. I mean, that's the only thing I recall in the video itself, is the incident with Cody.

Q. What do you consider police brutality?

A. I mean, pull somebody over and beat them with a night stick for no reason. I mean, or if you're in custody and you're getting shoved around aggressively.

Q. Was Jody Andrus punching an inmate considered police brutality?

MR. STAMEY:

Objection to the form of the question.

A. I have no knowledge of that incident even occurring.

BY MR. BHATLA:

Q. The critical incident form we reviewed together about Cody Miller's incident, it mentioned the Sergeant Andrus accident as well, right?

A. I'm sure it did, yeah. But as far as when it came to any disciplinary action, I mean, there was nothing to act on. So -- and that could have been someone's witness statement.

Q. Have any of the external agencies that

Page 316

Lieutenant Dunn contacted reached out to you?

A. No, not regarding any of this.

Q. Have you heard any complaints from other employees at EPD about misconduct going on at the department?

MR. STAMEY:

Objection to the question.

A. I am not, not specifically.

BY MR. BHATLA:

Q. Have there been any complaints against Randy Fontenot that were brought to your attention?

A. I mean, your normal people was Donnie Thibodeaux, Stephanie Myers, Michael Dunn, those were the main ones. They love coming to my office and telling what was going on, they loved that. They love to come in and drop their little issue and walk on out.

Q. What did Donnie Thibodeaux say to you?

A. Regarding what? I mean...

Q. Regarding misconduct at EPD.

A. I mean, they just felt like -- he felt like sometimes he was treated unfairly, I guess. Or maybe sometimes him being the Civil Service chairman, he would come in that capacity and talk

Page 317

about things.

And I think him being in an advisory position on the Civil Service Board, he knew more than other officers, so he would talk about issues, I guess specifically pertaining to claims that were made that had to go through the Civil Service Board. And like I said, I ran into Stephanie Myers at a restaurant. She just, Oh, my God, we've got to -- you've got to take the appointing authority away, you know.

I took a lot of it, you know, as serious as I could, but I'm hearing multiple sides of all these stories. So we go back, I like to get the truth. And sometimes when all parties are involved, none of the stories match up, how the hell do I get the truth right there?

Q. Did these reports from Lieutenant Dunn, Thibodeaux, and Myers motivate you, at least in part, to pass the resolution revoking Randy Fontenot's appointing authority?

A. Not necessarily them specifically. I think just overall. I think just to have more transparency in the City of Eunice and the police department. There was a public outcry, whether that was through social media, individuals



MAGNA
LEGAL SERVICES

Scott Fontenot

Page 318

themselves, people reaching out to the City Council members.

And we went back to how we had operated forever before. And we didn't think it was an issue. I think the chief -- and I don't want to say this if I'm wrong, but I think the chief probably felt in a sense that we didn't have confidence in him as far as the Council.

And I don't think that was the case at all. The Council had confidence in the chief. We trusted the chief. We trust all the other elected officials. Everybody takes an oath of office when they serve.

As far as the appointing authority went, we wanted to be more open with the people, the general public as a whole. There was nothing other than that.

Q. Did you ever discuss any of the alleged misconduct at EPD that Lieutenant Dunn brought to your attention with Randy himself?

A. Not really, no. I don't think so.

Q. Are you familiar with an individual named Joshua Tyler?

A. No.

Q. Are you aware of an incident where an

Page 319

inmate was found at EPD having swallowed glass?

A. No.

Q. Are you aware that this incident of this inmate was released instead of being sent to get medical care because Randy Fontenot didn't want to pay for the care?

A. No.

Q. How long have you known Randy Fontenot?

A. I think I've known of Randy Fontenot for a long time. His daughter graduated with my wife. So I kind of always knew Randy. He was a police officer growing up when I was a kid.

So -- but our first, I guess, real dealings was -- I got on City Council, he worked in City court, but we didn't even have dealings then. We started to work together back in 2015. So it's mostly just, you know, a working relationship.

As far as friendship-wise, I respect him. We don't, you know, socialize or anything like that. I think he's got a fine family. I have nothing against the man.

Q. Has Randy Fontenot ever spoken about wanting to remove Lieutenant Dunn from the department?

Page 320

A. Not directly to me.

Q. Has he said it indirectly?

A. I don't know. I mean, I never heard it, that's what I was saying. I never heard him say it.

Q. Are you aware of sentiments being expressed that Randy Fontenot wanted Lieutenant Dunn out of the department?

A. I don't think so.

Q. Has Randy Fontenot ever made statements to you about Lieutenant Dunn's mental fitness to be a police officer?

A. No, I don't think so.

Q. How often do you speak with Victor Fontenot?

A. I don't even talk to Victor at all. Victor worked for the police department and I would see him every now and then, Hey, how's it going. But other than that, I don't even really know Victor.

(Mr. Hebert re-joined the proceedings.)

BY MR. BHATLA:

Q. Has Victor Fontenot ever made any statement to you about Lieutenant Dunn?

A. No.

Page 321

Q. Are you aware of rumors spread by Victor Fontenot that Lieutenant Dunn is a dirty cop?

MR. STAMEY:
Objection to the form of the question.

A. That Victor said that Dunn was a dirty cop?

BY MR. BHATLA:

Q. Correct.

A. Because I heard it the other way around. So I don't know. I mean, I -- I heard Dunn say that Victor was a dirty cop.

Q. Have you heard anyone else say that Victor was a dirty cop?

MR. STAMEY:
Objection to the form of the question.

A. Man, I mean, word on the street, people would say that.

BY MR. BHATLA:

Q. Who are these people? Various citizens of Eunice?

A. I would say that, yeah. I mean, we have a Council member that people would tell her that.

Q. Multiple people?



Scott Fontenot                                                                November 20, 2024
Pages 322 to 325

Page 322

MR. STAMEY:

Objection to the form of the question. I'll just make it continuing.

A. I don't know about multiple people, but it was said. Like I said, I don't have no dealings with Victor. So...

BY MR. BHATLA:

Q. What do you think of Lieutenant Dunn's reputation in the Eunice community?

A. I don't really know him. He's not from Eunice. He's worked in Eunice for a while. I think the general public in Eunice has a total respect for all the police officers.

It sucks whenever half of them aren't even from your community, so you don't really get a chance to know them or their families or their backgrounds. So I don't know what the people's opinion is on Officer Dunn.

Q. Do you have any understanding as to how Lieutenant Dunn's reputation has been damaged by the rumors spread by Victor Fontenot?

MR. STAMEY:

Objection; form.

MR. HEBERT:

Object to form.

Page 323

MR. STAMEY:

Object to the form of the question.

A. I mean, I never heard somebody talk about that just randomly talking about it. I don't think people care about that.

BY MR. BHATLA:

Q. How would you describe morale at EPD during Randy's tenure as chief of police?

MR. DOHERTY:

Objection; asked and answered hours ago.

A. I mean, we answered that earlier. But, I mean, it was tough. And I think there was multiple factors involved. And I think it was police pay, I think it was being overworked, I think it was the general concept across the country to defund the police. It was just a tough time, man.

And I'll be honest with you, it's hard to be a chief of police. My dad did it for 12 years, man. Beat the hell out that guy, man.

BY MR. BHATLA:

Q. Are you aware that Lieutenant Thibodeaux testified that even after officers were given a raise, they continued to leave because they

Page 324

couldn't stand to work for Randy Fontenot?

MR. STAMEY:

Objection to the form of the question.

A. What was the question again?

BY MR. BHATLA:

Q. Are you aware that Lieutenant Thibodeaux testified that even after officers were given a raise, they still continued to leave because they couldn't stand to work for Randy?

A. Yeah, I mean, I don't know about that. I mean, we did give them a raise. I mean, and look, you've got to understand this. You're talking about a raise.

If you're going to put stuff on record, I don't want everybody to think -- now, they were making $9.75 an hour starting pay, all right? Now, this has been going on -- they didn't get a raise for God knows how long. So that you had those employees who had been there eight, nine years who never thought they would see any more money other than the longevity increase they would get or by promotion.

But then we came along and we get them up to, what, a big 12.75, all right? And it

Page 325

helps, but, man we're still so far behind everywhere else. And just recently, a little over a year ago, we got them up to 16 an hour. And now it's one of the highest paid departments in the South down here, South Louisiana.

Q. How, if at all, have things changed in Eunice since Randy left EPD?

MR. STAMEY:

Objection to the form of the question.

A. I mean, you've got more officers. We got a lot of young, new recruits, I'll say that. So the State has put some incentives into becoming a new officer if you're not -- if you didn't have any law enforcement experience. You get a stipend bonus if you stay on so long.

So I don't know if that's making some of these younger people who've never been in law enforcement join the force, but we've got a lot of those who have never been in law enforcement, which as before we wouldn't get any, and if you would, you lucky if they can pass the agility test.

So, I mean, I think there are other factors. I can't point the finger at exactly what



Scott Fontenot

Page 326

it was.  But, I mean, look, like I said earlier, you've got a new chief, it's like a new coach, everybody is fired up about it.  You've got more pay, we've got better equipment.

And they may have changed policy where they might let people have facial hair, I mean, things like that that maybe was not allowed in Randy's administration.  So we don't know exactly what that factor may have been.  But...

BY MR. BHATLA:

Q.  Do you have any reason to believe that Randy will run for chief of police again in Eunice?

A.  He looks pretty happy right now, I doubt it.

Q.  What do you understand Victor Fontenot's current position to be at EPD?

MR. STAMEY:

Object to the form of the question.

A.  Victor is no longer employed with the Eunice Police Department.

BY MR. BHATLA:

Q.  Is he a reserve officer?

A.  No, not to my knowledge.  He may be.  I don't know.

Page 327

Q.  You're still the appointing authority, right?

A.  Yes.

Q.  Has Kyle LeBouef respected your role as the appointing authority since he's been the new chief?

A.  I think he's respected the role as the mayor and appointing authority.  I think we both understand our role.

Q.  Has Chief LeBouef taken disciplinary action against any EPD personnel without telling you?

A.  No.

(Exhibit 16 was marked.)

BY MR. BHATLA:

Q.  I'm handing you what's been marked as Exhibit 16.  This is the first amended complaint that has been filed in this lawsuit.

Have you read the first amended complaint?

A.  The whole thing, like all this?

Q.  Have you read any of it?

A.  Let me just -- let me just clear my mind and focus on this, because there's multiple trials and things that we have been dealing with over the

Page 328

last couple of years.

Not this specific one right here.  I guess that's the one I probably put in the paper and all that, I guess, huh?  I probably read it, yeah.

Q.  This was filed on August 14 of 2023.  Then there was also the original complaint that was originally filed in 2021.

Do you recall --

A.  Okay.

Q.  -- if you reviewed the original complaint or the first amended complaint?

A.  I know for sure the first one, I probably did skim through this one.

Q.  What is your understanding of -- I withdraw the question.

I want to turn your attention to page 49 of the first amended complaint.  Do you see here where it says "Prayer for relief" --

A.  Yes.

Q.  -- and Lieutenant -- and it says, Wherefor Plaintiff Michael Dunn respectfully request that the court," colon, and then it sets a number of paragraphs after that?

A.  Yes.

Page 329

Q.  Do you see paragraph 195 where it says, "Order the City of Eunice to," colon?  Do you see the first item on the following page, on page 50, "Assign Lieutenant Dunn departmental duties -- any departmental duties comparable to the rank of lieutenant at Eunice Police Department, including, but not limited to, reinstating Lieutenant Dunn to handle narcotics investigations"?

MR. STAMEY:

Object to the form of the question.

I'll make this objection continuing as to this entire line of questioning.

BY MR. BHATLA:

Q.  Do you see this?

A.  I see it.

Q.  What are your thoughts on this request by Lieutenant Dunn?

MR. HEBERT:

Object to the form.  I also will make my objection generally continuing.

MS. WALL:

Same.

A.  A?

BY MR. BHATLA:

Q.  Yes.



Scott Fontenot

Page 330

A.  He's a lieutenant already.

Q.  How about point B, that the City of Eunice expunge from Lieutenant Dunn's personnel records any and all notations, complaints, and/or related references to any baseless internal investigations or other actions taken by defendants as retaliatory measures, do you have any opinions on this request?

A.  I don't even know if you can do that.  I mean, I don't know how that works.  I don't know who can just expunge someone's personnel records.  But...

Q.  I want to bring your attention, then, to subpoint D, where he asks the City to "acknowledge and publicly apologize for the retaliatory actions made against Lieutenant Dunn which have impeded Lieutenant Dunn's ability to seek future employment and tarnished Lieutenant Dunn's moral character and reputation were, in fact, retaliatory and unlawful."

Do you think the City would be willing to apologize to Lieutenant Dunn for the retaliation he has suffered?

MR. STAMEY:

Objection to the form of the

Page 331

question.

MR. HEBERT:

Joined.

A.  I mean, I don't know directly to retaliation.  I would apologize to him and anybody for anything they had to be put through regarding anything like this.  I mean, it takes a lot of time, it takes a lot of energy out of people.  I just think -- I mean, I would apologize.

I mean, look, I've -- shit, I'd punch somebody in the face and tell them I'm sorry, I mean, that's just the way it is.  You just -- I feel bad for people sometimes.  I feel bad for him even though I can't -- I don't know, he put himself through this.  I mean...

BY MR. BHATLA:

Q.  I want to direct your attention to paragraph 196 where it says -- where Lieutenant Dunn asks, quote -- asks the city to, quote, "Enter a permanent mandatory injunction" -- I'll withdraw the question.

Directing your attention to paragraph 196, it says, "Enter a permanent mandatory injunction ordering the City of Eunice to," colon, and it provides a list of items.  The

Page 332

first item in A, it says, quote, "Issue and require the use of head-mounted body cameras or video-recording eyeglasses by all Eunice police officers," end quote.

Has this already been completed by the Eunice Police Department?

A.  It's not a head-mount system.  It's a device that departments across the country use.

Q.  And you're pointing to your chest?

A.  Yeah.  It's a device that clips on the uniform and it's -- it works.  I mean, when you watch these body cam videos across the country, the same program that they're putting out there, we have the exact same program.  So that's been done.

Now, I question what they're asking for, to enter a permanent mandatory injunction ordering the City of Eunice; I don't understand how you could do that when you have a change in leadership sometimes in the police department.  Although I would accept that, I think that's cool, I think that's good, I don't know how you can force that upon another elected official, whoever comes after this.  I don't know how that works.  Unless that's a court order, I don't know.

Page 333

Q.  So I want to direct your attention to Item B here.  Do you think the citizens of Eunice would benefit if the City did as this asks, require crisis intervention and deescalation training for all EPD employees who respond to mental health emergencies?

A.  I think that's something that should be talked about across the country.  I mean, what are we talking about, going to an incident and we have someone who has a learning disability and how to handle that, is that what this is about?

Because, you know, I don't think it should be specific just to the Eunice Police Department, you know, because you're dealing with people who have a learning disability or may have any other health emergencies.  I think it would be good.

Q.  With respect to item C, do you think the citizens of Eunice would benefit if it was required for the Eunice Police Department to revise its policies to mandate that officers intervene to prevent the use of excessive force or other illegal conduct by fellow officers?

A.  It should be in everybody's policy, again.  I think, though, when you have those body



Scott Fontenot

Page 334

cameras, that's going to prevent a lot of that and a lot of allegations of that.

Q. Do you think the citizens of Eunice would benefit from item D, if it was instituted and implemented -- if there were instituted and implemented mandatory policies and procedures to ensure that employees of the Eunice Police Department submitted accurate records of daily hours worked?

A. I don't know if they don't do that already. I don't know when they get on duty if they don't key in on the mic that they're there for duty and when they get off duty. That might be how it's already done.

Q. But it is true that the Civil Service Board has previously found payroll irregularities at EPD, right?

A. They did. And some of those irregularities were based on time that I gave other City employees off that I think they were paid for that, if I'm not mistaken.

But, you know, payroll fraud is a serious deal. But to implement and institute mandatory policies and procedures in the Eunice Police Department, I think that would probably --

Page 335

I don't know how you would implement that. When you have a change in leadership and you have a change in a chief, how does one continue what the one prior did? That's a tough question unless this would be ordered by someone.

Q. But even when the chief changes, there are still the same laws and regulations that dictate EPD policy, right?

A. All of this would make it better.

Q. All of the listed items in paragraph 196?

A. We didn't go through all of them yet.

MR. HEBERT:
Well, yeah.

BY MR. BHATLA:

Q. Let's keep going. Point E, do you think the citizens of Eunice would benefit if --

A. No.

Q. -- if there were a funded and appointed a full-time paid investigator to the Eunice Civil Service Board?

A. No.

Q. Why do you say that?

A. I mean, I don't want to see the Eunice Civil Service Board weaponize themselves to start

Page 336

looking at all kinds of allegations that may be true or not.

Q. Do you think having an investigator could help avoid cases being ruled on technicalities?

A. I think if you have a fair board attorney that wouldn't be impartial it would work.

Q. Looking at Item F, do you think the citizens of Eunice would benefit if we eliminated all fees charged for the furnishing of copies of public records requested pursuant to the Louisiana Public Records Act in the custody of the City of Eunice or the police department?

A. No.

MR. STAMEY:
Objection to the form of the question.

MR. HEBERT:
Joined.

BY MR. BHATLA:

Q. Why do you say that?

A. I mean, we -- there's fees every other department, everywhere you want a public records request. We're not changing just to make it easy. I mean, it's hard everywhere.

Page 337

Q. Do you think the citizens of Eunice would benefit if the chief of police were required -- pursuant to subpoint G, if the chief of police were required to disclose to the public on a quarterly basis the number and substance of internal and external complaints of police misconduct that were received, investigated, deemed unsubstantiated, and/or closed by the Eunice Police Department?

MR. STAMEY:
Object to the form of the question.

MR. HEBERT:
Joined.

A. I mean, I don't know, man. That's -- that's a tough question for me to answer. I'm not sure. I wouldn't want to interfere in the day-to-day duties or any type of operation of the police department. So I'm not sure.

Man, it's good to be open about everything. So I know that reports are made on a monthly basis to the City Council on, you know, reports and complaints and different things like that. It doesn't have anything specifically with internal or external complaints of policeman misconduct. Could that be included? Possibly,



Scott Fontenot

Page 338

but I've never seen that before.

It's not like every other week they have an issue like this. And very seldom are you going to have an issue. So I don't know how to answer that question.

BY MR. BHATLA:

Q. One of the reasons the appointing authority was changed was to promote transparency, right?

A. Absolutely.

Q. Wouldn't this action help improve transparency into complaints about the Eunice Police Department?

A. I think it possibly could, I just don't know how it would affect their operations as they operate. I don't work in the police department. I'm sure it would be good. I think all of this could be beneficial to not only the Eunice Police Department but every police department in every jurisdiction.

Q. That's fine. I want to move on to a few other questions.

Briefly going back to the K9 program, do you have an understanding as to why Lieutenant Dunn is not currently a K9 handler even though he

Page 339

has the training?

A. Can you say that one more time.

Q. Do you have any understanding as to why Lieutenant Dunn is no longer a K9 handler although he has all the training?

A. Currently, since we've gotten new K9s?

Q. Yes.

A. As Chief Lebeouf told me, he would like to try to give these younger officers a chance. I'm not sure if it was offered to Lieutenant Dunn or not, it may have been.

He did offer to house a dog at his house for one of the officers because he couldn't have a kennel at his home, it was a rental home, he did offer to do that. So, I mean, he is a lieutenant. And then I can see the chief's point.

You know, when he came in the department, he wanted a way to kind of move up and give them promotions and things like that. So I think that's why the new officers all got a dog. You know, I don't think it was anything against Dunn at all.

Q. You testified earlier that you think Lieutenant Dunn brought this lawsuit because he wants change in Eunice; is that accurate?

Page 340

MR. STAMEY:

Objection to the form of the question.

A. I think he brought forth the lawsuit because, you know, in his mind, he was being treated unfairly. He probably wanted to see change. He obviously wanted to see Randy Fontenot gone.

Most of the things that he asked for has already been completed or in the process of getting taken care of, and that wasn't just because of this lawsuit itself, I think it's just a different way of policing brought by Chief LeBeouf, you know.

BY MR. BHATLA:

Q. How much money has the City of Eunice spent litigating this case thus far?

MS. WALL:

Objection; form.

MR. HEBERT:

Joined.

MR. STAMEY:

Same.

A. I don't even know, man. I don't even know.

Page 341

BY MR. BHATLA:

Q. What's your best estimate of how much has been spent by the City of Eunice?

MS. WALL:

Objection; form.

MR. STAMEY:

Objection to the form.

MR. HEBERT:

Object to form.

A. I have no idea, I really don't.

BY MR. BHATLA:

Q. Do you -- go ahead.

A. Look, everybody's -- you know, has a right to be heard regardless of the cost. And at the end of the day, all we want is, you know, justice to be served, whichever way that is, you know.

And in my personal opinion, and this is my personal opinion from Scott Fontenot, you don't even have to count as the mayor, I think it's a lot of BS.

Q. What is BS?

A. I think as many attorneys that are involved in all this, and no disrespect to anybody in here, I respect the heck out of everybody in



Scott Fontenot

Page 342

here, man, and just from a normal citizen, people don't realize what goes on in all this, man.

And, you know, that's just my personal opinion, it is. This is long. Long days, years. And what's the end game? What's the end result? What are we going for? Because I believe that the City of Eunice is taking initiative action to correct some of these things, and I would just like for it to work the best way for all parties. I just -- it's exhausting.

Q. Wouldn't it have been cheaper and easier for everyone if the City just listened to Lieutenant Dunn and implemented the ideas that you've described as being good for any police department?

MR. STAMEY:
Objection to the form of the question.
MR. HEBERT:
Object to form.
MS. WALL:
Form.

A. Who are you referring to as the City? Me?

Page 343

BY MR. BHATLA:
Q. The City of Eunice, whether that includes you and the City Council. Anyone who's responsible as a decision-maker for the City of Eunice?
Wouldn't it be easier and cheaper to implement the reforms Lieutenant Dunn is pushing for in this complaint?
MR. HEBERT:
Same objection.

A. How would we know about the reform if he never would have filed the lawsuit?
BY MR. BHATLA:
Q. And now that he has filed the lawsuit, do you think that can drive reforms in the City of Eunice.
MR. STAMEY:
Objection to the form of the question.
MR. HEBERT:
Same objection.

A. I mean, they're already in the process of being taken care of. I think when Officer Dunn was not being heard throughout the different agencies he went to, this is where we got. I

Page 344

think -- I think things probably could have maybe simmered down a little bit along the way, but it didn't.

And I think he felt like he had no other choice but to go this far and that's why we're here, and it's unfortunate for all involved.

Q. Has the City seriously considered implementing the reforms that Lieutenant Dunn is requesting in his amended complaint?

A. The new chief of police and I have discussed what was in there and we said, this is crazy because we're already doing this.

Q. What are you already doing?

A. The body cams and all the other things. Now, there are some policies --

Q. What other reforms that are listed on page 49 of the amended complaint is the City doing right now?

A. Well --
MS. WALL:
Objection; form, asked and answered.
MR. STAMEY:
Objection to the form.
MR. HEBERT:
Joined.

Page 345

A. He's a lieutenant already.
BY MR. BHATLA:
Q. But he's not handling narcotic investigations, right?

A. Including, but not limited to, reinstating Lieutenant Dunn to handling narcotics investigations.

Q. What other reforms in paragraph 196, for example, is the City implementing?

A. We did the body cams. I would have to look at the policy of the police department, but I'm sure he's already implemented policies regarding the excessive force. I know he did a body cam policy.

You know, some of the things are -- are crazy. I just couldn't see how we could fund and appoint a full-time paid investigator to the Eunice Police Department. Maybe we can appoint someone, maybe the marshal's office or someone like that, to assist. We have to look at the legality of all that. Some of this stuff is based on can it be done or not.

Q. Have you formed an opinion after talking with Chief LeBeouf about which one of these reforms can be done and which ones cannot?



Scott Fontenot

November 20, 2024
Pages 346 to 349

Page 346

MR. STAMEY:

Objection to the form of the question.

A.  Not specifically to each one.

MR. STAMEY:

Excuse me, please, Mayor.

Objection to the form of the question.  If any of your question has anything to do with something he's learned from counsel, that is -- should be excluded from the context of your question.

MR. BHATLA:

You can object for privilege, that's your prerogative.

MR. HEBERT:

And I will object and instruct you not to disclose the contents of any privileged communications with your lawyers.  I'm not sure that's where you were going but...

A.  I have -- I don't remember.

BY MR. BHATLA:

Q.  Are you aware of any documented history where Lieutenant Dunn was found to have lied to --

Page 347

on an official government form?

A.  Not to my knowledge.

MR. BHATLA:

Let's take a quick break.  And can I get the time?

THE VIDEOGRAPHER:

We are off the record.  The time is 5:50.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record.  The time is 6:03.

BY MR. BHATLA:

Q.  Scott, you said that the justification from Randy Fontenot to cancel the K9 program was motivated, in part, by cost; is that accurate?

A.  I believe that's what he stated in the Council meeting.

Q.  At the time, if he had asked you for a greater budget to support the K9 program, would you have sought to amend the budget to --

A.  I think I made that comment in the public meeting.  I believe I made the comment, that we could find that if we needed it.

Q.  And Randy Fontenot refused that offer?

Page 348

A.  I'd have to go back in the minutes of the meeting.  But he still asked the Council to terminate that program.

Q.  So do you think the budget was a legitimate excuse for discontinuing the program?

A.  I mean, it could have been.  I mean, I'm committed to public safety, so we would have had to find somewhere to pull from and make sure that was going to work.

Q.  You said in 2021, if a police officer beat someone up, they would burn Eunice to the ground; is that accurate?

A.  Well, what I meant was -- I mean, if you had a case of police brutality or any instance like that when an officer is physically assaulting someone else, we were going to take the risk to have everybody coming down to Eunice, Louisiana and protesting like they did in Lafayette.

But these are different instances.  You had officers who actually had altercations with civilians that ended up getting killed.  So it was a little different.  But I meant -- I didn't mean it like that, I would say.  I meant that we would have a lot of trouble on our hands possibly with public outcry for not handling that specific

Page 349

incident properly.

Q.  And do you understand that Lieutenant Dunn has alleged that there were multiple incidents from 2018 on that were not handled appropriately by the Eunice Police Department?

A.  I believe there were some incidents that he claimed, although there was no physical proof or evidence that was presented to me to back those claims up.

Q.  But Lieutenant Dunn presented you his journal, which included at least some evidence, correct?

A.  It possibly could.  I didn't read through the whole thing.  It was a long thing.  And after I got through a couple pages, I had enough and I turned it over to the clerk.

Q.  Were you the appointing authority at the time that you received that information?

A.  I don't think so.

Q.  When you became the appointing authority, did you think to review those materials to see if any disciplinary action was warranted?

A.  I don't even know how I would have initiated an investigation to start disciplinary action.  No, I did not go back and review that.



MAGNA
LEGAL SERVICES

Scott Fontenot

Page 350

Q.   So you don't know if you can have the police department investigate an employee as the appointing authority yourself?

A.   I mean, it goes back to the mayor interfering in the day-to-day duties of the police department.  There's a clear definition of what I can and can't do.  I can't authorize the chief of police or anybody in the police department to do something in their job; I can't and I won't and I'm going to stick by that.  Go ahead.

Q.   Going back to my question about 2021, have tensions in the community eased since then?

MR. STAMEY:
Objection to the form of the question.

A.   Pertaining to?

BY MR. BHATLA:

Q.   What you're talking about, about protesting, violence.

A.   I'm talking about the country as a whole, not just Eunice.  Eunice is a very united city.  You know, we had a walk together, the whole community, to march at one time together against wrongdoings across the country.  The chief I believe marched in that march with me and other

Page 351

officers did.

It's not a divided community.  I was referring to the perception of what was going on across the United States of America.  And I was worried and concerned that if we wouldn't handle our business on our end when we were brought facts and findings and video of an officer hitting someone in custody, if we wouldn't have done anything about it, regardless if the State Police justified it, it would have sent a wrong message; that's why we took that action.

Q.   If the kind of misconduct that Lieutenant Dunn has alleged in his amended complaint turns out to be true, do you think it was right for him to bring it to the attention of higher authorities?

MR. STAMEY:
Objection to the form of the question.

A.   I think if anybody has a legitimate complaint about anything they should have the right to go to anybody.

BY MR. BHATLA:

Q.   And so in Lieutenant Dunn's case, if the allegations proved correct, do you think he was

Page 352

right to bring those issues to you?

MR. STAMEY:
Objection to the form of the question.

MR. HEBERT:
Joined.

A.   He brought it to me I think asking for advice on what to do, not expecting me to do something on it.  I don't think he was expecting me to take action.  He never once said, Mayor, I expect you to do this.

I said, What you need to do is go here or go there.  He never once asked me to handle that business.  And going back to that journal, a lot of those letters were just letters printed with no name on the bottom of it.  It's printed, typed-up things.  You can't match anybody's handwriting.  I don't even know if any of them had his name on the bottom of it.

BY MR. BHATLA:

Q.   You testified -- sorry, go ahead.

A.   And that's where it gets confusing on a lot of that stuff.

Q.   You testified earlier today that you had a conversation with Lieutenant Dunn where he said

Page 353

he wished he could drop it, drop the case?

A.   Yes.

Q.   Are you aware that he said that only if the reforms in his amended complaint are enacted?

MR. STAMEY:
Objection to the form of the question.

MR. HEBERT:
Joined.

A.   He did not tell me that.  He just wished it would all go away.  He's happy with everything that's going on right now.  He expressed that to myself and the City attorney.  And Officer Wesley Rozas was standing right there with him, who he was training at the time.

MR. FEUCHT:
I'd be happy to repeat exactly what he said if you'd like.

THE WITNESS:
Go ahead, Stan.

BY MR. BHATLA:

Q.   Do you understand that Lieutenant Dunn categorically disagrees with that characterization?

A.   He never told me that, no.  He just



Scott Fontenot

Page 354

wished it go away.

Q.  He said he wished it would go away in the event his demands were fulfilled in the amended complaint, correct?

A.  He never told me that part.  No, he never told me that part.

Q.  You say the Eunice Police Department is currently making a number of reforms, right?

A.  Yes.

Q.  In addition to the body cameras, what are some of the other reforms that are being pursued?

A.  I'm pretty sure they have other trainings they're probably intending.  They created a SWAT team, more like a -- I guess a highly trained team to deal with tactical situations.

There's been a lot of different changes in the police department, you know, it really had been.  And, you know, as far as -- you know, we got new Tasers, we got rid of some of the older ones and every officer has a Taser now, which is a little more safer than, you know, shooting somebody with a gun, you know.

So, you know, there's been some changes

Page 355

that's been implemented.  You know, it -- and you see it.  I mean, it's -- you don't hear about a lot of the stuff, you know, that Dunn was complaining about.  And it's kind of where we're at.

Q.  If a new chief is elected, could he or she cancel the body camera program?

A.  I'm pretty sure they could if they wanted.

Q.  If a new chief were elected, could he or she cancel the SWAT training program?

A.  I'm pretty sure they could.

Q.  If a new chief were elected, could he or she no longer have every officer carry a Taser?

A.  I guess.  I mean, I don't know what the State requirement is on that, but I would assume.  They can change the policies and whatever they want to do.

Q.  So none of the reforms that EPD is pursuing are guaranteed to stay, right?

A.  I mean, not in its current state.  I just -- in my personal opinion, I don't understand how this could be just implemented saying you have to do this unless the court would order it, which I don't even know how that holds up, I really

Page 356

don't.

It just -- we've got to think about it.  It's a small town, a small police department.  You have an elected chief of police who -- like I said earlier, he doesn't even have to have a qualification of a police officer to be the chief of police.  I mean, they can go in and say, All right, we're getting rid of all the computers in here, we're going to do paper reports.

I don't even know if you can do that, but I'm just saying they can do what they want.  It's the craziest thing in the world.

Q.  So no matter what reforms Chief LeBeouf imposes, there's no recourse available if a subsequent chief were to cancel them?

A.  Not to my knowledge.  They would be, you know, crazy to take away that new technology.  But, I mean, that would be up to them.

Q.  And EPD's function and capabilities are entirely subject to who the elected chief is; is that correct?

A.  That's what it seems like, yeah.

Q.  You described Randy calling you and asking you what to do with overtime.  Are there other instances where Randy has reached out to ask

Page 357

you for assistance with something going on at the department?

A.  Not necessarily, unless it was something maybe with, you know, some police cars that were down and they needed to get some more, just things like that, just basic, you know, day-to-day operations where he needs a mayor.

Q.  Are there any other instances where Randy did something to try to make a point to you because he didn't agree with what you said or did?

A.  I don't think anything intentional that I can recall or -- directly or indirectly, I don't recall any of that.

Q.  Are there any other instances where Randy Fontenot tried to shift blame to you for an action that he decided to take?

MR. STAMEY:
Objection to the form of the question.

A.  I really don't know.  I don't know if he did or not.  It goes back -- I don't know what's being said on that side of the building.  I mean, for years -- I'm going to go back.  This is for years, the mentality in the City of Eunice was that if -- the fire department, they hated the



MAGNA
LEGAL SERVICES

Scott Fontenot

November 20, 2024
Pages 358 to 361

Page 358

mayor's office; the police department, they didn't like the mayor's office either.

I didn't know what the heck was going on when I became mayor. Because I worked at the fire department and I remember the tension and I listened to my dad when he was the chief and I saw it firsthand. I said, How can we fix this? But we've got to be open and honest, try to work together.

So, I mean, if they had the disagreements with me and they said it on their side of the building, so be it. I'm just trying to do my best. But -- and like I said, it goes back to old-school mentality. I think those things are changing. You see the change.

We've got a new fire chief. We have a new police chief. You know what I mean? We're evolving. And regardless of who the mayor is going to be, I hope it continues in the positive direction. I'm running for mayor again, though, so hopefully it's me.

BY MR. BHATLA:

Q. Well, good luck.

And what do you think the City of Eunice could do to make sure this situation never happens

Page 359

again?

MR. STAMEY:

Objection to the form of the question.

MR. HEBERT:

Joined.

A. Are we talking about the organization of the City of Eunice, like what I represent?

BY MR. BHATLA:

Q. Or what steps do you think the City of Eunice could take to make sure that the allegations in Lieutenant Dunn's complaint and the resulting events of the litigation, how would those be avoided by the City of Eunice?

MR. HEBERT:

Same objection.

MR. STAMEY:

Continuing.

A. That's really hard and tough to answer, because I would hope, if there's any allegations, whether they're serious or not, that are brought forth regarding wrongdoings of any police officer or anything like that, that somebody takes a look at it, you know.

The marshal's office -- Terry Darbonne,

Page 360

the City marshal, Michael Dunn was all in his ear, he knew about all that. Why didn't they do anything about it? Apparently he went to the sheriff's department. Why they didn't -- why they didn't do anything about it?

They -- I remember them -- I say "them," Michael Dunn and the marshal and some others had a meeting with the district attorney at a local office in town. They invited me to go. I didn't go because it was a setup.

BY MR. BHATLA:

Q. What do you mean by that?

A. Setting me up to go and say what I had to say to where it would be all in this, what we talking about right here. I already heard Michael Dunn's complaint.

I told him to go talk to other people. And they wanted to have a meeting and put all these people in there. And it just so happened after that meeting he filed the thing because he felt like nothing was getting done.

Q. Does the Eunice marshal have the ability to investigate EPD employees?

A. I mean, I don't know if he has authority to investigate employees of the police department.

Page 361

But if there's anything criminal, they have the same authority as our local police department, as the sheriff, with arresting powers.

MR. BHATLA:

All right. For the record, I'll ask the City to produce any Facebook messages referencing Lieutenant Dunn that were the subject of Mayor Fontenot's testimony, including those messages from his neighbor discussing Lieutenant Dunn's character.

And for the record, I call on counsel for Randy Fontenot to produce any notes taken by Randy Fontenot during this deposition.

MR. STAMEY:

Objection to the form of that question.

MR. BHATLA:

That's not a question.

MR. STAMEY:

It's a statement.

MR. DOHERTY:

On what basis?

MR. BHATLA:


MAGNA
LEGAL SERVICES

Scott Fontenot

Page 362

Relevant to the litigation, not protected by privilege. He's not an attorney. It's not attorney work product. It's not privileged.

MR. STAMEY:

How do you know his lawyer didn't ask him to take notes?

MR. BHATLA:

Then his lawyer can assert a work product to that extent. But if he is taking notes, that is not privileged.

MR. STAMEY:

He didn't bring in a notepad without being instructed to bring in a notepad.

MR. BHATLA:

His counsel can say that if that's accurate. For the purposes of the record, I'll call for that production.

MR. DOHERTY:

For purposes of the record, his counsel is not present while you're making this demand. So you may want to make that demand by a separate, formal discovery request.

MR. FEUCHT:

Page 363

As general counsel for the City, I'm going to object to it just on the fact that I do believe he wouldn't be taking those notes without some kind of instruction from his counsel.

MR. BHATLA:

You're welcome to that belief. I'll yield the rest of my time to Mr. Loughlin.

MR. LOUGHLIN:

Thank you. I have a few questions.

EXAMINATION

BY MR. LOUGHLIN:

Q. Mr. Mayor, you mentioned the incident at the KC hall, right?

A. Yes, sir.

Q. And you also talked about you had a serious crime problem in Eunice to be addressed, yes?

A. Yes.

Q. The KC hall involved in the crime problem, that's a locus of crime in Eunice?

A. I wouldn't say that specifically. It's an event center. And I know that they had an event at one time and they had a report of a

Page 364

shooting in the street. And from my knowledge, that was the only incident that ever happened like that at the KC hall.

Q. That's the incident you're talking about with Mr. Dunn's social media post, right?

A. I believe so, yes, sir.

Q. That's the Facebook post?

A. Yes.

Q. Have you read that post?

A. I probably did.

Q. Do you remember if you read it at the time or you read it after the fact?

A. I probably read it after the fact. I'm sure somebody screenshotted it and sent it to me.

Q. You have a Facebook account today, correct?

A. I have one, yeah.

Q. Are you a friend of Randy Fontenot on Facebook?

A. I am.

Q. How long have you been?

A. On Facebook?

Q. Yeah. Roughly speaking.

A. Oh, shoot. Probably since we was all running for office together I'm thinking, probably

Page 365

2014 or something.

Q. Are you a friend of Michael Dunn on Facebook?

A. Yes.

Q. How long have you been a friend of Michael Dunn?

A. Probably around the same time or maybe prior.

Q. The incident at the KC hall I think was in August of 2019; does that sound right?

A. Yeah, I was trying to go back on my messages and see. I believe so.

Q. Were you a friend of Michael Dunn and Randy Fontenot at that time, August 24, 25, 26?

A. On social media, yeah.

Q. Well, yeah, and on Facebook in particular.

A. Yeah.

Q. You mentioned also you didn't know if Dunn's post was detrimental to the department, that's the note I made. Is that what you said? The Facebook post about the KC hall.

A. Yes.

Q. The allegation by Randy Fontenot and perhaps others was that it was detrimental to the



Page 366

department, right?  Yes?

A.  I'm assuming, yes.

Q.  Well, you know that's what they claimed, right?

A.  Okay.

Q.  That's true?

A.  I'd have to go back and review that.

Q.  Chief Fontenot accused Michael Dunn of violating portions of the code of conduct with making that Facebook post, right?

A.  Yes.

Q.  Who drafted the code of conduct, if you know?

A.  I'm not sure.

Q.  And I think it was included in Exhibit 1 that we looked at at the beginning.  Do you remember looking at that, Exhibit 1?

A.  (No audible answer.)

Q.  Who has the authority to put together the code of conduct?

A.  In the police department?

Q.  In the police department, in the mayor's office, in the City of Eunice.  Who can contribute to the code of conduct?

A.  In the police department, it would be

Page 367

the police chief.

Q.  It's strictly the purview of the chief and not you, going back to the Larson Act issues you talked about?

A.  Yes, sir.

Q.  Have you spoken to Chief LeBeouf about changes to the code of conduct or other portions of the police policies and procedures?

A.  No.

Q.  Has he said anything to you?  Did you -- were you a passive listener to anything he said about that?

A.  I believe he said they were going to update it on certain things.  I know he talked about -- maybe because he added the body cams, that he had to have a policy in there regarding the body cams and such; I do remember him talking about that.

Q.  No policy about social media has been updated, right, that you know of?

A.  Not to my knowledge.  I'm not sure.

Q.  But there was an update in this year, right, 2024?

A.  That I do not know.

Q.  You don't know, okay.

Page 368

A.  The fire department is looking at doing that.

Q.  The post that Dunn made about the KC hall, that was about a crime that was about to happen and then did happen, right?

A.  I'd have to read the post again and see exactly what he put.

Q.  The shooting.

A.  But there was a shooting in --

Q.  Yeah.

A.  -- or alleged shooting in the front of the KC hall, which he lives across the street from.

Q.  That would concern Dunn, right?

A.  Yeah.

Q.  It concerns you as the mayor, right?

A.  Yeah.  Any shooting does.

Q.  Crime generally is a matter of public concern in Eunice, isn't it?

A.  Absolutely.

Q.  Are you yourself aware that Dunn's post violated any -- any portion of the code of conduct or any other police department or City of Eunice rule?

A.  No, I mean, I'm not aware of what their

Page 369

policy was to begin with.

MR. LOUGHLIN:

That's all I have.  Thank you.

THE COURT REPORTER:

Anyone else?

THE WITNESS:

I just tried to go and look on my Facebook Messenger from his neighbor.  I can show anyone here as a witness, it shows the message is no longer available.

I've never seen that.  I can show you right here.  And it's from April 23rd.  So I don't know if that was the same thing.  I'm going to go back on my text message with the neighbor and see.

MR. BHATLA:

I would ask that --

MR. STAMEY:

Anybody else have any questions?

MR. BHATLA:

No.

THE VIDEOGRAPHER:

This concludes the deposition.  We're off the record.  The time is



MAGNA
LEGAL SERVICES

Scott Fontenot

November 20, 2024
Pages 370 to 373

Page 370

6:24 p.m.
(END OF TESTIMONY AT 6:24 P.M.)

Page 372

REPORTER'S CERTIFICATE

I, Rita A. DeRouen, Registered Professional Reporter (RPR #6908) and Certified Court Reporter (Certificate #2014018) in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that on November 20, 2024, in the above-entitled and numbered cause, the deposition of SCOTT FONTENOT, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 371 pages;

That this testimony was reported by me in stenographic shorthand, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board;

That I have acted in compliance with the prohibition on contractual relationships, as

Page 371

REPORTER'S PAGE

I, RITA A. DEROUEN, Registered Professional Reporter (RPR #6908) and Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)";

That (sic) denotes when a witness stated word(s) that appears odd or erroneous to show that the word is quoted exactly as it stands.

RITA A. DEROUEN, RPR, CCR

Page 373

defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I am not of Counsel, nor related to any person participating in this cause, and am in no way interested in the outcome of this event.

SIGNED THIS 3RD DAY OF DECEMBER, 2024.

RITA A. DEROUEN
Registered Professional Reporter
Certified Court Reporter

