Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA


MICHAEL DUNN

                          CIV. A. NO.
VS.                       6:21-CV-01535

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, AND
JOHN DOE

   * * * * * * * * * * * * * * * * * * * * * * * * * *


                  June 28, 2023


        Videotaped deposition of TONY A.

   KENNEDY, taken pursuant to notice, was

   held beginning at 9:03 a.m. on the above

   date at Doubletree by Hilton Lafayette,

   1521 W. Pinhook Road,, Lafayette,

   Louisiana 70503, before RITA A. DEROUEN,

   Certified Court Reporter and Registered

   Professional Reporter.



           MAGNA LEGAL SERVICES

             (866) 624-6221

            www.MagnaLS.com


                                              **EXHIBIT G**



Page 2

APPEARANCES

FOR THE PLAINTIFF:
SIDLEY AUSTIN, LLP
BY: JAMES R. HORNER, ESQ.
BY: ALEXANDRA BIELER, ESQ.
BY: ERNESTO CLAEYSSEN, ESQ. (Appearing via Zoom.)
787 Seventh Avenue
New York, New York 10019
212-839-5300
jhorner@sidley.com
abieler@sidley.com
eclaeyssen@sidley.com

- AND -

KEARNEY LOUGHLIN, ATTORNEY AT LAW
BY: KEARNEY S. LOUGHLIN, ESQ.
602 Boulder Creek Parkway
Lafayette, Louisiana 70508
337-534-8803
kearney.loughlin@gmail.com

FOR THE DEFENDANT RANDY FONTENOT:
ERLINGSON BANKS
BY: KAITLIN A. WALL, ESQ.
301 Main Street
Suite 2110
Baton Rouge, Louisiana 70801
225-218-4446
kwall@erlingsonbanks.com

FOR THE DEFENDANT RYAN YOUNG:
NEUNER PATE
BY: JASON REED, ESQ.
1001 West Pinhook Road
Suite 200
Lafayette, Louisiana 70503
337-272-0348
jreed@neunerpate.com

Page 3

APPEARANCES: (CONTINUED)
FOR THE DEFENDANT CITY OF EUNICE:
BECKER & HEBERT, LLC
BY: MICHAEL D. HEBERT, ESQ.
201 Rue Beauregard
Lafayette, Louisiana 70508
337-233-1987
mhebert@lawbecker.com

FOR THE DEFENDANT VICTOR FONTENOT:
STAMEY LAW FIRM, LLC
BY: JOSEPH B. STAMEY, ESQ.
727 Second Street
Natchitoches, Louisiana 71458
318-951-1024
joe@stameylawfirm.com
(Appearing via Zoom.)

Also Present:
  Andrew Grover, Videographer
  Lauren Sylvest
  Michael Dunn (Appearing via Zoom.)

Reported by:

  Rita A. DeRouen, Certified
  Court Reporter No. 2014018
  in and for the State of
  Louisiana

Page 4

INDEX

|                        | Page |
| STIPULATION            | 5    |
| REPORTER'S PAGE        | 172  |
| CERTIFICATE            | 173  |
| EXAMINATION            |      |
|   BY MR. HORNER        | 7    |
|   BY MR. HEBERT        | 168  |
|   BY MR. LOUGHLIN      | 169  |

* * * * *

List of Exhibits

Exhibit #1                          82
   (Lt. Michael Dunn Internal Investigation,
   Incident Date 8-25-19,
   CityofEunice_Dunn_0000176 - 181)

Exhibit #2                          97
   (Document marked "Confidential,"
   CityofEunice_Dunn_0001645 - 1656)

Page 5

STIPULATION

It is hereby stipulated by and among counsel for plaintiff and counsel for defense that the deposition of
       TONY A. KENNEDY
be taken before RITA A. DEROUEN, Certified Court Reporter, for all purposes, pursuant to notice and to the provisions of the appropriate statutes of the Federal Rules of Civil Procedure.
The parties hereto waive all formalities in connection with the taking of said deposition and the reading and signing thereof, except the swearing of the witness, and the reduction of the questions and answers to typewriting.

* * *




Page 6

THE VIDEOGRAPHER:

We are now on the record. This begins Videotape Number 1 in the deposition of Tony Kennedy taken in the matter of Michael Dunn vs. Randy Fontenot, et al., being heard before the U.S. District Court for the Western District of Louisiana, Docket Number 6:21-cv-01535.

This deposition is being taken in Lafayette, Louisiana on June 28, 2023, beginning at 9:03 a.m. This deposition is being taken at the request of plaintiff.

My name is Andrew Grover of Magna Legal Services. The court reporter is Rita DeRouen with Magna Legal Services.

At this time, would counsel please introduce themselves for the record.

MR. HORNER:

James Horner on behalf of plaintiff.

MR. HEBERT:

Michael Hebert on behalf of the City of Eunice.

MR. REED:

Jason Reed here for Ryan Young.

MR. LOUGHLIN:

Page 7

Kearney Loughlin on behalf of Michael Dunn.

THE VIDEOGRAPHER:

Thank you. And by Zoom?

MR. STAMEY:

Victor Fontenot -- Joe Stamey on behalf of Victor Fontenot.

THE VIDEOGRAPHER:

And calling in?

MR. REED:

You're up, Kaitlin.

MS. WALL:

I'm sorry. I'm sorry, Kaitlin Wall on behalf of Chief Randy Fontenot.

THE VIDEOGRAPHER:

Thank you. Would the court reporter please swear in the witness.

TONY A. KENNEDY, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HORNER:

Q. All right. Good morning.

A. Good morning.

Q. My name is James Horner. I'm an attorney

Page 8

from Sidley Austin. I represent Lieutenant Michael Dunn in this ongoing dispute with the City of Eunice, Randy Fontenot, Victor Fontenot, and Ryan Young.

Could you please state your full name for the record, please.

A. Tony A. Kennedy.

Q. Thank you. And how would you like to be referred to? Lieutenant Kennedy? Mr. Kennedy?

A. Tony is fine.

Q. Tony, okay, thanks.

Have you ever been deposed before?

A. Yes.

Q. Okay. And by the way, I'd just like to offer my condolences and thank you for being here.

A. Okay.

MS. WALL:

Can y'all move the phone closer to the speaker?

MR. REED:

Sure, we got it.

MS. WALL:

Thank you.

BY MR. HORNER:

Q. You will be testifying under oath and your

Page 9

answers will be subject to the penalty of perjury.

Do you understand that?

A. Yes.

Q. Your statements here today have the same effect as though they were given in a court of law.

Do you understand that?

A. Yes.

Q. I'm going to ask you a series of questions. If I don't -- if you don't understand a question, please ask for clarification; otherwise, I'll assume you understood the question.

Do you understand that?

A. Yes.

Q. Would you please provide verbal answers to all questions. The reporter can't pick up head nods.

Do you understand?

A. Yes.

Q. If at any time you need a break, you can ask for one. If there's a question pending, you may need to answer the question before taking a break.

Do you understand that?



MAGNA
LEGAL SERVICES

Page 10

A. Yes.

Q. And is there any reason why you're unable to testify truthfully and completely today?

A. No.

Q. You mentioned you were --

MR. STAMEY:

Could everyone -- for the record, could everybody who's participating and appearing via Zoom also be identified, please.

THE VIDEOGRAPHER:

Mr. Stamey, you're the only person participating by Zoom.

MR. STAMEY:

Thank you.

BY MR. HORNER:

Q. You mentioned you were deposed before. How many times?

A. In my career, maybe two or three times I guess, may have been more. Over --

Q. What type -- I'm sorry.

A. Over traffic incidents. I mean, nothing civil like this or nothing as far as a big thing. But I've been through depos.

Q. Okay. Have you ever testified at a trial

Page 11

or other court proceeding?

A. Yes.

Q. Yeah. How many times would you estimate?

A. Put it over 30, over 40 maybe.

Q. Have you ever been a plaintiff or defendant in a lawsuit?

A. No.

Q. And you're not represented by counsel here today, right?

A. No.

Q. Okay. What, if anything, did you do to prepare for this deposition?

A. (No audible response.)

Q. Nothing?

A. Nothing. I don't know what -- just prepared myself to come tell what I know or whatever required that they ask me, that's about it.

Q. You didn't review any documents?

A. No.

Q. Did you bring any documents or notes with you?

A. No.

Q. And did you speak with anyone besides your counsel about today's deposition?

Page 12

A. No.

Q. All right. What's your educational background?

A. I have some college, a couple years of college.

Q. Okay. Do you have any professional certifications or licenses?

A. Pertaining to police department-wise, I mean, I had a lot of licensing pertaining to law enforcement.

Q. Okay, gotcha. And after those few years of college, what was your first job?

A. First real -- car wash, but then I went to the military and I served for six years in the military.

Q. Okay. And then what?

A. Then Eunice Fire Department for ten years, and then I switched over to Eunice Police Department, where I was employed until January of this year.

Q. And how many years had you been employed by the Eunice Police Department?

A. 25.

Q. What position did you begin your employment with Eunice Police Department?

Page 13

A. As a patrolman.

Q. And how long were you in that position?

A. Two, three years maybe.

Q. And then what came after that?

A. Just went to detectives. And I stayed in detectives and got promoted as sergeant of detectives. And stayed there quite a while 'til I was promoted to lieutenant and I had to go on the road for a minute. I went on the road for a little bit and was brought back as chief of detectives later on. And I retired as deputy chief.

Q. When did you become chief of detectives?

A. About seven, eight years ago.

Q. And when did you become deputy chief?

A. About -- it was two years before I retired.

Q. And you mentioned you retired. Why did you decide to retire?

A. I did my time right there. Move on and I've been -- the sheriff's department, was interested in working over there. So drawing retirement and still working at my other job, more money.

Q. What's your current job at the sheriff's

4 (Pages 10 to 13)



Page 14

department?

A.  Detective.

Q.  Have you ever been employed besides working for the Eunice Police Department or Eunice Fire Department with any other position for the City of Eunice?

A.  Other than the fire department and the City of Eunice, that's it.

Q.  When you first joined the Eunice Police Department, did you have to complete any training?

A.  Yes.  You have to go to the academy and all that.

Q.  Did you refresh your training periodically at the Eunice Police Department?

A.  Yes, we had training.

Q.  Are you familiar with the Eunice Police Department's official policies and procedures?

A.  If the new chief didn't change them, pretty -- basically, yes.

Q.  When you were there, was there a place you could find these policies and procedures?

A.  Yes.  They had a procedure on a booklet.

Q.  And are Eunice Police Department officers expected to follow these policies and procedures?

A.  I mean, yeah, they supposed to.  You ask

Page 15

me another question I'll have to tell you something else.  But yeah, they're supposed to, yes.

Q.  We'll get to that.  Thank you.

And who set these policies and procedures?

A.  That's the chief, the new chief that come in; they redo it, revise it.

Q.  Aside from the former policies and procedures, are there unwritten policies and procedures that Eunice Police Department officers are expected to follow?

A.  I would -- I would say you can't really expect some unwritten stuff to be followed when it's unwritten.  I mean, I struggle to answer that one because really -- it's kind of like commonsense stuff that we don't do.  But really everything is supposed to be documented for -- you know, for protocol or what -- may have you.

I wouldn't -- it's hard to say that you've got unwritten rules and then -- I really don't say I would answer that like that to say it's -- if it's not written, it would be hard to say that you have to follow something that's not in the procedure.

Q.  Okay.  Is there a process for

Page 16

investigation when officers are accused of violating the rules, the written ones?

A.  Yes.

Q.  Could you explain that process.

A.  Well, first, usually you get the letter of complaint and stuff, whatever the stuff is.  And then the chief gets to -- well, it would be the chief that has the authority of going in and ordering the investigation.  I think that authority was taken, so I guess it would be like the mayor, they present it to them and he like, Okay, order an investigation.

And from that point on, you call the -- if you need to talk with the officer -- or supervisor first, let him know that he's under investigation.  And then it goes on to allow the officer, if you need to talk to him, you record and sign this bill of rights and things like that while you talking with them and then, you know, you conduct your investigation.

If you're going to record audio, video, whatever, you document all that stuff.  We had a checklist, actually, that Eunice P.D. had us to follow the investigations, we follow the little checklist.

Page 17

And pretty much, after you get your final investigation, your written report, you turn it back over to the chief and he'll forward it back to the mayor and they'll determine what's in it just when -- their reaction that forms it or whatever.  Nothing ever happens out of it.

Q.  In your experience, was that procedure always followed?

A.  I mean, to my -- to my knowledge, I mean, that I know of, you know.  But I can't say for everybody because I wasn't the only one that did investigations, they had other people that did investigations as well.

Q.  Okay.  And in your experience, were complaints always investigated?

A.  If it's written, it's supposed to be investigated.  If you do a critical incident on it, it's supposed to be investigated.

Q.  And you mentioned different people did the investigating.  Who were responsible for doing investigations?

A.  At the time, I was one; they had Lieutenant Young; and at the time, Deputy Chief Daigle, when I was still chief of detectives, he did investigations as well.

MAGNA
LEGAL SERVICES

Page 18

Q. Was it based on the positions those individuals had at the time?

A. Of who would get assigned to do it?

Q. That's correct.

A. That's up to whoever the chief would decide to assign it. He would be like, Hey, you got this case. And that's -- to be honest, you know, it's small departments.

And to be honest with you, a lot of -- it's hard, you know, to order someone to do an investigation on someone you know, you know, like that and try to be -- do it the best you can. It's hard investigating other officers at times.

Q. Are you aware of officers getting different consequences for the same violation of the rules?

A. Tell you the truth, I mean, I don't really know, because I don't -- I wouldn't sit there and, Well, this one got this one for that or whatever. I really didn't -- I don't -- because like I said, we don't have the final determination on what the punishment is, or I didn't, put it that way.

Q. And just -- I know you spoke a little bit about this, but could you talk about the role that Chief Fontenot played in overseeing the proper

Page 19

conduct of the Eunice Police Department officers.

A. Well, I mean, he's -- the chief is the final word on what -- you know, how stuff is ran or what procedure orders you wanted to change or write or revise. And, you know, just mainly what the boss do is make sure everybody doing what they supposed to be doing.

Q. What was his role again in imposing discipline?

A. He would start the stuff, but his -- he would make the recommendations. I think when you leave, he'll make recommendations.

Q. So he would make recommendation but they weren't binding?

A. I mean, I don't know about if they binding or not, but he could make recommendations to the important authority, which would be the mayor, to what -- to as what type of punishment he would deem necessary for that.

Q. But the ultimate decision-making authority was up to the mayor?

A. Yes. That's they -- at one time they did have him, he had the authority to do it, but I think they changed it to -- made a way or something to where it's the mayor that had the

Page 20

final say-so on that.

Q. Do you recall when that was?

A. No, I don't recall.

Q. Do you recall what caused that change?

A. Because I think they had a meeting at one point or something and they kind of took their ranks away from them or something like that, from the way I understood.

Q. Was there any particular incident that caused the meeting?

A. I don't really know because, I mean, I found out about it because he was complaining about it. But I didn't -- you know, there's some things that -- I wasn't involved in everything. And some things that didn't involve me, some...

Q. Okay. And then just, again, I know you talked a little bit about this, but just to drill down, what was your role as the deputy chief overseeing the proper conduct of the Eunice Police Department officers?

A. Make sure they was doing their work on the road, doing their paperwork and stuff, you know, even to door checks where the lieutenants doing what they supposed to be doing over supervising their employees.

Page 21

And, Lord, I went up and beyond because I also had evidence to do, and that took a lot of time too. And like I say, scheduling the workers, make sure they had enough workers that night; if they were going to be short I had to find somebody. And I also was in charge of the fleet, the units, and stuff like that. So it was a job of many hats.

Q. And in addition to occasionally conducting investigations, what was your -- did you have any other role in imposing discipline on police officers at Eunice?

A. Only if I'm -- if I'm not investigating, then whoever -- no, I never -- I never ordered any investigation. I mean, I could if somebody was messing up. But I would have to go, you know, let the chief know.

Or I'll do a critical incident myself or something like that if they did -- messed up something that -- you know, messed up really bad or something or messed up, if I decided that disciplinary action was needed or warranted or -- that's basically...

Q. And so, on occasion, you did report officers yourself after witnessing this conduct or

6 (Pages 18 to 21)



Page 22

a violation of the rules?

A. I don't think, in my little time there, I ain't -- I don't really know if I did many. Because a lot of -- I did a lot of times where I may have did oral reprimands or something or something or something was brought to attention that they did or something like that. So I very seldom did a full-out where I ordered an investigation.

Q. But it did happen a few times, you might say?

A. I can't say I remember whether I ordered a full. I just -- I don't remember at this point right now if I ordered one. I did one, but it don't mean that -- if I do an investigation, don't mean that I ordered an investigation. You get it?

Q. Yes, I understand.

A. Yes.

Q. And how would you describe the way you were treated generally at the Eunice Police Department?

A. There was -- I was treated pretty well. Because I tried to treat people with respect. And I really didn't have too much problems with people that -- at least didn't let me know about it or

Page 23

whatever. But I pretty much was -- tried to be respectful in dealing with them or whatever the situation is.

Q. Were there any instances in which you felt you were treated unfairly?

A. When you working, sometimes you always going to feel that. Or if the chief and I didn't see eye to eye on some things, yeah, I felt -- sometimes I felt -- you know, if I thought something was -- that I like brought to his attention and he didn't see it my way, yeah, you know, you'll feel upset about it or think some things like that thought, you know.

Q. Could you give an example of when you didn't see eye to eye with the chief?

A. I mean, it was times when like patrol-wise or something that I seen, Look, Chief, let's do it this way or something like that, or let's -- I mean, I'm trying to get to exactly the point, but my mind right now is going a mile a minute.

Let's say -- even for like we were doing lates, we were working lates where the officers were working and getting the chance to work overtime or something like that. Then he like, Well, we're not getting enough -- no, this not

Page 24

bringing enough revenues and they're not -- yeah, but the officers rely on that to, you know, make a little extra money to increase they pay. Oh, no, not like that.

And I thought sometimes, you know, it be like that, I just didn't agree with it. And, I mean, that's giving some stuff like that, that I didn't agree with some things.

Q. Do you have any other examples that come to mind?

A. Not right now. I mean, I'm sure 25 years there, you know, I wasn't always happy. I'm just not remembering some things that probably I was -- you know, it happens.

Even being the second-in-charge, you still have somebody in charge of you that you still have to follow orders as well.

Q. Aside from the chief, did you feel that anyone else at the Eunice Police Department ever treat you unfairly?

A. No, I can't really say that -- not knowingly anyway or something. I mean...

Q. When did you first meet Chief Randy Fontenot?

A. Lord, years before he became police -- the

Page 25

chief of police. Because he -- I was in the reserves when he was a lieutenant with the Eunice Police Department.

Q. Okay. And how did that meeting come about?

A. I mean, I used to go work -- as a reserve, you go work the shifts, and he was the shift lieutenant. You start knowing him through just working.

Q. Okay. So this was a reserve in the police department, not a reserve in the military?

A. No, a reserve in the police department.

To clarify, while I was fire department for those ten years, I also was a police reservist, that's how I ended up going over, yes. But he -- yeah, so that's how I got to know him then.

Q. How long did you serve under him?

A. As far as with the police department? He did, what, eight years, two terms, eight years.

Q. And how often did you have direct contact with him?

A. Just about -- well, when I was deputy chief, just about every day. I mean, he was coming with something and I -- POB or bills or



Page 26

something like that. So pretty much was at times a lot of contact.

Q. Did you have contact with him outside of work?

A. Every blue moon. Not really. Every blue moon.

Q. And do you still -- strike that.

Are you still in contact with him?

A. Yeah. He -- he -- every once in a while he have -- for older officers, he have meeting -- not meetings, dinners at his house and, you know, I'll go.

Q. And how often would you say those occur?

A. That's every two or three months or maybe longer. I mean, I went to maybe a couple of them. That's since I retired. So...

Q. What was your opinion of Randy Fontenot as chief? Did you think he did a good job?

A. We had good -- I say some good and bad things about him. He did a fair job I think, pretty good -- pretty good job. I mean...

But to say it's -- to say who am I to judge, because maybe if I would have did things differently than the way he did it. But, you know, that's really kind of a hard question to

Page 27

say, to say -- to judge somebody on how they did.

I mean, everybody has his way. It was his show. But to me, I thought we had some good times, good and bad, I'm going to put it that way.

Q. Could you give an example of the good times?

A. Well, I mean, when it come out when stuff was going good, you know, running stuff good and, you know, listen to feedback and, you know, doing what's best for your department and stuff like that and looking out for your people.

Q. Could you give an example of the bad times?

A. Sometimes where he didn't see things kind of our way or something like that. He was more, you know, sometimes -- like I say, it's a political office, and maybe sometimes he couldn't do what we wanted him to do, you know. And so...

Q. Is that essentially what we talked about earlier?

A. I guess so, that kind of -- yeah. And like I say, little -- little things that he didn't see it our way or he didn't -- you know, it's not like he still had to do things his way, and just sometimes I didn't think it was the best way.

Page 28

But, you know, even somebody could do that to me if they didn't like the way I did it -- did some things. So -- but overall, I'd say the overall experience was all right. Because, I mean, nobody's perfect.

Q. What was his reaction when you had a disagreement with him?

A. Oh, he could -- he had a temper sometimes. I mean, we got into it. You know, he'd get -- sometimes he'd get frustrated or he gets mad or something like that. But he wouldn't stay mad.

Just like he -- he would, you know, get mad, "Oh, goddoggit," and maybe hit his desk or something like that. Yeah, yeah, I'm still here, you know. And then he would, you know, walk out maybe mad and then he would come back later, Oh, yeah, I'm sorry.

Okay, just saying, I ain't changed my opinion, whatever we talked about and whatever I said, I still feel the same way. All right. And that was it. It was just...

Q. So you feel, when there was a disagreement, that he would not hold a grudge against you?

A. Well, I feel that he never held a grudge

Page 29

against me. I mean -- because, I mean, we had arguments but it never came back where I think it was a grudge thing.

Q. Did you ever feel that he took some sort of action against you because you had a disagreement with him?

A. No.

Q. Are you aware of Chief Fontenot's reputation in the law enforcement community?

A. What you mean?

Q. In the local law enforcement community, what's Chief Fontenot's reputation?

A. I can't really answer that. I don't know. I mean, what are people saying about him or something? I mean, I don't know. And that's as far as I -- I don't know.

What other people saying about him as far as -- that's a political office. You have some people saying that he did a good job, some people saying he didn't do a good job. But who am I to judge, that's what I'm saying. Because people change candidates during the course of times or whatever.

Some people -- yeah, I heard some people say, "Well, I didn't think he did a good job," and



Page 30

some people thought he did an all right job, and some people think he did a good job.  But that's the most I can really say about that.

I can't elaborate more to judge other than for myself what I think and my overall -- I mean, just like everybody else, he did some good things and then he did some stuff that I think wasn't so good.

Q.  Do you think he treated officers at the Eunice Police Department fairly?

A.  As far as some -- as far as I seen, there's some that I think he was -- he got upset with a lot of them.  Now, like I said, I can't go underneath him and say if he was feeling that, Oh, I'm doing this because I don't like you, because I can go over there, because we never had those -- he never -- I can put it this way, he never ordered me to do something to somebody because he didn't like them.

Because he know, first of all, I wouldn't play that, that's just the way it is.  I think, in my own opinion, that he had some -- maybe had some, I guess, difficulties with some people, I guess, you know.  I can't go and say what's in his mind or how -- that he never came and told me.

Page 31

That's what I can say, that he never came and told me, I don't like him, I need you to do this to him or none of that.  So that's -- I mean, so under mind, what's in his mind, best I can see.

Now, if we getting to what we're here for, I can tell you this, that I think that question you were going to ask, if him and Dunn had problems between each other, yeah, I think so.

Q.  So you do think he's treated some people more favorably than others?

MR. REED:

Object to form.

A.  I wouldn't say it was -- I know he had problems with people, but I don't know if it would have caused him to treat somebody better than the other when they was going through what they was going to.

Because on the same realm, I played mediator between a lot of them, let me get that out there.  You know, and there was some times that I spoke with Dunn about some stuff and sometimes when chief came about some stuff right there.  I know they had problems.

That I can -- you know, being honest, I think they had problems.  But he never like came

Page 32

out and said, I want you to get him and get him because I don't like him.  I can't lie on that either.

But I do think what I know, what I judged out of it, that they were going through things.  Because Dunn would get mad at him, he would be mad at Dunn and vice versa.

BY MR. HORNER:

Q.  So he never -- strike that.

Did he ever ask you to do anything that you were uncomfortable doing?

A.  Like I said, it was something I'll tell him, but that's -- you know, but he had -- he asked me to do things that was, you know, within the scope of doing it, like some things with -- what I think it was, something with the change of shift or something that he said, Well, we need another lieutenant at night, get Michael Dunn to be at night.

I'm like, Okay.  When I went and talked with him I'm like, Damn, this is not my idea, this is Chief's, but he wants you to -- you know, we're going to have to switch it and stuff like that.

You know, he would get mad and get -- blow up.  He'll get mad at the chief or something like

Page 33

that or whatever.  That's I guess the most I can say, which all refer to do I think that they had issues.  Yeah, I think they had issues.

But I'm not going to sit here and lie on either one of them or even them and say that he told me to do something vindictive to him just because he don't like him because, like I said, that would have never -- that would have never flew.

Because I didn't have no problem.  I mean, like I said, I guess I had more arguments with Chief than I did with Dunn, but at the same time, still trying to get the department to go on when you still have people feuding.  You know, you do what you can talking-wise, like, Hey, settle down, don't give him no reason to do this, don't give him no reason to do that, just do what you're told.

Because, you know, lawfully stuff like that.  Because like I say, because I would get some orders to change the shifts or something with that.  Okay, that's within things, he has the right to do that.  But I never was geared where he said, Get him because he doing this or that.

Q.  Were there instances in which he -- just



Page 34

to go back to the beginning of that answer, were there instances in which he asked you to do something -- Chief Fontenot asked you to do something and you said you weren't comfortable doing it?

A. That's what I'm saying, he never -- he never would come there because he know I wouldn't do nothing that's right. So he knew he couldn't come that way with me or whatever because...

Q. You testified that he had a role in enforcing Eunice Police Department policies, correct?

A. Yes.

Q. And do you think he did that fairly?

A. I -- that -- I -- I think because -- no, because some things I think he paid more attention to others than others. I mean, you know, like some -- some was more -- meant more to him, I guess, than other little misdemeanor stuff.

So like I say, it's still hard for me to say he didn't do a good job because everybody is different and they feeling of doing stuff is different. But -- and which I guess some of the orders or some of the procedure orders have more impact or meaning than others.

Page 35

So I can't say he followed all of them to the tee, I can't say that. And I guess I'm going to assume his status he could, I guess. But then again, I'm still -- you know, it's a judgmental thing, hard to say for that. I would want to say he did the best he can at it but...

Q. When you said he paid more attention to some things than others, could you give more detail.

A. I'm guessing. What I'm saying by that is because you got some bigger procedure orders that you can mess up than the little ones, like, Okay, you supposed to shave, you didn't shave today. Okay, that's not going to be high on somebody's chart.

Now, on the other hand, if you at a higher level and you beating some citizen up there, you know, he's going to pay more attention to that. That's just the way -- because that's all procedure orders, that's what I'm saying.

Q. Has he -- did he ever -- strike that.

Did he ever talk to you about Lieutenant Dunn?

A. We had some talks about Lieutenant Dunn, yes.

Page 36

Q. And what did he say in those conversations?

A. We had a lot of con -- I mean, if he was upset or something happened or -- well, why is he doing this or -- I don't know. Because sometimes that I guess where they didn't -- they didn't see eye to eye on something like that or whatever, it was times where he, you know, I'm having trouble with the people saying Lieutenant Dunn doing this, Lieutenant Dunn doing that, and stuff like that.

You know, and I'll say my opinion or something. If I ain't heard nothing about that, I'd say, "Well, I never heard nothing about that," or something like that. Because like I said, most of my time was playing mediator between them two.

Q. Did he ever speak -- strike that.

Did Chief Fontenot ever speak with you about this litigation?

A. I never even really knew what's going on with nobody other than I'm hearing stuff. I didn't really know to say that, you know, we know that it was going on. Or I can't really say that he came and said, Well, this is what they saying or that's what they saying, I can't really say that.

Page 37

Now, over the past and heard him talking to the secretary or saying -- him say something about something, but that was very little that I heard. But that was it.

But if he ever came and said, Hey, look, this is going on, this is what you need to say or they say or they say that; no, not in that way. Because I ain't even really talk with nobody about what really was going on. I mean, if anything, I guess I can only say that Lieutenant Dunn told me a little bit about something that somebody said about me. That was basically it.

Q. So you don't recall any direct conversations between yourself and Randy Fontenot about this case?

A. Like I said, he would not say direct contact; he was telling the secretary some stuff. Or I know he would come back and be upset, you know, that somebody said this or that.

But he never, oh, you know, sat there and with all them sitting there and say, "Well, this is what this one said, this is what this one said." He was, you know, like I said, in Ms. Sherry's office. I did hear him upset, being upset about some of the stuff that went.

10 (Pages 34 to 37)



Page 38

But we're talking about days of doing this. So I mean, you know, I heard him maybe on a few occasions doing that. But he never really out there and said, This, this, this, and that, whatever, you know. I never -- I can't really say that.

Q. When you say that he would come back upset, what do you mean by that?

A. Well, because if it didn't -- you know, I guess if he didn't have a good day, I guess, you know. Not upset with everybody. I'm saying he was talking -- when I hear him talking with Ms. Sherry, he was, you know, I guess venting, I guess.

Q. He would only vent to his secretary though?

A. Well, if he did that I'm around, I mean, I can't say that I'm the only one that I heard because their office was like right there and mine's was -- I have to pass right by and he was up in there, or if I walked in there he was telling her something. But that's the extent of it. He didn't really go in, like I said, a whole lot of details.

Q. So he wouldn't vent to you?

Page 39

A. Not about the case too much. Because I mean, like I said, he would talk with Ms. Sherry and stuff like that and he was like -- and then that was basically it. I was like, Okay. I wouldn't entertain it either and stuff like that.

Q. You testified earlier that the City restricted Chief Fontenot's authority, correct?

A. Yeah.

Q. Did you ever hear him blame Lieutenant Dunn for that change?

A. I can't -- I can't really recall if I did hear him say that.

Q. Could you please describe your relationship to Victor Fontenot.

A. Regular working relationship with him.

Q. When did you first meet him?

A. When he came to work with Eunice P.D. I don't know how many years ago. But I know he came -- he was my jailer when he first came and then he ended up working his way up through the ranks and being an officer and then narcotics. So I ain't even know how many years that is, about seven, eight years maybe.

Q. And how often did you have direct contact with him while you were working with him?

Page 40

A. Well, when he was my jailer, every shift. At least after that he went to start -- when he became a police officer, he started working narcotics and I would -- when I was chief of detectives, okay, he was still kind of working under me and they would do their own little narcotic thing.

So we would talk off and on passing through or whatever. He would update me on stuff that he was doing sometimes.

Q. And did you ever have contact with him outside of work while you were working together?

A. You mean like going somewhere with him or something like that?

Q. I suppose any sort of contact with him outside of work.

A. No, I never -- I mean, we had phone conversations when you're not working maybe pertaining about work. But in a contact, I don't know what you're talking about exactly. Like he just calling me to call or contact or me going to his house or he come to my house or something like that?

Q. I believe you testified earlier that once in a blue moon you would have contact outside of

Page 41

work with Chief Randy Fontenot when you were working together.

A. Yeah, because he have the stuff. But I mean, that's what I'm saying, outside of work-related, because we would talk on the phone if work-related. Because if he'll call me and ask me a question pertaining to work, yeah. But as far as any personal stuff with him and I hanging, no.

Q. And are you still in contact with him?

A. No. He's not even working with us no more.

Q. What was your opinion of him as an officer?

A. I -- I -- poor.

Q. And why would you say that?

A. Because I think he lied a lot. He did some things unorthodox. And some of his so-called CIs that would pass information, just it never panned out, it just never panned out. And that's...

Q. What are the instances in which he lied?

MR. HEBERT:

I just want to make a general objection for the record before we go too

11 (Pages 38 to 41)


MAGNA
LEGAL SERVICES

Page 42

far. This came up yesterday at the deposition even though I wasn't there.

Although we have a standing confidentiality order in place, I don't think it's sufficient to address issues relating to confidential informants.

I just wanted to ask that the witness not name names of confidential informants on the record, although we do have the ability to designate some pages in the deposition as the --

MR. REED:

I think it was highly confidential.

MR. HEBERT:

-- highly confidential.

And we addressed this in a conference call a couple of months ago but it's never really come up until this week. That -- I don't believe that the standing order is sufficient to protect with regard to confidential informants.

So I would -- before the witness begins to speak, I would object to the disclosure on the record of any names of confidential informants.

Page 43

If that is an issue that we feel like we need to explore by names, then I think that's something that we probably need to address with the court in some fashion; perhaps we could, you know, even do it in camera or something.

But I just want to object to even the possibility of him saying on the record and then we later designate this as highly confidential, that I don't think that's a sufficient protection, both for the protection of the named informant and for whatever officer has gathered the information or thinks that that person is an informant.

I think there's serious safety concerns for both of them. So I don't have any general objection --

MS. WALL:

I would like to join the objection.

MR. HEBERT:

I don't have any --

THE COURT REPORTER:

Ms. Wall, can you put yourself on mute, please. We're getting some

Page 44

feedback.

MR. HEBERT:

Kaitlin, if you don't mind, let me finish. So the -- the -- I forgot where I was exactly.

But the witness was not asked directly to name names, but I feared that in the course of his answer he might inadvertently name the name of a confidential informant. So I wanted to heighten everyone's awareness of this issue on the record.

And I would object now before the witness begins to speak to the witness's disclosure of the names of anyone that he believes might have been a confidential informant that might be responsive to his answer.

Other than that, I don't have any fundamental objection to the general question, but if we -- but naming names is my concern and I would object to that.

MR. REED:

I join in that objection.

MR. LOUGHLIN:

Page 45

The basis of the objection, as I understand it, is there's a standing order which doesn't cover the names of confidential informants, and they can be designated in the transcript as highly sensitive, but you object to having a name spoken?

MR. HEBERT:

Yes. I don't believe that even putting a name on the record is sufficient. I think that's something that we ought to handle somewhere outside the context of a deposition.

I don't think even putting it under seal or something like that is going to be sufficient, at least at this point, at least in the context of this proceedings.

MR. HORNER:

Can I ask two questions? One, does that apply to people that have been named in discovery materials that have been produced?

MR. HEBERT:

What do you mean by that question?

MR. HORNER:



Page 46

If there's like an individual -- an individual, you know, in written discovery that has been produced to us, has been -- that individual has been named as a potential informant, would that objection still apply to discussing that individual?

MR. HEBERT:

I would say yes.

MR. HORNER:

But what would be the objection? The person has already been named. The cat's out of the bag to the extent -- I mean, I'm not really sure -- one second, let me finish.

I'm not really sure that -- how the names of these individuals would even escape the bounds of this litigation or what the risk is. But if there's someone who's actually been -- if they've been named in discovery materials to us, the cat's out of the bag. I mean, you can have certain details, but it's not like the identity is a secret.

And maybe, you know, when we -- if I ask about those individuals you may not

Page 47

have an objection, but in practice --

MR. LOUGHLIN:

What's the context in which the identity is going to be made known to the other side or to anybody?

MR. REED:

If you've got a depo transcript and it gets out there, you're talking about people's lives.

MR. LOUGHLIN:

I'm saying, if the name is never revealed in a transcript or otherwise.

MR. REED:

That's my concern, is whether it's revealed in a transcript obviously.

MR. LOUGHLIN:

I mean, when are the names going to be disclosed and in what format?

MR. HEBERT:

I don't know. And also, I would say that, from the best of my recollection, I think it was you guys that gave names of people that purport to be CIs and not us. So I'm not sure -- I thought you were -- I thought you were trying to indicate there

Page 48

was some kind of a waiver on our part by something that we gave you in discovery.

But I don't -- I don't believe that to be the case. I don't have anything in front of me, but I don't believe that to be the case.

I think those were names that you guys sent us that purport to be confidential informants; I don't know whether they are or not. But I just -- before this witness -- I didn't know what this witness may or may not say about that, which is further answer to your question about, you know, is it the cat out of the bag. I have no idea.

I don't know what the witness is going to say about what -- about what you released as purported confidential informants.

MR. HORNER:

Okay, well, I think my plan is to ask similar to yesterday, it's not going to be where we're going to ask about certain individuals. So I mean, if that was -- if yesterday was okay for you, then I think

Page 49

we're --

MR. HEBERT:

I wasn't there when that occurred but it wasn't okay.

MS. WALL:

I was there when it occurred. We objected. To the extent that you include -- if you name the person and you identify them and then in the context also say confidential informant or anything like that, we did object. It's statutory. Okay? We did object.

MR. HORNER:

Sure, but it already happened, is what I'm saying, right.

MS. WALL:

No. We stopped it. When she said -- when she used the guy -- the identity in conjunction with the term "confidential informant," we did not -- we stopped it there. It did not go forward.

MR. REED:

And there was also a stipulation to mark those pages highly confidential by all parties.

13 (Pages 46 to 49)



Page 50

MR. HORNER:

Well, we have no objection to the highly confidential, obviously. I mean, we don't want these names to get out there either.

MR. HEBERT:

Let me -- let me just keep going on this one point with regard to the statutory.

There is -- under state law, there is a political subdivision that the state has a privilege to refuse to disclose the identity of a person who has furnished information in order to assist in the investigation of a possible violation of criminal law.

So that's part of what we seek to assert here. And I think there's also privacy interest of both, again, the officer who purported to collect some information from a confidential informant and the informant himself.

MR. LOUGHLIN:

That's assuming that there is such an informant and that Mr. Fontenot is not

Page 51

lying about the existence of an informant, right?

MR. HEBERT:

Well, whether he's lying or not, I think -- we don't know. We don't know now.

MR. LOUGHLIN:

Well, my position is he says there's an informant that tells him X, Y, Z about Dunn, for instance, and I say, "You're lying, there is no such informant," he's not going to be able to refute that, right? He's not going to be able to say, "This is the person's name," correct?

MR. HEBERT:

I don't know what you mean when you say that. I'm saying if --

MR. LOUGHLIN:

If I say that Victor Fontenot is lying about having a confidential informant as to certain information, he's not ever going to say, "No, I'm telling the truth because this is the man's name," right?

MR. HEBERT:

I am saying --

Page 52

MR. STAMEY:

This is Joe Stamey on behalf of -- this is Joe Stamey on behalf of Victor Fontenot.

THE COURT REPORTER:

I can't hear you.

MR. HEBERT:

We can't hear you, Joe. Hold on.

MR. STAMEY:

Again, this is Joe Stamey on behalf of Victor Fontenot. I join in the objection that Mr. Hebert has offered.

And in addition to that, with regard to the suggestion as to how to get around anything with regard to an alleged issue with a comment made by Mr. Fontenot as to whether or not a person is a confidential informant or if he obtained information from a confidential informant, the standard is not one of guesswork here; in the very least, this would have to be brought in camera before the judge for review.

However, in a broad sense, we're going to make that objection general as to any

Page 53

issues associated with confidential informants.

If Mr. Dunn and Plaintiffs wish to put the lives and safety and/or risk lives and safety of confidential informants and officers at issue, that's your business.

I'm not going to sit around and throw caution to the wind on that, and I'm going to do what I can to protect their interests and not gain any benefit one way or the other based on conjecture, speculation, or assumptions.

MR. LOUGHLIN:

Was that the objection? We're not going to resolve anything right now. I'm just trying to get what the scope of this objection is. I'm trying to think a little bit down the road. But let's get going.

MR. HORNER:

Yeah, I think the objection is noted. That wasn't -- even going back to my original question, that's wasn't necessarily what I was getting at.

So I think the objection is there,

14 (Pages 50 to 53)




Page 54

we're going to proceed.

MR. HEBERT:

And I do understand your question, as posed, did not seek the identity of confidential informants, and I certainly acknowledge that.

Again, prior to the witness answering that question, I was concerned that the scope of the question was broad enough that he might inadvertently disclose the name of a confidential informant, and I wanted to make that objection clear and broad enough before that inquiry proceeded. And it may turn out to be a complete nonissue.

MR. HORNER:

I figure let's proceed and just -- we'll see.

MR. HEBERT:

I'm okay with that. We'll object again if it gets to that point, but I totally understand.

THE WITNESS:

Can I speak it now? Well, first of all, I wasn't going to say no name of any

Page 55

informant because I don't know the names of the informants.

MR. HORNER:

I was going to ask and forgot to ask.

MR. HEBERT:

You don't know what you don't know. So I wanted to be sure before we took another toe in the water about this that we address this.

MR. HORNER:

It sounds like it's probably a moot point.

THE WITNESS:

This is only from, you know, like we say, the hearsay. When he would tell us something, he would never give us the names of the individuals, not me anyway.

And it's set up that way for a lot of stuff that he does, where they're appointed numbers instead of names. So I wouldn't know that that's -- it's confidential informants anyway.

I only can go from what -- stuff that was -- that he claimed that they told him and which was negative stuff about a lot

Page 56

of people that -- anyway.

BY MR. HORNER:

Q. Okay. So just to go back to before all that, you said your view of Victor Fontenot was poor.

A. Some of his techniques, I guess.

Q. And one of the reasons was because you felt he lied about things?

A. Yes.

Q. Could you discuss examples of when he lied.

A. I mean, saying for sure like we was saying, like he said it's some stuff that you have to, I mean, figure -- well, one of the stuff that I -- like I heard through that -- you know, like times that he supposed to be helping, I guess, and -- well, and I don't know -- saying if he lied behind the CI or the CI gave him bad information.

But it was a lot of times, Well, it was such-and-such did this or such-and-such did that, and, you know, we come to find out it wasn't that. So what I guess I'm trying to say, rather than lying or whatever, I think a lot of -- that he told me personally about his -- not names of the CI but that they -- a lot of information that he

Page 57

was passing on to us that he was be saying he was receiving from confidential informants was off of the money a lot.

Q. And so you think he made it up?

A. Well, I can't say if made it up. I just saying he don't have a good confidential -- it never really -- it never really panned out, a lot of stuff.

I mean, which that could be the CI lied to him or he was fast to broadcast it without knowing what the deal is. But a lot of that stuff came out to be not true.

Q. Did any of those examples involve Lieutenant Dunn?

A. I -- one -- I'm trying to think. I'm trying to think of -- but this would still be hearsay. The only stuff that I heard that was through the grapevine, that was from Lieutenant Dunn saying that one time that what Victor was saying was him and I -- I was supposed to take Dunn's shift to work and then had a -- that a CI told him that a shipment was coming in and whoever was taking his place was going to make the -- let the shipment go through of dope, you know.

And the person that happened to take the



Page 58

place was me. So I think that's what at least I was told. That's -- and which -- I was told that by Lieutenant Dunn about -- that Victor had said that.

Q. Okay. And that was the only incident you recall with a CI?

A. That I recall right now. But it's just some things didn't pan out a lot in that area. That's the best I can say. I can't remember specifically everything.

Q. So you said your view of Victor Fontenot's reputation was poor also based on his techniques?

A. Yeah, I mean, some of his techniques and stuff. That's just my judgment and stuff. I'm just saying he...

Q. What do you mean by "techniques"?

A. His -- I think, first of all, handling of the CI stuff, you know, and what you put that they're saying. Because you've got to still remember, a lot of your CIs that you're dealing with are criminals, they going to lie if they have something to gain or lose even in that aspect.

But I just think that he -- you know, saying stuff like that prematurely on the thing of a CI, kind of like the lawyer said, messed up some

Page 59

officers' reputation over lies that you don't -- that you don't know if that's right. And he was -- and he put that out before realizing -- thinking that in a little bit to find out a little more if there's some truth to that.

Q. Why do you think he did that?

A. I have no idea why he did that. I wish I knew. But I only would be speculating.

Q. Was there anything else in his handling of confidential informants that you thought he could have done better?

A. That's basically the stuff I think with that. Knowing who you dealing with. I mean, and I'm only saying on that because I myself used to work CI and I handled confidential informants. Some things that you're not going to always be right and some things you just don't put out all like that and believe everything that they tell you, and especially when it start being things about some officers and stuff.

Because some of those don't like officers, you know, even though they working with them. But, you know, they could have been arrested by that officer before. So this is -- you've got to really be careful what you put out there and say

Page 60

they said and whatever and where you put that out at, because now you're messing with reputation of officers and stuff like that.

And I think that was a poor job done on some of the things that was said like from my perspective and from what I heard about even myself on that, you know.

Q. Are you aware of Victor Fontenot's reputation generally in the local law enforcement community?

A. Yeah, a lot of people don't trust him. That's -- yeah, I do know that, as far as the community don't trust him as being a policeman and officer, they don't -- a lot don't trust him.

Q. And why didn't they trust him?

MR. REED:
Object to the form.

A. Answer it or... you want to ask --

MR. LOUGHLIN:
You can answer the question.

BY MR. HORNER:

Q. Yeah, sorry. Unless you're instructed not to --

A. I mean, strictly that's -- like I say, just my say of this, that's what -- you know, a

Page 61

lot say they just don't -- you know, it's techniques they don't know. I put it out there, some of them say they didn't know what side of the law he's on.

Q. And just to be clear, when there's an objection, you should answer unless there's an instruction from counsel not to answer.

A. Okay.

Q. So like objection to form. Just to explain the ground rules.

A. But that's saying that's strictly people's opinion. Like I say, they can have the same thing on me. Because, you know, put it this way, because when you're dealing with people, when we go somewhere, we're going to have some people going to be happy, some people are going to be sad because we didn't do what this group wanted the other one had. That's what the word is that was out on him.

Q. Did that relate to his handling of confidential informants?

A. Well, I don't know for that -- the people care or know how he handled his confidential informants. I'm just saying on my part, that's -- I can't say what other people say about him, you

16 (Pages 58 to 61)



Page 62

know, the public. I just think that they -- a lot just hearing what they say, they didn't trust him.

Q. What about the other law enforcement officers he worked with?

A. I shared that they said they -- you know, they didn't think that he did a great job on it; you know, some say that, some liked him. That same kind of way, you know, it all depends on I guess the relationship or what they thought or what they heard or what they had dealings with, you know.

Q. Was the opinion -- strike that.

Was your opinion that he did a poor job of handling confidential informants shared by others in the department, the Eunice Police Department?

A. I think so. They had a few that -- you know, because like I said, there's always -- they were like, Oh, Lord, he done say something again that the CI done supposedly said, and it just wouldn't pan out or something like that, you know. So...

Q. Did you ever open any investigations into Victor Fontenot?

A. I never was -- no.

Q. Did you ever discipline Victor Fontenot?

Page 63

A. I don't think I -- I don't think I had to.

Q. Did you ever receive complaints from other officers about Victor Fontenot?

A. I think they was to the chief. I'm trying to think of myself personally and stuff like that. It was him and somebody that was never seeing eye to eye or something, but I can't remember who it was. But it wasn't an official complaint, it was just something to -- telling them to leave each other alone with the talk. But I'm trying to remember who was that. I can't recall who that was. But it never was nothing official.

Q. Did Chief Fontenot share your opinion of Victor Fontenot?

MR. REED:

Object to form.

A. I -- I couldn't really say. I don't think so. I don't -- I don't think so. Not making me aware of it because I never -- no, I don't think so.

BY MR. HORNER:

Q. So Chief Fontenot thought that Victor Fontenot was a good officer?

MR. REED:

Object to form.

Page 64

A. Like I said, I can't go in his brain and actually know what he said, but I never really -- he never really complained to me about him in that area.

BY MR. HORNER:

Q. Do you recall discussing Victor Fontenot with Chief Fontenot?

A. I don't recall. I just don't recall right now. I'm trying to -- I don't recall.

Q. Do you recall ever criticizing Victor Fontenot's handling of confidential informants to Chief Fontenot?

A. Well, I think I said about the -- you know, that the information just don't ever sometimes seem to be right, but that's, you know, mostly to the extent of it. And I'm still trying to think of who it was that he was upset with and I said that I talked to him about it or something. But I can't remember. That was a while back. That was a while back.

Q. And what was -- strike that.

Do you recall Chief Fontenot's reaction when you raised issues with Victor Fontenot's handling of confidential informants?

A. He listened to it. He didn't go off the

Page 65

handle or nothing with it, just matter of fact. I mean, I don't even know -- remember if he agreed to me to me or talked about it or just whatever he answered it was -- about that.

He just listened to me. I don't think he really replied. I just don't remember, you know, because he wasn't -- it didn't -- I don't remember the reply.

Q. Do you recall him taking any action?

A. No, it wasn't those type of complaints where -- to take action. It was more to just was saying, you know, general talking, you know.

Like you review your people that you say, "Well, I don't know his CI situation or something. But it wasn't nothing that actually he was doing that I think at the time warranted to be some necessary action because first, you know, address the situation first.

But it was like, you know, it wouldn't -- like what I was saying what I found out later about him, you know, saying officers doing this by word of the informant mainly was just like, you know, he's always saying his informant know this and know that and giving us intel and it never really come out. So that was the extent of that.



Page 66

It wasn't nothing to where officers was involved at the time, you know what I'm saying, about our reputations or lies about what the informant was saying, it wasn't about that part. That's only -- that only was discovered later, lately, just before -- like I said, seeing that before.

And that was just recently that that was discovered, you know, that he was coming out and saying stuff like that, that the CIs were saying stuff about the officers.

Q. So after you raised issues about Victor Fontenot's handling of the confidential informants and the fact that his informants often seemed to have inaccurate information, you don't recall Chief Fontenot having any -- taking any action or having any response?

A. Not -- I don't remember his response, that's what I -- because like I said, at the time, it wasn't pertaining to them saying officers was doing this and nothing negative. It was just the information he had been getting, like wow.

Q. Did you think that Victor Fontenot was treated more fairly by -- I'm sorry, strike that.

Do you think that Chief Fontenot treated

Page 67

Victor Fontenot more favorably than other officers?

A. That's -- that's -- I'll be honest with you, I think that's an unfair question because I can't judge that. I mean, I can't -- I don't know. I'm not around them all the time to say.

But I know he didn't have no complaints coming in to where he had to investigate and then he didn't that I know of. But it's hard to -- I can't really say. I mean...

Q. Did Victor Fontenot ever talk to you about Lieutenant Dunn?

A. Not really. Because in the same scope, I'm trying to remember to say, because in times of working with people, number one, to understand this, we'll pass -- sometimes we'll run across some stuff, Well, man, that was a dumb move he did, or something -- something that he did done.

He maybe have said that and I just -- I don't recall because, like I said, we all kind of do that amongst ourselves sometimes. You know, it was like, Man, that was stupid. And I'm sure they did that to me behind my back a lot of times too.

But I can't -- I'm just not recalling where -- right now the way he's saying. You know,

Page 68

I don't -- he probably done told me something, I just can't remember exactly what.

Because we all kind of that, to be honest with you, sometimes, you know, where somebody tell somebody something negative about somebody else. That's -- you know, you work in close quarters and you work that long with each other, yeah, it does that. Just like family, sometimes we quabble.

Q. But you don't recall anything that Victor Fontenot said about Lieutenant Dunn that went beyond that sort of family quarreling?

A. I know Ryan investigated something that I think it was Victor and somebody said. And I was at the table. I didn't hear it directly and stuff, but I just happen to know it was an investigation behind that I think, if I ain't mistaken.

Q. And what was the subject of that investigation?

A. Well, it was something that I'm trying to say that Victor -- Victor and another officer had said negative toward Lieutenant Dunn.

Q. Do you remember the specific --

A. No, that's what I'm saying. I was -- I wasn't even encountered in that conversation,

Page 69

and after I was at the table, but I was checking paperwork, and then I know later on they did have -- IA was launched off of that.

Q. Did Victor Fontenot ever discuss this litigation with you?

A. That was -- once it's in the investigation and stuff, I don't think -- after that was done or whatever, I don't think we ever -- or did he say -- or I just said something. I really -- that was a while.

I don't exactly recall if he even talked to me about it over there. He may have said something about it after and it was over or not. I don't recall because -- I don't recall.

Q. Did he ever discuss this litigation with you -- strike that.

Did Victor Fontenot ever discuss this litigation with you?

A. No. Like I said, the only stuff was what Dunn had told me and stuff about that. And I asked him about -- I did ask him about -- I say, "Well, I heard that you were talking about that I took over a shift to let some drugs come in." "Oh, that's what a CI said." I'm like, man, this is just BS. I was upset, so I left it alone.



Page 70

MR. HORNER:

I think we've been going about an hour. Do you want to take a five-minute break? Is that all right with everyone?

MR. REED:

Sure. Thank you.

THE VIDEOGRAPHER:

We are going off the record. The time is 10:11 a.m.

(A break was taken from 10:11 a.m. to 10:22 a.m.)

THE VIDEOGRAPHER:

We are back on record. The time is 10:22.

For the record, we've had two participants join by Zoom, Michael Dunn and Ernesto Claeyssen.

BY MR. HORNER:

Q. So in your experience, were there certain procedures that should be utilized as a law enforcement officer when handling confidential informants?

A. Yeah, I mean, should have had -- yeah, I do think.

Q. And what were those?

Page 71

A. I mean, first you've got to -- like I say, we do have protocol. Ask the question again, I'm sorry, it got away from me. Go ahead, what's your question again? Rephrase.

Q. What are the protocols -- strike that.

What are the proper protocols for handling a confidential informant?

A. From memory, from when I went through the school myself and all that stuff is, I mean, you make them reliable, first of all, with stuff is -- you know, where you have them do little things or whatever to kind of test them out to make sure, kind of see if they'll kind of be -- all to tell you and stuff like that or whatever.

And like I said -- and a lot is to go on the feelings of talking with them and, you know, getting that understanding that you lie or do you anything, you break the rules -- because they all have rules that they have to follow.

You give them things, tasks to do to see, to see -- check out they reliability, you know, for calling and stuff like that or whatever.

Now, as far as -- and if so many not trues that they tell you, you kind of dismiss them, you know. You don't keep them on there where they

Page 72

keep on because then they get into that -- confident that they can lie to you and I'm going to still use you and work you.

So I mean, you know, it's very little things like that that you still make sure to keep that clear that you are in charge of them the whole time and stuff like that. And you -- we're not going to tolerate you giving us some bull stuff lies, all your lies and stuff like that.

You know, that's basically -- that's basically it. I mean, most of the protocol is right. It's just those little things right there to keep -- to keep control of that or eliminate them if they really not being useful and they lying to you a lot.

Q. And you've experienced that in your career?

A. Yeah. I did narcotics myself, I handled informants.

Q. And did you think Victor Fontenot did that?

A. Well, like I say, I don't want to come off like a -- I mean, maybe to an extent he did, I guess, you know. But I just -- just know he was just getting -- and maybe he had some bad ones,

Page 73

just getting a lot of bad information.

I guess the downside of that was to say just watch what you put out from them. You've got to check stuff out before sometimes, if you can. So that's basically it. I wouldn't keep burning them down on the stuff.

Because, I mean other than that, did he do a lot of busts? He did his share of busts. And he helped with other cases and stuff like that. So that was the stuff that -- it was just kind of the downfall. But he did other stuff -- he did other stuff that he did do well other than that, you know.

Q. When you said that was kind of the downfall, what do you mean by that?

A. Well, I mean, that of putting stuff out that's, you know, like I'm saying that you kind of watch -- when you're getting to involving other officers, you kind of got to watch that.

You don't know, you know, they may have a vendetta against the officer. Like I said, not everybody is going to like us. And I kind of, for the record, just say that I thought his handling of the informants is poor, but I ain't saying that as his overall as being an officer is poor.

19 (Pages 70 to 73)


MAGNA
LEGAL SERVICES

Page 74

Let's get that stuff straight. I just didn't like that idea, how he handled his informants. But as far as getting some stuff done, and he worked some cases and stuff like that, he does -- he does his job on that.

It's just that part of that that I wanted to just clarify. Not saying -- bashing and saying he's a poor officer overall. I'm just saying he's weak in that area, which can cause some problems with officers and CIs and things like that. Just make the record straight on that, what I meant.

Q. Could you please describe your relationship to Ryan Young.

A. Good relationship. We started working together at the P.D. at the same time, a couple of weeks before him. He kind of followed -- like followed in the -- I was lieutenant and stuff, then he made lieutenant, then I was chief of detectives, then he made chief of detectives and stuff like that. I think we have a good working relationship.

Q. And how often did you have contact with him while you were working with him?

A. A lot, especially when I was deputy chief and he was the chief of detectives.

Page 75

Q. Did you ever have contact with him outside of work?

A. Other than, like I said, when we went -- he would be there to -- when I told you earlier what happened, the dinners at Chief Fontenot's house.

Q. And aside from those dinners, are you still in contact with Ryan Young?

A. Well, I'm still working with the sheriff's department. We still collaborate together on some cases that's intertwining, so to speak.

Q. What's your opinion of Ryan Young as an officer?

A. Ryan is a good officer in my opinion.

Q. Did you ever open any investigations into Ryan Young?

A. I don't think I ever -- did I -- I never -- I don't think I did an investigation on Ryan Young that I can recall. We talking years now. I mean, maybe there's one or two I've missed, I don't know.

Q. Do you ever recall disciplining Ryan Young?

A. I don't think I -- did I ever -- maybe -- I don't know. I know maybe times throughout the

Page 76

years, if anything, it was personal; nothing written down, stuff like that. Because, I mean, I correct a lot of -- if I catch some little minor stuff that officers do that we just have regular conversation, which still would count as, you know, rectifying the situation.

But I don't remember where it was anything that I had to write down, was written down on anything that I can recall at the time.

Q. I'm sorry, were you going to say something?

A. I'm just trying to remember. I just don't remember.

Q. Could you please describe Ryan Young's relationship with Chief Fontenot.

A. Kind of like I guess everybody. I guess they was -- they all right and stuff like that. They talk. And he has to talk with him a lot, he's the chief of detectives and stuff like that. So, I mean -- so they talk a lot.

Q. Would you say he was one of Chief Fontenot's favorites at the department?

MR. REED: Object to form.

A. Well, I'll say -- strictly as to people's

Page 77

opinions, I can't even say of everybody to say who's his favorite or not. I mean, I can't go in his mind and say you going to be -- you favorite, you not my favorite, even how you act. I really can't say that and I hate to even try to speculate on that.

BY MR. HORNER:

Q. Did Ryan Young ever talk to you about Lieutenant Dunn?

A. I'm sure through the courses of stuff, but if -- that he talked about -- that we maybe had discussions or something, I guess.

Q. And do you recall --

A. But anything major or something like that, I mean, because like I said, we as a whole when we work together, brothers and sisters, sometimes we talk good about people, sometimes we talk bad if you start something that was done.

I just -- I mean, I'm sure we done had discussions, maybe with Dunn at times or something, I'm sure. I'm just trying to remember whether it be any significant thing with him being really negative on him or not and stuff. I can't say that, Well, I remember or whatever, it would be something that significant, you know.

20 (Pages 74 to 77)



Page 78

And the reason I'm saying that is because sometimes, I mean, like to say if they thought it was a situation that one officer handled, say, and the other officer, well, they should have did this the other way. So that's probably happened -- prone to happen during the course of just, you know, working together.

Q. And just to -- strike that.

Did you ever speak with Ryan Young about this litigation?

A. No.

Q. And let's go back to Victor Fontenot. Did you ever -- strike that.

Were you ever asked to conduct an investigation of Victor Fontenot?

A. I don't think I did an investigation on -- did I on Victor? Not that I recall. Did I ever do one on Victor? I don't recall if I did.

Q. Do you recall anyone doing an investigation on Victor Fontenot -- strike that.

Do you recall anyone being asked by Chief Fontenot to do an investigation of Victor Fontenot?

A. I don't -- I don't recall. I mean, because like I say, I've been in there a minute,

Page 79

so there's investigations, I just -- I would have to look back. Because -- well, I used to keep a record of all that, even if it's a bit of a written reprimand or whatever. So I don't remember -- I don't remember.

Q. Okay. Can you please describe your relationship to Lieutenant Dunn.

A. We have an alright relationship, I think. We did talk a lot and stuff like that or whatever. And like I said, I thought we had an alright relationship.

Q. When did you first meet Lieutenant Dunn?

A. When he first came worked at the police department. That was the time I met him. I don't know how many years ago that was now, 10, 11 years maybe, whatever. However long he been working there.

Q. And you directly supervised him as deputy chief, correct?

A. When I was deputy chief, yes, that's all the road lieutenants, yes.

Q. Did you ever supervise him before becoming deputy chief?

A. I think, yeah, he was my sergeant at one time, at one point.

Page 80

Q. Did you ever work with him as part of the same team?

A. Yeah. He was on my shift.

Q. And this is when he was your sergeant?

A. Right.

Q. How long was that for?

A. I don't remember how long he stayed as my sergeant. I don't remember how long.

Q. And what's your opinion of Lieutenant Dunn as an officer?

A. Lieutenant -- he's a good officer and stuff. He's a good officer.

Q. And what's the basis for that opinion?

A. Well, he does -- I mean, at least he tries to do stuff right and stuff, you know. Like I said, yeah, I mean, he does his job, basically.

Q. Do you have social media?

A. Yeah.

Q. What social media platforms do you use?

A. Face -- Facebook.

Q. At the time of your retirement, was there a policy against posting social media by Eunice Police Department officers?

A. No, I think you could post, it just -- I don't think if he made one at the end of -- did he

Page 81

change it or something at the end. But, I mean, we didn't have really no policy about posting.

Q. So there was no policy about what you could post?

A. No.

Q. And so I presume that you were permitted to promote -- strike that.

Were you permitted to post about law enforcement or local crimes?

A. That I recall, yeah. I don't think you -- you could post.

Q. Were you aware of Eunice Police Department officers posting on social media about law enforcement or local crime?

A. Yeah, I think they had some posted on there that I recall. Yeah, they had some postings. We had some postings.

Q. Did anyone ever face discipline for posting about local crime or law enforcement?

A. About Jeremy Ivory, I think. But I don't know it wasn't about law -- I know he was reprimanded for --

MR. LOUGHLIN:
I'm sorry, I didn't get the name.

MR. HORNER:

21 (Pages 78 to 81)



Page 82

Yeah, sorry, I didn't get the name.

THE WITNESS:

Jeremy Ivory, Lieutenant Ivory, I think.

MR. LOUGHLIN:

Ivory.

A. I think -- I know he was out and he was written up for it. And I myself had to investigate Lieutenant Dunn for just some stuff around that, if that's what we getting at, yeah.

BY MR. HORNER:

Q. Okay. And I'd like to show you a document. One second.

MR. HORNER:

We'll mark this as Exhibit 1.

(Exhibit 1 was marked.)

BY MR. HORNER:

Q. I'm sure you've seen this before?

(Discussion off the record.)

BY MR. HORNER:

Q. Have you seen -- have you had time to review this document?

A. Yes, I kind of glanced at it. When I was looking at it, I remembered what the complaint was and all that about what he had posted about KC

Page 83

Hall and all that good stuff, yes.

Q. So you've seen this document before then?

A. Yes.

Q. And your ultimate conclusion, as stated in the document --

A. For that Facebook, yeah, my conclusion for that -- for that, that I didn't find any violation of anything of that.

Q. And you found that Lieutenant Dunn was just exercising his First Amendment rights, correct?

A. Yeah, that he's -- he's I think as a concerned citizen. He lives right across from there. And he was expressing his concerns.

Q. Why do you think Chief Fontenot initiated this investigation?

MR. REED:

Object to form.

A. I -- to say it again, I don't know why he put it out but he did. Again, I -- when I say that, because really he didn't -- like I say, he didn't come back and say, "Hey, blah, blah, blah." I don't know. That would be a good -- I guess a good question for him. I don't know.

BY MR. HORNER:

Page 84

Q. But you -- sorry.

A. Yes. And all I did was he assigned the investigation to me and I did the investigation.

Q. But you didn't see any grounds for a violation?

A. No. That's one area that I -- no. So that goes, what I keep telling you about, that we don't always -- you know, if he thought he did -- I don't -- I do what I see is fair, and that's what I did.

Q. So you don't recall if Chief Fontenot was upset at Lieutenant Dunn for this post?

A. I mean, yeah.

MR. REED:

Object to form.

A. I guess, to make the write-up, he was. I mean, you know, but now I can't say exactly why, you know, he shouldn't or shouldn't be upset. That was -- whatever he saw it as wrong, that was his -- his thoughts, you know. So I just did -- I put my thoughts when he assigned it to me for investigation.

BY MR. HORNER:

Q. So your only basis for believing that Chief Fontenot was upset at Lieutenant Dunn for

Page 85

this post was the mere fact that he initiated this investigation and not anything else; is that correct?

A. That's all I would have to go -- without assuming, because I can't assume what's in his mind.

Q. Were you aware of Chief Fontenot initiating any other investigations based on social media posts?

A. I think when you said -- on him or on Lieutenant Ivory, I know he did.

Q. Besides Lieutenant Dunn and Lieutenant Ivory?

A. I don't recall anybody else that I know of.

Q. Do you recall the substance of Lieutenant Ivory's post?

A. I think -- because they said he was -- I'm trying to think. They was saying he was trying to make mockery of another lieutenant in the department, calling her a witch or something pertaining to something that was negative toward another officer.

Q. So he criticized another officer?

A. Yeah, I guess.

22 (Pages 82 to 85)



Page 86

Q.  And what was the outcome of that investigation?

A.  He was -- I think he was stripped down to a lieutenant -- to a patrolman.  And it eventually was overturned, but he had -- he was -- he had some real discipline action.  Because I think it was off of that.  I'm not even positive anymore.

Because I think that was something else mixed up when he did that.  I -- I don't know if that was included into the stuff that -- which he had -- he was stripped down to lieutenant.  I don't remember.

That was another one that wasn't my case.  And I know he was -- I don't know if -- remember if that was still doing with the -- I don't remember the whole -- the whole investigation, if it was with that -- about the Facebook stuff and something else or strictly on that.

And I think, if I recall, something about -- something with another officer, something -- I don't remember if that was included in there.  I don't remember.

Q.  So you're not sure if Ivory's Facebook post was a factor in his demotion?

A.  Just all the way -- I don't remember

Page 87

because that was all part of -- all that was part of together with the thing.  Because I know he was demoted down to a patrolman, which he later went back and appealed.

Q.  What was Chief Fontenot's relationship with Ivory like?

A.  I guess the same like everybody, I guess.

Q.  I'm sorry, I didn't quite catch that.

A.  I thought they got along, I guess.  I mean, I know a while he -- you know, when that stuff went down, I'm sure Lieutenant Ivory wasn't feeling like a good cop or whatever.  But that's -- like I said, I don't know even the motive behind that or how they -- or whatever.

Q.  So earlier you said that Chief Fontenot had problems with Lieutenant Dunn; is that correct?

A.  I guess you could say they had issues.  That's what I said, issues.

Q.  Could you explain that further.

A.  I mean, because it's basically one was arguing about the other at times and stuff.  And also, Lieutenant Dunn wasn't happy with things, you know, how it went with the chief.  And like sometimes I guess some of they meetings didn't go

Page 88

well or stuff like that, they were kind of -- they were arguing, you know.

And he just felt that, at times -- when we talked.  And he just felt that sometimes that -- that's, again, he felt Chief was after him at times.

And I'm like, I don't know, but don't give him no -- don't give him no ammunition to go after you, you know, if it was something that's lawful -- if it's lawful, do what he wants you to do.  I said that.  So that was, you know, like I said, the issues amongst theyself, yeah.

Q.  Did you think Chief Fontenot had more issues with Lieutenant Dunn than with other officers?

A.  I think it came to the point where they was -- I don't know to say more -- well, I guess they start having some issues right there, that's -- that would make it -- yeah, he was the focus of the issues, I guess, at times, yeah.  Because at the end, that's what started happening, I guess, it was the two of them, you know.

Q.  And why -- why do you think Lieutenant Dunn and Chief Fontenot had so many clashes?

A.  That's -- well, I really -- because

Page 89

they -- they always different ideas and I guess different -- he would -- you know, I think when he would talk with Lieutenant Dunn sometimes he'd get angry and does that and he didn't take that well either and then he would get mad.

And then there -- that's why I said issues.  You know, they just -- communication between the two of them, I think wasn't the way it should be.

Q.  Do you recall incidents when Lieutenant Dunn reported potential misconduct of Chief Fontenot?

A.  If he reported -- rephase the -- I mean, ask the question again.

Q.  Do you recall instances where Lieutenant Dunn reported potential misconduct or something that Lieutenant Dunn thought was misconduct to Chief Fontenot?

A.  Well, if I know that he -- I don't know if he --

Q.  By another officer.

A.  Oh, I wouldn't know all that.  Chief wouldn't tell me everything either.  I don't -- if there was times, I don't know.  I mean, I don't know.

23 (Pages 86 to 89)


MAGNA
LEGAL SERVICES

Page 90

Q. What did --
A. I'm sorry, I just -- I don't recall.
Q. That's okay.
What is your understanding of what this lawsuit is about?
A. From the line of questioning right now, it looks like they was saying the chief was -- that the chief was mistreating Michael Dunn and stuff like that and doing stuff, coming after him just because. That's...
Q. Do you think it's been any specific instances of when Chief Fontenot came after Lieutenant Dunn, or allegedly came after Lieutenant Dunn?
A. I don't know. Just from what I'm gathering, I guess, it's everything that's gathered. I can't say a specific thing, I guess, you know. I don't know what -- was his draw the line and let me get this going. You know, like I say, you know.
Q. Do you think it was fair to say that Chief Fontenot came after Lieutenant Dunn?
A. I just know they had a lot of issues. I don't know if I could say particularly that because the way -- sometimes we get into it,

Page 91

that's what I'm saying. I don't -- and he never directly told me that -- this stuff right here.
But I mean -- you know, and I don't know. I don't know. I don't like to speculate on anything because I'm not there in the stuff. I just -- I'm going to leave it as -- I say it as such, there was issues that I seen, at least for that part that I know pertaining to.
Now, I don't know what -- his motive. I can't sit here and speculate. I don't know.
Q. When did you become aware of this lawsuit?
A. When everybody started getting subpoenaed and all that other stuff, that that was going on and all that stuff like that.
Q. So before you were asked to testify, you were not aware of this lawsuit?
A. Oh, yeah, I mean, from way when it -- when y'all started interviewing other people, everybody was hearing about it, yeah, you know, that they was having the depositions over a lawsuit, yeah, I did know about that.
Q. So you became aware of this lawsuit when it was filed?
A. I don't know exactly when it was filed. But when y'all started calling people to testify,

Page 92

how long ago y'all started doing that? That was -- and maybe -- I don't know, maybe a little before that.
Because I'm trying to think if Lieutenant Dunn told me himself that he was -- you know, took some action or something from way back then. But I don't -- but I know for sure it was going on when people started coming to depositions because...
Q. Do you remember the month or year when you became aware of the lawsuit?
A. Oh, no, no. Because this been going on a little while right now. I don't know whenever it first started.
Q. Have you discussed this lawsuit with anyone from the Eunice Police Department?
A. Not really. I didn't even really -- I didn't really know -- like I say, it's kind of like it's there, we know it was there, but...
Q. You mentioned that you spoke with Lieutenant Dunn about this lawsuit, correct?
A. A little bit, yeah, I mean, about what he told me about the Victor stuff and stuff like that. But we never really got into no details of stuff or what you asking for, none of that stuff.

Page 93

You know, he was telling me what Victor said and stuff like that. And that was it. He just did it for changes. And that's basically it.
Q. Just for the record, could you clarify what you mean by, you know, stuff about Victor or --
A. Well, by what he said about --
Q. Sorry, just maybe just explain exactly what the conversations you had with Lieutenant Dunn, what their substance was?
A. That -- about the --
Q. About this lawsuit.
A. About what Victor had testified about saying about that I had taken his place to let some drugs come into our town. That was -- that's because he let me know. He said, Man, that was -- that's what this dude said. And I'm like, Really?
That's -- that was mainly the main conversation of it. We never like sat down and went through what the basis is and all this stuff here. That was the content of the conversation, was like how messed up that was.
And I'm like, Well, really? So I took your place when you went on vacation and then whoever took the place was supposed to stand by

24 (Pages 90 to 93)


MAGNA
LEGAL SERVICES

Page 94

and let some drugs or something -- I was like, Well, what I was supposed to do with the shift? Let's all sit down at Nixon's and let people run through the city, you know? How you do that?

So that was -- it wasn't nothing of the meat of the cases or him trying to say, "Oh, you remember that Chief did me this or did me that"; no, no, none of that.

Q. So besides that issue with Victor Fontenot, you didn't discuss anything about this litigation with Lieutenant Dunn?

A. No. And the stuff that -- that's it. We never sat there and go through all this stuff here and say, "Well, let's go do this" or "He said that," no.

Q. Regardless of its connection to this litigation, did Lieutenant Dunn ever tell you about misconduct he witnessed by other officers at the Eunice Police Department?

A. Dunn would tell me a lot of stuff, I just don't know what it -- if it's specifically right now about anybody with any misconduct right now.

Q. So just to clarify -- I'm sorry.

A. Go ahead.

Q. Just to clarify, you recall that generally

Page 95

he spoke to you a lot about potential misconduct, but you don't recall any specifics?

A. Not right now, no. I'm -- I'm -- no.

Q. But is my earlier description of what you said correct, that you generally recall conversations with him but not specifics?

A. Yeah, right now. First understand my position; here I am with ten different people here and you asking me to remember things specifically right now. That's not going to happen.

I'm the focus of -- I don't remember everything exactly right now. And we had lots of conversations and I'm not remembering in detail of what. So I don't want to mislead you and tell you something that I'm lying about when I just can't remember at this time.

Q. Okay.

MS. WALL:
Can I just interject? If you don't recall, it is better to say that that you don't recall than trying to make something up.

THE WITNESS:
That's what I'm doing.

MR. HORNER:

Page 96

Yeah, exactly.

BY MR. HORNER:

Q. Do you recall if anyone ever told Chief Fontenot about complaints that Lieutenant Dunn had made to other law enforcement agencies about potential misconduct at the Eunice Police Department?

A. Shoot, like that they made to another agency about Eunice Police Department misconduct that they -- I'm...

Q. Yeah, so maybe -- let me try to restate it.

Do you recall any instances of hearing about Lieutenant Dunn making complaints about potential misconduct by officers at the Eunice Police Department to other agencies, like the district attorney's office, the sheriff's office, the State Police, that sort of thing?

A. See, I want to say I think it was -- if they -- Dunn himself said he was -- that's what I'm saying, right now I'm just -- I kind of look like I want to remember it, but it's just -- I think he told me that, it's just a lot of stuff that was talked about sometimes.

But I did think that he mentioned that at

Page 97

one time or something about another agency coming in there because, you know, past talk or something like that. I think he did say that at one time.

Q. Do you know if Chief Fontenot ever found out about that?

A. No, I don't know.

Q. All right. I'd like to show you another document. One second. I apologize.

(Exhibit 2 was marked.)

MR. HORNER:
We'll mark this as Exhibit 2, please.

MS. WALL:
This is going to be Exhibit 2?

MR. HORNER:
Yes, that is correct.

BY MR. HORNER:

Q. Take a second to read that, please.

A. Okay.

Q. Have you ever seen this document before?

A. This is my -- as you just -- not that I recall seeing it. Because this my first time actually -- he heard that I actually seen what he said about us -- me taking somebody place with him -- his place and all that stuff right there and whatever.




MAGNA
LEGAL SERVICES

Page 98

Q. Yeah, so are you referring to page 7 of this document?

A. Right.

Q. Could you please turn to that, please.

MR. HEBERT:

Is that Dunn 1651?

MR. HORNER:

Yes, that's correct. The stamp on the bottom right says 1651.

A. (Witness reading from document.)

BY MR. HORNER:

Q. And then turning to the next page, 1652, do you see where it mentions -- where you're mentioned in the second paragraph?

A. Yeah, I mean...

Q. And in the third paragraph?

A. Okay. I see.

Q. These allegations that are being made against you and Lieutenant Dunn were false, correct?

A. Yeah, I mean, definitely.

Q. And then could you turn to page 1654, that's the 10th page of that document. You're mentioned in the third paragraph where it starts, "The CI advised on two separate occasions..."

Page 99

A. Uh-huh.

Q. The third and fourth paragraph, do you see where you're mentioned?

A. Yes.

Q. Do you know what that's referring to?

A. I know it's referring to a lot of lies, that's number one.

Q. So none of this is true, correct?

A. No, sir.

Q. These are very serious allegations to make against a police officer, correct?

A. Yes. See, I wasn't even aware that that was even put down on paper, I was just told. So they didn't even -- nobody in that department came and said, Hey, look -- other than Lieutenant Dunn. I didn't even know this existed.

Q. You were not aware of the existence of this document?

A. No, sir, other than what I say that Lieutenant Dunn told me through here, you know, about what he had said.

Q. So your previous knowledge of these allegations was only through the conversations with Lieutenant Dunn?

A. Right. Nobody from that department even

Page 100

told me anything about that, other than Lieutenant Dunn, of course.

Q. Why do you think Victor Fontenot made this document?

A. That's a good question. That's a good question, why he would go on a CI with all this stuff right here and he never -- never asked me about that, never questioned me about that, no one.

Q. Do you know if Lieutenant Dunn was questioned about this?

A. I don't know.

Q. You don't recall any instances of Lieutenant Dunn being questioned about -- or discussing these allegations?

A. No. Because I didn't -- like I said, that was something they hid from me too as well. Because I didn't even know about this other than when he said -- when came over here and he told me that's what Victor said. As far as -- I didn't know if he was questioned about it. I know I wasn't questioned about it.

Q. Do you think that the CI told any of this -- actually said any of this stuff to Victor Fontenot?

Page 101

A. I'd be speculating.

MS. WALL:

Yeah, objection to form.

BY MR. HORNER:

Q. You can answer, if you have anything more to say.

A. Well, I mean, I really don't know what his motive was, why he said that, or if he say this guy said that, Dupre. Which, if I recall, I probably had dealings with him before, arrested him somewhere before or something like that, I guess.

But whatever, I mean, this is a serious -- without talking to the officers or nobody even advised me that that was actually said.

Q. Are you aware that Mr. Dupre has testified in open court that Victor Fontenot tried to coerce him into making false allegations against Lieutenant Dunn?

MR. REED:

Objection; form.

A. I'm trying to -- I think I kind of heard a little bit about it, but it never was -- it never was brought to formal.

Q. How did you hear about it?

26 (Pages 98 to 101)


MAGNA
LEGAL SERVICES

Page 102

A. Because that's what somebody was talking about, that -- but I didn't hear the whole gist of it because, like I said, I was kind of part of that stuff, so nobody told me none of that.

I was -- just heard -- who -- I'm trying to even think who I heard a little bit about that. I know something had went wrong in court or something, the judges or something that they said, his liability was shot down. And that was the gist of it.

Q. You don't recall any more specifics?

A. No, because it wasn't nothing formal or -- like I said, I didn't even -- most of the time that was hidden from me. I really didn't even know that he had really wrote that down. All I was going on was on hearsay. And like I say, of course, there's only one person that advised me of that, was Lieutenant Dunn.

Q. You stated before that you thought --

A. I'm sorry, I know we just had a break, but I am taking fluids pills. Can I go to the bathroom again?

Q. That's totally fine.

MR. HORNER:

You want to take a five-minute break,

Page 103

everyone?

THE VIDEOGRAPHER:

The time is 11:06 a.m. We are going off the record.

(A break was taken from 11:06 a.m. to 11:13 a.m.)

THE VIDEOGRAPHER:

We are back on the record. The time is 11:13.

BY MR. HORNER:

Q. Given your knowledge that Victor Fontenot often had -- strike that.

Given your experience that Victor Fontenot often came up with CI information that was false, do you believe that Victor Fontenot believed any of the allegations in this document?

MR. REED:

Object to form.

MR. STAMEY:

Objection to the form of the question. This is Joe Stamey on behalf of Victor Fontenot.

BY MR. HORNER:

Q. You can answer.

A. Evidently he wrote it down, he believed

Page 104

it. I mean, that's -- and after standing on this a little bit to say that, I guess. So if he wanted a photo, he never got a photo because none of that never happened.

Q. And, again, why do you think he made these allegations?

MR. REED:

Object to form.

A. That I -- I mean, evidently, what I consider from this is -- printing stuff that you don't know to be true or not or you think that without even finding out, that was to discredit me for sure. And I guess it would be -- the other negative person that he wrote in there is Dunn.

BY MR. HORNER:

Q. And why do you think he --

MR. STAMEY:

This is Joe Stamey. I'm trying to make an objection. I'll make my objection as to form and make it continuing.

MR. HORNER:

Okay.

BY MR. HORNER:

Q. And why do you think -- strike that.

Why do you think he wanted to discredit

Page 105

you?

A. That's the million-dollar question. Because he never let me know that he had against me or anything like that even though, like I said, I was his supervisor at times, and all through that -- and he never told me or questioned me or asked me anything about that.

Q. Why do you think he didn't do that?

A. Evidently trying for me not to know about it, I guess. I don't know. I mean, normally you kind of want to ask your supervisor about something like that or even whatever.

Or like you said, or even show cause of this one right here with the chief even telling him, Hey, they had to discount -- the CI said this and this CI said that. But none of that never was brought to my attention.

Q. Do you think it reflects poorly on him as an officer that he never brought any of this to your attention?

A. Yeah, I would -- even -- yeah.

Q. I assume that you were not aware of any investigations into these allegations against yourself?

A. No.



Page 106

Q. Are you aware that these allegations were investigated by -- strike that.

Were you aware that there was an investigation into the allegations against Lieutenant Dunn stated in this document?

A. I didn't even -- I wasn't aware of that either because I wouldn't have -- that's what I'm saying, they kept that away from me as well.

Q. Why do you think there was an investigation against Lieutenant Dunn but not yourself?

A. I don't know. But I wish they would have made me aware of it, because clearly -- because if they're lying on one, they're probably lying pretty much on the other one, because that was in connection with that. And I wasn't even aware that this -- all this paperwork existed.

Q. Is this the sort of allegation that could hurt someone in their career?

A. Yes.

Q. Would it prevent someone from --

A. I mean --

Q. I'm sorry. Please go ahead.

A. I mean, being that it's a police officer, I mean, you know, people respect who we are. But

Page 107

if you have dealings with people like that saying -- trying to make you be a crooked police officer, that would be damaging to your career in law enforcement.

Q. Do you think that even the mere fact that something has been alleged -- strike that.

Do you think the mere fact that these allegations were made, even if they weren't subsequently substantiated, could be damaging?

A. I mean, still you can't erase people's minds, you know, of stuff you wrote down. Yeah, it could still -- it still could have some effect on you and stuff like that. Just luckily -- and then especially when you said it went to court and it was read out in public or whatever, I mean, yeah, that could be damaging.

Q. And would that hurt someone's ability to get a new job at a different department if they wanted to?

A. I -- I mean, I can speak of myself if -- you know, it would make -- at least cause some investigation on it to -- could hinder -- if not stop you, it could hinder you at least from getting on, because they have a -- trying to give you a reputation as a dirty policeman.

Page 108

Q. Are you aware of any other corruption allegations concerning Lieutenant Dunn?

A. Not to -- no.

Q. Are you aware of any other corruption allegations concerning yourself?

A. No.

Q. Are you aware of any instances in which Lieutenant Dunn was himself accused of being a drug dealer?

A. No, I hadn't heard that one.

Q. Were there investigations of Lieutenant Dunn that were assigned to you?

A. Just that one that I -- the Facebook incident with the -- that one.

Q. So only the Facebook incident?

A. Well, yeah, but they was together with something else, wasn't it?

Q. What was the other piece of it?

A. I think it was for not getting with us before he got in touch with another agency or something over a crime that was -- for another agency, or something like that it was.

Q. Could you just explain that more, please.

A. Yeah, I'm trying to think, was it a rape case or something like that, and it was supposed

Page 109

to be turned over to another agency that he did himself, and it was supposed to like come through us and stuff and talk according to the procedures to us, we'll get it, and we'll go ahead and get with them and stuff like that. So that's what -- that was the other part of that was.

Q. Do you know what the outcome of that was? Sorry.

A. That didn't go nowhere.

Q. I'm sorry, you said that didn't go anywhere?

A. That didn't go anywhere.

Q. And you thought that was the correct call?

A. It was a -- if I had to rate it as a violation, okay, in my thought had I been -- like to say if I had the authority to dictate some punishment about it, I think that would be maybe a written -- a written reprimand or something.

Because, I mean, it -- according to our stuff, it was a violation. But it was, you know, a low-grade violation. But that's my opinion on it.

Q. And besides that, you're not aware of any other investigations into Lieutenant Dunn carried out by yourself or anyone else?



Page 110

A. No, that's -- as far as I'm aware, I think that was it. If somebody had another -- at this time, I think nobody had...

Q. Are you aware of any instances in which Chief Fontenot wanted to arrest Lieutenant Dunn for malfeasance?

A. I don't remember him telling me nothing like that or saying nothing like that. Like I said, a lot of times I wouldn't -- it depends on when it happened. Because, like I said, being the chief of detectives for a while and then deputy chief, so a lot of things I wouldn't know of, you know.

I don't know if it was real allegations or really -- you know, it was -- I don't remember if that was in the -- they conversation with each other or something like that. I'm just not remembering right now.

Q. Was there an incident in which Cody Miller was being investigated by the State Police for excessive force?

A. Yeah, I think there was. I think -- I think there was.

Q. And do you recall that Lieutenant Dunn did not want to speak to the State Police without his

Page 111

attorney present?

A. Yeah, yeah.

MS. WALL:
Objection to form.

BY MR. HORNER:

Q. And so that was a "yes"?

A. Yes.

Q. Just wanted to get that on the record.

A. I do remember on that, yeah, he didn't want to -- yeah, yeah.

Q. And do you recall what Chief Fontenot's reaction to that was?

MS. WALL:
Objection to form.

A. I knew he was upset about it and stuff like that. But I knew he was upset about it.

BY MR. HORNER:

Q. Did he raise wanting to arrest Lieutenant Dunn for malfeasance related to that?

A. I don't recall him saying that or something, I just know he was upset. But, I mean, I don't recall him saying that I want to arrest him for malfeasance of an office, I don't know if he told him that or -- I didn't hear that.

Q. Would that have been justified -- strike

Page 112

that.

Would that have been a justified arrest?

A. In my opinion, no.

Q. You were aware that Lieutenant Dunn was previously a K9 officer, correct?

A. Yes.

Q. And are you aware that he stopped being a K9 officer?

A. Yes.

Q. Do you know why he stopped being a K9 officer?

A. Chief disbanded that program or whatever I think it was at the time, stopped -- yeah, stopped the funding of it or whatever, the functioning of that.

Q. Has it been cut completely?

A. It was. I guess it was at that time.

Q. Why do you think Chief Fontenot did that?

A. Now, see that -- that he never discussed with me at all on that one. And I think at that time I was chief of detectives and it was Richard and them was together for that time. I ain't even know to make a speculation. It could be. I mean, I don't know.

Q. Do you think cutting the K9 program

Page 113

will -- strike that.

Do you think cutting the K9 program was a good idea?

A. Myself personally, no. I think it's good to have a K9 dog.

Q. And why do you think that's the case?

A. Because, I mean, they still needed, I mean, tracking, drugs, especially doing -- you know, you're working drugs on the road, a good sniffing dog helps out a lot, gives you probable cause to make an arrest to get to the drugs and all that stuff. So, yeah, in my opinion, I think that's really -- that's well needed.

Q. So the K9 program helped decrease crime?

A. I mean, it's a good tool to help it and -- yeah, right.

Q. Are you aware of any instances in which Lieutenant Dunn was denied pay that he believed he was owed?

A. I don't -- I don't -- I'm not remembering right now with pay issues. Did he?

Q. Are you aware of any instances in which Lieutenant Dunn was given an unfavorable shift as a punishment?

A. I don't know if -- to be honest, I have a



Page 114

problem when you say "unfavorable" as a punishment because I can't -- I can't justify saying that it was a punishment.

Chief did ask me to change his shift when he came back because we had all the bodies in the day shift, we needed a night shift lieutenant. And he said, Well, if -- when he comes back, put him on that shift.

But I can't say -- he didn't tell me, I'm doing this to punish him. I can't lie on the aspect of either side of the wall. So that was done. I don't know was that done -- was that changed, yes, he was changed to -- but that was his reason for saying that, for doing that, to me anyway.

So I can't -- I can't say if that's what -- he was doing that for retaliation purposes.

Q. You're not sure?

A. No. I mean, I'm never going to be sure if he's not going to tell me, I'm doing this to do it. I can only speculate. And then I'm not even speculating on that. He's my boss.

Which you did see where it needed to have another lieutenant at night, so that was -- you

Page 115

know, it wasn't an off the wall type of thing where you need it and it happened to be Dunn. Now, if it worked out he was thinking that and it worked out in his favor, I still wouldn't be able to say, "Well, he did that purposely" and stuff like that and have any evidence behind that.

Q. Do you know of any other instances in which Lieutenant Dunn was unfavorably transferred?

A. I don't know. I'm trying to think that there was something else he -- he wanted to shift rotations at one time or something if I can remember or something. I don't think -- I don't remember what the outcome of that or something like that. But I don't think he was granted it.

Q. Are you aware of any instances in which Lieutenant Dunn was not given appropriate backup that he requested?

A. I don't -- because it's hard to say. I don't know if he ever came and told me like that. Because they working on the road, and if stuff don't get to me, some stuff I wouldn't know of. He told me and nothing was done.

And what's he considered as backup? That could be the real deal or his opinion of what they had. I can't -- I can't really say that because

Page 116

we don't know how many people was on shift or what he considered wasn't perfect backup.

Because sometimes you're only working three on the road, and if two other ones down -- what he meant by not receiving backup. Did his own shift didn't go back him up? Well, he's in charge of that. I don't know the situation.

Now, if -- you know, I don't know what -- could you be more specific on what he was talking about on that one?

Q. Any incident in which he requested backup -- the backup was available but it was not provided, do you recall that?

A. Like backup from his own shift?

Q. Or from other --

A. That's what I'm trying to find out.

Q. Or other officers.

A. If it's his own shift, it's his shift. How you make a complaint on your shift? That's his shift.

Q. Or from another law enforcement agency?

A. Well, I mean, we have nothing to do with another law enforcement agency. That's...

Q. Did you ever hear of Chief Fontenot making any threats against Lieutenant Dunn?

Page 117

A. I heard him be mad at Lieutenant. I can't say that I heard like threats. What you mean? Like "I'm going to get him" or something like that out of anger or something like that?

Q. Did he say that?

A. No, I'm just asking. That's what you asking, if he -- like he saying something -- I'd be wrong to say that I say -- I never heard him say "I'm going to get him, I'm going to do -- I'm going to get him, I'm going get him," you know, out of retaliation purposes or something. I just -- no.

Q. When he would get angry against Lieutenant Dunn, what would he say?

A. I don't remember verbatim what he said. I just know he was like -- I don't know. It was nothing like I heard him never say that "I'm going to get you or fire you" or something, I never heard that.

I'm trying to remember when he would get mad -- when he would be telling me, "You need to listen to this or do something," he just wasn't saying it in a peaceful manner. But I never -- you know, never said I heard him say, "I'm going to get you" that I recall.

30 (Pages 114 to 117)



Page 118

Q. Other than incidents that we've discussed, did you ever observe Lieutenant Dunn being treated unfairly at work by anyone else at the Eunice Police Department?

A. Well, I mean, I wasn't around him all the time to say stuff like that. He did -- you know, he -- at times I think when -- he felt that he was being dealt with unfairly and I wouldn't be there to say if he is or not. It would be strictly on what his word is or what he was considered to be treated unfairly.

I would have no idea if I'm not there. Because what his idea of being treated unfairly in my eyes could be something -- if he was told no for a reason and it was a legitimate reason and not just to say just because -- just because.

I wouldn't -- you know, I wouldn't know. Like I said, the most that I can get that I know at times that they had issues, but I can't say whether he deliberately, you know, did stuff like that to say, "Oh, yeah, I'm doing this because I don't like him."

Now, could have, maybe. I just don't know. I didn't, to me, perceive it. That's me, honestly.

Page 119

Q. Understood.

Are you aware of any threats of physical violence that were ever made against Lieutenant Dunn by fellow members of the Eunice Police Department?

A. I almost -- I hate when I'm -- because a lot of stuff happened and I'm not -- I'm not all the way sure or remember correctly was it -- I think he had a round with I think Victor at one time or something that I heard or whatever.

I think, I'm not positive, but I think that it was -- remember when I was saying I was trying to remember who it was? I'm trying to think if it was him and Victor had a word and they was mad at each other. And I'm not even sure all the way. But I think -- I think they had a round before.

Q. You don't remember what that's about though?

A. Not right now. I mean, you know, we hearing this thing -- it's a lot of things, like I say. Stuff happens between workers and there's some little minor stuff like I say that it wouldn't -- nothing that warranted anything.

And sometimes it just slip your mind or

Page 120

you wasn't around and you didn't hear about it or it was something said real fast and done and, you know, I'm just not remembering right now.

Q. Okay. Then just one more question about that exhibit. Why do you think Chief Fontenot never told you about it?

A. That's --

MR. HEBERT:
Exhibit 2?

MR. HORNER:
Yes, Exhibit 2, sorry. Thank you.

A. I have no idea why. That's something that should have stood out. I'd want to know that other than hearing it like I did, because that's a serious accusation.

BY MR. HORNER:

Q. Do you believe that Chief Fontenot does not -- did not credit these allegations?

MR. REED:
Object to form.

MS. WALL:
Yeah.

A. I hope not. He never talked to me about it though.

BY MR. HORNER:

Page 121

Q. It wouldn't make sense for him to credit allegations against Lieutenant Dunn but not yourself?

A. Yeah, you'd want to -- you know, both of us named, you'd want to check that out.

Q. All right. As a police officer, what types of reports do you have to write?

A. Bunch of different reports. Crime against property, assault. I mean, I -- it's kind of -- you asked kind of a broad question there. It's a lot of stuff that we write reports about.

Q. Are you expected to be truthful in those reports?

A. Yeah, yeah. I mean, that's -- once they get a -- they became public documents, records of the court, you're bound to be truthful and all that. You don't make up anything and put that down in there.

Q. Did anyone ever ask you to write a false report at the Eunice Police Department?

A. No.

Q. Did you ever ask for any police reports to be altered?

A. No.

Q. Are you aware of anyone writing a false




Page 122

report at the Eunice Police Department?

A. Not just out like that that I know of, that I'm thinking of, that I can think of right now.

Q. What about disciplinary reports in addition to Exhibit 2, are you aware of any false disciplinary reports at the Eunice Police Department?

A. No, that -- no.

Q. Do you know who Nicholas Cooley is?

A. Yeah. Cooley, yeah.

Q. Who was he, or is he?

A. He used to work -- he was an employee that worked there, worked with us.

Q. What was his role?

A. He was a patrol officer.

Q. And what was your relationship with him?

A. He was a patrol officer. That's...

Q. Was he demoted?

A. Yeah, I think he was. Now, first let's say -- let me get something straight. Every discipline action that went on in the police department, I don't -- if I'm not involved with it, I don't know. I don't -- I kind of like -- yeah. If he was demoted, and fine, I heard about

Page 123

it, okay.

If I'm not in the investigation part of it or in it, I really wasn't into a lot of that, you know. So I don't go with everything that everybody that got discipline that I would know in my cap like that. I have no idea.

If it was nothing that was on my writing or my recommendation, that would be -- that's a lot more of the chief's stuff, he knows everybody that -- whatever he does. And I don't think the time Cooley was there, I wasn't even in no type of -- that position to where I need to know about that to begin with because I wasn't deputy chief or none of that and I was chief of detectives.

But if I was -- if I was to write that up -- you know, sometimes when you say it's not mine's, that's -- a lot of that was -- that's not mine's.

Q. Understood.

A. So I wouldn't know or remember when you asked me about that, that -- I'm not knowing because some of those I done forgot, it wasn't nothing that I was directly involved with and I put it out of my mind.

Q. Understood.

Page 124

So I take it that you don't know why Cooley was demoted?

A. I didn't know the specifics on it and stuff like that or even to speculate. Because I don't -- I don't even remember what the whole thing was about with him to be exact.

Q. Do you recall anyone being demoted because Chief Fontenot didn't like them personally?

A. Well, first to say if he did do something on the personal stuff like that, that's really not -- but I can't say that because I don't know. I don't know what goes through his mind, thinking "I demoted somebody because I don't like them." He's not going to say, "Hey, I'm demoting you because I don't like you." So it's speculation.

Q. Cooley is no longer with the Eunice Police Department, correct?

A. No, sir. No, sir.

Q. Do you know why he left?

A. I mean, I heard like the grapevine, because he didn't like being there no more and he had got another job. But that's the most I can say about that.

Q. Was the fact that he didn't like being there anymore related to --

Page 125

A. He didn't like I guess what was going on, I guess. You know, he didn't like -- he wasn't happy at Eunice P.D., that's what I heard. That's, you know, the extent that I heard of it.

Q. Do you think any of that had to do with Chief Fontenot?

A. I mean, could be, could not. Like I say, if he was disciplined behind it, I'm sure they have a little animosity and stuff like that I guess, you know. Because like I said, I didn't -- I wasn't all over there to see how they relationship was, because like I said, I was in the back for that one, way to the back.

Q. Are you aware of any -- strike that.

Are you aware that Cooley said he left the Eunice Police Department because Chief Fontenot demands that all officers pledge loyalty to him? Being Chief Fontenot.

MS. WALL:

Objection to the form.

A. I've never heard that.

BY MR. HORNER:

Q. Have you ever heard anyone else make a similar allegation?

A. I guess -- Chief, about that same thing?



Page 126

What's the question?

Q. I'm sorry.

So are you aware that Cooley said that he left the Eunice Police Department because Chief Fontenot demands that all officers pledge allegiance to him?

MR. REED:

Object to form.

MS. WALL:

Objection.

A. I didn't -- I didn't -- I hadn't heard that.

BY MR. HORNER:

Q. Okay. And are you aware of anyone else making a similar allegation?

MR. REED:

Objection; form.

MS. WALL:

Objection.

A. Well, I mean, I done heard some that left and stuff like that that didn't like the chief, I guess, you know. And that's -- they had a few that I think. But I never heard from Cooley.

BY MR. HORNER:

Q. Those other individuals, who were they?

Page 127

A. I'm trying to remember. They had a few that left that said that they didn't -- I don't remember exactly what it is. You know, just like they leave and they say, "I didn't like it there" and all that.

I don't remember their name. I don't remember their names. We had a lot to transfer to the sheriff's office where I'm at. And, you know, they -- not everybody not going to -- going to be happy.

Q. Did you ever work on narcotics investigations with Lieutenant Dunn?

A. I don't remember if I did. I've been there so long. I don't remember if I did, if I ever worked anything with him. Because when he was assigned with me, he was in patrol. I don't think he was in narcotics with me, I don't think.

Q. Was there ever -- strike that.

Was there ever an incident when you -- strike that.

Was there ever an incident when Lieutenant Dunn was prepared to make an arrest but he was unable to find the person? Actually strike that, maybe I'll try to rephrase this.

Were there ever instances where you think

Page 128

that information was leaked to suspects that prevented them from being arrested?

A. I mean, that could always be a possibility. You just -- you know, you just never know if there's a...

Q. But you're not aware of any instances where you think that --

A. Yeah, it was proven that that happened, no.

Q. Are there any instances where you suspect that that happened?

A. Not right off. But, I mean, it could happen, that's what I'm saying. Because -- and the reason being on that, there are officers that have kinfolks or something or friends and one let it slip out that there's a warrant for a person or whatever and whatever, or some call there's a warrant and sometimes the dispatchers make a mistake and they tell people that they -- yeah, they got a warrant.

Q. So you think this did happen during your time at Eunice Police Department, but you don't have any specific --

A. Yeah, I mean, the probability of it happening in between -- it's a good possibility

Page 129

that would happen. But, I mean, in the -- it probably happened to all of us. I'm with the sheriff's department now looking for a few people. I don't know if somebody them or whatever, because word get out, you just never know.

Q. But you don't recall anything specific?

A. No, no. There was nothing made big of it, no.

Q. Does Eunice Police Department have a use of force policy?

A. Yes.

Q. And are you familiar with the policy?

A. Yes.

Q. Could you briefly describe it to me.

A. I wish we'd have got a copy of it just because it's all written out. I mean, it's really a lot. You know, next to using next level and it's really a lot. It's just explanations of when you can go to the next level, when to do this and that. It's a nice section, long section.

Q. And I assume you've witnessed instances in which officers use physical force against arrestees, correct?

A. Yes, during my career I can say I did a few times.



Page 130

Q. Were there any instances in which officers used excessive force measured -- as measured against the policy against those they were arresting?

A. Did we ever have some -- yeah, we had some -- yeah, yeah, yeah. I had to investigate one, as a matter of fact.

Q. Can you -- can you tell me about those instances.

A. Well, at least the one that I had to investigate.

Q. Sure.

A. It was the deputy chief. And at the time, I was chief of detectives. And yeah.

Q. So you had to investigate the deputy chief for an excessive force complaint?

A. Yeah, because he struck somebody.

Q. And what was the cause of that investigation?

A. I was doing a -- well, it was ordered because the guy -- it was Chief ordered it. And he hit the guy and gave him a black eye.

Q. And what was the outcome of that investigation?

A. He was found guilty.

Page 131

Q. And was disciplinary action taken against him?

A. Yeah. I don't remember what the disciplinary action was, but I know it was a day or so, it was something he was taken -- he was found guilty.

Q. Are you --

A. To have done it, put it that way. Got to watch how we say that.

Q. Are you aware of any instances where excessive force was not investigated at the Eunice Police Department?

A. Where it should have been and it wasn't? I don't know, because it all depends who's definition of what it was, what was the excessive force, was it really or whose definition of it was.

Q. The policy definition.

A. It depends, you know, was it the public that came in and made a report of excessive force or was it one of the officers said, "I think the other one did that." I guess it could have happened. I don't think I was aware of nothing happening under that, because a lot of -- I don't know.

Page 132

Q. What about instances of excessive force as defined by the policy?

A. That wasn't investigated?

Q. Correct.

A. Not to my knowledge and stuff. If it -- I don't know if all -- you know, what was reported. Because if I didn't know that it happened, I wouldn't know if that was reported or not. Another thing is not everything would come across my desk.

Q. Have you ever heard of a person named Sonny Arnold?

A. I heard -- yeah, I know him a little bit. That's the wrecker's son.

Q. It was who's son?

A. The wrecker, Robbie's, you know, that's his son, the wrecking guy.

Q. Wrecker guy?

A. Wrecker guy, yeah.

Q. And have you heard of any interactions he's had with the Eunice Police Department?

A. I know he's driving his daddy's truck right now. So, I mean, not good. But, yeah, he's driving his daddy's -- well, he was -- I heard he's arrested right now. So I've been away from

Page 133

the courthouse.

Q. So you've heard --

A. He used to -- he had some -- he had some interactions with the Eunice Police Department, I think.

Q. You said he was arrested by the Eunice Police Department?

A. I want to say I think. If he wasn't, for sure it was St. Landry. But I think he was arrested by Eunice on a few occasions, if memory serves right.

Q. Do you know if he ever made out -- if excessive force was ever used against him?

A. Not to -- like I say, not to my knowledge or a report was made. I -- I don't recall that, if something was said.

Q. Are you aware of any allegations he's made -- Sonny Arnold has made of excessive force?

A. Not to my knowledge right off.

Q. Do you know of any allegations Sonny Arnold has made against Victor Fontenot?

MR. STAMEY:

Objection to the form. This is Joe Stamey.

BY MR. HORNER:

34 (Pages 130 to 133)



Page 134

Q. You can answer.

MR. STAMEY:

I don't think it's appropriate to ask leading questions, I want to make that clear. And I make my objection continuing.

BY MR. HORNER:

Q. You can answer. Did you answer?

A. I don't --

MR. STAMEY:

Hold on, let me finish my objection.

MR. HORNER:

Sorry.

MR. STAMEY:

You asked him and he answered. And he did not mention any incident, and now you're adding leading questions. So I want to make my objection clear and continuing.

MR. HORNER:

I don't think I actually previously asked the question.

BY MR. HORNER:

Q. But in any event, you can answer.

A. I don't recall if he did or not. I don't

Page 135

recall.

Q. Are you aware of Lieutenant Dunn ever reporting any incident of excessive force by an officer?

A. No, I don't -- I'm not -- who he reported it to or where he reported it. I just -- right now I'm not thinking of who he reported it to, excessive force.

Actually, this -- so this is from -- the questions are pertaining to a time frame. Because I have a long time frame, but you're asking if -- 25 years. So if something happened in my third year of things, I'm not remembering right now to this time.

So there's a time frame? You can almost give us a time frame almost? Within the last -- at least say within the last five or the last six, maybe I'll know. Or there's, in general, no time frame is given on all this stuff? Because that kind of helps a lot.

Because we deal with a lot of people come there and a lot of accusations could be made and may be founded or unfounded. I'm just trying to find out for that. I don't like -- I don't like to keep saying I don't remember, make you think

Page 136

I'm being, you know, funny and I'm not. It's just a lot in a long -- a broad period of time, you know.

Q. I'm mainly interested in incidents from 2018 going forward, if that's helpful to you.

A. You know, 2018 still -- we in 2023, you know. That's -- well, it could, I just, you know...

Q. You have to answer to the best of your knowledge.

A. Yeah, the best -- I don't remember as of right now something like that, about if stuff was made. Because like I said, a lot of things wasn't made -- brought to my attention or something, it was -- you know, if it was done through him or the deputy chief at the time and they didn't need -- and if I was on a don't-need-to-know basis, I probably didn't know nothing about it.

Q. Have you heard of a person named Kenneth Charles?

A. Strauss (sic), Strauss. What was he about? I heard the name Kenneth Strauss.

Q. Do you know if he was ever arrested by the Eunice Police Department?

A. I think Kenneth Strauss -- I don't

Page 137

remember what for now. But I think -- Kenneth Strauss I think was arrested by the Eunice Police Department. That name is familiar.

Q. Do you know if excessive force was used against him? Can you please give a verbal answer.

A. No, I don't know.

Q. Do you ever recall Lieutenant Dunn ever reporting anything about Kenneth Charles and excessive use of force against him?

A. Like I said, if he don't report it to me, I would have no idea. I don't recall him reporting it to me.

Q. Do you know of a person named Dave LeBlanc -- LeBlanc?

A. LeBlanc, David LeBlanc?

Q. Yeah.

A. I think Dave -- I think Ryan -- didn't Ryan do an IE I think, if I'm not mistaken.

Q. Ryan did a what? I'm sorry.

A. An investigation on an officer for excessive force, if I remember correctly.

Q. Do you remember what the details of that were?

A. That was the one that I remember about he was choked out by the jailer. I think so. If I





Page 138

recall, it was the jailer Joseph Andrus, right, if I'm not mistaken.

MR. REED:
I'm sorry, you said Joseph --

THE WITNESS:
Andrus, if I'm not mistaken.

BY MR. HORNER:

Q. Is that spelled A-N-D-R-U-S?

A. A-N-D-R-U-S, yeah, if that's the guy.

Q. Was Andrus investigated for this?

A. Yeah. By Ryan Young, yes.

Q. Do you know what the outcome of that was?

A. I don't remember what Ryan said, what Ryan did.

Q. Do you know --

A. I couldn't be involved with that because that was my nephew.

Q. Who was your nephew, Andrus?

A. Yes.

Q. I see.

A. That's why I'm thinking, if that's the guy.

Q. Do you recall an incident when Cody Miller used excessive force against a suspect who was handcuffed or chained to a bench?

Page 139

A. That was another one I think Ryan Young investigated. I don't know what the outcome of that was either.

Q. Do you know what happened to the suspect that was assaulted?

A. I -- I mean, what happened, what they did? He passed out or something like that. I don't remember exactly the details of that. But I think that was one that Ryan investigated.

Q. Do you think what Miller did was appropriate?

A. I don't even know -- remember the real specifics of it so -- I mean to say if it was appropriate or not.

Q. Do you know if Lieutenant Dunn ever made any reports about this incident?

A. I think he was the one that initiated it or said something about it, if I ain't mistaken, huh?

Q. Was Miller upset that Lieutenant Dunn had initiated the complaint against him?

MR. REED:
Object to the form.

A. I didn't -- I didn't have no dealings with him. I think that was all done -- I don't know.

Page 140

I'm sure he was upset, but I never -- I never spoke to Miller about that incident.

BY MR. HORNER:

Q. Besides Miller, do you know if anyone else was upset that Lieutenant Dunn had initiated a complaint against Miller?

MR. REED:
Object to form.

A. I -- no, I don't know. It could have been. I mean...

BY MR. HORNER:

Q. Are you aware of any instances in which a suspect in the Eunice Police Department custody was -- needed medical attention but did not receive it?

A. Time frame again, from 2018? '19? '20? I mean, we done had some -- we done had some instances where it was -- yeah, you know, yeah. I could say there's a couple people that didn't get it sometimes or something or whatever, was late, but I don't know which one you're talking about specifically.

Q. From 2018 on?

A. I can't really say. I mean, it could happen. It would be sometime that they late

Page 141

getting them to the doctors or whatever or with appointments being refused. I mean, it's not -- I don't know, if it wasn't reported and came through.

Q. Do you know of any instances in which Chief Fontenot ordered the release of a person instead of getting that person -- strike that.

Do you know of any instances in which Chief Fontenot released a person to avoid providing them medical care?

A. I don't know -- when you say "person," who?

Q. An arrestee.

A. It's not an uncommon practice for the jailer to go see the judge if somebody is seriously ill and we can't -- you know, the bill is going to -- we go and they talk with the judge, and they usually have them released so the family can take them to the doctor and stuff and let them see, you know, if it's something major.

And then they can't come back and be -- from a major operation and being in jail, you know. So I don't know if -- let's just say you left somebody not to have them treated, that's -- because usually when we take them to the hospital



Page 142

too a lot of times, if they're going to be kept over there and stuff, we have the judge release them so they didn't acquire the bill, you know.

Q. Was there an incident --

MS. WALL:

I'm so sorry. Can we have a break real quick.

MR. HORNER:

Yeah, actually, do you want to take lunch? It's about noon.

THE COURT REPORTER:

Let's go off the record first.

THE VIDEOGRAPHER:

We're off the record. The time is 11:57.

(A break was taken from 11:57 a.m. to 1:45 p.m.)

THE VIDEOGRAPHER:

We are back on the record. The time is 1:45.

MR. HORNER:

Thank you.

BY MR. HORNER:

Q. Do you recall an arrestee named Christopher Ashworth?

Page 143

A. I don't.

Q. Do you recall an arrestee named Joshua Tyler?

A. Not -- not ringing a bell right now.

Q. Do you recall hearing of an incident in which an arrestee swallowed a -- excuse me. Strike that. We'll restart.

Do you recall an incident where an arrestee swallowed a glass pipe and then Chief Fontenot asked for him to be released instead of getting medical care for him?

A. I wasn't aware of that.

THE COURT REPORTER:

I'm sorry?

THE WITNESS:

I wasn't aware of that.

BY MR. HORNER:

Q. I'd like to just ask a couple more questions about Exhibit 2.

Do you think Victor Fontenot should have done anything different before putting this in writing?

A. According to what -- yeah, that he had complaints that, first of all, that Lieutenant Dunn was taking buy money, yeah. Because you --

Page 144

as a narcotic detective, you have all kind of body mics and all that.

You would go ahead and have them, "Okay, when you going to pay?" You have them wired up and you catch them in action, you have it on video. That would be a better route to say if that's going on, that's your proof, it would be all on video.

Same with talking with -- about before you write that on paper, because now you have evidence other than hearsay. Because that's what the other guy was strictly -- that he's saying that this happened or saying that, in my instance, that I say somebody told him a CI, which you don't mention.

But you do it like that, should have been the same way. He could have -- if whatever that they kept on that I was doing with the other guys, they could have as well sat out there and take photograph, video, camera. Because that's a serious accusation. And you would collect evidence before you start putting that to paper and scandalizing officers' names.

Q. Do you think Victor Fontenot knew that the proper procedure would have been to investigate

Page 145

further and try to use the CI to get harder evidence of these accusations?

A. I mean, right. Just, really, that's what you supposed to do as an officer, you want to dig a little bit to find out, you investigate it. That's what we do.

Q. So do you think that Victor Fontenot --

A. Fell short on that, yes.

Q. Do you think he -- sorry, go ahead.

A. On the investigation, yes, he fell short on that of taking -- taking, you know, a CI word on officers and just let it be. He put it down on paper when you can get evidence.

You have the guy right there wanting to deal with you. So you start wiring him up, wire him up, "When you supposed to get paid." And you send them back, send them out there, and let that transaction that he's claiming take place.

Q. So do you think that Victor Fontenot intentionally disregarded the proper procedures in this matter?

MR. REED:

Object to the form.

MR. STAMEY:

Objection to the form of the question.

37 (Pages 142 to 145)



Page 146

Joe Stamey.

A. I think he did it wrong. He could have -- he could have did it that way. And you got -- you won't have just, "I have a say-so that this guy said this," you know, I said you did this, and whatever we have other than I said you did it.

But if you put it on -- get the evidence concrete would be that, okay, well, okay, you say that he paid you; well, wire him up and then let him go and try to -- 'til they find Dunn coming to get his payment and let them arrange that.

But none of that happened, which would lead me to think because why? None of that was going on. Don't think. If you have it, that's the way you do to find evidence.

BY MR. HORNER:

Q. Was it common for these sorts of proper procedures to be disregarded at the Eunice Police Department?

A. I mean, I can only at least speak for this instance of stuff. I guess, if he did this, it's got to be times that maybe he did it wrong other times.

Q. Do you think it was just limited to Victor Fontenot?

Page 147

A. I'm sure we make mistakes at times or whatever. So, I mean, I don't -- I didn't -- I can't really say if that's limited to him making mistakes or other people making mistakes.

But this is a big one that I think other officers -- if I can speak on behalf of the majority of officers on what they normally would do, they would look into that a little farther before putting that on paper and do all that, what he did.

Q. I want to go back to just a couple questions about when Lieutenant Dunn came back from medical leave and was assigned to the night shift.

A. Okay.

Q. Is the night shift normally assigned to a junior officer?

A. Usually, when you say -- yeah, usually. I mean, when you start out -- and it's really up to the chief on that or whatever. But normally -- and, you know, when I assign it, put it this way, that we normally let preference be to the -- preference be to the senior officer, you know, he usually work day shift normally.

But there's nothing written. There's

Page 148

nothing guaranteed. And then you put -- your junior officers would be working the night shift. But I think for that instance right there what it was, they switched out to go night, I know they was in need of a night supervisor.

But I don't remember if the -- who would have been the other day supervisor. I don't think that it was somebody moved a junior came to the -- I don't remember exactly how that went.

But normally, to answer that question, is normally you'd have -- the junior officer would do the night stuff when -- when everything is like it's supposed to be. But like I say, sometimes we run short, people were calling in sick and getting hurt and out of work.

So it's not unlikely that that couldn't happen. But normally it's the junior officer usually would work the night.

Q. Do you recall, when Lieutenant Dunn was assigned to a night shift, if there were more junior personnel who could have taken that shift instead?

A. That's what I don't remember -- I don't remember the circumstances, if they had other juniors. I know one was out, one of the other

Page 149

ones were out, one of the lieutenants. Because we were short of lieutenants at the time.

Because normally, the normal is usually four lieutenants that -- that's in charge of the shift. And when they start getting short or out on medical leave or sick leave or whatever, that's when you start having the problem and the sergeant take over.

But if there's another lieutenant, you move them around, you know, to try to make sure that everybody still would have a lieutenant. But I don't remember if everybody still had a lieutenant after that.

Because we were down -- at the time, I know we were down a lot of lieutenants for various reasons of sick -- out sick or sick leave and stuff like that.

Q. You testified earlier that you weren't involved in all disciplinary investigations, correct?

A. No, sir.

Q. Do you think that there's a reason that you weren't -- even as -- strike that.

Do you think that there's a reason that even as deputy chief you weren't involved in more

MAGNA
LEGAL SERVICES

Page 150

disciplinary actions?

MS. WALL:

Object to the form.

A. I really can't -- don't know. But, I mean, I wasn't involved in a lot. I wasn't -- I can attest to that. The reason being, I don't know. I wasn't -- you know, something I found out after the fact of stuff.

So -- but I -- I can't say it was purposely done or, you know, whatever. But...

Q. So turning back to use of confidential informants, are there rules on recruiting confidential informants at the Eunice Police Department?

A. That's nothing written concrete on that and stuff like that. But you have like certain rules. Like you can't use somebody that is not -- is known for everything for that -- in written about that.

You can't use, and that's court law, somebody on probation, parole, none of that kind of stuff, you're not allowed to use those people. You could use somebody that was arrested, you know, criminal stuff like that. That's normally who you use, you know. But the main restriction

Page 151

on that is not nobody on probation and parole.

Q. Are you aware of any instances in which Victor Fontenot violated those rules?

A. I don't even know who's his CAs -- his CIs. Because it's never -- the CIs is your guys. Don't -- unless, like I say, you go to court where he has to testify, well, who's the CIs, we don't -- I didn't know them, pretty much put it that way.

I don't know. Even for -- because I issued out money for him to do his little drug things and stuff, and all they used were -- you used numbers. And then I have no idea if 556 -- who is 556. I wouldn't know who. Victor would know, I would not know.

Q. Were there rules about when a confidential informant could be released from custody?

A. That's -- that's stuff that you -- you and the judge thing or something if somebody helped you or whatever and you can help talk -- that's between whatever you can work out with the D.A. and the judge and stuff.

We're limited on that. You needed help on that. And you even got to watch how you promise them kind of things.

Page 152

Q. Were there any circumstances that you recall in which a confidential informant was released despite the judge or D.A. not having signed off on it?

A. No, not to my knowledge. Not to my knowledge. That's -- you're breaking the law doing something like that yourself.

Q. Are you aware of any instances in which a Eunice Police Department officer coerced an individual to become a confidential informant?

A. It wasn't brought to my knowledge, coercing. I mean, I usually -- I don't know. I never had that brought to my attention.

Q. Do you know if Lieutenant Dunn ever reported incidents about mishandling confidential informants?

A. If he recorded -- I have no idea if he did, if he recorded.

Q. Does -- strike that.

Do you recall an individual named Jordan Arnaud?

A. Okay.

MR. HEBERT:

You might want to spell the last name.

BY MR. HORNER:

Page 153

Q. A-R-N-A-U-D.

A. Okay. The name sound familiar, I don't know the incident with him.

Q. Do you know if he had a relationship with Victor Fontenot?

A. I'm trying to think where I heard the name a few times. I don't know what type of relationship he had with Victor. I don't -- not from memory.

Q. Do you recognize the name Christopher Mettatal, that's M-E-T-T-E-T-A-L?

A. Mettatal, yeah.

Q. What do you know about him?

A. I know he was arrested, because he came through us a few times. But I don't know if there was any wrongdoing between him and Victor, I don't know.

Q. And then another Arnaud, Harrison or Sonny Arnaud? Again, A-R-N-A-U-D.

A. No.

Q. Did you ever hear of individuals at the Eunice Police Department that were asked to do something that was usually below their rank?

A. Yeah, that came out a lot of times. I guess when Donnie Thibodeaux made that public



Page 154

about, well, if you're a lieutenant you don't have to do this or you don't have to do that, whatever, because -- according to civil service rules of the ranks and all that stuff.

So we did hear about it. And it started becoming more popular in that area when he was broadcasting that out.

But kind of in reality, on that note, my opinion myself, I as deputy chief took reports and all that when we were short. We were short. Nobody really sat there and said, "Well, goddoggit, I ain't supposed to do this." Sometimes you're working with three people. I can say that myself. I just...

Q. Was there backlash against Thibodeaux related to that?

A. He's our civil service rep. I don't know if it's backlash because of that. But did he ever get written up for something? I know he was out on sick leave for a good while, but he started -- I guess he had some issues going on about being sick and then stuff like that.

And he was out in training records and all that stuff and he was switched -- not switched, but he was about to be -- I guess you'd say some

Page 155

of the stuff he had to do for the training, kind of making him do duties or something like that, you know.

Q. Can you explain that a little more.

A. Well, his job itself was doing -- he did the training and other stuff. But I know he ran across a problem where he went out sick, okay, and he was mad or something about -- he was mad about -- while he was out, that the chief had went his office or something like that, he was upset about that.

But -- and they had a civil service hearing, as you-all know, that when he -- wanted to transfer him out of training and they said they couldn't, so they had a civil service hearing on that. That was public record. That's the most that I know that ever came up with him.

Q. Are you ever aware of officers claiming pay that they were not entitled to?

A. No.

Q. Such as claiming overtime pay when they didn't actually work the overtime?

A. No.

Q. What about officers who claimed they worked when they weren't actually at work?

Page 156

A. I still -- no.

Q. What about officers trying to get paid for commuting time?

A. For what?

Q. Commuting time.

A. I mean, some are allowed to. I don't know which -- specific for that. When you in the academy and you go back and forth, you do get paid from the time you leave your house and all that, they did do that, some that I know of. But that's regulations in there.

Q. Were you aware of anyone ever being investigated at the Eunice Police Department based on allegations that they claimed pay they were not entitled to?

A. I don't -- I don't -- I'm not thinking about that, somebody -- I don't know.

Q. Did you ever hear of Lieutenant Dunn making any sort of accusations or reports about officers claiming pay they weren't entitled to?

MS. WALL:

Objection to the form.

A. I'm drawing a blank on that. I don't remember.

BY MR. HORNER:

Page 157

Q. Was there an investigation by the civil service board into Eunice Police Department spending during your time at the Eunice Police Department?

A. Some of those I can't -- I don't -- I don't know. I wasn't aware if they did. When I was -- at least in the position that I was, like I said, if it was something before and it didn't really concern me, I didn't.

But I'm not even recalling if they did. I know they do a rebudget every so often when you're over so much overtime and all that, and I know they had meetings over that.

Q. Did the Eunice Board of Alderman ever do anything to try to limit spending for the police department?

A. Well, I mean, they always was talking in meetings with the chief and all that stuff like that and whatever and stuff. Usually when they'd meet too, they was trying to figure out the balance of the budget.

If you short on one thing and was over on overtime, they would kind of, you know, allocate the funds to the overtime and stuff like that to balance stuff out. I know they had a lot of



Page 158

meetings going on with that and then during my time.

Q. Were there ever proposals to get rid of the deputy chief position?

A. Yes, there was at one time. The chief had said they had made -- I guess before I took over. So they was trying to eliminate it.

Q. And why was that?

A. Because they promised about the lieutenants or something that he promised that he had a heavy load of lieutenants and they wasn't going to -- they was going to eliminate the deputy chief's position in lieu of having all the lieutenants.

Q. So there were too many lieutenants --

A. Yes.

Q. -- and they were going to get rid of the deputy chief?

A. Yes, sir.

Q. They ultimately did not get rid of the deputy chief?

A. No, they had a reconsideration of it or whatever and they did away with it. But that was one councilman that was really pushing that issue.

Q. Are you aware of any attempts by Eunice

Page 159

police officers to investigate Eunice aldermen?

A. Not that I know of.

Q. Any attempts by Eunice police officers to target Eunice aldermen in any way?

A. Not to my knowledge.

Q. Are you aware of any attempts by Eunice police officers to target or investigate the mayor of Eunice?

A. I ain't never heard of them launching officially, but I heard rumors of -- they were talking. They would get mad -- I guess mad at the mayor for certain things. But I never -- nobody -- don't think anybody launched that. It was talking stuff at times, I guess.

Q. What were the rumors you heard?

A. It was just they being wrong or they being, man, wish he would stop doing what he doing and stuff like that. And like I said, mainly it was just some officers talking, I guess, you know. I never -- nobody ever in my face said, "We going to go after him and get him." They didn't like the -- they wanted raises and stuff. People -- mainly upset stuff that I heard. You know when you just upset with we're not making any money, wish we could get a raise, and stuff like

Page 160

that. Now, if it was said, probably so, I just didn't hear it.

Q. Were there ever instances where you felt cut out of the decision-making process at the Eunice Police Department despite your rank?

A. Yeah, sometimes I -- you know, when certain -- I guess sometimes it was I didn't know investigations sometimes were launched or nothing like that. I didn't know -- or they didn't -- I wasn't aware of.

Then let's just say this I wasn't aware of. You know, a few things, I guess you could say I was -- I wasn't made aware of. Some stuff like allegations, what you were talking about of some, you know -- for arrest -- abuse, officers abuse, I didn't know everything like that.

Q. Why do you think you were not included in those processes?

A. I mean, I really don't know.

MS. WALL:
Objection to the form.

A. I don't know. I don't know. Not all the time I agreed with everybody's opinions, you know, so I don't know. Because sometimes I'd be out on my own on my decision and I stand by what I

Page 161

believe or whatever.

So -- but I ain't saying that's necessary to think why I was eliminated out, but sometimes I wasn't advised of everything or investigations being launched.

BY MR. HORNER:

Q. So sometimes you think that you weren't included in the decision-making process because Chief Fontenot or perhaps others thought you would object to the process?

MR. REED:
Object to form.

A. I'm kind of like I can't really say that that's exactly the stuff. But I just know sometimes I wasn't, I wasn't. And I can't really say, speculate, like I said that's what's his ideas or thoughts.

BY MR. HORNER:

Q. Have you discussed this deposition with anyone from the Eunice Police Department?

A. Other than the little that I told you about Lieutenant Dunn and myself.

Q. Have you -- sorry.

A. And the little thing when I asked Victor about -- oh, you know when I told about that, when



MAGNA
LEGAL SERVICES

Page 162

Dunn told me. That was it, the extent of that.

Q. You asked Victor about that?

A. Yeah, I asked Victor about that.

Q. What did Victor say?

A. "Oh, no, that's just what" -- he downplayed it. "Oh, that's just what somebody said," and, "Oh, man, I ain't did" -- he downplayed it to -- like that. And that was a quick two or three-minute conversation about that.

Q. Did you think it was something that could be downplayed?

A. He downplayed talking to -- well, he tried to downplay what was said. I didn't know exactly because I'm going on what I was told with Dunn. So I didn't know that this all existed and all that, you know. So that -- quickly, when I think about that, I did talk with him about that real briefly.

Q. Do you think his response to you about that was misleading because he didn't disclose the written report?

A. Just him downplaying it. Because now that I'm even reading and what Lieutenant Dunn said, yeah, he downplayed it to me like it was -- it was -- I don't remember his exact words, but he

Page 163

was like, "Oh, no, there's somebody saying that, we just" -- but, I mean, he never before came up and said, "Well, look, this guy is saying this about you, just saying" -- or do like I told you, he could have added a setup or whatever to catch us in the act if we were doing all that.

And I was mostly hearing about -- talking about the stuff that I heard, the most stuff that was bothersome. Because this went in the main detail that even Lieutenant Dunn told me. But it was the stuff that I was saying that he was -- even that I was upset too about was that -- so say I took the shift, Dunn's shift while we let a shipment of dope come in.

Really? That's why I was saying, "Really? So what I did, made everybody go to McDonald's or something and sit down so the dope can come in?"

Q. So you're saying Victor Fontenot's -- what's written in this report doesn't even make sense?

A. No.

Q. It would have been inappropriate to launch an investigation based on this report?

MR. STAMEY:

Objection; form. Joe Stamey.

Page 164

A. Like I said, it was -- I thought it was weak, that's how I can say my comment on that. I can't speak for the chief. But I would -- I would have requested -- I would have wanted stuff like that before you put that on there.

Let's see can we -- would reading some of this stuff about money exchange, you've got -- you can set that up if that was happening, you catch that. That was an easy one, in my opinion.

BY MR. HORNER:

Q. Have you discussed this lawsuit or deposition with anyone from the St. Landry Sheriff's Office?

A. Other than the lawyers. And we didn't discuss nothing, it was just saying that I need to come over here. We did have an issue because I was telling them -- I said, I don't --

MR. REED:

Wait. Are you talking about what you talked to your counsel about?

THE WITNESS:

It wasn't nothing about this. About me being here because my son just passed. That was -- I mean, stuff about -- he didn't really -- it was nothing that he

Page 165

asked me about just because -- like he said, I don't really need to be there, you know.

MS. WALL:

Anything you talked to your personal attorney, the sheriff's attorney, you don't have to...

THE WITNESS:

No, that was it.

BY MR. HORNER:

Q. Yeah, and just to be clear, I'm not asking for that, just to clarify.

Has anyone told you what to say during this deposition?

A. No.

Q. Has anyone told you not to tell the truth during this deposition?

A. No.

Q. Has anyone told you not to testify at this deposition?

A. No.

Q. Has anyone tried to discourage you from testifying at this deposition?

A. No.

Q. Has anyone threatened you because you're



MAGNA
LEGAL SERVICES

Page 166

testifying here today?

A. They just finding out, I'm just finding -- but I haven't been threatened yet. I kind of hope I don't.

Q. Are you concerned about facing retaliation from anyone for your testimony here?

A. No.

Q. If there is a trial, do you plan to testify if asked?

A. If asked, I have to.

Q. Are you aware of any instances in which Lieutenant Dunn was targeted by the defendants that we haven't talked about here today?

A. I think I said pretty much everything that I remember.

Q. Are you aware of any incidents of other Eunice Police Department officers being targeted or treated unfairly by defendants that we haven't talked about here today?

A. No, no.

Q. Are there any other instances in which defendants acted inappropriately or unethically that we haven't talked about here today that you recall?

A. No.

Page 167

Q. Do you recall any violations of department policy by Eunice Police Department officers that we haven't talked about here today?

MR. STAMEY:

Let me just make a general objection to the form of the question. This is Joe Stamey.

MR. HEBERT:

Join.

MR. REED:

Same.

MS. WALL:

Same.

A. Not to -- I'm just -- not to my knowledge that I can remember at this point of saying that's a -- like I say, it's a lot of people deal with constantly I didn't have to deal with.

Usually if stuff is in a violation, it's used to investigate it or whatever. But I don't think that nobody said, "Oh, we had this done and y'all ain't did nothing about it" or whatever.

MR. HORNER:

I have no further questions for the witness. Thank you.

MS. WALL:

Page 168

I have no questions.

MR. HEBERT:

I just have one or two.

THE WITNESS:

Yes.

MR. HEBERT:

Never believe a lawyer when he says he has one question.

EXAMINATION

BY MR. HEBERT:

Q. Again, my name is Michael Hebert. I represent the City of Eunice in this matter.

Early on in your deposition, you described the office of chief of police in Eunice as a political office.

Did you mean by that that --

A. No, no, just -- go ahead with the question.

Q. Did you mean by that that the office of chief of police in Eunice is an elected position?

A. Yes, sir, that's exactly right.

Q. How long did you work for the Eunice Police Department?

A. 25 years.

Q. Was it always an elected position --

Page 169

A. Yes, sir.

Q. -- the whole time you were there?

A. The whole time, yes, sir.

Q. All right. That's all I have.

A. That's what I meant by saying that.

Q. I totally understand. Thank you.

MR. REED:

I don't have anything.

Joe?

MR. LOUGHLIN:

I have a question -- sorry, go ahead, Joe.

MR. STAMEY:

Nothing at this time. Thank you.

EXAMINATION

BY MR. LOUGHLIN:

Q. I just have a couple of questions on Exhibit 2, in the first paragraph, second line, a reference to "undocumented reliable informant."

Do you see that?

A. Yes.

Q. "Undocumented" means what?

A. He don't have the -- if he undoc -- he don't have they names down or -- I guess what he's trying to say, because undocumented means you

43 (Pages 166 to 169)



Page 170

haven't been tested yet, you don't have them down, the name, you don't have -- what I talked about yet, that C2 or whatever, the assigned number, and then you give them a few little tests to make them reliable. So I'm assuming that's what he's trying to say by "undocumented."

Q. Well, based on what you just said, there wouldn't be any such thing as an undocumented reliable informant, right?

A. Right. I mean, that's just wording, but no.

Q. A reliable informant is somebody who's been tested?

A. And documented. And you document -- you know, you at least yourself as the officer, you know who that is, that -- and you done put them to your little series of tests to make them reliable.

Q. And if he's not reliable, he's worthless, right?

A. That's right.

Q. And you don't know whether Victor Fontenot ever had a confidential informant, do you?

A. I'm going on his word. I don't -- as far as we put it out, no, because I never had names on none of them, just numbers.

Page 171

Q. So you don't know whether this informant alleged in Exhibit 2 ever existed?

A. Exactly.

MR. LOUGHLIN:
    That's all I have. Thank you.

MR. HORNER:
    I think we're done.

THE VIDEOGRAPHER:
    This concludes the deposition. We are off the record. The time is 2:16 p.m.

DEPOSITION CONCLUDED AT 2:16 P.M.

Page 172

REPORTER'S PAGE

I, RITA DEROUEN, Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), Registered Professional Reporter (RPR #006908), the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the record:

That due to the interaction in the spontaneous discourse of the proceeding, double dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a transcription of proceedings, and that the double dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the parenthetical "(phonetic)";

That the parenthetical "(sic)" is used to denote when a witness stated a word or phrase that appears odd or erroneous to show that it was quoted exactly as it stands.

RITA DEROUEN, CCR, RPR

Page 173

CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, RITA A. DEROUEN, Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), Registered Professional Reporter (RPR #006908), as the officer before whom this testimony was taken, do hereby certify that TONY A. KENNEDY, having been duly sworn by me upon authority of R.S. 37:2554, did testify on June 28, 2023, as hereinbefore set forth in the foregoing 172 pages; that this testimony was reported by me in stenographic shorthand, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with the transcript format guidelines required by statute and rules of the Board; that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in



Page 174

compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and the Rules and Advisory Opinions of the Board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter; that I am not related to counsel or to any of the parties hereto, I am in no manner associated with counsel for any of the interested parties to this litigation, and I am in no way concerned with the outcome thereof.

Signed and stamped this 11th day of July, 2023, Baton Rouge, Louisiana.

_____
Rita DeRouen, RPR, CCR



