Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA


MICHAEL DUNN

                          CIV. A. NO.
VS.                       6:21-CV-01535

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, AND
JOHN DOE

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


           Thursday, August 11, 2022


        Videotaped deposition of JACK ARDOIN,

     taken pursuant to notice, was held

     beginning at 8:57 a.m. on the above date

     at Kean Miller, LLP, 600 Jefferson Street,

     Suite 1101, Lafayette, Louisiana 71501,

     before RITA A. DEROUEN, Certified Court

     Reporter and Registered Professional

     Reporter.



           MAGNA LEGAL SERVICES

              (866) 624-6221

            www.MagnaLS.com


                                        **EXHIBIT I**



Page 2

APPEARANCES
FOR THE PLAINTIFF:
SIDLEY AUSTIN, LLP
BY: NORMAN HOBBIE, ESQ.
787 Seventh Avenue
New York, New York 10019
212-839-5300
nhobbie@sidley.com

- AND -
SIDLEY AUSTIN, LLP
BY: AMIT BHATLA, ESQ.
1501 K Street NW
Suite 600
Washington, D.C. 20005
202-736-8075
abhatla@sidley.com
- AND -
KEARNEY LOUGHLIN, ATTORNEY AT LAW
BY: KEARNEY S. LOUGHLIN, ESQ.
602 Boulder Creek Parkway
Lafayette, Louisiana 70508
337-534-8803
kearney.loughlin@gmail.com

FOR THE DEFENDANTS:
KEAN MILLER, LLP
BY: MARY LOVE, ESQ.
BY: CHELSEA CASWELL, ESQ.
400 Convention Street
Suite 700
Baton Rouge, Louisiana 70802
225-387-0999
mary.love@keanmiller.com
chelsea.caswell@keanmiller.com

Page 3

APPEARANCES: (CONTINUED)
Also Present:
  Andrew Grover, Videographer
  Michael Dunn
  Randy Fontenot

Reported by:

  Rita A. DeRouen, Certified
  Court Reporter No. 2014018
  in and for the State of
  Louisiana

Page 4

INDEX

                                    Page
STIPULATION                          5
REPORTER'S PAGE                     320
CERTIFICATE                         321
EXAMINATION
   BY MR. HOBBIE                      7
   BY MR. LOUGHLIN                  263
   BY MS. LOVE                      272
   BY MR. HOBBIE                    290
   BY MR. LOUGHLIN                  317

          * * * * *

          List of Exhibits
Exhibit #1                          171
   (Eunice Police Department Offense Report
    0619-8960, Dunn_0000794 - 797)

Page 5

STIPULATION

   It is hereby stipulated by and among counsel for plaintiff and counsel for defense that the deposition of
        JACK ARDOIN
be taken before RITA A. DEROUEN, Certified Court Reporter, for all purposes, pursuant to notice and to the provisions of the appropriate statutes of the Federal Rules of Civil Procedure.
   The parties hereto waive all formalities in connection with the taking of said deposition and the reading and signing thereof, except the swearing of the witness, and the reduction of the questions and answers to typewriting.


          * * *

2 (Pages 2 to 5)




Page 6

THE VIDEOGRAPHER:

We are now on the record. This begins Videotape Number 1 in the deposition of Jack Ardoin taken in the matter of Michael Dunn vs. Randy Fontenot, et al., filed in the U.S. District Court for the Western District of Louisiana, Docket Number 6:21-cv-01535.

Today's date is August 11, 2022. The time is 8:57 a.m.

This deposition is being taken at Kean Miller in Lafayette, Louisiana at the request of Sidley Austin, LLP.

The videographer is Andy Grover of Magna Legal Services. The court reporter is Rita DeRouen, also of Magna.

At this time, would counsel please introduce themselves for the record.

MR. HOBBIE:

Norman Hobbie from Sidley Austin on behalf of the plaintiff, Michael Dunn.

MR. BHATLA:

Amit Bhatla, also from Sidley Austin, on behalf of plaintiff, Michael Dunn.

MR. LOUGHLIN:

Page 7

Kearney Loughlin on behalf of Michael Dunn.

MS. CASWELL:

Chelsea Caswell on behalf of all defendants.

MS. LOVE:

Mary Love of Kean Miller, also on behalf of all defendants.

THE VIDEOGRAPHER:

Thank you. Would the court reporter please swear in the witness.

JACK ARDOIN, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HOBBIE:

Q. Hi. My name is Norman Hobbie, as you may have heard. I also go by JR. I represent Michael Dunn in an ongoing dispute with the City of Eunice, Randy Fontenot, Victor Fontenot, and Ryan Young.

Could you please state your full name for the record.

A. Jack Ryan Ardoin.

Q. What would you like me to call you by?

Page 8

Your rank?

A. You can call me Jack.

Q. Have you ever been deposed before?

A. No, sir.

Q. Have you ever testified at a trial before?

A. Yes, sir.

Q. How many times?

A. Maybe three.

Q. When was the last time you testified at a trial?

A. About a year ago. It was a Gwen's Law hearing, it wasn't a complete trial.

Q. What's that? What's a Gwen's --

A. Domestic violence hearing.

Q. Before we dive into the substance, I'm just going to give you a sort of an overview of the deposition ground rules just to make sure you understand.

Is that okay?

A. Yes, sir.

Q. So today you'll be testifying under oath and your answers will be subject to the penalty of perjury.

Do you understand that?

A. Yes, sir.

Page 9

Q. Your statements today have the same effect as though they were stated in a court of law.

Do you understand that?

A. Yes, sir.

Q. Today I'm going to ask you a series of questions. If at any point you don't understand a question, please just ask me for clarification; if you don't, I'm just going to assume that you understood it.

Does that make sense?

A. Absolutely.

Q. Now, if you look over to your right, Rita, our very kind court reporter sitting there, she will be transcribing this deposition. For her sake and for the sake of a clear record, could you please provide clear, verbal answers to all questions?

A. Yes.

Q. Rita will not be able to pick up head nods, gestures, murmurs, uh-huhs, stuff like that.

Does that make sense?

A. Yes, sir.

Q. Similarly, as I mentioned, Rita is transcribing everything, and it's hard for her to do that if we're talking at the same time. So I




MAGNA
LEGAL SERVICES

Page 10

would just ask that you wait until I finish my question before you start to answer.

Does that make sense?

A. Yes.

Q. Thanks.

As you're aware, defendants' counsel are in the room. They may object to my questions. I would just ask that you answer my questions even if there is an objection.

A. Okay.

Q. And, lastly, if at any time you want a break, feel free to just let us know, we're happy to take one.

A. Okay.

Q. The only thing is that, if there is a question pending, please answer that before we take the break.

Does that make sense?

A. Yes, sir.

Q. Great. What did you do to prepare for today's deposition?

A. Nothing in particular.

Q. Did you review any documents to prepare?

A. No, sir.

Q. Did you bring any documents with you

Page 11

today?

A. No, sir.

Q. Did you talk to anybody about the deposition?

A. Nothing regarding what was going to be said, just where it's going to be at, and that's it.

Q. Who did you talk to?

A. I spoke with Lieutenant Michael Dunn and Chief Randy Fontenot this morning.

Q. What did you talk about with Lieutenant Michael Dunn?

A. Just the location of where we're going to be, and I asked about estimated time on how long I would be here. That's about as far as it goes.

Q. And what did you talk about with Randy Fontenot?

A. The same thing, an estimate of how long I'd be here.

Q. When did you talk to Randy Fontenot?

A. This morning on the way here. We rode together.

Q. About how long is the drive from Eunice to here?

A. About an hour.

Page 12

Q. What else did you talk about during the hour?

A. Law enforcement matters just in general. Compared law enforcement back in the '80s to law enforcement today and recreational hobbies and stuff like that. That's about it.

Q. Did Randy Fontenot talk to you about this lawsuit in the car?

A. No. Only the location and the time, that's it.

Q. Are you aware that Lieutenant Dunn filed this lawsuit against Chief Fontenot, Victor Fontenot, Ryan Young, and the City of Eunice?

A. Yes, sir.

Q. Do you understand the nature of the lawsuit?

A. Not entirely, no. I mean, other than that it's a civil lawsuit, I don't know much else.

THE COURT REPORTER:

You don't know what?

THE WITNESS:

I don't know much else about it, the ins and outs.

BY MR. HOBBIE:

Q. Do you have a general understanding of the

Page 13

allegations in the lawsuit?

A. Yes, sir.

Q. What do you understand those to be?

A. The allegations would include, I'm assuming, retaliation against Michael Dunn allegedly. That's about it.

Q. When did you become aware of the lawsuit?

A. I would venture to say soon after it was filed, which, in my mind, was six months, a year maybe.

Q. I think we could probably use the filing date as a -- as a benchmark.

About how long after the case was filed do you think you became aware of it?

A. I would imagine not very long, because it made local news. So I would guess maybe a week afterwards, if I had to bet. I don't remember specifically, but about that.

Q. How did you become aware of the lawsuit?

A. Through the news.

Q. After the lawsuit was filed, did anyone from the Eunice Police Department discuss the lawsuit with you?

A. Not -- I mean, other than just, Did you see it? Sure, I saw it, yeah. Other than that,

4 (Pages 10 to 13)



Page 14

that's it.

MR. HOBBIE:

Can we go off the record real quick?

THE VIDEOGRAPHER:

We're off the record.

(A break was taken from 9:06 a.m. to 9:06 a.m.)

THE VIDEOGRAPHER:

We are back on the record. The time is 9:06.

BY MR. HOBBIE:

Q. Shortly after the lawsuit was filed, did anyone ask you about the witnesses who helped Dunn with his complaint?

A. No, sir.

"Asking," meaning asking me what about them? If you could clarify for me, please.

Q. Did anyone ask you to identify witnesses who may have helped Dunn draft his complaint?

A. No, sir.

Q. Do you know an officer named Joey Fontenot?

A. I do.

Q. Is he still at the department?

A. Yes, sir.

Page 15

Q. Did he approach you about the witnesses after Dunn filed the complaint?

A. So Joey Fontenot and I did have a conversation regarding a similar matter, but it was in reference to a civil service hearing that was coming up.

I was serving subpoenas at the time. I worked for the City marshal's office at the time we discussed it.

Q. And do you remember any details about that discussion?

A. He inquired as to who with the Eunice City Marshal may have -- may have told Lieutenant Dunn that subjects were planning to lie at the civil service meeting. He never asked me if I did it; within so many words, I think he did.

Q. Did he say who was planning to lie?

A. He didn't -- well, actually, if I'm thinking back, he was trying to see if I had told anyone that Lieutenant Ryan Young and Detective Victor Fontenot said they planned to lie at the civil service meeting.

Q. Did you know that they were intending to lie at the civil service meeting?

A. I did not. I can discuss the conversation

Page 16

that was had, if need be, on what he was inquiring about.

Q. Yeah, please go ahead.

A. So when I was serving subpoenas for the civil service meeting, I was having a conversation with Victor Fontenot and Ryan Young while I was getting signatures from them. And one of them said something to the effect of, There's going to be a lot of people who say "I don't recall."

Now, that's all that I was told. No one specifically expressed their intent to lie. And that's as far as it goes.

Q. Who said that a lot of people might say that they don't recall?

A. If I recall correctly, it was Lieutenant Ryan Young.

Q. And what did you understand that to mean?

A. I wasn't sure what it means.

Q. Have you ever heard of the blue wall of silence?

A. Yeah, I'm familiar.

Q. And what do you understand that to mean?

A. In my understanding, the blue wall of silence is when police officers cover for one another.

Page 17

Q. Do they often say, "I don't recall" during -- or when questioned?

A. I guess they would.

Q. Do you believe that's what Ryan Young was referring to?

A. I can't speak for what Lieutenant Young was referring to. It's possible, but I'm not sure.

Q. Did you ask him how he knew that people were intending to say they don't recall?

A. No, I didn't.

Q. Did he say that he told people to say they don't recall?

A. He didn't tell me that.

Q. I understand that you rode with Chief Fontenot this morning.

A. Yes, sir.

Q. At any other time since this lawsuit was filed did he discuss the lawsuit with you?

A. No, sir.

Q. Before today, did he discuss the deposition with you?

A. No, sir.

Q. Did Chief Fontenot say anything about Lieutenant Dunn to you since the lawsuit was

5 (Pages 14 to 17)


MAGNA
LEGAL SERVICES

Page 18

filed?

A. No, sir.

Q. Has Chief Fontenot said anything about Victor Fontenot since the lawsuit was filed?

A. No, sir.

Q. Since the lawsuit was filed, has Chief Fontenot said anything about Ryan Young to you?

A. No, sir.

Q. Since the lawsuit was filed, has Victor Fontenot discussed the lawsuit with you?

A. No, sir.

Q. Has Victor Fontenot discussed this deposition with you?

A. No, sir.

Q. Did he discuss his own deposition with you?

A. No, sir.

Q. Has Ryan Young discussed the lawsuit with you?

A. No, sir.

Q. Did he discuss the deposition with you?

A. No, sir.

Q. How about Jeremy Ivory, has he discussed the lawsuit with you?

A. Other than expressing how he's glad he's

Page 19

not involved in it. That's about as far as it goes.

Q. Do you remember specifically what he said to you?

A. I'm going to have to speak candidly. I'm glad you're having to go through that bullshit, because I'm not. Something to that effect. I don't remember specific.

Q. What did you understand "that bullshit" to be?

A. The -- I guess the entire case.

Q. Have you heard Jeremy Ivory refer to the lawsuit as bullshit before?

A. I guess I could -- sure. I guess that would be considered referring to the case as bullshit, sure.

Q. Has he done that on other instances?

A. Just once. That's the only time I can recall.

Q. Were other officers in the room when he said that?

A. There may have been, I'm not sure. There's usually quite a few of us when we do paperwork.

Q. How long ago was that?

Page 20

A. About a week.

Q. Did Jeremy Ivory discuss the deposition with you?

A. Other than that, no.

Q. Did he tell you why he thought it was bullshit?

A. No.

Q. Is it your understanding that other officers at the department think it was bullshit?

A. It seems to be the general consensus. No one is really excited to be involved in it. No one is -- in particular, nothing specifically said, but I don't think anyone's excited to be involved.

Q. When Jeremy Ivory said this, you said it was about a week ago?

A. Maybe, sure.

Q. Did anybody else respond to that comment?

A. I don't think so.

Q. Are you aware that it's alleged that Jeremy Ivory was a witness to many of the events that took place?

A. I'm not -- I'm not aware, no.

Q. Are you aware if the chief has ever targeted Jeremy Ivory?

Page 21

A. There were allegations of such a thing, sure.

Q. Who was alleging that?

A. This was several years ago. There was another civil service, I guess, trial where Lieutenant Ivory appealed certain disciplinary actions taken against him.

Q. In your opinion, was he being targeted by Chief Fontenot?

A. I don't think "targeting" would be the correct word. In my opinion at the time, I believe the disciplinary action was a little excessive. Other than that, you know, that's my opinion.

Q. Why do you think it was a little excessive?

A. I feel like he's a pretty good supervisor, and his supervisory rank was taken from him.

Q. Why was his rank taken from him -- actually, strike that.

Do you recall what the hearing was about, the civil service meeting?

A. Something to the effect Lieutenant Ivory had made a statement in the dispatch office about -- I don't know if he suggested that



MAGNA
LEGAL SERVICES

Page 22

officers not answer their phone to come into work. I felt like he wasn't instructing me to not come -- to answer my phone; just basically in general saying, if you don't want to get called in, you know, I wouldn't answer your phone.  And I think that's from what -- I think that's where that stemmed from.

Q.  And because he said that, what happened?

A.  I don't know if that's the only reason, there may have been several other reasons, but from that point forward, if I recall correctly, Lieutenant Ivory was placed under internal investigation for that incident and he was demoted two ranks down to patrolman.

Q.  Do you know about when this was?

A.  I'm thinking 2019, middle of 2019.

Q.  And who placed him under investigation?

A.  I'm assuming Chief Fontenot.

Q.  Has Tony Kennedy discussed the lawsuit with you since it's been filed?

A.  No, sir.

Q.  Has he discussed this deposition with you?

A.  No, sir.

Q.  Did he discuss Victor Fontenot's deposition with you?

Page 23

A.  No, sir.

Q.  Has anyone in the Eunice Police Department asked you to lie during this deposition?

A.  No, sir.

Q.  Has anyone from the Eunice Police Department asked you not to tell the full truth during this deposition?

A.  No, sir.

Q.  Has anyone from the department coached you to not recall events mentioned in Lieutenant Dunn's lawsuit?

A.  No, sir.

Q.  Has anyone from the police department asked you not to testify?

A.  No, sir.

Q.  Has anyone threatened you because you're testifying here today?

A.  No, sir.

Q.  Are you concerned that Chief Fontenot might target you because of your testimony today?

A.  No, sir.

Q.  Are you riding back to Eunice with him after this deposition?

A.  I am.

Q.  Does Chief Fontenot's presence here today

Page 24

affect your ability to testify truthfully?

A.  No, sir.

Q.  Are you concerned that Victor Fontenot might target you because of your testimony today?

A.  No, sir.

Q.  How about Ryan Young?

A.  No, sir.

Q.  Before we go any further, I just want to get to know a little bit more about you, your background and stuff like that.

A.  Okay.

Q.  What's your current job?

A.  I'm a patrol officer with the Eunice Police Department.

Q.  I'm sorry, where?

A.  With the Eunice Police Department.

Q.  How long have you been working in that capacity?

A.  Recently, maybe a month.  I've returned to the police department.

Q.  And what were you doing before that?

A.  For two years I was a deputy with the Eunice City Marshal's Office.

Q.  Tell me more about your role as a deputy at the marshal's office.

Page 25

A.  Most of my duties included court security three days a week, fugitive apprehension, working warrants and traffic enforcement, and serving papers, process.

Q.  What were you doing before that job at the marshal's office?

A.  I was briefly employed with the Basile Police Department for about eight months, and prior to that I was at the Eunice Police Department.

Q.  Can you tell me more about your employment at the Basile Police Department?

A.  General patrol duties, very low call volume, very boring.  I worked nights and only nights, just the same as I do here -- same duties as I do at the police department in Eunice.

Q.  Do you like working nights?

A.  I do.

Q.  Do you currently work nights?

A.  Right now it's a swap monthly -- one month are nights and the next month is days.

Q.  Why did you join Basile Police Department?

A.  At the time, I was -- I guess you could say I was fed up.  I'm close friends with Jeremy Ivory, and I guess at the time I was unhappy with

7 (Pages 22 to 25)



Page 26

how I felt he was being treated and, you know, I sought other employment.

Q. Treated by whom?

A. By Chief Fontenot.

Q. Can you give examples of that treatment by Chief Fontenot?

A. The demotion that we spoke of a minute ago.

Q. Was that it?

A. Everything revolving around that incident, that's it.

Q. Could you provide more detail on "everything revolving around that incident"?

A. Honestly, just him being demoted, that's it, really.

Q. Why were you fed up with it?

A. Because I consider Jeremy Ivory a close friend, and I took it personally.

Q. Did you report Chief Fontenot's targeting of Jeremy Ivory to anybody?

A. No.

Q. Why didn't you?

A. I'm not sure who I would report it to. I mean --

Q. Why didn't you report it to Chief

Page 27

Fontenot?

A. Because it really wasn't my business.

Q. Were you afraid of reporting to Chief Fontenot?

A. Not particularly. I was covered under civil service. I wasn't on probation. I don't think there could have been anything done to me if I would have complained to Chief. But, no, I didn't report anything.

Q. If the chief is targeting an employee, who do you report to?

A. Honestly, I'm assuming the civil service board. I don't know.

Q. If Ryan Young were targeting an employee, could you report that to the chief?

A. Sure.

Q. Why?

A. Because he's the agency head, I would assume. I'd honestly have to report it to the deputy chief first, or my supervisor first, go through chain of command.

Q. Who's the deputy chief?

A. That would be Tony Kennedy.

Q. If Tony Kennedy were targeting someone, who would you report that to?

Page 28

A. I would guess the chief.

Q. Why did you decide to leave Basile Police Department?

A. I needed more -- I needed to have more going on. I was bored.

Q. And what do you mean by "more going on"?

A. The call volumes. I would go a whole weekend sometimes without a single call for service. At night sometimes it would be hours before I'd see one vehicle pass. I was getting bored.

Q. For the record, it's not that you wanted to be in a place with more crime?

A. I did, yeah. Yeah, I need to stay busy.

Q. Okay. Is there more crime in Eunice than in Basile, in your opinion?

A. I would imagine so, yes.

Q. What's the population of Basile?

A. Somewhere around 2,000 maybe.

Q. And do you know the population of Eunice?

A. Around about 10,000.

Q. How big is the police department at Basile?

A. Usually around two officers on a night shift and one plus administration on the day

Page 29

shift. So six people, six or seven people, including the chief.

Q. And how many officers are at the Eunice Police Department?

A. I would say, per shift, maybe three, and that's not including the person working overtime. Sometimes two and the person that works overtime and plus administrative personnel. So I would say maybe 20.

Q. How about just officers?

A. Patrol rank? I guess that would be about ten of us maybe.

Q. And how big was patrol at Basile Police Department?

A. Like I said, the patrol division was just one person during the day and two people at night.

Q. Who was the chief at Basile Police Department?

A. Chief Allen Ivory.

Q. Is he related to Jeremy Ivory?

A. He's his father.

Q. And forgive me, but before you worked at the Basile Police Department, did you say you worked at the Eunice Police Department?

A. I did.



Page 30

Q. And how long were you there during that stint?

A. From November of 2017 to right before I got married, which was in June of 2019. So a little over a year and some change.

Q. And what was your rank at the Eunice Police Department?

A. Patrolman.

Q. Who was the chief while you were there?

A. Chief Fontenot, Randy Fontenot.

Q. Did you have a supervisor then?

A. I worked under several. I worked under -- in fact, when I started on patrol, I worked under Lieutenant Michael Dunn and Sergeant Nicholas Cooley.

Q. About how long did you work for Lieutenant Dunn?

A. Throughout my entire training process and a little after, so I'd say probably maybe six months.

Q. Back then, did Lieutenant Dunn typically supervise officers going through their initial training process?

A. I think it just depended on whose shift you landed on, who was going to be your training

Page 31

officer and which shift he worked on.

Q. Who else did you have as a supervisor?

A. I worked under Lieutenant Mary Guillory, and then I worked under Lieutenant Jeremy Ivory.

Q. Is Mary Guillory still employed at Eunice Police Department?

A. Yes, sir.

Q. Is Jeremy Ivory?

A. Yes, sir.

Q. During that time period, November 2017 to June 2019, what types of things were you doing at Eunice Police Department?

A. Traffic crash investigations, initial investigations, you know, theft, domestic violence, DWI, things like that.

Q. When investigating, did you have to write reports?

A. Yes, sir.

Q. Every time you respond to a call, did you have to write a report?

A. Not necessarily.

Q. When did you have to write a report?

A. Anytime the complainant who called wanted to make a report -- wanted to file a police report, or if there was a traffic crash, you know,

Page 32

involving a vehicle with damage over $500, you know, a crash report would be conducted.

Q. If there's a crash with damage of potentially over $500, do you have to write a report?

A. It's my understanding you have to, yes.

Q. If there's a theft, do you have to write a report?

A. If the complainant doesn't want a report, I don't have to write a report.

Q. I didn't know that.

A. It comes down to if this person wants to pursue changes. If they don't -- so...

Q. If force is used, do you have to write a report?

A. Yes.

Q. Do you understand that process at the Eunice Police Department?

A. Yes, sir.

Q. What do you have to do?

A. For instance, if someone has to be tased, there's a form that needs to be filled out on how and why and what part of their body was tased, why they used that level of force.

Q. Do you have to write a report if you punch

Page 33

a suspect?

A. I would definitely include it in my arrest report, my initial report. I'm not sure if there's a section on a use of force report that includes that, but I would definitely document it.

Q. If you punch someone and then don't arrest them, do you have to write a report?

A. If I -- I've never really thought of it that way, because if I punch someone, odds are they're going to jail. So...

Q. Have you ever punched someone, a suspect?

A. I have, yes.

Q. When was the last time that occurred?

A. It was about a year ago, maybe more, when I was with the marshal's office.

Q. I'd like to talk a little bit more about your time at the marshal's office.

What was your rank while you were there?

A. Deputy marshal.

Q. Could you explain the different ranks at the marshal's office?

A. So at the marshal's office, you have deputy marshal, then chief deputy, which is the number-two below the marshal himself.

Q. So it's the marshal, chief deputy, and



Page 34

then all deputies?

A. Yes, sir.

Q. Got it. At the marshal's office, how did your duties differ from those that you had at the Eunice Police Department during your first stint?

A. The difference was I was -- I was tasked with serving papers through like protective orders, evictions, civil citations, lawsuits. And then working court security is another thing I did not do at the police department that I did at the marshal's office.

Q. Did you execute search warrants at the marshal's office?

A. Other than DWI blood warrants, I was never involved in a -- in a search warrant with the marshal's office.

Q. How about an arrest warrant?

A. Several.

Q. What types of crimes -- strike that.

For what types of crimes did you execute those search warrants?

A. Generally, if they were the warrants issued by City court, they would be misdemeanor warrants because it's --

THE COURT REPORTER:

Page 35

They would be what?

THE WITNESS:

Misdemeanor warrants.

A. However, if I came across someone with a felony warrant with another agency, I would make the arrest.

BY MR. HOBBIE:

Q. Did you ever assist the Eunice Police Department in executing warrants?

A. Several times.

Q. Search warrants?

A. While with the marshal's office, no, I don't think so.

Q. Only with the police department?

A. Yes.

Q. Did those arrest warrants involve suspects who committed felonies?

A. Yes.

Q. Besides the Eunice Police Department, while you were at the marshal's office, did you work with other law enforcement agencies?

A. On occasion, I have.

Q. Which ones?

A. I've assisted the Louisiana State Police, Evangeline Parish Sheriff's Office, St. Landry

Page 36

Parish Sheriff's Office, and Acadia Parish, the neighboring parishes.

Q. About how -- I'm sorry.

A. And to include the Ville Platte and Opelousas City Marshal's Offices too.

Q. About how often did you work with law enforcement agencies besides the Eunice Police Department?

A. I would say at least once a month.

Q. Each of them once a month?

A. One or the other. Just -- it -- yeah, I'd say once a month, you know, one of the ones I named, sure.

Q. Did you speak with law enforcement officers at the agencies?

A. Sure.

Q. Did you ever speak about the Eunice Police Department with those officers?

A. Sure.

Q. What did you guys talk about?

A. We just discussed why I was no longer there and just the difference in the pay grade and, you know, the -- they would hear a lot about a lot of conflict within the police department. And, obviously, I didn't work for the police

Page 37

department at the time, so I wasn't able to answer intelligently. But other than that, that's it.

Q. Do you remember about when you had that conversation?

A. I don't. I don't even know who it was with.

Q. But during your time at the Eunice Police Department, did you witness internal conflict?

A. Sure, I would say so.

Q. Like the Jeremy Ivory incident?

A. Sure.

Q. Did you witness any others?

A. At one time, Detective Victor Fontenot and this other guy who's passed away since then, Lieutenant Robert Brickley, didn't see eye to eye on working narcotics, you know, one's rule of doing and the other person's way of doing it, and there was some argument here and there. But other than that, no.

Q. Did members of other law enforcement agencies ever talk to you about the reputation of the Eunice Police Department?

A. Reputation, no. I've had people ask if certain officers were considered dirty cops. And I don't even know if it was other agencies asking,

10 (Pages 34 to 37)



Page 38

this may have been civilians.  It's been -- the question has been posed.

Q.  Who were the, quote, dirty cops that they talked about?

A.  Detective Victor Fontenot.

Q.  You said dirty cops.  Was there more than one?

A.  They used the term plural.  But I think that's usually who they were talking about anytime I asked them.

Q.  In your opinion, is Victor Fontenot a dirty cop?

A.  I've never seen Victor Fontenot commit any type of malfeasance, anything that would be considered malfeasance, I never witnessed it.  So no.

Q.  Have you ever heard about him committing any type of malfeasance?

A.  I've heard rumors from people who -- who I wouldn't really put a whole lot of weight on their word saying, you know, he has sex with his confidential informants and that he uses drugs.  But, again, I'm never seen it.

Q.  Who were those people that told you about that?

Page 39

A.  I want to say one of the persons was a woman named Jesslyn Mettatal.

Q.  Is there any other people?

A.  Not that I can think of offhand.

Q.  Did Lieutenant Dunn ever discuss Victor Fontenot's misconduct with you?

A.  He has before.

Q.  What did he talk about?

A.  I believe we had a discussion once about Lieutenant Dunn wrote up Detective Victor Fontenot for mishandling some type of evidence in a case.

Q.  In your opinion, is that malfeasance by Victor Fontenot?

A.  I don't know the details on exactly how it was mishandled, so I wouldn't be able to answer intelligently.

Q.  Earlier you said you've heard rumors from people but you don't put a whole lot of weight on their word.

A.  Right.

Q.  Do you recall saying that?

A.  Yes, sir.

Q.  Do you put weight in Lieutenant Dunn's word?

A.  Sure.

Page 40

Q.  Why is that?

A.  He's been in law enforcement for quite some time.  From what I see, he has an impeccable service record.  I have no reason to disbelieve him.

Q.  The officers at the other law enforcement agencies, did they ever talk to you about Chief Fontenot?

A.  No, sir.

Q.  Did they ever talk to you about Chief Fontenot's reputation?

A.  No, sir.

Q.  Did they ever talk about Victor Fontenot's reputation?

A.  Sure, I've been asked about Victor Fontenot's reputation by other officers, that's correct.

Q.  From where?

A.  If I can recall correctly, it would be a Sergeant Caleb Aymond with the Evangeline Parish Sheriff's Office.

Q.  Anyone else?

A.  Assistant Chief Allerate Frank with the Basile Police Department.

In fact, I'll go back.  You asked if any

Page 41

other officers asked specifically about Chief Fontenot.  That's who -- I was incorrect on; I answered no.  A.J. is what he goes by, Frank Allerate, Frank, we call him A.J.  A.J. has made comments about Chief Fontenot in the past.

Q.  Where is A.J. Frank working?

A.  He's the assistant chief for the Basile Police Department at this time.

Q.  What did he say about Chief Fontenot?

A.  The two of them were opponents in elections in the past.  And I believe that A.J. worked around Chief Fontenot for a brief period of time.  And he's just -- I don't know anything in particular, but he claimed -- he just never expressed anything but disdain for Chief Fontenot.  I can't think of anything verbatim.  But...

Q.  When A.J. Frank worked for Chief Fontenot, do you believe he was targeted?

A.  I can't answer that.  I wasn't -- at the time, I was not employed by the Eunice Police Department.

Q.  Has anyone told you that A.J. Frank was targeted by Chief Fontenot?

A.  I want to say that Lieutenant Dunn told me that A.J. was -- basically that Chief Fontenot

11 (Pages 38 to 41)



Page 42

didn't want A.J. to be promoted to lieutenant, from sergeant to lieutenant. And other than that, I don't know -- I don't know what his intended means to stop him from being promoted was. But that's all I know, and that's only what I've heard.

Q. Do you know why Chief Fontenot wouldn't have wanted A.J. Frank promoted to lieutenant?

A. Personally, I do not know.

Q. What's A.J. Frank's race?

A. He's a black male.

Q. Have you ever heard of Varden Guillory?

A. I have.

Q. Have you spoken with Varden Guillory before?

A. Briefly.

Q. Have you talked with him about Chief Fontenot?

A. No, sir.

Q. Are you aware that he used to work at the Eunice Police Department?

A. I am.

Q. Are you aware of the circumstances of his departure?

A. If I understand correctly, he was arrested

Page 43

at some point in time, not long after he retired possibly, something like that.

Q. Are you aware that it was not long after he put in his notice to retire?

A. I wasn't aware.

Q. Are you aware that Chief Fontenot had Varden Guillory arrested?

MS. LOVE:
Object to form.

A. Sure, I would assume. I would assume it may have been under Chief Fontenot's direction, considering the crime that he was arrested for would generally be something that was committed administratively. So I'm guessing it would be under Chief Fontenot's direction.

BY MR. HOBBIE:

Q. What was the crime?

A. If I understood correctly, it would have been malfeasance in office and injuring public records, I think.

Q. Do you know what he did?

A. I was told he ripped up a statement that someone filled out, you know. I'm not sure.

Q. Are you aware of why he ripped up that statement?

Page 44

A. Not really. I think he just -- he assumed the person's statement was lies, so he ripped it up.

Q. While you were at the marshal's office, did you work with the Eunice Police Department?

A. We would collaborate often to back each other up.

Q. About how often?

A. I'd say on a daily basis.

Q. Did you personally work with them on a daily basis?

A. I'd say so, yes.

Q. Who did you work with from the Eunice Police Department?

A. Just about everybody who was assigned to patrol and investigations. If someone was looking for a certain person in particular, they would consult with me sometimes and I'd consult with them and just discuss, you know, the location of the suspects. Often that's usually the case.

Q. Before working with Eunice Police Department officers, did you have to get approval from Chief Fontenot?

A. No, sir.

Q. Did you have to get approval from Terry

Page 45

Darbonne?

A. Terry was -- Terry preferred that we not get too much involved in Eunice Police Department's cases, but I wouldn't have to seek out his approval. It was usually just use my discretion.

Q. Did Terry ever tell you why he didn't want you to get involved in Eunice Police Department cases?

A. Because Terry's not -- he's not a fan of Chief Fontenot. I think it's -- I think it goes back a long time.

Q. How do you know that?

A. Terry is just -- he doesn't speak fondly of Chief Fontenot.

Q. What does he say about him?

A. He -- basically, he just doesn't agree with the way Chief Fontenot runs his department, because no tickets were being written, no DWI arrests were being done, all things that affected Terry Darbonne's paycheck through fines that come through City Court, that's the majority of it.

Q. Are you aware that Terry Darbonne was deposed this week?

A. I was told, yeah.




Page 46

Q. Are you aware that he said that he and Chief Fontenot were friends?

A. I was not aware of that.

Q. I saw you smile.

A. I beg to differ them being friends. They've never -- I've seen them work casually together. I know they worked together at the police department a long time ago. But I wouldn't say they hang out together as friends, no.

Q. Has Terry Darbonne said anything negative about Chief Fontenot to you?

A. Sure.

Q. What did he say?

A. I should -- excuse my language, I should run against the son of a bitch and beat him, basically saying he should run for chief of police. That's to name one.

Q. You can name others?

A. He's expressed the fact that he holds more power as City Marshal over the City of Eunice than Chief Fontenot does as the chief of police.

I can't think of anything else specifically off the top of my head. That's -- he's never said anything nice about him, I can just put it like that.

Page 47

Q. Has Terry Darbonne ever said anything negative about personnel at the Eunice Police Department?

A. He has talked about Detective Victor Fontenot and Lieutenant Ryan Young, he has. He's brought them up before in a negative way.

Q. What has he said about Victor Fontenot?

A. He preferred that we not get involved in any kind of narcotics investigations as far as arresting the Eunice Police Department because he expressed that he believed Victor was dirty, a dirty cop.

Q. Did you believe Terry when he said that?

A. I just followed his orders, but I didn't particularly take Terry's word to be the truth. That's just assumption.

Q. Have you ever worked with Victor Fontenot to execute a warrant?

A. When I was with the police department I have, yes. The first time. I'm sorry, the first time I was with the police department, I did.

Q. During your time there, were you ever concerned about how Victor Fontenot went about getting a warrant?

A. Only through my lack of knowledge on the

Page 48

way narcotic investigations are to be handled correctly. I've never done a narcotics investigation past drug and addiction traffic stops.

Anytime a confidential informant is being paid, and that's sometimes how Victor Fontenot does his job, I'm assuming, I kind of -- all I do is sit back as a juror, if I were a juror, and think, maybe that's probably not a very reliable source. That's the extent of it.

Q. Have you witnessed Victor Fontenot pay people?

A. Not personally, no.

Q. Well, when do you sit back as a juror?

A. Just -- just in the past whenever search warrants have been conducted, it's been told to me, you know, how the search warrant was obtained, through confidential informants. And that's on -- whenever I think of that I'm like, you know, if I were sitting on a jury -- I can't tell you a specific time when I thought that.

Q. Sorry, I didn't know you were done. I apologize.

About how many times would you say you were concerned about one of Victor Fontenot's --

Page 49

strike that.

About how many warrants by Victor Fontenot were you concerned about?

A. Honestly, it was never about one warrant in particular; it was just the general way I was told Victor Fontenot operates in narcotics. And this was told to me by the late Lieutenant Robert Brickley.

Q. And what did Robert Brickley tell you?

A. He just stated that that's not the way to go about it. And he claimed, if he was in narcotics -- basically, just expressed that he would be better at it than Victor and he wouldn't, you know, basically pay informants to give him information, because a person might tell you anything whenever they're being paid.

Q. When did Sergeant Brickley say this?

A. I guess it would have been around the 2019 year. I can't tell you any more specific than that.

Q. You said during your time at the marshal's office you executed some arrest warrants?

A. Yes, sir.

Q. When you arrested suspects, did anyone ever ask you to call Victor Fontenot?

13 (Pages 46 to 49)





Page 50

A. Quite often.

Q. About how many times?

A. Generally, if it was a person -- a Caucasian individual being arrested or had a history of methamphetamine use, that's usually one of the first things that would come up on the traffic stop.

Q. Do you have an estimate of how many times?

A. I guess I'd have to -- I guess I'd say 20 or 30. Quite often.

Q. Wow. You said "generally, if it was a Caucasian individual."

Were they all Caucasian?

A. I don't think I've ever had a black person ask me for Victor that I can think of, no.

Q. Do you know why that is?

A. Probably because -- through a conversation I had with Victor one time, we were discussing doing a -- you know, the potential to do a search warrant on -- you know, on a person -- on a drug dealer who was black at the time, and he discussed having some -- having a hard time infiltrating because he had no black confidential informants or hardly any black confidential informants. So that's about it.

Page 51

Q. Has Victor Fontenot ever used a racial slur around you?

A. I've never heard him use a racial slur.

Q. Has Chief Fontenot?

A. No, sir.

Q. How about Ryan Young?

A. No, sir.

Q. Do you know why Victor has hardly any black confidential informants?

A. I don't know why.

Q. When you received these 20 or 30 requests from people about Victor Fontenot, were you concerned?

A. Not really, no. I still had a job to do, you know.

Q. Were you concerned about potential malfeasance by Victor Fontenot?

MS. LOVE:
Object to form.

A. Not particularly, no.

BY MR. HOBBIE:

Q. Why not?

A. I just always took it at face value, you know, them being a confidential informant and attempting to use that as leverage for me to avoid

Page 52

arresting them or writing them the ticket, whatever the necessary action would have been at the time.

Q. Did you ever tell Terry Darbonne about this?

A. Yes, sir, we've had conversations about it.

Q. And is -- in your opinion, is that why he told you to be worried about working with Victor?

A. I guess it could probably have something to do with it possibly.

Q. When you made other arrests, have suspects or individuals ever asked for other Eunice Police Department personnel?

A. There may have been a time or two when someone's asked for another officer, sure.

Q. Who? I'm sorry, I'll rephrase.

A. Okay.

Q. Which officer did they ask for?

A. I want to say one had asked for Lieutenant Ivory on some occasions, I want to say it was a DWI arrest. And there was someone recently who wanted to speak to Lieutenant Dunn. But that was about it.

Q. After you arrested -- strike that.

Page 53

After you confronted those 20 or 30 people who mentioned Victor Fontenot, do you know about how many were arrested?

A. I couldn't tell you. I have no idea.

Q. Do you know if Victor Fontenot helped any of them get out of trouble?

A. I would say he probably -- he may have attempted to. But at the end, it usually came down to the judge's decision, especially if it was a bench warrant. So, no, I couldn't tell you.

Q. Would you be surprised if Victor attempted to?

A. I wouldn't be surprised. You know, if he thought that keeping them out of jail would further his investigation, I wouldn't be surprised.

Q. Have you ever witnessed Victor Fontenot let an inmate out of jail?

A. I've never witnessed that, no.

Q. Have you ever heard of it?

A. I've heard about it.

Q. About when did that happen -- excuse me, I'll rephrase that.

When did you hear about that?

A. I'm guessing around the time that the



Page 54

instance I'm thinking of occurred, and I would say that's between 2018 and 2019.

Q. What instance are you thinking of?

A. If I recall correctly, one Jordan Arnaud was taken out of the back but was still in custody. And he was supposed to be helping Victor with some kind of investigation, I'm not sure. And maybe he escaped or tried to escape. I wasn't present for that.

Q. Are you aware if Chief Fontenot knew about this?

A. I can't comment. I'm not sure.

Q. Are you aware if Lieutenant Dunn knew about this?

A. At the time it occurred, you're asking if Lieutenant Dunn knew about it?

Q. Around the time that it occurred.

A. I think -- I'm sure -- I guess he did. I'm not sure.

Q. Do you know if Lieutenant Dunn reported this incident?

A. I'm almost positive he did. We had a conversation about it before, that Victor was allegedly trying to facilitate Jordan's escape. That's the conversation we had.

Page 55

Q. You said you had a conversation about it before?

A. Uh-huh.

Q. When was that conversation?

A. That could have been a few months ago or maybe a year ago.

Q. Do you understand the internal reporting process at Eunice Police Department?

A. Vaguely, especially since I've been gone for over two years now, I'm just now returning back to the police department. But I have a vague understanding of the standard operating procedure regarding that.

Q. And what is your understanding of the standard operating procedure?

A. If I'm not mistaken -- and this is my understanding of civil service law -- if someone gets put under investigation, I'm almost positive they're supposed to receive notice that they're under investigation and there's supposed to be a certain amount of time in which the investigation is conducted and all interviews need to be recorded, something to that effect. That's the extent of my knowledge.

Q. If there's an investigation, what happens

Page 56

if the investigating officer finds that there was wrongdoing?

A. I guess it would depend on if the wrongdoing was something that violated the policies or if -- versus if they violated the law.

Q. Okay. So what happened -- what would happen -- strike that.

If the wrongdoing was something that violated policy, what's the procedure at Eunice Police Department?

A. I think the investigating officer would turn all findings over to the chief, and I'm assuming he would determine the necessary disciplinary action.

Q. Are you aware of the Eunice Police Department policies?

A. To an extent. General awareness, sure.

Q. When's the last time you read them?

A. About a week ago I started skimming over them and never really read much into them. So the last time I actually read through those policies was probably when I first started in 2017.

Q. Who was the chief in 2017?

A. Chief Fontenot.

Q. And can you remind me when you started

Page 57

this most recent stint at the Eunice Police Department.

A. I want to say -- I can tell you -- I can tell you exactly when if you allow me to look at my commission card.

Q. That's fine. Take your time.

A. I was appointed on June 22nd of this year.

Q. That's just over a month and a half ago?

A. Sure, yes, sir.

Q. When you're commissioned, does that mean like you're ready to go out into the field?

MS. LOVE:
Object to form.

A. Not necessarily. I guess it would depend on the person's experience and the need for field training.

BY MR. HOBBIE:

Q. So when you -- what happens after you're commissioned -- or strike that.

After you were commissioned on June 22nd, what did you do the next day?

A. I went straight to work responding to calls, general patrol duties.

Q. Were you carrying a weapon?

A. Yes, sir.

15 (Pages 54 to 57)


MAGNA
LEGAL SERVICES

Page 58

Q. What weapon?

A. It's a Glock 17 9-millimeter pistol.

Q. How about a Taser?

A. I have no Taser at this time. My certification is expired.

Q. Is it encouraged at the Eunice Police Department, that patrol officers carry a Taser?

A. I wouldn't imagine it to be encouraged, because no one's asked me why I don't have a Taser when everyone else does.

Q. What other weapons are you carrying?

A. I have a can of OC spray, which is also known as pepper spray, and my phone. That's it at this time.

Q. How close does someone have to be to use the OC spray?

A. To tell you exactly, I wouldn't do it any closer than a foot or two without damaging this person's eyes through what's called a hydraulic needle.

Q. About how far away can you be to use it?

A. I may be able to get to Lieutenant Michael Dunn from here depending on the type of spray I'm using. I guess 20 feet maybe. It just depends on the brand and what type of canister it's in.

Page 59

Q. How wide is the field of spray?

A. The one I'm carrying, I think it's just a stream. I've seen other people use spray that just sprays, literally. So...

Q. So your spray is like pretty precise?

A. I would -- yeah, yeah. When I tested it when I first got this can -- I don't know when, I was still with Basile -- I tested it to make sure that the button wasn't stuck because, you know, things accumulate, dust and stuff. And it came out as a stream. I've pepper sprayed one person on it. So that's...

Q. When was that?

A. That was -- I was still with the marshal's office. That was about a year ago.

Q. Why did you pepper spray him?

A. He was actively resisting.

Q. How far away was he?

A. About 3 feet.

Q. If someone was 20 feet away from you running at you, would you use pepper spray?

A. 20 feet, I don't think I'd be comfortable using it effectively, I wouldn't imagine. Because a lot of things would come into consideration, such as the wind and stuff like that. So...

Page 60

Q. Could the wind mess up the stream that comes out of the OC spray?

A. I would think so.

Q. If a person is 20 feet away from you running at you, would you use your firearm? I'll rephrase.

If someone is 20 feet away from you running at you, would you draw your firearm?

A. Just running at me with no weapons visible?

Q. Correct.

A. I wouldn't draw my firearm. That wouldn't be the first thing I'd think of, no.

Q. What would be the first thing you'd think of?

A. I guess I'd have to consider their demeanor while they're running towards me, if this person is running to me for help or this person is running towards me to do me harm.

Q. If they're running towards you to do harm, would you draw your firearm?

A. Empty handed, if this person is not armed, no, I wouldn't draw my firearm.

Q. What if they had a knife?

A. Yes, I would draw my firearm.

Page 61

Q. At what point would you decide to shoot?

MS. LOVE:

Object to form.

A. I guess I don't believe I'd let them get any closer than you and I before I decide to take action.

BY MR. HOBBIE:

Q. Have you ever used a Taser?

A. Yes, I have.

Q. About how far away can you shoot a Taser?

A. Generally, about 20 to 25 feet is the maximum distance of it being effective.

Q. And what's the spray like out of a Taser?

A. It comes out vertically, two darts, and they'll separate more and more as they fly further. I'm not sure the ratio.

Q. In your opinion, is a Glock a lethal weapon?

A. Yes, sir.

Q. In your experience, is a Glock more lethal than a Taser?

A. Yes, sir.

Q. In your experience, would a Taser be effective if somebody is running at you from 20 feet with a knife?



Page 62

MS. LOVE:

Object to form.

A. I would say there's a possibility for it to be effective, sure.

BY MR. HOBBIE:

Q. Are you trained to use less lethal force before employing lethal force? Excuse me, I'm going to rephrase that.

Are you trained to use non-lethal force before using lethal force?

A. Not necessarily. It's favorable to use less lethal, if possible, but we're not instructed to like we have to use a Taser before we can use a gun. If my life is in danger, I skip the Taser part of it basically. There's no continuum.

Q. But you don't have a Taser?

A. Not at this time, I don't.

Q. You've been at the police department just over a month and a half; is that right?

A. Yes, sir. That's correct.

Q. Earlier you said that no one has encouraged you to get your certification for a Taser; is that right?

MS. LOVE:

Object to form.

Page 63

A. I discussed it with Lieutenant Ivory, and we just discussed what I have to -- he basically said, We'll have to see when there's going to be another training because my certification is expired. I'm not allowed to carry one at this time. But I did submit a training request yesterday for a training that's coming up.

BY MR. HOBBIE:

Q. Over the last month and a half, about how many days did you work?

A. Probably -- I work about half the month, so a little more than 15 days.

Q. And about how many people did you come into contact with? I'm going to rephrase.

About how many civilians did you come into contact with?

A. You know, in one capacity or another while working, I'd say maybe 100 or so, just whether it be, you know, them being stopped by me and detained or just casual conversation in public places.

Q. Were any of those 100 instances traffic stops?

A. I've made a few traffic stops since I've been back.

Page 64

Q. Did any of those result in arrest?

A. No, sir, not by me, no.

Q. Did any of those traffic stops result in you feeling threatened?

A. There's always a heightened state of mind. Anytime a traffic stop is conducted, I have to basically operate under the assumption that this person could want to hurt me. But I've never felt that particular person at that particular instance was a threat to me, no.

Q. Of the 100 or so interactions that you had in the last month and a half, did you ever feel threatened?

A. Sure, yes, sir.

Q. During any of those interactions, would a Taser have been effective?

MS. LOVE:

Object to form.

BY MR. HOBBIE:

Q. I'll rephrase that.

During any of those interactions, in your opinion, would a Taser have been effective?

A. No, sir, not that I can recall.

Q. Why not?

A. The -- well, the one instance that comes

Page 65

to mind is about a week ago. A man was threatening his neighbor with a firearm allegedly. And when I pulled up to the house, he grabbed the firearm, an AR-15, ran through the house.

And so I caught him in the back. And he was stopped at the fence trying to cross the fence with the gun still in his hands. So I drew my firearm on him and instructed him to drop the gun and gave him further instruction to detain him. Since he was no longer resisting or running with the firearm, tasing him wouldn't -- wouldn't have -- it would have been excessive.

Q. I want to get back to your days at the marshal's office. We've come a long way from there. While you were at the marshal's office -- strike that.

You also said that Marshal Darbonne talked negatively about Ryan Young.

Do you recall saying that?

A. Yes, sir.

Q. What did he say about Ryan Young?

A. He was upset, being that Lieutenant Young is a firearms instructor who would qualify -- because yearly officers have to qualify with their firearm to show that they're competent.

17 (Pages 62 to 65)



Page 66

Several times he had reached out to Lieutenant Ryan Young to qualify us, basically, to do it, and he claimed every time he talked to Lieutenant Ryan Young he had an excuse as to why he couldn't. And he just -- he wasn't thrilled with that.

Q. So did Ryan Young's excuses delay training at the marshal's office?

MS. LOVE:

Object to form.

A. Not particularly. Because he just called another firearms instructor with a neighboring agency and it was taken care of.

BY MR. HOBBIE:

Q. Did the marshal say anything else negative about Ryan Young?

A. There was another instance when -- regarding firearms qualification when I first started at the marshal's office. Marshal Darbonne alleged that Ryan didn't want to qualify the office because -- or there was one deputy, a reserve deputy in particular, that Ryan didn't want to interact with, and that's why.

And so Terry told him, Well, if you're not going to qualify the entire office, we're just not

Page 67

going to use you. That's what I was told.

Q. Do you know Ryan Young's reputation in the law enforcement community?

A. Sure. I know he's been doing this job a long time. He's -- he seems to be respected generally.

Q. Do you know what his duties are at the Eunice Police Department?

A. He's the -- he's in charge of the criminal investigations division. He's chief of detectives, I believe he's called.

Q. How many other detectives are there at the department?

A. At this moment in time, there's Lieutenant Ryan Young, Detective Victor Fontenot, and Detective Jessica Tezeno, who is a juvenile officer. I'm quite certain that's the only detectives we have.

Q. Does a juvenile officer only work on juvenile crimes?

A. From my understanding, correct.

Q. Do the other detectives also work within juvenile crimes?

A. Anytime there's a serious juvenile matter, it's usually referred to the juvenile officer.

Page 68

Q. Why -- was there a murder trial recently in the Eunice City Court?

A. Yes, sir.

Q. Did that involve a juvenile?

A. Yes, sir.

Q. Did Victor Fontenot testify at that trial?

A. I wasn't present during the trial. I had departed from the marshal's office at the time of the trial itself.

Q. Are you aware that Victor Fontenot testified at the trial?

A. He did indicate that he was going to court for a trial, so I would assume he did.

Q. Are you aware that Ryan Young also testified at that trial?

A. I believe so, yes.

Q. While at the marshal's office, did you continue to work with Jeremy Ivory?

A. Sure, yes, sir.

Q. Did you work with Tony Kennedy at all?

A. Not really.

Q. And about when did you leave the marshal's office, can you remind me? I think you've already said this.

A. It would have been maybe two or three

Page 69

weeks before I started at the police department again. So it would have probably been late May, early June.

Q. And why did you leave the marshal's office?

A. A lot of reasons. But the -- basically, the cherry on top was a disagreement the marshal and I had.

Q. And what was that disagreement?

A. He was not a fan of a Facebook post that I made about a particular elected official in the area. While I was visiting the site where a drunk driver killed my mom for New Year's, he waved to me with a beer in his hand. So I made a comment on Facebook about that. I didn't name him.

And that elected official, I guess the shoe fit, and he confronted me about it on Facebook. And we had words, respectful at first. So then that person called Terry Darbonne to make a complaint on something I did when I was not at work.

And Terry Darbonne, over text message, told me he didn't like the fact that I made that post and basically took this elected official's side. And I'm not going to work for somebody who

18 (Pages 66 to 69)



Page 70

supports people who drink and drive, just not going to happen.

Q. I understand. I'm sorry for your loss.

A. Thank you.

Q. To go back to --

MS. CASWELL:
Can we take a break?

MR. HOBBIE:
Yeah.

THE VIDEOGRAPHER:
We're off the record. The time is 10:13.

(A break was taken from 10:13 a.m. to 10:24 a.m.)

THE VIDEOGRAPHER:
We are back on the record. The time is 10:24.

BY MR. HOBBIE:

Q. Jack, earlier you said that Terry Darbonne was worried that Victor Fontenot may have been corrupt.
Do you recall saying that?

MS. LOVE:
Object to form.

A. Correct.

Page 71

BY MR. HOBBIE:

Q. You do remember saying that?

A. I do remember saying that, yes.

Q. Did Terry ever explain why he thought that?

A. Other than just the same set of circumstances of the way he utilized his confidential informants. But, you know.

Q. Earlier you said that sometimes you sit back as a juror and you consider whether you -- do you remember what you said related to that?

A. Sure.

Q. Could you repeat that?

A. Oftentimes I'll sit and put myself in the place of a juror if I were on, you know, a jury for criminal trial. And I imagine, you know, how much weight I'd give certain pieces of evidence.
And in relation to that, if I were a juror, I'm not sure I'd consider a person very reliable if they're getting paid to tell you probably what you want to hear. That's where I was going with that.

Q. Okay. Did you know some of Victor Fontenot's confidential informants?

A. Not personally. Maybe one or two.

Page 72

Q. Did you know their identities?

A. One or two. I'm trying to recall one of them's name. Naomi, that's the one that's coming to mind.

Q. Are you aware if any of Victor's confidential informants had ever been arrested?

A. The one I know of for sure, she's been arrested.

Q. Do you know for what?

A. I know she was arrested on a warrant out of Oklahoma one time, I have no idea for what. And her husband, I've arrested him several times for contempt of court, of warrants, and things like that.

Q. Do you know if Naomi's warrant was a felony warrant?

A. I have no idea. They did want to extradite, so I'm assuming it is a felony.

Q. Do you know if any of Victor Fontenot's informants were arrested for a felony?

A. Off the top of my head, I wouldn't be able to answer intelligently. I'm not sure.

Q. Do you know what qualifies someone to be a confidential informant?

A. Some degree of reliability and willingness

Page 73

to cooperate with law enforcement, you know.

Q. Does the Eunice Police Department have any policies for the qualifications of a confidential informant?

A. I'm not sure.

Q. During your time at Eunice Police Department, past and present, have you ever worked with Victor Fontenot?

A. Yes, sir.

Q. Did you ever conduct a traffic stop with Victor Fontenot?

A. While with the police department? I'd say we were probably present together on traffic stops in the past. I'm not thinking of any one in -- a certain stop in particular, no.

Q. Okay. But, I'm sorry, I'm just trying to clarify the record.
Have you done traffic stops with Victor Fontenot?

A. Yes, sir, sure.

Q. Have you ever witnessed Victor Fontenot conduct an illegal search of a vehicle?

A. In my opinion, I believe it was an illegal search at one time when I was with the marshal's office.

19 (Pages 70 to 73)



Page 74

Q. You said it was?

A. In my opinion, there was no probable cause to search the vehicle at that time.

Q. What happened in that instance?

A. I conducted a traffic stop for an individual who was driving under suspension; I took him into custody and was just waiting for someone with a valid license to take over the vehicle, or maybe I was waiting for a tow truck, I'm not sure.

And, again, I was with the marshal's office at the time. I considered that to be my traffic stop, my investigation. And when I -- I was -- I was conducting some type of paperwork in my unit. When I looked up, Victor was rummaging through the vehicle.

I don't know if he planned on doing an inventory, you know, pursuant to policy to tow a vehicle or if he was searching. There was no probable cause to search the vehicle. So I just asked everybody to stop searching, stop everything, it was my traffic stop.

Q. In your opinion -- strike that.

Did Victor stop searching when you asked him to?

Page 75

A. Sure, yes.

Q. During that traffic stop, was someone -- was it your understanding that someone was coming to pick up the vehicle?

A. Thinking back on it, I'm almost positive that it was a wrecker company coming to get the vehicle from the side of the road, if I'm not mistaken.

Q. Do you have a policy --

A. With the marshal's office at the time, yes. I'm sorry, I didn't let you finish the question.

Q. You're okay. I pause a lot, unfortunately.

Do you have a policy for searching vehicles at the marshal's office?

A. There was a policy that involved anytime a vehicle were to be towed after commission of a crime or, you know, for instance, no insurance, anything like that, if a vehicle were to be towed, the policy indicated that we were to do an inventory of anything of value inside the vehicle.

Q. Are you aware of any Eunice Police Department policy to the same effect?

A. I'm quite certain there is a policy

Page 76

outlining that procedure, yes.

Q. So if that -- strike that.

Did the towing company pick up that vehicle?

A. I'm assuming they did. I don't know which towing company. And like I said, I'm not even 100 percent sure if the vehicle was towed or if I allowed, you know, a person with a valid license to come get the vehicle. But it was removed from the roadside before I left, you know.

Q. And then did someone search it after?

A. After it was taken?

Q. (Attorney nodded head.)

A. I'm not sure. I don't know what happened to it after that.

Q. Now, with Eunice Police Department, who is your supervisor?

A. My immediate line supervisor would be Sergeant Quintin Doyle and Lieutenant Jeremy Ivory.

Q. Is your job with the Eunice Police Department now any different than back from your first stint?

A. No, sir.

Q. What does Victor Fontenot do at the police

Page 77

department?

A. He is over -- he's a narcotics officer.

Q. Do you know if he has a supervisor?

A. I understand he's Lieutenant Ryan Young's immediate subordinate.

Q. Is there a chain of command at Eunice Police Department?

A. Yes, sir.

Q. If you're an immediate subordinate, do you report to your immediate superior --

A. Correct.

Q. -- officer?

Do you report arrests -- or strike that.

What do you report to your supervising officers?

A. Any paperwork that's to be conducted, a supervisor is going to check it for errors and sign off on it or reject it. Any questions that may be over a patrolman's head, not sure about something, you would call your sergeant or your lieutenant in the absence of a sergeant. That's kind of just how it works.

Q. Does a supervisor check your arrest reports?

A. Yes, sir.

20 (Pages 74 to 77)



Page 78

Q. Do they always ask you questions about it?

A. If there's -- if there's errors or if there's some minor -- just if there's a misunderstanding of some wording, sure, they'll ask some questions.

Q. In your time at the Eunice Police Department, have any other department personnel expressed concern to you about Victor Fontenot?

A. Sure, yes, sir.

Q. Who?

A. There was -- he's no longer employed with the Eunice Police Department -- Grant Clancy. He would refer to -- as a joke, he would refer to Victor's way of doing things as black ops, referencing the video game. That's -- that's it.

Q. Which video game? Call of Duty?

A. Yeah, yeah.

Q. Do you know why he would refer to Victor Fontenot's operations as black ops?

MS. LOVE:
Object to form.

A. Probably for -- probably for the same reasons that other people considered Victor to be dirty or possibly be dirty. Just...

BY MR. HOBBIE:

Page 79

Q. What other people considered Victor to be dirty or possibly dirty?

A. For instance --

MS. LOVE:
Object to form.

A. For instance, I guess Terry Darbonne or whatever Clancy heard at the time.

BY MR. HOBBIE:

Q. Did Terry give any specific reasons why he thought -- strike that.

Did Terry tell you any specific reasons why he thought Victor was a dirty cop?

A. Other than the use of informants, no. No, that's it. That's all I can think of.

Q. Besides Grant Clancy, did any other officers at the Eunice Police Department express to you concern about Victor Fontenot?

A. The late Lieutenant Robert Brickley. No one that I can -- I'm sure I've heard people say a thing or two here, but nothing I can put my finger on and quote other than that.

Q. Has Jeremy Ivory ever spoken negatively about Victor Fontenot?

A. Yes.

Q. What did he say?

Page 80

A. It was around the time when Victor was just starting out, when he left patrol to go to narcotics.

And Lieutenant Ivory expressed some concerns of Victor's lack of knowledge on working narcotics and errors that could potentially be made through his lack of experience and just urged us to just use our discretion when assisting Victor because it was new to him, narcotics.

Q. Do you know around what time that was?

A. I believe Victor went into narcotics sometime in 2019, the end of 2019 maybe.

Q. Did you witness Jeremy Ivory -- strike that.

Was anybody else in the room when Jeremy Ivory told you that?

A. Sure. There was the entire shift at the time, I believe, which would have probably, at the time, included myself; Sergeant Quintin Doyle, who was patrolman at the time; and Officer Grant Clancy.

Q. Are you aware if Jeremy Ivory ever told Ryan Young -- strike that.

Are you aware if Jeremy Ivory ever expressed this concern to Ryan Young?

Page 81

MS. LOVE:
Object to form.

A. I'm not aware personally, no. I've never heard him tell anything to Ryan. He's never told me that he said something to Ryan. I can't speak on that.

BY MR. HOBBIE:

Q. Where is Grant Clancy currently employed?

A. If he's still there, I haven't talked to him in a while, but at the Carencro Police Department.

Q. Did he say anything else -- strike that.

Did he express any other concern about Victor?

A. Not that I can recall.

Q. Do you know around when this was?

A. This -- I guess 2019 at the time. And he may have said another thing. I think while Victor was still on patrol, he and Victor had some kind of disagreement on the methods used to clear a room tactically, and he think -- he had feelings that Victor didn't like him. But that's as far as it goes.

Q. Do you know what the methods were that Victor was using to clear the room?



Page 82

A. I have no -- no idea.
Q. Since Victor -- strike that.
Since Jeremy's -- since Jeremy expressed concern about Victor Fontenot when he first joined narcotics, has Jeremy expressed any other concern to you about Victor Fontenot?
A. No, sir.
Q. Has Lieutenant Dunn ever expressed to you concern about Victor Fontenot?
A. Yes, he has.
Q. What did he say?
A. Lieutenant Dunn told me about some allegations that were made that Victor may have been trying to get him set up or to be arrested some type of way. And I think just in -- generally disagreeing on the proper way to conduct a narcotics investigation.
But I don't know word for word any other instance when they disagreed or if he had anything bad to say about Victor.
Q. I understand you don't know word for word, but can you describe the instance you just referred to?
A. About the -- getting him set up or attempting to get --

Page 83

Q. You said "generally disagreeing on the proper way to conduct a narcotics investigation, but I don't know word for word any other instance."
A. Right. I think it just came down to the same -- just disagreeing on the tactics used to obtain information. That's about it.
Q. Do you remember specifics of --
A. I don't.
Q. Are you aware of any investigation that Victor Fontenot did to implicate Lieutenant Dunn?
A. Vaguely, I'm aware vaguely.
Q. What do you know about it?
A. I was just told that the target of an investigation by the name of Joshua Dupre had told Lieutenant Dunn on a traffic stop that Victor was going to try to get Dunn set up to be arrested. That's all I know.
Q. Are you aware that Joshua Dupre testified to that effect under oath at a bond revocation hearing?
MS. LOVE:
Object to form.
A. I was informed of that, yes.
BY MR. HOBBIE:

Page 84

Q. Who informed you of that?
A. Lieutenant Dunn.
Q. Do you know who the judge was at that bond revocation hearing?
A. If I recall correctly, it would have been Judge Gerard Caswell.
Q. Do you know Judge Caswell?
A. No, sir, not personally.
Q. Have you ever heard of Judge Caswell expressing concern about Victor Fontenot?
A. I think he expressed concern at that hearing related to Joshua Dupre on the seizure of certain phones without a warrant. That's just what I heard.
Q. Have you ever heard anything else about that?
A. That's it.
Q. Are you aware that Victor Fontenot was called to testify at the bond revocation hearing?
A. I was informed that he was present, yes.
Q. Are you aware that under oath -- strike that.
Are you aware that he was under oath during that hearing?
A. I would have imagined he would have been,

Page 85

sure.
Q. Are you aware that he testified that he took those phones without a proper warrant?
MS. LOVE:
Object to form.
A. Other than the fact that he was there and that Judge Caswell expressed concern on the seizure of those phones, I don't know what else was said in that hearing.
BY MR. HOBBIE:
Q. Do you know where those phones currently are?
A. I do not.
Q. Do you know if they're in an evidence locker?
A. I do not. I have no idea.
Q. Does the CID office have an evidence locker?
A. I've only been there maybe three times, and I've been working in Eunice for quite some time. I'm not sure. I believe we only have one evidence locker.
Q. Where is that?
A. It's at the main police department building.

MAGNA
LEGAL SERVICES

Page 86

Q. Have you ever witnessed Victor Fontenot handle evidence in a case?

A. I may -- I have. Yes, I have.

Q. Have you ever seen Victor Fontenot turn in evidence at the Eunice Police Department evidence locker?

A. I can't -- I can't think of an instance where I did watch him do that, no.

Q. Do you know if he does it?

A. I would hope he does. I don't know that he does.

Q. Why do you hope that he does?

A. That's -- you know, it's -- you want to handle evidence properly to avoid chain of custody issues and allegations of missing evidence. It's just -- I would imagine -- I would hope that he follows procedure.

Q. Are you aware that he was deposed in this case?

A. Yes, sir.

Q. Are you aware that he admitted that the two phones are still at the CID office?

MS. LOVE:
Object to form.

A. I was not aware of that, no, sir.

Page 87

BY MR. HOBBIE:

Q. In your experience, is that in compliance with Eunice Police Department policy?

MS. LOVE:
Object to form.

A. Considering that I don't know that there's an evidence locker at CID, I would imagine the proper place for the phones would be at the main evidence locker at the police department.

BY MR. HOBBIE:

Q. Are you aware that Chief Fontenot was at Victor Fontenot's deposition?

MS. LOVE:
Object to form.

MR. HOBBIE:
What's the basis for that objection?

MS. LOVE:
It assumes facts not in evidence.

MR. HOBBIE:
I'm sorry?

MS. LOVE:
Do you want me to repeat?

MR. HOBBIE:
I'm asking if he was aware.

MS. LOVE:

Page 88

Okay. That's okay.

BY MR. HOBBIE:

Q. Are you aware that Chief Fontenot was at Victor Fontenot's deposition?

A. I didn't know for certain, but I imagine that he was here.

Q. Do you know if he rode with Victor Fontenot to his deposition?

A. I'm not aware of that, no.

Q. When's the last time you've looked at an evidence log?

A. I want to say I logged evidence last week. I'm trying to think for what. But it hasn't been very long.

Q. In the last two weeks -- strike that.

I want to talk more specifically about the defendants in the case.

How long have you known Chief Fontenot?

A. Chief Fontenot and my mother worked together while Chief Fontenot was employed as a probation officer through Eunice City Court. So I would venture to say that I've been aware of him, I've known him in some form or fashion, for most of my life.

Q. Could you describe your relationship with

Page 89

Chief Fontenot in the past.

A. I remember vaguely him giving me a tour of the jail when I was really little, and then I began working for him. Prior to my departure the first time, when I was first here, I'll admit I had some -- I needed some attitude adjustment, you know, as far -- and as well as the handling of Lieutenant Ivory's situation, he and I didn't see eye to eye, Chief Fontenot and I.

Q. What attitude adjustments did you need?

A. I had a -- I guess I had an issue with authority, you know, just -- so I would like to think I've matured some since then.

Q. What's your relationship with Chief Fontenot like now?

A. It's fine. He hired me back, I'm grateful for that. And I have no issues with him.

Q. Have you had any disagreements since you joined recently?

A. With Chief Fontenot?

Q. (The attorney nodded head.)

A. No, sir.

Q. Are you aware of Chief Fontenot's reputation in the law enforcement community?

A. Not really, no, sir. I know he was

23 (Pages 86 to 89)


MAGNA
LEGAL SERVICES

Page 90

employed with the police department through the '80s and maybe into the '90s, but I don't know any specifics about it.

Q. Besides Jeremy Ivory, have other officers at the police department complained to you about Chief Fontenot?

A. There was -- there was an officer, the first one that comes to mind, he was Sergeant Nicholas Cooley. He's expressed quite a bit of disdain for Chief -- Chief Fontenot. I'm sorry.

Q. And what did he say about Chief Fontenot?

A. He expressed his feelings of Chief Fontenot operating under what he referred to as a good ol' boy system, crime only applying to certain individuals. He went on the news and said the same thing. That's -- I know he was a lieutenant at one time and believes he was demoted after a DWI arrest of a certain individual.

Q. In your opinion, does Chief Fontenot operate under a good ol' boy system?

MS. LOVE:
Object to form.

A. I don't know of anyone who doesn't, I'll put it that way. Basically what I'm saying is, anytime a person is in a political capacity,

Page 91

certain favors are to be made for certain people. But I've never seen anyone be cut loose because of a good ol' boy system, basically is what I'm trying to say.

BY MR. HOBBIE:
Q. Have you ever witnessed Chief Fontenot do favors for certain people?

A. I don't know if you'd classify it as a favor, but just yesterday Chief Fontenot requested that an officer -- personally requested an officer go to a certain establishment where a woman wanted to make a complaint about being stalked. I guess you could call that a favor.

Q. A second ago you said "basically what I'm saying is anytime a person is in a political capacity, certain favors are to be made for certain people."

A. I'm referring to like the fixing of tickets and things like that.

Q. And what do you mean by fixing tickets, just for the record?

A. Like urging the judge or the prosecutors to maybe drop it down to something non-moving because -- maybe if it was a speeding ticket, to reduce the cost for this person.

Page 92

Q. To your knowledge, has Chief Fontenot ever done that?

A. I don't have any direct knowledge of it, no, sir.

Q. Have you heard that he's done that?

A. I feel like he's fixed tickets for certain officers who have gotten tickets. So sure.

Q. How did you hear about those instances?

A. There's a dispatcher who's employed there now. I believe he did call in a favor. She got a ticket for driving pretty fast. And I'm fairly certain that she brought it to Chief Fontenot. And I don't know what happened to the ticket after that.

Q. You said, "I feel like he's fixed tickets for certain officers."

Which officers are you referring to?

A. I'm trying -- I'm trying to recall. There was one in particular. I think he was a jailer. His name was Miguel Bernard. And he'd gotten a speeding ticket a while back. And I say "a while back," I'm sorry, a few years ago. And he told me he brought it to Chief Fontenot. And, again, I don't know what happened to it. So...

Q. Well, he told you he brought it to Chief

Page 93

Fontenot?

A. Correct.

Q. Then did he say anything else happened?

A. We never talked about it. He -- I'm guessing he was under the impression that Chief Fontenot was going to help him by making a phone call, but I don't know what the disposition of the situation was.

Q. All he said to you was "I brought it to Chief Fontenot"?

A. Basically, sure, implying that he was going to have it -- you know, see if Chief Fontenot could call in a favor for him.

Q. Is that common in the Eunice Police Department?

A. Sure, sure.

Q. Does Chief Fontenot only do favors for certain officers?

MS. LOVE:
Object to form.

A. I can't say that for certain. I've never heard of him denying a favor to anyone. So...

BY MR. HOBBIE:
Q. Have you ever heard of Chief Fontenot doing a favor -- strike that.


MAGNA
LEGAL SERVICES

Page 94

Have you ever heard of Chief Fontenot fixing a ticket for Lieutenant Dunn?

A. Never.

Q. In your opinion and experience at the Eunice Police Department, does Chief Fontenot have favorites?

A. In my -- not particularly. I'm freshly back. So no. I know he and Lieutenant Stephanie Meyers had a close relationship at one time, and I don't believe they speak to one another anymore. So I'm -- I don't know.

Q. Have you ever heard that Chief Fontenot has a hit list?

MS. LOVE:

Object to form.

A. I've never heard of a hit list.

BY MR. HOBBIE:

Q. Have you heard that there are certain officers that Chief Fontenot does not like?

A. No. No, sir. From Chief Fontenot, no.

Q. Have you heard it from other officers?

A. No, not that I can recall.

Q. Has Lieutenant Dunn ever expressed to you that Chief Fontenot does not like him?

A. In so many words, sure.

Page 95

Q. What do you mean, "in so many words"?

A. Lieutenant Dunn expressed the feeling of being targeted by Chief Fontenot, which would lead me to believe that Chief Fontenot may not like him.

Q. In your opinion, has Chief Fontenot targeted Lieutenant Dunn?

A. I don't know the facts and circumstances on -- so possibly, but I don't know the reason any of this got started. I can't speak intelligently on that.

Q. Are you aware -- strike that.

Do you know why Stephanie Meyers and Chief Fontenot stopped talking?

A. I do not know, no.

Q. What do you know about Stephanie Meyers?

A. She's --

MS. LOVE:

Object to form.

A. She's employed as a lieutenant with the Eunice Police Department.

BY MR. HOBBIE:

Q. Do you know how long she's been there?

A. I don't. I do not.

Q. What's her position at the Eunice Police

Page 96

Department?

A. Honestly, other than the rank of lieutenant, I don't know what exactly she does. Especially since I'm back, I've maybe seen her once or twice. So I'm not sure what her job is.

Q. How long have you known Victor Fontenot?

A. Since -- November of 2017 is when we met, when I started at the police department.

Q. Could you describe your relationship with Victor.

A. I wouldn't call him a close friend of mine, but we're cordial with one another.

Q. Are you friends with most people in your department?

A. I'd say I'm on very good terms with most people in the department.

Q. Why not Victor Fontenot?

A. Again, like I said, I'm on good terms with everybody, I'm just not particularly friends with certain people. I don't hang out with everybody that works there.

Q. Beyond what we've already discussed -- or strike that.

Are you aware of Victor's reputation in the law enforcement community?

Page 97

MS. LOVE:

Object to the form.

A. The allegations of him being a dirty cop, that seems to be the predominant thing I hear about.

BY MR. HOBBIE:

Q. Have you ever discussed that reputation with Ryan Young?

A. Never.

Q. Do you know if anyone's ever -- strike that.

What's your relationship with Ryan Young like?

A. We talk from time to time when we see one another. It's cordial.

Q. I think you said this earlier, but can you remind me of his reputation in the law enforcement community?

A. Ryan Young's?

Q. Yeah.

A. He seems to be respected by most people of all walks of life. He's been there a long time. That's the impression I'm under.

Q. In your opinion, is he a good officer?

A. I'd say he is.

25 (Pages 94 to 97)



Page 98

Q. Why's that?

A. He's just demonstrated a very good ability to speak to people and to, you know, direct people to do what they're being asked to do as far as suspects and witnesses and things like that.

Q. Are you aware if he -- strike that.

Are you aware if he does that with Victor Fontenot?

A. If he does what?

Q. Well, you said he "demonstrated a very good ability to speak to people and to, you know, direct people to do what they're being asked to do as far as suspects and witnesses."

A. I haven't heard of him having to discipline Detective Victor Fontenot, so I'm assuming Victor Fontenot follows his orders correctly.

Q. What have you heard about that discipline?

A. I've never heard of any.  I just -- it's a lack of discipline.

Q. Oh, I'm sorry.

A. Correct.

Q. As a supervising officer at the Eunice Police Department, must you report misconduct to the chief?

Page 99

MS. LOVE:

Object to form.

A. I would think so.

BY MR. HOBBIE:

Q. Why is that?

A. Because we operate off of a general chain of command.

Q. Is it your understanding that supervising officers have a duty to oversee tasks by subordinate officers?

A. Yes, sir.

Q. Are you aware if Victor Fontenot was ever disciplined by Ryan Young for the search of the inventoried vehicle -- excuse me, strike that.

Are you aware if Victor Fontenot was ever disciplined by Ryan Young for the search of the vehicle we discussed earlier?

A. No, sir.

Q. Are you aware if Victor Fontenot was ever disciplined by Ryan Young for his selection of confidential informants?

A. No, sir.

Q. Are you aware if Victor Fontenot ever misrepresented facts to a judge?

A. Other than that -- the little bit I know

Page 100

about that hearing involving Joshua Dupre, I have no knowledge of Victor misrepresenting any facts to a judge.

Q. Are you aware if Ryan Young disciplined Victor Fontenot for his involvement -- strike that.

Are you aware if Victor Fontenot was disciplined for his handling of the Joshua Dupre case we discussed earlier?

A. I'm unaware of any disciplinary action.

Q. In that instance or just ever?

A. In that instance or -- and ever.  I can't -- other than the time that I believe he was written up by Lieutenant Michael Dunn for a separate case.  I don't know -- I don't have any knowledge of Detective Victor Fontenot being written up or anything like that.

Q. Has the chief -- strike that.

Do you have any knowledge of the chief disciplining Victor Fontenot?

A. I have no knowledge, no, sir.

Q. Have you ever expressed concern about Victor Fontenot to the chief?

A. No, sir.

Q. Has Jeremy Ivory?

Page 101

A. To my knowledge, no.  I'm not sure.

Q. Do you know if Lieutenant Dunn has?

A. I believe Lieutenant Young -- I mean, Dunn, sorry.  Lieutenant Dunn has -- I believe he did talk to Chief Fontenot about some of Detective Victor Fontenot's conduct, but I don't know to the extent of what, in relation to what, no.

Q. A minute ago you said there was some writeup.  Could you talk more about that incident?

A. My only understanding is that it was a case involving a sexual assault.  And someone, possibly Victor, mishandled the evidence, maybe the evidence went home with that person or something, didn't properly log it like it was supposed to be.

And I'm only assuming, I think I was told, that Lieutenant Dunn wrote him up for that.

Q. And to your knowledge, was Victor disciplined for that?

A. To my knowledge, I'm not sure what happened with that.  I'm almost certain I was working in Basile at the time, so I didn't hear anything -- any disposition regarding that case.

Q. Okay.  I misunderstood what you said earlier.  While you were in Basile, did the chief

26 (Pages 98 to 101)



Page 102

express concern about -- strike that.

While you were working in Basile, did the Basile police chief express concern about the Eunice Police Department?

A. Indirectly, yes.

Q. What do you mean by "indirectly"?

A. I was advised by A.J. Frank -- who at the time was sergeant, he's assistant chief. I was advised by him to no longer request Lieutenant Michael Dunn to use his K9 at the time. He had a dual-purpose K9. I was informed not to use the Eunice Police Department or Michael Dunn because it was Chief Fontenot's department and he didn't care for Chief Fontenot.

So that's -- that's the only -- I don't know if that came directly from Chief Ivory or if that was just Sergeant Frank telling me that.

Q. Did they -- did Sergeant Frank mention any other officers from Eunice Police Department?

A. He spoke of Lieutenant Robert Brickley a few times and just telling me stories of how they worked together, but no one in particular.

Q. Did A.J. Frank ever advise you to not work with Victor Fontenot?

A. No, sir, never.

Page 103

Q. Did A.J. Frank ever advise you not to work with Ryan Young?

A. No, sir.

Q. Did A.J. Frank ever advise you not to work with any other member of the Eunice Police Department besides Michael Dunn?

A. Never.

Q. And around what time was this?

A. This would have been -- this would have been early 2020. I'm not sure when. Because I was investigating a stabbing and I needed -- I requested for a K9 for an article search. And I was on a first-name basis with Lieutenant Dunn, so he was my first phone call.

And Sergeant Frank advised me not to do that again, not to call Lieutenant Dunn again.

Q. While you were investigating that stabbing, why did you request the K9?

A. Because I was looking for the weapon used. I was told by a witness on scene that he may have thrown the knife. I was trying to recover the knife, and I figured the fastest way to do it was possibly use a K9.

Q. Can K9s recover weapons?

A. They can -- they -- some -- and I'm not --

Page 104

I've never been a K9 handler, but I believe they're trained to track whatever might have human scent on it; and in that case, it would have been a knife.

Q. Do you know if K9s can track drugs?

MS. LOVE:

Object to form.

A. If they're trained to do such a thing, yes.

BY MR. HOBBIE:

Q. Does the Eunice Police Department have a K9 now?

A. No, sir.

Q. Do you know why not?

A. I believe the K9 unit was disbanded due to -- and I only heard that -- because it wasn't being used or needed at the time.

Q. Do you know when that was?

A. I would say --

Q. I'll rephrase that.

Do you know when it was disbanded?

A. I would say that -- probably 2020, '21.

Q. Have you heard that -- strike that.

Do you know who the K9 handler was prior to the unit being disbanded?

Page 105

A. Yes, sir. Lieutenant Michael Dunn.

Q. Do you know for how long he was a K9 handler?

A. He had the dog when I first started in 2017, and I think he had just recently acquired the dog at that time. But he also handled another dog years before I started. So I don't know. All in all, I'm not sure how long, but a few years.

Q. During your first stint, how many dogs did the Eunice Police Department have?

A. Just one.

Q. Do you know if they ever had two?

A. I'm fairly certain that before I started there, there was once a time where there may have been three or four dogs available.

Q. Do you know around when that was?

A. Possibly the '80s, early '90s.

Q. During your first stint at the Eunice Police Department, was -- excuse me, was Lieutenant Dunn the K9 handler?

A. Yes.

Q. Did you ever witness Lieutenant Dunn use the K9 for an investigation?

A. Yes, sir.

Q. About how many times?



MAGNA
LEGAL SERVICES

Page 106

A. It would be hard to say. 30. I would be lying if a gave you a number. The dog was usually with him all the time. So...

Q. During your first stint at the Eunice Police Department, when you were on duty, was your radio on?

A. Yes, sir.

Q. Do people typically request -- strike that.

In your experience, do officers request the dog over the radio?

A. Sometimes, sure, yes, sir.

Q. During your time from -- during your initial stint at the Eunice Police Department, did you hear other officers request the dog over the radio?

A. Yes, sir.

Q. Do you know what types of cases the dog was used for?

A. The one that stands out, myself and Lieutenant Robert Brickley were involved in a vehicle pursuit with a stolen vehicle, and when the vehicle came to a stop, three males abandoned the vehicle in the middle of the road and ran. And I recall Lieutenant Brickley calling for a K9

Page 107

to do a -- to track a person.

Q. Do you know if it worked?

A. I don't think -- we located only one of the subjects, and he was in the opposite area of where the dog had began tracking. So...

Q. Have you ever used the dog for a drug stop -- excuse me.

Have you ever used the dog for a traffic stop?

A. Yes, sir.

Q. Why would you use the dog at a traffic stop?

A. If you have reasonable suspicion that there may be the presence of narcotics, illegal narcotics inside the vehicle, you could utilize a K9 to do what's called an open-air sniff, which could possibly lead to probable cause to search the vehicle.

Q. Have you ever done that?

A. I have, yes.

Q. Have you ever called someone else in to do that?

A. Me personally, no. I've called for a K9 before, but I've canceled the K9 en route due to probable cause arising before the K9 was needed.

Page 108

I've -- I don't know how many times.

I've seen other officers, maybe it wasn't my traffic stop, but other officers have called for a K9, and the K9 arrived to do an open-air sniff.

Q. Do you know if those open-air sniffs found any drugs?

A. A few times, I believe so, sure.

Q. I just want to go back to Victor Fontenot -- strike that.

To your knowledge, did Chief Fontenot handle probation issues?

A. Prior to him being elected as chief of police, yes.

Q. While he was chief, have you ever witnessed misconduct by Chief Fontenot?

MS. LOVE:
Object to form.

A. No, sir.

BY MR. HOBBIE:

Q. While chief, have you ever witnessed Randy Fontenot violate Eunice Police Department policy?

MS. LOVE:
Object to form.

A. No, sir.

Page 109

BY MR. HOBBIE:

Q. While chief, have you ever witnessed -- strike that.

While he was chief, did you ever witness Chief Fontenot violate the law?

MS. LOVE:
Object to form.

A. Never, no, sir.

BY MR. HOBBIE:

Q. While he was chief, did you ever witness Chief Fontenot act unethically?

MS. LOVE:
Object to form.

A. No, sir.

BY MR. HOBBIE:

Q. Has Chief Fontenot ever asked you to violate the law?

A. No, sir, not that I can recall.

Q. Has Chief Fontenot ever asked you to violate policy?

A. No, sir.

Q. Has Chief Fontenot ever asked you to act unethically?

A. No, sir.

Q. Has Chief Fontenot ever asked you to



Page 110

operate in the gray?

A. No, sir.

Could you clarify what "the gray" is? I'm assuming that means the thin line between wrong and right. Is that what you're referring to?

Q. I can't testify. That's just a quote. "Within the gray" is a quote.

Has he ever said that to you?

A. I've never been instructed -- I've never been instructed by Chief Fontenot to operate in the gray, no.

Q. Did Chief Fontenot ever order you to destroy a home during the execution of a search warrant?

A. No, sir.

Q. Have you heard that Chief Fontenot ordered other officers to destroy a home while executing a search warrant?

A. You're asking if I heard that -- if Chief Fontenot ordered those officers to do it?

Q. Right.

A. At the time -- possibly through Lieutenant Dunn there was a search warrant. There was a room where the chief said to tear up the house. I don't know what search warrant it was. I

Page 111

don't -- I don't have firsthand knowledge of it.

Q. Do you know who executed the search warrant?

A. If it's the one I'm thinking of, it would have been -- the case agent would have been Victor Fontenot; but the execution of the warrant breaching the house and making entry would have been myself, Lieutenant Dunn, Chase Godeaux, and Grant Clancy.

Q. Do you remember destroying a home while executing a search warrant?

A. No, other than the possibility to damage a door, never purposely damaging a home.

Q. Do you remember executing a search warrant on 700 Juanita Street?

A. 7 -- no, sir.

Q. Has Chief Fontenot ever attempted to interfere with one of your investigations?

A. Not to my knowledge, no.

Q. Has Chief Fontenot ever attempted to do a favor which would interfere with one of your investigations?

A. No, sir, not to my knowledge.

Q. Has Chief Fontenot ever fixed one of your traffic tickets?

Page 112

A. Not to my knowledge, no.

Q. Did Chief Fontenot ever ask you to alter a police report?

A. No, sir.

Q. Did he ever ask you to change a statement?

A. No, sir.

Q. Did he ever ask you to change a traffic crash report?

A. No, sir.

Q. Did Chief Fontenot ever ask you not to execute a search warrant?

A. No, sir.

Q. Have you heard about Chief Fontenot having enemies within the Eunice Police Department?

A. Sure. I would consider he and Lieutenant Dunn to be enemies.

Q. Why do you say that?

A. Because Lieutenant Dunn has filed suit against him. I would say that's a pretty good way to qualify someone as your enemy. Other than that, I'm not sure.

Q. Have you ever seen Eunice police officers post on social media?

A. As in on their personal accounts?

Q. Right.

Page 113

A. Sure.

Q. Who?

A. I've seen Lieutenant Mary Guillory post pictures of her kids. I've seen Lieutenant Ivory post pictures of his kids. I post pictures of my child.

Q. I understand. Let me rephrase.

A. Okay.

Q. Have you ever seen Eunice police officers post on social media about local crime?

A. Sure, yeah, I have.

Q. What are some examples of that?

A. I don't recall the time in which it took place, but Lieutenant Dunn had made a post in a subgroup on Facebook about some -- a shooting or something that may have occurred by his house.

Q. Did you investigate the shooting?

A. I was not present for that, no, sir.

Q. What have you heard about the incident?

A. I was informed that -- if I'm not mistaken, Lieutenant Robert Brickley was the supervisor on duty at the time and performed the investigation, and that there were no findings of a shooting, no evidence of a shooting found.

Q. Are you aware that Chief Fontenot

29 (Pages 110 to 113)




Page 114

investigated -- strike that.

Are you aware that Chief Fontenot put Lieutenant Dunn on leave following this Facebook post?

A. Yes, sir.

Q. Do you know why?

A. I do not know why.

Q. Have you seen the Facebook post?

A. I have.

Q. What did it say?

A. It was a pretty lengthy post. But it was basically alerting the people of the neighborhood that there was a party going on at like a banquet hall of some sort right up the road and that he heard gunshots. And that's about all I can really remember. I don't know anything else about it. I don't know word for word.

Q. Has Lieutenant -- has Lieutenant Dunn told you why he was put on leave following the Facebook post?

A. He was -- he informed me that Chief Fontenot was displeased with him making that post and that that was the reason why he was put on leave.

Q. Do you think this is an instance of Chief

Page 115

Fontenot targeting Lieutenant Dunn?

MS. LOVE:

Object to form.

A. I don't know enough circumstances to speak on why Chief Fontenot put him on leave. If that is the only reason why he was put on leave, then, sure, I'd venture to say it's targeting. But I don't know.

BY MR. HOBBIE:

Q. Are you aware of any threats of physical violence made against Lieutenant Dunn by members of the Eunice Police Department?

A. Lieutenant Dunn told me about a case in particular, yes.

Q. What case are you referring to?

A. He informed me that he was aware of a threat being made by Detective Victor Fontenot to shoot him in the back of the head or something like that. I don't -- it wasn't a direct threat said straight to him but in the presence of other officers.

Q. You said earlier that Chief Fontenot and Lieutenant Dunn are enemies?

A. I would imagine they are.

Q. Has Chief Fontenot ever spoken negatively

Page 116

about Lieutenant Dunn?

A. To me?

Q. Right.

A. No, sir.

Q. Have you ever heard Chief Fontenot speaking negatively about Lieutenant Dunn?

A. Not personally, no.

Q. What do you mean, "not personally"?

A. I've never -- I would imagine, if someone is your enemy or considered to be your enemy, you would speak negatively about them. It's just never been done in my presence.

Q. Has Chief Fontenot ever spoken to you about Lieutenant Dunn?

A. Just in general?

Q. Right.

A. Sure, yes.

Q. Can you give me some examples?

A. It was when I first started at the police department. I was waiting to be qualified with a firearm so I could go out on patrol. And at the time, I wasn't really familiar with the proper chain of command.

So I went to Chief Fontenot and asked, you know, if we could put a rush on me getting

Page 117

qualified. And he just informed me that I needed to go through Lieutenant Dunn, who was my immediate supervisor at the time.

Q. Are there any other examples?

A. None that I can recall.

Q. Have you heard other officers at the department speak negatively of Lieutenant Dunn?

A. Sure.

Q. Who?

A. I mean, the quote about -- from Jeremy Ivory about getting involved in this bullshit was an implication that maybe he wasn't a fan of Lieutenant Dunn or what was going on with Lieutenant -- it's not to say he doesn't like him. I can't -- I mean, no one has said anything to me directly, no.

Q. Do you know if Chief Fontenot has any other -- strike that.

Would you consider any other officers enemies with Chief Fontenot?

A. Sergeant Frank or Assistant Chief Frank, I don't think he and Chief Fontenot like each other very much. Anyone present at the police department at this time, I -- I don't know what happened, but I believe he and Lieutenant Meyers

30 (Pages 114 to 117)




Page 118

are not seeing eye to eye on something; I don't know if I would classify it as an enemy. But there are people who disagree with him.

Q. Does Chief Fontenot treat his enemies within the department differently than other officers?

MS. LOVE:

Object to form.

A. I can't speak on -- I have -- I'm not sure. I don't know.

BY MR. HOBBIE:

Q. During your --

A. I'm sorry.

Q. I'm sorry?

A. I don't have any personal direct knowledge of that taking place, I don't.

Q. Have you heard of it?

A. Sure.

Q. What have you heard?

A. Just from what I've heard from Lieutenant Dunn and about what was alleged about Lieutenant -- I mean, sorry, Sergeant Frank not being promoted, those are the examples.

Q. Have you heard any instances involving Donnie Thibodeaux?

Page 119

A. Yes, sir. Yeah.

Q. Like what?

A. I know that Lieutenant Thibodeaux had appealed something through civil service regarding his position as a training officer as opposed to being a shift supervisor. And I don't know what else is involved.

Q. In your experience, does Chief Fontenot target officers that don't agree with him?

A. In my experience, I -- I can't speak personally. I -- no.

Q. During your stint -- your first stint at the department, I believe you mentioned that Jeremy Ivory was demoted; is that right?

A. Correct, yes, sir.

Q. Was anybody else demoted?

A. Lieutenant Nicholas Cooley was demoted from lieutenant to sergeant, back to sergeant, at one time.

Q. Do you know why Nicholas Cooley was demoted?

A. Only from what I've heard. I think the basis in the paperwork was due to Lieutenant Cooley's conduct off duty. But Lieutenant Cooley obviously gave me a different story. So -- but I

Page 120

don't know factually, no, I don't know.

Q. During your time -- strike that.

During your first stint at the Eunice Police Department, do you remember if there were officers who were investigated internally?

A. I think anytime a person is written up, it's considered an internal investigation. So yeah.

Are you inquiring about like any criminal matters being criminally investigated?

Q. No, just an internal investigation when someone is written up.

A. Yeah, I believe that's always considered to be because -- you know, there's a necessary -- necessary routine to be done, you know, as far as obtaining evidence that they violated some type of policy. So it would be considered an investigation.

Q. Who was investigated?

A. It would have been Lieutenant Jeremy Ivory, myself included. I was under internal investigation at one time. Nicholas Cooley. Just to name the ones I can think of off the top of my head.

Q. What about Lieutenant Dunn?

Page 121

A. I believe this -- when Lieutenant Dunn was written up or put on leave or whatever it was, that I wasn't employed with the Eunice Police Department at that time. So...

Q. Okay. Have you heard -- to your knowledge, has Chief Fontenot ever put Victor Fontenot on leave?

A. To my knowledge, no.

Q. To your knowledge, has Chief Fontenot ever put Ryan Young on leave?

A. To my knowledge, no.

Q. To your knowledge, has Chief Fontenot ever put Stephanie Meyers on leave?

A. Well, I'm not quite sure what you would call it, but I know she just hasn't been at work for quite a while due to some medical. I don't know if it was at the instruction of the chief or at the instruction of her doctor; I'm very unclear on that. So that would be the only circumstance that I can -- that wouldn't be a complete no.

MR. HOBBIE:

Why don't we take a five-minute break. Is that good with you?

MS. LOVE:

That's good.



Page 122

THE VIDEOGRAPHER:
We are off the record. The time is 11:30.
(A break was taken from 11:30 a.m. to 11:44 a.m.)
THE VIDEOGRAPHER:
We are back on the record. The time is 11:44.
BY MR. HOBBIE:
Q. Jack, has Lieutenant Ivory ever told you that he was being targeted by Chief Fontenot?
A. He did express at the time when all this was going on that he was being treated unfairly.
Q. Why did he say he was being treated unfairly?
A. He believed the disciplinary action that was taken was excessive, considering what was done to warrant it, I guess.
Q. Did he say he was being treated differently than other officers?
A. Maybe -- maybe he did. He mentioned one, Joey Fontenot, who's a traffic officer. But I can't really remember if he said -- what exactly he said. But he basically -- he talked about Joey Fontenot, what he does during his workday, or the

Page 123

lack of what he does, as opposed to what Ivory was doing. You know, he felt like he was being treated unfairly, I guess.
Q. You said "as opposed to what Ivory was doing."
What was Ivory doing?
A. Like basically he insinuated that he was doing his job while there was other people, for example, Joey Fontenot, who didn't do his job.
Q. Are there other examples?
A. Not that I can remember.
Q. Victor Fontenot?
A. I don't remember Victor's name coming up at that time.
Q. Has any civilian ever complained to you about Chief Fontenot?
A. Jesslyn Mettatal, the one we spoke about earlier. She talked to me after her cousin or someone was arrested for arson by the State Fire Marshal's Office, not even the police department, expressed that -- basically saying that Victor gets to do what he wants because Chief Fontenot allows him to, something like that.
I can't really think of any other instance in particular.

Page 124

Q. You mentioned earlier that the Basile police chief spoke to you about Chief Fontenot; is that right?
A. The assistant chief did. He was sergeant at the time, he's assistant chief now.
Q. Who was that?
A. Allerate Frank, A.J. Frank.
Q. Okay. Did Chief Ivory ever speak to you about Chief Fontenot?
A. Not that I can remember. Never anything. I didn't have much contact with him. He was rarely ever at the department. So...
Q. Do you know of Chief Ivory's relationship with Chief Fontenot?
A. I don't know if it's -- I'm assuming it's pleasant. I can't speak on it, though.
Q. Do you know of Victor Fontenot's relationship with Michael Dunn?
A. It doesn't sound -- from what I hear, it's not great, it's not good.
Q. Have you heard Victor Fontenot say he's going to break Lieutenant Dunn's mother fucking fingers?
A. I've never heard directly anyone say that, no.

Page 125

Q. Indirectly?
A. I've only heard about the allegation of Victor saying he was going to shoot Lieutenant Dunn or shoot the dog or something like that. But no, that's as far as I've heard.
Q. Besides Lieutenant Dunn, did you hear from anybody else?
A. No.
Q. Are you aware that Stephanie Meyers recorded that statement?
A. I was told that, yes.
MS. LOVE:
Object to form.
BY MR. HOBBIE:
Q. By who?
A. Lieutenant Dunn.
Q. Anybody else?
A. No, sir.
Q. Besides the vehicle search, have you ever witnessed misconduct by Victor Fontenot?
A. Not personally, no.
Q. You said not personally?
A. Correct. I didn't see it myself. I've heard about it, but I've never seen it.
Q. What have you heard about besides that?




Page 126

A. Someone, I believe it might have been Grant Clancy, that said when he first started he had handcuffed a guy and Victor said something to the effect of, You're supposed to put them even tighter than that, like put the handcuffs extremely tight on this man. I don't know that he even did it. But that's all I know about.

Q. Do you know of any other instances?

A. None that I can think of, that stand out, no.

Q. During your time at the marshal's office, did you arrest anybody?

A. Yes, sir.

Q. Did you ever arrest anybody who said that Victor Fontenot tipped them off about the arrest warrant?

A. No, sir, no.

Q. Have you heard of anyone at the marshal's office arresting someone who said that Victor Fontenot tipped them off?

A. I think there was always suspicion that he may have tipped people off. You know, my colleagues expressed suspicion of that happening. But I don't know that that ever happened directly, no.

Page 127

Q. Who expressed suspicion?

A. It would have been Chief Deputy Joey Peloquin.

Q. Why do you say it would have been him?

A. That's who it was.

Q. Oh, okay. When was that?

A. I guess about a year ago possibly.

Q. What did he say?

A. We were looking for a subject by the name of Sean Arnold. And after coming in contact with police for something unrelated to the warrant -- those officers weren't aware of the warrant to execute it.

Well, after someone -- one of the marshal's office deputies got on the radio and asked that he be detained. He had already been cut loose. The guy had fled and no reason to flee.

So Chief Deputy Peloquin claimed to have knowledge that Sean Arnold was a cooperating informant for Victor and that Victor may have called him and told him, They're about to come back to you because they just found out about a warrant. That's -- it was investigated, you know, the possibility of it was investigated; there was

Page 128

no findings that someone was tipped off.

Q. Who investigated that?

A. I looked into it myself. And I have nothing to go on other than the guy got his warrant cleared. I haven't -- I don't have any phone records. I went to the spot where the guy allegedly ran away. I didn't see any camera footage of Victor Fontenot's vehicle picking this guy up. This was at the direction of Marshal Terry Darbonne. There was no findings.

Q. Did you investigate him tipping someone off or him --

A. Possibly picking the guy up.

Q. Which one did you investigate?

A. Picking the guy up.

Q. You didn't investigate the tipping off?

A. I had no means of investigating that, no.

Q. What do you mean, "no means"?

A. I would have needed phone records, and that was...

Q. Have you ever seen Victor Fontenot's phone records?

A. I have not, no.

Q. Do you know how many phones Victor Fontenot has?

Page 129

A. I believe -- I think he only has one. I only have one phone number for him. So...

Q. During your time at Eunice Police Department, have you witnessed misconduct by Victor Fontenot besides the search of the vehicle?

MS. LOVE:
Object to form.

A. No, sir.

BY MR. HOBBIE:

Q. Have you ever witnessed Victor Fontenot violate the law?

A. No, sir.

Q. Have you ever witnessed Victor Fontenot violate policy?

A. No, sir.

Q. Have you ever witnessed Victor Fontenot act unethically?

A. No, sir.

Q. Have you ever heard about Victor Fontenot violating the law?

A. Sure. If what Clancy told me was true, that if Victor did, indeed, tighten the handcuffs, that would definitely be in violation of someone's civil rights, absolutely. But that's -- that's all.




Page 130

Q. That's the only instance you remember?

A. And I was told that he obtained a washer and dryer from someone after a call that he responded to but -- that could maybe be considered an ethical violation. But, again, I didn't see it, so I don't know.

Q. Who gave him the washer and dryer?

A. It most certainly would have been Jordan Arnaud.

Q. Why do you say "most certainly would have been"?

A. Because I remember the house in which they told me that the transaction took place, when the dryer was given to him, and I'm almost positive Jordan Arnaud resided there at some point in time.

Q. Have you ever heard Victor Fontenot discussing this transaction?

A. Never, no, sir.

Q. When you say "transaction," do you know if Victor Fontenot gave him something?

A. No. I mean that just solely by the -- just him receiving something by someone. I don't know if he paid anything or didn't pay. I don't know.

Q. Any other violations of law that you heard

Page 131

about from Victor Fontenot?

MS. LOVE:
Object to form.

A. Other than what we already discussed, no.

BY MR. HOBBIE:

Q. Besides the one instance we talked about, do you know if Victor Fontenot ever released a person that he arrested --

MS. LOVE:
Object to form.

BY MR. HOBBIE:

Q. -- without judicial approval?

MS. LOVE:
Object to form.

A. Personally, no. I've heard of people being logged -- and this is semantics -- but until someone is arrested, the radio code to be given is 1015 as opposed detained, which is 10, 5. And I've heard him transport a 1015, an arrestee, to CID and later on that person is released.

Now, again, I don't know that that person was advised they were under arrest or if they were reasonably -- reasonably believed they were under arrest and then released. I don't know. That's as far as it goes.

Page 132

BY MR. HOBBIE:

Q. But the person was logged as a 1015?

A. Sure, yes, sir.

Q. How did you know -- how did you know that?

A. I heard it over the radio. It was following -- and honestly, I don't even -- I can't even tell you the exact incident. But it was following like a shooting investigation or something like that.

Q. Do you remember any specifics about the shooting investigation?

A. I do not, no.

Q. Does everyone at the Eunice -- strike that.

Do you know how many radiofrequencies the Eunice Police Department uses?

A. We have I believe two at our disposal. But we very seldom use the second one, it's primarily the first one.

Q. And was that 1015 we just discussed said over the primary radio?

A. Sure.

Q. When was that?

A. Around about maybe a year. I couldn't give you any more specific time than that.

Page 133

Q. Oh, this was when you were at the marshal's office?

A. Yes, sir.

In fact, I'll clarify. We -- we would monitor the police department's radio station as well as the marshal's channel because we share jurisdiction for officer safety reasons and communication.

Q. Has Victor Fontenot ever asked you to violate the law?

A. No, sir.

Q. Has he ever asked you to violate policy?

A. No, sir.

Q. Has he ever attempted to interfere with one of your investigations?

A. Other than the one time he began searching that vehicle without consulting me and -- which would have been just a courtesy, no. Not directly, no.

Q. If Victor Fontenot tipped off someone about an arrest warrant, would that interfere with your investigation?

MS. LOVE:
Object to form.

A. It would, sure.



Page 134

BY MR. HOBBIE:

Q. How so?

A. If this person can -- if this person knows they're wanted and knows I'm coming for them, they can avoid apprehension, you know, leave the jurisdiction. At that point, I'd be unable to physically arrest them. So sure.

Q. Does that present any safety risks?

A. Absolutely.

Q. How so?

A. Some of these people are violent offenders. If they know I'm coming, they can -- I guess they could prepare for me, sure.

Q. Sure. Do you know if Joey Peloquin told Terry Darbonne about -- strike that.

Have you heard about Victor Fontenot attempting to interfere with an investigation at the Eunice Police Department?

A. Have I heard of that happening?

Q. Right.

A. Other than people saying that -- the same situation I've run into, when they make a traffic stop, his name comes up. Call Mr. Vic, is what they'll usually say. That's about as far as it goes.

Page 135

And that's not even to say he interferes, it's just those people believing that if they call him, he'll interfere and possibly give them a break, keep them from getting arrested.

Q. Earlier you said Jordan Arnaud -- Arnaud --

A. Arnaud, yes, sir.

Q. -- Arnaud may have given Victor a washing machine.

Do you recall that?

A. Yes, sir.

Q. Do you know Victor Fontenot's relationship with Jordan Arnaud -- Arnaud?

A. I can't speak for anything further than a professional, just police officer and civilian -- or citizen. Other than that, I don't know.

Q. Have you ever arrested Jordan Arnaud?

A. Me personally, no, I've never arrested him.

Q. Have you ever heard of him being arrested?

A. Yes, sir.

Q. When?

A. I haven't heard his name come out within the last few years. So it would have probably

Page 136

been about two, three years ago he was arrested on possibly a contempt of court warrant or something like that. So...

Q. Is that a misdemeanor?

A. If it -- well, if it occurs, sure, yeah. That would be an easy way to put it, yeah.

Q. Do you know if Jordan Arnaud was a confidential informant for Victor Fontenot?

A. Personally, I don't know for a fact if he was or not. I just -- I'm quite certain I believe his father was.

Q. What's his father's name?

A. If it's his father, I think it's his father, not his uncle, but his name would be Harrison Arnaud, also known as Sonny.

Q. Do they live at the same house?

A. They have at one point in time.

Q. How do you know that Sonny didn't give Victor Fontenot the washer and dryer?

A. I don't know, I really don't.

Q. Do you know about the investigations that Victor Fontenot used Harrison Arnaud on?

A. Not in particular.

Q. Have you heard about any?

A. I don't know -- if he used him, I wouldn't

Page 137

know, you know. I don't know the ins and outs of his cases. I was just told that he's a cooperating informant.

Q. Do you know if Harrison Arnaud has ever been arrested?

A. I believe he's been arrested several times.

Q. For what?

A. I'm thinking theft. And this is just me assuming. It's never been anything violent to my knowledge. Just theft and possession of narcotics, things like that.

Q. Any felonies?

A. I'm not sure. I -- I'm not sure.

Q. Do you know Judge Hoychick?

A. Yes, sir.

Q. How often do you see Judge Hoychick?

A. While with the marshal's office, I would see him almost once a day. And I have retained him as a civil attorney for a lawsuit that I'm filing. So I see him quite often.

Q. Has Judge Hoychick ever mentioned Victor Fontenot to you?

A. No, sir.

Q. Are you aware that Terry Darbonne

35 (Pages 134 to 137)



Page 138

testified that Victor Fontenot misrepresented facts to Judge Hoychick?

MS. LOVE:

Object to form.

A. I was not aware of that.

BY MR. HOBBIE:

Q. Are you aware that Terry Darbonne testified that Victor Fontenot leaked yet-to-be-executed arrest warrants to suspects?

MS. LOVE:

Object to form.

A. I did not know that.

BY MR. HOBBIE:

Q. Has Victor Fontenot ever told you he was going to lie under oath?

A. No.

Q. Did Victor Fontenot ever tell you that he would lie at a civil service board hearing?

A. No.

Q. Do you recall serving Victor Fontenot a subpoena for Lieutenant Dunn's civil service board hearing?

A. I do.

Q. Did you serve him personally?

A. I did.

Page 139

Q. Did he say anything when you served him?

A. Again, he and Lieutenant Young were served at the same exact time. I don't recall exactly what Detective Victor Fontenot said during the conversation, I don't.

Q. Is that the same conversation where Ryan Young said a lot of people will be saying "I don't recall"?

A. Correct.

Q. Do you know when that civil service board hearing happened?

A. I don't remember, I don't.

Q. Did you attend it?

A. I was not present for it, I don't think I was.

Q. To your knowledge, did -- strike that. Has Victor Fontenot ever asked you to alter a police report?

A. No, sir.

Q. Any official statement?

A. No, sir.

Q. Are there any other instances of misconduct involving Victor Fontenot that you can think of?

MS. LOVE:

Page 140

Object to form.

A. No, sir.

BY MR. HOBBIE:

Q. Any policy violations?

A. No, sir.

Q. What is Ryan Young's role now at the Eunice Police Department?

A. He's the -- he's in charge of all the detectives. He's chief of detectives.

Q. Oh, that's right. You said he supervises Victor.

A. Correct.

Q. I apologize. In your experience, how often do Ryan and Victor work together?

A. I'd say on a daily basis.

Q. Are they both stationed at that CID office?

A. They both hold -- they have offices there, separate offices.

Q. Do they also have offices at the police department?

A. No, sir.

Q. Okay. Do you see them around the police department a lot?

Page 141

A. Just about every day.

Q. And what -- what shift are you on again, can you remind me?

A. It's referred to as Shift C.

Q. Okay.

A. Yeah.

Q. Have you ever witnessed Victor Fontenot threaten anybody else at the department?

A. No, sir.

Q. Have you ever heard him threaten anybody else at the department?

MS. LOVE:

Object to form.

A. Other than Lieutenant Dunn, no. Hearing about a threat, no, other than the one that I heard about that he made.

BY MR. HOBBIE:

Q. Have you heard that Victor Fontenot said that Lieutenant Dunn can lick his left nut?

A. I didn't hear that, no.

Q. Did you hear about it?

A. It's the first I hear about that.

Q. Have you ever witnessed misconduct by Ryan Young?

A. No, sir.

36 (Pages 138 to 141)



MAGNA
LEGAL SERVICES

Page 142

Q. Are you aware that Stephanie Meyers -- are you aware that Stephanie Meyers testified that Ryan Young was stalking her?

MS. LOVE:

Object to form.

A. I was not aware of that.

BY MR. HOBBIE:

Q. Have you ever heard of Lieutenant Ryan Young stalking employees at the Eunice Police Department?

A. No, sir.

Q. Have you ever heard of him following them?

A. I know Lieutenant Dunn expressed some concern of someone with the police department possibly watching him due to this whole thing, but that's as far as I've heard.

Q. When was that?

A. Six months, a year ago.

Q. Did he say who the person was?

A. No, he didn't.

Q. Does Ryan -- strike that. Who leads inves -- internal investigations at the Eunice Police Department?

A. I think that would be the duty of the deputy chief.

Page 143

Q. Does Ryan Young investigate internal complaints?

A. I think he can be directed to investigate them, I would imagine. I'm not sure.

Q. Have you ever been investigated by Ryan Young?

A. Not to my knowledge, no.

Q. Has Lieutenant Ivory -- to your knowledge, has Lieutenant Ivory been investigated by Ryan Young?

A. To my knowledge, no. I think the only time that I know he was under internal investigation, I think former Deputy Chief Richard Daigle conducted the investigation, if I'm correct at all.

Q. To your knowledge, has Lieutenant Meyers been investigated by Ryan Young?

A. To my knowledge, no.

Q. What about Donnie Thibodeaux?

A. No, I'm not sure.

Q. Lieutenant Dunn?

A. I believe -- I think Lieutenant Dunn did tell me at one point in time prior to this starting up that Lieutenant Ryan Young was one of the persons tasked with performing the internal

Page 144

investigation.

Q. Do you know which internal investigation?

A. I don't.

Q. Do you know if there's been more than one internal investigation into Lieutenant Dunn?

A. I feel like -- everything I've heard, I'm not sure what runs together and what's separate throughout Lieutenant Dunn's situation with the Eunice Police Department. I'm not sure.

Q. What do you mean "Lieutenant Dunn's situation with the Eunice Police Department"?

A. This lawsuit, the civil service side, being placed on leave. I don't know where one stops and one ends. I'm just -- I'm unfamiliar.

Q. Since -- during your time at the Eunice Police Department, past and present, do you believe that Chief Fontenot and Lieutenant Dunn were enemies?

A. Yes, sir.

Q. Why is that?

A. Like I said, one is suing the other. And from what I've heard from Lieutenant Dunn, you know, the allegations made would suggest that a person is your enemy, you know, if they're -- again, it's putting weight on if something is

Page 145

true. But it just -- it would appear that they're enemies, yeah, I'd say so.

Q. Has Ryan Young ever asked you not to pursue a criminal suspect?

A. No, sir.

Q. Do you know someone named Chris Smith?

A. Chris Smith. The only one that comes to mind has been deceased for ten years. So...

Q. Do you recall an incident involving Chris Smith stealing an ATV from the City attorney?

A. I remember taking an initial report from the City attorney when the ATV was stolen, but I didn't -- I was unaware of the disposition of the case. In fact, I think it happened more than once within a month. So I don't know whatever happened with the case.

Q. Who investigated the case after you did the initial report?

A. I'm not sure. I don't know.

Q. Where would we be able to find that information?

A. Police records.

Q. After you do an initial report, do you follow up to see if there's been a supplemental report?

37 (Pages 142 to 145)


MAGNA
LEGAL SERVICES

Page 146

A. I usually don't, considering how shorthanded we are. It's sometimes difficult to -- you know, to go back in the case and work it when you have new cases coming in at the rate they do. So I never did look into it, no.

Q. You said "new cases coming in at the rate they do"?

A. Yes, sir.

Q. What do you mean by that?

A. As -- as -- you know, as a patrolman, your main duty is to answer calls for service, and lots of times those calls end up becoming report calls. So there's a lot of -- you have to manage your time, you know, between answering more calls and typing the reports that you're already getting. So you can imagine how backed up you'd get, you know.

Q. Have you noticed an increase in crime since your first stint at the Eunice Police Department?

A. I'd say there's the same amount of shootings and thefts as -- you know, that there were when I first started in 2017.

Q. Are there fewer officers now than when you started?

Page 147

A. I think so, yeah. I'd say we -- I'd say we've lost more than we've gained over those years.

Q. Do you know about how many you've lost?

A. I can't -- I can't say. I'm not sure. I don't know.

Q. Do you know why those officers left?

    MS. LOVE:
        Object to form.

A. The reasoning given is usually the lack of pay, that's the general consensus.

BY MR. HOBBIE:

Q. Has anyone ever told you they're leaving because of Chief Fontenot?

A. There was one guy who -- I think his name is Christopher Ortego. I think he -- I don't know if he was dismissed or if he quit, but he said it was because of Chief Fontenot.

Q. How about Jonathan Lee?

A. I remember Jonathan Lee going to the sheriff's office, but I don't remember having a conversation as to why.

Q. How about A.J. Frank?

A. Yeah, I'm thinking he left because of Chief Fontenot. He and Chief Fontenot didn't like

Page 148

one another, I guess.

Q. How about Lieutenant Dunn, has he ever discussed leaving because of the chief?

A. He's discussed leaving just in general, never really gave a reason why other than the possibility to make more money and because he's not happy working under Chief Fontenot, sure.

Q. Has Stephanie Meyers ever discussed leaving because of Chief Fontenot?

A. I can probably count on one hand the amount of times Lieutenant Meyers and I have had conversations, so no.

Q. Did Lieutenant Ivory ever mention leaving because of Chief Fontenot?

A. Yeah. At the time when his situation was going on, he did -- he discussed going to Louisiana State Police and -- maybe not solely based on because he was working under Chief Fontenot, but that could have been one of the reasons why. So...

Q. Do you know if Ryan Young has worked outside of the Eunice Police Department jurisdiction without approval?

A. I don't know that, no.

Q. Do you know if Victor Fontenot has?

Page 149

A. I've only heard he has.

Q. What have you heard?

A. I was advised that he conducted a controlled buy through a confidential informant from a drug dealer that -- and the controlled buy took place outside the city. That's what I was told.

Q. What's a controlled buy?

A. That's basically whenever an officer gives their informant money in order to go purchase narcotics to gain -- you know, to achieve evidence.

Q. Is that against Eunice policy, police department policy?

A. I can't -- I can't quote the policy, but I'm going to assume that it is due to the fact, if it happens outside of your jurisdiction, you know, you're committing a crime at that point, you have no authority to be doing it. So I guess it is.

Q. Do you know if Chief Fontenot investigated Victor Fontenot for that?

A. I do not know, no.

Q. At the Eunice Police Department, how do you become aware of the department policies?

A. When I first started, I was issued a copy



Page 150

of the standard operating procedures manual by Deputy Chief Richard Daigle. This new stint, I was not issued just because I guess I should be familiar with them.

And it's made available on the computer, the server, if you will. So I guess it would be incumbent upon a person to read it, to seek it out and read it.

Q. You said "I was not issued because I guess I should be familiar with them."

Why should you be familiar with them?

A. Because I worked there before. That's my only reason.

Q. Are you assuming that the policy hasn't changed?

A. I guess, yeah. I guess that would be safe to say.

Q. Did Chief Fontenot ever -- strike that.

Since you started a month and a half ago, did Chief Fontenot ever tell you to read the policies?

A. He never instructed me to read the policies, no, sir.

Q. During your time, past or present, at the Eunice Police Department, have you received

Page 151

e-mails from Chief Fontenot?

A. Yes, sir.

Q. Has he ever expressed policy in those e-mails?

A. I've received maybe one e-mail from him since I'm back, and that was in relation to some type of baton, asking if -- inquiring if certain officers carried a baton. I don't remember what the nature of the e-mails were in the past when I was there before.

Q. If you haven't read the policies since starting, how do you know what to do when you're out in the field?

A. Just operate off experience, I guess.

Q. Do you ever confront -- do you ever have questions when you're in the field?

A. Sure.

Q. And what do you do when you have questions?

A. I would call my immediate supervisor.

Q. And who's that, again?

A. It would be Sergeant Quintin Doyle.

Q. Can you give me an example of when you had to call Quintin Doyle?

A. When I first came back from the marshal's

Page 152

office. While I was at the marshal's office, investigating thefts were not -- you know, we were a reporting agency. So when I first came back, I was dispatched to a shoplifter who the person only concealed the property or the items in their pants but never left the building.

So I called Sergeant Quintin Doyle to inquire if the law had changed to a person being -- you know, a person is able to be prosecuted under theft for just concealing it and not leaving the store. That's an example. So...

Q. What did Sergeant Doyle say?

A. He informed me that the law had, indeed, changed, that a person can be charged with theft for just only concealing it on their person before passing all points of sale.

Q. And so -- so then what did you do?

A. I would have taken the person -- they would have been arrested, but the store decided not to pursue any charges due to the amount, you know, in value.

Q. Can you think of any other examples?

A. Recently, no. No. Since I'm back, no.

Q. What training have you done in the last month and a half -- or let me rephrase.

Page 153

What training have you done since you started about a month and a half ago?

A. I haven't conducted any type of training.

Q. Besides the Taser, are any of your other certifications expired?

A. I believe my radar certification is expired.

Q. What does a radar certification allow you to do?

A. Certify me to use speed enforcement using radar.

Q. Have you conducted traffic stops in the last month and a half?

A. Yes, sir.

Q. For speeding?

A. No, sir.

Q. Do you need a certification to do that?

A. In order to operate the radar, yeah, you've got -- the certification needs to be up to date.

Q. Any other certifications that are out of date?

A. I think I'm up to date on everything as far as -- as far as I know, everything is up to date.



Page 154

Q.  Are the policies at the Eunice Police Department different than the policies at the marshal's office?

A.  I don't think so, just only because there are certain jobs that the P.D. does and that the marshals do not, and vice versa, there may be differences.  But generally speaking, as far as enforcing the law, I believe they're pretty much the same.

Q.  Are you aware that Terry Darbonne testified that the policies are, in fact, different?

MS. LOVE:
Object to form.

A.  I'm not aware of that.

MR. HOBBIE:
I think now is a good time to break for lunch, if you guys are ready.

THE VIDEOGRAPHER:
We are off the record.  The time is 12:23.

(A break was taken from 12:23 p.m. to 1:08 p.m.)

THE VIDEOGRAPHER:
We are back on the record.  The time

Page 155

is 1:08.

BY MR. HOBBIE:
Q.  Jack, did you talk to anyone during the lunch break?

A.  No, sir.

Q.  You didn't talk to Chief Fontenot?

A.  Well, yeah.  I mean, I asked him if he was trying to go anywhere because I'm his ride.  I asked him if he wanted to go to lunch somewhere.  He said he was going downstairs.  And then a brief conversation with one of the ladies about eating lunch.  But other than that, that's it.

Q.  Earlier we were talking about Lieutenant Ivory being targeted by Chief Fontenot.
Do you remember that conversation?

A.  Yes, sir.

Q.  Other than the one disciplinary action -- other than the demotion, has Lieutenant Ivory expressed to you that he's been treated unfairly by Chief Fontenot?

A.  Other than that, no.

Q.  Since then, has Lieutenant Ivory expressed that he's being treated better now?

A.  He's never expressed it, but I hear no complaints from him.  So...

Page 156

Q.  In your opinion, do you think he is?

A.  I think -- yeah, in my opinion is he being treated fairly?  Yeah, I'd say so.

Q.  Do you know what changed?

A.  I don't.  I left the police department and they weren't on great terms; I returned to the police department and they are.  I don't know exactly what transpired, but it seems to be better.

Q.  You said you -- at the marshal's office, that you worked with the Eunice P.D., right?

A.  Yeah, we work together quite often.

Q.  Is Jeremy Ivory one of the officers you worked with?

A.  Sure.

Q.  About how often did you work with Jeremy Ivory while you were at the Eunice -- marshal's office?

A.  If he was on shift, I mean we'd come in contact with one another at least once a day.  And if they responded to something that required backup, I was usually always one of the ones to go if I was available.  So I'd say at least once a week or better.

Q.  During that time, did he speak about the

Page 157

Eunice Police Department?

A.  Other than just normal day-to-day activity, no.

Q.  During that time, did he talk about Lieutenant Dunn's ongoing disputes with the chief?

A.  We discussed whenever the dog -- the K9 unit was disbanded, but nothing that really stands out to me.

Q.  What did y'all talk about in relation to the dog?

A.  Just the reason why it was taken, because they said the dog wasn't being used.  We just discussed -- I don't remember the word-for-word conversation we had.

Q.  Did you ever say anything about Lieutenant Dunn being treated unfairly?

A.  Not -- I can't -- I can't recall, no.

Q.  Earlier you said that the CID has its own office.  Do you remember that conversation?

A.  Yes, yes, sir.

Q.  You talked about something going 1015 and 10, 5.  Can you explain what that means again.

A.  So 1015 is the code we use to let dispatch know that somebody is under arrest and they're being transported.  10, 5 would be this person is



Page 158

detained, they're not under arrest.  They may be detained for questioning, they may be -- 10, 5, as in a verb, we might be just transporting them somewhere because they need a ride, you know.

So it's just kind of -- I guess it's open to interpretation that way, you know.

Q.  So is your answer different now, what 10, 5 means?

A.  No.  I mean, 10, 5 is detained, this person is detained in the back of a police car.  That's...

Q.  So we talked about a specific instance involving Victor Fontenot.  Can you remind me about that?

A.  I guess -- like I said, I don't remember the details of this case.  I wasn't even working for the police department at the time.  I just heard someone was being transported as a 1015 somewhere, and then later I found out, I don't know how, but this person was never charged with a crime.  So...

Q.  Is there a jail at the CID office?

A.  No, sir.

Q.  So if a 1015 is transferred to the CID division, what does that mean?

Page 159

A.  I would assume that person is going over there to be questioned.

Q.  Who works at the CID office?

A.  I guess the only people who have offices there would be Lieutenant Young; the juvenile detective, Jessica Tezeno; and Detective Victor Fontenot.

Q.  Does Chief Fontenot have an office there?

A.  No, sir.

Q.  Do they have an interrogation room there?

A.  They have offices that I guess could be used as an interrogation room, correct.

Q.  I don't know the correct term.

A.  No, yeah.

Q.  Can you think of any other instances where a 1015 went to the police department -- excuse me, a 1015 went to CID and then went 10, 5?

A.  Off the top of my head, no, I can't think of any.

Q.  In your experience, is that common?

A.  I mean, you know, you encounter a person at the scene and there's -- you know, there's reason to believe that they committed a crime.  And you get them to wherever you're going, a controlled environment to talk to them, and you

Page 160

find out that they're not a suspect now.  Most of the time when that occurs that person is never under arrest until you know for sure.

Q.  So they're not 1015 then?

A.  Correct.  But generally, no.

Q.  To your knowledge, does Victor Fontenot take people out of jail for questioning in a location other than the Eunice Police Department?

A.  To my knowledge, I've never seen that happen, no.

Q.  Have you heard of that?

A.  Other than the one time with Jordan Arnaud, no.

Q.  We talked about your time in November 2017, the first stint and the second stint, which is now.

How many superior officers do you report to?

A.  Like on a daily basis?

Q.  Right.

A.  I mean, usually during a workweek, like on -- during regular business hours, I report directly to my sergeant and my lieutenant.

But I'm also subject to receiving orders from -- Lieutenant Ryan Young, who's over

Page 161

detectives, has rank over me and giving me orders.  The deputy chief, the chief that's available.  So quite a few people could give me an order that I would have to follow.

Q.  Well, do you have to follow every order?

A.  A lawful order, sure.

Q.  What do you do if an order is unlawful?

A.  I'm not -- I'm not going to break the law for somebody to -- you know, because I've been given an order.  Like I said, if it's not a lawful order, we can have a conversation about it.

Q.  Has that ever happened?

A.  To me, no.

Q.  Have you heard of that happening?

A.  Not personally, no.

Q.  So could you just paint the picture of the chain of -- your chain of command from you to the chief.

A.  That would be me, my sergeant, my lieutenant, then the deputy chief, then the chief.

Q.  Okay.

A.  And in the absence of the deputy chief and the chief, I believe the person over CID would be the superior officer.

Q.  Do you have any subordinate officers?



Page 162

A. No. Unless there's a reserve officer who would accompany me, I'm responsible for him. But I don't really particularly care to have people ride with me.

Q. Okay. So we have your sergeant, lieutenant, then deputy chief, then the chief?

A. Correct.

Q. So you, Jack Ardoin, who's your sergeant?

A. Quintin Doyle.

Q. Who's the lieutenant?

A. Jeremy Ivory.

Q. Deputy chief?

A. Tony Kennedy.

Q. How often do you hang out with Quintin Doyle outside of work?

A. Every now and then during football season we'll all get together and watch football. We talk a lot. Talk on the phone almost every day whether we're working or not. But...

Q. How about Jeremy Ivory, how often do you hang out with him outside of work?

A. The same amount of times.

Q. How about Tony Kennedy, how much do you hang out with him outside of work?

A. Never.

Page 163

Q. How about Chief Fontenot?

A. Never.

Q. Do you go to dinner with Chief Fontenot?

A. No, sir.

Q. Tony Kennedy?

A. No, sir.

Q. When you're working in the office, how often do you -- strike that.

Before reporting a problem to the chief, do you always follow the chain of command?

A. Yes, sir.

Q. How often do you communicate with the chief?

A. If I see him, if I cross him in the hallway, we tell each other good morning. Every now and then I like to pick his brain about police work back in, you know, the days when he started, you know, stuff like that. It's a very general conversation.

Q. What does he say about police work back in the days?

A. Well, we just talk about the amount of calls that used to come into the police department versus now and the type of crime, type of drugs that have come along, you know, over time that has

Page 164

become more popular, stuff like that.

Q. What does he say about the amount of calls?

A. He indicated that the -- there was a higher call volume back when he started.

Q. How about the type of crime?

A. It sounds like it was more theft than violent crime back in those days.

Q. And now what is it?

A. I guess more -- violent crime happens more often. We probably have just the same amount of theft, but these kids are carrying guns now, you know.

Q. How about drug crimes?

A. We just discuss about how we went from cocaine, powder cocaine, to crack cocaine, to methamphetamines seems to be the big deal right now.

Q. Are drug crimes more prevalent now in Chief's opinion?

A. I couldn't -- I couldn't comment. I'm not sure if that's how he feels.

Q. I'm not -- I'm sorry, I should have rephrased that.

During this conversation, did he opine on

Page 165

whether drug crimes are more prevalent?

A. Yeah, well, he indicated that the type of crimes that the users commit are a little different, crack users as opposed to meth users. Meth users generally don't really have a filter on who they commit a crime against, is basically what we talked about.

Q. So in general, it sounds like more crime is being committed now?

MS. LOVE:

Object to form.

A. I mean, they may -- also another stat we talked about, there's more risk back whenever the call volume was higher. So I guess records would reflect that crime was up then but maybe just more violent today, is what I'm gathering.

BY MR. HOBBIE:

Q. Do you know why there's less calls now?

A. I don't.

Q. Do you think it's because of Chief Fontenot's reputation?

MS. LOVE:

Object to form.

MR. HOBBIE:

What's the objection?



Page 166

MS. LOVE:

Calls for speculation.

BY MR. HOBBIE:

Q. In your opinion, is it -- are there less calls now because of the chief's reputation?

A. I wouldn't think so, no.

Q. Are you aware that the other day Terry Darbonne testified that there's -- that Chief Fontenot has a reputation of low trust in the community?

A. I'm not aware that he testified to that.

Q. Do you believe that reputation to be true?

A. No, because, I mean, he was elected twice. So that leads me to believe that -- I mean, seems like people like him.

Q. Is it perhaps because he's doing favors?

A. I can't speak for -- I mean, I don't know.

Q. Earlier you said elected officials do favors.

A. Yes, yeah. That's the state of Louisiana. Yeah.

Q. Is that the good ol' boy system?

A. I guess you could call it that, yeah.

Q. We talked more about investigations earlier. I know we talked about the demotion of

Page 167

Jeremy Ivory. Are you aware of any investigations that the chief conducted into Ryan Young?

A. I'm not aware, no.

Q. Do you believe that the chief engages in selective investigations?

MS. LOVE:

Object to form.

A. I can't -- I have no -- no -- I have nothing to base that on. So I'm not sure. I don't know. I mean...

BY MR. HOBBIE:

Q. Earlier you testified about the chief's enemies.

Do you remember that?

A. Sure.

Q. Do you believe that the chief investigates his enemies more often than the other people?

A. I guess a person would prefer to investigate their enemies over their friends, but I don't know that firsthand. I don't know.

Q. So earlier you said you didn't hang out with Chief Fontenot outside of work at all?

A. I can't recall an instance where that occurred, no.

Q. Do you report to him at work directly?

Page 168

A. No, sir.

Q. Do you report -- strike that. Does Chief Fontenot review your police reports?

A. Yeah, I'm pretty sure he does, from time to time.

Q. Do you bring them to him?

A. Not directly to him, no.

Q. Does he call you in his office frequently?

A. Not -- no.

Q. Does he go ride around with you guys frequently?

A. Like in our cars?

Q. Uh-huh.

A. No.

Q. How often would you say he's on the road?

A. If he's not at the P.D., I'm not sure where he is. I don't know. You know, he drives an unmarked vehicle. I don't know where -- I don't know.

Q. Does he have his own car?

A. Like a police car? Like a marked police car?

Q. Correct.

A. No. I mean, not one he uses all the time.

Page 169

I'm sure he's got his run of the fleet. But...

Q. Do you know if he has his own personal vehicle?

A. I don't know, no. I don't know who -- well, actually his license plate is not a public plate, so I'm assuming that's his vehicle. So...

Q. Does he ask employees to do favors for him?

A. I'm going to need you to be more specific as in "favors." I've never been asked to do a favor for him. But like I said earlier, whenever this lady who owns a business called him directly, I guess you could call that a favor to make sure it gets done properly, her -- you know, her complaint is investigated properly. So, yeah, I guess you can call that a favor.

Q. I can give you -- for example, has he ever asked you to change a statement because a friend was involved?

A. No.

Q. Are you allowed to take -- strike that. On duty, are you allowed to take your police unit outside of the jurisdiction?

A. Not unless approved by a supervisor.

43 (Pages 166 to 169)



Page 170

Q. Are you allowed to take your unit on vacation?

A. No, sir.

Q. Is there a policy for giving the chief rides places on the job?

A. I'm not aware of a policy.

Q. And you said you've never given him a ride before?

A. I don't recall ever giving him a ride before, no.

Q. Do you know why today is the first time you've ever given him a ride?

A. No, I don't. He said it would make more sense for us just to ride together.

Q. Did he approach you about riding together?

A. He did.

Q. When?

A. The evening -- yesterday evening, he called me on the phone.

Q. What time?

A. I guess like at 7:00 or 8 o'clock. I'm not even sure.

Q. Earlier we discussed a stolen vehicle. It's a report -- you mentioned you did the initial investigation.

Page 171

Do you remember that?

A. Yeah.

MR. HOBBIE:

I'd like to introduce plaintiff's Exhibit 1. This has been produced by plaintiff. It's Bates stamped Dunn 0000794 through Dunn 0000797.

I'm showing it to the witness now. Take your time reviewing it.

(Exhibit 1 was marked.)

(Discussion off the record.)

A. Yeah, I mean, I recognize my portion that I completed. But it's the first time I see Ryan Young's -- Ryan Young's supplemental to it. It's the first time I've seen it.

BY MR. HOBBIE:

Q. Can you just tell us what it is for the record.

A. It's regarding a stolen ATV from Stan Feucht.

Q. Do you know who wrote the initial report?

A. The initial was myself, Jack Ardoin.

Q. And that goes from which page to which page in the bottom right-hand corner, the Bates stamping?

Page 172

A. Oh, okay, so it would be from 794 to 795.

Q. And you recognize the report?

A. Yeah. I've -- I remember -- I mean, I remember talking to Stan's wife. The details on what kind of four-wheeler it was, no, I don't remember that. But I do recognize it.

Q. Can you tell me about the incident?

A. I remember getting there and Stan's wife, her name is Lisa, said Stan was on the phone, and told me about the four-wheeler. I asked him to bring the information regarding the vehicle, you know, the VIN number and everything to the police department and write me a statement.

And like in the last paragraph, I walked down the street and looked to see if there was any cameras or anything like that that may have captured the incident, and I didn't find anything. I don't remember Stan ever coming and bringing me a statement. I don't -- after that, no.

Q. Do you have any reason to believe that this report is inaccurate?

A. No. I mean, like I said, I don't remember the -- you know, typing it word for word, but it appears that everything that I was supposed to put is in there. So...

Page 173

Q. And at the bottom of Dunn 000795, do you see the supplemental report by Young, Michael Ryan --

A. Yes.

Q. -- on June 18, 2019?

A. Yes.

Q. Do you know what this is?

A. It appears to be just a supplemental to the initial report, like he may have possibly followed up on the investigation.

Q. Is that standard procedure, for them to follow up on the initial investigation?

A. Sure.

Q. How often does that happen with your investigations?

A. You know, I couldn't tell you. I'm not sure. Because I don't really pay attention to what happens to them after these initial -- unless it's something that, you know, that I might have some real shot at getting a suspect, I don't really follow up on them like maybe I probably should, but sometimes I don't have time.

I know, when it's a serious crime, yeah, I'd say it's almost always followed up on. But I'm not sure.

44 (Pages 170 to 173)



Page 174

Q.  Do you know if Ryan Young ever informed you about his follow-up investigation?

A.  I don't remember having a conversation with him about it.

Q.  Do you have any reason to believe that Ryan Young would lie in his supplemental report?

A.  No, not at all.

Q.  Turn to the last page.  I'll give you a second to read it.

A.  Okay.

Q.  Does that refresh year recollection?

A.  I mean, you're talking about like me and Ryan talked about it?

Q.  Right.

A.  It's very possible he called me.  We may have very well have had a conversation, I just don't remember it.

Q.  Did he advise you that Mr. Feucht stated he did not want to press charges on the individual?

A.  Like I said, I don't remember having the conversation, so I'm not sure.

Q.  Is it standard procedure to not arrest someone if the victim doesn't want to file charges?

Page 175

A.  It really depends on the crime that was committed; you know, obviously, a theft, sure.  I mean, if somebody don't want to -- if they don't want to file charges, without a cooperating victim, the district attorney's office will not prosecute them.  So...

Q.  Theft of a vehicle, is that the same as a theft of something less valuable?

A.  I mean, as far as the person not wanting to press charges?

Q.  (Attorney nodded head.)

A.  I don't know why in the world a person wouldn't want to press charges for the theft of a vehicle.  But, again, at the end of the day, if the victim doesn't want to pursue charges, I mean, there's really not a whole lot we can do.

Q.  Well, if you go back to the last page in Ryan Young's supplemental report it states, "Mr. Feucht stated that he did not want to file charges on the individuals as long as he cooperated with us and possibly provided us with information in solving other crimes."

Is that standard procedure?

A.  You know, I guess.  It's the first time I ever encountered something like that, like as in a

Page 176

civilian wanting to cut somebody a break to help us.  But nothing really surprises me.  Standard procedure, I'm not sure; I don't know if I'd qualify it as that.

Q.  I think earlier you said his vehicle was stolen again, or another vehicle.

Can you remind me what you said?

A.  I feel like -- I feel like the same vehicle was stolen like within a -- because I remember making the comment like, Man, lock your stuff.  You know, I didn't tell him that, but I was thinking it.  Because I feel like he did have something else stolen from him within a short amount of time.

Q.  Are you aware that Ryan Young actually told Mr. Feucht not to file charges?

MS. LOVE:

Object to form.

A.  I was not aware of that.

BY MR. HOBBIE:

Q.  Is that standard procedure?

A.  We don't instruct people -- no, that's not standard procedure.  We don't instruct people not to file charges.

Q.  If Ryan Young told Mr. Feucht that Chris

Page 177

Smith was a valued informant, could you then ask a civilian not to press charges?

MS. LOVE:

Object to form.

A.  I mean, I guess you could pose that to somebody and, you know, let them know that this person may be useful if they don't -- if they don't pursue charges.  I definitely wouldn't use it to urge somebody not to.

BY MR. HOBBIE:

Q.  Are you aware that Mr. Feucht told Lieutenant Dunn that Ryan Young told him not to press charges?

MS. LOVE:

Object to form.

A.  I was not aware of that.

BY MR. HOBBIE:

Q.  You and Lieutenant Dunn haven't talked about that?

A.  If we have, I don't remember.

Q.  Would that be against Eunice Police Department policy?

A.  What, the conversation or --

Q.  The -- telling the civilian not to --

A.  I would imagine it to be.  I'm not sure.





Page 178

But I do -- I'm pretty sure it would be frowned upon to try to talk your way out of pursuing charges, sure.

Q. In the later incident, the later stolen vehicle incident, do you remember if Chris Smith was a suspect?

A. I'm not even sure.

Q. Does it strike you as odd that the same vehicle would be stolen?

A. Very odd.

Q. Within such a short time span?

A. Very odd, yes, sir.

Q. After this person was let go?

A. Sure, yes, sir.

Q. Are you aware if Ryan Young arrested Chris Smith after the second vehicle was stolen?

A. I'm not aware.

Q. Are you aware if Ryan Young questioned Chris Smith after the vehicle was stolen?

A. I'm not aware.

Q. Are you aware if Victor Fontenot questioned Chris Smith after the second vehicle was stolen?

A. I'm not aware.

Q. Are you aware of any Eunice Police

Page 179

Department personnel executing invalid warrants?

A. No. You mean like search warrants based on a lie, is that -- is that -- is that what you're saying?

Q. That would -- yeah, that would count.

A. I don't have knowledge of that occurring.

Q. Have you heard about it?

A. I -- other than one time when we did a search warrant and it turned up dry, that didn't necessarily mean that -- that doesn't mean that they lied in the search warrant, it just means we didn't find anything. I don't...

Q. As an officer, are you aware of civilians' Fourth Amendment rights?

A. Yes, sir.

Q. Fifth Amendment rights?

A. Yes, sir.

Q. If an officer misrepresents facts to a judge to get a warrant, does that violate someone's constitutional rights?

MS. LOVE:
Object to form.

A. I would -- yeah, I would say so.

BY MR. HOBBIE:

Q. Earlier we talked about filing paperwork

Page 180

after use-of-force incidents.

A. Yes, sir.

Q. Do you still file that paperwork at the -- let me rephrase.

Is it still the policy of the Eunice Police Department to file paperwork or a report after a use of force?

A. As far as I know, yes.

Q. Are you aware of any Eunice Police Department personnel applying too much force against a person?

A. I've heard about it happening in the past. I've never been a witness to it.

Q. What have you heard about?

A. I heard that there was one incident where someone who was in a holding cell was beaten, but I don't know any of the circumstances surrounding it.

Q. Do you know who was involved?

A. I was told it was Deputy Chief Richard Daigle and Detective Victor Fontenot.

Q. Do you know why they --

A. Something to the effect that he broke a security camera, that's what I was told.

Q. Do you remember anything else about that

Page 181

situation?

A. I don't.

Q. Do you know if that was investigated?

A. I do not know.

Q. Do you know if that was reported to the chief?

A. I'm not sure.

Q. Do you know about when that was?

A. I don't. In fact, I don't think I was at the police department at the time. I may have been in Basile. What I'm saying is I don't -- I don't have no clue.

Q. That's fine.

But at the time, who was the deputy chief?

A. Richard Daigle.

Q. If the deputy chief is involved in an incident and it -- let me rephrase that.

If the deputy chief violates policy, to whom are you supposed to report?

A. I would say the chief.

Q. Are you familiar with any other instances where officers used too much force against a civilian?

A. I was told a story that happened years ago that -- I don't know anyone's name, I was just



Page 182

told, that back in the '90s, the trustees would have to get fresh mop buckets ready for the night shift because, you know, force was used quite often resulting in injury and, you know, you bring this person in, they're bleeding.

And then my mom, who worked for City Court, had said there were a lot of -- just about everybody who was arrested at one time came in with a resisting charge implying that, you know, people resisted or whatever. But I don't -- I don't know anything other than that.

Q. Was that in the '90s as well, the resistance charge stuff?

A. Yeah. She started in '95 up there, and then she worked there until she died on New Year's. So I would assume it would be the '90s and early 2000s when this occurred.

Q. Do you know if Chief Fontenot was an officer at the department in the '90s?

A. Well, he gave me a tour of the jail when I was little, and this would have been the '90s. So possibly, yeah.

Q. How about any more recent examples?

A. None that I can think of, no, sir.

Q. Have you ever heard the name Kenneth

Page 183

Charles?

A. The name sounds familiar.

Q. Have you heard of an incident that involved force that occurred outside of Lieutenant Dunn's home around 2019?

A. Force, as in like trying to break into his house?

Q. Where officers used force against a civilian.

A. Not that I can recall, no.

Q. Are you aware that Joey Peloquin -- strike that.

Earlier you said you're familiar with a person named Harrison Arnaud?

A. Yes.

Q. Arnaud, sorry.

You said you suspected that he was a confidential informant for Victor?

A. Yes.

Q. Are you aware of an incident where Victor Fontenot used force against Harrison Arnaud while he was handcuffed?

A. I wasn't aware of that.

Q. Have you heard of any other -- strike that.

Page 184

Have you heard of any Eunice Police Department personnel striking a handcuffed person?

A. I've heard some stories from a long time ago of Varden Guillory, he was the deputy chief at one time, and someone told me that story, he struck someone who was handcuffed.

Q. How about Victor Fontenot?

A. I can't think -- other than that one instance that occurred in the holding cell, I'm not -- I'm not sure.

Q. Since your time at the Eunice Police Department, have you ever arrested someone that needed medical attention?

A. Sure, yes, sir.

Q. Can you give me an example?

A. Just recently, I arrested someone who, while I was taking him into custody, his dog I guess was trying to attack me and attacked him instead and tore up his leg. So he was taken to the hospital prior to -- prior to going to jail.

Q. Is that policy, to take someone to the hospital prior to jail?

A. If this person needs medical attention, absolutely.

Q. And how do you decide who needs medical

Page 185

attention at a hospital versus at the jail?

A. Well, first thing I would do is I would ask the person if they want -- you know, if they want to be seen by paramedics or if they want to go to the hospital.

And then, in this particular situation, he said no, but he was bleeding quite a bit from his leg, you know. So, I mean, he had some pretty good teeth marks in his leg, so I guess I figured we probably should take him to the hospital.

Q. Did you arrest that person?

A. I wasn't the arresting officer, I'm the one who took him into custody though. The person who filed the charges was not me.

Q. Who arrested him?

A. That would be Officer Trace Tilbury.

Q. How do you know that?

A. I was supposed -- it was supposed to be my call, but I was backed up on reports and Tilbury had none. So Lieutenant Ivory instructed him to take over as the initial officer -- or as the case agent.

Q. So you took the person to the hospital and then Trace picked him up, is that what happened?

A. So I had put him in my car assuming that I




MAGNA
LEGAL SERVICES

Page 186

was going to be the case agent.  Since he was already in my car and we figured out Trace was going to take the complaint, rather than risk any other issues removing the person from car to car, I just took him straight to the hospital.

The jailer went there to stand by with him, and then I'm guessing she just took him to the parish jail.

Q.  Is that -- is the policy of the Eunice Police Department for the jailer to go to the hospital with that person?

A.  I'm not sure if that's the policy.  I know she was instructed to go by Lieutenant Ivory.  So...

Q.  Why did you put "the policy" in air quotes?

A.  Well, because I haven't read it, you know what I'm saying.  I don't know if that's what the policy says word for word so -- you know.

Q.  Are you aware if other officers at the department read the policy book?

A.  I'm just going to assume that they refer to it from time to time.  I don't know though.  I can't -- you know, I don't know.  I don't know if they do or not.

Page 187

Q.  After you took this person to the hospital, what did you do?

A.  I just went back into service and went -- I guess I went and completed my paperwork that I was backed up on.

Q.  What would you do if the person didn't want to be arrested?

MS. LOVE:
Object to form.

A.  If they didn't want to be arrested?

BY MR. HOBBIE:

Q.  Right.

A.  Well, I mean, if -- he didn't want to be arrested.  He tried to run with his firearm.  I mean, he was taken into custody anyway.

Q.  Do you know why he went to the county jail -- I'm sorry.

Do you know why he went to the parish jail?

A.  The charges that were filed against him were felony charges, so they would be heard in District Court, so he went to the parish jail where the District Court is.

Q.  Is the Eunice jail -- do you know if the Eunice jail is full right now?

Page 188

A.  I'm not sure.  I don't know what the population is like, I don't really remember.

Q.  What do you do if you arrest someone and the jail is overpopulated?

A.  I've never run into that situation before.  I just know like -- I can give you an example from when COVID was bad.

We just went to reactive -- I was with the marshal's office, but we went to reactive patrol, just basically tried not to have to take anybody to jail, don't go looking for trouble, basically.  But I've never run into a situation where the jail was overpopulated.

Q.  In your earlier stint at the jail, did you ever see it overpopulated?

I'm sorry.  In your earlier stint at the Eunice Police Department, did you ever see the jail overpopulated?

A.  I remember there being a lot of inmates at one time or another, but I don't know -- I don't know what overpopulating -- I don't know the number that would constitute, you know, overpopulated.  I don't know.

Q.  Do you know if there's a policy for that?

A.  I don't know.  I'm not sure.

Page 189

Q.  Do you know a person named Joshua Tyler?

A.  Joshua Tyler?  Off -- it's not ringing a bell.

Q.  Do you recall being called out to Walmart for a theft in 2018?

A.  I've worked several thefts at Walmart.  So I...

Q.  In this one, you had to draw your weapon.

A.  Okay.  Yeah, maybe so, yeah.  Yeah.  Yeah.  I -- he was -- I caught him on the side of the building.  Sure.

Q.  What can you tell me about that incident?

A.  I don't remember exactly what happened, but he -- you know, he ran from personnel at Walmart.  And I was -- I'm almost positive he had a bag of some sort with him, and whenever I found him, he may have been reaching in the bag or something.  I don't know.  But I can't recall the reasoning, exactly why I pulled my weapon on him.

Q.  Did you arrest him?

A.  I'm quite certain he was arrested.

Q.  Was it by you?

A.  I'm assuming -- if it was my call and I went, I have no other reason to believe I didn't.

Q.  Do you remember taking him back to the

48 (Pages 186 to 189)



MAGNA
LEGAL SERVICES

Page 190

jail?

A. I don't -- no, I don't remember transporting him there, no.

Q. Who would book someone after you arrested them?

A. If there was a jailer present, whoever the jailer would have been.

Q. And what's the booking process like, to your knowledge?

A. It includes some basic questions regarding the person's medical history, emergency contacts, and then their fingerprints would be taken and property would be inventoried.

Q. Do you book someone if the jail is overpopulated?

A. I'm assuming no, unless -- I mean, they can still be booked into jail and released on a summons, if that would be the case, the jail was overpopulated.

Q. Do you recall if Joshua Tyler needed medical attention while he was at the jail?

A. I don't recall.

Q. Do you recall hearing about anyone swallowing a broken glass pipe?

A. So now this is -- this -- I know the

Page 191

answer you're speaking of now. And I never knew his name. I was not the one that filed charges, now that I'm thinking about it. I was --

Q. Should I reask some of the questions I asked?

A. If you want to, yeah. Because now I know exactly who you're talking about. So...

Q. So what happened at Walmart?

A. So I remember getting a call that the subject had just walked out of Walmart with like six or seven hover boards in the basket. I caught him behind a little strip mall not far from Walmart.

And it was -- I was by myself at that moment in time. It was very dark back there and he would not show me his hands. So I did -- I drew my firearm. Once I figured out he was unarmed, I holstered my firearm and took him into custody.

I was about to get off of work. It was like close to shift change that night, in the morning. And I'm fairly certain Victor, who was just a patrol officer at the time, not a detective, I'm fairly certain he took the case.

And on my way back from the jail or

Page 192

from -- I transported him. And I heard him fumbling around in the backseat. I asked him what he was doing, he said nothing. And then when we got to the station, I guess he passed out or something.

At that point in time, I checked my backseat, and there was broken glass. It looked a lot like -- the pieces of glass that were still intact resembled the shape of either a crack pipe or a meth pipe. So I'm assuming he ate it.

So, yeah, now I'm on the same page with you. I do remember this incident.

Q. So after you get back to the Eunice Police Department, what happened?

A. He -- whenever he passed out or just -- or fainted or whatever it was he did in the hallway, he was transported to the hospital. And being under the impression that Victor was the case agent now, I went home. So I don't know what happened to him after that.

Q. Did you see him in the Eunice jail that week?

A. If I did, I just -- I don't remember. I don't think so. And this is the first time I -- this is the first time I can actually recall

Page 193

his name. So...

Q. Do you know if he was transferred to the parish jail?

A. I have no knowledge.

Q. Do you know if he was released?

A. I'm not sure. I'm quite certain he's not there now so, yeah, I'm sure.

Q. Do you know if he was released right after receiving medical attention?

A. I'm not sure.

Q. If someone's booked at the Eunice jail and they need medical attention, who pays for that?

A. The City of Eunice.

Q. Has the chief instructed you to not arrest people who need medical attention?

A. I've never been instructed to do that, no, sir.

Q. Have you ever heard that the chief's given that instruction?

A. No, sir.

Q. Do you know if Victor Fontenot wrote a report about this incident?

A. I'm not sure if he did or not.

Q. Did you write a report?

A. No, sir.



Page 194

Q. Do you have to write a report when you draw a weapon?

A. No, no. I've never been instructed to write a report based -- just based on the fact that my weapon had to be drawn.

Q. Would it surprise you to know that Joshua Tyler was released after receiving medical attention?

A. As in like no charges filed?

Q. Right.

A. It would surprise me, sure.

Q. Why is that?

A. Considering he stole quite a bit of merchandise from Walmart and had drug paraphernalia on him, on his person, yeah, I would think that he should have been, you know, booked into the jail on those charges, appropriate charges.

Q. Are you aware of any instances at the Eunice Police Department where personnel destroyed evidence?

A. Sure.

Q. When?

A. In a proper manner -- I'm assuming this is what you're talking about.

Page 195

So if I stop someone, I find a very minute amount of marijuana on them, say, for example. It gets log -- I -- it stays in my custody, it does not go back to them, but it gets logged into the evidence locker and has "To Be Destroyed" written on the bag.

I don't know what happens to it after that. I'm sure -- you know, I guess the crime lab has a manner of destroying it. But that would be the only thing.

Q. Are you aware of any instances where a Eunice police officer improperly destroyed evidence?

A. No, sir.

Q. Have you heard of any instances?

A. No, sir.

Q. Are you aware of any instances where a Eunice police officer mishandled evidence?

A. Yes, sir. The incident we spoke about earlier with -- involving the sexual assault case where evidence may have been taken home rather than logged into the locker.

Q. Is that important in a sexual assault case?

A. I would say so, yes.

Page 196

Q. Why is that?

A. Because chain of custody, you know, is important in the prosecution of a crime. Mishandling the chain of custody could raise a lot of questions as to the validity of the evidence.

Q. And what happens if evidence is invalid?

A. It gets kept out of court.

Q. And what does that mean?

A. It's suppressed, so the jury doesn't hear it. It's something -- one more thing you can't use to prosecute them.

Q. Do you know what happened to the sexual assault case?

A. I don't.

Q. Do you know if Lieutenant Dunn filed a critical incident report about this?

A. I -- I'm pretty sure that's what it's referred to, as a write-up at the Eunice Police Department. So, yeah, yeah, in that case.

Q. I didn't know that.

A. If I'm not mistaken, that's what they call it.

Q. Do you know if that was investigated?

A. I don't know.

Q. Do you know who the officer was who

Page 197

allegedly mishandled the evidence?

A. Either Detective Victor Fontenot or Officer Derrian Guillory.

Q. Do you believe an incident -- strike that.

Do you believe mishandling evidence in a sexual assault case should be investigated?

A. Yes, sir.

Q. Why?

A. To make sure it doesn't happen again. Because it's a serious crime. If someone is sexually assaulted, it's a serious crime, and it should be investigated to make sure officers don't mishandle evidence in the future.

Q. Do you know if the evidence was ever properly logged?

A. I don't know.

Q. Do you know if Chief Fontenot was aware of that instance?

A. I'm not sure.

Q. Do you know around when this was?

A. I don't. I would say -- because Derrian left the police department I guess two years ago. So at least -- it's been at least two years in my mind.

Q. Who was the deputy chief at that time?



Page 198

A. It would have been Richard Daigle.

Q. How long have you known Richard Daigle?

A. Since 2017, when I started at the police department.

Q. Can you describe your relationship with him?

A. Not great at the time, the first time I worked there. I'm not -- I didn't -- I didn't care for the manner in which he sent aggressive e-mails to me when he was displeased with me. But now that he's retired, I get along with Richard fine.

Q. Do you see him often?

A. From time to time. He works at City Hall now in another capacity. So...

Q. How far is City Hall from your office?

A. It's in the same building, yes, sir.

Q. Are you aware of former Deputy Chief Daigle's relationship with Lieutenant Dunn?

A. As in are they -- are you asking how they feel about one another or --

Q. Have you ever spoken to Deputy Chief Daigle -- former Deputy Chief Daigle about Lieutenant Dunn?

A. One time whenever I was requesting a shift

Page 199

change a long time ago, when he was still the acting deputy chief, I asked him what I need -- you know, what proper method I need to go about to request a shift change, and he told me to go through my lieutenant, who at the time was Dunn. So other than that, not -- not that I can remember.

Q. Why were you requesting a shift change?

A. The schedule -- the days off were better for me on the opposite rotation. I got along really, really well with some of the people on the other shift, I just felt like we clicked really well. So it was nothing personal against Don at all. It was just...

Q. Who was on the other shift?

A. That would have been Quintin Doyle and I guess at the time it would have been Clancy. I know for sure Quintin Doyle was on that shift.

Q. And who was -- who were your supervisors on that shift?

A. At that time, I don't think there was a sergeant on that shift, so it would have just been Lieutenant Jeremy Ivory.

THE COURT REPORTER:
Lieutenant who?

Page 200

THE WITNESS:
Jeremy Ivory.
BY MR. HOBBIE:

Q. Are you aware that Chief Fontenot told Lieutenant Dunn that you were being poisoned by Jeremy Ivory?

MS. LOVE:
Object to form.

A. I was told by Lieutenant Dunn that Chief Fontenot wasn't happy with me being on that shift, was considering doing a shift change, but I -- word for word "poison," no.
BY MR. HOBBIE:

Q. Do you know -- strike that.
Are you aware why Chief Fontenot wasn't happy with you being on that shift?

A. I'm quite certain it was in reference to the dispute that he and Lieutenant Ivory were having that ended up leading to -- to Ivory's demotion.

Q. Besides the disciplinary actions taken against Lieutenant Dunn and Lieutenant Ivory, are you aware of any other disciplinary actions that the chief took against Eunice Police Department personnel?

Page 201

A. I guess you could qualify it as a disciplinary action, because I was under internal investigation for -- I had -- I don't know. I didn't turn in reports in a timely manner, I guess I dropped the ball. But the only action that was handed down was just a verbal reprimand basically.
Off the top of my head, no, I can't -- and then Lieutenant Cooley being demoted to sergeant. Other than that, that's all I can really think of at this moment.

Q. How about Stephanie -- strike that.
During your first stint at the Eunice Police Department, how often did you receive training?

A. Well, there's mandatory training that we have to do every year in order to stay compliant with the POST council. And then there's always the opportunity to go through elective training, you know.
So I don't know, I wouldn't -- other than doing that once a year and then having an opportunity to attend other trainings, I guess it just depends on how aggressive you want to be with training, you know.

Q. How often do you have meetings about

51 (Pages 198 to 201)



Page 202

policy?

A. As far as -- well, never, not since I'm back. I know that the police department had a department-wide meeting just recently, this was before I came back. Maybe policy was discussed then. But other than a shift meeting that I attend, I don't attend meetings.

Q. Why not?

A. There's -- I mean, I know administration has a meeting every morning, and every now and then I'll drop by and drink coffee with them. But as far as meetings regarding policy, none specifically for that.

Q. Is it encouraged?

A. To have meetings regarding the --

Q. Is it encouraged for you to attend policy meetings?

A. If -- like I said, I don't know that there is a policy meeting. So you know...

Q. You said there's an administrating -- administration meeting every morning?

A. Yes, sir.

Q. What is that?

A. I think basically what goes on is you'll have the chief, the deputy chief, detectives

Page 203

there, and they just review the radio log from the night before, or from the whole weekend before, and read over reports that were conducted just to -- to be in the know, I guess you could say.

Q. Does Jeremy Ivory go?

A. I think the shift supervisor, whoever he is, or she is, on that particular day is encouraged to be there during that meeting.

Q. Do you know if Jeremy Ivory goes?

A. I believe he does.

Q. So it's the chief, deputy chief, detectives, and Jeremy Ivory?

A. And you'll have -- the person who's over the jail will usually be in there.

Q. Who's that?

A. That would be Nicole Dupre.

Q. Do you know if Lieutenant Dunn attends?

A. I believe he does.

Q. So it's also the supervisors?

A. Correct, yes, the shift supervisor, I'm sorry.

Q. Do you think Chief Fontenot properly investigates misconduct at the department?

MS. LOVE:

Object to form.

Page 204

A. From what I've -- from what I've witnessed, sure. I don't know the disposition of some of these cases that have been investigated to really speak intelligently on it, so I'm not sure what was done or what was not done. I'm not sure.

BY MR. HOBBIE:

Q. Well, are you aware of Lieutenant Dunn's civil service board hearings?

A. Sure, yes, sir.

Q. Are you aware of the outcomes of those hearings?

A. All I know is one for sure. I don't know if it was more than one. But I believe it was settled before having to have a hearing, if I recall correctly.

Q. Are you aware that the civil service board has found in favor of Lieutenant Dunn every time?

MS. LOVE:

Object to form.

A. Like I said, I didn't know there was more than one. And like I said, the only one that I'm thinking of right now was settled before it even started, unless I'm thinking of something else. But that's news to me.

BY MR. HOBBIE:

Page 205

Q. You said there were -- who were the officers who were investigated that you mentioned earlier?

A. In the sexual assault case, is that what you're asking?

Q. Well, I thought you said you weren't aware if there was an investigation in that case.

A. As far as an investigation into the criminal -- the sexual assault or if the mishandling of evidence was investigated?

Q. The mishandling of evidence.

A. I'm not sure. I don't know anything about that, no.

Q. Which internal investigations are you aware of?

A. Mine, Lieutenant Ivory's, and only some whatever transpired between -- you know, with Lieutenant or Sergeant Cooley at the time.

Q. And no investigations of Victor Fontenot?

A. I'm not aware of any.

Q. Do you believe Chief Fontenot protects certain personnel from disciplinary action?

A. I don't know that for a fact, no.

Q. Do you believe that?

A. I guess I could say sure, because I guess



Page 206

I could have gotten more of a -- more -- how can I word this?

Other than getting an oral reprimand, I guess he could have done more to me for the way I mishandled the paperwork at the time. So sure. I don't know if other people who have done the same thing have gotten something different. I don't know.

Q. So you think that he's protected you?

A. I don't know if he did it because he and my mom go back so far or because that's how he felt. I don't know. I can't speak for what he does.

Q. Do you think he protects Lieutenant Dunn?

A. No, I guess not, no.

Q. Do you think he protects Victor Fontenot?

A. Like I said, I don't know what happened after Lieutenant Dunn wrote up Victor Fontenot. I don't know anything. So I can't speak intelligently on that. I just -- I don't know.

Q. Are you aware of a car crash incident involving Victor Fontenot and Joey Peloquin?

A. Yeah, I do, yeah.

Q. What do you know about that?

A. I believe that the traffic stop was being

Page 207

conducted by one of the two you just spoke about. And I want to say Victor may have backed into Joey's unit or -- no, I'm sorry. Victor ran into a pole or something. And I just know Joey was in the vicinity when it happened.

I don't know. And then I -- I want to say Victor said he was trying to avoid Joey or something like that, his unit. But I didn't see the crash.

Q. Are you aware that an investigation took place after that?

A. I figured -- I wasn't aware, you know, but I figured somebody was looking into, you know, the damage to a police car, yeah.

Q. Has Terry talked to you about it?

A. I remember Terry wanted to see some video to see if Joey really did cause Victor to crash or something like that. But I don't -- I don't remember exactly what Terry -- Terry talks a lot, so I don't really know.

Q. Did you see the video --

A. I did not.

Q. -- of the car crash?

A. I don't remember seeing it, no.

Q. Was Joey Peloquin ever disciplined for

Page 208

that?

A. I don't think so.

Q. Do you know if Victor was?

A. I'm not sure.

Q. Do you know if the mayor ever investigated it?

A. I'm not sure, no.

Q. Are you aware that Victor Fontenot lied in that statement?

MS. LOVE:
Object to form.

A. About the part about Joey almost causing him to crash --

BY MR. HOBBIE:

Q. Correct.

A. I guess that would be the part that he lied -- I guess the video disputed that. I don't know. I didn't see it.

Q. Are you aware of any instances of misconduct that were covered up by Chief Fontenot?

A. No, sir.

Q. Are you aware of any payroll irregularities at the Eunice Police Department?

A. I remember the civil service board conducting some type of investigation regarding

Page 209

payroll, but I don't -- I was only present during that meeting. I don't even know why I was there. I don't know the outcome.

Q. Do you remember what the meeting was about?

A. I remember -- I feel like on that particular day they were announcing scores or -- no, I'm not sure. I'm not sure why I was even there or what it was all about. So...

Q. That's fine.

Do you know what the overtime policy is at the Eunice Police Department?

A. I know anytime I work overtime, I have to complete a form that basically shows when I worked overtime and the reason why I worked overtime and turn it into the acting supervisor.

Q. Is that always the same person?

A. Well, whoever is the supervisor on the shift that I'm working overtime signs that. So...

Q. Okay. How often do you work overtime?

A. Lately, not that often. My last stint there, all the time.

Q. Why have you been working less overtime lately?

A. I have a child now. I was single at the



Page 210

time.

Q. Congrats.

A. Yeah. So I'm married with a child now, so, yeah, things have changed.

Q. When you applied for overtime, have you ever been denied?

A. I've never been denied to work overtime.

Q. Has your -- forgive me for not understanding the process.

A. Right.

Q. But has your form ever been rejected, the overtime form?

A. Never. And that's generally because it's filled out after the overtime I worked. I wouldn't imagine it would be rejected. You know, you've already put in the hours. So...

Q. Are you aware of any officers who were denied overtime?

A. I feel like at one time I heard that someone was told not to come in to work overtime, he wasn't wanted to come in. His name is Chase Godeaux. But I'm not sure if that was true. I didn't -- I don't know. That's just what I was told.

Q. Do you know the details of that?

Page 211

A. No, not really. I feel like -- I feel like there was a shift that needed an additional person, and it was -- it came down to either Chase Godeaux or maybe Ivory having the opportunity to work it and Chase was denied it, like I said, if that's even completely accurate, you know, I'm not sure.

Q. Did you hear that there was anything improper about that?

A. That was back in 2019 or '18, so I don't -- yeah.

Q. While you were at the marshal's office, did you ever provide backup to the Eunice Police Department?

A. All the time, yes, sir.

Q. How often?

A. Just about every day that I was working. Like I said, if the police department got a call for any type of in-progress crime, especially something violent in nature, I was gone. So...

Q. Did you have to seek approval from Chief Fontenot before going?

A. While I was employed with the marshal's office?

Q. Correct.

Page 212

A. No, sir.

Q. Did you ever?

A. No, sir.

Q. How would you know if you were needed for backup?

A. Because we shared -- well, we didn't share, but we monitored their radio channel as well as ours. And so any call they got dispatched to, we knew about it.

Q. Do you remember an instance in March of 2021 where Grant -- do you remember an instance in March 2021 where a rookie officer was alone on the night shift?

A. I remember hearing that there was going to be the potential for him to be by himself at night because there was no one else to be there and there was no one to work overtime or allowed to work overtime. So I do -- I -- yeah.

Q. Do you know who the officer was?

A. It was Grant Clancy.

Q. Do you know why no one was allowed to work overtime?

A. I'm not sure. From what I understood, it was some kind of situation with the budget.

Q. Is it dangerous for an officer to be alone

Page 213

by himself at night?

A. In Eunice, yes, sir, very.

Q. Why do you say that?

A. I've seen that city get out of control very fast with a full shift, so one officer by himself...

Q. What's a full shift?

A. A full shift -- well, to me, since I've been there at one time -- you know, I've worked where there's been four of us plus a supervisor. So I'd consider that a full shift. And like I say, even that can get out of hand sometimes, you know, so calls can back up. So one person by himself, absolutely, it's dangerous.

Q. What's the shift size now at the Eunice Police Department?

A. I think every shift is running -- well, there's four shifts, and Lieutenant Dunn and Lieutenant Ivory are over those -- over two shifts each. I think every shift has a sergeant on it plus maybe one or two patrol officers. So give or take, at any given time, you're going to have three to four officers.

Q. Are shifts smaller now than they were during your first stint?

54 (Pages 210 to 213)



Page 214

A. I feel like they are smaller. Looking back on it, I feel like there's -- like I said earlier, there's people who left, and we've lost more than we've gained.

Q. Can you tell me more about the night when you had to provide backup to Officer Clancy.

A. I remember speaking with Clancy that day, and he just -- he let me know about there was going to be -- there was a possibility he was going to be by himself that night, and I found that to be concerning.

So I went to Chief Deputy Joey Peloquin and told him about it. And so, in turn, he called Marshal Darbonne. And Marshal Darbonne authorized us to work, you know, basically go out -- go outside of business hours. We typically work 8:00 to 5:00. So he authorized us to go out and just provide backup to whoever was going to be on the road that night.

Q. Did you speak to Lieutenant Dunn that night?

A. I did, just prior to going on shift. Lieutenant Dunn was -- I think was leaving because he worked until 11 o'clock that night.

Q. What did you and Lieutenant Dunn talk

Page 215

about?

A. I think we exchanged words over the radio about if anything had occurred before me going in, just to be aware of. Other than that, that's it.

Q. Did you get overtime for working those hours?

A. I charge basically what we call K time, it was paid time off. So, yeah, I was compensated for it, yeah.

Q. Do you know if Marshal Darbonne got authorization from Chief Fontenot?

A. No, sir.

Q. Do you know if he got authorization from the mayor?

A. I feel like I remember him talking to the mayor about -- because the marshal's office overtime budget is very slim. I feel like he spoke to Mayor Fontenot about it, Scott Fontenot, but I don't -- I don't know for sure.

Q. Are you aware of the overtime budget at the Eunice Police Department?

A. I'm not sure what the number is.

Q. Do you know if it's slimmer than the marshal's office?

A. I feel like there's more money allotted to

Page 216

the overtime budget at the police department than the marshal's office.

Q. Would you say -- would you say the same was true at the time of that incident?

A. About the difference in the budgets?

Q. Right.

A. Sure.

Q. Did anything -- strike that.

How many officers came to back up Officer Clancy that night?

A. That night it was myself, Chief Deputy Peloquin, and Lieutenant Robert Brickley ended up coming into work that night as well. So it would have been four total law enforcement officers in each -- you know, two and two from each department respectively.

Q. Why didn't you go home after Robert Brickley showed up?

A. Because we figured we were already out, already in uniform. And still the same rule applied, one person by themselves is dangerous, so is two people by themselves, so we figured we'd stay out.

Q. Was this -- what hours of the night was this?

Page 217

A. I feel like we went in service between the hours of like 8:00 and maybe 3:00 in the morning. 8:00 in the evening, 3:00 in the morning, something like that.

Q. Did anything notable happen during that day -- during that night?

A. Other than a few traffic stops and an arrest for a warrant, I don't think anything -- nothing crazy happened that night, no.

Q. Are you aware if Marshal Darbonne spoke to Chief Fontenot about this night?

A. I was told that the two of them got into a pretty heated argument in Marshal Darbonne's office the next day. I wasn't present.

Q. What did you hear about the argument?

A. I just heard there was a shouting match about authorization to come out and patrol or -- I don't know. Other than that, I don't know. I just know they argued.

Q. Do you know if it was about the backup?

A. I'm fairly certain that's what it was about.

Q. Why are you fairly certain?

A. That's just what Marshal Darbonne said how -- and I'm quoting him about how -- I'm




MAGNA
LEGAL SERVICES

Page 218

loosely quoting him about how Chief Fontenot asked him who gave him permission to send his guys out that night, that's what he told me.  So that was pretty much the gist of it.

Q.  Did you get permission on other nights?

A.  From Marshal Darbonne?

Q.  Correct.

A.  I've come out at night on different occasions with his permission, yes.

Q.  Do you know if he had to get permission from somebody else?

A.  As far as I -- as far as I know, no.

Q.  Not Chief Fontenot?

A.  No, sir.

Q.  Do you know why Chief Fontenot was mad that you provided backup?

MS. LOVE:

Object to form.

A.  I'm not sure.

BY MR. HOBBIE:

Q.  After this evening, did you talk to Lieutenant Dunn about this backup incident?

I'm going to rephrase that.

A.  Okay.

Q.  After that evening, did you talk to

Page 219

Lieutenant Dunn about the argument between Chief Fontenot and Terry Darbonne?

A.  I did.

Q.  What did you talk about?

A.  I'm pretty sure that's when Lieutenant Dunn told me that he was being put under investigation regarding that incident or from -- from the marshal's office coming out.

And the reason being was that it was suspected that Lieutenant Dunn requested our assistance that night, which led to us coming out and whatever transpired between Chief Fontenot and Marshal Darbonne.

Q.  Do you know who investigated Lieutenant Dunn?

A.  I think -- I'm almost positive it was Lieutenant Ryan Young did the investigation.

Q.  Do you know the outcome of the investigation?

A.  I don't.  I don't know what ended up happening.

Q.  Do you know if Lieutenant Dunn was put on leave?

A.  I don't remember hearing about him being placed on leave at that point, no.

Page 220

Q.  Do you know why Lieutenant Dunn was put under investigation for requesting backup?

A.  I do not know, no.

Q.  Does that strike you as odd?

A.  If that's the sole person -- purpose of a person placed under investigation, it would strike me as odd, correct.

Q.  Why is that?

A.  I've never come across through my time there a policy that didn't allow an officer to ask for backup from another agency.  If there is one, I'm not aware of it.

Q.  Are you aware of one at the Eunice Police Department now?

A.  I'm not.

Q.  Have you ever requested backup?

A.  From other officers?

Q.  Right.

A.  Sure, I've -- yeah.

Q.  When?

A.  Several times on a traffic stop, if people look like they're -- you know, they could pose a danger, I'll radio for another unit.  Yeah.

Q.  If there's only one officer on a shift, where do they get backup?

Page 221

A.  If something ends up happening, putting myself in that position as the sole officer, I'd -- I'd instruct the dispatcher to contact the sheriff's office, you know, being after hours at night.  So yeah.

Q.  How far away is the sheriff's office?

A.  It just depends on where their nearest patrol deputy would be.  It could be between two minutes to 30 minutes.  Usually the latter.

Q.  If there's two officers on the shift, where do they get backup?

A.  Each other, unless -- unless something major happens.  I guess, at that point in time, the dispatcher would again be instructed to contact the sheriff's office.

Q.  Do you patrol Eunice now?

A.  Yes, sir.

Q.  Do you drive around the city?

A.  Yes, sir.

Q.  Are you isolated to a part of the city or do you go all over?

A.  I have my run of the city, the entire city.

Q.  How long does it take you to get from one end of the city to the other?



Page 222

A. I want to say we timed it once. And, you know, depending on traffic conditions, usually not more than five minutes away from any other point inside the city.

Q. There's two officers on the shift and you need backup but the other officer is busy. What do you do?

A. I'd be instructing the dispatcher to get me somebody, anybody.

Q. If the other officer asks you for backup, what do you do?

MS. LOVE:
Object to form.

A. I guess it would depend on what exactly I'm dealing with at that point in time. Unless somebody is bleeding out, I'm going to back up my fellow officer.

MR. HOBBIE:
Do you guys want to take a little break?

MS. LOVE:
Sure.

THE VIDEOGRAPHER:
We're off the record. The time is 2:32.

Page 223

(A break was taken from 2:32 p.m. to 2:46 p.m.)

THE VIDEOGRAPHER:
We are back on the record. The time is 2:46.

BY MR. HOBBIE:
Q. Jack, earlier when I asked about Officer Clancy being alone at night --

A. Yes, sir.

Q. -- you said something to the effect of, You can't be alone in Eunice at night.
Do you remember saying that?

A. It wouldn't be a good idea. Yeah, I remember saying that.

Q. Why is that?

A. It has the potential to get very busy. There's some violent crime that goes on. So -- and at the very least, anytime an officer gets dispatched to a domestic disturbance in progress, at least two officers need to be there to separate the parties. So one officer by himself anywhere is a very -- it's asking for trouble.

Q. If you respond to a domestic disturbance -- or strike that.

Page 224

Are you allowed to respond to a domestic disturbance with only one officer?

A. I'm not sure if the policy outlines -- I know most agencies have a policy about sending at least two officers to a domestic in progress, and I'm willing to bet that we have the same, I just can't say for sure.

Q. In practice, when you respond to a domestic disturbance, do you show up with another officer?

A. Yes, sir.

Q. What if you're not with another officer? I'll rephrase that.
Before you go, what if you're alone?

A. It's not uncommon to get there before your backup does. So you just go about assessing the situation as if there is someone there. The other person will show up shortly after, just assist with keeping, you know, the scene under control.

Q. Do you wait for the backup officer?

A. No, especially if it's in progress, you -- you know, you take action.

Q. In your experience, do you feel safer when you have backup?

A. Sure, yes, sir.

Page 225

Q. And now do you work nights for the Eunice P.D.?

A. Every other month, yes, sir.

Q. And how many people are on your shift?

A. It will usually be myself, Lieutenant Ivory, and Lieutenant -- I'm sorry, and Sergeant Doyle. Those are the three assigned to that shift. But there's almost always another person who works overtime, at least to 11 o'clock or after.

Q. Are you all patrolling?

A. Yes, sir.

Q. Who's at the department?

A. At any given time, anyone can be there, several of us could be there just completing paperwork. At this moment, we don't have computers in our cars to do our paperwork, so we have to return to the station.

Q. Who watches the jail?

A. So if there's not a jailer present, it's -- the shift, we usually rotate about every hour to make a round in the jail, come off the road and go make a round in the jail.

Q. Just to be clear, someone checks in every hour?



Page 226

A.  We try to.  If we're not busy, yeah, dispatch will usually call one of us off the road to remind us to come in, just make a round.

Q.  Do you always do that?

A.  As far as I can remember, that's the way it's always been done.  But like I said, sometimes that hourly check doesn't happen, especially if we're busy, you know.

Q.  So sometimes you don't check in for longer than an hour?

A.  Yeah, it's very possible.

Q.  And who's watching the jail between check-ins?

A.  If there's no jailer, there's nobody.

Q.  How many jailers are employed at the Eunice Police Department?

A.  Two or three full-time.  Now, there are some dispatchers who also work overtime in the jail.  But -- I can only -- really two that I can think of, a person named Starlina and a fellow named Dustin.  And then there's a reserve officer named Jody, he'll come in from time to time and work at night to watch the jail.

Q.  Does one shift have more jailers than another?

Page 227

A.  No, sir.  Well, during the day, if there's -- the person who's in charge of the jail is present, plus the jailer, whoever is on that -- assigned to that shift.  So at night, the person who's in charge of the jail is usually not there, so it would just be typically one jailer.

Q.  How often is there no jailer?

A.  Seeing as there's only -- I feel like I'm forgetting someone.  I believe there's only two full-time jailers.

I guess quite often, because it's four shifts and two jailers.  So -- with the exception of the dispatchers who work overtime in the jail.  So I'm not sure.

Q.  How many jailers were employed -- strike that.

How many full-time jailers were employed during your first stint at the Eunice Police Department?

A.  Sometime -- when I first started, I don't really remember.  I know there's been times where we've had four jailers in one shift and there's been other times where, just due to people leaving the department, sometimes there's been one jailer.  You know, it just fluctuates.

Page 228

Q.  At night, in your experience, are there more crimes apprehended in Eunice?

A.  As in more arrests being made at night?

Q.  Right.

A.  I would say -- I'd say there's probably more arrests during the daytime.  Of course, that's -- maybe that's not completely accurate.  I'm not sure that there's a particular time in which we make more arrests.

Q.  Earlier you said it can get busy at night.

A.  Correct.

Q.  What do you mean, it can get busy?

A.  Just calls will start backing up, whether it be domestics in progress, we can have silent alarms for businesses.  Sometimes there's people, you know, calling in, they see subjects with firearms on the street.  Everything will happen at one time sometimes.

Q.  Do calls back up more at night than for the day?

A.  During the day there's usually more administrative personnel present to assist with, you know, getting the call volume down, catching up.  I don't think it really matters the time of day.  Sometimes -- you know, I've seen it get busy

Page 229

at 3 o'clock in the morning, 4:00 in the morning.  So there's really to way to nail down a specific time when it's very busy.

Q.  Earlier you said it's very dangerous to be alone at night in Eunice.

A.  Yes, sir.

Q.  Has it always been like that?

A.  I would imagine so.  Nighttime -- you know, I feel like we get more calls regarding subjects with firearms at night more than we do during the daytime.  So I'd say it's dangerous to be by yourself at night.

Q.  Are you aware that Lieutenant Dunn was put on the night shift this year?

MS. LOVE:

Object to form.

A.  As of right now, I know he's in charge of two shifts, one day shift and one night shift.  But I do believe, towards the beginning of the year, he was put on a permanent night shift.

BY MR. HOBBIE:

Q.  What do you remember about that?

A.  I don't recall any of the circumstances.  I believe he and Lieutenant Mary Guillory would relieve one another on the same rotation and he



Page 230

was put on night shift.  I don't know anything other than the fact that he got put on nights.

Q.  When you say "relieve one another," what does that mean?

A.  When one is taking shift, the other one is going home.

Q.  Got it.  So did Mary Guillory have the day shift?

A.  I think so.

Q.  So the relieving is like when she ends and Lieutenant Dunn starts?

A.  Correct.

Q.  Who has more seniority at the department?

A.  Both started long before I started working there.  I'm not sure.  I don't know who's been there longer.

Q.  Do you understand what I meant when I said "seniority"?

A.  Do you mean like as in tenure, or are you inquiring if one outranks the other?  Like I said, I'm not sure.  I think Lieutenant Dunn has been there longer than Lieutenant Guillory, but I'm not sure.

Q.  Are you entitled to certain benefits if you have a longer tenure at the department?

Page 231

A.  I think it has -- it plays into whether or not you or another person would be promoted.  But as far as benefits, you know, of two people of the same rank, I don't know of any circumstances where there would be a benefit.

Q.  How about selecting shifts?

A.  I don't know that there's a policy on it, but I would believe that people with more tenure would be afforded the -- you know, a schedule that fits them better.

Q.  Talking about that time earlier in the year when Lieutenant Dunn was put on permanent night shift, what is permanent night shift?

A.  That was -- at the time, it was before -- the department briefly, instead of rotating every month days, the next month nights, at one point in time the department had gone to a straight nights, straight days.

So if you were on a day shift, you were going to stay on a day shift.  So that just meant that Lieutenant Dunn, whatever shift he was on, was the shift that was nights at the time.

Q.  Did you ever talk to him about the shift assignment?

A.  I don't think so.  I don't remember a

Page 232

specific conversation involving him being on nights.

Q.  Did he ever tell you that he wanted to be on the day shift?

A.  I remember he did tell me that it would be more convenient for him to be on the day shift because he's got young children.

Q.  Earlier you discussed that you and Chief Fontenot talked about the evolution of crimes --

A.  Correct.

Q.  -- at the police department -- I'm sorry, at Eunice.

Do you remember that?

A.  Yes, sir.

Q.  Strike that, sorry.

During your time at the marshal's office, did any other Eunice Police Department officer request backup from the marshals?

A.  Maybe not directly, but I've heard an officer -- there's one instance that stands out that an officer did request backup, just not particularly from the marshal's office, but I did respond.

Q.  Sometimes did you respond to that request?

A.  Sure.

Page 233

Q.  Do you recall any other time after the marshal's office provided backup to the Eunice Police Department where Chief Fontenot yelled at Terry Darbonne?

A.  I don't think so.

Q.  Do you recall anytime where they got into an argument after marshal's deputies provided backup to the Eunice Police Department?

A.  I don't think so.

Q.  Do you see this as an instance of Lieutenant Dunn being targeted?

MS. LOVE:

Object to form.

A.  You talking about -- about Marshal Darbonne and Chief Fontenot's dispute being an instance of -- I'm not sure.

BY MR. HOBBIE:

Q.  Earlier you testified that you were aware of the write-up.

A.  Correct.

Q.  Do you believe that's an instance of Lieutenant Dunn being targeted?

A.  Without knowing what the policy says about requesting backup, assuming that it -- assuming there is no policy to be written up for, sure, I

59 (Pages 230 to 233)



Page 234

guess you could call it targeting, sure.

Q. Who asked you to provide backup?

A. On that night?

Q. On that night, sorry.

A. I was never requested. I was just told that there was possibly going to be one officer by himself. And no one requested me.

Q. Who told you that there was going to be one officer by himself?

A. I believe it was Grant Clancy, the officer who was supposed to be coming in that night.

Q. Grant Clancy told you that directly?

A. I feel like we spoke on the phone before he came in.

Q. Do you know if Chief Fontenot investigated Grant Clancy after that night?

A. To my knowledge, no.

Q. Let me rephrase to be more specific.

Do you know if Chief Fontenot investigated Grant Clancy after that night because he requested backup?

A. I'm not sure if he did or not.

MS. LOVE:

Object to form.

BY MR. HOBBIE:

Page 235

Q. Are you aware of any investigation -- strike that.

Are you aware of Chief Fontenot investigating Grant Clancy at all after that evening?

A. I'm not aware of anything.

Q. After you received the call from Grant Clancy, what did you do?

A. I brought what I had just found out to the attention of my immediate supervisor, who was Chief Deputy Joey Peloquin, and told him what I had just heard.

Q. What did he tell -- what did he say after you brought that to him?

A. He said, That sounds dangerous, and that he was going to call Terry and see if, you know, we'd be able to come out to render assistance.

Q. Do you know if Grant Clancy is one of Chief Fontenot's favorites?

A. I have no reason to believe that he is one of his favorites or not, no.

Q. Does Grant Clancy still work at the police department?

A. No, sir.

Q. Do you know he left? I'll rephrase.

Page 236

Are you aware of why he left?

A. I'm assuming to seek better wages with Carencro P.D.

Q. Do you know what he's getting paid?

A. He told me, and I don't remember the number, but it was substantially more than he was making at the Eunice Police Department.

Q. Did he ever tell you that Chief Fontenot was part of the reason why he left?

A. Yeah, I think he -- yeah, I'm sure we had a conversation when that may have come up.

Q. And what did he say?

A. He -- he basically spoke about a lack of leadership on Chief Fontenot's behalf and a lack of pay.

Q. Do you know Chase Godeaux?

A. I do.

Q. Is he still at the Eunice Police Department?

A. No, sir.

Q. When did he leave?

A. I'm thinking about 2020, possibly, or 2019, 2020, something like that.

Q. Did he ever tell you why he left?

A. He told me it was for better pay. He went

Page 237

to the St. Landry Parish Sheriff's Office.

Q. Did he ever say that it was also because of Chief Fontenot?

A. No. Chase never told me that directly, no.

Q. What do you mean, never directly?

A. Well, I'm saying I had a conversation with Clancy where he brought it up, where Clancy brought up other reasons other than pay. What I'm saying is Chase never did, no, not to me.

Q. Have you heard that Chase left because of Chief Fontenot?

A. I haven't heard that from anybody, no, just that St. Landry Parish paid better.

Q. During your time at the Eunice Police Department, past and present, have you worked with Chase Godeaux while he was at the sheriff's office?

A. No. Because he left and went to the sheriff's office when I was in Basile, and since I've been back working in Eunice, I don't think we've come across one another one time since.

Q. Even while you were at the marshal's office?

A. Yeah, I don't think so.



Page 238

Q. Okay. Do you know why Chief Fontenot didn't investigate Grant Clancy for requesting backup?

A. I do not.

MS. LOVE:

Object to form.

A. I don't know.

BY MR. HOBBIE:

Q. Has Chief Fontenot ever told you why he didn't investigate Grant Clancy for requesting backup?

A. No, sir.

Q. Has Terry Darbonne ever mentioned that?

A. No, sir.

Q. Earlier we talked about Lieutenant Dunn's Facebook post about some shooting.

Do you recall that conversation?

A. Yes, sir.

Q. Have you ever discussed that post with the chief?

A. No, sir.

Q. Have you ever discussed that post with anybody at the department?

A. I remember trying to inquire as to who was on shift that night just to talk to them, other

Page 239

than Robert Brickley. But I don't -- I don't remember ever having an actual discussion with anybody other than Robert Brickley.

Q. Do you recall anytime when Chief Fontenot, in sum and substance, said that he was out to get Lieutenant Dunn?

A. I've -- no, sir.

Q. Has Ryan Young ever said anything like that?

A. No, sir.

Q. Has Victor Fontenot?

A. No, sir, not to me.

Q. Are you aware of Victor Fontenot's investigation into Lieutenant Dunn related to the Joshua Dupre stuff we discussed earlier?

A. Yeah, only on its face. I don't know anything other than that.

Q. Do you know how long Victor investigated Lieutenant Dunn?

A. I don't.

Q. Have you heard what Victor was investigating Lieutenant Dunn for?

A. I feel like it had something to do with narcotics, being that Joshua Dupre was involved. He's been arrested on traffic and narcotics quite

Page 240

a few times. So I don't know exactly the charge that would have, you know, been filed had they had evidence. So I'm not sure, other than narcotics.

Q. Do you know if Joshua Dupre works as a confidential informant?

A. I don't believe he does. I've never known him to be the type to speak to police like that. So, no, I'm not sure.

Q. You said "speak to police like that"?

A. Right.

Q. Does he speak to police otherwise?

A. Well, other than any more than he has to. What I'm saying is he's not the type to volunteer information to us, yeah.

Q. Okay. That makes sense.

Do you know if he was texting Victor Fontenot?

A. I'm not sure if he was or not. According to what may have transpired in Judge Caswell's courtroom, maybe they had been texting, but I don't know that for a fact.

Q. Have you ever read that transcript from the courtroom?

A. Briefly. I skimmed over it.

Q. When?

Page 241

A. I guess maybe not long after it happened, Lieutenant Dunn let me look at a copy of what was said back and forth.

Q. Do you know around when the hearing was?

A. At least a year ago, that's all I can -- you know, I don't...

Q. Do you know if it was before Lieutenant Dunn filed this lawsuit?

A. I feel like -- I feel like it was before possibly.

Q. Do you know -- I'm sorry.

A. I'm not sure when -- when exactly it was filed. So I'm not sure if it was before or after.

Q. Are you aware that Lieutenant Dunn has another lawsuit in federal court?

A. Yes, sir, yeah.

Q. Do you know when that was initiated?

A. I'm not sure, because I was under the impression this was all the same thing. So there is, indeed, two separate cases. So I don't know when that was filed, no.

Q. Around when did Lieutenant Dunn let you look at the transcript?

A. I -- I don't know. Like I said, it's been at least -- it's been at least a year. And I


MAGNA
LEGAL SERVICES

Page 242

don't know how long after the court date that it occurred I got to see his transcript. I don't know.

Q. Does October 2020 sound right?

A. It's very possible.

Q. Did you read the transcript of Victor Fontenot's testimony from that hearing?

A. I remember skimming over the -- whatever Lieutenant Dunn showed me. But I didn't read it word for word, I just kind of skipped here and there from points where Judge Caswell was speaking. That was it.

Q. What do you remember from the transcript?

A. I just remember -- I remember for sure Judge Caswell instructing the phones to be returned to Joshua Dupre because they were not -- because they weren't seized pursuant to a warrant. So that's -- yeah, if I had to quote anything from it, I remember that part now.

Q. Do you know where the phones are now?

A. Thinking of it now, I'm guessing they're still in the custody of Mr. Dupre, if they were returned to him at that time. I'm not sure if they were or not.

Q. Do you remember anything else -- excuse

Page 243

me, sorry.

Q. Do you remember anything else from the transcript?

A. I remember reading that Judge Caswell had stated he didn't feel comfortable revoking Mr. Dupre's bond based on the information that he received regarding the cell phones and the possibility of one officer trying to get another officer in trouble, or something like that.

Q. And who was the one officer trying to get -- or who was the one officer trying to get someone in trouble?

A. I believe he was referring to Detective Victor Fontenot.

Q. And who was he trying -- who was Victor Fontenot trying to get in trouble?

A. Lieutenant Michael Dunn.

Q. By doing what?

A. By making it appear that Dunn was working with Joshua Dupre in a criminal capacity.

Q. To your knowledge, have any criminal charges been filed against Lieutenant Dunn?

A. No, sir.

Q. To your knowledge, is that investigation still ongoing?

Page 244

A. To my knowledge, I haven't heard anything to -- you know, either way. So...

Q. To your knowledge -- strike that.

In your opinion, is that an example of Victor Fontenot targeting Lieutenant Dunn?

MS. LOVE:

Object to form.

A. I don't know. I mean, sure. But I don't know what Victor Fontenot thinks. I don't know what he believes he has against Lieutenant Dunn. So on its face, sure. I would like to think Lieutenant Dunn is a clean officer, abides by the law. So him being under investigation would raise eyebrows to me. But...

BY MR. HOBBIE:

Q. Yeah, because earlier you said his record was impeccable.

A. Correct. As far as I know, it is. So sure, it would definitely raise eyebrows.

Q. And what do you mean by "raise eyebrows"?

A. I would be concerned as to, you know, how much merit to give it considering this man, he's got an impeccable service record, I've never witnessed him do anything that was shady involving a narcotics investigation. So I would --

Page 245

Q. And by "this man," you mean Lieutenant Dunn?

A. Correct.

So I would be shocked, you know, to find out that he was being criminally investigated because I've never seen him do any anything criminal.

Q. Have you ever heard of the officer bill of rights?

A. Pertaining to civil service, I believe so, yes.

Q. Do you know if officers are entitled to certain rights if they're under investigation?

A. Yes, sir.

Q. Do you know what those rights are?

A. I believe they're -- I want to say it outlines them having the right to be informed of the investigation and basically the investigation having to be conducted within a certain amount of time, something like that. I don't know any more than that. I'm just going to ramble.

Q. Do you know if Lieutenant Dunn was ever informed of this investigation?

A. To my knowledge, I wasn't told that he was or was not. So...

62 (Pages 242 to 245)



Page 246

Q.  Do you understand the internal investigation process at Eunice Police Department?
A.  To an extent, sure, yes, sir.
Q.  Have you ever heard of an unofficial investigation?
A.  No, sir.
Q.  Are you aware that Victor Fontenot testified that he was doing an unofficial investigation into Lieutenant Dunn?
MS. LOVE:
Object to form.
A.  I was not aware of that.
BY MR. HOBBIE:
Q.  Are you aware if Lieutenant Dunn reported misconduct internally?
A.  Sure.  If he told me that he wrote up or was going to write up Victor for the mishandling of evidence, then I would classify that as reporting misconduct, sure.
Q.  Are you aware if Lieutenant Dunn has written critical incident forms, or write-ups, as you called them earlier?
A.  Uh-huh, yes, sir.
Q.  Has he written more than one?
A.  I feel like he has written up Mr. -- he's

Page 247

passed away -- Mr. Elijah Joseph, and I don't remember for what.  So, yeah, he has.
Q.  Do you know if he's ever written up -- strike that.
Do you know what happens after an officer writes someone up?
A.  I'm sure it gets turned into the deputy chief, who brings it to the chief's attention. And I guess it would depend on the severity of the allegations, you know, on what would happen next.
Q.  Does it go to anyone -- do you know if it goes to anyone before the deputy chief?
A.  I'm not sure.
Q.  But it goes up the chain of command?
A.  Yes, sir.
Q.  In your experience, is the chain of command important in law enforcement?
A.  Absolutely.
Q.  Why is that?
A.  It makes sure that a job gets done because one person in particular who's in charge says it gets done.  And it -- I guess it eliminates -- I guess it delegates duties down -- down the chain and takes a little bit of pressure off whoever is in charge, sure.

Page 248

Q.  Do you believe it's important that misconduct be reported up the chain of command?
A.  Yes, sir.
Q.  Why is that?
A.  Because at this time, law enforcement is under a microscope by the public, by the media, and we need to police ourselves before the media does.
Q.  Even before law enforcement was under a microscope, did you still believe that it was important to report misconduct up the chain of command?
A.  I feel like law enforcement was under a microscope when I started.  But if you ask me how I feel about it before, absolutely.  I mean, law enforcement needs to be held accountable.  So sure.
Q.  Are you aware of anybody else at the Eunice Police Department who's completed critical incident forms?
A.  I feel like -- I feel like just about every supervisor there has probably done it at one point in time or another, but I just can't tell you a specific time and date and who was involved.
Q.  Are you aware of a supervisor writing

Page 249

someone up besides Lieutenant Dunn?
A.  Let me think.  I'm just trying to think of an instance when it happened.  I know I've heard people talk about having written someone up, I just can't tell you when and who.  You know, nothing is standing out at this moment in time.
Q.  That's okay.
Are you aware if Lieutenant Dunn reported misconduct at the Eunice Police Department to other law enforcement agencies?
A.  I was informed that he did report, I don't know what -- what he reported, but he did speak with Louisiana State Police regarding misconduct in the police department.
Q.  Who told you that?
A.  Lieutenant Dunn.
Q.  Did he tell you who he spoke to at the Louisiana State Police?
A.  I believe the -- no, I don't know who he spoke to directly.  Maybe Walter Mire.
Q.  Do you know any other law enforcement agencies that Lieutenant Dunn reported to?
A.  I feel like he said he spoke to the sheriff of St. Landry Parish, Bobby Guidroz.
Q.  Did he tell you what he said to Bobby


MAGNA
LEGAL SERVICES

Page 250

Guidroz?

A. The same, whatever he reported to State Police. I don't know the specifics of the crime that he reported to him.

Q. Are you aware if he reported misconduct at the Eunice Police Department to the district attorney?

A. I was informed that a meeting took place. I was informed of this by Marshal Terry Darbonne that the meeting was taking place one day.

Q. What did he tell you about the meeting?

A. That the meeting was organized by a person by the name of Shane Frye, and its purpose was to give Lieutenant Dunn the opportunity to sit down and speak with District Attorney Chad Pete regarding corruption within the Eunice Police Department.

Q. Do you know who was at that meeting?

A. I'm -- other than Chad Pete and Lieutenant Dunn, I'm not sure.

Q. Do you know if Terry Darbonne was at that meeting?

A. I don't think he was, but I'm not sure.

Q. At this time, are you aware of any criminal investigations into the Eunice Police

Page 251

Department?

A. I'm unaware of any.

Q. Did Lieutenant Dunn report misconduct at the Eunice Police Department to Terry Darbonne?

A. I'm not sure. Other than -- I don't know if it would be called reporting, but other than maybe just having a conversation. But I don't know what words were said between Marshal Darbonne and Lieutenant Dunn.

Q. Are you aware if they discussed misconduct at the police department?

A. I'm quite certain they did.

Q. Are you aware if Lieutenant Dunn reported misconduct at the Eunice Police Department to the attorney general's office?

A. It's not ringing a bell.

Q. Are you aware if he reported misconduct at the Eunice Police Department to the FBI?

A. I wasn't aware.

Q. Are you aware if he reported misconduct at the Eunice Police Department to the governor's office?

A. He did mention that he had spoke to whoever the Lieutenant Governor is, but I didn't know -- I didn't know what it was in reference to.

Page 252

Q. Did he tell you the substance of that conversation?

A. No, sir.

Q. Have you ever heard Chief Fontenot discuss Lieutenant Dunn's reporting to external law enforcement agencies?

A. No, sir.

Q. Have you heard anyone discuss it besides Lieutenant Dunn?

A. No, sir.

Q. Have you heard anyone refer to Lieutenant Dunn as a rat?

A. No, sir.

Q. Have you heard anyone at the Eunice Police Department call Lieutenant Dunn any names besides his birth name?

A. Correct, no, sir.

Q. To your knowledge, has anyone else at the Eunice Police Department reported misconduct at the department to other law enforcement agencies?

A. Not to my knowledge.

Q. To your knowledge, are people afraid to report misconduct within the department?

MS. LOVE:

Object to form.

Page 253

A. As in afraid to report it to Chief Fontenot or to report it to other agencies?

BY MR. HOBBIE:

Q. Let's start with Chief Fontenot.

A. I can't speak for anyone else. But I wouldn't be afraid to report something to Chief Fontenot.

Q. Have you ever written a report?

A. To Chief Fontenot?

Q. Correct.

A. No, sir. I've never reported any kind of misconduct to Chief Fontenot, no.

Q. Are you aware if people are afraid to report misconduct to external law enforcement agencies?

MS. LOVE:

Object to form.

A. Like I said, I can't speak to what other people feel. I wouldn't be afraid -- if I believed a crime was being committed, I would have no issue going about making sure that crime is addressed. But I'm not sure how other people feel.

BY MR. HOBBIE:

Q. Have you spoken to other people about



Page 254

reporting misconduct internally?

A. No, sir.

Q. No one has expressed to you that they are afraid to report misconduct within the department?

A. Not afraid, no, sir.

Q. Do you believe that Chief Fontenot targeted Lieutenant Dunn because he internally reported misconduct?

MS. LOVE:

Object to form.

A. I feel like some of the things we've discussed here today occurred before -- I have no timeline of when this -- I don't know. I don't know.

BY MR. HOBBIE:

Q. That's fine.

A. You've got to excuse me. My mind is kind of fried at this point.

Q. That's fine. I only have a few other questions.

MR. HOBBIE:

Do you guys want to take a little break?

MS. LOVE:

That's fine.

Page 255

THE VIDEOGRAPHER:

We're off the record. The time is 3:25.

(A break was taken from 3:25 p.m. to 3:44 p.m.)

THE VIDEOGRAPHER:

We are back on the record. The time is 3:44.

BY MR. HOBBIE:

Q. Jack, in your experience, does Eunice have a crime problem?

A. Sure, yes, sir.

Q. Does Eunice have a drug problem?

A. Yes, sir.

Q. In your experience, does having a K9 help tackle drug crime?

A. I would think it would definitely be beneficial to us.

Q. In your experience, has it been beneficial?

A. Sure, yes, sir.

Q. It's your testimony that Lieutenant Ivory said the dog was barely used.

Do you remember that?

A. I was -- I don't think that's what I said.

Page 256

Maybe I'm wrong. But I was just under the impression that that's the reason why the K9 division was disbanded. I don't think Ivory told me that.

Q. I'm sorry if I misrepresented.

What -- how did you get that impression?

A. I don't even remember. I just -- I remember discussing it with Robert Brickley maybe whenever the dog was first -- whenever the K9 division was disbanded. And I feel like it was Robert Brickley who told me that it was because it wasn't being used, if that's who told me. I'm not quite sure. But I know we discussed it at one time.

Q. But it's also your testimony that you've called in for backup, the K9 for backup that is, right?

A. I've requested that dog, correct, in the past, yes.

Q. And you've heard other officers request it over the radio?

A. Yes, sir.

Q. Did you read the complaint in this lawsuit?

A. No, not really. I mean, I skimmed over

Page 257

it, but it was quite lengthy.

Q. Are you aware of the allegations of misconduct in the complaint?

A. Sure, yes, sir.

Q. What do you understand those allegations to be?

A. In a nutshell, that Lieutenant Dunn was treated unfairly and his rights were violated when he made the Facebook post and received disciplinary action due to that Facebook post.

Q. Did you understand the complaint also alleged misconduct at the Eunice Police Department?

A. Yes, sir.

Q. Did you understand that the complaint also alleged that Lieutenant Dunn was retaliated against for reporting this misconduct?

A. If I recall correctly, I did read something to that effect.

Q. Were you working last night?

A. No, sir.

Q. Did you work yesterday during the day?

A. Yes, sir.

Q. When did you get off?

A. 5 o'clock.

65 (Pages 254 to 257)



Page 258

Q. You testified earlier that Chief Fontenot called you last night.

A. It was in the afternoon. It -- looking back now, I went to bed pretty early. So it may have been that night, but it was after I got off of work.

Q. It was after getting off of work?

A. Correct. I was on my couch.

Q. Did he call your personal phone?

A. Yes, sir.

Q. Do you have any other phones?

A. No, sir.

Q. When you're off work, do you have your radio on?

A. No, sir.

Q. How often does Chief Fontenot call you on your phone outside of working hours?

A. It's -- well, I've only been back for a little bit of time. But in the past, he's called me to inquire about certain reports that I've done, just cases I was on.

Q. Is that during your first stint?

A. Correct, yes, sir.

Q. It was to discuss work though, right?

A. Yes, sir.

Page 259

There was another instance. New Year's Eve night, I received a phone call from Chief Fontenot letting me know where I needed to go to meet the Evangeline Parish Sheriff's Office. I wasn't employed by Chief Fontenot at the time. He told me basically where my mom's crash occurred, that was all he told me. So other than that, that's it.

Q. Has he called you outside of working hours in the last month and a half besides last night?

A. No, sir.

Q. Does it strike you as odd that the night before your deposition the chief would give you a call?

A. Sure. He's not someone I talk to on the phone very often, so sure.

Q. Strike you as odd because he's a defendant in this litigation?

A. I mean, if you're asking my opinion, I don't think it would -- in his position, I don't think it would have been a great idea for us to ride together. But he is -- he's my boss, so I didn't question his order.

Q. What do you mean, "in his position"?

A. Well, considering that I'm here to testify

Page 260

against him.

Q. Well, you're here to testify to the truth.

A. Correct. But I'm here on behalf -- I'm thinking I'm subpoenaed by the person who's filing suit against him. So I just feel like that may not have been a smart thing to do. But, again, that's just my opinion.

Q. In your experience at the Eunice Police Department, have you ever investigated crimes?

A. Have I investigated?

Q. Right.

A. Yes, sir.

Q. Have you ever investigated -- strike that. Have you ever interviewed witnesses?

A. Yes, sir.

Q. Have you ever testified in court in a criminal case?

A. Yes, sir.

Q. Are you familiar with witness tampering?

A. I believe there's a Louisiana Revised Statute outlining it, but I'm not familiar with the verbiage of it.

Q. Do you understand that means to tamper with a witness?

A. I would imagine it means to try to

Page 261

encourage a person to testify one way or the other.

Q. Can you tell me specifically everything you remember discussing in the car ride this morning.

A. We talked about crime, like we talked about earlier. And we talked about our hobbies. We discussed Chief Fontenot's upcoming trip to Disneyland with his family -- or Disney World with his family. My hobbies include woodwork.

And we talked about a case that's -- that Lieutenant Ivory was working regarding some threats made against a business owner in town. They were trying to get that person into custody before it escalated. That's -- that's it.

Q. Was Lieutenant Dunn mentioned at all in the car ride?

A. Other than the fact that I asked Chief Fontenot if he knew how long I would be there. But that's the only -- no. Lieutenant Dunn was never mentioned. The case was mentioned in that aspect, that's it.

Q. Outside of the car ride, did you ever discuss the case with Randy?

A. No, sir.

66 (Pages 258 to 261)



Page 262

Q. You said that you asked the chief if he knew how long you'd be here?

A. Yes, sir.

Q. What did he say in response to that?

A. He said some people were -- had to be here past 5 o'clock, so he had no real way to know how long I'd be here.

Q. Did he talk about the other depositions?

A. No.

Q. Did he tell you who had to be here past 5 o'clock?

A. I believe he said Marshal Darbonne was here until 5 o'clock.  No, other than -- no.

Q. Did he tell you anything else about Marshal Darbonne's deposition?

A. No.

Q. Did he mention any of the other deponents?

A. Define "deponent" for me, please.

Q. People who have been deposed in this case.

A. We didn't discuss that testimony.

Q. Did you mention their names -- I'm sorry, I said did you mention.

Were their names discussed?

A. Yeah, well, when we were discussing how long certain individuals were having to be here,

Page 263

maybe he said Ryan or Victor was here till a certain point in time, like past 5 o'clock.  I don't remember exactly.

Q. Did he say anything else about Victor's deposition?

A. No, sir.

MR. HOBBIE:

I have no further questions.

THE VIDEOGRAPHER:

Sir, there's a microphone there.

Would you mind clipping it to your lapel.

EXAMINATION

BY MR. LOUGHLIN:

Q. What's your current employment status in terms of civil service protection?

A. I am provisional at this time.

Q. Is that the same as probationary?

A. I believe it's -- it's the step before probationary.  I haven't -- I haven't retested with civil service yet.  It's scheduled, but it's not done yet.

Q. When is it scheduled for?

A. It's actually not -- "scheduling" is not accurate.  I've applied to take it, I just have to log into the portal whenever I have some free

Page 264

time, a day off, to take it online.  So it could be tomorrow.

Q. If Chief Fontenot were to fire you or discipline you in some way, would you have any recourse?

A. No, not -- not -- not that I know of.

Q. You certainly couldn't do a civil servant's grievance, right?

A. Correct, correct.

Q. I think you may have just answered this.  But the person who told you the K9 unit was no longer needed, no longer being used, you said that was Robert Brickley?

A. I believe it was Robert Brickley.

Q. It wasn't anybody else other than Brickley?

A. I don't believe so.

Q. Do you remember what he said?

A. We discussed the dog and what was going to happen with the dog.  And I asked him if he knew -- because I was with the marshal's office at the time, so I was just kind of being nosy.  And I asked him, Well, why are they getting rid of the dog?  And he just said, It's not being used.

Q. Did he say or indicate that he knew that

Page 265

personally, he had personal knowledge of that?

A. I would assume he -- I guess he did.  I don't know where he got that from.

Q. What did he tell you was going to happen to the dog?

A. He wasn't sure.

Q. You also mentioned -- you were asked about Dunn's Facebook post about a shooting near his house, right?

A. Correct.

Q. You testified you were informed Robert Brickley did an investigation?

A. Yeah, I believe -- I believe he was the person who responded to the call.

Q. Who's the one who informed you of that?

A. I don't remember.

Q. Was it Brickley?

A. It may have been.  Me and Brickley may have talked about it.

Q. Okay.  What's your -- you said Brickley didn't find evidence of a shooting.

Do you remember saying that?

A. Yeah.  From what I understood, there was -- nothing went -- there was no investigation that went further than going check out the general



Page 266

area. So I'm assuming there was no evidence found.

Q. All right. What's evidence of a shooting?

A. I -- I guess the first thing I would look for is empty shell casings or bullet holes in items.

Q. A witness saying, I heard gunshots, that would be evidence of a shooting, wouldn't it?

A. Sure, I would classify it as evidence.

Q. Do you have any idea whether such a witness gave a -- gave a recorded statement?

A. I'm not sure.

Q. Recorded in writing, I mean.

A. I'm not sure.

Q. You don't know one way or the other?

A. I don't.

Q. Do you know if that was investigated by anybody other than Brinkley?

A. I do not. I have no knowledge of it, no.

Q. You talked early on about leaving the marshal's office because of a -- you made the Facebook post and then you had the back and forth with that -- with that official, right?

A. That was partially the reason. It was the straw that broke the camel's back for me to leave.

Page 267

Q. Well, what else led up to that?

A. My mom worked for City Court most of my life; in fact, I was two years old when she started there. I've grown up playing in that courtroom, that very courtroom. So we worked side by side in a lot of ways when I worked court security. And for the first time ever, she was no longer there.

So I was -- I was looking for a reason to leave. And then Marshal Darbonne -- some of the things he said, I didn't agree with regarding -- just things about related to drinking and driving. So that was my reason to get out.

Q. It was hard for you to be there?

A. Correct.

Q. You weren't ready?

A. Absolutely.

Q. Sticking just with your Facebook post, did that violate a policy of the marshal's office as far as you know?

A. Not -- not that I'm aware of. My Facebook did not indicate that I worked for the City Marshal's Office. It was my personal Facebook and my personal Facebook only. But I wasn't aware of a specific written policy.

Page 268

Q. What's your -- what's your understanding of the policy at Eunice Police Department in terms of a Facebook post or public speaking by an officer?

A. I'm not very -- I'm not versed on the specifics of what the SOP says. I know, as far as like press releases, we're not permitted to speak to press.

As far as social media, I don't know word for word, but I feel like it has something to do with if your Facebook indicates that you work for the Eunice Police Department, then anything you can say could probably reflect on the Eunice Police Department.

But I don't know -- like I said, I don't know the procedure, the -- the policy word for word.

Q. You mentioned that you saw Dunn's Facebook post about -- about gunshots, it was a lengthy post.

Do you remember saying that?

A. Yes, sir.

Q. Did you see it when he posted it or shortly after?

A. I feel like I saw it shortly after.

Page 269

Q. You saw it on Facebook?

A. Yes, sir.

Q. Do you have an understanding whether Dunn's Facebook post, that particular post, violated a policy of the Eunice Police Department?

A. I don't know -- like I said, I don't know enough about the specific policy regarding social media to say that he did or didn't violate. I don't know. I don't think he did, but I don't know.

Q. You're not aware of any part of that post that would have violated any policy of the Eunice Police Department?

A. I don't think so. I don't -- no.

Q. You talked a lot -- you were asked a lot about Victor Fontenot. You worked with him, to one degree or another, over the years.

A. Yes, sir.

Q. Do you know if he's got something wrong with his memory?

A. To my knowledge, no.

Q. He gave a deposition, as you know. The best I recall, every other answer he gave was "I can't recall." Is that a term --

MS. LOVE:



Page 270

Object to form.

BY MR. LOUGHLIN:

Q. -- he uses a lot with you?

MS. LOVE:

Object to form.

A. With me, no.  No.

BY MR. LOUGHLIN:

Q. You said you retained Judge Terry Hoychick for a civil suit.

Is that related to your mother's death?

A. Yes, sir.

Q. Victor Fontenot admitted under oath that he made disparaging comments about -- about Lieutenant Dunn, including saying that Dunn was conceived in the cesspool of his mother's womb.

Had you heard that before?

A. No, no, sir.

Q. I believe Victor's testimony was that he said that in front of other officers, including Chief Fontenot.  You hadn't heard anything like that?

MS. LOVE:

Object to form.

A. I heard the part about -- well, I've heard -- I've heard that there was a conversation had in

Page 271

the presence of Chief Fontenot at a meeting that Detective Fontenot had said some disparaging things about Lieutenant Dunn, that's what I've heard.

Now, I don't know anything about the cesspool or anything like that.  I don't know specifics of what was said.

BY MR. LOUGHLIN:

Q. About disparaging Lieutenant Dunn and his mother?

A. Yeah, I don't -- I don't know anything about that.

Q. If Victor Fontenot said in front of Chief Fontenot that you were conceived in the cesspool of your mother's womb, would you expect the chief to do something about that?

A. I don't have a poor relationship with Victor.  I would like to think, if anyone ever said that, they would be -- they certainly wouldn't mean it.  I don't know.  I don't know.  I guess a lot would depend on that.  If someone said that about my mother, I'd probably react harshly, I guess so.

Q. Well, if Victor said that about you and your mother, you might have a poor relationship

Page 272

with him afterwards, right?

A. I would imagine so.

Q. You'd think any other officer would, wouldn't you?

A. Certainly.

MR. LOUGHLIN:

That's all I have.  Thank you.

THE WITNESS:

Thank you.

EXAMINATION

BY MS. LOVE:

Q. Hi.  Earlier this morning, I said I'm Mary Love.  I'm here on behalf of all defendants.  I shouldn't have too many questions for you.

So earlier you had testified you were speaking with counsel about Varden Guillory.  And I believe you were discussing his departure from the department?

A. Yes, ma'am.

Q. And what happened shortly thereafter?

A. Yeah, from what I know about the situation, sure.

Q. Okay.  Do you have any direct knowledge of what happened after?

A. No.  I was -- I was -- I was not employed

Page 273

with the police department at the time.  I only -- this is only what I've heard.  So...

Q. Okay.  So earlier you would have no firsthand knowledge of whether Chief Fontenot arrested Varden Guillory?

A. No firsthand knowledge, no.

Q. Okay.  Earlier you also discussed with counsel Victor Fontenot and his confidential informant process.

Do you have any direct knowledge of Victor Fontenot's process with confidential informants?

A. I don't.

Q. Okay.  Do you have any direct knowledge about how Victor Fontenot obtains warrants for any of his cases or investigations?

A. I have no direct knowledge, no.

Q. Okay.  Earlier you also discussed I think Jordan Arnaud and a situation with him and Victor Fontenot and a potential escape; is that correct?

A. Yeah.

Q. Okay.  Do you have any firsthand knowledge about that situation?

A. I was not present during any of this, so, no, I have none.

Q. Okay.  Do you have any idea whether Jordan

69 (Pages 270 to 273)



Page 274

did or did not escape?

A. I feel like he did not escape, but, yeah, I don't know for a fact.

Q. Would that be something you had heard?

MR. HOBBIE:

Object to form.

A. Yeah.

BY MS. LOVE:

Q. Going back to confidential informants, you were discussing perhaps qualifications to become a confidential informant.

Do you have any training on being a narcotics officer?

A. Nothing past the police academy.

Q. Okay. Have you ever been a narcotics officer?

A. Never.

Q. Okay. Have you ever had any training specific to confidential informants?

A. Not past the police academy, no.

Q. Okay. Or for obtaining warrants related to narcotics cases?

A. No, no formal training.

Q. Okay. You had also discussed earlier with counsel a situation where Victor Fontenot might

Page 275

have started searching a vehicle that you had stopped?

A. Correct.

Q. Who decides whether a search is illegal or not?

A. Like on scene?

MR. HOBBIE:

Object to form.

A. On scene, it's courteous for whoever made the stop to be the one to decide how the rest of the stop is going to go.

BY MS. LOVE:

Q. Okay.

A. Now, if -- so who would have determined if there was probable cause? I guess if that person -- if evidence would have been recovered inside of the vehicle, then that person would have an opportunity to go before a judge to determine if there was probable cause for the search.

Q. Okay. Do you have any firsthand knowledge of what Victor Fontenot was looking for in the vehicle?

A. Most likely, I would assume it would be narcotics. The person who was stopped has been sev -- has been arrested several times on

Page 276

possession with intent to distribute narcotics.

Q. Do you have any firsthand knowledge, though, about what he was searching for?

A. No. He didn't tell me what he was searching for.

Q. Okay. Earlier you also discussed with counsel Joshua Dupre and Victor Fontenot --

A. Correct.

Q. -- and some phones that might have been discussed at a hearing?

A. Correct.

Q. Do you have any firsthand knowledge about where those phones are now?

A. I don't.

Q. Do you have any firsthand knowledge about the phones at all, the circumstances surrounding those phones?

MR. HOBBIE:

Objection; form.

A. Other than them being seized by Detective Fontenot, no. I don't know what was on the phones or anything like that.

BY MS. LOVE:

Q. Also, another situation you discussed earlier with counsel, a potential sexual assault

Page 277

case that Victor Fontenot might have been involved in.

Do you have any firsthand knowledge about that case?

A. I do not.

Q. Okay. Do you have any firsthand knowledge about whether -- or how he handled evidence in that case?

A. I have no knowledge, no.

Q. Okay. How did you learn about this sexual assault case?

A. Through Lieutenant Dunn.

Q. Okay. Have you ever heard, personally, Victor Fontenot threaten Lieutenant Dunn?

A. Personally, no.

Q. Has Chief Fontenot ever told you that Lieutenant Dunn is his enemy?

A. No, ma'am. No.

Q. Okay. Earlier you discussed a washer/dryer situation with Victor Fontenot, and I'm unclear if that was -- if you were referring to Jordan Arnaud or Harrison?

A. I think -- I think they're father and son, and they may have lived in the same -- in the same residence.



Page 278

Q. Do you have any direct knowledge relating to that washer/dryer incident?

A. I have none.

Q. Okay. Going back to your employment with the Eunice Police Department, when you first started there, can you kind of walk me through what training you received.

A. So I received about two weeks of training as a dispatcher in case I ever had to take the dispatcher's place in her absence or his absence; a few weeks in the jail; then after that, it happened to fall to where I was going to the police academy. So I attended the police academy for 16 weeks, I want to say.

Upon completion of the police academy, I went through what's called field training, ride-along with a senior officer. That's about two months, if I had to bet, of working days. And after that, the field training officer makes a determination if you're ready to be on your own or not, and I was cut loose on my own.

Q. Okay. Did that entail any weapons certifications when you first started?

A. As far as like firearms? Yeah, I had to qualify with a firearm, if that's what you're

Page 279

asking about, yeah.

Q. Okay. And then after that initial training period, what was your training schedule, I suppose?

A. There's yearly mandatory training through POST. There was another thing that we do with the police department, it's online, it's called Target Solutions. And then there's been a time or two where we've attended certain trainings. There was some ground fighting training that we went to. And then after that, you're pretty much afforded the opportunity to go -- to find a training that you're interested in and attend it. So...

Q. Okay. And then after your initial employment with the Eunice Police Department, your next chunk was with the --

A. Basile.

Q. -- Basile? Okay.

Did you receive any training when you went there?

A. I did. Other than the normal POST training, I attended a three-day course called Advance Search and Seizure, Warrantless Searches.

Q. Okay. And then after that you were with the City Marshal's Office?

Page 280

A. Correct.

Q. Any additional training when you started there?

A. I went through a -- like a week-long course on statement analysis and like detecting deception in interrogation. And I went through some type of active shooter training, preparing civilians for active shootings.

Q. Okay. And now that you're back with the Eunice Police Department, do you expect that you will continue to have trainings?

A. Sure.

Q. Okay. You discussed earlier a car crash involving both Victor Fontenot and Joey Peloquin; is that correct?

A. Yes, ma'am.

Q. Okay. Were you there for that car crash?

A. I was not, no.

Q. Okay. Any firsthand knowledge about what occurred in that crash?

A. Other than that Joey Peloquin told me what happened, no. I have no firsthand -- no, I didn't see it.

Q. Okay. Okay. Earlier you'd also discussed that night in March 2021 when you assisted the

Page 281

Eunice Police Department.

A. Yes, ma'am.

Q. And you testified that you were informed about the shift by Grant Clancy; is that correct?

A. Correct.

Q. Okay. Do you have any knowledge of how lieutenants and officers are assigned to shifts?

A. I would imagine that a certain lieutenant can request to have a certain officer work on his shift. But as far as -- other than that, I don't know what really -- if there's any process on determining where an officer gets put.

Q. Okay. And do you have any knowledge of the process of, if a shift appears shorthanded, what happens?

A. I think usually a person -- if there's -- if that shift absolutely needs a person to come in, that an officer can be ordered in, to come into work.

Q. Okay. Who makes that order?

A. It would usually be the shift supervisor.

Q. Is that -- would that be a lieutenant, is that --

A. Under some circumstances. Sometimes it will be a sergeant, whoever -- you know, if



Page 282

there's a lieutenant present, then he's the one in charge.

Q. Okay. And do you have any firsthand involvement in making that decision?

A. No.

Q. Okay. And correct me if I'm wrong, Grant Clancy, he's an officer?

A. That's correct.

Q. Or was at the time?

A. That's correct.

Q. Okay. So that would not have been his call to order somebody in?

A. No.

Q. Okay. And you mentioned that there was an investigation into Lieutenant Dunn after that incident?

A. Correct.

Q. Do you have any firsthand knowledge of the investigation?

A. Other than Lieutenant Dunn advising me that he was placed under investigation, I have no knowledge of what transpired after that.

Q. Do you have any firsthand knowledge about the reason he was placed under investigation?

A. Nothing further than what Lieutenant Dunn

Page 283

told me.

Q. Going back to Joshua Dupre's hearing, you mentioned that you had looked at or skimmed the transcript?

A. Correct.

Q. Okay. And that Lieutenant Dunn had shown you the transcript?

A. Yes, ma'am.

Q. Okay. What were the circumstances that led to you -- him showing you the transcript?

A. Lieutenant Dunn and I have -- we've worked together for quite some time. It appeared he needed someone to talk to because he seemed to be very stressed out about what was going on with -- within the department.

And he just began telling me about what's going on and what he has and what's been done against him. And that's how that conversation started.

Q. Were you with the marshal's office at this time or --

A. I was in the marshal's office.

Q. Okay. Do you have any firsthand knowledge of the events discussed in that transcript or at the hearing?

Page 284

A. No, other than reading the brief -- yeah, skimming it. No, I wasn't present, I have no firsthand knowledge.

Q. You also discussed the K9 unit and the unit being disbanded.

Do you have any firsthand knowledge about why the K9 unit was disbanded?

A. No firsthand knowledge, no.

Q. Okay. Do you know who would be involved in that decision?

A. I would imagine it to be the chief of police himself, would be the one to make that decision.

Q. Okay. You also discussed that you rode -- rode here this morning with Chief Fontenot; is that correct?

A. That's correct.

Q. Okay. Did he order you to ride with him?

A. I wouldn't -- he didn't phrase it as an order, but just -- he said, We're going to go ahead and ride together, it makes no sense for both of us to take separate vehicles if we're going at the same time.

I didn't question the man. But, you know, I don't know -- I don't know what would have

Page 285

happened if I said, No, I don't want to ride with you.

Q. So you agreed to --

A. Sure. I had no issue with it.

Q. Did he encourage you to testify any which way today?

A. No, ma'am.

Q. Going back to March 2021, the short-staffing incident, do you have any firsthand knowledge about the conversation that occurred the next day between Chief Fontenot and Terry Darbonne?

A. I was not present for the conversation, no.

Q. How did you hear about the conversation?

A. Marshal Darbonne allowed myself and Joey Peloquin to stay home -- to sleep in and come in a little later. And when we went into the office, the secretary -- whoever was working for Terry at the time as secretary -- informed us of what transpired.

Q. Okay. And what did she say?

A. That there was a pretty heated argument that took place between -- between Marshal Darbonne and Chief Fontenot.



Page 286

Q. Do you know that person's name?

A. Amanda Boulet.

Q. Okay. Any firsthand knowledge about the substance of the argument?

A. No firsthand -- as in having heard the argument, no.

Q. Okay.

A. No, no.

Q. Did she provide you with any of the substance?

A. She, in a nutshell, talked about how Chief Fontenot expressed displeasure with the marshal's office having coming out the night before. But other than that, that's it.

Q. You also discussed earlier a rumor about Chief Fontenot ordering officers to maybe destroy a home during a search warrant.

Do you recall that?

A. A question was posed regarding that, yeah, I recall it.

Q. Do you have any firsthand knowledge about Chief Fontenot ordering people to destroy a home?

A. No, ma'am.

Q. I apologize, I'm going back a little bit.

When we were discussing Victor Fontenot

Page 287

and Jordan Arnaud and a potential escape by Jordan Arnaud --

A. Correct.

Q. -- how did you learn about that situation?

A. I knew -- I knew at some point -- I knew Jordan was working for Victor. But the only way I knew that there was a possibility for him to facilitate an escape was through Lieutenant Dunn. I don't think I was even employed in Eunice at the time this occurred.

Q. You also discussed an incident involving Victor Fontenot and then-Deputy Chief Daigle.

A. Yes, ma'am.

Q. And I think you said something to the effect that a person in jail had broken a security camera and that led to --

A. Yes.

Q. How did you hear about the situation?

A. Initially, I don't -- I don't remember who told me, just because I was employed there at the time, and anytime something occurred in the jail, like someone -- you know, like something like that happening, somebody damaging jail property, it was usually the talk of the department. So I don't remember who initially told me about it.

Page 288

Q. So a situation involving force like that travels --

A. Correct.

Q. -- around? Okay.

MR. HOBBIE:
Object to form.

BY MS. LOVE:

Q. Do you have any firsthand knowledge about what type of force was used in that situation?

MR. HOBBIE:
Object to form.

A. From what I understand, this person was -- I guess closed-hand strikes. I really have no firsthand knowledge of what was used.

BY MS. LOVE:

Q. Okay. Did you witness?

A. I did not.

Q. Okay. And again, I apologize to be jumping around, but going back to the March 2021 event, did Grant Clancy request backup from you?

A. He did not.

Q. Okay. Did anyone from the Eunice Police Department request backup from you?

A. No, ma'am.

MS. LOVE:

Page 289

Can we take about a five-minute break?

MR. HOBBIE:
Sounds good. That works.

THE VIDEOGRAPHER:
We are off the record. The time is 4:23.

(A break was taken from 4:23 p.m. to 4:33 p.m.)

THE VIDEOGRAPHER:
We are back on the record. The time is 4:33.

BY MS. LOVE:

Q. Okay. I just have a couple more questions.

A. Okay.

Q. Just going back to the testimony about -- questions about the testimony before Judge Caswell that we discussed earlier, were you ever in the courtroom for that testimony?

A. No, ma'am.

Q. Do you recall verbatim what the testimony was?

A. I don't.

Q. Do you have any firsthand knowledge about what may have been talked about in Judge Caswell's



Page 290

chambers?

A. No, ma'am.

Q. Do you have any firsthand knowledge about what Judge Caswell ultimately did with those cell phones before or after the hearing?

A. No, ma'am.

Q. Okay. And do you have any firsthand knowledge about Victor Fontenot misrepresenting anything at the hearing regarding those cell phones?

A. I have no firsthand knowledge.

MS. LOVE:

I have no further questions.

EXAMINATION

BY MR. HOBBIE:

Q. I just have a few more. I promise I won't keep you long. Yeah, it won't be long.

Have you seen a court transcript before?

A. Yes, sir.

Q. In your experience before testifying in court, do you have to take an oath?

A. Yes, sir.

Q. What is that oath?

A. You're swearing to tell the truth, and failure to do so can get you charged with perjury.

Page 291

Q. Do you have any reason to doubt the validity of the transcript you read of Joshua Dupre's bond revocation hearing?

A. I have -- no, sir, I have no reason to doubt it.

Q. Do you have any reason to suspect that Judge Caswell -- withdrawn.

I want to talk about -- briefly about Grant Clancy, just because I'm a little bit confused.

You said that he called you, right?

A. I'm pretty sure the conversation was -- took place on the phone prior to him being scheduled to be on shift.

Q. But you just testified that he didn't request backup?

A. He didn't request me.

Q. What did he say?

A. He just told me that he was going to be by himself that night.

Q. And so then what did you do?

A. That's when I went to my superior and said, Hey, you know, there's going to be a guy out here by himself tonight.

Q. Your superior being Joey Peloquin?

Page 292

A. Correct. At the time, yes.

Q. Did Joey Peloquin mention hearing from Lieutenant Dunn?

A. He didn't tell me he did, no.

Q. After that instance in March of 2021, you testified that you became aware that Lieutenant Dunn was put under investigation, right?

A. Yes.

Q. Did you read the investigation notice?

A. I feel like Dunn may have showed it to me, but if I did, I don't remember.

Q. Was it your understanding, based on your reading of the investigation notice, that Lieutenant Dunn was put under investigation for the March 21st incident?

MS. LOVE:

Object to form.

A. I don't think it would be accurate, because I can't -- I don't remember what I read or if I read -- you know, me and Lieutenant Dunn have had a lot of conversations, and I don't remember reading anything. I just remember him making -- expressing it in so many ways, that that's why he was under investigation. I don't remember reading anything about it.

Page 293

BY MR. HOBBIE:

Q. You said earlier Lieutenant Dunn's track record is impeccable, correct?

A. In my opinion, yeah.

Q. Do you have any reason to doubt the truth of Lieutenant Dunn's statement that he was put under investigation because of that backup request incident?

A. No, I take his word. So, no, I mean, I have no reason to disbelieve him.

Q. Do you think Victor Fontenot has an impeccable track record?

A. As far as I know, sure. I don't know that he's ever been in any trouble as far as job related or otherwise, sure.

Q. Are you aware that he has a low reputation among law enforcement?

MS. LOVE:

Object to the form.

A. Other than some rumors, no, I don't know anything else. I don't know firsthand.

BY MR. HOBBIE:

Q. But you're aware that Victor, in your opinion, illegally searched a car, correct?

A. From what I saw on that particular day,

74 (Pages 290 to 293)


MAGNA
LEGAL SERVICES

Page 294

sure, unless he knew something I did not.  Then maybe he saw something, maybe he knew something.  But to my knowledge, from where I was sitting, there was no probable cause to search the vehicle.

Q.  Whose traffic stop was it?

A.  It was mine.

Q.  Was he there when you made the traffic stop?

A.  He was -- he may have been behind me.  I'm not sure when he arrived.

Q.  But in your opinion, there was no probable cause?

A.  At that moment in time, no.

Q.  Counsel mentioned something about the legality of searches.

When you're on the road, how do you determine if you can search a car?

A.  There's certain -- well, the rule is the warrant, and there are certain exceptions to the warrant.  There's a lot of different ways that can go.

Q.  And in that instance, did you have an exception to the warrant requirement?

A.  At that moment in time, I did not.

Q.  Yet Victor Fontenot still searched the

Page 295

car?

A.  Correct.

Q.  Do you know if Victor Fontenot found any drugs?

A.  To my knowledge, nothing was recovered.

Q.  Do you know if anyone in that car was charged with a crime?

A.  Two -- the two occupants of the vehicle both were taken to jail by me.

Q.  What happened after that?

A.  To the vehicle?

Q.  To the two people in the car who you just took to jail.

A.  The driver was charged with driving under suspension because -- and he was arrested on it because he was habitual.  And the passenger gave me a false name, so I charged her with resisting an officer by giving a fake name.

Q.  When you're on the road, who makes the determination if there's an exception to the warrant requirement?

A.  On the road, the officer who's in charge of that particular case.

Q.  So if it's your traffic stop, who makes that determination?

Page 296

A.  It would be me, unless over -- unless a supervisor thought there was no ex -- you know, there was no probable cause, then, you know, shut it down.

Q.  Counsel mentioned something about you receiving training for narcotics warrants, right?

A.  Correct.

Q.  Or not receiving training --

A.  Correct.

Q.  -- for narcotics warrants.

Do you know if it's okay to lie when you're submitting a warrant?

A.  It's not okay to lie.

Q.  Is it okay to lie when you're submitting a narcotics warrant?

A.  It's not okay, no.

Q.  How do you know that?

A.  It's never okay to lie, period.  But I -- you certainly don't want to lie to a judge.

Q.  Is it okay to search a car without probable cause?

A.  No.

Q.  Why not?

A.  You would be in violation of a person's Fourth Amendment rights.

Page 297

Q.  In your experience with traffic stops, have you ever searched a car without a warrant because there was an exception to the warrant requirement?

A.  Yes, sir.

Q.  Did any of those cases involve drugs?

A.  Yes, sir.

Q.  How do you know if you can search if you're not trained in narcotics?

A.  I think anybody who's received a certain degree of search and seizure training would know whether or not they could search a vehicle.

Q.  Do you think it's okay to falsify an unofficial investigation into a colleague?

A.  I would -- yes, it's not okay.

Q.  I'm sorry, just to be clear --

A.  Yeah.

Q.  -- is that okay?

A.  It's not okay.  I'm sorry.

Q.  Is it okay to falsify an unofficial investigation into a colleague?

A.  It's not okay.

Q.  Do you know if that's a policy at the Eunice Police Department?

A.  I don't know for sure, but I would venture



Page 298

to bet it's frowned upon to lie on your colleagues, correct.

Q. Do you think it's okay if Chief Fontenot let Victor Fontenot do that to Lieutenant Dunn?

MS. LOVE:
Object to form.

A. You're asking if it would be okay if he allowed him to do that, is that your question?  It would not be okay, no.

BY MR. HOBBIE:

Q. Do you know if there's a policy in the policy book about unofficial investigations?

A. I'm not quite sure the definition of an "unofficial investigation," so, no, I don't know. I don't know that there's a policy or not.

Q. Are you aware that during a break in Victor Fontenot's deposition, Chief Fontenot told him the difference between an unofficial investigation and an official investigation?

MS. LOVE:
Object to form.

A. I was unaware.

BY MR. HOBBIE:

Q. During any of the breaks today, did Chief Fontenot talk to you?

Page 299

A. Aside from offering to give him a ride to go get something to eat today, that's the only discussion we had.

Q. Counsel talked about some of the direct knowledge, or lack thereof, that you had or didn't have.

Do you have direct knowledge of how Victor Fontenot selects confidential informants?

A. I have no direct knowledge, no.

Q. Do you know who -- do you know who approves Victor Fontenot's selection of confidential informants?

A. I do not.

Q. In your opinion, should someone have to approve the selection of confidential informants?

MS. LOVE:
Object to form.

A. In my opinion, I believe that would render that person no longer confidential.  You know, I don't think anyone -- I'm trying to answer this.

I don't think it's a great idea to have to get approval from someone for a certain person to be a confidential informant, because at that point in time, that person's identity or confidentiality is compromised.

Page 300

BY MR. HOBBIE:

Q. But you testified earlier that Victor Fontenot and Ryan Young worked together, correct?

A. They do.

Q. They're both detectives?

A. That's correct.

Q. To your knowledge, do they share confidential informants?

A. I have no knowledge of who their -- no.

Q. To your knowledge, do they conduct investigations together?

A. I would assume they assist each other, sure, yeah.

Q. If the identity of confidential informants are not disclosed, how do you know if Victor Fontenot is breaking the law?  I don't want to make that a double negative.

If the identity of confidential informants are not disclosed, how can you know if Victor Fontenot is breaking the law?

MS. LOVE:
Object to form.

A. I'm not sure.  I'm not hanging onto the question.  Can you repeat it for me one more time, please.  I'm sorry.

Page 301

BY MR. HOBBIE:

Q. Earlier today you testified that you weren't sure about some of the selections that Victor Fontenot made.

A. Correct.

Q. Or something like that, right?

A. About the manner in which -- yeah, if an informant is paid or not.  So sure.

Q. Are there certain people, in your opinion, who should not be confidential informants?

A. Sure.

Q. If someone committed a murder, should they be a confidential informant?

MS. LOVE:
Object to form.

A. I don't necessarily think it would disqualify that person.

BY MR. HOBBIE:

Q. What disqualifies someone, in your opinion, from being a confidential informant?

A. Anyone who's showed a track record of being dishonest, lying to the police, lying in court.

Q. Anywhere in the policy book does it spell out the qualifications for a confidential



Page 302

informant?

A.  I'm unaware of anywhere in the policy.

Q.  So if no one else can know, then it's just up to Victor?

A.  I would assume so.

Q.  Do you see any issues with that?

A.  I can see the potential for a person to take advantage of that.  But I'm not Victor's supervisor.  I don't work narcotics.  I don't care to be in narcotics or investigations.  So I --

Q.  Do you -- sorry.  I don't mean to cut you off.

A.  That's okay.

So, yeah, I -- basically, it's not my -- it's not my cup of tea.  So, you know, that's it.

Q.  Do you think his supervisor should know the identity of confidential informants?

A.  I don't know.  It's hard to say.  I guess it would depend on that person's supervisor and their character.

But I have my own confidential informants, and there's not one soul in this world who knows who they are.

Q.  How do you know if Victor Fontenot's

Page 303

confidential informants exist then?

A.  I don't know.

Q.  Are you aware that Victor Fontenot testified that two confidential informants told him that Lieutenant Dunn was being paid by Joshua Dupre?

MS. LOVE:
Object to form.

A.  No, I was unaware.  No.

BY MR. HOBBIE:

Q.  Are you aware that Victor Fontenot refuses to disclose those names?

A.  I've heard Victor Fontenot talk about how he does not want to disclose the identity of his informants, correct, I have heard that.

Q.  Are you aware that we have discussed some confidential informants during this --

A.  I was unaware of that.

Q.  -- lawsuit?

That was my last word.

A.  Oh, I'm sorry.

Q.  No, you're fine.

Do you think there should be some oversight process for the confidential informant process?

Page 304

MS. LOVE:
Object to form.

A.  Part of me says yes; but then again, at the end of the day, you compromise this person's -- you know, their confidentiality.  And in the wrong hands, it could lead to that person getting hurt.  I'm not sure what my stance on that is, honestly.

BY MR. HOBBIE:

Q.  You just testified that you have confidential informants?

A.  I have people who talk to me who would otherwise not talk to officers, sure.

Q.  But you just told counsel you're not trained in narcotics?

A.  I'm not, no.

Q.  Why do you have confidential informants?

A.  People see things on the street that occur, you know.  Perhaps they may help me solve thefts, burglaries, shootings.  I believe it's a good idea to have some people in every neighborhood that are willing to talk to you.

Q.  You are not trained to be a detective, right?

A.  I am not, no, sir.  I've never been a

Page 305

detective, no.

Q.  Do other non-detectives at the Eunice Police Department have confidential informants?

MS. LOVE:
Object to form.

A.  I would assume they do.

BY MR. HOBBIE:

Q.  Do you know that other people have confidential informants?

A.  I don't know that, no.

Q.  But you have confidential informants?

A.  I have one or two here and there, sure.

Q.  Have you sought any clearance from a supervisor before you got a confidential informant?

A.  No, sir.

Q.  Do you see any issue with that?

A.  No, not really.  No, sir.  I mean, this person -- if this person is giving me information, I don't -- I don't know how it's any different than a person who's willing to reveal their identity to me -- or to anybody to give me information.  I don't feel the need to get clearance from anybody.

Q.  When do you stop trusting a confidential



Page 306

informant?

A. I guess if this person were to give me information that turns out to be completely untrue. I don't know. Depending on what kind of information it is X amount of times, then I would just probably break contact with that person and no longer listen to what they have to say.

Q. Are you aware that the unofficial investigation into Lieutenant Dunn is over?

A. I was not aware of its existence. So no, sir.

Q. Are you aware that Victor Fontenot testified that he still uses those two confidential informants?

A. I'm unaware of that.

MS. LOVE:
Object to form.

BY MR. HOBBIE:

Q. Given Victor Fontenot's reputation, do you think he should be supervised by Ryan Young?

MS. LOVE:
Object to form.

A. Sure. I mean, I think we all need supervisors, sure, yeah. I don't think it has much to do with his reputation, but I think -- you

Page 307

know, I think supervision is necessary.

BY MR. HOBBIE:

Q. Well, you said more people -- actually, strike that.

You said between 20 and 30 people asked for Victor after you arrested them?

A. Yeah. I mean, on a traffic stop or whether that person goes to jail or not, I've had several people ask me to call Victor.

Q. And you said that's more than anybody else?

A. Sure, absolutely.

Q. Is that suspicious to you?

MS. LOVE:
Object to form.

A. No, because I never took it -- I never gave it much -- much weight. Because no matter what Victor told them he could or couldn't do for them, they were going to jail. I mean, it had no bearing on my decision to make an arrest or not make an arrest.

BY MR. HOBBIE:

Q. I understand it didn't have a bearing on your decision --

A. Correct.

Page 308

Q. -- but were you concerned about Victor?

A. Not really, other than I felt like he was making promises to these people perhaps that he could not keep. But...

Q. Well, do you think there's anything wrong with that?

A. Sure, sure.

Q. And you still weren't concerned about Victor?

A. It's not my job to be concerned with Victor when I was at the City Marshal's Office.

Q. Well, you're a human.

A. Well, yeah. But I don't -- I don't -- I'm not quite sure where this is going.

Q. Well, where this is going is Marshal Darbonne instructed you to be careful when you worked with Victor.

MS. LOVE:
Object to form.

A. Uh-huh.

BY MR. HOBBIE:

Q. And you're saying 20 to 30 people testified -- or asked you for Victor after being stopped?

A. Uh-huh.

Page 309

Q. And you're saying you weren't concerned?

A. Dope fiends -- listen, a lot of his informants are probably dope fiends. He's in narcotics. Drug addicts is a better way to describe these people.

These people don't want to go to jail. They will tell you just anything not to go to jail. But I -- so maybe Victor was on the menu that day of what card to be played. I don't know.

Q. I understand.

You also heard that he may have been tipping people off about upcoming arrest warrants?

A. That was --

MS. LOVE:
Object to form.

A. That was through Chief Deputy Joey Peloquin.

BY MR. HOBBIE:

Q. But you heard about it?

A. I heard about it, correct.

Q. And you said, if someone is tipped off, that puts you in danger?

A. Sure.

Q. That doesn't concern you?

A. Absolutely, it does.



Page 310

Q. All those rumors about Victor Fontenot don't concern you?

A. I'm sure there's quite a bit of rumors about me, but I -- until I see someone break the law -- I don't know where else to go with that.

Q. Well, you said earlier breaking the law is conducting an illegal search.

A. Correct.

Q. And you said you witnessed him conduct an illegal search.

A. I did. And I shut it down. I said, Everybody stop until I figure out what's going on.

Q. Although you don't have direct knowledge of some instances of misconduct, you've heard about them?

A. Sure.

Q. You've discussed them with other officers?

A. Sure.

Q. With officers from other law enforcement agencies?

A. Okay.

Q. Yes?

A. Yeah.

Q. Marshal Darbonne instructed you to be careful?

Page 311

A. Uh-huh.

Q. Could you give a verbal answer?

A. Oh, yes.

Q. Joey Peloquin told you that Victor Fontenot lied about the crash?

A. Yeah, he did.

Q. Did you trust Joey?

A. Sure, yeah. Yeah. I had no reason to disbelieve him. I wasn't --

Q. That didn't concern you about Victor?

A. Well, listen, he -- Victor claims that Joey made him wreck. Now, whether that's a lie or if that's a misinterpretation of what occurred, I don't know. But Joey Peloquin said that that's not what happened. So...

Q. Well, would it concern you if you were Victor's supervisor?

MS. LOVE:

Object to form.

A. What would concern me?

BY MR. HOBBIE:

Q. All these rumors about Victor, would it concern you if you were his supervisor?

MS. LOVE:

Object to form.

Page 312

A. I would -- I would give it the weight necessary. And, sure, yeah, it would concern me if I was hearing lots of rumors about someone under my command, sure.

BY MR. HOBBIE:

Q. Would you investigate?

A. Sure.

Q. Why?

A. Like you said earlier, I'm a human. I mean, if somebody is doing something wrong, then absolutely I'd look into the possibility of them doing something wrong. It's our job to find criminal conduct.

Q. And you investigate crimes?

A. I have.

Q. When you have probable cause, are you sure that a crime has been committed?

A. It's more likely than not that a crime was committed. About 51 percent is the rule of thumb, from what I've been told.

Q. What about reasonable suspicion?

A. It's less than probable cause. They cannot be arrested, no, sir.

Q. But you could do a K9 sniff of a car?

A. Absolutely.

Page 313

Q. So you look into it a little bit?

A. Sure. It gives you the -- it affords you to opportunity to extend the -- if it's a traffic stop, to extend the stop reasonably.

Q. Is that what you've been trained to do?

A. Correct.

Q. And today you've testified that you're not aware if Chief Fontenot has ever investigated Victor Fontenot; is that right?

A. I'm not aware of anything, no, sir.

Q. You described Lieutenant Dunn as having an impeccable record, right?

A. To my knowledge, yes.

MS. LOVE:

Object to form.

BY MR. HOBBIE:

Q. Is that your testimony?

A. Yes, sir.

Q. But you've testified today that he's been investigated multiple times by Chief Fontenot?

A. Yes, sir. But he's never been arrested.

Q. I want to talk briefly about Jordan Arnaud.

A. Okay.

Q. Are you aware that Lieutenant Dunn



Page 314

recorded Victor Fontenot admitting to trying to let Jordan go?

MS. LOVE:

Object to form.

A. I was not aware of that.

BY MR. HOBBIE:

Q. Did Lieutenant Dunn tell you about that?

A. If he did, I don't remember.

Q. Earlier we talked about your car ride with Chief Fontenot. I understand your testimony, when opposing counsel asked you did Chief Fontenot order you -- what did you say?

A. I didn't know if it was considered an order or just a suggestion. I didn't question it though.

Q. You said, "I don't know what would have happened if I said, No, I didn't want to ride with you."

A. I mean, yeah. I don't -- he might have said, No, we're going to ride together to save the city gas, or he could have said, Fine, we'll take two vehicles. I just don't know.

Q. You said you had a couple of confidential informants?

A. Sure, yes.

Page 315

Q. Have you ever helped one of them get out of jail?

A. No, sir.

Q. Why not?

A. It's -- I want the information they give to me to be because they want to, not because they're trying to work something off.

Q. Have you ever blackmailed someone into giving you testimony?

A. No, sir.

Q. Or giving you a statement?

A. No, sir.

Q. If a confidential informant told you that he was paying Victor Fontenot, would you investigate Victor Fontenot?

MS. LOVE:

Object to form.

A. Me personally, I don't know if it would be within my scope of duties to investigate. But I would -- if someone told me that, I would bring it up to my superior officers.

BY MR. HOBBIE:

Q. Who would you tell?

A. My -- my sergeant, Quintin Doyle, he would be the first person to know about it.

Page 316

Q. Would you tell Chief Fontenot?

A. I would expect for my chain of command to relay it to Chief Fontenot at that point.

Q. Would you tell Ryan Young?

A. Unless he was the only supervisor available to me on that particular day, no. I would start with my sergeant.

Q. Would you do the investigation yourself or would you refer it to someone else?

A. I would -- it would be more appropriate for me to refer it to someone else, being we share the same rank.

Q. Would you conduct an unofficial investigation?

A. No, sir. I would just refer it to my supervisor.

Q. Do you even know how to conduct an unofficial investigation?

A. I'm not 100 percent sure of what an unofficial investigation is, no.

Q. Neither am I.

Have you ever taken a confidential informant out of Eunice to do a controlled buy?

A. No, sir.

Q. Why not?

Page 317

A. On its face, because I don't work narcotics; and, two, it would just be inappropriate to go outside of my jurisdiction and possess narcotics.

Q. Do you know the policy for that in the policy book?

A. I'm not sure, no, sir.

MR. HOBBIE:

I have no further questions.

MR. LOUGHLIN:

I have a few.

EXAMINATION

BY MR. LOUGHLIN:

Q. What did you say Victor's role was in that botched rape investigation?

A. I'm not sure exactly what his role may have been. I just know he participated in the -- in the investigation.

Q. Okay. On the car search, where Victor was searching the car without probable cause, I take it he didn't claim that he had probable cause, right?

A. He did not -- if he did, he never -- he never told me, he never expressed it to me, no.

Q. Likewise with consent, he never claimed he



Page 318

had consent?

A. Correct.

Q. The car wreck he had with Joey Peloquin, your understanding at least, or you were told, is that Victor lied about that, right?

A. That's what I'm told.

Q. You also talked about weighing evidence in the way a juror might.

You remember that?

A. Yes, sir.

Q. A juror in this case would have plenty of reasons to find Victor Fontenot to be not a truthful witness, right?

MS. LOVE:

Object to form.

BY MR. LOUGHLIN:

Q. Isn't that true?

A. Everything I'm going off of is -- I mean, I don't know. I can't tell you because I haven't heard firsthand anything other than what people have told me.

Q. Well, they've told you he's a liar, right, Victor?

A. Sure, sure.

Q. Okay. That's reason enough for a juror to

Page 319

say, I don't believe a word that comes out of that man's mouth, isn't it?

A. I guess -- I guess it would be reasonable for them to feel that way, sure.

MR. LOUGHLIN:

Thank you, that's all I have.

THE VIDEOGRAPHER:

This concludes the deposition. We are off the record. The time is 5:02 p.m.

DEPOSITION CONCLUDED AT 5:02 P.M.

Page 320

REPORTER'S PAGE

I, RITA DEROUEN, Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), Registered Professional Reporter (RPR #006908), the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the record:

That due to the interaction in the spontaneous discourse of the proceeding, double dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a transcription of proceedings, and that the double dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the parenthetical "(phonetic)";

That the parenthetical "(sic)" is used to denote when a witness stated a word or phrase that appears odd or erroneous to show that it was quoted exactly as it stands.

RITA DEROUEN, CCR, RPR

Page 321

CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, RITA A. DEROUEN, Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), Registered Professional Reporter (RPR #006908), as the officer before whom this testimony was taken, do hereby certify that JACK ARDOIN, having been duly sworn by me upon authority of R.S. 37:2554, did testify on August 11, 2022, as hereinbefore set forth in the foregoing 320 pages; that this testimony was reported by me in stenographic shorthand, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with the transcript format guidelines required by statute and rules of the Board; that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual




Page 322

relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and the Rules and Advisory Opinions of the Board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter; that I am not related to counsel or to any of the parties hereto, I am in no manner associated with counsel for any of the interested parties to this litigation, and I am in no way concerned with the outcome thereof.

Signed and stamped this 23rd day of August, 2022, Baton Rouge, Louisiana.

_____

Rita DeRouen, RPR, CCR

