Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN OF LOUISIANA

MICHAEL DUNN,

                      CIVIL ACTION NO.

      Plaintiff,      6:21-cv-01535

    v.

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, and
JOHN DOE,

      Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:

TERRY DARBONNE,

TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE

ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORTED AT THE LAW OFFICES OF:

KEAN MILLER LLP

600 JEFFERSON STREET, SUITE 1101

LAFAYETTE, LOUISIANA  70501

COMMENCING AT 8:57 A.M., ON AUGUST 8, 2022.

**EXHIBIT J**





Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
  SIDLEY AUSTIN LLP
  (BY:  NORMAN M. HOBBIE, JR., ESQ.)
  1501 K STREET, NW
  WASHINGTON, DC  20005
  (202) 736-8075
  nhobbie@sidley.com

    - AND -

  KEARNEY LOUGHLIN, LLC
  (BY:  KEARNEY LOUGHLIN, ESQ.)
  602 BOULDER CREEK PARKWAY
  LAFAYETTE, LOUISIANA  70508
  (337) 534-8803
  kearney.loughlin@gmail.com

FOR THE DEFENDANTS:

  KEAN MILLER LLP
  (BY:  MOLLY J. GUNNELS, ESQ.)
  (BY:  MARY LOVE, ESQ.)
  400 CONVENTION STREET, SUITE 700
  BATON ROUGE, LOUISIANA  70802
  (225) 387-0999
  molly.gunnels@keanmiller.com
  mary.love@keanmiller.com

FOR THE CITY OF EUNICE:

  STAN FEUCHT ATTORNEY AT LAW, L.L.C.
  (BY:  STAN FEUCHT, ESQ.)
  440 NORTH 2ND STREET
  EUNICE, LOUISIANA  70535
  (337) 550-1115
  stan@feuchtlaw.com

Page 3

A P P E A R A N C E S (Continued)

ALSO PRESENT:
  DON GROVER, VIDEOGRAPHER
  RANDY FONTENOT
  SCOTT FONTENOT

REPORTED BY:
  YOLANDA J. PENA
  CCR NO. 2017002, RPR
  STATE OF LOUISIANA

Page 4

I N D E X

PAGE

STIPULATION..........................................5

EXAMINATION BY:

  MR. HOBBIE................................7, 232

  MR. LOUGHLIN...................................189

  MS. GUNNELS....................................198

CERTIFICATE.......................................246

LIST OF EXHIBITS

(NONE)

Page 5

S T I P U L A T I O N

    IT IS STIPULATED AND AGREED by and among the parties that this deposition is hereby being taken pursuant to the Federal Rules of Civil Procedure.
    All formalities, excluding the reading and signing of the transcript by the witness, are hereby waived.
    All objections, except as to the form of the question and responsiveness of the answer, are considered reserved until trial or other use of the deposition.



MAGNA
LEGAL SERVICES

Page 6

THE VIDEOGRAPHER: We're now on the record. This begins video file No. 1 to the deposition of Terry Darbonne in the matter of Michael Dunn versus Randy Fontenot, Victor Fontenot, et al., on the -- in U.S. DC Western District Court. Today's date is Monday August 8th, 2022. The time on my camera is 8:57. This deposition is being -- taking place at 600 Jefferson Street at the request of Sidley Austin.

The videographer is Don Grover of Magna Legal, and the court reporter is Yolanda Pena of Magna Legal.

At this time, will counsel and all present please introduce themselves.

MR. HOBBIE: My name is Norman Hobbie from Sidley Austin, representing plaintiff Lieutenant Michael Dunn. I'm here with my colleague, Lia Higgins, who is or should be shortly attending as via Zoom videoconference.

MR. LOUGHLIN: Kearney Loughlin representing Lieutenant Michael Dunn.

MR. FEUCHT: Stan Feucht, the attorney for the city of Eunice.

MR. RANDY FONTENOT: Randy Fontenot,

Page 7

police chief for the city of Eunice.

MS. LOVE: Mary Love with Kean Miller on behalf of all defendants.

MS. GUNNELS: Molly Gunnels with Kean Miller on behalf of all defendants.

MR. SCOTT FONTENOT: Mayor Scott Fontenot, City of Eunice.

THE VIDEOGRAPHER: And the court reporter, please swear in the witness.

* * *

TERRY DARBONNE, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HOBBIE:

Q. Great. Well, my name is Norman Hobbie. As you may know, I also go by J.R. I represent Michael Dunn in an ongoing dispute with the City of Eunice, Randy Fontenot, Victor Fontenot, and Ryan Young.

Could you please state your full name for the record?

A. Terry J. Darbonne.

Q. Terry, you mind if I call you Terry?

A. Sure.

Page 8

Q. Have you ever been deposed before?

A. Years ago.

Q. And what was the nature of that dispute?

A. It may have been an automobile accident of some kind, probably 15 years ago.

Q. Were you a defendant in that case?

A. No.

Q. Were you a party in that case?

A. I was just a -- a witness to an incident.

Q. Since then, have you been deposed again?

A. No, sir.

Q. And in that dispute, it was just one deposition?

A. Yes, sir.

Q. Have you ever testified at trial or another court proceeding?

A. Yes, sir.

Q. How many times?

A. Oh, 20, 30.

Q. Is that an estimation?

A. Yes, that's an estimation because I've been in law enforcement 37 years.

Q. Great. Before we dive into the substance, I'm just going to give you an overview of the deposition ground rules. It's been, you know, over 15 years for

Page 9

you. Is that all right with you?

A. Yes, sir.

Q. Great. Well, you will be testifying under oath, and your answers will be subject to the penalty of perjury. Do you understand that?

A. Yes, sir.

Q. Your statements here today have the same effect as though they were given in a court of law.

Do you understand that?

A. Yes, sir.

Q. Now, today, I'm going to ask you a series of questions. If at any point you don't understand a question, please just stop and ask me for clarification. Otherwise, I'm just going to assume that you understood the question.

Does that make sense?

A. Yes, sir.

Q. Now, if you look over to your right, Yolanda, a very kind court reporter, is sitting there, and she will be transcribing this deposition. For her sake and for the same of a clear record, could you please provide verbal answers to all questions?

A. Yes, sir.

Q. Yolanda can't pick up head nods, murmurs, "uh-huhs," and whatnot. Do you understand that?



Page 10

A.  I understand.

Q.  Great.  Similarly, as I mentioned, Yolanda is transcribing everything, and it's hard to -- for her to do so if we're talking at the same time.  So I would just ask that you answer my questions after I'm done fully asking them.  Does that make sense?

A.  Yes, sir.

Q.  As you're aware, there are counsel for the defendants in the room.  They may -- Molly may object to my questions.  I would ask that you answer my questions even if there is an objection.

Does that make sense?

A.  Yes, sir.

Q.  And then finally, if at any time you would like a break, please just ask for one.  We're happy to take one.  All that I ask is that if there is a question pending, if I've asked you a question, please answer the question before taking a break.

Does that make sense?

A.  Yes, sir.

Q.  Great.  Now, did you do anything to prepare for today's deposition?

A.  No, sir.

Q.  Did you review any documents?

A.  I saw Lieutenant Dunn's documents.

Page 11

Q.  And what are Lieutenant Dunn's documents?

A.  Just the lawsuit that was, I guess, on the internet or whatever.

Q.  Did you read the complaint?

A.  Yes, I did.

Q.  Did you read articles related --

A.  I skipped over a lot of it.

Q.  Got it.  Did you bring any documents or notes with you today, to today's deposition?

A.  No, sir.

Q.  Great.  Now, before we get into anything else, I know we've spoken about logistics.  But I'd like to get to know a little bit more about you.

What is your current job?

A.  I am the city marshal for the city of Eunice.

Q.  And how long have you been working in that capacity?

A.  As marshal, this is year number 21.

Q.  And have you -- did you work at the marshal's office before you were marshal?

A.  Yes, sir.  I worked there two years prior.

Q.  And what was the other role at the marshal's office?

A.  I was chief deputy marshal.

Q.  Were you in law enforcement before that?

Page 12

A.  Before that, I was at Eunice Police Department.

Q.  For how long?

A.  As a full-time officer, eight years and as a reserve officer, probably an additional five years.

Q.  Did you work with Randy Fontenot at all?

A.  Yes, I did.

Q.  And I understand it may have been a long time.  But what years did you work with Randy Fontenot?

A.  We would -- I would probably have to say late or -- late '80s, beginning of the '90s.

Q.  Got it.  So you've been marshal for about 20 or 21 years.  Were you appointed, elected, or hired?

A.  Elected.

Q.  Do you still have to be elected every few years?

A.  Yes, sir.  Every six years.

Q.  When is the next election?

A.  I just went through an election a year and a half ago, so it'll be 27 -- well, it'll probably be in the year of '26.

Q.  And what are your duties as marshal?

A.  As marshal, I oversee the employees of our office.  We are a -- basically assigned to the court system.  We have the same duties as the sheriff's

Page 13

department, just on a smaller scale as to where the sheriff's department handles the whole parish, we handle a portion of the parish.

We not only do law enforcement in the city limits but our boundaries extend out the city limits.  We do -- we're full law enforcement.  We write citations.  We repossess vehicles, courtroom security, issue subpoen- -- deliver subpoenas, should I say, deliver civil papers.  Our basic duties are to Eunice City Court.

Q.  Now, it sounds like some of those duties may overlap with other law enforcement agencies, so I'd like to just pick that apart a little bit.

First of all, where is the marshal's office located?

A.  300 South 2nd Street in Eunice, Louisiana.

Q.  And how far away is your office from the Eunice Police Department?

A.  Walking distance.  We're in the same building.  I'm on the second floor.  He's on -- police department is on the first floor.

Q.  Are there any other floors in the building?

A.  No.  It's two floors for the building.

Q.  Do you often interact with the Eunice Police Department personnel?



Page 14

A. On occasions, yes.

Q. Do you have a separate policy book that governs the conduct at your office?

A. I'm sure mine is different from the police department because our duties are different.

Q. And do you create those policies?

A. There was a policy procedure book whenever I assumed office, and we amended a lot of things as the years went by. And laws changed, trainings changed, so we did amend policy.

Q. Do you have input in that process?

A. Yes.

Q. And what does the amendment process look like?

A. Well, when we come across something that is new, whether a new law comes out, new trainings come out -- when I originally received the policy manual, it was a rather old one, so we basically re- -- rewrote it again. And then over the years, as I said, as laws changed -- for instance, a use of force or whatever -- we go there and just amend the original policy that we had.

Q. Now, you said that your policies differ from the Eunice Police Department's because you have different duties. Does the marshal's office have different jurisdiction than the Eunice Police

Page 15

Department?

A. Yes, sir. We not only serve the city of Eunice, we serve the -- outside of the city limits of Eunice. Let's say the population of the city of Eunice is 11,000. I'm not sure what the census are. But we serve approximately 20,000 people, my office does, the marshal's office, because our jurisdiction doubles what the police department does.

Q. What do you do -- I'm sorry. Strike that. Are your duties outside the jurisdiction different than your duties inside?

A. No, sir.

Q. I'm sorry. Let me -- let me. Rephrase that. Are your duties outside of the city limits of Eunice different than inside the city of Eunice?

A. No, sir.

Q. How many employees do you have?

A. Five full-time, two part-time, and approximately 12 reserve deputies.

Q. Does that include yourself?

A. Yes, sir.

Q. So about 20 employees serve the jurisdiction twice the size of the city of Eunice?

A. Correct.

Q. In your opinion, do you have enough employees?

Page 16

A. No.

Q. Why would you say that?

A. There's more criminals out there than there is law enforcement, and we've worked shorthanded so many times, and of course money is always an -- an issue. We probably have more warrants now than we've ever had before. The number of applications are not there. Law enforcement is a dying breed. And so just speaking to other departments almost the same size as our office, it's basically the same thing, a shortage of officers.

Q. Now, you said there are a lot more warrants. Do you execute warrants?

A. Do I, personally, or my office?

Q. Do employees at your office execute warrants?

A. Yes, sir.

Q. Do the warrants differ from those handled by the Eunice Police Department?

A. It -- it can because they handle a lot of felony cases where most of ours are misdemeanors.

Q. Do you handle -- or does your office handle felony cases at all?

A. Yes.

Q. As marshal, how does your authority differ from the Eunice Police Department chief?

A. The description of the marshal is having the

Page 17

same duties and powers of that -- of the sheriff of the parish that you are located. So in the parish that we're in, it's basically the sheriff, the highest power in there. Then the marshal because we serve the outlying areas, and then the chief of police.

Q. Does the marshal's office investigate crimes?

A. No, sir. We're not a reporting agency.

Q. How does the authority of marshal's deputies differ from police officers?

A. How do they differ? They both have the same powers of arrest. The police department handles strictly criminal activity where we handle both civil and criminal, both.

Q. Do you often work with other law enforcement agencies?

A. Yes, sir.

Q. Which ones?

A. Well, we're working ship -- relationship with the U.S. Marshal's Office, Louisiana State Police, Opelousas police, the marshal' office in Ville Platte, the marshal's office in Opelousas, St. Landry Parish Sheriff's Department, and any other agencies that are local. And I could be listing a whole list of them.

Q. You can go ahead if you want.

A. I mean, every marshal's office probably in the



Page 18

state, which is probably 40 of them, from Shreveport all the way down to New Orleans.

Q. Do you discuss investigations with these other law enforcement agencies?

A. Well, investigations are warrants. I mean, most of the time when we're calling other jurisdictions, it's about a warrant that we have. For certain purpose, say someone from Eunice went to -- as an example, went to Shreveport and gotten in trouble or whatever, or vice versa, if Shreveport has somebody came to Eunice and committed a crime, then went back to Shreveport, Shreveport would call us and say, "Hey, we got a warrant for this guy. Can y'all go pick him up?"

Q. And after you pick someone up, what do you do with them?

A. We book them. We book them into the Eunice City Jail and advise them that we have their suspect in custody, and they send someone to pick it up -- pick them up.

Q. When else do you communicate with other law enforcement agencies?

A. Almost on a daily basis.

Q. Besides executing warrants or arresting someone, what else do you do?

A. We provide courtroom security. We basically

Page 19

take care of the building. I have access to cameras in my office to be able to do that. So we -- when we're having court, I am in my office monitoring what is going on in court through the camera system.

Q. Do you discuss investigations with other law enforcement agencies?

A. Yes.

Q. What types of investigations?

A. It could be information that we have received that would benefit another agency, and so we have discussions on possibly an address of where the suspect may be living. We work together to, I guess, try to capture this person.

Q. Do you work together with the Eunice Police Department?

A. Yes, sir.

Q. How often?

A. Me personally, not. My deputies, probably on a daily basis.

Q. What types of cases do personnel from your office and Eunice Police Department personnel work on together?

A. The marshal's office has a list of warrants. It's in a system that we -- we no longer use paper. It's a -- it's an iPad. That's where our warrants are

Page 20

at. We got a new system. We are only one of few in the state to have it.

And the police department basically has their own warrants, which is not entered into our system, and so a lot of theirs are felony cases. So we do get information through our office, and so we get in touch with the police department to let them know what information we do receive.

Q. Do you execute those warrants with Eunice Police Department personnel?

A. Sure.

Q. Do personnel from -- excuse me. Strike that.

Do deputies from your office execute search warrant with Eunice Police Department personnel?

A. Yes.

Q. Do personnel from your office assist Eunice Police Department personnel at crime scenes?

A. Probably on a daily basis.

Q. What types of crimes?

A. Anything. Being we're not a reporting office, because they are understaffed, and with our guys being on the road and that we are living in a small city, we want to make sure no one gets hurt. So our deputies are former police officers that -- you know, and so they don't want anybody to get hurt.

Page 21

And so if there's a domestic call or anything, I've always instructed them to at least make a pass by, make sure that they are okay or whatever, not necessarily get down but pass by and give a thumbs up or a thumbs down, whether they're needed or whatever. Execution, like I said, of warrants, they -- they also do that.

Q. What did you mean by "not necessarily get down"?

A. Because sometimes you don't need two or three officers at a scene. It -- it could be a domestic. It could be --

Q. I'm sorry. Just -- I apologize. I don't mean to cut you off. But I just am unfamiliar with the term "get down."

A. Means get out your unit.

Q. Okay.

A. It means get out your unit. So instead of having three units at a house, we pass by and just merely slow down to make sure the officer -- that officer's safety, that he's okay. So we'll just pass by and just -- basically to check on them.

Q. You said that "they" are understaffed. Who did you mean by "they"?

A. The Eunice Police Department.



Page 22

Q. What do you mean by "understaffed"?

A. They don't have a full capacity of the number of officers that they originally had.

Q. When you say "originally had," what time period are you referring to?

A. Oh, we can go back years, I guess you could say.

Q. So when you started as marshal, you said that was about 20 or 21 years ago, right?

A. Yes, sir.

Q. How many employees did the Eunice Police Department have?

A. I would have no idea.

Q. But it was more than they currently have?

A. Yeah.

MS. GUNNELS: Objection; form.

A. Yes, sir.

BY MR. HOBBIE:

Q. In your opinion, what is full capacity?

A. I don't know what is -- full capacity is. It's based on number of employees. I couldn't tell you because that number has changed since when I was employed with the Eunice Police Department.

Q. As marshal, how many days per week do you work?

Page 23

A. Five days, Monday through Friday, 8:00 to 5:00.

Q. Are you on call on the weekends?

A. Yes. And we do come out at nights on occasion. We're not just limited to days but as primary because that's when the court is running so...

Q. Do the deputies in your office work past 5:00?

A. On occasions, yes.

Q. How many shifts do you have?

A. One.

Q. Just that 9:00 to 5:00?

A. 8:00 to 5:00.

Q. 8:00 to 5:00. When you leave at 5:00 o'clock, is your radio on?

A. Norm- -- yes.

Q. And outside of your normal working hours, are you on call?

A. Always.

Q. As marshal, have you ever been named a defendant in a lawsuit?

A. No, sir.

Q. Are you aware that in this case, Chief Fontenot is a defendant?

A. Yes, sir.

Q. Are you aware that in this case, there may be

Page 24

40 depositions?

A. Unfortunately, yes.

Q. Are you aware that thus far, Chief Fontenot has attended every deposition?

A. I have no idea.

Q. As the head of the marshal's office, if you were a named defendant in a case with up to 40 depositions, would you be able to attend all of them?

MS. GUNNELS: Object to form.

A. I would make an attempt to attend all of them.

BY MR. HOBBIE:

Q. Why?

A. Because I think it's important that I be in -- in the deposition to -- being I'm accused of something, I would want to hear from -- what people had to say.

Q. Who operates your office when you're not there?

A. My chief deputy, Joey Peloquin.

Q. And how long has he been at the marshal's office?

A. Approximately five years.

Q. Where was he before marshal's office?

A. Maybe Evangeline Parish, and also -- he also worked at Eunice Police Department.

Q. Does he work with Eunice Police Department

Page 25

employees?

A. Yes.

Q. What types of cases does he work on?

A. It could be misdemeanor. It could be felony cases, drug cases, murder case.

Q. I want to talk a little bit more about the defendants in -- in this case.

Do you know Chief Fontenot?

A. Yes, I do.

Q. How?

A. He and I were friends years ago. We worked together at Eunice Police Department as -- he was my lieutenant at one time. I may have been a patrolman or a sergeant at the time, but we worked together.

Q. Did you meet him before you worked at the Eunice Police Department?

A. I would say yes.

Q. Were you friends with him before you started working at the Eunice Police Department?

A. Yes.

Q. Could you describe your relationship with Chief Fontenot back then?

A. I was young, just starting out into law enforcement, and I think that's how we basically got together or met. He -- he may have started his career

**MAGNA**
LEGAL SERVICES

Page 26

right before mine, so that's basically, I think, how we started talking.

Q. Are you still friends with Chief Fontenot today?

A. We are.

Q. How often do you talk to Chief Fontenot?

A. Whenever something arises, either with his department, my department, once a month maybe.

Q. Do you ever disagree with Chief Fontenot?

A. Yes.

Q. Could you give me an example?

A. I just don't agree with some of the ways that the police department is run and vice versa.

Q. When you say "vice versa," do you mean that he doesn't agree with the way that you run the marshal's office?

A. Correct.

Q. Why don't you agree with some of the ways that the police department is run?

A. Because there have been occasions when they have been shorthanded, and we try to assist and basically get chewed out because we offer assistance.

Q. When -- when you say "chewed out," can you give me an example of what that looks like?

A. He just don't agree with the way I would

Page 27

handle a situation of being shorthanded. It's a -- it's a -- I guess a verbal that he expresses that he doesn't like the way I -- I would run it.

Q. What would you do if you were shorthanded as a chief?

A. Chief Fontenot and I have worked together for a long time when we were at the police department, and I know there was more employees back at that time than there is now. And basically, when you had X amount of employees in the office and you know you were going to be shorthanded at night, you sent some of your detectives home so that they could come up to work that night to supplement what is going on on the street.

So he may send -- if you know you're going to be short two, three, whatever, you'd send them home. The first set would come in -- like, I don't know if the hours are 5:00 to 5:00 or 6:00 to 6:00, whatever it is. First ones would come in, take the first six hours. The second set would come in to take the second part of the shift to make sure that you had enough manpower to cover the city that night or day.

Q. Has Chief Fontenot ever told you why he doesn't want your help when they're understaffed?

A. He doesn't -- I don't think he likes the way I run my office, and I think he feels that -- in some

Page 28

way, that I want to be the chief of Eunice, and in no way do I want that.

Q. If the Eunice Police Department is short-staffed or understaffed, is that dangerous?

MS. GUNNELS: Object to form.

A. Very dangerous.

BY MR. HOBBIE:

Q. In your opinion, is that dangerous?

A. Very, very dangerous.

Q. Why is that?

A. You're putting officers at risk with the high crime that is across the nation right now. Working shorthanded does put you in a bad situation because the crime rate is high, and it's high everywheres.

Q. Does it also put members of the public at risk?

A. Yes, it does.

Q. How?

A. Because if you don't have the adequate police protection, you can't protect the people that you serve.

Q. Earlier, you said what's going on in the streets right now. Strike that.

Is the crime in Eunice worse now than when you started as marshal?

Page 29

A. Definitely.

Q. Why is that?

A. There's a new generation out there. We have more and more juvenile crimes than we ever had before. That's a real big issue, which is -- other departments are facing the same thing because I make calls, check on other agencies, and juvenile crime is -- is really bad.

Q. How about drugs?

A. Plentiful on the streets.

Q. In your opinion, do you see more drugs on the street now than when you started as marshal?

A. Definitely.

Q. Have you told Chief Fontenot that it's very, very dangerous to refuse your attempts to help?

A. Yes.

Q. And what has he said -- said in response to that?

A. That that was his department.

Q. Do you know what he meant by that?

A. Meaning he takes care of his department, and I take care of mine.

Q. In your opinion, is it the duty of the police department to take care of the people of Eunice?

A. Yes.

MAGNA
LEGAL SERVICES

Page 30

Q.  And by refusing your attempts to help, isn't Chief Fontenot going against that duty?

MS. GUNNELS:  Object to form.

A.  I would say so.

BY MR. HOBBIE:

Q.  Are you aware of Chief Fontenot's reputation in the law enforcement community?

A.  Yes.

Q.  Can you tell me about that?

A.  It is very low.  A lot of people do not trust -- not just saying Chief Fontenot, but members of his staff.

Q.  Who are the many people that don't trust him or members of his staff?

A.  Victor Fontenot.

Q.  I'm sorry.  I'll rephrase that.

A.  Okay.

Q.  How do you know that trust is low?

A.  Because I hear it on the streets from people.

Q.  Are "people" other law enforcement agencies?

A.  Yes.

Q.  Which ones?

A.  The St. Landry Parish Sheriff's Department, Opelousas Police Department.

Q.  How about the Louisiana State Police?

Page 31

A.  I don't communicate with them much anymore. The guy that was there, which was Captain Eric Duplechain, has retired, and so we basically don't -- which was a -- a friend of mine.  Basically, I don't even know who the captain is at the state police. Have not talked to them probably since Mr. Duplechain retired, which was earlier this year.

Q.  Did you talk to him about Chief Fontenot?

A.  Yes.

Q.  I'm sorry.  By "him," I meant Captain Eric Duplechain.  Did you understand that?

A.  Yes, sir.

Q.  What did you talk about in relation to Chief Fontenot?

A.  We just talked about the crime rate and his com- -- his complaining that he's received calls because he does live in Eunice.  Even though he doesn't live in the city limits of Eunice, he does live in Eunice.

Q.  I'm sorry.  Who is "he"?

A.  I'm sorry.  Captain -- retired captain, Eric Duplechain.

Q.  Thank you.

A.  He receives phone calls from people complaining about lack of law enforcement in a certain

Page 32

area or whatever, from people that call him because -- and "he" is Captain Duplechain.  On several occasions, people call to complain that they called the police department and nobody ever respond back to them, just things of that nature.

Q.  What did you say about Chief Fontenot specifically?

A.  To?

Q.  To Eric --

A.  To Eric --

Q.  -- or Captain Eric Duplechain?

A.  Think I said, "I do understand your problems." I know they are short-staffed.  You know, things are just not like they used to be because there is a lack of employees on the road.  You don't have as many people patrolling neighborhoods or any other things.

Q.  When you say there's not as many -- as many employees on the road, are you ref- -- referring to Eunice Police Department employees?

A.  Yes, I am.

Q.  Why aren't there as many on the road, in your opinion?

A.  People have left.

Q.  Have people left because of Chief Fontenot?

MS. GUNNELS:  Object to form.

Page 33

A.  Partially.

BY MR. HOBBIE:

Q.  Have you heard that people have left because of Chief Fontenot?

A.  Yes, sir.

Q.  Who have you heard left because of Chief Fontenot?

A.  To be specific, Nicholas Cooley.  I'm really not sure of the other one's names because I don't go down there every day.  Some of the employees that they hire, I do not even know who these -- these employees are by name.  But a lot come into my office and complain about things, what's going on downstairs, or whatever.  And you know, I mention it to them, that's not my department.

Q.  Who has come into your office to complain about Chief Fontenot?

A.  Different officers from -- from the past.

Q.  Like who?

A.  I'm trying to see who just left and whatever. Name-wise, right off the top, I -- I can't remember.

Q.  Has Lieutenant Michael Dunn complained to you about Chief Fontenot?

A.  Yes.

Q.  Has Jeremy Ivory complained to you about

MAGNA
LEGAL SERVICES

Page 34

Chief Fontenot?

A. Yes.

Q. Has Donnie Thibodeaux complained to you about Chief Fontenot?

A. Yes.

Q. Has Stephanie Myers?

A. On one or two occasions.

Q. Has Tony Kennedy complained to you about Chief Fontenot?

A. Couple of times.

Q. Has deputy -- former deputy -- Deputy Chief Daigle complained to you about Chief Fontenot?

A. Maybe on one occasion.

Q. What were Jeremy Ivory's complaints?

A. He was tired of working shorthanded, having to put in all the hours that he had to put in, and that there were other people that were at home not giving up of their time to come out and help with the shifts, that he was getting burned out.

Q. Did he have any specific complaints about Chief Fontenot?

A. He just said that he wished that Chief Fontenot would understand how short-staffed they were and how working understaffed just made it really bad and how it was a -- they were very tired and --

Page 35

which could cause a problem with them having to work so many hours.

Q. To your knowledge, did Jeremy Ivory tell Chief Fontenot about these concerns?

A. I have no idea.

Q. How about Donnie Thibodeaux? What were his complaints with Chief Fontenot?

A. He just felt that he wasn't able to do things that he used to do and that he had got put on the road when he shouldn't have been put on the road. There wasn't too much talking between he and I. It was just basic "we're so busy," he was the training officer and that there was really not much training going on, that he felt they should have more training going on.

Q. To your knowledge, did Donnie raise those concerns with Chief Fontenot?

A. I have no idea.

Q. How about Stephanie Myers? What were her complaints about Chief Fontenot?

A. I have probably seen Stephanie Myers maybe twice in the last year or two. I don't see her around the police department, but I don't specifically go down to the police department basically for anything. She just complained that she was put on leave, and she couldn't understand why she couldn't do the job that

Page 36

she was supposed to.

Q. Did Stephanie explain why she was put on leave?

A. No. She -- basically it was that she may have had a -- an incident with the chief or something. I -- she didn't elaborate. There were people around us. And Stephanie and I, we -- we just don't talk that much because I don't ever see her. I don't ever see her.

Q. Have any other officers complained to you that Chief Fontenot unfairly put them on leave?

A. Unfairly put them on leave? Michael Dunn, maybe Stephanie Myers, maybe Nicholas Cooley. That would be all I can remember, off the top of my head.

Q. What were Nicholas Cooley's complaints about Chief Fontenot?

A. He just felt that they wasn't allowed to do their job and how he wanted to do more and that he was being held back from doing his job. I know he was -- he was a very vocal person.

Q. What do you mean by "vocal person"?

A. He had a lot of Facebook posts that were -- let's just say policy in my office would be not to put posts like that, to criticize somebody.

Q. Were your aware of any other Eunice Police Department employees posting on Facebook?

Page 37

A. Present or --

Q. Present or past.

A. Past, yes.

Q. Who?

A. Varden Guillory.

Q. Was the Facebook post criticizing Chief Fontenot?

A. Yes.

Q. Do you remember what the post was about?

A. It was basically a rant on and on about situations of working at the police department. At one time, he was the deputy chief, I believe, under Chief Fontenot. And there was some disagreements. Like I said, we're -- we're two different agencies, so there's not a whole lot of interaction on my part with the officers like my deputies do have on a daily basis.

But his post was after -- after he was a deputy chief, was how they were held back from doing their jobs and things should be done better, how the -- the chief wasn't proactive on a lot of stuff. Just -- basically, just stuff like that.

Q. Did Varden Guillory ever complain to you about Chief Fontenot?

A. Yes.

Q. What did he say?

MAGNA
LEGAL SERVICES

Page 38

A.   And that was probably after he was replaced as deputy chief. I think he was -- he was upset. He just said that Chief Fontenot played favoritism to certain officers.

Q.   Did he say which officers were Chief Fontenot's favorites?

A.   At that -- that time, that is -- is years back, since Varden worked there. To be specific, I couldn't. It's too long ago for me to remember that.

Q.   Are you aware of the circumstances of Varden Guillory's departure from the Eunice Police Department?

A.   I just know he left. I don't know under what terms occurred.

Q.   Have you heard that Chief Fontenot had him arrested -- excuse me. Strike that.

Have you heard that Chief Fontenot had Varden Guillory arrested while he was deputy chief at the Eunice Police Department?

A.   I really -- it seems like I did hear about it. But to say absolutely, I couldn't tell you that.

Q.   How about Tony Kennedy? What were his complaints about Chief Fontenot?

A.   It was just probably in the last few months, he said I wish that Chief Fontenot would have been

Page 39

acting like he is acting now months ago where he's more into the -- the supervisor position as chief, that he's doing more now than he did in the past few years, should I say.

Q.   Did Tony Kennedy provide any examples?

A.   No. Tony and I graduated together. We basically talk about other things. It's not always police work. It's how we're both getting old, basically. And we've been in law enforcement probably about the same amount of time or whatever. That's about it.

Q.   Are you friends with Tony Kennedy?

A.   Yes.

Q.   Can you describe your relationship with him? Good friends?

A.   Good friends. Never had a -- beef with him, never had anything between he and I.

Q.   Are you aware that Victor Fontenot investigated Tony Kennedy for allegedly taking money from criminal suspects?

A.   No, not...

Q.   How about Deputy Chief Daigle? What were his complaints about Chief Fontenot?

A.   Deputy -- again, Mr. Daigle and I are personal friends. We grew up in the same neighborhood. He and

Page 40

I started our careers, again, very close together. He just wished things were a little different downstairs where they could do a few -- do other things than they were doing now. Never elaborated on what he was talking about, but most of the time, when our inter- -- interaction between Mr. Daigle and myself was something besides police work.

Q.   Did Tony Kennedy ever mention Chief Fontenot's treatment of Lieutenant Michael Dunn?

A.   No. We never discussed that.

Q.   How about Deputy Chief Daigle?

A.   No.

Q.   Did Lieutenant Michael Dunn ever come to you with complaints about Chief Fontenot?

A.   Yes.

Q.   What were those complaints?

A.   They went on for some time, that he and the chief did not see eye to eye. He claimed that he was being targeted by the chief by having his dog removed from him, and he felt everywhere he turned around, that somebody was there watching him to try to burn him, to get him fired.

Q.   In your opinion, was Lieutenant Michael Dunn targeted by Chief Fontenot?

A.   I felt at times, yes, he was.

Page 41

Q.   What times were those?

A.   The times when the chief and I had a discussion about the bad apples within the police department and -- and Nicholas Cooley and Michael Dunn's name came up.

Q.   What did Chief Fontenot say about Lieutenant Dunn?

A.   All he said was our department would run better if we didn't have so many people trying to buck us into the job that we're trying to do.

Q.   Why did you feel like that instance showed that Chief Fontenot was targeting Lieutenant Dunn?

A.   It was other activities that had happened. I think there was -- there was a shooting or something down the road from Lieutenant Dunn's house at one time, and there was a -- a big old -- maybe a write-up on Facebook or something, maybe. Lieutenant Dunn must have expressed something that he didn't like or whatever, and I think Lieutenant Dunn had approached me about the possibility of Chief Fontenot writing him up for what he had expressed over social media.

Q.   Do you know if Chief Fontenot took adverse employment action against Lieutenant Dunn because of that --

A.   At --



MAGNA
LEGAL SERVICES

Page 42

Q.  -- Facebook post?

A.  At that time --

MS. GUNNELS:  Objection; calls for a legal conclusion.

A.  -- I do not know.

BY MR. HOBBIE:

Q.  To your knowledge, did Chief Fontenot write up Lieutenant Dunn for the Facebook post?

A.  I cannot be positive.  I -- I kind of heard that he did, but I can't -- I can't be positive because I don't go to that side of the department because I'm on the second floor; they're on the first floor.

Q.  Are there any other instances where you felt like Lieutenant Dunn was being targeted by Chief Fontenot?

A.  Yes.

Q.  What were those other instances?

A.  There was a night where my deputy called. I do a broadcast on the radio for our local softball team, Eunice High.  And I received a phone call at approximately 4:30, 4:45 in the afternoon, asking if they could stay over and work, that he had found out that there were going to be only one officer working the road that night and that Lieutenant Dunn was getting off at 11:00 o'clock and that would have left

Page 43

one person on the road, which was a rookie, and that they felt that the citizens of Eunice were in jeopardy and so was this rookie officer who had supposedly just got out the academy.

So he called me.  I said, "Look, I don't have time to talk right now.  I need to finish up this game. And I'll -- I'll call you back.  It shouldn't be much longer."  I returned -- I returned the call.  I had a miss call on my phone during the game that I did not return.  It had one, I think, from Lieutenant Dunn and one from my deputy -- my chief deputy, Joey Peloquin. I don't remember which one I returned first.

Lieutenant Dunn stated that he was leaving at 1:00 o'clock -- excuse me, 11:00 o'clock and that my two deputies had offered to come in to help.  And so I said, "Well, let me check with the deputies."  And so I did call back Chief Deputy Peloquin and asked him if that was true that he said yes.  He said, "I can't see this kid getting hurt by himself, so we would like to come in and help him on that night," if it was all right with me.

So I -- I said sure.  I said let me contact Mayor Scott Fontenot because he does control part of our budget in the overtime area.  And so I did contact our mayor, Scott Fontenot, to make sure I get the okay

Page 44

to have a couple of guys come out.  And he said, "Do whatever you got to do to make sure the city is safe and don't worry about -- we'll take care of the payment of the officers."  So I think I returned the call to Lieutenant Dunn to let him know that I would have two officers that would come out that night to -- to assist.

Q.  And why did you feel like Lieutenant Dunn was, then, targeted from Chief Fontenot?

A.  The following morning -- or should I say that evening, I -- let's see.  The two guys go out.  The -- that evening, somebody had put a post on social media or something, so I put a post because I was upset.  And I did put something -- this is not the exact words. "Must be nice to be sleeping in your bed while there's a chance other people can get hurt."  No names or anything was mentioned to that cause.  Following morning --

Q.  I'm sorry.  I'm just going to stop you --

A.  Okay.

Q.  -- right there.

Who were you referring to in the post who was sleeping in their bed?

A.  Chief Fontenot and his staff.

Q.  And who could have potentially gotten hurt?

Page 45

A.  That rookie that was by himself.

Q.  How about Lieutenant Dunn?

A.  He was leaving at 11:00 o'clock.  He was not there.  He had worked, I think, an 18-hour shift, which is the max that they could work.

Q.  Okay.  I'm sorry to cut you off there.  But after you made the Facebook post --

A.  Okay.

Q.  -- what happened after that?

A.  The next morning, I went to work.  It was a little after 8:00 o'clock or whatever.  Chief Fontenot came into my office.  I could see he was very upset, could see his face was red.  And he threw a copy of my quote from Facebook on my desk, and he said, "Who are you speaking about?"

And I said, "Your F'ing -- and -- you and your F'ing administration."  I said, "I can't see how you can allow one officer to work the rest of the night by himself."  And his first words was, "Who authorized you to do that?"  And I immediately told him I don't need authorization.

Q.  But earlier, you also said that Mayor Scott Fontenot approved?

A.  Correct.

Q.  Did the conversation continue?



Page 46

A.  Oh, yeah.

Q.  What happened in the rest of the conversation?

A.  So he became irate whenever I told him that I didn't need his approval, that I actually had more power than he did.  But there's never ever been a power problem within our city between the chief and I.  I don't go around telling anybody that I have more power than he does because that's not important.  What's important is protecting the people of our city, and I've always put that utmost and more important than anything else.

So he was -- he was upset, and he said he had two people lined up to come in.  I said, "Could you tell me who you had coming in to help this rookie?"  And he said, "Well, I have to look at the log."  I looked at the log.  I didn't see anybody coming in.  He never specifically gave -- gave me any names or anything whatsoever.

And so that's when -- you know, so I had mentioned about getting permission from our mayor, Scott Fontenot, to go ahead and have the extra guys come in.  And so he got mad and stood up and kicked the chair back.  And when I mentioned that I had called the mayor, he said, "Well, you should have called me instead of calling the mayor."

Page 47

I said, "Well, the mayor controls my budget.  I control my people.  We can come out at night.  We can come out in the daytime," which we usually work.  We come out at anytime.  But the thing about it was that my two guys offered to come out and help because they did not want to get this kid hurt because he was new.  And I actually received a text from this officer the next morning thanking me for allowing him to go back home to his family because he would have been by himself.

Q.  I'm sorry.  Apologizes if I missed this earlier.  But who is the officer?

A.  I don't think he's no longer there.  I don't remember his name.

Q.  Okay.

MR. HOBBIE:  Why don't we take a short break --

MS. GUNNELS:  Okay.

MR. HOBBIE:  -- if you-guys don't mind.  We'll take, like, five minutes.

MS. GUNNELS:  Perfect.

THE VIDEOGRAPHER:  Off the record at 10:02.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the

Page 48

record at 10:11.

BY MR. HOBBIE:

Q.  So, Terry, I want to continue on about this disagreement with Chief Fontenot.  Is understaffing -- or I'm sorry.  Strike that.

Do you know why Chief Fontenot would leave a rookie short-staffed?

A.  I have no idea what the circumstances were that brought on that, only had one officer.

Q.  Do you know why Chief Fontenot would be upset if you were just trying to make the city more safe?

MS. GUNNELS:  Object to form.

A.  I -- I wondered myself, asking the same question of why, instead of coming up to my office to say thanks for having a couple of guys come out, that he was so upset with me, that only thing I was trying to do was trying to help the city.

But I know he's upset because I called the mayor, and whenever I said I called the mayor, that's when he became upset, stood up, kind of kicked the -- the chair back and said, "You should have called me."  And he did make a comment, "Well, you're trying to -- you're trying to be the chief or whatever?"  And I did make a -- a comment.  "If I wanted to be the chief, I'd have ran against you last election and beat you."

Page 49

BY MR. HOBBIE:

Q.  Earlier, you said that there's never been a power problem -- or in your opinion, there's never been a power problem between you and the chief.

A.  Correct.

Q.  Are you aware if the chief has a power problem with anybody else?

MS. GUNNELS:  Object to form.

A.  To say it's a power problem with -- with somebody else, you would have to ask the other departments what the problem is.

BY MR. HOBBIE:

Q.  Do you think -- in your opinion, is there a power struggle between Chief Fontenot and Mayor Scott Fontenot?

A.  No.  I know that there's been some disagreements between the -- the mayor's office and of course Mayor Scott Fontenot and -- and the chief over what -- I've heard budget issues was a problem, too much overtime, just basically stuff like that.

Q.  In this specific instance when the rookie was alone, do you think the chief prioritized his power over the safety of Eunice?

MS. GUNNELS:  Object to form.

A.  I -- I can't answer that to say he prioritized

MAGNA
LEGAL SERVICES

Page 50

himself over it because I don't know what the events led to that one person being on there by himself.

BY MR. HOBBIE:

Q.  Do you think that the Eunice Police Department is understaffed because of Chief Fontenot's policies?

A.  Part of it, yes.

Q.  Which policies?

A.  I couldn't get into -- I -- I don't know their policy book.  I mean, his is different than mine.  I had a policy when I started with the police department -- that's way back in the '80s -- which is outdated and, I'm sure, has been amended many times.  So his policy book and mine is not the same.

Q.  Do you think people have left the Eunice Police Department because Chief Fontenot targets them if they disagree?

MS. GUNNELS:  Object to form.

A.  I know many have left because they said they just can't take it there anymore.

BY MR. HOBBIE:

Q.  And what did they mean by "take it there anymore"?

A.  They were restricted from doing their job, that they had to do only specific jobs, and they wanted to do more but were being held back.

Page 51

Q.  Earlier, you said that you thought Lieutenant Dunn had been targeted sometimes.  Do you remember that?

A.  Yes.

Q.  When Chief Fontenot took away the K9, in your opinion, was that him targeting Lieutenant Dunn?

A.  It was just kind of a -- a -- a bad situation, that all of a sudden there was problems between the chief and -- and Lieutenant Dunn, and I couldn't tell you what -- every problem that he had with Lieutenant Dunn because you only hear bits and pieces because, again, I don't work for the Eunice Police Department.

I work for the marshal's office, and we're on the second floor.  They're on the first floor.  So I only hear what people came up to me and say.  That's -- that's about it.  Lieutenant Dunn has come to my office on a few occasion and just expressed himself as feeling like that -- in the K9 situation, that the dog was taken away from him for retaliation.  Retaliation for what, I'm not specifically sure about.

Q.  Have you heard that Chief Fontenot targets officers who disagree with him?

A.  As far as to say targeting people that -- I -- I can't truthfully say yes, that he does, because I --

Page 52

I don't talk to enough officers to be able to say yes, he does.

Q.  No, I understand.  I'm just asking if you've heard that he targets officers who disagree with him.

A.  That's what you hear around, but I can't specifically tell you.

Q.  Earlier, you said that the reputation of the Eunice Police Department -- or strike that.

Earlier, you said that the Eunice Police Department has a reputation, low trust.  Do you remember that?

A.  (Witness nods head.)

Q.  Can you give a verbal answer?

A.  Oh, I'm sorry.  Yes.

Q.  Who are the people at the Eunice Police Department who have a reputation of being untrustworthy?

A.  Untrustworthy?  Victor Fontenot is one of the main ones that we've dealt with, that we've had problems with.  To say anyone else that I or -- well, just say I.  That is the only one that I have ever -- that I can think of at this time, having problems with.

Q.  So you don't think Victor Fontenot is trustworthy?

A.  Oh, no.

Page 53

Q.  Why is that?

A.  We've had instances where we had warrants for people, and we found out that it was leaked out by Victor Fontenot before we were able to execute our warrants.  And these were from some of the actual people that we were looking for, that came forward and stated that they knew we had a warrant for them but they were tipped off that we were out there looking for them.

Q.  They specifically stated Victor Fontenot?

A.  Yes.

Q.  Who are the people who came forward and told you about this?

A.  These were people that were arrested.  I couldn't give you any specific names.

Q.  Have you discussed the Eunice Police Department's reputation with other law enforcement agencies?

A.  Yes.

Q.  Which agencies?

A.  St. Landry Parish Sheriff's Department and Opelousas police -- excuse me, Opelousas Police Department.

Q.  Do you know Lieutenant Ryan Young's reputation in the law enforcement community?



Page 54

A.  I don't hear too much talk about Lieutenant Ryan Young.

Q.  Have members of your -- excuse me, have members of the marshal's office ever complained about Lieutenant Ryan Young?

A.  We had an incident of -- Lieutenant Ryan Young is the range instructor for the police department, and he usually does our annual qualifications with our weapons.  And one year, he refused to do it, and when I asked him why, he just stated that it was one of my reserve deputies that he would not qualify because they had a little confrontation, not over police work but a pile of dirt that was located at their criminal investigation division, which is away from the police department.

My reserve deputy operates a nursery over there with plants and stuff.  I think there was a pile of dirt that was way and they got in a disagreement over that, and so Lieutenant Young said, "I cannot qualify him."

And so I said, "Why."

He said, "Because we don't get along."

And so I said, "Well, I don't think it's fair that the rest of us go qualify and we leave this guy alone by himself and tell him he cannot qualify with

Page 55

the rest of us."

So I had Eddie Thibodeaux from the St. Landry Parish Sheriff's Department, who is a firearms instructor -- he came and did our qualifications for all of us.  So I think Lieutenant Young became upset at that point, but he -- I mean, he does realize that it was a decision that I made based on I couldn't leave one person out and make him feel bad.  And Lieutenant Young does have a father who is one of my reserve deputies.

Q.  The one person who Lieutenant Young would not qualify, did he eventually --

A.  Yes.

Q.  -- get qualifications?

A.  I apologize.  I interrupted you.

Yes, sir.

Q.  You said Lieutenant Young's father is one of your reserve deputies.  What's his name?

A.  Mr. Herbert Mike Young.

Q.  How long has he worked for you?

A.  Four to five years.

Q.  Does he have, to your knowledge, any prior law enforcement experience?

A.  I don't think he had any until he -- he became one of our reserves.

Page 56

Q.  How do you qualify someone to become a reserve?

A.  It's a -- probably about a four or five step. You fill out an application.  From the application, we do a background check.  Should you pass the background check, we do a psychiatric test on you.  We send you off.  After that is complete, then we -- we take you to the range with a weapon to see if you can -- before you can actually qualify with that weapon, we want to make sure that you can shoot a handgun.

If we see that you will qualify, next step is a physical agility test.  And then after that, if that -- all of that is passed, we go back and bring him to the range and let him qualify with his weapon before he is sworn in by a judge.

Q.  Who makes the ultimate decision to hire someone as an employee of the marshal's office?

A.  I do.

Q.  Would you disqualify someone because you didn't like them?

A.  Never.

Q.  Would you disqualify someone because of a -- an instance where you disagreed with them?

A.  Unless I felt that it was a threat to our office to where it could hurt our office, then yes, I

Page 57

would.

Q.  And what do you mean by hurt your office?

A.  I mean, depend what the situation was, what the complaint was on this deputy.  Did he do something while he was at work that he wasn't supposed to, which could have caused problems to our office?

Q.  Like safety issues?

A.  Safety, legal.

Q.  I want to get back to the reputation of Chief Fontenot and other members of the Eunice Police Department.  You said that you've discussed their reputation with other law enforcement agencies.  Do you remember that?

A.  Yes, sir.

Q.  Do you believe that reputation is accurate?

A.  Yes, sir.

Q.  Why is that?

A.  People that I have spoke to, mainly the sheriff's department, are people that have been there for 20-plus years.  And so I think their reputation as law enforcement officers and -- and their experience has really paid a -- a -- a role in why they say what they say.

Q.  Because of Chief Fontenot's reputation, do other law enforcement agencies refuse to work with him?



Page 58

A. Yes.

Q. Which ones?

A. St. Landry Parish Sheriff's Department and a possibility of OPD, which is -- I'm sorry, Opelousas Police Department.

Q. Thanks.

A. But I can only say that because I hear that from -- to say I spoke personally to their chief, no. That's just officers.

Q. Which officers did you hear that from?

A. Can't give you a name because they're not my employees. And that was just recently because we had a murder trial, and some of those guys were asked to assistance -- "assistance" -- assist us in that murder trial for security.

So I asked them if they ever come to Eunice to assist on -- in any kind of way because I was about to do an operation of criminal patrol in Eunice with about five agencies. And they said, "Well, if it's your agency, we're going to come. If it's the police department, we're not coming."

Q. Would you disclose their names if all non-counsel of record in the room left?

A. I wouldn't know them.

Q. Oh, you don't remember their names?

Page 59

A. No, I don't remember their names because we were in a murder trial.

Q. Understood.

A. And I -- I called the chief from Opelousas to see if he could send us some help because our judge was threatened. So was a shooter and there was a juvenile matter -- a juvenile that was charged with second-degree murder and an attempted second-degree murder.

So it was a high-profile case that I actually had to move from Eunice because of the lack of security that we have there. We don't have scanners at the door or anything -- to move to the district courthouse in Opelousas because they have scanners there. They have their own staff.

So I contacted Opelousas Police Department, St. Landry Parish Sheriff's Department and Opelousas City Marshal's Office to see if they could send some officers over there to assist us with the trial, which went on for two and a half days.

Q. Did they explain why they wouldn't work with Eunice police --

A. No, I didn't have much -- I didn't have much time, and there were officers that came the night of -- the -- the night of the operation that I conducted in

Page 60

Eunice. We had approximately 24 officers that we brought in to -- to work.

Q. Do you know anyone at St. Landry Parish Sheriff's Department or at Opelousas Police Department who would know the names of those employees?

A. Sheriff's department, I could -- it'd be -- it would be the sheriff. Opelousas Police Department, I couldn't tell you.

Q. And I'm sorry. I missed it. Who refused -- who were you speaking to that told you that certain officers from your department would not work with the Eunice Police Department?

A. Who -- at when -- what instances?

Q. For this murder trial.

A. That was officers that came in and out that were relieving each other. So I only went in -- outside in the hallway on very few occasions because I stayed in the trial room or whatever. And so I'd come in the hall, and I'd basically thank the different ones that I did see because they were -- they were never the same ones there.

They would -- they would alternate in and out, whoever Chief McLendon sent over there. So I -- I couldn't tell you who -- who they were because, like I said, they -- they would change in and -- and out. I

Page 61

could walk out and there was one, and then I could come out, there would be another.

Q. Right. I -- I may have asked that question in a confusing way. You talked to someone from the sheriff's office, from -- someone from Opelousas Police Department for backup for this murder trial, right?

A. Yes.

Q. Who did you speak to from the sheriff's office?

A. It would be Eddie Thibodeaux, deputy chief, I believe. Eddie Thibodeaux was --

Q. And who did you speak to from Opelousas Police Department?

A. I spoke to the chief himself, McLendon.

Q. And they informed you that some of their officers refused to work with Eunice Police Department personnel?

A. They just made a comment that "Oh, it's the marshal's office, you know, we'll work." And we're going to -- we're going to go back. We -- it wasn't necessarily at that trial. I think we missed -- this was at the operation that we were doing, which was -- the trial was a few days before our operation.

It was really close, like days apart. It was when they came in for the operation that we were


MAGNA
LEGAL SERVICES

Page 62

conducting on that Tuesday night.  Like, the trial was the previous Wednesday, Thursday, and Friday, and then we did the operation on Tuesday.

Q.  Understood.

A.  So I want -- didn't want anybody to get confused.  It wasn't necessarily at the trial that this was spoken about.  It was basically the criminal patrol that we were -- we were doing on the Tuesday night.

Q.  And who told you about the distrust of the Eunice Police Department before the operation?

A.  It was during the operation --

Q.  During --

A.  -- whenever they got there.

Q.  Okay.

A.  We would have to see what officers signed up.  I don't know these officers on a name basis or whatever.  They just come in, they sign their names in there, and they go on from -- I mean, we had four agency, five agencies.  I probably could tell you the names of five, probably, from the sheriff's department because it's St. Landry Parish Sheriff's.  We use outside agencies, so I don't know -- I don't know their employees.

Q.  But it was the officers present at the operation --

Page 63

A.  Yes.

Q.  -- who said that they refused to work with Eunice Police Department?

A.  Yes.  It was one or two that made the comment that "Well, I wouldn't -- wouldn't work with the police department."  I never asked why.  That wasn't -- that wasn't what we were there for.

Q.  Do any members of your office refuse to work with the Eunice Police Department?

A.  Have any refused?  And to be honest, in actuality, I have instructed them to be very careful while working with Victor Fontenot.  My guys will not refuse to assist a police department.  They put the lives of our community first, and even though sometimes they -- they get frustrated or whatever, they will never not assist the police department because at the end of the day, we all want to go home.

Q.  Do any personnel at your office -- strike that.

Has anyone from your office ever said that they were concerned about officers at the Eunice Police Department?

A.  Yes.

Q.  Could you give me an example?

A.  The chief deputy, Joey Peloquin, about the

Page 64

trust with Victor Fontenot.  Maybe -- they may have mentioned another officer or so, but I really -- I really didn't pay attention to what they were talking about.  But I know Joey has expressed his concerns during search warrants and other things that they were concerned about.

Q.  What was he concerned about with the search warrants?

A.  To make sure that everything was legal and something that they couldn't get in trouble for.

Q.  To your knowledge, has Victor Fontenot ever gotten in trouble for -- in relation to search warrants?

A.  Speaking to our judge, our city judge, Mr. Terry Hoychick, he made a comment while he and I were talking that -- that he may have had a search warrant or something that he signed that was not based on the actual events.  We didn't go into details about what it is because that's no business of mine.  That's the judge and Victor.

Q.  How did he find out that Victor was -- submission was not based on the actual events?

A.  I guess the return, maybe, from the -- the search warrant or whatever it was, that it wasn't actually what it was supposed to be.  I -- I couldn't

Page 65

tell you.  I didn't ask him.

Q.  Have any other judges expressed distrust for members of the Eunice Police Department?

A.  I don't work with any other judges, just our city judge.

Q.  Is it just the one city judge?

A.  Yes, sir.

Q.  Okay.  Besides Joey Peloquin, has anyone else in your department expressed distrust with members of the Eunice Police Department?

A.  I have new officers right now because I've had others that have left.  Maybe Jack Ardoin who used to work for me, may have made a comment that he heard.  I couldn't even tell you what that was because, like I said, he no longer -- he no longer works for me.  He works for the Eunice Police Department.

Q.  Have you discussed this reputation -- or strike that.

Have you expressed the Eunice Police Department's reputation in the law enforcement community with Chief Fontenot?

A.  Would you repeat that?

Q.  Have you discussed the Eunice Police Department's reputation in the law enforcement community with Chief Fontenot?



Page 66

A.  We've had discussions because we go to grand openings or whatever and we discuss -- we discuss things.  We might not always agree on things, but we still have a relationship of law enforcement together, and, you know, I -- I hear something; I tell him.  And you know, he's answered, you know, shorthanded, short-staffed, people are overworked.  So we do have civil conversations.

Q.  Have you told Chief Fontenot about your issues with Victor Fontenot?

A.  Yes.

Q.  When?

A.  Oh, some time ago that --

Q.  Could you guess or estimate?

A.  A year, two years ago.  I -- I would say more or less a year, about the distrust we had with Victor.

Q.  I'm sorry.  Could you repeat that last part?

A.  About the distrust that we had with Victor Fontenot.

Q.  And that occurred about a year ago, is what you're saying?

A.  Yeah.  Year or -- or so ago, I would say.

Q.  What did you tell Chief Fontenot?

A.  I just told him about -- that it seemed like we had people that knew about warrants before we were

Page 67

coming to execute our warrants.  And a lot of times when we did pick up the -- the -- the suspect or whatever, the first thing out his mouth was, "Well, call Victor.  He'll -- he'll -- he'll get me out of this.  Call Victor."  It was always Victor's name that was brought up.  And there were times where Victor went and tried to get this certain guy out -- out of jail to -- to help him work a case or something.

Q.  What were the times when Victor got this person out of jail to help with a case?

A.  Oh, it was more than one time.  I had to go back to the judge and ask why -- we're going just to throw a name.  This is not the actual name -- John Smith, why did he get out of the jail?  And he said because Detective Victor Fontenot asked that we release him because they're working him as a CI on a case to try to get the bigger fish or whatever they were after.

Q.  Are you allowed to do that?

A.  If the judge says so.

Q.  Do you remember the person's name?

A.  No.  It was -- it was more than one time.

Q.  Every time that you remember, are you aware if a judge approved the actions?

A.  Sometimes he did, and the judge and I had a conversation.  And he said that in some of the

Page 68

instances -- or most of the instance whenever he did release the guy, the person didn't show up back for court again.  In other words, they let him out, probably gave him another court date, and he failed to show up for court.  And so we had to go back and look for him again.

Q.  Are you aware of any time Victor Fontenot released someone in jail without court approval?

A.  No.

Q.  Now, earlier, you said that you discussed your issues with Victor Fontenot with Chief Fontenot.

A.  Yes.

Q.  What did Chief Fontenot say to you when you raised these concerns?

A.  He just talked about how -- I mean, it was a civil conversation.  He said that how Victor had a lot on his plate and Victor was learning about detectives and all this and that he would look into the matter to see what happened.

Q.  To your knowledge, did Chief Fontenot look into the matter?

A.  I have no idea.

Q.  To your knowledge, has Chief Fontenot ever disciplined Victor Fontenot?

A.  I have no idea.

Page 69

Q.  To your knowledge, is Victor Fontenot a favorite of Chief Fontenot's?

MS. GUNNELS:  Object to form.

A.  Yes.

BY MR. HOBBIE:

Q.  Why would you say that?

A.  Because he is allowed to, let's just say, do a lot of things that -- I don't know how to answer.  He does a lot of things that, I guess, other officers are not doing or whatever in -- in that instance.

Q.  What sort of things?

A.  I know that he -- he leaves a -- a lot.  Sometimes he's not around, I guess, when we figure that he is working or -- or whatever.  It's hard to say.  I don't -- I don't handle their logs.  I don't -- we're two different departments.

Q.  Have you ever witnessed misconduct by Chief Fontenot?

A.  Misconduct?  No.

Q.  Have you ever witnessed Chief Fontenot violate the law?

A.  I don't go around them enough to say I would witness that because we see each other maybe once a month.

Q.  Have you heard about -- strike that.

MAGNA
LEGAL SERVICES

Page 70

Have you heard that Chief Fontenot violates the law?

A. I hear it. And mostly what I'm told is because whenever they go to civil service hearings that, you know, he loses the cases. I -- I don't go sit in on it. I'm not civil service; they are. So it's basically if -- if he has a grief or something, an officer has a grief with the chief, they go to civil service, and that's how it's -- that's how it's handled.

Q. Okay. I want to talk a little bit more about your experiences with Victor Fontenot. How long have you known Victor?

A. Three, four years. I'm not sure how long he's been employed there.

Q. But you knew him only after he joined the --

A. Correct.

Q. -- Eunice Police Department?

A. I mean, I didn't know him before.

THE REPORTER: I'm sorry. Can you repeat your answer?

A. Oh, I didn't -- I didn't know him before he was at the police department. I'm sorry.

BY MR. HOBBIE:

Q. Are you friends with Victor Fontenot?

Page 71

A. At times, yes. We -- we do talk, and at times, he avoids me.

Q. Why do you think he avoids you?

A. I'd like to ask him that question sometimes. All we ever do is try to help, but I think they think we step on their toes sometimes or whatever. And that's not what it's about; it's about working together. Just last week, we called for some assistance, and he did show up to assist.

He's asked for assistance from us because we do work out the city limits and the police department is only in the city limits, so we do assist them just like we assist the sheriff's department, in the capacity of helping out whoever, you know, needs the assistance.

Q. Have people at the marshal's office worked outside the city limits with Victor Fontenot?

A. Yes.

Q. If Victor is with members of your department, is he allowed to work outside of Eunice city limits?

MS. GUNNELS: Object to form.

A. That is the chief's decision or his supervisor or whatever. Sometimes he needs to go question somebody out of the city limits, and so he asked that if we could go with him, being that's our jurisdiction.

Page 72

Or if he's going to try to pick up somebody, he may call us; he may call the sheriff's department to go out there with him, which our guys do if we're not busy.

BY MR. HOBBIE:

Q. Are you aware of any instances where Victor Fontenot operated outside of the Eunice city limits without assistance from another law enforcement agency?

A. I couldn't -- I couldn't tell you that.

Q. Earlier, you said you've instructed other personnel at your department to be careful about working with Victor. Do you remember that?

A. Yes, sir.

Q. Do you still instruct them to do that?

A. I have probably instructed them way back, but to say I've done it recently, no. It's -- it's not like this is on a daily basis. This could be assistance to them. It could be every two weeks. It could be longer than that. So it's not like we work hand in hand with Victor and them every day because they have their own division and the detective division. We deal mostly with the officers that patrol the streets of Eunice.

Q. Do you ever execute warrants -- strike that.

Do members of the marshal's office ever

Page 73

execute warrants with Victor Fontenot?

A. Yes.

Q. Do you tell your officers to be careful about those warrants?

A. Yes.

Q. Why?

A. Just to be careful of what is going on whenever they execute the warrants, to make sure the warrants are legal, just stuff like that.

Q. Do you think that the marshal's office's distrust of Victor Fontenot affects the way in which you enforce the law?

MS. GUNNELS: Object to form.

A. No.

BY MR. HOBBIE:

Q. You're just more careful with him?

A. Yeah.

Q. Beyond trustworthiness issues, are you aware of Victor Fontenot's reputation in the law enforcement community?

A. I don't really go out and ask, in the community, about Victor Fontenot, so I'm -- I'm not in the community to ask that question.

Q. Have you discussed Victor Fontenot with any other law enforcement agencies?

MAGNA
LEGAL SERVICES

Page 74

A. Maybe with the sheriff's department.

Q. What do you remember about that instance?

A. That would probably be with Deputy Chief Eddie Thibodeaux.

Q. And what did he say?

A. He just said that the sheriff has advised him not to work with -- with members of the police department. And he did mention Victor's name.

Q. When was this?

A. Months ago.

Q. In 2022?

A. Possibly end of 2021.

Q. Do you know Ryan Young?

A. Yes, sir.

Q. How?

A. Working together.

Q. Did you know him before he started working at the Eunice Police Department?

A. Yes.

Q. What was your relationship like back then?

A. Friends.

Q. And around when was that?

A. '90s, maybe. Maybe late '90s, something like that.

Q. Are you friends with his dad?

Page 75

A. Yes.

Q. Beyond the general trustworthiness issues at the Eunice Police Department, are you aware of Ryan Young's reputation in the law enforcement community?

A. Ryan is a quiet person. He's a lot to himself. We may have had a disagreement here or there but nothing -- nothing real big. He and I still speak probably on a weekly basis, I -- I would guess.

Q. Have any other law enforcement agencies discussed Ryan Young with you?

A. No, sir.

Q. Okay. I just want to discuss a bit about how this reputation has affected your ability to work with the Eunice Police Department.

Besides Victor Fontenot, are there any other members of the Eunice Police Department with whom marshal's deputies refuse to work?

A. We still don't refuse to work with Victor. We still do. We don't turn our backs on anyone.

Q. My apologies. Besides Victor, are there any other members of the Eunice Police Department with whom marshal's deputies find -- strike that.

Besides Victor Fontenot, are there other members of the Eunice Police Department whom the

Page 76

marshal's deputies find untrustworthy?

A. Not that they ever brought it to me. They could have brought it amongst themselves, but they didn't come to me with anything.

Q. In your experience in the courtroom, does the city judge distrust Victor Fontenot?

A. To some degree, yes.

Q. Why do you say that?

A. Because he said if Victor would ever come in with other paperwork, he would make sure he double-checked it and made sure that whatever the case was, it -- whether it was a search warrant or whatever, to make sure that he had all the facts.

Q. Is that because Victor Fontenot had misrepresented facts to the judge before?

A. Yes.

MS. GUNNELS: Object to form.

BY MR. HOBBIE:

Q. Based on your knowledge, is that because Victor Fontenot misrepresented facts to the judge before?

A. According to the judge, yes.

Q. And what did the judge say about that?

A. That the trust with Victor Fontenot wasn't there, that he would make sure that anything that came

Page 77

from Victor was accurate and that he would check into it to make sure the facts were as stated.

Q. To your knowledge, has the judge ever raised these concerns with Chief Fontenot?

A. I have no idea.

Q. Have you ever discussed Chief Fontenot with the judge?

A. Yes.

Q. What did you discuss?

A. Just how I feel that the chief and I's -- a lot of our disagreements, I think, should not actually be disagreements. I think it should be a -- a good working relat- -- relationship between both of us. I just feel at times that chief thinks that I'm trying to do his job or be the person that is going to be wanting to be in front of the news camera every time something happens. I'm not like that. I don't want a TV camera around me, don't like it. I've had that in my career. I don't need it anymore.

We were never here to hurt the police department in any kind of way, would never do that. All we ever want is a good working relationship with them, and with them being shorthanded, we just want to be there to help. It's kind of hard to tell your officers not to go help our local agency. They are too



20 (Pages 74 to 77)

Page 78

shorthanded.  We were shorthanded.  Let's combine our resources together, and let's give what the people of Eunice deserve, and that's police protection.

So we've disagreed on certain ways of how things should be handled.  I am very proactive, very proactive.  Not saying the chief is not proactive in -- in some of the ways he conducts his stuff because I'm sure he -- he has his reasons behind that.  But we do have -- I would say we have a working relationship, which could be better than -- than what it is.

Not stepping on toes, not trying to take their investigations from them, because in actuality, we're not a reporting agency.  We are basically there for their backup.  When accidents occur, we go over there.  It might be only one officer, two officers because the rest are tried up.  We'll stay there and direct traffic for them so they conduct their investigation, un- -- until their finished.  We go on medical calls with them, domestics, anything.

But we do have a relationship, and I -- I -- that's all we ever wanted to do, was help each other out.  And, you know, chief disagrees with, I guess, the way I run my office, and I guess it's mutual because I disagree with the way -- some of the things he -- and -- and we have -- we have addressed that

Page 79

face-to-face before.

Q.  So you said that members of the marshal's office communicate with Eunice Police Department personnel almost on a daily basis?

A.  Every day.

Q.  And how often do members from the marshal's office actually work with members of the Eunice Police Department?

A.  All day long.

Q.  Every day?

A.  Every -- well, we're Monday to Friday.  But if they would execute a warrant for somebody and they didn't have somebody to see about them or whatever, they would call us, and we would go over there to handle situations, or their dispatcher would call us and say, "Hey, we -- another agency arrested somebody.  Or -- can y'all go get them?"

Or sometimes they're nice enough, if they're going to Opelousas and we have one -- while they picking up the lunches for the prisoners, they actually pick up that prisoner for us.  We try to work together to make it a better working relationship for both agencies.

Q.  Every time that members of the marshal's office work with personnel from the Eunice Police

Page 80

Department, do you get approval from Chief Fontenot?

MS. GUNNELS:  Object to form.

A.  Do I get approval for our deputies to work?

BY MR. HOBBIE:

Q.  Right.

A.  I don't need approval.

Q.  So do you know why that night with the one rookie officer by himself -- why that night was any different?

A.  I honestly think because it was Lieutenant Dunn that was working that night.

Q.  Why do you say that?

A.  Because he happened to be working that night, and I received calls from my deputy before I got in -- Lieutenant Dunn never called and asked for my help.  My deputies found out that this rookie was working by himself.  Then they actually called me to see if they could work and made the comment, "We'll work for free because we're concerned about the officer's safety, and we want him to go home."

And so I contacted our mayor, Scott Fontenot, again, like I stated before, to make sure that we had money in our budget to cover it.  And he said you do whatever you got to do to make sure that this city is protected.

Page 81

Q.  Do you think this is another example of Chief Fontenot targeting Lieutenant Dunn?

A.  Lieutenant Dunn told me the next day or day after that he was being threatened with a write-up for that incident that occurred that night.

Q.  So do you believe that that was another instance where Lieutenant Dunn was being targeted by Chief Fontenot?

A.  At that time, yes.

Q.  Besides that instance, have you ever witnessed Chief Fontenot act unethically?

A.  Not in front of me, no, sir.

Q.  Have you ever heard of the chief acting unethically?

A.  Unethically in what aspect?

Q.  Well, as another head of another law enforcement agency, anything that you believe is unethical?

A.  No.

Q.  Has Chief Fontenot ever asked you to act unethically?

A.  Never.

Q.  Has he ever asked you to violate the law?

A.  Never.

Q.  Has he ever asked you to violate your own



Page 82

policy?

A.  No, sir.

Q.  Has he ever asked -- strike that.

To your knowledge, has Chief Fontenot ever asked anyone at the marshal's office to violate policy?

A.  Not in my understanding because they would have been fired.

Q.  To your knowledge, has Chief Fontenot ever asked someone to violate the law but they refused?

A.  Not that -- not -- not that I know of.

Q.  Has Chief Fontenot ever attempted to interfere with work conducted by your office?

A.  Work conducted by my office?  Let's see.  I would say no.

Q.  Has he ever -- has Chief Fontenot ever attempted to interfere with an investigation conducted by your office?

A.  No, sir.

Q.  Has Chief Fontenot ever asked a member of your office to alter a search warrant?

A.  Not that I'm aware of.

Q.  Has Chief Fontenot ever threatened you?

A.  Has he ever threatened me as far as my position or...

Q.  Has he ever threatened you?

Page 83

A.  No.

Q.  Has he ever threatened your position?

A.  No.

Q.  Have you ever talked to Chief Fontenot about this lawsuit?

A.  No.

Q.  Have you ever talked to Chief Fontenot about today's deposition?

A.  No.  I can -- let me answer that again.  Let me retract.

I told him I didn't think I wanted to be here for this deposition, and that was probably when we was walking across the street.  That was it.  I don't want to be on the record saying the wrong thing.  We were walking across the street; I made that comment, "I really don't want to be here."

Q.  Why don't you want to be here?

A.  Because I got work to do, and I just feel that I don't have too much insight into what Lieutenant Dunn in -- what is going on in these proceedings.

Q.  Has Chief Fontenot ever threatened to retaliate against you?

A.  Retaliate against me?  No.

Q.  Are you concerned that he might after your testimony today?

Page 84

A.  Possibility.

Q.  Why?

A.  Because he is not running for chief, and he has four and a half months left into his term.  I would believe that we were -- could be friends enough that that would not occur, to say I'd be a hundred percent positive.  And I'm looking at him, I don't really believe that would happen.

Q.  Have you ever heard that Chief Fontenot has a hit list?

A.  A hit list?  I've heard of -- some -- I heard someone mention about it.

Q.  Do you know who's on the hit list?

A.  No.

Q.  Who told you know about the hit list?

A.  Lieutenant Dunn.

Q.  What did he say?

A.  That there was a hit list of -- of -- of people on it.  I may have read it in the -- whatever that is that Lieutenant Dunn posted or whatever.

Q.  Posted where?

A.  I don't know -- his 31-page whatever that I read.

Q.  Complaint?

A.  Yeah, his complaint.

Page 85

Q.  Okay.

A.  I may have seen it in there.  I'm not sure.

Q.  Did Lieutenant Dunn say he was on the hit list?

A.  We never went over whose names were on the hit list.

Q.  Have you heard that Chief Fontenot has enemies within the Eunice Police Department?

A.  Like, people that don't like him or enemies, you talking about?

Q.  Or vice versa.

A.  I mean, I know there are people that in -- within the department that don't agree with his method of being the chief.

Q.  Chief Fontenot mentioned -- or strike that.

You mentioned that Chief Fontenot discussed bad apples at the department with you.

A.  Uh-huh.

Q.  So -- sorry.

A.  I'm sorry.

Q.  Do you know who he was referring to?

A.  At that time, it was Nicholas Cooley, former employee, and Michael Dunn.

Q.  You said "at that time."  Are there any other bad apples that he's discussed?

**MAGNA**
LEGAL SERVICES

Page 86

A. Well, it's just that one conversation that we were having.

Q. Has he ever discussed Donnie Thibodeaux with you?

A. No.

Q. How about Stephanie Myers?

A. Like I said, I -- he -- he hasn't. I don't go down to his office. He basically don't come to my office. If we talk, it's somewheres either at a grand opening or he could be out in front of city hall or in -- in the back. It's just a kind of passing thing that we discuss a few things.

And -- and sometimes we'll go to his office when something comes up. And I may need their assistance with something as in we had a situation for court where we needed some extra officers in there and because it was a -- kind of a high profile, which he did send some extra officers. But that's probably our extent to conversations.

Q. Is that the -- that high-profile case that you just mentioned, is that the same as the murder trial you mentioned earlier?

A. Yes.

Q. When was that?

A. Last Wednesday, Thursday, and Friday.

Page 87

Q. Did you attend that trial?

A. Every day, as I was in charge of security for that. Even though we were in Opelousas, it was our city judge; it was our city clerk. And so being, as I discussed earlier, that there were so many accusations of threats against a lot of people, I had to call outside agencies. And this is the first time in the history of the Eunice City Court that we have a murder trial that is heard by our judge. It's not a jury trial.

And so I specifically put one of my deputies with the judge 24/7 to make sure of his safety and had extra people come in from the outside agencies to make sure that everyone in the courtroom as well as outside because there are officers right next to the courtroom -- to make sure that they were secured. So I probably had 14 or 16 officers working the trial and one, two, three -- four or five -- some days I had four; some days I had five -- was from my office. The rest was from other agencies.

Q. Did Victor Fontenot testify at this trial?

A. Yes, he did.

Q. Did Ryan Young testify at the trial?

A. Yes, he did.

Q. Do you remember why Victor Fontenot was

Page 88

testifying at the trial?

A. Because he was one of the detectives that worked that -- that case.

Q. Do you know if he issued any warrants in that case?

A. I would not -- no, I -- I do not know.

Q. Do you know if he conducted any improper investigations in that case?

A. I do not know if anything was done improper because I was not there that night. That was attorneys to attorney going back and forth, one accusing the other of it and back and forth. Like I said, to me personally, I wasn't there. I have no idea what happened at that scene.

Q. What did the defense attorney accuse Victor Fontenot of?

MS. GUNNELS: Object to form.

A. They just accused him of not doing a good job in their investigation.

BY MR. HOBBIE:

Q. Were they more specific?

A. Just of obtaining statements of securing the scene or whatever whenever they got there, which was, in reality, not their fault as far as securing the scene because I think there was only a couple of

Page 89

officers working that night. And by the time Victor got there, the -- the subjects were already gone, had been transported by private individuals to the hospital.

Q. So you're saying they were understaffed that night?

A. They were fairly understaffed that night when this incident occurred, and it -- and it occurred very quickly. And the location of it made it where there were so many people that ran out there to the scene, that without having additional officers, that would have made it virtually impossible to secure the scene properly.

Q. In your experience, if a scene is understaffed, are investigations conducted differently?

A. You're asking -- I'm sorry.

Q. Yeah, sorry.

A. If -- Yeah. If there's a large gathering out there and there is -- in this case, there was a double shooting. One died. One survived -- and once the police department is called or marshal's office or any law enforcement, it's going to take some time to get there. And if you have removed that person that has been injured from the scene, the scene becomes chaotic. You can walk right through it. You can kick shell

MAGNA
LEGAL SERVICES

Page 90

cases.  You can do whatever.

You -- you know, it's -- it's just an unfortunate situation that the police can't be there, you know, in an instant.  And -- and in that case, they got there as soon as they did, the -- the first two officers.  And then Victor and Ryan arrived later after being called out because they were detectives.

Q.  So it's harder to secure a scene -- or strike that.

Is it harder to secure a scene if you're understaffed?

A.  Yes.

Q.  On the evening of that shooting, were the officers more at risk because they were understaffed?

MS. GUNNELS:  Object to form.

BY MR. HOBBIE:

Q.  In your opinion?

A.  At -- at the scene, you're asking?

Q.  Yes.

A.  Yes.

Q.  In your opinion, on the evening of that shooting, were members of the public more at risk?

A.  Everybody that was out there was at risk. I had, actually, a deputy working that night a little bit aways from there before the incident occurred.

Page 91

Q.  Did your deputy go to the scene?

A.  He called it in.

Q.  And when you say "called it in," what does that entail?

A.  He radioed in on his radio to the police departments of shots fired.

Q.  And then did he go to the scene?

A.  His job -- the shooting probably happened 20, 30 yards, maybe, away.  His job was to work the event at the hall, which was the Dugout Event Hall.  It started as a graduation party and quickly escalated to a "put on Facebook, hey, we're having a party over here.  Y'all all invited" type thing, and they started collecting at the door.  And so it turned into a huge party at that time.

Q.  Earlier, you said that marshal's deputies assist the Eunice Police Department on some medical calls.  Do you remember that?

A.  Sure.  Any call.

Q.  Do the marshal's deputies have to ask Chief Fontenot before assisting?

A.  No.  Normally Chief Fontenot is at his office or somewheres else.

Q.  So they just show up?

A.  Correct.  We -- we monitor their frequency;

Page 92

they monitor our frequency.  Because they short-staffed, we normally have two or three extra, so we just try to combine them together to make sure that we help the citizens of our community.

MR. HOBBIE:  All right.  Do you-guys want to take, like, a ten-minute break right now?

MS. GUNNELS:  Yeah.

MR. HOBBIE:  It's been, like, an hour or something.

THE VIDEOGRAPHER:  Off the record at 11:25.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 11:46.

BY MR. HOBBIE:

Q.  Terry, during the break, we talked briefly about the murder trial you were at last week.  Has juvenile crime gotten worse since Chief Fontenot has been police?

MS. GUNNELS:  Object to form.

A.  I really don't think that's a fair statement, in all honesty.  If you look across the country, look across the state, this is everywheres.  I have people in law enforcement all over the state.  I've been past

Page 93

president of our Louisiana marshals association.

So we communicate a lot with different agencies.  And they're all going through the same problem because these juveniles know the law and adults are getting the juveniles to commit these crimes.  So juvenile is a -- juvenile crime is bad across the -- the nation.

BY MR. HOBBIE:

Q.  But earlier, you said it's gotten worse. Right?

A.  Yes.

Q.  Since you started as marshal?

A.  Oh, definitely.

Q.  And since Chief Fontenot was elected --

MS. GUNNELS:  Object to form.

BY MR. HOBBIE:

Q.  -- chief?

A.  His -- you're asking me since he got elected at --

Q.  Has -- has the juvenile crime gotten worse since he was elected chief?

A.  It has been on a steady incline.  I mean, I couldn't say because he was elected chief, that it got worse.  It just got worse all together.

Q.  No, I understand.  And I'm not -- I'm not

MAGNA
LEGAL SERVICES

Page 94

saying --
A.  I --
Q.  -- because he was elected.  Since he's gotten elected?
A.  Yes.
Q.  Just like since you got elected chief, it's gotten worse --
A.  I --
Q.  -- but it's not because of you?
A.  Correct.  I just wanted to answer it correctly.
Q.  Right.  Have drug crimes gotten worse --
A.  Yes.
Q.  -- since Chief Fontenot was elected?
A.  Yes.
Q.  Have there been more murders in Eunice since Chief Fontenot has gotten elected?
A.  Yes.
Q.  Been more violent crimes, besides murder, since Chief Fontenot has gotten elected?
A.  Yes.
Q.  I want to talk a little bit more about Victor Fontenot.  Have you ever witnessed Victor Fontenot violate the law?
A.  I know there was an incident where one of

Page 95

my deputies, they were involved in a chase after a suspect.  And my deputy -- and this is probably a couple of years ago.  My deputy was trying to assist in that chase or whatever, and the way he positioned his vehicle -- and Victor Fontenot came into the scene.  He came around or whatever causing him to strike a pole or whatever and tried to blame my deputy for the accident, which was not my deputy's fault.
Q.  Was that -- to your knowledge, was that incident ever investigated?
A.  I heard it was.
Q.  And how did Victor Fontenot violate the law in that instance?
MS. GUNNELS:  Object to form.
A.  I think he -- he filed a false statement, possibly.
BY MR. HOBBIE:
Q.  Are you aware that Mayor Fontenot disciplined Victor Fontenot for that false statement?
A.  I heard he got disciplined but never followed up on it whatsoever.  As long as my deputy was cleared, I was good with that.
Q.  Would you say that Victor Fontenot misrepresenting facts to a judge is a violation of law?
MS. GUNNELS:  Object to form.

Page 96

A.  Yes.
BY MR. HOBBIE:
Q.  Does that violate -- strike that.
In your opinion, is that unethical?
A.  Yes.
Q.  At the marshal's office, would that violate policy?
A.  Definitely.
Q.  To your knowledge, would that also violate Eunice Police Department policy?
A.  I do not know what their policy is, but I would say if it's in there, yes, it would be.
Q.  While you were at the Eunice Police Department, would misrepresenting facts to a judge be a violation of policy?
A.  At that time, I would say yes.
Q.  And how would that be -- strike that.
How would that policy violation be investigated or disciplined?
MS. GUNNELS:  Object to form.
A.  It would be investigated by whomever would be assigned to do the investigation on -- when the two parties disagreed saying "Hey, I didn't do that" and -- and if there was any circumstances that warranted an investigation.

Page 97

BY MR. HOBBIE:
Q.  As someone who's been in law enforcement, have you executed search warrants?
A.  Yes.
Q.  Have you submitted applications for a judge to sign a warrant?
A.  Yes.
Q.  Are you aware of a person's Fourth Amendment rights against unreasonable searches and seizures?
A.  Yes.
Q.  Are you aware of Miranda rights under the Fifth Amendment?
A.  Sure.
Q.  Are you aware that executing a faulty warrant violates a person's constitutional rights?
A.  That's correct.
Q.  If Victor Fontenot misrepresented facts to a judge during the warrant application process, would that warrant be faulty?
A.  Yes.
Q.  And you said, earlier, that Victor Fontenot had several issues with warrants, right?
MS. GUNNELS:  Object to form.
A.  Oh, of -- yeah, of leaks or whatever of -- of warrants.

MAGNA
LEGAL SERVICES

Page 98

BY MR. HOBBIE:

Q.   Other than the one that Judge Hoychick mentioned to you, what were the other instances?

A.   Just the judge had made the statement that, you know, he just didn't trust what, you know, was coming in to him when it came to Victor and that the judge had lost his -- his -- I guess his ability to trust Victor again.

I had -- we had issues with trusting Victor because basically the same thing.  You know, we didn't know if he -- because it seemed like after a while, it was every time we put our hands on somebody it was "Call Victor.  He's going to get me out.  Call Victor. He's going to get me out."  And it just became over and over again.

Q.   Is that ordinary?

A.   No.  You do get one or two here that'll say "Hey, call such and such.  I'm -- you know, I'm working for him" or whatever.  But we just had a -- just a large number.  It's just like his name was always mentioned.

Q.   And those people said that Victor tipped them off of -- about warrants?

MS. GUNNELS:  Object to form.

A.   I'm not going to say all of those did.  There

Page 99

was some instances that just threw his name out there. They didn't say "he helped me get out of the warrant" or "I knew the warrant was coming."  We had a couple of people that -- that mentioned -- I say "couple."  It could be a few more than that, that said that they knew there was a warrant out for them, that Victor had told them that there was a warrant, that he was going to help them out with it or whatever so...

BY MR. HOBBIE:

Q.   Okay.  So just to be clear, because -- or strike that.

Just to be clear, how did you know that Victor was tipping people off about warrants?

A.   Because that's what we had been hearing, and that was some of the things that -- that my deputies were -- were telling me because they work more with him than I do.  I'm like chief and like the mayor; we're in our offices.  So I do on the road a lot with my guys but not like they are.

Q.   Is tipping off someone about a warrant against the policy at your office?

A.   Definitely.

Q.   To your knowledge, is it against Eunice Police Department policy?

A.   Like I said, I don't know what their policy

Page 100

manual states in it.

Q.   Would you be surprised if the Eunice Police Department policy book said that they're allowed to tip off people before a search warrant is executed?

A.   Yeah, I wouldn't be surprised.

Q.   Why is that?

A.   Because it -- I mean, I think it should be part of the policy.

Q.   To your knowledge, is tipping off people about upcoming -- or unexecuted search warrants against Louisiana state law?

A.   I would say it is.

Q.   Do you know a person named Joshua Dupre?

A.   I heard the name before, but faces and names are bad with me because we see so many people.  Heard the name before, but that was about it.

Q.   Are you aware that Victor Fontenot asked Joshua Dupre to say that Lieutenant Dunn was being paid off?

MS. GUNNELS:  Object to form.

A.   No, sir.

BY MR. HOBBIE:

Q.   Are you aware that Joshua Dupre testified to that in Judge -- Judge Caswell's courtroom --

A.   No, sir.  No, sir.

Page 101

Q.   Sorry.  Are you aware that Victor Fontenot undertook a one -- strike that.

Are you aware that Victor Fontenot undertook an unofficial investigation into Lieutenant Dunn?

A.   I was -- I don't know that officially.  I heard that from Lieutenant Dunn.

Q.   Are you aware that Victor Fontenot testified that he conducted an unofficial investigation into Lieutenant Dunn?

A.   No.

Q.   Are you aware that Judge Caswell then called Victor Fontenot to testify in court at Joshua Dupre's bond revocation hearing?

A.   No.

Q.   Are you aware that in that hearing, Victor Fontenot admitted that he did not have authority to execute a search warrant for Joshua Dupre?

MS. GUNNELS:  Object to form.

A.   No.

BY MR. HOBBIE:

Q.   Besides -- besides the instances we've already discussed, are you aware of any other misconduct by Victor Fontenot?

A.   No, sir.

Q.   Have any -- has anyone from the marshal's

Page 102

office ever told you about any other misconduct by Victor Fontenot?

A. I want to say a comment was made, but that would be a former employee because, like I said, I have all new guys now.

Q. Do you remember that person's name?

A. I think his name was Jack Ardoin.

Q. When did Jack Ardoin work for you -- or at the marshal's office?

A. He worked up until about six months ago. I don't know. He began at the police department after he left my office.

Q. And what did he say about Victor Fontenot?

A. I really don't rem- -- because he made that out away from my office. I really don't know what the merits of the discussion was because they were having that amongst other deputies, and he was in his office, which is furthest point from my office.

Q. But he was saying something negative about Victor Fontenot?

A. Yes.

Q. To other deputies?

A. Yes.

Q. Do you know how many other deputies?

A. It could be one or two others because that's

Page 103

all I would have had in there at -- at that time. Probably only one.

Q. Who are the other deputies there?

A. Probably Chief Deputy Joey Peloquin, and that probably would have been the only one at the time because I think that's all I had employed at the time, full time.

Q. And those deputies and the chief deputy, are they on the road more often than you?

A. Oh, yeah.

Q. Would you say a lot of more?

A. Oh, they're on the road 90 percent of the time during the day.

Q. Do they have to get your authorization before they do anything?

A. Depending on what the situation is.

Q. What do you mean by that?

A. I mean, they don't have to call me to see if they can do a traffic stop or not. They don't have to call me if they can go to their house for a minute because, I mean, they're entitled to a break. Now, if they're going to go work a warrant or with any other agency or with the police department, yeah, they're instructed to give me a call to get approval.

Q. Are those instances when they have to give you

Page 104

a call outlined in your policies?

A. I would say some of them. I would guess it -- it all depends, you know, what it -- what -- what it was about.

Q. But they -- do they still do stuff without always seeking official approval?

A. If I'm not around because my chief deputy is next in line in command so...

Q. Today -- strike that.

Did any member of the public ever complain to you about Victor Fontenot?

A. Anyone from the public? Yes.

Q. Do you remember who?

A. No. I speak with so many people.

Q. Have you had many conversations about Victor Fontenot?

A. Not many. I've had a few conversations here and there.

Q. Do you remember the substance of any of those conversations?

A. It was basically on his investigative procedures, I guess, and stuff like that, I guess.

Q. And what about those investigative procedures?

A. Some of them were like, "Hey, you never called me back. I don't know if they followed through with my

Page 105

investigation or not. Do you think he's going to call me back?" Again, my -- my answer to him is that's not my employee. That's Chief Fontenot's employee. You have to contact him.

Q. Would it surprise you if Victor Fontenot testified that he didn't remember the last time he read the policies at the Eunice Police Department?

A. I would have no...

Q. Would it surprise you?

A. No.

Q. Would it surprise you if Victor Fontenot testified that he doesn't remember the last time he received training from the Eunice Police Department?

A. Yeah.

Q. How often do members of your department receive training?

A. We get on this -- we get online -- do a lot of our training online. But our chief deputy is in charge of training for our officers, so every time we find that there's a training available, we send them to training.

Q. Is that multiple times per year?

A. Oh, yes, multiple times. I have -- my chief deputy is actually certified, I believe, in use of force as an instructor. So I try to get them done, and



MAGNA
LEGAL SERVICES

Page 106

we're in the process of getting trying to get him taser certified. I -- we're trying to get the rest of them instructor status.

Q. Are your employees -- or strike that.

Are the deputies armed with weapons?

A. Yes, sir.

Q. What kind of weapons?

A. Most of them carry Glocks, and that's everybody from full time, part time, reserves.

Q. Do they have any other weapons?

A. Yes. We do carry AR-15s, basically our full-time guys do. I am not sure about our reserves. I don't think any of them carry them while they -- while they work. That would be their own personal --

Q. Do they have to be certified to carry --

A. Yes.

Q. -- these weapons?

A. Yes.

Q. How about tasers?

A. Yes.

Q. Do -- sorry. That could have been confusing.

Do deputies carry tasers?

A. Yes, sir.

Q. Do they have to be certified to carry tasers?

A. Yes, sir.

Page 107

Q. Do you allow any of your employees to carry tasers without certification?

A. No, sir.

Q. Do you allow your employees to carry Glocks without certification?

A. Definitely not.

Q. Do you allow any of your employees to carry AR-15s without certification?

A. No, sir.

Q. Who ensures that all certifications are up to date at your --

A. Our chief deputy.

Q. -- office?

Would it surprise you if certain personnel at the Eunice Police Department carried weapons without proper certifications?

A. What type of weapons? Are -- are we talking handguns, or are we talking rifles?

Q. The ones we just mentioned. The -- I can go piece by piece.

Would it surprise you if personnel at the Eunice Police Department carried tasers without the proper certifications?

A. I would have no idea because they -- they have a training officer, so I don't know -- I know they have

Page 108

periodic trainings. I -- I would say I can't answer that question because they have a training officer.

Q. Do you know if it's against the law for law enforcement officers to carry weapons without the appropriate certifications?

MS. GUNNELS: Object to form.

A. I would say yes.

BY MR. HOBBIE:

Q. Do you know if it's against -- is it against your policy for deputies to carry weapons without the appropriate certifications?

A. Is it against policy?

Q. Your policy.

A. Yes.

Q. While you worked at the Eunice Police Department, was it against policy to carry weapons without the appropriate certifications?

A. Yes.

Q. Would you be surprised if Chief Fontenot allowed officers to carry weapons without the appropriate certifications?

A. He has reserves that work without carrying weapons. To say his full-time guys, I've never seen one that did not have a weapon or was not certified because he has a firearm instructor.

Page 109

Q. Right. I'm just asking would you be surprised if they weren't certified but he allowed them to carry weapons?

A. The full-time guys, you're talking about?

Q. Yes.

A. I would be surprised if they wasn't certified.

Q. Do you remember a woman approaching you in the summer of 2021 talking about Victor Fontenot threatening her?

A. I don't recall.

Q. Do you recall anybody approaching you saying that Victor Fontenot was asking them to falsify a statement in a murder case?

A. I don't recall that.

Q. How about anybody who's said that Victor Fontenot was asking them to falsify a statement in any case?

A. I can't say yes to that.

Q. Earlier, you said that you talked about -- let me strike that. I'm going to rephrase.

Earlier, you mentioned that Chief Fontenot discussed bad apples at the Eunice Police Department, right?

A. Uh-huh. Yes, sir.

Q. Did he describe Victor Fontenot as a bad

MAGNA
LEGAL SERVICES

Page 110

apple?

A.  No, sir.

Q.  Would you describe him as a bad apple?

A.  Would I describe Victor Fontenot as a bad --

Q.  Right.

A.  Yes, sir.

Q.  Why is that?

A.  Because of the numerous allegations against him, the -- the distrust that he has with my office.

Q.  What would you do with Victor Fontenot if he worked at your office?

MS. GUNNELS:  Object to form.

A.  If he worked in my office?  Well, first of all, I'd make sure he was adequately trained into the position that he is in.  And if he wasn't adequately trained, then he wouldn't be working in that position that he's in.  And if it went on and things arose from that -- my office is different than the police department's because they're civil service, so they have to write them up, whereas I can terminate him immediately.

BY MR. HOBBIE:

Q.  Based on your knowledge, is Victor Fontenot adequately trained for his job?

MS. GUNNELS:  Object to form.

Page 111

A.  I would say in some areas, I don't think he has the proper training.

BY MR. HOBBIE:

Q.  Earlier, you said that Chief Fontenot said he was just young.  What did you take that to mean?

MS. GUNNELS:  Object to form.

A.  Mean he had just started there, I think in that capacity, as detective.  He had just recently started.  You know, he was -- meaning he was young and in that job assignment that he was given as being a detective.

BY MR. HOBBIE:

Q.  In your experience, if you have a young detective, are they allowed to violate constitutional rights --

A.  No, sir.

Q.  -- without discipline?  Sorry.

A.  Sorry.

Q.  That was my fault.

A.  No, sir.

Q.  I'll ask again just so the --

A.  Okay.

Q.  -- record is clear.

In your experience, if you have a young detective, are they allowed to violate constitutional

Page 112

rights?

A.  No, sir.

Q.  Are they allowed to do so without discipline?

A.  No, sir.

Q.  Do you recall testifying earlier that you confronted Chief Fontenot about Victor Fontenot?

A.  Yes.

Q.  About how many times did you do that?

A.  Once about the -- you know, the incident. I don't know if we ever brought it up in another conversation because I figured he would address the situation.

Q.  And that was how long ago?

A.  It could be a year, year -- maybe 20- -- the end of 2021 or whatever.

Q.  Other than the instances we've discussed, are you aware of or have you heard of any other instances of misconduct by Victor Fontenot?

A.  Not to my knowledge.

Q.  Would it surprise you if Chief Fontenot had not investigated Victor Fontenot for his misconduct?

MS. GUNNELS:  Object to form.

A.  No.

BY MR. HOBBIE:

Q.  Would it surprise you if Chief Fontenot didn't

Page 113

investigate Victor Fontenot for tipping off subjects of search warrants?

MS. GUNNELS:  Same objection.

A.  No.

BY MR. HOBBIE:

Q.  Why not?

A.  Because in kind of the eyes of our office in general, Victor was one that was going to do it the way he wanted to do it no matter -- no matter what.  I -- I don't know if he was ever disciplined by the chief or not, but he just basically got the reputation within our office of, like, he basically did what he wanted.

Q.  Are you aware of Chief Fontenot ever writing up Victor Fontenot?

A.  I was told he did, but I think you said he was written up by our mayor, Scott Fontenot, over that incident involving the vehicle and all that.  And I thought maybe it was Chief Fontenot that had wrote him up, but no.

Q.  Besides that incident?

A.  No, sir.

Q.  Have you heard of him disciplining Victor for the faulty search warrants?

A.  No, sir.

Q.  Have you heard about Chief Fontenot

MAGNA
LEGAL SERVICES

Page 114

disciplining Victor Fontenot for misrepresenting facts to a judge?

A.  No, sir.

Q.  Has Judge Hoychick mentioned any conversation that he's had with Chief Fontenot about disciplining Victor Fontenot?

A.  All I know is he's spoken to chief.  What's that conversation?  I -- I wasn't present.

Q.  Okay.  I want to talk a little bit about Ryan Young.  Have you ever -- besides the instances that we've discussed, have you heard of any other misconduct by Ryan Young?

A.  No, sir.

Q.  Are you aware that Victor Fontenot reports to Ryan Young?

A.  Yes.

Q.  Has Ryan Young ever discussed Victor Fontenot with you?

A.  No, sir.

Q.  Are you aware of Ryan Young ever disciplining Victor Fontenot?

A.  Not aware.

Q.  Have you ever mentioned Victor Fontenot's misconduct to Ryan Young?

A.  No, sir.

Page 115

Q.  Are you aware if Ryan Young works with Victor Fontenot?

A.  Yes.  He's his supervisor.

Q.  Are you aware if they execute search warrants together?

A.  I hear on the radio that they're out doing search warrants.  Whether they're together, I'm not sure because I'm not there.

Q.  Did Ryan Young testify in the recent trial, the murder trial we --

A.  Yes.

Q.  -- discussed earlier?

Did the defense attorney allege any misconduct by Ryan Young?

A.  Yes, sir.

Q.  What were the allegations against Ryan Young?

A.  Just basically investigation, the way some investigative purposes were -- actually, that probably was the defense attorney maybe just objecting, generally, about law enforcement, you know, and the law enforcement that was present was -- happened to be Ryan Young there also.

Q.  Has Ryan Young ever worked with personnel at the marshal's office?

A.  Yes.

Page 116

Q.  Has he ever executed a warrant with members of the marshal's office?

A.  I would say yes.

Q.  During any of those executions -- I'm going to rephrase that.

While executing any search warrant with Ryan Young and members of your office, was Victor Fontenot present?

A.  Couldn't answer that because I wasn't there.

Q.  Would -- as the deputy chief at your office, is it your understanding that Joey Peloquin would know who was present?

A.  Correct.

Q.  Has Ryan Young ever asked you to alter an investigation?

A.  No, sir.

Q.  Has he ever asked anyone at the marshal's office to alter an investigation?

A.  Not that I'm aware of.

Q.  As deputy at your office, does Joe -- Joey Peloquin oversee the day-to-day activities of your deputies?

A.  Yes.  He does assist me, but yes, his daily duties are to see about the deputies to make sure that they're doing their job.

Page 117

Q.  Is he their superior officer?

A.  He's under me.

Q.  Is he their -- the deputies' superior officer?

A.  Yes.

Q.  Sorry.

A.  I'm sorry.

Q.  As a superior officer, how often does Joey Peloquin communicate with the deputies?

A.  All day long.

Q.  Do they discuss search warrants, to your knowledge?

A.  I would guess so, but we don't do very many search warrant.  In fact, our search warrants assistance would probably be to the police department or to the sheriff's department.  That's to say that we actually to a search warrant for ourself, very seldom because we handle misdemeanors.  We don't handle felonies.

Q.  Right.  Do the deputies discuss their duties or their daily activities with Joey Peloquin?

A.  I would say yes.

Q.  As his boss, do you expect him to be aware of their daily activities?

A.  Oh, definitely.

Q.  Why?

MAGNA
LEGAL SERVICES

Page 118

A.   Because that's his job.  His job is to oversee what is going on with the deputies to make sure that they're out there executing our warrants, courtroom security, delivering subpoenas, delivering civil documents.  So whatever work they have to do for that day, yes, he oversees them.

Q.   And does he report back to you?

A.   Not necessarily on a daily basis.  I leave it up to him.  I do check with him periodically to make sure everything is going okay, any problems or whatever.  We do a lot of security, so he handles that part of it also, and so he oversees that part of lining up people for security details.

Q.   Does he report misconduct to you?

A.   He better.

Q.   What do you mean "he better"?

A.   It's his job to do it.

Q.   What if he doesn't?  Well, I'm going to -- we're using a lot of hes.

So what if Joey Peloquin doesn't report the misconduct by deputies to you?

A.   Then we will have a discussion in my office, and we'll see where that leads to.

Q.   Should he report all allegations of misconduct to you?

Page 119

A.   Oh, definitely.

Q.   All allegations of misconduct alleged against deputies, should those be reported to you?

A.   Yes, sir.

Q.   Would it surprise you if Ryan Young was unaware of Victor Fontenot's faulty search warrants?

A.   Can you say it one more time?

Q.   Would it surprise you if Ryan Young was not aware of Victor Fontenot's misconduct?

A.   Possibility.

Q.   What do you mean it's a possibility?

A.   It's not my guys.  So I'm not saying that he reports to him all the time.  I -- it's not my guys. I -- two different departments.  Hard for me to say what he would do in another agency.  It's not my agency.

Q.   But in your opinion, a superior officer should be aware of misconduct?

A.   That is correct.

Q.   And that misconduct -- strike that.

Forgive my ignorance.  You have a superior offer -- officer.  Do you call officers below you inferior officers?  Or is there another term?

A.   I just -- I just call them by their rank, is really what I call them by.  I wouldn't say inferior or

Page 120

whatever.  I -- we just discuss it as ranks, so that's how we follow it.

Q.   Thanks.  I appreciate it.

So do you expect that Joey Peloquin, as the -- as the officer higher in rank, should be aware of the misconduct of officers of a lower rank?

A.   He should be.

Q.   Do you think that's a good policy?

A.   Yes.

Q.   Why?

A.   Because that's kind of the chain of command.

Q.   Earlier, you testified that you understood Ryan Young was Victor Fontenot's superior officer, correct?

A.   Yes, sir.

Q.   In your opinion, should Ryan Fon- -- strike that.  In your opinion, should Victor Fontenot be aware -- I'm going to strike that again.

In your opinion, should Ryan Young be aware of Victor Fontenot's misconduct?

A.   He should if he's made aware of it.

Q.   And if he is made aware of it, should he report that --

A.   Yes.

Q.   -- to the chief?

Page 121

A.   Yes.

Q.   Are you aware of -- strike that.

Have any of your employees discussed Ryan Young's reputation?

A.   Not besides the incident with, you know, not wanting to qualify that other guy.  And, you know, the only other thing was Ryan asked, again, this year -- which we just qualified in May, I believe, of this year.  We qualify once a year with our weapons, which is required by POST to be able to carry a weapon, and get our state supplemental.

And I think my chief deputy spoke with -- with Ryan about qualifying.  And he said, "I guess y'all going to use Deputy Chief Eddie Thibodeaux of the sheriff's department again."  And he said -- well, I think the conversation was yeah, because you don't want to qualify one guy and we can't see us not at all qualifying as a group together.  Besides that, I know Ryan comes in our office.  He interacts with Joey a lot -- Peloquin, a lot.  I know they -- they work together a lot.

Q.   Great.

MR. HOBBIE:  Do you-guys want to break for lunch?

MS. GUNNELS:  Yeah.  Lunch is here.

MAGNA
LEGAL SERVICES

Page 122

THE VIDEOGRAPHER: We're off the record. Time is 12:30.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record at 1:13.

BY MR. HOBBIE:

Q. So where we left off, you said that -- that Ryan comes into your office a lot and talks with people. Do you remember that?

A. Yes, sir.

Q. You said he talked to Joey Peloquin. Does he talk to anybody else?

A. I'm sure he talks to my other deputies. I mean, they just -- I guess, they're talking about somebody looking for somebody or, you know, whatever. That's normally what it is.

Q. To your knowledge, what types of cases does Ryan Young work on with deputies at your department?

A. It could be a mutual warrant. We may have a misdemeanor warrant, and they may have a felony warrant on the same suspect. So they basically get together or "look, we've exhausted our leads. We've gone to this address, that address, that -- do you have any" -- police work.

Q. Okay. To your knowledge, when is the last

Page 123

time members of the marshal's office worked with Ryan Young?

A. They could be meeting on the road. They could be at a complaint together on the road. I would have no knowledge because Ryan does work on the road a lot. So I would say probably a -- a weekly -- weekly thing, maybe even more than that. I'm -- I'm not sure.

Q. Just for clarification, when deputies are on the road, what are they doing?

A. Whatever the duties are for that day. Mondays, Tuesdays, Wednesdays, we have court. Monday, we have criminal court. Tuesday, we have juvenile court. Wednesday, we have civil court. So all of my deputies basically -- and depends how big the docket is, of how many deputies are working in there.

Besides that, afterwards, the judge issues warrants for -- bench warrants for whoever didn't show up. So they basically go out, and their first duty is to execute the warrants of people that haven't shown up for court. And if there's subpoenas to be delivered, civil citations, lawsuits, repossessions, evictions, whatever.

Q. Are all the duties initiated by a court order?

A. Mainly, yes.

Q. Besides the defendants in this case that

Page 124

we've already talked about -- Chief Fontenot, Victor Fontenot, Ryan Young -- are you aware of any other Eunice police officer executing a faulty warrant?

A. No, sir.

Q. Has Judge Hoychick informed you of any Eunice police officers that are troublesome?

A. No, sir.

Q. Has Judge Hoychick -- you can strike that.

Are you aware of any Eunice police officer using excessive force against any person?

A. I have never witnessed anything.

Q. Have you heard about anything?

A. Only through what I read in Lieutenant Dunn's complaint.

Q. What did you read?

A. Whatever is listed in his complaint form of excessive force by someone or some officers, whatever it reads in there is what -- that's the only thing I know.

Q. Did that help you remember anything or --

A. No, because I really -- I really never heard them. And -- and to be honest, sometimes that -- when they are disappointed, mad at certain officers or whatever, we're talking about in the community, they would call and say "Hey, well, the police department

Page 125

don't want to do this" or "the sheriff's department doesn't want to do that." I'm sure police department gets the same thing on us or whatever. But I've never gotten any call on anybody complaining at excessive use of force.

Q. Have you ever heard of Kenneth Charles?

A. No, sir.

Q. Do you have any knowledge of Deputy Chief Joey Peloquin taking Cody Miller to the hospital in November of 2019?

A. I think so.

Q. What do you remember about that?

A. Maybe that was from an arrest and that, possibly, Cody was infected by some type of chemical or something, if that's the same incident. I'm not -- I'm not sure. I think it was Cody at that time.

Q. That instance, do you remember what the chemical allegedly was?

A. I don't think they knew at the time. I don't -- I don't remember if it was fentanyl or something else. But it -- supposedly, he was feeling very ill, and so I think they immediately threw him into Chief Deputy Peloquin's unit, and I think he took him to the hospital.

Q. Are you aware of the circumstances of that

Page 126

arrest?

A.  All I know it was somebody maybe around Lieutenant Dunn's residence.  I think that's about where it happened at.

Q.  And do you know what that person was doing around Lieutenant Dunn's residence?

A.  I think the call came in maybe as a suspicious person or a person messing around the house.  I don't really remember what -- the original call, but it had something to do with around Lieutenant Dunn's residence.

Q.  Did you hear that call?

A.  I heard it on the radio.  I was in my office.

Q.  Was that at night?

A.  Daytime.

Q.  Do you remember who called it in?

A.  I think some -- no, I can't.  I wouldn't say it's Lieutenant Dunn or an individual.  I -- I wouldn't remember.

Q.  Do you remember anyone talking about hitting a police unit?

A.  It was something about a police unit, I remember that.  I didn't remember if it was hanging around the unit, hitting the unit, whatever -- whatever it was.

Page 127

Q.  Why was Joey Peloquin there?

A.  Because I think he was close -- close by.  And he would have heard it on his radio, so that's how.

Q.  Are you aware that -- strike that.

Have you spoken to Joey Peloquin about this incidence?

A.  Recently or --

Q.  No.  At any time.

A.  Not since the incident occurred.

Q.  Did he say anything about force being used against the person that was arrested?

A.  No, he didn't.

Q.  Did he say who else was there?

A.  No, because I think he drove up -- I don't remember if he drove up before other officers arrived or after officers arrived.  All I know is that -- that Cody -- sorry, was transported by my deputy for possible exposure to some kind of chemical agent.

Q.  Is it typical for marshal's deputies to respond to calls of suspicious persons?

A.  Like I said, we work with them and probably because -- that day, probably because the call was around an officer's house.  And like I said, he was nearby.  And to answer your question, yes.

If there's anything that occurs and -- and

Page 128

them have all their units tied up, they may have only one unit to go over there.  So we go and, you know, just help them out, just check, make sure, like I said, that they're all right and don't need any type of -- of help.

Q.  After Peloquin left the scene with Cody Miller, do you know if other officers were there?

A.  I have no idea.

Q.  Did Joey Peloquin arrest the person?

A.  I don't believe so.

Q.  Do you know if Cody Miller arrested the person?

A.  He would have had to go back because he was -- he was transported.

Q.  After Joey Peloquin responded, did Chief Fontenot -- strike that.

Did you call Chief Fontenot before Joey Peloquin responded?

MS. GUNNELS:  Object to form.

A.  No, sir.

BY MR. HOBBIE:

Q.  Why not?

A.  I didn't think there was a need for me to call.

Q.  Did Chief Fontenot confront you about

Page 129

Joey Peloquin showing up?

A.  No, sir.

Q.  Do you know why not?

A.  I guess he didn't have a reason to.

Q.  Could it be because force was being used against a person?

MS. GUNNELS:  Object to form.

A.  It -- it's not a normal thing that he calls me all the time for calls or anything.  Or I call him for calls unless there is a need to.  And I was in my office, and I'm guessing he was in his office.

BY MR. HOBBIE:

Q.  To your knowledge, was this person arrested?

A.  I have no idea.

Q.  If the person were arrested, would that show up in a log?

A.  Yes, sir.

Q.  Does the marshal's office keep a log?

A.  Of our calls.  They have their own system.

Q.  Does the marshal's office log arrests?

A.  Yes.  If we -- if we arrest, yes.

Q.  Does your office log if force is used against a person?

A.  Anything that is called in, or whatever, is logged.

33 (Pages 126 to 129)

Page 130

Q. Are instances of force treated any differently?

A. No. It's -- it's reported.

Q. I'm sorry. After it's reported, are instances of force treated any differently?

A. No.

Q. Is there a -- strike that.

When you were at Eunice Police Department, were all arrests required to be logged?

A. Yes. That's a long time ago.

Q. Do you know if that's still the policy?

A. I would say so.

Q. Why?

A. Because that's what every police department does, is log arrests. So you can go back later, when you do your report, to have an arrest time.

Q. If you arrest someone and subsequently release them, is it still on the log?

A. We -- well, it wouldn't be on our log. I'm not sure if it would be on their log, if they're released. They have paperwork that is -- excuse me. They have paperwork that has to be filled out whenever someone is released, whether it's on bond or by judge. They'll send a sheet from city court saying to release the subject per Judge Hoychick per whatever reason. I

Page 131

do not know if they put it -- actually put it on their log or not.

Q. If the person is released from your -- the custody of your office, does the arrest still show up on the log?

A. All our arrests are taken to the police department. So we don't have a log of when they're released because we are -- we book them in the Eunice Police Department.

Q. Right. I'm saying if the person is released, do they remove the arrest from the log?

A. No, sir.

Q. At the marshal's office, if force is used, do you have to fill out any paperwork?

A. You write a statement as to the incident which occurred.

Q. Do you always do that?

A. Yes.

Q. I'm sorry. Do your employees always do that?

A. Yes.

Q. While you were at the Eunice Police Department, was that the same policy?

A. Yes, but a long time ago.

Q. Did you ever have to employ force while at the Eunice Police Department?

Page 132

A. Yes.

Q. And after doing so, did you have to write a statement?

A. Yes.

Q. Was there any time where you employed force and then didn't write a statement?

A. Never.

Q. In your opinion, is it important for officers -- excuse me, for law enforcement officers to write statements after employing force?

A. Yes.

Q. Why is that?

A. Because if this escalates into an investigation or into a lawsuit of any kind, then they will subpoena all records of the arrest of the use of force, whether a suspect was treated for injuries or anything like that.

Q. If a suspect is injured after force has been used against him or her, how are injuries treated?

A. They'll usually -- either we'll call an ambulance -- which is most of the time, that part. And it can either be at the scene or it can be whenever you booking them into the jail facility, or later on, they claim that they're hurting or whatever.

Q. How do you treat injuries at the jail?

Page 133

A. We don't.

Q. While you were at the Eunice Police Department, how are injuries treated at the jail?

A. Man. They were seen about as to the nature of their injuries, if they were actually injured or just trying to find a way not to go to jail.

Q. Where is the jail in relation to your office now?

A. We are located on the second floor of the municipal complex. We are on the northeast corner of the building. The police department is located on the first floor on the south, east, and west because there's a hallway on the second floor.

So we're -- if you walk in the front door, take that. When you're walking through the front door, you take a right to go to the police department. To get to our office, you go straight, get on the elevator, get off the elevator, take a left. We're the first office on the right.

Q. And the jail is inside the police department?

A. Correct.

Q. Okay. If force were used against a suspect, would you clean them off at the jail before -- you can strike this question.

In your time in law enforcement, have you ever

MAGNA
LEGAL SERVICES

Page 134

witnessed officers have to clean wounds of suspects who were the subject of force by other officers?

A. I wouldn't say force by the officers because sometimes it wasn't determined -- well, we treated abrasions. We treated cuts if they were brought in -- if they resisted arrest. We made sure we gave them first aid, and then we evaluated them from there.

Q. Would you have them shower?

A. Would we have them shower? Well, back then -- are you talking about when I was at the police department --

Q. Right.

A. -- or at the marshal -- back then, there was a possibility that they could go in the back and -- and shower.

Q. Would it surprise you if police officers use a hosed -- used a hose to wash off a person who experienced force from an officer?

A. I've never heard of an incident like that. We've had to hose off an individual, only because he urinated or whatever all over himself, where we actually took him into the, like, bull pin area, which is on the outside, and actually -- actually called his father. He was an adult. Actually, his dad was an attorney -- and had the dad do it. But yeah. But I've

Page 135

never seen someone that's been abused or whatever being washed off or whatever like that.

Q. In your opinion, would that be proper?

A. To wash off someone that has been injured?

Q. With a hose.

A. Depending on what the -- the situation was. Was it a cut? Was it something minor that you didn't have -- you didn't have it in the booking room and you needed to just walk down the hall and maybe wash off a leg or something like that because you didn't want to -- there was no other way to maybe clean them up. I don't know the whole layout there now.

Q. Do you know if they have showers at the jail?

A. Yes. They do.

Q. Would it be proper to hose someone off if you knew they were going to be taken to the hospital by an ambulance?

A. If you're trying to clean the wound to not get it infected or whatever.

Q. Did Joey Peloquin tell you -- strike that.

In your time in law enforcement, are you aware of any instance in which Chief Fontenot covered up misconduct by one of his employees?

A. While working at the police department?

Q. At any time.

Page 136

A. Repeat the question.

Q. Are you -- at any time --

A. Okay.

Q. -- were you aware of any instance where Chief Fontenot covered up misconduct by one of his employees?

A. No.

Q. Have you heard of any instances like that?

A. I stay up in my office and run my office and try to stay out of everybody else's business. No.

Q. Are you aware of any instances where Eunice police officers neglected to provide medical care to detainees?

A. No.

Q. Do you know someone named Joshua Tyler?

A. No idea who that is.

Q. Do you know someone named Christopher Ashworth?

A. Yeah, I've heard that name before.

Q. What have you heard about him?

A. I think we may have arrested him before. That's why his name comes up. It just sounds familiar.

Q. Have you heard of an inmate swallowing broken glass at the Eunice Police Department?

A. Somebody made a comment about it. I couldn't

Page 137

even tell you who. I may have read it -- I'm not even sure where I heard it from, but I did hear that, which was a surprise to me because I hadn't -- I hadn't heard about that.

Q. Why is that surprising?

A. Because that seems kind of -- kind of harsh, swallowing glass. But I wasn't there.

Q. Would you expect to hear about that if it happened?

A. Yes.

Q. Why?

A. Because people talk. So normally, if officers hang around with officers -- we're a small town. Things travel fast, and usually, you will hear whenever something like that, you know, would happen. And I don't hear everything that happens down there because I'm not there all the time.

Q. To your knowledge, if an inmate needs medical care, are they transferred to the hospital?

A. Not all the time.

Q. When are they?

A. Whenever it is believed by the officer that he is in need -- he or she is in need of medical treatment because a lot of times, we arrest people, and the first thing they want to claim is that they're injured, or


MAGNA
LEGAL SERVICES

Page 138

now, it's COVID. So the officer has to make a determination, whether to transport to the hospital or not.

Q. Do you know what happens if the jail is full?

A. If it's full, I -- I guess they got to house them somewheres else. I mean, I know that's basically what's being done now. Felon- -- any felonies go to our district, which is in Opelousas, and they keep misdemeanors and probationers downstairs.

Q. Are you aware of an instance where an inmate was transferred to a medical -- excuse me, to the hospital but was then released because there was no space at the Eunice jail?

A. No.

Q. Would it surprise you to know that the Eunice Police Department releases people without charges if there's not space in the jail?

MS. GUNNELS: Object to form.

A. I can -- I know they've released because there was too many people in jail, but to my knowledge, they were given court dates to return.

BY MR. HOBBIE:

Q. Were files charged?

A. I couldn't tell you because I don't have knowledge of all theirs, but there was -- there has

Page 139

been time when the jail has been full and we needed to book somebody into the jail, and it was too full. And I had to go meet the judge, and either he would call downstairs and say, "Look, this one is almost finished with their, say, six-month term or whatever, so we can release this one, and we'll put that one" or just issue them a summons and let them go.

Q. Did you make that determination, or did the judge?

A. I make some because the judge allows me to do it in his absence.

Q. Do you still do -- still do that today?

A. We don't have that problem because the jail is not full. It's been a while since -- it's been a long while since we had that because I think the jail holds a little over 40, and I think recently, it's been in the 20s.

Q. You said "a long while." Can you estimate how long it's been?

A. Two years, maybe.

Q. Does -- to your knowledge, does Victor Fontenot have authority to release inmates from jail when it's filled?

A. No, not that I'm aware of.

Q. Would it surprise you to know that he released

Page 140

an inmate from jail because it was full without judicial approval?

A. It's possible.

Q. Do you believe that Chief Fontenot has properly handled Victor Fontenot's misconduct?

MS. GUNNELS: Object to form.

A. At times, yes. And at times, no.

BY MR. HOBBIE:

Q. When were the times that he did?

A. Well, the time with the vehicle incident -- which I -- I think I was aware now -- it's the mayor that did it or whatever. At any other instances, I don't know because I don't work down there.

Q. Are you aware of any other instances?

A. No.

Q. So it was just the one time, yes?

A. As far as I know on that part of it, yes. The -- the one time, yes, he was in- -- investigated or whatever.

Q. Are you aware of any other instances of misconduct at the Eunice Police Department that Chief Fontenot investigated?

A. That Chief Fontenot himself investigated?

Q. Yes.

A. I -- I wouldn't be aware of -- of things

Page 141

that -- that happen over there. Again, I'm upstairs. They're downstairs. There could be things that -- that happen. I can't -- we're not in the same department.

Q. Are you aware of multiple investigations into Lieutenant Dunn?

A. Yes.

Q. Do you know how many?

A. No. I just see the civil service -- there's a bulletin board in the hallway where when there's a civil service action taking place that's -- by law, they must publish it and place it out there. So periodically, I look at it, and you can see the case and Lieutenant Dunn appealing something or, you know, whatever. But that would be how I would find out most of my stuff, would be just by looking up on the board.

Q. Are you aware of any investigations into Lieutenant Donnie Thibodeaux?

A. Only that Donnie stated one time that he was being investigated, and my phone rang. And I didn't ask him for what reason, so I never did find out.

Q. Do you believe Chief Fontenot permits violation of department policy?

MS. GUNNELS: Object to form.

A. Restate that question, please.

BY MR. HOBBIE:

MAGNA
LEGAL SERVICES

Page 142

Q.  Do you believe Chief Fontenot permits violations of depart- -- department policy?

A.  It's -- it's possible, but I can't say for a certainty because I'm not down there, so I don't know what goes on on a daily basis between he and his officers.  I can only tell you what I hear from time to time because, again, that's not my department.

Q.  Do you believe that Chief Fontenot shields certain personnel from disciplinary action?

A.  From disciplinary action?  I -- I -- I really don't know.

Q.  Do you think Chief Fontenot shields Victor Fontenot from disciplinary action?

A.  I would have to know what he committed or whatever the interaction that I had with the incident, he was disciplined.  To say any other things, like my complaint about the -- the warrant being leaked and stuff like that, I don't think he was disciplined for that.

Q.  So in those instances, do you think that Chief Fontenot shielded Victor from disciplinary action?

A.  Yeah.

Q.  And those instance being the issue with the warrant and the tipping off people?

Page 143

A.  Correct.

Q.  Are you aware of any other employees at the Eunice Police Department that Chief Fontenot has shielded from disciplinary action?

A.  Not that I'm aware of.

Q.  Are you aware of any payroll irregularities at the Eunice Police Department?

A.  Only thing I can tell you is what I read in Lieutenant Dunn's accusations.  I have nothing to do with their payroll.

Q.  Understood.  Did you witness -- strike that.

Did you see any civ- -- civil service board appeal about payroll irregularities at the Eunice Police Department?

A.  It seems like, at one time, there was something that was to be brought up on the agenda, but I can't say when or to what extent.

Q.  Would it surprise you if Victor Fontenot was getting overtime for hours that he didn't actually work?

A.  I don't know his hours of employment.  I don't know what's his scheduled hours.  I -- I don't operate their time sheets, so I couldn't tell you if he was supposed to be working from midnight to 6:00, from 6:00 to midnight, and he wasn't there or whatever.

Page 144

Q.  No, I understand.  Earlier today, though, you testified that sometimes he's off a lot when you're working.  Do you remember that?

A.  That he's off a lot when I'm working?  There's times he's not there.  I mean, I know he went through an illness and stuff, but that -- he wasn't there.

Q.  And would it -- I'm just asking would it surprise you if he were getting overtime for hours that he didn't actually work?

A.  I don't see his time sheets, so it would be hard -- you -- you want me to assume whether it was.  But I don't know what his scheduled time is.

Q.  I understand.

A.  And he doesn't work in the same building as we do.  He -- they are in a building that is across town.

Q.  I understand.  If you don't work more than your required hours, are you entitled to overtime?

MS. GUNNELS:  Object to form.

A.  If you don't work more than your required hours?

BY MR. HOBBIE:

Q.  Right.

A.  Not in our office, no.

Q.  If an officer claimed and was paid overtime but didn't work those hours, would that viol- --

Page 145

violate your policy at the marshal's office?

A.  Yes.

Q.  To your knowledge, would that violate policy at the Eunice Police Department?

A.  If that's in their policy book, which I would say yes.

Q.  Would you be surprised if that were not in the policy book?

A.  I have no idea what's in their policy book because their hours are different than our hours.

Q.  Do you think it's a good policy to pay people for hours that they didn't work?

MS. GUNNELS:  Object to form.

A.  Definitely not.

BY MR. HOBBIE:

Q.  Do you pay people overtime for hours that they didn't work?

A.  No.

Q.  Besides the one crash between Victor Fontenot and Joey Peloquin, are you aware of any other investigations undertaken by Chief Fontenot?

A.  Not to my knowledge.

Q.  Are you aware that the Eunice Police Department often works with confidential informants?

A.  Yes.

MAGNA
LEGAL SERVICES

Page 146

Q.  Are you aware that Victor Fontenot works with confidential informants?

A.  Yes.  They did that in the past.

Q.  Are you aware that Ryan Young works with confidential informants?

A.  I don't hear it that much with Ryan.  I -- I hear it with Victor.

Q.  You said you don't hear it much with Ryan.  Have you heard that he does work with confidential informants at any time?

A.  I'm sure he does.  He's a -- he's a detectives.  I've worked detectives when I was at the police department.  Just about everybody has a CI.

Q.  Do you know a person named Jordan Arnaud?

A.  Male?  Female?

Q.  Male.

A.  Jordan Arnaud?  Name sounds familiar, but I can't exactly tell you because I know a female by that name.

Q.  Do you know if the female is a confidential informant?

A.  Oh, I know she's not.

Q.  Do you know a person named Harrison Arnaud?

A.  Yes.

Q.  What do you know about him?

Page 147

A.  We had dealings with him in our marshal's office.

Q.  What kind of dealings?

A.  It's -- it would be misdemeanors if it was in our court, so it could have been a theft.  It could have been numerous things.  Failure to pay fines, stuff like that.

Q.  Does he go by the nickname Sonny?

A.  Yes.

Q.  All the last names.  There's a lot of Arnauds.

Are you aware that he works -- or worked as an informant for Victor Fontenot?

A.  I had no idea.

Q.  Are you aware that he gave Victor Fontenot a washing machine for free?

A.  No, I sure didn't.

Q.  Are you aware that he gave Victor Fontenot other items of value for free?

A.  No, sir.

Q.  In your opinion, is it improper for someone with Harrison Arnaud's background to give a detective items of value for no charge?

MS. GUNNELS:  Object to form.

A.  Repeat it.

BY MR. HOBBIE:

Page 148

Q.  In your opinion, is it improper for someone with Harrison Arnaud's background to give a detective items of value for no charge?

A.  Yeah, yes.

Q.  Why?

A.  Because during the scope of our work, in my office, if you had a warrant or whatever, had to deal with somebody, you do not -- you do not obtain anything of value from that person or have any transaction with that person.

Q.  Does your office have a policy against accepting gifts?

A.  It's in ethics.  It's an ethics violation of accepting gifts.

Q.  Is that a Louisiana state law?

A.  Yes.  We have to take a course every year, everybody has to within the police department, marshal's office, a bunch of other places.  You have to take an ethics class.

Q.  Sorry, the police department does too?

A.  Yes.

Q.  Okay.  And what happens if you violate the eth- -- ethics rules or laws?

A.  It can be brought to the attention of the ethics board.  You can get one of those nasty letters

Page 149

in the mail, say you have violated an ethics law, and they'll state to you what you have violated.

Q.  To your knowledge, have any of these charges been filed against Victor Fontenot with the ethics board?

A.  Not that I'm aware of.

Q.  Do you know a person named Christopher Mettetal?

A.  How's the spelling on that last name?

Q.  M-e-t-t-e-t-a-l.  Maybe it's "Mettetal."

A.  Met- -- "Mettetal"?  Yeah, I think that's who -- I think we're thinking of the same person.  Yes.

Q.  What do you know about him?

A.  He's been arrested several times.

Q.  By whom?

A.  Both agencies.  Marshal's office and the police department.

Q.  Over what span of time?

A.  Oh, years.  Couple of years, maybe.

Q.  Do you know what he was arrested for?

A.  Again, in our case, it would have to be something misdemeanor.  It could be probation violation.  It could be theft of goods.  It could be a couple of different things.  With their department, they deal with -- with misdemeanors also, but majority

MAGNA
LEGAL SERVICES

Page 150

of the police department is felonies that they deal with.

Q. Are you aware that Christopher Mettetal acts as an informant for Victor Fontenot?

A. Had no idea.

Q. Do you know a person named Kwan Fredericks?

A. Yes.

Q. What do you know about him?

A. We've had him in the past. Kwan had been a person that got in trouble a lot. And I know he had turned his life around, attending church. We spoke, occasionally, on the streets or in the grocery store or whatever. He always came up to me, "Hey, Mr. T., I changed my life." You know, that's -- that's about how I -- I know him.

Q. Do you know around when that was, the life changing?

A. Oh, in the last year.

Q. Are you aware that Kwan Fredericks has alleged misconduct by Victor Fontenot?

A. No, I did not.

Q. Do you know if Kwan Fredericks had worked with Victor Fontenot?

A. No knowledge.

Q. Do you know a person named Keith Tran?

Page 151

A. No.

Q. Okay. Besides Nicholas Cooley and Lieutenant Dunn, have you ever seen Eunice police officers post on social media about local crime?

A. Present or past officers?

Q. Anybody.

A. Yes.

Q. What are some examples of that?

A. You want to know names or -- or substance?

Q. Both.

A. Varden Guillory, Nicholas Cooley basically was bashing police department, the way it was being ran, didn't approve of the chief's running of the -- his department, just complaining.

Q. How about Jeremy Ivory? Have you ever seen any social media posts by him?

A. Yes, sir.

Q. Did they criticize the Eunice Police Department?

A. I wouldn't say they criticize the department. I would -- I -- I would say he's just frustrated and just -- because he's still employed there. If you would be hammering your own department, I think that would be pretty rough. But he's one that -- that works a lot, puts in a lot of hours. And you know, I've seen

Page 152

him put posts, like, you know, "I'm overworked and tired," just basically stuff like that.

Q. Are you surprised that he's still at the department?

MS. GUNNELS: Object to form.

A. No, sir, because he's a good officer.

BY MR. HOBBIE:

Q. Has he ever discussed Chief Fontenot with you?

A. Yes.

Q. Did he ever criticize Chief Fontenot to you?

A. Yes.

Q. What did he say?

A. Just that I -- I wish the chief would understand our side of it, how understaffed and how many hours we got to work and if we could just get more officers to come out during the day -- I mean, during the night for the nightshift instead of everybody going home, if we could -- if we could have extra officers that show up, would make our job a whole lot easier.

Q. Since Jeremy Ivory's social media post, have you spoken to him about his satisfaction with the Eunice Police Department?

A. I haven't seen any negative posts or anything like that. He does stop by our office, but it's just for a visit, cup of coffee, something like that. He

Page 153

doesn't -- he don't say much.

Q. You said earlier that -- just a minute ago, you said that "if he was hammering his own department, I think that would be pretty rough." What do you mean by that?

A. I mean, if he were talking about -- if you were on social media -- if I had my chief deputy on social media, for instance, talking bad about my department, I think that would be -- would be pretty bad because I do have a policy on social media that if, in any kind of way, you defame the office or anything like that, that's grounds, I believe it is, for an investigation or termination.

Q. Are you aware of the First Amendment?

A. Yes.

Q. Are you aware that people have freedom of speech?

A. Oh, boy, I found that out. Yep.

Q. How did you find that out?

A. Listening to other people telling me I got freedom of speech and upon coming in contact for other things.

Q. What other things?

A. Like, you on the street trying to arrest somebody, and you're trying to tell them "Hey, that's

MAGNA
LEGAL SERVICES

Page 154

enough" or whatever.  And "Hey, I got freedom of speech.  I can say what I want."

Q.  If someone in your office made a post on social media, would you make it rough for them?

A.  No.

Q.  What would you do?

A.  Discuss it first.

Q.  If it was something that concerned the public, the person's neighbors, would you discipline them for that?

A.  Depends how far he went into details on his post.

Q.  What about if he warned his neighbors that there were weapons on their street?  Would you punish an officer for that?

A.  If he was stating something that was factual and wasn't directed at the officer or whatever, then no, I would not.

Q.  Are you aware that Lieutenant Dunn made a social media post about alleged gunfire near his residence?

A.  Yes.

Q.  And earlier, you said you believed that Chief Fontenot punishing him for that was evidence of him being targeted.  Do you remember that?

Page 155

A.  Yeah, I think so.

Q.  Did you ever discuss that Facebook post with Chief Fontenot?

A.  No.

Q.  Did you ever discuss Chief Fontenot's investigations into Lieutenant Dunn with Chief Fontenot?

A.  No.

Q.  Do you recall any time that Chief Fontenot punished officers for disobeying his orders?

A.  Could have.  Not my office.

Q.  Do you remember any time?

A.  I would -- I would think he had because there were civil service hearings, so I would think he would have disciplined his officers.

Q.  If you give your deputies an unlawful order, are they expected to follow it?

A.  Not if it's unlawful.

Q.  Would you fire them if they didn't follow an unlawful order?

MS. GUNNELS:  Object to form.

A.  No.  I would have to -- repeat that.

BY MR. HOBBIE:

Q.  Would you fire a deputy who refused to follow an unlawful order?

Page 156

A.  No.  No.

Q.  Do you know someone named A.J. Frank?

A.  Yes, sir.

Q.  How do you know him?

A.  He worked for me, previously.

Q.  Around what time period?

A.  Oh, now we're going way back.  Over ten years ago, I would think.

Q.  Was it at the marshal's office?

A.  Yes, sir.

Q.  What was his position there?

A.  He was a part-time -- part-time deputy marshal.

Q.  When did he stop working for you?

A.  I would have to look back.  I probably don't even have records that far back.  He probably worked for me, I would say, a couple of years, and that would probably have been late '90s, early 2000s, I would guess.

Q.  Are you aware that he worked at the Eunice Police Department?

A.  Yes, sir.

Q.  Do you know if he still works there?

A.  He does not.

Q.  Do you know why he left the Eunice Police

Page 157

Department?

A.  No, sir.

Q.  Do you know anything about A.J. Frank's relationship with Chief Fontenot?

A.  Not really.

Q.  Would it surprise you to hear that A.J. Frank left because he was treated unfairly by Chief Fontenot?

A.  I don't -- I don't know if it would be treated unfairly or not because I know of his background whenever he worked for me, so I don't know what occurred within the police department.

Q.  The question I -- I asked was would you be surprised to hear that A.J. Frank left because Chief Fontenot treated him unfairly?

A.  If that's the way he -- I have no idea, but I think he would.  I will say yeah, I guess so.

Q.  Do you recall hearing any other instances where officers claimed to have been treated unfairly by Chief Fontenot?

A.  There's been so many officers that have come and gone.  I have no idea why they left or not.  No.

Q.  Do you recall, earlier, you testified that it was partially because of Chief Fontenot?

A.  Yes, that some of the officers left.

Q.  Have any former Eunice Police Department

MAGNA
LEGAL SERVICES

Page 158

personnel left the Eunice Police Department and then gone to the marshal's office?

A. Yes.

Q. Who?

A. Robert Johnson, who was my chief deputy. That was prior to the current chiefs being there. That was under previous administration. I believe Joey Peloquin, I believe, also worked with the police department. And I think he went to another agency. And then I hired him, Jack Ardoin.

A lot of my guys come from the police department and vice versa. They jump here and there, and it's usually because of pay or something they don't like or whatever. But I like to get people that are already POST certified so you don't have to send them to the academy again because that takes so long. And so just about all of my people that I have hired in my administration have come from the police department or the sheriff's office.

Q. Did Joey Peloquin tell you anything about misconduct at the Eunice Police Department?

A. We never -- we never discussed anything like that.

Q. Did he ever discuss disagreements with Chief Fontenot?

Page 159

A. No. We didn't -- we didn't talk about that.

Q. How about Jack Ardoin? Did he ever discuss misconduct at the Eunice Police Department?

A. Misconduct?

Q. Yes.

A. He aired grievances that he didn't like working down there for Chief Fontenot.

Q. What were those?

A. That they just didn't get along. That's basically what he said. He was a quiet person.

Q. I believe you said earlier that Jack Ardoin is going back to the Eunice Police Department. Is that correct?

A. Yeah. He's currently employed there.

Q. Do you know why he left your office and went there?

A. He has some issues. His mother was killed by a drunk driver, and it's still very hard for him to believe that his mother is gone. She was also our civil clerk in city court. It was very traumatizing on all of us because she was a friend of mine for over 20 years. And Jack went through a lot. Got him to a psychiatrist. His family was having trouble dealing with it.

And I really think -- he quit on me by text

Page 160

message when I was going on vacation. That was because of a post that he put on -- on Facebook between him and somebody else. And that other person called me, which was an elected official -- called me and said, "I don't appreciate the way your deputy is expressing his opinion. I didn't mean what happened."

And what happened was Deputy Jack was on the roadside fixing a cross where his mother was killed -- tragically killed. And a gentleman came over the railroad tracks that had been working all day, had an alcoholic beverage in his hand, picking it up to wave and he really got upset. And so he made a post about disrespect, something, by an elected official and -- and whatever.

And so I didn't see it that day. I didn't see it until the other person brought it up to my attention. So I -- I contacted -- no. The posts kept coming in. I didn't contact Jack right away. The posts kept coming in from the other party. He'd screenshot them, and he'd send them to me, what their discussions were.

And it was get- -- really getting out of hand. And the other guy, like I said, was an elected official, and he said, "If he wants to play that, then I'm going to start digging into his background." Don't

Page 161

know what he meant by that. But I guess, you know, there are some people that say that everybody has skeletons in their closet, so that's what I took it for.

And so I sent Jack a text. He was working a security detail. I didn't want to disturb him. It came to my attention late that evening because I had several texts back from this elected official saying "Please make this stop." And I didn't want it to cause any problems because they really both from the same town. And Jack has had a hard time dealing with it, and the process of it going to court has been postponed several times. And it's --

Q. What do you mean by "it," sorry?

A. It --

Q. Just for the record.

A. The court proceedings for the DWI vehicular manslaughter --

Q. Okay.

A. -- case had been postponed several times. He's attended every one of them. Him and his mother were very close because my office is on the second floor. City court is on the second floor. So when he worked court, he'd visit with his mom.

But I understand later that they were really

MAGNA
LEGAL SERVICES

Page 162

actually even closer than that and Chief Fontenot was also a friend of his mother as we were all very close to her and over 20 years of spending time with her as a civil clerk, calling to ask about different lawsuits or whatever.

And so make a long story short, I text Jack and ask him, you know, "Would you please just call the guy instead of y'all texting back and forth because, I mean, you're texting.  You're leaving a trail."  And I mean, he's screenshotting everything that's, you know, going back and forth.

And so I called one of his friends, and I asked her because I knew she still talked to Jack -- because Jack was really in a bad place.  Like, I've seen him in my -- I have video cameras in the courtroom and all that.  He goes sit in the courtroom and waits for his mom to get off of work, and she had passed away.  So he's having a very -- and I got him to a psychiatrist, which I think, still today, he's still seeing him.

And so I just asked him, you know, "Could y'all please just -- just call him" or whatever.  And he just -- he got mad on -- on that post and said, "Look, I'm going on vacation tomorrow.  Y'all could just -- y'all just settle it."  And he said, "You'll

Page 163

find my stuff on -- on the -- Chief Peloquin's desk tomorrow," and he quit.

And so we have not spoken.  I tried reaching out to him, calling, texting.  Still care about the kid.  It's a terrible thing that happened to his family.  And he went to work for Chief Fontenot at the police department where he was employed before.  Just seen him the other day, and we just crossed, and it was a "hey."  That was it, and we haven't talked since, so that's...

Q.  Thanks.  You said that Jack claimed to see someone -- strike that.

You said that Jack claimed to see an elected official with a beer can in his hand while driving.  Who was the elected official?

A.  Mark Denette, the mayor in Basile.

Q.  Did you ever investigate that person for driving under the influence?

A.  Who's that?  Mark Denette?

Q.  Right.

A.  I didn't find out till the next -- the next day.  And I mean, it's not even in my jurisdiction.  That's outside -- I mean, he admitted in the text to Jack, "Hey, I made a mistake.  I worked a car show all day.  It was almost 100 degrees.  I picked up a drink."

Page 164

They're -- they're close; they're friends.  And he said I was holding the steering wheel because -- the way the accident happened was a lady came over the railroad tracks and mom was on -- his mom on the other side and landed on top of the vehicle on her side, killed her instantly.

And so he was coming over the railroad tracks holding on to the steering wheel with the drink in his other hand.  It wasn't a beer.  It was some off-brand called -- like a Truly or -- I don't know.  Truly.  I don't know.  And he just -- he didn't mean to do it.  He just picked it up to wave to him, and he said that was the only drink he ever had that day.  He even told that to Jack in -- in the text.

And so it was getting heated back and forth, so I was just trying to calm the storm because both of them are friends with each other.  And then he apologized to Jack more than one time and said he was sorry for what happened.

Q.  If you witnessed a friend drinking while driving, would you pull them over?

A.  If I witnessed a friend?

Q.  -- drinking while driving, would you pull them over?

A.  Yes.

Page 165

Q.  Is that the policy at your department?

A.  I think it's basically just given knowledge, given policy.  I mean, we don't have a policy for everything, but, I mean, if you see somebody with a beer in their hand like that, yes, I would stop them.

Q.  Was that against Louisiana state law?

A.  Yes.  You have an open container.

Q.  You said that Jack, after the tragedy with his mother, was in a dark place, right?

A.  Right.

Q.  He went to a psychiatrist?

A.  Correct.

Q.  Do you have a psychi- -- psychiatric exam in order to be employed at the marshal's office?

A.  Oh, yes, definitely.

Q.  Did Jack pass that exam?

A.  Yes, he did.

Q.  Does the Eunice Police Department have a psychiatric exam to be employed at the Eunice Police Department?

A.  Yes.

Q.  In order to be employed at the police department, you must pass the exam?

A.  Yes.

Q.  So to your knowledge -- strike that.



Page 166

Do you believe that Jack Ardoin passed the psychiatric exam at the Eunice Police Department?

A. That's what I was told.

Q. Is Jack certified to carry weapons?

A. Yep.

MS. GUNNELS: Object to form.

BY MR. HOBBIE:

Q. While he worked for you at the marshal's office was he certified to carry weapons?

A. Yes. At the beginning when the incident occurred, I placed him on light duty at the request of not only myself but his psychiatrist. He gave the psychiatrist -- he signed a waiver where the psychiatrist could tell me anything I wanted to know, which I never asked what they were discussing. I was only trying to find out his state of mind, both in my office -- and I had actually talked to his wife, to make sure how he was. So I put him on desk duty inside the office.

Q. During that time, he was still authorized to -- or certified to carry a weapon?

A. Correct.

Q. When you passed by him the other day, was he carrying weapons?

A. Yes, sir.

Page 167

Q. Was he in Eunice Police Department uniform?

A. Yes, sir.

Q. Has Joey Peloquin said anything negative about Ryan Young?

A. No, because they work together.

Q. Does Joey Peloquin work with Victor Fontenot?

A. On occasion.

Q. Does he say anything negative about Victor Fontenot?

A. He just says that he's careful around him.

Q. Has Jack Ardoin said anything negative about Ryan Young?

A. No. Just that the incident about not shooting our guys because of -- because of one person that he didn't want to qualify but --

Q. Just for the record, "not shooting our guys," you mean the training?

A. I'm sorry. Not shooting our deputies with the marshal's office for training purposes.

Q. Right. I want to talk a little bit more about Lieutenant Dunn. Has he reported misconduct at the Eunice Police Department -- has he reported to you misconduct at the police department?

A. He just talks about how he just feels targeted and there's stuff that goes on at the police

Page 168

department, not really getting into details and says how he's reported it to different agencies to get assistance on it.

Q. Do you know -- strike that.

Did he mention to you the agencies that he's reported to?

A. I might have missed some. But --

THE REPORTER: I'm sorry?

A. I may miss some of the agencies that I'm going to say. I know he's contacted the district attorney's office, St. Landry Parish Sheriff's Office, Louisiana State Police, and possibly the attorney general's office. I may be wrong on one or two. I'm not exact.

BY MR. HOBBIE:

Q. Did he tell you what he told them?

A. No. We didn't get into details of what he told him.

Q. How many times has he discussed misconduct at the police department with you?

A. Three or four occasions, maybe.

Q. When was the most recent?

A. It's been a while. We really haven't talked about anything because I knew he had litigation pending. I really don't want to talk about anything because I had a feeling I was going to end up right

Page 169

where I'm sitting in this chair. It's been -- it's been a while. I know he was on sick leave and whatever else. I mean, we're not one that talks every day or every week or whatever. We're in the same profession of being law enforcement, and so it's here and there that we do speak.

Q. Have you talked with Lieutenant Dunn about Chief Fontenot?

A. About Chief Fontenot? He's talked to me about Chief Fontenot.

Q. Did you ever tell Lieutenant Dunn about a meeting you had or a disagreement that you had with Chief Fontenot?

A. Yes.

Q. What did you tell Lieutenant Dunn?

A. That was the disagreement with the incident occurred on that evening whenever my two deputies from the marshal's office had came out and helped the shift, that the chief and I had a disagreement.

Q. Has anyone else from the Eunice Police Department reported misconduct to you?

A. Directly to me? No.

Q. Have they reported it -- strike that.

Has anyone from the Eunice Police Department reported misconduct to deputies?

MAGNA
LEGAL SERVICES

Page 170

A.  The only one I can say is a former officer.
Q.  Who is that?
A.  Varden Guillory.
Q.  Do you know what he reported?
A.  Just saying that he couldn't work with Chief Fontenot because they didn't get along on certain things and -- and things weren't done correctly.  And I mean, things -- things along that line was what he was referring to.  And I -- I really stayed in my office as much as I can.  I have enough going on in my office without having to see about somebody else's office.
Q.  Besides Victor Fontenot's warrant-related issues, have you ever confronted Chief Fontenot about misconduct at the Eunice Police Department?
A.  No.  I can't tell him how to run his department.  He can't tell me how to run mine.
Q.  But you've had disagreements?
A.  Correct.
Q.  And what were those disagreements about?
A.  Just, like I said, basically on how he ran his department, how I ran mine.  And we're two totally different officers, so we didn't agree with it, kind of spoke about when we used to work together because he and I did work together on the same shift.
Q.  Earlier, you said that you discussed the

Page 171

Eunice Police Department with other law enforcement agencies.  Do you recall that?
A.  Yes, sir.
Q.  Can you remind me which agencies?
A.  Sheriff's depart- -- St. Landry Parish Sheriff's Department and Opelousas Police Department.
Q.  You mentioned that you work with the 40 other -- or approximately 40 other marshal's offices in state?
A.  Yes, sir.
Q.  Have they ever discussed the Eunice Police Department with you?
A.  No, sir.
Q.  When you discussed the Eunice Police Department with the St. Landry Parish Sheriff's Office, who did you talk with?
A.  I talked with both Deputy Chief Eddie Thibodeaux and the sheriff himself.
Q.  What's the name of the sheriff?
A.  Bobby Guidroz.
Q.  Did Sheriff Guidroz -- strike that.
    What did Sheriff Guidroz say about the Eunice Police Department?
A.  Just basically stated that he couldn't work with the police department, and there was times that

Page 172

they were left out of -- of activities that were occurring in -- in Eunice.
    And when they were asked for help, felt that they wasn't needed here because they -- I'm -- I'm saying "here."  I'm talking about in Eunice -- because he would never get a call for assistance.  I guess basically felt left out.  And he said that, you know, he'd get calls of a lot of drugs in Eunice that would go unfounded.  That was basically the extent of our conversation.
Q.  And what about the conversation with Opelousas --
A.  It was --
Q.  -- Police Department?
A.  It was basically the same thing, that they just didn't feel comfortable with working with the Eunice Police Department.  And we really didn't get into why because we were too busy with the operation that was going on.
    And -- and then the murder trial.  We didn't really discuss anything because, like I said, it was different people coming in and coming out.  I didn't -- chief was there.  We did not discuss anything about the Eunice Police Department whatsoever.
Q.  Is it fair to say that the Eunice Police

Page 173

Department's reputation has affected it's ability to work with other law enforcement agencies?
A.  Yes.
Q.  Is it fair to say that the St. Landry Parish Sheriff's Office doesn't work -- sometimes doesn't work with the Eunice Police Department because of their reputation?
A.  Yes.
Q.  Is it fair to say the same with Opelousas Police Department?
A.  Yes.
Q.  In your opinion, is that a bad thing?
A.  Yes.
Q.  Why is that?
A.  Everybody is shorthanded.  We have to work together as in a circle, and that circle has to go all the way around with the limited amount of resources that we all have and the limited amount of people that we do have.  Police department shorthanded, sheriff's department shorthanded, Opelousas P.D. shorthanded, we were shorthanded.
    It's very important that we all work together to accomplish the same goal, and that's the protection of the people that we serve.  And so that's why, recently, we've been having little extra details that



Page 174

was funded by our parish government, which allows us to call outside agencies to come in and assist with patrolling.

And last Tuesday, we did -- we did one where we had 20-something police officers that came in and -- a lot of problem in the drug infested areas, a lot of places that were being buglarized, a lot of places where teens were hanging out past curfew.  So we basically broke up everybody into teams to cover the different areas in Eunice and assist the police department with any calls that they had.  So we had a lot of officers there on -- on that night.

Q.  Have you had any recent disagreements with Chief Fontenot?

A.  He and I have not talked.  We see each other at -- here and there, but no.

Q.  Have you had any recent disagreements with any Eunice Police Department personnel?

A.  No, sir.

Q.  Have you dis- -- have you told Chief Fontenot about your conversations with St. Landry Parish Sheriff's Office?

A.  No.

Q.  Have you told them about the Opelousas P.D. conversations?

Page 175

A.  No, sir.

Q.  Why not?

A.  Because I felt if they had any issues, they should contact the chief directly.

Q.  To your knowledge, have they?

A.  I have no idea.

Q.  Have you made any sug- -- policy suggestions to Chief Fontenot?

A.  I have no idea what his policies are.

Q.  Do you have a set of policies at your office?

A.  Yes, sir.

Q.  Have you ever recommended a policy to Chief Fontenot?

A.  We never discussed it.

Q.  Have you ever recommended corrective action be taken at the Eunice Police Department?

A.  It's his -- it's his department.  I -- I can't.

Q.  What specific disagreements have you had with Chief Fontenot?

A.  As I said earlier, it's -- it's basically the way he runs his office.  I'm just a little different than he is, and so I run mine a little bit different.  Now, our offices are not the same.  They handle just criminal.  I handle civil and criminal, both, because

Page 176

of our jurisdiction exceeding the city limits.  So he operates his as he -- he sees fit, and I operate mine like I see fit.

Q.  Are there any examples of policies or actions that you do differently from Chief Fontenot?

A.  I couldn't think of one right now.

Q.  When you say how he runs his department, do you mean administratively?

A.  Yes.

Q.  Does that also include how officers act on the street?

A.  Could be part of it.  He has more officers than I do.  I have a small department.  He has a larger department.  He has more employees to deal with than what I do.

Q.  You testified earlier that you've heard about misconduct at the Eunice Police Department, right?

A.  If that's what I said.

Q.  Have you discussed Eunice Police Department misconduct with Mayor Fontenot?

A.  I'm sure we've had a conversation, yeah.

Q.  Have you discussed the Eunice Police Department's reputation with Mayor Scott Fontenot?

A.  I would think we have, yeah.

Q.  Do you recall the circumstances of those

Page 177

discussions?

A.  We get into so many discussions, I couldn't -- I couldn't tell you.

Q.  How many discussions have you had about misconduct at the Eunice Police Department?

A.  I don't know what misconduct happens unless I -- like I said, unless I see it on the board or somebody taking something to the civil service board.  That's the only way I can hear that there is any misconduct or actions that have been taken.

Q.  How many times have you discussed the Eunice Police Department's reputation with Mayor Scott Fontenot?

A.  Oh, we've talked about it numerous times.

Q.  Would you say more than ten?

A.  Yeah.

Q.  More than 20?

A.  No.

Q.  Approximately 15?

A.  Let's stick with ten.

Q.  Has Mayor Fontenot told you that he tried to take corrective action?

A.  He did mention something about trying to take some type of action but that his hands are tied because he can't really authorize the chief to do anything.  He

MAGNA
LEGAL SERVICES

Page 178

can just control his budget.

Q.  Was anyone else there when you had these conversations with Mayor Scott Fontenot?

A.  I don't -- I don't think so unless -- unless my chief deputy would have been there once, maybe.  I'm not going to say -- because I -- I don't -- I don't remember.  Most of the time I went there was stuff from my office or whatever to discuss.

Q.  What's the time frame of when these conversations occurred?  Last several years, would you say?

A.  Oh, yeah, last couple of years or what- -- whatever.  Somewhere around -- I'd say the last couple years.

Q.  When is the last time you think you've spoken with him about --

A.  About that?

Q.  -- the Eunice Police Department's reputation?

A.  A month or two ago, maybe.

Q.  Did he mention this lawsuit?

A.  Did he mention this lawsuit?

Q.  Right.

A.  The mayor?

Q.  Yeah.  Did Mayor Scott Fontenot mention this lawsuit?

Page 179

A.  He said that they had some litigation, that I didn't -- that's not my concern.  I'm not asking.

Q.  Did you discuss Lieutenant Dunn with Mayor Scott Fontenot?

A.  The only thing was I heard there was pending litigation and the last thing probably would have been that I got subpoenaed for this deposition.

Q.  Did you discuss anything about the deposition with Mayor Scott Fontenot?

A.  I only read the complaint last week.

Q.  Did you discuss the Eunice Police Department's reputation with any city of Eunice attorney?

A.  Not to my knowledge.

Q.  Did you discuss the Eunice Police Department's reputation with anyone at the district attorney's office?

A.  Probably so, yes.

Q.  Who?

A.  That would probably be Ronnie Whaley.

Q.  Do you know how to spell --

A.  W- --

Q.  -- Ronny's last name?

A.  W-h-a-l-e-y.

Q.  What did you discuss?

A.  He came to me.  That's when he was thinking

Page 180

about running for chief, and he kept asking me if I was running for chief.  At the time, I had numerous people asking me to run, and I was debating whether I was going to run or not, but I'm happy where I'm at.

And he -- he kept asking, kept asking if -- he said that that police department is -- is pretty run down, and that's why I'm thinking about running.  I think I'm going to go sit over there for qualifying, and if nobody qualifies or just the chief qualifies, I'm going to qualify to run against him.  That was probably the stents of our -- our -- I mean, he went on and on.  He did --

Q.  When was this?

A.  He did most of the talking.  I was -- I was really trying to avoid him and trying to leave.

When was that?  Oh, qualifying was, what, three or four weeks ago.  Let's say three or four weeks ago, he discussed that, and then within the last two to three weeks, he discussed that he -- well, right after qualifying, he said that he wouldn't be running for chief, that he would be supporting Kyle LeBeouf for -- he loves to talk politics.  I don't.

I just want to do my job.  And so he was getting into "Well, I hope he -- he changes a few things.  I hope he" -- you know, I -- I didn't listen.

Page 181

I did like my phone was ringing.

Q.  In or around March 2021, did you discuss misconduct at the Eunice Police Department with then district attorney?

A.  2021?  Who was the district attorney at that time?  It's a possibility I did.  I'm just -- that's far for me to remember.

Q.  I understand.  Did you ever have a meeting with Chad Pitre or "Pitre"?

A.  "Pitre"?  No, I never had a meeting.

Q.  Did you ever have a meeting with Lieutenant Dunn and Mayor Scott Fontenot?

A.  Do you know when?

Q.  Around March of 2021.

A.  It's possible, but I don't -- I can't deny, can't say yes.  And I don't remember if it occurred.

Q.  Besides the conversation with Ronnie Whaley, have you ever discussed misconduct at the Eunice Police Department with anyone from the district attorney's office?

A.  I'm tying to see who works there.  Maybe Mr. Rick Leger, possibility.  I'm not sure because Ronnie Whaley works with him.

Q.  And what did you discuss?

A.  It would have been just how the police



MAGNA
LEGAL SERVICES

Page 182

department was downstairs, how it's -- it's time for a change or something like that. It's no more than that, what we discussed.

Q. Did you discuss misconduct at the Eunice Police Department with anyone from the Louisiana State Police?

A. Eric Duplechain -- Captain Eric Duplechain, and I are friends, and we may have chatted on the phone because he had some stuff that was stolen or something happened in Eunice or whatever. And -- and he may have said, "What the hell is going on with that Eunice Police Department?" And we may have had a conversation at that time, but it wasn't an official whatever. That was -- he and I call each other all the time.

Q. Has he ever criticized Chief Fontenot?

A. He has said that the police department needs -- needs to change.

Q. How so?

A. Well, he just felt that some things just wasn't getting done, like not returning phone calls from the detectives working on a case. And you know, he did say, "I know they're understaffed." Just basically stuff like that.

Q. Did you discuss misconduct at the Eunice Police Department with anyone else from the Louisiana

Page 183

State Police?

A. I don't think I know anybody else higher up or whatever from the state police.

Q. Did you discuss misconduct -- excuse me. Did you discuss Eunice Police Department misconduct with anyone at the FBI?

A. Never spoke to anybody.

Q. How about at the attorney general's office?

A. Never spoke to anybody.

Q. Are you aware of any -- strike that. When Lieutenant Dunn reported misconduct to you, did he give you anything?

A. Anything like what?

Q. Did he give you any paperwork?

A. He may have given me a -- or may have shown me the disciplinary action or something.

Q. When you heard about Victor Fontenot's faulty warrants, did you report that to any other law enforcement agencies?

A. At the time, I don't -- I don't remember because it was kind of a city court type thing from where I -- you know, where I work at, so it wasn't really something to deal with another agency or whatever.

Q. Did you discuss Victor Fontenot's misconduct

Page 184

with any other law enforcement agencies?

A. The only one maybe would have been the sheriff's department.

Q. Is that the same conversation we talked about earlier?

A. It could have been a different conversation.

Q. Do you remember the substance of that conversation?

A. It could have been with Deputy James Bergeron maybe.

Q. Can you spell his last name?

A. B-e-r-g-e-r-o-n.

Q. Thanks.

MR. HOBBIE: Are you guys fine with taking, like, a five-minute break?

MS. GUNNELS: Yeah.

MR. HOBBIE: Okay.

THE VIDEOGRAPHER: Off the record at 2:54.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 3:09.

BY MR. HOBBIE:

Q. So I just want to go back to the potential March 2021 meeting that you may have had. Do you

Page 185

recall having a meeting in March of 2021 with someone named Mike Legers, L-e-g-e-r-s?

A. Leger.

Q. Leger.

A. I'm going to get you straight.

Q. He's an assistant district attorney. Do you recall meeting with him in March of the 2021?

A. It's -- it's possible. I mean, I do talk to him. We go to the same church. Outside the church, I do talk to him here and there. As far as having a meeting with him, no. It would have had to be either -- either he calls me or just in general contact somewheres.

Q. Do you recall ever having a meeting with the District Attorney Chad Pitre?

A. No.

Q. Do you recall having a meeting with Lieutenant Dunn and Nootsie Sandler -- Sattler?

A. It's possible, but I don't remember.

Q. Do you recall having a meeting with any of those people about potential crimes being committed at Eunice Police Department?

A. No.

Q. Earlier, I asked if anyone approached you about Victor Fontenot allegedly asking them to falsify

MAGNA
LEGAL SERVICES

Page 186

a statement in a case. Do you remember I asked you about that?

A. Yes.

Q. Do you have any recollection of that?

A. No.

Q. Do you know of someone named Brianna Sam?

A. The name kind of sounds fam- -- familiar, but I haven't -- I don't remember any contact with her.

Q. If I told you that she's the person who approached you, would that help refresh your memory?

A. Could be. I get approached every single day and not -- I don't know people's names, necessarily, unless they give them to me.

Q. Do people approach you often about Eunice Police Department employees asking them to falsify a statement?

A. There's people approaching me, you ask about -- you're talking about more than one person? You can repeat the question.

Q. Is it ordinary for someone to approach you about the Eunice Police Department employees asking them to falsify a statement?

A. It can happen, yes. It's --

Q. Has it happened more than once?

A. It's -- it's possible. I mean, I've been in

Page 187

the marshal's office for so long. It's -- it's possible.

Q. Is it common?

A. Is it common? No. It -- it -- it can happen because they approach me about everything. So from not being happy with somebody in my office to their office, the sheriff's department office. I just get contacted by so many people, it's -- I'm involved in the community a lot, so I am pretty well known because we're a small city.

And so I do a lot of community projects and stuff, so I do get a lot of calls. And unfortunately, my number is now public because somebody decided that -- I helped them with a dog complaint, and so somebody else had a dog complaint, so she posted my phone number on social media. So I'm sure a lot of people have stored my number now.

Q. Who posted your number because of a dog complaint?

A. It might have been an Amiee Babineaux, maybe. And she also posted the mayor's.

Q. If a member of the public told you that Victor Fontenot asked that person to falsify a statement, what would you do?

A. I would probably tell them that it depends who

Page 188

he falsified a statement to. My normal thing is when somebody comes and complains about an officer not following up on a report is I always refer them to the chief because that's -- that's his department just like he refers people to my office when it has something to do with one of my guys.

Q. To your knowledge, has the chief ever investigated any of those instances?

A. I have no idea.

Q. Earlier, you said that other law enforcement agencies are aware of Chief Fontenot's reputation and the reputation of the Eunice Police Department, right?

A. If that's what I said.

Q. Are you aware of any criminal investigation into Randy Fontenot?

A. I've heard rumors about it from long time ago to now.

Q. What have you heard?

A. Oh, started with Varden Guillory stating that some indictments against the chief were coming down, which never happened. And then Lieutenant Dunn stating that there was some stuff that would be coming down against the chief again. That's probably the ones that I've heard it from.

Q. Did they tell you any specifics?

Page 189

A. I don't ask. I have too much on my plate to be asking about other departments.

Q. Have you asked any law enforcement agencies about potential criminal investigations into Randy Fontenot?

A. Nope.

Q. Have you ever heard of -- strike that. Are you aware of any criminal investigation into Victor Fontenot?

A. Any criminal active investigation?

Q. Or past?

A. No, I'm not -- I'm not aware.

Q. Are you aware of any criminal investigations, present or past, into Lieutenant Ryan Young?

A. No.

Q. Are you aware of any investigations into alleged misconduct at the Eunice Police Department?

A. Not besides what is going on here.

Q. Thanks.

MR. HOBBIE: I have no further questions.

MS. GUNNELS: Kearney?

EXAMINATION

BY MR. LOUGHLIN:

Q. You mentioned the Facebook post by Mr. Dunn

MAGNA
LEGAL SERVICES

Page 190

about crime in his -- in his neighborhood or near his house?

A. Yes, sir.

Q. That's near the KC Hall, too, right?

A. Yes, sir.

Q. Did you see that post at or shortly after the time Dunn made it?

A. Yes, I did.

Q. Okay. Are you a Facebook friend of -- of Mr. Dunn?

A. Yeah, I think I am.

Q. Okay. What's the -- the reputation of the KC Hall in terms of criminal activity at it or around it?

A. I don't know the whole thing. It's rented on occasions. I don't think really that often. Sometimes people rent it under false pretenses of what it's actually supposed to be rented for. Up until that time, nothing really because I know the people that rent out the building, and they're very reputable about who they rent the building out to.

Q. Who are "they"? Who are those people?

A. That would be Chip Thibodeaux with -- I think it's Bayou State Homes, he may own or whatever. That's who has it.

Page 191

Q. All right. Is that who owns the KC Hall?

A. Yes, sir.

Q. Bayou State Homes?

A. Yeah -- well, yeah. Well, he -- Chip Thib- -- Thibodeaux, I think, owns Bayou State Homes, and that's -- it's rent -- you got to call Bayou State Homes to be able to rent the facility.

Q. It's -- who else has Bayou State Homes? It's not just Thibodeaux, is it?

A. I couldn't tell you.

Q. Okay.

A. I called to rent it once, and that's who I called.

Q. Okay. Do you know anything about the event that was happening on this night that -- that Dunn complained about?

A. No, sir.

Q. On social -- on the marshal social media policy, you men- -- you talked about Jack Ardoin posting on Facebook, right?

A. Correct.

Q. Did his post violate your policy, about the --

A. No.

Q. -- about the mayor --

A. No. That --

Page 192

Q. -- with -- with the beverage?

A. He -- he did that on his own. He did that after-hours. He didn't put a name in there. He just put an elected official. It was only bought up to my attention by that elected official, Mr. Mark Denette, and it didn't stop. They just -- they were going back and forth, and he -- he was getting angry because there were some ugly things that were being said back and forth.

And again, we're a small community where Jack is from and where the mayor is from, is in Basile, Louisiana, which is -- I don't know what their population is. It's very small. In the 2,000 people, I would guess. And so it was really -- it was really bad to see them two go at it.

Plus, as the mayor indicated to me, it was election time for him and for him to be badmouthed and whatever -- and I did explain to him -- I said, "He did not mention your name." He said, "No. But he said this post is going to make people ask questions. And eventually, it's going to get around that it was me. I just want to stop it. I apologized to him. I just want -- I just want it to stop."

Q. You mentioned a couple of ways that Ardoin's post didn't violate your social media policy. What is

Page 193

your policy, the marshal's policy, for social media?

A. Without having it in front of me, I'm going to have to --

Q. Give me -- give me the gist.

A. I'm going to give part of it.

Q. Give me -- give me the -- give me the highlights of it.

A. In it, you cannot discuss any ongoing investigations, anything that would have happened inside our office during business hours that would be detrimental to a case or whatever, if we spoke about a murder case or whatever, anything in -- in -- to that -- to that point.

Q. Does your policy make a distinction between a -- a deputy or an employee speaking in his employment capacity versus his private capacity?

A. I don't think so.

Q. Does -- does your policy make a distinction in terms of the subject matter of the post, whether it's a marshal's business or whether it's about a -- a personal issue?

A. No. That's more of a verbal thing that we have come to an understanding but will be -- will be put in place.

Q. How long is -- has the marshal's office had a

MAGNA
LEGAL SERVICES

Page 194

social media policy?

A.  Two, three years.  Three, four years, something -- something like that.

Q.  What's your role -- what was your role in -- in putting together the policy?

A.  I wanted to make sure that -- you know, I know other departments were putting together policies.  I wanted to make sure that no one was violating the policies because there's a lot of confidential information that is in our office that we don't want the public to get ahold of, so that's why it was basically put into there.

Q.  Did you write the policy yourself or put it together yourself?

A.  Probably myself and the -- the chief deputy, I would think.

Q.  Okay.  Are you, as the marshal, bound to the policy, the social media policy?

A.  Yes.

Q.  So you and everyone under you is -- is required to follow your social media policy?

A.  Right.

Q.  Is it posted publicly somewhere, the -- your policy?

A.  No.

Page 195

Q.  You talked a little bit about First Amendment and -- and the freedom of the speech.

A.  Right.

Q.  You're -- you're certainly acquainted with that, those --

A.  Right.

Q.  -- concepts?

Did you do anything to ensure that your social media policy comports with or is consistent with the freedom of speech protected by the -- the First Amendment?

A.  We tried to make sure that we wasn't violating anybody's rights.

Q.  All right.  And as marshal, you understand that -- that your subordinates have the right to -- to free speech?

A.  Oh, definitely.

Q.  And it can be constrained under certain circumstances but not others, right?

A.  Oh, definitely.

Q.  And you -- I take it you expect all your deputies to -- to know that, at least to a degree, right?

A.  Correct.

Q.  Do you know whether Chief Fontenot is familiar

Page 196

with the -- the interplay between restrictions that he can put on social media versus the -- the right to free speech of his -- his officers?

A.  I have no --

MS. GUNNELS:  Object to form.

A.  I have no idea.

BY MR. LOUGHLIN:

Q.  Would you expect him to know that?

A.  I would guess, if he has a policy in place for it.

Q.  Well -- or -- or a policy that governs speech on social media at all, right?

A.  (Witness nods head.)

Q.  Is there someone that you, as -- as marshal, consult for free-speech issues, constitutional issues, some -- some legal resource you use, either a person or a -- a database?

A.  Usually, I -- I call up one of our, I guess you could say, assistant marshals in Shreveport, Louisiana.  He's kept up to date with every -- they are a big department, and so they're up to date with all the laws and everything pertaining with new laws that come in.  And so he pretty much guides a -- a majority of our marshals on any laws, any questions that we have, any house bills that are pending, whatever.  He's

Page 197

just our go-to guy.

Q.  And who is that?

A.  Carl Richard in Shreveport -- Bossier's -- Shreveport marshal's office.

Q.  Okay.  Do you recall whether you consulted him about your social media policy?

A.  No, I couldn't recall.

Q.  Okay.  Is he known by others in the state as -- as -- as someone who's knowledgeable?

A.  Oh, yes.

Q.  It's not just -- it's not just your office he consults --

A.  Oh, no.  A -- a lot of the offices call on their office because, like I said, they're one of the biggest marshal's offices in the state.  So it helps out that we have someone to go to, to be able to answer our questions.  If not, he'll research it, and he'll get back to us.  I recommend other marshal's office to him also.

Q.  How long have you -- have you consulted Carl Richard on -- on these types of matters?

A.  I've known Carl ever since I became marshal, probably, so 19, 20 years, I would guess.

Q.  And for that 19 to 20 years, he's been -- he's been somebody you knew was --

**MAGNA**
LEGAL SERVICES

Page 198

A.  Oh, def- --

Q.  -- could provide reliable information --

A.  Definitely.

Q.  -- on legal questions?

A.  Yes, sir.

Q.  Including free speech of your employees?

A.  Yes, sir.

MS. LOVE:  That's all I have.  Thank you.

EXAMINATION

BY MS. GUNNELS:

Q.  Okay.  Mr. Darbonne --

A.  Let me turn to you.

Q.  -- I introduced myself this morning.  But again, my name is a Molly Gunnels, the law firm of Kean Miller, and we represent all defendants in this case.

So I have some follow-up questions on some things that counsel previously asked you about.  I will try to be brief.  I may ask you to repeat something just to confirm that's what you said and then ask another question about it.  But like I said, I will try to be brief.  Let's see where we want to start.

So going back to talking about Lieutenant Dunn, how long have you known him?

Page 199

A.  I actually DJed his wedding.

Q.  You DJed his wedding?

A.  Yes.  I don't know how many years he's been employed by the police department.  Probably since his -- I'd be taking a wild guess.  I don't know how long he's been there.  Ten years, twelve years, whatever, something into that amount of time, I would think.

Q.  How did you meet him?

A.  I would think whenever he became a police officer.

Q.  And what is your relationship with him like right now?

A.  We're friends.

Q.  How often do y'all speak to each other?

A.  Until recently, it had been two, three, four months, I guess, something like that.

Q.  Okay.  So you spoke to him recently; is that correct?

A.  I spoke to him when he called me for my address.  He needed my mailing address.

Q.  Okay.  Do you remember why?

A.  I didn't ask him, and I should have asked him.  No.  He -- he did call me and ask me for my address, and he said, "You will be getting something."  I

Page 200

thought an invitation for something.  I wasn't expecting a (mimics sound) knock on the door.

Q.  So before he called to ask you for your address, you said it had been two, three, or four months since you had spoken?

A.  Right.

Q.  What -- when you do speak, what kinds of things do you talk about?

A.  Just different things.  It could be from a case, somebody we're looking for, or he's complaining about how things are at the police department.  That's probably basically it.  We never have a long conversation, never.

Q.  Do you ever text each other?

A.  Do we ever text each other?  Yeah, yeah.

Q.  Do you know how often?

A.  Not that often.

Q.  Okay.  Do you ever spend time together socially outside of law enforcement activities?

A.  You mean somewheres else?

Q.  Right.

A.  No.

Q.  You ever been to dinner at his house or --

A.  No.

Q.  -- anything like that?

Page 201

A.  Nope.  We don't hang around together out of law enforcement.

Q.  So you said sometimes Lieutenant Dunn complains to you about stuff going on at the police department --

A.  Uh-huh.

Q.  -- is that right?

Do you remember about how long he's been complaining to you about stuff like that?

A.  Whenever the -- maybe when the K9 dog got taken away from him --

Q.  Uh-huh.

A.  -- it might have been around that time.  I don't remember if it was before that or not.  But I know definitely the K9 dog being taken away from him.  Like I said, I don't know if it's -- it's around that time or so.

Q.  Okay.  Were you -- well, let me backtrack.

You mentioned that Dunn has had a few appeal hearings before the civil service board that you're aware of; is that right?

A.  Correct.

Q.  Do you remember what those were about or what any specific one was about?

A.  Not really.  I see them on the board and just

MAGNA
LEGAL SERVICES

Page 202

read them. I may have attended one. I typically stop by, not just his but fire department or something else and stop by just to see what's going on in the civil service world being we're not civil service in our office.

Q. Uh-huh. But you don't remember specifically --

A. No.

Q. -- what the appeal hearing that you attended was about?

A. No, I sure don't.

Q. Were you ever subpoenaed as a witness for one of Dunn's appeal hearings?

A. I think I was.

Q. Do you remember what that appeal hearing was about?

A. No, because we also -- my office is in charge of delivering subpoenas.

Q. Uh-huh.

A. So we deliver so many subpoenas that I wouldn't remember exactly for which one it was, but I don't -- I didn't testify to anything. I don't know if it was dropped. I don't remember what the outcome was. But I never even -- I didn't testify.

Q. Do you remember what the testimony you were

Page 203

going to give was?

A. No, I sure don't.

Q. Do you remember why -- well, let me backtrack. Has -- did he ask you to be a witness for him?

A. No. I don't volunteer to be a witness for nobody. I learned that.

Q. So did you and Lieutenant Dunn ever speak about what you were going to say --

A. No.

Q. -- at the hearing?

A. Nope.

Q. Okay. And since you don't remember what the hearing was about, I'm assuming you wouldn't be able to remember what you would have said had you testified. Is that --

A. That's correct.

MR. LOUGHLIN: Object to form.

A. I don't know.

BY MS. GUNNELS:

Q. Okay. Did you ever tell anyone that you would assist in determining whether city actions violated civil service law?

A. I don't deal with civil service law.

Q. Okay.

A. I mean, somebody could have asked me, and I

Page 204

would have probably referred them to the -- Mr. Keith Vidrine, who is the chairperson or whatever they call him, whoever is the head of civil service. We're -- we're -- we're not civil service, so I don't have that. But whoever was in charge of civil service, I normally -- when they ask a question -- I don't know anything about civil service -- I usually recommend them to the civil service person.

Q. Okay. So in -- in connection with this hearing, did you ever say that you could testify to whether an action taken by the police department was made in good faith or not?

MR. HOBBIE: Object to form.

MS. GUNNELS: What's your objection?

MR. HOBBIE: I don't have to tell you my objection, but --

MS. GUNNELS: Well, it would help me rephrase my question.

MR. HOBBIE: -- not only is it confusing; it's a compound question.

MS. GUNNELS: Okay.

BY MS. GUNNELS:

Q. So just to retrack, you don't remember telling anyone that you would testify on behalf of Lieutenant Dunn whether or not something the city did

Page 205

was in good faith or not; is that correct?

A. That's correct.

Q. Okay. So to touch back on something coun- -- counsel mentioned earlier, you said that you -- you don't ever remember, in about March of 2021, having a meeting with either Chad Pitre, Mike Leger, or Nootsie Sattler; is that right?

A. That's correct.

Q. So is it safe to assume that you would also not remember having a meeting in March of 2021 with Lieutenant Dunn, Chad Pitre, Mike Leger, and Nootsie Sattler all at once?

A. I'm not going to say I -- it didn't happen. I just don't remember -- I don't want to say yes or no to that question because I just don't remember because -- you're saying that was in -- when?

Q. I'm asking you. But it would have been in March of 2021.

A. I don't remember.

Q. Okay. Going back to another thing that happened in March of 2021, that was when your deputies called you seeking overtime to work with EPD on a shift, right?

A. Yes, ma'am.

Q. Had an incident like that ever happened before

Page 206

where your deputies were working overtime to help cover a police department shift?

A.  We come out a lot --

Q.  Uh-huh.

A.  -- not even called.  We've come out to numerous shootings just recently, knowing that the shift is shorthanded, not just Lieutenant Dunn's but any other shift that has come up short.  I have come out a couple of times myself, and the chief could attest to that, in some shorts, flip-flops, and whatever.

Q.  Uh-huh.

A.  And it's because I care what happens to these officers.  I know that sometimes they're shorthanded; there's only one person.  There's a shooting -- and there's actually one that I heard from my own house.  And I ran, grabbed the radio, and heard where the shooting was and went.

And first officer on the scene was by herself until another unit arrived, and Chief Fontenot later showed up.  I think they had to call maybe a couple others.  And my -- another one of my deputies showed up because I called them.  I said, "They're going to need help out here."

And so I stayed until I could help them.  I

Page 207

walked with Chief Fontenot at the crime scene.  And then I knew I wasn't needed, and I left.  And I think Lieutenant Young asked my chief deputy if he could stay for a little while to help them maybe gather evidence or whatever.  We just there to help.

Q.  When you show up to help, is that typically within your working hours, like Monday to Friday, 8:00 to 5:00?

A.  No.  It can be after-hours.

Q.  Okay.  But when -- when you're staying to help out, does that overtime have to be approved by someone?

A.  Myself.

Q.  Okay.  So do you know if Chief Fontenot was aware of the staffing situation on that night in March where your deputies were covering a shift?

A.  Did I know beforehand, you're saying?

Q.  Do you know if he was aware --

A.  No.

Q.  -- of the staffing situation?

A.  No.

Q.  So you don't know one way or the other?

A.  No.

Q.  Okay.

MR. HOBBIE:  Object to form.

BY MS. GUNNELS:

Page 208

Q.  And do you -- do you think it would have been appropriate for you to call Chief Fontenot and let him know what was going on?

A.  Well, I mean, that is his office, so I would imagine his officers would have called him to verify that, and so that's why I did not call him.  I called the mayor because we're on a limited budget as far as overtime, and I wanted to clear it to make sure that it was okay because I would have two people working overtime later on during the night right -- not just right then and there because they had, I think, two people working: Lieutenant Dunn and that rookie that I spoke about earlier.

So they waited a while.  Then they -- they had to get the okay from me, and I had to finish broadcasting the softball game before I even returned the calls.

Q.  Uh-huh.

A.  So I figured the chief knew because that's his -- his department.

Q.  Yeah.  So just to backtrack, you're saying that you didn't call him about the situation because you figured he already knew?

A.  Yes, ma'am.

Q.  And you said your deputies contacted Chief

Page 209

Deputy Peloquin who then contacted you about the situation, right?

A.  No.  Chief Peloquin contacted me.

Q.  Okay.

A.  He was made aware -- I don't know -- either he was made aware or he -- and I think that was Jack Ardoin, I believe, was the -- I think was the other deputy.

Q.  So Jack Ardoin was working for you as --

A.  At the time.

Q.  -- a deputy at the time?

A.  That's correct.

Q.  Do you know how he became aware of the situation?

A.  I wasn't around that afternoon, so I have no idea how they became aware of them being shorthanded.

Q.  So after you called the mayor and got the overtime --

A.  Uh-huh.

Q.  -- approved, did you ever get any other updates from Lieutenant Dunn about the staffing situation?

A.  No.  It was the end of my -- it was the end of my conversation.  We had a conversation afterward -- well, let's see.  The chief deputy called me.  I was

MAGNA
LEGAL SERVICES

Page 210

doing the broadcast.  When I finished, I had a missed call from Lieutenant Dunn, and he said, "Hey, I understand you have two deputies that want to come out and help.  Is that true?"

And I said, "Yes."

He said, "Because I'm leaving at 11:00."

I said, "Well, they'll be there before then to -- to help y'all out."  And that's how it went.  And I didn't talk to Lieutenant Dunn again.

Q.  So Lieutenant Dunn never told you that a Sergeant Robert Brickley was coming in that night?

A.  We didn't talk long enough on the phone to even have that discussion.  Only discussion we had was "Hey, your guys volunteered to come out.  Is that okay?"  That was -- yeah, because I was busy trying to load up my stuff.

Q.  Well, what I'm wondering was, was there another call that Lieutenant Dunn made to you later telling you that someone else was going to come in with EPD?

A.  I don't -- I don't remember that.

Q.  Okay.  I want to talk a little bit about the Facebook post that you made.  Can you just tell me, again, why you made a Facebook post about that issue?

A.  It -- it may have had something else on there.

Page 211

I don't know if I was responding to it or I just put it on there.  Because it made me angry that this poor rookie was out there by himself and that two of my guys volunteered to go to work when I felt that that should have been taken care of beforehand where my deputies shouldn't have had to want to go out and help because they -- they had a full staff.

Q.  And who are you angry at?

A.  Who was I angry at?

Q.  Yeah.

A.  I was angry at the chief.

Q.  And you were angry at him even though, as you testified earlier, you don't know if he was aware of the staffing situation --

A.  That's correct.

Q.  -- or not?

A.  That's correct.

Q.  As we sit here today, do you feel like it was appropriate to post what you posted on Facebook?

A.  At the time, I was angry.  But if I had to do it, I wouldn't do it again.

THE REPORTER:  I'm sorry.  Can you repeat your answer?

A.  I said if I had to do all over again, I wouldn't do it.

Page 212

BY MS. GUNNELS:

Q.  If someone had made a similar Facebook post about you, would you have been upset?

MR. HOBBIE:  Object to form.

A.  No.  If it was true, I wouldn't have been upset.

BY MS. GUNNELS:

Q.  You said if it was true, you would not have been upset?

A.  Right.

Q.  Okay.  You said that you think that Eunice Police Department is understaffed; is that right?

A.  Yes, ma'am.

Q.  And you also said that you think the St. Landry Parish Sheriff's Office is understaffed?

A.  Yes, ma'am.

Q.  And did you also say that the city marshal's office is understaffed?

A.  Yes, ma'am.

Q.  Okay.  So this problem of low staffing is not unique to Eunice Police Department, then, is it?

A.  No.  Nationwide.

Q.  You went through a few individuals that work for EPD that have come to you and aired grievances about Chief Fontenot, correct?

Page 213

A.  Yes, ma'am.

Q.  Do you know if any of your deputies have ever gone to Chief Fontenot to air grievances about you?

A.  It's possible.  I don't know of any, but yes, it's possible.

Q.  And do you feel like just because a deputy might have a grievance to air, does that necessarily mean you did something wrong?

A.  No.

Q.  I want to ask about the -- the conversation you had with Judge Terry Hoychick.  Do you remember talking about that earlier?

A.  Yes, ma'am.

Q.  And my understanding was this conversation was -- Judge Hoychick was -- said he had some concerns about some factual information and a warrant submitted by Victor Fontenot.

MR. HOBBIE:  Objection --

BY MS. GUNNELS:

Q.  Do I have that right?

MR. HOBBIE:  -- misstates testimony.

A.  Yes.

BY MS. GUNNELS:

Q.  Is that what you said?

A.  Yes.

MAGNA
LEGAL SERVICES

Page 214

Q.  Okay.  How did you come to have that conversation with Judge Hoychick?

A.  We were talking about maybe warrants or search warrants or something because I know the judge is the one that signs the -- the search warrants for the -- probable cause for the search warrant.

And so we had that talk, and he said something about, "Yeah, I make sure I get my -- make sure all the facts are true the next time before I sign a search warrant."  And he said because Victor Fontenot either didn't put all the facts in there or whatever in that search warrant.  I couldn't tell you who it was about or anything like that.

Q.  So when he was talking about "next time I get a search warrant," was he talking about any warrant from anyone, he was going --

A.  He was talking about Victor.

Q.  -- to make sure that facts are true or --

A.  He was talking about Victor's --

Q.  Okay.

A.  -- search warrant.

Q.  That was my next question.  So he was referring to "next time I get a warrant from Victor"?

A.  Victor.  Yes, ma'am.

Q.  Okay.  Do you know where you were when you had

Page 215

this conversation?

A.  Judge's office.

Q.  Judge's office.  Do you know if Judge Hoychick ever expressed those concerns to Chief Fontenot about Victor's warrants?

A.  I don't know.  I know they have a lot of conversations of -- they're in a prayer group together and stuff like that.  I know chief talks to the judge a lot.  I -- I wouldn't know that.

Q.  So another thing we talked about was certain law enforcement agencies expressing concerns about working with EPD; is that correct?

A.  Yes, ma'am.

Q.  And those agencies include the St. Landry Parish Sheriff's Office, right?

A.  Yes, ma'am.

Q.  And the Opelousas Police Department?

A.  Yes, ma'am.

Q.  Are you aware of any specific situation where the -- one -- either of those agencies declined to work with EPD?

A.  No.  Just there was one that made a comment that when they came to assist the police department, that they were hand -- handed packets, like to go do warrants and stuff, and that they were just here for

Page 216

criminal patrol --

Q.  Uh-huh.

A.  -- and so that they -- they didn't ask Victor about because they wasn't comfortable because they thought they were just coming for criminal patrol.  And so I think they did ask Victor about that, and he said, "Well, if y'all come across these guys, these are people that are wanted."

Q.  Okay.  I'm a little confused.

So what law enforcement agency was this?

A.  Sheriff's department.

Q.  The sheriff's department.  And they were coming in to Eunice to help EPD, right?

A.  Correct.  There was numerous agencies that came in.  Just like what we finished doing --

Q.  Uh-huh.

A.  -- they did one also where he got people from other police departments in St. Landry Parish to come in and assist them on a criminal patrol.  Our St. Landry Parish government has given money to the chief, to myself, to other chiefs in the parish, to other marshals in the parish to help each other out on patrolling because everybody has the same situation: drugs, shootings, whatever.  So that's why they had their operation, and then we did one the other night.

Page 217

Q.  So the St. Landry Parish Sheriff's Office did come and work with EPD in that instance?

A.  In one.  In one of them.  They said they wasn't called out for the other one.

Q.  Okay.  So when you say they weren't called out, that means that Eunice Police Department did not ask them for help in that situation?

A.  Correct.

Q.  So then that would not be an example of the sheriff's office not -- choosing not to work with EPD, then; is that correct?

MR. HOBBIE:  Object to form.

A.  Correct.

BY MS. GUNNELS:

Q.  Okay.  Are you aware of a situation a few weeks ago that had deputies from the sheriff's office, Opelousas P.D., and other agencies working on a Eunice Police Department detail?

A.  Yes.

Q.  Is that what we were just talking about?

A.  Yes.

Q.  Okay.  I think you also said that the sheriff expressed that Chief Fontenot didn't always ask him for help.  Is that accurate?

A.  Right.

MAGNA
LEGAL SERVICES

Page 218

Q.  Do you know if Chief Fontenot does call the sheriff's office for help?

A.  No, ma'am, I do not know.

Q.  So he may and you're just not aware of it?

A.  That's correct.  I don't know the conversations that they have.

Q.  Okay.  Can you tell me a little bit more about what A.J. Frank's employment was like at your department -- or your -- your office?

A.  I don't think we have a tablet in here that big but --

Q.  You can be --

A.  -- had a lot of -- had a lot of complaints on Mr. A.J. Frank.

Q.  Like what?

A.  Over-aggressive, the way he spoke to people, the way he handled himself.  I guess that was the majority of the complaints that were lodged against him.  But I had numerous.

Q.  Were those complaints mostly from citizens?

A.  Yes.

Q.  Did he get complaints from his coworkers?

A.  His coworkers, which at that time in -- A.J. was only working for me part time.  He was not a full-time deputy.  So he only came in twice a week,

Page 219

maybe, because he was employed somewheres else.  I don't remember if it was the police department or not.  He was employed with another agency, I think, at the time that he came work with our department.

Q.  Do you remember about how many complaints you got from citizens about Mr. Franks?

A.  Oh, 10, 12, 15.

Q.  Do you remember in what time period?

A.  It was over however time he worked for me, which could have been a year to two years, maybe.

Q.  And how did you handle those complaints?

A.  A.J. was pretty smart.  He carried a recorder with him, a tape recorder.  So we didn't have body cams, so he kept the recorder with him.  So when they would file their complaints, I'd make A.J. come in and say, "Look, these people came in" or "they called in and they said this happened."

"Boss, this is what happened."  He'd put the recorder down.  And, say, on a few occasions of the complaints, the people wanted to -- to talk to him.  So I set up both of them in my office, and we came in and played the recording.  They got up and left.

Q.  So did you, just personally by what you knew, feel like there was any merit to any of the complaints that A.J. --

Page 220

A.  No, because nobody ever wanted to follow up on it.

Q.  Okay.  Interesting.

So how did -- and I apologize if you covered this earlier.  How did his employment with your office end?

A.  I think he left to go work at another agency.

Q.  Okay.

A.  He may have left Eunice totally.  I don't have -- I don't remember the sequential order of how it -- it happened or the time it was.

Q.  Uh-huh.

A.  It -- it's -- it's been quite a while.

Q.  So did you say, earlier, that the first time you read the -- Lieutenant Dunn's complaint in this lawsuit was last week?

A.  I think it was last -- let see.  Last week or the week before.  Within the last two weeks.

Q.  And why did you read it?

A.  Because my secretary had it on her computer.

Q.  And you were just interested?

A.  She says, "I'm -- I'm printing this out.  This is -- this is what Lieutenant Dunn is -- is alleging."  So that's how I got -- that's how I got it.

Q.  Do you remember when you first heard that

Page 221

Lieutenant Dunn had filed a lawsuit against the city and Chief Fontenot?

A.  I'm sorry.  What's that?

Q.  Do you remember when you first heard about Dunn's lawsuit?

A.  I had heard that one was filed but never -- just like everything you hear -- this one is going to be sued, that one is going to be sued -- you take it with a grain of salt, you know.  And I didn't -- I didn't have -- I -- I never heard anybody say "I got subpoenaed" or -- or whatever, you know.

There's been other officers in the past that have said, you know, "such and such is going to happen" and, you know, it doesn't happen.  So I had heard months ago, maybe, that supposedly he had filed some type of lawsuit or something.

Q.  When you read the complaint, were you familiar with the events that were described in it?

A.  I skimmed through it.  I didn't read everything to the fullest, I'll be honest.  It was 31 pages.  I had been working a lot, been working a lot of day and night and just didn't have time to look through it.

Q.  But when you skimmed it, did your eye happen to catch any events that you were familiar with?



56 (Pages 218 to 221)

Page 222

A.   There was the one -- the incident with the -- when I had to send my deputies that night; that one caught.  And then another one in there, something about a comment that was made within -- was made to one of my employees or whatever in my office.  And that employee doesn't even work in my office anymore, so I have no idea what was even said back then, which I think at the time was Jack Ardoin, maybe.

Q.   Okay.  Who all did you talk to about your deposition before you came here today?

A.   Well, my secretary knew -- well, my girlfriend knew because it was delivered to my house.  My staff.  Probably a couple of friends or something like that.

Q.   Did you ever speak to attorneys representing Lieutenant Dunn about your deposition?

A.   Only time I spoke to them was whenever they sent me texts to be here or whatever because we had to reschedule or whatever.

Q.   So you communicated with Lieutenant Dunn's attorneys about logistics of your deposition?

A.   Yes, that -- that I have on my phone.

Q.   Did you speak to them about anything other than the logistics of your deposition?

A.   No.

Q.   So nothing substantive to Lieutenant Dunn's

Page 223

lawsuit, then; is that correct?

A.   I had no reason to talk to them.

Q.   Did you ever provide Lieutenant Dunn or his attorneys documents related to this lawsuit?

A.   I wouldn't have any because, again, it's not my department.

Q.   Did they -- did Mr. -- excuse me.

Did Lieutenant Dunn or his attorneys ever give you any documents to review related to the lawsuit?

A.   The only thing I read was the document that I've already stated.  That's the only document.

Q.   Okay.  Have you ever been the subject of any internal complaints in your law enforcement career?

A.   Against me?

Q.   Yeah.

A.   By?

Q.   Let's start with internal complaints.  Has an internal complaint ever been filed against you?

A.   Not that I'm aware of.

Q.   What about a citizen complaint?

A.   A citizen complaint?  (Witness shakes head.)

Q.   Okay.  Have you ever been disciplined as an employee?

A.   In my years with -- I'd have had to discipline myself in the marshal's office.  And the police

Page 224

department was before that.

Q.   I -- I'm not asking if you've ever disciplined yourself.  Have you ever been disciplined when you were working as a -- at the Eunice Police Department?

A.   No, ma'am.

Q.   So you said a few times that you're not subject to the civil service board in your office, if that's right.

A.   Correct.

Q.   Is that right?  Okay.

What is the difference?  Do you know?

A.   Civil service is basically for police departments.

Q.   Uh-huh.

A.   The larger departments, I think, is what -- I think you got to have X amount of employees or whatever.  As far as civil service laws, I couldn't tell you one whatsoever.  We're not civil service.  Smaller police departments are not.  Sheriff's department are not civil service.  That's about all I can tell you besides going sit in on the city civil service and listening to what happens in a civil service.

Q.   I think one difference you mentioned is that you have the right to terminate your officers --

Page 225

A.   That's correct.

Q.   -- and Chief Fontenot does not?

A.   Correct.  He's civil service, and I'm not.

Q.   But do you ever fear retaliation from your deputies for any actions that you take?

A.   No.

Q.   Okay.  So earlier, we were talking about complaints against A.J. Frank, and it sounded like you felt that they were unsubstantiated.  Is that right?

A.   Yes.  The -- the ones that followed through or actually called me back and wanted to come to my office or whatever, he always had a tape recorder.  He put it in his pocket.  And so he would play it, and the version that we got from the other people and that one was not the same.  Now, not all followed up.  Some of them never came back, didn't want to file anything.  "I don't want to file anything."

Q.   So when the -- when it would happen that the -- the recording backed up A.J. Frank's version, did you still investigate that complaint?

A.   No.  The people didn't want to pursue it.

Q.   So if you feel that a complaint is un- -- unsubstantiated or unfounded, do you always follow through with an investigation?

A.   I usually check into it to see if there's any

MAGNA
LEGAL SERVICES

Page 226

other merit into it. But normally, when a person comes and says, "Well, I'm just dropping it," I -- I mean, a couple of them just bow their heads and just said "that's what happened" and just walked out.

Q. So back to my question, though. If -- if you feel like a complaint is unsubstantiated, you're not going to investigate it, are you?

A. I may look into it just to see if there was any -- any merit to the original complaint that was filed.

Q. So when you say "look into it," you mean like you're going to satisfy yourself --

A. Yes.

Q. -- as to whether there is --

A. Because I may have a question in my head of "hey, do I really need to look at this? Is this becoming a pattern that I need to see about?"

Q. So when you say "look into," you say -- you're meaning you yourself --

A. Yes.

Q. -- look at the facts and see if there's merit --

A. Yes.

Q. -- to a complaint or not?

A. Yes, ma'am.

Page 227

Q. Okay.

MS. GUNNELS: I propose we take one short break for five minutes. Is that good with everyone?

MR. HOBBIE: That's fine.

THE VIDEOGRAPHER: Off the record, 4:05.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 4:20.

BY MS. GUNNELS:

Q. Okay. Mr. Darbonne, I have one more area of inquiry for you.

We talked about concerns you had about Victor Fontenot letting people know about warrants, correct?

A. Correct.

Q. And you're talking about arrest warrants, not search warrants, right?

A. That's correct. I have nothing to do with search warrants.

Q. Okay. And how did you find out that Victor was doing that?

A. There was a couple of people that had -- had stepped forward and said, "I know y'all were looking for me." And said, "How?" Said, "Victor Fontenot."

Page 228

Q. And did you talk to those people?

A. Did I talk to them? I probably talked to one, and maybe one of my guys may have talked to the other.

Q. Okay. So we're talking about two people?

A. Yes.

Q. And --

A. At least two people. It could have been -- I don't remember.

Q. Two that you remember specifically, though?

A. Yes.

Q. And walk me through what they said again.

A. That they knew that they had a warrant for them, that Victor had told them that they had a warrant for them.

Q. And did -- to your knowledge, did him letting them know that affect your ability to arrest them?

A. At first, it did because we had a hard time to locate them because they were, I guess you want to say, running because we couldn't find them.

Q. Well, you said "at first, it did." Did that change?

A. Can you repeat that?

Q. So you said at first, Victor telling people about arrest warrants impacted your ability to arrest them?

Page 229

A. Correct.

Q. And I was wondering if that changed later.

A. If it changed later? As in?

Q. I'm trying to figure out why you said at first it affected your ability to arrest them.

A. Right. In the -- the beginning of -- of trying to arrest them, yes, it did. Because --

Q. I see what you mean.

A. Because of him telling them that -- whatever, it -- it's like we had a harder time to arrest that person because we couldn't find them.

Q. Was there anyone you weren't able to arrest because of that?

A. Eventually we arrest.

Q. Do you know what the typical delay in arrest would be in those situations?

MR. HOBBIE: Object to form.

A. Varies.

BY MS. GUNNELS:

Q. Okay. But just to clarify, you only had a conversation with one arrestee about Victor tipping them off, right?

A. Yes.

Q. And the other ones you just heard about?

A. Yes.

MAGNA
LEGAL SERVICES

Page 230

Q.  Okay.  And I also want to the talk about arrestees telling you to call Victor Fontenot and that he would get them out.  Do you remember --

A.  Uh-huh.

Q.  -- talking about that?

A.  Yes, ma'am.

Q.  Did you ever hear an arrestee say that?

A.  No.  My deputies would tell me.

Q.  Your deputies --

A.  I don't go out and normally make the arrests. My deputies do.

Q.  Is it -- well, let me rephrase.

Have you ever heard of any arrestee asking someone to call you for help?

A.  Any arrestee asking to call me?

Q.  Yeah.

A.  Oh, yeah.

Q.  Yeah.  And why would that be?

A.  Because we do a -- a Facebook post, I think, every Friday.

Q.  Uh-huh.

A.  My secretary puts out 12 to 15 faces on our marshal's page.  And so when they see their picture appear, we get a deluge of calls of "Hey, my picture is up there.  What am I wanted for?"

Page 231

Q.  I think I'm talking about something a little bit different.

A.  I think you are.

Q.  When you -- when one of your deputies goes to arrest someone --

A.  Right.

Q.  -- do you ever hear other names, aside from Victor Fontenot, as someone to call to -- to get an arrestee out?

A.  As far as using another officer's name or --

Q.  Uh-huh.

A.  Sure.

Q.  Okay.  So that's not that uncommon, then, for an arrestee to say --

A.  No.

Q.  -- ask you to contact another law enforcement officer?

A.  No.

Q.  Okay.

MS. GUNNELS:  That's all the questions I have.

THE WITNESS:  Thank you, ma'am.

MR. HOBBIE:  I've got a few more.  Just give me one second.

THE WITNESS:  Let me turn this way.

Page 232

RE-EXAMINATION

BY MR. HOBBIE:

Q.  I just want to pick up -- start on that last point.  Do you trust your deputies?

A.  To the fullest.

Q.  I'm sorry.  Can you repeat that?

A.  To the fullest.

Q.  Do you trust the deputies who arrested the suspects who alleged Victor Fontenot was tipping them off?

A.  Yes.

Q.  You said, earlier, that more suspects were asking about Victor Fontenot than usual.  Is that right?

A.  Yes.

Q.  Counsel asked if people request your help after being arrested.  Do you remember that?

A.  Yes.

Q.  Do you let friends out of jail if they've broken the law?

A.  That's not my determination, whether to release or not.  That's the judge's.  I can ask the judge or whatever, but the judge is the one that makes the decision of who gets released or who doesn't.  I don't have that power.

Page 233

Q.  Now, counsel asked you about Victor Fontenot's tipping off of arrest warrants.  Do you remember that?

A.  Yes, sir.

Q.  Are there any -- are there any issues with tipping off suspects about pending arrest warrants or upcoming arrests?

A.  Sometimes it -- it does because it just makes it harder on us to have to go find these people.  If we have -- sometimes these are -- most of these are repeat offenders that we're trying to get ahold of.  And if for some reason that the police department needs a certain person and they -- they come to us and say, "Look, hey, can y'all pick him up?  Can we call the judge and see what we can do?" we don't have a problem with that as long as we're working together.

Q.  Right.  In your experience, if someone knows about a to-be-executed arrest warrant, is the suspect more likely to become a flight risk?

A.  In most of the cases --

MS. GUNNELS:  Object to form.

A.  In most of the cases that -- when we're trying to find specific ones, yes.

BY MR. HOBBIE:

Q.  When suspects flee, does that increase danger to society?

MAGNA
LEGAL SERVICES

Page 234

A.  Yes, because you're leaving them on the streets.

Q.  Does it endanger officers?

A.  Yes.

Q.  If suspects know about soon-to-be-executed arrest warrants, does that endanger officers?

MS. GUNNELS:  Object to form.

A.  It endangers everyone because they could be committing more crimes.

BY MR. HOBBIE:

Q.  In your experience, if a suspect knows that an officer is coming to arrest them, could that endanger officers?

MS. GUNNELS:  Object to form.

A.  Most definitely.

BY MR. HOBBIE:

Q.  Earlier, counsel asked you if you recognized any allegations in the complaint.  I understand that you skimmed them, but you mentioned that one involving maybe Jack Ardoin jumped out at you.

Do you recall saying that?

A.  Jumped out at me?

Q.  Earlier, when counsel asked you about allegations that you may have recognized in the complaint, what were those allegations?

Page 235

A.  In what -- which complaint are we --

Q.  I'm sorry.  In Lieutenant Dunn's complaint in this lawsuit.

A.  Okay.  I --

Q.  I'm sorry.

A.  -- I got that now.

Q.  Earlier, you stated that you recognized a couple of instances in that complaint?

A.  Correct.

Q.  Which ones were those?

A.  And one of them was the one about an employee of my office.

Q.  Exactly.  What was the comment made in that situation?

A.  I really don't know because, like I said, my office is away from there.  And I have sliding glass, and he was in the office or whatever.  And I -- I really couldn't tell you what was said, but I could hear something about police department or whatever.

And I did not go back out there or whatever. I was busy in my office.  And the only reason I could say it would be Jack is because Jack is the only one in my office that was working at the time that is not employed now.  My other two that I hired are new guys.

Q.  Do you remember the gist of the allegation or

Page 236

the conversation?

A.  It wasn't to me.  It was, like -- it was to my employee.  It wasn't -- it wasn't even to me.

Q.  What was the allegation in the complaint about?

A.  I -- I didn't even ask him because they were too far away, and they were -- they were speaking there.  All I could -- heard say something about the police department, and that's all I heard that I -- I'm not going to -- I don't want to hear what they have to say.

Q.  No, I understand.  I'm just trying to understand --

A.  I understand.

Q.  -- why it jumped out at you.  Why did that --

A.  Because --

Q.  -- conversation jump out?

A.  Because where -- it's like his tone raised up higher than normal.  Like, he came in from downstairs and came upstairs.  And the first office is his office, and my office is in the back.  It's just his tone was a little bit higher than normal.

Q.  Right.  And I'm just -- I'm trying to understand which allegation in the complaint you're referring to.

Page 237

A.  I -- I don't know what he was discussing, is what I'm trying to say.

Q.  Okay.

A.  Is -- in there, it said one of my employees said -- said something, overheard something, or whatever.  I don't know what it is --

Q.  Got it.  Okay.

A.  -- plain and simple.

Q.  Okay.  I thought we were misunderstanding each other.

A.  No.

Q.  That makes sense.  Thanks.

A.  No.  Plain and simple, I have no idea.

Q.  Okay.  Counsel asked about your ability to -- to fire employees.  Do you remember that?

A.  Yes, sir.

Q.  Do you have the ability to hire and fire employees?

A.  Yes, sir.

Q.  Are you aware that Chief Fontenot does not have that ability?

A.  Yes, sir.

Q.  Are you aware that Chief Fontenot did have that ability?

A.  Yes, sir.

MAGNA
LEGAL SERVICES

Page 238

Q. Do you know why it was taken away?

MS. GUNNELS: Object to form.

A. I do not. I went to a city council meeting, as I go every once in a while, and I know they took it away from him. I -- I didn't ask why they took it away from him. I mean, they didn't mention it. I think it was -- it was during a council meeting so...

BY MR. HOBBIE:

Q. To your knowledge, could the city council take away your power to hire and fire?

A. We are a different entity. No.

Q. Earlier, you said that crime in the city of Eunice had increased, right?

A. (Witness nods head.)

Q. Could you give a verbal answer?

A. Oh, I'm sorry. Yes. I was waiting for the --

Q. You've been good. It's -- I just noticed it.

Do you have any experience working with a police K9?

A. I had a K9 at one time.

Q. When was that?

A. Oh, early '90s, maybe, I would say.

Q. Since the '90s, have you worked with K9s?

A. No.

Q. Were you ever on a call when a K9 was called?

Page 239

A. Yes.

Q. To be clear, I mean were you ever at a scene when a K9 was called?

A. In fact, I was last week.

Q. Does the marshal's office have a K9?

A. No.

Q. Which K9 was assisting you last --

A. St. Landry Parish Sheriff's Department.

Q. Are you aware that K9s can detect drugs?

A. Yes.

Q. In your opinion -- strike that.

In your experience, do K9s help solve crimes?

MS. GUNNELS: Object to form.

A. Yes.

MR. HOBBIE: Molly, what is the basis for your objection there?

MS. GUNNELS: You want to know?

MR. HOBBIE: Yeah, I would love to.

MS. GUNNELS: I think it's speculative.

MR. HOBBIE: Well, I'm asking in his experience, do K9s help solve crime. I don't understand how that's speculative.

MS. GUNNELS: Okay.

BY MR. HOBBIE:

Q. In your opinion, would having a K9 dog help

Page 240

fight crime in Eunice?

A. Yes.

Q. Would it help resolve cases involving drugs?

A. Yes.

Q. Would it help in resolving cases involving weapons?

A. Possibly, yes.

Q. How would it help in cases involving drugs?

A. Probable cause to stop a vehicle and they refuse a search, and the dog comes and hits on the vehicle. That's probable cause.

Q. And just for the record, what do you mean by "hits on the vehicle"?

A. I mean the dog sniffs, stops, indicates. Let's put it like that, indicates.

Q. The dog indicates that there's drug --

A. Narcotics within it.

Q. Thanks. Are you aware that Chief Fontenot took the K9 from Lieutenant Dunn?

A. Yes.

MS. GUNNELS: Object to form.

A. Yes.

BY MR. HOBBIE:

Q. In your opinion, is this another example of Chief Fontenot retaliating against -- strike that.

Page 241

In your opinion, is this another example of Chief Fontenot targeting Lieutenant Dunn?

A. I have no idea what the circumstances was for the removal of the dog. I just know it was sudden.

Q. What do you mean "sudden"?

A. I mean the -- one day, a dog was there; the next day, it was not there.

Q. Are you aware that the city council offered Chief Fontenot funding to maintain or keep the K9 program?

A. I heard it or read it in -- I think I read it in the Eunice News.

Q. Do you have any reason to believe that the Eunice News was inaccurate?

A. No.

Q. I want to talk just a little bit more about the short-staffing issues. You mentioned there was a recent call -- a recent shooting that your team assisted on. Do you recall that?

A. Yes, sir.

Q. Did you get authorization from Chief Fontenot?

A. No, sir.

Q. You said, earlier, that the departments -- several law enforcement agencies have to work together because of understaffing. Is that right?

**MAGNA**
LEGAL SERVICES

Page 242

A.  Yes, sir.

Q.  Is Chief Fontenot the only one who rejects your attempts to assist?

MS. GUNNELS:  Object to form.

A.  Yes, sir.

BY MR. HOBBIE:

Q.  I want to talk briefly about A.J. Frank. When these complaints were filed against A.J. Frank -- or strike that.

You said roughly ten were filed against A.J. Frank?

A.  Around that number, yes.

Q.  How many of these were civilian complaints?

A.  All of them.

Q.  Were any internal investigation complaints?

A.  I don't even think we had one because they would call on the telephone, and -- and I took that as -- as a complaint.  Things have changed since he left.  We have -- we have a complaint form now just as any other department has where you have to come in and actually file the complaint.

I believe it's five pages that you take and actually file the complaint.  And then I look at it, determine the merit of it, and then we get another agency to -- either we do our own or get another

Page 243

agency.  We'd rather be transparent, get another agency to do the investigation into it.  But we didn't have that back then when A.J. Frank worked for us.

Q.  That five-page form, is that only for civilian complaints?

A.  It's for anyone.

Q.  If an officer is filing a complaint against another officer, do you have a mechanism for that?

A.  I don't think we have a specific form for that.

Q.  If an officer at your office complains about another officer, what do you do?

A.  I take the statement -- well, I would. I've never had one.  I would take the statement of the complaining officer, review it.  I would get a statement from whoever he's complaining on to.  And if I had merit to deem that an investigation was needed, I would turn it over to another agency.

Q.  And why would you turn it over to another agency?

A.  Because it's more transparent.  People would desire more to say that you're not covering it up -- covering it up.  And so if you turn it over to another agency that's neutral that has -- or knows neither one of them, there's a -- bel- -- people believe that it's

Page 244

more fairly done than if you do your own.

Q.  The citizens -- strike that.

The civilian complaints that are filed with you on that five-page form, do you keep those?

A.  We keep them probably for maybe ten years -- eight years, ten years, something like that.

Q.  I understand that you testified earlier that you take a look at it?

A.  Right.

Q.  Does anyone else in your office take a look at the complaint?

A.  Not unless I pass it on to them.

Q.  You're aware of the Officers' Bill of Rights?

A.  Yes.

Q.  What is that?

A.  It's the rights of the -- rights of the officers.

Q.  Are you aware that within the Officers' Bill of Rights, they're entitled to certain rights when they're under investigation?

A.  Right.

Q.  Is that specifically for internal investigations?

A.  I would say so.  I've never had to do one in my office, never.

Page 245

Q.  Why do you think that is?

A.  I think I run a good clean office.  Let me knock on wood.

Q.  Just a couple more questions.  Bear with me. Does your relationship with Lieutenant Dunn affect your ability to testify truthfully?

A.  No, sir.

Q.  Did it affect your ability to testify truthfully today?

A.  No, sir.

Q.  How about your relationship with Chief Fontenot?  Has that affected your ability to testify truthfully today?

A.  No, sir.

Q.  Has Chief Fontenot's presence in this room affected your ability to testify truthfully today?

A.  No, sir.

MR. HOBBIE:  Great.  I have no further questions.

MS. GUNNELS:  Great.

THE VIDEOGRAPHER:  That concludes this deposition.  We're off the record at 4:42.

(This proceeding was concluded at 4:42 p.m. on August 8, 2022.)

MAGNA
LEGAL SERVICES

Page 246

REPORTER'S CERTIFICATE

I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, Registered Professional Reporter, and as the officer before whom this testimony was taken, do hereby certify that TERRY DARBONNE, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as set forth in the foregoing 245 pages.

I further certify that said testimony was reported by me in the Stenotype reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board and that I have been informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services.

I further certify that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions of the board.

I further certify that I am not an attorney or counsel for any of the parties, that I am neither related to nor employed by any attorney or counsel connected with this action, and that I have no financial interest in the outcome of this matter.

This certificate is valid only for this transcript, accompanied by my original signature and original raised seal on this page.

Baton Rouge, Louisiana, this 22nd day of August, 2022.

_____
YOLANDA J. PENA, CCR, RPR
CCR NO. 2017002, RPR NO. 907346

