The Deposition of

# DONNIE GENE THIBODEAUX

In the Matter of

# MICHAEL DUNN

versus

# RANDY FONTENOT

Taken On

# JULY 26, 2022



**EXHIBIT K**

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN OF LOUISIANA

MICHAEL DUNN,

                              CIVIL ACTION NO.

        Plaintiff,        6:21-cv-01535

    v.

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, and
JOHN DOE,

        Defendants.


* * * * * * * * * * * * * * * * * * * * * * * * * *
        TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:
                DONNIE GENE THIBODEAUX,
TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE
ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,
CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.
* * * * * * * * * * * * * * * * * * * * * * * * * *


        REPORTED AT THE LAW OFFICES OF:

        KEAN MILLER LLP

        600 JEFFERSON STREET, SUITE 1101

        LAFAYETTE, LOUISIANA  70501


        COMMENCING AT 9:09 A.M., ON JULY 26, 2022.


**2**

A P P E A R A N C E S

FOR THE PLAINTIFF:
    SIDLEY AUSTIN LLP
    (BY:  LIA M. HIGGINS, ESQ.)
    (BY:  NORMAN M. HOBBIE, JR.  ESQ.)
    1501 K STREET, NW
    WASHINGTON, DC  20005
    (202) 736-8075
    lhiggins@sidley.com
    nhobbie@sidley.com

        - AND -

    KEARNEY LOUGHLIN, LLC
    (BY:  KEARNEY LOUGHLIN, ESQ.)
    602 BOULDER CREEK PARKWAY
    LAFAYETTE, LOUISIANA  70508
    (337) 534-8803
    kearney.loughlin@gmail.com

FOR THE DEFENDANTS:

    KEAN MILLER LLP
    (BY:  MOLLY J. GUNNELS, ESQ.)
    (BY:  MARY LOVE, ESQ.)
    400 CONVENTION STREET, SUITE 700
    BATON ROUGE, LOUISIANA  70802
    (225) 387-0999
    molly.gunnels@keanmiller.com
    mary.love@keanmiller.com

FOR THE CITY OF EUNICE:

    STAN FEUCHT ATTORNEY AT LAW, L.L.C.
    (BY:  STAN FEUCHT, ESQ.)
    440 NORTH 2ND STREET
    EUNICE, LOUISIANA  70535
    (337) 550-1115
    stan@feuchtlaw.com


**3**

A P P E A R A N C E S (Continued)


ALSO PRESENT:
    MICHELLE RICKS, VIDEOGRAPHER
    RANDY FONTENOT
    SCOTT FONTENOT


REPORTED BY:


    YOLANDA J. PENA
    CCR NO. 2017002, RPR
    STATE OF LOUISIANA


**4**

I N D E X

                                              PAGE

STIPULATION......................................5

EXAMINATION BY:

    MS. HIGGINS..............................7, 423

    MR. LOUGHLIN.................................334

    MS. GUNNELS............................344, 440

CERTIFICATE.....................................443


        LIST OF EXHIBITS


Thibodeaux No. 1.................................94
    (CSB_0000959, Documents
    including 3/23/21 letter
    from the law office of
    Joseph R. Beck III)

Thibodeaux No. 2.................................98
    (Dunn_0000295, Documents
    including 3/3/21 letter
    of Mr. Thibodeaux)
Thibodeaux No. 3................................111
    (SMYERS_0000026,
    Handwritten statement
    of Mr. Thibodeaux)

Thibodeaux No. 4................................197
    (CSB_0000691, Documents
    including Notice of
    Regular Scheduled Public
    Meeting)

Thibodeaux No. 5................................403
    (Privileged, Randy Fontenot
    email, 5/18/22, Re: 14:134
    Malfeasance in Office)

STIPULATION

IT IS STIPULATED AND AGREED by and among the parties that this deposition is hereby being taken pursuant to the Federal Rules of Civil Procedure.

All formalities, excluding the reading and signing of the transcript by the witness, are hereby waived.

All objections, except as to the form of the question and responsiveness of the answer, are considered reserved until trial or other use of the deposition.

THE VIDEOGRAPHER:  We're on the record. This is the video deposition of Donnie Thibodeaux in the matter of Michael Dunn versus Randy Fontenot, et al. Today is Tuesday, July 26th, 2022, and the time is 9:09 a.m.  This is taking place in Lafayette, Louisiana, at the request of Sidley Austin.

The videographer is Michelle Ricks of Magna Legal Services, and the court reporter is Yolanda Pena of Magna Legal.

Will counsel and all parties present state their appearances and whom they represent.

MS. HIGGINS:  Lia Higgins with Sidley Austin for Lieutenant Michael Dunn.

MR. HOBBIE:  Norman Hobbie with Sidley Austin for Lieutenant Michael Dunn.

MR. LOUGHLIN:  Kearney Loughlin on behalf of Michael Dunn.

MR. RANDY FONTENOT:  Randy Fontenot, police chief for Eunice.

MS. LOVE:  Mary Love, Kean Miller, on behalf of all defendants.

MS. GUNNELS:  Molly Gunnels with

Kean Miller on behalf of all defendants.

MR. SCOTT FONTENOT:  Scott Fontenot, Mayor of City of Eunice.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

* * *

DONNIE GENE THIBODEAUX, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. HIGGINS:

Q.  Hey, Lieutenant Thibodeaux.  So as I mentioned, my name is Lia Higgins.  I'm with Sidley Austin, and I represent Lieutenant Michael Dunn in this litigation against the city of Eunice, Randy Fontenot, Victor Fontenot, and Ryan Young.

Do you mind restating your full name for the record?

A.  Donnie Gene Thibodeaux.

Q.  Okay.  Have you ever been deposed before?

A.  I don't believe for civil litigation, no.

Q.  Okay.  Do you know about how many times you've been deposed?

A.  I couldn't tell you.  Plenty.

Q.  Plenty?  But for criminal proceedings; is that correct?

A.  Criminal, yes.

Q.  Okay.  Have you ever --

A.  Except -- except for -- I'm sorry.  Except for, like, driver's license, civil, for DUIs and stuff. That's civil court too.

Q.  Any cases in which you were a party?

A.  I was a party as the arresting officer.

Q.  Okay.  All right.  Have you ever testified at trial or another court proceeding?

A.  Yeah.

Q.  How many times would you say?  Ten?  Fifteen? One?

A.  At least ten.

Q.  All as part of your job at --

A.  Yes.

Q.  Okay.  Are you represented by counsel here today?

A.  No.

Q.  All right.  I'm going to cover a couple of --

A.  Do I need to be?

Q.  No.

A.  Okay.  Just making sure.

Q.  No.  I'm going to go through a couple of ground rules.  Okay?

**9**

A.    Okay.

Q.    Today, you'll be testifying under oath, and your testimony and answers are subject to the penalty of perjury.  Do you understand?

A.    Yes.

Q.    Your statements here today have the same effect as if you were in a court of law.  Do you understand that?

A.    Yes.

Q.    Okay.  I'm going to ask you a series of questions.  You can always tell me that you don't understand the question and ask for clarification.  It's totally fine.  But if you don't tell me that you don't understand, I'm going to assume that you understood the question.

A.    Okay.

Q.    Do you understand that?

A.    Yes.

Q.    Okay.  We have a lovely court reporter here today.  Verbal answers would be very helpful for her to make sure that she's capturing everything you're saying.  So can you agree that you will answer every question I ask you verbally?

A.    Yes.

Q.    Okay.  So no head nods of the sort?

**10**

A.    Okay.

Q.    Okay.  If at any time you want a break, you can ask for one, also no problem.  That said, if a question is currently pending, please answer the question first, and then we'll take the break.

A.    Okay.

Q.    You understand?

A.    Yes.

Q.    Okay.  Is there any reason why you wouldn't be able to testify truthfully and completely today?

A.    No.

Q.    Okay.  Did you do anything today to prepare for today's deposition -- or did you do anything generally, rather, to prepare for today's deposition?

A.    No.

Q.    Did you receive any documents in anticipation of today's deposition?

A.    No.

Q.    Did you review any documents in anticipation of today's deposition?

A.    I have -- not for today's deposition, but I have just about the case in general because we had a public record request.

Q.    Okay.

A.    So I had to go through a bunch of documents

**11**

for the civil service board.

Q.    About how long ago was that?

A.    A couple of weeks ago.

Q.    Okay.  Did you bring any documents or notes to today's deposition?

A.    I didn't bring any in here.  I do have my civil service folder in my unit.

Q.    Okay.  And by "unit," you mean your car, correct?

A.    Yes, yes.

Q.    Can you tell me a little bit about your professional background?

A.    I've been with the Eunice Police Department since 2004.  I started out as a patrolman.  I was a motor cop, road motorcycles for a short time.  I took over the K9 position.  During the K9 position, I went up the rank of -- to sergeant and then eventually to lieutenant.  And then in 2016, I moved from the road into full-time training position.

Q.    Is that your current position?

A.    Yes.

Q.    What year were you promoted to sergeant?

A.    I believe 2007.

Q.    And then to lieutenant?

A.    2009.

**12**

Q.    Okay.  And do you mind telling me a little bit more about your current role at the Eunice Police Department?

A.    I'm in charge of the annual training that's required by state and federal for all of the officers and reserve officers.  I'm over the FTO program, the field training officer program.  I'm an instructor in various classes, so I do classes for the -- for the guys, outside agencies too.  I keep track of the training records, the dates.  I -- I keep track of certain nonlethal weapons and issue those out.  I take care of the equipment.

Q.    Okay.  Before you started at the Eunice Police Department, what was your previous job?

A.    I was an automotive manager, management.

Q.    Okay.  How long were you in that role for?

A.    At least 12 years.

Q.    Okay.  So did you have any other previous law enforcement experience before coming to the Eunice Police Department?

A.    I had -- in Texas, I had security private eye and just training, law enforcement training --

Q.    For how long?

A.    -- for, like, a reserve.  About four years.

Q.    Was that before you were in the automotive

**13**

industry?

A. Yes.

Q. About from when to when, would you say?

A. That's a long time ago. From '90 to '94.

Q. Okay. Who do you report to at the Eunice Police Department?

A. Deputy Chief Tony Kennedy.

Q. And who reports to you?

A. Various FTO officers that are trained and new recruits.

Q. Okay. Can you clarify what FTO means?

A. It's field training officer. They're selected and then certified, and they're the officers that the brand-new or transferred officers ride with, usually for 14 weeks, so they can learn the system -- learn our system, learn the basic geography of the city. And they start getting ready and preparing for the academy.

Q. Okay.

A. So they -- they do documents every day on them, and I review those to make sure they're making it and if there needs to be any adjustments or additional training.

Q. Okay. You're also in the civil service board, correct?

A. Correct.

**14**

Q. What's your current role on the civil service board?

A. Right now, I am the board chairman and the representative of the police department.

Q. How long have you been in that role?

A. I've been civil service rep, I believe, since 2012, I want to say, and board chairman, I want to say since 2017, maybe.

Q. Okay. What are your current responsibilities on the civil service board?

A. As the board chairman, I oversee the proceedings, court proceeding -- proceedings or the committee proceedings. I oversee any hearings that we have, the meetings. I make sure all the paperwork gets filed correctly with the secretary. I'm there to advise all employees, the appointing authority.

Q. Employees of whom?

A. Of the fire and police.

Q. Okay.

A. I meet with the board attorney when we have legal proceedings, do research on upcoming cases or hearings that we're having or employment issues, dealing with them -- the classified employees.

Q. And that covers employment issues at the Eunice Police Department, correct?

**15**

A. Correct.

Q. Okay. Were you previously on the civil service board in another capacity?

A. I was previously on civil service board, at first, as the representative of the police department, which is an elected official position.

Q. And what were your roles -- your responsibilities then?

A. As a regular board member, we still advise employees. We help advise the appointing authority and/or chiefs if they ask. We hear hearings. Sometimes we do investigations as a committee, and then we vote, ask questions during the hearings. I also did a lot of research then --

Q. Okay.

A. -- because of my legal background. So the board kind of -- there's a couple of us that -- that do the research so -- with the attorney.

Q. Would you say you have more responsibility now on the civil service board?

A. Yes, definitely.

Q. Okay. Would you say you have more influence on the civil service board now than you did?

A. I would say so, yes.

Q. Okay. In what circumstances would a civil

**16**

service board member need to recuse himself from a case?

A. If you have direct involvement and, like, was part of the case. Say if you wrote up an employee and you're the one that wrote them up, you would want to recuse yourself from the vote. Or if it's a direct employee -- I'm sorry. I meant immediate family member --

Q. Okay.

A. -- so wife, daughter, that type of thing, you would want to recuse yourself from the vote.

Q. Where do those rules come from?

A. They come from Louisiana state law and civil service board rules, which are also law.

Q. Have you ever been in a position where you thought you needed to recuse yourself but didn't?

A. No.

Q. Okay. I want to talk a little bit about some of the retaliation that you've been experiencing at the Eunice Police Department. Okay?

A. Okay.

Q. How many years have you ser- -- served at the Eunice Police Department under Chief Randy Fontenot?

A. This year makes eight.

Q. Eight? Can you tell me a bit about your

**17**

relationship with the chief?

A. Starting from the beginning?

Q. Yeah. That'd be great.

A. When he first took over, I was a -- a lieutenant on the road. We had some disagreements about laws and enforcement of laws. After we hashed those out, I guess, privately or with the deputy chief -- after that, it wasn't that bad of a relationship. Before he became chief, I considered us acquaintances, professionally and privately.

Q. Uh-huh.

A. He had a lot of complaints, apparently, about me, the way I ran shifts and stuff because I was a little strict. So he offered me a position off the road knowing that I liked training. I did it on my days off, so he offered me a full training position.

Q. When you say you had some disagreements about laws, can you tell me a bit about that? What does that mean?

A. Laws -- like where the law tells you that you shall impound a vehicle, he didn't like that. He wanted to find a way out of it. Told me I'd have to pay at meeting. One of our first meetings, he told me I would have to pay for the tow myself if I towed a vehicle for no insurance.

**18**

Q. So if you to- -- your testimony is that if you towed someone else's vehicle --

A. Correct.

Q. -- you would have to pay for it?

A. Yes.

Q. So is it your testimony that Chief Fontenot asked you not to follow the law?

MS. GUNNELS: Objection; misstatement.

BY MS. HIGGINS:

Q. You can answer the question.

A. In a roundabout way, yes, I would say. He was -- basically, I felt threatened that if I did follow the law, there'd be consequences, financially.

Q. For you?

A. Yes.

Q. Okay. Are there other examples of law-related disagreements that you had with Chief Fontenot?

A. Over the last eight years, yes, there have been plenty.

Q. Can you give me a few more examples?

A. Civil service law, civil service board rules, which were also law. He would make decisions on employees, and I would tell him that he couldn't do that because of civil service law, and if it went that way, it would most likely be overturned.

**19**

Q. Can you state that last part again?

A. That if he went through with his actions that he was going against employees --

Q. Uh-huh.

A. -- like, for some work out of the class, which is against board rules or against civil service law, or going after people because he was mad at them because he didn't like them, trying to find things on people, selectively enforcing rules from his procedural orders or ignoring them for certain employees.

And I would explain to him, you have to be fair about it; you have to follow the police officer bill of rights to a T. And he would get mad and argue with me about it, so I would just stop because I'd give my advice, and I was done. So that went on through the last, at least, five years.

Q. Okay. Let's break that down a little bit more. Are there any other rules or laws, specifically, that Chief Fontenot did not want you to follow by? Can you just give me some more examples of what you're talking about?

A. Well, personally, a lot of the employees come to me when they have civil service questions, so I have a lot of stuff that was given to me, but it's secondhand. As far as me -- as far as, like, officers

**20**

carrying tasers that are not certified, our policy says you can't carry anything if you're not currently certified, and he allows that to happen. And I tell -- told him, time and time again, they're doing it.

Using force, pepper spraying people in the jail and stuff like that, and no use of force reports are being done about it. Nothing is being over- -- you know, looked at. And he would say he didn't want the federal government overlooking stuff. When I'd ask for grants, "Oh, that was none of their business. I'm going to run the department the way I want. I'm the chief," those kind of things.

Q. Okay. You mentioned that Chief Fontenot was "going after people," end quotes; is that correct?

A. Yes.

Q. Can you tell me what that means?

A. I've had a few employees tell me that he's asked them to change the reports, crash reports, change the victim one -- vehicle one to be vehicle two, and if you didn't do it, then all of a sudden they were always in trouble. And he goes directly to those patrolmen instead of going through the chain of command and starts going over their paperwork and redlining their paperwork after their supervisors have already approved it, just start picking on things.

**21**

When he had took me out of my position and put me back on the road after a counsel hearing where they basically were going to cut his deputy chief position, the next morning after that meeting -- he got real mad in that -- during that counsel meeting.  It's on tape and everything.

The next morning, he called up the deputy chief and told me to go home.  I was starting on nights that night and didn't give me any warning besides that. He later told some people that I was in the mayor's office too much, so he moved my office from next door to his office because he said I heard too much -- what was going on in there and moved me across town to a building by myself.

After he made those moves, I know there were some emails between him and the mayor where the mayor basically told him he wasn't being professional.  I have copies of that.  Before that happened, when Jeremy Ivory had his hearings and when -- and the board had overturned it because he didn't record, he violated his bill of rights.

Q.    Who -- who violated whose bill of rights?

A.    The chief violated Jeremy Ivory's bill of rights during his hearing.

Q.    How so?

**22**

A.    He didn't record -- the bill of rights says you have to record any investigation, any hearings with them.

Q.    Okay.

A.    He didn't record them.

Q.    Why not?

A.    He said because the recorder messed up, that he didn't have the first part, and he didn't record the second hearing.  So we ended up having to overturn it because the law says if they don't follow the bill of rights, it's nullified, so we had to nullify it.  He got mad.

Q.    What's nullified?  The investigation?

A.    Overturn it --

Q.    Okay.

A.    -- the actions.  He had demoted him --

Q.    Okay.

A.    -- and suspended him for 30 days.  He demoted him from lieutenant to officer because he had posted something on Facebook that the chief didn't like.

Q.    Okay.

A.    So the chief had came out during the hearing and started reading the Fa- -- Facebook posts that had nothing to do with Jeremy.  It had to do with his family in Basile because his dad is a chief over there.

**23**

So we ended up having to shut him down.  I had to stop him from talking because it had nothing to do with it, which made him really mad.

Q.    Made who really mad?

A.    The chief.

Q.    Okay.

A.    He turned red and got real mad.  I know he's vindictive.  He has a history of being vindictive, so I knew he was going to start coming after me.  And -- and Lieutenant Dunn had -- was assisting Jeremy with his hearings, so then he started going after Lieutenant Dunn.

The -- the counsel and appoint- -- the counsel and the mayor ended up taking his appointing authority back, which gave him the right to hire and fire.  They took that away from him.  They had given to him a year and a half before.

Q.    Okay.

A.    After Jeremy's hearing, they took that away, and he blamed me and Dunn for that.  That's what he told all his friends.  He told everybody in the PD. Everybody knows that, if you ask any of them.  He also told the mayor a month after that that he needed to get rid of me next.

Q.    Okay.  You gave a lot of testimony there.

**24**

A.    Sorry.

Q.    Don't -- don't be.  Let's back up and break it down a little bit more.  Okay?

A.    Okay.

THE REPORTER:  And can I ask you just to slow down a little bit, if you can think about it?

THE WITNESS:  Sure.

THE REPORTER:  Thank you.

THE WITNESS:  Sure.

BY MS. HIGGINS:

Q.    You talked about some crash reports being altered; is that correct?

A.    Yes.

Q.    Why would the chief want to alter crash reports?

A.    The officer told me that -- I believe vehicle one was 16 or 18 years old.

Q.    The driver of vehicle one?

A.    The driver of vehicle one, which is who they -- or the -- the driver of -- that he wanted to be vehicle one was actually vehicle two.  He made them switch it and put the 16-year-old or the 18-year-old as vehicle one to make her look like it was her fault because she was still young and she had time to fix her

**25**

insurance.  And apparently, the older guy was either a friend, a relative.  I don't know.  The officer that -- the officer ended up leaving because he said, "I can't do stuff like that."  He works for the sheriff's office.

Q.    So the officer left the Eunice Police Department --

A.    Correct.

Q.    -- because he did not want to alter the -- the crash report; is that correct?

A.    Well, that was the last straw.  He didn't like what --

Q.    Okay.

A.    -- was going on at the department.  Yes.

Q.    So the chief wanted to alter the crash report in order to help out one of the drivers who he thought had less ability to fix his insurance; is that correct?

A.    Correct.

Q.    Would you say that the information that the chief wanted to alter was material?  Was it important?

A.    Yes.

Q.    So it wasn't just a minor change that he wanted --

A.    No.

Q.    -- the officer to make to the crash report; is

**26**

that correct?

A.    Correct.

Q.    Okay.  I want to go back to your terminology when you say that the chief goes after people, including yourself and Lieutenant Dunn.  When you say "go after," can you tell me what sort of actions encompass that term?

A.    Well, at first, he would go after you and write you up and try to punish you by suspension or demotion or fire you.  After the civil service board was overturning his stuff because he wasn't do it correctly or he wasn't doing it in good faith, then he started disciplining people that wouldn't be on paper.

Q.    How so?

A.    Like taking things away, changing their schedule.

Q.    Taking what sort of things away?

A.    Like with Lieutenant Dunn, they took the dog away.

Q.    Okay.  We'll get to that.

A.    When he first -- when he first got in, he got rid of another dog and retired the dog because he didn't like the officer, and that was his words.  So he retired that dog, and he got rid of both dogs so it wouldn't look like he was going after that one officer.

**27**

Q.    Got it.

A.    That was the first time when he first took over, and he said we didn't have a drug problem in Eunice.

Q.    That you do not have a drug problem --

A.    Correct.

Q.    -- in Eunice?

A.    We didn't need a dog.

Q.    Do you have a drug problem in Eunice?

A.    Yes, we do.  We've always had a drug problem in Eunice.

Q.    So do you think that getting rid of the K9s is good for crime in Eunice?

A.    No, very bad.  It's a deterrent by itself.

Q.    Having the dogs is a deterrent --

A.    Correct.

Q.    -- against narcotics dealers in Eunice; is that correct?

A.    Yes.  And against people running because the dogs were dual purpose.  So --

Q.    Running?

A.    -- to check buildings, burglaries, running away from the police when they're chasing you, that type of thing.

Q.    Okay.

**28**

A.    Searches.

Q.    So would you say it was more important for the chief to get back at those officers than it was to reduce crime in Eunice?

A.    I think that's his No. 1 motive.

Q.    What's his No. 1 motive?

A.    Revenge, vengeance.

Q.    Does he have a reputation at the Eunice Police Department for being vengeful?

A.    Yes, he does.

Q.    Would you say everyone shares that belief?

A.    I would say 95 percent, but they won't speak on it because they're afraid, just like I'm really nervous with him being here because I know it's going to -- he's going to retaliate even though he only has a few months left.

Q.    What are you expecting to happen?  And by "being here" -- let me back up a second.

By "being here," you mean at this deposition today; is that correct?

A.    Yes.

Q.    And having Chief Fontenot in the room for you -- with you currently makes you nervous; is that correct?

A.    Correct.

**29**

Q.   Is he doing anything right now that's making you uncomfortable?

A.   No.  But I just know how he is.

Q.   Okay.  What do you expect to happen?  Or what do you think might happen?

A.   I don't know.  He picks apart everything I do, and he tries to give me extra work that he's never given me before just to pile it on me because apparently, he was told -- since he didn't win my civil service hearing, to pile a bunch of extra work on me to make me not want to be there in that position, to either quit or step down in that position.

Q.   Are you talking about the civil ser- -- service hearing that you filed --

A.   Yes.

Q.   -- or another civil --

A.   No.  That --

Q.   -- service hearing?

A.   My civil service hearing, which is pending an appeal in district court right now.

Q.   Who filed the appeal?

A.   The chief and the city.

Q.   Okay.  Let's look -- circle back to that in a little bit.

Would you say that you've been treated

**30**

unfairly by Chief Fontenot --

A.   Absolutely, yes.

Q.   I know you talked a little bit about the ways in which you've been made to feel that.  But do you mind going -- walking me through those incidents in a little more detail?

A.   Well, he slowly started taking my duties away just like he did with Lieutenant Myers.  He came in and said -- even though he had told me that I'm supposed to have all the files, the training files, he wanted all the files taken out of my office and moved to his secretary's office.

He took me -- I'm training coordinator for POST.  He took that away from me and gave it to the -- the account he gave to the deputy chief, but they still wanted me to do the -- the work and sign in under his name.  He took the radars away from me.

Q.   Just for clarification, so he took the actual training away from you?

A.   The training -- the POST training, which is with the state where you put it into their computer --

Q.   Uh-huh.

A.   -- so that officers keep their POST up so they don't lose their state pay and have to go through academy again.

**31**

Q.   Okay.

A.   Somebody has to enter every training in -- into that system and add people, take people out, and keep track of all that stuff.

Q.   And you no longer have that job?

A.   I have that job.  I no longer have that title or the account, so I have to go through the deputy chief to do anything.  And he doesn't know how to do that stuff, so he has me doing it with his sign in.

Q.   Would you view that as a demotion of sorts?

A.   Yes, I would.

Q.   Did it effect your salary?

A.   No, it did not.

Q.   Okay.  You can keep going on, telling me what else you feel was retaliatory against you.  Title --

A.   He started denying me -- you know, officers have to be certified to carry nonlethal.  So when my recertifications as an instructor would come up, he would start -- he started denying me to get recertified.

So now we have a bunch of officers that are carrying nonlethal weapons that are not certified anymore.  He said, "Somebody had to first get certified in that.  Who made that up?  That's just a made up thing.  Certifications aren't needed.  We don't need

**32**

those."  He even called the other departments and ask them if they need -- need those things.

Q.   So people don't have appropriate certifications for the weapons they're carrying?

A.   No.  I've been trying to get them certified since I've got back in this position and the board overturned him --

Q.   Uh-huh.

A.   -- because he had put me on nights -- straight nights after that meeting.

Q.   Okay.

A.   He put me on straight nights on patrol.  He gave me less people than everybody else.  Kind of like what he does with Lieutenant Dunn.  No -- no jailer so that we'd have to work out of our class and do the jailer's job.

For a while, didn't have a dispatcher, but the day shifts had plenty of people.  And then he would go in the mornings and ask the people that came in the mornings, "Go through all his paperwork and if you find anything wrong, bring it to me so I can deal with him."  So he was always looking for something.  So --

Q.   Looking for something on who?

A.   Anything -- any mistake I make or that I signed off on --

**33**

Q. To try to get you in trouble?

A. To try to get me in trouble.

Q. Just a quick point of clarification, is not having your certifications and still carrying a lethal weapon legal in the state of Louisiana?

A. Some of them are illegal; some of them are case law.

Q. What law?

A. Case law --

Q. Okay.

A. -- where the judges have said you need to have certifications. But when you get certified and carry that weapon, the manufacturer says this certification is good for three years.

Q. Okay.

A. Okay. Louisiana has a law about the tasers --

Q. Uh-huh.

A. -- which they were all out of certification until I got put back in this position by -- the civil service board ordered him to put me in this position last October.

Q. Uh-huh.

A. So I've been certifying the guys slowly, but they still have a lot of guys that -- that tase people that were not certified. They still have people

**34**

spraying people that are not certified, and they're still carrying batons that are not certified.

Q. And that is illegal, correct?

A. The tasers, there's a specific Louisiana law.

Q. Okay.

A. The other ones are more case law.

Q. Okay.

A. It's a liability issue.

Q. It's a liability issue for --

A. Yes.

Q. -- the city of Eunice; is that correct?

A. Yeah. And a training issue because those skills are diminishable. Any skills that you do and that you don't keep up with, they get diminished, and then you end up using it incorrectly.

Q. So would you say it's unsafe for the people of Eunice to have their police officers equipped with these weapons without proper training?

A. In my opinion, yes, it is.

Q. Okay. And it's the chief's decision not to have these officers up on their training; is that correct?

A. Correct.

Q. Why wouldn't he want them up on their training?

**35**

A. He was punishing me. He put me on straight nights where I couldn't do the training. And then he denied me -- when I tried to get recertified in some of those things or get certifications so that I could train the guys, the officers, he denied it. We fill out a training request form.

Q. Okay.

A. And there's a spot on the training request form for the deputy chief to sign off on. There's a spot for the training coordinator to sign off on, and then there's -- he has the final approval. A lot of times they give it to the deputy chief, he won't sign it. He won't put "no" or "yes." He just won't sign it at all or it sits on his desk, and I'm told by deputy chief he said no, he ain't going to sign it.

Q. And that's a form of punishment towards you?

A. Yes, it is.

Q. Are there any other ways in which you believe that Chief Fontenot has punished you?

A. Besides giving me -- like, he had said that after the -- the hearing -- my hearing, he started giving me extra training for certain employees. And he'd write it all out, like anger management for this employee and all kind of stuff that would cost money that I'm not qualified to do. I'm not qualified to --

**36**

to do anger management for people and stuff that you -- it's just hard -- hard for me without a budget to do. And he said it was because risk management had ordered him, because of their psych evaluations, to do this extra training. But according to human resources and other departments, that's not true.

So he told me that so I'd have these extra jobs to do, but he didn't give me -- he set me up for failure. He didn't give me the money to do it. When I questioned it and asked what kind of budget I had, I found some stuff but it cost money, he said, "Just do your job. Quit -- quit avoiding all the stuff I'm giving you and do your job." But I was told that he had said -- to try to get rid of me, he'd just pile stuff on me that I didn't want to do.

Q. All right. What do you think the reason is that Chief Fontenot has punished you in all these ways?

A. Because of my position on the civil service board.

Q. Can you explain that a little bit more for me?

A. Because we've had to overturn a lot of his actions of discipline, and officers come to me for advice or the other civil service board members. And the latest one, I had put out an email because I was getting a lot of phone calls, so I put my opinion,

**37**

give them some advice about working -- he was trying to order people to work out of class, like have a lieutenant working the jailer's position, doing their duties.

So I put out an email, and I put the laws in there. I did not send him a copy when I put the email out because I was doing it as the training coordinator and the civil service rep. I only put it on classified employees because it was them, the ones that were calling. I knew his -- his two guys would show it to him, but I didn't respond to it.

Q. Who are his two guys?

A. Victor Fontenot and Ryan Young.

Q. So they -- Victor Fontenot and Ryan Young, you believed, showed Chief Fontenot an email that you sent out to classified personnel; is that correct?

A. That's my opinion, yeah. And I was told somebody showed it to him, so that would be the two I would think.

Q. Okay. What was the chief's response to that email?

A. He threatened to charge people with malfeasance of office for not following his rules.

Q. Do his rules differ from the rules that you laid out in your email?

**38**

A. Yes. Mine are civil service law, and his were policies and his own actions and -- and orders --

Q. Would you call those --

A. -- that go against the --

Q. Sorry.

A. The orders that go against civil service law and his procedures.

Q. So the policies that he wanted the officers to follow contradicted the formal policies of the civil service law; is that correct?

A. Not necessarily his policies but his orders. The way he's having people actually do stuff, not what his -- his policies say.

Q. Not his written policies but his -- would you call them informal policies?

A. Infor- -- yes.

Q. Okay.

A. What he actually has people doing.

Q. Can you give me some examples of those informal policies?

A. Like having dispatchers, who are supposed to be dispatching, doing jail work, booking people in, that type of stuff. Having jailers go answer alarm calls on the road. Having the chief secretary being in charge of equipment and paid to maintain and issuing

**39**

that out, which is a lieutenant's job in our classifications by having --

Q. Is the secretary qualified to do that job?

A. No because she can't check the equipment. She doesn't know nothing about the equipment. So how do you get a taser from somebody or whatever and make sure it's still working, clean it up, and issue it back out? It might not be working properly.

Q. Is that dangerous for her to be in charge of that job?

A. Yes. That's very dangerous, and that's why the ward rules put it under a lieutenant, to be in charge of fleet, equipment, that type of stuff.

Q. Okay. What are some other informal policies?

A. He had sergeants doing lieutenant jobs where they're running the whole shift, signing off on paperwork. They're supervising the jail, which they're not supposed to. They're supervising dispatchers, which they're not supposed to. They're only supposed to supervise the road patrolmen.

He has road patrolmen doing investigative jobs, secondary investigations, which is a sergeant's job. He has lieutenants doing all the jobs, whether it's dispatching, jailing, patrol work, just whatever -- it's all mixed up right now. It's like --

**40**

kind of like a sheriff's office. You come in today. This is your new duty. This is your new job. And nobody has any structure.

It changes day to day. It's very demeaning for people. They don't know what to expect every day. And if you tell him no, a lot of people are really scared of him because they say, "I see what Jeremy went through. I see what Dunn went through. I seen all the people that left, what they went through, and I see what Donnie goes through. And I don't want that to happen to me. It's not worth it." So they either quit and leave -- everybody says because of the money, they leave and take jobs that are paying less because of that, you know.

Q. So they're leaving because of fear of Chief Fontenot; is that correct?

A. Yes, of retaliation.

Q. Okay.

A. He has records clerks doing IT work on computers, which is not in the classification. He has regular jailers doing supervisor work over the jail, which is actually the deputy chief's job. And he has the deputy chief doing jobs that are supposed to be under lieutenants, so everything is just --

Q. Why would he have people doing jobs that are

**41**

outside the scope of their job descriptions?

A.   Because he says civil service laws are not laws; they are just a guide.  Classifications are just a guide.

Q.   In your opinion, is that true?

A.   Well, the law specifically says that these board rules are law and shall be followed.  That's in the laws and supreme court rulings in Louisiana.  They're specifically right there in the law.

Q.   So Chief Fontenot is not following the law?

A.   No.

MS. GUNNELS:  Objection; conclusory.

BY MS. HIGGINS:

Q.   Earlier, you mentioned that Chief Fontenot wanted to "get things on people," quote.  Can you tell me what you mean by that?

A.   Well, I know he searches Facebook and tries to find things that people say on Facebook.  He has some of his -- his officers following people around, trying to get stuff on people, taking pictures.  Just the people that he doesn't like or that said no to him.

Q.   Are those people civilians, or do they work --

A.   No.

Q.   -- at the Eunice Police Department?

A.   They work in the department.

**42**

Q.   Who are those people?

A.   That still work there, or are you talking from the beginning?  I mean, there's a -- a long list.

Q.   About how many people would you say are on that list?

A.   At least 10.

Q.   At least 10.  Why don't you tell me about a couple of instances in which Chief Fontenot tried to get things on people at the Eunice Police Department?

A.   Well, Jeremy -- Jeremy Ivory, he had got his stuff off of Facebook, and he used what his sister put in the pa- -- paper in Basile to go after him.  He had copies of that.

Q.   Can you give me more specifics about that?  Why did --

A.   They were having some kind of issue in Basile between the chief over there, which is Jeremy's father, and between the mayor or the counsel over there.  And apparently, Jeremy had made some statements on Facebook, and his sister had made some statements on Facebook.  So he had all that as copies.  So he went into their pers- -- their private -- or I guess it's public.  I'm not sure how Facebook works, but I know he had copies of all that.

And he brought all that up, and he had wrote

**43**

Jeremy up, originally, because he didn't follow chain of command.  But chain of command is not followed, especially by the chief.  He goes directly to patrolmen, sends them emails bypassing all the supervisors.  So Jeremy just basically told another patrolman, "Hey, you need to do your job," type thing.  Maybe he wrote him up or -- or reprimanded him or whatever, and he went after him and suspended him for that.

Q.   Jeremy went after the other officer for --

A.   No.  The chief went after Jeremy.

Q.   Okay.

A.   Because he went after an officer not on his chain of command.

Q.   Okay.

THE REPORTER:  Can you slow down a little bit, please?

THE WITNESS:  I'm sorry.  Got a lot of information that I'm trying to not forget anything.

BY MS. HIGGINS:

Q.   It's okay.  Just take your time.

A.   With Dunn, I know he had -- Dunn had made some private comments, not as a police officer, as a private citizen on Facebook, and he investigated him with an IA

**44**

for that and disciplined him.

Q.   Disciplined him how?

A.   I don't remember what exactly the discipline was or -- or what the outcome of it was, but I know he had an IA on him.  And when --

Q.   He did what on him?

A.   Internal investigation.

Q.   Okay.

A.   And I know we had to overturn, but I don't remember exactly what the punishment was because there's been a -- a lot of different punishments.

Q.   Okay.  What's usually the reason that Chief Fontenot tries to get information on various Eunice Police Department officers?

MS. GUNNELS:  Objection; calls for speculation.

BY MS. HIGGINS:

Q.   Why do you think that is?  You can answer the question.

A.   I think it's because he doesn't do the job the way the chief has told him to do it or that he wants him to do it.  He tries to tell them when to arrest somebody, when not to arrest somebody.

Q.   Who tries to tell him that?

A.   The chief tries to tell officers --

**45**

Q. Okay.

A. -- when to arrest somebody or when he doesn't want them to arrest somebody. And when you tell him no, you're his enemy. He turns on you. He starts talking about you behind your back, looking for stuff to try to find on you, going through paperwork his self and redlining just little things and writing stuff on the -- the reports, unprofessional words. He let's the other officers in the morning talk bad about you, threaten you.

Q. Threaten you how?

A. I know one instance where Victor Fontenot threatened to kill the K9 dog in front of the chief and nothing was said.

Q. Nothing was said by whom?

A. The chief. He didn't stop it, just let it go. Later, he said they were blowing off steam or whatever, but that's every morning --

Q. So --

A. -- they get to talk like that.

Q. Victor Fontenot threatened to kill a dog -- a K9 dog at the Eunice Police Department?

A. Yes.

Q. And Chief Fontenot overheard this?

A. He was sitting right there, yes.

**46**

Q. And he did not reprimand Victor Fontenot for this?

A. No.

Q. Okay. What's the ultimate goal you think that Chief Fontenot has when he's getting all of this information on people or writing you up for misconduct that he did -- or rather, not misconduct but conduct that he didn't agree with? Is he trying to get you fired?

MS. GUNNELS: I'm going to object just because that was a very compound question.

A. Control.

BY MS. HIGGINS:

Q. You can answer.

A. Control.

Q. Control?

A. (Witness nods head.)

Q. Would you say that Chief Fontenot tries to get certain people at the Eunice Police Department terminated?

A. Yes.

Q. Do you think those people deserve to be terminated?

A. No, not all of them. I'm not saying every one of them but most of them, no.

**47**

Q. Can you give me an example?

A. One example would be Chris Ortego.

Q. What happened there?

A. He was hired with a disability, knowing that he had a disability. And the chief, I guess, didn't like what he had to say, didn't like the way he did his job. I'm not really sure. I know they had some words, so all of the sudden he made him do a -- which he's never done before that -- made him do an agility test.

Q. A what test -- agility test?

A. Agility test, yes. Which we used to do before they hire, but he had stopped that. But he brought it back after this guy had already been hired. And I agreed that the guy shouldn't have been hired in the first place, but he had already hired him, and now you're singling him out.

Q. Did Mr. Ortego's disability make him unable to adequately complete the agility -- agility test?

A. I wasn't there, but I was told yes. And that's why they fired him, and he appealed it.

Q. Did Chief Fontenot know that Mr. Ortego likely would not be able to complete the agility test adequately because of his disability?

A. Yes.

Q. And he still asked him to do the dis- -- the

**48**

agility test.

A. Yes.

Q. Is that correct?

Was anyone else asked to do the disability test -- or the agility test, rather?

A. After that incident, yes.

Q. But not prior?

A. No, not that I'm aware of, anyway.

Q. Was there another reason that Chief Fontenot gave for asking Mr. Ortego for doing the agility test?

A. I was told he was going to fail it no matter what, but that was -- that came from Ryan Young who he had -- who the chief had perform the agility test.

Q. So is it your belief that Chief Fontenot asked Mr. Ortego to do the agility test because he knew he would fail and would then have a reason to fire him?

A. Correct.

Q. Would you call that discriminatory behavior?

A. Yes, I would.

Q. On the basis of his disability; is that correct?

A. Yes, yes.

Q. Okay.

A. And they ended up settling and rehiring him because he appealed it.

**49**

Q.   With the civil service board?

A.   Yes.  And then we were told by -- we were told that we couldn't hear it because he was too short and -- and he didn't have full civil service coverage. So they took it to district court -- took us to district court for not hearing his appeal.

Q.   Uh-huh.

A.   And our board attorney said because of COVID, the -- the -- the dates may get overturned because they had -- our governor had put in emergency rules, so it -- it might have made the dates not work out.  So we probably should have heard it just to be on the safe side.  So they ended up settling, giving his -- him his job back, paying him some money with the understanding that he would resign because he had already got another job, and he's still working in the police department somewhere else now.

Q.   Okay.  If Mr. Ortego had a disability, is -- why was he hired in the first place?

MS. GUNNELS:  Objection; calls for speculation.

A.   I don't know.  I -- I quit sitting on the hiring boards because he never took any of our -- he never took any of our opinions.  He just hired them if he wanted; didn't hire them if he didn't want to.  So

**50**

we were just there for show.

BY MS. HIGGINS:

Q.   But was Mr. Ortego, to your understanding, able to complete his duties as an officer even with his disability?

A.   I don't know if he could do all of his duties or not because I've never seen him fail his duties. But I think he is just as capable as some of the people that work there now.

Q.   Do you think that the real reason Chief Fontenot fired Mr. Ortego was because he lacked the physical ability to do his job properly?

MS. GUNNELS:  Objection; leading.

A.   No, because he hired him knowing that.

BY MS. HIGGINS:

Q.   So you think there was another reason?

A.   Yes, but I don't know what that is.

Q.   Okay.

A.   I'd be speculating.

Q.   I want to go back to the malfeasance email that Chief Fontenot sent.

Do you think that charging someone with malfeasance is a proper punishment for going against the chief's orders?

A.   Not only is it improper, there's case law --

**51**

THE REPORTER:  I'm sorry?

A.   I said not only is it improper but there's case law that says you can't do it.  Unless there's actually a criminal charge that has a criminal penalty, you cannot charge them with malfeasance in office.  Or a court -- second court of appeals has a couple of cases on it.  And the law, if you read it, says that. The district attorney's office says that.  But I did not respond to that email because I was advised not to by legal counsel because it was -- it was -- they called it chest puffing.  It's not --

BY MS. HIGGINS:

Q.   Your legal --

A.   -- not getting engaged.

Q.   Your legal counsel advised you not to answer; is that correct?

A.   My legal coun- -- several -- several -- my legal counsel and several friends that are in the business, yes.

Q.   By "in the business," you mean they're lawyers?

A.   Lawyers, yes.

Q.   Okay.

A.   And judges.

Q.   Other than Chief Fontenot, are there any other

**52**

officers at the Eunice Police Department that have treated you unfairly?

A.   Not really besides, like, behind my back, talking about me type stuff and giving him ideas of how to get rid of people.  But not to me personally, to my face.

Q.   Who is giving him ideas about how to get rid of you?

A.   To my understanding, Lieutenant Young.

Q.   Lieu- --

A.   Lieutenant Young.  Ryan Young.

Q.   "Young" is Ryan Young?

A.   Yes.

Q.   Okay.

A.   Which also who --

Q.   Do you have any details about that?

A.   Well, that's who told him, apparently, to -- if you get rid of the dog, Dunn will quit.

Q.   We'll go back to the dog.

A.   Okay.

Q.   But no one else in the department has necessarily treated you unfairly; is that correct?

A.   No.

Q.   Other than Ryan Young?

A.   Corr- -- Well, like I said, he hadn't treated

**53**

me personally.

Q. And the chief?

A. The chief? He hadn't treated me -- Ryan hasn't treated me personally, just behind the scenes type thing. And that's only stuff I'm hearing.

Q. What else besides this -- behind the scenes have you heard that Ryan Young has said about you?

A. Only behind the scene stuff.

Q. Like what?

A. Oh, just, like earlier this year, I had ordered equipment for the tasers so that I could certify the officers that were uncertified.

Q. Uh-huh.

A. The equipment is expensive. I put in a request for a PO number to go get the bill paid because I can't order anything until then. I ordered it. It was shipped. The deputy chief called me and said, "Hold off on that shipment. The chief doesn't want to do it. He's thinking about getting rid of the tasers all together."

I was told later on that Ryan -- so Ryan doesn't like tasers. So Ryan had told him we don't need that, so that's where the idea came from. From two days, it changed -- he changed his mind. That happens all the time; he changes his mind and does

**54**

stuff that -- usually to cover up his other mistake. But that's the only real instances, stuff like that --

Q. Okay.

A. -- that we don't need a certification for this. And he's one of the ones that is not certified that sprays the OC spray and that type of stuff so --

Q. Why do you think he's making these comments behind your back?

A. I couldn't tell you.

Q. Okay. I want to talk a little bit more about why you think the chief treats you unfairly.

Earlier, you mentioned that you believe it's because of your role on the civil service board; is that correct?

A. Yes.

Q. Is it because you review investigations and -- filed by other members of the Eunice Police Department and you side with them sometimes? Or can you give me some details?

A. Well, as a chairman, I usually don't vote when --

Q. Okay.

A. -- there's a vote unless I need to. I can vote, but usually, if there's enough to have a decision, I usually don't vote. But I'm the one -- I'm

**55**

the voice of the board, so I'm the one that has to say what's going on during the -- the hearings and stuff. And I'm the one that -- that supervises the hearings. So I'm the one that -- that helps with asking questions and makes decisions, as the board chairman.

Normally when we have an investigation, we assign two members as a committee, and they do their investigation. They come up with findings, and they bring it to the board, and we go over it in a meeting, and then we -- we pull a vote. Somebody makes a move or a motion to make a decision, which will -- what we're going to do about it.

And I'm the one that calls for the -- and I'm the one that reads -- reads the investigation out loud. I'm the one that reads all the disciplinary action, anything overturning. I'm the one that asks questions, like, to the attorney that's there.

Q. Okay. Are you on the committees that investigate incidences that occur at the Eunice Police Department?

A. I have been.

Q. Are you now?

A. Not right now, I'm not, no. But because they are not police officers, a lot of research, I help them with.

**56**

Q. "They" meaning the special committee members; is that correct?

A. Right. Yeah, as far as case law, Louisiana law, federal law, civil service law.

Q. But you don't actually vote or do the investigations; is that correct?

A. Normally, no.

Q. Normally, no.

So if you're not voting or conducting the actual investigation, why do you think that the chief would punish you for your role on the civil service board?

A. Because he can't do anything to the other members. They don't work for him.

Q. Oh.

A. I'm the only one that he can reach out to, that he can affect.

Q. So you think that he's taking his anger out on the civil servi- -- with the civil service board on you in particular?

A. Yes.

Q. Okay. Do you have reason to believe that Chief Fontenot thinks you're helping Lieutenant Dunn with this lawsuit that's going on?

A. Yes.

**57**

Q.   Do you think that some of these punishments that you've received have been because you're helping Lieutenant Dunn with this lit- --

A.   Yes.

Q.   -- with this litigation?

A.   He has told many lieutenants that Lieutenant Dunn is the way he is, is because I trained him that way and it's my fault.

Q.   What does that mean, he is the way he is?

A.   And Stephanie too, the way she acts.  Huh?

Q.   What do you mean the way he is or the way she acts?

A.   That he's strictly by the law, by the book. That's the way I trained them to be.

Q.   So it's a problem?

A.   Chief Fontenot says -- yes.  Chief Fontenot says I don't have enough gray areas.

Q.   Tell me what that means, "gray areas."

A.   To me, a gray area is when the law says "may," you may do something, and it's black and white when it says you shall do something.  He disagrees with that, and he gives the reason with the "shall" word.  He said sometimes you can make the "shall" word a gray area, and I don't believe that, and that's the way I've always trained my guys.

**58**

And he said for the last eight years -- he told me this in our last meeting after the civil service board with Deputy Kennedy -- Deputy Chief Kennedy in the room.  He said, "I've watched you for the last eight years tear apart this department and train people wrong," and he goes off for two hours, basically.

Q.   Who goes off for two hours?

A.   The chief.

Q.   Oh.  By "goes off," do you mean --

A.   On -- on me.

Q.   -- on a speaking rant?

A.   Yes.

Q.   Okay.

A.   But in 2016, he gave me supervisor of the year, so apparently he liked some of the stuff I did. But that's not what he said.

Q.   How do you explain that discrepancy, that he gave you supervisor of the year but now he's given you all these punishments?

A.   Ever since I've been on the board because I give advice to employees, and when they tell him, "Well, Lieutenant Thibodeaux said this," he'll turn bright red.  Everybody tells me that.  My name just makes him mad for some reason, so does Dunn's name.  If

**59**

he sees one of our names on there, he'll start going through to see "Oh, they made overtime" or "They're on the list?  Let's go through the paperwork."  Why is he this and why is -- he just -- like, he's -- we're on his mind all the time.

Q.   Why would your advice to the other employees make Chief Fontenot mad?

A.   Because I give them what the law says, specifically, and I give them the law to go read it themselves, and I tell them to go read it themselves.

Q.   And the law con- --

A.   And he doesn't agree.  Yes, it contradicts his orders.

Q.   Contradicts Chief Fontenot's orders?

A.   And -- and sometimes he contradicts his own policies, so.

Q.   So is it your understanding that the reason Chief Fontenot does not like you, Donnie -- or sorry, you, Lieutenant Dunn and Lieutenant Myers because you follow the law?

A.   Yes.

Q.   And he does not want you to always follow the law; is that correct?

A.   If it's a law he agrees with, he wants you to follow it but his way.  If he doesn't agree with it, he

**60**

doesn't want you to enforce it --

Q.   What are some --

A.   -- or follow it.

Q.   What are some laws he doesn't agree with?

A.   Impounding vehicles that don't have insurance, speeding in certain places, stop sign violations.  You know, if you go up to a stop sign, if they don't stop all the way and they roll through it and there's somebody else coming, then y'all shouldn't enforce that.  He's put out emails telling us not to enforce stuff like that.

Don't enforce the 25 mile an hour in a residential zone.  Wait till they're at 35 or 40 miles an hour.  That's what the speed limit should be.  Stuff like that.

Q.   Do you think it's within the chief's authority to decide which laws to follow and which not to?

A.   Absolutely not.

Q.   Do you think it makes the city of Eunice safer that the chief of police doesn't want to follow the laws?

A.   No.  But I think it makes the officers look like hypocrites when they're not enforcing laws or they're not following the laws and they're enforcing those on other people.

**61**

Q.   So you think that diminishes your --

A.   Authority.

Q.   -- and other officers' authority within --
among civilians?

A.   I do.  Yes, I do.

Q.   Does that decrease trust in the city of Eunice
between the police officers and the citizens?

A.   Yes, it does.

Q.   Does that make the city less safe?

A.   Yes.

Q.   Okay.  With respect to your involvement in
this litigation and helping Lieutenant Dunn, has
Chief Fontenot ever talked to you about your
involvement in this case?

A.   No.

Q.   So how do you know he's not happy about your
helping Lieutenant Dunn?

A.   From his actions towards me, from the stuff
that he has told Lieutenant Dunn, who has told me, from
the things related to that that he has told other
officers, other lieutenants, et cetera --

Q.   What type of things?

A.   Just that it's my fault that civil service
board doesn't know what they're doing.  It's just a
guidance that Lieutenant Dunn is -- we would -- he

**62**

would get along, the chief would get along with him if
it wasn't for Donnie.

Q.   Who would get along with him?

A.   Lieutenant Dunn.

Q.   Would get along with?

A.   The chief.

Q.   If it wasn't for you?

A.   If it wasn't for the way I trained him.

Q.   Okay.  Do you think you've been punished in
any way specifically because you've assisted
Lieutenant Dunn with this litigation?

MS. GUNNELS:  Objection; asked and
answered.

BY MS. HIGGINS:

Q.   You can answer the question.

A.   I have been punished for not only helping Dunn
but anybody, any employee, whether they like me, don't
like me.  I answered the question because it's my job
as a civil service rep and as a lieutenant.  He's tried
to get some people to run against me, because I'm voted
for by the employees.

Q.   Run against you in your position on the civil
service board --

A.   Civil service board.

Q.   -- is that correct?

**63**

A.   Yes.

Q.   Okay.

A.   Even though it doesn't pay anything, I didn't
want to do it, I told people that asked me, I said, If
I get elected, I'll do it again, but I really don't
want to because I'm a target.  I've said that for the
last three terms.  And they're three-year terms.

He tried to run another employee against me
and lost.  And then one time, no one would even put
their name in the -- so I didn't have -- I was elected
by default because no one wanted to run against me.

Q.   So do you view the chief trying to get someone
else to be elected to your position as a form of
punishment?

A.   Yes, I do.

MS. HIGGINS:  Okay.  Let's take a break
for a minute.

THE VIDEOGRAPHER:  We're off the record
at 10:10.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the
record at 10:32.

BY MS. HIGGINS:

Q.   Lieutenant Thibodeaux, I just want to follow
up on a couple things we were talking about before.

**64**

Okay?

A.   Okay.

Q.   The crash report that was altered that you
were referring to earlier, who did Chief Fontenot ask
to alter that report?

A.   Chase Godeaux.

Q.   Chase?

A.   Godeaux.

Q.   Godeaux.

Has he ever asked anyone else to alter a
report?

A.   I've been told he has, but I'm not sure of the
names.  There's only one other report that I remember
the name of, and that was a burglary that happened.
And it was at the, I believe, Ruby's Restaurant.  But
that still might be under litigation.  I'm not sure if
they've...

Q.   Do you know what about the report
Chief Fontenot asked the officer to change?

A.   The victim and the suspect.

Q.   Their names?

A.   I don't remember their names.  Oh, switch --
like, not charge the person that was breaking in
because he was rammed by a car or something, and they
wanted him charged with the burglary but not charge the

**65**

owners who ran into him with the car.  I don't remember the exact details.

Q.  Okay.

A.  Lieutenant Dunn has the full information on it.

Q.  Okay.  But Chief Fontenot asked the officer to alter --

A.  The report.  He does that a lot, though.  He has people change reports a lot.

Q.  Does he ask them to change important information in the reports, generally?

A.  Sometimes.  The charges.

Q.  The charges.  Does he ask for the charges to be lesser or greater?

A.  Both.

Q.  Both?

A.  Yeah.

Q.  In what instances does he ask for reports to be altered?

A.  I couldn't tell you that.

Q.  Do you know why he asked people to alter reports?

A.  Either he doesn't agree with it, doesn't agree with the officer, or he knows the -- either the victim or the suspect.

**66**

Q.  When you say he knows the victim or the suspect, are they friends of his or family members?

A.  Both, I would assume.

Q.  Does he ask officers to alter the reports to protect victims or that are family members or -- let me rephrase.

Does Chief Fontenot ask officers to alter reports in order to protect people he knows from being charged with crimes?

A.  Sometimes.

Q.  Can you think of an example?

A.  Not specifically, no.

Q.  Okay.  You mentioned that Chief Fontenot wanted someone to run against you for your civil service board position.  Who did he want to run against you?

A.  I've heard different names.  Keith Laverne, Joey Fontenot.

Q.  Why would he want those people to run against you?

A.  Well, Joey Fontenot is a friend of his, personally.  He's a sergeant that rides the motorcycle and does traffic.  And they have a personal relationship, so.  And Keith Laverne, I guess because Keith follows -- works out of the class without

**67**

complaint.  He does -- he's a records clerk, but he does, like, IT work, computer work, not records work.

Q.  And Chief Fontenot likes him?

A.  Well, he's the one that has him doing it.

Q.  So would you say that the two people he asked to run against you are people who tend to listen to what Chief Fontenot says?

A.  Yes.  They're compliant.

Q.  Are they compliant even when Chief Fontenot asks them to do something that's not in line with the law?

MS. GUNNELS:  Objection; calls for speculation.

A.  Yes.

MS. HIGGINS:  I'm going to ask that you refrain from continuing to make impermissible objections, speaking objections.  This is a long deposition, and we have a lot to get through.  It's disruptive.  Thank you.

BY MS. HIGGINS:

Q.  You can answer the question.

A.  I said yes.

Q.  Yes.  Okay.  Great.

Who is the current deputy chief?

A.  Tony Kennedy.

**68**

Q.  And when Chief Fontenot started at the Eunice Police Department as the chief, about how many people were employed by the Eunice Police Department?

A.  Without looking at a roster, I would guess maybe 40, give or take.

Q.  And about how many people work at the Eunice Police Department now?

A.  I don't know.  I haven't been given a roster in a long time, so -- I would guess 20, maybe, maybe a little bit more or less.

Q.  It seems like a big gap.  Why do you think there's such a gap in the amount of people that were working there when Chief Fontenot started and who work there now?

MS. GUNNELS:  I'm going to object to you testifying on the size of gap.

MS. HIGGINS:  Again, it's an impermissible speaking objection but okay.

MS. GUNNELS:  Can we go off the record for a second?

THE VIDEOGRAPHER:  We're off the record at 10:37.

(Off-record discussion.)

THE VIDEOGRAPHER:  We're back on the record at 10:38.

**69**

A.   Could you repeat the question?

BY MS. HIGGINS:

Q.   Why do you think so many people have left the Eunice Police Department or that there are less people employed by the Eunice Police Department now than when Chief Fontenot started?

A.   There are several reasons, but one of the major factors that I've been told from people that have left is because they couldn't work for him because he's vindictive.

Q.   Can you give me an example?

A.   Well, he came, testified a couple days ago, and it's slipping my mind right now, his name.  But Chase Godeaux is one of them.  Noah Courville is one of them, who's trying to come back.  Josh Courville is one of them.  Grant Clancy is one of them.  Cody Miller is one of them.

They all work at other law enforcement agencies.  All of those have moved up in ranks since they've left here.

Q.   By "here," you mean the Eunice Police Department?

A.   Correct.  Eunice Police Department.

Q.   And you know that they all left because of Chief Fontenot?

**70**

A.   Yeah.  They've told me.  And some of them have written letters, have written notes and stuff and recorded the conversations.

Q.   What specifically did Chief Fontenot do that made them leave?

A.   Go after employees that didn't listen to him, agree with him, or that wanted to be strictly by the book.  And they said they can't do their jobs, and it's not worth it to stay here for the amount of money that they pay.  So they went somewhere -- most of them went places that paid a little bit more.

Q.   Would you say that Chief Fontenot -- sorry, go ahead.

A.   And when he came in, he cut the benefits for employees real far, like vacation.  Whenever a new employee started -- like when I started, after one year, you'd get 15 days' vacation, okay.  That's 12-hour shifts.

Now I think you get seven after a year.  And after 20 years, you max out at 14 days, after 20 years working here.  Whereas, when I started, all of us that were grandfathered in, we got 15 days after the first year and just kept going up, and we maxed out at 30.

So a lot of the employees that come may not ask about that at the beginning, but once they're there

**71**

and they compare that to everywhere else, and with all the stuff that they have to put up with here, they look at the whole picture and they're like, I'm not going to work here for that and have him going after me when I'm trying to do my job.  When they notice they can't do their job, that's when they usually leave.  That's why they leave quickly.

Q.   When you say "they can't do their job," can you explain a little bit more what you mean?

A.   Like, if you do your job and he doesn't agree with it, a patrolman shouldn't have the chief calling him, telling him, Change what you did.  Go back and redo this.  Go get another statement because I don't agree with what you did.  I don't like the charges.  Change the charges to this.  And he knows them directly or calls them in the office or calls them on the phone directly.  He'll call them on the scene and tell them to change what they're doing.

Q.   Would you say that Chief Fontenot makes it difficult for people to do their job if they don't agree with him?

A.   Oh, he makes it very difficult.  He makes it a priority for himself to make them miserable.

Q.   How does he make them miserable?

A.   The things we've already talked about.  He

**72**

tears apart any work they do.  He goes through it himself and tears it apart.  You know, finds any little thing wrong with it, sends it back to them.  Has them come in on their day off to finish something.  Puts out some emails.  Threatens people.

Q.   Threatens people how?

A.   Well, just like the malfeasance in office thing, you know.  Get them scared that he's going to go after them.  I know he was trying to get charges on Lieutenant Dunn for a while.

He talks a lot in the mornings, at his morning breakfast with all his detectives and the administration people, and I used to sit in on it.  I quit sitting in on it because all they basically do is talk bad about everybody that wasn't there.  So I just quit going, unless I was ordered to go, so.

He's very intimidating, especially to the young people that don't know a lot, don't know how to fight him.  Until you're there as a brand-new officer, for 18 months, you don't have the protection of civil service, so he can just go after you and get rid of you without you being able to appeal it.  So a lot of young officers leave fast when they figure that out, they have no retaliation.

Q.   How does he get rid of people?

**73**

A.    Just makes them miserable.  Like, he might promise somebody, You're going to work straight days when you get out of the academy, and then put them on nights.

Q.    So is it your opinion that he essentially forces people to quit?

A.    He makes them miserable enough to quit, like he was trying to do to me -- still trying to do to me.

Q.    Okay.  Like who, other than you?

A.    Lindsey Burton.

Q.    What happened there?

A.    He had promised her day shift, and when she got out of the academy, he put her on straight nights. He told her it was temporary, but she stayed on it for a long time.  And because of her family, you know, her husband and stuff, the way he works, she ended up going taking a lesser job at the sheriff's office, dispatching.

But she told me, she said, I see what he's doing to you.  Because I was on her shift at the time. That's when he moved me to straight nights.  And he doesn't keep his word, so I just can't put up with this, and she left.

Q.    Why did he do that to her?

MS. GUNNELS:  Objection; calls for

**74**

speculation.

A.    I don't know why he did that to her.  Usually, if he doesn't like somebody, he'll put them on the shift that the person don't like.  At the time, it was me.  So if you he didn't -- you did something he didn't like, he'll pull someone on my shift and leave me shorthanded.  Now it's Lieutenant Dunn's shift.  When we were both on the road, it was our two shifts, he'd split the people that he had problems with on the shifts.

BY MS. HIGGINS:

Q.    Other than contradicting Chief Fontenot, which we've talked about a little bit, what are some other reasons why he wouldn't like an officer?

A.    If they argue with him about a law and try to show that this is what the law says and it's not what he said, he gets very angry about that because you're showing him up or because you're saying he's wrong.  I think it's an ego thing, but that's just my opinion.

He wants -- he wants things done his way and his way only.  And if he doesn't agree with the law and you're enforcing the law, then he would get mad and try to get you or make you miserable or put you on a different shift or swap your shifts.

If you do what he asks you to do and you're

**75**

switching things for him, well, then, you get more people on your shift because you're doing what he wants.  And you get the people that you want on you shift.  You get the nicer vehicles or whatever it is like that.

Q.    So he favors people that follow his directives; is that correct?

A.    Correct.

Q.    Have you ever been demoted at the Eunice Police Department?

A.    Not officially.

Q.    Unofficially?

A.    Yeah.

Q.    How so?

A.    When I was taken out of my position Monday through Friday with weekends and holidays off till I'm strictly nights with a skeleton crew shift.

Q.    A what crew shift?

A.    Less than anybody else, other shifts, less people on it.

Q.    Is that dangerous?

A.    Well, yes, it's dangerous.

Q.    How come?

A.    Because if we have a shooting that happens or a disturbance, you don't have backup.  You know, a

**76**

murder trial that we're going through in the next three days, there was only a couple of us on the road on a Saturday night.  And when the shooting went off, the victim was pulled from us while he was bleeding because there was only two of us there.  And there was about 30 to 40 people, and we couldn't stop them from taking the guy in the truck.  They took him to the hospital.  We were waiting on the ambulance.

There are shootings all the time in Eunice. We have a lot of murders this year.  Shootings happen, I want to say, almost weekly now.  It's dangerous. There's people on bikes getting shot a block from our house just walking to work in the morning.  And a guy on the bicycle came by and they just shot him.

So when you're looking for that guy and you don't have but a couple people, it makes it very dangerous to go hunt somebody down door to door and go search houses and stuff like that.  We have to get other agencies to come help us when they are available. And they're shorthanded too, I'm sure so.

Q.    Does that make it harder for you to do your job?

A.    Yes, it does.

Q.    Is it Eunice Police Department policy to have these sort of shorter-staffed shifts?

**77**

A. Policy?

Q. Do you have less people on the shifts than you're supposed to have to be in accordance with police department policy?

A. Yes.

Q. So having less people work with you on these shifts that you're concerned about is a violation of Eunice Police Department policy; is that correct?

A. I don't know if the policy has how many people. I know we're allotted so many people. We're not up to that. So, yeah, we're in violation of that. That's -- he does the scheduling, so.

Q. By "he," you mean Chief Fontenot?

A. The chief, yes. He approves the scheduling.

Q. Would you say it's best practice in a police department to have more people than you're talking about on a shift?

A. Yes.

MS. GUNNELS: Objection; lack of foundation.

BY MS. HIGGINS:

Q. Yes?

A. Yes. The 18 years I've been there, yes.

Q. Are there any other ways in which you've been unofficially demoted at the Eunice Police Department?

**78**

A. Not besides taking duties away.

Q. What duties?

A. We had talked about them earlier.

Q. Okay.

A. Yeah.

Q. When were these duties taken away from you?

A. Well, originally they started being taken away after the council meeting where he blamed -- he thought I was the reason they were trying to take the deputy chief position and get rid of it.

Q. Why did he think that?

A. I guess because I was in the mayor's office and the council people were talking to me about it. As a civil service rep, they asked me how do they get rid of that position, so it's my job to tell them how to do it.

I was in there a lot discussing that, when they were trying to ask me on the phone with the state, to make sure I was correct. And he made the comment that I was in there too much. And then that night when they did that, like I said, the next morning he moved my position.

Now, he moved another lieutenant to make it look like, from what I'm told, that he wasn't doing it just to me. But a lot of people kept their unnecessary

**79**

jobs Monday through Friday and he didn't put them on the road.

Like right now, he has four shifts. He's got five sergeant slots, but two of the sergeants are in the administration, and there is one shift without a sergeant at all, but he says they're full.

Q. Did he give you -- did he give you a reason for why --

A. He said because it was shorthanded. He didn't give me a reason. His emails said because we're shorthanded.

Q. Were you shorthanded?

A. Yes. We've been shorthanded for a while. We weren't any more shorthanded than we were the months before that.

Q. But do you think that was the actual reason why your shift was changed?

A. No. He changed my shift because he was mad at me.

Q. For your role in civil service board --

A. Correct.

Q. -- in removing --

A. We had just turned in a payroll investigation, where he paid some employees, and we found that it broke civil service rules and law, and we referred it

**80**

for criminal investigation to other agencies. Because he -- the civil service board makes the rules that say when you can have off. Okay.

Q. Uh-huh.

A. You cannot get people off just because you want them to have a paid day off, and that's what he did, to only certain people.

So we did an investigation because we had a complaint. That's our job.

Q. Who filed the compliant?

A. On that one, I'd have to look.

Q. Okay.

A. And then for us to do an investigation, we don't have to have a complaint. We can do an investigation on our own. We've done several investigations like that. So we'd just came back with the findings that found that he paid them, when he didn't have the authority to pay them, to have a day off.

Q. Who did he pay?

A. I believe his secretary and some of the office people. Might have been an officer or two. He paid them to go home. And I want to say it was for either a hurricane or something similar to that, which civil service rules do not allow for that.

**81**

Q.   Why would --

A.   You can take a vacation day if you want that day off, which some people did.

Q.   So you're saying that he gave certain people paid time off when they were not permitted to have paid time off --

A.   Correct.

Q.   -- according to civil service rules; is that correct?

A.   Correct.  And then there was another one where he paid people for bereavement leave for like, let's say, an uncle, where civil service says it has to be immediate family, uncles are not included, but he paid them anyways.

Q.   Why would he do that?

A.   Those are people that are compliant with him, that do what he asks.

Q.   So are you saying he gave paid time off to people that he showed favored to in the department?

A.   Yes.  And one of those is one that he had went after -- Jeremy Ivory was one of them.  But since we overturned his stuff, Jeremy has kind of became favoritism to him, towards him, started doing what he wanted him to do, so he'd get more people on the shift.

Q.   Jeremy started doing what Chief Fontenot

**82**

wanted him to do --

A.   Correct.

Q.   -- in order to reap the benefits?

A.   Right.

Q.   Is that correct?

A.   Right.  To play the game.

Q.   Okay.  And just to clarify, he wouldn't give -- Chief Fontenot would not give this paid time off to all employees; is that correct?

A.   No.  People have been denied for the same reason before.

Q.   What same reason?

A.   For, like, your uncle -- I've asked for my uncle that died in Tomball, and I was told, No.  That's not immediately family.

Q.   Oh.

A.   Not to him specifically.  I went to my chain of command.

Q.   So the people who have been denied paid time off for the same reasons, are those people he's shown favoritism towards in the past?

A.   Not that I'm aware of.

Q.   Are those people that you would say Chief Fontenot seems to dislike?

A.   Yes.

**83**

Q.   Like who, other than you?

A.   I can't remember specifically because it was years ago.

Q.   Okay.

A.   And I don't even think they're here anymore.

Q.   Okay.

A.   I just remember getting the phone calls asking me about it.

Q.   So these informal demotions that we've been talking about --

A.   Yes.

Q.   -- do you think you were demoted for improper reasons?

A.   Yes.  And I feel it was a demotion because the email he put out when he put me in the training coordinator position --

Q.   Uh-huh.

A.   -- he said that everybody needs to think of me as, like, answering to the deputy chief, that I had the same power as him when it comes to if you want training or not, to follow my instructions as if I was the deputy chief.  That's in an email.

And then all of a sudden, I went from that to a night shift supervisor with hardly anybody on the road, no holidays, no -- you know.  And I was the

**84**

senior lieutenant, which normally, for the last 18 years, gets to pick what shift they want.

Q.   Okay.

A.   I was put on the shift that nobody wants.

Q.   And just to make sure I have this timing correct, these demotions occurred after you assisted the civil service board, as is your role, with the payroll fraud investigation; is that correct?

A.   After a few of those, yes, and after overturning his actions.

Q.   Okay.  Did you report any of these demotions?

A.   I appealed them.

Q.   To the civil service board?

A.   Yes.

Q.   What's happening with that?

A.   When the hearing came, my attorney, which now works for the city, said that he made the transfer illegally because they had took the appointing authority away from him.  And the law says the appointing authority can switch my shift, not the chief.  The board agreed with it and overturned it before the hearing started.

Q.   Do you mind just clarifying what transfer exactly you're referring to?

A.   The transfer from the training coordinator to

**85**

night shift supervisor. I was transferred from one position to another.

Q. By Chief Fontenot?

A. By Chief Fontenot, yes.

Q. And bear with me. Just clarify again. Who has that authority to make that transfer?

A. The appointing authority, which is the city council and the mayor.

Q. So Chief Fontenot did not have that authority to make that transfer?

A. No.

Q. So because he lacked that authority, the civil service board overturned that transfer; is that correct?

A. Correct.

Q. Okay. Did the civil service board tell Chief Fontenot that he did not have that authority?

A. That night, yes.

Q. Yes. Had he had that authority previously?

A. Yes.

Q. So they removed that authority?

A. The council removed it, by ordinance.

Q. By ordinance?

A. Yes.

Q. And what did the ordinance say, specifically?

**86**

A. The state law he had got changed, I believe in maybe 2016 or 2017, to say that, by ordinance, a resolution, the council can appoint him at the appointing authority but has the right to take it back.

So they had -- I want to say it was in 2017 they had done an ordinance to give him appointing authority.

Q. And the appointing authority, just to clarify, is -- encompasses hiring, firing, transfer decisions?

A. And disciplinary.

Q. And disciplinary action?

A. Yes.

Q. And Chief Fontenot now no longer has that power; is that correct?

A. Correct.

Q. That seems like a lot of power to remove from the chief based on one incident. Are there other incidences that motivated the civil service board to revoke that authority from Chief Fontenot?

MS. GUNNELS: Object to form.

A. The civil service board didn't take it away. The city council took it away.

BY MS. HIGGINS:

Q. The -- apologies. The city council. Were there other reasons that the city council

**87**

took away Chief Fontenot's appointing authority?

A. I don't know what any other reasons would be. They just -- during the council meeting, I watched it. They basically said, Just because we've always had it.

Q. Who's always had it?

A. The council.

Q. Okay.

A. And that we should have never gave it up in the first place, is what they said.

Q. Okay. Is it your opinion that Chief Fontenot abused that authority?

A. Yes.

Q. Do other people in the Eunice Police Department hold that same opinion?

A. I would say the majority of them, yes.

Q. Do people on the civil service board also hold that opinion?

A. I don't know.

Q. To your knowledge.

A. I mean, looking at the plans we've had, it looks like that's what was going on.

Q. Okay. Have you ever reported these informal demotions to any other authority figures, people within the Eunice Police Department or outside the civil service board?

**88**

A. I've reported it to the mayor and several councilmen.

Q. Did the mayor take any action in response to your report?

A. He said he could not because he was told by the city attorney that you can't get involved with the chief.

Q. Okay. After you filed your appeal regarding you transfer decision and the civil service board overturned your transfer, what was Chief Fontenot's reaction?

A. He was angry.

Q. How do you know that?

A. I could see it on his face. And people told me that he went out of there and was pacing up and down the hall until early in that morning. And the next morning, apparently he went to my office that was locked and unscrewed the padlock and went in there looking for something.

Q. What do you think he was looking for?

A. I have no clue. But there's cameras there, so.

Q. So you know that he broke into your office?

A. Yes. He got permission from the mayor to unlock the door, the main door. But I had a padlock on

**89**

there because the door doesn't close all the way.

Q.   Okay.

A.   And the padlock apparently was backwards, so you could get to the screws and take it off.  And he was in there for a while.  I don't know -- I don't have a camera in my office, so.

Q.   Did you ever ask him what he was looking for?

A.   Some files were missing, but I don't know -- I don't know what he took and what he went through.

That was the next day.  And then Sunday came.  I called the deputy chief and said -- or texted him.  I can't remember if I called him or texted him.  I said, I haven't been told.  Am I supposed to start my regular position back Monday or what?  And he said he'd let me know.  And then he called me the next morning -- or called me back and said to be in the chief's office the next morning for a meeting.

And that's when -- when I said he was sitting there berating me for two hours, basically, telling me how bad I am and all that, that was that next morning.  And started adding a bunch of extra stuff to my duties that I had never done before and taking away duties.

Q.   Can you tell me a bit more about what he said when he berated you?

A.   Just saying that I -- he's watching me tear

**90**

apart this department and tell people wrong things and basically trying to blame me and a couple other people for the morale, for the people that are leaving.

I don't know.  It was two hours long.  After a while, I just kind of blocked him out.  But the deputy chief was in there too, and he was -- he was angry.  He was red in the face, and he was raising his voice the whole time -- basically the whole time.  He started calming down at the end because deputy chief kind of stepped in.

Q.   Stepped in to calm him down?

A.   Yeah.  Basically, y'all quit.  Because I started getting angry, and I don't know if I raised my voice, but, you know, I never cursed or yelled at him or whatever.  But I was tired of him saying all these things without me saying anything, so I started saying, no, actually, it's this.  And I started correcting him on stuff, which made him more mad.  And then deputy chief finally stepped in.  But it was over two hours, I believe.

Q.   During that meeting or at any other time, have you ever been threatened by Chief Fontenot?

A.   No.  Until that time, he had never -- I've heard him raise his voice and throw things and get mad and all that kind of stuff, but I never had him do it

**91**

to me personally.  I had heard him do it to other people, but he had never done it to me until that day.

Q.   Who have you heard him threaten before?

A.   Lieutenant Dunn.  I was in the office.

Q.   What did he say?

A.   I don't remember which time was which, but he threatened him a few times and told him if he didn't quit that he was going to go after him, do an eye on him if he didn't turn in his resignation.  I've heard him say how he doesn't do a good job and that type of stuff, just berated him.  Just putting people down.  That's what he likes to do.

Q.   Has he threatened anyone else?

A.   I believe he's threatened -- well, he's threatened quite a few people, but ones I've actually heard was just Lieutenant Dunn I've heard him threaten other people in front of me but not in front of them, like --

Q.   Can you give me an example?

A.   Well, like, I mean, he's talked bad about Lieutenant Ivory, how he doesn't do a good job.  And Lieutenant Young, before they got on the same side, he would tell you he was one of the worst lieutenants he ever had.  Rest in peace, he talked bad about Brickly, Robert Brickly, who passed away.

**92**

Q.   So --

A.   Stephanie Myers.

Q.   When you say he threatened these people, in addition to talking bad about them, has he ever said that he would try to take away their job?

A.   No.  He would say -- like insinuate that he was going to find something on them, type thing.

Q.   To do what?

A.   I guess discipline them.

Q.   Okay.

A.   And this is over the last eight years.  This is not a one time, yeah.

Q.   Have you ever heard him threaten anyone with physical violence before?

A.   No.

Q.   Have you ever heard any rumors about him threatening anyone with physical violence before?

A.   Not besides -- well, yes, actually, I have.  I heard he went and started banging on the city marshal's desk because he was mad because of something Lieutenant Dunn had said or done or -- the marshal had helped Dunn send some officers out there -- or the officers had volunteered -- deputy marshals had volunteered to help Dunn because he was so shorthanded, and they had volunteered to stay over.  When he found

**93**

out about it, he went in to Terry's office and threw a fit and started banging on his table. And I think -- the way Terry told it, it was threatening, the way he did it.

Q. Okay.

A. That's the only time I can think of specifically.

Q. Do you know about when that was?

A. Within the last -- it was before my hearing. Within the last two years, I guess. I'm speculating, ma'am, the time limit because the last two or three years have kind of been a blur.

Q. Okay. And no other instances in which Chief Fontenot has threatened anyone that you've heard about --

A. That I've heard specifically, no.

Q. Okay. Have you ever been threatened by anyone else at the Eunice Police Department?

A. No.

Q. Have you heard of anyone else being threatened by any officers at the Eunice Police Department?

A. Not besides the one I already told you about.

Q. Okay.

MS. HIGGINS: I'm going to hand the court reporter a document to be marked as

**94**

Thibodeaux Exhibit 1. It bears Bates number CSB_0000959.

(Thibodeaux No. 1 was marked for identification.)

BY MS. HIGGINS:

Q. Now, this is a long document, so feel free to take your time and familiarize yourself with it if you would like. Otherwise, I can direct you to the page in which I have questions. Okay?

A. Okay. My case has 50-something emails and stuff, so I can't recall every single thing.

Q. That's okay.

MS. HIGGINS: Just bear with me a minute while I take these out, because these are quite lengthy.

(Discussion held outside hearing of reporter.)

MS. HIGGINS: Here you go, Lieutenant. Would you like a copy as well?

MR. LOUGHLIN: Yes, please.

MS. HIGGINS: Can I get that one, please? Yeah. Thank you.

MR. LOUGHLIN: Thank you.

BY MS. HIGGINS:

Q. All right. So the page I have questions on is page 18. It's a March 23, 2021, letter from the law office of Joseph R. Beck III. The Bates number is

**95**

CSB_0000976. I imagine flipping to the 18th page is not exactly convenient.

Do you recognize this letter, Lieutenant Thibodeaux?

A. Yes.

Q. Is Mr. Beck your attorney?

A. He was.

Q. He was. When was he your attorney?

A. When I originally filed my appeal.

Q. Okay. When was that?

A. I believe it was in 2020, April. I'd have to look at my phone date.

Q. It's okay. You can give me an approximate date as well.

A. It was April 20th -- March 23rd. So it happened on March the 10th.

Q. Of what year?

A. Somewhere -- 2021. That Wednesday morning -- because the council meeting was the 9th -- that Wednesday morning is when I was put on nights. So somewhere between the 10th and the 23rd.

Q. Of March of 2021; is that correct?

A. Correct.

Q. Okay. But he was your attorney at the time this letter was written?

**96**

A. Correct.

Q. Is that correct?

A. Yes.

Q. For the record, can you explain what this letter is?

A. This is my appeal letter --

Q. Okay.

A. -- to the board, the civil service board.

Q. Okay. I'm going to read part of the letter. In the letter it says, "Lieutenant Thibodeaux hereby appeals the personnel action taken against him on or about Wednesday, March 10, 2021, wherein he was improperly transferred."

And then on the next page, CSB_0000977, it says, "The transfer of Lieutenant Thibodeaux was made deliberately to discriminate against him. The transfer imposed by the City was arbitrary, unreasonable, without just cause or any basis in fact or in law and was not made in good faith."

Can you tell me what personnel action you were appealing in this letter?

A. That's when he transferred my position from training coordinator to night shift supervisor.

Q. And by "he," you mean Chief Fontenot, correct?

A. Correct.

**97**

Q.   In the letter it says you were deliberately discriminated against.  Can you tell me a little bit about what that means?

A.   Discriminated against because of my position as a civil service representative and board chairman.

Q.   Okay.

A.   Because we had ruled several times against him and reversed his actions.  And the investigations that we did found him in violation of civil service law.

Q.   So by "discriminated against," you mean he singled you out for those actions and punished you for them?

A.   Correct.

Q.   Do you agree with the statement in this letter that the transfer imposed by the City was arbitrary, unreasonable, and without just cause?

A.   Correct.

Q.   I know we talked about this a little bit, but just -- if you don't mind, what was the civil service board's decision in this appeal?

A.   They said that he did not have the authority to transfer my position because he was not the appointing authority.

Q.   And just so I have the timeline correct, did they remove his appointing authority before or after

**98**

this appeal was filed?

A.   Before.

Q.   Before?

A.   Yes.

Q.   Was it before or after the transfer was made?

A.   It -- they removed it from him before.

Q.   Before he transferred --

A.   Transferred, correct.

Q.   Okay.

A.   I want to say it was 2019, the end of 2019.

Q.   Okay.  So because he did not have the authority -- and I know we already talked about this, but just to clarify.  He did not have the authority to make the transfer, and the civil service board overturned that transfer --

A.   Correct.

Q.   -- in your favor, correct?

A.   Correct.

MS. HIGGINS:  Okay.  I'm going to hand the court reporter another document, to be marked as Thibodeaux Exhibit 2.  The Bates number is Dunn_0000295.

(Thibodeaux No. 2 was marked for identification.)

BY MS. HIGGINS:

Q.   And I'm just going to direct you to the first

**99**

page.  But, again, the document is a few pages long, so if you'd like to familiarize yourself, no problem.

A.   You want this one back?

Q.   That's okay.  You can hang on to it.

MS. HIGGINS:  I think I accidentally handed out two copies somewhere.

THE WITNESS:  Okay.  I'm familiar with this.

BY MS. HIGGINS:

Q.   Okay, Lieutenant Thibodeaux, you know what this letter is?  You recognize it?

A.   Yes, I do.

Q.   For the record, can you state what this letter is?

A.   It is public record request for emails from and to the chief from any council members or the mayor of Eunice.

Q.   Did you write this letter?

A.   No.

Q.   You did not?

A.   No.

Q.   Why is your signature at the bottom of the letter?

A.   Oh, you're talking about the original letter?

Q.   Yeah.

**100**

A.   Yes, I did.  This letter, yeah.  I was looking at this, the next page.

Q.   Okay.

A.   Yes.  This one I did, yeah.  I did the records request.

Q.   The records request, you did write that letter?

A.   Yes.

Q.   To clarify for the record, Dunn_0000295, you wrote that letter, and that is your signature on the bottom?

A.   Correct.

Q.   And it was written March 3, 2021?

A.   Yes.

Q.   Was this request for public records related to the same incident regarding your improper transfer that we've just discussed?

A.   No.

Q.   Oh.  What was this related to?

A.   I don't think so.
This was related to overtime being taken away.

Q.   From you?

A.   No, from the chief.  Because it was a safety issue.

Q.   Can you explain that a little bit more?

**101**

A.    Are you sure this is the right letter for this?

Q.    It's a separate letter.  Just look at the letter on its face.

A.    Because I can't -- let's see.

Q.    If you don't -- this is isn't a memory test, so if you don't remember what this is related to, that's okay.  Just let me know.

A.    I just believe that the date is wrong on the top.

Q.    What do you think the date should be?

A.    It was probably the 13th.

Q.    Of?

A.    March.

Q.    March.

So what do you think that you were requesting records in response to?

A.    To my appeal.

Q.    To your appeal?

A.    Yeah.  Transfer.

Q.    The transfer appeal that we just discussed?

A.    Yes.  I just got confused because the date isn't correct on there, but I think it is a misprint of the date.

Q.    Okay.

**102**

A.    Because when I first said it, it was about the appeal, because I remember writing that.  But I've written more than one.  That's why it's confusing.

Q.    Okay.

A.    Because I've done a lot of record requests, as the board member and as personal, so.

Q.    But you were, you think, requesting public records in your personal capacity --

A.    Correct.

Q.    -- with respect to this letter; is that correct?

A.    With respect to my appeal for this email, yes.

Q.    Okay.  Why did you specifically ask for emails sent from Chief Randy Fontenot's email from March 5th, 2021, through March 23, 2021, or from Mayor Scott Fontenot or any of the city council members of the City of Eunice?

A.    I'm trying to recall.  I believe I had a conversation with the mayor, and he had said he had spoke to the chief about it, so.

Q.    About you transfer?

A.    No.  About the -- well, the whole thing that was going on after the council meeting.  Because I felt like he did the transfer because of what happened the night before.  So I was calling to inform him.

**103**

Q.    Because of what happened the night before with the payroll findings?  Is that --

A.    No.  That -- the night before with them -- they voted to take away the deputy chief position, which the chief was opposed to, but they voted to do it on the 9th.

Q.    Okay.

A.    And that's when he made all these changes about the overtime and transferring my shift.

Q.    And the changes you're referring to, these are on the next page, the document Bates stamped Dunn_0000296?

A.    Correct.

MS. HIGGINS:  I think there's one additional zero.

BY MS. HIGGINS:

Q.    What did you expect to find in these documents that you asked for?

A.    The conversations between him and the mayor.

Q.    What did you think those conversations would say?

A.    About the overtime and about the power struggles.

Q.    What overtime?

A.    That the chief was telling everybody that he

**104**

had cut out the overtime because of the mayor.

Q.    Because the mayor --

A.    The city council took away the overtime, was basically what he was telling everybody.

Q.    Was that true?

A.    No.

Q.    What actually --

A.    Not from my understanding.

Q.    From your understandings, what --

A.    The chief, after that meeting, decided to take overtime away because he said he was over budget.  And that was his -- that was his, I guess, way of fixing it, because he was mad.

Q.    Mad at whom?

A.    He was mad at the council.  He was mad at the mayor.  He was mad at the people he thought were involved in taking away the deputy chief position.  And some -- he thought some people had given the mayor and councilmen information on overtime issues, that people were writing the overtime, claiming overtime that they weren't working, or working it and not doing anything excessively, so that the budget was over.

Q.    Okay.

A.    So he said, You're going to have to work with what you have, no matter how short your shift is, due

**105**

to budget issues. And the mayor had said that he never told -- the council and the mayor that night had never told him to cut anything. They just said, Get it within your budget. That's your job.

Q. Okay. What did cutting overtime have to do with your transfer?

A. I guess he just used that as an excuse. But he was telling people that it was my fault, that I'm the one that was over there pushing to get rid of the deputy chief. Because I was in the mayor's office, and other councilmen were coming to my house and talking to me and asking me how to do it and asking what's going on with the PD and asking me about people that were working overtime. Asking Dunn the same kind of questions. So he thought we were in the -- we were the ones behind it.

Q. Why did people want to get rid of the deputy chief position?

A. They were trying to help him fix his budget, because he kept complaining about the budget. And it was a new position. The deputy chief position is basically a political position. Used to, we had a assistant chief, and it was by passing a test and seniority. And then they changed it to where every three years, he can pick somebody to be the deputy

**106**

chief. And after three years, if they're not doing what he wants, of course he can pick somebody else. So it became a political position instead of a civil service, but it is protected by civil service.

Q. He could pick someone else. By "he," you're referring to Chief Fontenot?

A. Yeah, Chief Fontenot could pick somebody to fill that position every three years and be in charge of everybody else.

Q. Why do you think it was important to Chief Fontenot to keep that position?

A. Because he can control that position, because if they don't do what he says, he'll just get them out and put somebody else in there. Because it's a competitive position; it's not a promotional position, even though you're still the boss of everybody else, the supervisor over the lieutenants. So I think he thought he would lose power that way --

Q. He would lose power if the deputy chief position was gone; is that correct?

A. Correct.

Q. Okay.

A. Because all the deputy chiefs that I spoke to were always afraid if they didn't do what he said, or whatever chief was in there, you know, their position

**107**

wasn't held, they would be demoted back down to their position they were in before, after the three years is up, or before if they could find a reason.

It takes you a year to become permanent. So that first year, you can only appeal on certain things. And then the next two years, you're covered. But at the end of those -- that third year, they can just put somebody else in there if he wants.

Q. Okay. So would you say that the deputy chief position is someone who would be ensured to follow Chief Fontenot's directives?

A. If they wanted to keep that position, yes.

Q. Okay. You mentioned a power struggle earlier. What power struggle were you referring to?

A. About who controls what in the police department.

Q. Who is the power struggle between?

A. The appointing authority and the chief.

Q. And what sort of documents with respect to this power struggle were you expecting to find in this request?

A. That the chief was trying to make it sound like it was all the mayor and counsel, of why he was making the decisions that were hurting the department.

Q. So by "it was all," you mean the decisions

**108**

that were negatively affecting the Eunice Police Department? He was --

A. Correct.

Q. Chief Fontenot was trying to shift blame onto the council and Mayor Fontenot; is that correct?

A. Correct.

Q. And you were trying to show that it was actually Chief Fontenot that was making these decisions --

A. Decisions.

Q. -- that were adversely affecting the -- the department. Is that correct?

A. Correct.

Q. Okay. Was anything produced to you in response to this request?

A. Emails, yeah.

Q. What was in the emails?

A. Back and forth between the mayor and Chief Fontenot.

Q. Do you remember what these emails said?

A. Vaguely. I'm reading them just to be sure that I don't get it wrong. You want me to read it?

Q. Sure. Why don't -- why don't you summarize it, if you can?

A. Well, basically, the mayor had told him that

**109**

he talked to him yesterday and during past meetings between them two, that he would support a budget amendment if he went over budget because they do that every year when you go over overtime budget. That's expected.

He says, "I won't -- I won't, however, support wasteful spending. You're given -- you're giving out overtime without hesitation during the first nine months of the fiscal year, and now since the council has questioned this, you merely put a stop to all overtime. You're putting officers at risk and the general public."

And then he goes in to say the Lawrason Act is clear definition of separation and duties between the mayor and elected chief. And he --

Q.  Who is "he"?

A.  The mayor is the one --

Q.  Okay.

A.  -- writing this.

Q.  Okay.

A.  And he -- and he -- he puts the mayor's duties, what it says in there. And he says, "I refuse to play politics when it comes to city business or anything else. I will not accept responsibilities for any of your actions, and I'm going to forward this

**110**

email to each coun- -- counsel member for their knowledge. I hope there's some clarification." And then the --

Q.  Let's talk about that email for a second.

So for the record, you were just reading from Dunn_0000296 and 297; is that correct?

A.  Well, I was trying to summarize it, yes.

Q.  Okay. You were summarizing that email.

Would you say that there was a power struggle between the mayor and Chief Fontenot?

A.  It's hard to say. It's somewhat -- I think the mayor wants to help the city and the officers, but it feels like his hands are tied in a lot of things.

Q.  Why are his hands tied?

MS. GUNNELS:  Objection; lack of -- or objection; calls for speculation.

BY MS. HIGGINS:

Q.  Why do you think --

A.  From what I understand, because of the legal advice that he's given from the city attorney.

Q.  Okay. What's their relationship like, Mayor Fontenot -- or sorry, Chief Fontenot and the mayor?

A.  I really couldn't tell you.

Q.  Okay. I want to move away from this for right

**111**

now, this document. Okay?

A.  Okay.

MS. HIGGINS:  I'm going to hand the court reporter another document to be marked as Thibodeaux Exhibit 3.

(Thibodeaux No. 3 was marked for identification.)

BY MS. HIGGINS:

Q.  Do you recognize this document?

A.  I recognize the handwriting.

Q.  Who's handwriting is it?

A.  It's mine.

THE WITNESS:  I know it's messy. I hear y'all laughing over there.

BY MS. HIGGINS:

Q.  For the record, could you tell us what this document is?

A.  Again, I'm going to try to skim over it because I write a lot of notes.

Q.  Take your time.

A.  Okay. This was -- I had handwrit- -- started handwriting some of my -- putting my evidence together for my hearing.

Q.  For your hearing regarding your transfer; is that correct?

A.  Correct.

**112**

Q.  Are the notes in this document only about your transfer?

A.  No.

Q.  Okay.

A.  It's about retaliation. It's about a lot of things going on in the department.

Q.  Has anyone else read this document, to your knowledge?

A.  I'm sure, yes.

Q.  Who do you think has read it?

A.  My attorneys, Lieutenant Myers, possibly Lieutenant Dunn.

Q.  Why would Lieutenant Myers and Lieutenant Dunn have read this?

A.  I was needing some help putting it together.

Q.  Okay.

A.  And some of the -- the evidence and stuff. And I had asked, I believe, Lieutenant Myers -- I had asked her to type it up for me so it'd be easier to read.

Q.  Got it.

A.  She types very fast, so.

Q.  Okay. I'm going to walk through some of the statements in this document. And if you don't know where they are, just let me know.

**113**

A. Okay.

Q. And I'm happy to help point them out to you. Okay?

A. Okay.

Q. So I'm going to start on the first page of this document, which is SMyers_0000026. In the document, you say, "I had no jailer and asked for help and jail procedures since I had been off patrol over five years. No response."

What was meant by that?

A. Which number is that? E --

Q. It's towards the top of the first page.

A. Right here?

Q. Yep, right there.

A. Okay. When I was put on night shifts -- I was put on night shifts. I hadn't been on -- for over five years, I hadn't been on the road. And they changed procedures on everything. They changed computer programs, how you do your paperwork, and I was put on a shift with no jailer. And I received a -- I received a letter and some -- some information that he was going after --

Q. Who is "he"?

A. -- my night shift. The chief was going to the day jailer and saying if he could find anything, that

**114**

the paperwork is messed up, "make sure to bring it to me so I can take care of it." So I had sent an email asking for some help about the new procedures.

Q. Asking who for some help?

A. The deputy chief. And I don't remember if I cc'd the chief or not. I can't remember, exactly, on that email, and I hadn't gotten any response yet.

Q. So when you say you asked for help from the deputy chief, what were you asking for?

A. Someone to show me how to do the new procedures and the paperwork and all the stuff that he was complaining about in the mornings about --

Q. Who is "he"?

A. The chief --

Q. Okay.

A. -- in his morning meetings because he said if he found any mess-ups, he was --

Q. Mess-ups by you?

A. By me or my shift that I signed off on, that he -- that he would hold me responsible. But like I said, I didn't have any jailers, so I had -- I had to have patrol officers volunteering to do jail -- jail duties. And I didn't know how they were doing, if they were correct or not, because I hadn't been on the road and no one showed me the correct procedures they

**115**

wanted. And there's nothing in writing; there's no procedural orders on the jail, that I know of.

Q. Is it standard to have patrol officers help with jailing proceedings?

A. From what I understand, lately, it's been that way. It's not supposed to be. They're supposed to be able to book the people but not -- not do all the rest of it, like give out medication and all that kind of stuff and stay back there with them and make sure that stuff is getting cleaned and --

Q. By "them" you mean people in custody; is that correct?

A. Correct. Yes.

Q. So jailers, specifically, are supposed to be --

A. In charge of the inmates.

Q. Got it. But you have no jailer?

A. No.

Q. Why not?

A. They had three jailers, I believe, at the time, and they were all on day shift.

Q. On what shift?

A. Day shift.

Q. And you were on the night shift?

A. Correct.

**116**

Q. Why wasn't a jailer staffed on your shift?

A. I can't speak to that because I wasn't assigned one. They --

Q. Why do you think?

A. Because he was after me.

Q. By "he" you mean Chief Fontenot?

A. Yes. Instead of putting two or three jailers in the daytime, he didn't have none at night when you need them.

Q. So is it your understanding that not having a jailer staffed with you on the night shift was a form of punishment?

A. Yes. Not having enough patrol men, a dispatcher, yes.

Q. About when was this?

A. This was right after he switched my shift the next month.

Q. Chief Fontenot --

A. Chief Fontenot transferred me.

Q. From?

A. From training coordinator to the night shift supervisor on this rotation.

Q. You said that you emailed deputy chief for assistance; is that correct, in this matter?

A. I believe it was him that -- either -- I don't

**117**

know who I put on there first and who I cc'd.

Q.   Okay.  But you didn't receive a response; is that correct?

A.   No, I didn't receive a response.

Q.   Why do you think no one responded to your request for help?

A.   A lot of my emails are not responded to, and they'll call you, but they don't -- I guess they don't want anything in writing because we always ask for -- we always ask for a public record request, and they have to produce those so it's written down.

Q.   Who -- who is "they"?

A.   The chief.

Q.   Chief Fontenot and --

A.   Yes.

Q.   -- anyone else?

A.   Sometimes the deputy chief.

Q.   Why wouldn't they want this in writing?

A.   Because then they'd have to be held to what -- what -- what they said, and they can't change their mind and say they didn't say it.  Because a lot of times, it goes against law, and a lot of times it goes against the procedure order that are written.

Q.   So to clarify, a lot of what they would say in these emails goes against proc- -- the law and

**118**

procedural guidelines.  Is that --

A.   Correct.

Q.   -- what you're saying?

A.   Yes.

Q.   Okay.  I'm going to move to another part of the document a little bit further down on the same page.  It says, [As read]:  "April 25th, 2021.  Board gives finding of payroll irregularities and recommends forwarding to agencies to investigate possible criminal -- criminal violations."

Now, we may have already covered this.  But do you mind telling me what that was about?

A.   That was about the payroll that was -- they were paying people days off and paying for funeral leave and paying for made-up holidays.  We called it payroll irregularities because we didn't want to say fraud or whatever until it was proven.

Q.   Okay.  Right after that, it says, then, "April 16th, emailed DC, said he was advised my shift assist is only temp" -- I'm assuming that's an abbreviation for "temporary."  Is that correct?

A.   Yes.  After I appealed and he found out what I was appealing for, he told DC to email me and say I was told by --

Q.   Who is "he"?

**119**

A.   The deputy chief said I was told by the chief that this is only temporary -- and this is a month after it happened -- and that they'll put you back on your regular rotation when they can.

Q.   Was it temporary?

A.   No.

Q.   Why would he say it was temporary?

A.   To try to cover his actions because he always makes actions before he thinks about it, and he has to switch it later.

Q.   And by "he" you're referring to Chief Fontenot --

A.   To Chief Fontenot --

Q.   -- correct?

A.   -- yes.  Yes.  Sorry.

Q.   Did you believe there was a valid reason for making the shift change?

A.   No.

Q.   Were you given a reason?

A.   Yes.

Q.   What was that?

A.   Because of overtime.  Because the overtime was cut out and because they were shorthanded, which they had been shorter than that previous to that, and I wasn't switched but --

**120**

Q.   But you don't think that was the actual reason --

A.   No.

Q.   -- for your shift change?

A.   Everybody knows it wasn't.

Q.   Why do you think that wasn't the actual reason for your shift change?

A.   Because of his -- his history of being vindictive and doing things that didn't make sense to anybody else.  But he would, in his mind, say that makes sense to him, and it makes it look like I'm doing something good for somebody.  He's always blaming everybody else and playing the victim.  So --

Q.   Okay.

A.   -- it ain't his fault.  It's the mayor's fault, or it's the employee's fault.  It's the parent's fault.

Q.   Parent's fault?  Whose --

A.   Yeah.  I'm just saying --

Q.   It's everyone else's fault?

A.   Correct.

Q.   Is that what you're saying?

A.   Yeah.

Q.   It's an expression?

A.   Like, for the -- well, I mean, he put a big

**121**

add in -- on Facebook representing the police department, saying it was the parent's fault why kids are bad and just stuff like that instead of -- why the crime is so bad in Eunice?  It's not his fault.

Q.    So he does not take respons -- the chief --

A.    Correct.

Q.    -- does not take responsibility for the increase in crime rate in Eunice; is that what you're saying?

A.    Correct.  Yes.

Q.    And he shifts the blame onto --

A.    Everyone else.

Q.    -- pretty much everyone else?

A.    Yes.

Q.    Okay.  A little bit further down in the document, you say, "I was out sick May 7 through 9 and as per policy, turned in doctor excuse on the 10th.  May 14th, I get an email that chief threatened not to pay me if I didn't explain why 'other' was checked instead of 'sick' or 'injured' and was telling people I did on purpose to mess with him.  He was angry.  I responded."

            What were you referring to here?

A.    I had a -- I was out -- I was out sick and on my doctor's excuse, they have a checkbox that says

**122**

"illness" or "injury."

Q.    Uh-huh.

A.    And my doctor didn't put the checkbox, so in the office, he was being loud and all mad and saying that I did that --

Q.    Who is "he"?

A.    The chief -- just to mess with him.  I had several people tell me he was saying that, I just didn't check that box just to mess with him.

Q.    You didn't check the box?

A.    Right -- or -- yeah.

Q.    Are you supposed to check the box?

A.    No, I'm not.  I didn't.

Q.    Why do you think the doctor didn't check the box?  Is the doctor supposed to check the box?

A.    They do; sometimes they don't.  I mean, they just say "he's out sick for this amount of time."  It doesn't matter if it's an injury or -- or illness.  My sick time covers both, so it --

Q.    Okay.

A.    -- didn't really matter to the doctor, you know, which one it is.

Q.    But there wasn't a real reason --

A.    No.

Q.    -- why the box wasn't checked --

**123**

A.    No.

Q.    -- to your understanding?

A.    No.  But I was told he wasn't going to pay me unless I told him why.

Q.    The chief told you he was not going to pay --

A.    The chief told the deputy chief --

Q.    -- you for your sick leave?

A.    -- to tell me.  Yes, to either tell -- the deputy chief said, "Chief said you're -- you have to let us know why you were out or he's not going to pay you for it."  And he thought that I had got a sick leave from my doctor because somebody in my family was sick, like my son, which doesn't even -- my wife and my daughter don't go to my doctor, so that wouldn't even make sense to me.  That would be fraud, which I wouldn't do anyway.

Q.    Okay.  Was there an explanation in the note as to why you were out sick?

A.    No.

Q.    No?  You just had a note --

A.    That's --

Q.    -- from your doctor that said you were out sick?

A.    And that's the way we've always done it.

Q.    So it's not customary for you to provide --

**124**

for your doctor, rather, to provide a detailed reason as to why you were out sick; is that correct?

A.    Correct.  The only time he would do that -- if it was something that was contagious, then they would do it.

Q.    But it wasn't something contagious --

A.    No.

Q.    -- in that instance?

A.    No.

Q.    Have there been other times where other officers have handed in sick notes in which the box was not checked and there was not a detailed explanation given by their doctors?

A.    I couldn't say yes or no.  I don't know.

Q.    Okay.

A.    I -- I don't remember if I've seen some or not, but I know they didn't have a reason in there, either way.

Q.    Okay.

A.    Some people may put a reason, but I haven't seen those.  Most of the time, it just says "under my care" from such and such date to such and such date, and they're handwritten.

Q.    But just to clarify, in order to receive payment for these sick days, it is not required that

**125**

your doctors note have this box checked or that it provides a detailed explanation?

A. No. Civil service law and board rules say that the employee shall be entitled to this many days of sick leave, period.

Q. Okay.

A. They have to pay for them.

Q. So why wouldn't the chief pay you for your sick days if your notes were in compliance with what's required?

A. Because my name was on it.

Q. Okay. No other reason?

A. And he's vindictive, just -- just being difficult, trying to make trouble for me.

Q. Okay.

A. I know he's called --

Q. When you --

A. -- on other people.

Q. When you said he was angry, how do you know he was angry?

A. I was told by several people that were in the office when -- when he was -- voice is raised, he's all red, and you could tell he was mad, talking.

Q. About this in particular?

A. Yes.

**126**

Q. Do you know specifically what Chief Fontenot said?

A. Just what I told you.

Q. Okay. I'm going to skip around a little bit. Towards the end of that first page, it says, [As read]: "I was denied a free Boston insurance certification course because he said we don't need that."

A. Baton.

Q. Got it, baton. Thank you for that correction.

A. You're -- you're welcome. It's my handwriting. I understand.

MS. HIGGINS: Apologies everyone.

BY MS. HIGGINS:

Q. Why were you denied that certification course?

A. He said we don't need that, is what -- what the deputy chief told me he said.

Q. "He" being Chief Fontenot?

A. Yes. But that he didn't sign the paper denying it; he just didn't give it back to me.

Q. Okay. Did you think you needed that training course?

A. Yes, I did. Because they still had some people carrying batons, and they still had people issued batons.

Q. By -- by "they" who do you mean?

**127**

A. Officers.

Q. Okay.

A. And our policy says if you are going to be issued or have a baton in your possession or use it, then you have to be certified -- currently certified, which is every three years.

Q. Okay. So in your opinion, that certification course was actually required in order for the officers -- not all but some of the officers at the Eunice Police Department to be in compliance with training requirements; is that correct?

A. Yes. And I had never been denied for recertification before for any of my certifications.

Q. Why do you think you were denied this time?

A. Because he was mad at me and trying to punish me.

Q. For the same issues we've been talking about?

A. The same -- this is right after that, yes.

Q. Okay. Just above that, you wrote, "Training and officer certifications are way behind, and we have officers who are not certified." A little further down, you say, "That should not be carrying use-of-force tools. This is a big liability on the city and citizens of Eunice."

We talked a little bit about this, but I just

**128**

want to talk about it a bit more.

A. Okay.

Q. I'm assuming from the next sentence about the baton -- now that I know what it says -- course, that batons are one of the weapons for use-of-force tools that you believe that officers needed certifications for but did not have them. Correct?

A. Correct.

Q. What other use-of-force tools are you referring to?

A. The taser, the pepper gun, OC spray.

Q. Okay. When you say "this is a big liability on the city and the citizens of Eunice," can you tell me a bit more about what you mean by that?

A. Well, I kind of touched on it earlier.

Q. Uh-huh.

A. Skills diminish over time.

Q. Okay.

A. And they -- each -- like, taser is -- every year they want you recertified. New laws, new case laws come out that say when you can tase somebody, when you can spray somebody. That's all covered under the certifications when -- when we redo certifications. I go over case law. I go over use of force. We go over deescalation techniques that come out. It's always

**129**

ongoing. It's ever going, depending on what case comes out.

So when I do a certification class and when I get recertified, I'm brought up to date, and then before I do a class, I have to go online to the different agencies and make sure that I'm using the latest case law and the latest training bulletins. So if they don't have that information, they may be breaking the law and not know it, or they may use it incorrectly because they haven't practiced it and they haven't touched it --

Q. "May use it incorrectly" meaning the weapons --

A. The use-of-force weapon, whatever --

Q. Okay.

A. -- which one that is. Yes.

Q. Okay. Who's in charge of deciding whether these trainings take place or not?

A. The chief.

Q. And why would he say that we don't need these trainings if, as you say, they're important to keep officers up to date on new developments in the law and how the weapons have changed?

MS. GUNNELS: Objection; calls for speculation.

**130**

A. He always says -- he has told me several times that somebody had to be the cert- -- first one that got certified, and they just made that up. It's not -- you know, somebody -- who had the first certification for taser? That's something that's just made up, and then it's done every time after that, so we don't need that.

BY MS. HIGGINS:

Q. So to clarify, Chief Fontenot believes you just need one training on that use-of-force tool and that's it?

A. I can't say if he thinks you even need one training. They purchased some launching OC guns, I think, last year or the year before last. And whenever Lieutenant Ivory asked him to get certified to be able to use it, he said, "You don't need to do that. You don't need to get certified for that." And he had never been certified on it, so he refuses to use it, so it's just sitting there.

Q. So Chief Fontenot doesn't think that, in your -- to your understanding, does not think that officers need training to use certain use-of-force tools; is that correct?

A. Somebody's told me. That's what -- my understanding, yeah.

Q. What would qualify a police officer to be able

**131**

to use these tools that's different from a civilian?

A. Well, a lot of tools are sold to law enforcement only.

Q. But why would an officer know how to use these tools without that training better than I would, for example?

A. They wouldn't.

Q. Okay. And I know we talked about this a little bit. But do you think not having these trainings is dangerous for the officers?

A. Yes.

Q. And what about for the people of Eunice?

A. Very dangerous because you could break bones with the baton. You could blind somebody with OC spray if you get too close, don't use it at the proper time. If you don't know where your impact is going to be with the taser darts, they could have problems with their heart, et cetera.

Q. Would you say, to your knowledge, that the people of Eunice are afraid of the police officers use of these tools?

A. Some of them are, yeah.

Q. How come?

A. Because they've been used on them before, and they see what goes on TV.

**132**

Q. Have they been used on them - on the civilians improperly?

A. Yes, they have.

Q. Can you tell me about that?

A. Well, I know, like, OC in the jail has been used improperly, and there's been some lawsuits with it.

Q. Can you give me an example?

A. There was a -- years ago, there was a girl making a lot of noise, and one of the officers opened the door and sprayed her real close to the eyes, and she ended up having some eye issues -- permanent eye damage.

Q. Which officer did that?

A. He's no longer there. I -- I can't think of his name right now.

Q. Why would he do that?

A. He came from Rayne PD. I -- I would guess because he -- I don't know. I can't answer that. I wasn't under the training department at that time so --

Q. When he used the spray on the woman in custody and it didn't go well for her eyes, as you said, was this incident investigated?

A. I have no idea. Not that I'm aware of. It didn't happen on my shift.

**133**

Q. Do you know if this officer was punished --

A. Yes.

Q. -- for using --

A. He -- they got rid of him.

Q. Oh, he was fired for using --

A. That was -- yeah.  And that --

Q. -- the spray?

A. -- that specific incident was before Chief Fontenot.

Q. Oh.  Who was in charge at that time?

A. Chief Dies.

Q. Okay.  Since Chief Fontenot has taken over as the chief of the Eunice Police Department, have there been any other instances in which officers have used use-of-force weapons improperly?

A. Only that I've heard from other officers.

Q. Okay.  Can you tell me about that?

A. I know there's been a couple of instances in the jail where people were sprayed while they were handcuffed, sprayed in the back of cars when handcuffed.

Q. Sprayed with what?

A. OC.

Q. Okay.  Who were they sprayed by?

A. Different officers.

**134**

Q. Can you name some?

A. Because they're not -- they're not turning in the reports, so I don't have -- they're supposed to turn in a use-of-force report, but they're not turning them in because they're not certified.

Q. Okay.

A. But everybody knows that it's happening, so I hear about it.

Q. So --

A. So I can't give you a really specific --

Q. So to be clear, you have heard about a number of incidences in which Eunice police officers are using OC spray when they are not supposed to be using them because they lack training and then they are not writing reports about this use of force because they lack that training.  Is that correct?

A. Because they're not certified.

MS. GUNNELS:  Objection; compound.

A. Yeah.  And -- and then the deputy chief asked me a couple of times, "We need some more OC spray. They've run out."  I said, "Well, I haven't got a report and I usually don't give out a can unless I get a report.  So until I get a report, I'm not going to give any cans out."  So apparently they were going to order them through -- order them on their own instead

**135**

of going through me because I document everything. Same with the taser cartridges.

BY MS. HIGGINS:

Q. Is a report necessary to conduct an investigation in -- into these incidences?

A. It's in our policy to do it.

Q. It's in your policy to have a report in order --

A. A use of force --

Q. -- to conduct an investigation?

A. No.  It's in our policy that if you use of force, that you do a -- a report.

Q. Okay.

A. I -- I -- I didn't understand your question.

Q. That's okay.

A. Yeah.

Q. Does Chief Fontenot, to your knowledge, know about these instances in which OC spray has been improperly deployed on civilians?

A. I know they talk about it in the mornings --

Q. Who is "they"?

A. -- in front of him.

Q. Okay.

A. All the supervisor meetings that they have, I've heard them talk about it, and my office was across

**136**

the hall.

Q. Have these instances been investigated by Chief Fontenot?

A. Not that I'm aware of.

Q. Normally, would an excessive -- or let me rephrase.

Normally, would an instance of this sort, in which OC spray was improperly deployed, be investigated?

A. It should be, yes.

Q. It should be.  Why aren't they investigated, then?

A. I couldn't tell you that.  I -- I know before -- when we do taser -- when we have a taser use, they give me a report to get another taser cartridge.

Q. Uh-huh.

A. And I know in the past, I'd get those and read them, and I'd bring it up to the deputy chief and the chief sometimes and say, "This doesn't look right. Y'all need to look into it."  But it never -- as far as I know, they never looked into it.  If they did, I didn't hear nothing else about it, so I just assume they didn't do anything with it.

Q. Have you ever heard of any officers being disciplined for using these tools improperly?

**137**

A.    I don't recall any since Chief Fontenot has taken over.

Q.    Okay.

A.    But in the past, before that, yes.

Q.    But not since Chief Fontenot has taken over?

A.    Not that I can remember.

Q.    All right.  Let's turn to the next page of the document.  It says, "September 30th, 2019, Lieutenant Dunn's complaint about V. Fontenot and D. Guillory, that you didn't act on, is found to have violated civil service laws by this board."

What was going on there?

A.    The complaint about Victor Fontenot and Darien Guillory?

Q.    Uh-huh.

A.    We got a complaint from Lieutenant Dunn that he had made complaints on those two officers, and we did an investigation -- committee did an investigation.  The committee found that civil service laws were broken, possible criminal violations.

Q.    What was the incident?

A.    I don't know if they -- I don't know if they put that in the report or not because usually we don't deal with criminal.  So -- but civil service law was violated, and we referred it to the appointing

**138**

authority to be dealt with.

Q.    What was the incident that's being referred to here?

A.    I'd have to look at the report, to be honest with you, because there's been quite a few over the years.

(Brief interruption.)

MS. HIGGINS:  Bless you.

A.    I know -- I know Darien Guillory has to do with some evidence issues.  I believe that -- that the chief had investigated Dunn for an incident with a rape.  And he had some issues with -- but I'm not sure if this is the investigation they did on it, that -- that Dunn is complaining about because there's been several things with -- with Victor Fontenot.

BY MS. HIGGINS:

Q.    Okay.

A.    I'm sure I have copies of the investigation downstairs if you need it.

Q.    Okay.  In that sentence, you say, "That you didn't act on."  What did you mean by that?  Who didn't act on what?

A.    The chief.  Because the law says if he gets a complaint from an officer --

Q.    Uh-huh.

**139**

A.    -- a formal complaint, that he has 14 or 15 days to start an investigation.

Q.    Into that complaint?

A.    Yes.

Q.    And to your knowledge, Chief Fontenot did not start an investigation into that complaint; is that correct?

A.    Not to my knowledge.

Q.    Why wouldn't he have investigated this?

A.    They were both detectives, which usually the detectives are handpicked by him, the ones that sit in the office all morning.  And Victor Fontenot is a -- they're both patrolmen, but Victor answers directly to him.  He doesn't have to answer to anybody else and pretty much does what he wants.  It's -- their favoritism, that's -- that's why I don't think it was done, because they laughed about it at their breakfast table.

Q.    Who laughed about it?

A.    The chief and the detectives and Lieutenant Young and whoever else was in there with them.

Q.    So is it your understanding that Chief Fontenot does not investigate all complaints made by other officers when those complaints involve

**140**

officers that are his favorites?

A.    Yes, that would be my opinion.

Q.    Okay.  What makes an officer Chief Fontenot's favorite?

A.    As I've said before, it's the ones that do what he wants --

Q.    And Victor Fontenot --

A.    -- without question.  Yes, Victor Fontenot is --

Q.    -- does what he wants without question; is that correct?

A.    Yes.

Q.    Okay.

A.    He's a narcotics detective.  And several officers that had been interviewed by the chief for that position were told, "You can have this position, but you got to understand I'm going to give you people to go after, and people I say don't mess with, don't mess with."  That's what they told me --

Q.    Who told you that?

A.    Joshua Courville told me that and Nicholas Cooley told me that when they were in that position or being --

Q.    In what position?

A.    Detectives.

**141**

Q.   Okay.

A.   Or being interviewed for such.

Q.   So would you say that it's somewhat of a prerequisite in order to become a detective, that you're willing to abide by Chief Fontenot's directives about who to go after and who not to go after?

A.   Yes.

        MS. GUNNELS:  Objection; calls for speculation.

BY MS. HIGGINS:

Q.   That's your opinion; is that correct?

A.   Yes, that's my opinion.  And that's what I've been told by officers.

Q.   Which officers have told you that?

A.   Joshua Courville, Nicholas Cooley, Chase Godeaux, a few others that have been interviewed that are not here anymore.

Q.   Okay.  So that's a general perception in --

A.   Yes.

Q.   -- your office; is that correct?

A.   Yes.  And ev- -- that's everybody's, pretty much, general opinion.

Q.   Okay.  Later on in the document, you say, "June of 2020, you took K9 from Dunn.  He appealed June 19, 2020.  December 2020, another shift change.

**142**

Dunn shift shortest with shift B, not lieutenant still," parenthesis, "over one year."

        Can you tell me what was going on with that?

A.   Yeah.  After he -- Lieutenant Dunn appealed, when he took the K9 away -- right after every time he would appeal, there'd be a shift change, and Dunn would end up with less people than everybody else on his shift, usually within a week.

Q.   Why would Dunn have less people on his shift?

        MS. GUNNELS:  Objection; calls for speculation.

BY MS. HIGGINS:

Q.   Why do you believe that Dunn had less people on his shift?

A.   Because the chief was going after him, trying to make him miserable to quit --

Q.   Okay.

A.   -- or to punish him --

Q.   Okay.

A.   -- because he went against him.  He wouldn't do things the way he wanted, and Dunn was by the book.

Q.   By "by the book," what do you mean?

A.   Follow the law to the T.  Followed the -- followed it to what the law says.

Q.   And just to clarify, that's an issue for

**143**

Chief Fontenot, correct?

A.   Yes.

Q.   Okay.

A.   And even now, if you look at the -- the two lieutenants that are on shift, one of them has four people on the -- on their shift, the other one has six. It's always -- Dunn's shift is always the shortest. When I was there, it was my shift or me and Dunn's shift.

Q.   Is it your opinion that having a shorter shift is a form of punishment for him?

A.   Yes, it is.

Q.   What about taking the K9 away from Dunn?  Is that a form of punishment?

A.   Yes.  That was done so -- that was -- that was done so he would quit.

Q.   So it's your understanding that taking the K9 away from Lieutenant Dunn was a way to force Lieutenant Dunn to quit his position at the Eunice Police Department?

A.   Yes.  And whenever -- my office was still over there in the office, whenever I said -- when chief found out that Dunn -- he said, "Dunn can't appeal that."

        I said, "Yes, he can appeal that."

**144**

He got really mad.  "He shouldn't be able to appeal that."  And then he did it anyway after I told him you can't just take the dog away like that.

Q.   Why did you tell him he couldn't take away the dog?

A.   Because I was a civil service rep, and I was trying to explain to him, just like I did on other cases, that you have to follow civil service law.  You can't just do things like that.  They can appeal it. And then he said, "So you mean to tell me if I just put you back on the road, you can appeal it?"  I said, "Yes, I can."  He said, "Well, that's" -- then he cursed and went off on his rant.

Q.   Okay.  So civil service rules say that Chief Fontenot does not have the authority to just take the dog away; is that correct?

A.   Yes, if it's done as a discipline, as punishment.  You can't do it as punishment.

Q.   Did Chief Fontenot give another reason for taking the dog away?

A.   He told the council something that he just didn't want it.  First, he said he couldn't afford it, and the council offered to give him extra money.  He said, "I just don't want it."

        And they said, "Well, is it a handler issue?

**145**

The dog is doing good?" I mean, it's all on public record. It's -- it was at the council meeting.

And he said, "No. I can't discuss that." And he kept going back.

Q.   So --

A.   He said, "I don't care if y'all pay it, it's going to be y'all paying for the bills. I'm not having a dog. Just don't want it." And he left it like that.

Q.   Is having a K9 helpful for narcotics officers?

A.   Absolutely. Their -- their nose is very helpful. They can smell things that we can't.

Q.   And you mentioned earlier that narcotics is a big issue in the city of Eunice. Is that correct?

A.   Very big. My wife is afraid to walk down the street anymore.

Q.   Okay. So do you think that taking away the K9 from Lieutenant Dunn was in the best interest of the city of Eunice?

A.   No.

Q.   No. Do you think it was more important, in your opinion, for Chief Fontenot to punish Lieutenant Dunn by taking the K9 away than it was for him to protect the city of Eunice?

A.   Yes.

Q.   We're going to come back to that.

**146**

A.   Okay.

Q.   This is more just for clarification. But later on in the document, it says, "Then civil service meeting. February 25th, 2021, board announces investigation of payroll irregularities from your actions."

What actions are you referring to here?

A.   Well, there was two different ones. One was about -- I don't know which one was first. One was about the -- the bereavement leave --

Q.   Uh-huh.

A.   -- that was given to a couple of people. I believe it was maybe Victor Fontenot and Jeremy Ivory for uncles or aunts or whatever. And then the other one was for those several employees that got paid time off, and other employees didn't get the same treatment for time. That's not given by civil service.

Q.   Okay. So the incidences we've already discussed.

A.   Yes.

Q.   Correct?

A.   Yes, yes.

Q.   Okay. In that same area of the document but in the margins, you wrote, "You targeted Myers. You thought she had filed complaint but put admin leave,

**147**

four hours."

What was going on there?

MS. GUNNELS:  I'm sorry. Where are we looking in this document?

MS. HIGGINS:  If you look on page 2 of the document, in the margins on the right-hand side.

MS. GUNNELS:  Okay.

A.   Whenever we announced the -- the investigation, his -- the chief's biggest thing at -- at the meeting was he wanted to know who filed the complaint. I want a copy of the letter.

And we said this one -- the board is initiating it's own investigation because I got several calls asking about it, so the board decided to look into it. We had a motion. We decided to look into it. And he said he wanted to know -- he was mad because we wouldn't tell him who it was, so he --

BY MS. HIGGINS:

Q.   Who is "we"?

A.   The board.

Q.   Okay.

A.   Because he said -- and then he requested public records for it, but we didn't have a formal complaint. I had just been called, so the board

**148**

decided to do the investigation ourselves.

Q.   And --

A.   So he thought that Myers was the one that actually had -- she was doing payroll at the time.

Q.   Okay.

A.   So he started going after her, and he -- actually, from what she said, he told her later on that's why he was mad, because he thought that she had given up -- or made the complaint or given information or whatever.

Q.   So to clarify, Chief Fontenot thought that Lieutenant Myers had filed the complaint, and as a result, he put her on admin leave. Is that correct?

A.   I don't know what reason. I'd have to look at my records. I don't -- I don't remember what reason he said he put her on admin leave. I don't -- I -- I can't say for sure.

Q.   Okay.

A.   Because he -- he did -- he's done a couple of things with her like that, so.

Q.   After he was under the impression that he -- that Lieutenant Myers filed the complaint, that you're aware of, did he take any other action to punish Lieutenant Myers?

A.   I don't know if it was right after this or

149

something else similar to it --

Q.   Uh-huh.

A.   -- but he started taking her duties away also.

Q.   And you viewed that as a form of punishment --

A.   Yes, I did.

Q.   -- correct?

A.   Yes.

Q.   Other than his opinion or his belief, true or not, that Lieutenant Myers filed this complaint, are there any other reasons that he would have started taking her duties away?

A.   I believe that he thought she was helping Dunn and me with stuff, and then she ended up getting hurt, and he had her on light duty.  And then when he got mad at her, he tried to take the light duty away.

Q.   Got mad at her for what?

A.   For the stuff that was going on with Dunn and myself and all these investigations.

Q.   For helping Lieutenant Dunn?

A.   For helping, yeah.

Q.   Okay.

A.   And I think he told her something about that she gave somebody a recording of him saying stuff.  A recording --

Q.   Saying negative things?

150

A.   Saying negative things and him and other people in the department.

Q.   On that recording, do you know what sort of things he thought was being said or that were said on the recording?

A.   Like, the threatening of the dog when that all happened, that was recorded, apparently.

Q.   Who threatened the dog?

A.   Victor Fontenot in front of the chief, and they were all just talking about Dunn.  And the chief had the complaint from Dunn and let the people he was complaining on, the two patrolmen, read the complaint from Dunn in front of every body, and they were all laughing and joking about it.  And then there were some cuss words said, you know, "F Dunn," that kind of thing.  I think it was Victor who said that or something similar to that.

Q.   And Chief Fontenot was present --

A.   Yeah.

Q.   -- for this conversation?

A.   Yeah, could hear him talking.

Q.   He participated in the conversation?

A.   I -- I don't know how much of the conversation because I didn't listen to the whole thing.  I just heard part of it so --

151

Q.   You listened to the recording, though, at some point.

A.   At some point, yes.

Q.   Is that correct?

Did Chief Fontenot threaten Lieutenant Dunn in any way in the recording, that you remember?

A.   I don't remember in that recording, no.

Q.   Other than Victor Fontenot threatening to kill the K9, did he make any other threats in the recording, that you remember?

A.   I don't remember.

Q.   Okay.

A.   I honestly don't.

Q.   So just to wrap up this part, it's your understanding that because Lieutenant Myers may have submitted a complaint to the civil service board, helped Lieutenant Dunn, and made a recording, that she was punished by Chief Fontenot; is that correct?

A.   Yeah.

Q.   And there were not valid reasons, to your knowledge, for these punishments; is that correct?

A.   Correct.  I don't think she has anything on her record to show that.

Q.   Okay.

THE REPORTER:  I'm sorry?

152

A.   I don't think she has anything on her record -- like punishment, like disciplinary action, like with an action sheet -- to say that she does -- you know, that she has had problems in the past.

BY MS. HIGGINS:

Q.   Also, in the document, it says, "March 16th, you take an officer off my shift leaving me shorter on shift.  March 31st, Lieutenant Dunn advised me to watch out."

Why were you -- why did officers get taken off your shift and by whom?

A.   Where do you -- where do you see that at?

Q.   Towards the bottom.

A.   I see that "watch out."  But --

Q.   There -- I think right there.

A.   March -- yeah.  He transferred an officer off my shift and gave him to Dunn -- to Lieutenant Dunn's shift, and Dunn even called me and said, "I've got more officers than you already.  You can keep them because it's going to leave you even shorter."

And he told me to watch out because apparently Randy had been talking a lot in the office about trying to get me, and that's when he went to the jailer and told the jailer in front of Lieutenant Dunn -- he went straight to the jailer without the chain of command and

**153**

said -- that's when he had said if he find any mess-ups from the nightshift -- he was going through all my paperwork to try to find anything that -- that was wrong -- to bring it directly to the chief, not through the chain of command, so he can hold me responsible.

And these are all letters and emails, the numbers on here --

Q.   Uh-huh.

A.   -- in -- in my evidence, that's what this refers to.

Q.   Okay.

A.   Yeah.  So the full story is not just right here.  I was just jotting down what each one of them had to do with.

Q.   Got it.  So you said that in this instance, Chief Fontenot actually gave Lieutenant Dunn the officers who were supposed to be on your shift.  Is that correct?

A.   Yes.

Q.   Was this before Lieutenant Dunn and Chief Fontenot's relationship got contentious?

A.   No.  But after one of the appeal hearings, he had brought Lieutenant Dunn in.  They had supposedly had a meeting.  They said they were going to try to start from fresh in good faith and all that.  And I

**154**

think this was during that time.

But then from what Dunn told me, Chief Fontenot ended up -- started doing things behind him and saying stuff about him again, so it just all went to -- you know, all went back to the way it used to be.  It was just talk.

Q.   Okay.  So this happened in a time where it's your understanding that Lieutenant Dunn and Chief Fontenot were in a better place --

A.   I wouldn't say good place, but yes, better place.  Yes.

Q.   Okay.

A.   He had his sight set on something else at that time, the chief did.

Q.   Is there anything else in these notes that we haven't gone over that you think is important?

A.   Not really with Dunn's case.  I mean, it has to do with him coming after me about stuff, you know, asking for inventory he never asked for before and just changing everything about my job to try to give me more work.  Like I said, he was supposedly told to try to give me more work to make me want to leave that position instead of appealing it.  That would be easier for him just --

Q.   To leave what position?

**155**

A.   The training position.

Q.   Okay.

A.   Instead of -- instead of appealing it, and it's just -- I have email after email of him trying to just pick it apart.

Q.   Pick what apart?

A.   My job.

Q.   Okay.

A.   And try to give me stuff that he had never gave me before.  And when I would ask questions, he would email me back saying, you know, just unprofessional stuff.  That's what the rest of this is pretty much about.

Q.   So these are all examples of --

A.   Retaliation.

Q.   By lieutenant -- or apologies.  By Chief Fontenot against you; is that correct?

A.   Correct.

Q.   Are there any other instances of retaliation that you talk about in this letter -- or in these notes, rather, that we haven't covered yet?

A.   No.  Just say, like, in 8/24, after -- after five months of being on the night shift, right before my hearing was already scheduled --

Q.   Uh-huh.

**156**

A.   -- I had my same unit the whole time.  It's an unmarked unit with no cage.  And then all of a sudden he wanted me to change to a road unit because I'm on the road now, but he kept saying that it was temporary until the overtime issue was fixed.

And then we got an email saying, "Oh, we're going to cut down on the over- -- overtime because we got more people now, so y'all can start working overtime again."  But my position was still never changed, and then he put in a marked unit.  And I -- these are just notes showing that it was not true in the first place.  It's just showing that --

Q.   What was not true?

A.   That it was a temporary position.

Q.   Okay.

A.   Now, he undid the -- he said it was because there was no overtime.

Q.   Uh-huh.

A.   And then when the overtime came back, he still didn't move me.

Q.   Okay.

A.   And then right before my appeal hearing, decided to switch my units around, put me in a marked unit with a cage.  That's what --

Q.   Are those less nice units?

**157**

A.    Well, I mean, if you ever sit in a unit with a cage, there's not a lot of room in it.  And it's marked -- administration used it as driver marked unit.  So I was trying to prove that it wasn't temporary; it was permanent.

Q.    Your change in position was permanent?

A.    Correct.

Q.    Is it correct to say that in these notes, what you're trying to demonstrate is that the change in your position was not actually because there was a cut in overtime but because Chief Fontenot wanted to punish you?

A.    Correct.

Q.    Okay.

A.    And this ends on E35, for evidence, and I only have like 50 something now.

Q.    It does look like there's some pages missing from this document.

A.    Yes.

Q.    Is that correct?

A.    Yes.

Q.    Do you know where they are?

A.    Well, I didn't -- I added -- I don't know where the other passages -- the handwritten pages.

Q.    Okay.

**158**

A.    But when she typed it out, I just started adding to that.  So I have my evidence I'm still gathering because it's still open.

Q.    Okay.

A.    And it's just been adding to these, even though since this time, like I said, there's 20-something more email pages of stuff.

Q.    Would you be willing to give those to plaintiff's counsel for review?

A.    Sure.

MS. GUNNELS:  I'm going to object to that.  I'm not sure if it's proper for you to be asking him for documents outside the scope of a subpoena of some sort.

MS. HIGGINS:  Why?

MS. GUNNELS:  Because he's not your client.

MS. HIGGINS:  We can ask for documents if he's willing to produce them, if we were to issue a subpoena.

Is that correct?

THE WITNESS:  Yeah.  Most of it is public record anyway.

MS. HIGGINS:  There you go.

BY MS. HIGGINS:

**159**

Q.    We've talked a lot about retaliation taken against you by Chief Fontenot.

Was there ever a time when your vacation time was cut?

A.    My vacation time was cut.  You mean, like, taken away?

Q.    Yeah.

A.    No, I don't believe so.

Q.    Okay.  Were there any other shift changes that you believe were retaliatory actions that we haven't covered?

A.    On -- towards me?

Q.    Uh-huh.

A.    I don't believe so.  It's possible.  But like I said, there's so much that's happened, sometimes it kind of jumbles together.  Why?  You have something?

Q.    Okay.

A.    Because it's possible.  I just don't remember.

Q.    Does Chief Fontenot ever attempt to micromanage you in any way?

A.    Yes.

Q.    Can you explain that a little bit to me?

A.    Well, a lot of times he has told me that when someone makes a training request, I'm supposed to look at it first.  And if it doesn't go past me, then they

**160**

don't go.  A lot of times he signs it first and then sends it to me, after it's already approved, and for me to approve it.  He wants me to sign after it's already been signed.

Q.    Is that proper procedure?

A.    No.  No.  It's even in line that way.  But that's the way they've been doing it.  Not all the people, just certain people.

Q.    Why have they been doing that?

A.    I don't know.

Q.    Okay.

A.    It seems like certain people that ask, they go straight to him for stuff.  They don't follow the procedure.

Q.    Okay.

A.    A lot of these notes that I put on here was for micromanaging.  Like, he wanted to know the inventory of every single radar piece, everything in my office, which he has never asked for before until all this stuff happened.

Q.    Okay.

A.    He started asking for all the additional training.  He wanted written, documented, all these kind of trainings that I'm certified to do that he wanted me to do and blamed it on the -- like I said,

**161**

the insurance.

Q.   Okay.  Why do you think the chief micromanages you?

MS. GUNNELS:  Objection; calls for speculation.

A.   He's trying to find something to get me on, to get me in trouble with, to punish me for.

BY MS. HIGGINS:

Q.   Does he make --

A.   Because he goes through -- like, when I was on the road for that little short time -- even when I was first on the road, he would go through my -- all -- anybody that was on my shift, he'd go through all the paperwork and find something to -- to -- that he didn't agree with.

And he would send, like, me an email -- sometimes he would just send me a copy; sometimes he wouldn't -- saying, This should have been handled a different way.  Should have been done this.  Ordered the patrolmen to work out of their class and go follow up investigations.

And he'd just pick apart anything that I would sign.  He goes over -- anytime he sees my name on the log for anything, he wants to know why my name is on the log, why I was working overtime.  And Dunn too,

**162**

from what I understand, if he sees our name.

Q.   Does he micromanage Dunn in the same way?

A.   Yes, he does.

Q.   Does me micromanage anyone else in that way?

A.   Most people.

Q.   Most people?

A.   Yeah.

Q.   Do you think that he micromanages you and Lieutenant Dunn to find something to punish you with?

A.   I think he over-micromanages me and Dunn, and probably maybe even Myers, for that reason.  But I think in general, he -- he micromanages the department.

Q.   Okay.

A.   He just -- he hones in on certain people more than others.

Q.   Why does he hone in on certain people more than others?

A.   Just the people that don't comply with him, to punish them, to find something on them.

Q.   Okay.

A.   To find something wrong.  I mean, if you -- well, I don't want to speculate, so.

Q.   No, if you have something to say?

A.   No.  I was just trying to give you an example.  Like, if an officer follows a car long enough, you can

**163**

find something in the law book, what they did wrong, you know.

So if you're looking for something to pull somebody over for, you can find something.  If you're looking for something to write somebody up for, if you tear apart and micromanage them long enough, you're going to find something.

Q.   Is it your understanding that he micromanages you, Lieutenant Dunn, and Lieutenant Myers in this way specifically?

A.   Yes.  And other people at other times have been done.  Either they're not here no more or got on his -- in a better relationship with him because they backed off of telling him no, like Jeremy Ivory.

Q.   But to clarify, the other people that he micromanages in this way are people that he does not get along with; is that correct?

A.   I wouldn't say doesn't get along with.  I would say that don't follow his way of doing things.

Q.   Okay.

MS. GUNNELS:  I just want to say, our lunch is here, if we want to break.

THE WITNESS:  We were never, like, ugly, except for that one time I told you about.  Usually, it was always hello.  You know, it

**164**

was all, on the surface, professional to me, until that one time.

BY MS. HIGGINS:

Q.   Got it.

A.   It's behind the scenes where...

Q.   Is there anything else with respect to the retaliation you've experienced that you want to cover?

A.   Not that I can remember at this time.

Q.   Okay.

A.   I'm sure there's other stuff, because like I said, I got pages and pages of emails and emails.  I just can't think of them all right now.

Q.   Okay.  I just have one more question before we break.

A.   Okay.

Q.   Just now, you said that there was behind-the-scenes conversations.  What did you mean by "behind the scenes"?

A.   Well, just the stuff he talks about around the office when only the office personnel are there.

Q.   Uh-huh.

A.   You know, that either, you know, Dunn ain't doing his job right.  Donnie is not doing anything right.  That kind of stuff he talks, you know, in front of the deputy chief or the other detectives or the

**165**

secretary or records or the people that are in the walls next hall over.

Q.  Saying what?

A.  Just the stuff I was saying, negative stuff about us --

Q.  Okay.

A.  -- about different people.

MS. HIGGINS:  All right.  Let's take a break for half an hour for lunch.

MS. GUNNELS:  Okay.

THE VIDEOGRAPHER:  We're off the record at 12:27.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 1:10 p.m.

BY MS. HIGGINS:

Q.  Lieutenant Thibodeaux, I want to talk a little bit more about how you're micromanaged by Chief Fontenot.

You said that he micromanages you, Lieutenant Myers, and Lieutenant Dunn specifically; is that correct?

A.  Yes.

MS. GUNNELS:  Objection; misstatement.

BY MS. HIGGINS:

**166**

Q.  Does he micromanage anyone else as severely?

A.  Not as severely, I don't believe, no.

Q.  Does he micromanage Victor Fontenot?

A.  I don't know.

Q.  You don't know?

A.  No.

Q.  How about Ryan Young?

A.  From what I'm told, no, but I don't know for firsthand experience.

Q.  And just to clarify, why wouldn't he necessarily micromanage Ryan Young as much as he micromanages you and Lieutenant Dunn and Lieutenant Myers?

MS. GUNNELS:  Objection; calls for speculation.

A.  After -- before Ryan -- when he was on sick leave, the chief talked bad about him a lot.  Said he wasn't a very good lieutenant and was always missing.  And when he came back -- while he was on sick leave, he would sit there talking to the chief almost every day while he was on sick leave.  And then when he came back, all of a sudden, he changed his position.

BY MS. HIGGINS:

Q.  The chief changed his position --

A.  Yeah.

**167**

Q.  -- on Ryan?

A.  -- on Ryan, to detective -- head of detectives.  And doesn't even have the same duties as the last chief of detective, like evidence and that kind of thing.  But Ryan does what he -- Ryan is compliant with his orders and stuff, so.

Q.  Why do you think Chief Fontenot had a change in opinion of Ryan Young?

A.  I couldn't tell you.  I think it's just because he quit fighting him on things.

Q.  Why wouldn't Ryan Young have the same duties as people in his previous -- previously in his position, I should say?

A.  I couldn't tell you, because he said --

THE REPORTER:  I'm sorry?

A.  Because I'm guessing he said he didn't want to do the evidence and other things he was doing.

BY MS. HIGGINS:

Q.  Do you know if he told Chief Fontenot that he didn't want to do these jobs?

A.  I mean, I was told he gave him reasons why he didn't -- he wanted this done first, an audit done first by the state police on the evidence, before he would take it.  And it was just a bunch of excuses.  None of that was ever done, though.

**168**

Q.  None of the additional steps he wanted were ever done?

A.  Right.

Q.  And Chief Fontenot, to your knowledge, is okay with Ryan Young not completing these duties; is that correct?

A.  I'm assuming so.

Q.  You're assuming so because why?

A.  There hasn't been any discipline or any action sheets stating otherwise, investigations, as far as I know.

Q.  If someone else in the Eunice Police Department's office said that they didn't want to do duties that they would typically be assigned, how do you think the chief would react?

A.  If it was the chief that wanted them to do those duties, he would most likely go after them, either try to discipline them, do an investigation on them, or discipline them or punish them.

Q.  Why do you think he's okay with Ryan Young, then, not doing the duties that Chief Fontenot would normally want him to do?

A.  I don't know.  Just because he's compliant with the way the chief wants things done.

Q.  Would you say that Ryan Young is a favorite of

**169**

Chief Fontenot's?

A. Yes, definitely, now.

Q. Do you think that's why the chief --

A. I think it's favoritism. Yes.

Q. Okay. Just to clarify, do you think that's why the chief doesn't micromanage him as severely?

A. Yes.

Q. And do you think that favoritism is the same reason why Ryan Young is not obligated to do jobs he was normally supposed to do?

A. Yes.

Q. Okay. Earlier you said that Chief Fontenot gave Lieutenant Dunn an officer that was on your shift; is that correct?

A. Yes.

Q. And you said that things were not good between Lieutenant Dunn and Chief Fontenot during that time but they were better, correct?

A. Yes.

Q. You also said that Chief Fontenot had his sights set on somebody else at that time. Who were you referring to?

A. Myself.

Q. Okay. Would you say that you were a target of Chief Fontenot?

**170**

A. Yes.

Q. Who else would you say has been targeted by Chief Fontenot?

A. Lieutenant Dunn, Officer Myers. Over the years, other people. I mean, Vardenen Guillory, when he was here, was targeted, went after him.

Q. And just to clarify, why do -- how do people become targets of Chief Fontenot, in your opinion?

A. By going against him.

Q. By going against him?

A. Uh-huh.

Q. And when someone becomes a target of Chief Fontenot, what kind of things happen to them?

A. Either they are micromanaged more, till he can find something on them, or they're punished, either officially or unofficially, like changing their shifts, taking away stuff, changing cars, positions.

Q. Are they punished by Chief Fontenot?

A. Yes.

Q. Would you say that people in the Eunice Police Department are aware that if they go against the chief, they might be punished?

A. Yes.

Q. Would you say that they're aware -- or they would call this retaliation --

**171**

A. Yes.

Q. -- for going against the chief?

Would you -- how would you describe the culture between the officers and the chief at the Eunice Police Department?

A. Toxic.

Q. Can you elaborate a little bit?

A. All of them that don't want to fight or that don't want to have him going after them, they try to just keep their head down and at least tell him that they're going to comply with him, even if they do or don't. Because they see that everybody that stands up to him or that tries to go strictly by the law and by the book is going to become a target and there's going to be retaliation.

Q. A target of Chief Fontenot?

A. Yes.

Q. Would you say that there's a culture of retaliation at the Eunice Police Department?

A. Very much so.

Q. Okay. I want to talk little bit about retaliation specifically against Lieutenant Dunn. And I know we've talked a little bit about this already, so this might be repetitive.

Have you ever observed Lieutenant Dunn treated

**172**

unfairly at work?

A. Yes.

Q. By whom?

A. By the chief.

Q. Anyone else?

A. By the deputy chief.

Q. Chief Kennedy?

A. Yes.

Q. Deputy Chief Kennedy. Apologies.

Can you tell me about those incidents?

A. Well, just with shift changes, going around him, like breaking chain of command, going straight to his patrolmen to have them do something. And then telling Lieutenant Dunn about it later, Why wasn't this done correctly from this patrolman? And Lieutenant Dunn is like, I didn't even know he was supposed to do that. No one told me because they went around me.

When he sends emails asking questions, Can I put some people on overtime this weekend because we're shorthanded, a lot of times from either one of those, from the deputy chief or the chief, they go unanswered. The emails, when he writes somebody up, nothing happens with the papers. When he writes an employee up, nothing ever happens with the papers.

173

Q.   When you say that, do you mean that when Lieutenant Dunn makes a complaint about a fellow officer, it goes uninvestigated?

A.   Correct.

Q.   Why would that be?

A.   Because it's coming from Lieutenant Dunn and the chief does not like him.

Q.   Is there a reason why the chief would think that maybe what Lieutenant Dunn was writing in these complaints weren't true, that it wouldn't warrant an investigation?

A.   From the write-ups I've seen, they all warrant an investigation.  And the board has investigated because of that.

Q.   So as far as you can tell, there's no real reason why these reports have gone uninvestigated; is that correct?

A.   Correct.

Q.   You just mentioned that the civil service board does investigate these reports that Lieutenant Dunn made; is that correct?

A.   The ones that are given to us, yes.

Q.   Can you tell me about those?

A.   We already talked pretty much about them. Some of them were discipline issues.  Some of them were

174

payroll.  I don't know if his was the payroll issue. But the discipline issues and of being treated unfairly.

Q.   Who being treated unfairly?

A.   Lieutenant Dunn.

Q.   Okay.  When the civil service board has investigated these reports filed by Lieutenant Dunn, what have they found?

A.   They were sustained.  The complaints were valid.

Q.   So they corroborated what Lieutenant Dunn --

A.   That's it.  Or complained about.

Q.   -- reported, correct?

A.   Yes, correct.

Q.   So they agreed -- the civil service board has agreed with what Lieutenant Dunn has reported, correct?

A.   Yes.

Q.   After the civil service board found that all of Lieutenant Dunn's reports should be sustained, was there any action taken by the chief to deal with these incidents?

A.   No.

Q.   Why not?

A.   Like I said before, he's told people that he thinks the board is just suggestive, that it's not law.

175

Q.   Is that true?

A.   No, it's not true.  It specifically says it is law and that what we say is supposed to be taken care of, that what the board rules on is supposed to be done.

Q.   To your knowledge, has Chief Fontenot given a reason why he's failed to take action after the civil service board has found in favor of Lieutenant Dunn in these cases?

A.   Not that I'm aware of.

Q.   So these officers who Lieutenant Dunn reports, have they ever been punished in connection with these reports?

A.   Not that I'm aware of, no.

Q.   Okay.

A.   Usually when there's a -- a discipline, there's an action sheet done, and the board gets copies of those going in the permanent record, and we have to approve them and I have to sign them.

Q.   Why hasn't the civil service board said anything to Chief Fontenot about failing to take action?

A.   Because all of the civil service board laws say that we direct everything to the appointing authority.

176

Q.   Okay.

A.   And when he was not the appointing authority anymore, we send it to the mayor and the appointing authority, our directives.

Q.   And what has the appointing authority done?

A.   As far as I know, they haven't done anything with it but give it back to the chief.

Q.   And what has the mayor done?

A.   Given the papers back to the chief, from what I've been told.

Q.   Okay.  So just to clarify, Lieutenant Dunn has filed reports about misconduct committed by officers at the Eunice Police Department with both the chief and with the civil service board; is that correct?

A.   Yes.

Q.   When they were filed with the chief originally, the chief failed to take action and investigate these reports; is that correct?

A.   Correct.

Q.   The civil service board agreed with Lieutenant Dunn that these investigations were warranted into these officers; is that correct?

A.   Correct.

Q.   And even after the civil service board found that these investigations were warranted and that these

**177**

officers presumably -- correct me if this is wrong -- were supposed to be punished, no one in the city took action?

A.   Correct, not that I'm aware of.

Q.   How serious would you say some of this misconduct was that Lieutenant Dunn has filed reports about?

A.   I would say pretty serious, especially dealing with evidence, because that puts into question every bit of evidence that has been touched.

Q.   So Lieutenant Dunn has filed a report against an officer about a mishandling of evidence; is that correct?

A.   I believe it was Darien Guillory.

Q.   Who mishandled evidence?

A.   Yes.

Q.   Okay.  Have you been made aware of any internal investigations into Lieutenant Dunn?

A.   Yes.

Q.   Can you tell me about those?

A.   I don't remember the specifics besides the one with the -- the Facebook post.  And there was a few others, but I can't think of the specifics on them.  I know we've overturned quite a few rulings for Lieutenant Dunn.

**178**

Q.   Overturned in Lieutenant Dunn's favor?

A.   Yes.  All of them in his favor.

Q.   By "we," just to clarify, you mean civil service board, correct?

A.   Civil service board or the city conceded, and they made a deal before we heard it.  But we still have to approve that before it goes forward.

Q.   Okay.  Has there ever been a time where there has been an internal investigation into Lieutenant Dunn and the civil service board has sided against Lieutenant Dunn?

A.   No.

Q.   So to your knowledge, there hasn't been a time where Lieutenant Dunn was deserving of any of the disciplinary action taken against him --

A.   No.

Q.   -- is that correct?

A.   Correct.

Q.   Okay.  I want to talk a little bit about the specifics of the Facebook incident, and maybe you'll recall any other incident that comes to mind.  But can you tell me what happened with the Facebook incident that you're referring to earlier?

A.   From what I understand, there was a disturbance down the street from Lieutenant Dunn's

**179**

house.  He was off duty.  I believe there were some shots fired.  Some of the neighbors heard the shots fired.  They called the police.  I think it was investigated.  Unfounded or something like that.

And I know some of the neighbors were saying, No, we heard the shots.  And apparently -- I believe Chief Fontenot had put in the paper that Lieutenant Dunn basically lied and that there wasn't -- that his officers didn't find anything of the -- that what they said happened happened.

And the neighbors came out -- I've heard they went to the council meetings -- and said that they were there.  They had to jump on the floor afraid of getting shot.

And since he had put on Facebook his side of story, what had happened, as a civilian, Chief Fontenot got mad and did an investigation on him.

Q.   Was chief -- or let me rephrase.

Was Lieutenant Dunn within his rights to make these posts on Facebook?

A.   Yes.

Q.   So in your opinion, he did nothing wrong?

A.   Correct.  It was for the greater good of the public because it's a public safety issue.

Q.   Okay.  After the investigation, was

**180**

Lieutenant Dunn disciplined for this incident?

A.   I don't remember on that specific incident, if that was one of them that he was actually disciplined or if he let it go.  I can't remember.  I'd have to look at my records.

Q.   Did Lieutenant Dunn file an appeal regarding this incident with the civil service board that you remember?

A.   I don't remember if that was one of them or not.  Like I said, there has been several.

Q.   Okay.  But to your knowledge, there hasn't been a time in which Lieutenant Dunn has been investigated internally by members of the Eunice Police Department and Chief Fontenot in which Lieutenant Dunn was found to have actually done any wrongdoing; is that correct?

A.   Correct.

Q.   Okay.  Have you ever served as a witness for Lieutenant Dunn in an internal investigation?

A.   As a witness?  No.

Q.   Okay.

A.   I have been there as representation of civil service, to stand by during an interview --

Q.   Can you tell me about that?

A.   He said he didn't want to go in there alone

**181**

because --

Q.   Lieutenant Dunn said --

A.   Lieutenant Dunn said he didn't want to go to the interview alone, so he asked me as a civil service rep if I would stand by. And I said, I can go in there, but I can't answer questions. I can just be there.

Q.   Okay.

A.   And as a -- you know, as a civil service rep, just to make sure nothing funny goes on or whatever. That's what he asked me to do.

Q.   Why did Lieutenant Dunn not want to go alone to his interview?

A.   He was feeling threatened by some things he had heard.

Q.   Do you remember what?

A.   I know it was against him, but I don't remember who the threats came from. I want to say it was somebody -- I know it was some people in the department. I want to say maybe Victor, but I'm not a hundred percent sure which one it was, that he had heard made threats against him.

Q.   In your opinion, was Lieutenant Dunn's concern about going to the interview by himself founded?

A.   At the time, I would say so, yes.

**182**

Q.   So you --

A.   And I think he had been told that he might -- that they were trying to build a criminal case against him about something else too. I think it was at the same time as that, if I'm not mistaken.

Q.   Do you remember what they were trying to build a criminal case about?

A.   It had something to do with him -- they said he was -- either a drug dealer was paying him off or a CI. I don't remember the exact specifics. But he was worried about it, that they were making something up.

Q.   Who was trying to make something up?

A.   The detectives in the Eunice Police Department.

Q.   Which detectives?

A.   Victor Fontenot and Ryan Young. Possibly the chief, he said.

Q.   Possibly the chief as well?

A.   Yes.

Q.   Did anything ever come of that criminal investigation?

A.   Not that I'm aware of.

Q.   To your knowledge, was there ever any evidence that Lieutenant Dunn was working with a confidential informant or a drug dealer inappropriately?

**183**

A.   Not inappropriately, no. I know that person brought it out in district court to the judge. Said something about it, that Victor was trying to make him -- that he had it on his phone that Victor was trying to make him say something against Dunn that wasn't true.

Q.   Do you remember that person's name?

A.   I sure don't.

Q.   Was it Joshua Dupre?

A.   Possibly.

Q.   Do you remember any more specifics about what came out in district court?

A.   I know that the judge had ordered Victor to produce the phone, which was never produced, from what I understand.

Q.   So a judge ordered Victor Fontenot to produce a phone in connection with the allegations made in the district court, and Victor Fontenot failed to produce this phone; is that correct?

A.   From what I was told, yes.

Q.   Is that permissible?

A.   No, it's not.

Q.   According to who?

A.   Well, I mean, it's contempt of court.

Q.   So it's illegal not to have produced the

**184**

phone; is that correct?

A.   (No audible response.)

Q.   Did Chief Fontenot know that Victor did not produce the phone?

A.   I was told he did, but I don't know for a fact.

Q.   Did you ever hear of any action taken against Victor Fontenot in this regard?

A.   Not that I'm aware of.

Q.   So the chief, to your knowledge, never asked him to comply with the judge's order to produce the phone?

A.   Not to my knowledge.

Q.   Okay. Do you remember what was alleged was on that phone?

A.   Text messages. I don't know if it was text messages or voicemail of Victor trying to get him to --

Q.   Trying to get who?

A.   The suspect to lie on Dunn, to say that he was getting money from Dunn or he was giving him money, one of the two. Basically, that he was a dirty cop.

Q.   And this was a lie?

A.   Yes.

Q.   Did the suspect say so --

A.   Yes.

**185**

Q.    -- that this was a lie?

A.    Yes.  He actually approached Dunn on a scene and said, Look, they're trying to get you.  They're trying to make me lie on you.  And he had arrested - Dunn had arrested him before, but he said, You've always been really fair, so I'm just letting you know.

Q.    Dunn had arrested the suspect, and the suspect let him know that Victor Fontenot was trying to make up a lie --

A.    Right.

Q.    -- about Dunn to make it look like he was a dirty cop; is that correct?

A.    Correct.

Q.    Okay.  Did Chief Fontenot know that Victor was trying to create this lie?

A.    I don't see how he couldn't know.  I mean, everybody else in that department knows.

Q.    How did everyone else know?

A.    Because cops talk.

Q.    Okay.

A.    Judges talk.  Attorneys talk.  I mean, criminals talk.

Q.    Is it proper within the Eunice Police Department to have officers try to fabricate crimes committed by other officers to make them look bad?

**186**

A.    Repeat that question.

Q.    Fair enough.  Do you think that Victor Fontenot should have been disciplined for trying to create a lie that Lieutenant Dunn was a dirty cop?

A.    Absolutely, yes.

Q.    Was he disciplined?

A.    Not as far as I know.

Q.    Why not?

A.    Because he's one of the chief's favorites.

Q.    Any other reason?

A.    Not that I'm aware of.

Q.    And just to recap, there's clear evidence that this was in fact a lie, correct?

A.    Yes.

Q.    Okay.  Why would Victor Fontenot want to make up this lie about Lieutenant Dunn?

MS. GUNNELS:  Objection; calls for speculation.

BY MS. HIGGINS:

Q.    That you know of.

A.    I don't know.  I know he doesn't like him -- he doesn't like Lieutenant Dunn, because he talks, said some bad things, you know, before, so.

Q.    Like what?

A.    Just the stuff I told you about earlier, about

**187**

killing his dog and F him and that -- I'm not going to say the explicit stuff he says about doing stuff to -- sexually or whatever.

Q.    You can say it.  Please do.

A.    Something about he couldn't -- I don't know if it was lick this, or something to that effect.

Q.    To lick a body part?

A.    Yes.

Q.    Okay.

A.    Or something similar to that.

Q.    Do you know why Victor Fontenot doesn't like Dunn so much that he would make these sorts of comments?

A.    I don't -- I guess because he's just strictly by the book, I guess.  And a lot of people -- some cops don't like officers that are that way.

Q.    And "by the book," again, you mean operates within the law, very clearly?

A.    Yes.  Strictly.

Q.    Is that correct?

A.    Yes.

Q.    Why would Victor Fontenot have a problem with that as a law enforcement agent?

A.    Because the chief says that if you're in narcotics that there's a lot of gray areas and you need

**188**

to swerve on the line, and that's what he tells his guys, to do that.

Q.    In your opinion, as a law enforcement agent, are you supposed to swerve by the line?

A.    No.

Q.    What are you supposed to do?

A.    When the law says you shall, you do it.  When it says you may, officer discretion.  But you always enforce the law.

Q.    Okay.

A.    It's like having a CI -- you have a CI, which is confidential informant, that has convictions of drug dealing, you're not supposed to use those.  I mean, that's just common practice.  But Victor has a few of those, and that's why they don't get along with some other people, because we don't trust the CIs.

THE WITNESS:  Was that too fast?  I'm sorry.  I could see your expression.

BY MS. HIGGINS:

Q.    Are you aware of any instances in which Lieutenant Dunn was given unfavorable shift as punishment?

A.    Yes.

Q.    Can you tell me about that?

A.    When we were -- they had switched the shifts.

**189**

It used to be that you did two weeks day shift, two weeks night shift, and it would switch.  Then they went to two shifts of being on straight days and two shifts of being on straight nights.  And usually, like I said, the senior lieutenants on the road get to pick which shifts they want.

And Dunn had told the chief his personal stuff, about his wife was working certain shifts and they have two young kids, and the day shift, he took it because it was easier for his family.

And then Dunn had went out on sick leave, and when he came back, they put him on straight night shifts.

Q.    And putting him on night shift was a punishment; is that correct?

A.    Oh, it is a punishment, yes.  For Dunn, it was almost impossible because you have to find somebody to watch your kids at night which in a small town is hard.

Q.    And Chief Fontenot was aware this would be very difficult for Dunn; is that correct?

A.    Yes.  And Dunn made that very clear.

Q.    Is Chief Fontenot the one who changed Lieutenant Dunn's shift?

A.    Yes.

Q.    What was the reason he gave for changing

**190**

Lieutenant Dunn's shift?

A.    I don't know what reason he gave him.

Q.    Why do you think he changed Lieutenant Dunn's shift?

A.    To punish him.

Q.    For what?

A.    For going against him and appealing more -- more stuff that was done to him.

Q.    What did he appeal?

A.    The most recent ones he appealed was when he came back off of sick leave, the chief refused to take his sick leave excuse.  Wanted him to change something on it.  And then when Dunn refused to change -- change it, he ordered him back to work.  But when he did the paperwork -- that's one of our appeals -- the chief didn't put the correct dates, so they don't match what really happened.

In other words, if they come back on the 4th, it's a doctor's excuse, but you didn't come back till the 8th and the payroll says you paid them sick leave for the 8th, there's four days missing.  It doesn't match.  You can't give him sick leave if you didn't have an excuse type thing.

So he appealed that.  And he appealed a few other things.  I can't think of his other -- second

**191**

appeal right now but it has to do with more punishment, more retaliation.

Q.    Okay.

A.    So when he came back, they put him on a shift that he knew he wouldn't like.

Q.    And I know you've said this a few times, but just to be clear, in all of his appeals, Lieutenant Dunn has been found to --

A.    So far, yes.

Q.    -- do no wrong; is that correct?

A.    Correct.

Q.    Okay.  Did you give Lieutenant Dunn any advice on how to handle the change in shift?

A.    I'm sure I did, yes.

Q.    What do you think you said?

A.    I really don't remember.  I give a lot of advice out.  That's part of my job as a civil service rep.  I get calls day and night.

Q.    Other than the instances we've already covered, are there any other times in which Lieutenant Dunn was unfavorably transferred that you know of?

A.    I know he has been transferred to unfavorable shifts, like the people that have the problem officers on it, the short shifts.  He has been transferred,

**192**

switched shifts to the short shifts.  He has been transferred opposite of his wife's rotations before.  She worked at the hospital.

Q.    Okay.

A.    So, like, when he was off, she was at work; and she was off, he was at work.

Q.    And all of these shift changes, would you say these are bad shift changes for Lieutenant Dunn?

A.    Yes.  They're all going against -- that hurts him in his personal life or professional life.

Q.    About how many different changes in shifts of this kind have happened to Lieutenant Dunn, would you say?

A.    It seems like after every appeal that he files, another shift change would happen.  I don't know how many.

Q.    Could you ballpark it?

A.    Four or five, maybe, guessing.

Q.    Okay.  But it's your understanding that all these shift changes have happened pretty much almost exactly after Lieutenant Dunn has filed an appeal with the civil service board --

A.    Yes.

Q.    -- about an action taken against him by the chief; is that correct?

**193**

A.  Correct.

Q.  So would you say that all these shift changes and transfers are a form of punishment?

A.  I would say so, yes.

Q.  Okay.  Let's talk about the K9 program. You're aware that Lieutenant Dunn was a K9 officer; is that correct?

A.  I actually trained him to be and gave him the dog.

Q.  There you go.

A.  Okay.

Q.  And you're aware that Lieutenant Dunn is no longer a K9 officer; is that correct?

A.  Correct.

Q.  What do you know about why Lieutenant Dunn stopped being a K9 officer?

A.  Because the chief didn't want him to have the dog anymore.  And he knew that if he took the dog away that it would probably get overturned, so he just did away with the K9 program.  That's the only way to get Dunn not to have a dog.

Q.  Who else had a K9?

A.  Originally?

Q.  Well, when --

A.  The chief took over?

**194**

Q.  -- the chief decided to get rid of the program.

A.  Well, he did it twice.

Q.  Okay.

A.  The first time, they had two dogs.  Richard Abadie had a dog and Lieutenant Dunn had a dog.

Q.  And we talked about this a little bit, but the K9 program is important in reducing narcotics violations in Eunice; is that correct?

A.  That and other crimes, yes.

Q.  And other crimes.  Okay.

So even though having a K9 unit was helpful to deterring crimes in Eunice, the chief still took it away?

A.  Yes.

Q.  Did he give any reason as to why he took away the K9 program completely?

A.  Not from -- what I told you earlier that happened at the council meeting --

Q.  Okay.

A.  -- you know.

Because the second time, when we got the dog back, it was because citizens voluntarily gave money, donated money to get the dog back, because they wanted it that bad.

**195**

Q.  Oh.

A.  Yeah.

Q.  And then the K9 program was taken away again?

A.  Again, yes.

Q.  Why was that?

A.  Well, from what I was -- from my understanding, it was so he could get Dunn to quit.

Q.  So to clarify, so Chief Fontenot could compel Lieutenant Dunn to quit --

A.  Yes.

Q.  -- Correct?

Did he give any other reason for taking away the K9 program that second time?

A.  He did, but he retracted on it every time he'd come up with a reason.  Like, whenever he said it was a lack of money, the city offered to give him the extra money, how much more is it going to cost, he said that -- he refused that in the council meeting.

And they said -- he said something about the dog, and then someone said, I talked to the person that has the dog, and they said the dog is doing great. It's certified all that stuff.

And then he said -- I think he went blank, and then one of the councilmen asked him, I mean, is it a handler problem?  He said, I can't talk on that right

**196**

now.  He said something to that effect, maybe not exact words.

Q.  In your opinion and from your understanding, there was no legitimate reason for getting rid of the K9 program in either instance; is that correct?

A.  Correct.

Q.  And to your knowledge, the only reason why the K9 program was obviated was because of wanting to get back at Lieutenant Dunn; is that correct?

A.  Correct.

Q.  Did you ever hear Chief Fontenot say something to that effect?

A.  Just except for what I told you when he talked about taking the dog away and asked if he could be appealed.  And I said it could be appealed, and he got mad.  He said it shouldn't be able to be appealed; he should be to do what he wants.

Q.  Okay.  Do you know of any instances in which Lieutenant Dunn was not appropriately compensated for being a K9 officer?

A.  Yes.

Q.  Can you tell me about that?

A.  There's case law that says you have to compensate him for feeding and taking care of the dog. I know he was paid before, and they did not pay him --

**197**

Q.   Who's "they"?

A.   The chief.

And he appealed that, and we reversed it and made them pay him back pay.

MS. HIGGINS:  I'm going to hand the court reporter a document to be marked as Thibodeaux Exhibit 4, I believe.  Is that correct?  Okay.

(Thibodeaux No. 4 was marked for identification.)

MS. HIGGINS:  And the Bates number on this document is CSB_0000691.

BY MS. HIGGINS:

Q.   Now, again, this is a longer document, so if you want to take some time to familiarize yourself with it, that's okay.  But if not, I'm going to direct you to page 4, which is Bates number CSB_0000694.

A.   Okay.

Q.   Okay.  Lieutenant Thibodeaux, do you recognize this document?

A.   Yes.

Q.   Is that your signature at the bottom of the document?

A.   Yes, it is.

Q.   And you wrote this letter -- or this part of the document, rather?

**198**

A.   I signed it.  The board secretary typed it up.

Q.   But you acknowledge it as your own opinion; is that correct?

A.   Yes.  It is the decision of the board.

Q.   Can you, for the record, tell me what this document is?

A.   This is a finding of fact after the appeal hearing.

Q.   Finding of fact by whom?

A.   By the civil service board, finding in favor of Lieutenant Dunn.

Q.   Okay.

A.   Because --

Q.   Go ahead.

A.   I said because the appointing authority didn't send a representative and stipulated that officer -- Lieutenant Dunn's rights were violated during the investigation.

Q.   I'm going to read part of this letter for a second, okay.  It says, "A motion was made by the board and seconded to dismiss the disciplinary actions taken against Officer Michael Dunn by the appointing authority based upon the finding of fact of a failure to meet the minimum standards afforded to an officer under Louisiana 42:531, thereby making all actions an

**199**

absolute nullity.  It is further ordered that Lieutenant Michael Dunn receive his back pay of $187, representing eight hours of training he was deprived due to the violation.  It is further ordered that the appointing authority be ordered to pay attorneys' fees as authorized by LA RS 33:2501.1 to Officer Michael Dunn."

Is that what it says?

A.   Yes.

Q.   Can you tell me about this incident that brought on this disciplinary action?

A.   I don't really remember the details.

Q.   What do you remember?

A.   Just what it says, that he was under investigation for something.  I don't remember exactly what it was -- the investigation was for.

But during that investigation, his right -- his police officer bill of rights was violated.  And after speaking with the appointing authority -- that's right after they took the appointing authority back from the chief of police -- that since it happened the way it did and his rights were violated, they would stipulate that and not send anybody to the hearing.

Q.   And not?

A.   Not send any representative -- anybody to

**200**

represent the appointing authority in the hearing.

When we have a hearing, it's the appointing authority against the employee.

Q.   Okay.

A.   It's not necessarily the chief of police --

Q.   Okay.

A.   -- against.  Because it's the appointing authority that we deal with in civil service.

Q.   Okay.  Can you explain to me why Lieutenant Dunn's rights were violated?  Or do you not recall?

A.   I think it went over the 60 days.  I don't know if that was the only violation.

Q.   What went over the 60 days?

A.   The investigation.

Q.   And that's a violation of Lieutenant Dunn's --

A.   Yes.

Q.   -- rights; is that correct?

A.   Back then, yes, it was.

Q.   Who was in charge of this investigation?

A.   Either the chief of police or his designee, whoever he assigned to it.  I want to say it was lieutenant -- or Deputy Chief Kennedy that was assigned that investigation by the chief of police.

Q.   And "the chief of police" being?

**201**

A.   Randy Fontenot.

Q.   Were there any other ways in which Lieutenant Dunn's rights were violated in this instance?

A.   I don't recall.  I don't know if it says it in there or not.  I don't remember specifically if there was evidence.

Q.   Okay.  Do you remember any other times in which Lieutenant Dunn's rights as an officer were violated in response to an investigation opened against him?

A.   Besides -- not "besides."  The one we talked about earlier, where he was threatened to either quit or that he would be disciplined and investigated, that he would open an IA.

Q.   Who would open an IA?

A.   The chief of police had told Dunn if he didn't quit right then, in a meeting in his office.

Q.   Uh-huh.

A.   That if he didn't quit, that he was going to basically go after him.

Q.   And this was a violation of Lieutenant Dunn's rights; is that correct?

A.   Yes.

Q.   Under what authority?

**202**

A.   Under the officer bill of rights.

Q.   Okay.  Do you remember when that happened, that conversation that you just referred to?

A.   No, I don't.

Q.   Do you remember what prompted it?

A.   No, I don't.

Q.   Okay.  Going back to this document, it says that Lieutenant Dunn was ordered to receive his back pay as well as attorneys' fees, correct?

A.   Yes.

Q.   Is that order a finding in favor of Lieutenant Dunn?

A.   Yes, it is.

Q.   It is.  So it seems to me, from what you said, that Lieutenant Dunn -- or, rather, the civil service board found in favor of Lieutenant Dunn based on some sort of technicality about potentially the amount of time that this investigation took; is that correct?

A.   Yes.

Q.   Do you know if the merits of this investigation were ever looked into by the civil service board?

A.   On that particular case, I don't remember if we had discussed it or not.

Q.   Okay.  But to your knowledge, Lieutenant Dunn

**203**

did not actually do anything wrong that the civil service board would have found differently had they investigated the merits outside of this technicality; is that correct?

A.   Correct.

Q.   Okay.  Is this decision representative of other decisions that the civil service board has made regarding incidents involving Lieutenant Dunn?

A.   Yes.

Q.   So generally -- again, I know this is repetitive -- but they found in favor of him, correct?

A.   Yes.

Q.   Okay.  I want to go back to Lieutenant Dunn being denied compensation for the K9 program.  Do you remember we just talked about that a little while ago?

A.   Yes.

Q.   Okay.  Why wasn't he compensated appropriately?

A.   I couldn't tell you why besides the chief's decision.

Q.   Do you think it was fair that he wasn't given his due compensation?

A.   No, I don't.  I think it was not done in good faith.

Q.   Why do you think that?

**204**

A.   Because whether he was at work or not, he still had to take care of the dog, which is what he was getting paid for.  He still had to feed the dog, look after the dog, clean up after the dog, et cetera.

Q.   When the K9 program was in existence, was it police department policy to compensate officers for this sort of work?

A.   Yes.

Q.   So failing to compensate Lieutenant Dunn was a violation of department policy; is that correct?

A.   Yes.

Q.   Okay.  Have you ever heard of any other instances in which Lieutenant Dunn was denied pay he was owed?

A.   Yes.  But I don't remember the specifics, but I do remember there was another incidence.

Q.   At least one other?

A.   At least one other, yeah.

Q.   Potentially more, would you say?

A.   Potentially more, yeah.

Q.   Okay.

A.   I know some of this stuff.  I remember he had let go and just pick -- pick your battles, you know.

Q.   Why would he have done that?

A.   Because it's stressful going through an appeal

**205**

and then having him retaliate more against you and --

Q. By "him" you mean?

A. The chief of police, Randy Fontenot.

Q. So sometimes it's better for the officer not to report --

A. Yes.

Q. -- these sort of violations of department policy; is that correct?

A. That happens a lot.

Q. Can you tell me about that?

A. I mean, just little things, you know, violations of working out of your class or making your shift short or giving you orders to change something. A lot of times it's --

Q. These are all examples of actions that would be taken if you file a report; is that --

A. Well, no, those are actions that were taken that they didn't file because they said it wasn't worth fighting it. Or working -- say if you worked up in your class and you put in for sergeant pay and you're a patrolman and they didn't pay you, they denied it, but you were doing the sergeant's job that pay period --

Q. Uh-huh.

A. -- or that day or shift, they'll come to me and ask me, and I'll say, "Yeah, it's appealable," you

**206**

know. You can appeal it. And they'll think about it, or they'll come back to me and say, "It's just not worth the fight. He's going to come after me."

Q. So to be clear, it's not worth the fight because they didn't want the money; it wasn't too little money on the table. Is that correct?

A. Yeah. It's -- it's not because of the money; it's because of the retaliation.

Q. Would you say this happens a lot?

A. Yes, it happens a lot.

Q. With officers other than Lieutenant Dunn, correct?

A. Yes.

Q. How many other officers would you say have failed to file reports because they're afraid of retaliation?

A. At least, I would say, more than 50 percent.

Q. So would you say there's a lot of other misconduct that goes on at the Eunice Police Department that's not even reported?

A. Yes.

MS. GUNNELS: Objection; calls for speculation.

BY MS. HIGGINS:

Q. Have you heard about incidences --

**207**

A. Yes.

Q. -- like this? Yeah?

And to be clear, these instances that go unreported, does the chief ever investigate what happens in them on his own?

A. As far as I know, he hasn't.

Q. And the officers that are involved, are they ever disciplined in these unreported instances?

A. I haven't seen any paperwork showing that, no.

Q. Okay. We talked a little bit about officers not having enough fellow officers on a shift with them. Have you ever heard or been made aware of any instances in which Lieutenant Dunn was not given appropriate backup?

A. Yes.

Q. Can you tell me about that?

A. There's been a few calls where he called for backup and nobody showed up, from what I was told.

Q. Why would no one show up?

A. I think the only people that were on the road were the detectives.

Q. Detectives, who?

A. Lieutenant Young and Victor Fontenot.

Q. Why wouldn't they show up to help a fellow officer?

**208**

A. I don't know. I just know that it's happened several times, that Dunn has told me that he's called for backup and they never showed up.

Q. If an officer typically calls for backup, is it protocol for the fellow officers that are on duty to come to their aid?

A. Yes. I know in certain instances, other departments have came to his aid.

Q. So you're saying that there have been times when Lieutenant Dunn has asked for backup and his own fellow officers have failed to come to the point where other law enforcement agencies have had to come to help him?

A. From what he told me, yeah.

Q. Is Chief Fontenot aware that Lieutenant Dunn has called for backup and that his fellow officers have failed to come help him?

A. I would say yes because he leaves his radio on all the time.

Q. Is this behavior that, in your opinion, should be disciplined?

A. Yes.

Q. Has it been?

A. Not that I'm aware of.

Q. Why not?

**209**

A.  Goes back to favoritism.

Q.  So Chief Fontenot, in your understanding, allows Victor Fontenot and Ryan Young to ignore Lieutenant Dunn's call for backup without any repercussions; is that correct?

A.  Yes.

Q.  If another officer had called for backup and -- well, let me backtrack.

If another officer had called for backup, do you think that Victor Young and -- Victor Fontenot and Ryan Young would come to their aid?

A.  I've -- I've heard them go to other shifts, other lieutenants that called.

Q.  So why do you think they haven't come to Lieutenant Dunn's aid?

A.  Oh, they don't -- I mean, it's known that they don't like him.

Q.  Okay.

A.  They -- and they -- they were the ones saying he was dirty and -- when all of that was going on with the CI.

Q.  So in the times that you're aware of that Lieutenant Dunn has called for backup, there wasn't a legitimate reason why --

A.  Not that I'm aware of, no.

**210**

Q.  -- anyone wouldn't come to help him; is that correct?

A.  Not that I'm aware of.

Q.  Okay.  And let's just say that officers had failed to come to an officer, other than Lieutenant Dunn's aid, when there's been a call for backup.  Would they normally have been disciplined?

MS. GUNNELS:  Objection; calls for speculation.

A.  Just depends on who they are.

BY MS. HIGGINS:

Q.  Should they have been disciplined?

A.  Yes.

Q.  Under what authority?

A.  Under the authority that -- many times, they have said that -- that detectives are going to backup officers when we're shorthanded.

Q.  Who said that?

A.  The chief put an email out or the deputy chief has put an email out that said that we know you're shorthanded in the daytime, so they're going to help you take calls; detectives are going to help this.

Q.  So is it your testimony that it's Chief Fontenot's own policy that detectives are supposed to come to the aid of other officers when

**211**

called in for -- as backup; is that correct?

A.  It has been, but things changed there a lot. So I don't know when the last email that he put was like that.  But I haven't seen an email going against it either.

Q.  So when that was the policy, would you say that on- -- the policy only applied to some officers and not to others?

A.  That's what it seemed to be, certain shifts, yeah.

Q.  Which officers were given backup?

A.  Lieutenant Ivory's shifts.  They always seem to be helping those shifts but not when Lieutenant Dunn is working.

Q.  Why would he help Lieutenant Ivory on his shifts?

A.  Well, I mean, they're friends with him.

Q.  Who's "they"?

A.  Lieutenant Young and -- and Victor are -- they're friends with Lieutenant Ivory.

Q.  Is it Eunice Police Department policy that when a fellow officer calls for backup, an officer is supposed to come and assist, if available?

A.  Usually everybody that's available goes.

Q.  But is that the policy?

**212**

A.  I'm not sure if that's in the policy or not. It's just -- it's a known --

Q.  Okay.  We talked a little bit about threats made against Lieutenant Dunn.  Are there any other threats made by Chief Fontenot against Lieutenant Dunn that we haven't covered, that you know of?

A.  Not that I can remember, no.

Q.  Have you ever heard about the chief making any threats against anyone in Lieutenant Dunn's family?

A.  I haven't, no.

Q.  Okay.  Do you know of anyone else in the department who has made any threats against Lieutenant Dunn?

A.  I seem to recall something Victor said, but I don't -- I can't remember what it was --

Q.  Okay.

A.  -- where it came.

Q.  But nothing else comes to mind --

A.  No.

Q.  -- is that correct?

A.  No, ma'am.

Q.  Okay.  In addition to the situation we already covered in which Victor Fontenot tried to create some sort of fabrication of a criminal violation committed by Lieutenant Dunn, have you ever heard of anyone else

**213**

at the Eunice Police Department trying to drum up a criminal violation that -- allegations that Lieutenant Dunn committed?

A.    No.

Q.    What about any ethics violations?

A.    I do seem to recall them talking about an ethics violation, but I don't remember the specifics of it.

Q.    Okay.

A.    If it ends up coming up, it'll probably jog my memory but...

Q.    Okay.  If it comes to mind --

A.    Okay.

Q.    When Lieutenant Dunn filed this lawsuit, did you hear of any reaction that Chief Fontenot had?

A.    Not specifically.  I -- I was told that they didn't think it was a big deal.  They weren't worried about it.

Q.    Who didn't think it was a big deal?

A.    The people in the office.

Q.    Why not?

A.    I don't know.  That's just the rumors that were going around.  I didn't hear anybody specifically, like, through my ears.  But...

Q.    And by not a "big deal," do you know what that

**214**

means?

A.    They weren't taking it seriously.

Q.    That you're aware of, did Ryan Young have any reaction to Lieutenant Dunn's filing of this lawsuit?

A.    I didn't hear anything.

Q.    What about Victor Fontenot?

A.    I didn't hear any- -- I don't really talk to them that much.  They don't talk to me so --

Q.    How come?

A.    They don't care for me either, so.

Q.    Okay.

A.    The only time they talk is when they have a civil service question or a law question; they'll call me.

Q.    And do you give them advice when that happens?

A.    Absolutely.  I'll help anybody that needs it.

Q.    Okay.

A.    As a -- as a civil service rep, I -- I help any employee that -- that calls me.

Q.    Have they ever called you about any issues with Chief Fontenot?

A.    They've called to ask me questions just about civil service law and -- and about, you know, search and seizure laws and that type of thing because they know I stay up to date on most of that.

**215**

Q.    Okay.  Anything related to how the Eunice Police Department is run?

A.    I mean, I -- they've called and asked me what to do on, you know, a certain case or whatever, and I give them advice.  I don't really follow up to see if they followed it or not, you know.

Q.    Okay.

A.    I tell them where to look for the law, what my opinion is and, you know, where to go read about the case law.

Q.    Okay.

MS. HIGGINS:  Let's take a five-minute break.  And I'm going to ask that everyone come back by 2:15.  Okay.

THE VIDEOGRAPHER:  We're off the record at 2:08.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 2:17.

BY MS. HIGGINS:

Q.    Lieutenant Thibodeaux, have you ever seen Chief Fontenot do something that you believed was illegal?

A.    Criminally, no.

Q.    Have you ever heard of anything that

**216**

Chief Fontenot did that you believe was illegal?

A.    No.

Q.    How about unethical?

A.    Yes.

Q.    Can you tell me about that?

A.    Well, the payroll issues and to pay somebody that time did not allotted --

Q.    That's unethical?

A.    -- and earn.  It's unethical, yeah.  It's public funds.  Allowing people to use their units for vacation or with their -- use it as their personal unit outside of the city, that's completely unethical, yes.

Q.    Were there any other instances of misconduct that you recall that Chief Fontenot committed?

A.    You mean besides civil service law violations?

Q.    Including civil service law violations.

A.    I mean, that happens all the time, unlawful orders.

Q.    Can you tell me about that?

A.    Just ordering people to work outside their class, going against civil service laws.

Q.    Which civil service laws?

A.    About working out of class, getting paid to work in a different class.  You're supposed to get paid for whatever class you're working in at that time.

**217**

So he has somebody working -- let's say, a lieutenant working as a dispatcher. They're supposed to be getting paid as a dispatcher because other dispatchers get paid that amount, and they're doing the same job as them, so the law says you can't do that. But he -- he -- he allows it and mandates it sometimes, to do that.

Q. Why?

A. I mean, one reason because we're shorthanded. The other reason is because they'll -- they'll do it or else.

Q. Would you say that people are working outside their class and positions that they don't have training to be working in?

A. Yes.

Q. Do you think that's appropriate?

A. No. I think it's a liability for the city. I think it also hurts criminal cases, too, but --

Q. What do you mean?

A. It -- well, I mean, if you put a -- if you put someone that's not trained to be dispatch and they're answering emergency calls and they mess up, that could cost somebody their life. It could cost you a case. If you put somebody in that position and they're not trained to do that position -- working

**218**

secondary investigations on a homicide, let's say, or a major burglary -- and they don't know what they're doing, they've never trained to do it properly or hadn't been trained in years or up to date on the latest case law, I mean, it could -- it causes problems.

Q. Is the formal Eunice Police Department policy that officers are supposed to work within their class?

A. In the policy, they have certain duties, which is not followed either. But the classes come from the board rules, and the board rules are law. So when the board makes the rules up, if you read the statute, it says, "And these rules are considered and have their full effect of law." So --

Q. Okay. So in accordance with the civil service board rules, officers are supposed to work within their designated class; is that correct?

A. Correct.

Q. Would you say that it's an informal policy at the Eunice Police Department that officers be permitted to work outside their class?

A. Yes, all the time.

Q. And who allows that?

A. The chief of police, Randy Fontenot.

Q. Even though, as you said, it could be a

**219**

liability for the city; is that correct?

A. Correct.

Q. And even though that could potentially put citizens' lives at stake even; is that correct?

A. Correct.

Q. So if this is potentially a dangerous situation, to allow officers to work outside their class, why does the chief permit it?

A. I don't know. He wants to run the way he wants to run. He wants to make his own decision. He don't want nobody telling him what to do.

Q. Okay.

A. He said several times, you know, "if we didn't have civil service, I'd got rid of most of these people."

Q. He would have gotten rid of most of these people being whom?

A. Well, like, employees. You know, "If it wasn't for civil service, I'd have fired so-and-so." And he'd been saying that since he's taken over office.

Q. Who would he have fired?

A. Specifically, he had said Jeremy Ivory. He had said Ryan Young at one time. Some other people that are not there anymore. And just every time he had a problem with somebody, he would bring that up.

**220**

Q. So why hasn't he fired them?

A. Because of civil service.

Q. What specifically?

A. Well, I mean, you got civil service coverage. It's there to protect you, and he can only make a recommendation to the appointing authority, and they have to make the decision.

Q. So he doesn't have the actual ability to fire these people --

A. He doesn't have the authority --

Q. -- is that correct?

A. -- to fire them, correct.

Q. And just to be clear, he doesn't have the authority to fire Lieutenant Dunn, correct?

A. Correct.

Q. Otherwise, he would have, you think?

A. Yes, absolutely.

Q. Okay.

A. And me.

Q. And you?

A. Yeah. I mean, he's said that before so --

Q. He said that to you?

A. Well, he said that to the mayor, and he said it to other people.

Q. That he would have fired you --

**221**

A.    That he wanted to, yeah.  Wanted to get rid of me.

Q.    Okay.  So instead of firing you because he doesn't have the authority, he's taken all of these other retaliatory actions that we've discussed; is that correct?

A.    Correct.

Q.    Okay.  Other than the events we've already discussed, have you ever witnessed a Eunice Police Department officer being treated unfairly by Chief Fontenot?

A.    Yes.

Q.    Can you tell me about that?

A.    Well, we've discussed most of them.  By switching their shifts to a shift that they would have problems with, either going from nights to days or from one rotation to another and have to change -- with short notice, have to change their babysitters.  Switching positions.

Q.    Do you recall who he's done this to?

A.    Over the years, it's been several.  I -- I can't think, specifically.  I mean, I know he's done it to Dunn.  I know he's, you know, changed duties of -- of, like, Lieutenant Myers, myself, Lindsey Burton.

Q.    How about Jeremy Ivory?  Do --

**222**

A.    He didn't --

Q.    You know an officer named Jeremy Ivory, correct?

A.    Yeah.  Lieutenant Ivory, he -- he didn't switch a shift, but he did suspend him and demote to a patrolman.

Q.    Why?

A.    We talked about it earlier.  Because I know one of them was because he had wrote up an -- a patrolman for --

Q.    "He" being Jeremy --

A.    Lieutenant Ivory had wrote up a patrolman for a violation of policy.  And he said he wasn't in his chain of command, but at the time, he didn't like Jeremy Ivory so --

Q.    The chief did not like --

A.    Yes.

Q.    -- Jeremy Ivory?

A.    And then the other reason -- I don't remember what -- what the other violation he said he -- he did was.  I think it was maybe the Facebook comments of speaking out publicly.

Q.    Remind me what the Facebook comment was.

A.    I don't remember it specifically, but it was back and forth.  It was a long -- it was --

**223**

Q.    Uh-huh.

A.    -- a couple of pages of stuff.

Q.    Okay.

A.    Lieutenant Ivory likes to speak his mind, so.

Q.    Okay.  Were these incidents of -- investigated by the civil service board?

A.    The appeals were, not the incident.

Q.    The appeals were?

A.    The appeals were heard, yes.

Q.    What were the board's conclusions with respect to these appeals?

A.    During the middle of the witnesses, Lieutenant Ivory's attorney asked that we come to a conclusion because his rights -- the recordings -- his -- his rights were violated because they weren't recorded, his -- the interviews weren't recorded on both cases.  So the board nullified it because of that.

Q.    Nullified the punishment of --

A.    Both punishments, yes.

Q.    -- Jeremy Ivory --

A.    And we made him give back attorney fees and back pay, seniority, the 30 days that he was suspended, and restored his lieutenant status.

Q.    What was the chief's reaction after you nullified his disciplinary actions against

**224**

Lieutenant Ivory?

A.    He was very angry.  And, I mean, he said some words but we couldn't understand them because he turned red and got mad and left, walked out.  And then that's -- after that, I believe, is when the council started looking at taking his appointing authority back.  And he started going after Dunn because Dunn had helped Ivory with his case.

Q.    So you think that part of the reason that his appointing -- Chief Fontenot's appointing authority was revoked was because of how he disciplined Jeremy Ivory; is that correct?

A.    Well, I think that was part of one of the final straws, but he had been -- he had been having confrontations with -- employees were leaving in droves --

Q.    Okay.

A.    -- going to other departments because he would get mad or go after them, and they would just -- wouldn't fight it; they quit.  A lot of them just quit.  And the council members and the mayor kept asking, you know, what's going on over there?  And -- and employees would tell them, you know, this is what's going on.  They can't work for him.

Q.    What do you mean, "this is what's been going

**225**

on"?

A.    That he micromanages and he goes after people, he's vengeful.  If you don't do exactly what he says, he gets mad and takes it out on you.  Or he'll go after you, or he'll discipline you, like punish you, not -- not just on paper but on -- like, switching your shift around or changing your shifts or just whatever he can do that -- a lot of people opened up to him and told him about their personal lives.  I mean, it's a small department.

Q.    Uh-huh.

A.    So he knows most people.  He knows their personal lives, about their wives and what -- where -- where they work and -- you know.  I mean, he knows intimate stuff like that.

Q.    Does Chief Fontenot use people's personal lives against them?

A.    Yes.

MS. GUNNELS:  Objection; lack of foundation.

A.    Yes, I would say so.

BY MS. HIGGINS:

Q.    Can you tell me an example?

A.    Well, just -- just like in Dunn's case, he knew where -- what shift his wife works and that he

**226**

has small kids at home and putting him on nights would be a -- a toll on his family.

Q.    Okay.

A.    And he's done the opposite for other people and say, "Well, I'm putting this person on days because she has young kids and, you know, she's a mother" and --

Q.    So a little while --

A.    -- that kind of thing.

Q.    A little while ago, we talked about there being a culture of retaliation at the Eunice Police Department, correct?

A.    Yes.

Q.    Would you say that the civil service board, through all these conversation that you just referred to, were aware of this culture of retaliation?

A.    I believe so, yes.

Q.    And in your opinion, do you think that's why the civil service board withdrew Chief Fontenot's appointing authority?

A.    The civil service board didn't do that.  The city council did that.

Q.    Do you think the city council was aware of this culture of retaliation that we've been talking about?

**227**

A.    I -- I think they became aware of it during the year and a half or whatever that he was the appointing authority.

Q.    And you think that's why the city council took away the --

A.    Yes.

Q.    -- appointing authority?

A.    I do.

Q.    Yes.  In your opinion, was the punishment that Jeremy Ivory received appropriate, the suspension and demotion, I mean?

A.    Originally, when Chief Fontenot asked me about -- about it, before it was done, he had told me that Jeremy Ivory had been written up several times for the same reason and that he was told not to do this before and that it had happened in the past.  And I said if that's the case, if what you're telling me is true, then yeah, it's probably comparable to that.

But when Jeremy Ivory came and the appeal came out, there was no prior write-ups; there was no prior incidences.  So no, it was -- it was over -- overbearing.  It was -- it didn't fit the crime.  You know, it didn't fit the -- the mistake or whatever.

Q.    Okay.

A.    But like I said, at the time beforehand, when

**228**

I gave my advice, I had told him if what you're telling me is true, yeah, that -- that fits.

Q.    But the justification for the punishment --

A.    It wasn't there.

Q.    -- that Chief Fontenot gave you was not true.

A.    Right.  Correct.

Q.    Is that correct, what they're saying?

A.    Yes.

Q.    Okay.  Did the civil service board agree with your opinion that the punishment was over- --

A.    Well, we didn't have to get that far.

Q.    Why?

A.    Because of the violation, the -- the law says if they violate the bill of rights, it's absolute nullity.  So it doesn't -- anything else doesn't matter after that point.

Q.    Did you discuss this incident with other members of the civil service board?

A.    Well, during the hearing, we heard from witnesses.

Q.    Okay.  Did they believe, to your knowledge, that the punishment didn't --

A.    Yeah.  After --

Q.    -- fit the --

A.    After the hearing was done --

**229**

Q.  -- misconduct?

A.  -- yeah.  Yes.

Q.  Yes?

A.  They told me that, yeah.

Q.  Okay.

A.  Because the -- Chief Ivory, which is -- Lieutenant Ivory's father had stood up in the middle of it and said, "I've had enough of this," because the chief was talking about his family and bringing out all kind of stuff from what was going on in Basile.  And Chief Ivory stood up and said, "That's it.  I've had enough.  You got to stop."  And he got mad, and that's when I shut down the chief, which did not make him happy that I shut him down.

Q.  How did you shut him down?

A.  I said that's -- this is irrelevant, move on, "quit talking about it" type stuff.

Q.  What was the Chief Fontenot bringing into the appeal hearing that was --

A.  Off of Facebook, back-and-forths between Jeremy Ivory's family and members of the public in Basile on Facebook.  Just -- it was a bunch of gossip and back and forth about what was going on over there, politicly.

Q.  But in your opinion, it was inappropriate for

**230**

the chief to be introducing --

A.  Yes.

Q.  -- this sort of testimony during a hearing?

A.  Yes.  It had nothing to do with Jeremy Ivory himself.

Q.  Okay.  So you said that the punishment that Jeremy Ivory received was more severe, in your opinion, than he should have received; is that correct?

A.  Yeah.

Q.  Do you know of instances in which other Eunice Police Department officers have broken department policies and state law and that have not been punished as harshly as Jeremy Ivory was?

A.  I mean, it happens all the time.

Q.  It does?

A.  Yeah.

Q.  Like, the --

A.  I mean, the laws are not followed all the time.  The -- the culture is as long as he doesn't agree -- disagree with it, then it's okay.  I mean, it's kind of like a -- a domestic call.  There's been calls that they go over there and the law says you have to do a report if there's an allegation.  On the logs, you see it all the time, that there's no report.  Nothing is ever done with that.  He goes over the logs

**231**

every day.

Q.  So there are officers who the chief knows has broken state law --

A.  Or should know.

Q.  -- that have not been punished as severely as Jeremy Ivory was?

A.  Or at all, yes.

Q.  Why do you think that is?

A.  I couldn't tell you.  At the time, he was mad at Jeremy Ivory because Jeremy Ivory speaks up for other officers and goes in there and fights for them, and he's very vocal.

Q.  And that's why Jeremy Ivory was punished so severely in your opinion?

A.  That's why I think he was going after him, yeah.

Q.  In terms of the officers that have broken state law and not been punished as severely, which officers were -- are those?

A.  I really can't speak on that because until they're found guilty, I mean, I can't say.

Q.  Because they're found guilty --

A.  Because they haven't been found guilty.

Q.  Okay.

A.  I don't want to say that they broke a certain

**232**

law.

Q.  Okay.  What about department policy?  Are there officers that have broken department policy in a more serious way than Jeremy Ivory did that have not been punished as severely?

A.  Well, just, like, allowing patrolmen to talk in front of the chief bad about lieutenants and disrespect them, that's all in the policy, that you can't do that.  None of that is ever punished.  I think that's worse than what -- what Jeremy did.

Jeremy corrected somebody that needed to be corrected and just because it wasn't his chain of command when the chain of command is not followed at all there.  Just -- the chief doesn't follow it.  Nobody else really follows it either.  But he goes after the ones he don't like for not obeying chain of command like Jeremy Ivory, which got either the suspension or the demotion for that.  I don't remember which is which.

Q.  Who doesn't get punished at the Eunice Police Department?

A.  The ones that comply are his favorites.

Q.  Like who?

A.  Lieutenant Young, Victor Fontenot, Joey Fontenot.  There's a few others.  It just depends

233

on what time.

Q.   So in your opinion, there have been times when Victor Fontenot and Ryan Young have broken department policy and have not been punished when they should have; is that correct?

A.   Yes.  In other words, the allegation of some use-of-force issues that Dunn brought up, and it was never investigated.

Q.   Can you tell me about that?

A.   It happened in front of Dunn's house.  It was a -- I believe it was a homeless guy, and apparently, they were a little rough on him and -- and Dunn reported it, and nothing was ever done.

Q.   When you say "a little rough on him," do you know of specifics?

A.   They -- well, from what Dunn said and the witnesses said, they beat him up or roughed him up.

Q.   Would you call what they did using excessive force?

A.   Yeah.

MS. GUNNELS:  Objection; calls for speculation.

A.   From what I heard, yes.

BY MS. HIGGINS:

Q.   And which officers were involved in that

234

incident?

A.   I don't remember exactly which officers they were.  I want to say Victor was one of them, but he wasn't the only one.

Q.   Okay.  And Chief Fontenot knew that?

A.   From what Dunn told me, yes.

Q.   Okay.

A.   That it was reported.

Q.   Do you know about when that was?

A.   I sure don't.

Q.   Okay.  What do you know about the circumstances of Lieutenant Ivory's departure from the Eunice Police Department?

A.   Lieutenant Ivory?

Q.   Sorry.  Jeremy Ivory?

A.   He -- he didn't leave.

Q.   He --

A.   He's still there.

Q.   He didn't leave?  Okay.

A.   Yeah.  He's still lieutenant.

Q.   Okay.  I want to talk about Stephanie Myers a little bit.

A.   Okay.

Q.   We talked a bit about Ms. Myers being treated unfairly at the Eunice Police Department; is that

235

correct?

A.   Yeah.

Q.   Can you tell me about that?

A.   Well, if you -- if you -- she had a problem with, I believe, her foot surgery.

Q.   Uh-huh.

A.   And he had a lot of other people to be on light duty and allowed her to be on light duty, and then he ended up getting mad at her for whatever disagreement there was.  He didn't -- she wasn't doing something the right way that he wanted, so he tried to take that away from her, but he didn't take it away from the other people or, like, taking her duties away and taking her office away, taking her vehicle away, changing her hours around.

Q.   Do you know why he did all this?

A.   Well, from what she says, it's retaliation.  I don't see any other reason why it would have been done.

Q.   For what?

A.   It didn't make sense.

Q.   Retaliation for what?

A.   For what he thought -- that she had given Dunn and other people evidence against him, stuff that was going on at the department with payroll, recordings, or information.

236

Q.   Okay.  Do you know an officer A.J. Frank?

A.   Yes.

Q.   What do you know about him?

A.   He used to work for the police department.  He works for Basile PD now.  He ran against the chief for an election last -- I think it was last election.

Q.   Do you think Officer Frank was treated unfairly at the Eunice Police Department?

A.   I think in the end, yes, he was.  He actually had wrote an appeal letter to the board and then withdrew it and end up quitting.  He didn't want to fight it.

Q.   Can you tell me what happened?

A.   I don't remember the details.  I know that they had -- I believe they demoted him or changed his shift or something.  I don't know the specifics of --

Q.   You don't remember why?

A.   I don't remember why, no.

Q.   Okay.

A.   I'd have to read his appeal letter.

Q.   Do you know why he left the Eunice Police Department?

A.   Because he couldn't work for Randy anymore, the chief.

Q.   Did A.J. Frank tell you that?

**237**

A.   Yeah.  He said --

Q.   Do you remember --

A.   -- he couldn't deal with it anymore.

Q.   Do you remember what he said, more specifically?

A.   I -- I don't.

Q.   Okay.  Do you know about when that was?

A.   A couple years ago.

Q.   And since then, have there been similar instances with people leaving under similar circumstances --

A.   A lot of them.

Q.   -- for the same reasons?

A.   Yeah.

Q.   Okay.

A.   John?  Johnny?  I have a letter from one of them explaining it and some recordings for other ones -- from other ones.

Q.   Okay.  What about Officer Jonathan Lee?

A.   That's who I was -- he wrote a letter explaining the problems.

Q.   What was in the letter?

A.   Basically that he had a conversation with the chief of police when he was leaving, and he explained to him why, that he was being unfair going after Dunn

**238**

and other people.

Q.   The "chief of police" being Randy Fontenot?

A.   Randy Fontenot, yeah.

Q.   Do you remember the specifics?

A.   Not all the specifics, but I remember he said that -- that Randy had told him that he just don't understand some of his business and some people don't want to follow him.

Q.   All right.

A.   And I don't remember if he told Jonathan Lee that or if it was Noah Courville, that he said that -- basically that if they didn't follow what he said, that he would get rid of them or go after them.  I don't remember if it was in his letter or if it was in the recording.  It kind of all jumbles together.

Q.   Okay.  When Chief Fontenot goes after people, earlier you mentioned that he looks for policies that he can say that officers didn't abide by; is that correct?

A.   Or even sometimes technicalities of the law.  I mean, he had -- he had Varden Guillory arrested for tearing a piece of paper and taping it back together.

Q.   For what?

A.   For tearing a piece -- a statement -- tearing a statement and taping it back together.  He charged

**239**

him with malfeasance and -- and of course the DA through it out, but he still got arrested and booked.

Q.   Why did he do that?

MS. GUNNELS:  Objection; calls for speculation.

A.   He was going after him.  He was retaliating.  We changed -- he changed -- he took his office away.  He changed his position, changed his hours, and same -- same type of stuff.

BY MS. HIGGINS:

Q.   What did Varden do that prompted this sort of retaliation?

A.   He was the deputy chief at the time.

Q.   Uh-huh.

A.   And apparently, they had a history, but they -- he didn't get along.  He didn't like Varden, and he said he didn't like Varden.

Q.   Do you know why he didn't like Varden?

A.   I don't know why.

Q.   But you didn't think it was appropriate to have him arrested -- to have Varden arrested, rather, for tearing up a piece of paper; is that correct?

A.   Correct.

Q.   In your opinion, do you think if Victor had done the same thing, Chief Fontenot would have had him

**240**

arrested?

A.   No.

Q.   What about if Ryan Young had done it?

A.   No.

Q.   What about if Lieutenant Dunn had done that?

A.   Possibly.

Q.   What about if you had done that?

A.   Possibly, yep.

Q.   And what about Lieutenant Myers, if she had ripped a piece a paper?

A.   Possibly, yeah.

Q.   She -- you think he might have had you arrested.

A.   He might have went after her, yeah.

Q.   Is that correct?

A.   Or at least went after, yeah.  And that's why when he sent out the email threatening everybody with malfeasance, people took him seriously because they know what he did to Varden because it's common knowledge.

Q.   So even though as an officer -- let me backtrack.

Do other officers at the police department know that Chief Fontenot does not have the authority to charge them with malfeasance in most instances?

**241**

MS. GUNNELS: Objection; misstates facts.

A. The younger guys don't know. Most of them do now because they've been told and showed the law and showed the case law, but at -- at the time, no, they didn't know. The older ones took it like, "Yeah, okay." But the younger guys were scared.

BY MS. HIGGINS:

Q. Because of what the chief --

A. The threat, yes.

Q. Okay.

A. And I say younger. I didn't mean age-wise. I mean --

Q. Newer --

A. -- career-wise.

Q. -- at the department?

A. Yes. I had a lot of them come to me, so I just showed them the law, what it says and the case law that goes with it.

Q. So even though you've showed them the law, are they still afraid?

A. Yeah, because they said he could still do it, and then they'd have to go fight it. They still would have -- you know, they could still get arrested and then have to fight it and get it thrown out because

**242**

they said if they could get him for a piece of paper -- I said, but technically -- I mean, that was a technicality, but that was a crime that had a penalty. I said those policies don't have a penalty, and I tried to show that to them but -- you know.

Q. What policies don't have a penalty?

A. The policies of the police department; they're not a criminal offense.

Q. Okay.

A. It's an administrative offense. I was trying to explain to them the difference. But some of those guys are right out of the academy, haven't been to the academy yet. So --

Q. Okay.

A. You know, just because you tell them that, doesn't mean they fully understand it.

Q. And to be clear, ripping up a piece of paper as Varden did, was that a criminal offense?

A. It depends on your interpretation of it. I mean, he taped it back together. Did he tear it? Yes, he did. And he tried to say that was destruction of evidence or something. But I mean, that's not an arrestable offense. That's kind of ridiculous.

Q. Okay. What does that do to an officer's career, to be arrested and have to fight it, even if

**243**

the charges are eventually thrown out?

MS. GUNNELS: Objection; calls for speculation.

BY MS. HIGGINS:

Q. You can answer.

A. It just -- it pretty much puts a black mark on you and nobody else is going to want to hire you.

Q. What do you mean by "black mark"?

A. Well, whenever you go to apply for a department, they're going to call the chief of police at the place you worked at before, and they're going to ask, you know, questions. You're not supposed to say anything bad, but they do. I mean, I've heard -- I've heard conversations, you know. I know how that works within the job.

And if you're a whistleblower, say like Dunn or, you know -- ain't nobody going to hire him in a -- in a 30-mile radius because you're going to be considered trouble because you blew the whistle on somebody or that -- you know, you told on them or whatever you want to call it.

It hurts your career and being arrested, having a -- an arrest on your record, unless you get it expunged -- even if you get it expunged, it's still there. So yeah, it's pretty much a career ender, or

**244**

you're stuck where you're at.

Q. Would you say that Chief Fontenot operates outside of the scope of his authority to instill fear in the officers at the Eunice Police Department?

A. Yes.

Q. So to clarify, even though he doesn't have the authority to hire and fire or usually charge people with malfeasance, he finds a workaround; is that correct?

A. Yes.

Q. Okay.

A. And -- and, you know, he's -- he's smart. He -- he knows how to talk, and he's good at politicking and stuff, and he can explain it to where you would think that he -- he is -- he's justified in doing what he's doing.

Q. Uh-huh.

A. He can make -- he's a good story teller. I don't know how you want to say it. But he's not -- he's not -- he's very smart, so.

Q. So are you saying that Chief Fontenot is able to cover up these retaliatory actions to make them look legitimate?

A. He can, yes.

Q. Do people still know --

**245**

A. Most people do.

Q. -- that the reasons are not legitimate?

A. Most people, yes, they know that it's not legitimate.

Q. How do they know?

A. Just from the history of what's been going on there.

Q. Okay. Does Chief Fontenot ever write people up for violating a policy having to do with conduct unbecoming of an officer?

A. I believe he wrote Dunn up for that and maybe Jeremy.

Q. What does that mean, conduct unbecoming of an officer?

A. Doing something that would put shame on the department that an officer shouldn't be doing. Let's say going to a bar in the middle of town, getting drunk and falling down, and everybody knows you're a police officer and you arrest people for DUIs, but you're walking out of there intoxicated. That kind of thing would make the department look bad.

Q. Okay.

A. So that's conduct unbecoming of an officer that you should not be doing.

Q. And you mentioned that you think that he's

**246**

written up Lieutenant Dunn for conduct unbecoming of an officer?

A. I believe he did for the Facebook post, if I'm not mistaken. I could be wrong, what it was for but...

Q. Do you think that Facebook post qualifies as conduct unbecoming of an officer?

A. No. I already said I think that was justified, what he did. I think the supreme court covered that.

Q. The Supreme Court of Louisiana?

A. Of the United States.

Q. Oh, okay.

A. About speaking out -- officers speaking out. There's a three-part test.

Q. You mean that, to clarify, it was within Lieutenant Dunn's constitutional right --

A. Correct.

Q. -- to make that Facebook post.

A. Yes, I do.

Q. Is that correct?

A. Yes.

Q. Under the first amendment?

A. Yes.

Q. Okay. Has Lieutenant Dunn ever committed any other act that you believe falls under the canopy of

**247**

conduct unbecoming of an officer?

A. Not that I'm aware of and not ever that -- when he worked under me. As a sergeant and as a patrolman, I've never seen him commit that.

Q. When Lieutenant Dunn was written up for conduct unbecoming of an officer, do you know what happened with that? Was he punished?

A. I don't remember what the outcome was, to be honest with you.

Q. Okay.

A. It was probably one of the appeals that we did, but I'd have to -- like I said, it all kind of jumbles together because there's so much that has happened.

Q. Are there any other instances that come to mind in which Chief Fontenot has written up officers for conduct unbecoming of an officer that wasn't deserved?

A. Not that I can recall. Nothing that comes to mind.

Q. Okay. Have you ever heard of Chief Fontenot involuntarily placing officers on extended leave in unjustified situations?

A. Yes.

Q. Can you tell me about those?

**248**

A. He has put some people on administrative leave. The only way you can put somebody on administrative leave according to civil service rule -- board rules is for an investigation.

And we have a pending one right now. We're waiting on the conclusion for Lieutenant Myers where he put her on administrative leave and there was no investigation, and we rejected the -- the action sheet because it had no legitimate reason written on there.

Q. Uh-huh.

A. And we still haven't gotten a corrected one, so it's still open and pending.

Q. Why do you think he placed her on -- on administrative leave?

A. I think he was trying to find something on her, a reason to go after her.

Q. So you think it was a form of retaliation?

A. Yeah.

Q. For what?

A. It's just ongoing.

Q. Okay. What about Nicole Dupre? Was she ever placed on administrative leave unjustifiably?

A. Yeah. She was -- I'm trying to remember her case. She had went out for COVID. She was on light duty, from a work injury, for over a year. And she had

**249**

went out when she got COVID, and when she came back, he said she couldn't come back. She had a release from the COVID. And he said she couldn't come back until she had full duty release from her original injury. And she appealed it, and the appointing authority settled with her and gave her back her duties.

Q. How come?

A. Because he took it away -- took something away from her without due process, and the appointing authority decided not to fight it.

Q. Why do you think Chief Fontenot took it away from her?

A. It was retaliatory for some -- something she did or didn't -- didn't do, either -- either/or. He -- he wasn't following her -- whatever directives they -- that he was wanting her to do or not do.

Q. But you don't remember the specifics?

A. I don't remember the specifics, no.

Q. Would you say that Chief Fontenot uses administrative leave as a tool to punish officers?

A. Yes. Even though they're getting paid, it's still -- you know, it's still stressful on you, knowing that they're trying to go after you.

Q. Okay. Have you ever heard of Chief Fontenot having a hit list?

**250**

A. I have heard of it. I haven't seen it.

Q. What have you heard about it?

A. That my name was on it along with some others --

Q. Do you know who else --

A. -- that he wanted to get rid of. I know Lieutenant Dunn's was on there, and I -- I believe Myers, but I don't know who else.

Q. How do you think people end up on that list?

A. By going against him, by not following his directives, by being by the book.

Q. What do you think happens to people who are on that list?

A. I think he targets them.

Q. And does what?

A. Retaliates against them, punishes them.

Q. In the ways that we've been discussing?

A. Yes.

Q. Any other ways that we haven't covered?

A. I mean, I'm -- there -- there might be, but it's pretty much the same type of thing. I might not remember every single one of them, but it's similar to what we're talking about.

Q. Do you mind just giving me a few examples just --

**251**

A. That's what I said. I can't remember exactly specifics because I -- I don't want to make up anything, you know, so --

Q. Okay.

A. Yeah.

Q. But, like, the shift cuts and whatnot that we've been talking about?

A. Yeah, whether it's, you know, changing units or -- or shift changes or position changes, duty changes.

Q. Okay.

A. Yeah.

Q. Are you aware of Chief Fontenot having any other enemies within the department -- or any enemies within the department, rather?

A. I think the people that don't agree with him, he considers an enemy, but I don't know anybody that really looks at him as an enemy. I mean, I don't look at him as an enemy.

Q. Okay. Do you think Chief Fontenot looks at Lieutenant Dunn as an enemy?

A. Yeah.

Q. And just to be clear, the people that you think he thinks of as an enemy, they face the same ret- -- retaliatory actions that we've been discussing;

**252**

is that correct?

A. Correct.

Q. Other than the instances we've already covered, are you aware in -- of any instances in which Chief Fontenot altered official paperwork?

MS. GUNNELS: Objection; misstates facts.

BY MS. HIGGINS:

Q. Are you aware of any instances in which Chief Fontenot altered official paperwork?

A. Not other than people telling me that he changed reports and stuff, but I --

Q. Changed reports, to be clear for the record, that we've already discussed --

A. Yes.

Q. Like the car crash --

A. Right.

Q. -- or the car reports, correct?

A. Correct.

Q. So we have discussed official reports --

A. Yes.

Q. -- that Chief Fontenot has altered, right?

A. Yes.

Q. Okay. Any other official paperwork?

A. Only rumors, you know, that he goes in and

**253**

changes reports.  I don't know specifics on them.  I've just been told.

Q.   What rumors?

A.   Like, ask people to change arrests, either "I want you to go arrest this person from this" or "take this charge off" or something like that, just things that I've been told by officers.  I -- I can't remember any specifics, but it was similar to stuff like that.

Because after you -- our reports are done on the computer, and once you approve it as a lieutenant or a -- and send it in, if somebody goes back in, you can see.  And Dunn has told me about -- I don't remember the specifics, that he went in and changed his report or -- or --

Q.   Who went in and changed his report?

A.   The chief.

Q.   Changed Lieutenant Dunn's report?

A.   Yeah.  But I don't remember which cases or what it was exactly.

Q.   Is that proper protocol, to change a report?

A.   No.

Q.   Is it a violation of department policy?

A.   Well, yes, because the person who did the report putting their name on it that this is their report.  And if somebody goes to change it and doesn't

**254**

change the name, then they're falsifying the report.

Q.   Is altering a report in violation of any other law or rule that you're aware of?

A.   I'm sure it is, but I don't -- I couldn't tell you what it is.  I mean, once it's an official document, you're not supposed to alter it.

Q.   Would you say it's unethical to do so?

A.   Yes.

Q.   Would you say it's even possibly illegal to do so?

A.   Possibly.

Q.   Okay.  And these changes that you've heard about Chief Fontenot asking -- or making, rather, do you think they're important changes?

A.   I mean, I'm sure they are.

Q.   Either way?

A.   They could alter the case, I mean.

Q.   Okay.

A.   Yeah.

Q.   But they're not just, like, minor spelling corrections --

A.   No.

Q.   -- or edits like that, correct?

A.   No.

Q.   Okay.

**255**

A.   I haven't heard of any.  I mean, he might.  I don't know, but not that I'm aware of.  Usually redlines and gives it back to the officer.

Q.   Okay.  I want to talk about Ryan Young a little bit.  Have you seen Ryan Young treat people in the department unfairly?

A.   I've seen him be unprofessional, if that's what you're saying.

Q.   Can you tell me about that?

A.   Just the way he talks to people under his rank, like cursing at them.

Q.   What does he say?

A.   Well, like yesterday, I had a call from somebody I guess just to give me an earful that Ryan was saying "F her" to her face in front of people because he didn't agree -- or she didn't agree with him.  And she -- she thought it was very unprofessional, so she just wanted to complain to somebody, I guess.  I'm a good listener.

Q.   In your opinion, is that unprofessional for an officer to curse at another officer?

A.   Especially for a lieutenant to curse at a subordinate.

Q.   Do you think she might have found that intimidating?

**256**

A.   Yes, I do.  Well, she did because she said.

Q.   She said she did?

A.   Yeah.

Q.   Do you think that made her uncomfortable?

A.   Yes.  But I've seen it before.  I mean, he said things over the radio the other day that were -- made me uncomfortable, you know, just --

Q.   Like what?

A.   -- little remarks, just unprofessional.

Q.   Like what?

A.   I don't know.  Like, kind of flirting with females and stuff on the radio, just -- just unprofessional stuff and --

Q.   So --

A.   He -- he might be joking, but it's -- these -- this day and age, you can't joke like that type.  It just -- yeah.

Q.   So to clarify, Ryan Young makes comments directed at women in particular that are unprofessional?

A.   He has.  I'm not saying he does it every day.

Q.   But he has?

A.   But he has, yes.

Q.   Are these comments sexual in nature?

A.   Not really.  I wouldn't say "sexual" but

**257**

flirtatious. Like, without being sexual, the in- -- the innu- -- innuendo is there, you know.

Q. Can you give me an example?

A. Like, "I'm single," something, you know, or "I'm single" type thing over the radio.

Q. Okay.

A. They're just not professional at all.

Q. Do these comments make his fellow female officers uncomfortable?

MS. GUNNELS: Objection; calls for speculation.

A. I don't know, but I'm uncomfortable listening to it, so I'm sure it does to them too.

BY MS. HIGGINS:

Q. So they make you uncomfortable?

A. Well, yeah.

Q. About how often does he make these sorts of comments?

A. I wouldn't say they were often.

Q. Okay. Have you ever seen Ryan Young do something that you believed was illegal?

A. No.

Q. Have you heard about him doing anything that's potentially illegal?

A. I've heard. I've heard things, yeah, when he

**258**

was on the road.

Q. What have you heard?

A. I don't know. Just like catching somebody with a small amount of marijuana and stumping it out on the ground instead of putting it in evidence type -- just minor things like that, nothing major.

Q. But these things are illegal that he --

A. Yes.

Q. Are they in accordance with department policy about how he's supposed to handle, for example, finding a bag of the marijuana on a suspect?

A. No.

Q. Does the chief know that this is how Ryan Young handles these situations sometimes?

A. I couldn't tell you. This was --

Q. Has --

A. -- when he was on the road, so since he's been a detective, I haven't really worked with him.

Q. To your knowledge, has Ryan Young been disciplined for this sort of misconduct?

A. No. But a lot of that happened before this chief was here, when he was on the road.

Q. Okay. Other than what we've already talked about, have you ever heard about Ryan Young doing something unethical?

**259**

A. No, not really --

Q. Okay.

A. -- that I can remember.

Q. Have you ever heard about Ryan Young putting a hit on city council members for not giving Eunice Police Department enough money?

A. I haven't heard of him putting a hit, but I've heard him say that he would buy a steak if somebody caught the mayor drinking and driving, because he said it a lot in front of everybody.

Q. Can you tell me a bit more about that?

A. Just because the budget cuts and about his shop -- the mayor's shop, has a window-tinting shop, that he's doing illegal window tint.

Q. That he's doing what? I'm sorry.

A. Putting illegal window tint on.

Q. Window tint. Okay.

A. The law says you can have a certain amount of window tint darkness. And he has a business that puts window tint on.

Q. That's darker?

A. Right. And saying that he drinks and drives in the mayor unit, and he was saying he would buy steaks or something.

Q. So Victor -- or Ryan Young, rather, is saying

**260**

that Mayor Fontenot drinks and drives?

A. Has said, yes.

Q. And he's said that he puts in illegal window tint on his storefront; is that correct?

A. On people's vehicles.

Q. Okay.

A. Yeah.

Q. Are these accusations true?

A. I don't think so. I don't know. I've never seen the mayor drink and drive, and I don't know what he's putting on as the window tint.

Q. So by saying he'd buy a steak for anyone who caught the mayor drinking and driving --

A. I think it was a steak he said. It could have been something similar. Yeah.

Q. Okay. Is it your understanding that Ryan Young was saying that he would compensate someone for catching the mayor doing something illegal? Is that correct?

A. I didn't -- I mean, personally, I didn't take it as he was being serious.

Q. Okay.

A. Yeah. I think he was just insulting.

Q. Do you think that's appropriate?

A. No, I don't think it's appropriate.

**261**

Q.   Okay.

A.   Not in front of -- especially, like I said, insubordinates, if you're -- insubordinates, you know.

Q.   Let's talk about Victor Fontenot a little bit more.  Have you seen Victor Fontenot treat people in the department unfairly?

A.   Unfairly, no, not really.

Q.   He hasn't treated Lieutenant Dunn unfairly, to your knowledge?

A.   Well, I guess clarify what you mean by unfairly.  I mean, he's under -- he's a patrolman, and Lieutenant Dunn is over him, so.

Q.   Other than trying to frame Lieutenant Dunn as being a corrupt cop, has Victor Fontenot ever treated Lieutenant Dunn in a negative way --

A.   Not in front of me.

Q.   -- to your knowledge?

A.   Not in front of me.  Just from what I've heard, you know, that Lieutenant Dunn has told me.

Q.   What have you heard?

A.   Well, about the CI, the CI thing, and that he's always telling people -- criminals and stuff that he's dirty -- that Lieutenant Dunn is dirty and asking them, Has he ever, you know, given you money or tried to get money from you or whatever?

**262**

Q.   Have you ever heard these rumors from anyone else?

A.   No.

Q.   Okay.  Have you ever heard of an instance in which Victor Fontenot threatened anyone at the Eunice Police Department other than the K9, which he apparently threatened to kill.

A.   That's the only one that I've heard of, yeah, that I can remember.

Q.   Okay.

A.   Like I said, I remember there was some other threat, but I don't remember the specifics on it.

I know Lieutenant Dunn was worried for a while, but I don't remember the -- I just -- I'm drawing a blank.

Q.   Now, I know this is a little uncomfortable, but a while back --

A.   All this is uncomfortable.

Q.   Of course.  But this in particular.

We talked a little while back about Victor Fontenot saying that Lieutenant Dunn could lick some body part.

For clarification, do you mind giving us the exact quote that you remember?

A.   It was the male genitals.  I don't remember

**263**

which male genital part it was.

Q.   Okay.  Has he made any other similar comments to anyone else?

A.   Not that I can recall.

Q.   What about to Lieutenant Dunn?

A.   I don't remember what was said.  I know they've had words before.

Q.   Okay.  The comment asking -- or saying that Lieutenant Dunn could lick whatever male genital part, do you think that was appropriate?

A.   No.

Q.   Is there a department policy that covers this sort of speech amongst officers?

A.   There is a -- well, I mean, unbecoming an officer is one of them, but there's probably more specific ones.  Because there's also civil service law that covers that.

Q.   So would you say making these comments are a violation of the civil service law you're referring to?

A.   Yes.

Q.   And you would say that these sorts of comments are -- they qualify as conduct unbecoming of an officer; is that correct?

A.   Yes.

Q.   So you mentioned that Chief Fontenot has

**264**

disciplined other officers for conduct unbecoming of an offer; is that correct?

A.   Yes.

Q.   Has he disciplined Victor Fontenot for making these sorts of comments unbecoming of an officer?

A.   Not that I'm aware of.

Q.   Why do you think that is?

A.   Because he's one of his favorites.

Q.   Okay.  And the comments that we were talking about earlier that Ryan Young made towards the officer that you got a call from yesterday, saying F you, do you think that's conduct unbecoming of an officer?

A.   Yes.

Q.   What about the other comments that he's made over the radio that you've felt were uncomfortable?  Is that conduct unbecoming of an officer?

A.   It's borderline.

Q.   Has Ryan Young ever been disciplined for these actions?

A.   Not that I'm aware of.

Q.   Okay.  Other than the incidents we've already discussed, have you ever heard about Victor Fontenot doing anything that you believe was illegal?

A.   Just rumors, like accepting gifts from CIs and their families, like washer and dryer, stuff like that.

**265**

Q. What kind of gifts, other than the washer and dryer?

A. Washer-dryer. I don't know what else.

Q. What was he accepting the gifts in favor of, according to the rumors?

A. I don't know. I just caught -- I caught part of the conversation, and I just tried to not hear all that.

Q. Who said this?

A. I don't remember exactly who it was, but I know Dunn was in the conversation, a couple other people, and some that are not here anymore. But I don't remember who was actually speaking.

Q. That you've heard of, has Victor Fontenot had any other inappropriate interactions with confidential informants?

A. I don't know specifically.

Q. Have you heard rumors that he has?

A. I've heard rumors.

Q. Like what?

A. Spending time with them outside the city when he's not working, that kind of stuff.

Q. Are those sorts of interactions okay with police department policy?

A. If you're documenting that stuff.

**266**

Q. Was he documenting it, that you know of?

A. As far as I know, he's not. He might be documenting some of it. But just, like, you know, getting evidence and keeping it in your car and not turning it in, they can't find it, it wasn't turned in, type stuff, that's --

Q. You've heard rumors that Victor Fontenot has kept evidence in his car and not turned it in?

A. More than once, yes.

Q. What kind of evidence?

A. Either drugs or paraphernalia or whatever.

Q. Why would he be keeping drugs in his car?

A. I don't know.

Q. Are you permitted to keep drugs in your car?

A. No. It's supposed to be turned in right away.

Q. As evidence, correct?

A. Yes. I also heard of an instance where he did a search warrant on a house and backdated it.

Q. When was that?

A. A couple years ago.

Q. Why would he backdate it?

A. Because he didn't get a warrant ahead of time, and someone told him he needed a warrant after he already done it, so he went and got a warrant.

Q. Is that legal?

**267**

A. No.

Q. Is that ethical?

A. No.

Q. Is that in accordance with police department policy?

A. No.

Q. Is Chief Fontenot aware that Victor sometimes keeps drugs or drug paraphernalia in his car?

A. I can't say if he is or is not. I can't see how he could not be.

Q. To your knowledge, has Victor Fontenot ever been disciplined for keeping drugs or drug paraphernalia in his car?

A. Not that's come across civil service officially, no.

Q. Do you think if another officer had kept drugs in their car, they might have been disciplined by Chief Fontenot?

A. Depending on who it was.

Q. Who might have been disciplined for that kind of conduct?

A. The same people that he's retaliated against: Lieutenant Dunn, myself, Myers, or whoever was in his target at that time.

Q. So to be clear, if you're a favorite of

**268**

Chief Fontenot, you're allowed to go so far as to keep drugs and drug paraphernalia in your car without discipline? Is that correct?

A. Well, I don't know for sure that he knew about it. But I would assume so, yes.

Q. Okay. With respect to the backdating on the warrant, is that legal?

A. No.

Q. Is that permitted by police department policy?

A. No.

Q. And it's not ethical, correct?

A. Correct.

Q. Okay.

A. And it's not hard to figure out if you look at the log, the time the warrant was signed, and the time that the warrant was done.

Q. And Victor Fontenot would know that he's not supposed to --

A. Yes.

Q. -- backdate a warrant, correct?

A. Well, he should know, yes.

Q. Same question, he's -- he should know that he's not supposed to keep illegal contraband in his car, correct?

A. Correct.

**269**

Q.   Okay.  With respect to the warrant, to your knowledge, has Chief Fontenot ever reprimanded Victor for backdating this warrant?

A.   Not to my knowledge.

Q.   Do you think Chief Fontenot knows that he backdated a warrant?

A.   Can't say for sure, but I don't see how he couldn't.

Q.   When you say you couldn't see how he couldn't know, can you tell us a bit about what you mean by that?

A.   Well, I mean, it's talked about in the department amongst the shifts.

Q.   So all the other officers know these rumors?

A.   All the officers that were here at the time know, yeah.

Q.   Okay.

A.   And there was officers on the scene, so they know.  I mean, it's not like he was by himself.

Q.   The officers were on the scene of what?  The warrant incident?

A.   Uh-huh.

Q.   And they've corroborated this rumor that Victor Fontenot backdated the warrant inappropriately?

A.   Yes.

**270**

Q.   Is that correct?

A.   I got the phone call.  They asked me about it.

Q.   Was this incident ever investigated, to your knowledge?

A.   Not to my knowledge.

Q.   How about the drug paraphernalia and drugs in the back of the car?  Were those incidents ever investigated?

A.   Not to my knowledge.

Q.   And same thing, did those rumors about him, Victor Fontenot, having drugs in his car, does everyone in the department seem to know about that?

A.   I would say the majority of people.  I wouldn't say everyone.

Q.   So it's your opinion that the chief should know about that?

A.   Yes.  But when you're reporting stuff about violations of law and reporting stuff of violations of procedure order for years and nothing gets done, you get tired of reporting it.  That make sense?

Q.   Yeah.

A.   So those officers that have blown the whistle before and nothing gets done, they get tired of blowing the whistle.  They tell other people to cover themselves, to let somebody else know, but they quit

**271**

reporting it to the administration since nothing is going to be done anyway.

Q.   So to be clear, officers in your department believe that Victor Fontenot has actually kept drugs that were evidence and drug paraphernalia in his car?

A.   Yes.  I'm not saying that he kept them and they never got turned in.

Q.   Uh-huh.

A.   Because I don't know.  All I'm saying is they weren't properly put in evidence like they should have been for cases.

Q.   Okay.

A.   Yes.

Q.   But my question is that the officers in your department, they believe these are not just rumors --

A.   Yes, common knowledge.

Q.   -- that they actually happened, correct?

A.   Yes.

Q.   And it's your understanding that these have gone unreported because the officers have seen that other similar incidents of misconduct have been reported and gone undisciplined; is that correct?

A.   Ignored.  Yes.

Q.   Why would you ignore something like that, to your knowledge?

**272**

A.   I don't know.  I can't answer that.

Q.   Do you think it helps the Eunice Police Department run better to not investigate and discipline these sorts of incidences of misconduct?

A.   No.  I think it makes it very inefficient.

Q.   I also want to clarify.  The issue of the warrant, where it was backdated, other officers believe that this is true, that Victor Fontenot backdated a warrant, correct?

A.   Yes.

Q.   It's not just a rumor?

A.   Right.

Q.   And they didn't report it for the same reason we just discussed?

A.   I don't know if they reported that incident or not.

Q.   Okay.

A.   I couldn't tell you.

Q.   But to your knowledge, there has been no disciplinary action taken for this?

A.   Correct.

Q.   Okay.  Have there ever been any other incidents in which Victor Fontenot has changed a warrant improperly or submitted an improper warrant?

A.   I couldn't say for sure.  Because I remember

**273**

discussing somebody calling me something about a warrant with him, but I can't remember the specifics.

Q. Okay. And to be clear, you don't recall any incidents in which Victor was involved with a warrant that was invalidated; is that correct?

A. I can't remember it, no.

Q. Okay. What's Victor Fontenot's general reputation within the department?

A. I hate to use the word "incompetent," but similar to that, untrained or incompetent. It's a harsh word, but. I know with the other departments, they don't want to work with him.

Q. What other departments?

A. Like the sheriff's office. He has a reputation that he's not trusted over there.

Q. When you say "not trusted," what do you mean by that?

A. That they don't want to work drug cases with him unless they're ordered to.

Q. How come?

A. I guess he has a reputation of just not using reliable CIs, confidential informants, that his information is not good. A lot of times, they went after his information and it was shown to be unreliable.

**274**

Q. Has that happened more than once?

A. Yes.

Q. Have you ever heard a rumor that Victor Fontenot had a confidential informant steal a gun for him?

A. No.

Q. Okay. So you've mentioned that other officers outside of the Eunice Police Department don't necessarily trust Victor Fontenot; is that correct?

A. And a lot of officers that work there that don't trust him either.

Q. Okay. Why don't they trust him?

A. Because of his reputation.

Q. Can you elaborate a little bit?

A. That he's not trustworthy and his information is not trustworthy and that he has a lot of CIs that shouldn't be CIs.

Q. Why shouldn't they be CIs?

A. Because of their drug history and criminal history.

Q. Why do you think he uses CIs that aren't necessarily trustworthy?

A. I don't think he was properly trained --

Q. Okay.

A. -- for one.

**275**

Q. What's Victor's reputation with the public? Do you know?

A. Most of the criminals don't trust him either. He says one thing and does another. Like, you know, I'll do this if you do this, and then he doesn't follow through on his end.

Q. Like what?

A. You know, I won't charge you with this if you do this for me, and then ends up charging them anyway.

Q. Well, what does he want these criminals to do for him?

A. I don't know. Like, you know, go buy from a certain person or --

Q. Go buy drugs from a certain person so that Victor Fontenot can make a case --

A. Bust that person.

Q. -- against that person; is that correct?

A. Right.

Q. Are these sorts of exchanges permitted within the Eunice Police Department?

A. You're supposed to be able to do that with your CIs if they're reliable. But you have to make them reliable first, and you have to document all that.

Q. Does he document that?

A. I couldn't say if he did or did not.

**276**

Q. Okay.

A. I've been told he doesn't, but I don't know for sure. I'm sure he has to document some of it.

Q. Okay. Let's talk a little bit about the payroll irregularities at the Eunice Police Department.

A. Okay.

Q. Have you witnessed any officers claim pay that they're not entitled to?

A. You mean besides ones that we did the investigation on?

Q. Uh-huh.

A. I can't say that I have witnessed someone claim something that I can say for sure they didn't work, no.

Q. Have you ever heard about someone --

A. Oh, I've heard, yes, that people claim overtime and they're not there.

Q. Like who?

A. Lieutenant Young, Victor Fontenot. I've heard Jeremy Ivory has done it before. But like I said, I don't know -- I can't say from firsthand knowledge. I just -- I know that a lot of times people say that, like, Ryan Young goes 10-85 in the morning because it's helping the shift, but the shift says he's nowhere around and they haven't seen him or heard from him.

**277**

Q.   Is claiming this sort of pay a violation of department policy?

A.   Yeah.  It's illegal.

Q.   It's illegal?

A.   Yeah.

Q.   To your knowledge, have any of these payroll irregularity instances that you just mentioned been investigated?

A.   Not to my knowledge.

Q.   Have these officers been disciplined, to your knowledge?

A.   Not to my knowledge.  I know council people have asked about them and stuff.

Q.   Why do you think that is?

A.   I don't know.  I guess they're allowed to have so much overtime from the chief, I guess, because they're his favorites.

Q.   So if you were to claim overtime that you did not actually work, what do you think would happen?

A.   If I claimed any overtime, the deputy chief gets a phone call and he wants to know why.  Same with Dunn too.  Dunn gets denied overtime when he wants to help out.

Q.   So earlier you categorized yourself and Lieutenant Dunn as people who the chief targets,

**278**

correct?

A.   Yes.

Q.   So if people who the chief targets were to make these same claims to pay that Victor and Ryan and Jeremy have been permitted to make, you would be investigated; is that correct?

A.   Absolutely.

Q.   Would you be punished?

A.   I'm sure, if he could.

Q.   Okay.  Would you say there's a different set of rules at the Eunice Police Department that apply to the people that Chief Fontenot favors versus the ones that he targets?

A.   Yes.  I believe that's the culture that's been created.

Q.   Would you say that everyone at the police department is aware that that's the culture?

A.   I would say 90 percent of them.

Q.   Who's not aware?

A.   The ones that don't want to be.

Q.   Okay.

A.   Some people go to work and stay in their little box.  They don't want to know nothing.  You know, like, the --

THE REPORTER:  I'm sorry?

**279**

A.   Records, like people that work in records, away from the department.

BY MS. HIGGINS:

Q.   Have you ever heard about officers claiming time, that driving to work is time spent working?

A.   I've heard that they go 10-8 from their house when they live out of town but I can't say for a hundred percent sure because I've never looked at their time card and the log and compared them myself, no.

Q.   Who have you heard does this?

A.   I've heard Lieutenant Ivory.  I've heard Joey Fontenot has done it.  And there has been a couple others, but I don't remember who they were because I don't work there anymore.

Q.   Do you think that's appropriate?

A.   No.  You're supposed to go get paid when you get in the city limits.

Q.   Have these instances ever been investigated that you're aware of?

A.   Not that I'm aware of.

Q.   Are you aware of any disciplinary action taken in regards to this matter?

A.   Not that I'm aware of.  I do know there was an officer that was in his personal unit at a grocery store outside of town, and there was something done

**280**

about that, but other than that, I don't know.

Q.   Do you know which officer that was?

A.   It was Sergeant Noel Sebastian -- Sebastian Noel, I'm sorry.

Q.   And why was something done about that particular incidence?

A.   Probably because he was working under me.

Q.   What was done about it?

A.   They gave me the picture and told me to handle it and make sure that I did a verbal reprimand with him.  Took care of it.

Q.   So you had to punish him; is that correct?

A.   Yeah.  I think that was, you know, done so that it would create -- because he knows that the chief allows other people to do that, so I think it was done to create animosity between the people that work for me and myself.

Q.   So did you view that as a form of retaliation against yourself?

A.   I did, yes.  I didn't think it was right for me to tell him he can't do it when he allows other people to do it.

Q.   Okay.  Are you aware of any allegations involving payroll fraud?

A.   Allegations?  Not besides the ones we've

**281**

talked about.

Q. Okay. Have you ever heard of officers falsifying reports, other than the chief making those alterations to reports that we've already discussed?

A. And besides the ones that we talked about that he had somebody else change, no.

Q. Can you remind me which ones he had someone else change?

A. Like the burglary one.

Q. Like the burglary one.

A. Yeah.

Q. Okay. And just to clarify, do you think having changes made to reports, is that appropriate?

A. No.

MS. GUNNELS: Objection. That has been asked and answered.

BY MS. HIGGINS:

Q. Is it a violation of department policy?

A. I couldn't say yes or no, but I think the appropriate thing would be to -- if you needed something changed, if it was really incorrect, then you would have -- through the chain of command, have the officer change it through his chain of command, if it was appropriate and legal, I mean.

Q. Okay.

**282**

A. Yeah.

Q. And to your knowledge, there have been no investigations into these changes of reports; is that correct?

A. Not to my knowledge, no.

Q. And no disciplinary action taken in response?

A. Not to my knowledge, no.

Q. Okay. I want to briefly circle back to the officers who were working outside their class at the moment --

A. Okay.

Q. -- or in the past as well.

Has the civil service board ever investigated claims regarding these matters?

A. Yes.

Q. What have been the board's conclusions?

A. That there were a lot of employees working outside their class. And we ordered the state examiner's office, after speaking with the appointing authority, to do a job analysis. And once they've completed the job analysis, they'll bring it back to the board so we can decide what to do with it.

Q. So the decision is pending at the moment --

A. Yes.

Q. -- is that correct?

**283**

During this investigation, have there been any steps taken by Chief Fontenot to correct this issue?

A. No.

Q. Have there been any steps taken by anyone else that you know of to correct this issue?

A. No.

Q. But it's your belief that officers working outside their class is a problem, correct?

A. Yes. And the committee found that they were working outside their class. It's just we haven't done the finding of facts yet because we're waiting on the OSE to give their opinion. It's just an opinion, and then the board can make a decision how to fix the problem.

Q. But it's the board's intention to fix the problem, right?

A. Yes.

Q. If the board fixes the problem, would that contradict what Chief Fontenot wants?

A. Yes.

Q. How so?

A. Because like I had stated previously, he wants to run the department like he wants, and he wants to assign duties as he sees fit, not as the law says, or the board rules say either.

**284**

Q. Okay. To your knowledge, have there been reduced officer patrols in Eunice?

A. As in less people patrolling? Yes.

Q. How come?

A. Because we've lost a lot of our force over the last eight years.

Q. For the same reasons --

A. Yes --

Q. -- that we've been discussing?

A. -- same reasons.

Q. Do you think that's a safety issue for the City of Eunice?

A. Absolutely.

Q. Why do you think that there hasn't been more of an effort made to hire more people, then?

A. Well, I mean, there's the national issues, which is a small part of it. The pay, a small part of it. But if you go to the academy and say you work for Eunice, they'll try to start recruiting you there because Eunice has a reputation, this chief has a reputation all over the Acadiana area.

Q. A reputation for what?

A. For going after people, being retaliatory, being vengeful, you're going to do it his way or the highway, which he has repeated several times.

**285**

Q. So would you say that the chief's reputation makes it harder for the Eunice Police Department to retain new employees?

A. Yes, on top of everything else. They see what's going on there, how bad the morale is, and they don't want to stay. I don't blame them.

Q. So would you say that the chief's role in the department in effect, then, makes the city less safe?

A. Yes.

Q. Has anyone else done anything to correct this issue?

A. I mean, the mayor and the council worked on a tax that -- they gave us a raise. And even after the raise was approved, we still lost officers because they couldn't work for the chief even after the raise.

So they have tried to do some stuff, but like I said, their hands are tied because the city attorney tells them, He's an elected chief. You can't do anything.

But they have tried to listen to our concerns, you know, as much as they think they can.

Q. Okay. Have there been any steps taken, though, that you know of to actually try to hire more people?

A. Not that I'm aware of.

**286**

Q. Okay. We talked a little bit about warrants potentially being invalidated that were related to Victor Fontenot's work. Do you recall that?

A. I recall you asking me, but I didn't know any specifics.

Q. Right. But you recall our conversation about it, correct?

A. Yes.

Q. Have you ever heard of any other incidents in which warrants have been invalidated not involving Victor Fontenot?

A. Not that I can recall.

Q. Okay. To your knowledge, has there been a misuse of department vehicles and fuel?

A. Yes.

Q. Can you tell me about that?

A. Just one instance. Victor Fontenot was allowed to use his vehicle like it was his own, with his family, outside the city, to go, I've heard, on vacation. When he was on sick leave, he drove it around like it was his own vehicle. He smokes in it, which is illegal. It is allowed.

Q. It's allowed by whom?

A. The chief. I mean, everybody sees him. He pulls up in the back and smokes in it.

**287**

Q. So --

A. Other people --

Q. -- he has never been investigated for misusing his vehicle in this way?

A. No.

Q. How come?

A. I guess one of the favorites.

Q. And he has never been disciplined for misusing his vehicle, correct?

A. He's still doing it, so I assume no. Not that I'm aware of.

Q. Has anyone else misused their vehicle?

A. I mean, I've heard.

Q. What have you heard?

A. That people, you know, drive wherever they want with it. But I couldn't say specifically who else. That's the one I hear about all the time, and we see it and we hear it on the radio. And when he was on sick leave, you could see him driving it.

Q. Do you think if Lieutenant Dunn were to use his vehicle in the same way Victor Fontenot does that he would be punished?

A. Yes. He has been told not to use his vehicle for personal.

Q. Oh he has?

**288**

A. Yes.

Q. By whom?

A. Either by the deputy chief through the chief, or by the chief through the deputy chief, or the chief himself, I guess. You'd have to ask Dunn who actually gave him the order.

Q. What if you used your vehicle in that way? Would that be permitted?

A. I'm sure it wouldn't. When I was on sick leave, they came and got my vehicle. They wouldn't leave it in front of my house.

Q. But Victor Fontenot is permitted --

A. Yeah, keep his.

Q. -- to keep his vehicle?

A. And use it, yes.

They took Dunn's unit for a while, I think, one of the times he was gone. And they took Stephanie Myers' unit when she was on sick leave too, so.

Q. So to clarify, you, Lieutenant Myers, and Lieutenant Dunn have either been told that you cannot use your vehicle on your personal time or have actually had their vehicle taken away while you were on leave; is that correct?

A. Yes. But I don't use mine -- I don't use mine on personal time. Because the mayor had put out an

**289**

edict saying don't do that, so it was stopped then, in town.

Q.    So is it your opinion, then, that Victor's behavior should be investigated?

A.    Well, I mean, I don't know who is going to investigate him because the chief allows him to do it.

Q.    Okay.

A.    That's who would investigate it.

Q.    Should he be reprimanded --

A.    Yes.

Q.    -- for using his vehicle in this way?

A.    He should be treated like everybody else.

Q.    Is anyone else allowed to use their vehicle in this way?

A.    I can't say for sure.  I don't know.

Q.    Other than --

A.    I mean, the chief has said if you're in town, you know, you can use your vehicle, but not outside of town.  But Victor don't live inside of town; he lives outside, so.

Q.    Okay.  To your knowledge, has there been a misuse of department funds, other than the payroll issues we've already discussed?

A.    I mean, besides the gas that's being used when they're using it for themselves.

**290**

Q.    Okay.  Have you ever heard Chief Fontenot use any racially motivated derogatory comments towards anyone at the Eunice Police Department?

A.    Racially motivated, racial -- towards anyone in the department?

Q.    Uh-huh.

A.    Not at the department, no.

Q.    What about people outside the department?

A.    I mean, I've heard him use racial slurs before.

Q.    Like what?

A.    This is when he -- before office and when he first took office, I've heard him use the N-word.

Q.    In what context?

A.    Talking about black people.

Q.    Black people like who?

A.    Just in general.  Like these N-word, just because of them, just in a conversation.  Why it's like this or like that.

Q.    What do you mean?

A.    Like why there's crime in this area or why the youth is committing all these crimes.

Q.    So he --

A.    Like I said, I haven't heard that in years because he doesn't talk to me like that anymore.

**291**

Q.    So he blames -- or he has in the past blamed black people for the rise in crime in Eunice; is that correct?

A.    Not in so many words.  But in specific instances, yeah.

Q.    And he's the used the N-word in doing that; is that correct?

A.    Yes.

Q.    Has he made, to your knowledge, or has he used these racial slurs in front of anyone else other than you?

A.    Yes.

Q.    In front of whom?

A.    I believe, at least a couple times, in front of Dunn, or at least once in front of Dunn when I was present.

Q.    Do other officers know that Chief Fontenot uses this sort of language?

A.    I don't know.

Q.    Okay.

A.    I couldn't tell you.  Like I said, I haven't heard him do that since probably the first year he was in there.

Q.    Do you believe using these sort of racial slurs is conduct unbecoming of an officer?

**292**

A.    I think it's inappropriate for anybody to use.

Q.    Okay.  Have you ever heard Chief Fontenot, or heard of Chief Fontenot, making any other sort of -- how about gender-based derogatory comments towards anyone at the Eunice Police Department?

A.    In general, not specifically.

Q.    In general?

A.    Saying that women shouldn't be on the road.

Q.    Why shouldn't women be on the road, according to Chief Fontenot?

A.    Because he doesn't think it's their place.

Q.    What does that mean?

A.    He doesn't think women -- I don't know if they're maybe physically or capable of doing patrolmen job.

Q.    Because their women?

A.    Yes.

Q.    Anything else?

A.    The same type of stuff like that.  I mean, that's what I remember specifically.  But he's said that more than once.

Q.    He's said that more than once, you said?

A.    Yes.

Q.    Do you remember any other comments he made more specifically?

**293**

A.    I remember him saying something about watching a domestic video, from inside someone's house, and the woman was pushed, and he said, Well, sometimes it's okay to push a woman.  He was acting like he was joking, but it still was inappropriate from a leader to say that.  And I want to say the house was on Park.  There's a video of it in the department somewhere.

Q.    So you recall him saying that it was okay to push a woman; is that correct?

A.    Yeah, that sometimes it's okay.

Q.    Are other people in your office aware that Chief Fontenot makes these types of comments?

A.    Yeah.  He does it pretty openly.

Q.    How does that make people in your department feel, do you think?

A.    Very uncomfortable, but they won't say anything in front of him.

Q.    How does it make you feel?

A.    Uncomfortable.

Q.    Have you ever spoken to any of the women in the department about how it makes them feel?

A.    Yes.

Q.    What have they said?

A.    They think it's very inappropriate, and they think that it'll hold them down, similar stuff like

**294**

that.

Q.    Okay.  With respect to the racial slurs -- or actually, let me backtrack for a second.
Who specifically have you had those conversations with, the women that you've talked about, that have told you that they feel uncomfortable about these comments?

A.    Myers is one of them.

Q.    Who else?

A.    Lindsey Burton was one of them.  There was some dispatchers that are not there anymore that discussed it before with me.

Q.    Okay.  So you would say more than three people have had these sorts of discussion with you --

A.    Yes.

Q.    -- that they are uncomfortable with this sort of commentary; is that correct?

A.    Yes.

Q.    Okay.  With respect to the racial slurs, have you heard about -- well, how did they make you feel?

A.    That he was -- first of all, that surprised me.

Q.    Uh-huh.

A.    Because I know he has grandchildren, so I didn't expect it to come out of his mouth.  But then it

**295**

kind of made me feel like -- like with Varden, maybe he went after him because he didn't like him because of his color.  But I can't say that for sure; he never said that.  He never called him a name, so I can't say specifically.  But it made me doubt who I thought he was.

Q.    So are you saying that it gave you the impression that Chief Fontenot retaliates against certain officers because of their race?

MS. GUNNELS:  Objection.

MS. HIGGINS:  To what?

A.    It made me feel for the possibility --

MS. HIGGINS:  What's the basis of the objection?

MS. GUNNELS:  The basis is that you're misstating facts and it's leading.

MS. HIGGINS:  I asked the question.
It's not leading at all.

BY MS. HIGGINS:

Q.    You can answer the question.

A.    It put doubt in my mind, that that could be a possibility.

Q.    Okay.

A.    But I tried -- I had a lot of respect for him before he took office, so -- I thought he was a

**296**

different person.

Q.    When you say you thought he was a different person, what do you mean by that?

A.    I just didn't think, for one, that he talked like that, you know.  And for number two, that he was -- I thought he was someone that would obey the laws and would be professional and a leader, that would lead the department, not tear it apart and be vindictive and go after people that he didn't like.

Q.    Have you heard about other people in the department feeling uncomfortable as a result of hearing these racial slurs made by Chief Fontenot?

A.    Well, I know Lieutenant Dunn said something about it to me when it happened.

Q.    What did he say to you?

A.    He just -- at the time, he was at a -- a lodge that he was thinking about joining, and that made him change his mind.

Q.    Can you explain that a little bit more to me?

A.    The hunting lodge in Eunice.  It's a lodge for Masons.

Q.    Okay.

A.    And Dunn was trying to join.

Q.    Okay.

A.    And after those conversations, Dunn just

**297**

didn't come back.  And he had discussed it with me.

Q.    Is Chief Fontenot a member of this lodge?

A.    Yes.

Q.    And because Lieutenant Dunn heard Chief Fontenot make racially driven derogatory remarks, he no longer wanted to be a part of this same lodge; is that correct?

A.    That was part -- most of the reasoning, yes. That was the --

Q.    Okay.

A.    Yeah.

Q.    Has the thought, to your knowledge, been put in other people's minds that perhaps Chief Fontenot retaliates against certain members of the police department because they're black?

A.    Not besides what I said.

Q.    What about for any other race, not limited?

A.    I never heard him saying anything else about another race.

Q.    Okay.  We talked about just now it being a thought in your mind after you heard Chief Fontenot make these racial slurs that perhaps he retaliated against officers because of their race, correct?

A.    Uh-huh.

Q.    Do you think he ever directs officers to

**298**

charge people with crimes because of their race?

A.    Not that I'm aware of.

Q.    Okay.  I want to move on.

A.    Okay.

Q.    We talked a little bit about Victor Fontenot having potentially inappropriate interactions with confidential informants, correct?

A.    Yes.

Q.    Beyond those instances, have you ever heard anything about any other Eunice Police Department officers having inappropriate interactions with confidential informants?

A.    No.

Q.    Do you know a person named Jordan Arnaud?

A.    Doesn't ring a bell.

Q.    Okay.  How about Christopher Mettetal?

A.    That name sounds familiar, but I'm not good with names, better with faces.  But his name sounds familiar.

Q.    But you don't recall anything specific about him?

A.    I don't know.

Q.    What about Harrison Sonnie Arnaud?

A.    (No audible response.)

Q.    No?

**299**

A.    No.  Haven't been on the road in a while, so. I know probably more of the older guys.

Q.    Okay.  We talked about an instance in which physical force was used against someone you think was a homeless person outside of Lieutenant Dunn's home; is that correct?

A.    Yes.

Q.    Have you heard about any other instances in which officers used physical force against people they were arresting?

A.    I mean, I've heard several over the years.

Q.    What have you heard?

A.    Some were investigated; some weren't.

Q.    What have you heard?

A.    Well, there was the instance in the jail, and I believe it was investigated, or at least -- Cody Miller.

Q.    What happened?

A.    He ended up getting into it with -- with an inmate, and I guess -- I don't know if he struck him or -- he was accused of excessive force, but he was cleared by the state police.  But then the chief ended up demoting him anyway.

Q.    Why did the chief demote him anyway if he was cleared?

**300**

A.    I have no idea.  But he didn't have civil service -- he wasn't covered by civil service where he could appeal.

Q.    Because he wasn't at the department long enough?

A.    He wasn't a sergeant long enough.  But he was on Dunn's shift.

Q.    Any other specific incidents that you recall?

A.    Not specifically that I can recall, no.  I mean, there's always allegations but.

Q.    Okay.

A.    Yeah.

Q.    Okay.  Have you ever heard about any instances in which officers neglected to seek appropriate medical care for people in custody at the Eunice Police Department?

A.    From what I understand, it happens a lot in the jail.  People ask for medical.  But, you know, a lot of those turn out to be not real.  So sometimes officers, That guy always cries wolf and nothing is ever wrong with him, so they just kind of ignore it.

Q.    Have there been times when people in custody weren't crying wolf and actually needed medical care and were not given it?

A.    I can't tell you specifically, but I've heard

**301**

about it, yes.

Q.   What have you heard about?

A.   Where someone had, you know, fell off the bunk and they wouldn't send them to the hospital, they wouldn't call an ambulance.  They brought them out, gave an aspirin and told them put some ice on it, type stuff, and they were asking for medical help and it wasn't given.

Q.   Why didn't they get the medical help?

MS. GUNNELS:  Objection; calls for speculation.

BY MS. HIGGINS:

Q.   To your knowledge.

A.   Because usually whenever you call or send somebody in the ambulance, usually in the morning you get a phone call and they want to know why you're spending money.  You know, they fuss about the bills, the medical bills and stuff.

Q.   So is it your understanding that sometimes people who are in custody at the Eunice Police Department, who in fact actually need medical attention, are not given it because --

A.   They're afraid of what's going to happen, they're going to get griped at or in trouble for spending the money.

**302**

Q.   For spending -- because of financial issues with the department?  They don't want to spend -- the department doesn't want to spend the money?  Is that correct?

A.   I think that goes into part of their decision, yes.

Q.   Who doesn't want to spend the money?

A.   The chief.  He's in charge of the budget.  He doesn't want to go over the budget.  I've never heard him told anybody not to give medical attention, not specifically, like, say, Don't do that.  But, I mean, you know, that's the culture you create --

Q.   Well, what would give the impression to officers that they are not to seek medical care when it's needed --

A.   Because you get --

Q.   -- because of budget constraints?

A.   Every decision you make like that gets picked apart by the chief of police the next day, and then you're questioned about every decision you make.  And that wears on you after a while.  You don't want that phone call.

Q.   Are you aware of a specific time in which someone sought -- an officer sought medical care for someone in custody and then that decision was, as you

**303**

say, picked apart by the chief?

A.   Well, it's usually -- just about every one of them, unless somebody had surgery or something like that.  The ones that are sent there for a couple of hours and sent back you usually hear about the next day.

Q.   And in those conversations, to your knowledge, does Chief Fontenot say that the reason that medical care should not be sought is because of budget constraints?

A.   No.

Q.   What does he say?

A.   I've never heard -- I've heard him say that.

Q.   So what does he say --

A.   I mean, I've heard him say similar things to, you know, they didn't need medical care.  They shouldn't have sent them to the hospital, because they were faking it, there really wasn't nothing wrong with them, stuff like that.  Nothing specific to any specific person.

Q.   Is it department policy to deny people in custody medical care when it's needed?

A.   No, it's not a policy.

Q.   Is it department policy to actually provide medical care when it's needed?

**304**

A.   You're supposed to call and get permission.

Q.   Who are you supposed to call to get permission from?

A.   The deputy chief.

Q.   And the deputy chief then authorizes the medical care?

A.   Yes.

Q.   What criteria has to be met in order for him to authorize medical care being given?

A.   I don't know -- I can't tell you, because every time I've called him, he's always approved it.

Q.   Okay.

A.   And then if it was an emergency, I didn't even call.  I just called to tell him after the fact.

Q.   And have you been questioned for those cases where you called after the fact?

A.   I've never been called, no.

Q.   Okay.  In your opinion, the times that you've actually gotten medical care for someone in custody has been necessary, correct?

A.   Yes.

Q.   When you say necessary, what kind of things have happened that you sought medical care for someone in custody?

A.   Fights in the back, where somebody gets a

305

contusion or gets their head cut open or something broken or falls off the bench or has chest pains, staph infections, that kind of thing, with a fever, blood pressure too high.

Q.  Okay.  Do you know who Joshua Tyler is?

MS. GUNNELS:  Leah, I'm going to suggest we take a break at some point when you get to a stopping point.

A.  No, I don't.

MS. HIGGINS:  I need a few more minutes, and then I will.

MS. GUNNELS:  Sure.

BY MS. HIGGINS:

Q.  You don't know who Joshua Tyler is?

A.  No.

Q.  In your opinion, if someone swallowed a glass pipe would that qualify as a need for medical attention?

A.  Yes.

Q.  Can you think of a reason of why someone who swallowed a glass pipe would be denied medical care?

A.  No.

Q.  Okay.  Do you know someone named Christopher Ashworth?

A.  Yes.

306

Q.  What can you tell me about him?

A.  He's got a drug problem.  He commits a lot of crimes.  He's a frequent flyer in the jail.

Q.  Has he ever needed medical attention while in custody at the Eunice Police Department?

A.  I believe so, yes.

Q.  Was he given that medical attention?

A.  As far as I know, he was.

Q.  Why do you think he needed medical attention? Do you recall any specifics?

A.  I don't recall.  We've been seeing him since he was a juvenile.

Q.  Okay.

A.  Yeah.

Q.  Have you heard about any instances in which officers have repeatedly stopped civilians without cause?

A.  I've heard of allegations of that, yes.

Q.  What have you heard?

A.  That they would follow somebody around and -- till they found something to pull them over for.

Q.  Who was involved in those instances that you're referring to?

A.  A.J. Frank.

Q.  Can you tell me more specifics about what

307

happened?

A.  That people come and complain that he kept pulling them over for different reasons and he was following them was the allegation.

Q.  He was pulling them over for no reason?

A.  Well, he was finding a reason, but they were saying there was no reason.

Q.  Who were the types of people that he was pulling over?  Criminals?

A.  Yeah, most of them had been arrested before. Yes.

Q.  Okay.  To your knowledge, did he have an actual reason for pulling over these -- these civilians?

A.  As far as I know, he did.

Q.  He did?

A.  Yes.

Q.  Okay.  Do you know who Phyllis Vail is?

A.  No.

Q.  Okay.  Have you ever heard of any instances in which officers inappropriately harassed civilians, beyond the A.J. Frank instances we just discussed?

A.  Nothing comes to mind.

Q.  Okay.  Have you ever heard about anyone at the Eunice Police Department covering up for other

308

officers' family members or friends?

A.  I've heard allegations, but I don't know of any personally.

Q.  You've never witnessed any?

A.  No.

Q.  But you've heard allegations; is that correct?

A.  Yes.

Q.  What have you heard?

A.  I've heard that -- well, when Tony Kennedy was a lieutenant, he got involved in one of his sons or -- one of his sons' cases.  I've also heard A.J. Frank getting involved in a case before like that.

Q.  Can you tell me specifics of what happened --

A.  I don't remember.

Q.  You don't remember?

A.  No.

Q.  Are officers permitted to cover up for their own family or friends?

A.  No.

Q.  Can other officers cover up another officer's family member or friends?

A.  They're not supposed to.

Q.  Not supposed to.

In the incident with Kennedy, do you know that -- if it was ever investigated, this cover-up that

**309**

you're talking about?

A. I don't know.

Q. Was he ever disciplined for it, to your knowledge?

A. Not to my knowledge.

Q. What about the incidents with A.J. Frank?

A. Not to my knowledge, no.

Q. So he was not investigated or disciplined?

A. I don't even know if it was reported.

Q. Do you know what happened?

A. (Witness shakes head.)

Q. No?

A. I know with the A.J. Frank -- from what I understand, it was one of those somebody didn't have insurance and they were going to tow the vehicle, and he stepped in, somebody in his family; and he told the officer, because he was a sergeant, not to tow it, that he wasn't going to allow them to tow it.

Q. Is that permissible?

A. No. The law says you shall -- it should have been investigated. But like I said, I don't know if it was reported to anybody or not.

Q. But to your knowledge, it was not investigated; is that correct?

A. To my knowledge, it was not.

**310**

Q. And he was not --

A. Disciplined --

Q. -- disciplined?

A. -- on that, no.

Q. Do you think Chief Fontenot would have known about these incidents?

A. I can't say that he would.

Q. Okay.

MS. HIGGINS: Let's take a ten-minute break.

THE VIDEOGRAPHER: We're off the record at 4:01.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 4:16.

BY MS. HIGGINS:

Q. Other than what we've already covered, have you ever witnessed any other violations of department policy by Eunice Police Department personnel? We've covered a lot, I know.

A. I mean, it pretty much happens every day, so it's kind of -- we don't follow the policy, probably 60 percent of it, so -- it's just not done that way.

Q. Why don't you follow the policy that much?

A. The chief runs it a different way.

**311**

Q. So you don't follow the policy 60 percent of the time, approximately?

A. 50 to 60.

MS. GUNNELS: Objection; misstates facts.

BY MS. HIGGINS:

Q. It's your understanding that the department doesn't follow the policy 50 to 60 --

A. Percent.

Q. -- 50 to 60 percent of the time at the directive of Chief Fontenot; is that correct?

A. Yes.

Q. So do these violations of department policy often go unreported, then?

A. Yes.

Q. And they go uninvestigated, then; is that correct?

A. Yes.

Q. Okay. Do you recall any instances in which Chief Fontenot interfered with an internal investigation to achieve a desired outcome?

A. I can't say specifically. I can't remember any specific details.

Q. Okay. Other than the events we've already covered, have you ever heard about any police

**312**

misconduct that Chief Fontenot refused to punish or didn't punish appropriately?

A. Just the ones we've discussed.

Q. Okay. And again, other than what we've already covered, are you aware of any instances of misconduct covered up by Chief Fontenot?

A. Not specifically, no.

Q. Okay. In your opinion, do you believe Chief Fontenot properly handles incidents of misconduct committed by Eunice Police Department personnel?

A. No.

Q. Can you tell me about that?

A. Just what we've discussed. I think it depends on who it is. And if -- when it comes to law, it depends on if he agrees with that law or not.

Q. Do you believe that Chief Fontenot permits violations of department policy or procedure in some instances, then? Is that what you're saying?

A. Yes.

Q. And I know we've talked a bit about this, but who does he usually allow to permit violations of department policy or procedure?

A. Most of the time, it's the ones that do as he says, his favorites. And kind of like in his policy, it says that if you use your unit for off-duty

**313**

security --

Q.   Uh-huh.

A.   -- you have to pay -- write a check to the city -- I think it's $25.

Q.   Okay.

A.   And it's done all the time, but no one has ever paid anything.

And Dunn, I know, at one time was told not to use his unit for security, but other people still use theirs and no one's ever paid.  I've never heard of anybody writing a check to the city for that.  But that's just one instance.

Q.   Are there other similar instances that you're aware of?

A.   Yeah, there's many.  But that one I can remember specifically because I got a phone call about it.

Q.   Okay.  And to clarify, do you mean to say that you think that Chief Fontenot shields certain employees from disciplinary action for violations of department policy?

MS. GUNNELS:  Objection; leading.

A.   Yes.  Like, you know, certain people are supposed to stay home on sick leave and only -- he has people making sure that they call when they leave to go

**314**

anywhere, but other people can -- when they're on sick leave, they've had people go to parades on sick leave or show up at the department or have other jobs or just not be at home.  But it depends on who you are whether that's followed or not.

BY MS. HIGGINS:

Q.   And it's these same favorites --

A.   Yes.

Q.   -- who are allowed to violate department policy without repercussions; is that correct?

A.   Correct.

Q.   Okay.  And to clarify, who isn't allowed to violate department policy without any sort of repercussions or -- yes.  That's the question.

A.   Well, as far as that work there now, it's mostly the same people: Lieutenant Dunn, myself, Lieutenant Myers.  For a while, it was Nicole Dupre.  The ones that don't agree with him that he's retaliated against.

Q.   Okay.  Do you believe that the chief prioritizes reducing crime in Eunice?

A.   No.

Q.   Is it part of the chief's job, do you think, to make that a priority?

A.   To enforce all laws.  Yes.

**315**

Q.   Why do you think it's not a priority for Chief Fontenot?

A.   I believe he has his own agenda.

Q.   Has he taken any steps to reduce crime in the city of Eunice?

A.   I mean, every once in a while, if they get a grant or something, he'll heavy stack one night here and there.  "Heavy stack," I mean put a lot of patrol officers and bring other officers from other departments just to be out, seen in the city.

And if there's a shooting or something, sometimes he'll have people come in that -- just to show that we have a lot of people that night.  He has done that, but it's very sparingly done.

Q.   It's sparingly done?

A.   Yes.

Q.   So it's not that he's taken general steps and reforms within the department to decrease crime within the city; is that correct?

A.   I don't see any, no.

Q.   Conversely, has he actually taken steps that you believe have increased crime in the city?

A.   Yes.

Q.   Like what?

MS. GUNNELS:  Objection; this has been

**316**

asked and answered.

MS. HIGGINS:  No, it hasn't.

A.   Getting rid of the dog was one of those as a deterrent.

BY MS. HIGGINS:

Q.   Okay.

A.   Going after people, making them go find other jobs, decreasing the amount of people we have.

Q.   Uh-huh.

A.   The way he set up the shifts, shorting the night shifts --

Q.   Okay.

A.   -- when the most crime is prevalent and heavy stacking the day shifts, or the certain people that work days.

Q.   And why do you think he's taken those steps?

A.   Because the people that are his favorites want to work those hours, so.

Q.   So would you say that given -- giving favorable treatment to his favorites has been more of a priority for Chief Fontenot than making the city safe?

MS. GUNNELS:  Objection; leading.

A.   It sure seems that way.

BY MS. HIGGINS:

Q.   Okay.  What have you observed about

**317**

Chief Fontenot's relationship with city leadership?

A.   Most of the time it's confrontational.

Q.   Can you tell me about that?

A.   As long as he's getting his way and what he wants, then he seems to be cordial with them.  But when he doesn't get his way, then he becomes very angry and, you know, says stuff behind their back or -- if they're not doing a good job or that type of thing to his employees.

Q.   Can you give me some examples?

A.   Well, just -- just what I say, like blaming the city council for the overtime issue or the budget issues.  It's all their fault because he didn't get what he want.  Or if they didn't want to give him the kind of vehicles he want, he went on rants.  And like I said, most of the time I just kind of tune it out.  But, I mean, everybody here's about it.

Q.   When you say "they," who are you talking about in particular?

A.   Well, I mean, you can just watch the council meetings and see how he reacts to what is said up there.  And it's on TV.

Q.   What would you say the power dynamic is between the city council and Chief Fontenot?

MS. GUNNELS:  Objection; vague.

**318**

A.   What do you mean, "the power dynamic"?  I don't -- more specific, what do you mean?

BY MS. HIGGINS:

Q.   Do you think there's a power struggle between --

A.   Yeah.  We discussed that earlier.

Q.   Okay.

A.   Yeah.

Q.   What about between the mayor and Chief Fontenot?  Would you say that there's a power struggle between the mayor and Chief Fontenot?

A.   Yes.

Q.   Can you tell me a bit about that?

A.   We talked about it earlier.

Q.   Okay.

A.   It's just the mayor feels like his hands are tied, and the chief feels like that the council and all them are trying to tell him what to do and run his department and the mayor.

Q.   Other than taking away Chief Fontenot's appointing authority that we discussed earlier, are you aware of city officials trying to dilute Chief Fontenot's power in any other way?

A.   Not besides budgetary.

Q.   Do you think that, to be clear, cutting the

**319**

budget is a way to decrease Chief Fontenot's authority?  Is that what you mean?

A.   I think it -- I think they cut the budget from what the chief had said, I guess, to punish --

Q.   Okay.

A.   -- punish him.  I don't know the right word for it.  But he -- you know, he complained about them cutting the budget when they shouldn't be and that type of thing.

Q.   Okay.  I just want to get some procedural background quickly and some background on your training before we --

A.   Okay.

Q.   -- move on.

When did you become a lieutenant at the Eunice Police Department?

A.   Sometime in 2009, I believe.

Q.   Okay.  What training did you complete to become an officer at the Eunice Police Department?

A.   FTO training, field training, with another officer.

Q.   What about to become a lieutenant?

A.   Civil service test.  And as a sergeant, you work under a lieutenant, and they slowly start giving you -- teaching you how to do their job.

**320**

Q.   As part of your training, did you become familiar with the Eunice Police Department's official policies and procedures that we've been discussing?

A.   The ones that were there at the time.

Q.   And since then, have you updated your familiarity --

A.   Yes.

Q.   -- with these policies?

A.   Yes.  I actually helped write a lot of the use of force parts, dealing with weapons and stuff, the K9 policy, taser policy, the pursuit policy.

Q.   Okay.  And to clarify, do you think these policies have been enforced in an even-handed way since Chief Fontenot has become the chief of the Eunice Police Department?

A.   No.

Q.   And to clarify again, you believe that there are informal policies at the Eunice Police Department, correct?

A.   Yes.

Q.   That differ from the formal policies?

A.   Yes.

Q.   Which policies are you more often directed to follow?  The formal or informal policies?

A.   Me personally or --

**321**

Q.   Generally at the department.

A.   Generally at the department, it's the informal that are followed.

Q.   And who directs you to follow these informal policies?

A.   Directives from the -- that come down from the chief of police.  They're either emails or verbal or through -- sometimes through the chain of command.

Q.   So is it correct that sometimes you receive these informal policies via email?

A.   Sometimes, yes.

Q.   How else do you learn about these informal policies?

A.   Verbally or by phone calls.

Q.   Would you say --

A.   Or by third party.

Q.   Third party?  Such as whom?

A.   Through the chief's secretary, through sometimes records, sometimes the jailers.  Chief said this.  Chief said do this.  Sometimes through your chain of command.

Q.   I know that we said that the -- or that you said, rather, that the informal policies differ from the formal policies.  Correct?

A.   Yes.

**322**

Q.   Do they contradict the formal policies?

A.   A lot of them do, yes.

Q.   Can you give me an example of one?

A.   Well, like, chain of command, chain of command is supposed to be followed up and down.

Q.   Okay.

A.   And there's basically, most of the time, no chain of command unless -- some people he makes follow the chain of command.  Just like the policies with the units, using the units, or being certified with the weapon that you're carrying, your duties -- some of the duties that are in there.

The Narcan, he put out an email saying one thing to be certified with Narcan.  It doesn't match with the law or the policies, but he made it mandatory through email.  I mean, there's a bunch of them.

Q.   Okay.  Do you think that these informal policies are enforced fairly amongst officers at the Eunice Police Department?

A.   No.  No.  It depends if you're one of his favorites or not whether he enforces it, just like with the sick leave.

Q.   Okay.  So if you're one of his favorites, do you have to follow these informal policies?

A.   Some of them, yeah.  Sometimes he makes them

**323**

follow those.

Q.   But not as often?

A.   No.

Q.   And if you're not one of his favorites, is it strict that you have to abide by these informal policies?

A.   Every situation is different, so it just depends.

Q.   Is it stricter, in your opinion?

MS. GUNNELS:  Objection; asked and answered.

A.   I would say it's stricter on certain people, yes, that he makes them do certain things, like with putting the reason for your sick leave.  You know, I know Lieutenant Dunn turned in sick leave doctor's excuse, and they called the doctor's office to see if it was real, that he didn't forge it.

BY MS. HIGGINS:

Q.   Is that normal?

A.   No, that's not normal.  I had never heard of that before.

Q.   So why did he call the doctor's office to see if it was real?

MS. GUNNELS:  Objection; calls for speculation.

**324**

A.   Well, he had somebody else call.

BY MS. HIGGINS:

Q.   Why do you think he had someone call?

A.   I guess he didn't believe him.  I don't know.

Q.   Okay.  If a complaint is made about an officer committing misconduct, where would that information be found?

A.   The chief of police would have it.

Q.   Anyone else?

A.   Unless he gave a copy of it.  Sometimes they give copies to the civil service board to have it on file so it doesn't disappear.

Q.   Now, if a complaint is made about an officer committing misconduct, just to clarify, what's Chief Fontenot's role in overseeing that the misconduct is investigated and disciplined?

A.   You're supposed to start the investigation, like we had talked about before.

Q.   Uh-huh.

A.   You got certain amount of days you got to start the investigation for a formal complaint.

Q.   Does he always do this?

A.   No.  We discussed that, yeah.

Q.   Okay.  Do you know who Sherry Clark is?

A.   Yes.

**325**

Q.   What's her responsibilities?

A.   She -- her title is secretary to the chief.

Q.   What does she do as part of that title?  Do you know?

A.   She takes care of files, answers the phone.

Q.   Okay.

A.   He has her in charge of some equipment right now.  And I know she -- I think she was doing payroll for a while.

Q.   Is she qualified to do payroll?

A.   I don't know.  I know it's not -- I don't think it's part of her duties.

Q.   Okay.

A.   I know it's not part of her duties to be in charge of equipment.

Q.   Does Sherry Clark manage personnel files at the Eunice Police Department?

A.   Yes.

Q.   Is she responsible for documents related to officer misconduct?

A.   I'm not sure which files are in her office and which files are in his office, because they moved them a while back.

Q.   When did they move them?

A.   When I was still in the office over there.

**326**

Q.   Does Sherry Clark keep a desk file that is supposed to have this information, to your knowledge?

A.   She has personnel files in there, because I've seen her go in there and get them.

Q.   Do you know what else she keeps in her desk file other than personnel files?

A.   The training files now.

Q.   Anything else?

A.   As far as I know, that's all.  I mean, I don't know what else is in there.

Q.   Okay.  We talked a little bit about certain Eunice police officers posting on social media about local crime, correct?

A.   Correct.

Q.   Is that a fairly common occurrence?

A.   I'm not on social media a lot, so I don't know.

Q.   Okay.  We've talked about some punishments that people, including Lieutenant Dunn, have received for posting on social media, correct?

A.   Yes.

Q.   Is it common for the chief to punish officers who post on social media about local crime?

A.   I had really never seen it before until, I believe, Lieutenant Ivory and then Lieutenant Dunn.

**327**

Q.   So would you say it's more typical for Chief Fontenot to refrain from punishing officers for making posts on social media?

MS. GUNNELS:  Objection; misstatement.

A.   Yeah.  I mean, I know he's told certain officers to not pose in uniform, because I had to tell a brand-new recruit that one time, that he told me to tell him.  But other than that, no, I haven't seen him...

BY MS. HIGGINS:

Q.   So would you say that Lieutenant Dunn and Jeremy Ivory were singled out for posting on social media?

A.   It would seem to be, yes.

Q.   Okay.  Why do you think they were punished for posting on social media specifically?

A.   Because they had went against him on something and he was mad at them.

Q.   Okay.  Do you think that was fair?

A.   No, I don't.

Q.   What do you think would be the appropriate way to handle it?

A.   Well, I think it's their First Amendment right to -- to say what they want on there.

Q.   Okay.

**328**

A.   He could have spoke to them about it and said that he didn't think it was appropriate, you know, and ask them to take it down or something.

Q.   Okay.  But he didn't do that, correct?

A.   Not to my knowledge, he didn't.

MS. GUNNELS:  Objection; calls for speculation.

BY MS. HIGGINS:

Q.   Not to your knowledge, he did not?

A.   Yeah.  Sorry, I had a cramp.

Q.   No problem.

Did you take time off to attend this deposition today?

A.   No, I didn't.  I originally was going to.

Q.   Are you currently on duty?

A.   Yes.

Q.   Are you being paid to be here today?

A.   Yes.

Q.   By whom?

A.   The department.

Q.   Okay.

A.   I had originally -- I was -- I went back and read the civil service rules, and it does allow to get paid for a subpoena, as long as you don't cash the check that y'all give to us, because that would be

**329**

double-dipping.  So I just didn't cash the check.

Q.   So you're not double-dipping right now?

A.   No, because I'm not going to cash y'all's check.  If that makes sense.  We had asked the deputy chief, and that's what he said, so I went back and read the rules to make sure that it was allowed.

Q.   So it's technically against the rules to cash a check for being here in response to a subpoena; is that correct?

MS. GUNNELS:  Objection; misstatement.

A.   Yeah.  You can't get paid twice for the same job.  You're already getting paid for your job.  Ethics says you can't get paid for the same job you're doing that you're getting paid from the city for.  So it would be double-dipping.

Just like when we get a subpoena from the city -- from the district court, you don't cash those checks or you don't get paid; you take time off and cash the check.

BY MS. HIGGINS:

Q.   So help me understand.  Why are you getting two checks, then, if --

A.   I'm not.

Q.   Is anyone in the department getting two checks --

**330**

A.   No.

Q.   -- for attending depositions in response to a subpoena with this litigation?

A.   When we got our subpoena --

Q.   Uh-huh.

A.   -- it came with a check from one of the attorneys.

Q.   Okay.

A.   And I still have it in my car with the subpoena.

Q.   Okay.

A.   So I'm just not going to cash it.  And I'm either going to -- I have to give it back to you or the city.  Or shred it.  I don't know what you do with it.  But we've never cashed those.

Q.   Okay.

MS. HIGGINS:  Let's take a break for five minutes.  Okay?

THE VIDEOGRAPHER:  We're off the record at 4:39.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 4:51.

BY MS. HIGGINS:

Q.   Lieutenant Thibodeaux, earlier we discussed

**331**

that some people in the Eunice Police Department were afraid to report misconduct within the police department; is that correct?

A.   I wouldn't say afraid to report misconduct but wouldn't report it because nothing would happen, and they were afraid to report on themselves.  Something happened negatively to them, so they wouldn't have retaliation.  I don't remember saying that they were afraid to report.

Q.   When you say "report," misconduct on them?  Is that what you mean?

A.   Like the chief going after them.

Q.   Okay.

A.   Yeah.

Q.   So would you say that people were afraid to report misconduct that negatively affected them?  Is that what you're saying?

A.   Yes.

Q.   Are you saying that they were afraid to report that misconduct out of fear of retaliation?  Is that correct?

A.   Yes.

Q.   Okay.  Would you say that some people were also just sick of reporting because they knew nothing would come of it?  Is that correct?

**332**

MS. GUNNELS:  Objection; leading.

A.   Yes.  I had already said that.

BY MS. HIGGINS:

Q.   I'm just making sure that that is correct and you remember that statement.

So in situations where perhaps the chief is the one who committed the misconduct or knows about the misconduct, those are situations in which the misconduct wouldn't necessarily be investigated; is that correct?

A.   Correct.

Q.   So if you can't report the misconduct to the chief, who else would you report it to?

A.   Well, depending on what the misconduct was.  If it was criminal, I mean, you could report it to DA's office, but it usually doesn't go anywhere.  You could report it to the appointing authority.  Or you can report it to the civil service board, depending on what it is.

Q.   Okay.  And those are the only other avenues of recourse; is that correct?

A.   Well, I mean, there's, you know, the IG.  There's the attorney general.

Q.   Okay.

A.   But -- yeah.

**333**

Q.   Do people tend to explore those other avenues? I know we've talked about some civil service board reports but --

A.   Most of the time, no.

Q.   No?  Why not?

A.   Just the culture in Louisiana.  It's not going to go anywhere.

Q.   What do you mean, it's the culture in Louisiana?

A.   The good ol' boy system.

Q.   Okay.  Could you elaborate a little more on what that means?

A.   I mean, it's Louisiana' history.  Most of them are elected officials, and usually it's hard to report something against another elected official.  They don't like going after each other.

Q.   So it's an honor system, of sorts?

A.   Yeah.  We call it good ol' boy system.  But yeah.

Q.   Okay.  So do officers in those situations where they can't report misconduct to the chief, would you say that they feel like they don't actually have any other course of action to take?

MS. GUNNELS:  Objection; misstates facts.

**334**

A.   I think most of them feel like they haven't -- they wouldn't go anywhere -- they have nowhere else to go.  Yes, correct.

BY MS. HIGGINS:

Q.   Okay.

MS. HIGGINS:  No further questions for Plaintiff's counsel at this time.

MS. GUNNELS:  Okay.  Kearney?

MR. LOUGHLIN:  I just have a few questions.

MR. HOBBIE:  You want to swap seats, by any chance?

MR. LOUGHLIN:  I'm fine here, as long as everyone can hear me.

THE VIDEOGRAPHER:  I'd like to give you a microphone.

MR. LOUGHLIN:  Okay.

THE WITNESS:  His voice carries pretty good, though.

MR. HOBBIE:  Could you go off --

MR. LOUGHLIN:  Thank you.

THE VIDEOGRAPHER:  Okay.

EXAMINATION

BY MR. LOUGHLIN:

Q.   You mentioned, I think, that you had not seen

**335**

Chief Fontenot violate the law.  You remember saying that?

A.   I haven't -- yeah, I haven't seen him violate the law.

Q.   Okay.  You also explained to us that the civil service rules have the force of law, right?

A.   Yes.

Q.   And that Chief Fontenot routinely ignores those?

A.   Yes.

Q.   Okay.  So he does violate the law?

A.   Yes.  I was speaking -- when I said "law," I meant criminal law.  I'm sorry I wasn't more specific.

Q.   I understand.  I just wanted to clarify that for myself.

Let's see.  You talked a little bit about the code of conduct, that conduct unbecoming an officer?

A.   Yes.

Q.   That's written -- that's a written rule, right?

A.   Yes.

Q.   That's part of the code of conduct and ethics?

A.   It's in our procedure orders.

Q.   Do you know who drafted that particular rule? Do you have any idea?

**336**

A.   No, I don't.

Q.   Okay.  Do you know who drafts or who's in charge of compiling the code generally?

A.   I know the chief is in charge of approving the procedure orders.

Q.   How do you know that?

A.   Sir?

Q.   How do you know that?

A.   Because he's the one that gives the directive out to follow procedure orders, usually yearly or every other year.

Q.   You know how -- since you've been at the Eunice Police Department, I think, since, what, 2004?

A.   Yes, sir.

Q.   How many times has the -- has the code been revised or amended?

A.   The policy has been amended -- the policy itself has probably been amended at least ten times. But the code of conduct is pretty the same each time.

Q.   To the best of your recollection, has the provision on conduct unbecoming an officer been amended since you've been at the police department in Eunice?

A.   Not specifically.  I can't recall.

Q.   Okay.  How is the code disseminated?  Is it a paper booklet?  Is it by email these days?  How do

**337**

you -- do you know how that's given out?

A.   It used to be given out by paper; now they email it to you.

Q.   When is the last time you were emailed a -- one?

A.   I believe at the end of 2020.

Q.   Okay.

A.   Or beginning of 2021.

Q.   And I take it you had gotten copies, probably several times before that, over the years?

A.   Yes, sir.

Q.   Why did you get one, then, at the end of 2020 or 2021?

A.   I believe Sherry Clark emailed it out to everybody.

Q.   It had been updated or revised?  Do you know?

A.   He revised a few things in it, so they sent the whole thing back out with revisions.

Q.   Okay.  So every officer got one at the same time, or approximately the same time?

A.   As far as I know, yes.

Q.   You mentioned some of the training you did for -- to become an officer.  Did you do a preemployment mental or psychological evaluation?

A.   Yes, I did.

**338**

Q.   Do you remember what you did for that?

A.   I went to the psychiatrist's office and took a test and spoke with him.

Q.   Do you remember who it was?

A.   No, I don't.

Q.   Do you remember the name of the firm or the practice?

A.   It was in Eunice.

Q.   It was in Eunice?

A.   Yes, sir.

Q.   Do you remember the -- you said a psychologist?

A.   I believe it was a psychologist.

Q.   Okay.

A.   I know I took a psychiatric test because I had to take one before, so.

Q.   Is that something you did on pen and paper?

A.   Yes.

Q.   Okay.  Is that required of every -- of every new hire in Eunice, in your experience?

A.   Every full-time, yes.

Q.   Would it have been required of Victor Fontenot, as far as you know?

A.   As far as I know, yes.

Q.   Did you do a polygraph examination in

**339**

connection with being hired by the Eunice Police Department?

A.   No.

Q.   Do you know if that's required of anyone?

A.   I don't -- I'm not aware of any, no.

Q.   Okay.  You mentioned the Harmony Lodge. Remember that?

A.   Yes, sir.

Q.   Are you yourself a Mason?

A.   Yes, sir.

Q.   Are you a member of the Harmony Lodge?

A.   Yes, sir.

Q.   You said or at least indicated that Chief Fontenot is a member of the Harmony Lodge, right?

A.   Yes, sir.

Q.   What is his role?

A.   I haven't been in years, so I don't -- I'm not sure what his role is anymore.

Q.   I don't want to get too much into your personal business.  Is there a reason you haven't been in years?

A.   Because of Chief Fontenot.

Q.   Okay.  Are other members of the Eunice Police Department members of the Harmony Lodge?

A.   Yes.

**340**

Q.   Who in particular that you can recall?

A.   Joey Fontenot.

Q.   What about Victor?

A.   No.

Q.   What about --

A.   Not that I'm aware of, no.

Q.   What about Ryan?

A.   No.

Q.   Okay.  On a related note, you're familiar with the KC Hall in Eunice, aren't you?

A.   Yes.

Q.   Okay.  Do you know who manages that?

A.   No, sir.

Q.   Do you know who owns the property or the land?

A.   I have no idea.

Q.   Do you know anybody who's affiliated with the KC Hall at all?

A.   No.

Q.   Are you aware or do you have an opinion as to whether the KC Hall is, maybe for lack of a better term, a magnet for crime?

A.   I know they have a lot of criminal activity there sometimes on the weekends, but it's rented out. It's not the people that own it.

Q.   Do you know Tonya McGee?

**341**

A.   I'm familiar with her.  Yes.

Q.   Who is she?

A.   I believe that's the wife of the McGee Equipment owner.

Q.   Is she a niece of the chief?

A.   I don't know.

Q.   Okay.  Is she related to the chief in any way as far as you know?

A.   I have no idea.

Q.   Are you aware of any kind of event she might have hosted at the -- or been responsible for at the KC Hall?

A.   No.

Q.   You understand that Officer Dunn's Facebook post, or at least one of the ones we're talking about, had to do with gunfire at or near the KC Hall?

A.   Yes.

Q.   Do you know where Officer Dunn lives in relation to the KC Hall?

A.   Yes, sir.

Q.   And where is that?

A.   411 North Second Street.

Q.   How far is that from the KC Hall?

A.   Maybe four houses, on the opposite side of the road.  I sold them the house.  So yeah.

**342**

Q.   Let's see.

A.   Matter of fact, Mr. Sam Feucht used to live across the street.

Q.   You mentioned a Facebook post by the chief on behalf of the Eunice Police Department about parents being responsible for their kids being criminals, words to that effect.  Do you remember that?

A.   Yes.

Q.   There is a Eunice Police Department Facebook page, right?

A.   Yes.

Q.   Do you know who maintains that or who's in charge of that?

A.   So far as I know, it's the chief of police.

Q.   Okay.  Does anyone else have access to it to change it, to update it, as far as you know?

A.   I have no idea.

Q.   Okay.

A.   But he wrote the same article in the paper, with his name on it, so that's how I knew.

Q.   In the post the chief made about gun activity at the KC Hall in response to Mike Dunn's post, do you remember that?

A.   I remember hearing about it.  I did not read it.

**343**

Q.   Okay.  Did you actually read any of these Facebook posts about -- either by Dunn or by the chief regarding gunfire?

A.   No.

Q.   Okay.  Let's see.  Let's see.  You mentioned judge in district court, the issue with Victor Fontenot and the confidential informant and having to give up his phone.  Do you remember talking about that?

A.   Yes.

Q.   Okay.  And that he didn't -- Victor didn't -- didn't comply with the judge's order?

A.   That's what I was told, yes.

Q.   The judge you're talking about is Judge Gerard Caswell, isn't it?

A.   Correct.

Q.   Do you know anything about what Judge Caswell told or might have told Mike Dunn about Dunn's life being in danger?

A.   I remember that Dunn said that Judge Caswell had spoken to him, but I don't remember the exact words.  I remember him saying something about watching out, watch out, be aware.

Q.   Do you remember anything more particular?

A.   I don't remember anything more particular, no, sir, sorry.

**344**

MR. LOUGHLIN:  That's all I have.  Thank you.

THE WITNESS:  Thank you.

MS. GUNNELS:  Okay.  I will go ahead and start on my list of questions.

EXAMINATION

BY MS. GUNNELS:

Q.   Lieutenant Thibodeaux, as I stated this morning, my name is Molly Gunnels.  I am with the law firm of Kean Miller.  We represent all the defendants in this matter.

Now, I will warn you I might have to ask you to repeat some of your questions.  It's just to, you know, affirm, to build a foundation, to ask you the next question.  It's not on purpose, and I'll try to keep that to a minimum.

The first question I have for you, we talked a lot about the civil service board rules.  Where do those come from?

A.   Where do the rules come from?

Q.   Yeah.

A.   From the civil service board.

Q.   And so who is in charge of writing the rules?

A.   The board.

Q.   Okay.  And do you mean the board members --

**345**

A.   Yes.

Q.   -- in general?

A.   Board as a total.

Q.   Okay.  And as a chairman, do you have a special role in writing those rules?

A.   No.

Q.   Okay.  So it's kind of a communal activity?

A.   Yes.

Q.   How often do you write rules?

A.   The last time they were updated, I believe, was 2016, and I was not the chairman then.

Q.   Okay.  Is there anything specific about how often they should be rewritten?

A.   No.

Q.   And is there a specific agency or body that's charged with enforcing those rules?

A.   The civil service board.

Q.   Civil service board.  Anyone other than that?

A.   No.

Q.   Okay.  I'm going to the beginning of my notes now.

And you said that you started sitting on the civil service board in 2012; is that right?

A.   I believe so.  I took over somebody else's spot.

**346**

Q.   Okay.  And why were you interested in doing that?

A.   I was asked to.

Q.   By who?

A.   At the time, the deputy chief and the chief of police.

Q.   Okay.

A.   If I would be interested in it.

Q.   And you were interested it?

A.   I became interested after they told me what it entailed, yes.

Q.   What about it interested you?

A.   Just that if an employee was wronged, that it could help them; or if an employee wasn't doing their job, it could make sure that we didn't send bad apples back out there.

Q.   Okay.  And you mentioned before that you -- or excuse me -- the board had initiated an investigation into payroll irregularities at EPD; is that right?

A.   Yes.

Q.   And whose decision was it to implement that investigation?

A.   The board was -- it was done by motion.

Q.   Okay.  Who made the motion?

A.   I'd have to look at the -- I'd have to look at

**347**

the minutes, because I don't remember who made the actual motion.

Q.   Okay.  Do you remember where the information you got about the irregularities came from?

A.   Originally, I'm not sure.  Because I was asked by several people about it, if it was right or -- I don't remember -- I don't know which investigation -- there was two of them, so I don't remember which one you're talking about.

Q.   Okay.  I was not aware that there was two.  Can you kind of walk me through the first one?

A.   Well, one of them was with the bereavement.

Q.   Okay.

A.   And the other one was with the extra days off.

Q.   Okay.  So those were two separate investigations?

A.   I don't think we put them all in one.  It's kind of fuzzy right now, we've had so many.

Q.   So do you remember which individuals that information came from?

A.   Not originally.  I remember getting a bunch of different phone calls asking about it.

Q.   Who did you get phone calls from?

A.   I remember I was asked by Sherry Clark, maybe Keith Laverne, Lieutenant Myers, and I can't remember

**348**

who else.

Q.   So once you came to the decision to have an investigation into payroll irregularities, what happened after that?  What was the next step?

A.   After the motion was made and carried?  To form a committee to investigate it.

Q.   Who was on the committee?

A.   That one, I believe it was Garrett Daville and Keith Vidrine.

Q.   Okay.  Why were they the ones selected to be on the committee?

A.   They were just the first -- they were sitting the two closest to me.

Q.   Okay.

A.   And Garrett works for the fire department, so he's right there, across the street, so it's easier for him to get access and stuff.  And Keith Vidrine has experience because he was the chairman at one time; so he has been on the board longer than me.

Q.   Who else could have been on the committee?

A.   Anybody on the board.

Q.   Okay.  So, then, I guess my question is who else is on the board currently?

A.   Currently -- well, we just had a new board member.  But it was Mr. John Guillory and Mr. Andrew

**349**

Hickerson.

Q.   Okay.  Does John Guillory ever get appointed to committees?

A.   Yes.  He has been appointed to the committee before.

Q.   Which ones?

A.   I don't remember.  I worked a committee with him on some stuff, so I know he's been on the committee.

Q.   But you don't remember which ones?

A.   No, I don't.

Q.   What about Mr. Hickerson?

A.   I can't say if he -- I think he might have been on at least one, but he's newer.  So I want to say at least one, but I don't know which one.

Q.   When you say "newer," when did he join?

A.   Couple years ago.

Q.   Okay.  So once Garrett and Keith were selected to be on the committee, what did they do next?

A.   You'd have to ask them what they did.

Q.   Okay.  Did they tell you about what they did?

A.   They wrote a report and turned it back in.

Q.   Yeah.  I guess what I'm trying to find out is how did they go about getting information to put in that report, if you know?

**350**

A.   Some of the information I got for them, by doing record requests and asking payroll for it.  I don't -- you'd have to ask them the rest.  I don't know what all was in there.  I don't remember.

Q.   Do you know if they interviewed any witnesses?

A.   I don't know.

Q.   Do you know about how long it took them to conduct their investigation?

A.   No, I don't.  Because we meet every couple of months, so.

Q.   Is there a set schedule for your meeting, like how often it should be?

A.   We have to have at least quarterly meetings, and sometimes more.  If there's an appeal or something else going on, we could have more.

Q.   But you don't remember how long it was between when the motion was made to set up a committee and when the findings were reviewed; is that right?

A.   No, I don't.

Q.   Do you remember about how many instances of payroll irregularity the investigation revealed?

A.   I know there was two on the bereavement, and I want to say four or five on the other one.

Q.   Okay.

A.   I think that was subpoenaed, all that

**351**

information.

Q.   Which information?

A.   The payroll investigation.

Q.   Oh, you mean for this lawsuit?

A.   Yes.

Q.   Okay.  To your knowledge, has there been any payroll irregularities happening at the police department since then?

A.   Not that I'm aware of.

Q.   Have you heard anything about payroll irregularities since then?

A.   No one's made a complaint.

Q.   Have you heard anything --

A.   That's what I say --

        MS. HIGGINS:  Asked and answered; objection.

A.   I don't know.

BY MS. GUNNELS:

Q.   Let me clarify.  You said no one's made a complaint.  That -- I'm trying to find out if you've heard --

A.   I mean, you hear things all the time.

Q.   -- (speaking over each other) complaint.

A.   Nothing that I can pinpoint.  Like, you know, the overtime issue we talked about, that kind of stuff,

**352**

yeah.

Q.   Okay.  What kind of action was taken following the investigation?

A.   It's still open.

Q.   It's still --

A.   Oh, no.  On that one?  I'm sorry.

Q.   Yeah.

A.   I'm sorry.  The board, after they received the committee findings, wrote a letter to the appointing authority to have them do a resolution to fix it -- to correct it.

Q.   And the appointing authority is the city council?

A.   And the mayor, yes.

Q.   And the mayor.

Do you know if they did fix it?

A.   To our knowledge, it has not been fixed.  And we just sent out another letter, on the 13th, so we're waiting on the responses.

Q.   I guess I just want clarification.  What do you mean when you say "fix it"?

A.   To correct the issue, the irregularities.  Because they were given -- they were paid for time they weren't allowed to have.

Q.   Do you mean "fix it," like reallocate those

**353**

funds?

A. They would either -- from -- from what I've been told, they would either have to take the money back and do it as K time or vacation, or they would have to compensate all the other employees to make it even.

Q. Okay. To your knowledge, that hasn't happened yet?

A. No, that hasn't happened. I was told they were waiting on some reports from, I guess, the auditor or something. I don't know.

Q. Did the board forward information about the findings of the payroll investigation to any law enforcement agencies?

A. Yes.

Q. Which ones?

A. I know it was forwarded to the DA's office, the attorney general's office, the sheriff's department, the IG's office, and the ethics board.

Q. What about the legislative auditor?

A. I think them too.

Q. Did any of those agencies take any action, to your knowledge?

A. I don't know. We're fixing to write a letter to them to find out.

**354**

Q. Okay. So I guess I want to talk a little bit more about how the civil service board conducts investigations in general.

My first question is what authorizes them to do that?

A. State law.

Q. State law?

A. Yeah.

Q. Can you be more specific?

A. I'd have to pull it up.

Q. I guess what I'm asking is -- you're talking about a specific statute --

A. Yes.

Q. -- says that the civil service board may conduct investigations --

A. Into violations of our board rules or civil service laws. Yes.

Q. How many investigations have been undertaken since you've been the chairman?

A. Well, I mean, the hearings are an investigation too, so are you including that?

Q. I guess if you could clarify.

A. Well, they call it an investigation, hearing. It can be the same. You can do the investigation during the hearing or you can do it separate. So it

**355**

can be considered the same thing, depending.

Q. So that state statute authorizes you to conduct investigatory hearings, correct?

A. Well, it says investigations. I don't know. I'd have to read the exact wording. Yeah.

Q. I'm just trying to clarify this differentiation that you made between an investigatory hearing and an investigation. Those -- to your knowledge, those are both authorized by that state statute?

A. Yes.

Q. Okay. And how are decisions made about what to -- what civil service board rules -- rule violations are going to be investigated?

A. Either the appointing authority can ask us, the chief of departments can ask us, civilians can ask us to do it, or we can do it on our own accord.

Q. And that's what happened with the payroll irregularities, right?

A. Yes.

Q. Okay. So you don't -- do you investigate every possible civil service board rule violation?

A. No.

Q. Okay. What determines whether or not you're going to conduct an investigation?

**356**

A. Someone has to make a motion for the board, or we have to have a formal complaint.

Q. I guess I'm trying to figure out what types of violations would you consider investigation worthy and what types you wouldn't.

A. It would be on a case-by-case basis.

Q. Okay. Earlier we talked at some point about the possibility of the deputy chief position being eliminated. Do you remember that?

A. Yes.

Q. Whose idea was it to attempt to eliminate the deputy chief position?

A. Originally, I have no idea.

Q. Okay. Was it eliminated?

A. Yes. It was voted to be eliminated, and then it was reversed later.

Q. Who voted -- what body voted to eliminate it?

A. The city council.

Q. And did they reverse their own decision later?

A. I'm guessing.

Q. Okay. If they didn't reverse it, who else might have?

A. Well, it would have to have been one of them. I wasn't there, so.

Q. And your testimony earlier was you thought

**357**

that Chief Fontenot didn't want to get rid of it -- the DC position because it's a political position that allows him to kind of have his way within the department; is that right?

A. Yes.

Q. Did Chief Fontenot create the deputy chief position?

A. No.

Q. Who did?

A. The city council, with the chief's recommendation. Not this chief; a different chief.

Q. What chief?

A. Dies.

Q. Do you know if the civil service board was involved in creating that position?

A. They came up with the -- well, yeah, they have to create it, after they were asked to by the appointing authority. And the city council had created an ordinance for it, as the state statute requires.

Q. Do you feel that having a deputy chief is a value to the department?

A. Are you asking my personal opinion?

Q. Yeah.

A. No, I don't.

Q. Why not?

**358**

A. Because we already have an elected chief there, so it's the same thing.

Q. So you're saying the chief and the deputy chief have the same duties?

A. No. I'm saying that they have -- the chief -- the deputy chief is an extension of the chief's wants or needs or desires.

Q. Okay. So your testimony is you -- are you saying you thought that it should be an eliminated position?

A. I'm not saying I thought it should be. I just thought it never should have been changed.

Q. Okay. Do you know why it was created in the first place?

A. Because from what I understand, Dies pushed for it in the legislature to be done, and I guess our local representative got it put in there.

Q. Okay. You said when you were put on night shift, at a certain point you didn't have a jailer assigned to your shift; is that right?

A. Yes.

Q. And your thinking on this is that that was a form of punishing you; is that right?

A. Yes.

Q. Are there other legitimate reasons why you

**359**

might not have been provided a jailer?

A. I don't know what they are.

Q. Okay. And you mentioned that there were three jailers assigned to day shift at that time, correct?

A. From what I remember, yes.

Q. So were they all three there every day, or did they alternate days?

MS. HIGGINS: Object to form; compound.

A. I don't remember.

BY MS. GUNNELS:

Q. So you don't remember whether there were three jailers on the day shift and none on the night shift?

A. It depended on what days. It was -- I didn't work days, so I don't know.

Q. Okay. Do you think the jailers are perhaps busier during the day?

MS. HIGGINS: Objection; calls for speculation.

BY MS. GUNNELS:

Q. To your knowledge?

A. Every day is going to be different. I don't know. They have a lot more people there during the daytime.

Q. In general, just your knowledge of what a jailer does, do they have more responsibilities during

**360**

the day as to -- as opposed to during night?

A. Like I said, every day is different, so I don't know how to answer that.

Q. Now, do you know if there was a night jailer in place before you were assigned to night shift?

A. At one time there was. I don't know -- right before I took over, I don't know.

Q. So it's possible that the status of the night jailer didn't change when you were assigned to night shift, correct?

MS. HIGGINS: Objection.

MS. GUNNELS: What?

MS. HIGGINS: Calls for speculation.

A. I don't know.

BY MS. GUNNELS:

Q. We talked a little bit about the payroll, again. Different questions, though.

So the issues, as I understand them, involving bereavement leave and the other leave was because the civil service board rules did not provide for that type of leave. Is that right?

A. Correct.

Q. Okay. What would you say is the purpose of the civil service board rules?

A. Be more specific.

**361**

Q.   Would you say the point of the civil service board is to protect and act on behalf of employees of the police department?

A.   Not specifically, no.

Q.   I guess what I'm trying to get at is why is it an issue to be given leave not mentioned in the civil service board rules?

A.   Because the civil service laws were put in there to not have spoils of the good ol' boy system or favoritism from political.  It's what the legislature wrote.  So if you have favoritism, you can give one person days off extra and not the other person.  And it's there to eliminate that, so that everybody is on the same playing field.

Q.   So let's say other city employees, not police officers, got different -- other types of leave.  Let's say you were allowed to take bereavement leave for a friend.  Is there a reason why that shouldn't be extended to police officers?

A.   Because civil service law doesn't allow that.

Q.   So you view the civil service laws as more of a ceiling than a floor of the rights of police officers?

MS. HIGGINS:  Objection; misstatement.

**362**

BY MS. GUNNELS:

Q.   I'm asking if that's what you said or what you mean.

A.   They are totally different than civil service employees, classified employees, and their benefits are totally different.  So you can't compare them.

Q.   Okay.  Now, other --

A.   We have different holidays.  We have different -- we have everything different.

Q.   Okay.  So the rules applying to other city employees and classified employees are not the same at all?

A.   No.

Q.   Okay.  Other type of leave, other than bereavement, had to do with some times when the police office was closed; is that right?

A.   Yes.

Q.   Okay.  And my understanding is those employees are physically not allowed to come into the office at that time.  Is that right?

A.   I don't know if they were not physically allowed.  I don't know what you mean by that.

Q.   There was -- so my understanding is that there was an issue given by the -- an order issued by the city saying that these buildings are closed and you

**363**

can't come to work.  Is that your understanding?

A.   I don't know.  That's for city employees.  I don't know.  We're not -- we're not -- we're classified civil service employees.

Q.   So -- but we're talking about police department employees here in the payroll irregularities, right?

A.   Anybody that works under the chief, yeah, is the police department.

Q.   And you said earlier they were not allowed -- they were not coming to work that day; they were prevented from coming to work, right?

A.   They were given the day off with pay.

Q.   Well, why -- was there any weather situation that would have prevented them from going to work that day?

A.   Usually, either -- in the past, whenever those days were given off because of a hurricane or whatever reason, everybody in the civil service was compensated or nobody was.  You could take -- if you wanted that day off and not come in -- because we've had them come in to help with the dispatchers and -- or to help with whatever.  They would stay there during emergencies.

Q.   Uh-huh.

A.   So they were either all compensated or nobody

**364**

was compensated.  It didn't change until recently.

And the appointing authority can give an extra day off, but they have to give it to everybody -- or compensation.

Q.   Uh-huh.  So you don't know whether or not these employees were physically going to be allowed to come to their office and do their jobs on these days in question.  Is that your testimony?

A.   No.  I don't understand what you're talking about, "physically."  Who was going to stop them?

Q.   That they were -- that the city had declared that offices were closed that day.

MS. HIGGINS:  Objection.  You're feeding the witness testimony.

BY MS. GUNNELS:

Q.   Is that what -- are you familiar with that?

A.   Our directive like that when they give to city employees do not have anything to do with the police department or the employees there.

Q.   Okay.  So just -- I just want to make sure I understand the rules.  Do you know of any -- well, let me get to that in a second.

Do you know of any other office employees that were not paid for those days in question?

A.   What do you mean?

**365**

Q.    So we can -- we can look at these documents in a minute if we need to, but my understanding is that the days that this leave happened, there was either a hurricane or an ice storm.  Is that your understanding?

MS. HIGGINS:  Objection.  You're feeding the witness testimony.

A.    I don't remember the details.

BY MS. GUNNELS:

Q.    Okay.  So you don't know if any other office employees were not paid that day?

A.    "Office employees," as in?

Q.    Police department employees that worked in the office.

A.    That were not paid.  I don't know.

Q.    Go back to your role at the civil service board.  When there is an appeal hearing, what is the process for that during your meeting?

A.    From what -- starting where?

Q.    Okay.  So you have a civil service board meeting.  You're going to have an appeal hearing that day.

A.    Okay.

Q.    You say, This the appeal of blank.  What happens?

A.    Normally, oaths are given, sworn in.  And

**366**

usually, the appointing authority goes first.  They have the burden of proof.  And after they're finished calling their witnesses, then other employee gets to call their witnesses.  During that time, board members can ask questions.

Q.    Is there evidence presented by both sides during that time?

A.    Yeah, during that time.  Yeah.

Q.    Would it be a violation of procedure not to allow a party to present evidence?

A.    Just depends on specific -- you have to be more specific.

Q.    Do you --

A.    Some evidence is not allowed.  It's controlled by the board, so.

Q.    So the board controls what evidence is --

A.    Yes.

Q.    -- allowed to be put on, correct?

A.    Yes.

Q.    And the board controls whether or not evidence is allowed to be presented.  Is that your testimony?

A.    Well, it just depends what evidence is. Usually, we have the board attorney there, and if there's any questions, we ask him.

Q.    Okay.  So, for instance, in Lieutenant Ivory's

**367**

hearing, was any evidence presented?

A.    Yes.

Q.    What was the evidence?

A.    I don't remember all the evidence.  I know there was copies of Facebook posts and a copy of the paper, the Basile paper.

Q.    So you believe the board held a full hearing in the Ivory matter?

MS. HIGGINS:  Objection; vague.

BY MS. GUNNELS:

Q.    You can answer.

A.    Ivory -- well, no, it was -- the hearing was stopped short.

Q.    Why was that?

A.    Because there was a motion made because of the nullification from the violation of his rights, that would nullify it right then.

Q.    And this was about some of his interviews regarding his discipline not being recorded, correct?

A.    I believe so, yes.

Q.    You believe so?

A.    Because there was two hearings that night.

Q.    Right.  Do you mean other than Lieutenant Ivory, or Lieutenant Ivory had two hearings?

A.    Lieutenant Ivory had two hearings.

**368**

Q.    Okay.  So did you -- did the board take evidence on whether or not that testimony -- that interview had been recorded?

A.    Yes.  There was testimony about it.

Q.    There was testimony.  Who gave testimony about it?

A.    I believe it was the chief of police.

Q.    And what do you remember him saying?

A.    I remember the attorney asking him if it was recorded in full.  And he said at first they had a problem with the recording or something, but, no, it was not recorded in full.

Q.    Now, there are two different interviews that should have been recorded, correct?

A.    Yes.

Q.    And is your testimony that -- well, let me ask.  The issue with the recording, was that for both of them?

A.    After they made the ruling on the first one, I believe both attorneys, for both sides, stipulated that it would also count for the second one.  I'd have to go back and read the minutes.

Q.    Okay.  So do you believe that the second, what we're calling, interview with Lieutenant Ivory was recorded or was not recorded?

**369**

A.   I don't remember.

Q.   You don't remember.

A.   I know the city's attorney is the one that stipulated for the second one.

Q.   So just to clarify, you're not saying it wasn't; you're saying you just don't remember?

A.   I just don't remember, no.

Q.   Okay.  What about -- was it Officer Ortego at that time?  Was he an officer when he had an appeal before the civil service board?

A.   Yes.

Q.   Was evidence presented in a full hearing conducted for Ortego?

A.   No.

Q.   Why not?

A.   Because we were told by the office of state examiner's office that because of his time there that he didn't have the right to appeal it on that grounds, so we denied his appeal.

Q.   And what about your own appeal hearing?  Was that a full hearing with evidence presented where both parties could make arguments?

A.   There was evidence given, but there was not a full hearing, no.

Q.   Why not?

**370**

A.   Because they had a motion -- you'd have to read the minutes, because I wasn't a part of that appeal.  There was a motion made by my attorney, Aaron Green, that the transfer of positions was made without the authority.  The chief didn't have authority at the time because the appointing authority had been taken away from the council.  And he put into evidence the law that states that and the copy of the ordinance where it took away his appointing authority.  I remember that evidence is in there.

Q.   So is the appointing authority allowed to present a contrary opinion during that hearing?

A.   The hearing never started.

Q.   So the appointing authority didn't get a chance to make arguments during the hearing?

A.   Oh, they did.  They spoke for a long time, because they were told they had to be quieted down because they kept talking.

Q.   Okay.

A.   There were two different attorneys talking.  There's only supposed to be one.

Q.   That happens.

A.   Yeah.

Q.   So that day that your appeal hearing was supposed to happen --

**371**

A.   And that was by, the way, as much of a surprise to me as it was to everybody else.

Q.   What was, specifically?

A.   The ruling -- I mean the -- that my attorney stood up and said that.  I was not expecting that.  I was expecting a full hearing with my witnesses.  I was ready for it.  I wanted it to come out.

Q.   There was an issue with the court reporter that day, wasn't there?

A.   You'd have to speak with the ones in charge.  I was not in charge of that hearing, so I'm not going to speak to that.

Q.   So you don't know whether or not your attorney told the appointing authority and the board that he was going to provide a court reporter?

A.   I know at one time he had said that, yeah.  We had talked about it.

Q.   Do you remember if he had provided one for the hearing?

A.   No, he did not provide one.  He had told the board that he wasn't going to before the board -- before the hearing.

Q.   How soon before the hearing --

A.   I don't know.

Q.   -- do you remember?

**372**

Do you remember why he didn't provide a court reporter?

A.   I don't remember.  No.

Q.   Okay.

A.   And Mr. Green now works for the city; so, I mean, you could probably ask him.

Q.   So, yeah, I want to talk a little bit about your appeal and your transfer.  So I believe what was stated earlier, and you can correct me if I'm wrong, is that the decision was made because the chief did not have the authority to transfer you.  Is that right?

A.   Correct.

Q.   So is the chief not allowed to change anyone's shift?

A.   In my particular case -- you can read the statute.  It says the appointing authority can transfer position to position, and that's what my attorney went off of.

Q.   What do you mean, "position to position"?  Is that, like, day versus night shift?

A.   That means position of -- from night shift supervisor to training coordinator.  It's a different position, in the same class.  Class and position are not the same thing.

Q.   Yeah, so tell me about that.  What's the

**373**

difference between class and position?

A.   Well, class is like rank.

Q.   Uh-huh.

A.   Has to do with your pay.

Q.   So would that be lieutenant, sergeant --

A.   Correct.

Q.   -- police officer?  Okay.

A.   Jailer, dispatcher.

Q.   And just so I'm clear, the appointing authority can make changes to someone's class?

A.   As long as it's not done from discrimination, yes.

Q.   Okay.  Now, what about position?  How is that different?

A.   Well, that's -- that's what I was talking about, transfer position to position.  They can't transfer your class.

Q.   Oh, so you're taking this to mean the same thing, position and class?

A.   No.  I misunderstood what you said.

Q.   Okay.  So for positions --

A.   Okay.

Q.   -- what would be an example to you of change in position?

A.   I just said -- like, from an administrative

**374**

supervisor to a night supervisor or -- well, that's a good one right there.  Or from training coordinator to night shift supervisor.

Q.   Okay.  So, similarly, you would say that the chief is also not allowed to make changes in position, in your opinion?

A.   That's what the law says.

Q.   Okay.  Your opinion on what the law says?

A.   It's black and white.

Q.   Okay.

A.   I don't know how you could argue that.

Q.   What about just general scheduling changes?  Can the chief make those?

A.   I don't know.  That has nothing to do with my case, so I don't know.

Q.   Your testimony is that you don't know whether Chief Fontenot has the authority to change people's schedules within the Eunice Police Department?

A.   He can.  I'm sure he can, as long as it's not for punishment or discrimination.

Q.   Okay.  Now, let's talk a little bit about your position as training coordinator.  When did you start that?

A.   I want to say in 2016, maybe.

Q.   Before you started that, was there a training

**375**

coordinator?

A.   At one time, there was.

Q.   How long ago?

A.   A few years before he took over.

Q.   Okay.  Was there a training coordinator in place immediately before you became --

A.   No.  That's one of the things he campaigned on.  There's a big old article in the paper about it, how we were so far behind in training, so he needed a whole training coordinator to do it full-time.

Q.   Okay.  So Chief Fontenot -- would it be fair to say he created the position of training coordinator?

A.   I don't know.  It was already there; it just -- it wasn't filled.

Q.   So would it be fair to say he brought it back?

A.   Well, at the time, I believe Sherry Clark was the training coordinator when he took over.

Q.   Why do you believe that?

A.   Because her name was on the training coordinator.  She's the one that put all the input in for the POST coordinator.  And that's the title that you get, is POST training coordinator.

Q.   Does she handle any other trainings besides POST training?

A.   No.  It was spread out.

**376**

Q.   Okay.  So under what authority was the training coordinator position initiated?

A.   Like I said, it was already there.  It just wasn't -- it just wasn't the way it is now.

Q.   Okay.  But you don't remember how long it had been there?

A.   It'd been there since I'd been there.

Q.   Since -- that would be 2004?

A.   Yeah.  I mean, the official POST started up when POST put it into law.  Before that, it was done by the administrative supervisor, or they might have had a training -- I don't know.  But there was somebody that took care of that that was in the office.

Q.   Uh-huh.  Would it be fair to say that training coordinator is not its own class?

A.   Yeah.

Q.   So, then, what is the problem with -- why doesn't Chief Fontenot have the authority to move you if it's not an official class?

A.   Well, I'm not going to -- I'm not going to sit here and go through my case that's still open --

          MS. HIGGINS:  Objection; calls for speculation.

A.   -- and argue it.  I'm not going to argue it with you, so.

**377**

BY MS. GUNNELS:

Q. Okay. So you're currently in charge of training, aren't you?

A. Yes.

Q. Okay. And you mentioned several times that there are officers that are behind on their training at the police department, right?

A. Yes.

Q. Why is that?

A. Which time?

Q. Let's just start with one example, and let's go from there.

A. Well, when he moved me to strictly nights --

Q. Uh-huh.

A. -- I was taken out of that position full-time and just put on night shift.

Q. Uh-huh.

A. So from that point on, there was no training being done.

Q. Right. But you got back to being training coordinator eventually, right?

A. Yeah, eventually. Yes.

Q. When was that?

A. Officially, the day -- the week after my hearing was scheduled.

**378**

Q. Remind me of when that was. Was that in March of 2021?

A. September -- March was the complaint. 2021, I think so.

Q. 2021. So we're coming up on a year now that you've been back in your training coordinator position, right?

A. Uh-huh.

Q. So why haven't you taken care of the gaps in training since you've been back?

A. I've taken care of a lot of them. And I've -- the ones that were offered, if they didn't come, I can't -- I can schedule them; I can't make them come.

Q. You can't make officers come to training?

A. No.

Q. Can you establish when to hold a training?

A. I -- I do when it's approved through the deputy chief.

Q. What about CPR and first aid? Have you done those trainings before?

A. No. Because when I asked to be certified in that, I was told no.

Q. So you're not certified to hold CPR and first aid trainings?

A. No, I'm not. I did request it; it was turned

**379**

down.

Q. When was that?

A. Couple years ago.

Q. Okay. So let's talk a little bit more about when this alleged transfer occurred. The given reason was because of being short-staffed. Is that right?

A. I'm not going to discuss it with you because it's an open case.

Q. So you're not going to answer my question?

A. Not without my attorney present, no.

Q. Okay. How were you notified of this transfer?

A. Through email.

Q. Okay. And do you remember what the email said?

A. No, but it's right here somewhere.

Q. Okay. So just to summarize, it said that you are now on night shift. Is that an accurate summary, to your recollection?

A. Yeah, that I was being transferred.

Q. The email says transfer?

A. Yes.

Q. Does the email say anything about your role as training coordinator?

A. No, I don't believe so. I'd have to read it.

Q. Did anyone ever tell you that you were no

**380**

longer training coordinator?

A. It just says that Lieutenant Thibodeaux will be shift supervisor of shift B.

Q. Okay.

A. And that no more overtime. If someone calls in sick, you just have to work short.

Q. So does that email say anything about your duties as training coordinator?

A. No.

Q. So why did you feel that you were no longer training coordinator?

A. Because, in his own words, it was a full-time position. He took me out of that full-time position and put me in a different full-time position. Can't do both of them. There's no way to keep up with both of them. In his words.

Q. So did he ever -- did Chief Fontenot ever have a conversation with you that he wanted you to continue holding trainings after your shift moved?

A. No, he did not.

Q. Okay. So did anyone ever tell you not to hold trainings?

A. No, I don't believe so, besides specific trainings when I asked and I was told no. Not in general.

**381**

Q.   And your testimony is the reason you believed you weren't still training coordinator was because of that email, that you had been moved to night shift?

A.   Yes.

Q.   Was there any further communication to indicate that you shouldn't hold trainings anymore?

A.   After I filed my appeal.

Q.   After you filed your appeal.

A.   Yes.

Q.   What communications were those?

A.   Lieutenant -- Deputy Chief Kennedy sent me an email.

Q.   Okay.  And this is the email where he said something to the effect of --

A.   I needed to do both, and if I didn't want to do it anymore, I needed to train a new person to do it.

Q.   Okay.  I want to touch back on something we were talking about earlier --

A.   And he authorized some overtime, because I told him I couldn't do it without that, so.

Q.   I'm sorry.  Say that again.

A.   I had wrote, asking -- when he asked me to try to continue to do the training or continue the training, I said there's no way to do it with my shift work, that they would have to authorize overtime for me

**382**

to come in on my days off and try to keep up with it.

Q.   Since this alleged transfer, has anyone else been put in the position of training coordinator?

A.   The deputy chief is the training coordinator now.

Q.   When was that designation made?

A.   Right before my appeal hearing was scheduled, I believe.

Q.   So sometime in August or September of 2021? Would that be a safe estimate?

A.   I don't remember the exact date.  It was an email saying that it was done.

Q.   Okay.

A.   But that I was still responsible for it.

Q.   I want to go back and talk a little bit more about the chief and, you know, the reason that your appeal went through is because the board found that he didn't have authority to transfer you.

Who transferred you into the training coordinator position?

A.   I already told you, I'm not discussing this without my attorney.

Q.   Okay.  I'm going to continue to ask --

A.   Okay.

Q.   -- and you can say that in response, if that's

**383**

what you want to do.

A.   Okay.

Q.   Who was -- so you became training coordinator in 2016, correct?

A.   I've already answered that question.

Q.   Who was the appointing authority in 2016?

A.   I don't recall if he was it or not.  I don't know.

Q.   You don't remember whether --

A.   I believe it was council, I believe, yeah.

Q.   You believe it was the city council?

A.   I can't remember the exact date that they made him appointing authority.

Q.   Okay.  So --

A.   But I remember he went to the council and discussed it.

Q.   So Chief Fontenot transferred you into the training coordinator position when he was not the appointing authority; is that right?

A.   I don't know.

Q.   You don't know?

A.   Well, I'm not going to discuss it with you. Like I said, it's an open case.

MR. FEUCHT:  Correct.  That's correct.

MS. GUNNELS:  I don't think you can make

**384**

those answers right now.

BY MS. GUNNELS:

Q.   So just so we're clear, you're not saying yes or no; you're saying you're not going to answer the question?

A.   Not without my attorney, no.  I'm not going to answer any questions about any of that open case.

Q.   Okay.  So why would you feel comfortable discussing it with counsel and not me?

A.   Because she wasn't discussing the particularities of the appeal.

Q.   Okay.

MS. HIGGINS:  Objection.  This is bordering on harassment of the witness.

MS. GUNNELS:  I disagree, but we'll move on.

MS. HIGGINS:  Okay.  I'd also like to note for the record that the witness has been invoking privilege.  Correct?

THE WITNESS:  Yes.

MS. HIGGINS:  Okay.

MS. GUNNELS:  We're going to take a short break.  Give me ten minutes.

THE VIDEOGRAPHER:  We're off the record at 5:52.

**385**

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 6:06 p.m.

BY MS. GUNNELS:

Q. Okay. Lieutenant Thibodeaux, when we left off, you had said that you're not going to answer questions about the ongoing lawsuit related to your appeal; is that right?

A. Correct.

Q. Okay. And we are going to talk about the lawsuit we're here today about, but I wanted to follow up on one more thing.

Did you say that Chief Fontenot had at some point approved overtime for you to continue doing training?

A. Had approved some overtime, limited, yes.

Q. Okay. When was that?

A. I don't recall the exact date.

Q. Do you remember about what time?

A. Probably a couple of months after my appeal.

Q. Okay. Let's talk about Dunn's lawsuit for a second. When did you first hear about Lieutenant Dunn filing a lawsuit against the city?

A. Don't remember when.

Q. Okay. Do you remember if it was before the

**386**

lawsuit was filed?

A. I'm not sure --

Q. Okay.

A. -- honestly.

Q. Have you discussed this lawsuit with Lieutenant Dunn?

A. A little bit, yeah.

Q. Okay. What have you discussed?

A. That he wasn't asking for any money; he just wants things fixed.

Q. So would you say you're familiar with the facts in his lawsuit?

A. A few of them.

Q. Which ones? Just from your memory of what the lawsuit is about.

A. Some of the issues that are going on at the police department.

Q. Did you ever help Dunn with his lawsuit?

A. No.

Q. Okay. Do you know if anyone else at the department did?

A. I don't know. I did have to answer a subpoena for the board, so I went through all the stuff they asked for, so.

Q. So that was a civil service board appeal,

**387**

correct?

A. No. That was this lawsuit.

Q. This lawsuit. I understand what you're saying. As the chairman for the civil service board, you went through the documents --

A. Yes.

Q. -- that you requested through the subpoena?

A. Yes.

Q. Okay. What kind of -- well, let's see. Have you ever provided Lieutenant Dunn with any documents related to this lawsuit other than what we just talked about?

MS. HIGGINS: Objection; asked and answered.

A. I think what was on the subpoena, unless it was public record or something.

BY MS. GUNNELS:

Q. Okay.

A. I don't recall anything specific besides that.

Q. Has Lieutenant Dunn ever provided you with electronic records or paper records about this lawsuit?

A. Not unless it was part of his appeal.

Q. Have you ever received documents from Mr. Dunn's attorneys related to the lawsuit?

A. I got a subpoena.

**388**

Q. Other than the subpoena?

A. I don't think so. I mean, I've gotten stuff from his attorneys, but I think it was for civil service appeals, so I don't -- anything specific about this lawsuit.

Q. Okay. Have you ever spoken with Mr. Dunn's attorneys before today?

A. Yes.

Q. When?

A. I don't remember. A couple months ago.

Q. Do you remember what you talked about?

A. They were asking me civil service questions.

Q. So things related to his civil service appeal?

A. No. They were asking me about how civil service works and that kind of stuff.

Q. Do you remember who the specific attorneys were that you spoke with?

A. I believe they were from New York.

Q. Okay. But you don't remember their names, correct?

A. If you told me their names, I might remember.

Q. And how was that conversation held? Was it by phone? Was it in person?

A. No. Phone.

Q. Do you remember about how long it lasted?

**389**

A. It wasn't too long. I don't remember exactly how long, though.

Q. Would you say less than an hour, would you say?

A. Oh, yeah, I would say so.

Q. How did you come to be in contact with Lieutenant Dunn's attorneys?

A. I believe they called me. I didn't call them, so, yeah.

Q. Are there any other times you've spoken to Mr. Dunn's attorneys?

A. I think there was one other time they had called and forgot to ask me something, and I think it was something I had already answered and I answered it again. But I don't remember exactly what it was. It was something minor.

Q. Do you think that was also related to the civil service board questions they were asking you about?

A. I think so, yeah.

Q. Were there any other times?

A. Not that I remember.

Q. Did you speak with them about the logistics of scheduling your deposition?

A. I might have spoke with them on the phone or

**390**

we texted the date and time and stuff. I'd have to look on my phone.

Q. Was there anyone else present with you when you had those telephone calls with Lieutenant Dunn's attorneys?

A. No. I was at home.

Q. And I know we talked about this this morning, so just refresh my memory. What kind of preparation did you do for your deposition today?

A. None, really.

Q. So you didn't review any documents, correct?

A. No.

Q. Did you have any conversations with anyone about this deposition?

A. Not beside, like, logistics and...

Q. I know I asked you if you provided documents to Lieutenant Dunn about the lawsuit. Have you ever provided documents to his attorneys?

MS. HIGGINS: Objection; asked and answered.

A. I gave him what was subpoenaed.

BY MS. GUNNELS:

Q. What was subpoenaed.

A. That's pretty much everything that I have.

Q. So have we now discussed all the times you've

**391**

communicated with Mr. Dunn's attorneys?

A. I think so. I don't think they've ever emailed me or anything. But I had some texts, but it was logistics.

Q. I'd like to talk a little bit about what was discussed before about possible changes being made to crash reports. Do you remember talking about that?

A. Yes.

Q. Okay. And it was your testimony that the chief had ordered certain changes to be made in certain crash reports?

A. I was told that. Yes.

Q. Who were you told that by?

A. Chase Godeaux, Lieutenant Dunn.

Q. Anyone else?

A. I don't remember.

Q. Okay. Did you have any direct knowledge of what was in the report before it was changed?

A. Not besides what I was told. No.

Q. Did you have any direct knowledge of what the report said after it was changed?

A. Only what I was told.

Q. So is it safe to say that you don't have any personal knowledge about the chief changing crash reports, other than what you were told?

**392**

A. Correct.

MS. HIGGINS: Objection; misstates facts.

BY MS. GUNNELS:

Q. Have you ever ordered someone working underneath you to change a report?

A. Before it was approved, yeah.

Q. Can you tell me what you mean by "approved"?

A. Well, as a supervisor, if one of my subordinates does a crash report, I have to approve it before it's official. So if I see something that's, you know, misspelled street, they didn't put -- they left a blank, something, then I have them -- you have to send them a message on their thing and have them change it. I don't change it.

Q. Have you ever suggested that a change be made to a more substantive piece of a report?

A. What do you mean?

Q. Other than a missing street name or a blank. Something bigger than that?

A. Yeah, if it was missing information, if it didn't make sense. Because they were my direct -- direct subordinate, that's what way chain of command works, so I have to approve it. So if I had questions about it, I'd have to ask them about the accident if I

**393**

wasn't there.

Q.   And when the officers take crash reports, do they always see the crash?

A.   No.

Q.   Would you say more often than not, they haven't seen what happened before they get there?

A.   Correct.  Under the narrative, it says state the officer's opinion, is what it says.  Because most of the time, we're not there.  His opinion and his observation.

Q.   During your time at EPD, have you ever been the subject of any investigation?

A.   As far as?

Q.   For anything.

A.   I'm sure I've had complaints on me, yes.

Q.   Have you ever been placed on administrative leave?

A.   Yes.

Q.   When was that?

A.   Maybe -- I want to say 2005, maybe.

Q.   What was that involving?

A.   Allegations made from an ex-wife.

Q.   Okay.  What kind of allegations?

A.   She filed a restraining order against me and said that the police department had disciplined me for

**394**

an incident that happened, which was not true.

Q.   So there was no other incident other than that one that was the basis of the restraining order?

A.   There was a incident call from when it started.

Q.   Why was the incident call made?

A.   There was a disturbance at my residence.

Q.   Was that disturbance between you and your wife?

A.   Yes.

Q.   Ex-wife?

A.   Well, wife at the time.  Yeah.

Q.   Wife at the time.

When did you get divorced?

A.   Maybe 2006.

MS. HIGGINS:  Objection.  Is this relevant?

BY MS. GUNNELS:

Q.   So did your ex-wife also work for the Eunice Police Department?

A.   Yes.

Q.   What was her role at EPD?

A.   Police officer.

Q.   Okay.  Were you also a police officer at that time?

**395**

A.   Yes.

Q.   Does she still work there?

A.   No.

Q.   Okay.  So how long were you on leave because of that restraining order?

A.   I don't know.  Less than 30 days.

Q.   Okay.

A.   While they fixed it.

Q.   How was it fixed?

MS. HIGGINS:  I'm going to object to this whole line of questioning on relevance grounds.

BY MS. GUNNELS:

Q.   You can still answer.

A.   Because she had lied to the judge.  And I went to the chief at the time's house, and he called the judge and told him.  And the judge basically told him that we'd have to wait until we went to court.  And the only way to make it faster than that would be to change the wording, get with her attorney and have my attorney come up with some papers so we could agree.  And I said I was fine with that because all I wanted was the stuff out of my house, and she wouldn't give it to me.  So she had called the police on me because I went in there to get it, because I was legally able to go get it.

**396**

Q.   Just for clarity, when you say that she lied, are you referring to she had said there was an incident --

A.   She said I was disciplined, correct, and there wasn't.

MS. HIGGINS:  Objection.  This whole line of questioning is beyond the scope of the direct examination.  It's not permitted.

MS. GUNNELS:  Counsel, this is a fact deposition.

MS. HIGGINS:  It's still outside the scope.  Did you cross-notice this witness for a deposition?

MS. GUNNELS:  Can you cite me to the rule?

MS. HIGGINS:  I don't need to.  Did you provide a cross-notice to depose this witness?

MS. GUNNELS:  No.

MS. HIGGINS:  No?  So this is beyond the scope of what I asked in my direct examination; is that correct?

MS. GUNNELS:  Is there a rule that says that I can't do that?

MS. HIGGINS:  I'm just noting you're outside the scope.  I believe there is.

**397**

MS. GUNNELS: But you don't have a rule to cite right now?

MR. FEUCHT: Can we go off the record?

MS. GUNNELS: Yeah, we can go off the record.

THE VIDEOGRAPHER: We're off the record at 6:23.

(Off-record discussion.)

THE VIDEOGRAPHER: We're back on the record at 6:23.

MS. GUNNELS: Counsel, your statement is that you only agreed to extend this deposition beyond the seven hours if it was only an additional two hours; is that correct?

MS. HIGGINS: That's correct.

MS. GUNNELS: Okay. That was not my understanding. I was told that we were able to continue this deposition for a, quote, a few more hours. So that issue is now preserved. I would like to continue with my questions.

MR. HOBBIE: Well, if I may.

MS. GUNNELS: You're not permitted to speak.

MR. HOBBIE: Can we go off the record?

**398**

MS. GUNNELS: Yes.

THE VIDEOGRAPHER: We're off the record at 6:24.

(Off-record discussion.)

THE VIDEOGRAPHER: We're back on the record at 6:25.

MS. GUNNELS: So my understanding is that the witness told you that he only had two more hours that he could stay. Is that right?

MS. HIGGINS: Okay. I'm not being deposed, so I'm just going to make my statement.

The reason we only agreed to two extra hours, which we did agree to, was because the witness has been here all day and wanted to get home and did not want to be here until late at night.

So we agreed to extend past the seven hours because that's what the witness wanted, but only to a certain extent.

We did not agree to keep going all night and to use this time for you to make -- for you to ask questions that are beyond the scope of direct. Unless you're planning to use this as one of your depositions, which, as we've

**399**

said already, you have not cross-noticed, then this doesn't make sense to use all this time.

How much longer do you think you're going to go?

MS. GUNNELS: In response to that, I'll say I was not privy to the conversation with the witness where he stated he only had two more hours.

MS. HIGGINS: Yes, you were.

MR. FEUCHT: She has -- let's go off --

MS. HIGGINS: You're also definitely not admitted to speak. I feel like we've gone over this -- actually, I don't feel like. I know we've gone over this multiple times over the last two days.

MR. FEUCHT: That's fine. But out of common courtesy, you need to let her finish speaking.

MS. GUNNELS: May I continue with my questions, Counsel?

MS. HIGGINS: Go ahead.

MS. GUNNELS: Okay.

BY MS. GUNNELS:

Q. You talked earlier about some legal training that you had; is that right?

**400**

A. As far as what?

Q. Have you had legal training?

A. I mean, I'm POST certified. I went to the academy.

Q. Okay. Do you give legal advice to police officers about their civil service board hearings?

A. I give advice about civil service rules and law, yes.

Q. You've had -- you stated that you've had several disagreements with Chief Fontenot about the law; is that right?

A. Yes.

Q. Why -- what makes you more qualified to interpret the law than Chief Fontenot?

A. Because I read the law. I don't interpret it; I just read it black and white like it states, which is what the Louisiana Supreme Court says you're supposed to do, not interpret it, civil service law.

Q. And that's the only -- that is your testimony, is that you're not interpreting the law; you are just reading what it says?

A. Most of the time. Going off of the board attorney's advice too. Yes.

Q. Okay. I'll start going through these notes. You said at one point that the chief gave you

**401**

extra work; is that right?

A. Yes.

Q. What kind of extra work was that?

A. Like doing inventory of everything I have, which I've never been asked in six years. The specific training that was -- he said was required by the insurance company for specific employees, like anger management training and things of that nature, there was a whole list of stuff he put.

Q. I want to go back to the issues of officer training that you brought up. Can you specify what kind of training officers are lacking right now in the department?

A. Baton certification. Some of them are lacking JPX certification.

Q. What is that?

A. It's a pepper gun.

Q. Okay.

A. OC certification. CPR, first aid certification. Naloxone administration training.

Q. Do you know how many officers are missing, for example, their baton training?

A. Quite a few.

Q. What about the pepper gun?

A. Same thing.

**402**

Q. Okay. So we talked before about an email that you sent to all the classified employees about -- well, can you tell me about that email?

A. Which -- which one? I send a lot of emails out.

Q. So it was the -- it's the one we were talking about where Chief Fontenot sent an email following it, about malfeasance.

A. Okay.

Q. What did that email say, again?

A. I would have to read it to remember, but it basically was clarifying some of the questions I was getting about class duties.

Q. Okay.

MS. HIGGINS: Is this an email you're holding in your hand?

MS. GUNNELS: Uh-huh.

MS. HIGGINS: I'd like to call for production of that.

MS. GUNNELS: It's going to be attached to the deposition, so you'll get it.

MS. HIGGINS: Are you introducing it as an exhibit right now?

MS. GUNNELS: Yep.

MS. HIGGINS: Okay.

**403**

MS. GUNNELS: I am handing the court reporter a document that we're going to mark as Thibodeaux -- I want to say 5 or 6.

THE REPORTER: Five.

MS. GUNNELS: Five. Thank you.

Okay. And I'm handing it to opposing counsel, and I'm handing it to the witness.

(Thibodeaux No. 5 was marked for identification.)

BY MS. GUNNELS:

Q. If you could just take a minute to look over this email.

MR. LOUGHLIN: Do you have another one?

MS. GUNNELS: I do.

MR. LOUGHLIN: Thank you.

BY MS. GUNNELS:

Q. And just let me know when you familiarize yourself with it.

A. This is not the email I sent.

Q. Right.

A. Oh, Okay.

Q. I'm going to get to that.

A. Okay.

Q. So is this the email that Chief Fontenot sent in response to an email that you sent, to your understanding?

**404**

A. Yeah, but I didn't -- he didn't respond to me from my email because I didn't send it to him.

Q. Uh-huh.

A. Yeah.

Q. So have you seen this email before?

A. Yes, I have seen it.

Q. Okay. So I just want to confirm. This is the email that you're referring to in which you said Chief Fontenot was threatening people with?

A. Yes.

MS. HIGGINS: Can we go off the record for a moment, please?

MS. GUNNELS: Sure.

THE VIDEOGRAPHER: We're off the record at 6:32.

(Off-record discussion.)

THE VIDEOGRAPHER: We're back on the record at 6:33.

MS. HIGGINS: I'd like to make a note for the record that Plaintiff's counsel has never seen this document, this is email that's about to be discussed, it's marked as privileged, with big red letters on top of it. It's an email from Randy Fontenot, dated May 18, 2022, and it's sent to quite a few

**405**

members of Eunice Police Department.

Continue.

Oh, and to clarify, Plaintiff's counsel is under the impression, at the moment -- it is our understanding that this document has never been produced to us.

MS. GUNNELS:  Apologies for the pause.  I don't want to repeat questions.

BY MS. GUNNELS:

Q.    You talked about Sherry Clark having a role dealing with equipment, correct?

A.    Yes.

Q.    What did she do with the equipment?

A.    It depends on which month you're talking about.  Her roles have changed quite a bit on it.  I know she was issuing it for a while, taking it in, storing it, taking care of it, I guess.

Q.    When you mean "issuing it," you mean giving it to officers?

A.    Yes.

Q.    How are those requests made for that equipment?

A.    You'd have to ask her.

Q.    Okay.  You said at one point that Chief Fontenot asked someone to run against you for the

**406**

civil service board position; is that right?

A.    That's what I was told, yes.

Q.    Who told you that?

A.    Several employees.

Q.    Who are they?

A.    I believe maybe Sherry Clark was one of them, maybe Julie Shaw, I think.  Maybe Lieutenant Myers.  People who are around the office a lot.

BY MS. GUNNELS:

Q.    Okay.  So do you have any personal knowledge of the chief wanting someone to run against you, other than --

A.    From his mouth?  No.

Q.    Yeah.  Other than what people have told you.

A.    Not from his mouth, no.

Q.    And did you say at some point the chief was trying to, quote/unquote, get something on Lieutenant Dunn?

A.    Yes.

Q.    How did you know about that?

A.    Just from -- my office was right next to the chief's office, so I overheard a lot of conversations and the questions that were asked to me about civil service, things that were going on.

Q.    Did you hear the chief say that about Dunn,

**407**

that he was looking for things on him?

A.    I don't remember if he specifically told me.  I'm sure he didn't tell me that.  So I don't remember if I was told he wanted to do that or if I overheard him on that particular case.  Because I've heard so much.  So I don't want to say I actually heard specific things.

Q.    You said at one point you were aware of some examples of improper use of force at the jail; is that right?

A.    That I had heard about it, yes.

Q.    And that the ones you had heard about, did you say they were all before Chief Fontenot became chief?

MS. HIGGINS:  Objection; misstates facts.

A.    I don't -- I don't think I said that, no.

BY MS. GUNNELS:

Q.    Okay.  Are you aware of improper uses of force at the jail after he's become the chief?

A.    I've heard about it.

Q.    But you don't have any personal knowledge about that?

A.    No.

Q.    Who did you hear about it from?

A.    Officers talking during shift change, officers

**408**

talking in the office, officers talking in the hall, outside.

Q.    And so how do you know the uses of force were improper?

MS. HIGGINS:  Objection; calls for a legal conclusion.

A.    Because that's what they were told to me as.

BY MS. GUNNELS:

Q.    So you said that there are instances of misconduct that Chief Fontenot hasn't investigated; is that correct?

A.    Yes.

Q.    Do you remember the specific incidents?  Or can you think of a specific --

A.    Well, two of them were Victor Fontenot and Darien Guillory that the board did the investigation on and found violations.

Q.    Are you aware of any others?

A.    I mean, there's a -- almost -- there's a lot.  Yes.

Q.    Why hasn't the board investigated those other ones?

A.    They haven't been asked to.  And we haven't had people calling complaining on it.

Q.    And the board hasn't decided of its own accord

**409**

to investigate those instances?

A.   Because we stay busy with other investigations and appeals right now.

Q.   But is it true that you could investigate those other instances if the board chose it?

A.   If they violate civil service rules or laws, we could, yes.  We don't do criminal investigations.

Q.   So is it your opinion that the K9 was removed from Lieutenant Dunn in order to make him quit?

A.   Yes.

Q.   Why do you think that?

A.   One, because I was told that the idea was given to him.

Q.   You were told that that idea was given to Chief Fontenot?

A.   Yes.

Q.   Who told you that?

A.   I don't remember who said it, but I remember who it was said from.

Q.   Who?

A.   That Lieutenant Young told him if he wanted to get rid of Dunn, that's the way to get rid of him.

Q.   But you didn't hear Lieutenant Young say that, did you?

A.   No.  But every time the chief had been asked

**410**

why he wanted to get rid of the dog, he changed the reason.

Q.   You said at some point there was a conversation mocking one of Dunn's complaints.  Do you remember saying that?

A.   Yes.

Q.   Were you there for that conversation?

A.   No.

Q.   Who did you hear about it from?

A.   I heard a recording.

Q.   Heard a recording.  Who made that recording?

A.   I'm not sure who made it.

Q.   How did it come to be in your possession?

A.   I heard it.  Somebody played it for me.  They were playing it for other people.  I just heard it.

Q.   But you don't remember who was playing it?

A.   I don't remember who was playing it.

Q.   Is it a violation of department policy to make recordings without people's consent?

A.   The law says as long as one person knows.

Q.   What about within the police department itself?

A.   I don't know, but the policy doesn't override the law, so.  I don't know exactly what the policy says.  Like I said, we don't follow most of it, so.

**411**

Q.   Do you believe it's appropriate to record people without their consent?

A.   Yes, I do, as long as one person knows.  That's what the law says.

Q.   So to you there's no difference between what the law says and what is okay to do?

MS. HIGGINS:  Objection; misstates facts.

A.   I already said that's what the law says.  If you have nothing to hide, it shouldn't bother you to be recorded.

BY MS. GUNNELS:

Q.   Counsel asked you questions earlier about the relationship between Dunn and Chief Fontenot.  Do you remember that?

A.   Vaguely.

Q.   How would you have knowledge of the relationship between Dunn and Chief Fontenot?

A.   It's out in the open.  Everybody pretty much knows.

Q.   Is that something that you and Lieutenant Dunn talk about?

A.   I'm sure we have, as his representative, yes.

Q.   So we talked about a couple of situations where this fact pattern occurred:  Where Lieutenant

**412**

Dunn complained about something, no action was taken at EPD, his complaint was upheld by the civil service board, and then no further action was taken.

Do you remember talking about that specific set of facts?

MS. HIGGINS:  Objection; vague.

A.   You have to be more specific.

BY MS. GUNNELS:

Q.   Okay.  Have there been times where Lieutenant Dunn has complained about something up his chain of command, ends up going to the civil service board, and whatever action Dunn took was upheld?

MS. HIGGINS:  Objection; compound.

A.   No.

BY MS. GUNNELS:

Q.   No?  That hasn't --

A.   No.  He made a -- you're talking about the Darien and Victor?

Q.   I'm talking about in general.

A.   I don't know what you mean by his actions were upheld, like --

Q.   So -- you're right, that's confusing.

So he made a complaint or wrote up another officer.

A.   Okay.

**413**

Q. And that complaint or disciplinary action was upheld by the civil service board. Has that happened before?

A. We don't get those write-ups. I don't -- I'm confused about what you're trying to get out, what you're trying to say.

Q. Okay.

A. He made a formal complaint to us. Are you talking about that?

Q. Yeah. Tell me about that.

A. We've already discussed it. It was --

Q. Which one are you referring to?

A. About Victor Fontenot and the one about Darien Guillory.

Q. Okay. Are there any other examples where that's happened, where he's come to you with a complaint -- or come to you as -- come to the civil service board?

A. And made a formal complaint? I don't believe so.

Q. Okay. So earlier we talked about a Facebook post that Lieutenant Dunn made about an incident that happened near his house. Do you remember that?

A. Yes.

Q. And I believe your testimony was that he

**414**

should be allowed to post it and that it was also for the greater good. Do you remember saying that?

A. For public safety, yeah.

Q. I'm just curious. What about the post was in the furtherance of public safety?

MS. HIGGINS: Objection; this calls for a legal conclusion.

BY MS. GUNNELS:

Q. In your opinion.

A. Because he was talking about what was going on on that street, the crime that was going up when it happened, as were his neighbors.

Q. Are you saying his neighbors also made Facebook posts about it?

A. From what I heard. I don't get on there, so I don't know. But I was told that, yeah. And I believe they went to the council and spoke about it too, so.

Q. The city council?

A. Yes.

Q. Do you remember if anything was done after that?

A. I don't remember.

Q. Did you say you're aware of instances where Lieutenant Dunn has called for backup in certain situations and never received it?

**415**

A. I said I was told that. Yes.

Q. Who were you told that by?

A. Lieutenant Dunn.

Q. And you also said that, at times, the only other people -- I believe the phrase is "on the road" -- were Victor Fontenot and Ryan Young. Is that correct?

A. That's what he said.

Q. That's what he said.

A. -- at the time, yeah, that were available.

Q. So do you -- do you have personal knowledge of the reasons why Dunn didn't receive backup in those situations?

A. Just what I was told.

Q. Okay. And again, that was told to you by Lieutenant Dunn?

A. Yes.

Q. And what did he say about why he didn't receive backup in those situations?

A. He didn't get into specifics. He just said when he called for backup, they wouldn't come.

Q. We discussed a comment earlier where Chief Fontenot allegedly said, you know, Without the civil service board, I'd have fired certain individuals. Do you remember that?

**416**

A. Yes.

Q. Were you present for that comment?

A. Yes.

Q. What was the context?

A. Talking about employees in general, about things that were going on in the department.

Q. Where was that comment made?

A. His office.

Q. Was anyone else there?

A. Don't believe so.

Q. Okay. We also talked about use of force issues outside the jail. Is that correct?

A. Yes.

Q. And do you have any personal knowledge about improper use of force?

A. No.

Q. Okay. Who have you heard about those alleged instances from?

A. Lieutenant Dunn, other officers that were there, but I don't remember which ones, that case we were talking about. I know they're no longer with us.

Q. Has the civil service board ever investigated those issues?

A. No. We never got a formal complaint about it.

Q. And you never initiated your own

**417**

investigation?

A.   No.  Like I said, we don't do the criminal investigations.

Q.   Would that be a criminal investigation?

A.   It could be, yeah.

Q.   Could it also be a civil investigation?

A.   It could be, yeah.

Q.   You said that you had heard rumors about changes being made to the crimes that certain people were charged with.  Is that right?

A.   On paper.  You're talking about reports?

Q.   Right.

A.   Okay.

Q.   Is that -- you had heard rumors about that?

A.   Yes.

Q.   Who did you hear the rumors from?

A.   Different officers.

Q.   Okay.  Did you ever see that happening?

A.   As far as --

Q.   Did you --

A.   -- him telling people to do it or something?  No.

Q.   Yeah.  Did you ever overhear someone else tell an officer to change a report?

A.   No.

**418**

Q.   It came out in your testimony earlier that you heard, let's call them, rumors about Victor Fontenot possibly backdating a warrant.  Is that correct?

A.   Yes.

Q.   Who did you hear that from?

A.   The officers that were on scene.  One was Lieutenant Dunn.

Q.   Okay.  Did you ever see the warrant?

A.   No.

Q.   Did you know anything about the facts of the case?

A.   No.

Q.   So you don't have any personal knowledge about the warrant, then?

A.   No.

Q.   Same question about Victor Fontenot and holding evidence in his car when he wasn't supposed to.  You said that you had heard he had done that, correct?

A.   Yes.

Q.   Do you have -- did you ever see him do it?

A.   Nope.

Q.   Did he ever tell you that he did that?

A.   No.

Q.   Who did you hear about those things from?

A.   A bunch of different officers.

**419**

Q.   So, again, you don't have any personal knowledge about --

A.   Kind of like -- no, no.

Q.   Okay.

A.   As a civil service rep, I get a lot of phone calls and asked for advice and legal questions and...

Q.   And we also talked about misuse of department vehicles.  Did you ever see Victor Fontenot using his unit while he was supposed to be on sick leave?

A.   Yes.

Q.   Other than that, have you ever witnessed what you feel is misuse of a unit or vehicle?

A.   Yeah.  I've heard them go 10-8 from Basile, going to the store in Basile, and go 10-7.  I mean, it's pretty common knowledge.  We see him all the time with his family in the car, and he lives in Basile.

Q.   What about other than Victor Fontenot?  Do you have -- have you ever witnessed other officers misusing their units?

A.   Not outside of the city.

Q.   Have you witnessed them misusing units inside of the city?

A.   I wouldn't say misusing, but I've seen them using it.

Q.   And they're allowed to use their units, right?

**420**

A.   Inside the city limits.

Q.   Okay.

A.   Well, according to the chief, they are.  According to the mayor, they're not, so.

Q.   I want to touch on a comment you said that the chief made, something to the effect of, like, women shouldn't be on the road.  Do you remember saying that?

A.   Yes.

Q.   And you heard him say this?

A.   Yes.

Q.   And was it your testimony earlier that you believe that to be said in a joking manner?

A.   Yes.

Q.   Are there women officers on the road in units right now?

A.   Yes.

Q.   Were there at the time?

A.   I would assume so.

Q.   Okay.  You also talked about the medical issues of people in custody.  Do you remember that?

A.   Yes.

Q.   Okay.  Have you ever personally witnessed a time when someone in custody didn't get medical care that you believe they needed?

A.   No.

**421**

Q.    Okay.  And counsel asked your opinion as to whether someone who made a glass pipe would need medical care, and you said yes.  Is that correct?

A.    Yes.

Q.    Do you have any personal knowledge of that occurring?

A.    No.

Q.    I'm going to talk a little bit about -- you said that you received a check attached with your subpoena, correct?

A.    Yes.

Q.    Do you remember who that check was from?

A.    No.

Q.    Do you remember if it was an attorney for Lieutenant Dunn?

A.    I just remember --

MS. HIGGINS:  Objection; asked and answered.  Go ahead.

A.    It was from an attorney's office, but I didn't really pay attention to which one.

BY MS. GUNNELS:

Q.    How much was the check for?

A.    I think it was $40.

Q.    And what was your understanding of what that was for?

**422**

A.    Subpoena fee.

Q.    Do you know what subpoena fee -- what does a subpoena fee mean?

A.    I know that when we're subpoenaed to court, they give us -- the court gives you a subpoena fee check.  And if you're on duty, you don't cash it or don't go pick it up.

Q.    Okay.

MS. GUNNELS:  All right.  Let's take what I hope will be our last break of the day.

THE VIDEOGRAPHER:  We're off the record at 6:59.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 7:10.

MS. GUNNELS:  Okay.  I just want to clarify something for the record.

The exhibit that was just introduced as Thibodeaux 5, I believe, you had questions and concerns about it being marked privileged.

I would like to state the privilege doesn't have anything to do with this content or the substance of the email.  It's marked privileged because it was a communication between our client, who forwarded us the

**423**

email, and us.

And it wasn't produced in discovery because it's not responsive to any requests.  So I just wanted to put -- clarify that for the record.

And at this time, I have no further questions.

MS. HIGGINS:  Okay.  I'd like to redirect and ask a few additional questions, please.

RE-EXAMINATION

BY MS. HIGGINS:

Q.    We've talked a lot about the payroll irregularities, but I just want to clarify a couple of things really quickly with respect to the civil service board's investigation of the payroll irregularities.  Okay?

A.    Okay.

Q.    Is the civil service board an independent organization?

MS. GUNNELS:  Objection; vague.

A.    Independent as in?

BY MS. HIGGINS:

Q.    Is it run by any other authority?

A.    No.  It's -- it's independent in that way,

**424**

yes.

Q.    Okay.  Who sits on the civil service board?

A.    Five members.  One member is elected by the classified employees of the police department.

Q.    Is that you?

A.    Yes.

Q.    Okay.

A.    One member is elected by the classified employees of the fire department.

Q.    Uh-huh.

A.    One member is elected by the council.

THE WITNESS:  And the mayor?  Or just the council, the one member?

A.    And then the other two members come from a list that comes from LSUE.  They give four names to the council, and they pick two of those names.

BY MS. HIGGINS:

Q.    "LSUE"?

A.    The college.

Q.    Oh, okay.  So just to be clear, the members of the board are not all Eunice police officers, correct?

A.    Only one.  Correct.

Q.    Okay.  When you decided -- the civil service board, rather, decided to investigate these payroll irregularities, did you specifically make that

**425**

decision?

A.   I brought up that there was concerns about it, and I brought it up to the board, but I didn't make the motion.

Q.   Who made the motion?

A.   I don't remember.  It was --

Q.   Okay.

A.   -- one of the members.

Q.   But would you say it wasn't your individual decision --

A.   Decision?  No.

Q.   -- to actually investigate the payroll irregularities?

A.   I can't decide on my own.

Q.   So it was a collective decision of the board, correct?

A.   Yes.  And it was voted on unanimously.

Q.   Unanimously?

A.   Yes.

Q.   Okay.  To your knowledge, was the investigation conducted properly?

A.   To my knowledge, yes.

Q.   Okay.  And you said that you reported the results to the attorney general, the DA, and other law enforcement agencies; is that correct?

**426**

A.   Yes.

Q.   Can you repeat which other ones you reported it to?

A.   The sheriff's office, I believe the Louisiana attorney general, the ethics board, and the legislative auditor.

Q.   And you said that these law enforcement agencies have not yet taken action with regard to the payroll irregularities?

A.   Well, they haven't -- they haven't told us what's going on with it.

Q.   Okay.  To your knowledge, have they not taken action yet because they disagreed with the civil service board's findings?

           MS. GUNNELS:  Objection; misstates.

A.   That's not correct.  No.  To my knowledge, they haven't taken action.  I don't know why.  Or if they have, I don't know either.

BY MS. HIGGINS:

Q.   But they haven't given you --

A.   Any reasons, no.

Q.   -- any sort of indication that they disagree with the civil service board's decision?

A.   Correct.

Q.   Okay.  To your knowledge, have they done any

**427**

investigations to this point?

A.   I'm not sure either way.

Q.   Okay.  Have you heard that Lieutenant Dunn reported incidences of misconduct to these agencies?

A.   I know he's reported it to the DA's office.  I know he's reached out to the attorney general's office, I believe, and some other agencies.  I don't remember exactly which ones.

Q.   Do you remember specifically which misconduct he reported to these agencies?

A.   I don't know about all of them.  I know one of them was the use of force that we were talking about in front of his house.  I believe he reported -- I don't know which agency he reported that to, but I know he's been in contact with them.

Q.   Do you know what the outcome was?

A.   No, I don't.

Q.   Okay.

A.   I know he had told me one time that when he met with the DA's office, they weren't interested because it happened before this DA.  It happened in the previous DA's administration.

Q.   Okay.

A.   But that might have been a different issue, not that use of force issue.

**428**

Q.   Are you aware of any criminal investigations into Chief Fontenot?

A.   Criminal?  No, I'm not aware of any.

Q.   What about any criminal investigations into other members of the department?

A.   Not that I'm aware of, no.

Q.   Earlier you said that the civil service board does not investigate all civil service board violations.  Is that correct?

A.   Correct.

Q.   Is that because all conduct is not reported to the civil service board?

           MS. GUNNELS:  Objection; leading.

A.   Correct.

BY MS. HIGGINS:

Q.   Are there other reasons why it wouldn't be investigated?

A.   Most times, it's because it's not reported. And a lot of times, it's because we just don't have the manpower or the time.  With everything else going on, it gets put on the back burner.

Q.   When Eunice Police Department misconduct is first reported, where is it reported to?

A.   Usually, it's supposed to be reported to the supervisor.

**429**

Q. "The supervisor" being?

A. Whoever their supervisor is that's making the report.

Q. Okay. Going back to the payroll irregularities specifically, defense counsel indicated that there might have been a hurricane or storm on the day in which the officers were given paid time off; is that correct?

A. That's what she said, yes.

Q. Okay. On the day in question, do you know if all officers received paid time off?

A. No, they did not.

Q. So only a few officers received paid time off?

A. Correct.

MS. GUNNELS: Objection; misstatement.

A. A few employees, correct.

BY MS. HIGGINS:

Q. Okay. Would you consider the Eunice Police Department officers emergency responders?

A. Yes.

Q. Do they work during hurricanes?

A. Yes.

Q. What about storms?

A. Yes.

Q. To your knowledge, on the day in question, did

**430**

officers in fact work that day?

A. Yes. Some did, not all.

Q. Some did?

A. (Witness nods head.)

Q. What did they do, to your knowledge?

A. I don't recall --

Q. Did the officers --

A. -- specifically.

Q. Okay. We also talked about the deputy chief position being revoked. Do you recall that?

A. Yes.

Q. You said earlier that the deputy chief position was established by Chief Dies; is that correct?

A. Yes.

Q. And the position was initially attained through promotion rather than appointment, correct?

MS. GUNNELS: Objection; misstatement.

A. Before it was the deputy chief position, it was assistant chief.

BY MS. HIGGINS:

Q. Can you say that again?

A. It was the assistant chief before.

Q. Okay. When did the change occur?

A. While Chief Dies was in office.

**431**

Q. We also talked about your position on the night shift and not having a jailer. Do you recall that?

A. Yes.

Q. You characterized your shifts as being short-staffed; is that correct?

A. Yes.

Q. Why do you think that that shift was short-staffed?

A. Because the other shifts had more people on them.

Q. And is it dangerous when an officer works a short-staffed shift?

MS. GUNNELS: Objection; leading.

A. Oh, yes, it's dangerous.

BY MS. HIGGINS:

Q. Okay. And specifically, you said that you were put on night shift but did not have a jailer; is that correct?

A. Correct.

Q. And you stated that a jailer is most needed at night; is that correct?

MS. GUNNELS: Object; misstates testimony.

A. It just depends on the day. I mean,

**432**

sometimes, yes, on the weekends. And sometimes -- you know, every day is different.

BY MS. HIGGINS:

Q. Okay.

A. But we do definitely -- you definitely need one at night.

Q. Why would you say "definitely need one at night"?

A. Well, because that's usually when the inmates have problems, medical problems. They need medicine. The road is busier at night, so all the officers are usually on the road. And the dispatcher is in there by herself with all the inmates.

Q. So have you been -- on nights when you've had no jailer, have there been inmates in custody?

A. Yes.

Q. And you were alone with those inmates; is that correct?

A. What do you mean, alone with them?

Q. You had no additional staff supporting you on those nights.

A. Well, I had patrol and sergeant and a dispatcher but no jailer.

Q. But no jailer, correct?

A. Yes. I mean, sometimes you can get one to

**433**

come in and work overtime or a reserve to come in and watch the jail sometimes.

Q.    Have you heard of other instances in which there were no jailers on duty but people in custody?

A.    That happens all the time at night.

Q.    With other people who are staffed?  Or just you?

A.    No, with other people too.

Q.    Okay.  All the time, you said --

A.    Yes.

Q.    -- this happens?

A.    Happens all the time.

Q.    I want to talk a little bit about your transfer from being the training coordinator.  Can you be the training coordinator if you're only on the night shift?

A.    Not without coming in on your days office.

Q.    So would you say that you wouldn't have enough time during your normal hours to do both jobs?  Is that correct?

A.    Correct.

Q.    So you would have to work both day and night shifts in order to be the full-time trainer, correct?

A.    Correct.

Q.    Do people often work both shifts?

**434**

A.    A lot of the officers work day and nights. They stay over and work 18-hour shifts.

Q.    How come?

A.    A lot of times because we're shorthanded.

Q.    Are they compensated for that?

A.    Yes.

Q.    So you mentioned that the deputy chief became in charge of training; is that correct?

A.    He was designated as the training coordinator. Yes.

Q.    After you had been de-designated from that role; is that correct?

A.    Yeah.  He switched it from me to him.

Q.    Okay.  Has the deputy chief done an adequate job of training the employees, in your opinion?

A.    He only got the title.  He got the account. But I was still having to do the -- the job.

Q.    And you, in your opinion, have made every best effort to correct the training deficiencies that you've identified in your previous testimony; is that correct?

A.    Yes.

        MS. GUNNELS:  Objection; leading.
BY MS. HIGGINS:

Q.    Okay.  Did Chief Fontenot prevent you in any way from conducting training after you were

**435**

transferred?

A.    After I was transferred to the night shift?

Q.    Yes.

A.    Yeah, he denied me to get recertified for the baton.  He's denied other training.  And I was limited on the amount of overtime I could have.

Q.    Okay.  So you -- it's your testimony that you were not only limited in the amount of time you could allocate to training but also that you were denied certain training requests that you made; is that correct?

A.    Correct.

Q.    Do you need adequate time -- would you need more time to adequately do your job as a training coordinator?

A.    Yes.

Q.    And would you need to be granted permission to conduct the trainings that you've after -- asked for to do an adequate job as the training coordinator?

A.    Yes.

Q.    But, to confirm, it's your testimony that you were prevented from taking these steps by Chief Fontenot, correct?

A.    On certain certifications, yes.  And I was like I said, limited on the amount of overtime I could

**436**

have.

Q.    Did you view these limitations as a form of punishment?

A.    Yes.

Q.    Okay.

        MS. HIGGINS:  Sorry.  Bear with me one
    second.

        MR. HOBBIE:  Did it freeze?
        MS. HIGGINS:  Uh-huh.
BY MS. HIGGINS:

Q.    I want to talk one more time about the crash reports that we've been going over.

A.    Okay.

Q.    Defense counsel asked you if you've ever made -- directed someone to make changes to crash reports; is that correct?

A.    Yes.

Q.    The changes that you've directed people to make, have you -- they ever included asking people to make changes that would then make the report contain false information?

A.    No.

Q.    Would you say that most of those changes that you've directed officers to make have been spelling or --

**437**

A.   Stuff that was left off.

Q.   -- things that --

A.   Overlooked.

Q.   -- things that needed to be in the report, in your opinion, but were left out?

A.   Yes.

Q.   So the changes that you asked to be made, in some cases, they were to make the reports more accurate; is that correct?

A.   Yes.

Q.   Okay.  And just to be clear, did you ever direct someone to change liability, who was liable, in a crash report?

A.   Not that I remember ever doing that.

Q.   But you've heard of instances in which the chief has directed officers to do that?

A.   On one particular, yes.

Q.   Okay.  Have you ever directed someone to change a report because a friend or family member was involved?

A.   No.

Q.   Did you ever direct someone to change their professional opinion in a report?

A.   No.

Q.   Earlier you mentioned that Victor Fontenot

**438**

went 10-8.  What does that mean?

A.   10-8 means in service, in your unit on the radio.  Like in the morning, when you get in service, you go 10-8 on the radio so they can log it down.  That means you're driving around in your unit.

Q.   What does 10-7 mean?

A.   That you're out of service.

Q.   So when you heard Victor Fontenot using his vehicle while he was 10-7, what does that mean?

A.   It means he wasn't on duty, he was at home, and, like, went to the store.  He'd go 10-8 in his vehicle going to the store, and when he'd get done and get back home, he'd go 10-7.

Q.   Is that improper?

A.   Well, it's outside the city.  It's not supposed to be done.  So he quit doing that on the radio.

Q.   Okay.  Have you ever heard Chief Fontenot saying that he was out to get Lieutenant Dunn in any way?

A.   I don't know about those words specifically.

Q.   Have you ever heard Chief Fontenot saying that he wanted to get information on Lieutenant Dunn that might make him look bad?

MS. GUNNELS:  Objection; asked and

**439**

answered.

A.   Not from his mouth to my ear, no.

BY MS. HIGGINS:

Q.   Have you ever heard Chief Fontenot saying anything else negative about Lieutenant Dunn?

A.   Yes.  Over the years, he's made comments about the way he does his job, just little remarks.

Q.   Have you ever heard Chief Fontenot saying that he wanted to hurt Lieutenant Dunn with respect to his job?

A.   Not anything specific, besides what we talked about.

Q.   Remind me what we talked about that you're thinking of.

A.   Well, whenever he told Lieutenant Dunn that if he didn't resign that he was going to put him under IA and he was going to be put on administrative leave and investigated.

Q.   Okay.  You testified earlier that you heard Chief Fontenot say the N-word; is that correct?

A.   Yes.

Q.   In what context did he use the N-word?

MS. GUNNELS:  Objection; asked and answered.

A.   I don't remember exactly, but it was what I

**440**

had said earlier, to the effect of blaming what was going on at the time.

BY MS. HIGGINS:

Q.   Did you believe that his comments were a joke?

A.   No, not a joke.

Q.   Okay.  Do you think it's appropriate for Chief Fontenot to joke about women in the department?

A.   No.

Q.   Do you think it's appropriate for Chief Fontenot to use the N-word to describe crime being committed in the city?

A.   No.

MS. HIGGINS:  I'd like to ask for a two-minute break quickly.

MS. GUNNELS:  Sure.

THE VIDEOGRAPHER:  We're off the record at 7:31.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 7:33.

MS. HIGGINS:  Plaintiff's counsel has no further questions at this time.

MS. GUNNELS:  I have one more follow-up.

RE-EXAMINATION

BY MS. GUNNELS:

**441**

Q.  You said that Deputy Chief Kennedy has been made the training coordinator; is that correct?

A.  He was designated the training coordinator, yes.

Q.  How did that designation happen?

A.  The chief either emailed or called the state and changed it.

Q.  Changed what, specifically?

A.  The account, the POST training --

Q.  The POST account?

A.  The coordinator account, yes.

Q.  So is there anything other than the change in the POST account to indicate that he's the training coordinator?

A.  Everything that the state sends has to go through him.  I mean, he's the designated training coordinator by the chief.  Now, I don't know how --

Q.  Has the chief referred to him as the training coordinator?

A.  I don't know.  You'd have to ask the chief. He doesn't really talk to me.

Q.  Have you heard anyone else refer to him as the training coordinator?

A.  The state, yes.

Q.  And the state by way of him having the POST

**442**

log-in?

A.  They -- everything they send is to him as the training coordinator.  He's just designated that.

MS. GUNNELS:  Okay.  No further questions.

THE VIDEOGRAPHER:  This concludes the deposition.  The time now is 7:34.

(This proceeding was concluded at 7:34 p.m. on July 26, 2022.)

**443**

REPORTER'S CERTIFICATE

I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, Registered Professional Reporter, and as the officer before whom this testimony was taken, do hereby certify that DONNIE GENE THIBODEAUX, after having been duly sworn by me upon authority of R.S. 37:2554, did testify on the 26th day of July, 2022, in Lafayette, Louisiana, as hereinbefore set forth in the foregoing 442 pages.

I further certify that said testimony was reported by me in the Stenotype reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board and that I have been informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services.

I further certify that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions of the board.

I further certify that I am not an attorney or counsel for any of the parties, that I am neither related to nor employed by any attorney or counsel connected with this action, and that I have no financial interest in the outcome of this matter.

This certificate is valid only for this transcript accompanied by my original signature and original raised seal on this page.

Baton Rouge, Louisiana, this 2nd day of August, 2022.

YOLANDA J. PENA, CCR, RPR
CCR NO. 2017002, RPR NO. 907346