Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA


MICHAEL DUNN

                         CIV. A. NO.
VS.                      6:21-CV-01535

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, AND
JOHN DOE

  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


          Monday, November 28, 2022


          Videotaped deposition of BUDDY DUPRE,

     taken pursuant to notice, was held

     beginning at 9:12 a.m. on the above date

     at Doubletree by Hilton Lafayette, 1521 W.

     Pinhook Road, Lafayette, Louisiana 70503

     before RITA A. DEROUEN, Certified Court

     Reporter and Registered Professional

     Reporter.


          MAGNA LEGAL SERVICES

            (866) 624-6221

          www.MagnaLS.com


**EXHIBIT L**



Page 2

APPEARANCES
REPRESENTING MICHAEL DUNN:
SIDLEY AUSTIN, LLP
BY: AMIT BHATLA, ESQ.
BY: PETER MARDIAN, ESQ. (Appearing via Zoom.)
BY: NORMAN HOBBIE, ESQ. (Appearing via Zoom.)
787 Seventh Avenue
New York, New York 10019
212-839-5300
abhatla@sidley.com
pmardian@sidley.com
nhobbie@sidley.com

   - AND -
KEARNEY LOUGHLIN, ATTORNEY AT LAW
BY: KEARNEY S. LOUGHLIN, ESQ.
602 Boulder Creek Parkway
Lafayette, Louisiana 70508
337-534-8803
kearney.loughlin@gmail.com

REPRESENTING RANDY FONTENOT:
ERLINGSON BANKS, PLLC
BY: KAITLIN A. WALL, ESQ.
656 Sunset Boulevard
Baton Rouge, Louisiana 70808
225-288-7427
kwall@erlingsonbanks.com

REPRESENTING RYAN YOUNG:
NEUNER PATE
BY: ROBERT E. TORIAN, ESQ.
1001 West Pinhook Road
Suite 200
Lafayette, Louisiana 70503
337-237-7000
rtorian@neunerpate.com

Page 3

APPEARANCES: (CONTINUED)
REPRESENTING VICTOR FONTENOT:

JOSEPH B. STAMEY, APLC
BY: JOSEPH B. STAMEY, ESQ.
727 2nd Street
Natcitoches, Louisiana 71457
318-352-4559
joe@stameylawfirm.com

REPRESENTING THE CITY OF EUNICE:

BECKER & HEBERT, LLC
BY: JAMES PAUL DOHERTY, III, ESQ.
201 Rue Beauregard
Lafayette, Louisiana 70508
337-233-1987
james@lawbecker.com

Also Present:
   Don Grover, Videographer
   Michael Dunn (Appearing via Zoom.)
   Randy Fontenot
   Victor Fontenot

Reported by:
   Rita A. DeRouen, Certified
   Court Reporter No. 2014018
   in and for the State of
   Louisiana

Page 4

                    I N D E X
                                    Page
STIPULATION                         5
REPORTER'S PAGE                     218
CERTIFICATE                         219
EXAMINATION
     BY MR. BHATLA                  8

              * * * * *
         List of Exhibits

     (No exhibits marked.)

Page 5

               S T I P U L A T I O N

     It is hereby stipulated by and among counsel for
plaintiff and counsel for defense that the
deposition of
          BUDDY DUPRE
be taken before RITA A. DEROUEN, Certified Court
Reporter, for all purposes, pursuant to notice and
to the provisions of the appropriate statutes of
the Federal Rules of Civil Procedure.
     The parties hereto waive all formalities in
connection with the taking of said deposition and
the reading and signing thereof, except the
swearing of the witness, and the reduction of the
questions and answers to typewriting.

                    * * *

2 (Pages 2 to 5)




Page 6

THE VIDEOGRAPHER:

We're now on the record.  This is the video deposition of Buddy Dupre taking place -- in the matter of Michael Dunn vs. Randy Fontenot, et al., in the USDC, Western District of Louisiana.

Today's date is November 28th, Monday, 2022.  The time is 9:12.  This deposition is being taken at 1521 West Pinhook, Lafayette, Louisiana at the request of Sidley Austin, LLP.

The videographer is Don Grover.  The court reporter is Rita DeRouen.  We're both with Magna Legal Services.

At this time, will counsel please introduce themselves.

MR. BHATLA:

Amit Bhatla from Sidley Austin on behalf of plaintiff, Michael Dunn.  I'm joined by my colleagues, Peter Mardian and JR Hobbie and plaintiff, Lieutenant Michael Dunn, over Zoom.

MR. DOHERTY:

I'm James Doherty, counsel for the City of Eunice.

Page 7

MR. STAMEY:

Joe Stamey, counsel for Victor Fontenot.

MR. TORIAN:

Robert Torian with Neuner Pate, counsel for Ryan Young.

MS. WALL:

Kaitlin Wall with Erlingson Banks on behalf of Chief Randy Fontenot.

MR. LOUGHLIN:

I'm Kearney Loughlin.  I represent Lieutenant Dunn.

THE VIDEOGRAPHER:

And also present?

MR. V. FONTENOT:

Detective Victor Fontenot with the Eunice Police Department.

MR. R. FONTENOT:

Chief Randy Fontenot.

THE VIDEOGRAPHER:

At this time, will the court reporter please swear in the witness.

BUDDY DUPRE, having been first duly sworn, was examined and testified as follows:

Page 8

EXAMINATION

BY MR. BHATLA:

Q.  My name is Amit Bhatla.  I represent Michael Dunn in an ongoing dispute with the City of Eunice, Randy Fontenot, Victor Fontenot, and Ryan Young.

Could you please state your full name for the record?

A.  Buddy James Dupre.

Q.  And what would you like me to call you?

A.  Buddy.

Q.  Have you ever been deposed before?

A.  What you mean?

Q.  Have you sat for a deposition before?

A.  No.

Q.  Have you ever testified at trial or another court proceeding?

A.  Yes.

Q.  When?

A.  In the City court.

Q.  Was that pursuant to your job at the Eunice Police Department?

A.  Yes.

Q.  Now, before we dive into the substance, I'm just going to ask you -- or just give you kind

Page 9

of an overview of the deposition ground rules and make sure you understand them.

Does that sound good to you?

A.  Yes.

Q.  Great.  You will be testifying under oath and your answers will be subject to the penalty of perjury.

Do you understand that?

A.  Yes.

Q.  Your statements here today have the same effect as though they were given in a court of law.

Do you understand that?

A.  (The witness nodded head.)

Q.  Today I'm going to ask you a series of questions.  If at any point you don't understand one of my questions, please ask for clarification; otherwise, I'll assume you understood the question.

Does that make sense?

A.  Yes, sir.

Q.  Now, if you look over to your left, Rita is our very kind court reporter, she will be transcribing the deposition.  For her sake and for a clear record in the future, could you please

3 (Pages 6 to 9)



Page 10

provide verbal answers to all questions.

A. Yes.

Q. Additionally, it's easier if we're not both speaking at the same time, so I'd ask that you wait until I finish asking my question before you begin responding.

Do you understand that?

A. Yes.

Q. As you're aware, counsel for defendants are in the room. They may object to my questions. I ask that you answer my question even if there's an objection.

Do you understand that?

A. Yes.

Q. If at any time you want a break, please ask. If there's a question pending, however, I ask that you answer the question before we go on break.

Do you understand that?

A. Yes.

Q. What, if anything, did you do to prepare for today's deposition?

A. Nothing.

Q. Did you review any documents in anticipation of the deposition today?

Page 11

A. No.

Q. Did you bring any documents or notes to the deposition?

A. No.

Q. Are you aware that Lieutenant Dunn filed this lawsuit against the City of Eunice, Randy Fontenot, Victor Fontenot, and Ryan Young?

A. Yes.

Q. Do you understand the nature of the lawsuit?

A. No.

Q. What do you know about the lawsuit?

A. Nothing. I got a paper to come to a deposition.

Q. When did you become aware of the lawsuit?

A. People talking around the P.D. about it.

Q. Who was talking about it?

A. I don't remember. Just passing through, I'd hear he was suing the City or something.

Q. Do you recall who was talking about the case?

A. No.

Q. In general, folks in the police department were talking about the case?

A. Yes.

Page 12

Q. Do you recall any commentary about what was said about this case?

A. No.

Q. Is that how you first learned about the lawsuit?

A. Yes.

Q. Have you discussed this lawsuit with anyone in the Eunice Police Department?

A. No.

Q. Have you discussed this deposition with anyone at the Eunice Police Department?

A. I told some people I had a deposition.

Q. Who did you tell?

A. Victor. This morning I told him I had to come to Lafayette.

Q. What did Victor say to you about the deposition?

A. He had one too.

Q. Could you repeat that?

A. He had a deposition this morning.

Q. Could you clarify, what did he -- what did Victor tell you?

A. He had a deposition this morning.

Q. And what did you tell Victor?

A. I had to come to the Doubletree Hotel.

Page 13

Q. Did you talk to anyone else about the deposition?

A. No.

Q. Has Chief Fontenot discussed this lawsuit with you?

A. No.

Q. Has he discussed this deposition with you?

A. No.

Q. Has Victor Fontenot discussed this lawsuit with you?

A. No.

Q. Has Ryan Young discussed this lawsuit with you?

A. No.

Q. Has Ryan Young discussed this deposition with you?

A. No.

Q. Has Jeremy Ivory discussed this lawsuit with you?

A. No.

Q. Has he discussed this deposition with you?

A. No.

Q. Has Tony Kennedy discussed this lawsuit with you?

A. No.

4 (Pages 10 to 13)



MAGNA
LEGAL SERVICES

Page 14

Q. Has he discussed this deposition with you?
A. No.
Q. Has anyone from the Eunice Police Department asked you to lie during this deposition?
A. No.
Q. Has anyone from the Eunice Police Department asked you to not tell the full truth during this deposition?
A. No.
Q. Has anyone from the Eunice Police Department encouraged you to not recall events during this deposition?
A. No.
Q. Has anyone discouraged you from testifying?
A. No.
Q. Has anyone from the Eunice Police Department asked you not to testify?
A. No.
Q. Has anyone threatened you because you're testifying here today?
A. No.
Q. Does Chief Fontenot's presence here today affect your ability to testify truthfully?

Page 15

A. No.
Q. Are you concerned that Chief Fontenot might target you because of your testimony today?
MR. STAMEY:
Objection to the form of the question.
Subject to that objection, you may answer.
A. Possibly.
BY MR. BHATLA:
Q. Can you elaborate?
A. What you mean?
Q. Why do you think it's possible that Chief Fontenot might retaliate against you for your testimony today?
A. He might target me.
Q. Why do you say that?
A. He targeted my wife.
Q. Can you explain how?
A. She got hurt on the job. She was able to work. She went out with COVID. He told her not to come back to work until she was full release, but he let her work before on light-duty.
Q. What's your wife's name?
A. Nicole Dupre.
Q. And she works at the Eunice Police Department?

Page 16

A. Yes.
Q. So your wife was on sick leave?
A. She was hurt, went to the doctor, and was able to come back to work on light duty.
Q. She was medically cleared?
A. Not fully.
Q. Was she given the chance to come back on light duty?
A. Yes.
Q. And did Chief Fontenot allow her to return on light duty?
A. Yes.
Q. So why do you say that she was targeted?
A. Because she came back, and then she got COVID, and then he told her not to come back to work until she was fully cleared.
Q. Even though she had been light cleared?
A. Yes. She filed an appeal and then she was able to come back to work.
Q. When you say she filed an appeal, can you elaborate on that?
A. Civil service board.
Q. She filed an appeal with the civil service board?
A. Yes.

Page 17

Q. And how did the board rule?
A. She can come back to work.
Q. Were there any conditions placed on her return to work?
A. Same as it was before.
Q. Is it common for officers who get COVID to be told they can't return to work until they're fully cleared?
MR. STAMEY:
Objection to the form of the question.
Subject to that objection, you may answer.
A. I mean, they go home and then 14 days, I think it was, then they came back to work.
BY MR. BHATLA:
Q. Was your wife treated differently from other officers at the department?
A. She went home and then she had to sit home for eight months.
Q. Why eight months?
A. Until they had a hearing through civil service.
Q. She was not permitted to return after she was negative for COVID?
A. No, she couldn't come back to work.
Q. What was the reason?



Page 18

A. Till the civil service -- until the civil service hearing.

Q. Why was it -- sorry, go ahead.

A. And then she was able to return to work.

Q. Why wasn't she allowed to return once she was negative for COVID?

A. Because Chief told her not to come back until she was released full duty from her previous injury.

Q. Have other officers at the Eunice Police Department been permitted to work when cleared for light duty?

A. Yeah.

Q. Are you aware of any other officers who were told not to come in because they had COVID and were not cleared for full duty?

A. No.

Q. Why do you think Chief Fontenot told your wife to stay home?

A. I don't know.

Q. Are you concerned that Victor Fontenot might target you because of your testimony today?

MR. STAMEY:

Objection to the form of the question. Subject to that objection, you may answer

Page 19

if you understand the question.

MR. BHATLA:

I'll ask that counsel please refrain from speaking objections.

MR. STAMEY:

I'm not --

MR. BHATLA:

Federal Rule of Civil Procedural 30(c)(2) provides that objection to the form is the extent of the objection.

MR. STAMEY:

That's pretty much what I did.

MR. BHATLA:

Additional commentary is not necessary.

MR. STAMEY:

Subject to your interpretation.

MR. BHATLA:

I can repeat the question.

BY MR. BHATLA:

Q. Are you concerned that Victor Fontenot might target you because of your testimony today?

A. What you mean, "target"?

Q. Are you concerned that Victor Fontenot will mistreat you at the department based on your

Page 20

testimony here today?

MR. STAMEY:

Objection to the form of the question. Subject to that objection, you may answer.

A. May I answer?

BY MR. BHATLA:

Q. I didn't catch your answer, sorry.

A. Can I answer it?

Q. Yes.

A. I don't think so. I hope not.

Q. Are you concerned that Ryan Young might target you because of your testimony today?

A. No.

Q. Will you be able to provide truthful testimony today?

A. Yes.

Q. Before we go any further, I'd like to get to know more about you.

What is your current job?

A. I work for City court, probation officer.

Q. How long have you been working in that capacity?

A. About six years.

Q. When did you first join the Eunice Police Department?

Page 21

A. Probably six years ago. I'm a reserve.

Q. You mean you're a reserve officer?

A. Yes.

Q. How is a reserve officer different from a full-time officer?

A. We just go out and help them.

Q. Do you receive civil service board protections?

A. No.

Q. What does that mean? What does it mean to not have civil service board protection?

A. We can get fired at any time.

Q. So if Chief Fontenot wanted to, he could fire you for any reason?

A. Yeah.

Q. Where were you working before working at the Eunice Police Department?

A. Louisiana Crane, truck driving.

Q. And you are married?

A. Yes.

Q. How long has your wife worked at the Eunice Police Department?

A. About five years.

Q. What is her role at the Eunice Police Department?

6 (Pages 18 to 21)




MAGNA
LEGAL SERVICES

Page 22

A. The jail.

THE COURT REPORTER:

I'm sorry?

THE WITNESS:

The jail.

BY MR. BHATLA:

Q. What are your duties as a reserve officer?

A. Just to back up the full-time officers.

Q. What does that typically require you to do?

A. Just help them out, whatever they need on scene.

Q. What hours do you work?

A. Whenever we want to.

Q. Is there a particular shift that you work?

A. No.

Q. Who's your supervisor?

A. For the P.D. or City court?

Q. At the Eunice Police Department, who is your supervisor?

A. The shift supervisor.

Q. How many officers work at the Eunice Police Department?

A. I don't know.

Q. Are there fewer officers now than when you

Page 23

first joined?

A. Yes.

Q. Why do you think that is?

A. The pay.

Q. Can you elaborate on that?

A. Eunice gets very little pay compared to other agencies.

Q. Are there any other reasons why fewer people are at the department than before?

A. Most of the people leave for money.

Q. What other reasons do people leave for?

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer.

A. They leave for the money.

BY MR. BHATLA:

Q. Is that the only reason people --

A. Eunice doesn't get paid very much.

Q. Is that the only reason people leave?

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer.

A. I mean, I don't know. They might have their own reasons they leave, but I -- I don't know.

Page 24

BY MR. BHATLA:

Q. During your time -- during your time at EPD, have you worked with other law enforcement agencies?

A. I mean, we went out and assisted other agencies.

Q. What agencies?

A. Evangeline, Port Barre, Basile.

Q. How often do you work with those other law enforcement agencies?

A. I don't know.

Q. Do you work with them weekly? Monthly?

A. I mean, if I have a warrant in their jurisdiction, I call them, they come assist me.

Q. How often do you have a warrant in their jurisdiction?

A. That's all the time.

Q. All the time.

Do you talk about the Eunice Police Department with officers from other law enforcement agencies?

A. No.

Q. What is EPD's reputation with those other law enforcement agencies?

A. I don't -- I don't understand. I mean...

Page 25

Q. How is the Eunice Police Department perceived by other law enforcement agencies?

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer.

A. I don't know.

BY MR. BHATLA:

Q. I want to talk about some of the defendants in this case.

Do you know Chief Fontenot?

A. Yes.

Q. How do you know him?

A. Through work.

Q. How long have you known him?

A. About six years.

Q. Can you describe your relationship with Chief Fontenot.

A. Go to work and then go home. I don't hang out with him or anything.

Q. How often do you talk to him?

A. Almost every morning.

Q. What do you talk about?

A. They have a meeting every morning.

Q. What happens during those meetings?

A. They talk about what went on the night




Page 26

before, the weekend, check paperwork.

Q. Are you aware of Chief Fontenot's reputation in the law enforcement community?

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer.

A. What you mean as in "reputation"? What --

BY MR. BHATLA:

Q. Does Chief Fontenot have a reputation in the law enforcement community?

MR. STAMEY:

Same objection.

A. Bobby Guidroz don't like him.

BY MR. BHATLA:

Q. Who does not like Chief Fontenot?

A. Bobby Guidroz.

Q. Who is Bobby Guidroz?

A. The sheriff.

Q. Why does he not like Chief Fontenot?

A. I don't know. Bobby thinks he runs the whole town, city, everything.

Q. Who runs the whole town?

A. Chief runs it.

Q. Bobby Guidroz believes that Chief Fontenot runs the whole town?

Page 27

A. No. Bobby thinks he runs everything in St. Landry Parish.

Q. Bobby believes that Chief Fontenot --

A. No. Bobby Guidroz thinks he runs our police department.

Q. And so why does he not get along with Chief Fontenot?

A. I don't know.

Q. Are you aware of anyone else who does not get along with Chief Fontenot?

A. Michael Dunn.

Q. Are there any other law enforcement officers who don't get along with Chief Fontenot?

A. I don't know.

Q. Do you know Victor Fontenot?

A. Yeah.

Q. How do you know him?

A. Through work.

Q. How long have you known him?

A. Probably six years.

Q. Can you describe your relationship with Victor Fontenot?

A. I mean, it's good.

Q. How often do you talk to him?

A. Probably every morning.

Page 28

Q. Do you talk to him during those meetings with --

A. Yeah.

Q. -- the entire department?

A. Yes.

Q. Do you talk to Victor outside of those meetings?

A. Yes.

Q. What do you talk about?

A. When I'm looking for somebody, if he knows where they're at.

Q. How often do you talk to Chief Fontenot outside of those meetings?

A. When I see him walking through the hall.

Q. What do you talk about then?

A. I don't know. Hey, how you doing. If something comes up, something comes up.

Q. Are you aware of Victor Fontenot's reputation in the law enforcement community?

A. No.

Q. Does Victor Fontenot have a reputation in the law enforcement community?

A. He --

MR. STAMEY:

Objection to the form of the question.

Page 29

Subject to that objection, you may answer the question.

A. I mean, he's our detective.

BY MR. BHATLA:

Q. Has anyone at the Eunice Police Department ever talked to you about Victor Fontenot's reputation?

A. No.

Q. Has anyone at other law enforcement agencies ever talked about Victor to you?

A. No.

Q. Have you heard any rumors about Victor Fontenot?

A. As in?

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer.

BY MR. BHATLA:

Q. I'll rephrase the question.

Have you heard any rumors about the way Victor Fontenot handles cases?

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer.

A. I mean, if we arrest somebody and they



Page 30

tell me, You can't arrest me because I work for Victor, but, I mean, it's a criminal...
BY MR. BHATLA:
Q. Individuals you arrest tell you that they cannot be arrested because they work for Victor?
A. Yeah.
Q. And what do you do in those circumstances when someone says that?
A. I arrest them.
Q. Do you talk to Victor about it?
A. I go let him know that they putting his name out there.
Q. What happens then?
A. I don't know. They go to jail. I mean, it's a criminal. You going to believe a criminal?
Q. Can you recall the names of any individuals who said they worked for Victor?
A. Scotty Fournerat, Gary Fields. They on probation with me.
Q. Any other individuals you can recall?
A. Not right offhand.
Q. Do you know what happened to those individuals after you arrested them?
A. They went to jail.
Q. Did any of them get out of jail on the

Page 31

basis of their connection with Victor?
A. Not that I know of. Once I put them on the bench, they see the judge.
Q. Are you aware of any other confidential informants that Victor Fontenot handles?
MR. STAMEY:
Objection to the form of the question.
Subject to that objection, you may answer.
A. No. I don't know his CIs.
BY MR. BHATLA:
Q. Do you know of Victor Fontenot's reputation with respect to handling of CIs?
MR. STAMEY:
Objection to the form of the question.
Subject to that objection, you may answer.
A. No.
BY MR. BHATLA:
Q. Are you aware of any reports of abuse of the confidential informant process?
A. No.
Q. Do you know Ryan Young?
A. Yes.
Q. How do you know him?
A. Through work.
Q. How long have you known him?

Page 32

A. Six years.
Q. What is your relationship like with Ryan Young?
A. It's okay.
Q. How often do you talk to him?
A. Every morning.
Q. During those meetings?
A. Yes.
Q. Do you talk to him outside of those meetings?
A. Sometimes.
Q. What do you talk about?
A. Send little Snapchat, TikTok videos to each other.
Q. Do you ever talk to Ryan Young about your cases?
A. If I'm looking for somebody.
Q. Do you ever talk to Victor Fontenot about your cases?
A. If I'm looking for somebody.
Q. Do you ever text Victor or Ryan about your cases?
A. If I'm looking for somebody, yeah.
Q. Do you ever e-mail Victor or Ryan about any of your cases?

Page 33

A. No.
Q. Have you executed any arrest warrants with Victor or Ryan?
A. I'm pretty sure I did.
Q. Have you executed any search warrants with Victor or Ryan?
A. Yeah.
Q. Can you recall any specific instances where you executed a search warrant with Victor?
A. Boudreaux. College. College Road, College.
Q. Any others that you can recall?
A. No, because that's the only one I did.
Q. Can you recall any search warrants you executed with Ryan Young?
A. I think the same one Ryan was there maybe.
Q. Are you aware of the Eunice Police Department's reputation in the law enforcement community?
MR. STAMEY:
Objection to the form of the question.
Subject to that objection, you may answer.
A. No, I'm not.
BY MR. BHATLA:
Q. Do you know if any law enforcement



MAGNA
LEGAL SERVICES

Page 34

agencies refuse to work with the Eunice Police Department?

A. No, because when I call, they -- different agencies, they help me.

Q. Do you know if they refuse to help other officers at the department?

A. I don't know.

Q. Going back to Chief Fontenot, have you ever witnessed any misconduct by Chief Fontenot?

A. What you mean, "misconduct"?

Q. Have you ever witnessed any activity that violates department policy by Chief Fontenot?

A. I don't know.

Q. Have you ever witnessed any action by Chief Fontenot that violated department procedure?

A. I don't know if it violated department, but my wife, I mean, when he sent her home.

Q. When did Chief Fontenot send your wife home?

A. For the COVID deal.

Q. Yes. I'll rephrase the question.

Can you tell me everything you remember about the situation, including the timing.

A. She got --

MR. STAMEY:

Page 35

Objection to the form of the question.

Subject to that objection, you may answer.

Can you further describe which situation you're referring to.

MR. BHATLA:

Sure.

BY MR. BHATLA:

Q. You have described that Chief Fontenot did not permit your wife to return to the Eunice Police Department; is that correct?

A. Correct.

Q. Can you tell me everything you remember about that situation, including when it occurred.

A. When -- for COVID, when she got COVID, he told her she couldn't come back to work until she was released from her doctor for her shoulder injury and neck injury.

Q. When did this occur?

A. I don't know the date.

Q. Roughly when did her injury take place?

A. Probably, I don't know, two years ago.

Q. And when -- withdrawn.

How long after her injury was she cleared for light duty?

A. I don't -- I don't know.

Page 36

Q. After she was cleared for light duty, she was allowed to return to the department?

A. Yes.

Q. How long after she returned did she get COVID?

A. I don't know. A while.

Q. Roughly, how long do you think she was working on light duty for that time?

A. I don't know.

Q. She was working for some period of time at the department on light duty and then she got COVID?

A. Yes.

Q. What did she do when she got COVID?

A. She went to the doctor. They told her to go home for I think 14 days, and then she couldn't come back to work.

Q. Who did she tell about her diagnosis?

A. I don't know who she told.

Q. Did she tell Chief Fontenot that she was diagnosed with COVID?

A. I'm guessing she did.

Q. And what did Chief Fontenot say to her?

A. Go home.

Q. When did he say this?

Page 37

A. I guess the day she told him she had COVID. So she went home for 14 days.

Q. Do you recall roughly what time period, month, year, that was?

A. No.

Q. What did she do after the 14 days had elapsed?

A. She was going to come back to work but she couldn't.

Q. Did she tell Chief Fontenot that she wanted to come back to work?

A. Yeah.

Q. Do you recall specifically what he told her?

A. No.

Q. Was she given paid leave for the months while she was out after COVID?

A. Yes.

Q. And how long was your wife out until she was permitted to come back based on the civil service board's decision?

A. I think about eight months.

Q. So your wife was on paid leave for eight months?

A. Yes. She had to sit home.



Page 38

Q. Did she receive the full pay she's normally guaranteed?

A. I think so.

Q. During that eight-month time period, she was still only cleared for light duty?

A. Yes.

Q. Was she cleared for full duty at any point?

A. No.  She'll never be cleared for full duty.

Q. So right now she's still on light duty?

A. Yes.

Q. The civil service board decision permitted her to come back on light duty?

A. Yes.

Q. Have you ever witnessed Chief Fontenot violate the law?

A. No.

Q. Is that a no?

A. No, correct.

Q. Has Chief Fontenot ever asked you to violate the law?

A. No.

Q. Has Chief Fontenot ever asked you to operate in the gray?

Page 39

A. No.

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer.

BY MR. BHATLA:

Q. Did Chief Fontenot ever ask you to falsify an arrest warrant?

A. No.

Q. Did Chief Fontenot ever ask you to falsify a search warrant?

A. No.

Q. Did he ever ask you to falsify a search warrant on or about June 2019?

A. Not that I recall.

Q. Has Chief Fontenot ever asked you to alter a police report?

A. No.  The only reports I do is a falsification of a drug screen, that the probation is falsified, then I got to do a report.

Q. Has Chief Fontenot ever gotten involved in any of your investigations?

A. No.

Q. Has Chief Fontenot ever asked you to change what you were doing when you were investigating something?

Page 40

A. No.

Q. Has Chief Fontenot ever interfered in any of your investigations?

A. No.

Q. Has Chief Fontenot ever threatened you?

A. Yes.

Q. When?

A. He told me I couldn't drink anymore, I had to give up drinking or I'd get kicked off the reserves.

Q. Can you elaborate?  What happened?

A. Supposedly I went to The Dugout and arrested somebody or attempted to arrest somebody and they come filed a complaint on me.  I said, Well, pull the video up and see, they have cameras over there.  They said I had my badge around my neck.  Looked at video and that wasn't true, I didn't have a badge.  I didn't try to arrest anyone.

Q. What happened then?

A. What you mean, "what happened"?

Q. This individual who you arrested filed a complaint against you?

A. Yeah.

Q. And what did he say in the complaint?

Page 41

A. That I tried to arrest him, I had my badge around my neck.

Q. Did you try to arrest this person?

A. No.

Q. And when you went to the security camera footage, what did it show?

A. It showed I didn't try to arrest anyone. Me and Chief looked at the video.

Q. So you were not present there?

A. Yes, I was there.

Q. But you did not try to arrest anyone?

A. No.  I didn't have my badge or anything.

Q. So why did Chief Fontenot threaten you?

A. I don't know.

Q. Were you drinking at The Dugout?

A. Yes.

Q. Were you on duty at the time?

A. No.

Q. You looked at the security footage with Chief Fontenot?

A. Yes.

Q. Did Chief Fontenot say anything to you afterwards?

A. No.  He went and talked to the judge, because that's who my boss is, and I had to sign a

11 (Pages 38 to 41)


MAGNA
LEGAL SERVICES

Page 42

paper that I couldn't drink no more or I'd be fired from the judge too.

Q. Why did you have to sign that paper?

A. It was either that or get fired. I need my job.

Q. Who was threatening to fire you?

A. The judge and chief. She said if I didn't quit drinking, if I get caught drinking, I'd be off of the reserves.

Q. Can you explain to me, what is The Dugout?

A. A bar.

Q. And you were at the bar drinking?

A. Yes.

Q. Off duty?

A. Yes.

Q. Why would you be fired for drinking off duty?

A. I don't know. I'm just a reserve.

Q. And it was based on the complaint from this individual that the question came up of you potentially being fired?

A. Uh-huh.

Q. Are you aware of any other officers who got in trouble for drinking off duty?

A. No.

Page 43

Q. Why do you think you were threatened with being fired?

A. I don't know. I don't know.

Q. Did Chief Fontenot tell you you had to sign that agreement or else you would be fired?

A. Yeah. If I didn't sign it, then I couldn't have a job.

Q. Chief Fontenot told you that?

A. Yeah. We was in the judge's office.

Q. Do you know why they asked you to sign that paper?

A. (No audible answer.)

Q. Have you drank on duty before?

A. No.

Q. Sorry, I don't think we caught an answer to my previous question. I'll restate it.

Do you know why Chief Fontenot asked you to sign that paper?

A. No.

Q. Are you aware of any other officers at the department who have been instructed to sign that sort of agreement or else they would be fired?

A. No.

Q. Any idea why you alone were targeted for that?

Page 44

A. No.

Q. When did this happen?

A. A couple years ago.

Q. Roughly two, three years ago?

A. Correct.

Q. Did this happen before or after the incident with your wife where she was put on leave?

A. I think after.

Q. Did you ever complain to Chief Fontenot about your wife not being allowed to come back to work?

A. No.

Q. Did your wife complain to Chief Fontenot about not being allowed to come back to work?

A. I can't answer for her.

Q. Was your wife unhappy that she wasn't allowed to return to work?

A. Yes.

Q. Did Chief Fontenot know that she was unhappy about not being allowed to return?

A. I don't know.

Q. Did other officers at the department know that your wife was unhappy about not being able to return to work?

Page 45

A. I'm pretty sure.

Q. Was the agreement about your alcohol intake related to the situation with your wife?

A. What you mean, related to my wife?

Q. Do you think you were threatened based on the interaction with your wife not being allowed to return to work?

A. No.

Q. Do you have any reason to -- withdrawn.

Why do you think you were threatened by Chief Fontenot?

A. I don't know.

Q. Has Chief Fontenot ever threatened you in any other way?

A. No.

Q. Has Chief Fontenot ever threatened your wife?

A. No.

Q. Have there been any physical threats against you at the department?

A. No.

Q. Have there been any physical threats against your wife at the department?

A. No.

Q. Have there been any threats to your career



Page 46

at the department?

A. Just if I get caught drinking again, then I don't have a job at the reserves.

Q. If you got caught drinking anytime, even when you're off duty?

A. Uh-huh, correct.

Q. So if you drink and are found out by any member of the Eunice Police Department, you could lose your job?

A. Yes.

Q. Even when you're off duty?

A. Yes.

Q. Is that common at the department?

A. No.

Q. Are you aware of any other individual who's not allowed to drink?

A. No.

Q. Did you have any other situations at the department where alcohol came up?

A. What you mean?

Q. I'll rephrase.

Were there any other instances at the department where your intake of alcohol became an issue?

A. No.

Page 47

Q. Why do you think you were targeted for the prohibition on alcohol intake?

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer.

A. I don't know.

BY MR. BHATLA:

Q. Have you heard of or witnessed any other misconduct by Chief Fontenot?

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer the question.

A. No.

BY MR. BHATLA:

Q. Have you heard that Chief Fontenot has a hit list?

A. No.

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer the question.

THE COURT REPORTER:

Did you answer?

THE WITNESS:

Page 48

Yes. I answered no.

BY MR. BHATLA:

Q. Have you heard about Chief Fontenot having enemies within the Eunice Police Department?

A. Michael Dunn.

Q. Why is Michael Dunn considered an enemy of Chief Fontenot?

A. I don't know. They went to court in Eunice, everything was good, and then now we're here today.

Q. Can you elaborate on the instance when they went to court in Eunice.

A. I don't know. I didn't go.

Q. What do you know about that situation?

A. Nothing.

Q. Do you know if Lieutenant Dunn is considered an enemy by Chief Fontenot?

A. I mean, they don't like each other.

Q. What have you heard about that relationship?

A. Well, with all of this going on, I mean...

Q. "All of this," you mean this lawsuit?

A. Yeah.

Q. Do you know if their relationship was tense before this lawsuit?

Page 49

A. I don't -- I don't know.

Q. Does Chief Fontenot have any other enemies?

A. I don't know.

Q. Does Chief Fontenot have a tense relationship with anyone else at the department?

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer.

A. I -- I don't know.

BY MR. BHATLA:

Q. Are there any other individuals at the department who don't get along with Chief Fontenot?

A. Not that I know of.

Q. Do you believe that Chief Fontenot has targeted Lieutenant Dunn?

MR. STAMEY:

Objection to the form of the question.

Subject to that objection, you may answer the question.

A. I don't know. I don't know what he did.

BY MR. BHATLA:

Q. What who did?

A. Lieutenant Dunn.

13 (Pages 46 to 49)


MAGNA
LEGAL SERVICES

Page 50

Q. You don't know --

A. If he was targeted, I don't know. I don't know what he's done to be targeted or anything.

Q. Do you believe Chief Fontenot targets officers who disagree with him?

MR. STAMEY:
Objection to the form of the question. Subject to that objection, you may answer the question.

A. I don't know.

BY MR. BHATLA:

Q. Have you ever felt targeted by Chief Fontenot?

MR. STAMEY:
Objection to the form of the question. Subject to that objection, you may answer the question.

A. Just I can't drink anymore.

BY MR. BHATLA:

Q. Any other instances where you think Chief Fontenot has targeted you?

MR. STAMEY:
Same objection.

A. No.

BY MR. BHATLA:

Page 51

Q. Have you heard that Chief Fontenot has favorites at the department?

A. No.

Q. Do you think Chief Fontenot has favorites at the department?

MR. STAMEY:
Objection to the form of the question. Subject to that objection, you may answer the question.

A. I mean, I don't know. I don't stay there. I work for City court. I just go to the P.D. here and there.

BY MR. BHATLA:

Q. Do you think Chief Fontenot favors certain officers?

MR. STAMEY:
Same objection.

A. I don't know.

BY MR. BHATLA:

Q. Have you heard of any officers receiving favorable treatment from Chief Fontenot?

A. No.

Q. Has Lieutenant Ivory ever told you he was targeted by Chief Fontenot?

A. He got demoted.

Page 52

Q. Can you tell me about that.

A. I don't know.

Q. What do you know about the situation?

A. He was a lieutenant, he got demoted to an officer, and then he's back a lieutenant.

Q. Do you know why he was demoted?

A. No.

Q. Do you know when he was demoted?

A. No.

Q. What do you know about the circumstances behind the demotion?

MR. STAMEY:
Objection to the form of the question. Subject to that objection, you may answer the question.

A. I don't know why he was demoted.

BY MR. BHATLA:

Q. Did Lieutenant Ivory tell you he was treated unfairly by Chief Fontenot?

A. I don't recall.

Q. Has any civilian ever complained to you about Chief Fontenot?

A. No.

Q. Has anyone at the Eunice Police Department ever complained to you about Chief Fontenot?

Page 53

A. My wife, when she got demoted -- not demoted, just had to stay home.

Q. Has your wife suffered any other mistreatment by Chief Fontenot?

A. No.

Q. Has your wife complained about Chief Fontenot at all in other circumstances?

A. When she came back to work, she had somebody else to supposedly help her. And then my wife had went out, and then she got in charge of the jail.

Q. Why do you say "supposedly help her"?

A. Because she came to help her, and then she got COVID, and then she was sent home, and then she had to stay home until she got a doctor's release for her shoulder, and this person took over the jail.

Q. Who was the person who took over the jail?

A. Mary Guillory.

Q. So your wife was assigned to help Mary Guillory?

A. No. Mary Guillory was assigned to help her.

Q. And what is Mary Guillory's role at EPD?

A. She's a lieutenant.

14 (Pages 50 to 53)


MAGNA
LEGAL SERVICES

Page 54

Q.  At the time, she was assigned to help your wife?

A.  Correct.

Q.  Is that common at the department, that folks are assigned to help someone at the department?

A.  She didn't need any help with what she does.

Q.  So your wife did not need help, but she was assigned to help her anyway?

MR. STAMEY:
Objection to the form of the question. Subject to that objection, you may answer the question.

A.  Yes.  And then she got COVID, she went out, and then this person got her position.

BY MR. BHATLA:

Q.  Why do you think Chief Fontenot assigned a helper to your wife?

A.  I don't know.

Q.  Did she need a helper?

A.  No.

MR. STAMEY:
Objection to the form of the question. Subject to that objection, you may answer.

Page 55

BY MR. BHATLA:

Q.  Why didn't she need that helper?

MR. STAMEY:
Same objection.

A.  Because she does everything on a computer.

BY MR. BHATLA:

Q.  So then what was Mary Guillory's role in helping your wife?

A.  I don't know.

Q.  Did Mary Guillory have any other responsibilities?

A.  She was a lieutenant.

Q.  What did that help look like?

A.  What you mean, what it looked like?

Q.  So in a typical day before your wife got COVID, what was Mary Guillory doing to help your wife?

A.  She was on the road, a road lieutenant.

Q.  So Mary Guillory would ride with your wife?

A.  No.  My wife would stay in the office, and Mary was like a patrolman, a lieutenant.

Q.  So then how was Mary Guillory helping your wife?

A.  She wasn't.

Page 56

Q.  But Chief Fontenot assigned Mary Guillory to help your wife?

A.  Correct.

Q.  Why do you think he assigned Mary Guillory to help your wife?

A.  I don't know.

Q.  Was Mary Guillory assigned to supervise your wife's work?

A.  Maybe.  I don't know.

Q.  Do you think Mary Guillory was needed there to keep an eye on your wife?

A.  No.

MR. STAMEY:
Objection to the form of the question. Subject to that objection, you may answer.

BY MR. BHATLA:

Q.  Can you answer?

A.  No.

Q.  So Mary Guillory did not need to be there?

A.  No.

MR. STAMEY:
Objection to the form of the question. Subject to that objection, you may answer the question.

BY MR. BHATLA:

Page 57

Q.  But she was assigned to look over your wife's shoulder anyway?

A.  Yes.

MR. STAMEY:
Same objection.

BY MR. BHATLA:

Q.  And what was your wife's complaint about the situation?

MR. STAMEY:
Objection to the form of the question. Subject to that objection, you may answer the question.
Can we take a brief recess, please?

MR. BHATLA:
I'd ask that the witness answer the question first.

MR. STAMEY:
All right.  Then I want to confer with you outside.

MR. BHATLA:
Sure.

A.  Can you repeat it.

BY MR. BHATLA:

Q.  What did your wife say to you in complaint about the situation with Mary Guillory?



Page 58

A. That she didn't need to be there. She didn't know anything about the jail. So how you going to put somebody to help you -- supervise you in that position when you don't know the job?

Q. Thank you.

MR. BHATLA:

Let's take a short break.

MR. STAMEY:

Recess, please.

THE VIDEOGRAPHER:

Off the record at 10:03.

(A break was taken from 10:03 a.m. to 10:15 a.m.)

THE VIDEOGRAPHER:

We're back on the record at 10:15.

BY MR. BHATLA:

Q. Before the break, we were talking about your wife's supervision by Mary Guillory.

Did you observe any of the supervision by Mary Guillory of your wife?

A. She'd come in and out the office.

Q. You saw Mary Guillory coming in and out of the office?

A. Correct.

Q. Did you ever see Mary Guillory do anything

Page 59

to help your wife?

A. She would do some bookings here and there.

Q. Mary Guillory did some bookings for your wife?

A. Yes. She was there to help.

Q. I'd like to turn now to Victor.

Have you ever witnessed any misconduct by Victor Fontenot?

MR. STAMEY:

Objection; form.

A. As in? "Misconduct"?

BY MR. BHATLA:

Q. Have you ever witnessed Victor Fontenot violate the law?

MR. STAMEY:

Objection; form.

A. Not that I recall. I don't recall any.

BY MR. BHATLA:

Q. You don't recall Victor Fontenot violating the law?

A. No. Is there a certain instance you're -- I mean, I...

Q. Have you ever witnessed Victor Fontenot violate department policy?

MR. STAMEY:

Page 60

Objection to form.

A. Not that I can recall.

BY MR. BHATLA:

Q. Have you ever witnessed Victor Fontenot act unethically?

MR. STAMEY:

Objection; form.

A. No.

BY MR. BHATLA:

Q. Have you ever seen Victor Fontenot mistreat another officer at the Eunice Police Department?

MR. STAMEY:

Objection; form.

A. Me and Victor got into it one time.

BY MR. BHATLA:

Q. Victor got into it with who?

A. Me.

Q. Victor got into a fight with you?

A. Well, argument, screaming match.

Q. When did this happen?

A. I don't know the date and time.

Q. What happened?

A. Somebody was arrested, Scotty Fournerat was arrested. He wanted to get out of jail or

Page 61

something.

I said, You can't go nowhere, you've got a probation warrant, you know, you've got to wait and see the judge.

I work for Victor. Victor says I don't go to jail.

Oh, well, you're in jail now.

And then he started saying some stuff and then Victor -- Scotty told Victor something, and then Victor come hollering at me in the hallway and I started hollering at him. Deputy chief separated us.

Q. What did Victor say to you?

A. I don't remember. But it all boiled down to the criminal telling Victor something that I said something, and I didn't even say it. So it was a big misunderstanding.

Q. What were you accused of saying?

A. I don't remember. It's been a couple years ago. The criminal basically just didn't want to be in jail.

Q. And this individual was an informant for Victor?

A. I think so.

Q. Do you remember why Victor screamed at

16 (Pages 58 to 61)



Page 62

you?

A.  Because the criminal told him I said something -- that Victor couldn't help him to get out of jail or something.  I don't recall the exact words.  But besides that, we good.

Q.  What did Victor say to you?

A.  I don't remember.

Deputy chief come and broke us up.

Q.  Did the deputy chief tell you anything about the situation?

A.  What you mean?

Q.  I'll rephrase.

Did the deputy chief weigh in on the situation?

A.  I mean, he heard us screaming.  He came and separated us.  I went in the office.  Victor came back in.  Deputy chief took him and made him leave.

Q.  The deputy chief made Victor leave?

A.  Yeah, go outside the P.D.  And then later on, Victor come and apologize to me for doing that.

Q.  Victor apologized to you for screaming at you?

A.  Yeah.  Because the criminal had said

Page 63

something and he took it the wrong way and screamed at me.

Q.  So Victor spoke to the criminal after you had arrested that individual?

A.  Yeah.

Q.  Is that common, for officers to go in to talk to someone who's in custody?

A.  Yeah.

Q.  Do you have any knowledge of what they discussed?

A.  No.

Q.  But after Victor spoke with that individual, he was mad at you?

A.  Yeah.

Q.  Have you ever seen Victor Fontenot ever mistreat any other officers at the department?

MR. STAMEY:

Objection; form.

A.  No.

BY MR. BHATLA:

Q.  Have you seen Victor Fontenot get in an argument with other officers at the Eunice Police Department?

A.  No.

Q.  Are you aware of Victor Fontenot making

Page 64

any threats towards other officers at the department?

A.  No.

MR. STAMEY:

Objection; form.

BY MR. BHATLA:

Q.  Can you answer the question?

A.  No.

Q.  Does Victor get along with other officers at the department?

A.  Yeah.

Q.  Have you witnessed Victor mistreat any other officers at the department?

A.  No.

MR. STAMEY:

Objection; form.

BY MR. BHATLA:

Q.  Has Victor Fontenot ever attempted to interfere in an investigation that you were conducting?

A.  When I arrest someone, he came and, Hey, why you arrest him, why you arrest him?  Because I got a warrant for him.  Okay.  And then I bring him down to the jail.

Q.  When did that happen?

Page 65

A.  I don't know.  I think it's one of his CIs.

Q.  Can you recall when that arrest took place?

A.  No.

Q.  Do you remember who it was that you arrested?

A.  No.

Q.  When did Victor approach you about the arrest?

A.  When we was on scene.

Q.  So you were arresting someone on the scene?

A.  Yes.

Q.  And Victor approached you about not making the arrest?

MR. STAMEY:

Objection to the form of the question.

A.  He asked me, Why you arresting this person?  I said, Because I got a warrant for him.  And he said, Oh, okay.

BY MR. BHATLA:

Q.  Did Victor say anything else to you about that arrest?

A.  No.

17 (Pages 62 to 65)



Page 66

Q. Do you recall the circumstances of the arrest?

A. No.

Q. Do you recall the nature of the crime?

A. No. A lot of times the P.D. goes down on the call, I'll go over there to assist them, and if I got a warrant, then I'll arrest them.

Q. And Victor did not know of the warrant?

A. No.

Q. Was he on the scene when you arrived?

A. I don't know.

Q. Has Victor ever asked you not to arrest someone?

A. No. I mean, I have to arrest them. They have a warrant. Now, he can go upstairs to my boss or the judge and talk to them; if they want to recall the warrant, that's them. But I can't.

Q. Has anyone ever recalled a warrant after you went to go execute it?

A. What you mean?

Q. I'll rephrase.

Has a warrant ever been recalled when you were about to execute it?

A. No.

Q. Are you aware of any incidents where

Page 67

Victor asked a warrant to be recalled?

A. Unless he goes up to my supervisor. I can't recall any warrants.

Q. Are there any other instances where Victor Fontenot attempted to interfere with one of your investigations?

MR. STAMEY:

Objection; form.

A. Not that I recall.

BY MR. BHATLA:

Q. Do you know if Victor Fontenot has ever worked outside of EPD jurisdiction against policy?

A. I don't know where he goes.

Q. Do you know if Victor conducts law enforcement operations outside of EPD jurisdiction?

A. I'm not there with him.

Q. Have you heard of any situations where Victor has operated outside of EPD jurisdiction?

A. No.

Q. Are you aware of any instances where Victor Fontenot tipped off a suspect before a warrant was executed?

A. No.

Q. Are you aware of any instances where

Page 68

Victor Fontenot informed a suspect that they were the subject of a criminal investigation?

A. No.

Q. Has Victor Fontenot ever asked you to alter a police report?

A. No.

Q. Has he ever asked you to alter an official statement?

A. No.

Q. Have you ever provided a police report to Victor for his approval?

A. No.

Q. Have you ever provided an official statement to Victor for his approval?

A. No.

Q. Has Victor ever altered one of your police reports?

A. Not that I know of.

Q. Has Victor ever altered an official statement that you prepared?

A. No.

Q. Are you aware of any instances where Victor Fontenot violated the law?

MR. STAMEY:

Objection to form.

Page 69

A. No.

BY MR. BHATLA:

Q. Do you know who supervises Victor?

A. Ryan Young.

Q. What is your understanding of the relationship between Victor and Ryan?

A. Coworkers.

Q. Do you know if they're friends?

A. I don't.

Q. Who leads internal investigations at the Eunice Police Department?

A. I guess whoever the chief puts in charge.

Q. Do you know who's in charge right now of internal investigations?

A. No.

Q. Has Victor Fontenot ever talked to you about this case?

A. No.

Q. Has Victor ever talked to you about Lieutenant Dunn?

A. No.

Q. I want to talk about Ryan Young.

What is Ryan Young's role at the Eunice Police Department?

A. A lieutenant, chief of detectives.

18 (Pages 66 to 69)



Page 70

Q.  Does he work with Victor Fontenot?
A.  Yeah.
Q.  How often do they work together?
A.  I don't know.
Q.  In your experience, have you seen them working together?
A.  Yeah, we -- I mean, I worked with them. We chased a suspect the other day.
Q.  You worked with Victor and Ryan together?
A.  Yeah.
Q.  And the three of you were chasing a suspect?
A.  Correct.
Q.  What happened?
A.  We lost him.
Q.  Was it a vehicle pursuit?
A.  No.  Foot.
Q.  Was anyone else involved in the chase?
A.  Deputy Chief Kennedy.
Q.  And this happened a few days ago?
A.  About a month or so maybe ago.
Q.  How often do you work with Victor and Ryan?
A.  Whenever there's a call, somebody shows up, I go.  I mean, that's for any officer on duty.

Page 71

Q.  How many calls in a month would you say you worked with Victor?
A.  I don't know.  It's hard to say the calls. Sometimes you've got a lot, sometimes you don't.
Q.  How many calls a month would you say you work with Ryan?
A.  The same.  I mean...
Q.  Do you know if anyone has ever complained about Victor to the department?
        MR. STAMEY:
        Objection to the form.
A.  No.
BY MR. BHATLA:
Q.  Has anyone ever complained about Victor Fontenot to you?
A.  No.
Q.  Are you aware of any complaints about Victor Fontenot to the department?
        MR. STAMEY:
        Same objection.
A.  No.
BY MR. BHATLA:
Q.  Are you aware of any complaints about Victor Fontenot to Chief Fontenot?
A.  No.

Page 72

Q.  Are you aware of any complaints about Ryan Young to Chief Fontenot?
A.  No.
Q.  Have you ever witnessed misconduct by Ryan Young?
A.  No.
Q.  Has Ryan Young ever asked you to violate the law?
A.  No.
Q.  Has he ever asked you to violate policy?
A.  No.
Q.  Has he ever asked you to violate -- withdrawn.
    Has Ryan Young ever asked you to act unethically?
A.  No.
Q.  Has Ryan Young ever attempted to interfere with an investigation that you conducted?
A.  No.
Q.  Has Ryan Young ever asked you to alter any police reports?
A.  No.
Q.  Has Ryan Young ever asked you not to execute a warrant?
A.  No.

Page 73

Q.  Have you ever witnessed Ryan Young conduct an illegal search of a home?
A.  No.
Q.  Do you know if Ryan Young has worked outside of Eunice P.D. jurisdiction against policy?
A.  No.
Q.  Has Ryan Young ever asked you to alter an official statement?
A.  No.
Q.  Has Ryan Young ever talked to you about this case?
A.  No.
Q.  Has Ryan Young ever talked to you about Lieutenant Dunn?
A.  No.
Q.  Has anyone ever complained to you about their treatment by a Eunice Police Department officer?
A.  No.
Q.  Has anyone ever complained to you about Chief Fontenot?
A.  You hear it walking in the halls, they all na, na, na, na, na, griping.
Q.  Who has griped about Chief Fontenot?

19 (Pages 70 to 73)



Page 74

A. The whole P.D.

Q. What do they say about Chief Fontenot?

A. Oh, it's not -- how you say it?

MR. STAMEY:

Objection; form.

A. They just bitching basically. Excuse my French.

BY MR. BHATLA:

Q. Any particular complaints that you can recall?

A. No.

Q. What do people normally gripe about?

A. People --

MR. STAMEY:

Same objection.

A. -- not coming to work, people taking off, running sick leave out.

BY MR. BHATLA:

Q. Who doesn't have to come into work?

A. What you mean, who don't have to come to work?

Q. You testified that people were griping about other officers not coming into work.

A. Yes. Like Mary is still on sick leave, Stephanie is still out. There's two lieutenants

Page 75

that's not at work, everybody else is pulling extra load, but they not there.

Q. Do you know why they're not there at the department right now?

A. Foot issues.

Q. You mentioned Stephanie. Do you mean Stephanie Meyers?

A. Correct.

Q. And what's her role at the department?

A. She's a lieutenant.

Q. And she is currently on leave?

A. Yeah.

Q. Are you aware of the circumstances behind her being on leave?

A. She got a hurt foot.

Q. Are you aware of Stephanie Meyers wanting to return to work?

A. Doesn't look like it.

Q. Are you aware of Stephanie Meyers wanting to return to work but not being allowed to by Chief Fontenot?

A. No.

Q. You described Mary as not working as well. Is that Mary Guillory?

A. Correct.

Page 76

Q. And is Mary Guillory on paid leave?

A. Yes.

Q. Do you know the circumstances behind her being on leave?

A. She hurt her foot or something.

Q. And Mary Guillory is a lieutenant at the department?

A. Correct.

Q. Are there any other individuals who are not working at the department right now?

A. Not that I recall.

Q. Why do people gripe about Chief Fontenot in the context of Lieutenant Meyers and Lieutenant Guillory?

A. Because we need help at the police department and they don't want to come back to work. People say, Oh, they waiting for Chief to get out, then they going to come back to work.

Q. Can you elaborate on that?

A. What you mean?

Q. Can you explain why people say they're waiting for the chief to leave?

A. He's only got, what, 40 days left, then he retires.

Q. Why do people think they're waiting for

Page 77

Chief to leave?

A. Because they ain't been here all year. You see them on the floats in the parades, drinking, jumping. But you can't come to work because your foot hurts?

Q. Are you aware of if they've tried to come back?

A. No.

Q. So you don't know if they've asked to return?

A. No.

Q. Do people blame Chief Fontenot for them not coming back to the office?

A. No.

Q. You testified that people complained that some individuals at the department are running out their sick leave; is that right?

A. Correct. Those two.

Q. Is there anyone else who is accused of doing those types of activities?

A. I don't know if any other people are out.

Q. Who complains about Mary Guillory and Stephanie Meyers?

A. Everybody that works there.

Q. All of the members of the department?



Page 78

A.  Yeah.  They working 18, sometimes 24 hours a day, but they just sitting at home doing nothing.  I mean, we very short-staffed.

Q.  The Eunice Police Department is short-staffed right now?

A.  Yes.

Q.  Are you aware that Stephanie Meyers has an active civil service case right now?

A.  No.

Q.  Are you aware of Stephanie Meyers' attempts to return to the office and not being permitted to?

A.  No.

Q.  Do you think people at the Eunice Police Department abuse the sick leave policy?

A.  Yeah.

Q.  Why do you think that?

A.  They got 365 days they can take off and still get paid.  So why come to work when you can sit at home and collect a check?

Q.  The Eunice Police Department provides 365 days of sick leave?

A.  Well, not to everybody.  It changed.  The new people get so many days, you work, you get sick time off.  But the older people, they got

Page 79

365.

Q.  When you say "older people," how senior do you have to be to get the 365?

A.  Six years ago I think they changed it.

Q.  They changed the policy six years ago?

A.  I don't know if it's the policy or who does it, but...

Q.  Who changes the policy?

A.  I don't know.

Q.  Did Chief Fontenot change the policy with respect to sick leave?

A.  I don't know.

Q.  What was the old sick leave policy?

A.  You get 365 days off a year.

Q.  All employees get 365 days off a year?

A.  Yeah.  If you get -- six years ago or something, it changed, and you got to work so many days, you get days off for sick leave.

Q.  But that change in sick leave policy only applied to new officers?

A.  Correct.

Q.  Was that change in policy made when Chief Fontenot first became chief?

A.  I don't know.

Q.  What officers do you think abused the

Page 80

sick leave policy?

A.  Mary, Stephanie.

Q.  Are there any other officers that come to mind?

A.  No.  Everybody else that's there usually comes to work, I think.

Q.  Why do you think they abuse the policy?

A.  Because they get a check sitting at home.

Q.  Do you think they're able to work and just not working, or are they actually unable to work?

A.  No, if you can go partying and jumping on your leg, taking vacations, I'm pretty sure you can come back to work.

Q.  Who have you seen partying and jumping on their leg when they were out on sick leave?

A.  Mary Guillory, Stephanie Meyers.

Q.  Can you describe when you saw them.

A.  Stephanie was out -- we had a hamburger sale.  She was in high heels running back and forth to the building giving orders out.  If your foot is hurt, how you walking in high heels?

Mary posted pictures on vacation in Alaska.  The homecoming parade, Mary Guillory was on the float jumping up and down.  So, I mean, if you can do all that, you can come to work.

Page 81

Q.  How long has Mary Guillory been at the department?

A.  I don't know.

Q.  Has Mary Guillory been at the department since you joined?

A.  Yes.

Q.  Do you know what Chief Fontenot's relationship is like with Stephanie Meyers?

A.  No.

Q.  Do you know if Chief Fontenot gets along with Stephanie Meyers?

A.  I mean, she had an office next to him.

Q.  Do you know how often they talked?

A.  No.

Q.  Do you know what Chief Fontenot's relationship is like with Mary Guillory?

A.  No.

Q.  Do you know if Chief Fontenot and Mary Guillory got along?

A.  I don't know.

Q.  How long has Stephanie Meyers been on sick leave?

A.  I don't know.  She ain't been there in a while.

Q.  When you say "in a while," do you mean --



Page 82

A.  When she was there, she would sit in her unit outside, let it run all day, and then go home.  It stayed like that, and then all of a sudden she just quit coming.

Q.  So she's been on sick leave for several months, you'd say?

A.  Yes.

Q.  How long has Mary Guillory been on sick leave?

A.  A while.  Probably almost a year.

Q.  So are Stephanie Meyers and Mary Guillory's sick leave going to run out soon, to your knowledge?

A.  Well, it's going to run out and then it will start back again.

Q.  How does the sick leave start again?

A.  Every year you get 365 days.

Q.  So every year, older officers at the department get 365 days of sick leave?

A.  (The witness nodded head.)

Q.  Are you aware -- sorry, go ahead.

A.  No, I was just answering.  Correct.

Q.  Are you aware of any attempts by Chief Fontenot to change the sick leave policy?

A.  No.  I don't know who does it.

Page 83

Q.  Are you aware of any complaints to Chief Fontenot about the sick leave policy?

A.  Nobody likes it.

Q.  Who specifically at the department has complained about the sick leave policy?

A.  My wife.

Q.  Anyone else?

A.  She got hired on I think 19 days too late, so she don't get it.

Q.  So how many sick days does she get in a year?

A.  I don't know.  Because you got to work so much, then you get a day.  It goes by the hours you work or something.  So if you get really sick, then you're just screwed.

Q.  Do you know how many sick days you get per year?

A.  I got it through City court.  I get 96 hours.

Q.  Are you aware of any complaints made against Stephanie Meyers to Chief Fontenot?

A.  (The witness shook head.)

Q.  Are you aware of any complains made to Chief Fontenot about Mary Guillory?

A.  No.

Page 84

Q.  Do you think the sick leave policy should be changed?

A.  Yes.

Q.  Why do you think Chief Fontenot hasn't tried to change it?

A.  I don't know who changes it.

Q.  Are you aware of any other individuals at the department who are on extended sick leave?

A.  Not that I know of.

Q.  Have you ever read the EPD policy book?

A.  No.

Q.  Has Chief Fontenot ever told you to read the policy book for the EPD?

A.  Ms. Sherry tells us -- when you first join, she gives it to us and tells us that's our policies, we need to read it.

Q.  Sherry Clark told you to read the EPD policy book?

A.  Yeah.

Q.  But Chief Fontenot never told you to read the policy book?

A.  No.  We get it from Ms. Sherry.

Q.  Did Ryan Young ever tell you to read the policy book?

A.  No.

Page 85

Q.  Did Victor Fontenot ever instruct you to read the EPD policy book?

MR. STAMEY:
Objection to the form.

A.  No.

BY MR. BHATLA:

Q.  Do you know if it's required for EPD officers to read the policy book?

MR. STAMEY:
Objection to form.

A.  I'm pretty sure you should.

BY MR. BHATLA:

Q.  You should, but you're not required to read the policy handbook?

A.  Not that I know of.  They give you the book.  I mean...

Q.  Has Chief Fontenot ever talked to you about department policy in the department policy book?

A.  No.

Q.  Have any of your supervisors ever talked to you about the policies in the department policy book?

A.  No.

Q.  Are you aware of any department policies


MAGNA
LEGAL SERVICES

Page 86

outside of what's put in the policy book?

A. I don't know what's in there really. So it might be in there, I don't know.

Q. Do you know if other officers at the department have read the policy book?

A. I don't know.

Q. Do other officers talk about EPD policy?

A. I don't know. I just go to work.

Q. How do you know the proper procedure for a pursuit?

A. Training videos.

Q. Who tells you to watch the training videos?

A. The training coordinator.

Q. Who's the training coordinator?

A. Donnie Thibodeaux.

Q. And when was the last time you watched a training video?

A. Last year. We have to do them every year, and he can see if we did them or not.

Q. What was the last training video you watched?

A. I don't know. We had 30-something videos we had to watch.

Q. Are these training videos prepared by the

Page 87

Eunice Police Department?

A. No.

Q. Do you know where these training videos come from?

A. No.

Q. Do these training videos feature EPD officers?

A. No.

Q. Are you aware of any EPD policies that are different from other departments?

A. No.

Q. Do these training videos ever talk about EPD policies?

A. No.

Q. Do these training videos ever talk about EPD procedures?

A. No.

Q. Has Chief Fontenot ever indicated that there would be a change to the department policies?

A. No.

Q. Has anyone discussed EPD policies with you?

A. No.

Q. Are you aware of any unofficial policies

Page 88

that aren't in the policy book?

A. No.

Q. Is it common for officers at the department to not read the policy book?

A. I don't know.

Q. Do you know how many other officers have read them?

A. I don't know.

Q. Your supervisors have never asked you to review the policies?

A. No.

MR. STAMEY:

Objection to the form.

BY MR. BHATLA:

Q. I want to talk about an incident that happened in June 2019.

Are you familiar with an individual named A. Thibodeaux?

A. Who?

Q. I only have the first initial, A. Thibodaux. I'll --

A. Thibodeaux?

Q. Thibodeaux, yes. What do you recall about him?

A. Had warrants on him before.

Page 89

THE COURT REPORTER:

I'm sorry?

THE WITNESS:

Had warrants.

BY MR. BHATLA:

Q. Are you familiar with a person named Bridgette Miller?

A. Uh-huh, yes.

Q. What do you know about her?

A. That's Anthony's girlfriend.

Q. Was Anthony Thibodeaux a subject of any criminal investigation that you were operating?

A. I had a warrant for him.

Q. Can you tell me about that situation?

A. Had a warrant, somebody called me, told me he was in the house. We went, Bridgette wouldn't let us in the house. So I called the judge. He said, Type up a search warrant and go get him.

So I had Cody Miller sitting on the house, make sure he didn't leave. Went and typed up the search warrant. We went and got him, arrested him and Bridgette.

Q. What did the search warrant say?

A. We was there to search the house for Anthony.



Page 90

Q. Was anything else in the search warrant?
A. No. I was there just for him.
Q. So the search warrant only named Anthony Thibodeaux?
A. Yes.
Q. And you were the investigating officer?
A. Yes.
Q. You're the one who executed the warrant?
A. Yes.
Q. Was there anyone else there at Bridgette Miller's house when you were executing the warrant?
A. Cody, Victor, Deputy Chief Daigle, maybe Ryan.
Q. So you executed the search warrant for Anthony Thibodeaux at Bridgette Miller's house?
A. Yes.
Q. Did you find Anthony Thibodeaux?
A. Yes.
Q. Did you arrest Anthony Thibodeaux?
A. Yeah.
Q. After you found Anthony Thibodeaux, did you continue searching the house?
A. We arrested Bridgette for resisting because he was in there and she told us he wasn't.

Page 91

Q. Bridgette first told you to go get a search warrant before you could enter her house?
A. I told her, I know he's in there. And she said, Well, you're not going to look. I said, I'm going to go get a search warrant and we're going to come in and look for him. She said, Well, go get a search warrant. So we went and got a search warrant.
Q. So what was the process like for getting the search warrant?
A. Just typed it up, judge approved it, we went back and got him.
Q. Did you ask any other EPD officers for help drafting the warrant?
A. I don't remember.
Q. Did anyone at the department have to approve the search warrant?
A. The judge.
Q. Did anyone at the Eunice Police Department have to approve the search warrant before you presented it to the judge?
A. I don't remember.
Q. Do you recall asking anyone about the search warrant before you presented it to the judge?

Page 92

A. I'm guessing I probably turned it in to a supervisor to let him read over it or something.
Q. Do you recall who the supervisor was at the time?
A. No.
Q. And the search warrant was for a wanted suspect?
A. Yes.
Q. Who executed the search warrant?
A. Me.
Q. Did anyone else help you in executing the warrant?
A. Victor, I think Ryan, Cody Miller, Deputy Chief Daigle, we was all there.
Q. What happened after you got the warrant?
A. We went and got Anthony Thibodeaux. He was hiding in a closet.
Q. Did you knock on the door of Bridgette Miller's house?
A. Yes.
Q. What did you say to Bridgette Miller?
A. I don't remember if it was her that opened the door or another lady. We told them, We got a search warrant to search for Anthony. They moved out the way, and we went and start searching and

Page 93

found him.
Q. After you found Anthony, did you continue searching the house?
A. Went back -- we put Anthony in the car, went back and arrested Bridgette for resisting because he was in the house and she wouldn't let us go get him.
Q. Did she arrest -- withdrawn.
Did she resist after you obtained the warrant?
A. No. The charge of resisting is because she was hiding him.
Q. Is hiding a criminal suspect often associated with a resisting arrest charge?
A. Yes.
MR. STAMEY:
Objection; form.
A. They're resisting, not letting us in, and we know the person's in there. It's only a misdemeanor. It's kind of like harboring a fugitive, but that's a felony charge. So we can't charge them with harboring because he's on misdemeanor probation.
BY MR. BHATLA:
Q. So can you explain what the basis was for

24 (Pages 90 to 93)


MAGNA
LEGAL SERVICES

Page 94

the charge on Bridgette Miller.

A.  She was charged with resisting because she was hiding him in the house.

Q.  Did any EPD personnel search the house after you had already taken Anthony out of the house?

A.  I mean, they was in the house.  I went and put him in the car.  So everybody was still in the house.

Q.  Who do you mean when you say "everybody was still in the house"?

A.  Deputy Chief, Victor, I want to say it was Ryan that was there, and Cody Miller.

Q.  Why were all four of those individuals still in the house after you executed the search warrant?

A.  Because I needed to come back and get Bridgette.

Q.  Were all four officers necessary to get Bridgette?

MR. STAMEY:

Objection to the form.

A.  I mean, they were talking to her while I was putting him in the car, then I came back and got her.

Page 95

BY MR. BHATLA:

Q.  You came back to arrest Bridgette Miller?

A.  Yeah.

Q.  So then what were the other four officers doing in the home at the time?

A.  Well, they kept her right there so she wouldn't run from me.

Q.  Were those individuals searching the house?

A.  They had looked and found some weed on the table, a little pipe here or something.

Q.  After you had already caught Anthony?

A.  Yeah.  And Bridgette was still in the house.  And Deputy Chief told them -- he says, You got to leave the drugs right there, if y'all want to search it, you got to go and get another search warrant to search for the drugs.

Q.  So after you had already found Anthony, the officers at the scene continued searching and found drugs?

A.  Well, they stayed -- I don't know what they were doing inside.  I was outside.  But I know they was there holding Bridgette for me to get back to the vehicle.

Q.  And they found drugs during that search?

Page 96

A.  If they were searching, yes.

Q.  Generally, after you arrest the target of a search warrant, what are you supposed to do?

MR. STAMEY:

Objection to form.

A.  Well, I arrested the person for the search warrant, but I wanted to arrest Bridgette too.

BY MR. BHATLA:

Q.  Why didn't --

A.  After we arrested her, then we left.

Q.  While you were arresting Anthony, why didn't one of the other officers arrest Bridgette?

A.  Because she wanted to talk to me or something.  But she didn't realize that she was getting arrested too.

Q.  Was Chief Fontenot involved in that investigation at all?

A.  No.

Q.  Did Chief Fontenot provide you with any instructions to allow Victor to assist with the search?

A.  No.

Q.  Are you aware if Bridgette objected to a follow-up search of her house after Anthony had been taken out?

Page 97

A.  No.

Q.  Did you ask anyone about how to write that search warrant?

A.  I think the judge.

Q.  Did Chief Fontenot order you to allow Victor to write that search warrant?

A.  No.

Q.  Did Chief Fontenot order you to work with Victor and Ryan in executing that search?

A.  No.  Just whoever's not busy, I asked that person to come and help me.

Q.  During the search, did anyone say that they were going to -- withdrawn.

Are you aware of any statements made by officers at the scene about flipping the house inside out?

A.  No.

Q.  Are you aware of any other incidents where a person was charged with resisting arrest for harboring a fugitive?

A.  No.

Q.  Did it --

A.  I went and asked the judge.  I told him -- I said, I know he's in the house.  I got somebody calling me, they looking at him right now.  He



MAGNA
LEGAL SERVICES

Page 98

said, Go over there and see if you can get in; if they won't let you in, come back and get a search warrant, I'll sign it, and go get him.

Q. Did the judge say anything to you -- withdrawn.

In your conversation with the judge, did you bring up arresting Bridgette Miller?

A. Yes. I'd asked him if I arrest her for not letting us in and the guy being in the house. And he said, Yes, you charge her with resisting.

Q. That was your instruction from the judge?

A. Yeah.

Q. Are you aware of any situations where an EPD officer executed an invalid warrant?

A. No.

Q. Are you aware of any situations -- withdrawn.

Are you aware of any EPD officer using too much force against an individual?

A. No.

Q. Are you aware of any incidents where an EPD officer used force against a restrained suspect?

A. I've heard about it.  I wasn't there.

Q. What have you heard?

Page 99

A. Somebody spit on somebody and hit him or something.  State Police came, investigated, cleared it.

Q. And do you know if it's appropriate for officers to use force against a restrained suspect?

MR. STAMEY:
Objection to form.

A. I mean, they're restrained, they can't do anything.

BY MR. BHATLA:

Q. So officers cannot use force against a restrained suspect?

A. No.

MR. STAMEY:
Objection to the form.

A. I mean, if you've got them restrained, how can they hurt you?

BY MR. BHATLA:

Q. Are you aware of any other instances where an EPD officer used force against a restrained suspect?

A. No.

MR. STAMEY:
Objection to the form.

Page 100

BY MR. BHATLA:

Q. Are you familiar with a person named Kenneth Charles?

A. I know of Kenneth Charles.

Q. What do you know about him?

A. I mean, a black guy.

Q. Any other details you can recall about him?

A. I don't know him personally.

Q. Are you familiar with an alleged excessive force incident that occurred outside of Lieutenant Dunn's home in November 2019?

A. We got a call, somebody was beating his unit, slapping his unit or something, so we responded to go over there.

Cody Miller fell out.  Thought he might have had fentanyl or something.  Marshal brought him to the hospital.  When I got there, they were putting Kennedy in the back of Mr. Huckaby's car. EMS got to the P.D., they said to wet him down in case it was fentanyl so it wouldn't fly.

So we wet him down, checked him, brought him inside, took his wet clothes off, gave him a jumper, and put him in the pink room.

Q. What do you mean when you say "Cody Miller

Page 101

fell out"?

A. He fell on the ground.  Come to find out, his potassium was low.

Q. Were you one of the first officers to respond to the incident with Kenneth Charles?

A. No.  I was probably the last.  I was on the west side of town.  When I got there, they were putting him in somebody else's car.

Q. Was he restrained at the time?

A. Yeah.

Q. Did you see anyone use force against Kenneth Charles?

A. No.  They put him in the car and brung him to the P.D.

Q. Are you aware of any force used against Kenneth Charles?

A. I wasn't there.

Q. Are you aware of any complaints that officers used force against him after he had already been restrained?

A. No.  We just wet him down, put him in the pink room, went home.  And I guess he bonded out. I don't know.

Q. What is the pink room?

A. A little confinement room, just a single



Page 102

person in there.
Q. Is that where all arrestees are put?
A. If they belligerent, drunk, something like that.
Q. Was Kenneth Charles belligerent?
A. No. We wet him down, changed his clothes, they put him in there, and then I guess they booked him later on.
Q. Was he drunk?
A. I think he's a little slow.
Q. Do you know if he had fentanyl on him?
A. No, because we wet him down and just stripped him. That's what the paramedics told us to do, wet him down so it wouldn't fly on everybody else if he did have anything.
Q. Have you ever had to wet down another suspect?
A. No.
Q. Are you aware of any other criminal suspects being wetted down like that?
A. No. We did it because the ambulance service asked us to do it because they were going to check him out and they didn't want it flying on them. So we just took the hose and kind of wet him down to keep the dust from flying.

Page 103

Q. Is that how you would normally wet a suspect down, using a hose?
A. We never did it before, I mean, besides for OC. If we spray them, yeah, we take a hose and rinse their face and stuff off to decontaminate them.
Q. Did you witness any dust or particles flying off of him?
A. No. When he got there, we just hurried up and wet him down, not a straight stream, like a little shower just to wet him.
Q. And you witnessed him being hosed down?
A. Yeah.
MR. STAMEY:
Objection to the form.
A. I'm the one that hosed him off.
BY MR. BHATLA:
Q. Was he restrained when you hosed him down?
A. Yeah.
Q. Did you witness anyone using force against him after you arrived?
A. No. He was at the P.D. We took him out the car and wet him down.
Q. You transported him to the department first?

Page 104

A. No, somebody else transported him.
Q. So you only saw Kenneth Charles when he was transported to the department?
A. Getting put in the back of the car by Lieutenant Dunn's house. I left, went to the P.D. They arrived and I helped them take him out the car.
Q. And then you hosed him down at the department?
A. Correct.
Q. Do you know why he wasn't hosed down at the scene?
A. No.
Q. Did you see him being slammed against a police car as they were leaving the scene?
A. No.
Q. Did you see anyone punch Kenneth Charles before he left the scene?
A. No.
Q. You arrived at the scene as he was being put in the car?
A. Correct.
Q. Whose car was he put into?
A. Mr. Huckaby.
Q. And Mr. Huckaby is a member of the police

Page 105

department?
A. He's a reserve. He's an older fellow.
So I went on ahead and left, got to the P.D., waited for when he got back to help, being his age, in case the guy became belligerent, to help the man.
Q. Are you aware of any instances where EPD officers did not provide medical care to a detainee?
A. No.
Q. Do you know what you're supposed to do if a person in jail has a medical issue?
A. Bring them to the hospital.
Q. Are you aware of any person who was detained who asked for medical help and didn't get it?
A. No.
The jail's got papers, medical requests. If they need to go to the doctor or something, fill it out, and they can make them a doctor visit on TeleMed or something, or if it's serious, they get them to the hospital.
Q. Are you aware of any suspects who had a serious medical issue?
A. No.



Page 106

Q. Are you aware of a person named Joshua Tyler?

A. (The witness shook head.)

Q. Are you familiar with an incident where an individual had swallowed glass while in custody?

A. No.

Q. Are you aware of any incident where an individual had swallowed glass and was not allowed to get medical care?

A. No.

Q. Are you aware of any incidents where an EPD officer destroyed evidence?

A. No.

Q. Are you aware of any instances where EPD officers mishandled evidence?

A. Not taking it and put it in the bag and put it in the box?

Q. Department policy requires you to put it in a bag and put it in a box?

A. That's what everybody does.

Q. Are you aware of anyone who has failed to do that in a criminal case?

A. I don't sit there and watch the box.

Q. Have you heard of any incidents where evidence was mishandled?

Page 107

A. No, I -- I mean, they do an arrest, they do their paperwork, drop it in, go on about their business.

Q. Do you know of any criminal cases that were dropped because evidence was mishandled?

A. No.

Q. Are you aware of any criminal cases that were dropped because an officer mishandled a case?

A. No.

Q. When an officer obtains evidence, what are they supposed to do with it?

A. Do their report, put it in the bag, and drop it in the evidence locker.

Q. Where is the evidence locker?

A. In the room at the P.D.

Q. There's an evidence room at the Eunice Police Department?

A. When they do their reports, they got a big mailbox that's locked that you got to drop it in.

Q. After officers write their report, are they supposed to put the evidence in the mailbox of the evidence room?

A. Yeah.

Q. Is there any other place that officers are allowed to store evidence subject to a criminal

Page 108

investigation?

A. Not that I know of. I mean, unless you can't finish your report, you hang onto your evidence.

Q. Can you hang onto evidence after you finish your report?

A. I wouldn't.

Q. Do you know if it's allowed under department policy to keep evidence after you've filed a report?

A. I don't know. I didn't read the book.

Q. Are you familiar with the CID office of the Eunice Police Department?

A. Yeah.

Q. What is the CID?

A. It's where they bring people to talk to them.

Q. Why are some people brought to the CID and not others?

A. So they can't be seen by the public if they're giving information out.

Q. Is there any other reason why EPD officers use the CID?

A. No.

Q. Do you know if evidence can be stored at

Page 109

the CID?

A. I don't know.

Q. Have you ever heard of evidence being stored at the CID?

A. No.

Q. Is it allowed under department policy to store evidence at the CID?

A. Don't know.

Q. Other than the events we've specifically covered, are you aware of any other incidences of misconduct that weren't punished by Chief Fontenot?

MR. STAMEY:

Objection to form.

A. No.

BY MR. BHATLA:

Q. Has any P.D. officer ever mishandled a criminal investigation?

MR. STAMEY:

Objection to form.

A. Not that I know of.

BY MR. BHATLA:

Q. Do you believe Chief Fontenot properly handles incidents of misconduct committed by EPD personnel?



Page 110

A. I don't know what he does. I'm just a reserve over there. I just go help the shift.

Q. Have you heard of any complaints about the way an EPD officer handled a criminal investigation?

A. No.

Q. Are you aware of any EPD officers violating department policy?

A. Not that I know of.

Q. Are you aware of any EPD personnel who violated department procedure?

A. No.

Q. Do you believe Chief Fontenot permits violations of department procedure or policy?

MR. STAMEY:
Objection to the form.

A. I don't know.

BY MR. BHATLA:

Q. Do you believe Chief Fontenot shields certain personnel from disciplinary action?

A. I don't know.

Q. Are you aware of any instances of misconduct that were covered up by Chief Fontenot?

MR. STAMEY:
Objection to the form.

Page 111

A. No.

BY MR. BHATLA:

Q. Are you aware of any payroll irregularities at the Eunice Police Department?

A. No. I don't turn in a time sheet to them.

Q. Have you heard others at the department talk about payroll irregularities at the department?

A. No. Well, my wife got chief's check one day, he got hers. It was an accident. I mean...

Q. Are you aware of any investigations into the Eunice Police Department for payroll irregularities?

A. No.

Q. Are you aware of any public discussions about payroll disparities at the department?

A. (The witness shook head.)

Q. Are you aware of any complaints made about some officers being paid more than others?

A. You got different levels. I mean, officer gets a different pay from sergeant and lieutenant.

Q. How different is the pay?

A. I don't know what they get paid.

Q. Are you aware if the Eunice Police Department misuses public funds?

Page 112

MR. STAMEY:
Objection to the form.

A. Not that I know of. I don't know what they supposed to go to.

BY MR. BHATLA:

Q. Do you think -- withdrawn.

Are you aware of any instances where Eunice Police Department personnel have misused department funds?

MR. STAMEY:
Objection to form.

A. No.

BY MR. BHATLA:

Q. Are you aware of any instances where personnel at the department have misused department vehicles?

MR. STAMEY:
Objection to the form.

A. No.

BY MR. BHATLA:

Q. Are you aware of any instances where EPD personnel have misused public resources?

MR. STAMEY:
Objection to form.

A. (The witness shook head.)

Page 113

BY MR. BHATLA:

Q. Are you aware of any investigations into the Eunice Police Department for misuse of department funds?

A. No.

Q. Are you familiar with the confidential informant process at the department?

A. No.

Q. Have you heard about any EPD officer inappropriately handling confidential informants?

MR. STAMEY:
Objection to form.

A. No.

BY MR. BHATLA:

Q. Have you heard about any abuses related to the confidential informant process in Eunice?

MR. STAMEY:
Objection; form.

A. I don't know who the confidential informants are.

BY MR. BHATLA:

Q. Are you aware of any law enforcement operations that have been conducted using confidential informants?

A. (The witness shook head.)

MAGNA
LEGAL SERVICES

Page 114

Q. Do you have any knowledge of operations with any confidential informants?

A. No.

Q. Have you ever been a part of any investigation where a confidential informant was involved?

A. No.

MR. BHATLA:

Why don't we take a five-minute break.

THE VIDEOGRAPHER:

Off the record at 11:21.

(A break was taken from 11:21 a.m. to 11:37 a.m.)

THE VIDEOGRAPHER:

We're back on the record at 11:37.

BY MR. BHATLA:

Q. Are you aware of any -- oh, thank you. I'll restate the question.

Are you aware of any instances where officers at the Eunice Police Department have disobeyed Chief Fontenot's orders?

A. No.

Q. Are you aware of any instances where Randy Fontenot has punished officers for disobeying his orders?

Page 115

A. No.

Q. Are you aware of threats of physical violence made against Lieutenant Dunn by members of the Eunice Police Department?

A. No.

Q. Have you heard of any physical threats made against Lieutenant Dunn?

A. Lieutenant Dunn has said it.

Q. What have you heard about it?

A. They were going to shoot his dog or shoot him.

Q. Who was going to shoot his dog?

A. Victor.

Q. So you have heard that Victor Fontenot said he would shoot Lieutenant Dunn or his dog?

A. Lieutenant Dunn told me that.

Q. Have you heard of that from anyone else?

A. No.

Q. Have you heard of any other threats of physical violence made against Lieutenant Dunn?

A. No.

MR. STAMEY:

Objection to the form.

BY MR. BHATLA:

Q. Are you aware of any threats of physical

Page 116

violence made against Lieutenant Dunn's family?

A. No.

Q. Have you heard of any threats made against Lieutenant Dunn's wife?

A. No.

Q. Has Randy Fontenot ever talked to you about Lieutenant Dunn?

A. No.

Q. Has anyone at the Eunice Police Department ever talked to you about Randy Fontenot's relationship with Lieutenant Dunn?

A. No.

Q. Do you believe Lieutenant Dunn is being targeted by Chief Randy Fontenot?

A. No.

Q. Why do you think that?

A. I said no. I mean, he comes to work, he goes home.

Q. Let me clarify.

Are you aware of any instances where Lieutenant Dunn has been targeted by Chief Randy Fontenot?

MR. STAMEY:

Objection to form.

A. (The witness shook head.)

Page 117

BY MR. BHATLA:

Q. Do you believe Lieutenant Dunn is not being targeted, or do you not know if he is being targeted?

A. I don't know if he's being targeted. I mean, he comes to work and he goes home.

Q. Are you aware that Lieutenant Dunn reported misconduct at the Eunice Police Department to other law enforcement agencies?

A. No.

Q. Have you heard of Lieutenant Dunn making reports about EPD to other law enforcement agencies?

A. No.

Q. Are you aware of any reports made about EPD personnel to other law enforcement agencies?

A. No.

Q. To your knowledge, has anyone at the department ever reported EPD personnel to other law enforcement agencies?

A. No.

Q. Are people afraid to report misconduct at the Eunice Police Department?

MR. STAMEY:

Objection to form.


MAGNA
LEGAL SERVICES

Page 118

A. Not that I know of.
BY MR. BHATLA:
Q. Are you aware of any reports by Eunice Police Department officers that another officer violated policy?
A. No.
Q. Are you aware of any internal investigations that have been conducted at the Eunice Police Department?
A. Yes.
Q. Can you tell me about that.
A. Officer Cooley was investigated.
Q. Officer Nicholas Cooley?
A. Yeah.
Q. Why was he investigated?
A. Because somebody had made a claim against him or something.
Q. Do you know the nature of the claim?
   MR. STAMEY:
      Objection to the form.
A. I don't remember.
BY MR. BHATLA:
Q. What do you recall about that situation?
   MR. STAMEY:
      Objection to the form.

Page 119

A. I had to go to CID and testify.
BY MR. BHATLA:
Q. What happened next?
A. I went over there, they asked me questions, and I left.
Q. What were you questioned about?
   MR. STAMEY:
      Objection to the form.
A. I don't remember. Some girl had said something. He had wrote her a ticket or something and he had followed her or something around town.
BY MR. BHATLA:
Q. Why were you called to testify --
withdrawn.
   Why were you called to answer questions about the situation?
   MR. STAMEY:
      Objection; form.
A. Because he was at my house one night, somebody needed a ride. And come to find out it was that girl that he wrote the ticket to. So I went and ride with him, drop her off at home, and we went back to my house. And she said he tried getting with her or something, and that didn't happen.

Page 120

BY MR. BHATLA:
Q. Were you present when Officer Cooley gave that woman a ride?
A. Yes.
Q. And it was that ride that was the subject of the complaint against Officer Cooley?
A. Correct.
   MR. STAMEY:
      Objection to form.
BY MR. BHATLA:
Q. Who asked you to answer questions?
A. Deputy Chief Kennedy.
Q. Deputy Chief Kennedy is the one who interviewed you?
A. Yes.
Q. When did this interview take place?
A. A couple years ago.
Q. Are you aware if Officer Cooley was punished at all?
A. I don't know.
Q. Do you know the results of the investigation?
A. I don't think he was punished because he didn't do anything.
Q. Was anyone else asked to provide testimony

Page 121

about the circumstances of that investigation?
   MR. STAMEY:
      Objection to the form.
A. I think maybe my wife.
BY MR. BHATLA:
Q. Anyone else?
A. I don't know.
Q. Who conducted the internal investigation?
A. I think Deputy Chief Kennedy.
Q. And that's Tony Kennedy?
A. Yes.
Q. Was he deputy chief at the time?
A. No.
Q. What was his role at the time?
A. I think chief of detectives.
Q. Is the chief of detectives the one who normally does an internal investigation?
A. I guess.
Q. Are you aware of any other internal investigations into Eunice Police Department personnel?
   MR. STAMEY:
      Objection to form.
A. Not that I recall.
BY MR. BHATLA:


MAGNA
LEGAL SERVICES

Page 122

Q. Are you aware of any internal investigations into Lieutenant Dunn?

A. No.

Q. Are you aware of any internal investigations into Victor Fontenot?

A. No.

MR. STAMEY:
Objection to form.

MR. BHATLA:
What's the basis for that objection?

MR. STAMEY:
It could be confidential if it exists. I don't know if he's been investigated or not. I'm just giving a broad objection, which is my right to do, because the question may be outside the law.

MR. BHATLA:
Confidential is not one of the objections under the Civil Rules.

MR. STAMEY:
All I'm telling you is I have a right to preserve my objection until I've had a chance to satisfy myself that, indeed, that is appropriate. So I'm preserving my objection for that --

Page 123

MR. BHATLA:
I ask that Counsel make --

MR. STAMEY:
-- for that and other grounds.

MR. BHATLA:
I ask that Counsel make appropriate objections under the Civil Rules.

MR. STAMEY:
I have made an appropriate objection to the form.

BY MR. BHATLA:

Q. Are you familiar with the procedure for internal investigations at the Eunice Police Department?

A. No.

Q. Are you aware of any other individuals at the department who have been interviewed pursuant to an internal investigation?

A. Not that I recall.

Q. Have you heard of any other internal investigations into officers at the department?

A. No.

Q. Are you aware of any complaints made to EPD personnel about other officers?

A. No.

Page 124

Q. Have you heard any EPD personnel complain about sexism at the department?

A. No.

Q. Are you aware of any complaints about racism at the Eunice Police Department?

A. No.

MR. STAMEY:
Objection to the form.

MR. BHATLA:
What's the basis for that objection?

MR. STAMEY:
Relevancy.

MR. BHATLA:
Counsel, I'll just state that relevancy objections are not appropriate in depositions.

MR. STAMEY:
I'm objecting to the form of the question. Those are among the grounds that I'm relying upon.

MR. BHATLA:
I'll ask that Counsel state appropriate form objections under the Civil Rules.

MR. STAMEY:

Page 125

One question I have then, if we're going to go into this dialogue, since you've started it, is your allegations in your suit, does it specifically include the issue of racism?

MR. BHATLA:
I'm not the one being deposed here, Counsel. If you want to go off the record, we can go off the record.

MR. STAMEY:
I'm happy to go talk about it.

MR. BHATLA:
Let's go off the record.

MR. STAMEY:
Let's go.

THE VIDEOGRAPHER:
Off the record at 11:48.

(A break was taken from 11:48 a.m. to 11:55 a.m.)

THE VIDEOGRAPHER:
We're back on the record at 11:55.

BY MR. BHATLA:

Q. Buddy, before the break we were talking about reports of misconduct at the department. Do you know if people in the department



Page 126

are afraid to report misconduct to Chief Fontenot?
    A. No.
    Q. Do you know if Chief Fontenot is aware of Lieutenant Dunn's reports to other agencies about the department?
    A. I don't know.
    Q. Are you aware of any allegations that Chief Fontenot has retaliated against other EPD personnel besides Lieutenant Dunn?
        MR. STAMEY:
            Objection to the form.
    A. Lieutenant Ivory got demoted.
BY MR. BHATLA:
    Q. Lieutenant Ivory was demoted as a form of retaliation against him?
        MR. STAMEY:
            Objection to the form.
    A. I don't know. I'm guessing. I don't know why he got demoted.
BY MR. BHATLA:
    Q. Are you aware of any other instances where Chief Fontenot has been accused of retaliating against EPD personnel?
    A. No.
    Q. Do you think you have been treated

Page 127

unfairly at the Eunice Police Department?
    A. Just because I can't drink anymore.
    Q. Has anyone checked in with you since that incident to ask if you have been drinking?
    A. No.
    Q. Has the chief talked to you about your alcohol consumption since you signed that agreement?
    A. No.
    Q. Has anyone at the department talked to you about your alcohol use since you signed that document?
    A. No.
    Q. Do you know Lieutenant Donnie Thibodeaux?
    A. Uh-huh, yes.
    Q. Do you think Lieutenant Thibodeaux has been treated unfairly at the department?
    A. He's at another building.
    Q. Are you aware of complaints made by Lieutenant Thibodeaux about Chief Randy Fontenot?
    A. No.
    Q. Are you aware of Lieutenant Thibodeaux having a civil service appeal related to actions taken by Chief Fontenot?
    A. No.

Page 128

    Q. Do you know that Lieutenant Thibodeaux has an ongoing dispute with the Eunice Police Department over unfair shift changes?
    A. No.
    Q. Do you know Lieutenant Stephanie Meyers?
    A. Yes.
    Q. Do you think Lieutenant Meyers was treated unfairly by the Eunice Police Department?
    A. I don't know. She's been out.
    Q. Lieutenant Meyers has been out on sick leave?
    A. Yes.
    Q. Are you aware of any complaints Lieutenant Meyers has made about that situation?
    A. No.
    Q. Do you know that Lieutenant Meyers has complained of retaliation against her by Chief Fontenot?
    A. No.
    Q. Do you know that there's an active civil service case against Lieutenant Stephanie Meyers?
    A. No.
    Q. Was Lieutenant Ivory treated unfairly by Chief Fontenot?
    A. I -- he got demoted, I don't know why.

Page 129

    Q. Do you know an EPD officer named A.J. Frank?
    A. Yes.
    Q. What do you know about him?
    A. He was a sergeant with us. Now he's in Basile, I think.
    Q. Do you know why he left?
    A. No.
    Q. Do you know how long he worked at the Eunice Police Department?
    A. No.
    Q. Was he at the department before you arrived?
    A. Yes.
    Q. Do you know how long ago he left?
    A. Four or five years.
    Q. Do you know what his relationship was like with Chief Fontenot?
    A. No.
    Q. Are you aware of allegations that A.J. Frank was treated unfairly by Chief Fontenot?
    A. No.
    Q. Do you know former Deputy Chief Varden Guillory?
    A. He was leaving when I just started.




Page 130

Q. What do you know about him?

A. He was a deputy chief.

Q. Anything else?

A. No. I think we crossed paths once or twice and that was it.

Q. Are you aware of Deputy Chief Varden Guillory being arrested a week before his retirement?

A. I read something about that online the other day.

Q. What do you know about the situation?

A. I don't remember.

Q. Do you think Varden Guillory was treated unfairly by Chief Fontenot?

A. I don't know.

Q. Do you know why Varden Guillory left the EPD?

A. No.

Q. Do you know anything about his relationship with Chief Fontenot?

A. No.

Q. Do you recall any other instances where an officer was unfairly punished?

A. No.

Q. Are you aware of any incidents where a

Page 131

Eunice Police Department officer was punished for committing some action?

A. No.

Q. Are you aware of any Eunice police officers who have been suspended from their duties?

A. No.

Q. Are you aware of any Eunice Police Department officers who have been threatened?

A. No.

Q. Are you aware of any EPD personnel whose jobs have been threatened?

A. No.

Q. Has your job ever been threatened?

A. Yeah, just, like I said before, if I get caught drinking, then I can't be a reserve officer anymore.

Q. Who made that threat?

MR. STAMEY:

Objection to the form of the question.

A. It wasn't a threat, he just told me that I -- unless I quit drinking, I couldn't do it anymore. Chief.

BY MR. BHATLA:

Q. Chief Randy Fontenot said that to you?

Page 132

A. Yeah.

Q. And do you recall roughly when this was?

A. No.

Q. Are you aware of any other EPD personnel being threatened with their jobs?

A. No.

Q. You testified before that you believe your wife was targeted by Chief Fontenot?

A. Yes.

Q. Why do you think she was targeted?

A. I don't know.

Q. Are there any officers at EPD who are working on light duty right now?

A. My wife.

Q. Any other officers?

A. No.

Q. Are you aware of any officers in the past who have been permitted to come back on light duty other than your wife?

A. Not that I recall.

Q. I want to go back to the Kenneth Charles incident. Can you just walk me through what happened from the beginning.

A. They --

MR. STAMEY:

Page 133

Objection to the form of the question.

A. They put him in the back of the cop car, brought him to the P.D., hosed him off, brought him to the pink room, gave him some dry clothes, and closed the door.

BY MR. BHATLA:

Q. From the very beginning, when did you first hear about the incident?

A. On the radio.

Q. Who alerted you over the radio?

A. The dispatcher gives the calls out. So I was just going that way.

Q. And then what happened?

A. When I got there, they were loading him up. He had slapped Lieutenant Dunn's unit or hit it or something. Cody Miller went to see what it was and he fell out. The marshals brought him to the hospital. Kenneth was handcuffed, put in the back of the cop car, and brought to the P.D.

Q. And then what happened?

A. Paramedics told us to hose him off in case he had fentanyl on him. They checked him out. They left. I brought him in the P.D., changed his clothes, put him in the pink room.

Q. And then what happened?



Page 134

A. I left.

Q. You left the department?

A. Yeah. Once he was secured in the pink room, I left.

Q. Do you know what happened to him after that?

A. No.

Q. Were the paramedics at the scene?

A. No.

Q. When did the paramedics first see Kenneth Charles?

A. At the P.D.

Q. Why were the paramedics not called to the scene?

A. I don't know. I don't know who called the paramedics.

Q. Is it normal to hose someone off who might have fentanyl?

A. Now I would, being that the paramedics told us to so it wouldn't -- the particles wouldn't fly.

Q. And where was he hosed off?

A. Where we wash the cars at the P.D.

Q. Kenneth Charles was hosed off at the Eunice Police Department?

Page 135

A. Yeah.

Q. No one hosed Kenneth Charles off before he was put in the car?

A. No.

Q. Why not?

A. I don't know. I wasn't there.

Q. You were at the scene, correct?

A. I got there when they were putting him in the back of the cop car. When that car went to leave with him, I left.

Q. Why was Kenneth Charles not hosed off before he was put in the car?

A. I don't know.

Q. Who was the driver of the car he was placed in?

A. Mr. Huckaby.

Q. Did Mr. Huckaby show any signs that he was affected by fentanyl?

A. No.

Q. Did you see Mr. Huckaby when he exited the vehicle at the Eunice Police Department?

A. Yeah.

Q. Did he seem all right to you?

A. Yeah.

Q. Did you have any reason to believe that

Page 136

Kenneth Charles had fentanyl on him?

A. That's what we assumed, being as our officer had touched him and fell out.

Q. Cody Miller touched Kenneth Charles; is that correct?

A. Yeah. He got there first.

Q. He touched Kenneth Charles and then fell?

A. I guess. They just said he was on the ground or something. The marshal came on the radio, said he was on the ground and he was taking him to the hospital. So he threw him in the marshal unit and took off.

Q. The marshals threw Cody Miller into their vehicle and went to the hospital?

A. Yeah, put him in the back seat.

Q. Did anyone else touch Kenneth Charles?

A. Out there?

Q. At the scene.

A. I don't know.

Q. Do you know who restrained Kenneth Charles?

A. No.

Q. Did you witness who put Kenneth Charles in the back of the vehicle?

A. I don't remember.

Page 137

Q. Did an officer have to put Kenneth Charles in the back of the vehicle?

A. Yeah, they helped him get in.

Q. So there was another officer who touched Kenneth Charles?

A. I'm guessing, yeah.

Q. Did anyone else fall over like Cody Miller?

A. I left. I wasn't there.

Q. Are you aware of any other officers who fell over at the time?

A. No.

Q. To your knowledge, only Cody Miller fell over?

A. Yes.

Q. Did Mr. Huckaby touch Kenneth Charles?

A. I think, when we got to the P.D., I done put a mask and gloves on, brought him to the wash rack and hosed him off.

Q. Did anyone else touch him without gloves?

A. I don't think so.

Q. But at the scene, someone did touch him to put him in the car?

A. Yeah, I'm assuming so.

Q. And Mr. Huckaby showed no signs of



Page 138

illness?

A. No.

Q. The paramedics arrived at the Eunice Police Department?

A. Yes.

Q. Did they look at Mr. Kenneth Charles? Did they treat him?

A. I think they checked his blood pressure and checked his eyes and stuff. But he was okay.

Q. Were there any signs that Mr. Charles was sick or unwell?

A. No.

Q. Do you know who called the paramedics?

A. No.

Q. Who else was at the police department when you hosed down Kenneth Charles?

A. I think my wife.

Q. Anyone else that you can recall?

A. No.

Q. Who witnessed you hose down Kenneth Charles?

A. The paramedics and my wife.

Q. Did anyone else see you hose him down?

A. Not that I recall.

Q. Is that a no?

Page 139

A. No.

Q. Have you ever hosed down anyone else?

A. Just if we spray OC in their face.

Q. What is OC?

A. Red pepper oil.

Q. Have you ever washed down any other individual with a hose?

A. The ones that we sprayed OC on.

Q. When do you spray OC on someone?

A. When they're being combative.

Q. Did you witness Kenneth Charles being combative at all?

A. He was already cuffed when I got there.

Q. Whose decision was it to hose him down?

A. The paramedics.

Q. Did anyone instruct you at the department to hose him down?

A. No.

Q. So you followed the paramedics' instructions to hose him down?

A. Yes. Because they didn't want the particles to fly while they were touching him if he had something on him.

Q. Do paramedics generally give EPD officers instructions?

Page 140

A. No.

Q. Are you aware of any policies with respect to following paramedic instructions at a scene?

A. No.

Q. Are you aware of any EPD policies with respect to handling of suspects based on paramedic comments?

A. No. I did it because they instructed so they could check him out for his well-being.

Q. Who told the paramedics that Mr. Charles had fentanyl?

A. I don't know.

Q. Who talked to the paramedics when they arrived at the department?

A. Me. I think they were there already. I just brought him to them and they said to hose him off.

Q. Were the paramedics at the department because they heard of Mr. Charles being arrested?

A. I'm guessing.

Q. So they were called to the department because of the Kenneth Charles incident?

A. Yes.

Q. Did you mention fentanyl to the paramedics?

Page 141

A. I don't remember.

Q. When you arrived at the scene, did anyone mention the possibility of there being fentanyl involved?

A. I think somebody had said it on the radio.

Q. Do you recall who that was?

A. No.

Q. Do you know what the basis for that statement was?

A. Because of Cody Miller falling out.

Q. And because he fell over, someone just assumed that Kenneth Charles had fentanyl?

A. Yes.

Q. Have you dealt with suspects using fentanyl before?

A. Yes.

Q. Have officers fallen over dealing with fentanyl suspects before?

A. No. They done ingested it already. They're pretty much dead, I'll Narcan them and wait for the paramedics to get there.

Q. But you're not aware of any other officers falling over after dealing with a suspect?

A. No.

Q. You heard from someone that there may be



MAGNA
LEGAL SERVICES

Page 142

fentanyl involved?

A. Correct.

Q. That information was shared with the paramedics?

A. I'm guessing so. Someone might have told them.

Q. Was Kenneth Charles naked when you hosed him down?

A. No, he had some clothes on.

Q. Was he bleeding when you hosed him down?

A. No.

Q. Did he have any visible bruises when you hosed him down?

A. No. I wasn't checking.

Q. What time of day did you hose him down?

A. I don't know the exact time. It was daytime.

Q. So you hosed him down during the day?

A. Yes.

Q. You hosed him down outside?

A. Yes. Between 8:00 and 5:00, that's when I work.

Q. Did anyone express any concern about him being in the car with potentially having fentanyl on his clothes?

Page 143

A. No.

Q. Did Kenneth Charles show any sign of pain when you hosed him down?

A. No.

Q. How did Kenneth Charles react when you hosed him down?

A. He was handcuffed. He tried pulling away. But we just held him and tried instructing to him why we was doing it.

Q. Was someone restraining him while you hosed him down?

A. Yeah, we just had him (indicating) spraying the water hose.

Q. So you held him and then sprayed him down yourself?

A. Yes.

Q. Did anyone else hold him?

A. I don't think so.

Q. Was he in the same clothes when you hosed him down that he was wearing at the scene?

A. Yeah.

Q. How far away were you from Kenneth Charles when you hosed him down?

A. Arm length.

Q. So you were standing right next to him

Page 144

when you hosed him down?

A. Yes.

Q. Did you check to see if he had any bruises?

A. No.

Q. Did you check to see if he had any blood or open wounds?

A. No.

Q. Was there a risk to the driver by not hosing him down before putting him in the car?

A. I don't know.

Q. What was your impression of Kenneth Charles' behavior during the incident?

A. He was upset being arrested, put in hand restraints.

Q. Did he struggle?

A. No, not really.

Q. Did he say anything to you during the incident?

A. No.

Q. You testified earlier that you thought Kenneth Charles was slow; is that correct?

A. Yeah.

Q. What do you mean by that?

A. Just the way he was walking down the hall.

Page 145

He kind of swayed a little bit and mumbled to himself like he was talking to somebody, just mumbling.

Q. What did you interpret that behavior to mean?

A. I mean, most people don't talk to theirselves.

Q. Did you think he was sick?

A. He might have a mental illness or something maybe.

Q. Did you think that Kenneth Charles had a mental illness at the time?

A. Possibly. I don't know.

Q. But at the time, you thought he was slow?

A. Yeah, because he just kept mumbling to himself.

Q. Did you think his behavior was odd?

A. No. He didn't really struggle bringing him to the pink room.

Q. Is it normal for suspects to mumble to themselves as you're arresting them?

A. No.

Q. So was his behavior out of the ordinary?

A. Yeah, he just mumbled to himself.

Q. Did you think he might have a mental



Page 146

illness?

A. Yeah.

Q. Did you take into account that he might have a mental illness as you were hosing him down?

A. What you mean, take that into account?  He wasn't resisting me or anything.  He just stayed there and I just lightly sprayed him.

Q. Did you tell anyone that you thought Kenneth Charles might have a mental illness?

A. No.

Q. Did Kenneth Charles' behavior affect the way you handled him?

A. No.

Q. Did you ask him any questions before you hosed him down?

A. No.  I asked him if he had fentanyl on him and he, Mum, mum, mum, mum, mum.  That was it.

Q. So you didn't get a response?

A. No.

Q. Did you get -- withdrawn.

Did you ask him any other questions?

A. Not that I recall.

Q. After you saw him mumbling to himself, did you consider getting any medical care for him?

A. They was already there.

Page 147

Q. Did you tell the paramedics that he might have a mental illness?

A. No.

Q. Why not?

A. I don't know.  They was there just to check his vitals, see if he was okay.

Q. Do you recall if the paramedics checked him out for any bruises?

A. I don't know.

Q. Do you recall if the paramedics checked him out for any open wounds or blood?

A. I don't know.

Q. Do you know if a police report was filed about the Kenneth Charles incident?

A. I don't know.

Q. Did you write a report about the Kenneth Charles incident?

A. No.

Q. Did you write a report about hosing him down?

A. No.

Q. Do you know if anyone did write a report about the Kenneth Charles incident?

A. I would assume Cody Miller.

Q. Why do you assume that?

Page 148

A. Because he was the officer that responded to the call.

Q. Was Cody Miller the arresting officer?

A. No.  Cody went to the hospital.

Q. So who was the arresting officer?

A. I don't know.

Q. In that situation, who would normally write the police report?

A. Whoever arrested him, whoever put the cuffs on him.

Q. Do you know who put the cuffs on him?

A. No.

Q. Did anyone talk to you afterwards about the situation?

A. No.

Q. Did anyone at the Eunice Police Department ask you what you did to Kenneth Charles after taking him into custody?

A. No.

Q. Is that common, that you wouldn't report having to hose him down?

A. Yeah.

Q. You said earlier that when someone is exposed to OC, you would also hose them down; is that right?

Page 149

A. Uh-huh, correct.

Q. Would you put that in a police report, that a suspect was hosed down after being exposed to OC?

A. If I do the report, yeah.

Q. If you do the report, you would write that the suspect was hosed down?

A. Correct.  Because usually who sprayed him is the officer that decontaminates them.

Q. Are there other ways to decontaminate a suspect?

A. No.  Water is the only thing.

Q. So whoever wrote the police report on Kenneth Charles would put that he was decontaminated with -- by hosing him down?

A. Yes.

Q. And do you know if anyone wrote a police report?

A. I don't know.

Q. Was Kenneth Charles arrested?

A. Yeah, he was handcuffed and put in the pink room.

Q. Do you know the charges against him?

A. No.

Q. If he was put in cuffs and taken to the



Page 150

pink room, should there have been a police report about the situation?

A. Yeah, because they got to book him in. That's got to get turned into the jailer, that way they can do the booking process, you know, the charges.

Q. Who was the jailer on duty at the time?

A. I don't know.

Q. Did you check to see if a police report was filed about the incident?

A. No.

Q. Did anyone at the department ask you to file a police report about the incident?

A. No.

Q. Did you talk to Cody Miller after the incident about why he fell over?

A. No. He left the hospital, talked to somebody, and they said his potassium was low.

Q. Do you know if Cody Miller ever wrote a police report about the situation?

A. No.

Q. Were you ever interviewed about your involvement in the Kenneth Charles case?

A. No.

Q. Do you know if anyone at all was

Page 151

interviewed for their story on the Kenneth Charles incident?

A. No.

Q. Did Kenneth Charles have a necklace around his neck when you had him in your custody?

A. I don't remember.

Q. Did anyone tell you that Kenneth Charles had a necklace around his neck?

A. No.

Q. After you hosed him down, did you strip him of all his clothes?

A. Yes.

Q. And then did you dress him afterwards?

A. Yes.

Q. Did he need help being dressed?

A. No.

Q. Did you help him dress or did he dress by himself?

A. He dressed himself.

Q. So at the time when he -- withdrawn.

Did you strip him yourself or did he take off his own clothes?

A. I think he took them off.

Q. Can you just walk me through the time line. You hosed him down, then what happened?

Page 152

A. Walked down the hallway, went to the pink room.

Q. He was restrained at the time you walked him down?

A. Yes.

Q. When you got to the pink room, did you remove the restraints?

A. Yes. Put him inside, removed the restraints, and had him take his clothes off.

Q. You gave him a change of clothes?

A. Yes.

Q. He took his clothes off and put on a new set of clothes?

A. Yes.

Q. And then he sat in the pink room?

A. Yes.

Q. Did he have any mental health issues showing at the time?

A. Just mumbling.

Q. Did you tell anyone that you thought that he was having a mental episode?

A. No.

Q. What happened after he was put in the pink room?

A. I left.

Page 153

Q. Do you know what happened to Kenneth Charles after that?

A. No.

Q. The next time you came to the department, was he still in the pink room?

A. Not that I know of.

Q. Do you know if he was charged with a crime?

A. No.

Q. Why not?

A. I don't know what everybody's charges are when they come to the P.D. They might be there because of some little bench warrant; they pay their money and they leave.

Q. Do you know if Kenneth Charles was bonded out?

A. No.

Q. Are you aware of any complaints made by Kenneth Charles' family members against the Eunice Police Department?

A. No.

Q. Are you aware of any complaint filed by Kenneth Charles against the police department?

A. No.

Q. Who took over handling Kenneth Charles




Page 154

after you left?

A. I don't know.

Q. Who would have been in charge?

A. The jailer.

Q. When did the paramedics leave?

A. After they checked him out under the patio.

Q. And they checked him out outside the department?

A. Yes.

Q. Did they watch you hose him down?

A. Yeah.

Q. And they checked Kenneth Charles while he was in his wet clothing?

A. Yes.

Q. How long did it take them to check Kenneth Charles?

A. Five minutes.

Q. Is that common for a criminal suspect?

A. It depends on their situation.

Q. Did Kenneth Charles say anything about being hurt or wanting to go the hospital?

A. No.

Q. Were any of his family members nearby at the scene or at the police department?

Page 155

A. I don't know.

Q. Are there any other facts you can recall about the arrest?

A. No.

Q. Did you ask Lieutenant Dunn any questions about why Kenneth Charles was at his house?

A. No. He was off duty.

Q. Do you know if anyone interviewed Lieutenant Dunn about the situation?

A. I don't know.

Q. Who all witnessed Kenneth Charles slapping Lieutenant Dunn's car?

A. Lieutenant Dunn. He's the one that called it in.

Q. Anyone else?

A. I don't know.

Q. And can you remind me who all responded to the scene?

A. Mr. Huckaby, Victor, Cody Miller, Dunn was there. I think that's it.

Q. Did anyone take Lieutenant Dunn's statement?

A. I don't know. I got there late.

Q. All right.

MR. BHATLA:

Page 156

I think we can take lunch now. Thank you.

THE VIDEOGRAPHER:

Off the record, 12:30.

(A break was taken from 12:30 p.m. to 1:30 p.m.)

THE VIDEOGRAPHER:

We are back on the record at 1:30.

BY MR. BHATLA:

Q. Buddy, did you speak to anyone during the lunch break?

A. My wife.

Q. Did you speak to anyone during this lunch break?

A. My wife.

Q. Did you speak to anyone else?

A. No. I didn't go anywhere.

Q. What did you talk about with your wife?

A. Oh, I talked to the court reporter right there.

Q. Great.

Did you -- what did you talk about with your wife?

A. Lining up somebody to pick up the little boy from catechism.

Page 157

Q. Did you speak to Victor Fontenot or Chief Fontenot during the break?

A. Not really talked to them. I just told they he was late.

Q. Sorry, can you repeat that.

A. I told him they was late.

Q. Did you speak to Victor Fontenot or Chief Fontenot during any of the prior breaks?

A. I talked to Chief.

Q. What did you talk about?

A. He just told me he couldn't invite me to go to lunch with him.

Q. Did you talk about anything else?

A. No.

Q. Did you speak to anyone else during any of the previous breaks?

A. No.

Q. I want to go back to talking about the department in general.

Are you aware of any instances where officers claimed pay that they were not entitled to?

A. No.

Q. Are you aware of any instances where officers claimed time driving to work as part of



Page 158

time working?

A. No.

Q. Do you know if it's appropriate to claim time driving to work as time working?

A. I don't know.

Q. What time are you allowed to count as working while you are an officer at EPD?

A. I don't know. I don't get paid through the police department.

Q. Do you know how you're supposed to report your time at the department?

A. No.

Q. Are you aware of officers at EPD performing duties outside of their class?

A. I don't know what's their classification to be doing.

Q. Are you aware of lower-ranked officers performing duties that are traditionally performed by higher-ranked officers?

A. No.

Q. You testified that there are fewer officers working at the department than when you first joined; is that right?

A. Right.

Q. How many officers were on patrol in Eunice

Page 159

when you first joined?

A. Patrol as in the lieutenants on the shift, the sergeants, or just patrol officers?

Q. How many officers were patrolling the streets of Eunice when you first joined?

A. 20, 25.

Q. How many officers are there patrolling the streets of Eunice now?

A. 12, 15 maybe.

Q. Why do you think there are fewer officers on patrol now?

A. They went to St. Landry.

Q. Are officers who used to do patrol now assigned desk duty?

A. No.

Q. Are there more officers on desk duty now than when you first joined?

A. No. There's nobody. We've got Lieutenant Thibodeaux, he's always been in the office. That's it.

Q. Is he the only one who normally works in the office?

A. Yeah.

Q. How often are you at the Eunice Police Department office?

Page 160

A. Every day.

Q. Do you work out of the EPD office?

A. I sit in my wife's office and use her computer.

Q. How many hours of the day do you spend at EPD versus the City court?

A. I don't have an office in City court.

Q. So you spend most of your time at the EPD office?

A. Yeah, because I can use their computer to look up warrants.

Q. Does your wife have her own computer?

A. Yeah. She has two in the office.

Q. And you use one when you need to use a computer?

A. Yes.

Q. What is your opinion of Lieutenant Dunn?

A. What you mean?

Q. What is your opinion of Lieutenant Michael Dunn?

A. He goes to work and goes home.

Q. What is your relationship like with Lieutenant Dunn?

A. We talk and -- no big deal. We don't hang out or anything.

Page 161

Q. Would you say you have a friendly relationship with Lieutenant Dunn?

A. Yeah.

Q. Do you ever ask Lieutenant Dunn for advice on your cases?

A. Yeah. Whoever's at the P.D. I'll ask.

Q. How often would you say you've asked Lieutenant Dunn for advice?

A. I don't know. 10, 15 times.

Q. Do you normally take his advice on your cases?

A. Yeah.

Q. Have you ever complained to Lieutenant Dunn about inappropriate conduct by other officers?

A. I don't know.

MR. LOUGHLIN:

I'm sorry, I didn't hear the answer.

THE WITNESS:

I don't remember.

BY MR. BHATLA:

Q. Have you ever told Lieutenant Dunn that a criminal investigation was handled inappropriately?

A. I don't recall.



Page 162

Q. Have you ever expressed any concerns about a criminal investigation to Lieutenant Dunn?

A. Not that I remember.

Q. Are you aware that Lieutenant Dunn was once employee of the year at the Eunice Police Department?

A. Yes. Yes.

Q. Does that surprise you?

A. No.

Q. Why not?

A. He's a good officer.

Q. Lieutenant Dunn is a good officer?

A. Yeah.

Q. Does it surprise you, then, that Chief Fontenot has initiated internal investigations against Lieutenant Dunn?

A. I don't know that he did.

Q. Would it surprise you to know that Lieutenant Dunn has been investigated at the department?

A. I don't know how to answer that. I mean, if he did something wrong, then yeah.

Q. Are you aware that Lieutenant Dunn was once a K9 officer?

A. Yes.

Page 163

Q. What do you know about that?

A. He had the dog.

Q. Do you have any other knowledge about the K9 program?

A. No.

Q. In any of your cases, did you ever ask for help from the K9 unit?

A. I don't remember. Do you have a specific one?

Q. Just do you recall any instances where you called in for backup from the K9?

A. No. I seen the dog perform but not for me.

Q. You saw the dog perform in a criminal investigation?

A. Yeah. Somebody stopped somebody. The dog went, sniffed, sat, and they searched the car.

Q. What was your opinion of the K9 program?

A. I liked it.

Q. Why did you like it?

A. Cause it gets drugs off the streets. If we can't see it, the dog can smell it.

Q. Was the K9 helpful, then, for drug interdiction?

A. I think so.

Page 164

Q. Are you aware that Chief Fontenot dismantled the K9 program at EPD?

A. I heard he was getting rid of the dog.

Q. Do you know why he did that?

A. No.

Q. Are you aware that he did that after Lieutenant Dunn reported EPD misconduct to other external agencies?

A. Now I do.

Q. Do you think it benefited the Eunice Police Department to cancel the K9 program?

A. Not to cancel it, no.

Q. Why do you think Chief Fontenot canceled the program?

A. I don't know.

Q. Are you aware of whether Lieutenant Dunn was compensated appropriately for his time as a K9 officer?

A. I don't know. I don't know what he gets paid.

Q. Do you think the Eunice Police Department should have kept the K9 program?

A. I think so.

Q. Why do you think that?

A. Because it helps. We have a fleeing

Page 165

victim, the dog can chase it down, sniffs drugs out that we can't see.

Q. Does Eunice have a K -- withdrawn.

Does Eunice have a crime problem right now?

A. Yeah.

Q. Has it gotten worse over the past few years?

A. Probably.

Q. Would a K9 have helped tackle the crime problem?

A. Maybe.

Q. Why do you think crime has gone up in Eunice?

A. Stealing everybody's catalytic converters.

Q. So why do you think crime has increased?

A. Because they get a lot of money for it.

Q. Are you aware of any internal investigations initiated by Chief Fontenot?

A. No.

Q. Has Chief Fontenot ever initiated an investigation into you?

A. I don't think so.

Q. Do you use social media?

A. I look at it.



Page 166

Q. Do you ever post?

A. No.

Q. Do other officers at the Eunice Police Department post on social media?

A. Yeah.

Q. Do they ever talk about their jobs?

A. I don't know.

Q. Do they ever talk about happenings in Eunice?

A. I mean, they just watch TikTok videos. I don't have a Facebook account or anything like that.

Q. Does the department have a social media policy?

A. Yes.

Q. Do you know what it says?

A. You can't post any pictures or anything.

Q. Are you aware of any details?

A. No.

Q. Are you familiar with an individual named Joshua Dupre?

A. I heard the name.

Q. What do you know about him?

A. Nothing.

Q. Are you familiar with an individual named

Page 167

Jordan Arnaud?

A. Yeah.

Q. What do you know about him?

A. He was on probation with us.

Q. Anything else you can recall?

A. No.

Q. Are you familiar with an individual named Sonny Arnaud?

A. Yes.

Q. What do you know about him?

A. He's on probation with us.

Q. Anything else you can recall?

A. (The witness shook head.)

Q. Are you aware of Jordan or Sonny Arnaud being used in any law enforcement operations?

A. No.

Q. Are you familiar with an individual named Christopher Ashworth?

A. Yes.

Q. What do you know about him?

A. He's on probation.

Q. Can you tell me anything else?

A. He runs from us.

Q. Are you familiar with an incident where he claimed he had a medical need while being detained

Page 168

at the Eunice Police Department?

A. I mean, they all complain once they're arrested. Their tooth hurts or their finger hurts. Everybody want to go to the doctor.

Q. And what do you do when someone complains about having a medical issue?

A. They turn it over to my wife, she'll set a Zoom meeting or something with the doctor, TeleMed.

Q. So the individuals are given a Telemedicine appointment with the doctor?

A. Yeah, unless it's bad, and then they bring you to the emergency room.

Q. Are you aware of any individuals who were detained and then released instead of being given medical care?

A. No.

Q. If someone has been arrested, can you release them without providing medical care?

A. Say that again.

Q. If you arrest someone and they say they need medical care, can you release them?

A. No.

Q. Why not?

A. Because they arrested.

Page 169

Q. So what has to happen?

A. They go to jail.

Q. And if that person requests medical care but the department doesn't want to give it, can they release them?

A. No.

Q. Are they then required to provide medical care?

MR. STAMEY:

Objection to the form of the question.

A. They can ask the judge if you can release them.

BY MR. BHATLA:

Q. The judge has to give approval to release the individual?

A. (The witness nodded head.)

Q. So if an arrestee needs medical care, they have to be provided that care, correct?

A. Yeah.

Q. Are you aware of any EPD personnel covering for family members who are subject to a criminal investigation?

A. No.

Q. Do you know what Chief Fontenot's relationship is like with the civil service board?



Page 170

A. No.

Q. Do you know what Chief Fontenot's relationship is like with the City of Eunice City Council?

A. No.

Q. Are you aware that Chief Fontenot's authority related to hiring and firing of employees was stripped --

A. Yes.

Q. -- by the City Council?

A. Yes.

Q. What do you know about that?

A. That he doesn't hire and fire himself.

Q. He doesn't hire and fire anymore; is that right?

A. Correct.

Q. Do you know why that change was made?

A. No.

Q. Have you ever witnessed an officer being disciplined for violating department policy?

A. No.

Q. During your six years at the Eunice Police Department, have you observed any officer being disciplined for any violation?

A. No.

Page 171

Q. Have you witnessed any investigations into any officers during your time at the department?

A. No.

Q. You did observe the investigation into Cody Miller; is that correct -- withdrawn.

Did you observe the investigation into Nicholas Cooley when he was accused of having inappropriate contact with a woman?

A. Yeah, they brought me into the room to ask me a few questions and then left out.

Q. Is that the only investigation you recall witnessing?

A. Yes.

Q. Have you heard of any of the investigations into Lieutenant Dunn?

A. No.

Q. Are you aware of any instances where an officer did not report all of the evidence that they seized in the course of an investigation?

A. Yes.

Q. Can you tell me about that.

A. I had taken pictures of evidence. It went on a while. I went to clear my camera. So I went and looked in the book, and everything that was on my phone wasn't in the book.

Page 172

Lieutenant Dunn was working, so I went and asked him. I showed him the picture. I said, I don't see it. Because I wanted to delete the pictures.

Q. Can you tell me more about the situation.

A. I think it was seven white pills that was logged down and I had ten white pills in the picture.

Q. When was this?

A. A few years ago.

Q. What was the basis of the investigation?

A. Search warrant.

Q. Who was the search warrant directed to?

A. The subject's name?

Q. (Attorney nodded head.)

A. Scotty Fournerat. It was his house.

Q. You received a search warrant to search Scotty's house?

A. No.

Q. Who obtained the search warrant?

A. I think Detective Fontenot.

Q. Detective Victor Fontenot obtained the search warrant of Scotty's house?

A. Yes.

Q. Did Victor Fontenot execute that warrant?

Page 173

A. Yes.

Q. Is Victor Fontenot the one who took pictures of the evidence?

A. No. I did.

Q. Were you also present at the house?

A. Yes.

Q. Who all was present at the house?

A. Me, Victor, I think Lieutenant Dunn.

Q. Was there anyone else?

A. I don't remember.

Q. And it was Victor Fontenot who executed that search warrant?

A. Yes.

Q. Who collected the evidence, you or Victor?

A. Victor.

Q. You photographed the evidence that Victor collected?

A. Yes.

Q. What happened to the evidence after you took photographs of it?

A. I'm guessing he put it in bags and dropped it in the safe.

Q. By "he," you mean detective Victor Fontenot?

A. Yes.

44 (Pages 170 to 173)



Page 174

Q.  So after you photographed the evidence, Victor Fontenot took pic -- took the evidence, put it in a bag, and put it in a locker?

A.  Yes.

Q.  When did you then go back to look at the picture?

A.  I don't remember.  I was just trying to clear out pictures out of my phone.  I come across that, so I went to the book to see if it was logged down.  It was logged down, so I deleted them.

Q.  How long after the crime did you go back to look at the picture?

A.  I don't know.

Q.  Weeks?  Months?  Days?

A.  Probably months.

Q.  So several months after the seizure, you went back to clear out the photos in your camera?

A.  Yes.

Q.  When you looked at the photo, did you then compare it to what was in the log?

A.  Yes.

Q.  Did you go to the evidence locker itself and compare what was in the bag to your photo?

A.  I can't get to it.

Page 175

Q.  Who can get to the evidence in the locker?

A.  The deputy chief.

Q.  Only deputy chief?

A.  Yeah.  That's all I know, the only person that has a key.

Q.  Can Chief Fontenot access the evidence locker?

A.  I don't know.

Q.  What did you see when you looked at the log?

A.  That he had logged down all the stuff that we had taken at that residence.

Q.  By "he," you mean Detective Victor Fontenot?

A.  Yes.

Q.  So Victor Fontenot logged all of the evidence that was seized?

A.  Yes.

Q.  And what did the log say with respect to the number of pills?

A.  I think it was seven, seven white pills.

Q.  And what did you have in your picture?

A.  I think it was ten.

Q.  So what did you do?

A.  So I went, asked Lieutenant Dunn.  I said,

Page 176

Hey, he wrote seven, was it a mistake?  I got ten.

Q.  What happened then?

A.  He said he didn't know, he didn't write it down.

Q.  What happened then?

A.  Then I left.

Q.  You didn't follow up?

A.  No.

Q.  Is that --

A.  I just didn't want to delete the picture if it was something else he had that I didn't take a picture of.

Q.  Did you ask Victor about the discrepancy?

A.  No.

Q.  Why not?

A.  I don't know.

Q.  Is that normal, for there to be a discrepancy in the evidence log?

A.  I don't know.  I just went to check if it was in there, that way I can delete the pictures. I didn't want to delete them and Victor comes and says, Hey, you got that, what bedroom that was in?

Q.  Did you ask Victor before deleting the pictures?

A.  No.

Page 177

Q.  Why not?

A.  I don't know.

Q.  You don't know?

A.  No.

Q.  Is it strange that three pills were missing from the evidence log?

A.  Might have made a mistake writing it in there.  It could have had ten pills in the back.

Q.  Did you ask Victor if he made a mistake writing it down?

A.  No.

Q.  Why not?

A.  I don't know.

Q.  Is that normal, to just leave evidence discrepancies in the log?

A.  I don't know.  That's the first time I ever ran across it.

Q.  Did you not think to follow up with the chief of detectives?

A.  Not really, no.

Q.  You didn't think to follow up with the deputy chief?

A.  No.  He just goes, Take it out whenever he's ready, I guess.

Q.  You didn't think to follow up with Chief



Page 178

Fontenot?

A. No.

Q. Why not keep the photo in case it became an issue later on?

A. I don't know.

Q. Is that appropriate, to allow a discrepancy in the evidence log?

A. I don't know. They might have had ten pills in the bag and he might have just wrote it wrong.

Q. But you didn't think it was worth following up on?

A. I didn't -- at that time, I didn't think about it.

Q. If there's an error in the evidence log, can a case get thrown out?

A. I don't know.

Q. Are you familiar with the chain of custody?

A. I mean, whoever collects it, they hold on to it and then log it down and drop it in the box.

Q. If evidence is logged inappropriately, can a criminal case get thrown out?

A. I'm guessing. I have no clue.

Q. Don't you think that's relevant for your

Page 179

job to know?

A. I mainly serve probation warrants.

Q. Do you think, as an officer at the EPD, you should confirm that the evidence log is accurate if you know there might be a discrepancy?

A. I mean, I went to Lieutenant Dunn.

Q. Did Lieutenant Dunn provide you any additional instructions?

A. No. I brought it to a superior officer. He should have went with it.

Q. Why didn't you ask Victor?

A. Victor wasn't there. When I saw it, Lieutenant Dunn was coming down the hall, so I asked him.

Q. Why not ask Victor the next time you see him?

A. I didn't think about it.

Q. You didn't think it was important to ask him about why there was a discrepancy in the evidence log?

A. I might not see Victor for two or three days.

Q. Was it that important to delete the pictures that you couldn't wait two or three days?

A. No.

Page 180

Q. But you just didn't think it was important to correct a potential mistake?

A. I don't know.

Q. Did you report it to anyone else?

A. No. I went to the lieutenant that was on duty, I saw him in the hall.

Q. Have you received any training about appropriate handling of evidence?

A. (The witness shook head.)

Q. You don't get trained at the Eunice Police Department on handling evidence?

A. The reserves don't get trained like the full-time officers do. They go to the academy.

Q. Do you know what EPD policy is with respect to proper logging of evidence?

A. No.

Q. I want to go back to the Anthony Thibodeaux incident briefly.

A. Uh-huh.

Q. What was the charge against Bridgette Miller?

A. Resisting.

Q. She was charged with a resisting arrest?

A. Correct.

Q. Is that common for someone who has a

Page 181

fugitive in their home?

A. That they won't let us in? Yes.

Q. And then is it common to, after you receive a warrant, to charge them with resisting arrest?

A. Yeah, you can.

Q. For having someone in their home who has a warrant out?

A. Yes. Because she knew he had a warrant. Because when I went to the residence, I asked her if he was there. She said No. I said, Someone just called me and told me they seen him in the house, they just passed here.

I said, He's got a warrant. I said, Can I come look? She said, No, if you want to come in here, get a warrant. So I went and got a warrant.

Q. Was she within her rights to ask that you come back with a search warrant?

A. Yeah.

Q. So how did she resist arrest?

A. Because she didn't want to tell us the guy was in the house. And he had the warrant. We know he was in there.

Q. Does lying to a police officer count as resisting arrest?



Page 182

A. Yeah.
Q. Are you familiar with the statute under Louisiana law that says that?
A. No.
Q. Did you serve the search warrant on Anthony Thibodeaux?
A. Yes.
Q. Who told you that it is against the law to lie to a police officer and that qualifies as resisting arrest?
A. Nobody told me that. I asked the judge -- I said, Bridgette won't let us in the house, we got confirmation he's in the house. He said, Do a search warrant, and then you can arrest her for resisting because you told her he has a warrant and she would not let you inside.
Q. Do you know if the case against Bridgette Miller was prosecuted?
A. Yes.
Q. What was the outcome of that case?
A. She got put on probation.
Q. Do you know if the case against Anthony Thibodeaux was prosecuted?
A. Yes.
Q. What was the outcome on that case?

Page 183

A. He served time in jail.
Q. How did you learn about those outcomes?
A. Because I'm there for the probation court, and I was in court for Bridgette because she was taken into trial.
Q. How often are you there in court for a case?
A. Usually every Monday I go to court because we have court every Monday.
Q. Do you only go to court for cases where you were involved in the investigation?
A. No.
Q. You just go to the court every Monday?
A. Yes, to help the marshals out.
Q. Were Bridgette and Anthony's cases on Monday -- on a Monday?
A. Anthony's was probably on a Wednesday. That's usually when our probation hearings are, Wednesday, unless the judge changes it to another day.
Q. Are you present for all of the probation hearings at the court?
A. Sometimes it's in the judge's office, sometimes I'm downstairs listening on the monitor.
Q. How do you decide which probation hearings

Page 184

you go to and which ones you don't?
A. If I'm there, I go listen.
Q. Are you required to be at any certain probation hearings?
A. No.
Q. Even if it's someone that you arrested, you're not required to be at their probation hearing?
A. No.
Q. So you choose when to go to a probation hearing?
A. Yes. If I want to hear what the judge is doing to them, I go.
Q. Did you collect any evidence in the Anthony Thibodeaux case?
A. On his person, not that I recall.
Q. Did you collect any evidence from his house, from Bridgette Miller's house?
A. No.
Q. Did EPD personnel obtain another search warrant for the drugs that were in Bridgette Miller's house?
A. I don't think so.
Q. Why not?
A. I think it was just paraphernalia.

Page 185

Q. You had testified earlier that they had found some weed; is that not accurate?
A. And a little burnt pipe or something, a little weed pipe.
Q. Did the EPD officers not think it was prudent to get a search warrant?
A. I don't know.
Q. If you find combusted drug materials incident to a search, do you normally not get a search warrant for additional drugs?
A. You can.
Q. Is it common for EPD personnel to not get a search warrant?
A. I'm not involved in their cases.
Q. Have there been other cases where you were involved where there were drugs but no further investigation?
A. When I went to arrest somebody, no, there was no drugs.
Q. If you were in that position, would you have gone back to get another search warrant for the drugs in Bridgette Miller's house?
A. For the paraphernalia, probably not.
Q. Why not?
A. It's just a little grinder here, nothing's

47 (Pages 182 to 185)


MAGNA
LEGAL SERVICES

Page 186

in it.  I mean, you can buy them all day long at the store.

Q.  I want to go back to the Kenneth Charles incident.  Did you discuss the Kenneth Charles incident with anyone at the department afterward?

A.  No.

Q.  It never came up in any conversation with anyone else?

A.  (The witness shook head.)

Q.  Did you talk to Lieutenant Dunn about the Kenneth Charles incident?

A.  No.

Q.  So after you brought him in, put him in the pink room, that was the end?

A.  (The witness nodded head.)

Q.  You had no further involvement or discussion about his case?

A.  No.  I was going because they needed a transport.  He was already getting transported.  So...

Q.  You testified earlier that you thought Kenneth Charles had mental health issues; is that right?

A.  Uh-huh.

Q.  If you were aware that he had mental

Page 187

health issues, why did you leave him alone in the pink room?

A.  That's where we put everybody.

Q.  Did you leave him alone in the pink room unrestrained?

A.  Yeah.

Q.  Is it common to leave someone with mental health issues alone in a room unrestrained?

A.  Yeah, they got a camera in there that they can watch them on.

Q.  So that's common, you'll leave someone with potentially a mental health episode alone unrestrained in the pink room?

A.  Yeah.

MR. STAMEY:
Objection to the form of the question.

BY MR. BHATLA:

Q.  Was there a concern that he might have been loaded up with fentanyl?

A.  According to paramedics, he was fine.

Q.  But before you hosed him down, someone had expressed concern that he was on fentanyl and had it on him; is that right?

A.  They thought it was fentanyl because the officer went down.

Page 188

Q.  "It was fentanyl," does that mean they thought fentanyl was on him?

A.  Yeah.

Q.  Was there any thought that he might have taken fentanyl?

A.  Possibly.

Q.  If an individual is suspected to have taken fentanyl, would you take them to the hospital?

A.  No.

Q.  Would you seek immediate medical care?

A.  No.  We have Narcan.  If something happens, we can give it to them, and then we can take them to the hospital or call EMS to pick them up.

Q.  Who thought there was fentanyl on him?

A.  I guess whoever was at the scene.

Q.  That being Victor Fontenot, Cody Miller, or Ryan Young?

A.  Lieutenant Dunn.

Q.  Or Deputy Chief Daigle?

A.  Maybe him or Lieutenant Dunn was there.  Might have been him.  I don't know.

Q.  Lieutenant Dunn was off duty though, right?

Page 189

A.  Yeah.

Q.  Who might have thought that he had fentanyl on him?

A.  Whoever was out there.

Q.  Did you hear that there was a possible suspicion that he might have fentanyl?

A.  Yeah, I think something might have come over the radio or something during --

Q.  Do you know who said that over the radio?  Sorry, go ahead.

A.  No.

Q.  Did you hear about it at any other point aside from the radio?

A.  When we got the -- when he got to the police department, the paramedics said to hose him off in case he had fentanyl on him.

Q.  Do you know who told the paramedics that he might have fentanyl?

A.  No.

Q.  Can the paramedics listen in to the police radio?

A.  No.

Q.  So they would have been told separately from that radio transmission?

A.  If somebody called them to come.



Page 190

Q. Someone at the scene may have called the paramedics and told them that Kenneth Charles had fentanyl?

A. There; maybe the dispatcher heard it, maybe she called the paramedics.

Q. Do you know who called the paramedics?

A. No.

Q. Did you tell anyone that you thought Kenneth Charles had mental health issues?

A. No.

Q. Why not?

A. I don't know.

Q. Is there a department procedure for handling criminal suspects with mental health issues?

A. Not that I know of.

Q. Does an officer having a mental health issue -- withdrawn.

Does a suspect having a mental health issue pose a risk to officer safety?

A. Yes.

Q. Why not tell others that then?

A. Everybody was on scene.  They already know what's going on.

Q. When you took Kenneth Charles to the pink

Page 191

room, did you inform the jailer that you thought Kenneth Charles was having a mental health episode?

A. I don't know if the jailer was there or not.

Q. Do you know who was at EPD at the time?

A. No.

Q. Do you know who would have been in charge of processing Mr. Kenneth Charles?

A. That would have been the jailer.

Q. But you don't know if the jailer was there?

A. No.

Q. Did you not think to check if the jailer was there?

A. No.

Q. Why not?

A. Sometimes they go to Opelousas to get lunches.

Q. Did you not think it was important to tell the jailer that there's a suspect in custody who might be having a mental health episode?

A. No, just because I think somebody is mental doesn't mean they mental.

Q. Is it not prudent for officer safety to at

Page 192

least alert the jailer of that being an issue?

A. I mean, when they go talk to him, they can see him mumbling to himself.

Q. So you left that up to the jailer to find out by themselves?

A. Yeah.  Just -- just because I thought he had mental illness, he might not have been mental.

Q. But you didn't think to express that concern to anyone?

A. No.

Q. Would you normally leave someone alone who has a mental health issue like that?

A. Yeah.

Q. Would you not tell anyone about that being a concern?

A. I don't know.

Q. If you brought him in, were you supposed to also book him into the system?

A. No.

Q. Who was responsible for booking him in?

A. The jailer.

Q. If you weren't there, who was -- who would be there to tell the jailer about the circumstances of the incident?

A. Whoever turns in the arrest report.

Page 193

Q. Who would be the person to turn in the arrest report?

A. The person that arrested him.

Q. And who do you know to be the person who arrested him?

A. I don't know.  They were loading him up in the car when I got there and he was already handcuffed.

Q. You didn't think to ask who was filing the report?

A. No.

Q. You didn't think to follow up and say, Do I need to file a report because Cody Miller is in the hospital?

A. No.

Q. So you just brought Kenneth Charles in, put him in the pink room, and left without talking to anyone at the department?

A. Mr. Huckaby transported him.  I just washed him off outside.

Q. You washed him off and then you took him to the pink room?

A. Correct.

Q. Did you tell anyone about the fact that you had washed him off and put him in the pink



Page 194

room?
   A.  I think we came on the radio and might have said it so whoever put the handcuffs on him knows where he's at.  They either in the pink room or sitting on the bench.
   Q.  Did you tell anyone that Kenneth Charles might have consumed fentanyl?
   A.  Not that I know of.
   Q.  You say there's a camera in the pink room; is that right?
   A.  Correct.
   Q.  Who would be monitoring the camera?
   A.  The dispatcher.
   Q.  If Kenneth Charles had a medical reaction to the fentanyl, the dispatcher would have to catch that on the camera, right?
   A.  Yes.
   Q.  Would the dispatcher know that Kenneth Charles had potentially consumed fentanyl?
   A.  She should have if she dispatched people to the call.
   Q.  But you don't know if she knew or not, if the dispatcher knew or not?
   A.  I can't say if she did or not.  But if she dispatches somebody to the call and she's

Page 195

listening to the radio, she ought to hear it.
   Q.  Did you think to tell the dispatcher that Kenneth Charles may have consumed fentanyl?
   A.  No.
   Q.  Why not?
   A.  I don't know.
   Q.  You didn't think that was an important detail to share?
   A.  We tell them we put somebody in the pink room and they start watching the camera.
   Q.  Is that all the dispatcher does is watch the camera?
   A.  No.  She dispatches the calls.
   Q.  Is it possible that a dispatcher might not be watching the camera for a certain period of time?
   A.  It's possible.
   Q.  How many dispatchers are usually on duty as the Eunice Police Department?
   A.  One.
   Q.  So one person is responsible for routing calls and dispatching and monitoring the pink room?
   A.  Correct.
   Q.  Did anyone instruct you at the department

Page 196

to put Kenneth Charles in the pink room?
   A.  No.  We couldn't just leave him naked out for the public to see him.
   Q.  Is there a jail at the Eunice Police Department?
   A.  Yes.
   Q.  Why put him in the pink room instead of the jail?
   A.  Because he ain't been booked in yet.
   Q.  Is that common, you put all individuals who haven't been booked in the pink room?
   A.  Or on the bench.  Once they get booked in, strip-searched, then they go in the jail.
   Q.  Did you strip-search Kenneth Charles?
   A.  No.
   Q.  Why not?
   A.  I just took his clothes off.  I didn't ask him to squat and cough and all of that.
   Q.  Were you in the room when Kenneth Charles took his clothes off?
   A.  He was in the pink room.
   Q.  Were you in the room with him?
   A.  No.  I was outside.  I just opened the door, stand right there.
   Q.  But you didn't search him?  You didn't

Page 197

search his person?
   A.  No.  Took all his clothes and took it out.
   Q.  Did you search his clothes?
   A.  No.  It was all wet.
   Q.  Why not?
   A.  Because I didn't have any gloves with me.
   Q.  Are there no gloves at the Eunice Police Department?
   A.  Yes, we have gloves.
   Q.  Why not search -- why not grab some gloves and then search his clothes?
   A.  The officer that arrested him takes his property, gives it to the jailer.  They can search him.
   Q.  Is that common for the jailer to be the one who does the search?
   A.  Correct.
   Q.  Is it common for the jailer to be the one to do the strip-search?
   A.  Yes.
   Q.  Do you ever do strip-searches?
   A.  Sometimes.
   Q.  Why sometimes?
   A.  Because if they got a female working, a female jailer, she doesn't strip-search males, and


MAGNA
LEGAL SERVICES

Page 198

she'll ask whoever -- whatever officer is there to come and strip-search them.

Q. Did you put Kenneth Charles in the pink room with the expectation that he would be booked and then put in the jail?

A. Yeah.

Q. Did you ask who would be filing the report on Kenneth Charles?

A. No.

Q. Did you take Charles' clothes off or did he take them off himself?

A. He took them off.

Q. The paramedics were the ones who instructed you to hose Kenneth Charles down; is that correct?

A. Correct.

Q. Did you not ask for approval from a supervisor to hose him down?

A. No.

Q. Why not?

A. Because if this guy did consume fentanyl, he needs medical attention. I can't just run around with him trying to find a supervisor.

Q. Was there any discussion of sending Kenneth Charles to outpatient care?

Page 199

A. I don't know.

Q. Did you ever discuss that with anyone?

A. No.

Q. Did you think Kenneth Charles might need medical care?

A. No.

Q. If you take someone's clothing, is there some sort of record or log of what was taken?

A. Yes.

Q. Did you record the clothing that you took from Kenneth Charles?

A. No.

Q. What did you do with the clothing that you took from him?

A. Left it at the door, outside where he was at.

Q. You left it in the door, you didn't bag it?

A. No.

Q. You didn't label that it was his clothing?

A. No. He was in the pink room. It's his.

Q. You just left it on the floor?

A. Yes. And then when the jailer comes, he'll take the clothes, got a paper, fill out it was their clothes, put their name on it.

Page 200

Q. Did you not think that if there was fentanyl on the clothes, that should be bagged?

A. According to the paramedics, once we wet it, it was good. That's why they wanted us to wet it.

Q. You didn't think there might have been trace amounts of fentanyl still on the clothing?

A. I don't know.

Q. Or any other evidence of criminal activity on the clothing, did you think that there might be a chance of that being there on the clothes?

A. Didn't think about it.

Q. So you just took his clothes and put them on the ground in front of the pink room?

A. Correct.

Q. Is that how you would normally approach bringing in a suspect to the pink room?

A. If I'm not the arresting officer, yes. If I'm the arresting officer, I turn in the arrest report and I go and take their clothes, label it, and give it to the jailer.

Q. Why does it make a difference if you're the arresting officer or not?

A. In case they need to look at the clothes, search it for something.

Page 201

Q. If you put the clothes in a bag, can someone still search them?

A. Yes. But then, if I save it, they don't know where it's at.

Q. Why not?

A. Because the officers don't go save the clothes, the jailer does. They have a special room that's locked for the inmate property.

Q. Can you label that bag and drop it off in the room where the jailer has access?

A. Yeah.

Q. But you didn't here?

A. No, I didn't that time.

Q. Why not?

A. I don't know.

Q. Is that common at Eunice, where the officer who's not the arresting officer can just place evidence wherever they feel like?

MR. STAMEY:

Objection to the form of the question.

A. It was at the door with the inmate.

BY MR. BHATLA:

Q. Is that consistent with department policy in terms of the handling of the evidence?

A. I don't know. I didn't read the book to



Page 202

see what we had to do with their clothes.

Q. In your training, when you receive the personal effects of a suspect, what are you supposed to do with it?

A. What you mean?

Q. If you obtain clothing or personal items from a criminal suspect, what are you supposed to do with it once you have obtained it?

A. Whatever I collect, I tag.

Q. And you collected Kenneth Charles' clothes, right?

A. Yes. But I wasn't the arresting officer.

Q. But you collected his clothes and didn't tag them?

A. Correct. I left it at the door with him.

Q. When you collect evidence from an individual, are you supposed to note who handled it?

A. No. Because it's on the sheet of paper.

Q. Are you familiar with the chain of custody?

A. I didn't know his clothes was evidence. That's just his personal items.

Q. Is that generally the case, that you would not tag someone's clothing if they're brought in

Page 203

for a criminal activity?

A. If I arrest them, I tag their clothes. I just brought him in and put him in the pink room; that way, whoever the arresting officer is, they can go and deal with his clothes.

Q. But you were told that he might have fentanyl on his clothing, correct?

A. Yeah.

Q. So even though you thought he may have fentanyl on his clothes, you didn't think to tag it?

A. No.

Q. Does that not seem strange to you, to not tag clothing that possibly has fentanyl on it?

MR. STAMEY:

Objection to the form of the question.

A. I never ran into that before. That was the only time. The paramedic said it was fine after we wet it.

BY MR. BHATLA:

Q. The paramedics told you there was no more fentanyl on the clothes?

A. They just said that once we wet it down, there's no more exposure to it.

Q. There's no more risk that you will be

Page 204

exposed by handling it?

A. Correct.

Q. But the fentanyl might still be on the clothing?

A. Maybe.

Q. But despite that, you did not tag the clothing?

A. No, I did not tag it.

Q. Was that the first time you had dealt with a situation where an individual might have had fentanyl on their clothing?

A. Yeah.

Q. Do you consult your supervisors when you run into a new situation?

A. Yeah.

Q. Did you consult your supervisor here with what to do with his clothing?

A. No.

Q. Why not?

A. I don't know.

Q. Did you not think to ask whether you should tag the clothing?

A. I didn't think to ask.

Q. Do you know if Kenneth Charles' clothing was eventually tagged?

Page 205

A. No, I don't.

Q. So you don't know what happened to the clothing?

A. I guess when he bonded out, got released, he got his clothes back.

Q. You don't know if the jailer ever got custody of the clothing; is that right?

A. Correct. I wasn't there. I'm pretty sure he didn't walk out naked.

Q. He was wearing clothes in the pink room, right?

A. Yes. Our jumpsuits, orange jumpsuit.

Q. But you don't know if his clothing was ever properly tagged?

A. No.

Q. Anyone could have come in and grabbed the clothing who was in the department?

A. It's possible.

Q. Is that not a risk to the chain of custody?

A. I don't know.

Q. Are you familiar with the concept of chain of custody?

A. Yeah.

Q. Were you not concerned, then, that leaving



Page 206

the evidence there without anyone knowing about it might taint the chain of custody?

A. No. We done wet it down.

Q. What does wetting it down have to do with the chain of custody?

A. Paramedics said there's no more exposure to it after it's wet down. It's a powder. That's why they made us wet it down.

Q. Does evidence being wet change the way you're supposed to log it or tag it?

A. Well, it wasn't evidence, it was his personal property.

Q. Do you normally -- scratch that.
When you book a suspect and you take their clothing, is it normally logged and tagged at the department?

A. The jailer takes their clothes.

Q. Do you know if Kenneth Charles' clothing was logged?

A. No.

Q. Did you ever go back and check if it had been logged?

A. No.

Q. Did you ever go back and check with the jailer if they had received his clothing?

Page 207

A. No.

Q. Did you go back and check if the clothing had been tested for fentanyl?

A. No.

Q. Did you tell anyone that you thought the clothing might have fentanyl on it?

A. No.

Q. Did you think the clothing might have fentanyl on it?

A. According to what was on the radio, possibly.

Q. Was there an official arrest of Kenneth Charles?

A. What you mean, "official arrest"?

Q. Was Kenneth Charles arrested?

A. Yeah. He was handcuffed, brought to the Eunice Police Department.

Q. If someone is arrested, is there a report that's filed about the arrest?

A. Yeah.

Q. Is there always a report for every -- for every arrest?

A. Yes. The jailer gets that, books them in.

Q. Would it surprise you if there was no arrest report about Kenneth Charles?

Page 208

A. Why wouldn't there be?

Q. My question is: Would it surprise you if there was not one?

A. Yes. Everybody that's arrested has an arrest report.

Q. So there should be an arrest report for Kenneth Charles?

A. Yeah.

Q. Would it surprise you if Kenneth Charles was not charged with a crime?

A. Yeah.

Q. Why would that surprise you?

A. He's beating on the officer's unit.

Q. Is beating on an officer's unit a crime?

A. Yeah.

Q. So Kenneth Charles should have been charged?

A. Yeah.

Q. He should have been booked at the department?

A. Yeah.

Q. He should have been placed in the jail?

A. Yeah, unless he bonded out before they put him in the jail.

Q. There should have been an arrest report

Page 209

about his arrest?

A. Yeah.

Q. Do you find it strange that there was no police report?

A. There should have.

Q. Is it strange that there was no police report?

A. So you're telling me there was none?

Q. Yes. And do you find that strange?

A. Yeah.

Q. Are you familiar with any other arrests where there was no accompanying arrest report?

A. No.

Q. So it's not consistent with department policy for there to not be an arrest report?

A. No, because he's got to have a report, and then that gets sent up to court.

Q. Do you find it strange that there was no inventory from the arrest of Kenneth Charles?

A. Yeah.

Q. Why is that strange?

A. Because there's always an inventory property sheet.

Q. Someone expressed concerns that Kenneth Charles might have been poisonous to touch at the



Page 210

scene; is that right?

A. They said he possibly had fentanyl on him.

Q. And that he was dangerous to touch?

A. Yeah, I guess you could say that.

Q. Is it strange, then, that he was put in the car despite that danger?

A. I guess.

Q. It was strange that he was put in the car despite the danger?

A. I mean, he's arrested, we got to bring him to the P.D. We can't just leave him in the street handcuffed.

Q. Would you not take precautionary measures before putting him in the car to make sure he's not potentially poisonous?

A. Nobody knew what to do until the paramedics told us what to do.

Q. Did you think to call the paramedics ahead of time and ask?

A. I didn't.

Q. Did anyone at the department think to call the paramedics and ask?

A. Somebody had called because they showed up.

Q. Did anyone ask the paramedics how to

Page 211

safely put Kenneth Charles in the car?

A. No.

Q. Why not?

A. I wasn't there. They were putting him in the car when I drove up.

Q. If there was a risk that Kenneth Charles was a risk to officer safety --

A. The officer could have called the paramedics to go out there.

Q. But no one called the paramedics to come out to the scene?

A. I don't guess.

MR. BHATLA:

On the record, I'll ask Counsel, if you possess the arrest report for Kenneth Charles, I'd ask that that be produced.

MR. STAMEY:

Let me ask you this question: I don't have the ability to look through all these voluminous records right this moment, but did y'all ever specifically submit a production request to anyone associated with Kean Miller about those documents?

MR. BHATLA:

That arrest report is covered in the

Page 212

discovery request that we served upon defendants.

MR. STAMEY:

Was Kenneth Charles specifically referenced in connection with that? So I'm trying to answer your question.

MR. BHATLA:

Right.

MR. STAMEY:

So I'm trying to first find out, did y'all ask Kean Miller to produce that information?

MR. BHATLA:

I'm happy to go and confirm for you and we can circle back to that. But I can say that it was specifically named in multiple correspondences that we've provided Counsel; the February 17th confirmatory e-mail, it's covered in Request For Production Number 3, we mentioned it during the February 10th meet-and-confer.

So I will say that it has been -- defendants have been on notice that we've asked for the arrest report, and I will

Page 213

just ask on the record that it be produced.

MR. STAMEY:

Kenneth Charles in particular.

MR. BHATLA:

That has been identified to Counsel, yes, as part of our correspondence.

MR. STAMEY:

As part of a discovery -- formal discovery request?

MR. BHATLA:

Yes, that is encompassed as part of a formal discovery request.

MR. STAMEY:

And, again, because I haven't gone through all those records regarding Kenneth Charles right this moment, do you recall if the prior attorneys responded to that request specifically as to the Kenneth Charles issues you're referring to?

MR. BHATLA:

I'm happy to talk about this off the record during our meet-and-confer, but I don't want to take up more time.




MAGNA
LEGAL SERVICES

Page 214

MR. STAMEY:

No, no, but you're asking us to immediately produce that report, and I don't -- I can't even begin to tell you if it exists.

MR. BHATLA:

I'm just making a request on the record. We can go over that later.

MS. WALL:

Can I just ask if we -- can I just ask you, if I go and look through all the request for production of documents, will I find one somewhere that says "produce Kenneth Charles'" like in the request for production of documents specifically?

MR. BHATLA:

Let's talk about that in the conference.

BY MR. BHATLA:

Q. So, Buddy, let's keep going on our deposition.

THE WITNESS:

Can we take a break?

MS. WALL:

Yeah.

Page 215

MR. BHATLA:

Sure, why don't we take a short break.

THE VIDEOGRAPHER:

Off the record at 2:35.

(A break was taken from 2:35 p.m. to 2:44 p.m.)

THE VIDEOGRAPHER:

We're back on the record at 2:44.

BY MR. BHATLA:

Q. Buddy, have you received any training while at the Eunice Police Department about proper handling of evidence?

A. No.

Q. Have you reviewed any department policies with respect to the handling of evidence?

A. No.

Q. Have you reviewed any department procedures with respect to the handling of evidence?

A. No.

Q. Was any of your testimony today affected by concern that you'll be retaliated against by Chief Fontenot?

A. No.

Q. You are not entitled to civil service

Page 216

protection; is that right?

A. Correct.

Q. Does that mean the chief can fire you for any cause?

A. Correct.

MR. BHATLA:

I have no further questions.

MR. STAMEY:

With that, give us just a moment, about five minutes, and we'll be right back with you. We're going to take a break.

MR. BHATLA:

Sure.

THE VIDEOGRAPHER:

Off the record, 2:45.

(A break was taken from 2:45 p.m. to 12:51 p.m.)

THE VIDEOGRAPHER:

We're back on the record at 12:51.

MR. BHATLA:

Buddy, would you like to read and sign the deposition or do you waive that right?

THE WITNESS:

Waive it.

Page 217

THE VIDEOGRAPHER:

And that concludes this deposition. We're off the record at 2:51.

DEPOSITION CONCLUDED AT 2:51 P.M.




MAGNA
LEGAL SERVICES

Page 218

REPORTER'S PAGE

I, RITA DEROUEN, Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), Registered Professional Reporter (RPR #006908), the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the record:

That due to the interaction in the spontaneous discourse of the proceeding, double dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a transcription of proceedings, and that the double dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the parenthetical "(phonetic)";

That the parenthetical "(sic)" is used to denote when a witness stated a word or phrase that appears odd or erroneous to show that it was quoted exactly as it stands.

RITA DEROUEN, CCR, RPR

Page 219

CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, RITA A. DEROUEN, Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), Registered Professional Reporter (RPR #006908), as the officer before whom this testimony was taken, do hereby certify that BUDDY DUPRE, having been duly sworn by me upon authority of R.S. 37:2554, did testify on November 28, 2022, as hereinbefore set forth in the foregoing 218 pages; that this testimony was reported by me in stenographic shorthand, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with the transcript format guidelines required by statute and rules of the Board; that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual

Page 220

relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and the Rules and Advisory Opinions of the Board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter; that I am not related to counsel or to any of the parties hereto, I am in no manner associated with counsel for any of the interested parties to this litigation, and I am in no way concerned with the outcome thereof.

Signed and stamped this 8th day of December, 2022, Baton Rouge, Louisiana.

Rita DeRouen, RPR, CCR

