UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MICHAEL DUNN,
                                    CIVIL ACTION NO.
        Plaintiff,                  6:21-cv-01535

    v.

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, and
JOHN DOE,

        Defendants.


* * * * * * * * * * * * * * * * * * * * * * * * * * * *

        TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:

            CHASE MICHAEL GODEAUX,

TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE

ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *


        REPORTED AT:

        DOUBLETREE BY HILTON LAFAYETTE

        1521 WEST PINHOOK ROAD

        LAFAYETTE, LOUISIANA  70503


        COMMENCING AT 10:23 A.M., ON JUNE 26, 2023.

# MAGNA
## LEGAL SERVICES

**EXHIBIT M**

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
    SIDLEY AUSTIN LLP
    (BY:  LIA M. HIGGINS, ESQ.)
    1501 K STREET, NW
    WASHINGTON, DC  20005
    (202) 736-8075
    lhiggins@sidley.com

    (BY:  ERNESTO R. CLAEYSSEN, ESQ.)
     [VIA VIDEOCONFERENCE]
    787 SEVENTH AVENUE
    NEW YORK, NEW YORK  10019
    (212) 839-5387
    eclaeyssen@sidley.com

FOR THE CITY OF EUNICE:

    BECKER & HEBERT, LLC
    (BY:  JAMES P. DOHERTY III, ESQ.)
    201 Rue Beauregard
    LAFAYETTE, LOUISIANA  70508
    (337) 233-1987
    james@lawbecker.com
        - AND -
    STAN FEUCHT ATTORNEY AT LAW, L.L.C.
    (BY:  STAN FEUCHT, ESQ.)
    440 NORTH 2ND STREET
    EUNICE, LOUISIANA  70535
    (337) 550-1115
    stan@feuchtlaw.com

FOR RANDY FONTENOT:
    ERLINGSON BANKS, PLLC
    (BY:  KAITLIN WALL, ESQ.)
    301 MAIN STREET, SUITE 2110
    BATON ROUGE, LOUISIANA  70801
    (225) 218-4446
    kwall@erlingsonbanks.com

Page 3

A P P E A R A N C E S (Continued)

FOR VICTOR FONTENOT:
    STAMEY LAW FIRM, L.L.C.
    (BY:  JOSEPH B. STAMEY, ESQ.)
    727 SECOND STREET
    NATCHITOCHES, LOUISIANA  71457
    (318) 352-4559
    joe@stameylawfirm.com

FOR RYAN YOUNG:
    NEUNER PATE
    (BY:  JASON REED, ESQ.)
    1001 WEST PINHOOK ROAD, SUITE 200
    LAFAYETTE, LOUISIANA  70503
    (337) 237-7000
    jreed@neunerpate.com

ALSO PRESENT:

    DON GROVER, VIDEOGRAPHER

    ALEXANDRA BIELER

    RANDY FONTENOT

    MICHAEL DUNN

REPORTED BY:
    YOLANDA J. PENA
    CCR NO. 2017002, RPR
    STATE OF LOUISIANA

Page 4

I N D E X

                                              PAGE

STIPULATION..........................................5

EXAMINATION BY:

    MS. HIGGINS................................7, 263

    MR. REED.....................................229

    MR. DOHERTY..................................246

    MS. WALL.....................................252

REPORTER'S PAGE..................................272

REPORTER'S CERTIFICATE...........................273

LIST OF EXHIBITS

(NONE)

Page 5

S T I P U L A T I O N

        IT IS STIPULATED AND AGREED by and among the
parties that this deposition is hereby being taken
pursuant to the Federal Rules of Civil Procedure.
        All formalities, excluding the reading and
signing of the transcript by the witness, are hereby
waived.
        All objections, except as to the form of the
question and responsiveness of the answer, are
considered reserved until trial or other use of the
deposition.



Page 6

THE VIDEOGRAPHER: We are now on the record. This begins video file number one of the deposition of Chase Godeaux in the matter of Michael Dunn versus Randy and Victor Fontenot in the U.S.D.C., Western Louisiana Court.

Today is Monday, June 26, 2023. The time is 10:23. This deposition is being taken at Doubletree Inn, Lafayette, Louisiana, at the request of Sidley Austin LLP.

The videographer is Don Grover, and the court reporter is Yolanda Pena. We're both with Magna Legal Services.

At this time, will counsel and all parties present state their appearances and whom they represent.

MS. HIGGINS: Lia Higgins with Sidley Austin for Lieutenant Michael Dunn.

MR. REED: Jason Reed for Ryan Young.

MR. STAMEY: Joe Stamey here on behalf of Victor Fontenot.

MR. DOHERTY: James Doherty on behalf of the City of Eunice.

THE VIDEOGRAPHER: Also present?

MS. BIELER: Alexandra Bieler with

Page 7

Sidley Austin.

MR. FONTENOT: Randy Fontenot, former chief of police.

THE VIDEOGRAPHER: And by Zoom?

MR. STAMEY: I'm sorry.

THE VIDEOGRAPHER: And by phone?

MR. STAMEY: Kaitlin? Kaitlin, can you hear me? Kaitlin, go ahead and announce your name and representation, please.

MS. WALL: This is Kaitlin Wall. I'm here on behalf of Chief Randy Fontenot -- or former Chief Randy Fontenot.

MR. FEUCHT: Stan Feucht, Eunice city attorney.

THE VIDEOGRAPHER: At this time, will the court reporter please swear in the witness.

* * *

CHASE MICHAEL GODEAUX, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. HIGGINS:

Q. All right. I'll get started. My name is Lia Higgins. I represent Lieutenant Michael Dunn. I work

Page 8

with Sidley Austin LLP. And throughout the day, I will refer to my client as Lieutenant Dunn.

Will you know who I'm referring to when I refer to him that way?

A. Yes, ma'am.

Q. Okay. Can you state your full name for the record?

A. Chase Michael Godeaux.

Q. Have you ever been deposed before?

A. Yes, ma'am.

Q. How many times?

A. Two to three times.

Q. What type of proceeding?

A. Crashes.

Q. Have you ever testified at trial or another court proceeding?

A. Yes, ma'am.

Q. About how many times?

A. Probably about four or five.

Q. As part of your duties as an officer?

A. Yes, ma'am.

Q. Are you represented here by counsel today?

A. No, ma'am.

Q. All right. We're going to go over a couple of ground rules, just basic things to cover the day.

Page 9

Okay?

A. Okay.

Q. So you will be testifying under oath, and your answers will be subject to penalty of perjury. Do you understand that?

A. Yes, ma'am.

Q. Okay. Your statements here today have the same effect as they would in a court of law. Do you understand that?

A. Yes, ma'am.

Q. I'm going to ask you a series of questions. If you don't understand the question, that's totally fine. Just ask me to restate for clarification, and I'm happy to do so. If you do not do so, I will assume that you understood the question. Do you understand that?

A. Yes, ma'am.

Q. Okay. Please make sure that you provide verbal answers to all questions, so no head nods, thumbs-up. We have a lovely court reporter here today, but she can only record verbal answers. Do you understand?

A. Yes, ma'am.

Q. Okay. If counsel objects, you must still answer the question unless they direct you not to



Page 10

answer. Do you understand that?

A. Yes, ma'am.

Q. If at any time you want a break, no problem, happy to do that. We all needs breaks. Just let me know. If we're in the middle of a question, I might ask you to finish the answer to the question or the series of questions, and then we'll take a break shortly thereafter.

A. Yes, ma'am.

Q. Understood? Okay.

Is there any reason why you would be unable to testify truthfully today?

A. No, ma'am.

Q. Okay, great. So did you do anything to prepare for today's deposition?

A. No, ma'am.

Q. Okay. Did you review any documents in anticipation of today's deposition?

A. No, ma'am.

Q. Did you bring any documents or notes today?

A. No, ma'am.

Q. Okay. Have you produced any documents in connection with this dispute?

A. No, ma'am.

Q. Do you understand that there will be a trial

Page 11

in this matter in spring of 2024?

A. Yes, ma'am.

Q. Do you plan to testify at this trial?

A. Yes, ma'am.

Q. Are you aware that Lieutenant Dunn filed this lawsuit against Chief Victor Fontenot, Ryan Young, and the City of Eunice?

A. Yes, ma'am.

Q. Do you understand the nature of the lawsuit?

A. Yes, ma'am.

Q. When did you become aware of the lawsuit?

A. In the last two years, maybe.

Q. Can you tell me a little bit about how you became aware of the lawsuit?

A. Just hearing about it, once I left Eunice PD, hearing about it.

Q. Did you hear about it from other officers at Eunice PD?

A. Yes, ma'am.

Q. Can you tell me which?

A. There was a couple of them, between Austin Doucet, Cody Miller, Michael Dunn, Joshua Courville, Cody Richard, a lot of people that I worked with at that time that I left.

Q. Okay. Have you discussed the lawsuit with

Page 12

anyone at the Eunice Police Department?

A. No, ma'am.

Q. Okay. You now work at St. Landry Parish, correct?

A. Yes, ma'am.

Q. Have you discussed the lawsuit with anyone at St. Landry Parish?

A. Other than my supervisors, letting them know about it.

Q. What did you let them know about?

A. I got subpoenaed for it.

Q. To be deposed today --

A. Yes, ma'am.

Q. -- is that correct?

When did you tell them about that?

A. When I first received the call saying that I was going to be getting a subpoena.

Q. Did you discuss any other details or just that you were being deposed?

A. Just that I was being deposed.

Q. Okay. Have you ever discussed this lawsuit with former Chief Fontenot?

A. No, ma'am.

Q. What about with Victor Fontenot?

A. No, ma'am.

Page 13

Q. What about with Ryan Young?

A. No, ma'am.

Q. Has anyone from the Eunice Police Department asked you to lie during this deposition?

A. No, ma'am.

Q. Has anyone from St. Landry asked you to lie during this deposition?

A. No, ma'am.

Q. Has anyone from the Eunice Police Department asked you to bend the truth during this deposition?

A. No, ma'am.

Q. What about from St. Landry?

A. No, ma'am.

Q. Has anyone from Eunice Police Department or St. Landry asked you, perhaps, not to recall --

A. No, ma'am.

Q. -- anything related to this lawsuit during this deposition?

Okay. Has anyone discouraged you from testifying here today?

A. No, ma'am.

Q. And no one has threatened you because you're testifying here today --

A. No, ma'am.

Q. -- is that correct?



Page 14

A.  That's correct.

Q.  Are you concerned at all that you might face any sort of retaliation as a result of testifying here today?

A.  No, ma'am.

Q.  Okay.  So you'll be able to provide truthful testimony here?

A.  Yes, ma'am.

Q.  Okay, great.  I want to go over your background just a little bit.  All right?  So can you tell me a bit about your educational background?

A.  As far as?

Q.  Where did you -- did you go to college?  What's the highest level of degree you have?

A.  High school diploma.

Q.  High school diploma.

Do you have any sort of professional certifications or licenses?

A.  No, ma'am, not that I can think of.

Q.  Okay.  What was your first job out of college?

A.  I was a busboy at the Coushatta in Kinder, the Coushatta Casino Resort.

Q.  Do you remember what year that was?

A.  2008.

Q.  And what was your next job after that?

Page 15

A.  United States Air Force.

Q.  For how long?

A.  Two years.

Q.  Okay.  And then what?

A.  Then I went back to Coushatta Casino Resort as a server.

Q.  For -- until what year?

A.  2012.

Q.  And then what?

A.  I started at the Eunice Police Department in January of 2012.

Q.  How long were you employed at the City of Eunice?

A.  From January 2012 till September of 2019.

Q.  In what position did you start your employment with the Eunice Police Department?

A.  Patrol officer.

Q.  And then what was your next position?

A.  Sergeant over patrol.

Q.  And then the next one?

A.  And that's --

Q.  That's --

A.  I was acting lieutenant.  But that was about it.

Q.  Okay.  In your role as sergeant, what were

Page 16

your responsibilities?

A.  Supervising the shift and the officers on duty, payroll, checking reports.  If I worked nights, checking on the jail if I didn't have a jailer, sometimes dispatcher, things of that nature.

Q.  Who was your supervisor?

A.  For a short time, I didn't have one, other than the deputy chief.

Q.  Who was, at the time?

A.  Richard Daigle.

Q.  Okay.

A.  And then Robert Brickley became my lieutenant after a while.  I think he was my last -- no, Mary Guillory was my supervisor at one point, too, as a lieutenant.  I think that was the only two that I can remember.

Q.  Did you report to Chief Fontenot at all?

A.  Yes, ma'am, when needed to.

Q.  What do you mean by that, "when needed to"?

A.  Depending on certain occasions, if he asked me questions about them.

Q.  Like what types of cases?

A.  Whether it's juvenile incidences, crash reports, regular incidences that we would go to and investigate.

Page 17

Q.  Is there a reason why he would be asking you about those particular incidents as opposed to any other form of case you'd be working on?

A.  No.  It was just depending on the incident.  If he needed more information on it, if I hadn't turned it in yet, or anything of that nature.

Q.  Are there other situations where he would need more information other than you just hadn't turned in your report yet?

A.  I mean, other than possibly for the news or just for his generalized to keep updated with the cases.

Q.  Okay.  We're going to circle back a little bit.

While you were at the Eunice Police Department, did you work with any other law enforcement agencies?

A.  Yes, ma'am.

Q.  Which ones?

A.  St. Landry Parish, Eunice city marshals, U.S. Marshals, Acadia Parish, Evangeline Parish, and state police.

Q.  Could you give me just a general overview of in what capacity you would work with these other law enforcement agencies?



Page 18

A. Either them assisting us or us assisting them with different cases, whether it's pursuits coming into the city, crashes, medical calls, things of that nature.

Q. So would you say that if you needed more hands on deck, additional help, you might work with another law enforcement agency --

A. Yes, ma'am.

Q. -- in the area? Is that correct?

A. Yes, ma'am.

Q. Okay. All right. How many officers worked at the Eunice Police Department while you were there?

A. I couldn't put a number on it. It was a lot.

Q. Okay. When you left the Eunice Police Department, would you say that there were more or less officers who worked there?

A. Compared to?

Q. When you started.

A. Less.

Q. Why is that?

A. Pay, I would assume, among -- everybody had their own reasons. A lot of people left because of pay.

Q. Because of pay?

A. (Witness nods head.)

Page 19

Q. Can you elaborate a little bit?

A. I started at 9.75 an hour in 2012. When I left, I was at $11.53 an hour, if I'm not mistaken.

Q. And how many years had gone by? Can you remind us?

A. Close to eight years.

Q. Are there any other reasons why people left?

A. I'm sure there is. A lot of people would claim administration or -- or pay was the two main reasons that I can remember.

Q. When you say "administration," what do you mean by that?

A. Just how things were handled, I guess you'd say, whether it be from people not liking the way that the chief at the time was handling things or their supervisor on the road, or whatever the case may be.

Q. To clarify, "the chief at the time" was Chief Fontenot, correct?

A. I had two different chiefs during that time span.

Q. Which chief are you referring to when you say that people might not have liked the way the chief handled things?

A. Both of them.

Q. Can you name for the record the other chief,

Page 20

then?

A. Chief Ronald Dies.

Q. Okay. I want to talk a little bit about why you left the Eunice Police Department. Can you tell me when you left the Eunice Police Department?

A. September of 2019.

Q. Can you tell me why you left the Eunice Police Department?

A. Pay. And then the day that Lieutenant Dunn was placed on admin leave, the very first time was the day that I turned in my application to St. Landry.

Q. What does Lieutenant Dunn's being placed on leave for the first time have to do with your leaving?

A. Because I looked at him as somebody who did everything correctly, did it by the book. So if somebody was trying to make him out to be something he wasn't, whether it was punishment or anything of that nature, I felt like it was only a matter of time before I would be next.

Q. Now, I'm going to tug at some details here a little bit.

A. Okay.

Q. When you say someone trying to make him out to something he was not, who do you mean by someone?

A. Whether it be another lieutenant on shift --

Page 21

or I say "on shift" -- at the department, the deputy chief or the chief.

Q. Okay. So to clarify, did these someones -- because it sounds like you're talking about a few people now -- did that include Chief Fontenot, Ryan Young, and Victor Fontenot?

A. The Chief Fontenot at the time, whenever -- before I left, yes. But after I left, I think those were included later.

MR. STAMEY: I'm objecting to speculation. Subject to that objection, please continue.

BY MS. HIGGINS:

Q. Is it your understanding that Chief Fontenot tried to make Michael Dunn look like something he was not? Is that an appropriate use of your words?

A. In my opinion, yes, ma'am.

MR. STAMEY: Objection to the form.

BY MS. HIGGINS:

Q. Okay. When you say something he's not, can you elaborate what you mean by that?

A. Let's see if I can find the words for it. Pretty much making him out to be like he's not doing his job correctly or he's violating a policy or state law when, in my eyes, he wasn't.



Page 22

Q. Can you tell me what policy he was being made out to violate and who was making this allegation?

A. I really can't remember which policy was at the time. And I'm not sure who's the one that accused him out of it. I just remember him being placed on leave at that time, which in turn made me turn my application in.

Q. Do you remember who placed him on leave?

A. I would assume it would be the chief.

Q. Okay. And it's your understanding that Michael Dunn did not do whatever breach in policy he was being alleged to have done; is that correct?

MR. STAMEY: Object to the form of the question.

MR. DOHERTY: Same objection.

BY MS. HIGGINS:

Q. Is that your understanding?

A. Yes, ma'am.

Q. Okay. Why did that make you want to leave the Eunice Police Department?

A. Because I felt it was only a matter of time that I would be the next person to be placed on leave.

Q. Because why?

A. For any reason.

Q. Would you say that you thought that you might

Page 23

be falsely accused of breaking policy? Is that correct?

MR. DOHERTY: Object to the form.

MR. STAMEY: Objection to form.

BY MS. HIGGINS:

Q. You can answer the question.

A. Yes, ma'am.

Q. Okay. Was this a common occurrence, that officers at the Eunice Police Department were made out to seem that they were doing something against policy or law?

MR. STAMEY: Objection to form.

MR. DOHERTY: Objection; calls for speculation.

BY MS. HIGGINS:

Q. Okay. You can answer the question.

A. Can you restate the question? I'm sorry.

Q. Was it a common occurrence that officers at the police department -- at the Eunice Police Department were falsely accused of breaking policy?

A. Only some.

Q. Who?

A. Lieutenant Dunn, for one. I'm trying to remember who else. I can't remember anybody else.

Q. But you think that there were other people in

Page 24

the same situation?

A. Not as far, I would say, as being put on admin leave and that nature. But it could be that they'd been wroten up -- written up, I'm sorry -- verbally counseled, something low like that as far as punishment towards a policy violation.

Q. And why do you think this happened to those people in particular?

MR. REED: Object to the form; speculation.

MR. DOHERTY: Same.

BY MS. HIGGINS:

Q. You can answer.

A. It could be just something as small as -- let's see. I'm trying to remember. I can't remember.

Q. Okay.

A. Lost my train of thought.

Q. That's okay. Why do you think Lieutenant Dunn was placed on administrative leave?

A. Because he didn't do what was asked of him, I guess. There's probably countless reasons at the time.

Q. Asked of him by who?

A. Whether it be the chief, deputy chief, or other lieutenants.

Q. What was he asked to do? Do you recall?

Page 25

A. I don't recall.

Q. Okay. We can come back to that later. You're currently at the St. Landry Parish, correct?

A. Yes, ma'am.

Q. Can you tell me your position there?

A. I'm a patrol lieutenant.

Q. And how long have you been there?

A. It would be close to four years.

Q. What are your current responsibilities?

A. Oversee the shift, Delta shift, at night; report to any traffic accidents, fatal traffic accidents on a parish road; check reports; payroll; and probable causes, arrests, and crash reports.

Q. In your capacity at St. Landry, do you work with the Eunice Police Department?

A. Yes, ma'am.

Q. I want to talk a little bit about some of the training that you did to become an officer at the Eunice Police Department. Okay?

A. Okay.

Q. All right. Did you complete any specific training to become an officer at the EPD?

A. The POST academy.

Q. Can you explain that a little bit?



MAGNA
LEGAL SERVICES

Page 26

A.  Pretty much the police academy where we -- I forgot how long it was at the time.  But we go through and we end up taking a POST course to become pretty much certified as a police officer.

Q.  Okay.  Did you have to familiarize yourself with any sort of official policies and procedures for the Eunice Police Department?

A.  Yes, ma'am.

Q.  Can you tell me about that?

A.  That was just the policies and procedures at the time through Chief Dies that I had to memorize, I'd say, and remember.

Q.  Was it a handbook that you had to memorize?

A.  I believe so, yes, ma'am.

Q.  Okay.  And while you were at the Eunice Police Department, were you asked to refresh your memory of these policies and procedures throughout?

A.  Yes, ma'am.

Q.  So you would say that you were familiar with these policy procedures throughout you time at EPD; is that correct?

A.  Yes, ma'am.

Q.  Okay.  So there was an official source of policies and procedures at the Eunice Police Department which was that handbook; is that correct?

Page 27

A.  Yes, ma'am.  I believe it changed later to a computer format, if I remember correctly.

Q.  Okay.  So a digitalized version --

A.  Yes, ma'am.

Q.  -- of the handbook; is that correct?

A.  Yes, ma'am.

Q.  Do you know who decided what the policies and procedures were at the time you were with the Eunice Police Department?

A.  The chief.

Q.  So would that be Chief Dies and then later Chief Fontenot; is that correct?

A.  Yes, ma'am.

Q.  Okay.  So they were the sources of the official policies and procedures; is that correct?

A.  Yes, ma'am, along with the civil service board.

Q.  Okay.  And in tandem, the chief and the civil service board would write down these policies and procedures that you were expected to follow?

A.  If I'm not mistaken, the chief would kind of do his policy to kind of match the civil service board's policies on how things should be.

Q.  Okay.  Other than the official policies and procedures that were in this handbook -- I'm going to

Page 28

call it "the handbook" for now for ease and convenience for everyone.

Were there any other sources of policies and procedures that were more informal?

A.  Other than the digitized one, that was -- that should be about it.

Q.  So there were never any policies that were perhaps unwritten that you were supposed to follow but were just known amongst the officers?

MR. DOHERTY:  Object to the form.

BY MS. HIGGINS:

Q.  You can answer.

A.  Not that I remember.

Q.  Okay.  Did you ever get an email of any sort with a policy and procedure that you were supposed to follow that was maybe different than the one in the handbook?

A.  I remember receiving emails about policies, yes, ma'am.  But to say it was different from the one in the handbook, I can't recall.

Q.  Did you ever receive an email about a policy and procedure you were expected to follow by Chief Fontenot that perhaps you weren't sure were in line with the policies and procedures that were official in the handbook?

Page 29

A.  I can't remember, to be honest with you.

Q.  Okay.  And were you ever told to follow a policy and procedure that you thought might have been different from the ones that were official in the handbook?

A.  Not that I can recall.

Q.  Okay.  So there are no sort of rules that you remember being expected to follow --

MR. REED:  Object to form.

BY MS. HIGGINS:

Q.  -- that are not in the handbook?

A.  Not that I can remember.

Q.  Okay.  If you were to be told that someone at the Eunice Police Department had committed misconduct, what do you understand that to mean?

A.  It could be an array of things.

Q.  Like what?

A.  Misconduct, whether it's not submitting evidence; could be disrespectful to a supervisor; committing a crime on duty; things of that nature.

Q.  Was there a certain protocol you were supposed to follow if you saw or heard about an incident of misconduct?

A.  Yes, ma'am.

Q.  Can you tell me what that protocol was?



Page 30

A. Whether it was reported to your first supervisor, if it was your first supervisor who did it, you would go above them, and so on and so forth.

Q. Above them to whom?

A. So if it was your sergeant, if he was an officer, if it was your sergeant who committed the crime or the misconduct, you would then report it to your lieutenant. If it was your lieutenant, you could go above him to the deputy chief, and then to the chief if need be.

Q. And that would be by the time you left Chief Fontenot; is that correct?

A. Yes, ma'am.

Q. Can you explain what Chief Fontenot's role was in overseeing the proper conduct or misconduct at the Eunice Police Department?

A. Pretty much the -- if I remember the appointing authority, so he would -- if he received a report of misconduct, and once somebody was assigned to look into it, he would review the findings and determine a punishment, if any.

Q. Would he determine whether that allegation of misconduct was investigated or not?

A. I'm not sure. I believe so, though.

Q. Okay. Would you say that the officers at the

Page 31

Eunice Police Department actually followed that protocol that you just described in reporting misconduct?

A. Some of them.

Q. Who didn't follow that procedure?

A. There was a couple of them, I would say, over that time span of eight years.

Q. Can you give me some names?

A. Let's see. I know Victor, Ryan. Who else? Richard Abadie was one. He's no longer there. I can't -- I think there's more, but I can't recall their names.

MR. STAMEY: Let me make a general objection to the extent any witness tries to offer hearsay testimony, speculative testimony, or responds to leading questions. I would make my objections continuing, and we'll follow if any specific requirements are required.

MR. REED: I'll join.

MS. HIGGINS: So noted.

MS. WALL: We'll all join in.

MS. HIGGINS: Noted.

MS. WALL: We can continue.

MS. HIGGINS: Thank you.

Page 32

BY MS. HIGGINS:

Q. So to clarify, the two names that you mentioned before -- Richard Abadie, Victor Fontenot, and Ryan Young -- the defendants in this matter, correct?

A. Yes, ma'am.

Q. Do you remember a particular incident where they didn't follow a protocol to report misconduct?

A. Two.

Q. Can you tell me about those?

A. One occurred with Richard Abadie, myself, and Ryan Young. Went assisted Richard Abadie on a traffic stop. While that subject -- the driver of the vehicle was in handcuffs, Richard had grabbed him by the throat and was yelling at him. At the time, I reported it to -- I believe he was my supervisor at the time -- Lieutenant Dunn. And then he followed up with reporting it to who he needed to.

And then I remember one incident --

Q. Can we back up just for one moment, please?

A. Sure.

Q. So when was this incident with the crash?

A. I can't recall the year, but it was during Chief Dies's term.

Q. Okay.

Page 33

A. So 2008 -- not 2008, I'm sorry. 2012, 2013 area.

Q. Can you just state again who else was present at this incident?

A. It was myself, Richard Abadie, and Ryan Young, and then the driver of the vehicle.

Q. Okay. So you saw Richard Abadie grab the driver of the vehicle by the throat; is that correct?

A. Yes, ma'am, while in handcuffs.

Q. Is that proper conduct at the Eunice Police Department?

A. No, ma'am.

Q. Why not?

A. It's illegal.

Q. Can you explain?

A. It's -- somebody is detained. It's -- it's pretty much battery.

Q. Okay. So you would say that he potentially applied too much physical force than what's legally allowed? Is that correct?

A. Yes, ma'am.

Q. Okay. Is that something that the Eunice Police Department officers are supposed to report when they see another officer doing?

A. Yes, ma'am.



Chase Michael Godeaux

June 26, 2023
Pages 34 to 37

Page 34

Q. So is it your understanding that Ryan Young should have reported this incident?

MR. REED: Object to form.

A. Yes, ma'am.

BY MS. HIGGINS:

Q. Did he report this incident?

A. I could not tell you. I really don't know.

Q. Do you think he reported this incident?

MR. REED: Object to form.

A. Again, I would believe he did, but to say for certain, I do not know.

BY MS. HIGGINS:

Q. Okay. Earlier I had asked you about when you thought that perhaps Eunice Police Department officers did not follow the proper protocol for reporting misconduct. Why do you think the proper protocol for reporting misconduct was not followed in this incident?

MR. REED: Object to form, speculation.

A. Whether it was fear of retaliation against them by a supervisor, not really knowing that they should, because if they're new or maybe that's just how they did things when they started in police.

BY MS. HIGGINS:

Q. Who is "they"?

A. It could be everybody that I worked with from

Page 35

2012 to 2019.

MR. STAMEY: I'm going to enter a general objection that the answer is not responsive to the question. Make that objection continuing.

BY MS. HIGGINS:

Q. In this particular incident, who did not follow the proper protocol in reporting the misconduct?

A. Lieutenant Ryan Young.

Q. Lieutenant Ryan Young. Okay.
What was he supposed to do that he did not do?

A. Report it and have it investigated further.

MR. REED: Object to form, speculation.

BY MS. HIGGINS:

Q. Why do you think he did not report this incident?

MR. REED: Object to form, speculation.

A. I really do not know.

BY MS. HIGGINS:

Q. Okay. You reported this incident to Michael Dunn; is that correct?

A. Yes, ma'am.

Q. What did Michael Dunn do with this information?

A. I believe he forwarded it up to his

Page 36

supervisor, whether it was the deputy chief or his lieutenant at the time, because I believe he was a sergeant at the time. And then they went forward with it however they needed to.

Q. So Lieutenant Michael Dunn did, in your opinion, follow the proper protocol in this incident --

A. Yes, ma'am.

Q. -- is that correct?

A. Yes, ma'am.

Q. Okay. Do you know if this incident was investigated after Michael Dunn reported it?

A. I couldn't tell you. I really don't know. I didn't see anything severe-wise as a punishment, like suspension or administrative leave for that matter. But what was -- was a write-up done? I really couldn't tell you.

Q. So are you aware of any punishment or consequences that Richard Abadie faced as a result of this incident?

A. No.

Q. Okay. In your opinion, should Richard Abadie have been punished for this sort of misconduct?

A. Yes, ma'am.

MR. STAMEY: Objection to the form.

MS. HIGGINS: That's fine.

Page 37

BY MS. HIGGINS:

Q. Would this be considered a serious breach of conduct?

MR. REED: Objection; form.

A. Yes, ma'am, an excessive use of force.

BY MS. HIGGINS:

Q. According to who would this be a pretty serious incident of misconduct?

MR. STAMEY: Objection to form.

MR. REED: Same.

A. A lot of people, whether you're in law enforcement, an attorney.

BY MS. HIGGINS:

Q. Would you say that this misconduct was illegal?

A. Yes, ma'am.

MR. STAMEY: Objection to form.

MS. HIGGINS: Okay. You have a standing objection going, but that's fine.

BY MS. HIGGINS:

Q. In general -- actually, I'm going to go back.
You said there was a second incident in which -- you're aware of that the proper protocol for reporting misconduct was not followed. Can you tell me about that?



Page 38

A.  We went to -- I can't remember if it was serving an arrest warrant or a search warrant on a subject near Eunice Junior High, I think it is, or Eunice Middle.  It was one of the two.  Once they got the subject arrested and placed in handcuffs, I witnessed Victor Young grab him by the throat while he was making comments about --

MR. REED:  I'm sorry.  Who?  Victor Young?

THE WITNESS:  Victor Fontenot.

BY MS. HIGGINS:

Q.  Can you repeat that sentence?

A.  I had observed Victor Fontenot grab the subject, who was in handcuffs, by the throat while he was making comments about Victor.

Q.  Was the subject hurt in this course of the incident?

A.  Not that I can remember.  I don't believe so, no, ma'am.

Q.  Is this another incident where you would say that too much physical force was applied?

A.  Yes, ma'am.

Q.  Okay.  What provoked Victor to do this?  Do you know?  Did you hear the comments?

A.  I believe the comments Sunny was making, the

Page 39

subject who was detained, yes, ma'am.

Q.  Is the subject you're referring to Sunny Arnaud?

A.  Sunny Arnaud, yes, ma'am.

Q.  What comments did Sunny make?

A.  To summarize it -- I can't remember verbatim the comments, but to summarize it, pretty much saying that he was giving items to Victor in exchange for information about if they was looking into him, or pretty much stating that Victor was a dirty cop.

Q.  Did you hear the phrase "dirty cop" used?

A.  Not that I can remember.

Q.  So what makes you think that he was saying he was a dirty cop?

A.  Just by the comments he was making at the time.

Q.  Is your opinion of what you heard in summary -- I know you said you don't remember it verbatim -- that Victor Fontenot was being given gifts of sorts by Sunny in exchange for information?

A.  Yes, ma'am.

Q.  What sort of information?

A.  Whether or not it was information on when a search warrant would be done on his house.  I really couldn't tell you the information he would ask for.

Page 40

Q.  Would you characterize this sort of exchange as a bribe?

A.  Yes, ma'am.

MR. STAMEY:  Objection to the form.

THE REPORTER:  Can we pause for 15 seconds?

MS. HIGGINS:  Sure.

THE VIDEOGRAPHER:  Off the record at 10:58 -- 9:58.

(Off-record discussion.)

THE VIDEOGRAPHER:  With corrected time stamp, the time is now -- we're going back on the record at 9:59.

BY MS. HIGGINS:

Q.  Was this sort of exchange of information for gifts, is that allowed at the Eunice Police Department?

A.  No, ma'am.

Q.  According to what?

A.  State law.

Q.  Okay.  Do you know what sort of gifts Sunny was providing to Victor in exchange for this information?

A.  No, ma'am.

Q.  Do you know if it was more than one gift?

A.  No, ma'am.

Page 41

Q.  Did it sound like it was more than one gift, from what Sunny was saying?

A.  Yes, ma'am.

MR. STAMEY:  Object to the speculation. Subject to the objection --

MS. HIGGINS:  He was present.  It's not hearsay.

MR. STAMEY:  He already said he didn't know.

BY MS. HIGGINS:

Q.  You can answer the question.

A.  Yes, ma'am.

Q.  Yes.  Okay.  Did you get the sense, then, that there were multiple gifts, more than two?

MR. STAMEY:  Objection to the form.

A.  Yes, ma'am.

BY MS. HIGGINS:

Q.  Yes.  Okay.

A.  Yes, ma'am.

Q.  Okay.  Had you heard what these gifts might be, elsewhere, outside of this conversation, that you actually witnessed?

A.  No, ma'am.

Q.  Okay.  Who else was with you during this incident?



Page 42

A.  At the time, that I can remember, myself, Victor Fontenot, Deputy Chief Richard Daigle.  And I can't recall anybody else.  I believe there were others; I just can't recall who.

Q.  Okay.  So the use of physical force on Sunny you would characterize as misconduct; is that correct?

A.  Yes, ma'am.

Q.  Would you also characterize the exchange of information for gifts that you heard about in that incident as misconduct?

A.  Yes, ma'am.

Q.  So there are two incidents of misconduct that we're discussing here, basically, correct?

A.  Yes, ma'am.

Q.  Who was supposed to have reported this misconduct?

A.  Anybody who witnessed it.

Q.  Did you report this misconduct?

A.  Yes, ma'am.

Q.  To whom?

A.  Lieutenant Michael Dunn.

Q.  And what did Michael Dunn do with this information?

A.  He reported it.

Q.  To whom?

Page 43

A.  I really don't know whether it was -- it should have been the chief since the deputy chief was there.

Q.  Which deputy chief?

A.  Richard Daigle.

Q.  Was Richard Daigle not with you at this incident?

A.  Yeah.  So if -- being that he was there, then Lieutenant Dunn should have reported it to the chief.

Q.  Fontenot, or which chief?

A.  Chief Fontenot.

Q.  Okay.  Do you know if he did report it to Chief Fontenot?

A.  I believe he did, yes, ma'am.

Q.  Did Richard Daigle report this incident to Chief Fontenot?

A.  I do not know.

Q.  Was he supposed to report this incident to Chief Fontenot?

A.  He should have yes, ma'am.

Q.  But you're not sure if he did or did not?

A.  No, ma'am.

Q.  Okay.  Do you know if this incident was investigated?  Actually, let me clarify.

Do you know if either the application of

Page 44

physical force that was used on Sunny or the exchange of information for gifts were investigated?

A.  Not that I know of.

Q.  Do you know if Victor Fontenot was punished for either of these incidents of misconduct?

A.  Not that I know of.

Q.  The application of physical force that is perhaps too much against Sunny, would you say that's illegal?

A.  Yes, ma'am.

MR. STAMEY:  Same objection.  Make it continuing.

BY MS. HIGGINS:

Q.  Would you say that the exchange of information for gifts by a police officer to a civilian is illegal?

A.  Yes, ma'am.

MR. STAMEY:  Same objection.

Q.  So these, you would say, are serious incidents of misconduct, correct?

A.  Yes, ma'am.

Q.  In your opinion, should these have been investigated by Chief Fontenot?

A.  Yes, ma'am.

Q.  Should they have been punished?

A.  Yes, ma'am.

Page 45

Q.  Okay.  We talked about two separate occasions just now, is that correct, one involving Richard Abadie in a crash and one involving Victor Fontenot and Sunny Arnaud; is that correct?

A.  Yes, ma'am, except the first one was involving a traffic stop, not a crash.

Q.  Apologies.  Thank you for the clarification.

A.  Yes, ma'am.

Q.  Traffic stop.  In both incidents, you've just testified that you reported this misconduct to Lieutenant Michael Dunn, and Lieutenant Dunn then, to your knowledge, reported these incidents upward?

A.  Yes, ma'am.

Q.  In your understanding, both you and Lieutenant Dunn followed the appropriate police protocol in terms of reporting misconduct; is that correct?

A.  Yes, ma'am.

Q.  After Lieutenant Dunn reported this misconduct, did he face any sort of consequences as a result?

A.  A result of those two?  Not that I can remember.

Q.  So the chief investigated both of these incidents after he reported them?

A.  I do not know for sure.



Chase Michael Godeaux                                                June 26, 2023
                                                                    Pages 46 to 49

Page 46

Q.  Why do you think he wouldn't have investigated these incidents?

A.  I really couldn't tell you.  I don't know why he did or might have or didn't investigate them.

Q.  But you previously said that both these incidents were pretty serious; is that correct?

A.  Yes, ma'am.

Q.  And there's no reason that you can think of why they might not have investigated them?

MR. DOHERTY:  Object to form.

MR. REED:  Same objection.

A.  No, ma'am.

BY MS. HIGGINS:

Q.  That's interesting.  Okay.

Is it common practice when someone like Lieutenant Dunn reports a serious incident of misconduct that it goes uninvestigated by the chief?

MR. DOHERTY:  Objection; calls for speculation.

A.  No, it's not common practice.  It should be investigated.

BY MS. HIGGINS:

Q.  Was it a common occurrence, though, when Lieutenant Michael Dunn reported misconduct that it went uninvestigated, to your knowledge?

Page 47

MR. STAMEY:  Objection.

MR. DOHERTY:  Objection.

A.  To my knowledge, yes.

BY MS. HIGGINS:

Q.  Why do you think that is?

A.  I really do not know, whether it was -- I couldn't say what their reason for it would be.

Q.  Is it your understanding that when other officers reported misconduct, it went investigated?

MR. REED:  Object to form.

A.  I do not know.  I don't know if -- if and when any other misconducts were reported or if they were investigated except if it was on my shift.

BY MS. HIGGINS:

Q.  In general, what's a consequence for this sort of misconduct, typically?

A.  Typically, termination, charges filed on them, arrested, written up.

Q.  Is that typical at the Eunice Police Department or at St. Landry Parish?

A.  It's typical at St. Landry Parish.

Q.  But not at the Eunice Police Department?

A.  From the two incidences I've witnessed, no.

Q.  So why do you think at the Eunice Police Department there are no consequences for this sort of

Page 48

misconduct, that you're aware of, but there would be at St. Landry Parish?

MR. DOHERTY:  Objection; form.

MR. STAMEY:  Objection.

MR. REED:  Speculation.

A.  I really do not know.  I guess it depends on who's over the department at the time.

BY MS. HIGGINS:

Q.  Can you clarify what you mean by that?

A.  Whether it's the chief or the sheriff.

Q.  Which chief?

A.  Either one of them, Chief Dies or Chief Fontenot.

Q.  Are you aware of other incidents in which Chief Fontenot learned of misconduct by one of his officers that he then investigated?

A.  Not that I can remember.

Q.  Can you remember any Eunice Police Department officer receiving any sort of punishment for misconduct?

A.  Not that I remember.

Q.  Are there other incidents of misconduct that you're aware of?

A.  Besides the two that I was there for, everything else would be just hearsay.

Page 49

Q.  Okay.  We can talk about that a little bit more.

So you're not aware of any other Eunice Police Department officer receiving any sort of punishment for misconduct throughout your time at Eunice Police Department?

MR. STAMEY:  Asked and answered.

MS. HIGGINS:  It's for clarification purposes.

A.  I'm sorry, can you repeat that?

BY MS. HIGGINS:

Q.  Absolutely.  While you were at the Eunice Police Department, you never heard of any Eunice Police Department officer being punished for misconduct?

MR. STAMEY:  Objection; asked and answered.

A.  No.

BY MS. HIGGINS:

Q.  Are you aware of any consequences that Eunice Police Department officers faced, not for committing misconduct but for reporting it?

A.  Not that I can -- not that I know of, no.

Q.  Okay.  I want to talk a little bit about the defendant's reputation.  Okay?

A.  Okay.



Chase Michael Godeaux                                              June 26, 2023
                                                                Pages 50 to 53

Page 50

Q.   Are you aware of Chief Fontenot's reputation in the law enforcement community?

A.   Yes, ma'am.

Q.   Can you tell me a little bit about that?

A.   If I remember correctly, Eunice Police Department he worked at, and I think probation and parole.

Q.   But what's his reputation like?

A.   Respectable whenever he ran for office.

Q.   What about after he ran for office?

A.   I really don't know.  I mean, once he got into office, I think it was because of the way the crime rate was going, a lot of people in the public didn't like it because the crime rate was going up.  But inside the department, before I left, it was one of the reasons I left.  And then after I left, I don't know what his reputation went to.

Q.   To clarify, when you say "got into office," you mean when he became chief of police, correct?

A.   Yes, ma'am.

Q.   Okay.  When you say that the crime went up in Eunice, can you talk a little bit more about that?

A.   Whether the -- the crime rate, whether burglaries started occurring more, shootings, homicides, stabbings.  It's the crime rate in general

Page 51

in the city.

Q.   Since Chief Fontenot became chief of police; is that correct?

A.   Yeah.  Once -- I think it was a few years after he became chief, it started going up.

Q.   Why do you think that is?

A.   Less officers.

Q.   Why were there less officers?

A.   Pay rate.  And then like I said before, the administration.

Q.   Was there anything that Chief Fontenot, in your opinion, could have done to have more officers?

A.   With the pay rate, I believe -- if I remember correctly, he tried to get a pay raise, but the city wouldn't do it.  So that's one big factor why a lot of people wouldn't stay, because a lot of agencies are paying way more.

Q.   Earlier you mentioned that Chief Fontenot was part of the reason that you left, but I didn't fully understand your statement.  Can you clarify a little bit what you meant about -- what does Chief Fontenot's reputation have to do with why you left the Eunice Police Department?

A.   Like I said, because if Lieutenant Dunn was somebody I looked at with respect, did things

Page 52

correctly, he was actually the one who trained me when I first started, so to see him going admin leave for something I didn't think he should have been made me think, All right, so at what point am I next to be placed on admin leave for something I don't believe I did?  Or didn't -- or they think that I did something I didn't do.

Q.   I'm sorry, I'm just trying to get a little bit more clarification.  I'm not sure I'm fully following.

So in terms of Chief Fontenot's reputation, what does that have to do with Lieutenant Dunn being placed on admin leave?  Would you say -- how would you characterize his reputation, such that it would have to do with Lieutenant Dunn going on admin leave?

A.   His characterization with the officers?

Q.   Yeah.  Let's start with the officers.

A.   Some people liked him, and some people didn't.

Q.   You just testified that Lieutenant Dunn was placed on admin leave by Chief Fontenot; is that correct?

A.   Yes, ma'am.

Q.   Did Chief Fontenot have a reputation for placing people on admin leave?

A.   Prior to that?  I don't believe so, that I can remember.

Page 53

Q.   After that, did he acquire that reputation?

A.   Yes, ma'am.

Q.   And in terms of that reputation, was he known for putting people on admin leave who were supposed to be on admin leave?

MR. STAMEY:  Objection to the form of the question.

A.   I'm not sure.  The only -- after I left, I could only tell you what I would hear.

BY MS. HIGGINS:

Q.   What did you hear?

A.   The --

MR. STAMEY:  Objection to hearsay.

MS. HIGGINS:  We're not in court.

That's fine.

A.   If I remember correctly, Lieutenant Dunn was placed on admin leave after that.  I can't remember if there was anybody else.  Once I left, I dealt with my work at the sheriff's office.  I left that kind of behind.  So I didn't really keep up with who was getting in trouble and who wasn't at the Eunice Police Department.

BY MS. HIGGINS:

Q.   Did you hear about Chief Fontenot placing people on admin leave that -- without any sort of



Chase Michael Godeaux

Page 54

reason?

A.   No, not that I remember.

Q.   So what about Chief Fontenot's reputation was concerning to you, in terms of placing Lieutenant Michael Dunn on admin leave?

A.   Just the fact that, okay, if reputation -- pretty much, what did he do -- what did Lieutenant Dunn do to get put -- put on admin leave and once he was, it was okay?  Now, if I do anything in the slightest that maybe somebody doesn't like or they think it's against policy, will I be placed on admin leave and face consequences for something I didn't do?

Q.   By "somebody," who do you mean?

A.   Whether -- the chief would have to be the one to place me on admin leave.

Q.   Chief Fontenot?

A.   Yes, ma'am.

Q.   Okay.  So would you say that Chief Fontenot was developing a reputation for putting people on admin leave without a reason?

MR. STAMEY:  Objection.

BY MS. HIGGINS:

Q.   You can answer the question.

A.   As far as with Lieutenant Dunn, yeah.  But with anybody else, I really don't know.

Page 55

Q.   Okay.  Aside from not liking that the crime rate was going up in Eunice, as you just testified, what else was Chief Fontenot's reputation with the public?

A.   I really couldn't tell you.  I didn't talk to him about it.

Q.   Okay.  What about Ryan Young?  What was his reputation within the law enforcement community?

A.   Firearms instructor, patrol lieutenant.  I think he had been with the Eunice Police Department for a good 10, 15 years.  I think he's soon to retire.

Q.   Did he have a good reputation with the law enforcement community?

A.   I would say so.

Q.   What about with St. Landry?

A.   I'm not sure with St. Landry.

Q.   Your officers at St. Landry like working with Ryan Young?

MR. REED:  Object to form.

A.   I really couldn't tell you.  I don't really speak with him, and he doesn't work on patrol anymore either.

BY MS. HIGGINS:

Q.   Okay.  What about at St. Landry when Chief Fontenot was still at the Eunice Police

Page 56

Department?  Did St. Landry work a lot with Chief Fontenot?

A.   Directly, I'm not sure.  I know any time that I worked in -- Eunice PD needed any kind of assistance, we would try our best to help and vice versa.

Q.   Was it easy to work with the Eunice Police Department under Chief Fontenot's leadership?

A.   It depends on who was working as supervisor at night.

Q.   Which supervisors might have made things more difficult?

A.   Some people wouldn't help because they were shorthanded or because there was, I think, an active order saying that they couldn't help assist us or --

Q.   Who would have given such an active order?

A.   The chief, Chief Fontenot.

Q.   Why would he give an order that he couldn't help the people at St. Landry?

A.   I'm not sure the reasoning.

Q.   Okay.  Is it beneficial to the Eunice population that these law enforcement agencies work together?

A.   Yes, ma'am.

Q.   Is it standard that a chief would give an order -- a standing order that the Eunice Police

Page 57

Department could not work with the officers at St. Landry?

MR. DOHERTY:  Object to form.

MR. STAMEY:  Object to form.

MS. WALL:  Same.

A.   I'm sorry, you're going to have to repeat that.

BY MS. HIGGINS:

Q.   Has it happened with any other chief that you're aware of that there has been a standing order not to work with St. Landry?

MR. STAMEY:  Objection.  Make it continuing.

MS. HIGGINS:  Excuse me.  Can you state the grounds again?

MR. STAMEY:  Yeah.  Objection, making the objection continuing for my prior objection.  Objection to form.

A.   Not that I'm aware of.

BY MS. HIGGINS:

Q.   I want to move on to Victor Fontenot's reputation.  What's his reputation in the law enforcement community?

A.   Not good.

Q.   Why is that?



Chase Michael Godeaux                                                                June 26, 2023
                                                                                    Pages 58 to 61

Page 58

A.   Personally from what I witnessed, and a lot of other things that are hearsay.

Q.   What have you witnessed that would make his reputation "not good," in your words?

A.   The incident we spoke of earlier, with him grabbing Sunny Arnaud by the throat while in handcuffs.

Q.   Any other incidents that you're aware of?

A.   Other than it being hearsay.

Q.   We can talk a little bit more about what you've heard later.

Do officers at St. Landry like working with Victor Fontenot?

A.   No.

Q.   Why not?

A.   They don't trust him.

Q.   Why not?

A.   From what they tell me, which is hearsay --

MR. STAMEY:  Objection to the form; hearsay.

BY MS. HIGGINS:

Q.   That's okay.  You can continue.

A.   From what they tell me, which is hearsay --

MR. STAMEY:  Make it continuing.

A.   -- is that they don't trust him.  They don't trust anything that he does and don't want to be near

Page 59

anything that he does.

BY MS. HIGGINS:

Q.   Why, though?

A.   Because they believe what he's doing is illegal.

Q.   What would he be doing that's illegal?

A.   Whether it's taking bribes, working outside his jurisdiction.  Other than that, I really -- I don't know if there's other reasons that they may not trust him.  There may be, but I'm not sure.

Q.   When you say "working outside his jurisdiction," can you explain what you mean by that?

A.   Pretty much working -- doing police work outside the Eunice city limits, corporate limits.

Q.   What kind of work is he doing outside the city limits?

A.   Whether it's -- at the time, I think it was investigating narcotics, so I don't know what he was doing.  Again, a lot of it is just hearsay.

Q.   What did you hear?

MR. STAMEY:  Again, I want to make it crystal clear I'm making --

MS. HIGGINS:  We're clear.

MR. STAMEY:  -- an objection to any hearsay that is being offered by this witness.

Page 60

MS. HIGGINS:  That's fine.

MR. STAMEY:  I make my objection continuing.

MS. HIGGINS:  Your objection has been noted, and I'd appreciate if you could stop interrupting.  We understand the continuing objection.

(Speaking over each other.)

MR. STAMEY:  I appreciate the witness not giving hearsay testimony.

MS. HIGGINS:  We're in a deposition; we're not in court.

MR. STAMEY:  But it's rank hearsay; he's just speculating.

MS. HIGGINS:  That's fine; we're in a deposition.  He's permitted to answer the question.

MR. STAMEY:  We have a disagreement. I'll make a continuing objection.

MR. REED:  For the record, I'll join.

MS. HIGGINS:  No problem.

BY MS. HIGGINS:

Q.   What have you heard?

A.   I think one was near G&J Zydeco Rd.  They were watching a house for narcotics, which is way outside

Page 61

the city limits.  Whether or not he was working with another agency, I do not know.

Q.   Why would he be doing that?  Do you know?

A.   Not a clue.

Q.   Why would working outside your jurisdiction be an indicator for other officers at St. Landry not to trust Victor?

A.   Because that's just something that's not common, you don't do unless you work for another agency.

Q.   Why not?

A.   Because you have no authority outside your jurisdiction as a law enforcement officer, especially if you're working a case, because then everything that you find on that case pretty much gets thrown out the window in court.

Q.   Okay.  Other than the incidents that we've already discussed, are there any other times that you witnessed misconduct by Victor Fontenot?

A.   Other than that one, not that I can remember.

Q.   Before you left the Eunice Police Department, what was the level of officer morale while Chief Fontenot was in charge?

A.   Low.

Q.   Why do you think that is?



Page 62

A.   Everybody has their own opinion on what it was, whether it was pay or, like I said, anything else. I'm not sure.

Q.   What was your opinion?

A.   Pay and -- and administration, whether it's being moved around different shifts multiple times; watching, like, Lieutenant Dunn getting put on admin leave.

Q.   Can you tell me a little bit more about what you mean by the shifts getting moved around?

A.   I remember I got moved around to different shifts multiple times within a matter of couple months. And it felt like anytime there was a shift change where people got moved around, I was always one of them that got moved around. And there was some that never got moved.

Q.   Why do you think you got moved around?

A.   I really don't know the reason.

Q.   Were there other people who got moved around more than others?

A.   I know -- if I remember correctly, I was moved around more than anybody.

Q.   Anyone else?

A.   There was a few others that got moved around, but not as many times as me.

Page 63

Q.   Who else got moved around a lot?

A.   I think Officer Courville, Joshua Courville, got moved around. I believe Nicholas Cooley got moved around, Austin Doucet, Cody Miller, a couple others. But every time there was a shift change, my name was on it.

Q.   Did you view this as a form of punishment?

A.   I really couldn't tell you. I don't -- it might have been; it might not have been. I really don't know. But, yeah, there's nothing I could say about it because I'm doing what I'm asked, move shifts because of shorthandedness or needing a supervisor at the time or anything like that.

Q.   And no one ever gave you a reason why you in particular were getting moved around a lot?

A.   No, because majority of the time it wasn't just me. There was others getting moved. But I was always on that list to get moved.

Q.   Was Lieutenant Dunn's shift frequently changed?

A.   Yes.

Q.   How often?

A.   I don't remember how often. But I remember I was on his shift once or twice, and I had gotten moved from it -- a couple of us had gotten moved from it.

Page 64

Q.   Was he getting moved to better or worse shifts?

A.   Depends on who you ask and their opinion of it.

Q.   In your opinion.

A.   Compared to whenever I was on it, it was worse.

Q.   Why do you think his shifts were getting changed to worse shifts?

A.   Proactiveness, I can think of, is why I thought it did. Because whenever I was on there, along with a couple others, we was proactive in the city. We was always doing stuff. We was always doing traffic stops, finding people with warrants, finding narcotics, stolen guns, stolen, I think, property. And then once it got changed around, that all kind of went away.

Q.   I'm sorry, I'm going to need you to clarify a little bit more. I'm not sure I'm following.

A.   The proactiveness of officers kind of went away. So once his shift got changed, nobody was proactive anymore. It was just them going to their calls and then going home.

Q.   So to back up a little bit, is it Chief Fontenot who was in charge of changing the shifts?

Page 65

A.   I believe so.

Q.   And he changed Lieutenant Dunn's shifts so that the officers were not as proactive; is that correct?

A.   I'm not sure if that was the reason.

        MR. DOHERTY:  Object to form.

A.   But in my opinion, that's what I looked at.

BY MS. HIGGINS:

Q.   That's what it seemed like in your opinion?

A.   Yes, ma'am.

Q.   Why would an officer -- or let me rephrase. Why would Chief Fontenot want to change Lieutenant Dunn's shifts if they were so proactive, as you characterize them?

        MR. REED:  Objection; form.

A.   I'm not sure. I don't know if that was his -- his train of thought or if it wasn't.

BY MS. HIGGINS:

Q.   Did changing Lieutenant Dunn's shift, was that good for crime in the Eunice city?

        MR. REED:  Object to form.

A.   In my opinion, no.

BY MS. HIGGINS:

Q.   So -- okay. And there's no reason you can think of why either of your shifts were changed so



Chase Michael Godeaux                                June 26, 2023
                                                     Pages 66 to 69

Page 66

frequently?

A.  I mean, not that I can think of, not --

Q.  You mentioned earlier that you weren't sure necessarily if the change in your shifts was a form of punishment; is that correct?

A.  Correct.

Q.  Did you view the change in Lieutenant Dunn's shift as a form of punishment?

A.  I couldn't say because I didn't know the reason behind it.  And at the time, it wasn't just his.  It was other people getting moved around as well.  So it wasn't happening to just one; it was happening to all of them.

Q.  Did this shift changes negatively impact the officers whose shifts were being changed?

A.  For me it did.  I can't speak for anybody else.

Q.  So it wasn't a good thing for you?

A.  Not for me, no.

Q.  Was it a good thing for Lieutenant Dunn?

A.  In my opinion, no.

Q.  Why not?

A.  Because he enjoyed being proactive with all of us and -- and doing stuff to help keep the crime rate down.  And when you change to people who are less

Page 67

proactive, it just kind of -- crime rate goes up.  Now it's more work you got to do.

Q.  So is it your testimony that changing Lieutenant Dunn's shifts increased the crime in Eunice?

A.  Not necessarily.  It's just a factor in it, in my opinion.

Q.  But it was a factor, in your opinion?

A.  In my opinion, yes, ma'am.

MS. HIGGINS:  Okay.  I'm going to ask that we take a quick break.  Is that okay?  Let's reconvene in about five minutes.  Is that fine with everyone?

THE VIDEOGRAPHER:  Off the record at 10:30.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record at 10:43.

MS. HIGGINS:  I want to start off by making it very clear that hearsay is permitted in depositions, so to the extent that we can stop the continuous objections.  I'm aware that you have a standing one for the remainder of this deposition.  But to the extent that we can stop the continuous interruptions, it would be much appreciated.

Page 68

BY MS. HIGGINS:

Q.  I want to go back to something that we were talking about earlier, which was the process for reporting misconduct at the Eunice Police Department.  When there's an incident of misconduct that you observe, do you write up a police report of the sorts, or any sort of official report?

A.  Depends on who -- the person who witnessed it.  Usually, they can write something up for their records and then report it to their supervisor.  But the supervisor is probably going to want a statement --

BY MS. HIGGINS:

Q.  So the --

A.  -- from the witness stating what they observed.

Q.  "The witness" being the Eunice Police Department officer who witnessed the incident; is that correct?

A.  Yes, ma'am.

Q.  And you would write up a formal statement --

A.  Yes, ma'am.

Q.  -- that would be submitted?

A.  Yes, ma'am.

Q.  Who do you submit the statement to?

A.  It would be to your supervisor that you're

Page 69

reporting it to so he can pretty much type up almost like a report to provide to the chief.

Q.  So the chief would then, in theory, get two reports, the one from the witness and then the one from the supervisor?

A.  He would get a statement from the witness in the supervisor's report.

Q.  So in the incidents we discussed earlier -- there were two.  Do you recall testifying to those?

A.  Yes, ma'am.

Q.  Did you or anyone else draft an official statement to report the misconduct?

A.  I might have, if I remember.  I'd have to look on my jump drive to see.  But whether -- if Lieutenant Dunn did a report, I'm not sure.

Q.  Okay.  And both of those statements would have been submitted to Chief Fontenot; is that correct?

A.  And the -- Lieutenant Dunn's report, yes, if one was done.

Q.  Okay.  I want to go back to Chief Fontenot a little bit.

A.  Okay.

Q.  Have you ever seen him do anything that you believed was illegal?

A.  That I seen, personally witnessed?  No.



Chase Michael Godeaux

June 26, 2023
Pages 70 to 73

Page 70

Q.  How about unethical?

A.  Depends on who you would ask, really.

Q.  In your opinion.

A.  Witnessed it personally?  No, other than a disagreeance in a crash report.

Q.  Can you tell me a little bit about that?

A.  I worked a crash involving two vehicles by the theater in Eunice on -- is that Warner?  I can't remember the street name.  And based on what I had seen felt one was in violation and caused the crash.  And he had asked me to change it to the other one because he felt as if they was in violation.  But we discussed it and kept it as how I did it.

Q.  I want to ask you some questions to clarify, to make sure I have the situation straight.  Okay?

A.  Okay.

Q.  All right.  So when you say he wanted you to change it, you're refer- -- "he" is referring to Chief Fontenot, correct?

A.  Yes, ma'am.

Q.  Can you explain a little bit more about what Chief Fontenot wanted you to change in your report?

A.  Pretty much changing which driver was in violation that caused the crash.

Q.  Why did he want you to change it?

Page 71

A.  I guess because he believed the one that was in violation that I had originally put wasn't in violation and it should have been the other driver.

Q.  Why would he believe that?  Was he there?

A.  No.

Q.  So what grounds would he have for thinking that one driver caused the crash over the other?

MR. REED:  Object to form, speculation.

A.  Because I guess -- I think he talked to the registered owner about what happened.

BY MS. HIGGINS:

Q.  Registered owner of the vehicle?

A.  Yes, ma'am.  And felt that they wasn't the one in violation; it was the other party.

Q.  Do you know what was said?

A.  No, ma'am.

Q.  Why did you think that the driver you wrote up as having caused the accident was in fact the one who caused the accident?

A.  Because the other vehicle was more in the roadway than the other, which showed that she was backing up before the other vehicle was.

Q.  So you had physical evidence that you personally observed that indicated that the driver you wrote as having caused the crash caused the crash; is

Page 72

that correct?

A.  Yes, ma'am.

Q.  And you're not sure what information would have been given to Chief Fontenot that would have suggested the other driver caused the crash?

A.  Other than they was backing up first, no.

Q.  But the evidence was conclusive in showing that that could not have been what happened; is that correct?

MR. REED:  Objection.

A.  Yes, ma'am, because they were both backing up.

BY MS. HIGGINS:

Q.  Did Chief Fontenot know this other driver?

A.  I'm not sure.  I don't think so.

Q.  What did he ask you to change exactly about the report?

A.  Just changing who -- which vehicle was in violation causing the crash.

Q.  Was there any benefit to either of the drivers?  Like, did it matter who was at fault in terms --

A.  Insurance purposes, that would be the only thing.

Q.  Can you explain that a little bit more?

A.  Pretty much our reports reflect who's in

Page 73

violation of a -- who's in violation of a crash or caused the crash, who did the violation that caused the crash.  The insurance agencies determine who is at fault.  So if they go off of my crash report showing this person was at fault, their insurance rates could go up, which costs -- would cost more money for their insurance policies.

Q.  Is there any reason that you're aware of that Chief Fontenot would not want the driver at fault's insurance rates to go up?

A.  Not that I know of.

Q.  Is it your understanding that he asked you to change the report because of an insurance issue?

A.  Whether it was for an insurance issue, I don't know, but that's what I would assume.

Q.  But Chief Fontenot never told you that it was because of an insurance issue?

A.  No, ma'am.

Q.  How did you come to the conclusion that it was because of an insurance issue that he would want you to change the report?

A.  I didn't write nobody a citation.  That's the only other thing that it would really affect.

Q.  Why didn't you write anyone a citation?

A.  Officer's discretion.



Page 74

Q. You chose not to write --
A. I chose not to write anybody a citation.
Q. How come?
A. Depends on the severity of the crash and on what occurred, how bad the violation was.
Q. So you determined that it was not bad enough to write a citation; is that correct?
A. It was more or less an improper backing, so I decided not to write anybody a citation.
Q. Did anyone direct you not to write the citation?
A. No, ma'am.
Q. Or you came to that decision on your own?
A. I came to it myself.
Q. Okay. So you had written a formal police report about the crash incident; is that correct?
A. Yes, ma'am.
Q. And you submitted it to Chief Fontenot; is that correct?
A. Eventually, that's where it went it, yes, ma'am.
Q. And then after he read through the statement -- or the report, rather, let me rephrase -- he then asked you to change the report; is that correct? I just want to make sure I have the timeline

Page 75

accurate.
A. If I remember correctly, yes, ma'am.
Q. And he didn't provide a basis for why he wanted you to change the report?
A. Other than that he felt that the other driver was in violation.
Q. Okay. Have you ever been asked to be -- to change a report before other than that incident?
A. I believe that's the only one.
Q. Is that standard police practice, to be asked by your chief to change a police report?
A. No.
Q. Why not?
A. But it all depends on what needs to be changed or what they're asking to be changed.
Q. In a situation like the one we're discussing right now, is it customary or common practice for a chief of police to ask the officer who wrote the report to change it?
A. Again, it depends on the circumstances, whether -- if they see something the officer didn't that might reflect the change in it, that's possible; whether it's in the photos or narrative or statement, it's possible. But it can be considered common practice, depending on the circumstances of -- or the

Page 76

reason the report needs to be changed.
Q. What sort of reason would make it appropriate to ask to change a police report?
A. Seeing tire marks on a crash scene in a photograph would indicate something that a vehicle did, that maybe that the report needs to indicate something different. Or let's see. Getting a witness statement who wasn't on scene at the time the officer was, that would kind of go against what you already have. I mean, it could -- a lot of things vary.
Q. And to clarify, none of those things -- like, there wasn't additional information that Chief Fontenot had other than the information that you already had that would warrant or justify a change in the police report?
A. Correct.
Q. Would you say that changing who was at fault for the crash was kind of a big change in the police report?
      MR. STAMEY: Objection; form.
A. I would say it is.
BY MS. HIGGINS:
Q. Yeah?
A. Yes, ma'am.
Q. It's not a minor change, correct?

Page 77

A. No, ma'am.
Q. Okay. Would you say that changing who was at fault for the crash would be falsifying the report?
      MR. REED: Objection to form.
      MR. STAMEY: Objection; form.
A. Changing who was in violation of the crash? It would in my opinion, because I was the on-scene investigator. It would be as if I was falsifying the report because it wouldn't reflect what I had seen or did or determined, in my opinion.
BY MS. HIGGINS:
Q. So the change he was asking you to make wouldn't be truthful; is that correct?
      MR. REED: Objection; form.
A. If I was the reporting officer, no, it would not be truthful. If he was the reporting officer, then it would be his opinion on how the crash occurred instead of -- but being that it was my report, me changing it would, in my opinion, be false because it was my report and those wouldn't be my findings.
BY MS. HIGGINS:
Q. Okay. Why didn't you change the crash report?
A. Because those weren't -- what I put, those were my findings, and I had nothing else to say otherwise.



Chase Michael Godeaux                                    June 26, 2023
                                                         Pages 78 to 81

Page 78

Q.  How did you feel about being asked to change the report?

A.  A little upset.  But I had no reason to change it, so I wouldn't.

Q.  Why were you upset?

A.  Just almost like at some point, I guess, disrespected.  But again, sometimes it happens.  But crashes or something, I really take appreciation in doing, so I -- almost like a -- I didn't know what I was doing, almost, based on what I had seen and what I had notated in the report.

Q.  Did it bother you that you were being asked to change your report to something that you didn't feel was the truth?

A.  Yeah, I would say so.

Q.  Has any other supervisor ever asked you to change a report in this way?

A.  No.

Q.  Why not?

A.  Not without having any kind of evidence to back it up or reason to show what I had seen didn't -- I don't want say -- I don't want to say that.  Pretty much without having a good reason or good cause to show otherwise why it needs to be changed.

Q.  Why do you think that no other supervisor of

Page 79

yours has ever asked you to change a report in this way?

A.  Because they all agree with my findings, I guess, or there was no other reason for me -- they couldn't find no other reason to have it changed.

Q.  Do you think that it was ethical that Chief Fontenot asked you to change this report?

A.  No, I don't think it was.  Like I said, he has his own opinion on why he wanted it changed, but there was no reason to.

Q.  Has he ever asked you to change any other crash reports -- or let me rephrase.

Has he ever asked you to change any other report, period?

A.  No, ma'am.  That was the only one.

Q.  What about an official statement?

A.  No, ma'am.

Q.  Have you ever heard of him asking anyone else to change any sort of report or official statement?

A.  Not that I remember.

Q.  Okay.  Did Chief Fontenot ever ask you to violate the law?

A.  No, ma'am.

Q.  What about a policy?

A.  No, ma'am.

Page 80

Q.  Did he ever ask you to act unethically, in your opinion?

A.  No, ma'am.

Q.  Have you ever heard or seen an instance in which Chief Fontenot asked another person at the EPD to violate the law?

A.  It would be hearsay.

Q.  That's okay.  You can tell me about.  I asked if you ever heard of it.

A.  Yeah, I've heard of it, but whether or not it's true, I really don't know.

Q.  Can you tell me about what you heard?

A.  I had heard that Chief Fontenot had asked -- if I remember correctly, had asked Victor Fontenot to do something against Dunn, to set him up with something.  I'm not sure.  I don't remember the entirety of the story or what I was told.

Q.  Can you explain what you mean by "set him up with something"?

A.  I know there was an incident involving a subject in Eunice.  When he was arrested, he was told he was being set up by Victor if he didn't lie about Lieutenant Dunn.  I think it all end up coming out in court that that happened.  But whether or not it went --

Page 81

Q.  So is what you heard that Chief Fontenot asked Victor to have this person you're referring to who was arrested lie about Lieutenant Dunn?  Is that what I'm understanding?

MR. STAMEY:  Objection to the form.  Make it -- it's a leading question.  Make it continuing.

A.  I believe so.  I don't remember the entirety of the story, but I believe that's what it was -- the underlying.

BY MS. HIGGINS:

Q.  Do you remember what the lies were?

MR. STAMEY:  Same objection.

MS. HIGGINS:  It's not leading, but that's fine.

A.  Pretty much that Lieutenant Dunn was a dirty cop and doing things that were illegal and what you would consider misconduct.

BY MS. HIGGINS:

Q.  To your knowledge, are any of these accusations true about Lieutenant Dunn?

A.  None of them were true.

Q.  Definitively, none of them true.  Is that what you're saying?

A.  Definitively, none of them are true.



Page 82

Q.  Why do you think the chief at the time and Victor would want this person to lie about Lieutenant Dunn?

A.  I don't know their -- why they would want that, I really don't.

Q.  And do you recall if this person who you're referring to -- did he say definitively that he was asked to lie?

MR. STAMEY:  Objection; leading.

A.  From what I recall, he's -- that's what he definitively said, that he was asked to lie about Lieutenant Dunn by Victor.

BY MS. HIGGINS:

Q.  By Victor?

A.  (Witness nods head.)

Q.  And how did you hear that Chief Fontenot was involved in this incident?

A.  I think it came later down the road -- I say "later down the road" -- couple months later that it had come out that he was asked whether or not specifically that way.  But that's how it came all -- it all came about.

Q.  Do you remember the details of how it all came about?

A.  I know whenever the subject who was arrested

Page 83

went to -- I believe it was lineup, he had told whoever was there about it, to the judge or his court-appointed attorney.

MR. STAMEY:  Objection.  Let me -- I don't want to interrupt you, but the fact of the matter is can we at least get a distinction between what he knows in -- personally versus this voluminous hearsay testimony so that we can reserve those rights without having to object?

BY MS. HIGGINS:

Q.  Have you ever read a deposition transcript -- or sorry -- a trial transcript or a hearing transcript in which the person at issue -- I believe this person is Joshua Dupre; is that correct?

MR. STAMEY:  Objection; leading.

A.  Yeah.

BY MS. HIGGINS:

Q.  Do you know who Joshua Dupre is?

A.  I remember -- I recalled his last name being Dupre.  I just didn't want to say his first 'cause I didn't know it, couldn't remember it.

Q.  Is that the person who you're referring to in this incident?

A.  I believe so, yeah.

Page 84

Q.  Okay.  I'm going to use his name moving forward, then, for this conversation.

MR. STAMEY:  Well, you suggested the name to him.  He did not recall it independently.

MS. HIGGINS:  That's fine.

BY MS. HIGGINS:

Q.  Did you ever read a hearing transcript in which this issue was discussed?

A.  No, ma'am.

Q.  So where did you hear about his issue?

A.  I can't recall who had told me.  But I remember hearing about it, that it all ended up coming about in court.

Q.  Okay.  So it's your understanding that the details of this incident came out in a court proceeding while Mr. Dupre was under oath?  Is that correct?

A.  Yes, ma'am.

Q.  Okay.  I'm going to move on.  Did Chief Fontenot ever ask you to falsify a search warrant?

A.  No, ma'am.

Q.  What about an arrest warrant?

A.  No, ma'am.

Q.  What about to change a warrant in any way?

Page 85

A.  Not that I can remember, no, ma'am.  Only issue I had with warrants was I thought there was no probable cause, he thought there was, and had me send it to the judge.

Q.  Can you tell me about that?

A.  There was a few warrants I felt there was not enough probable cause to make an arrest on or get a warrant signed.  He thought there was.  We would send it to the judge, and the judge wouldn't sign it because there was no probable cause.

Q.  Why did Chief Fontenot want you to pursue this warrant if there was no probable cause?

A.  I'm not sure.  I think in his opinion, there was probable cause.

Q.  But the judge agreed with you?

A.  Yes, ma'am.

Q.  Did he ask you to alter the report -- or the warrant application at all so that it would look like there were probable cause?

A.  No, ma'am.

Q.  After the warrant was rejected by the judge, did he ask you to further pursue this incident?

A.  No, ma'am, because he couldn't, other than look into it or investigate it a little bit further and see if any more evidence came up.  But other than that,



Page 86

he really couldn't.

Q. What was your finding after you looked into it a little bit more?

A. There's still not enough, in reference maybe to that incident, but it could have been more in a different one. I don't remember.

Q. I just want to go back to the crash report he asked you to alter, shortly. Is it police department policy to allow officers to alter reports in such a way as to change who was at fault for a crash?

A. No.

Q. Is it legal to change a report in this way?

A. No.

Q. Have you heard of any other incidents in which Chief Fontenot asked other officers to change reports?

A. Not that I remember.

Q. Has Chief Fontenot ever threatened you?

A. No, ma'am.

Q. Have you ever heard about him threatening anyone else -- or witness him threaten anyone else, rather?

A. No, ma'am.

Q. Have you ever heard about Chief Fontenot having what's been referred to as a "hit list"?

A. I've heard hearsay. Whether or not it's true,

Page 87

I don't know.

Q. What have you heard about it?

A. Just people that, I guess, he didn't like or they disagreed with each other a lot or didn't do what he was asked. Whether or not it's a hit list to get them fired or if it was just a certain group of people he didn't like.

Q. Who's on that hit list?

A. I do not know.

Q. Do you know any names?

A. I just know some people he didn't agree with.

Q. Like whom?

A. Michael Dunn.

MR. STAMEY: Objection. Are we still talking about the hit list, or are we now talking about just people he didn't like?

MR. DOHERTY: I'm going to object to the use of the word "hit list." He didn't classify it as such.

BY MS. HIGGINS:

Q. Do you know what I'm referring to?

A. Yes, ma'am.

Q. Okay. Glad we clarified that. Who are some people he didn't agree with that you think might be on this hit list?

Page 88

MR. DOHERTY: Object to the use of "the hit list." Those are your words, not the witness'. He said he --

BY MS. HIGGINS:

Q. Have you heard about something called, quote, a hit list at the Eunice Police Department that Chief Fontenot has?

A. I've heard people use that phrase, yes, ma'am, but.

MS. HIGGINS: He knows exactly what I'm talking about. And he's already clarified that he does understand what I'm referring to in those words. And the snickering we can pause on. Okay?

MS. WALL: Look, he knows what you're talking about because you're leading him. You're leading him through half of these questions.

MS. HIGGINS: That's a totally inaccurate characterization of what I'm doing right now, actually. And I'm allowed to ask these questions, and he's permitted to answer. Okay. He understands exactly what I'm talking about. This hit list has come up before. This is a well-known thing. All right? I'm

Page 89

going to keep going. Do you need a second to drink some water? We can take our time.

THE WITNESS: No, I'm good.

A. Need me to name names?

BY MS. HIGGINS:

Q. Sure. That would be great.

MR. STAMEY: Again, just for the record, are we talking about -- is the question directed to people who he believes were not liked by Fontenot versus being on some list?

MS. HIGGINS: I'll ask a question to clarify. But again, it's my time to ask questions right now, not yours.

MR. STAMEY: That's correct.

MS. HIGGINS: Okay.

BY MS. HIGGINS:

Q. What do you understand this hit list to be, then?

A. A group of people that he don't like or doesn't want employed there no more or that they didn't agree with each other or whatever the case may be. I don't know the reasons behind the list. But in my opinion, that's what it would be based off of.

Q. Okay. So have you ever seen a physical list?



Chase Michael Godeaux

Page 90

A. No, ma'am.

Q. Okay. It's a conceptual list, as far as you're aware?

A. Of what people say, yes, ma'am.

Q. Got it. Okay. Who do you know to be on that conceptual list?

A. Michael Dunn; later in time, Donnie Thibodeaux, Stephanie Myers. Who else? I can't think of any other names.

Q. Why do you think those people were on that list?

MR. STAMEY: Again, just objection to the form.

BY MS. HIGGINS:

Q. You can answer.

A. I'm not sure. Maybe because they disagreed with each other on certain things or they would only do things the way they were taught, which was by the state legislature law and their POST academy. I'm really not sure.

Q. I'm going to ask you a couple of questions to tease that out, then. Okay. When you say "they disagreed," who are you referring to? Who disagreed with whom?

A. Whether Chief Fontenot disagreed with

Page 91

Donnie Thibodeaux, Michael Dunn, Stephanie Meyers, or vice versa.

Q. What did they disagree about?

A. I really couldn't tell you. Certain -- I guess the way things were done, whether it was how the shifts were ran, the way things -- it could be a number of things on why -- on what they disagreed on, whether -- but I can't tell you exactly what they've disagreed on in the past because it has been too long.

Q. Okay. When you say the way things are done, what do you mean by that?

A. Whether it's the way they police, proactiveness. It could be a number of things.

Q. I'm sorry, I'm just trying to understand some of the details. So when you say police proactiveness, who was advocating for proactiveness and who was not? I'm just trying to understand which side of things people were on?

A. Some of us -- whether it was me, Lieutenant Dunn, Joshua Courville, Nicholas Cooley, Austin Doucet -- we all enjoyed being proactive. But at one point, we were all separated from either, so it kind of went away, the proactiveness.

I don't know if that was the reason behind it, because we were being proactive, or there was other

Page 92

reasons on why we was all moved. But we all disagreed with that change that was made.

Q. The "change that was made" meaning the shift change that made you less proactive --

A. Yes, ma'am.

Q. -- is that correct?

Okay. And just to clarify, you got the understanding that Chief Fontenot did not want you to be proactive and that's the disagreement source?

MR. STAMEY: Objection; form.

A. That's how I took it.

BY MS. HIGGINS:

Q. That's how you understood it?

A. That's how I took it, yes, ma'am.

Q. Were there other things that Chief Fontenot agreed with you -- Donnie you mentioned, Stephanie Myers you mentioned, and Lieutenant Dunn -- about that you're aware of?

A. That we agreed?

Q. No, disagreed about.

A. Not that I can remember.

Q. You mentioned earlier that perhaps there was a disagreement regarding the aforementioned officers doing things the way they were trained; is that correct?

Page 93

A. Correct.

Q. Can you explain that a little bit more?

A. Depending on who trained them, it would depend on who would disagree with him. So if somebody was trained and got released from their training officer and came to my shift, there may have been a certain way they were trained to do things that I didn't agree with, or the way they typed the reports I didn't agree with, things of that nature.

Q. When you didn't agree with the sort of these training practices, who had done the training that you didn't agree with?

A. Depends on who trained them. There was multiple officers during that time span that trained other people.

Q. I'm just a little confused. I'm trying to understand how Chief Fontenot's disagreement with you over the training comes in.

A. I wouldn't say necessarily he disagreed with me.

Q. Okay. Who did he disagree with?

A. He could have disagreed with the three people that I had stated, Donnie Thibodeaux, Michael Dunn, and Stephanie Myers. There might have been more, but those are the ones I can recall.



Chase Michael Godeaux                                    June 26, 2023
                                                        Pages 94 to 97

Page 94

Q.  I just don't -- can you clarify a little bit how Chief Fontenot disagreed with those three people in regards to training issues?

A.  I can't remember how they -- all what the reason was on the training issues.

Q.  When -- you said you were trained by Lieutenant Dunn; is that correct?

A.  Yes, ma'am.

Q.  Did Lieutenant Dunn train you well, in your opinion?

A.  In my opinion, yes, ma'am.

Q.  Did he train you in accordance with EPD guidelines --

A.  Yes, ma'am.

Q.  -- and policy?

What about in accordance with Louisiana state law?

A.  Yes, ma'am.

Q.  So you believe that the training that Lieutenant Dunn offers to his trainees is the proper training; is that correct?

A.  Yes, ma'am.

Q.  Did Chief Fontenot like or agree with the way that Lieutenant Dunn trained his trainees?

A.  I'm not sure.

Page 95

Q.  Have you ever heard of an incident where he disagreed with the way Lieutenant Dunn trained his trainees?

A.  I might have.  I'm not sure.

Q.  What about Donnie?  How does Donnie train his trainees?  Are they in accordance with EPD guidelines?

A.  Yes, ma'am.

Q.  What about with Louisiana state law?

A.  Yes, ma'am.

Q.  So you would say that he -- Donnie, I'm referring to -- trained his trainees properly in accordance with the law and Eunice Police Department policies; is that correct?

A.  Yes, ma'am.

MR. STAMEY:  For the record, who is Donnie?

BY MS. HIGGINS:

Q.  Donnie Thibodeaux, is that correct, you were referring to?

A.  Yes, ma'am.

Q.  What's Donnie Thibodeaux's role in the Eunice Police Department?

A.  As of right now or when I was there?

Q.  When you were there.

A.  He was a patrol lieutenant, if I'm not

Page 96

mistaken.

Q.  Okay.  Were you aware of any disagreements that the chief had with Donnie regarding training?

A.  Not that I'm aware of, whether -- it would probably be hearsay.  Like I say, I can't recall the exact reason they were disagreeing.  I just remember the disagreements between the two.

Q.  There are no details you remember about why they disagreed?

A.  Not that I can remember.  I just remember the disagreements.

Q.  So earlier when you mentioned that there would have been a disagreement over training practices, where did that come from?

A.  Training practices?  I lost my thought.

Q.  That's okay.  It happens.

A.  Oh, yeah.  I can't remember the reason for it. I'm sure it'll come back to me later.

Q.  Okay.  Why don't you just let me know if and when it does.  Is that okay?

A.  Okay.

Q.  All right.  Other than the people we just discussed, have you ever heard about Chief Fontenot having any enemies within the Eunice Police Department?

A.  I mean, other than the ones they disagreed

Page 97

with each other a lot about, that was it.  I don't know if there was more or if they really were enemies or just, I'd say, butt heads a lot.

Q.  And the ones that he butted heads with, I just want to clarify.  Are you referring to Stephanie Myers, Donnie Thibodeaux, and Lieutenant Dunn?

A.  Yes, ma'am.

Q.  Is there anyone else?

A.  Depending on the situation, if there was more or not.

Q.  Can you clarify what you mean by that?

A.  I guess it depends on what the subject matter was and whether or not they would disagree with him or not.  So if there was a change in policy or an email or whatever the case may be, there would either be less people to disagree with him or more people to disagree, depending on the subject.

Q.  I'm sorry, I'm not following.  So there might have been --

A.  So depending on what they were discussing would depend on how many people would disagree with him and how many wouldn't.

Q.  Okay.  And those are other people other than the three we've discussed?

A.  Yes, ma'am.



Chase Michael Godeaux

June 26, 2023
Pages 98 to 101

Page 98

Q.  Do you remember who?

A.  Majority of them would be supervisors.  So I know Mary Guillory would disagree sometimes.  Jeremy Ivory would disagree sometimes.  Robert Brickly would disagree sometimes.  But how much they would disagree, I really don't know.

Q.  Do you remember any specific incidents when these people you just named disagreed with the chief?

A.  Not that I can remember.

Q.  You just mentioned about a policy being sent around.  I'm just trying to understand, because earlier we had discussed that EPD's official policy came from a digitalized handbook; is that correct?

A.  That is correct.

Q.  So why would there be a policy that's sent around in an email?

A.  It would be more or less a revised policy, if a policy subsection or section was revised.

Q.  Who revised it?

A.  It would have to be the chief.

Q.  Chief Fontenot; is that correct?

A.  Yes, ma'am.

Q.  How often did he revise policies via email?

A.  It varied.  It could be -- depending on -- it could be anywheres from a couple months to a couple

Page 99

weeks.  One would get revised, and then sometimes it would go a span of six, seven, eight months before -- if one was revised or not.

Q.  Was that within his authority, to revise the policies in that way?

A.  Yes, ma'am.

Q.  The way he revised the policies, were they in line with the civil service board rules?

A.  I'm not sure.  I don't remember the policies that were revised.

Q.  Was there ever a policy revision that made you question the policy revision?  Were you ever concerned about a policy revision in that way?

A.  Not that I can remember.  Like I said, I'd have to see the revisions that we had sent whenever I was there.

Q.  Okay.  So just to clarify, there were now, I'm understanding, two sources of official policy.  One would have been the digitalized handbook that we discussed earlier, and another source would be these emails that Chief Fontenot sent around; is that correct?

A.  Not necessarily.  He would -- the emails we would get would show which section was revised, and then that would replace the one in the handbook -- or

Page 100

the digitalized handbook.

Q.  Was the handbook actually revised?  Like, you saw a change in the digitalized handbook after the email went out?

A.  I believe so.  I can't remember, it's been so long.

Q.  Who else has to sign off on these changes in policy?

A.  I'm not sure.  I believe it's only the chief, unless -- yeah, it should only be the chief because he's the one that runs the police department.  So it's his policy, as long as it fits with civil service and state law.

Q.  And his changes in policies always fit with civil service and state law?

A.  That I remember.  I really don't remember which ones were revised and how they were revised.

Q.  So it's -- you said it's within the chief's authority to alter policy via email; is that correct?

A.  To change it or revise it, yes, ma'am.

Q.  Could he ever alter policy just by word of mouth?

A.  Not good practice, because then it doesn't get around to everybody.

Q.  Did that happen ever, where he changed the

Page 101

policy via word of mouth?

A.  Not that I remember.  I just remember it being emails showing changes or revisions in policies.  Whether or not it was revised word of mouth, I really don't know.

Q.  What was the chief's policy while you were at the EPD on how to handle drunk drivers?

A.  I don't remember.  Not to let them go or drive.

Q.  Were you supposed to write them up?

A.  On civilian drunk drivers?

Q.  Uh-huh.

A.  You could.  You could use officer discretion and find them a ride to have somebody come and get them.  You could give them a citation for the violation.  You could have did a standardized field sobriety test and arrested them for DUI if they were -- if you had enough signs and indications to show.  It all depended on the situation.  I've never had any issue, whether it was finding them a ride to get home or arresting them for driving under the influence.

Q.  Is that typical police practice, to just find a drunk driver a ride?

A.  It depends.  Every agency is different.  Every officer is different.  Sometimes they'll find them a



Page 102

ride to get home, and sometimes they'll arrest them.

Q.  What would be the deciding factor?

A.  Everybody is different.  Everybody is going to have their own opinion on whether they want to arrest them or not.

Q.  What are usually some deciding factors about whether you arrest someone for drunk driving?

A.  Depending on who the driver is or if they have no prior records, where there's no prior tickets, criminal offenses.  It could be them going somewheres, if they had an emergency.  It could be a variety of things on whether or not they decide to arrest them or find them a ride.

Q.  Would you say that drunk driving is a pretty serious offense?

A.  Yes, ma'am.

Q.  Have you ever pulled over a drunk driver and not written them up?

A.  Yes, ma'am.

Q.  Would you say it's good practice, not to write them up?

A.  It's not good practice, no.  But it does happen, especially where -- with the sheriff's office, we have a high call volume, and we don't have really anybody who's certified in getting a breath sample from

Page 103

Intoxilyzer.  So we would have to contact other agencies to assist, depending on where they were at.  And in this day and age, everybody is short, so.

Q.  Was Chief Fontenot aware that you didn't always write up drunk drivers for drunk driving?

A.  I'm not sure.  He might have been; he might not have.  I really couldn't tell you.

Q.  I want to circle back to something we were talking about a little earlier, in terms of the disagreements between Chief Fontenot and the officers who we discussed.

Is it your understanding that Chief Fontenot has officers that he disagrees with like we just discussed?

A.  Yes, ma'am.

Q.  Do you believe that Chief Fontenot targets officers who he disagrees with?

A.  It's possible.  In my opinion, there has been some instances where I thought that.

Q.  Can you tell me a little bit about those incidents?

A.  The incident with Lieutenant Dunn.

Q.  What happened?

A.  The first time he was placed on administrative leave.

Page 104

Q.  Why do you think he was placed on administrative leave?

A.  Because he -- apparently, they thought he did something or that violated policy or state law that in my opinion he didn't.

Q.  Which policy or state law?

A.  I'm not sure.  I can't remember what the reason was he was placed on admin leave.

Q.  So your memory, just to clarify, is that Lieutenant Dunn disagreed with Chief Fontenot about something; is that correct?

A.  Yeah.

MR. STAMEY:  Objection; form.

BY MS. HIGGINS:

Q.  And you're not sure what it was?

A.  Correct.  I didn't ask any of the details.

Q.  Did you believe that Lieutenant Dunn was correct in his side of the agreement --

A.  Yes, ma'am.

Q.  -- or the disagreement, rather?

A.  Yes, ma'am.

Q.  And you believe that he was placed on admin leave as a result of this disagreement; is that correct?

A.  Yes, ma'am.

Page 105

Q.  What led you to believe that?

A.  Lieutenant Dunn called me and told me he was getting placed on admin leave.

Q.  But what led you to believe that it was because of the disagreement?

A.  Just the mere fact that that's what usually happens.  They don't see eye to eye on a lot of things, and then next thing I know, he's getting placed on admin leave.  But like I say, I don't know what the reason was for their disagreement, if that's what it was over.  I just remember him placing him on admin leave.

Q.  When you say this is something that "usually happens," do you mean between Lieutenant Dunn and Chief Fontenot?

A.  As far as?

Q.  I can rephrase.  Is that helpful?

A.  Yes.

Q.  Okay.  You just testified that what usually happens is that there's a disagreement and then a placement on admin leave.  Does this usually happen with Lieutenant Dunn and Chief Fontenot, or does this usually happen with other officers as well?

MR. STAMEY:  Objection; form.

A.  So the disagreements between the two, I don't



Chase Michael Godeaux

June 26, 2023
Pages 106 to 109

Page 106

want to say that's what usually happens, but the reason for it, whether there's disagreements or -- I'm trying to think of the way to word it.

BY MS. HIGGINS:

Q.  Take your time.

A.  Yeah, I don't want to say that's what usually happens, as far as a disagreement between the two, that he gets placed on admin leave or anybody else gets placed on admin leave.

Q.  Did it happen more than once?

A.  That I know of, I know of that incident.  And then I believe there was others after I had left.

Q.  What other incidents?

A.  I just know there was other times where he was placed -- Lieutenant Dunn was placed on admin leave, for what reasons, I don't know.

Q.  Have you heard of any other incidents in which other officers had a disagreement with Chief Fontenot and then were placed on admin leave?

A.  Whether -- whether it was because of a disagreement, I don't know.  But I know there was -- I know Stephanie Myers was placed on admin leave.  Were there others?  I do not know.  But I know those two for sure.  And the reason for it, I don't know, I do not know.

Page 107

Q.  Are there any other officers that you're aware of who were placed on admin leave not long after having a disagreement with Chief Fontenot?

A.  Not that I know of.

Q.  Okay.  Have you heard that Chief Fontenot has any favorite at the department, or had, rather?

A.  I wouldn't say necessarily favorite but people that he would go to over others, yeah.

Q.  Like who?

A.  Jeremy Ivory, Ryan Young.  Maybe Victor was one of them.  Tony Kennedy, I believe.  There may be others.  I don't remember.

Q.  Do you have an understanding of why he would have -- I'm sorry.  What was your wording, again, in terms of maybe they weren't his favorites but picked them over others?

A.  Yeah.

Q.  Is that what you said?

A.  Would favor some over others.

Q.  Why would he do that?

A.  Because I believe some of them wouldn't really argue with him.  They would just do what was asked.

Q.  Other than being placed on admin leave, are there any other consequences you saw that EPD officers faced after they disagreed with Chief Fontenot?

Page 108

A.  Again, I'm not sure if that's the reason they were placed on admin leave or whether it was a disagreeance.  Could have been something other.  But I know at one point, they had took the K9 away from Lieutenant Dunn while he was admin leave, but I don't know if that was just part of the procedure or not.

Q.  Why do you think they took the K9 from Lieutenant Dunn?  Do you know?

MR. DOHERTY:  Objection; speculation.

A.  Other than to reassign it to somebody else as a form of punishment.  That would be the only reason I could think of.

BY MS. HIGGINS:

Q.  But you did view it as a form of punishment?

A.  I seen it, yes, ma'am.

Q.  Do you remember why he was being punished?

A.  I don't remember why.

Q.  Who did they give the K9 to?

A.  They had offered it to me while he was on admin leave, but they -- I don't think they gave it to anybody else.  It ended up staying with Lieutenant Dunn.

Q.  So you didn't agree to take the K9?

A.  No, ma'am.

Q.  Why not?

Page 109

A.  Because I didn't think it would be right.

Q.  Why not?

A.  Because he was the K9 handler.  And eventually, for whatever reason he was placed on admin leave, would go to civil service.  And civil service, in my opinion, would have overturned it, given him the dog back, so it would have been pointless for me to take the dog for it only to go back to its original handler.

Q.  Why do you believe that civil service would have reassigned the dog back to Lieutenant Dunn?

A.  Because it was part of, I would say, his punishment, would be taking the dog, so if they would reverse the decision of the punishment, the dog would have to go back to him, too, because it could be perceived as a form of punishment, taking the dog from him.

Q.  And you were confident that this punishment would be overturned by CSB; is that correct?

A.  In my opinion, yes, ma'am.

Q.  Is it also your understanding that this would have been viewed as a punishment by the civil service board?

A.  Yes, ma'am.

Q.  Why do you say that?



Chase Michael Godeaux

June 26, 2023
Pages 110 to 113

Page 110

A. Because once -- if the dog is assigned to him, there has to be an adamant reason for the dog to be taken from him, and I don't believe there was an adamant reason to take the dog.

Q. What was the reason that was given for taking the dog from Lieutenant Dunn?

A. To me, whenever they asked me to place a letter in for it, they was just going to reassign the dog to somebody else. That was the only reason that was given to me.

Q. Was there ever talk about not having enough money to operate the K9 program.

A. To me, no, ma'am.

Q. At the Eunice Police Department.

A. That's what -- word was there was not enough money to pay a K9 handler or the upkeep of the dog.

Q. Who gave that reason to who? So you said that you were not given that reason.

A. Correct.

Q. Who was given that reason?

A. I'm not sure who was given that reason. But I would assume the only person that would know whether or not there's enough money to upkeep a dog would be the chief.

Q. And other people had heard that rationale,

Page 111

that that's why the dog was being taken away from Lieutenant Dunn?

A. One of the reasons.

Q. So help me out here. I'm a little confused. If there wasn't enough money to operate the K9 unit and the dog needed to be taken away from Lieutenant Dunn, why would the dog then be offered to you? Isn't that the same amount of money being spent?

A. I believe so. But if I'm not mistaken, the dog was offered to me before the talk of not having enough money to upkeep the dog.

Q. What happened with the dog after, then?

A. If I'm not mistaken, they was -- so they end up retiring him and end up staying with Lieutenant Dunn.

Q. So you said that you viewed this as a form of punishment, taking the K9 way from Lieutenant Dunn, correct?

A. Correct.

Q. Did other people at the Eunice Police Department view this as a form of punishment?

MR. DOHERTY: Objection; calls for speculation.

A. Some did; some didn't.

BY MS. HIGGINS:

Page 112

Q. How do you know that?

A. Some of them I had spoke with. We were all on the same shift together and some people agreed with it and others didn't. Others didn't believe that we should have had a K9-unit, and others thought we should have, depending on who you asked.

Q. I'm going to move on for now.
Did you ever interview with Chief Fontenot to be a narcotics detective?

A. No, ma'am.

Q. Did you ever consider becoming a narcotics detective?

A. No, ma'am.

Q. There was no discussion between you and Chief Fontenot about becoming a narcotics detective?

A. No, ma'am.

Q. Okay. Other than the -- other than the instances of misconduct that we've discussed, are there any other instances of misconduct that you've witnessed by Chief Fontenot?

A. No, ma'am.

Q. What about that you heard of?

A. I don't remember any.

Q. Okay. Have you ever heard of any civilians complaining about Chief Fontenot?

Page 113

A. Everybody has got an opinion they complain about somebody. So yeah.

Q. What did you hear?

A. Just the crime rate, like usual. They don't -- the crime rate is going up and the chief needs to do a better job, because they view him as the face of the police department, so that's who they blame.

Q. Why do you think the crime was going up while Chief Fontenot was in charge?

A. It could be anywheres from less proactivity from officers to less officers in general.

Q. Why were there less officers? Do you know?

A. The reason for them leaving I don't know, or the reason for anybody coming. A lot of the reason had to do with pay. Nobody would go work over there for 11 -- well, it was $9.75, and then it went up after I had left, and I think it just went up again. So when they could go other places making twice as much.

Q. We discussed a number of instances of misconduct at the Eunice Police Department so far. Did Lieutenant know about any of these instances other than the ones we discussed?

MR. REED: Object to form.

A. Lieutenant Dunn?

BY MS. HIGGINS:



Page 114

Q.   Yeah.

A.   Did he know about any of the other instances?

Q.   Uh-huh.

A.   What he knew about, I really couldn't tell you.  There's a lot of stuff that he probably knew that he wouldn't tell me.

Q.   Do you know if he filed any reports formally about any of the misconduct incidents we've discussed?

A.   I'm sure he did.

Q.   When you say you're sure, like you have actual personal knowledge of these reports?

A.   I believe, yeah.  I would say -- I don't want to say personal knowledge as far as visually seeing these reports personally.  But being told that they did it, yes.

Q.   Which incidents were those for?

A.   Which one?  I know the two we spoke about.

Q.   Uh-huh.

A.   And what would be the other two?

Q.   Which other two?

A.   You said the four incidents.

Q.   No.  Which other?  Sorry.

A.   Just the two incidences that I know of.

Q.   Okay.  After Lieutenant Dunn filed those two incidence reports regarding the misconduct that we

Page 115

previously discussed, was he ever -- did he ever face any consequences as a result of filing those reports, to your knowledge?

A.   Not that I remember.  I mean, it might have been a reason later down the road, but at that time, no.

Q.   "A reason later down the road" for what?

A.   Just to, I guess, add on to the pile of reasons they decided to do -- place him on admin leave or whatever the case may be, whether it was change the shifts or any other reasons we discussed that occurred to him.

Q.   Why would that be a reason to punish Lieutenant Dunn?

A.   I couldn't tell you.  Just a reason.  I couldn't tell you the reason.

Q.   Are there other officers at the Eunice Police Department who reported misconduct?

A.   I'm not sure.  I believe there was, but I can't say a hundred percent definitively there was.  But I believe there were a few who reported it.

Q.   Do you know who?

A.   No, ma'am.

Q.   Do you know in what context they would have reported misconduct?

Page 116

A.   Probably just a supervisor at the time.

Q.   But you know what sort of things would have happened?  Like, is there a certain incidence coming to mind?

A.   Not that I can remember.

Q.   Okay.  Have you ever heard about any other Eunice Police Department officer who reported misconduct at the Eunice Police Department facing any sort of repercussions for doing so?

A.   Besides Lieutenant Dunn, right now, no, not that I remember.

Q.   Okay.

A.   It's been four years.  It's been a while.

Q.   I understand that.

MS. HIGGINS:  Do we want to take a break for lunch, or do we want to keep going?  I'm open either way.

MR. STAMEY:  Matters not to me.

MS. HIGGINS:  Excuse me?

MR. STAMEY:  Matters not to me.

MR. REED:  Yeah, I don't care either.

MR. DOHERTY:  Whatever the group wants to do.

MS. WALL:  Normally at this point, I'm starving, but I'm okay today.

Page 117

MR. STAMEY:  I'll defer to the witness.  Sir, if you want to take a break, we can take a break.

THE WITNESS:  Okay.

MS. HIGGINS:  Yes, would you like that?

THE WITNESS:  Oh, yeah.

MS. HIGGINS:  Okay.  Let's take a break.

THE VIDEOGRAPHER:  Off the record at 11:44.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 12:49.

BY MS. HIGGINS:

Q.   Thank you for being here.  We really appreciate it.

A.   Yes, ma'am.

Q.   I know this is a long day, so I think I can speak for everyone when we say we really appreciate your time.

I wanted to circle back to the official protocol for reporting misconduct and also for investigating misconduct.  Are you aware of any law that says that you have to investigate official complaints of misconduct?

A.   Yes.



Page 118

Q.   Is it a Louisiana state law?

A.   I believe so.  I think there's a federal one too.

Q.   Okay.  Earlier we had discussed that, correct me if I'm wrong, there were some incidents of misconduct that were not investigated, to your knowledge; is that correct?

A.   Correct.

Q.   Why wouldn't those have been investigated if there is a law that mandates such an investigation?

A.   Your guess is as good as mine.  I'm not sure.

Q.   And who would have made the decision not to investigate these incidents?

A.   It would be the chief.

Q.   Chief Fontenot?

A.   Or Chief Dies, depending on the incident.

Q.   Okay.  I want to touch on something new having to do with Chief Fontenot.  Are you aware that he lost his appointing authority at some point?

A.   Yes, ma'am.

Q.   Can you explain a little bit about what that means?

A.   If I remember correctly, anytime somebody is written up, punished, hired, fired, it no longer goes through the chief; it will go through the city council

Page 119

and the mayor.

Q.   Do you know when that happened?

A.   Exact date, no.  I know it's within the last few years, last two or three years maybe.

Q.   While you were employed at EPD?

A.   After, after I left, if I'm not mistaken.

Q.   Do you know the circumstances that gave rise to him losing his appointing authority?

A.   I don't recall the circumstances of it.  But I know a lot of it had to do with some of the write-ups, if I'm not mistaken.

Q.   What do you mean by that?

A.   Certain write-ups, I think, were issued that were overturned by civil service.  So I think a complaint was made to the city council to have it removed, and they all voted in favor to have it removed.

Q.   Bear with me.  I'm going to ask you a couple of clarifying questions.

A.   Okay.

Q.   Who made these write-ups that were overturned by civil service?

A.   I'm not sure.  It could have been a couple different ones.  I think there was Lieutenant Dunn, Lieutenant Thibodeaux, and I'm not sure if there were

Page 120

any other ones.

Q.   What sort of write-ups were these?

A.   I can't recall the type or what they were for.

Q.   So can you explain what you mean by a write-up, then?

A.   A form of disciplinary action.

Q.   Were they Lieutenant Thibodeaux and Dunn reported someone else?

A.   I'm not sure.  It could have been something as small as Lieutenant Thibodeaux getting moved from training back to the road.

Q.   And he would then file a write-up, as you call it, with the civil service board?

A.   For that it wasn't a write-up.  It was just a change, which I think would be done outside of his class, if I'm not mistaken.  Or it was done some type of way which it was appealed and overturned by the civil service board.  I don't know the exact circumstances of it.  I just remember him getting moved from training to patrol and then it getting overturned by the civil service board and he got moved back to training.

Q.   "He" being Donnie Thibodeaux --

A.   Yes, ma'am.

Q.   -- is that correct?

Page 121

A.   Yes, ma'am.

Q.   Okay.  Why did he get moved from training to patrol?  Do you know?

A.   I do not know the reason.

Q.   Why did the civil service board overturn that decision?  Do you know?

A.   If I'm not mistaken -- no, I don't know.

Q.   And the person who made that decision to move Donnie to patrol was Chief Fontenot; is that correct?

A.   Yes, ma'am.

Q.   In all these instances that you're aware of in which these write-ups were submitted to the civil service board, did the civil service board always agree with Donnie or Lieutenant Dunn?

A.   Yes, if I'm not mistaken.

Q.   So you're not aware of any instances in which a civil service board complaint was made that the civil service board sided with Chief Fontenot?

A.   Not that I'm aware of.

Q.   Okay.  And as a result Chief Fontenot, lost his appointing authority; is that correct?

A.   Correct, I believe so, that was the reason.

Q.   Who was given that authority?

A.   The mayor and the city council.

Q.   Are there any other comments that were made in



Chase Michael Godeaux

Page 122

terms of why the chief lost his appointing authority by the civil service board?

A. Not that I'm aware of.

Q. So what's your -- just for clarification, what's your understanding of why the civil service board took away the appointing authority?

A. The city council?

Q. Yes, sorry, city council. Apologies.

A. I think because of those reasons. I'm not exactly sure of the reasons. That's what I believe they were. As far as what the actual reasons were, I'm not sure.

Q. Okay. I'm going to move on to Ryan Young. Have you ever seen Ryan Young do something that you believe was illegal?

A. Besides maybe not reporting the incident with Richard Abadie, which I don't know if he did or didn't. But I know I did.

Q. What leads you to believe that he didn't report that situation?

A. Nothing -- no disciplinary action occurred to Richard Abadie that I knew about, as much as a suspension, or even a termination. But if something smaller, like a counseling or a write-up, was done, I wouldn't know.

Page 123

Q. But you reported that incident, I thought. Right?

A. Yes, ma'am.

Q. So -- and there was still no punishment, correct?

A. Not that I'm aware of.

Q. So why would it make a difference if you reported the incident or if Ryan reported the incident in terms of a punishment being doled out?

A. It eventually ends up coming down from the chief, who was Dies at the time. But it's always better to have more than one person report something, even if it's just one. It's still good, but it's always good when you have more than one.

Q. Are you aware of other instances in which Ryan Young witnessed misconduct and didn't report it?

A. Not that I can remember. There might be. I'm not sure.

Q. Okay. Did you ever see Ryan Young do something you believed was unethical, other than failing to report misconduct?

A. Not that I can remember.

Q. Did you ever hear of Ryan Young doing anything that, in your opinion, was illegal or unethical?

MR. REED: Object to form.

Page 124

A. I've heard, yeah.

BY MS. HIGGINS:

Q. What did you hear?

A. Pretty much, asking people to look out for the mayor if he was driving intoxicated, stopping him and arrest him.

Q. I want to dive into that a little bit more. So why would he ask people to look out to see if the mayor was driving drunk? Is that what you said?

A. Uh-huh.

MR. REED: Object to form.

BY MS. HIGGINS:

Q. What would be the reason he was looking for that? To protect him?

A. No.

MR. REED: Object to form.

A. To -- because of the pay raise that was requested and got turned down.

BY MS. HIGGINS:

Q. Can you elaborate a little bit more? I'm not quite following.

A. Pretty much, I think a pay raise was requested but was denied. I don't remember the reason why.

Q. A pay raise was requested --

A. For the police department.

Page 125

Q. And the request was made to the mayor?

A. The city council and the mayor.

Q. And the mayor said no?

A. City council and the mayor both said no.

Q. Okay. And Ryan Young was --

A. A lot of people were upset about it, but because of that, a lot of people -- say "a lot of people." That was one comment that was made about it: If anybody sees the mayor at the time riding around, especially in the early morning hours, after midnight, to find probable cause to stop him and determine if he's under the influence of any alcohol, and if he is, to arrest him.

Q. Is that something other Eunice Police Department officers do, look for specific people and try to catch them in an illegal act?

A. It depends on the circumstances. As far as a city council member, like that, no. I mean, it's -- it's people that sell you the narcotics. That's who you want to look for, or is known to use it. But it's not common practice to do that for somebody with some type of authority.

Q. Is it your belief that Ryan Young wanted to catch the mayor driving drunk as a form of retaliation for failing to agree to the pay raise?



Chase Michael Godeaux

June 26, 2023
Pages 126 to 129

Page 126

MR. REED:  Objection; form.

MR. STAMEY:  Form.

A.  It's possible, but I can't say for sure his reasoning behind it.

BY MS. HIGGINS:

Q.  Did you actually hear Ryan Young make this statement about wanting to catch the mayor driving around in the early hours intoxicated?

MR. REED:  Object to form.

A.  Not that I remember.  I just remember hearing about it.

BY MS. HIGGINS:

Q.  Who did you hear it from?

A.  Multiple people from the Eunice Police Department.

Q.  Do you remember who?

A.  Not exactly who.

Q.  Do you know who was present when this statement was made?

A.  No, ma'am.

Q.  Okay.  Are there any other people that Ryan Young has made similar comments about wanting to catch?

A.  Not that I can recall.

Q.  Has Ryan Young ever asked you to violate the law?

Page 127

A.  Not that I can recall.

Q.  How about police policy?

A.  Not that I can recall.

Q.  Has he ever asked you to act unethically?

A.  Not that I can recall.

Q.  Has he ever asked anyone else to violate the law that you're aware?

A.  Not that I'm aware of.

Q.  What about to violate department policy?

A.  Not that I'm aware of.

Q.  And to act unethically?

A.  Not that I'm aware of.

Q.  Okay.  Has Ryan Young ever attempted to interfere with an investigation conducted by you?

A.  No, ma'am, not that I can remember.

Q.  What about by someone else?

A.  Not that I remember.

Q.  Have you ever witnessed Ryan Young conduct an illegal search of a home?

A.  Not that I remember.

Q.  Have you ever heard of Ryan Young conducting an illegal search of a home?

A.  Not that I can remember.

Q.  Do you know if Ryan Young ever worked outside the Eunice Police Department jurisdiction against

Page 128

department policy?

A.  If I'm not mistaken, it was the same incident with Victor Fontenot near G&J Zydeco, but I can't a hundred percent say for certain.

Q.  Do you mind just briefly reminding us about what you're referring to?

A.  Doing surveillance on a residence in reference to illegal narcotics sale.

Q.  Do you know why he would be doing that?

A.  No.  Like I said, I don't know if he was working with another agency or -- or what, or the reason behind why they were doing it.  And I couldn't think of a reason why they would.

Q.  Are you aware of Lieutenant Young ever being placed on medical leave?

A.  Yes.

Q.  Did he take up any other employment while he was on medical leave?

A.  If I'm not mistaken, at Double Action.

Q.  Excuse me?

A.  At Double Action.

Q.  What is that?

A.  It's a firearms store.

Q.  Was he permitted to have that alternate employment while he was on medical leave?

Page 129

MR. REED:  Object to form.

A.  I'm not sure.

BY MS. HIGGINS:

Q.  Is it department policy that you can maintain alternate employment while you're on medical leave?

A.  I don't believe so, because of workman's comp.

Q.  It's your understanding that because of workman's comp, you're not permitted to take on alternate employment while you're on medical leave; is that correct?

MR. REED:  Object to form.

A.  Correct.

BY MS. HIGGINS:

Q.  Okay.  Where did you learn that he was working at the firearms store?

A.  Personally.

Q.  So you saw him there?

A.  Uh-huh.  Yes, ma'am.

Q.  Working at the counter, or in what capacity?

A.  At the counter.

Q.  Okay.  Did Chief Fontenot know that he was working at the firearms store?

MR. REED:  Object to form.

A.  I'm not sure.

BY MS. HIGGINS:



Page 130

Q.  If Chief Fontenot knew that he was working at the -- at the firearms store, would he be obligated to punish Ryan Young for that in some capacity?

MR. REED:  Object to form.

A.  I would believe so.

BY MS. HIGGINS:

Q.  What leads you to believe that?

A.  Because it's -- it's a violation, in my -- my opinion, of the workman's comp.  And if I'm not mistaken, you're also getting paid for the Eunice Police Department because you're on medical leave.

Q.  So working at the firearms store, would you classify that as unethical?

MR. REED:  Objection; form.

BY MS. HIGGINS:

Q.  You can answer the question.

A.  I would say so, yeah.

Q.  Why would you say that?

A.  Because only way I can really describe it, it's almost like double-dipping.  You're getting paid to be out of work because of a medical issue, but you're working somewheres else when you could be working at the police department.

Q.  Do you know about how long Ryan Young was working at the firearms store?

Page 131

A.  No, ma'am, I do not.

Q.  Do you know if anyone else saw him working at the firearms store?

A.  I believe so.

Q.  Who?

A.  A couple of officers, if I'm not mistaken.  I really don't know who.  But it was known that he was working there.

Q.  Known generally?

A.  Throughout the officers, yes, ma'am.

Q.  So do you think it's possible that Chief Fontenot would have heard about this?

MR. REED:  Object to form.

A.  It's possible.  I can't say for sure or not.

BY MS. HIGGINS:

Q.  Was it known to just you and maybe one other officer, or did multiple officers know about this?

MR. REED:  Object to form.

A.  I would say multiple.

BY MS. HIGGINS:

Q.  Was Ryan Young doing anything to kind of cover up the fact that he was working at the firearms store, to your knowledge?

MR. REED:  Object to form.

A.  Not to my knowledge.

Page 132

MS. HIGGINS:  He's testifying to his personal knowledge about the situation.

MR. REED:  I objected before you said "to your knowledge."

MS. HIGGINS:  Then let me finish the question.  Okay.

MR. REED:  I thought you were finished.

MS. HIGGINS:  Let me finish my questions.

BY MS. HIGGINS:

Q.  Did Ryan Young ever ask you to alter a police report?

A.  Not that I recall.

Q.  Did he ever ask anyone else to alter a police report, to your knowledge?

A.  Not that I can recall.

Q.  What about an official statement?

A.  Not that I can recall.

Q.  Do you think Lieutenant Young treats different -- treats employees differently based on their gender?

A.  Not that I remember or have seen.

Q.  Do you think that he favors any employees over others?

A.  Not that I've seen.

Page 133

Q.  Okay.  Other than the incidents we've discussed, are there any other instances of misconduct involving Ryan Young that you're aware of?

A.  Not that I can recall.

Q.  Okay.  In terms of Ryan Young's working at the firearms store, did you report this to anyone?

A.  No, because everybody knew about it.

Q.  To your knowledge, did anyone report this?

A.  Not that I'm aware of.

Q.  Okay.  So to your knowledge, he was never investigated or punished for having this alternative employment; is that correct?

A.  Not that I'm aware of.

Q.  Okay.  I'm going to move on to Victor Fontenot.  Have you ever seen or heard Victor Fontenot do something that you believe to be illegal?

MR. STAMEY:  Objection to form of the question to the extent it has been asked and answered.  And I will make that objection continuing.

MS. HIGGINS:  I haven't asked this about Victor.  I've asked it about Chief Fontenot, and I've asked it about Ryan Young.

MR. STAMEY:  To the extent it has been



Chase Michael Godeaux

Page 134

asked and answered, I'm objecting.  Go ahead and answer the question.

MS. HIGGINS:  That's fine, but it hasn't been asked or answered yet.

MR. STAMEY:  I'll take your word for it.

A.  Yeah, I've answered that one.

BY MS. HIGGINS:

Q.  So have you ever seen Victor Fontenot treat people in the department unfairly?

A.  Not in the department, not that I can remember.

Q.  What about outside the department?

A.  Yes, ma'am.

Q.  Who?

A.  Sunny Arnaud.

Q.  Can you tell me about that?  Is that the incident you were referring to earlier?

A.  Yes, ma'am.

Q.  And when you say he treated him unfairly, can you explain what you mean by that?

A.  Grabbing him by the throat while in handcuffs.

Q.  And just to clarify, that's not permitted by department policy, correct?

A.  Correct.

Q.  What about by the law?

Page 135

A.  No, ma'am, it's not.

Q.  Okay.  Has Victor Fontenot ever asked you to violate a law?

A.  No, ma'am.

Q.  What about department policy?

A.  No, ma'am.

Q.  Have you ever heard about him asking anyone else to violate a law?

A.  Not that I can remember.

Q.  What about department policy?

A.  Not that I can recall.

Q.  Has Victor Fontenot ever attempted to interfere with an investigation conducted by you?

A.  No, ma'am.

Q.  What about by anyone else?

A.  Not that I know of.

Q.  Do you know if Victor Fontenot ever worked outside the Eunice Police Department jurisdiction against policy?

A.  Yes, ma'am.

Q.  Can you tell me about that?

A.  The same incident we had spoke about earlier, surveillance on a narcotics sale house.

Q.  Okay.  Any other incidents?

A.  Not that I know of.

Page 136

Q.  Okay.  Do you know of any instances in which Victor Fontenot tipped off suspects about warrants that were not yet executed?

A.  It was mainly hearsay.

Q.  Can you tell me about what you heard?

MR. STAMEY:  Objection; form.

A.  Same incident with Sunny Arnaud and the reason we had did a search warrant on his house.  And I don't think anything -- I can't remember if we had located anything, but I don't believe we did.

BY MS. HIGGINS:

Q.  I'm going to ask a couple details about that to make sure I'm following.  So there was an incident you discussed earlier in which Victor grabbed Sunny Arnaud by the throat, correct?

A.  Correct.

Q.  When was the warrant executed?

A.  The search warrant was done prior to that, if I remember correctly.

Q.  And --

A.  I don't believe we had found any -- anything inside the house as far as illegal narcotics-wise.

Q.  Is it your understanding that Sunny Arnaud had prior knowledge that the search warrant was going to be executed before it was actually executed?

Page 137

A.  It's possible.

Q.  Why do you think that?

A.  Because of the comments that was made afterwards.

Q.  By whom?

A.  By Sunny.

Q.  What was the comment that he made?

A.  About giving items to Victor, and then that's when Victor had grabbed him by the throat.

Q.  Did he specifically say that he had known about the warrant before it was executed?

A.  Not that I remember.  I don't remember him saying that.

Q.  But just that he had gotten information before?

MR. STAMEY:  Objection; form.

BY MS. HIGGINS:

Q.  Is that your understanding?

A.  Yes, ma'am.

MR. STAMEY:  Objection to the form of the question.

BY MS. HIGGINS:

Q.  Is that proper, in your opinion, for a Eunice Police Department officer to give that sort of advance information to a suspect about a search warrant that



Chase Michael Godeaux

Page 138

has not yet been executed?

A.  No.  It puts people in danger.

Q.  Is that in line with police department policy, to do such things?

A.  No, ma'am.

Q.  What about the law?

A.  No, ma'am.

Q.  Are there any other incidents that you're aware of in which a suspect might have been tipped off about a warrant before it was executed?

A.  Not that I can recall.

Q.  What about an arrest before it occurred?

A.  Not that I can recall.

Q.  Did Victor Fontenot ever ask you to alter a police report?

A.  No, ma'am.

Q.  What about an official statement?

A.  No, ma'am.

Q.  Are you aware of a time when Victor Fontenot may have asked another Eunice Police Department officer to alter a police report?

A.  Not that I'm aware of.

Q.  What about an official statement?

A.  Not that I'm aware of.

Q.  Are you aware of any instances in which

Page 139

Victor Fontenot himself altered a police report?

A.  Not that I know of.

Q.  What about an official statement?

A.  Not that I know of.

Q.  An affidavit?

A.  Not that I know of.

Q.  Are you aware of any situations in which Victor Fontenot held evidence in a non-secured location against department policy?

A.  Personal knowledge, I believe so.

Q.  Can you tell me about that?

A.  I can't recall the actual date or circumstances.  I just remember hearing about -- it might have been over the radio about some narcotics being seized.  And later that day or the next day, I had submitted some evidence I had gotten, and I didn't see it logged in the evidence book.

Q.  Who was supposed to log the evidence in the evidence book?

A.  Whoever had it, which would have been Victor.

Q.  So you had seized evidence from a crime scene?

A.  I did.  And then when I went to go submit it, I had -- I have to go read into the book and log down what evidence I had, the date, and what it was.  And then while looking, I seen Victor's name wasn't on

Page 140

there for the incident that happened either that day or the day prior.

Q.  What was he supposed to have done?

A.  He was supposed to have logged and submitted the evidence into the evidence locker, the secured evidence locker.

Q.  What sort of secured evidence are we talking about?

A.  It could have been illegal narcotics.  I can't recall the exact evidence that it was.

Q.  Do you know where he kept this evidence if it wasn't in the locker?

A.  I do not know where he would have kept it.

Q.  Do you know why he would have kept this evidence?

A.  Not a clue.  No idea.

Q.  Is that proper protocol according to the Eunice Police Department official policies, to keep evidence outside of the locker where it's supposed to be?

A.  No.  You're supposed to submit it into the locker.

Q.  Did anyone report the fact that the evidence was missing?

A.  I'm not sure.  I don't know if anybody noticed

Page 141

it was missing other than me or if it had already been reported or if it was actually somewheres else secured.

Q.  Are there other instances you're aware of in which evidence was kept outside of where it was supposed to be?

A.  Not that I can remember.

Q.  Okay.  Are you aware of an incident in which Victor Fontenot vandalized a residence while executing a search warrant?

MR. STAMEY:  Objection; leading.

BY MS. HIGGINS:

Q.  You can answer the question.

A.  No.  I do not -- cannot recall.

Q.  Other than the incidences that we've talked about thus far, are there any other instances of misconduct that you're aware of involving Victor Fontenot?

MR. STAMEY:  Objection; asked and answered.

A.  Not that I can recall.

BY MS. HIGGINS:

Q.  So earlier this morning, we discussed that Victor Fontenot had a bad reputation amongst law enforcement agents; is that correct?

A.  Yes, ma'am.



Chase Michael Godeaux

Page 142

MR. STAMEY:  Objection; asked and answered.

MS. HIGGINS:  I'm clarifying.

MR. STAMEY:  Objection; asked and answered.

MS. HIGGINS:  This was hours ago.  Okay.  That's great.

BY MS. HIGGINS:

Q.  So now that we've clarified that that was your previous testimony, has there been any direct discussion that you've participated in regarding other officers not trusting Victor Fontenot?

MR. STAMEY:  Objection; asked and answered.

A.  Just the mere fact of -- I think when asked specifically, like, narcotics at the sheriff's office, they would refuse to do so because as long as Victor was involved with it, they didn't want no part of it.

BY MS. HIGGINS:

Q.  Can you clarify that a little bit?  How many officers are we talking about?

A.  At the time, there may have been four or five narcotics agents.

Q.  And what -- they were asked to do what?  I'm sorry.

Page 143

A.  Just assist or look into a narcotics complaint.

Q.  That involved Victor Fontenot?

A.  And they said if it involved him, they did not want to be a part of it.

Q.  How come?

A.  Because of his reputation at the Eunice Police Department and from what they -- I guess the information they would gather from their informants on the streets.

Q.  Do you know what information you're referring to specifically?

MR. STAMEY:  Objection; form.

A.  Just the mere fact that they don't trust him.  They said that he's doing dirty stuff.

BY MS. HIGGINS:

Q.  The informants don't trust him?

A.  The narcotics agents.

Q.  Okay.  When you say "doing dirty stuff," what do you mean by that?

A.  Illegal.

Q.  Like what, though?

A.  It could be a multitude of things.  I really couldn't give you any kind of examples.  I really don't deal with the narcotics side of it and how they do

Page 144

things or what they would be speaking of.

Q.  Okay.  Do you know of any other officers that the -- that the officers at St. Landry refused to work with?

A.  That's the only one I would mainly hear about or be told about.

Q.  Okay.  Do you know what Victor's reputation is with the public?

A.  No, ma'am.

Q.  We've talked about a couple of incidences of misconduct.  Other than the ones we've already discussed, do you know if Lieutenant Dunn reported any of this misconduct committed by Victor Fontenot?

A.  I believe so.  The one with Sunny Arnaud.

Q.  Okay.

A.  Since I witnessed that and informed him of it.

Q.  We talked about that a bit.

A.  Yes, ma'am.

Q.  Okay.  I want to talk about some more general issues that were going on potentially at the Eunice Police Department while you were there.

A.  Okay.

Q.  Have you witnessed any officers committing payroll fraud while you were at the Eunice Police Department?

Page 145

A.  Not to my knowledge.

Q.  Were there any incidents regarding an officer claiming that time driving to work was time spent working?

A.  Not to my knowledge.

Q.  Were there any instances of payroll fraud that you were aware of but might not have actually witnessed yourself?

A.  It would be mainly hearsay, but I really don't recall who it was.

Q.  What do you recall?

A.  I mean, I get -- I just remember hearing about people talking about payroll fraud.  I'm assuming some of them were committing payroll fraud.  But as far as the extent of it and how they were doing it, I don't remember.

Q.  Do you remember who was involved?

A.  Not that I can remember.

Q.  Do you know if Chief Fontenot was aware of these payroll fraud allegations?

A.  Not that I know of.

Q.  So you never heard about any investigation by Chief Fontenot into these payroll fraud allegations?

A.  No, ma'am.  They might have happened after I left.


MAGNA
LEGAL SERVICES

Chase Michael Godeaux

Page 146

Q.  Did you ever hear about anyone getting punished for payroll fraud?

A.  Not that I know of.

Q.  Okay.  Have you ever heard of any incidences in which the EPD misused public funds?

A.  In my opinion it would be, but I'm not sure if it would be technically misuse of public funds.

Q.  Can you tell me about that?

A.  Paying subjects on the streets just for information without validating it.

Q.  Can you elaborate a little bit more?

A.  So if I find somebody on the streets and ask them for information to, say, illegal narcotics seller and they give me information and I pay them without verifying or validating that information and it comes up to nothing even close to what they told me and I just gave somebody that gave me -- they pretty much used me for money.  So now I done lost that money, which in my opinion would be, like, a misuse of public funds.

Q.  To your knowledge, how much -- how often did that happen?

A.  It could have happened once every couple days to couple times or once a week.

Q.  Okay.

Page 147

A.  It just varied.

Q.  Who was involved in that?  Which officers?

A.  Victor Fontenot, I know.

Q.  So he was paying subjects on the street for information without validating it; is that correct?

MR. STAMEY:  Objection to the form of the question.

A.  To my knowledge, yes, ma'am.

BY MS. HIGGINS:

Q.  Did Chief Fontenot know about this?

A.  I'm not sure.

Q.  Was Victor ever investigated for this?

A.  Not that I know of.

Q.  Was he ever punished for it?

A.  Not that I know of.

Q.  Did other members of the Eunice Police Department know about this?

A.  I believe so.  I'm not sure who, though.

Q.  About how many officers do you think would have been made aware of this?

MR. REED:  Object to form.

A.  Probably ten or less.

BY MS. HIGGINS:

Q.  And you think this because you actually discussed these incidents with them?

Page 148

A.  Yes, ma'am.  It was just something we would -- it would be hearsay, you know, around the patrol officers.

Q.  Is there a specific subject that you're aware of that Victor Fontenot paid for information that wasn't --

A.  Like, if we would be working a theft or a burglary, he would tell us where somebody was or where the property was and he would get word.  Like I said, it would be hearsay.  He wouldn't come out and say it, that he got the information from this person, but wouldn't say how or if they were paid for it or not.

And there was times where it wasn't even close to where the property was or the person was, and there was times where that's exactly where it was.

MR. STAMEY:  Sounds like money well spent.

BY MS. HIGGINS:

Q.  Generally --

MS. HIGGINS:  Excuse me?

MR. STAMEY:  I'm talking to my colleague.

BY MS. HIGGINS:

Q.  Generally, do you typically, as an officer, pay subjects on the street for information?

Page 149

A.  Without validating it?  No.

Q.  So what's that process supposed to look like according to Eunice Police Department policy?

A.  I couldn't tell you.  It's -- it's -- it's a lot of that people went to school for, you know, in reference to narcotics and informants and how to manage informants and things of that nature.  And I've never gone to that class, so I wouldn't know the proper procedure for doing it.

Q.  To your knowledge, is it proper procedure to pay someone on the street for information without vetting it?

MR. STAMEY:  Objection to the form; foundation.

A.  It's best to validate it before you pay it.  Because if you don't validate it, then you've paid for nothing.

BY MS. HIGGINS:

Q.  Okay.  How do you normally go about validating it?  Do you know?

A.  Just verifying the informing some kind of way.

Q.  Okay.  Are there any other officers that you're aware of who went through this sort of "paying without validating subjects on the street" process?

A.  Not that I know of.



MAGNA
LEGAL SERVICES

Page 150

Q. Okay. Are you aware of any criminal investigations that were handled improperly by the Eunice Police Department?

A. I want to say there was some, but I can't remember what they were.

Q. Okay.

A. I'm not sure.

Q. All right. It's okay. If anything comes to you, you can stop me.

MR. FEUCHT: Chase, can you speak up just a little bit? I'm having a hard time hearing you.

THE WITNESS: All right. Not a problem.

BY MS. HIGGINS:

Q. We've talked about a number of instances of misconduct where you're not aware that the chief investigated these instances, correct?

MR. STAMEY: Objection to the form of the question.

A. Correct.

BY MS. HIGGINS:

Q. Are you aware of any instances in which the chief covered up these instances of misconduct?

A. Not that I'm aware of. Like I said, I didn't know if he investigated it. I can't say that he

Page 151

covered it up or not. So I don't know if somebody was disciplined or not, especially if they was a write-up or a counseling. The only way I would know, if I didn't see them for a while, and chances are they suspended, or it could have been vacation. So I didn't go really ask around and try to figure out what happened and what didn't happen because it wasn't my place, so.

Q. Are there instances of misconduct that you know the chief was aware of and wasn't investigated?

A. The only thing I could think of is the incident with Sunny Arnaud.

Q. Okay. Other than the incidents we've already discussed, like with the crash report, are there any other times where you were instructed by a Eunice Police Department officer to alter an official police report?

A. Not that I remember.

Q. Did Tony Kennedy ever ask you to alter a police report?

A. There was an incident with that. But I think one of his officers had took a complaint of a domestic but didn't do a report as stated by state law. The next day she made another complaint about it, and I ended up taking her complaint and doing the report.

Page 152

Q. So there was a domestic violence complaint that was made?

A. To one of his officers.

Q. To one of Tony Kennedy's officers?

A. (Witness nods head.)

Q. Do you know who?

A. I want to say it was Officer Blood, but I can't -- I don't want to say a hundred percent certain. But I believe that's who it was.

Q. And Officer Blood did not file a police report; is that correct?

A. Correct.

Q. Do you know why?

A. No, ma'am, I do not.

Q. Okay. Did the incident involve anyone at the Eunice Police Department?

A. Not that I can remember. I don't believe it did.

Q. Okay. So then you were called back by the same victim?

A. I believe so. If I recall correctly, yes, ma'am.

Q. And you filed the police report?

A. Yes, ma'am. And then when it was learned that she had made the complaint prior, the day prior, I was

Page 153

in contact with Lieutenant Dunn, who was at the time my supervisor due to Lieutenant Kennedy being off, and he instructed me to go ahead and do the report because I received the complaint.

Q. Uh-huh.

A. So that's what I did.

Q. Who did you -- you made the report to Lieutenant Dunn?

A. Yeah, letting him know that she had made a complaint the day prior, and I couldn't find a report that was made by anybody.

Q. Okay.

A. So I had to let him know what I needed to do. He said, "Go ahead and take the report instead of her waiting for the officer to come back to file the report," so that's what I did. And I had notated in there exactly what she informed me of.

Q. Did Lieutenant Dunn ever report up the chain the fact that the police report wasn't initially taken?

A. I'm not sure if he did or didn't. I know Lieutenant Kennedy, they came and talked to me about it.

Q. And what was said in that conversation?

A. He was upset.

Q. About what?



Page 154

A.  Pretty much that I jumped chain of command and didn't discuss it with him first about the incident, even though he wasn't at work at the time and Lieutenant Dunn was my immediate supervisor at the time.  So I really couldn't tell you the reason why he got upset about it.  But that's what -- that's what they had told me.

Q.  Was he unhappy that you filed the police report?

A.  I believe so.

Q.  And you don't know why that would be?

A.  No, ma'am.

Q.  Was there anything that indicated that this report was fraudulent in any way?

A.  Not speaking to the complainant, other than the mere fact that the officer should have taken that report as stated by state law.

Q.  Was it ever investigated why this officer didn't take the report in the first place?

A.  I'm not sure if -- Lieutenant Kennedy would have been the one to do it, and he was full aware of it.  So whether he did it or didn't, I'm not sure.

Q.  Was this officer ever punished for failing to take the report?

A.  I do not know.

Page 155

Q.  In your opinion, do you believe that this officer should have been punished for failing to take this report?

A.  Yes, ma'am.

Q.  How come?

A.  It clearly states in state law any kind of domestic abuse accusation or report shall be filed.

Q.  And there's no reason you can think of why it wasn't filed?

A.  No, ma'am, unless he -- if I remember correctly, he was fairly new.  So whether or not he knew or didn't know shouldn't have been an excuse, because that's something he should have been taught while he was in training.

Q.  Okay.  Are there any other similar instances that you're aware of where a police report was supposed to have been filed but was not?

A.  Personally, no.  That would be the only one that I can remember.

Q.  Okay.

A.  There might have been more, but eight years is a long time.

Q.  Okay.  Have you been made aware of any instances in which officers destroyed or mishandled evidence other than the incident that we discussed

Page 156

where Victor Fontenot was supposed to place the narcotics in the locker room and did not?

A.  I can say -- I haven't fully done the research on it yet --

Q.  Uh-huh.

A.  -- but I have seen officers who are no longer in law enforcement destroy paraphernalia on the side of the road.  I've seen them allow the subjects with the paraphernalia destroyed on the side of the road as well.  I've heard about it as well.

Q.  But you've actually witnessed this happen?

A.  Once, yes, ma'am.

Q.  Who was involved in that?

A.  Raymond Mott.  That was, I think, during Chief Dies's term.

Q.  Did you ever see Ryan Young participate in allowing the destruction of evidence?

A.  Not that I can remember.

Q.  What about Victor Fontenot?

A.  Not that I remember.

Q.  About how many incidents would you say you've seen in which evidence was mishandled in this way?

A.  Probably less than five.

Q.  What about that you've heard about?

A.  More than five, for sure.  If I'm not

Page 157

mistaken, they had an officer that used to work for Eunice PD before I got there, and he's been arrested two or three times for that -- being part of it, amongst other things.  So it occurs not only at the Eunice Police Department, or did occur, but it occurs at other agencies too.

Q.  Do you know why these officers permitted the subject to destroy evidence?

A.  Some people say they can do it as long as the subject who owns it does it.  I've always looked at it as obstruction of justice.  But I haven't really been able to find a solid answer.

Q.  Who says that this is allowed?

A.  It's mainly hearsay.  Like I say, I haven't found an exact answer on whether or not you can allow somebody to destroy their own narcotics or destroy their own paraphernalia or not.  I'm not sure.

Q.  To your knowledge, does the Eunice Police Department policy permit this?

A.  I wouldn't believe it does.

Q.  Do you know if state law permits this?

A.  I haven't found a solid -- the only way I look at it is obstruction of justice, destroying evidence.

Q.  So in your understanding, this is illegal?

A.  The way I would read it, yes, ma'am.



Page 158

Q. Do you know if Chief Fontenot was aware of these incidents in which evidence was mishandled?

A. No, I do not know.

Q. Do you know if -- sorry, go ahead.

A. Whenever I had seen it with Raymond Mott, that's whenever Dies was chief of police at the time. Seen it during Chief Fontenot's term, I don't recall seeing it. I might have. I can't really tell you. I'm not sure.

Q. Do you know if any of these instances were ever reported?

A. I'm not sure. I may have talked to my supervisor about it, which at the time, I don't know if it was Lieutenant Dunn or not, because I don't remember if we worked on the same shift. But I did ask about it. So whether or not if he reported it, I'm not sure. Because I was fairly new at the time, so I didn't know if it was or wasn't. I was taught differently.

Q. What do you mean, you were taught differently?

A. The way I was taught, anytime you have any kind of evidence, paraphernalia, whatever the case may be, even if you destroying it, it gets submitted into evidence and logged to be destroyed.

Q. Who taught you that?

A. Lieutenant Dunn, Lieutenant Donnie Thibodeaux.

Page 159

Q. Do you believe that's the proper way to handle evidence?

A. Yes, ma'am, in my opinion.

Q. Did anyone disagree with you, that you know of, that that was the proper way to handle evidence?

A. Not that I can recall. Everybody just -- even if some of them would seize evidence, they would have to do a report, and a lot of people didn't want to do a report over something they was going to destroy. So it varied. But it didn't stop them from still logging it and putting it to be destroyed. And I've only seen, during my time there, would be Raymond Mott.

Q. Okay.

A. But other than that.

Q. But you said that you had heard about this happening a number of times, correct?

A. Correct.

Q. Are you aware of any officers that were investigated for this sort of behavior?

A. Not at the Eunice Police Department.

Q. Okay. And are you aware of any EPD officers ever being punished for this sort of behavior?

A. Only one I knew of was Raymond. And like I said, at the time, I don't know if it was investigated or if he was disciplined for it or not.

Page 160

Q. So you didn't see him get suspended or anything like that?

A. No, ma'am.

Q. Okay. Why do you think that is?

A. I really don't know.

Q. In your opinion, is destroying evidence a serious violation of Eunice Police Department policy?

A. Yes, ma'am, as well as, if I'm not mistaken, state law.

Q. So is this something that you would expect to see punished?

A. Yes, ma'am.

Q. Have you ever heard any of the defendants make any racist comments?

A. Not that I can recall.

Q. What about sexist comments?

A. Not that I can recall.

Q. Have you ever heard of -- I may have asked it that way before. I just want to make the distinction whether you've actually witnessed it yourself or heard about any times in which the defendants made any racist comments.

A. No, ma'am, not that I can recall.

Q. Okay. Do you recognize someone named Jordan Arnaud?

Page 161

A. Yes, ma'am.

Q. What do you know about him?

A. Jordan -- I knew Jordan since before law enforcement. I knew of him before law enforcement. I think I met him around 2008 -- no, I'm sorry -- 2005, 2006. I met him while I was still in high school. And then once I got into law enforcement, it wasn't for a couple of years that I seen him again.

Q. In what context did you see him?

A. Just -- I don't want to say good friends but like a mutual respect for each other. We see each other and we talk and ask each other how they doing and making sure we was all right with each other.

Q. Was he ever in police custody?

A. Yes.

Q. For what?

A. Probably array of charges, ranging from resisting an officer to possession of methamphetamine.

Q. Under what circumstances was he released from judicial custody?

A. I can't --

Q. I'm sorry, police custody.

A. If I remember correctly, I think he was released at one point for -- to get information, or he was given a -- a signature bond.



Chase Michael Godeaux

Page 162

Q.  Who was involved in making those decisions?

A.  I'm not sure.

Q.  Do you remember who the arresting officer was?

A.  I think there was a couple different ones, but as far as who they were, I really don't know.

Q.  When he was released from police custody, do you know if he went through the traditional judicial process in that happening?

A.  I don't know.

Q.  So as far as you're aware, he was released properly?

A.  I would assume he was, yes.  But as far as being able to say I seen the paperwork and showing that it was done correctly, I can't say that.  I could only assume that he was released properly.

Q.  Okay.  Do you know someone named Christopher Mettetal?

A.  Yes.

Q.  What do you know about him?

A.  Let's see.  I know Chris from when he first moved to Louisiana.  My first dealing with his was at -- in Beulah Gardens in Eunice.  I've had dealings with him as far as him -- I think domestic violence issues, theft issues, and drug abuse.

Q.  Has he ever acted as a confidential informant

Page 163

for the Eunice Police Department?

A.  If he has, I wouldn't know.  But if I'm not mistaken, I remember correctly, he has claimed to be one, but I take it with a grain of salt.

Q.  What can you tell me about that?

A.  Just the comments that he would make, talking about he's a CI for Victor or things of that nature, those kind of statements.  Just to say that -- tell officers he's a CI so he doesn't get in trouble.

Q.  You don't think he was actually a CI for Victor?

A.  It's possible.  I couldn't verify it.  But that's just the comment he would make, to try to prevent from going to jail or getting in trouble.

Q.  Has that worked in the past for him?

A.  Not with me.

Q.  What about other officers?

A.  It might have; it might not.  I don't know who he's all done that to or with, but I know he has done it with me.

Q.  Beyond the incidents that we've already discussed, are you aware of any other instances in which officers used physical force inappropriately on civilians?

A.  It would be more hearsay than actual

Page 164

physically witnessed it.

Q.  Okay.  In what situations?

A.  Just instances in the jail.  If I'm not mistaken, there were some.  To what capacity, I'm not sure.  Like I said, I take what people tell me with a grain of salt.

Q.  What incidents in the jail?

A.  I'm trying to remember.  I can't recall an exact incident.

Q.  Okay.  Do you know someone named Kenneth Charles?

A.  I know that name, but I don't think that's what I would call him.  But I know that name.  I just can't picture him.

Q.  Do you recall hearing any incidents having to do with him and Eunice Police Department officers?

A.  It's possible.  Like I said, I can't picture who he is, so it's hard to match him to any instance that I might have heard or witnessed dealings with him.

Q.  I want to switch gears to people who are in custody at the Eunice Police Department a little bit more.

A.  Okay.

Q.  Have you ever witnessed any instances of misconduct in which officers neglected to seek

Page 165

necessary medical care for someone in custody at the EPD?

A.  That I've personally witnessed?  No.

Q.  What about that you've heard of?

A.  I've heard, yes.

Q.  What have you heard?

A.  I can't remember the guy's name, but I do remember him -- being told, him complaining, of a cyst or something to that nature on one of his arms and he never got the medical assistance that he needed, if I was told correctly, to the point where his arm had to get amputated.

Q.  Do you know who was on duty when he was asking for medical assistance?

A.  At the time, I would say it was Cathy Miller, but I cannot say a hundred percent sure that's who it was.  I don't remember if there was a night jailer or day jailer or when or who he gave the complaint sheet to.  But if I remember correctly, she was over that at one point.

Q.  So if someone in custody makes a complaint asking for medical assistance, what's supposed to happen with the officers?

A.  You set them up a doctor's appointment.  Or if it's severe enough, have an ambulance come check them,



Chase Michael Godeaux                                           June 26, 2023
                                                             Pages 166 to 169

Page 166

or bring them to the emergency room.

Q.  Who makes the decision which course of action actually happens?

A.  It depends on when it happens.  If it happens during the day, then the day shift, the supervisor jailer that's on shift, can make that decision or speak with the deputy chief or chief to make that decision.

If it's at night, depending on the circumstances, the road supervisor, which could be the lieutenant, would make that decision.  If it's severe enough, he would contact the deputy chief or the chief to make the decision on whether or not they need to be transported to the emergency room or -- or not.

Q.  Is there ever a scenario where you're supposed to ignore a custodian's complaint that they need medical attention?

A.  No.

Q.  How long did it take before -- this person you're referring to who needed the arm amputated -- before they got appropriate medical attention?

MR. STAMEY:  Objection to the form.

A.  I'm not sure.  I think once he was released is whenever he went to seek medical.  And then not long after that, they had amputated his arm.

BY MS. HIGGINS:

Page 167

Q.  Was Chief Fontenot aware of this person's request for medical attention?

A.  I'm not sure.  I don't know if it made it up to him or not.

Q.  Do you know a person named Christopher Ashworth?

A.  Yep, sure do.

Q.  What can you tell me about him?

A.  Christopher Ashworth, I know him from always running from the police, I believe burglaries and use of marijuana and selling of marijuana.

Q.  Was there ever a situation where he was in EPD custody and asked for medical attention that you're aware of?

A.  It's possible.  I'm not sure.

Q.  Okay.  Do you know someone named Joshua Tyler?

A.  I've heard that name before, but to put a -- to put a face to him, I don't remember.

Q.  Did you ever hear of an incident in which he swallowed a glass pipe while in EPD custody?

A.  Now that you say that, yeah, I remember that.

Q.  What can you tell me about that?

A.  That's about it.  All I know is he swallowed a glass pipe.  But whether he was transported or not, I couldn't tell you.

Page 168

Q.  So you don't remember if he got appropriate medical care?

A.  No, ma'am, I don't know if he did or didn't. I just remember hearing about it.

Q.  Do you remember hearing anything else about the incident?

A.  No, ma'am.

Q.  With respect to the incident in which the custodian lost his arm, it was amputated --

A.  Uh-huh.

Q.  -- was this conduct ever investigated on behalf of the officer who failed to report it and seek appropriate medical attention?

A.  Not that I know of.

MR. STAMEY:  Objection to form.

A.  Not that I know of.

BY MS. HIGGINS:

Q.  Was that officer ever punished?

A.  Not that I'm aware of.

Q.  Was Lieutenant Dunn aware of this incident or no, to your knowledge?

A.  I believe that he was.  But to what extent, I'm not sure.

Q.  Do you know if he reported it?

A.  I couldn't tell you.  I really don't know.

Page 169

Q.  Are there any other instances you're aware of in which someone in EPD custody sought medical care and did not receive it?

A.  No, not that I can remember.

Q.  Do you know someone who went by the name of Red Bean?

A.  Yes.

Q.  How did Red Bean die?

MS. WALL:  I'm sorry, Red Beet or Red Bean?

MS. HIGGINS:  Bean.

THE WITNESS:  Red Bean.

A.  If I'm not mistaken, this may or may not be right, but I believe he hung himself.

BY MS. HIGGINS:

Q.  Where?

A.  In the jail.

Q.  How did he do that?

A.  I don't know the exact circumstances.  I just remember hearing about it, because I'd dealt with him prior to that.  And one day I went into work, and they had told me about it, that he had hung himself in the jail.  To what extent, how he did it, I'm not sure.

Q.  So you were not present when he hung himself?

A.  No.



Chase Michael Godeaux

June 26, 2023
Pages 170 to 173

Page 170

Q.  Do you know who was?

A.  No, ma'am.

Q.  Do you know what he hung himself with at all?

A.  Not a clue.  If I had to guess, either a jumpsuit that they're supposed to wear or bed sheets.  That's the only thing I could think of.

Q.  Who -- so you're not sure who was in charge of watching him at the time?

A.  Not at the time.  Because there's -- if it's during the day, there could have been a jailer, plus the supervisor over the jail.  At night there could have been just one jailer or no jailer, depending on --

Q.  Why would there be no jailer?

A.  If the staff was short.

Q.  Is that --

A.  If the patrol staff is short, usually once inmates are told to kind of go to sleep, every 30 minutes, I think it is, somebody would go in and do a round and check on everybody.

Q.  If there was a jailer on duty?

A.  Even if there wasn't, somebody would come off the road and do a check every 30 minutes.

Q.  Is there supposed to be someone who's in the jail at all times, even when the inmates are supposed to be sleeping?

Page 171

A.  In the close proximity, I would say so, yeah.

Q.  But there wasn't always?

A.  Not always.

Q.  How come?

A.  Staff.

Q.  Whose decision was that, not to have a jailer at all times?

A.  Whether -- I don't know whether if it was the deputy chief's or the chief's decision.  It depends on if we even have the people to do it.  And there was times where if the patrol crew had enough people, then somebody wouldn't be on the road; they'd be sitting and watching the jail.  But if you're shorthanded, it's kind of -- kind of hard to weigh those and try to balance them out.

Q.  In your opinion, is it important to have someone who's staffed as the jailer?

A.  Yeah.  I would say so, yeah.

Q.  When Red Bean died, was Chief Fontenot in charge?

A.  I don't recall.  I don't remember who -- when that happened.

Q.  Okay.

A.  Why do you think he was able to hang himself?

MR. STAMEY:  Objection; form.

Page 172

A.  I'm not sure.  There's times where there's not a jailer back there, so they're not -- besides what they can see through the cameras.  I mean, he could easily go into a cell where no camera can see and tie something up and hang himself with it and not get reported until an inmate sees it.

BY MS. HIGGINS:

Q.  Has that happened other times?

A.  I can only recall, I think, one other time somebody hung themselves other than Red Bean.  But as far as when and who, I don't remember.

Q.  But it's happened more than once that somebody has been able to commit suicide in police custody at the Eunice Police Department?

A.  At the Eunice jail, yeah.

Q.  In your opinion, is that acceptable?

MR. STAMEY:  Objection; form.

MS. HIGGINS:  Asking about an opinion.

A.  No, it's not.  But at the same time, there's some things you just can't control.  If they're going to want to commit suicide, they're going to do it.

BY MS. HIGGINS:

Q.  Aren't there things that you could do within your control to prevent that, though?

A.  Yeah, you could.

Page 173

Q.  Like having a guard on duty?

A.  Correct.  But at the same time, they -- they would have to be back there the entire time throughout their shift.

Q.  Who would have made the decision that a guard was not on duty?

A.  Sometimes you should have one, but they don't come into work, so it all depends.  If it's at night, the lieutenant would have ultimately be kind of stuck with it, but he'd call around and see if anybody wanted to come in.  And if he got a no, then it was a no.  He'd have to make somebody from the road crew go sit in the jail or periodically check in.  Or the dispatcher would watch from the cameras.  Or during the day.  It -- it would just depend.

Q.  Was Chief Fontenot aware that there wasn't always a jailer on duty?

A.  I believe so.

Q.  Ultimately, would it have been his decision whether or not a jailer was on duty?

A.  You could say that.

Q.  Okay.  Are you aware of any instances in which someone was arrested and then let go without any rationale?

A.  I believe so.  Whether witnessing it



Chase Michael Godeaux                                                    June 26, 2023
                                                                  Pages 174 to 177

Page 174

personally, I don't recall, but hearing about people being arrested or being told they were under arrest and then let go has happened.

Q. Can you tell me about that?

A. I don't know specific names. I just remember being at work, you'd hear somebody over the radio tell dispatch to -- to log they had one arrested. And a little while later, nobody would show up at the jail.

Q. What do you mean, no one would show up at the jail?

A. Once they're arrested, they're either issued a summons, brought to the jail, fingerprinted, let go because they gave a summons, or they would be placed in jail, incarcerated. It's not normal to see -- hear somebody getting arrested and nobody show up to the jail.

Q. To process them?

A. Yes.

Q. Okay. Do you know why these people were let go?

A. I do not.

Q. Is that Eunice Police Department policy, to just let people go without any sort of rationale?

A. No, especially after you tell them they're under arrest. That's pretty much it. You can't

Page 175

un-arrest somebody. You're not supposed to.

Q. Sorry, go ahead.

A. You're not supposed to, let me rephrase that.

Q. Not supposed to what?

A. Un-arrest somebody.

Q. Just let them go, you mean?

A. Yeah.

Q. Okay. We had previously discussed Jordan Arnaud. Did this ever happen with him, where he was let go without any rationale, that you recall?

A. Not that I know of.

Q. What about Joshua Ashworth?

A. Not that I'm aware of.

Q. Okay. Have you ever witnessed any instances in which EPD officers inappropriately harassed civilians without cause?

A. I don't want to say I have, but at the same time, I might have. I really can't say for sure.

Q. Okay. Have you ever heard about anyone at the Eunice Police Department covering up for other officers, family members, or friends?

A. Not that I know of, not that I can recall.

Q. Do you know someone named Alex Simien?

A. Oh, yes.

Q. What do you know about him?

Page 176

A. Now that you bring that up, yes.
Alex Simien, I had stopped him on a traffic stop, and firearms, illegal narcotics were located.

Q. You located firearms and narcotics during the traffic stop; is that correct?

A. Yes, ma'am, after we had gotten a search warrant. And -- and we had a K9 out from Coushatta police and did an exterior sniff. And after obtaining the search warrant and the exterior sniff of the dog, firearms, ammunition, and illegal narcotics were located inside the vehicle.

Q. I'm just going to pause you for one second.

MS. HIGGINS: Are we done with the side conversations and the snickering?

MS. WALL: I actually wasn't laughing or talking to anybody. I thought my defense counsel over here was writing very aggressively, and I found it entertaining. I'm sorry.

MS. HIGGINS: Okay. I'm going to keep going.

BY MS. HIGGINS:

Q. So after you found the drugs and the gun inside the car, what happened?

A. He was placed under arrest, him and his

Page 177

girlfriend. I think, if remember correctly, Allen Parish sheriff's office actually went to a hotel right outside of Oakland, found more illegal narcotics, which was where Simien and his girlfriend was staying at. End up seizing the narcotics, the firearms, cell phones, search warrant on the cell phones. I believe that was it that I can remember.

Q. So after you found all this illegal evidence, did anyone ask you to cover up this finding?

A. Not as much as the illegal narcotics. I think it was more of the contents in the cell phone.

Q. Who asked you to cover up the contents in the cell phone?

A. I can't remember if they was asked directly to me or if it was asked to somebody else which relayed it to me. But if I'm not mistaken, Lieutenant Tony Kennedy was asked -- or asked about it.

Q. What did he ask specifically?

A. It was mainly about the contents in the cell phone.

Q. What did he want you to do with it?

A. Not seize it or not search it.

Q. How come?

A. I didn't get a specific answer from him.

Q. Was Tony Kennedy related to Alex Simien?



Chase Michael Godeaux

June 26, 2023
Pages 178 to 181

Page 178

A.  If I'm not mistaken, he is.

Q.  Did you find anything in the cell phone that was related to Tony Kennedy that he would have wanted covered up?

A.  Without looking into my case file, I can't recall.  I don't want to say and be -- be incorrect.

Q.  In your opinion, is it appropriate to ask another officer to uncover potentially incriminating evidence -- sorry, to cover up potentially incriminating evidence?

A.  No.  It's not professional.

Q.  Is that against EPD policy?

A.  Yes, ma'am.

Q.  What about the law?

A.  Yes, ma'am.

Q.  Did you do it?

A.  No, ma'am.

Q.  Was Chief Fontenot aware that Tony Kennedy had asked you to cover up the information in the cell phone?

A.  I'm not sure.

Q.  Was Tony Kennedy ever investigated for making this request?

A.  I am not sure.

Q.  Was he ever punished for it?

Page 179

A.  Not that I'm aware of.

Q.  Are there any other times that you're aware of officers asking you to cover up potentially incriminating evidence?

A.  Me personally, other than that situation, unless -- like I said, I looked through my different cases throughout the year, nothing that I can definitively say that would actually ring a bell to help me remember.

Q.  Are you aware of any other times in which an EPD officer asked another officer other than you to cover up potentially incriminating evidence?

A.  It's possible.  Like I said, I can't definitively say.

Q.  Is there something that's coming to mind?

A.  Not that I can really remember.

Q.  Do you think that this happened on more than one occasion, even if you can't recall a specific incident?

A.  It's possible.

Q.  Was this acceptable behavior?

A.  No.

Q.  Was it permitted?

A.  No.  No, it's not permitted.

Q.  Was anyone ever punished for asking another

Page 180

officer to cover up for a family or a friend?

A.  Not that I'm aware of.

Q.  So if there were no repercussions for asking someone to cover up potentially incriminating evidence, then did officers get the sense that it was okay to actually do this?

MR. STAMEY:  Objection to the form.

MR. DOHERTY:  Object to form.

BY MS. HIGGINS:

Q.  It's okay.  You can answer.

A.  Not necessarily.  I don't want to say they thought it was okay.  They might have told the person -- gave them a good, you know, butt chewing for it and left it alone.  You know, some officers knew that it wasn't okay, and others, I don't know if they knew it was or didn't know.

Q.  Which officers, would you say, maybe didn't know if it was or wasn't okay?

A.  Possibly some of the newer ones.

MR. REED:  Object to form.

BY MS. HIGGINS:

Q.  Okay.  Did you ever witness any other violations of a department policy by EPD personnel that we have not covered?

A.  I'm sure I have, but to say who or when, I

Page 181

can't remember.  Like I said, I have to go through my notes to definitively say.

Q.  Other than the incident with the crash report where he asked you to alter the report, are there any other instances that you recall where Chief Fontenot interfered with an internal investigation to achieve a desired outcome?

A.  Personally, not with me.

Q.  What about with someone else?

A.  It is possible, yeah.

Q.  Is there anything specific coming to mind?

A.  Not specifically.  Like I said, I'd have to go through my notes and see if anything comes up, any cases that I had or I was involved in, to really remember.

Q.  Okay.  What would make you think that this had happened before?

A.  The only thing I could think of is if it happens with me, there's a chance or possibility it could happen with somebody else.

MR. DOHERTY:  I'm going to object to that answer as nonresponsive.

MS. HIGGINS:  It is responsive, but that's okay.

BY MS. HIGGINS:



Page 182

Q.  Other than the events that we have specifically covered, have you ever witnessed any other police misconduct that went uninvestigated?

MR. STAMEY:  Objection to the form.

MS. HIGGINS:  What is the objection?

MR. STAMEY:  It's vague, it's ambiguous, and it's probably been asked and answered because you're just now fishing for something else that you haven't already asked.

MS. HIGGINS:  I'm just trying to be thorough and fair.  I think we all want that.

THE WITNESS:  Can you repeat the question for me?

BY MS. HIGGINS:

Q.  Other than the events that we've specifically covered, have you ever witnessed any other police misconduct that went uninvestigated?

A.  Personally witnessed, it would be the only ones we spoke about.

Q.  Or that you heard about?

A.  There probably is that I've heard.  But to say it occurred or didn't occur, I couldn't say.

Q.  See, I'm asking because there have been a number of instances of misconduct that we've talked about, but I haven't once heard you say that you were

Page 183

aware of a time in which an officer was investigated for this misconduct.  Is that correct?

A.  That I'm aware of.

Q.  So to clarify, you're aware of a number of times where police department personnel have behaved in a way that you would classify as misconduct and they were neither investigated or punished for it; is that correct?

A.  Correct.

Q.  Why do you think that is?

A.  I really couldn't tell you.  Like I said, if they were written up or verbally counseled as a form of punishment, I wouldn't know about it.  So unless they were suspended for a number -- a period of time or fired, I wouldn't know if it was investigated or if they were punished or not.

Q.  But you're not aware of any firings or suspensions having to do with misconduct that have occurred while you were at EPD; is that correct?

A.  That's correct, not that I can recall.

Q.  But we've talked about some kind of serious incidents of misconduct here.  Do you think firing or suspension would have been appropriate in any of those incidences?

MR. STAMEY:  Objection to the form.

Page 184

MR. DOHERTY:  Objection.

A.  Yes, ma'am.

BY MS. HIGGINS:

Q.  Which ones?

A.  All of them.

Q.  And to clarify, Chief Fontenot was in charge at the time of some of them at least?

A.  Some yes, ma'am.

Q.  On that note, do you believe that Chief Fontenot properly handled incidents of misconduct committed by EPD personnel, in your opinion?

MR. STAMEY:  Objection; form.

MS. HIGGINS:  It's an opinion question. He's allowed to answer.

MR. STAMEY:  He's not.  He's never been a supervisor.

THE WITNESS:  I was a sergeant at the Eunice Police Department as a supervisor.

MR. STAMEY:  Didn't have hiring and firing obligations, did you?

THE WITNESS:  Nobody did but the chiefs.

MS. HIGGINS:  Again -- hold on.  I'm asking the questions right now.  Your turn will come, but it's not right now.  Okay?

BY MS. HIGGINS:

Page 185

Q.  You're trained as an EPD personnel?

(Speaking spontaneously.)

MS. HIGGINS:  Excuse me?

MS. WALL:  I said did the chief?  I thought his appointing authority was taken away.  I was just checking with my colleagues.

MS. HIGGINS:  It was taken away.

MS. WALL:  Okay.

MS. HIGGINS:  Yeah.

BY MS. HIGGINS:

Q.  Are you aware of the hiring and firing practices at EPD?

A.  Yes, ma'am.

Q.  Okay.  You can answer the original question, please.

A.  Can you repeat it for me?

Q.  Absolutely.  No problem.  Do you believe that Chief Fontenot properly handled incidents of misconduct committed by EPD personnel, in your opinion?

A.  If he was made aware of it, I really couldn't say.  Because like I said, I don't know if there was any kind of punishment besides a suspension or termination.  If those would have happened, then I would know about it.  But if a verbal or written counseling occurred, I would never know.




MAGNA
LEGAL SERVICES

Page 186

Q.  Why wouldn't the chief have been made aware of these incidents, in your opinion?

A.  If he wouldn't have been made aware of it, then that means the person I reported it to, Lieutenant Dunn, wouldn't have reported it to him.

Q.  Do you think that's the case?

A.  No.

Q.  You think that Lieutenant Dunn reported every incident of misconduct that you reported to him to Chief Fontenot, correct?

MR. DOHERTY:  Object to form.

A.  Yes.  The other one would have been through Chief Dies.

BY MS. HIGGINS:

Q.  Okay.  So you think that Chief Fontenot, when he was in charge, would have been made aware of these incidents of misconduct?

A.  Yes, ma'am.

Q.  Do you believe that Chief Fontenot actually permitted these violations of department policy in these instances?

A.  I'm not sure.

Q.  Do you think that he shielded certain employees from disciplinary actions regarding violations of department policy or even the law?

Page 187

A.  I'm not sure.  Depends if he was made aware of it or not.

Q.  But as we just discussed, you think he would have been made aware, correct?

A.  Correct.

Q.  Okay.  Why do you think he would have shielded certain people from disciplinary action?

MR. REED:  Object to form.

A.  I really couldn't tell you.  Again, I'm not sure if those subjects got disciplinary action or not, unless they were fired or suspended.  That's the only way I would know.

BY MS. HIGGINS:

Q.  And that never happened?

A.  No, ma'am.

Q.  Okay.  Are you aware of any time that Chief Fontenot punished an officer?

A.  I'm one of them.

Q.  Who?  You said you're one of them?

A.  Uh-huh.

Q.  I'm sorry.  Can you tell me about when he punished you?

A.  There was an incident that we was investigating.  I think it was a vehicle theft.  After I took the report, the victim had called saying she had

Page 188

a list of subjects who she thought were the suspects.  And at the time, I didn't think nothing of it.  I still had it, took a picture of it, but I never submitted it.

Come to find out later down the road, everybody on that list was involved in car burglaries, car thefts, including mine.  Among other things, shootings in the city.

Lieutenant Dunn actually wrote me up, because I was underneath his supervision at the time.  He wrote me up.  And there was another instance where --

Q.  Can you pause for one second?  I don't understand.  Why were you punished for this?

A.  Because it was, I don't want to say, evidence; but at the same time, it's a list of suspects possibly involved in the car theft, which later determined they were involved in a lot of car thefts and a lot of vehicle burglaries in the Eunice area.  So it's -- it's almost considered as evidence, but it's just a list of names of people to look into --

Q.  So --

A.  -- that I didn't submit.

Q.  So you didn't follow proper protocol --

A.  Correct.

Q.  -- in terms of submitting that list?

A.  Correct.

Page 189

Q.  Okay.  On a scale of seriousness, between failing to submit that list to the proper person versus some of the other instances of misconduct that we've discussed involving other EPD officers, where do you think you fall?

A.  In my opinion, because -- again, my opinion.  It's I hold myself to a high standard, so failing to do that could have -- I don't know what the outcome could have been, but in my opinion, it's bad because that's how I see it.

Q.  Okay.

A.  How it looks at from somebody else, it could be minute compared to what we've discussed.

Q.  So compared to Victor Fontenot grabbing someone by the throat during an arrest, do you think that failing to submit the list is more or less serious than that?

A.  Failing to submit the list was less serious than that.

Q.  What about Victor Fontenot's mishandling of evidence, the illegal narcotics we discussed that was not in the locker where it was supposed to be?

MR. STAMEY:  Objection.

BY MS. HIGGINS:

Q.  More or less serious?



Chase Michael Godeaux

Page 190

A. Less.

MR. STAMEY: Objection to form.

MS. HIGGINS: Again, you can let me finish asking my questions before you object.

MR. STAMEY: But I will make my objection.

MS. HIGGINS: No problem.

A. It would be less serious, not submitting that list of names.

BY MS. HIGGINS:

Q. Is there another incident of misconduct that we've discussed today that you think was less serious than what you described regarding yourself and your failure to submit the list properly?

MR. STAMEY: Objection; form.

A. The incident with Richard Abadie for sure.

BY MS. HIGGINS:

Q. Which one was that, again?

A. Where he, same incident, grabbed somebody by the throat while they were in handcuffs.

Q. Let me rephrase the question. Do you think there's an incident other -- that we've discussed today that you think was better on the scale than what you did -- than what you did? I'm asking if you think that what you did was worse than anything else we've

Page 191

discussed today.

A. No.

MR. STAMEY: Objection; form.

MS. HIGGINS: Okay.

BY MS. HIGGINS:

Q. But you were punished and they were not; is that correct?

A. From my knowledge, yes, ma'am.

Q. Why do you think that is?

A. I couldn't tell you.

Q. Do you think that Chief Fontenot cherry-picked who to punish when misconduct occurred at the EPD?

A. It's hard to say. Like I said, I don't know if some were punished via paperwork or not.

Q. How do you think he treated people who reported misconduct at the EPD? And by "he," I mean Chief Fontenot, to be clear.

A. I'm not sure, because I don't know who's all reported any kind of misconduct and who hasn't.

Q. Do you feel like you ever faced any repercussions for reporting misconduct?

A. My personally, no.

Q. You don't think that your shift changes had to do with reporting misconduct?

A. It's possible. I can't say for sure.

Page 192

Q. Okay. I want to move now to discussing specific instances of retaliation against Lieutenant Dunn. Okay?

A. Okay.

Q. What's your relationship with Lieutenant Dunn?

A. Good friends since 2012.

Q. Okay. And you just mentioned a few minutes ago that he actually wrote you up for misconduct; is that correct?

A. Correct.

Q. And your relationship since that happened is what? How would you describe it?

A. Is unfazed. We both have an understanding that when we're at work, it's work. When we're off, we're friends. So regardless if he's my supervisor or not, I understand he's going to have to do what he needs to do if I mess up, and vice versa. We have that understanding.

Q. Okay.

A. So.

Q. Generally, what's Lieutenant Dunn's reputation in the law enforcement community that you know of?

A. Respected by a lot.

Q. Can you be more detailed about that?

A. The public pretty much looks at him as

Page 193

understanding. They respect him because he's not going to sugarcoat anything. He's going to tell them exactly what he needs to tell them, regardless if he knows they're going to like it or not. He'll help people when he can. But in certain circumstances, he can't, and they understand that. And that's why a lot of them respect him for it.

Q. Would you say Lieutenant Dunn follows the law?

A. Yes, ma'am.

Q. Would you say that he followed the Eunice Police Department policies and procedures?

A. Yes, ma'am.

Q. Has he ever deviated from these policies and procedures that you know of?

A. Not that I'm aware of.

Q. What about from the lawsuit?

A. No, ma'am.

Q. Okay. We've talked about a couple of instances in which Lieutenant Dunn reported misconduct at the Eunice Police Department; is that correct?

A. Correct.

Q. Do you know if he ever reported misconduct at the EPD to other law enforcement agencies, not just internally within the EPD?

A. From what I was told, yes.



MAGNA
LEGAL SERVICES

Page 194

Q. Which agencies?

A. St. Landry Parish Sheriff's Office, district attorney's office, Louisiana State Police, and I'm not sure if the AG's office or not.

Q. How do you know about this?

A. That's what I was told.

Q. By whom?

A. Lieutenant Dunn.

Q. Do you know which incidences he reported to exterior law enforcement agencies?

A. Not for sure which ones went to which agencies.

Q. Generally, do you know anything about which incidents he reported to other agencies?

A. If I had to take a shot at it, it would be everything that happened after I left.

Q. Like what?

A. The incidences with -- like I said, there was numerous incidents with Victor Fontenot. And I guess the incidences with him and them trying to convince Mr. Dupre to lie about them. There's probably more, but I really can't recall all of them.

Q. Do you know about how many times he reported incidences of misconduct to other law enforcement agencies?

Page 195

A. I'm not sure exact how many times.

Q. Okay.

A. But I know he's persistent, so there's probably a few.

Q. Okay. Do you know if someone told Chief Fontenot about Lieutenant Dunn's reporting?

A. I don't know.

Q. Do you believe that Lieutenant Dunn faced any negative consequences as a result of his reporting?

A. It's possible. I'm not sure.

Q. What do you think is possible?

A. Pretty much with everything that happened, if he decided he wanted to go somewhere because of what was -- he's reported, it's possible that nobody else would hire him, which would be a negative impact on him.

Q. Do you think he's faced any internal consequences at the EPD as a result of reporting misconduct to other law enforcement agencies?

A. I'm not sure. I haven't been there to verify if he has or hasn't.

Q. Have you heard about anything?

A. I don't know if he's tried going to any kind of instructor trainings or anything like that. So all I know is he's been on patrol since.

Page 196

Q. What do you mean?

A. He's -- he just stays as a patrol lieutenant. So I don't know if he's tried applying to any kind of classes and been denied or anything of that nature, to show, like, a punishment or not being favored to take these classes because of what happened.

Q. When you say "what happened," what do you mean?

A. From what -- whatever he had reported as misconduct.

Q. Okay. Are you aware of any instances in which Lieutenant Dunn filed a report that Chief Fontenot refused to investigate?

A. If he did, it would have been after I left.

Q. So nothing you've ever heard about in that respect?

A. (Witness shakes head.)

Q. Okay.

MR. DOHERTY: We didn't get a verbal response from the witness there.

BY MS. HIGGINS:

Q. You can say no. You shook your head, correct?

A. No, not that I'm aware of.

Q. Okay. Have you been made aware of any internal investigations into Lieutenant Dunn?

Page 197

A. I believe that would have been one of the reasons he was sent on admin leave.

Q. What can you tell me about that?

A. That he was sent on admin leave. And I think they were looking into an incident pretty much as an IA. But for what reasons, I don't really remember.

Q. You don't know why they were looking into him at all?

A. Not from that incident, no, ma'am.

Q. Do you believe that Lieutenant Dunn did anything wrong to warrant an internal investigation?

A. No, ma'am.

Q. Does anyone else have the opinion that Lieutenant Dunn did anything wrong that would warrant an internal investigation that you're aware of?

A. It's possible.

Q. Has anyone told you that they think Lieutenant Dunn did something wrong?

A. Nobody has ever told me that they thought he did something wrong.

Q. We talked a little bit about Lieutenant Dunn's K9 being taken away from him. Do you remember that?

A. Yes, ma'am.

Q. And we talked a little bit about how that might have potentially been a punishment; is that



Page 198

correct?

A. Yes, ma'am.

Q. Do you think that was maybe a punishment for Lieutenant Dunn's decision to report misconduct at the EPD outside of law enforcement agency -- outside of the EPD to other law enforcement agents?

A. If I'm not mistaken -- he's had two dogs, and I think that was the first dog he had. Whether or not that happened with the second, I'm not sure. I know with Zeus, they tried taking it, and that's when they offered it to me. But I want to say he had a second one after that. I don't know if it was taken and gave to somebody else or not.

Q. But you believe it was taken as punishment?

A. In my opinion, yes.

Q. For what?

A. Pretty much just to take something that he enjoyed. They knew he enjoyed having the dog, and he's been having it for a couple of years, as long as I was there at the time. And to give it to somebody else and take it without no really reason, in my opinion, yeah, I would see that as punishment.

Q. Why do you think he was being punished?

A. Like I said, I can't recall the reason he was put on admin leave. But to say the exact reason or --

Page 199

I really don't know. In my --

Q. Sorry.

A. -- in my opinion, it would just be kind of -- I don't want to say failing to go along, but kind of making the argument that what's happening to him isn't fair, the switching of shifts or switching people around, or whatever the case may be, kind of those issues. But nothing to a point of him completing any kind of misconduct or violating any kind of policy or state -- state law.

Q. I'm a little unclear what you mean about complaining about the shifts. So did Lieutenant Dunn make a complaint about the changes in the shifts?

MR. STAMEY: Objection; form.

A. I believe he did.

BY MS. HIGGINS:

Q. To whom?

A. It would have been to the deputy chief or the chief.

Q. And what was their reaction, to your knowledge, of this complaint?

A. I'm not sure. Because we didn't get switched back, so that was pretty much my answer.

Q. So I'm just trying to understand how this relates to the punishment of taking away the K9. Why

Page 200

do you think that Lieutenant Dunn's making this complaint about the shift changes resulted in the K9 being taken away?

A. Just something that's not agreed upon throughout the whole shift, or even the department, and just being one of the people in the department that would step up and try to get it back to the way it was.

Q. What do you mean?

A. Leaving the shifts the way they were because of the proactiveness and the crime rate going down and everything like that, and then the morale. So he would be one of the ones that would try to fight for us, to keep us happy, even with the low pay and everything else. So if we have something to look happy for, we would work there. But if we don't, nobody is going to want to work there.

Q. By "us," you're referring to EPD officers?

A. Yes, ma'am.

Q. And who was against being for you?

A. I really couldn't tell you who was against or for me. But I know some of the people that were against the changing of the shifts were Joshua Courville, Nicholas Cooley, Austin Doucet. We were always on the same shift. We all worked good together. We did a lot of stuff together as far as patrol-wise.

Page 201

And there was never a moment where we wasn't doing anything.

Q. So to clarify, Lieutenant Dunn complained about these shift changes, correct?

A. Yes, ma'am, among other things, I'm sure.

Q. What else did he complain about?

A. I'm not sure.

Q. Okay.

A. But I know that there's probably some other things that was an issue.

Q. And to clarify, he would have complained to the deputy chief and the chief, right?

A. Either one.

Q. And that would have included Chief Fontenot?

A. Yes, ma'am.

Q. Okay. How long after he complained about the shifts was the dog taken away?

A. I think the shifts were changed a couple different times, and then it wasn't but a few months or longer -- later that he was placed on admin leave. And then during that time is whenever they said that they're talking about reassigning the dog and asked if I was still interested in it, and if I was, to put in a letter for the dog.

Q. I'm going to switch gears a little bit here.



Chase Michael Godeaux

June 26, 2023
Pages 202 to 205

Page 202

Have you ever been made aware of any instances in which Lieutenant Dunn was not given or denied appropriate backup?

A.  I've heard, yeah.

Q.  Tell me what you've heard.

A.  I can't -- I don't remember the exact incidences of it, if it was a traffic stop or disturbance or whatever the case.

Q.  To the best of your memory.

A.  Best of my memory is Lieutenant Dunn was on -- like I said, I don't know the exact kind of incident, but it was at a point where he needed additional officers.  And from what I understood, he called multiple times on the radio, and nobody ever showed up, except for, like, five to ten minutes after he had done did what he needed to do, clearing the complaint or arresting somebody or putting somebody in hand restraints.

Q.  Why did no one show up?

A.  I couldn't tell you.  I do not know.

Q.  Who made the decision to not have anyone show up?

A.  Whoever decided not to go.

Q.  Who was supposed to go?  Do you know?

A.  Anybody who was working.

Page 203

Q.  Was there ever a time where Victor Fontenot was working and did not show up for his backup when he was supposed to?

A.  I'm not sure.

Q.  What about Ryan Young?

A.  I'm not sure.  If it did, it happened after I left.

Q.  Okay.  When another officer calls for backup, is it appropriate just to ignore that request --

A.  No.

Q.  -- in your opinion?

A.  No.

Q.  Is that department policy, to ignore that request?

A.  No.

Q.  Why is that potentially an issue, to ignore such a request for backup?

A.  That's officer safety.  Get somebody seriously hurt or killed.

Q.  So the refusal to provide backup to Lieutenant Dunn jeopardized his safety, in your opinion; is that correct?

A.  Correct.

Q.  That you're aware of, did you ever hear of Chief Fontenot making any threats against Lieutenant

Page 204

Dunn?

A.  Not that I know of.

Q.  What about against his family?

A.  Not that I know of.

Q.  Are you aware of an incident regarding the KC hall in which Lieutenant Dunn made a Facebook post that's the subject of another litigation?

A.  I believe, if I'm not mistaken, I was working that night.

Q.  What do you know about that incident?

A.  I remember them having a call at the KC hall.  There was a party at the KC hall.  And eventually they had multiple shots that were fired in front of or around it.  And I think Lieutenant Dunn actually called in the complaint, because I remember him -- I believe he called me about it, and I was actually on my way over there for it.

Q.  Was Lieutenant Dunn working that night?

A.  No, ma'am.

Q.  So what did he call you to say?

A.  To let me know about what was going on at the KC hall, about people shooting and there being -- I want to say there was a loud music complaint too.  But mainly for the shots being fired right next to his house, which was probably four houses down from him,

Page 205

five.

Q.  Did anyone else call to complain about the incident?

A.  I believe so.  I believe there was other people who made complaints about it.  I can't remember exactly, though.

Q.  Were they civilians?

A.  Yes, ma'am.

Q.  When Lieutenant Dunn called you to ask that you -- well, did he ask that you report to the KC hall to investigate?

A.  He was calling pretty much to inform me about it, letting me know.  And like I had told him, I was actually on my way over there whenever he had called me.  We had already got the call.

Q.  Okay.

A.  It was just a matter of getting there.

Q.  All right.  Did he participate in the investigation in any other way, other than making the original call?

A.  Not that I -- as far as on-scene-wise, I don't remember seeing him.  But that was -- other than the complaint and -- yeah, that's the only thing I can think of, is the complaint.  But as far as investigation-wise, I don't believe.



Chase Michael Godeaux

June 26, 2023
Pages 206 to 209

Page 206

Q.  Okay.  Do you believe that Lieutenant Dunn was treated unfairly at work?

A.  In certain circumstances, yeah.

Q.  What circumstances?

A.  The shift change and the K9 issue.  And I'm sure there's others since I left.  But personally, yeah, those.

Q.  Why do you think he was treated unfairly at work?

A.  I couldn't definitively say the reason.  I mean, the only thing I could think of is, you know, we follow what the statute says.  We go by civil service.  So if it's asked of us to do something out of our class, we usually don't because it's against civil service.

Q.  And that's a problem?

A.  Sometimes it is, and sometimes it isn't.  Depends on who you ask.

Q.  Well, who would say that that's a problem, to act against civil service policy?

A.  It could be anywheres from who your supervisor is to the deputy chief to the chief.

Q.  Did Chief Fontenot have an issue with your -- with, rather, Lieutenant Dunn's wanting to comply with the civil service board policy?

Page 207

A.  It probably depended on what was asked, whether it was to -- if I'm not mistaken, complete a report, which if I'm not mistaken, lieutenants don't have to.  I can't really remember.  But it could be anywheres from that to something else.

Q.  Is there a specific incident you recall in which Lieutenant Dunn was asked not to abide by civil service policy?

A.  Not that I remember.

Q.  Is there something that's coming to mind that made you -- that prompted your initial response regarding there being an issue with him following civil service policy?

A.  No, just instances like that.  Like I said, there might have been, but to which or there being a specific incident, I can't really remember.

Q.  Did you ever hear about Chief Fontenot asking -- well, let me rephrase.

Did Chief Fontenot ever ask you to act in a way that was not in accordance with civil service policy?

A.  Not that I can remember.

Q.  Are you aware of him asking any other officer to act in a way that was not in accordance with civil service policy?

Page 208

A.  It's possible.  But as far as knowing about it, I'm not sure.

Q.  Did he have a reputation for asking officers to not abide by civil service policy?

A.  I'm sure it's possible because of the civil service hearings that they've had.

Q.  Can you elaborate?

A.  If I'm not mistaken, there was the one with Lieutenant Dunn, Lieutenant Thibodeaux.  I want to say there were some others, but I can't recall who was involved or what it was about.

Q.  What do you know about those?

A.  One of them, working out of their classification; or their being positions, as far as detectives in narcotics, not being a classified position.  There was issues with that.

Q.  Who was acting outside of their classification?

A.  Pretty much, if I'm not mistaken, it was whenever Donnie was moved from training to patrol.

Q.  I'm not following.  Can you explain a little bit what --

A.  So when -- Lieutenant Donnie Thibodeaux was over training, the training department.  At one point he was moved out from that department to patrol.  And

Page 209

that was actually overturned by the civil service -- service board, and he was moved back to training.

Q.  By the civil service board?

A.  Yes.

Q.  Do civil service board rules have the effect of law in Louisiana?

A.  If I'm not mistaken, yes.

Q.  So asking an officer to act in a way that is not in accordance with the civil service board rules could in effect be acting in a way that is not in accordance with Louisiana state law; is that correct?

MR. STAMEY:  Objection; form.

A.  Yes, ma'am.

BY MS. HIGGINS:

Q.  And even though you can't recall specific instances at this time, you have heard, you believe, of times in which Chief Fontenot asked officers at the EPD to act in a way that was not in accordance with civil service board policy; is that correct?

MR. STAMEY:  Objection; form.

A.  Correct.

BY MS. HIGGINS:

Q.  Correct.  How often did that happen?

A.  I can't say definitively how often.

Q.  More than once?



Chase Michael Godeaux

June 26, 2023
Pages 210 to 213

Page 210

A. Yeah.

Q. More than ten times?

A. I really couldn't say because there might be instances where I knew nothing about the question he asked him. So I can only really notate about what I know of.

Q. And what you know of is about how many times?

A. Two or three.

MR. STAMEY: Objection; form.

A. Two or three.

BY MS. HIGGINS:

Q. Okay. Did you observe any reaction from Chief Fontenot following Lieutenant Dunn's filing of this lawsuit?

A. No.

Q. What about from Ryan Young?

A. No.

Q. What about from Victor Fontenot?

A. No.

Q. Are you aware of any threats of physical violence made against Lieutenant Dunn by members of EPD?

MR. STAMEY: Objection; form.

MS. HIGGINS: What is the objection?

MR. STAMEY: You've already asked that

Page 211

question.

MR. FEUCHT: You've asked --

MS. HIGGINS: I asked specifically about Chief Fontenot, whether he threatened, but I did not ask about whether he heard about any other threats.

MR. STAMEY: He's one of them. You asked whether Victor Fontenot had ever done that. If you want to exclude Victor Fontenot from that question, I'll withdraw my objection.

MS. HIGGINS: Happy to do so.

BY MS. HIGGINS:

Q. Since you've already said no; is that correct?

A. Correct.

Q. Okay. So have you ever heard of anyone else at the Eunice Police Department make a physical threat of violence against Lieutenant Dunn?

A. No, ma'am.

Q. Have you ever heard about it?

A. I've heard about it.

Q. What did you hear?

A. Just that threat was made against Dunn.

Q. By whom?

A. I cannot recall who it was made by. I just

Page 212

remember hearing about it.

Q. What was the threat?

A. I think more or less physical violence. I'm not sure the actual threat that was made. But it was more or less of just physical violence that I can remember.

Q. Do you recall an incident in which somebody threatened to put bullets in Lieutenant Dunn's head?

A. Not that I -- not that I know of.

Q. Okay. Did you ever hear of any threats made against Lieutenant Dunn's family members?

A. Not that I've heard.

Q. And now, the threat that you do remember, do you remember under what circumstances that threat was made?

A. I think it was prior to this. I'm not sure.

Q. Prior to what?

A. The lawsuit.

Q. You don't remember what provoked it, though?

A. No.

Q. Do you remember if the person who made the threat was investigated for making such a threat?

A. Not that I know of. It was -- it occurred while I was -- wasn't working there.

Q. Do you know if that person was punished for

Page 213

making a threat?

A. I wouldn't know.

Q. Do you consider it acceptable behavior to threaten another EPD officer's life?

A. No, ma'am.

Q. Do you think that that sort of behavior should be punished?

A. Yes, ma'am.

Q. We talked a little bit about Donnie Thibodeaux earlier, correct?

A. Correct.

Q. Do you think Lieutenant Thibodeaux was treated unfairly at work?

A. It's possible. I'm not sure.

Q. What makes you say it's possible?

MR. STAMEY: Objection to the form.

A. Because Donnie is the one that trained Dunn, and Donnie is also on the civil service board.

BY MS. HIGGINS:

Q. Why is that an issue?

A. Because if anybody gets written up or gets any kind of punishment, he's the civil service rep, and that's who they go to pretty much seek counsel with in reference to civil service. And it's what they can or can't do in reference to it, if it's -- if it's



Page 214

something they should appeal or shouldn't appeal or whatever the case may be.

Q.  Why would anyone think that that was a problem, though?

A.  Because if they go to him and he tells them to appeal it, now the punishment pretty much goes in front of the civil service board and can be wiped away, which overturns the decision made by the chief, who was the appointing authority at the time.

Q.  Got it.  So did Chief Fontenot treat Donnie unfairly in your opinion?

A.  Switching him from the training to the road? I can see it as that.  But at the same -- yeah. Because there was other people who could have been moved to the road that didn't.

Q.  Why do you think he changed Donnie to the road?

A.  I couldn't tell you.  I really don't know.

Q.  Was there a civil service board decision that was made by Donnie that the chief didn't agree with?

A.  It's a possibility.  I'm not sure.

Q.  Not that you know of?

A.  (Witness shakes head.)

Q.  We earlier also spoke about Lieutenant Stephanie Myers, correct?

Page 215

A.  Yes, ma'am.

Q.  Do you think she was treated unfairly at work?

A.  It's possible after I had left.  I don't know what she was doing.

Q.  What made you think it's possible?

MR. STAMEY:  Objection to form.

A.  Talking to her, she let me know she was on leave, I think, or sick leave or something to that nature.  I'm not sure.  I know she had been out for a while.

BY MS. HIGGINS:

Q.  Why would --

A.  She said that she would be sending me a subpoena for civil service?

Q.  For what?

A.  She didn't -- kind of like this, just some more or less characterization of the whole incident and while I was there.

Q.  What whole incident?

A.  Whatever is involving her.  But I wasn't there from when it happened, so I really didn't question as to why she was subpoenaing me.

Q.  What incident are you referring to that happened?

A.  She didn't fully explain it to me.  She just

Page 216

told me that I'd probably be getting a civil service subpoena for hers.  So I don't know exactly in detail what she's dealing with.

Q.  Are you aware of any situations in which Lieutenant Meyers was punished in any way at EPD?

A.  Not while I was there.

Q.  That you've heard about since you left?

A.  I've heard.  But to say what she was punished for and what she did, I do not know.

Q.  What have you heard?

A.  That she was punished for something and she hasn't been at work.  That's about it.

Q.  You don't know why?

A.  I don't -- I really don't ask questions.

Q.  Have you ever heard of Lieutenant Myers doing anything that you would consider wrong?

A.  No, because she trained underneath the same person I did, and that was Dunn and Donnie.

Q.  What does their training have to do with you thinking that they wouldn't have done anything wrong?

A.  Because it's the way they teach us.  If -- if it says in that book or that policy you do it this way, that's the way you do it.  There's -- there's no other way.

Q.  So is it your understanding that Lieutenant

Page 217

Dunn treats -- trains people to behave according to the policy?  Is that what you're saying?

A.  Correct.  Policy and state law.

Q.  You, Lieutenant Myers, and Donnie were all trained by Lieutenant Dunn?

A.  Lieutenant Donnie trained all three of us.

Q.  Lieutenant Donnie, that's correct.  Okay. Lieutenant Donnie trained all three of you.

And you're saying that Donnie also trained you in such a way that you don't deviate from policy or law; is that correct?

A.  Correct.

Q.  Are there any other people other than the ones that you -- than you, Stephanie, and Dunn who Chief Fontenot seems to have punished?

A.  Not that I know of.

Q.  I'm just trying to understand why the people who follow the policy in particular are the ones who are being treated unfairly at work.  Can you tell me about that?

MR. STAMEY:  Objection to the form.

A.  I can't speak on somebody else and their decisions.  I know mine, I did wrong.  I messed up.  I grabbed my punishment and I dealt with it.  But that's just from my perspective.  Now, everybody else's,



Page 218

there's times where I don't believe it was right and --
but I also don't know the entire circumstances of it
either.
BY MS. HIGGINS:
   Q.  Would you say that Victor Fontenot abides by
policy and law?
       MR. STAMEY:  Objection to the form.
   A.  Based on my experience, no.
BY MS. HIGGINS:
   Q.  Would you say that Ryan Young behaves in
accordance with law and policy?
       MR. REED:  Objection form.
   A.  Based on what I have seen, no.
BY MS. HIGGINS:
   Q.  Why do you say that about Mr. Young?
   A.  The incident -- if -- if it was or wasn't
reported dealing with Richard Abadie, and also the
workman's comp and working at the gun shop.
   Q.  Okay.
       THE VIDEOGRAPHER:  We need to go off the
   record and star a new video file.
       MS. HIGGINS:  Okay.  Sure.
       THE VIDEOGRAPHER:  Off the record at
   2:48.
       (Recess taken.)

Page 219

       THE VIDEOGRAPHER:  We are back on the
record at 3:02.
       MS. HIGGINS:  There is one housekeeping
issue that I have to get on the record.  For
tomorrow's deposition, they were unable to
secure an in-person court reporter.  There
will be one over Zoom.  I just need everyone
to agree to that stipulation.  Is that okay?
       MR. REED:  Yeah, I'm fine with it.
       MR. DOHERTY:  I'm good.  Have we figured
out the location of the deposition?
       MS. HIGGINS:  Not that I'm aware of, but
as soon as I find out, I'll be happy to share
that with everyone.
       MR. STAMEY:  One of your colleagues --
       Or one of your colleagues said that they
could do tomorrow, though.  So that's --
apparently something changed, I guess.
       MS. HIGGINS:  They hadn't checked with
the scheduling people at Magna, and they had
already scheduled them on a different
assignment before they --
       MR. STAMEY:  Okay.
       MS. HIGGINS:  I'm sure if they could
have gotten someone in person, that would have

Page 220

happened.
       MS. WALL:  Do we know 9:00?  9:00?
       MS. HIGGINS:  I believe so.
       MS. WALL:  I have to leave at like -- I
have to leave so early.
       MS. HIGGINS:  So everyone is agreed to
that?  That's fine with everyone?
       MR. STAMEY:  Sure.
       MS. HIGGINS:  Okay, great.
BY MS. HIGGINS:
   Q.  All right.  Do you know Lieutenant Jeremy
Ivory?
   A.  Yes, ma'am.
   Q.  Do you believe he was treated unfairly?
   A.  Based on the circumstances of what I was told,
yes.
   Q.  By whom?
   A.  Chief Fontenot.
   Q.  What were you told?
   A.  He was disciplined for allowing somebody to
use a unit.
   Q.  A "unit" being a department vehicle?
   A.  Yes, ma'am.
   Q.  Okay.
   A.  And was demoted from lieutenant to patrolman.

Page 221

   Q.  Why do you think that was unfair?
   A.  Too steep of a punishment.
   Q.  Why do you think he received such a steep
punishment?
   A.  I'm really not sure.  I just felt it was too
big of a punishment for what I was told.  Whether there
was more, I'm not sure.
   Q.  Do you think that allowing someone to use a
unit is more severe than, let's say, putting an
arrestee in a choke hold?
       MR. STAMEY:  Objection; form.
   A.  Letting someone use a department vehicle is
less serious than grabbing somebody by the throat, in
handcuffs.
BY MS. HIGGINS:
   Q.  But the person who grabbed someone by the
throat in handcuffs was not punished, correct?
   A.  That I'm aware of.
   Q.  And Jeremy Ivory was?
   A.  Yes, ma'am.
   Q.  Okay.  Do you know why that would be?
   A.  Not -- not a clue.
   Q.  Not a guess?
   A.  No, ma'am.
   Q.  Okay.  Do you know an officer named



Chase Michael Godeaux

June 26, 2023
Pages 222 to 225

Page 222

A.J. Frank?

A.   Yes, ma'am.

Q.   Do you think he was treated unfairly by Chief Fontenot?

A.   In regards to -- you have to refresh my memory.

Q.   Well, what do you recognize about him?

A.   I know he was a narcotics detective for a while, and then he was moved to patrol.  I believe he was a sergeant on patrol for a while, and then he ended up leaving.  I don't know if it was termination on why he left or if he just resigned.  I don't remember the reason behind it.

Q.   Do you remember any of the circumstances regarding why he left the EPD?

A.   Not that I can remember.

Q.   Do you remember anything about his relationship with Chief Fontenot?

A.   The only thing I can remember, it was maybe a little rocky between the two.  But as far as how bad, I really don't know.

Q.   When you say "a little rocky," what do you mean by that?

A.   Disagreements between either.

Q.   About what?

Page 223

A.   I really don't know.  I just know they didn't really get along, but they got along at the same time.  It was one of those situations.

Q.   Do you know an officer -- or former officer, rather -- named Varden Guillory?

A.   Yes, ma'am.

Q.   What do you know about him?

A.   He was the deputy chief whenever I first started at Eunice police.

Q.   Do you believe he was treated unfairly by Chief Fontenot?

A.   For what had happened, I don't know the entire story of it, so can't really make a decision on whether or not it would be unfair or not fair.

Q.   Well, what happened?

A.   Just to my knowledge, all I know was a written statement written by somebody was ripped up.  Now, whether it was completely filled out by the person or it was a blank statement form, I'm not sure.

Q.   Who ripped up the statement form?

A.   Varden Guillory.

Q.   Do you know who wrote the statement form?

A.   No, ma'am.  A complainant or a witness or a victim.  I'm not sure which one.

Q.   But he ripped it up, correct?

Page 224

A.   Correct.

Q.   And then what happened?

A.   I found out later that it was either taped back together or a new one was given.  And then he was actually arrested and disciplined, if I'm not mistaken.  I forgot for what.

Q.   Who disciplined him?

A.   It would have been the chief.

Q.   Fontenot?

A.   Yes, ma'am.

Q.   How did he discipline him?

A.   I'm not sure if he got suspended, placed on admin leave, or written up.  I do remember he was arrested for that incident.

Q.   Arrested?

A.   Yes, ma'am.

Q.   Do you think that was an appropriate punishment?

A.   Like I said, all I know is the circumstances surrounding the statement.  If there was more, I don't know.  So I can't really say if it was or wasn't.

Q.   Do you think ripping up a statement is more severe misconduct than putting your hands around someone's neck who was under arrest, or less severe?

     MR. STAMEY:  Objection; form.

Page 225

A.   It's hard to say.  Depends on the circumstances surrounding the case, what the incident -- what's the statement even for, what the statement will contain.  The statement can be considered as evidence.  So it's -- it can be construed worse than grabbing somebody by the throat, but it could be less.  Depends on who you ask.  For me it would be a little bit less than putting your hands around somebody's throat.

BY MS. HIGGINS:

Q.   Do you think that's less severe -- let me rephrase.

     Do you think that ripping up a statement is less severe than failing to report misconduct that you've observed as an EPD officer?

     MR. STAMEY:  Same objection.

A.   I would say it is.

BY MS. HIGGINS:

Q.   Do you think that -- that ripping up a statement form is less severe than working at an alternative form of employment when you are not permitted to do so?

     MR. REED:  Object to form.

BY MS. HIGGINS:

Q.   In your opinion.



Chase Michael Godeaux

June 26, 2023
Pages 226 to 229

Page 226

A.  I would say.

Q.  And to clarify, Varden Guillory was punished for ripping up a statement form, correct?

A.  To my knowledge.  I don't know if there was more.  I think there was more.  I'm not sure.  So I can't definitively say that was the only reason.

Q.  And Chief Fontenot punished him?

A.  Yes.

Q.  Were Ryan Young or Victor Fontenot punished for the incidents that I just referred to?

A.  Not to my knowledge, unless it was done via counseling or -- or written reprimand.

Q.  Okay.  Do you recall any other instances where an officer was, in your opinion, unfairly punished?

A.  There might be.  I'm not sure.  I can't recall anything.

Q.  Okay.  Other than the one incident we talked about where you mishandled the submission of a list of evidence -- that was evidence rather, are there any other times when you've been punished at EPD?

A.  I remember that one.  There was one that went along with it.  But I think after me and the chief's meeting, that one kind of got scratched away and it was mainly for the list.  I've probably had counselings before, verbal counselings.  What they were about, I'm

Page 227

not sure.

Q.  What happened at the meeting you were just referring to?

A.  Just had a meeting going over the write-up and giving me the opportunity to speak about it, on whether I agree with it or disagree with it and whether or not a punishment was going to be handed down.

Q.  Do you feel as if you faced retaliation while you were employed at the EPD?

A.  Personally?  No.

Q.  Is it your opinion that Lieutenant Dunn was retaliated against while employed at the EPD as a result of his reporting incidents of misconduct?

A.  It's possible, yeah.

Q.  Why do you say it's possible?

A.  I haven't -- I haven't been there to really see everything that has been going on.  A lot of it is what I'm being told.

Q.  By whom?

A.  Multiple people, whether they work at the -- the police department or formerly worked there or just civilians.

Q.  Would you say that you've heard this from multiple people, then?

A.  Yeah.

Page 228

Q.  About how many?

A.  Probably less than ten.

Q.  More than five?

A.  Maybe between probably seven to five.

Q.  Okay.  Is it your opinion that there are other officers at the Eunice Police Department who faced retaliation as a result of reporting misconduct that was ongoing at the EPD?

A.  I'm not sure.  I'm not sure who's all reported it and who hasn't.

MS. HIGGINS:  Okay.  I'm going to ask that we go off the record and take just a two-minute break.

THE VIDEOGRAPHER:  Off the record at 3:13.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record at 3:18.

BY MS. HIGGINS:

Q.  So I just had a couple more questions before I wrap up.  And I want to thank you again for your time.  It's very much appreciated.

Earlier we spoke about an arrest warrant that Chief Fontenot wanted you to pursue where you believed that there was no probable cause; is that correct?

Page 229

A.  Correct.

Q.  Who was that in regard to?  Who was the arrest warrant for?

A.  I'm not sure.  I can't remember who it was for.

Q.  Do you remember any of the other circumstances surrounding it?

A.  No.

Q.  Okay.  Earlier we talked about Chief Fontenot sending out emails to EPD personnel that would officially change the EPD policy.  Do you recall that conversation?

A.  Yes.

Q.  Were there ever emails that he sent out where he didn't officially change any sort of policy but provided guidance that you were expected to follow?

A.  I can't -- I can't recall whether or not there was or wasn't.

Q.  Okay.  With respect to Chief Fontenot being in the room here today, did that hinder your ability to answer any of my questions truthfully?

A.  No, ma'am.

MS. HIGGINS:  Okay.  Plaintiff's counsel has no further questions at the moment, but I reserve the right to ask more questions after



Page 230

you've completed your questioning.  Go ahead, Counsel.

MR. REED:  Tell you what, I'll go next.

EXAMINATION

BY MR. REED:

Q.  Jason Reed, I represent Ryan Young.

A couple different times, you referred to "my notes."  What do you mean when you said "my notes"?

A.  Just different case files I've saved over the years.  I usually save my narrative.

Q.  Have you created any kind of written documents specific to this litigation?

A.  No, sir.

Q.  Have you created any documents in preparation for today's deposition?

A.  No, sir.

Q.  Okay.  What -- what case files would you maintain from when you worked at the City of Eunice?

A.  Different investigations I've worked, different cases.  When a report was done, I usually save the narrative.  That way, it gives me something -- whenever I train somebody, to look at, look, this is where I started, this is where I am now.  Or if I have to go to court, instead of trying to get a copy from records, I have my narrative.

Page 231

Q.  Okay.  So would you have maintained all your documentation, or is it just certain documents?

A.  Depends.  Sometimes I would save them, and sometimes I'd honestly forget to save them because I was rushing out the door to go to a call or going home.

Q.  Okay.  Have you shared any of those documents with the plaintiff, Michael Dunn?

A.  As far as?

Q.  In preparation for this deposition, for instance.

A.  No.  It was all the -- mainly case files.

Q.  What about in connection with this litigation?  Have you shared any documents with Michael Dunn?

A.  No, sir.

Q.  Okay.  Let's talk about your background a little more.  Now, I think I've gotten it right; I just want to make sure.  You were hired by Eunice PD about 2012?

A.  January of 2012.

Q.  Okay.  And what date did you leave employment?  Was it 2019?

A.  September of 2019.

Q.  Okay.  And you said you were trained by Donnie Thibodeaux and by Mr. Dunn?

A.  Mainly, as far as field training officer, it

Page 232

was done by Lieutenant Dunn.

Q.  Okay.  Which of those years between 2019 -- I'm sorry, 2012 and 2019 did you work the same shift as Dunn?

A.  I've worked the same shift with them different times throughout that eight years.

Q.  Okay.  Can you tell me which years of those eight years you worked on the same shift as Lieutenant Dunn?

A.  I could not tell you.

Q.  Okay.  During what time period was he your direct supervisor?

A.  There was different times.  I really couldn't tell you.

Q.  You have any estimate as to -- of the eight or nine years, how many years he was your direct supervisor?

A.  There was times where he was, and there was times I wasn't even on a shift with him.

Q.  Okay.  I think you testified that you would describe Dunn not only as a friend but as a good friend; is that correct?

A.  That's correct.

Q.  When did you-guys go from just a pure professional relationship to a friendship?

Page 233

A.  Since probably the day I started.

Q.  Okay.  Would you describe him as your best friend?

A.  One of them.

Q.  Okay.  Would you describe him as your mentor?

A.  You could say that.

Q.  Okay.  How often have you spoke to Dunn since you left the Eunice PD in about September of 2019?

A.  Not as much as I used to.

Q.  Do y'all talk once a week?  Once a month?

A.  It varies.  Sometimes it could be once a month, and sometimes it could be two -- two times a week.

Q.  Okay.

A.  It depends.

Q.  At any point have you spoken to Lieutenant Dunn about this litigation?

A.  No.  Because whenever we talk, it's not about work.  It's how are the kids, how's the family, go fishing, things of that nature.

Q.  Just to be clear, at any point did Lieutenant Dunn say, "I need a witness to cover X, Y, and Z"?

A.  No, sir.

Q.  Have you ever had any written communication with Lieutenant Dunn about this lawsuit?



Chase Michael Godeaux

June 26, 2023
Pages 234 to 237

Page 234

A. No, sir.

Q. About this deposition?

A. No, sir.

Q. Y'all never texted about this lawsuit?

A. Other than letting me know I'm going to be getting subpoenaed for it. That's it.

Q. And that happened via text?

A. He called me and told me about it --

Q. Okay.

A. -- let me know, "Be prepared. This number will be calling you. Let you know you'll be getting a subpoena."

Q. Did y'all talk about any of the substance about what you were going to testify about?

A. No, sir.

Q. Said, "This number will be calling you." Whose number was that?

A. I believe his attorney's office.

Q. When somebody from the attorney's office contacted you, was it an attorney, or who was it?

A. I couldn't tell you.

Q. The conversation we just had with Dunn that you just testified about, how long was that conversation?

A. It wasn't long. It was just letting me know

Page 235

I'm going to be getting a subpoena. I said okay. And that was it. And we go on talk about make sure everybody is okay. And he's my son's godfather, so.

Q. So he's your son's godfather, you said?

A. (Witness nods head.)

Q. Is that a "yes"?

A. Yes, sir.

Q. I don't think you answered me. How long was that conversation with Dunn?

A. I don't recall the length of it.

Q. Was it more than five minutes?

A. Yes, sir.

Q. My natural reaction if somebody says, "You're going to be subpoenaed," I'd say, "What's the subject matter?" Did y'all have any of that discussion?

MS. HIGGINS: Object to form.

A. No, sir.

BY MR. REED:

Q. When somebody contacted you from the attorney's office, was there any discussion about the substance of what you would testify to?

A. No, sir.

Q. You talked about when you left the department, you were concerned you'd be put on some kind of administrative leave; is that correct?

Page 236

A. Yes, sir.

Q. Did anybody ever threaten you with administrative leave?

A. No, sir.

Q. Did anybody ever threaten you with an investigation?

A. No, sir.

Q. Was a particular subject matter that led you to be concerned about that?

A. Just the mere fact that somebody I looked up to that I've seen never really did any wrong, always followed the law, policy, being put on admin leave made me worry.

Q. Okay. All right. Let's shift gears. You talked at length about two different incidents. One of them involved Richard Abadie; is that correct?

A. Yes, sir.

Q. Okay. And that was under the regime of Chief Dies; is that correct?

A. Correct.

Q. When did Chief Dies go out of office?

A. I believe it was 2014. I can't say for sure.

Q. Okay. But I think you testified you think that incident is one where you believe that somebody was choked was probably in 2012; is that accurate?

Page 237

A. 2012, 2013, somewheres around there.

Q. I don't remember if you said the name of the suspect. Do you know who we're talking about?

A. Arkevious Hebert.

Q. Can you spell that for the court reporter?

A. I could not. I'm not sure how to spell "Arkevious."

Q. What was your rank back when this happened in 2012 or 2013?

A. Just a patrol officer.

Q. What was Ryan Young's?

A. Lieutenant.

Q. So if Ryan Young made a complaint about that incident, would he be submitting that complaint to you?

A. No.

Q. Would he make you aware of that complaint?

A. No.

Q. Would you be cc'd on such a complaint?

A. No, sir.

Q. Do you recognize one way or the other if Ryan Young made a complaint?

A. No, sir.

Q. Okay. So how does it work? If five officers see misconduct, do all five have to register a complaint?



Chase Michael Godeaux

June 26, 2023
Pages 238 to 241

Page 238

A.   I'm not sure.  Some do; some don't.  Depends.

Q.   Do you know if there's a requirement for multiple officers to register a complaint?

A.   It would be nice to have witness to it.

Q.   But I think that's two different things, you know, witnesses versus a complaint.  Wouldn't it be redundant to have five different people make the same complaint?

MS. HIGGINS:  Object to form.

A.   If they don't all know the other made a complaint.

BY MR. REED:

Q.   In this instance -- and I'm talking about the incident that happened in 2012 or 2013 with Richard Abadie -- you made a complaint, correct?

A.   Correct.

Q.   And it's your belief that Michael Dunn made a complaint, correct?

A.   Correct.

Q.   I want to talk about the second incident, the one about Sunny Arnaud.  I just want to make sure the record is clear.  At one point you said that Victor Young was involved, and I think you clarified that what you meant was Victor Fontenot, correct?

A.   Correct.

Page 239

Q.   Ryan Young was not involved in that particular incident in any way, correct?

A.   I don't believe so, no, sir.

Q.   Okay.  All right.  You testified a little bit about an incident where somebody said -- you know, encouraged an arrest of the mayor for DWI.  Do you remember that?

A.   Yes, sir.

Q.   Who made that statement, to your knowledge?

A.   Told me or made the statement?

Q.   Well, let me clarify and ask a better question.  Did you hear anybody make such a statement?

A.   No, sir, not verbatim from their mouth.

Q.   Okay.  Who do you think made such a statement?

A.   From what -- that was told to me was Ryan Young.

Q.   Okay.  Now, who told you Ryan Young made such a statement?

A.   I don't recall who told me.

Q.   Okay.  You think it was a police officer?

A.   Yes.

Q.   Was it one officer or multiple?

A.   I cannot recall.

Q.   So all you remember about that statement is somebody, whose identity you can't recall, told you

Page 240

that Ryan Young had suggested it would be a good thing if somebody could get the mayor for DWI, basically?

MS. HIGGINS:  Objection; mischaracterizes his testimony.

A.   Basically, yeah.  I don't remember -- I can't remember who told me because of how long it was, but I do remember hearing it.

BY MR. REED:

Q.   So whoever told you, what exactly did they tell you that they thought Ryan Young had said?

A.   Exactly what they said, for somebody -- if somebody can see him or locate him driving under the influence, stop him and arrest him.

Q.   And by "he," you're talking about the mayor?

A.   The mayor, yes, sir.

Q.   Isn't that just kind of part a patrol officer's duty?  If you see somebody driving under the influence, you're supposed to arrest them, correct?

A.   Correct.

Q.   When did that happen?  When did somebody indicate that Ryan Young had made that statement?

A.   I don't remember the year.

Q.   Okay.  Do you have any approximation?

A.   No, sir.

Q.   Was the mayor ultimately arrested for a DWI?

Page 241

A.   Not that I'm aware of.

Q.   All right.  Let's talk about the incident I think you said near Zydeco Road; is that correct?

A.   G&J Zydeco Road.

Q.   And just to make sure I'm on the right page, that's when you think Victor Fontenot and Ryan Young were working outside of jurisdiction?

A.   Yes, sir.

Q.   Okay.  Where were they working?  Is that in some other city?

A.   It's outside the city limits, in between Eunice and Lawtell.

Q.   How did that come to your attention?

A.   Because the guy they was looking at I had arrested and had information that he was selling narcotics.

Q.   And what's this guy's name?

A.   Dexter Mays.

Q.   Okay.

A.   And they had informed me that he was arrested for -- for the narcotics.  And it was just told to me that a lot of the surveillance was done outside of our jurisdiction.

Q.   I'm sorry.  It was told to you by whom?

A.   Different officers at the police department.



Page 242

Q. Do you remember who said that?

A. No, sir.

Q. Okay. Do you know one way or the other if the officers involved in that surveillance, if they coordinated with other agencies?

A. State police.

Q. I'm sorry, say again?

A. Louisiana State Police.

Q. So you think that before doing surveillance outside of Eunice city limits, the officers coordinated that with state police?

A. It's possible. I know they was involved with it. But that's why I said, I'm not sure if they were assisting another agency or not.

Q. Would it be appropriate to work outside of the city of Eunice if you obtained proper permission?

A. If you are deputized, have the authority by that jurisdiction that has authority, yeah.

Q. Okay. And do you know if that happened in this instance?

A. No, sir, I do not.

Q. All right. Let's talk about -- is it Double Action?

A. Yes, sir.

Q. Okay. What is Double Action?

Page 243

A. Double Action is an outdoors shop, sales of firearms, hunting equipment, things of that nature.

Q. And it's my understanding of your testimony, you think at some point Ryan Young worked there?

A. Yes, sir.

Q. Okay. During what time period?

A. I'm not sure. I just remember him having that -- the shoulder surgery and him being there with his arm in a sling.

Q. Okay. Did you go in the store just to be a customer, or why were you there?

A. I think I went and purchased some bullets.

Q. Okay. And was Ryan Young an employee at the time?

A. From what I understood, yeah.

Q. Okay. Did you have any conversation with Ryan Young about what he was doing there?

A. Not necessarily, just mainly asked him about his shoulder.

Q. What was he doing? Was he stocking shelves? What was ryan Young doing at the store?

A. He was sitting behind the counter one of the times I went over there.

Q. Did you actually see him doing any work?

A. No. Just sitting behind the counter, really.

Page 244

Q. Did you ever ask him if he was working or visiting an employee or what he was doing?

A. I believe we had talked about it, and he had said that he was working over there.

Q. What exactly did he tell you?

A. That he was working there, and that's about it. I didn't go into detail about what he was doing.

Q. Any idea if he worked there for one day or multiple days?

A. Probably multiple days, because I would see his truck outside the store. Now, whether or not he was working or as a customer, I don't know.

Q. How many times did you see him behind the counter? Just that one day?

A. I think there was a few times. To put an exact number on it, I don't know.

Q. Did you report that to anybody?

A. No, because it was -- it was known throughout the police department.

Q. Okay. Do you know one way or the other if Ryan Young -- you know, assuming he was working -- if he got permission to work that duty?

A. I do not know.

Q. Okay. Do you have any idea what his job duties would have been at Double Action?

Page 245

A. No, sir.

Q. Do you have any idea what kind of physical job requirements would have been necessary of Ryan Young?

A. No, sir.

Q. At one point -- I'm going to kind of skip around for a couple more questions. At one point you were asked a question; you said, "I have not fully researched that yet." Do you recall that?

A. Yes, sir.

Q. Have you done any research in preparation for today's proceeding?

A. No, sir.

Q. Is there any research you intend to do before this matter goes to trial?

A. No, sir.

Q. You talked about somebody named Red Bean. Do you remember that?

A. Yes, sir.

Q. What is Red Bean -- or what was Red Bean's full name?

A. I don't recall.

Q. Okay. When was it he hung -- hanged himself? Was that before Chief Fontenot became chief?

A. I'm not sure. I think it was during.

MR. REED: All right. I think that's



Chase Michael Godeaux

June 26, 2023
Pages 246 to 249

Page 246

all the questions I've got.

MS. WALL:  Do you want to go?

MR. DOHERTY:  Yeah, I just have very few, generic.

MS. WALL:  Red Bean or blood?

MR. FEUCHT:  Red Bean.

MR. REED:  Is it Red Bean?

THE WITNESS:  Red Bean.

MR. DOHERTY:  There was something blood involved.  There was another name with blood.

MS. WALL:  Okay, there was.  Okay.

EXAMINATION

BY MR. DOHERTY:

Q.  You said that -- my name is James Doherty.  I'm one of the attorneys representing the City of Eunice.

A.  Yes, sir.

Q.  You said that you and Lieutenant Dunn are friends.

A.  Yes, sir.

Q.  I think you said y'all go fishing?

A.  We have, yes, sir.

Q.  How many times have you been fishing with Lieutenant Dunn?

A.  I want to say at least once.

Page 247

Q.  Do you --

A.  But it's just something we talk about doing, but we -- family, we never really get the time.  And we was opposite shifts of each other, so never really worked out.

Q.  So it's an idea that y'all talk about, but to your recollection, you've only been fishing with him once?

A.  Yes, sir.

Q.  Where was that?

A.  Chicot.

Q.  When was that?

A.  That was years ago, before I even left, so anywheres between -- if I had to guess, 2013, 2015.

Q.  What other kind of social activities do you and Lieutenant Dunn do together?

A.  Talk on the phone, when we do get in touch with each other.  Play video games together.  And that's -- that's really as far as it's gone.

Q.  When y'all play video games together, are y'all both in the same location?

A.  It has been like that before, but recently, no.

Q.  And would that -- when y'all are at the same location playing video games, would that be at your

Page 248

house or at his house?

A.  At his.

Q.  You mentioned that he is the godfather to your son.  What's that son's name?

A.  Colton.

Q.  How old is Colton?

A.  Colton is eight.

Q.  How many children do you have?

A.  Two, one stepchild.

Q.  Colton who's eight, and what's the name of the other child?

MS. HIGGINS:  Objection; relevance.

A.  Adilynn.

BY MR. DOHERTY:

Q.  And how old is that child?

A.  She's five.

Q.  Is Lieutenant Dunn also godfather to the five-year-old?

A.  No, sir.

Q.  Are you and Lieutenant Dunn related in any way?

A.  No, sir.

Q.  You were asked questions about the reputation of different individuals.  With respect to the reputation of Chief Fontenot, what members of the

Page 249

public did you poll to gather what their viewpoint of Chief Fontenot was?

A.  Didn't poll anybody.  It's just civilians or people that I've talked to on complaints.

Q.  And as we sit here today, can you identify the names of any of those individuals?

A.  No, sir.

Q.  Same questions with respect to Lieutenant Dunn.  You talked about his reputation.  Who did you poll from the public about Lieutenant Dunn's reputation?

A.  Same people, same thing, just people I've talked to on complaints and that I've seen.  And that's how they would give their opinion of him.

Q.  All right.  And of those folks, you can't tell us any names today?

A.  No, sir.

Q.  Did I understand you earlier to testify that you and other officers looked to Lieutenant Dunn as "being for us."  Was that a term you used?

MS. HIGGINS:  Object to form.

A.  I'm not sure if that's -- that's what I had -- the term that was used.  But he was a person that looked out for the people below him, his subordinates.  So could that term be used?  Yeah.



Page 250

BY MR. DOHERTY:

Q.  So I guess the question is:  Is Lieutenant Dunn someone that, while you were a member of the EPD, that you looked to as -- as sort of a -- a mentor?

A.  Yes, sir, in certain situations.

Q.  And did you look to him as sort of an advocate for his subordinates?

MS. HIGGINS:  Object to form.

A.  Not necessarily, because we could -- any one of us could go and talk to him about anything.  So I wouldn't necessarily have to go talk on behalf of somebody else.  They could easily go do it themselves, and they knew that.

BY MR. DOHERTY:

Q.  If you had a topic that you wished to discuss or an issue or a complaint, Lieutenant Dunn was someone that you could go to to have that conversation with?

A.  Right.

Q.  You talked about reporting of -- of alleged misconduct.  And I think this was asked, and if it was, I apologize.  But you don't really know if Lieutenant Dunn reported those incidents of misconduct that we talked about; is that right?

A.  Correct.

Q.  And if he did report it, you weren't privy to

Page 251

the contents of that report, were you?

A.  Correct.

Q.  Okay.  And you don't know what was done after it was reported, if in fact it was reported?

A.  Correct.

Q.  You weren't part of the -- the persons looking into the complaint; is that right?

A.  Correct.

Q.  And you weren't part of the body or entity or group that was tasked with reaching a conclusion or resolution of the complaint; is that right?

A.  Correct.

MS. HIGGINS:  Object to form.

BY MR. DOHERTY:

Q.  And I think you said the only thing that you would know would be if there was a suspension or a termination?

A.  Correct, because the person wouldn't be there for an extended period of time.

Q.  So that would be some objective indication that something was going on with that individual?

A.  That's correct.

Q.  Other than that, you don't know any details?

A.  Other than --

MS. HIGGINS:  Object to form.

Page 252

A.  Other than anything that I personally witnessed, no.

BY MR. DOHERTY:

Q.  So along those lines, you wouldn't be made aware every time an officer made a complaint about anything?

A.  Unless, if it was investigated, they would contact me to see if I witnessed anything, I wouldn't know if it was being investigated or not or if a complaint was made.

Q.  The line of questioning about what Ryan Young is alleged to have said about the mayor and -- and picking him up for DWI, which mayor are we talking about?

A.  The current one.

Q.  Okay.

A.  I can't remember his name, but I can see his face.  I just can't remember his name.

MR. DOHERTY:  Thank you.  I don't have any further questions.

MS. WALL:  One second.  I'm sorry.

THE VIDEOGRAPHER:  Microphone.

MS. WALL:  Sorry.

EXAMINATION

BY MS. WALL:

Page 253

Q.  I just have a few questions, too, and I'm going to kind of jump around as well.  And then I think Joe is going to have questions, but I don't know where he is.

You talked about an incident where you faced potential discipline, and it was with respect to submitting a list of names.  You said there were two things that you were up for discipline for.

A.  Correct.

Q.  What was the other thing?

A.  The other was an incident where the chief stated he had gave me a direct order to file for a warrant on somebody and that I didn't do it.  But upon discussing both of those incidences during our meeting, I told him that I did not recall that order.  I remember us discussing about the warrant and that person.  But as far as an order being given, I did not remember or recall him telling me that.

So I think there was kind of an agreement on that.  Whether or not it happened or not, I don't remember.  And that's kind of what we went over.

Q.  So he chose not to take any disciplinary action for that?

A.  I don't believe so.  I think it mainly was because of the list of names.



Page 254

Q.  Okay.

A.  It may have been.  I'm not sure.  I can't remember.

Q.  But you weren't disciplined for that either, right?

A.  It was part of it, like I said, but I'm not sure if the suspension was just from the list or -- and we decided not to deal with the order or if it was a little bit of both that went into it.  And it wasn't as extreme as it probably could have been.  It was actually a little bit lessened.

Q.  Did you appeal that discipline?

A.  No, ma'am.

Q.  Why not?

A.  Because I probably would have gotten the same discipline or it would have been upheld through the civil service board -- civil service appeal.

Q.  What can you tell me with respect to Donnie Thibodeaux's role in the civil service board?

A.  He was a civil service member at one point and the civil service rep for the department.  And I believe he is currently the civil service chairman.

Q.  So what's the chairman's role?

A.  Don't make me lie to you.  He's pretty much the head over the civil service board for our area, in

Page 255

our department, as well as the fire department.

Q.  So Donnie had an issue where he had to go to civil service, correct?

A.  Correct.

Q.  He appealed?

Did he have to recuse himself for that?

A.  Yes.  They had -- replaced him with somebody else, if I'm not mistaken.

Q.  Okay.  Were you there?

A.  I was subpoenaed.  Yes, ma'am.

Q.  And you testified?

A.  No, ma'am.

Q.  Were you there?

A.  Yes, ma'am.

Q.  Okay.  Did Dunn ever talk to you about a civil service appeal?

A.  Just the fact that I was getting subpoenaed, just like with Donnie's.

Q.  You said that -- you testified earlier that you knew he was going to get his animal back, the dog, so it wasn't really worth putting in the fight and going through all that because he was going to get it back, right?

A.  Correct.

Q.  Was that during the time when

Page 256

Donnie Thibodeaux was the -- the chair?  Or what is it?

A.  The chairman?

Q.  The chairman.

A.  No, ma'am.  I think he was just a member at that time.

Q.  Who would have been the chairman?

A.  I want to say his last name is Vidrine.  I can't think of his first name.

Q.  So when did Donnie Thibodeaux become the chairman?

A.  If I'm not mistaken, it was just recently, within the last few years, last probably two to three, if I had to guess.  I'm not exactly sure.  It was done -- I want to say he became chairman after I had left and went to the sheriff's office.  I'm not exactly sure.

Q.  So if he wasn't the chairman when Dunn appealed, was that -- Dunn's appeal was way before that?  It was before you left?

MS. HIGGINS:  Object to form.

A.  I believe so.

BY MS. WALL:

Q.  So how did you know that he would get the dog back?  Did you talk to Donnie Thibodeaux about that?

MS. HIGGINS:  Object to form.

Page 257

A.  No, ma'am.  Just that feeling I had.  I didn't want to put in for it because I had faith in Lieutenant Dunn, thinking or knowing that he didn't do nothing wrong.  So I didn't want to get my hopes up in getting a K9 to only get it taken away to give back to the rightful owner.  I say "rightful owner," but to the prior handler.

BY MS. WALL:

Q.  I believe you testified that they gave the dog back to Dunn.

A.  Correct.

Q.  Does he have the dog now?

A.  If it's Zeus, Zeus is deceased.  So.  And Robin, I don't know where Robin is at.  But, no, he doesn't have neither one of them.

Q.  I believe Robin was the dog that -- with the civil service appeal.  I think Zeus was way before that.

A.  I can't remember.

MS. HIGGINS:  Object to form.

A.  I remember Zeus and Robin.

MS. HIGGINS:  Lack of foundation.

A.  But I can't remember if Zeus was still in service at the time or if it was Robin.

BY MS. WALL:



Page 258

Q.  Okay.  Would you be surprised if I told you that Dunn never picked the dog up after given the opportunity to do so?

MS. HIGGINS:  Object to form, lack of foundation.

A.  Not sure.

BY MS. WALL:

Q.  Did you ever --

A.  I would say surprised or -- there's usually a reason he does what he does.

Q.  Did he ever have any conversations with you about the dog, about the dog's behavior?

A.  Not as far as the dog's behavior.

Q.  The dog's actions?

A.  No, not that I can remember.

Q.  Any issues with the dog?

A.  Not that I can remember, no, ma'am.

Q.  Were your children ever around the dog?

A.  No, ma'am.

Q.  You testified earlier that it was -- to your knowledge, the chief asked some officers to act in conflict with civil service rules.

A.  Correct.

Q.  Can you give me some examples?

A.  Like I explained earlier, kind of like if -- a

Page 259

lieutenant, if I recall correctly, in the civil service rules of lieutenant, they don't necessarily have to go to calls or take reports.  So if it's asking them to do that, it would be kind of acting out of their class; or having a patrol officer dispatch, it would be acting out of their class.

Q.  Can you -- can you give me any names of people?

A.  I mean, I've had to dispatch before when I worked out of there and would be working out of my class, or working as a jailer, I worked out of my class.  So, I mean, it's situations like that.

Q.  Anyone else?

A.  There's been a couple people, probably.  At the time I was there, we all did it.  Because we -- if we had no dispatcher, then we was kind of stuck up creek.  So we would do what we needed to do.

Q.  Can you cite any specific instances, names?

MS. HIGGINS:  Asked and answered.

A.  Myself, Joshua Courville, Nicholas Cooley, Austin Doucet.  Pretty much everybody that's working there, or did.

BY MS. WALL:

Q.  Do you have any knowledge with respect to the civil service rules regarding ex parte communications

Page 260

with board members?

A.  Not right offhand, no, ma'am.

Q.  Do you know if Dunn talked to anybody on the board during his civil service appeal?

A.  Not that I'm aware of.

Q.  You testified earlier that Dunn likely reported to outside agencies, and then I put in quotes, "all the incidents that occurred after you left."  Does that sound right?

A.  Correct.

Q.  Did he report any incidents that occurred while you were there to outside agencies?

A.  If he did, I wouldn't know.

Q.  So again, you have no firsthand knowledge of this, if he had --

A.  No, ma'am.

Q.  Did he tell you that?

MS. HIGGINS:  Object to form.

A.  He told me that he had reported it to these different agencies, but that's about it.  I don't -- I try not to go too far into detail.

BY MS. WALL:

Q.  Is it fair to say, then, that the majority of the retaliation that Dunn alleges occurred happened after you left --

Page 261

A.  Yes, ma'am.

Q.  -- the department?

So then you can't -- so you don't have any firsthand knowledge of a lot of that, then?

A.  Correct.

Q.  You testified about your knowledge with respect to officers failing to report misconduct, various instances of misconduct.

A.  Uh-huh.  Yes, ma'am.

Q.  Did you ever go back behind them and report it?

A.  The only two that I physically witnessed is the two I reported.

Q.  Although you saw the other incidents where they didn't report misconduct?

A.  Which ones?

Q.  Any of them.

A.  I physically witnessed two of them.  I can't speak for anybody else.  And those are the two I reported.

Q.  Do you know whether Officer Blood was employed with EPD during Randy Fontenot's term?

A.  I believe so, yes, ma'am.

Q.  So you'd be surprised if I told you it wasn't during his term?



Chase Michael Godeaux

June 26, 2023
Pages 262 to 265

Page 262

MS. HIGGINS:  Object to form.

A.  Probably so.  It has been a while.  So yeah.

BY MS. WALL:

Q.  When was the last time you reviewed the EPD policy?

A.  Four or five years.

Q.  Did you review it all the way through?

A.  If I did, it was years ago.

Q.  So if I asked you about specific provisions, you probably wouldn't be able to recite it back to me?

A.  No, ma'am, because I have a whole new policy I have to deal with.

Q.  And again, I just want to get clarity with respect to the, quote, hit list.  Who has told you that Chief Fontenot has a hit list?

A.  I can't recall who exactly told me.  I just remember hearing about it from different officers.  And I don't want to say this is what they called it.  It's just a group of people they thought he didn't like.

Q.  And that was -- the hit list, was that -- did you hear about it while you were employed at EPD?

A.  Yes, ma'am.

Q.  And it was several officers talking about it?

A.  Yes, ma'am.

Q.  But you can't remember any of their names?

Page 263

MS. HIGGINS:  Asked and answered.

A.  As far as who told me?  No, I can't recall who exactly told me.

MS. WALL:  I think that's all I have.

MS. HIGGINS:  I just have a few questions.

MR. STAMEY:  Well, I have a few, but I want to take a short few-minute break so I don't plow over too much old ground.  Take five minutes, please.

THE VIDEOGRAPHER:  Off the record at 3:57.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record at 4:06.

MR. STAMEY:  I have no questions at this time.  Thank you.

MS. HIGGINS:  I just have a few quick questions to wrap things up.

RE-EXAMINATION

BY MS. HIGGINS:

Q.  We discussed an incident with Richard Abadie.  Do you recall that?

A.  Yes, ma'am.

Q.  Who else other than you and Ryan would have

Page 264

been present to make a report?

A.  It would have just been me and Ryan, Richard Abadie, and the subject that was arrested.

Q.  If there was a report filed by Ryan, do you believe you would have been interviewed regarding that report?

A.  As a witness, yes, ma'am.

Q.  Were you ever interviewed regarding that report?

A.  Not that I can recall, no, ma'am.

Q.  We talked about another -- other instances of misconduct that you weren't aware of any reports filed; is that correct?

A.  Correct.

Q.  Were you ever interviewed as a witness in any of those investigations?

A.  Not that I can recall, no, ma'am.

Q.  Do you believe you would have been interviewed if a report was filed?

A.  I would believe so, yes, ma'am.

Q.  Okay.  We talked a little bit about Ryan and Victor both working outside of the jurisdiction of the EPD; is that correct?  Do you recall?

A.  Correct.

Q.  Do you believe that they had the proper

Page 265

permissions to conduct that work?

MR. REED:  Object to form.

A.  I'm not sure.  I can't say whether or not they did or didn't.

BY MS. HIGGINS:

Q.  Okay.

MR. STAMEY:  I'll join in that objection.

BY MS. HIGGINS:

Q.  Okay.  We talked a little bit about Ryan Young making a statement regarding the mayor and wanting to catch him in a drunk driving incident; is that correct?

A.  Correct.

Q.  Opposing counsel asked if it was part of your duty to look for people who were drunk driving; is that correct?

A.  Correct.

Q.  Did you have any reason to believe that the mayor would be drunk driving?

A.  At the time?

MR. REED:  Object to form.

A.  No.  It was just known that he would frequent the bars on the weekends.

BY MS. HIGGINS:

Q.  Had he ever been drunk driving before?



MAGNA
LEGAL SERVICES

Chase Michael Godeaux

Page 266

MR. REED:  Object to form.

A.  Not that I've seen, no, ma'am.

BY MS. HIGGINS:

Q.  Is it part of your duty to look for people drunk driving, without any sort of foundation?

A.  No, ma'am.  You have to have probable cause.

Q.  Was there probable cause in this instance?

A.  Only if we was able to find him.

Q.  Did you ever find him like this?

A.  No, ma'am.  Never went looking.

Q.  Okay.  We talked a little bit about Ryan Young's alternate employment at the gun shop.  Do you recall?

A.  Yes, ma'am.

Q.  Why would he be sitting behind the counter if he wasn't working?  Do you know?

MR. REED:  Object to form.

A.  No, ma'am, I do not.

BY MS. HIGGINS:

Q.  You mentioned that you saw his truck parked in the lot a few times; is that correct?

A.  Correct.

Q.  How many times?

A.  I can't give a number to it.

Q.  Was he parked there during working hours?

Page 267

A.  Yes, ma'am.

Q.  Okay.  Opposing counsel mentioned a dog named Robin.  Do you know which dog she was referring to?

A.  Yes, ma'am.

Q.  Are you aware that the dog was sold?

A.  Yes, ma'am, I am aware.

Q.  By whom?

A.  After the dog was already sold, Lieutenant Dunn.

Q.  Can you explain?  He was -- the dog was sold to Lieutenant Dunn?

A.  No, ma'am.  The dog -- after the dog was sold, Lieutenant Dunn informed me that the dog was sold.

Q.  Who sold the dog?

A.  I'm not sure.  I believe he had told me the kennel that had him at the time.

Q.  Do you know if Lieutenant Dunn was given an opportunity to claim Robin before she was sold?

A.  Not that I know of.

Q.  Okay.  Do you know if Lieutenant Dunn wanted the dog?

A.  I'm sure he did.  I can't say for sure.

Q.  So is it your opinion that he would have claimed the dog?

A.  I'm sure he would have, yes, ma'am.

Page 268

Q.  Okay.  You mentioned earlier that you didn't appeal your disciplinary action with the civil service board because you believed it would have been upheld; is that correct?

A.  Correct.

Q.  Did Donnie ever file an appeal with the civil service board?

A.  In reference to what?

Q.  Any sort of disciplinary action taken against him.

A.  Yes.

Q.  What about Dunn?  Did he ever file an appeal with the civil service board regarding any disciplinary action taken against him?

A.  I believe so, yes, ma'am.

Q.  What did the civil service board find in those proceedings?

A.  They were both overturned and -- in favor of Lieutenant Thibodeaux and Lieutenant Dunn.

Q.  Do you think that Donnie's participation on the civil service board had any effect on these decisions?

A.  I'm not sure.  I can't say for sure.

Q.  Is there any reason for you to think that?

A.  I wouldn't believe, no.

Page 269

Q.  Okay.  We talked a little bit about the K9 being taken away from Lieutenant Dunn as well as shift changes that were unfavorable.  Do you recall that?

A.  Yes, ma'am.

Q.  Would you characterize those changes and the K9 being taken away as a form of retaliation?

A.  Whether it was retaliation or disciplinary, I would see it as a disciplinary.  But at the time, I don't know if it would be considered retaliation but more or less disciplinary.

Q.  Would you consider them punishments?

A.  Yes, ma'am.

MR. STAMEY:  Object to the form of the question.

BY MS. HIGGINS:

Q.  Did those actions occur while you were employed at the EPD?

A.  The shift changes for sure were.

Q.  What about the K9?

A.  The K9, I think it was more taken from him after I left, but it was asked if I was interested in the K9 position and if I was, to put in a letter.

Q.  After you left EPD?

A.  Prior to leaving.

Q.  So the dog was taken away by Chief Fontenot



Page 270

prior to you leaving EPD; is that correct?

A.  I'm not sure exactly.

Q.  Why would he offer it to you if you had already left EPD?

A.  It was told to me that they was considering re- -- how you say that? -- reissuing or reassigning the K9 to somebody else, and if I was interested to put in a letter for it.

Q.  To come back to be employed by EPD?

A.  That was while I was employed.

Q.  Okay.  So you were employed by EPD when the K9 incident occurred?

A.  Right.  But I wasn't sure -- I can't recall if it was taken from him at that time.

Q.  Okay.  But there was an issue involving the K9 and the consideration of taking it away from Lieutenant Dunn while you were still employed?

A.  To reassign it, yes, ma'am.

Q.  So would you say that you have firsthand knowledge of both of these incidents?

A.  To a certain degree.

Q.  Okay.  Just two more questions.  Did your relationship with Lieutenant Dunn sway your ability to answer any of my questions today honestly?

A.  No, ma'am.

Page 271

Q.  Do you believe it would be ethical to answer a question inaccurately that I asked you today just because of your friendship with Lieutenant Dunn?

A.  No, it would not be ethical.

MS. HIGGINS:  Okay.  No further questions.

THE VIDEOGRAPHER:  That concludes this deposition.  We're off the record at 4:13.

(This proceeding was concluded at 4:13 p.m. on June 26, 2023.)

Page 272

REPORTER'S PAGE

I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, (CCR #2017002), Registered Professional Reporter (RPR #970346), the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the record:

That due to the interaction in the spontaneous discourse of the proceeding, double dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a transcription of proceedings, and that the double dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the parenthetical "(phonetic)";

That the parenthetical "(sic)" is used to denote when a witness stated a word or phrase that appears odd or erroneous to show that it was quoted exactly as it stands.

YOLANDA PENA, CCR, RPR

Page 273

REPORTER'S CERTIFICATE

I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, Registered Professional Reporter, and as the officer before whom this testimony was taken, do hereby certify that CHASE MICHAEL GODEAUX, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as set forth in the foregoing 272 pages.

I further certify that said testimony was reported by me in the Stenotype reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board and that I have been informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services.

I further certify that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions of the board.

I further certify that I am not an attorney or counsel for any of the parties, that I am neither related to nor employed by any attorney or counsel connected with this action, and that I have no financial interest in the outcome of this matter.

This certificate is valid only for this transcript, accompanied by my original signature and original raised seal on this page.

Prairieville, Louisiana, this 7th day of July, 2023.

_____
YOLANDA J. PENA, CCR, RPR
CCR NO. 2017002, RPR NO. 907346

