Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

MICHAEL DUNN

                          Civ. A. No.

vs.                      6:21-cv-05135

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, AND JOHN
DOE

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REMOTE VIDEOTAPED DEPOSITION OF
BRAD GUIDROZ

January 12, 2026

(Beginning at 9:32 a.m.)

Reported by:

Rita A. DeRouen, CCR, RPR
(CCR #2014018)
(RPR #006908)

**EXHIBIT O**



Page 2

REMOTE APPEARANCES:
REPRESENTING THE PLAINTIFF:
SIDLEY AUSTIN, LLP
787 Seventh Avenue
New York, New York  10019
212.839.5300
BY:  YU KYUNG KIM, ESQ.
eunice.kim@sidley.com

REPRESENTING THE DEFENDANT CITY OF EUNICE:

BECKER & HEBERT, LLC
201 Rue Beauregard
Lafayette, Louisiana  70508
337.233.1987
BY:  MICHAEL D. HEBERT, ESQ.
mhebert@lawbecker.com
BY:  JAMES DOHERTY, ESQ.
jdoherty@lawbecker.com

REPRESENTING THE LOUISIANA STATE POLICE:

DEPUTY GENERAL COUNSEL, LOUISIANA STATE POLICE
DEPARTMENT OF PUBLIC SAFETY
OFFICE OF LEGAL AFFAIRS
7979 Independence Boulevard, Suite 307
Baton Rouge, Louisiana  70896
225.922.2312
BY:  JOSEPH OUBRE, ESQ.
joseph.oubre@la.gov

REPRESENTING THE DEFENDANT VICTOR FONTENOT:

STAMEY LAW FIRM, LLC
727 Second Street
Natchitoches, Louisiana  71458
318.951.1024
BY:  JOSEPH B. STAMEY, ESQ.
joe@stameylawfirm.com

Page 3

REMOTE APPEARANCES:  (CONTINUED)
REPRESENTING THE DEFENDANT RYAN YOUNG:

NEUNER PATE
1001 West Pinhook Road, Suite 200
Lafayette, Louisiana 70503
337.272.0348
BY:  JASON T. REED, ESQ.
jreed@neunerpate.com

Also Present:
  Bob Odell, Videographer
  Lauren Sylvest, Becker & Hebert

Reported by:
Rita A. DeRouen, Certified
Court Reporter No. 2014018
in and for the State of
Louisiana

Page 4

I N D E X

                                    Page
Stipulation                          5
Reporter's Page                     58
Reporter's Certification            59

EXAMINATION

  By Ms. Kim                         7

(No exhibits marked.)

Page 5

S T I P U L A T I O N

    It is stipulated and agreed by and between counsel that the testimony of the witness, BRAD GUIDROZ, is hereby being taken pursuant to Notice under the Federal Rules of Civil Procedure for all purposes permitted under law.

    The witness reserves the right to read and sign the deposition. The original is to be delivered to and retained by YU KYUNG KIM, ESQ., for proper filing with the Clerk of Court.

    All objections, except those as to the form of the questions and/or responsiveness of the answers, are reserved until the time of the trial in this cause.
                    * * *

    Rita DeRouen, Certified Court Reporter in and for the State of Louisiana and Registered Professional Reporter, officiated in administering the oath to the witness.



Page 6

THE VIDEOGRAPHER:

We are now on record.  This begins Media 1 in the video deposition of Brad Guidroz in the matter of Michael Dunn versus Randy Fontenot, et al., in the United States District Court for the Western District of Louisiana, Civil Action Number 6:21-cv-01535.

Today is January 12, 2026, and the time is 9:32.  This deposition is being taken virtually at the request of Sidley Austin.

The videographer is Bob Odell of Magna Legal Services, and the court reporter today is Rita DeRouen of Magna Legal Services.

And all counsel present will be stated on the stenographic record.

And will the court reporter please swear in the witness, after which we'll begin questioning.

BRAD GUIDROZ, having been first duly sworn, was examined and testified as follows:

Page 7

EXAMINATION

BY MS. KIM:

Q.  Well, good morning.  My name is Eunice Kim, and I'm an attorney at Sidley Austin, LLP, and I represent Lieutenant Michael Dunn in this matter involving the City of Eunice, Victor Fontenot, and Ryan Young.

Could you please state your full name for the record.

A.  Yes, ma'am.  Brad Guidroz.

Q.  And how would you like to be referred to?

A.  Mr. Guidroz is fine.

Q.  Mr. Guidroz, okay.

A.  Brad is fine, yes, ma'am.

Q.  Mr. Guidroz, have you ever been deposed before?

A.  I have not.

Q.  Have you ever given sworn testimony before outside of a deposition context?

A.  I have.

Q.  In what -- what context is that?

A.  Criminal cases, criminal court.

Q.  So I just want to go over a few ground rules before we get to the questions specific to

Page 8

this litigation.  So you'll be testifying under oath, and your answers will be subject to the penalty of perjury.

Do you understand that?

A.  I do.

Q.  And your statements here today have the same effect as though they were given in a court of law.

Does that make sense to you?

A.  Yes, it does.

Q.  And I'm going to ask you a series of questions.  If you don't understand a question, could you please ask for clarification; otherwise, I will assume you understood it.

A.  Okay.

Q.  Great.

And please provide verbal answers to all questions.  The reporter -- it's mostly for the reporter, who can't pick up head nods.

Is that -- is that okay with you?

A.  Yes, ma'am.

Q.  And if at any time you want a break, you can ask for one.  The only thing I ask is that if there's a question pending, that you answer that question before taking a break.

Page 9

Do you understand that?

A.  I do.

Q.  Great.

And it's easier for the court reporter if we don't interrupt each other.  So I would appreciate if you'd wait to let me finish a question, and I'll do my best to let you finish your answers.

Does that sound good?

A.  Yes, ma'am.

Q.  Great.

Is there any reason why you'll be unable to testify truthfully and completely today?

A.  No, ma'am.

Q.  Mr. Guidroz, do you know what this case is about?

A.  I do.

Q.  What is your understanding of this case?

A.  A civil action brought by Lieutenant Dunn against the City for different grievances.

Q.  And what, if anything, did you do today -- did you do to prepare for today's deposition?

A.  I read the complaint.

Q.  Did you review any other documents?



Page 10

A. Only an email that I had sent when I first learned of this incident.

Q. And who was that email sent to?

A. My supervisors and our legal -- our legal section.

Q. Did you bring any documents or notes to today's deposition?

A. No, ma'am.

Q. And did you speak with anyone else besides your counsel about today's deposition?

A. I've spoken to coworkers.

Q. Have you ever been a plaintiff or a defendant in a lawsuit?

A. I don't think I have.

Q. And, for the record, are you represented here by counsel today?

A. Yes, I am.

Q. Mr. Guidroz, could you tell us about your educational background.

A. I have a bachelor's degree in applied life sciences from the University of Louisiana at Lafayette. It's actually general studies with a concentration in applied life sciences, to be technical.

Q. And besides that degree and

Page 11

certification, do you have any other professional certifications or licenses?

A. Licenses, I'm a private pilot. Other than that, that's it.

Q. And what was your first job out of college?

A. So my first job was as a wildlife enforcement agent for the Louisiana Department of Wildlife & Fisheries.

Q. And after that?

A. Trooper with Louisiana State Police.

Q. And was your next job the -- did you join the Louisiana State Police after that?

A. Yes. So I worked for the Department of Wildlife & Fisheries from 2001 to 2006; and 2006 to present, I've been employed with -- by Louisiana State Police.

Q. And would you mind if I sometimes refer to the Louisiana State Police as LSP?

A. Yes, that's fine.

Q. When you began -- when you first joined the LSP, what was your role or responsibility?

A. Out of training academy, I reported to the patrol division.

Q. And how long were you in that position?

Page 12

A. Until about April of 2008, so about two years.

Q. And could you describe your responsibilities in that position.

A. Sure. Traffic enforcement and traffic crash investigation.

Q. And what was your next position in LSP?

A. My next position was assigned to the bureau of investigations in the narcotics division.

Q. And who did you report to in that position?

A. Sergeant Harold Jean Batiste.

Q. And did you have anyone reporting to you?

A. No.

Q. And then after bureau of investigation in narcotics, what was your next position?

A. So, essentially, I've been in the bureau of investigations from that point to present. I've worked in different divisions of the bureau of investigations. From narcotics, I worked in the insurance fraud and auto theft unit.

Q. And is that where you are currently?

A. No, ma'am.

Page 13

Q. Which division are you in?

A. I am currently in the criminal investigations division, or CID.

Q. And could you briefly describe what your job responsibilities are in that position?

A. Right now I'm the executive officer, so responsible for inventory and, you know, doing certain projects for our commander, administrative work, basically, paying the bills at the office and doing the administrative work to keep our division running.

Q. Mr. Guidroz, have you ever been employed by the Eunice Police Department?

A. No, ma'am.

Q. Have you ever been employed by the City of Eunice?

A. No, ma'am.

Q. Does the Louisiana State Police --

A. I'm sorry, I was turning. Go ahead.

Q. Does the LSP investigate misconduct by local police departments?

A. We do.

Q. And could you give that -- give me some examples of the types of misconduct that the Louisiana State Police investigates within the

Page 14

local police departments?

A.   Excessive force complaints, in-custody deaths, thefts.

Q.   Is it possible for police misconduct to potentially jeopardize an investigation?

A.   Can you repeat that?

Q.   Do you think it's possible for instances of police misconduct to potentially jeopardize an investigation?

MR. OUBRE:

I'm going to object.  That calls for speculation on his part.  You're asking him to speculate a hypothetical situation.

BY MS. KIM:

Q.   Mr. Guidroz, you can answer that.

A.   Is it possible, yes.

Q.   And would you agree that, for example, a local police department officer that operates outside of his or her jurisdiction would constitute misconduct?

MR. OUBRE:

Objection; calls for a legal conclusion.

Page 15

MR. STAMEY:

Object to form.

MR. REED:

Join in.

MR. STAMEY:

I'll also join in that objection, Joe Stamey.

MR. REED:

Yeah, same thing.  I'm being repetitive, but if you didn't get it, I joined, Jason Reed.

BY MS. KIM:

Q.   Mr. Guidroz, unless you're specifically told by your counsel not to respond to a question, you should respond.

A.   Can you ask me the question again?

Q.   Would you agree, for example, a local police department officer operating outside of his or her jurisdiction would constitute misconduct?

A.   Without the approval of -- or any kind of permissions or permission from another agency, is what you're asking me?

Q.   Yes.

A.   Yes.

Q.   So who in -- who at the LSP handles

Page 16

these kind of investigations of police misconduct?

A.   Well, our criminal investigations division handles that.

Q.   And so -- and that's the division in which you are currently in?

A.   Yes.

Q.   And are there any written LSP policies or procedures that relate to how to respond to complaints of misconduct in local police departments?

A.   We have a policy manual, yes.

Q.   And what is a typical process for when the LSP receives a complaint of police misconduct?

A.   What is the typical what, ma'am?

Q.   A typical process when the LSP receives a complaint of police misconduct.

A.   Well, we get complaints from multiple ways, right.  And sometimes the agency head will call with the complaint, other times the public will call with complaints.  Sometimes officers within will call with complaints.

So the way I've done business with this in the past has been, if someone calls that is not the agency head, we give the agency head a notification and a phone call or we have a

Page 17

conversation to determine whether that agency is actively investigating that complaint themselves or not.

Q.   And just to clarify, so if -- you said that a complaint can also come from an officer within the police department, am I --

A.   Yes, ma'am.

Q.   -- saying that correctly?

And so in that case, would -- would you say you would notify the agency head of the complaint?

A.   It all depends on the nature of the complaint, who the complaint is on.  You know, every situation is unique.

Q.   And what -- what type of situation would the agency head not be notified?

A.   If there's substantial evidence that the agency head is involved in a criminal -- in a crime, you know, if the agency head is the target, obviously, we wouldn't contact the agency head, given, you know, adequate evidence.

Q.   Okay.  If the agency head of the police department tells you that they would prefer to handle a complaint through internal local channels, does LSP typically defer to that

MAGNA
LEGAL SERVICES

Page 18

decision?

A. Yes, if the agency head wants to investigate their own issue, we allow them to clean up their own house, so to speak, you know, to handle their complaint if they want to handle it. We won't do a simultaneous complaint, or investigation, rather.

Q. And going back to my previous question about notifying the agency head about the complaint, does that notification also include -- provide information about the identity of the complainant?

A. All depends on the complaint that's lodged and filed.

Q. So at the -- just so the record is clear, if the alleged misconduct involves the agency head, would there be notification to the agency head about the complaint?

A. If there's evidence that the agency head is involved in the investigation, we would not notify the agency head, if there's evidence of that.

Q. Mr. Guidroz, during your time at LSP, did you ever work on an investigation of a local police department's misconduct?

Page 19

A. Yes.

Q. How many?

A. I mean, we -- multiple. I can't give you a number, to be honest with you.

Q. Would you say, I mean, ballpark, more than 50?

A. I mean, are you talking about excessive force complaints or investigations, or are you talking about -- what kind of complaints are you talking about?

Q. Just generally, you know, any allegations of misconduct within a police department.

A. The office that I am employed at, we work, on average, about ten officer-involved shootings a year, so there's those. And I've been in that division for ten years or more. So there's -- we've worked, you know, quite a few investigations on police officers.

Q. And what is your role in these types of investigations?

A. I mean, if we're the -- I don't understand your question, ma'am. What is our role for the lead agency, what is our role?

Q. Yes. So, you know, do you work with a

Page 20

local police department in the course of the investigation, for instance?

A. Sure. There's plenty of times where we need information that that agency has in-house, so we typically have a liaison that we work with, you know, within the agency.

Q. So switching gears a little bit, I'm going to ask you some questions that are not specific to investigations of misconduct by police departments.

So does LSP -- does LSP generally collaborate with local police departments?

A. Yes.

Q. And what types of things do you collaborate with the local police departments on?

A. We work task force-type, you know, situations with other agencies. We assist other agencies with, you know, investigations that they ask us for help on regularly.

Q. Does the LSP have a policy that applies when it observes local police misconduct in the course of an investigation?

A. We have a policy manual, but, you know, we -- I don't know what that policy manual says talking to you right now, I'd have to pull it up.

Page 21

Are you asking if we have a policy about helping other agencies or working other investigations?

Q. So specifically about, you know, a policy that would inform how you would respond if, in the course of an investigation you, you know, come -- you determine or you observe instances of police misconduct?

A. We have a policy about if we observe it, we have a duty to intervene type policy, yes.

Q. And outside of the policy, what would -- what is a typical practice that would be applicable -- that would be applicable when you observe these instances of police misconduct in the course of an investigation?

A. I'm sorry, I don't understand what you're asking. So what typical -- can you repeat that, please?

Q. Sure.

So in the course of an investigation, you observe -- if you do observe local police misconduct, what would your response be? What would you do in that instance?

A. Well, we would continue our investigation. We would do -- likely do, you

**MAGNA**
LEGAL SERVICES

Page 22

know, a little more interviewing. We would consult with our local district attorney.

Every case, it depends. This is not cook -- you know, police investigations like what you're talking about are not -- they're not all the same, every one is a little different. So there's -- you can't approach every single one the same way.

Q. Would that -- would your response also involve notifying the chief of the local police departments?

A. It depends. If it's an employee of his agency, we would certainly give him the courtesy of him knowing that we were investigating an officer of his agency if we had no evidence that he's involved himself or herself.

Q. And, Mr. Guidroz, have you ever worked on a case with the Eunice Police Department?

A. Yes.

Q. And just for ease of reference, I'm going to refer to Eunice Police Department with the abbreviation EPD.

Is that okay with you?

A. Sure. Yes, ma'am.

Q. Okay. How many cases would you say you

Page 23

worked on with the EPD?

A. So I can't tell you a number. I've been in the bureau of investigations for, I'm guessing, around 18 years, maybe a little less. So there has been numerous, you know.

For quite a long time, I've been working with the Eunice Police Department and all the agencies in our area of responsibility, so I can't give you an exact number, but it's several.

Q. And what is your opinion of the EPD?

MR. OUBRE:
Objection to relevance on opinion of the EPD.

MR. REED:
Join.

MR. STAMEY:
This is Joe Stamey. I join in that objection.

BY MS. KIM:

Q. Mr. Guidroz, you can respond.

MR. OUBRE:
No, I'm telling him not to. Opinion -- he's not here -- he's not an expert, his opinion on EPD.

Page 24

BY MS. KIM:

Q. Do you think the Eunice Police Department -- are you aware of Eunice Police Department's reputation in the law enforcement community?

A. What reputation is that?

Q. Does -- are you aware of Eunice Police Department's reputation in the law enforcement community?

MR. OUBRE:
Objection to the question. It doesn't say what the reputation is. Objection.

BY MS. KIM:

Q. Do you believe that the Eunice Police Department has a positive reputation?

A. I believe the Eunice Police Department is an agency just like all the other small agencies. I mean, they have -- it depends on who's talking about the agency.

Some people are not happy with the agency because they've been arrested. Some people are happy with the agency because they're serving their community well. I've heard pros and cons of that agency and a lot of agencies.

Page 25

Q. Did you receive any complaints about the Eunice Police Department?

A. We've worked several officer-involved shootings involving the Eunice Police Department and use-of-force cases.

Q. And who did those complaints come from?

A. From the chief of police.

Q. Did you receive any complaints about Eunice Police Department from anyone else?

A. I mean, I've talked to Lieutenant Dunn on the telephone about the Eunice Police Department, if that's what you're asking me, yes, ma'am.

Q. And could you tell me what you discussed with Lieutenant Dunn about his complaint?

A. Yeah. He had a complaint about some things at the police department. Some of the things he explained to me were what he described as civil rights violations.

Q. What were the civil rights violations that he was complaining about?

A. He talked about -- one of the things that he told me was that he felt that agents in the office were threatening his life, and he also reported on a battery, made a battery complaint

MAGNA
LEGAL SERVICES

Page 26

against an officer.

Q. And were these separate complaints or was this just different, multiple complaints?

A. Separate complaints.

Q. Just taking the first complaint, the threats to his life, which officers was he complaining about?

A. I don't know which officer he was complaining about, I don't remember. What I remember about that is that he was giving me very vague information and nothing very detailed, nothing that was actionable.

Q. And so did the -- what did LSP do once Lieutenant Dunn brought it to your attention with respect to that?

A. So in our conversation, I explained to him that what he was describing to me were civil rights violations, and I referred him to the FBI for that.

Q. Now going to the second complaint that you referred to, the report on a battery, is that -- was that a complaint involving an allegation of an officer punching someone in the lobby that he was arresting?

A. Yeah, I don't know if it was in the

Page 27

lobby --

MR. STAMEY:

Objection. Objection to the leading nature of that question. Subject to that objection, you may answer. I want to preserve my objections and rights throughout.

MR. OUBRE:

Can you ask it again.

BY MS. KIM:

Q. The complaint about the -- about the battery, did that involve an officer punching someone in the lobby that he was arresting?

A. It was -- I don't know if it was in the lobby. It was at the police department. And, yes, it was involving a suspect who spit on an officer, and the officer struck the suspect.

Q. And who was the officer?

A. I don't remember.

Q. And do you recall who the victim was?

A. I don't.

Q. And what did LSP do once Lieutenant Dunn brought this complaint to your attention?

A. Well, we asked Lieutenant Dunn to come in for an interview, we interviewed other

Page 28

officers, we interviewed the person who spit on the officer, and then once we got to the point where we knew what we knew, we consulted and advised the chief of police of all the things that we learned.

Q. So you said you asked Lieutenant Dunn to come in for an interview. Was an interview ever conducted?

A. Never interviewed Lieutenant Dunn. He didn't come into the office. He didn't -- as -- my memory is that he didn't cooperate with the investigation. One of our sergeants was trying to line up that interview and it never happened.

Q. Why did -- why did Lieutenant Dunn -- did Lieutenant Dunn say he did not want to be interviewed?

A. I don't know what he told Sergeant Billingsley, but I know what was reported to me was that he was not interviewed.

Q. And you also mentioned that you interviewed other officers. Who were the other officers that were interviewed?

A. I don't remember who all was involved. I know other interviews were done.

Q. And what was the outcome of this

Page 29

investigation?

A. We had -- we had a victim who did not want to be a victim, the guy who was struck by the police officer. And so, at that point, we consulted with the chief of police and he -- he wished to handle it as an in-house administrative investigation, so we closed our criminal investigation and he handled it in-house administratively.

Q. And when -- when a matter gets handled in-house, does the LSP get any updates or know what ultimately happened with that investigation?

A. No, ma'am. I mean, we would not. We wouldn't go asking.

Q. But besides the two complaints that you had mentioned, are there any other complaints that you recall happening -- receiving from Lieutenant Dunn?

A. From Lieutenant Dunn, no, ma'am, I don't remember anything else.

Q. Mr. Guidroz, how would you describe your relationship with Lieutenant Dunn?

A. I don't -- I don't know Lieutenant Dunn. I know that our office -- at the time, my office, investigative group, investigated use-of-force or



Page 30

officer-involved shootings in which he was a part of, so I'm sure he's come to our office. But I don't know him or have a relationship with him.

Q. So just so I'm clear, you never worked directly with him?

A. Not that I remember, no, ma'am.

Q. You mentioned you spoke to Lieutenant Dunn on the phone. Had you ever exchanged any text messages with Lieutenant Dunn?

A. No, I don't -- I don't -- I don't have Lieutenant Dunn's number.

Q. What is your opinion of Lieutenant Dunn's abilities as a police officer?

A. I don't have an opinion of him as a police officer. I haven't worked with him, you know, much at all.

Q. Do you know former EPD Chief Randy Fontenot?

A. I know of him, yes.

Q. How would you describe your relationship with him?

A. Professional. He was the chief of police and I was the CID lieutenant at the time. So we spoke on the phone mainly. I've been there to inform him of investigations such as

Page 31

officer-involved shootings, give him an update on where we were on things. But other than that, it's strictly professional.

Q. And have you -- has he ever talked to you about Lieutenant Dunn?

A. Yes.

Q. In what context?

A. He made a complaint with me about Lieutenant Dunn.

Q. Could you tell me the details of that complaint?

A. Yes. So Chief -- Chief Fontenot was concerned that Lieutenant Dunn was leaking information from inside of the department on a -- on some narcotics case.

Q. And after receiving that complaint, what did LSP do in response?

A. We did an inquiry. So the complaint the chief lodged, coincidentally, we were working a narcotics investigation that ran the same circles that he was claiming Lieutenant Dunn was involved in. And we looked at phone tolls and things that we had access to at the time and looked for Lieutenant Dunn's telephone number on the records that we already had in hand.

Page 32

Q. And what was the outcome of that?

A. There was no evidence that Lieutenant Dunn was calling the people that he was alleged to have been communicating with.

Q. Have you ever spoken to Randy Fontenot about this litigation?

A. No.

Q. I'm sorry, just going back to the complaint that Chief Fontenot had about Lieutenant Dunn, do you recall when that complaint was made?

A. No, ma'am, I don't. It was around the same time that I received Lieutenant Dunn's complaints. So it was right about the same time, is all I can remember.

Q. Understood.

And was this on the phone or in person?

A. We spoke over the telephone.

Q. Do you know if there was anyone else in the conversation that was in -- or was it just between you and Randy Fontenot?

A. That conversation?

Q. Yes.

A. That conversation, as far as I know, was just me and Chief Fontenot.

Q. And how many times did you speak to

Page 33

Chief Fontenot about that complaint?

A. I don't know. I know when he first gave me the complaint for sure and then when I called to tell him that we did an inquiry and we found no evidence, so at least two.

Q. Mr. Guidroz, do you know Victor Fontenot?

A. I've heard his name. I don't know him.

Q. In what context have you heard his name?

A. Working narcotics cases with the -- so what you need to understand is that, at this time, I was the lieutenant over detectives and narcotics. So the narcotics guys, agents and sergeant, reported to me, as did the detectives and detective sergeant.

So I'm familiar with Victor's name through our narcotics work with that group, working with the Eunice Police Department.

Q. So you have not worked with him directly; is that correct?

A. No, ma'am. I don't know him. If I've seen him somewhere, I don't know that he's Victor Fontenot. I don't know him.

Q. Got it. Thank you.

And so -- and just so the record is

MAGNA
LEGAL SERVICES

Page 34

clear, and you don't believe you've ever spoken to him either?

A.  No, ma'am, I don't think I've ever spoken to Victor Fontenot.

Q.  Do you know Ryan Young?

A.  Yes.

Q.  Would you please describe your relationship to Mr. Young.

A.  Ryan Young and I have been working together for most of my time in the bureau of investigations.  He's a trusted source of information for me at the Eunice Police Department and a coworker and he's -- for many years he's served as my go-to guy for anything we needed at the Eunice Police Department.

Q.  Do you recall when you first met Ryan Young?

A.  I don't.

Q.  And how often would you say you have direct contact with him?

A.  I talk to Ryan nowadays maybe three times a year.

Q.  Do you just have professional contact with him or do you also have -- you know, do you two socialize?

Page 35

A.  Professional.

Q.  Do you think Mr. Young does a good job as a police officer?

MR. REED:
Object to form.

MR. STAMEY:
Same.

MR. HEBERT:
Objection as well.

BY MS. KIM:

Q.  Do you need me to repeat the question?

A.  What's your question?

Q.  Do you think Ryan Young does a good job as a police officer?

A.  Ryan Young has never done anything to make me question his integrity, if that's what you're asking.

Q.  So I'll take that as a yes.

Has he ever -- has Mr. Young ever talked to you about Lieutenant Dunn?

A.  Yes.

Q.  And could you -- do you recall what you spoke about?

A.  I mean, we've talked about these office -- Lieutenant Young was involved in at

Page 36

least two officer-involved shootings, so, you know, we've talked about that.  Ryan was our liaison with that agency on those cases, so we -- you know, we've talked about him in that context.

Q.  Okay.  So what was the relevance -- so you mentioned Lieutenant Young was involved in at least two officer-involved shootings.

What was the reference to Lieutenant Dunn with respect to those shootings?

MR. REED:
Object to the form.

A.  Can you ask me again, Ms. Kim?

BY MS. KIM:

Q.  Yes.

So we had talked earlier about whether -- I had asked you earlier about whether Lieutenant Young -- is that the -- ever talked to you about Lieutenant Dunn, and you mentioned that Lieutenant Young was involved in at least two officer-involved shootings.  So I'm just trying to understand the relevance.

A.  Sure.  So when a -- we investigate a case like that, we have to have someone in the agency that we can talk to about, you know, records.  You know, sometimes we need -- we need

Page 37

evidence, right, video evidence, things like that.  So, I mean, we talked about that stuff, you know, collecting the evidence we need in our investigations.

Q.  Has -- so besides these two officer-involved shootings, has Lieutenant Young ever spoken about Lieutenant Dunn in other instances?

A.  Well, I've called him and asked about -- you know, I called and asked about it, if this thing was still going on, you know, because when I received the subpoena, I was quite surprised that -- because so many years have passed, that this case was still going on.  So I called and asked if this was and he said, yes, it was.

Q.  So that was pretty recent?

A.  That was recent, yes.

Q.  Were there any other prior communications you had with Lieutenant Young about Lieutenant Dunn or about this litigation?

A.  I don't remember anything or anything about that.

Q.  And so speaking about the subpoena and the lawsuit, when did you become aware of the lawsuit?

Page 38

A.  I don't know the exact date, but I became aware of it from a news article that came out on KATC TV3.  So I don't know the date, but it was several years ago.

Q.  Just so I understand, so you heard about the case from a news article?

A.  Yes.  I saw a news article and I read about it there.

Q.  After you read about it, did you do anything in response to learning about the lawsuit?

A.  Sure.  I read the petition that was online and then I notified my supervisors and also LSP's legal section.

Q.  How did you find the petition?

A.  It was attached to the news article. Yeah, so I -- so basically, I found it, I read it, I followed our protocol, which is to notify our supervisors.  Because if I -- if I remember correctly, it said the words "Louisiana State Police" in that -- in that document.

And I'm calling it a petition.  Whatever the legal document was that was assigned -- that was attached to the news article.

Q.  And have you discussed the lawsuit with

Page 39

anyone from EPD besides who we've just spoken about?

A.  No.

Q.  Okay.  And, Mr. Guidroz, are you aware of Lieutenant Dunn reporting misconduct at the EPD to other law enforcement agencies?

A.  I know that he's reported it to FBI, because when I called them -- I did our due diligence, which is when I told him that he needs to report civil rights violations to FBI.  I picked up the phone and I called the FBI myself just to ensure that they were notified, and when I did, I was -- I was informed that they had spoken to him about this.

Q.  And just so I have it clear, is that in relation to his complaint about the threats that he received?

A.  Threats, and he alleged some use of force in the agency, but I don't know the details of that because he was very vague with that when he talked to me about it.  So he wouldn't give any details or anything that was actionable for us.

So I don't know the specifics about what he was talking about, I just referred him that if he had civil rights violations, that he should

Page 40

contact the FBI, which sounds like he did.  And I followed up and made -- and I was told he absolutely did.

Q.  And the allegation of use of excessive force, do you recall sort of the nature of the conduct that he was complaining about?

A.  No, ma'am, I don't.

Q.  So besides -- besides the FBI, are you aware of any other agencies, law enforcement agencies, that Lieutenant Dunn reported misconduct to?

A.  The only -- only the agencies listed in the documents that I read in the amended complaint and that's it.

Q.  Okay.  Mr. Guidroz, if there is a trial in this case, would you plan to testify, if asked?

A.  If I get a subpoena to testify, yes, ma'am, I would testify.

Q.  Then you mentioned talking to Mr. Young about the deposition, correct?

A.  Uh-huh.

Q.  And then you also spoke to -- you just told your other colleagues at the LSP about the deposition?

A.  About this deposition, yes.  I talked to

Page 41

Walter Mire and my supervisor.

Q.  And what did you discuss exactly about the deposition with Walter Mire?

A.  Just -- just -- I mean, he told me (audio distorted).

THE COURT REPORTER:
I'm sorry.  This is the court reporter.  That was distorted for me on my end.  Could you repeat your answer? Something with the audio.

THE WITNESS:
Yes, ma'am.

A.  Walter Mire was one of my subordinates. And he told me that he had gotten a subpoena for a deposition in this case.  And so I kept up with him, you know, leading up to it.  And after -- after -- you know, the day he went and afterwards, we talked about it.

BY MS. KIM:

Q.  And then you recently told him that you had received a subpoena for a deposition?

A.  Yes.

Q.  And you said you spoke to your supervisor.  What did you discuss with your supervisor about this?



11 (Pages 38 to 41)

Page 42

A.  I told my supervisor that I was going to be reaching out to our legal section and notified him that I had a subpoena.  And then I shared the information from the email that I initially wrote when I found the KATC article, right.  So I initially told my supervisor back then, so I shared that information with my sup -- my current supervisor.

Q.  And going back to your conversation with Lieutenant Young, so my understanding there is you -- you asked him is this case still going on, and that was the extent of your conversation with him?

A.  Yes.  I asked if it was still going on. I mean, that's the extent of the conversation.

MS. KIM:
Could we take a five-minute break?
MR. OUBRE:
Sure.
THE VIDEOGRAPHER:
The time is now 10:20, going off video record.
(A break was taken.)
THE VIDEOGRAPHER:
The time is now 10:30, we're back on

Page 43

video record.
BY MS. KIM:
Q.  Mr. Guidroz, did you speak to your counsel during the break?
A.  Yes.
Q.  What did you speak about?
A.  Not about this -- this deposition.  Just about the temperature in the room, honestly.
Q.  How is the temperature?
A.  It's feeling better now that the heater is on.
Q.  Great.  My office actually is -- tends to get way too hot.
Okay.  Well, Mr. Guidroz, I just wanted to kind of go back to what you were talking about earlier about the complaints that you received from Lieutenant Dunn.
So the first complaint about the -- what you referred to as civil rights violations, do you recall when that was, when the complaint you received was?
A.  No, ma'am.  So, I mean, I don't remember a ballpark.  I know that it was around the time that he was calling with complaints against the chief and the chief was calling with that

Page 44

complaint against him.  I don't know the time frame.
Q.  Okay.  So you don't know like, ballpark, a year of when that may have been?
A.  No, ma'am, I don't.  It would be ball -- I don't know.
Q.  Okay.  And just so the record is clear, the allegations that Lieutenant Dunn brought to your attention about the threats to his life, do you recall who he was alleging made those threats?
A.  He didn't tell me -- I don't remember him saying who made the threats.  It was -- he told me that in a very vague way as well, and just that when I questioned him about if anyone had taken any steps, you know, in furtherance of that -- of any kind of statement he may have heard, I didn't get anything from him that was actionable that we could follow up on.
Q.  And did he tell you what the threats were?
A.  No, he didn't tell me what the threats were.  He just told me that he felt like people in the department were trying to hurt him, or trying to kill him, is what he said.
Q.  And you mentioned that you referred

Page 45

Lieutenant Dunn with respect to that complaint to the FBI?
A.  Yes.
Q.  Is that correct?
A.  Yes, ma'am.
Q.  Did you -- did you report that complaint to anyone else at LSP?
A.  I always report things like this up my chain of command to the supervisor in our regular meetings.  (Audio distorted).
THE COURT REPORTER:
I didn't hear the last sentence.
THE WITNESS:
In our -- in our regular meetings, our weekly meetings.
THE COURT REPORTER:
Thank you.
BY MS. KIM:
Q.  And did you inform anyone at EPD about the complaint that Lieutenant Dunn made?
A.  I don't -- not that I remember.
Q.  Do you remember speaking to Randy -- Chief Fontenot about that complaint?
A.  No, I don't remember having that conversation with Chief Fontenot.

MAGNA
LEGAL SERVICES

Page 46

Q.   What about the Ryan Young?

A.   I don't remember having the conversation with Ryan Young.  If I would have asked anybody at that agency for any kind of -- you know, any kind of information or evidence about that, it would have been Ryan, but I don't -- I don't remember having a conversation with Ryan.

Q.   And then just going on the second complaint, the battery complaint, you mentioned -- so reading from the transcript here, you said you got to the point where we knew what we knew, and you advised the chief of police of all the things that we learned.

And then I understand that the chief of police informed you that they wished to handle it in-house.

Am I summarizing your testimony correctly?

A.   What we did was we had the guy who was struck by the police officer, he told us that he didn't want to pursue any charges and he -- you know, he wanted -- you know, he didn't want to be a victim in this thing.

We advised the chief of police of that and we asked him, Do you want us to continue the

Page 47

criminal investigation or do you want to handle it in-house administratively?  And he chose to handle it in-house administratively.  We were doing this criminal investigation at his request.

Q.   Who's the "he"?

A.   Chief of Police Fontenot.

Q.   But the complaint was originally brought by Lieutenant Dunn?

A.   Lieutenant Dunn made the complaint to his agency, and then the chief of police requested that we investigate it.

Q.   Okay.  Just so -- just so I'm clear, you said that Lieutenant Dunn made the complaint to his agency.

So are you referring -- do you mean here that Lieutenant Dunn made the complaint to the EPD?

A.   Lieutenant Dunn made the complaint to the Eunice Police Department, yes.

Q.   Okay.  And at what point did Lieutenant Dunn raise this matter to you?

A.   I don't remember at what point.  I mean, I know he -- he made the complaint.  If I remember correctly, it was his patrol shift.  He was the shift supervisor.

Page 48

Q.   And he spoke to you directly about this complaint?

A.   I don't know that he spoke to me directly.  I know that -- I just -- I know that it was referred -- I was notified about it because he brought it forward.

Q.   And how did you come to be notified about this complaint?

A.   That complaint -- I don't remember -- I don't remember exactly.  But, at some point, Eric Duplechain, which was our patrol captain at the time -- Eric was contacted by, I think, I'm not sure on this, I think Randy Fontenot contacted Eric and then Eric told him that that is a CID matter, which then I got contacted.  And the investigation was done at the request of the chief of police as the agency head.

Q.   And with respect to the first complaint about the civil rights violation, but that you received directly from Lieutenant Dunn?

A.   I received that directly from Lieutenant Dunn.  I advised him to contact the Federal Bureau of Investigation.  I followed up with the FBI and they had -- they had spoken to him about his complaint.

Page 49

Q.   Okay.  With respect to -- I apologize for the back and forth.  But with respect to the battery investigation, did you speak with anyone else at EPD about their investigation?

A.   Not that I remember.

Q.   Did you speak to Ryan Young about this investigation?

A.   I mean, we (audio distorted).

THE COURT REPORTER:
Sorry, the audio is cutting out again.

A.   Ryan Young was typically our liaison for anything we needed for an agen -- from Eunice Police Department when we would do an investigation like this.  So have I talked to Ryan about this, probably so, yes.

BY MS. KIM:

Q.   And what would you discuss when -- if you were to speak to Ryan Young about this investigation?

A.   Collection of evidence, basically if we needed video evidence or line up interviews, things of that nature.

Q.   Have you -- you mentioned Walter Mire before the break.  Did you -- have you spoken to



Page 50

Walter about Lieutenant Dunn?

A. Walter -- yes. Walter -- we spoke about this, you know, his subpoena and mine.

Q. And what did you discuss about the subpoena?

A. That we were having to come for a deposition, you know, because Lieutenant Dunn had a lawsuit against the City.

Q. And prior to the deposition -- outside of the depositions, did you -- have you ever spoken to Walter Mire about Lieutenant Dunn?

A. Yeah, I've asked Walter about how long Lieutenant Dunn has been employed by the police department. Walter worked at that police department years ago.

So we've had conversations about -- you know, I didn't know how long Dunn had been employed there, so he answered those questions.

Q. Have you ever spoken to Walter Mire about any of the complaints that Lieutenant Dunn had about police conduct at EPD?

A. Yes. Walter was in our CID group and has been as long as I've been there. So Walter would have been involved in anything that we had going on. Walter was my narcotics sergeant, and

Page 51

before I became the administrative lieutenant, he was my detective sergeant.

Q. We've spoken about several complaints that Lieutenant Dunn had about EPD. Which of those complaints did you speak to Walter about?

A. I've spoken to Walter about the battery one in the jail, in the office there. I've spoken to Walter about the narcotics complaint where the chief made a complaint against Dunn. And Walter has assisted in the officer-involved shooting investigations that Lieutenant Dunn was involved in.

Q. The -- so taking your last point about the officer-involved shooting investigation, what was Lieutenant Dunn's involvement in that -- in that incident?

A. There were two. He was the officer involved in both, two separate shootings several years apart. He was the shooting officer. We investigated the case and he was cleared in both incidents.

Q. Okay. And when you mean he was the shooting officer, he was the officer that initiated the shot?

A. Well, he -- so I don't -- we've worked

Page 52

so many of these, I don't exactly remember it. The first one, I know it was near the police department. I don't remember if Lieutenant Dunn was a shooter or a witness in that one.

And I know the second one he and a -- he and a trainee were shooters in the second one.

Q. I see, okay.

And for both these incidents, what were the outcomes?

A. We -- we had no probable cause that Lieutenant Dunn did anything excessive.

Q. Do you know Mayor Scott Fontenot?

A. No, ma'am.

Q. So you don't have any contact with him, any -- or acquainted with him at all?

A. I don't know who he is. If I've met him in passing, I don't remember.

MS. KIM:

I'm just going to take two minutes to just see if I have any more questions and then I'll be back shortly, if that's okay.

THE WITNESS:

Yes, ma'am.

THE VIDEOGRAPHER:

Page 53

The time is now 10:44, going off video record.

(A break was taken.)

THE VIDEOGRAPHER:

The time is now 10:47, we're back on video record.

BY MS. KIM:

Q. Mr. Guidroz, did you speak to your counsel during the break?

A. Yes, ma'am, I did.

Q. And what did you speak about?

A. I had a question for him about an address. I was -- I was served at my home, this subpoena, so I had a question about can I notify you guys that, you know, I am a public employee and I can give an address if you'll take it for any -- if there's any other service, legal service that needs to come to me, if I can get served at work and not at my home.

Q. We're happy to discuss it with your counsel offline.

A. Okay.

Q. Okay. Great.

Mr. Guidroz, we spoke earlier about, you know, LSP's policies or procedures about

**MAGNA**
LEGAL SERVICES

Page 54

responding to a complaint of misconduct in a local police department.

Do you recall that?

A.  Yes.

Q.  Okay.  So what I just wanted to clarify here is sort of what the typical process would be when you do receive a complaint of police misconduct.

Could you just sort of lay out for me what the general process is?

A.  Yes.  So typically if we get a complaint of police misconduct, right, so first thing I do is I hear the complaint, I notify my supervisors, and then we collectively make a decision based on information given whether the LSP will accept that investigation or not.  Sometimes we do, sometimes we don't.

Q.  And how do you normally get complaints?  Is it orally or are they written?

A.  Phone calls, written.

Q.  And what sort of factors do you take into account when determining whether or not to pursue a complaint?

A.  Whether there's any evidence associated with the complaint, anything that's actionable,

Page 55

you know, whether there seems to be any type of personal agenda behind the complaints.  Mainly if there's any evidence of any wrongdoing.

Q.  And you also mentioned that there is sometimes notification given to the agency head.

Is that the same as the chief of police?

A.  Yes.  Chief of police or sheriff or a marshal, you know, the agency head.  If we get a complaint of an employee of theirs, we give them the courtesy of knowing, you know -- again, without valid or actionable evidence that they're involved, we would give them a courtesy call to let them know that we've received the complaint, and we want to ask whether they've already initiated a criminal investigation themselves.

We won't do a simultaneous -- we're not going to investigate the same thing at the same time.

Q.  Okay.  So are there any exceptions to what you just told me about if an agency wants to handle a matter in-house, LSP won't do their own investigation?

A.  I'm sorry, can you clarify the question?

Q.  Yeah.  So what I understand is, if the agency wants to investigate an issue in-house, I

Page 56

understand from your testimony -- your testimony is that you will defer to that decision.

Are there any exceptions to that general rule?

A.  Certainly we would not notify the chief or the agency head, the sheriff or whatever agency it is, if there's credible evidence or any evidence that they're involved, you know, or any -- any credible actionable information that they're involved in the alleged complaint.

MS. KIM:

All right.  I do not have any further questions.  Thank you so much, Mr. Guidroz.

MR. HEBERT:

This is Michael Hebert on behalf of the City of Eunice.  We have no questions.

MR. REED:

This is Jason Reed for Ryan Young.  No questions.

MR. STAMEY:

Joe Stamey for Victor Fontenot, and I will have no questions at this time.  Thank you.

Page 57

MS. KIM:

Thank you, Mr. Guidroz.

THE VIDEOGRAPHER:

The time is now 10:52, that concludes this video deposition.

(END OF TESTIMONY AT 10:52 A.M.)



Page 58

REPORTER'S PAGE

I, RITA A. DEROUEN, Registered Professional Reporter (RPR #6908) and Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)";

That (sic) denotes when a witness stated word(s) that appears odd or erroneous to show that the word is quoted exactly as it stands.

RITA A. DEROUEN, RPR, CCR

Page 59

REPORTER'S CERTIFICATE

I, Rita A. DeRouen, Registered Professional Reporter (RPR #6908) and Certified Court Reporter (Certificate #2014018) in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that on January 12, 2026, in the above-entitled and numbered cause, the deposition of BRAD GUIDROZ, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 58 pages;

That this testimony was reported by me in stenographic shorthand, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board;

That I have acted in compliance with the prohibition on contractual relationships, as

Page 60

defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I am not of Counsel, nor related to any person participating in this cause, and am in no way interested in the outcome of this event.

Signed this 21st day of January, 2026.

RITA A. DEROUEN
Registered Professional Reporter
Certified Court Reporter

Page 61

WITNESS CERTIFICATION

I, BRAD GUIDROZ, the undersigned, do hereby certify that I have read the foregoing deposition taken on January 12, 2026, and it contains a true and accurate transcript of the testimony given by me:

(  ) No corrections.
(  ) With corrections as reflected on the Errata Sheet(s) prepared by me and attached hereto consisting of _____ pages.

_____
BRAD GUIDROZ

_____
Date

