The Deposition of

# VICTOR FONTENOT

In the Matter of

## MICHAEL DUNN

vs

## RANDY FONTENOT, ET AL

Taken On

## JULY 28, 2022



EXHIBIT P

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN OF LOUISIANA

MICHAEL DUNN,

CIVIL ACTION NO.

Plaintiff,        6:21-cv-01535

v.

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, and
JOHN DOE,

Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:
VICTOR FONTENOT,
TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE
ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,
CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

REPORTED AT THE LAW OFFICES OF:
KEAN MILLER LLP
600 JEFFERSON STREET, SUITE 1101
LAFAYETTE, LOUISIANA  70501

COMMENCING AT 9:05 A.M., ON JULY 28, 2022.

**2**

A P P E A R A N C E S

FOR THE PLAINTIFF:
SIDLEY AUSTIN LLP
(BY:  PETER J. MARDIAN, ESQ.)
(BY:  NORMAN M. HOBBIE, JR., ESQ.)
(BY:  AMIT BHATLA, ESQ.)
[VIA VIDEOCONFERENCE]
787 SEVENTH AVENUE
NEW YORK, NEW YORK  10019
(212) 839-5592
pmardian@sidley.com
nhobbie@sidley.com
abhatla@sidley.com
- AND -
KEARNEY LOUGHLIN, LLC
(BY:  KEARNEY LOUGHLIN, ESQ.)
602 BOULDER CREEK PARKWAY
LAFAYETTE, LOUISIANA  70508
(337) 534-8803
kearney.loughlin@gmail.com

FOR THE DEFENDANTS:
KEAN MILLER LLP
(BY:  CHELSEA GOMEZ CASWELL, ESQ.)
(BY:  MOLLY J. GUNNELS, ESQ.)
400 CONVENTION STREET, SUITE 700
BATON ROUGE, LOUISIANA  70802
(225) 387-0999
chelsea.caswell@keanmiller.com
molly.gunnels@keanmiller.com

**3**

A P P E A R A N C E S (Continued)

ALSO PRESENT:
MICHELLE RICKS, VIDEOGRAPHER
RANDY FONTENOT
MICHAEL DUNN

REPORTED BY:
YOLANDA J. PENA
CCR NO. 2017002, RPR
STATE OF LOUISIANA

**4**

I N D E X

PAGE
LIST OF EXHIBITS...................................5
STIPULATION.......................................6
EXAMINATION BY:
MR. MARDIAN..............................8, 337
MR. LOUGHLIN...............................302
MS. CASWELL...............................333
CERTIFICATE.....................................341

**5**

LIST OF EXHIBITS

Plaintiff No. 1.....................................32
    (DUNN_0000806,
    Eunice Police Department
    Offense Report, 8/17/18)

Plaintiff No. 2.....................................60
    (CityofEunice_Dunn_0001282,
    Interoffice Memorandum,
    1/28/21)
Plaintiff No. 3.....................................76
    (DUNN_0000141, Critical
    Incident Form, 1/30/19)
Plaintiff No. 4....................................114
    (CityofEunice_Dunn_0001330,
    Documents including
    Interoffice Memorandum,
    Re: Notice of Investigative
    Ruling, 10/3/19)

Plaintiff No. 5....................................140
    (CityofEunice_Dunn_0000156,
    Critical Incident Form,
    8/27/19)
Plaintiff No. 6....................................242
    (CityofEunice_Dunn_0001645,
    Statement of Victor
    Fontenot)

Plaintiff No. 7....................................270
    (CityofEunice_Dunn_0003515,
    Transcript of Probation
    Revocation Hearing)

**6**

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and among the parties that this deposition of VICTOR FONTENOT, is hereby being taken pursuant to the Federal Rules of Civil Procedure.

All formalities, excluding the reading and signing of the transcript by the witness, are hereby waived.

All objections, except as to the form of the question and responsiveness of the answer, are considered reserved until trial or other use of the deposition.

**7**

THE VIDEOGRAPHER: We're on the record. This is the video deposition of Victor Fontenot in the matter of Michael Dunn versus Randy Fontenot, et al. Today is Thursday July 28th, 2022, and the time is 9:05 a.m. This deposition is being -- taking place in Lafayette, Louisiana, at the request of Sidley Austin.

The videographer is Michelle Ricks of Magna Legal, and the court reporter is Yolanda Pena of Magna Legal Services.

Will counsel and all parties present state their appearances and whom they represent.

MR. MARDIAN: Peter Mardian from Sidley Austin on behalf of plaintiff, Michael Dunn. Joined with me in person is my colleague, Norman Hobbie, Junior, and my colleague Amit Bhatla via Zoom. I'd also note for the record that Lieutenant Dunn is also present today.

MR. LOUGHLIN: Kearney Loughlin on behalf of Michael Dunn.

MR. RANDY FONTENOT: Randy Fontenot, police chief for the city of Eunice.

**8**

MS. CASWELL: Chelsea Caswell and Molly Gunnels on behalf of all defendants, including deponent Mr. Victor Fontenot.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

* * *

VICTOR FONTENOT, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MARDIAN:

Q.   Good morning, Detective Fontenot. My name is Peter Mardian, and as I said, I represent Lieutenant Michael Dunn who has -- you will likely know, has filed the lawsuit against you, the City of Eunice, Randy Fontenot, and Ryan Young.

Have you ever been deposed before?

A.   No.

Q.   Have you ever testified in trial before?

A.   Yes.

Q.   And is that testimony pursuant to your responsibilities as an officer of the Eunice Police Department?

A.   Yes.

Q.   To begin, I'd like to go over some ground

**9**

rules that will hopefully make our back-and-forth a little bit cleaner, easier for the court reporter, and more efficient.

First, do you understand that you're testifying under oath today?

A. Yes.

Q. And do you understand, therefore, that your answers are subject of the penalty of perjury?

A. Yes.

MS. CASWELL: Can I just say something? Put your hands down. Just since you have the mike on, because you're videotaped, we don't want to muffle you.

BY MR. MARDIAN:

Q. I'll do my best to answer -- to ask you clear questions, and if you don't understand the question, please ask me to clarify. If you don't ask me to clarify, I'm going to assume that you understood my question. Is that fair?

A. Yes.

Q. I also ask that you please provide verbal answers instead of head nods or "uh-huhs" because it's not possible for the court reporter to record those in -- in the transcript. Is that fair?

A. Yes.

**10**

Q. If at any time today you would like a break, please ask for one. I'm more than happy to take one. I just ask that you answer the question pending if there is a question pending at the time. Is that understood?

A. Yes.

Q. And finally, you are represented by counsel today who may object to certain of my questions. I would just request that unless your counsel specifically instructs you not to answer a question, you do in fact answer the question. Is that understood?

A. Yes.

Q. Detective Fontenot, what, if anything, did you do to prepare for today's deposition?

A. Met with Chelsea on Monday.

Q. Have you met with anyone else in preparation for today's deposition?

A. No.

Q. And when you met with Ms. Caswell, was anyone else in the room?

A. Yes.

Q. Who was in the room?

A. I can't remember his name right now.

MS. CASWELL: Ed Harden.

**11**

A. Ed.

BY MR. MARDIAN:

Q. I understand.

A. Ed.

Q. Did you meet with Ms. Caswell and Mr. Harden at -- at any other times in preparation for today's deposition?

A. We may have met at the police department once before.

Q. Do you recall about when that was?

A. I don't.

Q. Have you spoken with anyone other than your legal counsel about the allegations in Mr. -- in Lieutenant Dunn's complaint?

A. I don't recall.

Q. Did you review any documents in preparation for today's deposition?

A. Yes.

Q. Did those documents refresh your recollection as to any of the underlying events at issue in this litigation?

A. Not really.

Q. Did you bring any documents with you to today's deposition?

A. No.

**12**

Q. I'd like to get an understanding of your professional background. What is the highest level of formal education that you've attained?

A. GED.

Q. And after attaining your GED -- GED, what was your first job?

A. I think it was Mr. Gatti's Pizza.

Q. And after that?

A. Pizza Hut.

Q. And when did you start working at the Eunice Police Department?

A. I started working at the Eunice Police Department 2010.

Q. And what was your role?

A. I was a corrections officer, jailer.

Q. Are a corrections officer and jailer two distinct positions or are they one and the same?

A. They're one and the same, just classified differently in different departments, I guess.

Q. I may refer to it as jailer. You understood --

A. Sure.

Q. What are the primary responsibilities of a jailer in the Eunice Police Department?

A. Intake, booking of people that would have

**13**

gotten arrested, processing paperwork, just overall care of the inmates that are incarcerated, feeding, seeing to their needs, transporting inmates from our facility to -- to other facilities.  That's the -- a basic overview of my responsibilities.

Q.    You said the overall care of the inmates?

A.    Yes.

Q.    Can you please describe that?

A.    That would be if -- if they need soap or anything like that.  If there's an injury back there, making sure they have blankets and everything that's required by the police department to provide them, just their overall wellbeing, I guess you would -- you'd call it.

Q.    Understanding that it may change from inmate to inmate, if you could ballpark it, how long does an individual stay in the jail?

A.    Two, three months, average.

Q.    And then dependent upon their legal proceedings, they may then go to a different location; is that how it works?

A.    Correct.  Or be released, yes.

Q.    Throughout your time at the Eunice Police Department, have there ever been instances where inmates needed medical care?

**14**

A.    Yes.

Q.    What were those times?

A.    We've -- we've had fights back there that we had to deal with before.  I don't recall times or instances.  We've had -- we've had times where inmates passed out or slipped in the shower or fell out of their bunk, had seizures, but I don't recall specifics on -- on any of those either.

Q.    Have you ever had to intervene in a fight between inmates?

A.    I don't recall.

Q.    Has an inmate ever needed medical care?

A.    Yes.

Q.    Which inmate, if you can recall?

A.    I can't recall.

Q.    About when?  Can you recall?

A.    No, sir.

Q.    And are there -- is there more than one?

A.    Possibly.

Q.    Have you ever had to transport an inmate to a medical facility, such as a hospital?

A.    Yes.

Q.    Which inmate?

A.    I don't recall names.

Q.    Who determines whether an inmate should be

**15**

transferred to a medical facility?

A.    That is usually either call of the shift commander or the deputy chief, I think.

Q.    Is the shift commander to whom you reported as a jailer?

A.    Yes.

Q.    And does the shift commander report to the deputy chief?

A.    Yes.

Q.    Do you have any understanding of how a shift commander determines whether an inmate should be transferred to a medical facility?

A.    No.

Q.    Are you currently a jailer at the Eunice Police Department?

A.    (No audible response.)

Q.    After being a jailer, were you promoted?

A.    After being a jailer, I then became a patrolman.

Q.    What are the primary responsibilities of a patrolman at the Eunice Police Department?

A.    To take calls from dispatch, go to those calls, get a resolution, whether it's arrest or civil or no further.  That's the -- that's the primary responsibilities of a patrolman.

**16**

Q.    When a call comes into dispatch, is the patrolman the individual or woman expected to respond to that call in the first instance?

A.    Yes.

Q.    To whom does a patrolman or patrolwoman report?

A.    It would be a chain of command starting with the sergeant on shift.

Q.    And to whom does the sergeant report?

A.    He reports to the lieutenant on shift.

Q.    And to whom does the lieutenant report?

A.    To the deputy chief.

Q.    And does deputy chief report to the chief?

A.    Correct.

Q.    About how long were you a patrolman?

A.    Two and a half years, approximately.

Q.    Do you recall about which year you stopped being a patrolman?

A.    Approximately '18 or '19.

Q.    And what did you do after you stopped being a patrolman?

A.    I was placed in detectives, CID.

Q.    Is that your current role?

A.    Yes.

Q.    What are the primary responsibilities of a

**17**

detective at the Eunice Police Department?

A.   Primary is to follow up on initial instan- -- instances, whether it be theft or homicide.  We're secondary investigators.

Q.   So when you say "follow up," does that mean the patrolman or woman responds and gets a certain understanding of the facts, and then it becomes your responsibility to follow up on -- on figuring out what happened and who may be at fault?

A.   Correct.

Q.   To whom does a detective report?

A.   To the chief of detectives.

Q.   And to whom does that individual report?

A.   Deputy chief.

Q.   Who's currently the chief of detectives at the Eunice Police Department?

A.   Lieutenant Ryan Young.

Q.   And who currently is the deputy chief of the Eunice Police Department?

A.   Deputy Chief Tony Kennedy.

Q.   And Mr. Kennedy reports to Chief Randy Fontenot; is that correct?

A.   Yes.

Q.   Has Chief Fontenot been the chief of the Eunice Police Department for the entirety of your

**18**

duration at the Eunice Police Department?

A.   No.

Q.   Who was chief before Chief Fontenot?

A.   Ronald Dies.

Q.   And how long were you at the Eunice Police Department while Chief Dies was chief?

A.   The entire -- the entire time.

Q.   Sorry, I may be misunderstanding.

So when you started your employment in -- I believe you said 2010, was Chief Dies the chief?

A.   No.

Q.   Okay.  So the entirety of the time Chief Fontenot has been the chief of the Eunice Police Department?  The entirety of the time that you've been at the Eunice Police Department, Chief Fontenot has been the chief?

MS. CASWELL:  No.  But I think he just misunderstood.

BY MR. MARDIAN:

Q.   Apologies.  When you began at the Eunice Police Department in 2010, who, at that time, was chief of the Eunice Police Department?

A.   At that time, it was Gary Fontenot.

Q.   Understood.  After Mr. Gary Fontenot, who was -- who became chief of the Eunice Police

**19**

Department?

A.   Mr. Ronald Dies.

Q.   And after Mr. Ronald Dies, it was Chief Randy Fontenot?

A.   Correct.

Q.   About which -- in which year did Chief Dies take over from the first Chief Fontenot?

A.   That would have been probably January of '11, 2011.

Q.   And about what time did the current Chief Fontenot take over from the former Chief Dies?

A.   2015-ish.  I'm -- I'm -- I'm -- I'm guessing.

Q.   So you, fair to say, have had a few years under the tutelage of both Chief Dies and Chief Randy Fontenot?

A.   Correct.

Q.   How do the two compare?

A.   In what capacity?  What are you...

Q.   That's a fair question.

What are the primary responsibilities of a chief at the Eunice Police Department?

A.   I have no idea.

Q.   Do you know what decisions the chief has the authority to make?

A.   No, I don't.

**20**

Q.   Do you know whether the chief can make decisions regarding the budgets of the Eunice Police Department?

A.   No, I don't.

Q.   Do you know to whom, if anyone, the chief of the Eunice Police Department must report?

A.   I don't.

Q.   Do you know if the chief of the Eunice Police Department determines who may or may not apply for overtime?

A.   I don't.

Q.   Do you know if the chief of the Eunice Police Department has any responsibility for setting the policies and procedures of the Eunice Police Department?

A.   I don't.

Q.   So to clarify, do you know if anyone other than the chief of the Eunice Police Department has authority to conduct any of the activities that we just discussed?

A.   I don't.

Q.   Can you please describe your relationship with Chief Randy Fontenot?

MS. CASWELL:  Object to form; vague. If you could, maybe just -- and what type of

**21**

relationship -- you know.

A.  Could you be more specific?

BY MR. MARDIAN:

Q.  Sure.  Do you ever socialize with Chief Randy Fontenot outside of work?

A.  I think I've been to one of the -- I don't remember if it was a Christmas party.  It was -- it was actually a department party.  Would that be considered outside of the police department?

Q.  Perhaps.

A.  Okay.

Q.  But that's a helpful -- helpful.  I appreciate it.

A.  Okay.

Q.  Are there any other similar situations you can think of where you --

(Brief interruption.)

BY MR. MARDIAN:

Q.  -- may have socialized with Chief Fontenot outside of work?

(Brief interruption.)

A.  I had an anniversary -- I believe it was an anniversary party for myself and my wife, and chief and his wife did come to that party.

THE REPORTER:  Can we go off the record

**22**

just a moment?

THE VIDEOGRAPHER:  We're off the record at 9:23.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 9:29.

BY MR. MARDIAN:

Q.  I believe you testified that you attended a Christmas party with Chief Fontenot.  Is that correct?

A.  A departmental Christmas party, I believe, is what it was.

Q.  And then you invited him and his wife to you and your wife's anniversary party?

A.  Correct.

Q.  Any other times that you can recall socializing with Chief Fontenot?

A.  I can't recall any -- any other times.

Q.  Do you consider Chief Fontenot a friend?

A.  Sure.

Q.  Why is that?

A.  I spend a lot of time with Chief Fontenot and the other officers at the Eunice PD, probably more time than I spend with my family, which can be said about the other officers there too.  And by doing that, human nature, you form bonds and you become friends with, I'd

**23**

like to think, everybody there that we work with.  So I would consider him a friend.

Q.  Anyone at the Eunice Police Department that you do not consider a friend?

A.  No.

Q.  How would you characterize your relationship with Lieutenant Michael Dunn?

A.  Standoffish.  I respect Lieutenant Dunn. I think he's -- he's very knowledgeable.  And there's different degrees of friendship.  I just -- I have respect for him as a person, as a lieutenant.

Q.  And you mentioned one of the reasons you have respect for him is that he's knowledgeable; is that fair?

A.  He's -- he's knowledgeable about police work, law enforcement, yes.

Q.  Are there any -- any other reasons why you respect Lieutenant Dunn?

A.  I can't think of any right now.

Q.  Have you ever reported to Lieutenant Dunn?

A.  Have I --

Q.  -- ever reported to Lieutenant Dunn?

A.  Have I worked under?

Q.  Correct.

A.  Yes.

**24**

Q.  When was that?

A.  I can't recall specifics, but it would have -- it would have been maybe when I was working overtime and he just happened to be the shift commander at that time, but I can't recall any specific time.

Q.  And forgive me if you answered this earlier. But would that have been when you were a jailer?

A.  That would have been when I was a jailer.

Q.  At that time, did you have respect for the decisions he made as your superior?

A.  I don't think I ever went against any of his decisions.

Q.  Are there any decisions you can recall throughout the entirety of your time at the Eunice Police Department where you disagreed with a decision that Lieutenant Dunn made?

A.  I can't recall.

Q.  Any times where you've been in a verbal altercation with Lieutenant Dunn?

A.  I can't recall.

Q.  Has Lieutenant Dunn ever asked you for backup on a call?

A.  I can't recall.

Q.  How often on a call do you request backup?

A.  How often on a call do I request backup?  I

**25**

don't recall ever asking for backup on a call.

Q. Has Lieutenant Dunn ever asked you for backup?

A. I can't recall.

Q. Do you have any understanding how -- of how frequently Lieutenant Dunn requests backup?

A. No.

Q. Have you ever heard anyone at the Eunice Police Department refer to the, quote, "gray area" of the law?

A. I can't recall.

Q. Have you ever been instructed to operate in the gray area of the law?

A. I don't think so.

Q. Have you ever been instructed to take an action at the Eunice Police Department with which you disagreed?

A. Could you repeat the question?

Q. Have you ever taken an action -- excuse me. Have you ever been instructed to act in a manner with which you disagreed?

A. I can't recall.

Q. Have you ever witnessed misconduct at the Eunice Police Department?

A. Could you be more specific?

Q. Have you ever witnessed conduct at the Eunice

**26**

Police Department that you believe is illegal?

A. Have I witnessed?

Q. Correct.

A. I don't think so.

Q. Have you ever witnessed conduct at the Eunice Police Department that you believe is immoral?

A. Again, have I witnessed?

Q. Correct.

A. I can't recall.

Q. Have you ever witnessed conduct at the police department that you believe is unethical?

A. I can't recall.

Q. Has anyone ever told you about conduct at the police department that you believe is illegal?

A. I can't recall.

Q. Has anyone ever told you about conduct at the Eunice Police Department that you believe is immoral?

A. I can't recall.

Q. And has anyone ever witnessed -- has anyone ever told you about conduct at the Eunice Police Department that you believe is unethical?

A. I can't recall.

Q. How would you describe the overall morale of the Eunice Police Department?

A. At this time?

**27**

Q. Correct.

A. Could you be more specific?

Q. Do officers -- withdrawn. Do you enjoy working at the Eunice Police Department?

A. Yes.

Q. Do you have any understanding of whether other officers enjoy working at the Eunice Police Department?

A. I don't.

Q. You never talk with your colleagues about whether they enjoy their jobs?

A. Not much, no.

Q. You don't talk about frustrations you may have at work?

A. Not that I recall.

Q. Do you ever celebrate victories at work when you apprehend a convict?

A. Can't recall.

Q. Have you ever apprehended a convict?

A. Yes.

Q. And you can't recall, at that time, being with your colleagues and being happy about the fact that you -- that you apprehended that convict?

A. I can't recall.

Q. Does your job ever frustrate you?

**28**

A. Yeah.

Q. In which manner?

A. When I feel that I haven't done the best that I could have done to resolve an issue or make an arrest.

Q. Are there any other ways in which your job frustrates you?

A. Can't recall.

Q. So just to be clear, it is your testimony under oath today that you cannot recall any time, other than when you fell short, of when your job frustrated you?

A. Correct.

Q. It is your testimony today, under oath, that at no time has anyone else engaged in conduct at the Eunice Police Department that frustrated you?

MS. CASWELL: Object to form; vagueness.

BY MR. MARDIAN:

Q. At any time during your employment at the Eunice Police Department, did someone else's conduct frustrate you?

A. I stated before I can't recall that.

Q. And that is your testimony under oath?

A. Yes.

Q. How does the sick leave policy work at the

**29**

Eunice Police Department?

A. For me individually or --

Q. The policy, generally.

A. Sick leave for officers that have been there, I believe, before a certain time period, I believe it was 364 days that the sick leave allowed. And then I believe after a certain date of hire, it may have -- it may have been per month. I'm not really sure.

Q. If you want to request sick leave, what do you do?

A. Contact your superior.

Q. And do you automatically receive it?

A. Sick leave? Yes.

Q. Does anyone have to approve your request?

A. For sick leave?

Q. Yes.

A. Your supervisor.

Q. How does the overtime policy work at the Eunice Police Department?

A. Would you be more specific?

Q. When you want to work overtime, what do you do?

A. You fill out an overtime sheet.

Q. Do you have to submit that sheet to anyone?

A. I believe it's submitted to the -- either

**30**

sergeant or lieutenant that is working on that shift, that specific shift that you would be working overtime on.

Q. And it's that individual's decision whether you are approved to work overtime?

A. I can't recall how it works. I haven't -- I haven't worked in that -- patrolman for years. I don't know how it works. I don't recall.

Q. Understood. Are detectives not eligible for overtime?

A. Yes, we are.

Q. You are. Can you recall the last time that you worked overtime?

A. I can't.

Q. Was it in the year 2022?

A. I don't recall.

Q. How frequently would you say you work overtime?

A. I can't recall.

Q. So if someone were to ask you on the sidewalk, "Detective Fontenot, do you frequently work overtime?" your response to that individual would be, "I can't recall"?

A. Yes.

Q. Understood. The times that you have worked

**31**

overtime, do you recall any of the individuals that approved your requests to work overtime?

A. Are you talking as a detective or as a patrolman?

Q. At any time.

A. I do recall as a patrolman, maybe a few instances where the lieutenant on shift would have to sign my overtime sheet, yes.

Q. Do you know anyone named Joshua Tyler?

A. The name sounds familiar. I just can't place where I know the name right now. Could you help me?

Q. Do you have any recollection of arresting a Mr. Tyler in August of 2018?

A. I still can't place -- I know the name. I just can't place the incident.

Q. Understood. Do you recall executing an arrest in a -- a Walmart parking lot on or around August 2018?

A. Can't recall.

MR. MARDIAN: I'm going to mark as Plaintiff's Exhibit 1 a -- a Eunice Police Department offense report.

THE REPORTER: Mr. Mardian, can we go off the record just a moment?

MR. MARDIAN: Yeah, please.

THE VIDEOGRAPHER: We're off the record

**32**

at 9:46.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 9:56.

MR. MARDIAN: As I was saying before we went off the record, I'm marking as Plaintiff's Exhibit 1 a Eunice Police Department offense report.

(Plaintiff No. 1 was marked for identification.)

BY MR. MARDIAN:

Q. Take as much time as you would like to review this document, and I'll have some questions for you.

One note, I'll be showing you some documents today, and you will see that there's a marking in the lower right-hand corner of several, if not all, of them. That simply means that it's been produced by one of the parties in this litigation. I'll be using it to reference specific page numbers because it's generally easier to do so.

So if you can, take a moment to review the police report. Just let me know when you're ready.

A. Yeah. Before we do that, can I request that we -- that I clarify the overtime question that you were asking?

Q. Of course.

**33**

A.   When you were asking about overtime questions, I was thinking back to my patrolman days.  Now, as a detective, it's -- it's different.  We're asked to come in at 7:00 a.m., and I work till 5:00 p.m. every day, which is a ten-hour day.  This is a -- this is normal for detectives.  I don't always do that.  Sometimes it's nine hours.

But what I'm getting at is our pay period is an 80 -- 84-hour week -- workweek.  But every pay period us, as detectives, working those hours, it is considered overtime each pay period, whether it be two hours or -- or four hours.  Each pay period is going to have overtime on them -- on them, like I said, because it's an 84-hour workweek.  And with the times that we're asked to come in, it's -- it's -- it's going to be overtime -- what's considered overtime.

Q.   Thank you very much for that clarification.  Just a few follow-up questions.

The 84 hours -- or 84-hour workweek, that includes overtime within it; is that --

A.   No.  That's -- that's your basic straight time pay.

Q.   And so then anything above 84 hours constitutes overtime?

A.   Correct.

**34**

Q.   Is there a set amount of overtime that detec- -- detectives work?

A.   No.

Q.   So if you work any hours above 84 in a week -- or -- a week, that qual- -- qualifies as overtime?

A.   Pay period, which is a two-week, yes.

Q.   Thank you.  So any time in a two-week period over 84 hours concentrates overtime?

A.   Correct.

Q.   And do you receive greater payment for overtime work?

A.   Correct.

Q.   Do you recall the percentage of your wage that -- that is increased?

A.   I don't know exactly what it is.  I think supplemental pay has something to do with it also.  It's somewhere like time and a half.

Q.   Thank you.  If you work above the 84 hours, do you have to tell anyone before you do?

A.   Me as a detective?

Q.   Correct.

A.   No.  It's just we're told to come in at 7:00, and we leave at 5:00; that's detective hours.

Q.   Is there a cap of the total amount of overtime that you're allowed to work in a two-week period?

**35**

A.   Not that I'm aware of.

Q.   Have you ever heard of anyone been -- who has been told "you're working too much overtime"?

A.   Not that I recall.

Q.   Are you aware of any policy that the Eunice Police Department has to limit or constrain the amount of overtime that any detective is permitted to work?

A.   Not that I recall.

Q.   So is a detective of the Eunice Police Department able to work as much overtime as he or she wishes?

A.   I don't know.

Q.   Have you ever been told you are not permitted to work X overtime?

A.   I don't recall.

Q.   So you're not aware of any instance in which an individual deprived you of the ability to work overtime?

A.   I don't recall.

Q.   Just trying to parse that question a little bit.  My question is if you can recall any instance in which someone deprived you of the opportunity to work overtime, so essentially, I'm asking if you do recall any.

Is it your testimony you cannot recall a

**36**

single instance in which someone deprived you of the opportunity to work overtime?

A.   No, I can't recall.

Q.   So the answer is no, you are not aware of a single instance, while you've been a detective, of when someone did not permit you to work overtime?

A.   No.  The answer is I don't recall.

Q.   But my question is whether there are any instances that you -- that -- withdrawn.

My question is if you can recall a single instance in which someone said you could not work overtime, your answer is there are no such instances?

A.   My answer is I can't recall.

Q.   Understood.  How many hours of overtime do you generally work in a two-week period?

A.   Give me a second.  I would say the average would be somewhere around ten hours a pay period.

Q.   And you have, essentially, sole discretion to determine the number of hours of overtime you work in any given two-week period?

A.   If I worked ten hours a day, which is what we're asked to do, for two five-day week periods, that's 100 hours, correct?

Q.   Correct.

A.   Anything over 84 would be considered overtime.

**37**

So in any given pay period, I could work -- I could work 16 hours. I mean, does that breakdown to 16 hours of overtime --

Q. So --

A. -- a pay period?

Q. Are you expected to work those 16 hours of overtime?

A. We're expected to work from 7:00 a.m. to 5:00 p.m. in the afternoon.

Q. So the answer is yes, you are expected to work 16 hours of overtime in each two-week pay period?

A. I'm expected to work from 7:00 o'clock in the morning until 5:00 o'clock in the evening.

Q. And if you extrapolate that 7:00-to-5:00 period across the ten-day pay period, it does indeed lead to the result that you're expected to work 16 hours of overtime in -- in every two-week period; is that correct?

A. Correct.

Q. What if you want to work more than that 16 hours of overtime?

A. Then I have to ask my supervisor, Lieutenant Ryan Young, if it would be okay for me to work over.

Q. Can you recall any instance in which you did indeed ask Lieutenant Ryan Young to work greater than

**38**

16 hours of overtime?

A. I can recall having to make controlled illegal narcotics purchases after 5:00 p.m., and I would call him and ask him if it was okay to do that. Yeah.

Q. So I don't mean to make this more complicated than it already is. But if it's a Tuesday in the first week of the two-week pay period and you're going to be working until 7:00 p.m., I take it you don't know at that point if, after the two-week pay period, your total overtime is going to exceed 16 hours?

A. Correct.

Q. So are there any times where you've gone to Lieutenant Young where your time likely is going to exceed 100 -- 16 hours of overtime and you therefore requested permission to work additional overtime?

A. Yes.

Q. In any such instance, did Mr. Young ever decline your request?

A. I don't -- I don't recall.

Q. My last question about this. Is this policy of the 16 hours of expected overtime -- is that set forth in writing anywhere?

A. I -- I don't know.

Q. Now I'd like to turn to the Plaintiff's Exhibit 1 that I handed you a few minutes ago.

**39**

MS. CASWELL: Do you have an extra copy?

MR. MARDIAN: Yeah.

MS. CASWELL: Thank you.

BY MR. MARDIAN:

Q. Sir, I would direct you -- do you see at the top, there's a line that says, "Officer: Fontenot, Victor David"?

A. Yes.

Q. Is that you?

A. Yes.

Q. Is this a Eunice Police Department offense report that you filled out?

A. It appears to be, yes.

Q. Do you see the date of offense is listed as August 17th, 2018?

A. Yes.

Q. And do you see about middle of the way down the page, it says, "Person type: Suspect name: Tyler, Joshua E."?

A. Yes.

Q. If you turn the page, it's Bates marked 8 -- 807 at the bottom. Do you understand this to be a description of an arrest that you executed in a Walmart parking lot in August of 2018 of one Mr. Joshua Taylor?

MS. CASWELL: And if you need to look at

**40**

it a little bit more, feel free to take your time.

MR. MARDIAN: Of course.

A. Yes.

BY MR. MARDIAN:

Q. Can you please, to the best of your recollection, describe the events that are set forth in this off- -- arrest report?

A. Can you give me time to read the --

Q. Of course.

A. -- supplement.

Q. As much as you need.

A. Okay.

Q. Can you please describe the events that are set forth in this arrest report?

A. Okay. I don't -- I don't recall this. The only thing I can tell you is what the report says because I don't recall this happening.

Q. Would you describe the events that are written in this report as common in your line of work?

A. The events? The -- the type of call?

Q. Let's break it apart. We can start with the type of call. Individual -- your dis- -- dispatch asks you to go to a Walmart parking lot because of a potential theft. How frequent do you respond to such a

**41**

call?

A.    As a patrolman, maybe once a week.

Q.    Once a week.  You arrive, individual is fleeing.  Is that still once a week?

A.    Yeah.

Q.    Attempt to apprehend the individual, individual resists.  How frequent is that?

A.    It's common.

Q.    In -- in attempting to apprehended the individual, you notice something in the individual's mouth.  How common is that?

A.    Not too common.

Q.    Not to common.  So at that point, this arrest becomes an uncommon arrest?

A.    Yes.

Q.    How many of those types of arrests did you respond to as a patrolman?

A.    I can't recall.

Q.    And this happened in August of 2018, so fewer than four years ago?

A.    Right.

Q.    And it's your testimony that, other than what's written here, you don't have any recollection of this event?

A.    No, sir, I don't.

**42**

Q.    Fair to say that because you wrote this, we can believe that it's accurate?

MS. CASWELL:  I object to form.
Requires speculation.
You can answer.  You can answer.

BY MR. MARDIAN:

Q.    Do you have any reason to doubt the accuracy of this report given that you wrote it?

A.    No.

Q.    Do you see in the third paragraph on the page that ends with the number 808 -- in the middle of the paragraph, you wrote, quote, "Dispatcher advised multiple times that she needed officers to respond to the Eunice Police Department booking area due to Mr. Tyler attempting to escape custody."
Did you write that?

A.    Yes.

Q.    You believe it's accurate?

A.    Yes.

Q.    How frequent does someone attempt to evade custody from the Eunice Police Department?

A.    Maybe two, three times a year.

Q.    Flip the page to the one ending with the number 809 at the bottom.  The first paragraph reads quote, [As read]:  "An ambulance service was dispatched

**43**

to the police department to evaluate Mr. Tyler due to his change in demeanor and pro- -- profuse sweating."
How frequently does an individual that you apprehend exhibit, quote, "profuse sweating"?

A.    Pretty common in narcotics.

Q.    Does that indicate to you that that individual is on drugs?

A.    Again, it could be -- it could be drugs.  It could be just him being exhausted from running.  This particular time, I -- I -- I don't recall, if that's what you're asking.

Q.    Does it change your analysis if that same individual previously had something in his or her mouth?

A.    Say that again.

Q.    In attempting to parse between the reason why someone is sweating, do you consider whether they happen to have anything in their mouth at the time?

A.    Could be considered, yeah.

Q.    The report continues, quote, "First responders arrived and began evaluating Mr. Tyler when they noticed that he was chewing on something.  They advised Mr. Tyler to open his mouth, and they observed what looked liked colored glass inside of Mr. Tyler's mouth.  Officers then did a search of the hallway and the

**44**

booking area and found more glass particles on the floor."
Other than the time that's written here, can you recall any other time while you were at the Eunice Police Department where someone you apprehended had colored glass inside of his or her mouth?

A.    No.

Q.    Is it fair to describe that as uncommon?

A.    Yes.

Q.    Fair to describe it as extraordinary?

A.    Yes.

Q.    And yet, other than seeing it written here today, you have no recollection of witnessing Mr. Tyler having glass in his mouth?

A.    I don't recall this incident, no.

Q.    The report continues, "At this point, Mr. Tyler was transported by the medics to AMC for further evaluation and medical treatment."
Is AMC a hospital?

A.    Yes.

Q.    Do you recall whose determination it was to transport Mr. Tyler to a hospital?

A.    I don't.

Q.    You go to the next paragraph.  It reads, quote, "The medical staff spent several hours

**45**

attempting to get glass out of Mr. Tyler's mouth and throat area and also did X-rays which found that he still had particles of glass in his intestines."

Did you write that?

A.   Yes.  Yes, I'm pretty sure I did.

Q.   And yet, it's still your testimony that you have no recollection of Mr. Tyler having glass in his mouth and throat area and his intestines?

A.   I do not recall anything concerning this incident other than what I'm reading in my report.

Q.   Understood.  The report continues after the next sentence, quote, [As read]: "At this point, I left the hospital and went home to the -- due to the end of my shift.  I returned to the police department to begin my evening shift when I was advised by other officers that Mr. Tyler refused to be treated at the local hospital and also refused to be booked into the Eunice Police Department.  Due to the overpopulation of the Eunice jail, all felony suspects must be transported to the St. Landry Parish -- Parish Sheriff's Department for housing."

So I'd just like to understand what you wrote here recognizing that you don't actually recall the underlying event.  You left the hospital because your shift had ended.  Is that what this describes?

**46**

A.   It appears so, yes.

Q.   The next day, you return to the police department.  Maybe, perhaps, later that day, you return to the police department to begin your evening shift.

MS. CASWELL:  Going to object to form.

MR. MARDIAN:  Sure.  Withdrawn.

BY MR. MARDIAN:

Q.   This records that at some point, you returned to the police department for your evening shift.  Was that correct?

A.   It appears so.

Q.   Then you say Mr. Tyler refused treatment at the hospital and refused to be booked.  Setting aside Mr. Tyler for a second, if you have an individual at the hospital who's refusing treatment and refusing to be booked, is there any policy that governs what the Eunice Police Department is supposed to do with that individual?

MS. CASWELL:  I'm going to object to form.

A.   Not that I'm aware of.

BY MR. MARDIAN:

Q.   So do you know how anyone at the Eunice Police Department determines what to do with that individual given these circumstances?

**47**

MS. CASWELL:  Object to form; speculative.

MR. MARDIAN:  Withdrawn.

BY MR. MARDIAN:

Q.   Do you have any understanding of how an individual at the Eunice Police Department is to determine what to do with a suspect in these circumstances?

A.   Well, I've never been a supervisor, so I don't know how the determination comes about.

Q.   And you have no recollection of speaking to your supervisor at the time of this occurrence --

A.   No.

Q.   -- is that correct?

A.   No, sir, I don't.

Q.   Now, I'd kind of like to understand this policy as you describe it.  So if there's a suspect who wants to leave the hospital but can't be booked into EPD, what becomes of that suspect?

A.   So there's a suspect -- say that again. Repeat that.

Q.   Sure.  If there's a suspect who's in the hospital and doesn't want to be in the hospital anymore but also doesn't want to go back to EPD, what do you do with that suspect?

**48**

A.   Can't go back, or doesn't want to go back?

Q.   Doesn't want to.

A.   What would I do today?

Q.   What would you do in the normal course of --

A.   Are you asking me what I did --

Q.   I assume you don't recall --

A.   I don't.

Q.   -- at this point.  So today, what would you do?

A.   Has he been medically cleared?

Q.   Now, the -- well, I'll just withdraw the question because we're far afield of -- of purpose.

You see that you said that the Eunice jail was overpopulated?

A.   Yes.

Q.   What does that mean?

A.   I think when it's considered overpopulated, back when I was a jailer, it was determined on how many beds were available in the particular men's cell or -- or women's cell.  That would determine what we would call overpopulated.

Q.   So what determines the point at which you are overpopulated?  Is it when all the beds are taken or something else?

A.   It'll be when all the beds are taken.  You

**49**

know, it would -- that would determine overpopulation.

Q.   So where do you book suspects to once the jail is overpopulated?

A.   I don't -- I don't know.  I haven't dealt with the jail in seven years.  I -- I don't know.

Q.   So do you ever bring in suspects to the EPD?

A.   Yes.

Q.   And you hand those off to the jailer; is that correct?

A.   Correct.

Q.   What if the jailer doesn't have room in the jail?  Does that individual come back to you and say "I don't have room for this suspect"?

A.   No.  He would have to consult his supervisor, the shift supervisor, or whoever is in charge that day.

Q.   How many people work at the Eunice Police Department?

A.   At this time?

Q.   Currently.

A.   Twen- -- fifteen to 20.

Q.   Fifteen to 20.  Do you know how many worked at the Eunice Police Department in about August of 2018?

A.   I have no idea.

Q.   Fair to say more or less than today?

A.   I have no idea.

**50**

Q.   Have -- are there more people there today than when you started?

A.   Than when I started in 2010?

Q.   Correct.

A.   No.  They -- I would say there was more then.

Q.   About how many?

A.   Maybe 20, 25.

Q.   So about five or ten more in 2010 than there are today?

A.   Yeah.

Q.   What about 2015?

A.   I don't -- I don't recall.

Q.   Do you have any understanding as to -- as to the underlying reason why there are fewer people employed at EPD today than there were in 2010?

A.   No, I don't.

Q.   Ever talk to any of your colleagues about why they choose to leave EPD?

A.   I'm guessing it would be monetary.

Q.   But you'd just be guessing?

A.   Yeah.

Q.   Have any reason to believe that it could be the management of EPD?

A.   No reason to believe that.

Q.   Have you ever talked to an individual named

**51**

Jonathan Lee?

A.   I remember a Jonathan Lee.

Q.   Do you have any understanding -- withdrawn.
Do you know if Jonathan Lee still works at EPD?

A.   Does not.

Q.   Do you know why he left?

A.   No, sir.

Q.   So now going back to the jail.  Bring someone in, hand the suspect off to the jailer, the individual doesn't have space for the suspect.  He or she tells his or her supervisor.  Is that your testimony?

A.   Correct.  I believe that's the way it's supposed to work, yes.

Q.   Then what happens?

A.   I don't know.

Q.   When you were a jailer, were -- was there ever a time where the jail was overpopulated?

A.   Yes.

Q.   And in that instance, what did you do?

A.   I can remember a couple of times where summons to appear were given to those individuals.  I can remember a time where maybe a signature bond was given to those individuals and a -- a return court date was given.

**52**

Q.   Do you recall what any of those individuals, that were released, were charged with?

A.   I -- I can't.  No, I don't.

Q.   In determining whether to give someone a signature or a bond release, do you consider the charge that they're facing?

A.   When I was a jailer?

Q.   Correct.

A.   I can't remember.

Q.   What about today?

A.   Can you be more specific?

Q.   If today there was no room at the jail for a suspect that you had brought in and the jailer and his or her supervisor were determining what to do with that individual, would you expect that they would consider, in determining whether to release the individual, the charges that that individual was facing?

MS. CASWELL:  I'm going to object to form; speculative.

A.   The charges would determine if he was going to be in the city jail or if he was going to be in the parish jail.  If we had no room in the -- well, let me rephrase.  If it was felony charges, he would have been brought to the parish today.  If it was city charges, then maybe they -- maybe the judge would have been

**53**

called to see if he could have been released on a signature bond or a -- yeah.

BY MR. MARDIAN:

Q. Do you have an understanding of whether in August of 2018, possession of a narcotic in Louisiana is a felony?

A. Yes.

Q. Was it a fen- -- fen- -- fen- -- felony at that time?

A. I'm sure it was.

Q. So fair to say that Mr. Tyler was facing a felony charge?

MS. CASWELL: I'm going to object to form.

A. Yes.

BY MR. MARDIAN:

Q. And is that why, to the best of your recollection, you or your colleagues were considering sending him to the St. Landry Parish Sheriff's Department?

MS. CASWELL: Object to form; speculative. He's already testified that he doesn't recall the situation.

BY MR. MARDIAN:

Q. You can answer.

**54**

A. Could you repeat the question?

Q. Was the fact that Mr. Tyler could be facing a felony charge a consideration in determining whether he should have been sent to St. Landry Parish Sheriff's Department?

A. I don't recall.

Q. So you have no recollection of what became of Mr. Tyler?

A. No.

Q. Does it strike you in any manner that you don't have such a recollection?

A. Can you be more specific?

Q. Mr. Tyler, you've written, was eating glass; is that correct?

A. Correct.

Q. You have no reason to doubt the accuracy of your own report?

A. No.

Q. Does it strike you in any manner that you can't recall anything about that occurrence despite the fact that he was eating glass and you testified, previously, that this was an extraordinary event?

A. Yes. At the -- at the time, it was extraordinary. Now, that I've dealt with the circus that we call Eunice, this would be very common, okay.

**55**

So I've -- I've worked, as a detective -- especially as a detective, I've worked multiple cases and incidences where this is just common -- this would be just common now. So I can't -- and I don't know why. I can't remember details of specific cases. That's the best I can -- I can explain to you. I can read something tomorrow and forget what I read the -- the following day.

Q. Thank you. I have a few questions. You said you can't recall the details of this event. I just want to clarify.

It's not solely the details; you can't recall anything about this event. Is that your testimony?

A. Correct.

Q. Secondly, you referred to the circus that is Eunice. What do you mean by that?

A. This is just -- this is -- this is common. This type of activity is common now in Eunice, things that I've dealt with in detectives.

Q. Eating glass is common?

A. I've -- I've seen it.

Q. How frequently?

A. Either once or twice since I've been in detectives.

Q. Does the Eunice Police Department have a

**56**

written policy that covers what to do with suspects, such as these, who refuse to be treated at a hospital but can't be booked at the St. Parish -- St. Landry Parish?

A. I don't know.

Q. You don't know?

A. I don't know.

Q. Have you ever seen such a policy?

A. Not that I recall.

Q. Does it surprise you that you that you haven't seen such a policy given that you -- pursuant to your testimony, this is such a common occurrence?

MS. CASWELL: Object to form; misstates his testimony.

A. Repeat.

BY MR. MARDIAN:

Q. Sure. Previously, you testified that today, given the, quote, "circus of Eunice," this is actually not very uncommon anymore. Is that correct?

MS. CASWELL: Object to form; misstates his testimony.

A. Are you talking about eating glass, specifically?

BY MR. MARDIAN:

Q. Yes.

**57**

A.    It's still uncommon, but it happens.

Q.    Okay.  So let's parse that a little bit.
Eating glass is still uncommon in Eunice today?

A.    Eating glass is still uncommon in Eunice today.

Q.    It still would be considered extraordinary by you?

A.    Define "extraordinary."

Q.    Just smacks you in the face of something you cannot believe took place?

A.    No.  Nothing smacks me in the face to where I just can't believe it anymore.

Q.    It is something that you would only experience once in a five-year period?

A.    For eating glass?

Q.    Correct.

A.    Maybe once or twice a year.

Q.    Okay.  But then, separately, you said the circus of Eunice --

A.    Uh-huh.

Q.    -- things have changed.  How so?

A.    Seem to have more gang activity, more shooting incidences, just things you wouldn't expect as a civilian -- things that would shock you as a civilian,

**58**

I guess.  That's what I -- that's what I meant.

Q.    Do you have any understanding of the reason that those have become more frequent?

A.    Not only Eunice.  It's the world.  Yeah, the world is experiencing.  And surrounding areas, Opelousas and, you know, Lafayette, all these places are experiencing the same thing we are in Eunice.  It's just nobody has morals anymore.  Nobody -- nobody cares anymore, and it's starting to show.  It's starting to project itself out, and we see a lot of more of it.

Q.    So the reason there's been an increase in these crimes is because people don't have morals anymore?

MS. CASWELL:  I'm going to object to form; speculative.

A.    That's my opinion.

BY MR. MARDIAN:

Q.    Based on your experience working as a detective and patrolman at the Eunice Police Department for the past ten years, have you come to understand any of the underlying reasons that crime has increased in Eunice?

A.    Like I just said, it's not just Eunice that I see it.  It's in other communities.  And society is breaking down, and we have problems with morals now --

**59**

Q.    But --

A.    -- maybe more than we used to.

Q.    But in Eunice, do you have any understanding of the reasons that crime has increased?

A.    Again, morality.  Parents -- some parents. The juveniles we deal with, there's no -- there's no discipline.  There's no -- they just don't care. They're doing their own thing, you know.

Q.    Have you ever been disciplined by EPD?

A.    Yes.

Q.    Can you recall the times at which you were disciplined?

A.    Yes.  I can recall being in a vehicle pursuit and getting into an accident with my unit.  An internal investigation was done.  It was brought before the mayor of Eunice, and he determined that I be given one-day suspension without pay.  I think that's what it was.  I think that's what the -- it was either one- or two-days suspension without pay.  I don't -- I don't recall.

Q.    Did this happen in January of 2021?

A.    I don't -- I don't recall.

Q.    Do you recall why you were disciplined?

A.    Because I was found to be at fault.

Q.    At fault of the traffic accident?

**60**

A.    Yes.

Q.    Any other reasons why you were disciplined?

A.    I don't recall.

(Plaintiff No. 2 was marked for identification.)

BY MR. MARDIAN:

Q.    I'd like to mark as Plaintiff's Exhibit 2 a set of materials that was produ- -- that I'll represent to you was produced by your counsel.  I'll further represent to you that we've done our best job to cut these documents into a way that makes the -- the most logical sense.  They were produced as a large set of documents.  But just -- so you'll see a few in here that I'll be asking you about.

A.    And where do these come from?

Q.    They came from your counsel.  You can see at the bottom, the lower right, there's a -- "City of" -- that means they were produced by your counsel.  The previous document was produced by us.

If you could, just take some time and review the documents.  I'm also going to be pointing you to some specific portions --

A.    I hope so.

Q.    -- if that would help.  The first place I would like to ask you about is this first document. It's an interoffice memorandum.  It appears to be from

**61**

Mayor Scott Fontenot to you, Officer Victor Fontenot.

Is that a fair representation of this document?

A. Yes.

Q. Do you recall receiving this interoffice memorandum?

A. Do I recall receiving this document?

Q. Correct.

A. No.

Q. Have you ever seen this document before?

A. I signed it, so I would say yes.

Q. You see at the first paragraph on the first page reads, quote, "On January 6th, 2021, we initiated an investigation into an event involving you which occurred on January 4th, 2021. Our investigation has provided information to support the following: Officer Fontenot was involved in a vehicle accident in which he claimed another agency cut him off causing the accident."

The first question is do you have an understanding of what the word "agency" means there?

A. Another -- he's talking about the marshals.

Q. Understood. The report -- or the memorandum, rather, continues, quote, "After speaking to witnesses and watching the video of the incident, it was

**62**

determined that Officer Fontenot was not cut off as he reported. Furthermore, he cut off a civilian vehicle nearly causing an accident, and his reckless operation of his unit is what caused the accident."

Is this a fair representation of the mayor's office's findings with respect to this underlying incident?

MS. CASWELL: I'm going to object to form; speculative.

A. It -- it appears to be their findings, yes.

BY MR. MARDIAN:

Q. And you signed this document, as you testified previously, correct?

A. Yes.

Q. Do you have any understanding of the portion that says, quote, "It was determined that Officer Fontenot was not cut off as he reported"?

A. I was cut off, as I -- as I reported, at the intersection of -- well, what's your question?

Q. If you have any understanding of why it says, quote, "It was determined that Officer Fontenot was not cut off as he reported"?

A. No.

Q. Can you explain what you were starting to speak to with respect to how you were cut off at one

**63**

intersection?

A. The video shows that I was cut off by one of the marshals driving his unit --

Q. And --

A. -- at one point.

Q. At one point. What point was that relative to the point of the actual accident?

A. Him cutting me off at the intersection of Second and Maple did not cause the accident. As I stated in the beginning, the marshals cut me off, but it didn't cause the accident.

Q. Did you ever tell anyone that it did cause the accident?

A. I don't recall.

Q. If you flip to the page that ends 1285, the lower right, do you see the top of this page reads, "Reference: Detective Victor Fontenot; Reason: Violation of Procedural order No. 15-20, 19-01; Date Submitted: January 25th, 2021; Investigating Officer: Lieutenant Ryan Young"?

A. Yes.

Q. Do you have any understanding of what this document is?

MS. CASWELL: If you need to review it first.

**64**

THE WITNESS: Yeah.

MS. CASWELL: It goes on.

A. This appears to be Lieutenant Young's internal investigation into the incident.

BY MR. MARDIAN:

Q. Do you have any reason to doubt the accuracy of Lieutenant Young's investigation?

A. No.

Q. Do you believe Lieutenant Young to be an upstanding individual?

A. Nobody is an upstanding individual, but in this case, I believe he -- this is going to be accurate, if that's what you're asking me.

Q. Are there any cases in which you believe his report was inaccurate?

A. Not that I can recall.

Q. In the second paragraph, do you see that it reads, quote, "On January 5th, 2021, Chief Randy Fontenot was notified of the incident by myself and Detective Fontenot. Detective Fontenot made a statement in front of myself, Detective Dan Wil- -- Dane Wilson, and Chief Fontenot that an assisting officer with another agency," parenthetical, "(Chief Deputy Joey Peloquin of the Eunice City Marshal's Office) had," quote, "'cut him off,'" closed quote,

**65**

"during the course of the traffic stop, which resulted in him striking a concrete barrier causing damage to the unit"?

Do you see that Lieutenant Ryan Young put that in this report?

A.  I do.

Q.  Do you have any reason to doubt the accuracy of that statement?

A.  I don't.

Q.  So then is it fair to say that you did in fact tell certain individuals, including Chief Fontenot, that someone else had cut you off and that had, quote, "caused" -- or excuse me, "resulted in you striking the concrete barrier causing damage to your unit"?

MS. CASWELL:  Object to form.  It's not an actual quotation.

A.  It appears I did say that.

BY MR. MARDIAN:

Q.  And you said that to Chief Fontenot?

A.  It appears so.

Q.  So you told Chief Fontenot that the reason that you crashed into the concrete barrier was because the other individual had cut you off?

A.  It appears so.

Q.  And that was inaccurate?

**66**

A.  That was inaccurate.

Q.  Do you recall if Chief Fontenot ever learned that that statement was inaccurate?

MS. CASWELL:  I object to form; speculative.

A.  I don't know.

BY MR. MARDIAN:

Q.  Do you recall this conversation with Chief Fontenot?

A.  Yes.

Q.  What can you recall about this conversation?

A.  Only what I see written here.

Q.  Do you know why the mayor's office was involved in this investigation?

A.  I do not.

Q.  Is it common for the mayor's office to be involved in -- in an investigation?

A.  I don't know.

Q.  You don't know?

A.  I don't know.

Q.  Is this the only time that you've been the subject of an investigation conducted by the mayor's office?

A.  I think so.

Q.  Is it important to be truthful as an employee

**67**

of the Eunice Police Department?

A.  Yes.

Q.  And that's because people rely on your representations?

MS. CASWELL:  I object to form; speculative.

A.  Say again.

BY MR. MARDIAN:

Q.  Do you expect individuals with whom you communicate to rely on the veracity of your communications?

A.  Big words.  Break it down for me.

Q.  Do you expect individuals who -- with whom you communicate at the EPD to believe that what you're telling them is truthful?

A.  Yes.

Q.  Do you expect that when they communicate with you, that they're statements will also be truthful?

A.  Yes.

Q.  It could create problems if either party was being dishonest?

MS. CASWELL:  I'm going to object to form; speculative.

A.  Possibly.

BY MR. MARDIAN:

**68**

Q.  Are there any ways in which it would not create problems if their conduct was -- if their statements were dishonest?

MS. CASWELL:  Object to form; speculative.

A.  I don't know.

BY MR. MARDIAN:

Q.  When you testify in court, is it important that your statements be truthful?

A.  Yes.

Q.  Why is that?

A.  Okay, okay.  I'm trying to follow you.

Q.  Of course, of course.

A.  Okay.  I'm sorry.  What now?

Q.  When you testify in court, is it important that your statements be truthful?

A.  Yes.

Q.  Have you ever witnessed someone else say something at EPD that was determined to be dishonest?

A.  I don't recall.

Q.  Have you ever witnessed another individual at EPD who was found to be -- withdrawn.

Have you ever -- are you -- withdrawn.

Have you -- are you aware of an investigation that has found that any of your colleagues have been

**69**

dishonest?

A. Am I aware of any investigation that -- what?

Q. That has determined that one of your colleagues was dishonest?

A. Not that I'm aware of.

MS. CASWELL: Just in a few minutes...

BY MR. MARDIAN:

Q. Are you aware of any Eunice Police Department policy or procedure that forbids employees from being un- -- untruthful?

A. Am I aware of any policy? I'm not aware of any policy.

Q. You be- -- I believe you testified earlier that the punishment for this conduct was you lost one day's pay. Is that correct?

MS. CASWELL: Object to form; misstates his testimony.

A. I said I -- I believe it was one day or two days.

BY MR. MARDIAN:

Q. Do you recall if you also lost any, quote, "days of seniority"?

A. I don't -- I don't know what that means.

Q. Okay. Do you see on the page that ends 1284, the first paragraph reads, quote, [As read]:

**70**

"Following a pre-disciplinary conference, which was held on February 2nd, 2021, we have all evalu- -- we have evaluated all available information and determined that disciplinary action is appropriate. This is to inform you that you are suspended for one calendar day, will lose one day of seniority, and will lose eight hours of pay."

Do you see that that's written there?

A. Yes.

Q. Do you see that this is also an interoffice memorandum from Mayor Scott Fontenot to you?

A. Yes.

Q. Do you have any reason to doubt the veracity of this memorandum?

A. No.

Q. And do you have any understanding of the phrase, quote, "day of seniority"?

A. The only thing I could -- I could figure or -- or put that into perspective is if me and you are hired on the same date and I receive this, then when it came down -- time for promotions, I would be one day behind you. That's the only thing I can figure that this is saying.

Q. Thank you.

A. Is that -- is that what this is saying?

**71**

Q. Thank you.

MR. MARDIAN: I -- we can go off the record.

MS. CASWELL: Okay. Thank you.

THE VIDEOGRAPHER: We're off the record at 10:53.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 11:26.

BY MR. MARDIAN:

Q. Detective Fontenot, before we broke, we were talking about the language of "day of seniority." You explained what you think it might mean. Is -- is that fair?

A. Is it fair -- say again.

Q. Is it my fair -- is my characterization correct -- or is it a fair characterization that we were talking about what that phrase means and it's your testimony that you're ultimately not sure?

A. Yes.

Q. Do you recall when you received this punishment?

A. I don't.

Q. Do you recall if you did anything to determine what it meant?

**72**

A. I wasn't really concerned about the loss of day of seniority. I was more focused on the day off without pay. So I -- I understood that, so I didn't seek clarification on -- on that.

Q. You understood what the loss of a day of seniority was?

A. I -- I didn't really. I wasn't really concerned with that. I was more concerned about the day off without pay, and I understood what that meant.

Q. So just to confirm, there were two aspects to this punishment, and one of those you didn't understand and did not take any efforts to attempt to understand?

A. Correct.

Q. Did you talk to Chief Fontenot at all about this punishment?

A. I think I did.

Q. Do you recall the sum and substance of that conversation?

A. I -- I -- I don't.

Q. Do you recall anything that you said to Chief Fontenot during that conversation?

A. If I recall, the only thing I was asking about was what day would that -- would that be, that I wouldn't be able to come to work.

Q. Is it -- is it within his discretion to

**73**

determine the day?

A. I don't -- I don't know.

Q. Do you recall anything that he said to you during that conversation?

A. No.

Q. Has Chief Fontenot ever punished you?

A. Other than this, you mean?

Q. Let me rephrase. Has Chief Fontenot ever punished you?

A. As in what?

Q. Has Chief Fontenot ever opened an investigation into your conduct at EPD?

A. Other than this one, I -- I don't recall. I -- I don't know if he did or not. That would be in my files.

Q. Is it fair to say that if there is no other investigation in your files, it's because there was no other investigation?

MS. CASWELL: I object to form; speculation.

A. I don't know.

BY MR. MARDIAN:

Q. Have you ever seen your files at EPD?

A. I don't think I have.

Q. Do you have the ability to access your files

**74**

at EPD?

A. I don't know.

Q. Do you know if there's a policy and procedure that affords you the right to review your files at EPD?

A. I don't know.

Q. Have you ever sought to review your files at EPD?

A. I don't think I have.

Q. You recall this investigation. Do you know why you recalled it?

A. This? Why I recall this one? Maybe because it's -- it's recent. I don't know.

Q. Is it notable to have an investigation opened into your conduct at EPD?

A. Is it notable? Explain.

Q. Essentially, what I'm trying to get at is would you remember if an investigation was opened into your conduct at EPD and you were told about that investigation?

A. Would I remember every investigation that was ever opened on me; is that what you're asking?

Q. Yes.

A. I don't.

Q. How frequently are investigations opened into officers at EPD?

**75**

A. I don't know.

Q. Have you ever heard of an investigation being opened into another officer at EPD?

A. I don't recall.

Q. Are you aware of any other investigation that was opened in -- into your conduct at EPD?

A. I don't recall.

Q. Is Chief Fontenot generally involved in investigations that are conducted at EPD?

A. I don't know.

Q. Are you aware of any investigation at EPD in which Chief Fontenot was not involved?

A. I don't know.

Q. Do you ever talk to Chief Fontenot about open investigations at EPD?

A. Not that I recall.

Q. But you did in fact talk to Chief Fontenot about this investigation at O -- EPD, correct?

A. Yes. You're talking about this investigation here, this paperwork?

Q. Correct. The one that took place in January of 2021.

A. Yeah.

MR. MARDIAN: I would like to mark as Plaintiff's Exhibit 3 a critical incident

**76**

reform -- critical incident form.

MS. CASWELL: Are we done with that whole packet?

MR. MARDIAN: Yeah. You can set that to the side.

MS. CASWELL: And sorry. Are we giving these to -- are you giving these to her or -- the marked ones?

MR. MARDIAN: Yes. We'll need to give the marked ones to the court reporter.

(Plaintiff No. 3 was marked for identification.)

BY MR. MARDIAN:

Q. Sir, I'm handing you a document that's been marked Plaintiff's Exhibit 3. I represent to you that, as you can see in the lower right-hand corner of this document, it was produced by plaintiff's counsel in this litigation.

Do you see that at the top, the document is titled "Critical Incident Form"?

A. Yes.

Q. Do you see that the employee name listed is Victor Fontenot?

A. Yes.

Q. And do you see that the supervisor name is Lieutenant Michael Dunn?

**77**

A.   Yes.

Q.   Do you see that date of this critical incident form is January 30th of 2019?

A.   Yes.

Q.   On January 30th of 2019, was Lieutenant Michael Dunn your supervisor?

A.   I -- I don't recall.

Q.   Sir, do you recall who your supervisor was in January of 2019?

A.   No, sir.

Q.   Sir, do you know today, who your supervisor is?

A.   Yes, sir.

Q.   Do you recall who your supervisor was before your current supervisor?

A.   Lieutenant Tony Kennedy.

Q.   And before Lieutenant Tony Kennedy who was your supervisor?

A.   I think it was Lieutenant Mary Guillory.

Q.   And prior to Lieutenant Mary Guillory, who was your supervisor?

A.   Lieutenant Young.

Q.   And prior to Lieutenant Young, who was your supervisor?

A.   I believe it was Lieutenant Hoke.

**78**

Q.   Going from today to the last supervisor that you mentioned, you have a sense of the -- the time span, that time period?

A.   Specific.

Q.   The -- the individuals that we just listed, how far back in time would that take us?

A.   2015-ish.

Q.   And so in that time, we've identified four or five supervisors.  Is that fair?

A.   That's fair.

Q.   So you've had, on average, about a supervisor a year?

A.   That sounds about right.

Q.   Does that strike you as a lot of turnover?

A.   What?

Q.   Does it strike you that that's a lot of turnover at the EPD?

A.   "Turnover" as in?

Q.   Meaning individuals at EPD frequently changing roles.

A.   Oh.  I don't know.  I -- I have nothing to compare it to.  It's the only place I've ever worked as law enforcement, so I -- I -- I don't know.

Q.   Sir, are you aware of an incident that took place on or around January 26th, 2019, where you sought

**79**

to apprehend one Mr. J. Ashworth?

A.   Where I went to apprehend Joshua Ashworth?

Q.   Correct.

A.   Refresh my memory.

Q.   Have you ever sought to apprehend Joshua Ashworth?

A.   Yes.

Q.   Did you ever seek to apprehend him by using an incarcerated individual as bait?

A.   Oh, okay.  I see where you're -- yes.

Q.   Can you please describe that?

A.   You want me to read this and describe it to you, or do you want me to off my memory?

Q.   Yeah.  If you can, just first speak to your memory.  That'd be --

A.   Okay.  From what I remember or what I think I remember, we were after Mr. Ashworth -- I think we were after him because I had a warrant for his arrest, and I don't remember if it's for stealing money from the department.  Is that -- is that -- is that what -- where we're at, that incident?

Q.   I can't testify for you, sir.

A.   Okay.  Then I'm going to sit here and read this whole thing.  Okay.

Q.   Okay.  But --

**80**

A.   And then I'll get back to you.

Q.   Okay.  Sure.

A.   Okay.  This is what you're asking, right, what's in this paperwork?

Q.   Well, sir, to be clear, the pending question is if you've ever used an individual as bait in -- to attempt to attempt -- to attempt to apprehend Mr. Ashworth?

A.   Yes.

Q.   So there is such an incidence?

A.   Yes.

Q.   What can you just tell me about that incident?

A.   Okay.  I believe I went to Lieutenant Young -- Lieutenant Dunn.  I don't remember if he came to me or I -- I came to him about it.  We made the decision.  I don't know who made the decision to use a former CI of mine, who I personally arrested and put in the city jail, the former CI.  We were going to use him to draw Ashworth to a location.

And if I recall right, we had to change the location at one time.  I don't remember what one of the locations was, but I remember the other location was the -- what we call the City Lake in Eunice.  I think something happened there.  There were too many people there or -- I can't recall the -- the details of that.

**81**

But it ended up that we -- I don't -- we were not able to -- to make it work. Ashworth was not arrested that day, from what I recall.

Q. Do you recall the name of the confidential informant?

MS. CASWELL: Objection. Is -- if he's -- is he still a confidential informant?

THE WITNESS: He's not and his name is -- is in here, yeah.

MS. CASWELL: Okay. I just want to make sure.

A. Yeah. Jordan Arnaud.

MR. LOUGHLIN: So was that Arnold or Arnaud?

THE WITNESS: I say "Arnaud." It's A-r-n-a-u-d. Yeah.

BY MR. MARDIAN:

Q. Is it correct, sir, that you testified that either you went to Lieutenant Dunn with this plan or he came to you?

A. Yeah, I can't remember how it came about.

Q. So it's your testimony that, possibly, it was Lieutenant Dunn's plan to use Mr. Arnaud to capture Mr. Ashworth?

MS. CASWELL: Object to form; misstates

**82**

his testimony.

A. Yeah. I -- I can't remember if I went to him or he came to me.

BY MR. MARDIAN:

Q. Was Mr. Arnaud one of Lieutenant Dunn's confidential informants?

A. I have no idea.

Q. You never asked your confidential informant if he was also a confidential informant for one of your colleagues?

A. Mr. Arnaud? No.

Q. Do you have any understanding of the identities of the confidential informants that your colleagues used?

A. Okay. I don't -- I don't understand.

Q. Sure. So certain of your colleagues at EPD also rely on confidential informants?

A. Correct.

Q. Are you aware of any of those confidential informant's identities?

A. I am not.

Q. Would you want to know if a confidential informant with whom you are working is also working with another officer at EPD?

A. It really wouldn't matter if they were or not.

**83**

Q. It would have no affect on your job?

A. Not that I know of, no. I can't foresee it having any effect.

Q. Other than this instance, are you aware of any other time -- withdrawn.

To clarify, Mr. Arnaud was incarcerated at the time of this event; is that correct?

A. As far as I can rememb -- yes, I think he was.

Q. And so the --

A. I'm pretty sure he was.

Q. The plan was to release him from incarceration to attempt to apprehend Mr. Ashworth?

MS. CASWELL: Object to form.

A. Release him? I -- I -- I would have to read this whole thing to be able to -- to answer that. Okay.

BY MR. MARDIAN:

Q. You understand that this is an incident report written by Lieutenant Dunn; is that correct?

A. Yes.

Q. And so you're relying on reading it to inform you as to what occurred; is that correct?

A. Correct.

Q. And that's because you trust the veracity of Lieutenant Dunn's incident reports?

**84**

A. Well, I would take what he has in here and try to jog my memory as to facts and -- and determine if -- if what it is in here -- because I don't think I've ever read this -- to determine if it's factual.

Q. When someone files a critical incident report, is it sent to the subject of that report?

A. I don't know.

Q. Have you ever filed a critical incident report?

A. Not that I remember.

Q. Are you aware of any report being filed about you?

A. By?

Q. Anyone.

A. Right now, I can't recall.

Q. Can you recall ever seeing a critical incident form?

MS. CASWELL: Ob- -- all right. Go ahead.

A. Against me?

BY MR. MARDIAN:

Q. Against anyone.

A. I can't recall.

Q. You can't recall whether you've ever seen a critical incident -- incident reform written about any

**85**

member of EPD at any time during your employment at EPD?

A.   Right now, I can't recall, no.  You would have to be more specific.

Q.   All right.  Well, I think that question is fairly specific, sir.

A.   Okay.

Q.   The question is have you ever seen one of these forms written about anyone at EPD during the entirety of your employment at EPD?

A.   I can't remember.

Q.   Are you aware of the officers' bill of rights?

A.   I've -- I've heard it.  I think I've read it once.

Q.   Do you have any understanding of whether the officers' bill of rights requires the subject of investigation to be notified of that investigation?

A.   I think so, yes.

Q.   Nonetheless, you've never seen one of these forms?

A.   On me, yes.  I -- I do recall now, yes.

Q.   You do recall having seen one of these forms written about you?

A.   Yes.

MS. CASWELL:  Object to form.  I mean,

**86**

are we talking about this critical incident form and an internal investigation?  They're not necessarily -- I think we're crossing wires here.

MR. MARDIAN:  The question is --

MS. CASWELL:  It's not one and the same.

MR. MARDIAN:  -- whether the witness has ever seen a critical incident form written about himself.  He testified extensively that he had not.  Sounds like, now, he's recalling that he has.

THE WITNESS:  Correct.

MS. CASWELL:  Okay.  But then you asked about internal investigations.  It -- it's just not, necessarily, one and the same, so I'm just --

MR. MARDIAN:  Look, you can keep your speaking objections to yourself, counsel.  I don't think that's appropriate.

MS. CASWELL:  Well, I think it's -- he's confused so -- I'm -- I'm confused.

MR. MARDIAN:  Okay.  Well, if he's confused, he can -- he's asking me considerably to clarify.

MS. CASWELL:  Okay.

**87**

MR. MARDIAN:  We don't need comments potentially coaching him as to his confusion.

MS. CASWELL:  Okay.

BY MR. MARDIAN:

Q.   I would like to direct you to the description of "incident" written in this critical incident form.

Do you see the first paragraph reads, quote, "On January 26th, 2019, I, Lieutenant Michael Dunn, was contacted by Victor Fontenot in reference to helping him serve a misdemeanor warrant for Joshua Ashworth while I was off duty"?

A.   Yes.

Q.   Do you have any reason to doubt the accuracy of that statement?

A.   No.

Q.   Does that clarify, to you, whether this plan was yours or Lieutenant Dunn's?

A.   Yes.

Q.   Was it your plan?

A.   Yes.  It appears so, yes.

Q.   Next paragraph, it reads, quote, "V. Fontenot informed me he was in contact with a CI who was going to have J. Ashworth, who has an outstanding warrant, meet him at Eunice City Lake to allow us to capture him."

**88**

Do you see that?

A.   Yes.

Q.   Do you have any reason to doubt the accuracy of that sentence?

A.   No.

Q.   It comports with your understanding of what took place?

A.   Yes.

Q.   Next paragraph begins, quote, "I questioned V. Fontenot about how J. Arnaud would be meeting with J. Ashworth since he was a prisoner in our jail.  V. Fontenot explained he had permission from Chief Randy Fontenot and Judge Terry Hoychick to allow J. Arnaud to be taken out of the jail area, placed into civilian clothing, and allowed to meet with J. Ashworth."

Do you see that?

A.   Yes.

Q.   Do you have any reason to doubt the accuracy of that statement?

A.   No.

Q.   Do you believe that to be a true statement?

A.   I do.

Q.   Do you recall seeking permission from Chief Randy Fontenot to conduct this attempted apprehension?

**89**

A. I don't.

Q. Do you have any recollection of seeking permission from Judge Terry Hoychick to conduct this attempted apprehension?

A. I don't.

Q. Would it be normal for you to seek the permission of a judge to release an individual from jail?

A. Yes.

Q. Would it be normal for you to seek the permission of your chief to release someone from jail?

A. Chief, then judge. Yes.

Q. You simply don't recall having those actual conversations?

A. Not this particular one, no.

Q. Would it surprise you to believe that they did in fact take place?

A. Would it surprise me to -- to what?

Q. You don't have any reason to doubt that they took place; you simply can't recall them. Is that correct?

A. Right. Correct.

Q. Next page, first full paragraph, last sentence reads, quote, "Chief Fontenot informed me" --

A. Where are we?

**90**

Q. Sorry. First full paragraph --

A. Okay.

Q. -- last sentence. Quote, "Chief Fontenot informed me that he would still allow the operation and have my self and a few others assist V. Fontenot."
Do you see that?

A. Yes.

Q. And to clarify -- I should have done at the beginning -- this is written from the perspective, it appears, of Lieutenant Dunn.

A. Okay.

Q. So in this sentence, "Chief Fontenot informed me," Chief Fontenot informed Lieutenant Dunn --

A. Okay.

Q. -- "that we would still have the operation."
Understanding that you weren't a party to that conversation, do you have any reason to doubt the veracity of the statement written here?

MS. CASWELL: I'm going to object to form; requires speculation.

A. Do I believe this took place, is what you're asking me, this conversation took place?

BY MR. MARDIAN:

Q. Do you believe that Chief Fontenot informed Lieutenant Dunn that you could conduct this operation?

**91**

MS. CASWELL: Object to form; requires speculation.

A. It appears so on the paperwork here. It appears that -- that's what happened.

BY MR. MARDIAN:

Q. Do you have any reason to doubt the accuracy of that statement?

A. I -- I don't know.

Q. In your time at EPD, is it common for officers to use an incarcerated individual as bait to attempt to apprehend someone at large?

MS. CASWELL: I object to form; requires speculation.

A. In -- in general? Or just what I have done?

BY MR. MARDIAN:

Q. What you have done.

A. It's been done a couple of times, yes.

Q. How many times in your ten-year tenure at the EPD?

A. With me? Maybe this and one other time.

Q. So two times that you can recall?

A. Yeah.

Q. How many times can you recall where others, but not yourself, were involved?

A. I have no idea.

**92**

Q. So it's not the most common occurrence in your experience?

A. I've done it maybe twice.

Q. In the times that you did it, did you seek Chief Fontenot's permission?

A. Spoke to chief to get permission to go up and speak to the judge about it, yes.

Q. If you see -- in the fourth paragraph that begins "while briefing," do you see that it reads, quote, "While briefing the team, V. Fontenot walked into my office with J. Arnaud. V. Fontenot explained he was dropping J. Arnaud off outside the city near City Lake and he would be unsupervised"?
Do you see that?

A. Yes.

Q. Do you have any reason to doubt the accuracy of that statement?

A. No.

Q. Do you recall walking into Lieutenant Dunn's office with Mr. Arnaud?

A. Yeah.

MS. CASWELL: Object to form. That's not what it says. I'm sorry. I might have misread it. Withdraw my objection.

A. Yes.

**93**

BY MR. MARDIAN:

Q.    You do recall walking into Lieutenant Dunn's office with Mr. Arnaud?

A.    I do.

Q.    Next sentence -- excuse me, next paragraph, second or third sentence beginning "shortly thereafter." It's in the middle of the paragraph. Do you see that it reads, quote, "Shortly thereafter, V. Fontenot returned to my office. I explained, again, to V. Fontenot all the issues I had with his plan. I explained to him J. Arnaud was a flight risk and he was to remain in -- in his custody no matter what transpired even if J. Ashworth ran. V. Fontenot then became argumentative"?

Do you see that this is written there?

A.    I see it's written here.

Q.    Do you have any reason to doubt the accuracy of that statement?

MS. CASWELL: Object to form; compound.

Can we be a little more specific?

BY MR. MARDIAN:

Q.    Do you have any reason to doubt the -- the accuracy of any of the statements that I just read?

A.    No.

Q.    Do you recall this conversation between you

**94**

and Lieutenant Dunn?

A.    Very vaguely.

Q.    Do you recall that he raised issues with the plan?

A.    Yes.

Q.    Do you recall whether you formed any opinion as to whether his issues were valid?

A.    I don't recall what they were, but we did have that conversation, yes.

Q.    Earlier, you testified that you respect Lieutenant Dunn; is that correct?

A.    I respect him as a police officer, yes.

Q.    And you said that's part due to his knowledge of the law?

A.    Correct.

Q.    So when he comes to you with issues, you take those seriously?

MS. CASWELL: Object to form.

A.    Now? This time period? This --

BY MR. MARDIAN:

Q.    I'll clarify. When Lieutenant Dunn identifies issues for you today, do you take those seriously?

A.    Yes.

Q.    When, in 2019, he identified these issues to you, did you take them seriously?

**95**

A.    My lack of experience in this time frame, I don't think I took him as serious as I would today.

Q.    Can you explain that? What do you mean by your lack of experience?

A.    I'm more knowledgeable as a police officer, as a detective. As I was back then, I didn't really see an issue or issues with the plan back then. Today, I think I would have gone a different route, maybe.

Q.    Understood. Sir, is your -- your testimony that today, you would not have attempted to execute this plan?

MS. CASWELL: Object to form. That misstates his testimony.

A.    I'm not saying that I wouldn't have. I'm just saying I would have looked at dif- -- different options to get the same result as we were trying to get then.

BY MR. MARDIAN:

Q.    And the reason -- withdrawn.

Is part of the reason you would look at different options because you identify that there are issues with this plan?

A.    There could be, yes. There could be.

Q.    And some of the issues that there could be are the issues that Lieutenant Dunn had identified?

A.    Yes.

**96**

Q.    Did anyone other than Lieutenant Dunn identify these issues to you?

A.    I don't recall.

Q.    Do you recall discussing any of these issues with anyone other than Lieutenant Dunn?

A.    The issues that he had?

Q.    Correct.

A.    I don't recall, no.

Q.    You do test- -- you did testify earlier that you discussed this plan with Chief Fontenot, correct?

A.    Yes.

Q.    And do you have any recollection of Chief Fontenot identifying any of the issues that Lieutenant Dunn raised?

A.    No, I don't.

Q.    After Lieutenant Dunn raised these issues, did you discuss those issues with Chief Fontenot?

A.    I -- I don't remember if I did or not.

Q.    Do you have any recollection of discussing those issues with anyone other than Chief Fontenot?

A.    No, I don't.

Q.    And pursuant to your job responsibilities at EPD, if your supervisor identifies issues with a plan and you disagree, do you take those concerns to anyone other than your supervisor?

**97**

A.  No.

Q.  You do not take them to anyone other than your supervisor?

A.  You seem surprised.  Refrain -- I mean, re- -- re- -- re- -- reask the question in a -- another way.

Q.  I'm just wondering if -- pursuant to your job responsibilities at EPD, if you had disagreement with your supervisor, do you -- is there any mechanism to resolve that dispute?

A.  I don't know.  You're talking about policy-wise?

Q.  Correct.

A.  I -- I don't know.

Q.  Practically speaking, what do you normally do?

A.  Do what the supervisor says.

Q.  Is that what took place in this incident?

A.  I don't recall.

Q.  Going back to the document, looking at the same paragraph, picking up where we left off with the document, we're now looking at fifth paragraph, last sentence.  "V. Fontenot made the following statements, which are worded to be the best of my recollection."  Quote, "look, go ahead, arrest me.  When y'all were looking for him, I knew where he was at each time."

Sir, do you have any recollection of making

**98**

that statement?

A.  I'm saying this?

Q.  Correct.

A.  Yes.

Q.  You do recall saying that?

A.  I think I do, yes.

Q.  Next statement.  Quote, "So what if he gets away?  I need him on the street."

MS. CASWELL:  Peter, one second.  He just --

MR. MARDIAN:  Oh, my apologies.  Sorry.

THE WITNESS:  Okay.

BY MR. MARDIAN:

Q.  Next statement, quote, "So what if he gets away?  I need him on the street."

Do you recall making that statement?

A.  I --

MS. CASWELL:  And object to form.  It's misleading because it even says that it's worded to the best of his recollection so --

A.  I don't remember saying that one, no, sir.

BY MR. MARDIAN:

Q.  Do you remember saying anything similar to that statement?

A.  No.

**99**

Q.  You don't remember saying anything similar to the statement written here?

A.  The second one?

Q.  Correct.

A.  No.

Q.  Do you have any reason to believe that Lieutenant Dunn would have incorrectly recorded the statement?

A.  I don't know.

Q.  Next statement.  Quote, "Look, if he gets away, I will just pick him up later.  I know where he is going," closed quote.

Do you have any recollection of making that statement?

A.  No.

Q.  Do you have any reason to doubt that you made that statement?

A.  No.

Q.  Do you have any understanding of what it means where Lieutenant Dunn wrote, "I know where he is going"?

A.  No.

Q.  Next statement reads, quote, "I took Jordan to his house.  I met with Sonny and told them how this was going to work."  Same question.

**100**

Do you have any recollection of making that statement?

A.  No.

Q.  Do you have any recollection of making a similar -- a statement, excuse me, similar to that statement?

A.  No.

Q.  Do you have any reason to doubt that you made that statement?

A.  No.

Q.  Who is Sonny?

A.  That was Jordan's father.

Q.  Was he also a confidential informant?

A.  No.

Q.  What's your relationship with Sonny?

A.  What was my relationship with Sonny at the time?  At this time?

Q.  Correct.

A.  Just someone that I talked to when I would drive up to speak with his son Jordan.  If Sonny was outside, we would speak.

Q.  It's -- do you have any understanding if Sonny knew that Jordan was a confidential informant?

A.  I don't know if he did.  I don't know if he did.

**101**

Q.   Do you know what Sonny's profession is?

A.   What his profession is?

Q.   What he does for a living.

A.   Back then?  I think he did small engine repairs, stuff like that.

Q.   Small engine repairs?

A.   I think that's what he was doing, yeah.

Q.   Next statement.  Quote, "Come on.  We got to let him do this, man.  It only going to be for an hour or so."

Do you see that?

A.   I do see.

Q.   Do you have any recollection of making that statement?

A.   No.

Q.   Do you have any recollection of making anything similar to that statement?

A.   No.

Q.   Do you have any reason to doubt that Lieutenant Dunn's recollection of the statement is accurate?

MS. CASWELL:  Object to form; requires speculation.

A.   Yeah, I don't know.

BY MR. MARDIAN:

**102**

Q.   Next sentence.  Quote, "I promise I will get him.  It's only going to take a day or so before I pick him."

Do you have any recollection of making that statement?

A.   No.

Q.   Do you have any recollection of making -- saying anything similar to that statement?

A.   No.

Q.   Do you have any reason to doubt the veracity of Lieutenant Dunn's recollection?

A.   I don't know.

MS. CASWELL:  Object to form; requires speculation.

A.   I don't know.

BY MR. MARDIAN:

Q.   Sir, do you have any recollection of whether this attempted apprehension took place?

A.   I think it did take place.

Q.   Do you have any recollection of the result of it?

A.   I don't -- I don't remember if we arrested -- if it worked.  I don't think we have arrested Mr. Ashworth in this -- I don't think we did.  I -- I don't recall.

**103**

Q.   Is Mr. Ashworth incarcerated today?

A.   I have no idea.

Q.   Do you know what ever became of him after this incident in January of 2019?

A.   He moved out of town.  And I think he came back to town.  I have no idea where he is now.

Q.   And perhaps this is a strange question.  Forgive me.  But how would you know if he moved out of town or not?  If -- if you knew where he was, why would you not try to capture him?

A.   After he -- what do you mean?  After this?

Q.   Yeah.

A.   Oh, I captured him.

Q.   Oh, so -- oh, so he was captured and incarcerated, but he's just not currently incarcerated?

A.   Do you realize how long ago this was?

Q.   Well, fewer than -- a little longer than three years.

A.   It was a misdemeanor warrant, if I recall, right?

Q.   I think that's accurate, yes.

A.   Well, I mean, I don't know what it was for.  I don't remember, but that was four years ago.  He would not have been incarcerated for four years for a misdemeanor warrant.  I don't -- I don't think so.

**104**

Q.   Is a misdemeanor warrant a minor offense?

A.   Yes.  It's not a felony.

Q.   So it's not something that would take up a lot of your time?

A.   Right.

Q.   If that's the case, why were you considering putting someone who was incarcerated on the line to capture him?

A.   I don't know.  I don't remember all the details of why we were doing this.

Q.   But you have testified that this was your plan and you attempted to --

A.   Uh-huh.

Q.   -- carry it out, correct?

A.   Correct.

Q.   So it's your testimony that, notwithstanding the fact that this was a minor event, you were considering releasing someone from jail to -- to execute it.  Correct?

MS. CASWELL:  Object to form; misstates his testimony.

A.   I don't remember what the details were about.

BY MR. MARDIAN:

Q.   Do you know what ever became of this critical incident form?

**105**

A.    No.

Q.    Do you know if you were ever punished on account of the conduct that's described therein?

A.    No, I don't remember.

Q.    Do you ever -- do you have any recollection of speaking with Chief Fontenot about this incident report after it was written?

A.    No, I don't remember if we did or not.

Q.    Do you have any recollection of speaking with Chief Fontenot about the event -- events described in the incident report at any time over the past four years?

A.    No.  No.

MR. MARDIAN:  It's noon.  I'm happy to break for lunch now.  I'm happy to keep going depending on what you-all would prefer.

MS. CASWELL:  We can go off the record just real quick.

THE VIDEOGRAPHER:  We're off the record at 12:04.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 12:51.

BY MR. MARDIAN:

Q.    Did you speak with anyone during the lunch

**106**

break?

A.    Yes.

Q.    With whom did you speak?

A.    To Chelsea.

Q.    Did you speak with anyone other than Ms. Caswell?

A.    Chief offered me a napkin.  I said thank you.

Q.    Understood.  Thank you.

THE WITNESS:  There is somebody at the door.

BY MR. MARDIAN:

Q.    Sir, are there geographical limits to the jurisdiction of the Eunice Police Department?

A.    Yes.

Q.    What are those limits?

A.    We have what's called the city limits, which is incorporated.  North, south, east, and west, there is a limitation to our jurisdiction.

Q.    So are you allowed to operate as a member of the Eunice Police Department outside the city limits of Eunice?

A.    We are not allowed to take action or make arrests outside of our jurisdiction.

Q.    Are you allowed to do anything pursuant to your job responsibilities as a member of the EPD

**107**

outside the city limits of Eunice?

A.    As a detective, we're allowed to investigate outside of our city limits.  If we're going to take action during the investigation -- let's say we go to Crowley.  You know where Crowley is?  Okay.  Okay.

MS. CASWELL:  They're from New York.

A.    Acadai -- I'm sorry.  I -- I forgot. Acadia Parish.  I can do investigations there, but if I'm going to execute a warrant or make an arrest or make physical contact with anyone there, I would have to have the assistance of the Crowley Police Department or Acadia Parish Sheriff's Department with me, if I take action.

BY MR. MARDIAN:

Q.    So you cannot, by yourself, take action outside the city limits of Eunice if that action is arresting someone, executing a warrant, or -- I believe you said have physical contact with them?

A.    Physical contact -- contact meaning making an -- an arrest or executing the warrant, yes.

Q.    Are there any acts, other than executing a warrant or making an arrest, that you are not -- excuse me, that you are -- withdrawn.

Other than making an arrest or executing a warrant, are there any other acts that you are not

**108**

permitted to take outside the Eunice city limits?

A.    I don't think so.

Q.    And you're only allowed to take those acts if you're acting with another law enforcement agency?

A.    To make an arrest or -- yes.

Q.    Are you permitted to speak with potential suspects outside of Eunice city limits by yourself?

A.    No.

Q.    Are you allowed to -- withdrawn.

How frequently do you execute responsibilities pursuant to your obligations as a Eunice Police Department member outside of Eunice city limits?

A.    Them big words again.  Break -- break it down for me.

Q.    Yeah.  It's fair.  I'm just wanting -- how often -- if we can say that you're allowed to do certain things outside of Eunice city limits by yourself, I'm trying to understand what those things are.  If you could, just help me to understand "oh, I'm allowed to do this and allowed to do that because I -- that's not executing a warrant and that's not arresting someone."

A.    Okay.  We are allowed to do surveillance and meet with informants outside the city limits for their safety.  We travel to other jails to speak with

**109**

subjects that are locked up that we need information from. We transport outside of our jurisdiction if we need it.

Q. Is there any policy that sets forth what you are and are not permitted to do outside of Eunice city limits?

A. Like written -- written policy?

Q. Correct.

A. I -- I'm not sure.

Q. What are the written policies that govern the conduct of EPD?

A. I don't know.

Q. Have you ever asked to see them?

A. I think I was given a copy, yes.

Q. When would that have been? When you started in 2010?

A. Yes. I believe when Chief Fontenot took office, we were given a -- an extended edition or -- you know. Yeah, so it would have been probably 2015.

Q. Do you ever question whether -- withdrawn. Before taking any action, do you ever feel the need to consult the written policies?

A. I trust my supervisor to know what those policies are.

Q. Do you ever ask your supervisor "is X conduct

**110**

allowed under the written policies and procedures?"

A. Uh-huh.

Q. Can you recall any of those specific times that you asked?

A. I can't recall a specific time, no.

Q. You testified that -- and correct me if this is wrong. There are written policies that govern -- withdrawn -- with- -- withdrawn. How have you come to learn that certain conduct is permitted and other conduct is not permitted outside of the Eunice city limits?

A. Be specific.

Q. So earlier, you testified as to certain conduct you're allowed to engage in outside of Eunice city limits. Do you recall that?

A. Uh-huh.

Q. How have you come to learn that that conduct is permissible?

A. I guess when a situation would come up, me and the supervisor would discuss it. I'm pretty sure we would discuss it. You -- you know, you hear other officers speaking. You learn your -- your policy and what's permissible and what's not. I'm -- I'm guessing on a daily, day -- day-to-day basis you -- you hear and you learn, you -- yeah.

**111**

Q. In those discussions with your supervisor, does your supervisor ever point you to a specific policy and explain "this is permissible or impermissible conduct because of what it says in this policy"?

A. I -- I don't recall.

Q. Have you ever discussed these written policies with Chief Fontenot?

A. I don't recall.

Q. Has Chief Fontenot ever given you training on these policies?

A. On which policies?

Q. Any in the entire manual.

A. I -- I don't -- I don't think so. I don't recall if -- if he had.

Q. Has anyone in the Eunice Police Department ever given you any training regarding any of the policies?

A. I don't -- I don't recall.

Q. You can't recall any time in which anyone at EPD trained you on any of the policies that are in the written manual?

A. No.

Q. So then, sir, how do you understand what is permissible and impermissible conduct when conducting

**112**

your job?

A. Hearing other officers speak, their experiences, their knowledge. Again, trusting my supervisor with 20-something years of experience that he knows what's permissible and what's not permissible, trusting his judgment and his experience.

Q. When you say "he" and "his," to whom are you referring?

A. Lieutenant Young, Lieutenant Kennedy when he was head of detectives, when I was in detectives.

Q. Did Lieutenant Young ever point you to a specific policy?

A. If he did, I don't recall --

Q. Did Lieutenant --

A. -- any specific.

Q. Excuse me.

A. Sorry.

Q. Did Lieutenant Kennedy ever point you to a specific policy?

A. And if he did, I -- I don't remember.

Q. Have you ever disagreed with one of your colleagues' interpretations of a policy or procedure?

A. I don't recall.

Q. Has there ever been a time where you've wondered if conduct is permissible under a policy and

**113**

you've raised it with your colleagues and they didn't know?

A.   I don't recall.

Q.   So there's never been a time where you raised a unique situation?

A.   I said I don't recall a time.  I didn't say there never was.  I said I don't recall a time.

Q.   Understood.  Sir, are you aware of an alleged rape that took place during August of 2019?

MS. CASWELL:  Object to form; extremely vague.

A.   Yeah.  Not right offhand, no.

BY MR. MARDIAN:

Q.   Pursuant to your job responsibilities as a detective at EPD, do you ever investigate alleged rapes?

A.   Yes.

Q.   How often would you say?

A.   I think I've investigated one -- one in my career, yeah.  I do, yeah.

Q.   Do you recall when that took place?

A.   I -- I don't.

Q.   Could you ballpark it?

A.   No.

Q.   Do you recall the alleged victim?

**114**

A.   I can't remember.

Q.   Do you recall the alleged rapist?

A.   I do, but I can't remember his name.

MR. MARDIAN:  I'd like to mark as Plaintiff's Exhibit 4 a set of materials that were produced by defendant's counsel.

(Plaintiff No. 4 was marked for identification.)

BY MR. MARDIAN:

Q.   And I'll represent to you again, sir, that this is from a larger set of documents, and we've made our best attempt to provide you the -- the set that we think most closely was kept together in the -- in the defendant's ordinary course of business.

A.   Okay.

Q.   That said, it's a fairly long document, and so I will -- will be directing you to specific portions. At any time, if you would like to read other portions to understand context, I'm of course happy to let you do so.  I would like to begin not on the first page. I'd like to begin on the page that ends, at the lower right-hand corner, dash 337.

Sir, do you see that this is an interoffice memorandum written by Chief Randy Fontenot and directed to you, Detective Victor Fontenot?

MS. CASWELL:  Peter, you gave him a

**115**

highlighted copy.  You might want that one.

THE WITNESS:  Can I keep that one?

MR. MARDIAN:  Thank you, counsel.  I was wondering where the highlighted copy went.

THE WITNESS:  There you go.

MR. MARDIAN:  Thank you so much.  So now -- this must have been the one I was --

THE WITNESS:  I'll just keep that one.

MR. MARDIAN:  I'll give you a fresh one just so we don't mess any of this up.

BY MR. MARDIAN:

Q.   Apologies about that.  If you could, please turn to page 337.  It's a little hard to see because it's right under a phone number that incidentally is also 337.  Do you see that it reads, sir -- or excuse me, withdrawn.

Do you understand, sir, that this is an interoffice memorandum sent to you by Chief Randy Fontenot?

A.   Yes.

Q.   Do you see that it was sent on or about October 3rd, 2019?

A.   Yes.

Q.   Do you see, sir, that it reads, quote, "The investigation of August 13th, 2019, incidents has

**116**

been concluded.  It is my finding that appropriate counseling with Detective Victor Fontenot has been done to correct the violations that were reported.  I also find that any further disciplinary action would be unwarranted."

Do you see that it -- it reads that?

A.   Yes.

Q.   Do you recall receiving this, sir?

A.   No.

Q.   Do you have any understanding of what the August 13th, 2019, inc- -- incidents are?

A.   No.

Q.   Do you recall the, quote, "appropriate counseling" that you underwent?

A.   No.

Q.   And do you recall Chief Fontenot's decision that further disciplinary action would be unwarranted?

A.   No.

Q.   Sir, do you have any understanding -- withdrawn.

Sir, has Lieutenant Dunn ever alleged that you improperly responded to an alleged rape?

MS. CASWELL:  Object to form; speculative.

BY MR. MARDIAN:

**117**

Q. Sir, are you aware of any time that -- withdrawn.

Are you aware of whether or not, at any time, Lieutenant Dunn has ever alleged that you did not appropriately respond to an alleged rape?

A. Not that I recall.

Q. Could you please turn to the page that ends dash 1355 in the lower right. Sir, do you see that this document is dated September 3rd, 2019?

A. Yes.

Q. Do you see that the subject line is "Re: Critical incident forms, employee Darien Guillory and Victor Fontenot"?

A. Yes.

Q. Do you have any understanding of what these critical incident forms are?

A. Not at this moment, no. If I read them, I would know what they were about.

Q. Understood. If you flip the page to the one that ends dash 1357, do you see the first paragraph heading that reads "September 3rd, 2019, Location CID"?

A. I'm still looking for 357.

Q. Oh. It might be --

MS. CASWELL: On the back --

MR. MARDIAN: -- at the back.

**118**

MS. CASWELL: -- of one of them. Yeah, it's front and back.

MR. MARDIAN: On the back of this first one. Oh, no.

MS. CASWELL: Here, give me your pile.

MR. MARDIAN: Thank you.

MS. CASWELL: This page.

THE WITNESS: This is 55 --

MR. MARDIAN: Then 57.

MS. CASWELL: Oh, sorry. All right.

THE WITNESS: Okay.

BY MR. MARDIAN:

Q. Do you see the September 3rd heading?

A. Yes.

Q. What does CID mean? Do you know?

A. It means criminal investigation department. But I -- I was thinking of something else.

Q. Understood. Do you see, sir, that if you flip to page 1359 --

MS. CASWELL: There you go.

BY MR. MARDIAN:

Q. -- that this is signed by Lieutenant Ryan Young?

A. Yes.

Q. Do you have any understanding of what this

**119**

document is that Lieutenant Ryan Young extensively wrote?

A. You're talking about this entire document? No, not yet. But we're going to get there, I'm sure.

Q. Okay. Now, with apologies, let's flip back to page 1357.

A. Okay.

Q. Same portion, September 3rd, first line. Quote, "I made contact with Victor Fontenot and stated to him that I was conducting an internal affair investigation in reference to a policy and procedure violation allegation."

See that?

A. Yes.

Q. Do you have any recollection of this policy and procedure violation allegation?

A. Well, it mentioned myself and Darien, so I'm -- I kind of remember the incident, yes.

Q. Okay. It may refresh your rec- -- recollection if you flip to page 1342.

A. Okay.

Q. Do you see that this document is titled "Critical Incident Form Police"?

A. Yes.

Q. Do you see that it lists employee name as

**120**

Victor Fontenot?

A. Yes.

Q. Do you see that it reads "Supervisor name, Lieutenant Ryan Young"?

A. Yes.

Q. Okay. If you go down to the description of incident, do you see that it reads, quote, "On August 13th, 2019, at approximately 10:06 hours, I, Lieutenant Michael Dunn, went to assist Officer Cody Miller investigate a possible rape"?

A. Yes.

Q. Who was Cody Miller?

A. He's a former police officer there.

Q. Do you know why he left the department?

A. I don't.

Q. Ever speak with him about why he left the department?

A. I didn't.

Q. How frequently did you work with Cody when he was at the department?

A. I -- when I was a patrolman on patrol, I think I was on Cody's shift for maybe a couple of months. When I went to detectives, I -- I didn't really work with Cody after that.

Q. Understood. If you turn the page to one

**121**

ending 1343, in the very middle of the page is a paragraph that begins "I was later informed."

Do you see that?

A. Yes.

Q. Do you see that it reads, quote, "I was later informed by the dispatcher when she called Officer D. Guillory to ask her about answering the 62A at AMC. She could hear Officer V. Fontenot in the background stating, to the best of her recollection, quote, 'That's not our job. They need to send someone. We are out of town,'" closed quote?

Do you have any recollection of making that statement, sir?

A. Yes.

Q. What do you recall about that statement?

A. I recall making the statement. I believe this was when Officer Guillory was a detective. We were headed out of the city limits to speak with an informant. I believe that's when the call came on over the radio. I think that's when this took place, if I remember correctly.

Q. Do you recall, sir, whether that call was about an alleged rape?

A. That, I don't remember.

Q. Do you know, sir, if --

**122**

THE WITNESS: Can I clarify something about the rape he asked me about earlier?

MS. CASWELL: Sure. Ask him.

BY MR. MARDIAN:

Q. I'm sorry, sir?

A. I want to clarify something. You asked me earlier about a rape that I investigated. I never investigated this rape. The rape I was talking about was another rape that I investigated early in my detective. This one, I never did investigate. I had no hands on -- in any of this.

Q. Thank you for that clarification, sir. That's helpful.

Even though you didn't investigate this, you do recall making the statement that we -- that we just read, correct?

A. Yes.

Q. So you recall that the EPD was investigating this rape even though you specifically were not?

A. Say again.

Q. You recall that EPD did in fact investigate this rape; it's just that you weren't a part of that investigation?

A. Yes.

Q. When you said you were out of town, do you

**123**

recall where you were?

A. At the time the call came over the radio? I mean, I could explain it to you, but you wouldn't know what -- where I'm talking about. I was probably five miles outside the city limits at that time.

Q. And you said you were meeting with a confidential informant?

A. Yes.

Q. And it's your understanding that that's permitted under --

A. Yes.

Q. -- Eunice policy and procedures?

A. I don't know. My supervisor okayed it.

Q. And which supervisor was that?

A. That would have been Lieutenant Kennedy.

Q. Do you understand, sir, what became of this rape investigation?

A. No, I don't.

Q. You said, I believe, that this was when Darien was a detective. Do you recall stating that?

A. I -- I -- I think that's when she was a detective or coming into detectives.

Q. Is Ms. Guillory not currently a detective?

A. She no longer works at the police department.

Q. When did she leave?

**124**

A. A year ago, maybe, something like that, maybe.

Q. Do you have any understanding why she left?

A. No.

Q. Did you ever speak with her as to the reasons why she left?

A. I may have, but I don't recall what she said.

Q. Do you know when -- when Ms. Guillory was promoted to detective?

A. I don't.

Q. Do you note here, sir, that in the paragraph we just read, it refers to Ms. Guillory as "Officer Guillory"?

A. Yes, I see that.

Q. Do you have any reason to doubt that perhaps at this time, she was an officer and not a detective?

A. If she wasn't a detective, I don't know why she would have been not in her unit. If she was an officer, a patrolman, I think she would have been in her unit. If she was a detective, she would have been in my unit riding with me. I could be mistaken. But --

Q. I appreciate it, sir.

A. -- best of my recollection, I think she was a detective.

Q. Are you aware of any allegations that the

**125**

rape -- that a rape kit -- withdrawn.

Are you aware of any allegations that a rape kit that was taken here was not properly stored by EPD?

A.  Okay.  A rape kit that was done by EPD?

Q.  Correct.

A.  Was not properly stored?

Q.  Correct.

A.  I -- I don't -- I don't recall it.

Q.  Do you have any understanding of any allegations regarding a rape kit that was done here?

A.  No.

Q.  Sir, if you go to the next page that ends 1344, the -- do you see the fourth paragraph from the bottom that begins "On 8/19"?

A.  Yes.

Q.  Do you see that it reads, quote, "On 8/19/2019, I received a phone call from other employees that informed me both V. Fontenot and D. Guillory made several comments after being informed of the email I sent to DC Daigle during the morning meeting"?

A.  I see that.

Q.  Who is DC Daigle?

A.  He was the deputy chief, Richard Daigle. He was deputy chief before current Deputy Chief Tony Kennedy was in that position.

**126**

Q.  Was there ever a time that the EPD did not have a deputy chief?

A.  I -- I --

Q.  Withdrawn.

Was there any time, when you've been employed at EPD, there was not a position of deputy chief?

A.  Yes, I think so.

Q.  Do you recall when that was?

A.  I don't.  Not specifically, no.

Q.  Do you understand that the position was eliminated?

A.  When was it eliminated?

Q.  Sorry, sir.  My question is do you understand that the reason that there wasn't a position at that time was because it had been eliminated?

A.  Oh.  No, I'm not aware.

Q.  Do you have any understanding as to why the position didn't exist for a portion of -- of the time that you were at EPD?

A.  No.  That's when I first -- when I first started.  I believe there was no deputy chief position.

Q.  Sir, do you have any understanding of the August 19th, 2019, phone call that's being described here?

A.  I see what they're saying, yes.  I -- I'm

**127**

reading this, but I'm still trying to -- who made the phone call?  I -- I don't know who made the phone call.

Q.  Would it surprise you, sir, if it was Lieutenant Dunn who is the "I" in that sentence, such that he was the one who, quote, "received a phone call"?

A.  Okay.

Q.  Does that refresh your recollection at all?

A.  No.  Okay.

Q.  Do you have any understanding of this phone call, sir?

A.  I -- I see what -- I see what he's saying, yes.  In the -- in the -- in the ending of the paragraph, I see where -- where this is -- yes.

Q.  You're referring to the -- the sentence that reads, quote, "V. Fontenot supposedly stated," quote, "'He can lick my nuts,'" end quote?

A.  Yes.

Q.  Sir, do you have any recollection of making that statement?

A.  Yes.

Q.  Why did you make that statement?

A.  I was upset, emotional, just -- I don't know what you call it when -- when you -- when you say something like that out of just -- yeah.  Well, you

**128**

know, he can lick my nuts, you know.  What do you call that?  Sporadic -- what -- what's the word I'm looking for?  I don't know.

Q.  You said you were upset.  Why were you upset?

A.  I think I was upset because he called us and wanted us to go back into the city and deal with -- for her to do with -- Officer Guillory or Detective Guillory to deal with it.

Q.  Were you frustrated?

A.  Yeah.

Q.  So earlier this morning when you testified that your colleagues' conduct has never frustrated you, that was inaccurate?

A.  Not inaccurate.  I just couldn't remember at the time.

Q.  Can you recall now any other times where your colleagues' conduct frustrated you?

A.  I can't, but I'm sure you're going to remind me of some.

Q.  Why do you say that, sir?

A.  I -- I don't know.  I'm just -- I don't know.

Q.  Understood.  Sir, do you see the sentence continues, quote, "D. Guillory supposedly stated," quote, "'Fuck him and his wife.  I was not around anyone when I was on the phone," closed quote?

129

A.   I -- I think I remember her saying that, yes.

Q.   Did she say it to you?

A.   I don't know if -- I don't know if she said it to me or if I was standing around when she said it to someone else.  But I remember hearing that, yes.

Q.   Sir, do you understand that Lieutenant Dunn filed a critical incident form about this event?

A.   Yes.

Q.   Did you ever read that critical incident form before today?

A.   I don't -- I don't remember if I did or not.

Q.   Sir, I believe you described this as some sort of an outburst borne from your frustration.  Is that a fair characterization?

         MS. CASWELL:  Object to form; misstates his testimony.

A.   I didn't say that.  I said I was frustrated and I just spoke.  And I asked you what the word was that I was looking for, and you couldn't find it or didn't give it to me.  That's -- that's what I said.

BY MR. MARDIAN:

Q.   Understood.  Those types of occurrences, however we want to describe them --

A.   Okay.

Q.   -- how frequent are they?

130

A.   For me?

Q.   Correct.

A.   I don't know.  I mean, how frequent -- I mean, how often do I verbally express myself with these types of language?

Q.   Exactly.

A.   Oh, okay.  I mean, I don't know.  That's hard -- it's hard to answer.  Daily basis, maybe, yeah.

Q.   Do your colleagues ever say similar things?

A.   Possibly.

Q.   So they may, but they may not?

A.   Yeah, may or may not.  I don't recall.

Q.   Do you know if it's in compliance with Eunice Police Department policies and procedures to make statements such as these?

A.   Such as what?

         MS. CASWELL:  Sorry.  Object to form; vagueness.  Can we, like, narrow it into, like, while on the job?  It's just --

         THE WITNESS:  Yeah.

         MS. CASWELL:  -- very vague.

         MR. MARDIAN:  Fair.

BY MR. MARDIAN:

Q.   On the job, is it common for EPD officers to make statements similar to the one that you -- you

131

testified to making earlier?

A.   To cursing out loud, whatever, making emotional...

Q.   Correct.  Yes.

A.   Not specifically at he or she; you're talking -- right?  Just --

Q.   That's a good clarification.  Is it common -- withdrawn.

     Is it in compliance with Eunice Police Department policies and procedures to make derogatory statements about your colleagues directed to your colleagues?

A.   Is there a policy against?

Q.   Correct.

A.   I don't know.

Q.   Have you ever talked to your supervisors about whether such a policy exists?

A.   I don't recall if I did or not.

Q.   Sir, can you please flip back to the page ending 1357?

         MS. CASWELL:  Flip it that way so that it can stay in order.  Just -- so flip this this way just so it kind of stays in order.

         THE WITNESS:  Okay.

132

BY MR. MARDIAN:

Q.   So you recall, sir, that this September 3rd paragraph we looked at previously -- you recall we looked at this paragraph before?

A.   Yes.

Q.   And this, again, you remember, is written by Lieutenant Young.  Correct?

A.   Yes.

Q.   So now, let's look back again.  It says Lieutenant Young, quote, "Made contact with Victor Fontenot and stated to him that he was conducting an internal affair investigation in reference to a policy and procedure violation allegation."

     Do you see that?

A.   Yes.

Q.   Have you refreshed your recollection as to what that policy and procedure violation allegation was?

A.   No.

Q.   You don't understand whether it related to Ms. -- to Lieutenant Dunn's allegation that you didn't properly respond to the rape incident?

A.   I'm sure it has something to do with that. I just don't know the specific policy.

**133**

Q.   And is that because you generally aren't aware of the policies and procedures of the Eunice Police Department?

MS. CASWELL:   Object to form.

A.   I don't frequent the policy and procedure manual.

BY MR. MARDIAN:

Q.   And no one at EPD requires you to be trained on that manual?

A.   Not that I'm aware of.

Q.   If you skip a few lines down, do you see in the middle of the same paragraph, it reads, quote, [As read]:  "He was specifically asked if he made a comment in the briefing room after reading or hearing the contents of Lieutenant's Dunn email that he was named in.

"He says he does recall making a comment after hearing he was going to be pos- -- going to possibly be written up by Lieutenant Dunn.  He says he made the comment based on emotions and acknowledges that it was probably not the correct thing to say.  I asked him to elaborate on what he said, and he said that Dunn," quote, "'Could suck on his left nut or maybe his right one.'  But he did own up to saying he made an obscene statement."

**134**

Sir, do you understand that part of what Lieutenant Young was investigating was your statement about Lieutenant Dunn that we just read?

A.   Yes, yes.

Q.   And is it correct, sir, that you admitted to Lieutenant Young that that was an obscene statement?

A.   Yes.

Q.   And that it was not the correct thing to say?

A.   Yes.

Q.   It continues, quote, "He was also asked if he had been counseled prior to this interview in reference to what Lieutenant Dunn was told the dispatcher overheard when she was on the phone with Darien."

Sir, do you have any recollection of whether that conversation is the one that we read a few pages back?

A.   Yes.  I think it is.

Q.   And that's the one that says, "Fuck him and his wife.  I was not around anyone when I was on the phone"?

A.   I think that's the one that they're talking about.  She -- so yes.

Q.   Do you see, sir, that it continues, quote, "This is what Lieutenant Dunn asked me to address with Victor on August 12th, 2019.  Victor acknowledges that

**135**

I had previously counseled him on that matter.  Interview was concluded"?

A.   Yes.

Q.   So, sir, when it refers to the, quote, "counseled" or counseling, do you recall what that counseling was?

A.   I don't.

Q.   Do you understand, based on this, the counseling related to the phone conversation with Darien?

MS. CASWELL:   Object to form.  I don't know if that's what it says but --

A.   Say -- say again.

BY MR. MARDIAN:

Q.   So part of what confuses me about this is it references the obscene statement and then it references the conversation with Darien.  Is that -- is that correct?

A.   Okay.

Q.   And then it refers to counseling.  Do you see that?

A.   Yes.

Q.   In fact, it says, "He was also asked if he had been counseled prior to this interview in reference to what Lieutenant Dunn was told the dispatcher overheard

**136**

when she was on the phone with Darien."

Do you see that?

A.   Yes.

Q.   And so my question is, is the counseling that you received in connection with this solely related to the conversation with Darien?

A.   I don't recall if it was just that or not.

Q.   Do -- do you recall if any of the verbal counseling that you received related to your comments about Lieutenant Dunn's left nut or maybe his right one?

A.   I don't remember any of the counseling that I -- I got on -- on this that it's speaking of here.

Q.   Okay.  Sir, do you have any recollection of the number of times that you've received counseling while a member of EPD?

A.   No.

Q.   Do you have any ballpark understanding?

A.   No.

Q.   Sir, do you know what verbal counseling at EPD even includes?

A.   I would guess it would be when the supervisor calls you in and you talk about an incident that happened.  You're told how to right that incident, that wrong.  I don't know.  Just, you know, "Hey, you did

**137**

this.  Don't let that happen again.  I just counseled you."

Q.  Thank you.  Would you describe it as informal?

A.  The counseling that happens at EPD?

Q.  Correct.

A.  Informal as in what?  Another big word, break it down for me.

Q.  I'm just trying to get a sense of --

A.  I know what "informal" means in -- but not in this context, no.

Q.  Understood.  Thank you for clarifying.

How long would a counseling session last?

A.  At EPD?

Q.  Correct.

A.  I don't know.

Q.  Do you recall how long this counseling session lasted?

A.  I don't recall my counseling session.

Q.  Do you recall any counseling sessions that you've had while employed by EPD?

A.  No.  At this time, I don't know, I don't.

THE WITNESS:  Has it been an hour?

MS. CASWELL:  Do you want a break?  You can --

THE WITNESS:  Yeah.  Can we --

**138**

MS. CASWELL:  You don't have to wait an hour.  You can just --

THE WITNESS:  Okay.

MS. CASWELL:  -- ask for a break.

THE WITNESS:  Take a break.

MR. MARDIAN:  Of course.

THE VIDEOGRAPHER:  We're off the record at 2 -- 1:36.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record.  We're back on the record at 1:50.

BY MR. MARDIAN:

Q.  Sir, correct me if this is wrong.  But I believe when I asked you previously if you'd ever seen the critical incident report that Dunn wrote about the alleged rape incident, you said that you could not recall.  Is that correct?

A.  Correct.  I couldn't recall.

Q.  Detective Fontenot, have you ever threatened Lieutenant Dunn?

A.  Have I ever threatened Lieutenant Dunn?

Q.  Yes.

A.  As in face-to-face, personally threatened him?

Q.  Or indirectly.

A.  I've never personally threatened

**139**

Lieutenant Dunn.

Q.  Have you ever made a statement that is a threat to Lieutenant Dunn that you simply did not direct at him?

A.  I don't think so.

Q.  So is it your testimony, sir, that you have never threatened Lieutenant Dunn?

A.  I can't recall threatening Lieutenant Dunn.

Q.  Is it possible that you have threatened Lieutenant Dunn?

A.  I can't recall.

Q.  Is the reason you can't recall because it is in fact possible that you threatened Lieutenant Dunn?

A.  I can't recall threatening Lieutenant Dunn at this moment.

Q.  Sir, are there any individuals in your life for whom you could emphatically say "I have never threatened that individual"?

A.  I've never threatened President Trump.

Q.  How do you know that you've never President Trump?

A.  Rephrase your question.

Q.  You testified that you know you've never threatened President Trump.  My question is how do you know that?

**140**

A.  Because I've never met him.

Q.  Do you have to have met someone before you threaten them?

A.  What is a threat?

Q.  A statement of intent to commit bodily harm against another individual.

MS. CASWELL:  Object to form.  I disagree with the definition but continue.

MR. MARDIAN:  Thank you, Counsel.

A.  As far as I can remember, I have never threatened Lieutenant Dunn.

MR. MARDIAN:  I'd like to mark as Plaintiff's Exhibit 5 an additional critical incident report.

(Plaintiff No. 5 was marked for identification.)

BY MR. MARDIAN:

Q.  I represent to you, sir, that this document was produced by your counsel and bears Bates number City of Eunice_Dunn_000156.

Sir, do you see at the top that this document is entitled "Critical Incident Form Police"?

A.  Yes.

Q.  Do you see that it lists the employee name as Victor Fontenot?

A.  Yes.

**141**

Q. An do you see that ident- -- it identifies the supervisor as Lieutenant Tony Kennedy?

A. Yes.

Q. Do you see that it's dated December 6th, 2019?

A. Yes.

Q. And do you see that it refers to an incident that took place, allegedly, on August 27th, 2019?

A. Yes.

Q. Sir, have you ever seen this critical incident form before?

A. I may have, but I don't recall.

Q. Understood. Do you see, sir, that it reads on the first line of the description of incident, quote, "On August 26th, 2019, I, Lieutenant Michael Dunn, completed critical incident forms on both Victor Fontenot and Darien Guillory for policy violations which were submitted to Deputy Chief Richard Daigle"?

A. Yes.

Q. Sir, do you have any understanding of whether these critical incident forms are the critical incident forms that we looked at previously regarding the alleged rape?

MS. CASWELL: Object to form; requires speculation.

**142**

A. I don't know if they were or not.

BY MR. MARDIAN:

Q. Sir, are you aware of any other critical incident forms addressing conduct that both you and Darien Guillory are alleged to have committed?

A. Not that I re- -- recall, no.

Q. Do you see that it continues, quote, "On August 27th, 2019, I was -- I was informed Chief Randy Fontenot, in front of several witnesses, allowed both D. Guillory and V. Fontenot to read the critical incident forms against them," end quote?

A. I see that, yes.

Q. Sir, do you have a recollection of whether you were permitted to read critical incident forms in front of several witnesses?

A. No, I don't remember that.

Q. Do you have a recollection of Chief Randy Fontenot ever permitting you to read critical incident forms in other -- in front of other witnesses?

A. I don't recall that.

Q. Do you see, sir, that it continues, quote, "During this time, V. Fontenot threatened to do bodily harm to me and the police K9 Robin when he gets the chance in front of Chief R. Fontenot"?

A. No. I don't remember saying that.

**143**

Q. You do not recall, quote, "threatening to do bodily harm" to Lieutenant Dunn and the police K9 Robin?

MS. CASWELL: Object to form. It misstates it but continue. Go ahead.

A. I do recall saying something about the K9, but I do not recall ever threatening Lieutenant Dunn.

BY MR. MARDIAN:

Q. What do you recall saying about the K9?

A. That I would put two bullets in its head.

Q. Two bullets in the dog's head?

A. Yes.

Q. Do you recall, sir, why you made that statement?

A. I don't recall the exact conversation that was going on at the time. I know I said it in a joking manner, but I don't recall the exact conversation that was going on at that time.

Q. Sir, it's your testimony today that you were joking about two -- putting two bullets in the dog -- in the head of a dog?

A. Yes.

Q. Do you often joke about putting bullets in the head of a dog?

A. It was just that once, I believe.

**144**

Q. And it's your testimony that that was in fact a joke?

A. Yes.

Q. Do you recall if other individuals to whom you told it took it as a joke?

MS. CASWELL: Object to form; requires speculation.

A. You're asking me who was in the room at the time, who was there?

BY MR. MARDIAN:

Q. That's a better question. Who was in the room at the time?

A. I believe Chief Fontenot was in the room, Deputy Chief Daigle, Lieutenant Young, myself. Who was the other one? Oh, I remember. Stephanie Myers.

Q. Sir, what is the K9 unit at EPD?

A. What is the K9 division? Unit?

Q. Correct. What -- what would you call it?

A. The K9 division. It's like we have a traffic division, narcotics division. A K9 division is -- was overseen by Lieutenant Dunn. He had a special unit which housed the K9 dog. That's basically what we -- what we got -- what we had.

Q. Would you call individuals in that division K9 officers?

**145**

A.   I have never called the dog a K9 officer.

Q.   So how would you refer to it?  I'm just trying to come to a common understanding of a term to use in my future questions.  So how should I refer to it?

A.   As I referred to it?

Q.   Sorry.  I'm just trying to understand what I should call people who worked in the K9 division.

A.   Oh.

MS. CASWELL:  Yeah.  The people, not the dog.  I think --

A.   Oh.  Oh, I'm sorry.  Yes, K9 officer.  Yes, yes.  Sorry.

BY MR. MARDIAN:

Q.   What's the difference between a K9 officer and a non-K9 officer?

A.   K9 officer handles the -- the dog.

Q.   And why would an officer need a dog?

A.   An officer would use a K9 dog for traffic stops.  Some are trained in narcotics.  Some are trained in locating people.  Some are trained in bombs.  Some are trained in locating dead bodies.  I believe this specific dog was locate -- trained in locating narcotics and possibly locating people.

Q.   And do they locate people or narcotics through sense of smell?

**146**

A.   I have no idea how that works.

Q.   Do you have any understanding of the effectiveness of the -- of a K9?

A.   No.

Q.   Do you think that they help an investigation?

A.   Do I think a K9 would help an investigation?

Q.   Yes.

A.   I have no idea.  I've never ran a dog.

Q.   Do you work in narcotics currently?

A.   Yes.

Q.   Is part of your job looking for narcotics?

A.   Yes.

Q.   Are dogs -- withdrawn.

Can dogs be effective at finding narcotics?

A.   I'm sure they can in certain situations.

Q.   Have you ever responded to a call or executed any of your responsibilities as a member of EPD and in so doing, requested the assistance of a K9?

A.   Yes.

Q.   What can you tell me about that time or those times?

A.   Okay.  The time I do remember, we made a traffic stop on a vehicle, on a subject that I had warrants on.  That traffic stop was made on North MLK inside the city limits of Eunice.  Traffic stop was

**147**

conducted.  The subject that I had the warrant on was detained.  At one point, we called Lieutenant Dunn to come to the traffic scene and run the K9 around the unit.

Q.   And you did so because you understood that having the K9 there might increase the likelihood of finding drugs?

MS. CASWELL:  I'm going to object to form.

A.   In --

MS. CASWELL:  Go ahead.  Go ahead.

A.   In this particular case?

BY MR. MARDIAN:

Q.   Yes.

A.   No.

Q.   So why did you request the K9?

A.   Rephrase your question again.

MR. MARDIAN:  Can you please rephrase my question before I said yes -- or excuse me, restate, not rephrase.

THE REPORTER:  The last question, you would like, sir?

MR. MARDIAN:  Yes, please.

THE REPORTER:  "QUESTION:  So why did you request the K9?"

**148**

THE WITNESS:  The question before that.

THE REPORTER:  "QUESTION:  And you did so because you understood that having the K9 there might increase the likelihood of finding drugs?"

A.   Okay.  We did so to solidify the case.  I located some of the drugs right away.  And -- or did we?  I don't recall if we pulled narcotics out of the vehicle with him first or if we left everything in the vehicle until the K9 -- I don't recall.

But I know after I called the K9 unit over, I observed -- this was before he got there.  I -- I observed a -- a packet of what I believed was heroin on the floorboard of the front passenger side.  He ran the dog.  I think the dog hit, and I -- and I don't recall if we pulled the narcotics -- if we located narcotics before or after the dog got there.

BY MR. MARDIAN:

Q.   So you testified, sir, that you, quote, "did so to solidify the case."

A.   Yes.

Q.   What do you mean by that?

A.   Well, it was a narcotics case, to begin with.  Any -- any -- any evidence that we could add to the case would have helped if the subject would have taken

**149**

it to court. So by bringing in the K9, we -- we were able to gain more evidence for the case, solidifying the case is what I meant.

Q. Sir, does EP -- EPD currently have a K9 division?

A. Not that I'm aware of.

Q. Do you know what happened to the K9 division?

A. I think it was disbanded, if you want to call it disbanded, done away with.

Q. Do you know when it was done away with?

A. I don't. I can't recall the specific day -- date.

Q. Can you ballpark it?

A. Two years ago.

Q. Do you know why it was done away with?

A. I don't.

Q. Are there any times today when you wish you could request the assistance of a K9?

A. Yes.

Q. Why?

A. During traffic stops, I see where the K9 could be used in certain situations that I've had -- that I've encountered where I suspected there was narcotics in the vehicle. Yeah, I've -- I could have used a K9.

Q. Earlier this morning, sir, when you testified

**150**

as to what you referred to as the circus of Eunice, was part of the reason that you used that phrase because of drug use or drug presence in the city of Eunice?

A. No. I said the morality of society was collapsing, which -- not only in Eunice. I said other cities, other areas, also, were seeing a decline, yeah. I didn't specifically say anything about narcotics.

Q. You work in narcotics today?

A. Yes.

Q. When did you start working in narcotics?

A. Three -- two, three years ago, somewhere in -- approximately. I -- I -- I don't know.

Q. Understood. Have you seen any change in the presence of narcotics -- withdrawn.

Have you ever seen any change in the amount of narcotics arrests in Eunice?

A. I haven't seen change in the -- in the amount of arrests. I've seen change in the narcotics.

Q. What is that change in narcotics?

A. Heroin, fentanyl. That's -- that's a change that we've seen, not only in Eunice but in the entire area, state. We now have heroin and fentanyl, which when I first got into narcotics, we didn't. Nobody did around here.

Q. Do you have any understanding as to the cause

**151**

of that change?

MS. CASWELL: Object to form; requires speculation.

A. Yeah. I mean, I can -- I could guess, but I'm -- I'm no professional. I -- I don't know. Money? Don't know.

BY MR. MARDIAN:

Q. Sir, does EPD ever attempt to determine the underlying reasons that the level of crime has changed in Eunice?

A. Have we -- have we tried to determine why -- why what?

Q. Why the crime has changed?

A. Why the drugs have changed, the narcotics or --

Q. Any of it.

A. Oh. I haven't, no.

Q. Do you know if anyone else has?

A. Not that -- not that I'm aware of.

Q. In your experience, how, if at all, has EPD responded to this increase in crime?

A. We attempted to put more officers on -- on the road -- officers on the road. Again, in my opinion, that's -- that -- that was done, an attempt to get more officers on the road was done. And that -- that lasted

**152**

for a couple of weeks, and then those officers were taken back off the road. Officer presence would be -- would be helpful.

Q. I'm sorry. I didn't catch that. You said officer presence would be helpful?

A. Yeah. More officers on the road would be very helpful.

Q. Who determines whether an officer is on the road or not?

A. I guess that would be the chief and the deputy chief.

Q. So when the officers were pulled off the road, is it your understanding that that was either the chief or deputy chief's decision?

A. No, no. That was the city. That was the civil service board that determined that.

Q. And can you explain that?

A. Lieutenant Donnie Thibodeaux was placed in a training position by the chief. When the chief made the decision we needed more officers on the road, he took Lieutenant Thibodeaux from the training division, being that he was a lieutenant and he was once before a shift commander, placed him on the road as a shift commander to try to assist us in preventing -- or deterring crime.

**153**

It came to one point where civil service determined that that was not chief's decision to make, so they demanded that Lieutenant Thibodeaux was put back in the training position that he was once holding. So that's one incident that I can -- I can say occurred.

Q.   Is it your understanding that civil -- civil service board's decision was to take only Lieutenant Thibodeaux off the road?

A.   I --

MS. CASWELL:  Object to form to the extent it requires speculation.

A.   Yeah.  I -- I don't know.

BY MR. MARDIAN:

Q.   You do understand that they made a decision to bring Lieutenant Thibodeaux off the road?

A.   I do understand that.

Q.   Are you aware of any other officers that the civil service board has taken off the road?

A.   I am not.

Q.   Earlier, when you were discussing the initiative to put more officers on the road, was off- -- was Lieutenant Thibodeaux the only one who was put on the road, or were there any others?

A.   I don't -- I don't recall.

**154**

Q.   So you recall that Lieutenant Thibodeaux was placed on the road, but you don't recall if anyone else was?

A.   I remember seeing Lieutenant Thibodeaux a couple of times working shift, but I don't -- I don't recall anybody else.  There may have been, but I don't recall seeing them.

Q.   Understood.  Today, do you wish there were more officers on the road?

A.   Yes.

Q.   And that's for the reasons you previously stated?

A.   Yes.

Q.   Do you have any understanding of why there are not?

A.   I would guess -- speculating, money.  Eunice is one of the lowest paid departments in the area. Smaller departments around us are paid more than Eunice Police Department is paying, so I'm speculating that they're going where the better pay is or the -- you know, rather than coming to Eunice.

Q.   And you said you're speculating.  Is that speculation based on anything?

A.   The -- the salaries, that is not speculation. I'm just speculating -- you asked me why I thought we

**155**

didn't have officers coming in.  I'm speculating that they're getting -- they're getting paid better or offered better salaries at other departments.

Q.   Have you ever considered going to a different department?

A.   Not until about a week ago.

Q.   Can you explain that?

A.   This current chief is not going to run for reelection, so I don't know if I'm going to stay.

Q.   Why would the fact that the current chief may not run for reelection lead you not to stay at EPD?

THE WITNESS:  Can I not answer?  No?

MS. CASWELL:  No.

THE WITNESS:  Okay.  Could you ask the question again?

MS. CASWELL:  Yes.

MR. MARDIAN:  Can you read it back, please?

THE REPORTER:  "QUESTION:  Why would the fact the current chief may not run for reelection lead you not to stay at EPD?"

A.   Because --

BY MR. MARDIAN:

Q.   Can I just clarify?  I would -- let me just -- as to avoid the double negative.  Why would the fact

**156**

that the current chief -- withdrawn.

Why would the fact that Chief Fontenot may not run for reelection lead you to leave EPD?

A.   Because I don't want to go -- I don't want to be taken out of detectives and be put back on the road, just my preference.  And I don't know if the incoming new chief is going to keep me in that position.  So...

Q.   Why did you ask your counsel if you have to answer that question?

A.   Because I felt it was personal -- it was personal reasons why I didn't want to stay, and I didn't know if I had to share that with you or not.

Q.   Understood.  Why would you rather be in -- a detective than on the road?

A.   Because I feel like I'm really good at what I do.  I make a difference, and my record shows that. And it -- to me, it would just be -- you know, you have all this excitement here and then you go to, you know, taking cats out of a tree or "hey, my neighbor is blowing leaves on my lawn."  That would be boring to me, you know.  After all the experience and everything I've experienced, going back to something like that, it just -- I don't know.

Q.   Forgive me, sir, but based on the way you've described Eunice, I don't think I would consider it

**Page 157**

boring. Why do you use that word?

A. My job is not boring. I get to see all the action. I get to work the homicides. I get to put the bad guys in jail. You know, I get to -- get the narcotic off the streets. I'm used to doing that. It's something I -- I enjoy very much. It feels like I -- I've accomplished. Now, before I got into detectives, I was a patrolman. At times, that was pretty boring, you know.

Q. Do the patrolmen not also work in arrests?

A. They do. They do. It's just something I prefer.

Q. Do you know who's currently running to be chief of EPD?

A. Yes.

Q. Who?

A. I think there's three candidates. Varden Guillory; Cody Andrepont, who I don't know; and Kyle LeBeouf, who I don't know.

Q. Do you believe that if one of them is elected, you will be taken from detectives and put back in -- put back on the road?

MS. CASWELL: Object to form; requires speculation.

A. Yeah. I -- I can't -- I can't be sure. I

**Page 158**

can't be sure if either one -- any one of those got in, the changes that they would make. I just have a feeling. I just feel like I would be taken out of the detectives division and put back on the road.

BY MR. MARDIAN:

Q. What's that feeling based upon?

A. I guess hearsay. Call it hearsay.

Q. What have you heard?

A. That I'm going to be taken out of detectives and put back on the road.

Q. Who told you that?

A. I've heard different officers talking to themselves.

Q. Which ones?

THE WITNESS: Do I have to say which ones? Yep?

A. Lieutenant Jeremy Ivory. And I heard him speaking to Officer Tilbury.

BY MR. MARDIAN:

Q. And what, to the best of your recollection, did you hear from that conversation?

A. The best of my recollection? Victor is going to be taken out of detectives because he is not a sergeant, and he's going to be put -- be put back on the road.

**Page 159**

Q. And without speculating, you may not know, do you have any understanding of how one would reach that conclusion --

A. No.

Q. -- not knowing who the -- the chief is actually going to be?

A. No.

Q. But it was your understanding that, from their conversation, it was regardless of who the chief is going to be, you'll be taken out?

A. That's what it sounded like to me, yes.

Q. Sir, would you wait until after the election -- withdrawn.

Do you have any current plans to leave EPD?

A. No.

Q. Do you know, sir, whether a K9 can detect heroin?

A. I don't know.

Q. Do you know whether a K9 can detect fentanyl?

A. I don't know.

Q. When you testified that there are times that you wish that you had a K9, are any of those times incidences that involved either heroin or fentanyl?

A. Yes.

Q. Is it your understanding that the K9 would

**Page 160**

assist you because it could detect the heroin or fentanyl?

A. Well, not specifically that. A hit on any narcotics, illegal narcotics would justify me getting into the vehicle. It doesn't have to be specifically fentanyl or heroin. I think I'm correct in that. I've never ran a K9, but watching Lieutenant Dunn over the years, I -- I think it would justify me getting into that vehicle, if the dog hit.

Q. What do you mean by "if the dog hit"?

A. Well, just listening to Lieutenant Dunn over the years, that's -- I think that's the lingo he uses. The dog alerts. When they walk the dog around the vehicle, there's a certain alert that the handler is looking for, that they understand if the dog does this search -- certain thing, then he's indicating to the handler that there's narcotic in that vehicle.

Q. Sir, do you have any -- withdrawn. Do you ever talk to -- withdrawn.

How many other the officers are in narcotics?

A. At this time, I'm the only one.

Q. And you said you've been in narcotics for three or four years?

A. I think I said two to three.

Q. When you started, how many officers were in

**161**

narcotics?

A.   None.

Q.   Have you always been the only officer in narcotics?

A.   No.

Q.   Who else has worked in narcotics?

A.   Detective -- well, no longer detective. Shane Beard.  I think that's the only one that I remember, while I was there.

Q.   Who is Shane Beard?

A.   He was an officer with Eunice Police Department who's no longer employed there.

Q.   Do you have any understanding of why Mr. Beard is no longer employed at EPD?

A.   He told me he was tired of law enforcement. A job opportunity came up where he was able to work, maybe in a family business, making almost twice as much money as he was making with the police department.  So he decided to leave and take that opportunity.

Q.   Do you wish there were more officers in narcotics than there are?

A.   Yes.

Q.   How many officer do you believe would adequately staff the narcotics division at EPD?

MS. CASWELL:  Object to form; requires

**162**

speculation.

A.   More than one.

BY MR. MARDIAN:

Q.   More than two?

A.   Two would be great.  It would be twice as many as we have now.

Q.   Would three be better?

A.   I mean, come on.  Really?  I don't know where you're going, but I -- I don't know.

Q.   I just -- you've worked in narcotics for two to three years --

A.   Yeah.

Q.   -- correct?

And so you have, I assume, form to understanding of how many people it takes to do this job?

A.   Yes.

Q.   If you were in charge, how many would you put in this division?

A.   I would put two.

Q.   Two.  Returning to the document that we looked at a few minutes ago, I believe we ended in this second paragraph on the first page regarding the alleged threat to do bodily harm.  Do you recall that?

A.   Yes.

**163**

Q.   Do you see the next sentence that reads, quote, "Chief R. Fontenot said," quote, "'We putting him under investigation for interfering with an investigation,'" closed quote, "referring to me."

Do you see that?

A.   Okay.  I don't.  Where are we?  Where are we?

MS. CASWELL:  I think it's over --

A.   Do I have the right page?

BY MR. MARDIAN:

Q.   I believe you do.

A.   Okay.

Q.   Have you read the line, sir?

A.   I've read it, yes.

Q.   Do you have any recollection of whether Chief Fontenot ever said, quote, "We putting him under investigation for interfering with an investigation"?

A.   I don't.

Q.   Do you have any understanding of whether Lieutenant Dunn has ever been under investigation by EPD?

A.   I don't.

Q.   Do you have any understanding of whether Lieutenant Dunn has ever been under any investigation by any government authority?

A.   I don't.

**164**

Q.   Do you see, sir, that it continues, quote, "Some of the statements made in front of several witnesses by V. Fontenot are as follows," quote, "'I am going to break his mother fucking fingers,'" closed quote?

A.   I see that.

Q.   Sir, did you ever say "I am going to break his mother fucking fingers" in reference to Lieutenant Dunn?

A.   I don't recall saying that.

Q.   Do you recall ever saying something similar to that statement?

A.   No.

Q.   Do you see the next line that begins quote, "he was conceived in the cesspool of his mother's womb," closed quote?

A.   I do.

Q.   Sir, did you ever say that statement in reference to Lieutenant Dunn?

A.   I do remember saying that.

Q.   Why did you say that?

A.   Again, joking manner.

Q.   It's your testimony that it's a joke to refer to the, quote, "cesspool" of someone's mother's womb?

A.   I didn't say it was a joke.  I said I said it

**165**

in a joking manner.

Q. What's the distinction?

A. I don't know. You asked.

Q. You're saying that it wasn't a joke but you said it in a joking manner. My question is what's the distinction between those two?

A. You said I thought it was joke, to refer to his mother's womb as -- are it was -- that was a joke or something. I don't -- I don't know.

Q. So you do remember saying that; that's your testimony. Correct?

A. I do remember saying that.

Q. And then I asked you, I believe, why did you say that? What -- and I believe you said that your answer was it was a joking manner?

A. Yes. I said it as a joke, yes.

Q. Do you know -- withdrawn.

Who heard you say that?

MS. CASWELL: I object to form; requires speculation.

BY MR. MARDIAN:

Q. Sir, who was within the audible radius?

A. Yeah. That one, I -- I -- I can't remember.

Q. Who was in the room?

A. I'm still trying to remember where I was when

**166**

I said this. I do remember saying it. I just don't remember where I was when I said it.

Q. Do you remember the context in which you said it?

A. No, no. I'm going to say wherever it was, Stephanie Myers was around recording the conversation illegally, according to policy that you keep referring to. But I don't recall who else was in the room at the time that I said it.

Q. Why do you believe that it -- that Ms. Myers' alleged recording was illegal?

A. Why do I believe it was illegal? Again, I overheard someone say that she was recording the conversations illegally, but I do not remember who said that. But I know that was said.

Q. Is the only basis by which you believe that recording to be illegal what you heard from someone else?

A. Yes.

Q. It's not based on your reading of the manual?

A. Right. I didn't go and read it out of the manual. No, I did not.

Q. Do you recall if Ms. Myers had any reaction when you made this statement?

A. I don't.

**167**

Q. And other Ms. -- than Ms. Myers, you don't recall if anyone else was in the room?

A. I don't recall who was in the room.

Q. Do you see that it continues, quote, "I am going to fuck him up when I catch him alone on a call," closed quote?

A. I see that.

Q. Sir, do you recall making that statement?

A. I do not.

Q. Do you recall making any statement similar to this statement?

A. I do not.

MS. CASWELL: Sorry.

BY MR. MARDIAN:

Q. Do you see, sir, that it continues, quote, "When Lieutenant Ryan Young made the comment about K9 Robin being given to V. Fontenot to punish me" --

A. I don't see that. Where -- where are we?

MS. CASWELL: It's the last part of this.

THE WITNESS: Okay. No.

MS. CASWELL: Starting right here.

THE WITNESS: Okay. Yes.

BY MR. MARDIAN:

Q. -- "V. Fontenot stated," quote, "'I'll put two

**168**

in his head before he gets in my unit,'" closed quote?

A. I see that.

Q. Is this the statement that you previously testified to making about putting two in the head of the K9?

A. Yes.

Q. So it's your testimony --

A. No, no. My unit. I never said this. I don't recall saying this.

Q. So you -- just to be clear, you testif- -- you do recall saying that you would put two in the head of the K9?

A. Yes.

Q. But you do not recall saying you will put two in the head of his -- whoever "his" is here, right?

A. Whoever they're talking -- who -- who would -- who would get in my unit? I -- I don't -- I don't understand. "I'll put two in his head before he gets in my unit." I don't recall saying this at all.

Q. Is the phrase "put two in his head" something you frequently use?

A. No.

Q. Is the only time you can recall ever using it in relation to the K9?

A. Yes.

**169**

Q.   And this reference is not to the K9 because -- well, withdrawn.

Do you see it -- the next paragraph begins, quote, [As read]:  "I was informed Chief R. Fontenot," quote, "'nor other ranked employees,'" closed quote, "did not make any attempt to stop -- stop this behavior among others"?

A.   I -- I see that.

Q.   Do you have any understanding of what this sentence means?

A.   No.

Q.   Are you aware of whether any investigation was opened in reference to the fact that you said at least that you would put two in the head of a K9 and that Lieutenant Dunn was conceived in the cesspool of his mother's womb?

A.   I'm thinking that's the investigation that Lieutenant Ryan Young did earlier.  Am I correct -- that we -- we went over.

Q.   It's your belief that the Young investigation we looked at previously about, for lack of a better phrase, the left nut and the right nut and --

A.   Right.

Q.   -- Ms. Guillory is the same investigation that's being referenced here?

**170**

A.   I'm asking if it is.

Q.   I -- I -- unfortunately, I --

A.   Okay.  I don't recall --

MS. CASWELL:  He can't testify.

A.   Yeah, I -- I don't recall.

BY MR. MARDIAN:

Q.   Does that mean, sir, that you're not aware of any investigation that was unique to the K9 and cesspool language here?

A.   No.  It means that -- there may be, but I don't recall at this time, if there ever was.

Q.   If you flip the page, sir, do you see this handwritten statement?

A.   Yes.

Q.   Do you recognize this handwriting?

A.   No.

Q.   Do you recognize the signature at the bottom?

A.   I can't read the signature, but I see 300 on the end of it, which would indicate Chief Fontenot.

Q.   So is it your belief that Chief Fontenot wrote this?

A.   I have no idea.

MS. CASWELL:  Object to form; requires speculation.

BY MR. MARDIAN:

**171**

Q.   But the fact that it lists 300 is an indication that Chief Fontenot wrote this?

A.   He could have.

Q.   Is it more likely that he wrote this than anyone else of which it --

A.   I don't know.

Q.   Do you see that it reads at the top, quote, "No further action taken," closed quote?

A.   I see "no -- no further action taken."  Yes.

Q.   Do you know what that refers to?

A.   No.

Q.   If you go down four lines, do you see the line that reads, quote, "Just officers," quote, "'blowing off steam,'" closed quote?

A.   Yes, I see that.

Q.   Do you know to what that refers?

A.   Nope.

Q.   Are you -- withdrawn.

Do you know what it means for an officer to blow off steam?

A.   No.

Q.   Do any of your colleagues ever say that they're blowing off steam?

A.   Not that I recall.

Q.   Do you see the next line reads, quote, "No

**172**

threats or comments were made to Lieutenant Dunn"?

A.   Hold on.  Yes, I see that.

Q.   Do you have any understanding of what that means?

A.   No.

Q.   Do you see, if you go down five lines, there's a sentence that begins "it is expected"?

A.   Yes.

Q.   Do you see that it reads, quote, "It is expected that officers will at times," quote, "'blow off steam,'" closed quote?

A.   Yes, I see that.

Q.   Do you have any understanding of what that means?

A.   No.

Q.   Have you ever blown off steam at work?

A.   I don't know what "blow off steam" means in this context.

Q.   Have you ever heard Chief Fontenot use the phrase "blow off steam"?

A.   Not that I recall.

Q.   Do you see the sentence continues, quote, "I encourage this in briefing room," closed quote?

A.   Hold on.  Yes, I see it.

Q.   What is the briefing room?

**173**

A.   The briefing room is actually a kitchen area in -- inside the department where meetings are held.

Q.   Does Lieu- -- excuse me, Chief Fontenot encourage any behavior in the briefing room?

A.   Not that I'm aware of.

Q.   Does he discourage any behavior in the briefing room?

A.   Not that I'm aware of.

Q.   Do you see, two lines down, the sentence that reads, quote, "The reason I removed microphones from briefing room was for this purpose"?

A.   Yes, I see that.

Q.   Do you know whether there are microphones in the briefing room?

A.   I -- I don't know.

Q.   Do you know whether there ever were microphones in the briefing room?

A.   I don't know.

Q.   Do you know if there are microphones anywhere at EPD?

A.   I know there's one in the shift -- shift supervisor's office, which we also use that area to do interviews and interrogations.  There's recorded audio and video.  That's the only one that I'm positive that has audio microphones in it.

**174**

Q.   Are there any rooms that you suspect are recorded?

A.   No.

Q.   Are there any rooms that you know, as a matter of fact, are not recorded?

A.   No.

Q.   Do you know how long recordings are kept for the shift supervisor's office?

A.   I -- I'm not -- I'm not aware.

Q.   Do you know who keeps those recordings?

A.   They stay on that device unless an officer asks the IT guy to burn a copy of it.  If he doesn't ask, if it stays on there, I don't know how long it stays on that device.

Q.   Who is the IT guy?

A.   Keith Laverne.

Q.   How long has Mr. Laverne been at EPD, if you know?

A.   As long as I've been there.  Before that.

Q.   Pursuant to your job responsibilities at EPD, do you use email?

A.   Pursuant?

Q.   As part of your job at EPD, do you use email?

A.   Yes.

Q.   Do you have a computer at EPD that you access

**175**

for email?

A.   Yes.

Q.   Do you access that email from anywhere else?

A.   Yes.

Q.   Where else?

A.   Cell phone.

Q.   Is the -- how many cell phones do you have?

A.   How many do I have?  One.

Q.   And is that a cell phone you use for business and personal purposes?

A.   Yes.

Q.   Do you ever delete information from that cell phone?

A.   Yes.

Q.   What do you delete?

A.   Photos.

Q.   Do you ever delete work emails?

A.   No.  You can't delete them.  They just go to -- I forget what it's called, draft or whatever.

Q.   It -- just they're stored in a --

A.   Yeah.

Q.   -- separate folder?

Do you ever text about work?

A.   Do I ever text about work?  I'm sure I do. I'm pretty sure I -- I do.

**176**

Q.   To whom?

A.   My wife, Lieutenant Young, probably every officer at the department.

Q.   Do you ever delete those text messages?

A.   I don't think those can be deleted either. I'm not sure, though.

Q.   So you never attempted to delete any?

A.   No.

Q.   Do you know if your phone could automatically delete them?

A.   I don't know that.  I don't.

Q.   Do you ever text with CIs on your phone?

A.   Yes.

Q.   Do you ever delete any of those texts?

A.   Those -- again, I don't think they can -- they can be deleted.

Q.   Why do you understand that the text cannot be deleted?

A.   Why do I understand it?  I don't understand that they can or can't.

Q.   You don't know one way --

A.   I don't know --

Q.   -- or the other?

A.   -- if they can or can't.  I can barely turn my computer on.

**177**

Q. Do you ever access your work email from your -- withdrawn.

Do you have a home computer?

A. No.

Q. So the only computer you ever access your work email from is at EPD?

A. Yes.

Q. Sir, do you know anyone by the name of Kenneth Charles?

A. Sounds familiar, but I -- I can't recall.

Q. Do you -- do you recall ever arresting anyone named Kenneth Charles?

A. No.

Q. Do you recall ever responding to a request from dispatch to respond to an incident involving a Kenneth Charles?

A. No.

Q. Do you recall responding to an incident -- withdrawn.

Do you recall having ever responded to an incident at Lieutenant Dunn's home?

A. Yes.

Q. What can you tell me about that incident?

A. I -- I think the call was -- this -- this Kenneth Charles might have been walking down the road

**178**

and beat on Lieutenant Dunn's unit as he was walking by. And I think Lieutenant Dunn called the PD to have officers respond. I think that's what it's about.

Q. Did you respond?

A. Yes.

Q. What can you recall took place?

A. If that's the incident you're talking about, I didn't do much. Lieutenant -- Lieutenant Dunn was outside when I arrived, and I think -- I don't know if he was a sergeant at the time. I think Sergeant Cody Miller went hands-on with this guy. I don't -- I don't remember if a taser was used or if pepper spray was used.

But what stands out is as Officer Miller was hands-on with this guy, he -- Officer Miller believed that he may have been contaminated with fentanyl, and he was -- he was -- he was drove to the hospital. That's what I -- I remember the most about that --

Q. You said --

A. -- if that's the incident.

Q. To be clear, you do -- regardless of this -- withdrawn.

Why do you feel the need to say "if that is the incident"?

A. Because I'm not positive -- I -- I remember

**179**

the name, but I don't remember if that's the specific incident that you're referring to right now.

Q. So the incident that you're describing that you responded to involving Officer Miller and the fentanyl, you do recall that incident; you simply do not recall if that involved Kenneth Charles?

A. Correct.

Q. You said that Officer Miller went hands-on with the suspect. What does that mean?

A. I don't remember if he was attempting to handcuff this guy or if the guy was fighting with him. I -- I don't remember. I do remember him saying, "I don't feel good. I think it was fentanyl." He get -- he got into a unit with another officer, and they drove him to the hospital.

Q. How was the suspect behaving?

A. I -- I don't recall.

Q. Do you recall about how long ago this was?

A. Two years, approximately. I -- I don't know.

Q. Is this the only time that you responded to a call at Lieutenant Dunn's home?

A. I think so. I think so.

Q. So notwithstanding that and the fact that Cody Miller was driven away, you don't have any specific recollection of how the suspect was behaving?

**180**

A. No.

Q. Do you have any recollection of whether the suspect resisted arrest?

A. I don't recall.

Q. Were you involved in arresting the suspect?

A. I don't -- I don't think so. I don't recall, though. I really don't recall.

Q. Do you recall who was involved in specifically arresting?

A. No.

Q. Was Mr. Miller involved in arresting the suspect?

A. Mr. Miller was taken off the scene by another officer.

Q. So when he --

A. I don't know if he made the arrest or not. I don't recall.

Q. What's the distinction between going hands-on and actually making the arrest?

A. Making the arrest would be placing the handcuffs on the subject and telling him "you're under arrest."

Q. Do you recall if anyone placed handcuffs on the subject?

A. I don't recall.

181

Q.   Do you recall if anyone rushed the suspect?
A.   I don't recall.
Q.   Do you recall if anyone slammed the suspect against the police car?
A.   I don't recall.
Q.   Do you recall if you punched the suspect?
A.   If I punched the suspect?  I don't recall.
Q.   Do you recall if anyone punched the suspect?
A.   No.
Q.   Do you recall attempting to punch the suspect?
A.   No.
Q.   Do you recall witnessing anyone else attempt to punch the suspect?
A.   No.
Q.   Do you recall dragging the suspect?
A.   No.
Q.   Do you recall witnessing anyone else drag the suspect?
A.   No.
Q.   Do you recall slinging the suspect into the ground?
A.   No.
Q.   Do you recall witnessing anyone else sling the suspect into the ground?
A.   No.

182

Q.   Do you recall whether the suspect was wearing an emergency alert button in a -- in a lanyard around his neck?
A.   I do not.
Q.   Do you recall the race of the suspect?
A.   The what?
Q.   Race.
A.   No.
Q.   Do you recall the gender of the suspect?
A.   It was a male.
Q.   Do you recall the approximate age that you would estimate the suspect was?
A.   No.
Q.   Do you recall if the suspect was bald?
A.   No, I don't recall.
Q.   Do you recall anything that the suspect was wearing?
A.   No.
Q.   Do you recall anything about this incident that you haven't already told me?
A.   No.
Q.   Do you know if an arrest report was ever filed about this incident?
A.   I don't.  I don't know.
Q.   Do you recall writing an arrest report about

183

this incident?
A.   No.
Q.   If I wanted to find this arrest report, where would be the best place to look?
         MS. CASWELL:  Object to form.  Excuse me.  It's --
A.   If there was one?  If there was actually an arrest report?
BY MR. MARDIAN:
Q.   Correct.
A.   Records.  Records department.
Q.   Who at EPD manages records?
A.   Julie Shaw, I want to say.
Q.   And records retains all arrest reports?
A.   I don't know if they retain all.  I know that's where they're supposed to go.  After they complete it, they're supposed to go up to records.
Q.   Do you know if reports -- withdrawn.
     Do you know if records ever destroys arrest reports?
A.   Oh, I don't know.
Q.   Have you ever tried or needed to adjust an arrest report?
A.   I don't recall.
Q.   Is there a policy by which you can change an

184

arrest report?
A.   I don't know.
Q.   So you've never had the need to ask if you needed to change something?
A.   I don't recall.
Q.   Are you aware of anyone at EPD ever changing an arrest report?
A.   I don't recall.
Q.   Are you aware of anyone at EPD ever changing a crash report?
A.   Don't recall.
Q.   Are you aware of anyone -- anyone at EPD ever changing any formal document of EPD?
         MS. CASWELL:  Object to form; vagueness.
A.   No.
BY MR. MARDIAN:
Q.   Earlier you said, in response to my question, "if there is an arrest report" when I asked where I would find it.  Why did you feel the need to make that clarification?
A.   Because you asked me if there was a report done.  I said I didn't know.  So I didn't know if there was a report done, so I said if there was one done, it should have went up to records.
Q.   Is it the policy of EPD that every time an

185

officer responds to a call, an arrest report -- withdrawn.

Is it the policy of EPD that every time an officer responds to a call, a report of some type is written?

A.   No.

Q.   When would a report not be written?

A.   If I go to a call, "neighbor is blowing grass in my yard," and it's resolved, necessary action was taken, that wouldn't require a report to be done in that incident.

Q.   So it's your testimony that any time the incident is resolved at the time of the call, a report is not necessary?

MS. CASWELL:  I object to form.  That misstates his testimony.

A.   No.  That's not what I said.

BY MR. MARDIAN:

Q.   So when is it the case that you do not need a report for a call to which you responded?

A.   Be more specific, please.

Q.   What -- what determines whether you need to file a report after responding to a call?

A.   Many things can determine that.  The severity, many things.

186

Q.   When you say "severity" --

A.   If you tell me what you're getting at, we can -- we can get to the answer quicker.

Q.   I'm just trying to understand why an arrest report would not have been written about the incident that we're describing.

A.   I don't know.

Q.   Would it surprise you if one had not been written?

A.   Yeah.

Q.   Why is that?

A.   Because an officer had to go to the emergency room in that -- in -- in that situation.  Yeah.

THE WITNESS:  Break?

MS. CASWELL:  Yeah.

MR. MARDIAN:  Mind if I ask --

THE VIDEOGRAPHER:  We're off the record at 2:58.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 3:14.

BY MR. MARDIAN:

Q.   Sir, do you know anyone by the name Joshua Dupre?

A.   Yes.

187

Q.   Who is Mr. Dupre?

A.   He's an alleged drug dealer that I purchased illegal narcotics through a controlled investigation.

Q.   Why do you refer to him as an alleged drug dealer?

A.   I don't know if it went to court.  I don't know if he was proven innocent or guilty yet.  I don't -- I don't -- I didn't keep up with the case.

Q.   What is your relationship with Mr. Dupre?

A.   I have no relationship with him.

Q.   Have you ever interacted with him?

A.   Yes.

Q.   Can you describe those interactions?

A.   After we made the purchases from him using the CI, we eventually arrested Mr. Dupre and brought him to CID, myself and Lieutenant Young.  And he was questioned there.

Q.   Do you recall when you arrested Mr. Dupre?

A.   I don't.

Q.   Do you recall what you charged Mr. Dupre with?

A.   I don't.

Q.   Do you recall how many times you arrested Mr. Dupre?

A.   Once, possibly twice.  Once for sure.

Q.   Can you describe the time of which you can

188

recall?

A.   What do you want me to go into?  The --

Q.   Just walk --

A.   -- transaction or --

Q.   Yeah.  Can you just take me from the beginning to the arrest, your interactions with Mr. Dupre that you can recall?

A.   Okay.  I didn't personally interact with him until I made the arrest, the day that we made the arrest.  And I don't recall what day that was.

Q.   What happened the day of the arrest?

A.   We did have a warrant on him for his arrest. I located him -- visually located him on a property. I can't remember the name of the street.  I called Lieutenant Young and told him I had eyes on him, or I may have come over the radio to dispatch.

Officers arrived.  I don't remember which officers were there.  I do remember Lieutenant Young being there.  We made contact with Mr. Dupre at his vehicle.  He was placed in handcuffs, advised he was under arrest, advised of his Miranda rights, and he was taken to our offices at CID.

Q.   For what, if you can recall, was Mr. Dupre arrested?

A.   Well, I made buys from him, so it'd have been

**189**

possession with intent to distribute. I don't remember what illegal narcotics it was, and I don't remember the other -- if there were any other charges.

Q. And when you testified that you, quote, "made buys from him," is that through a confidential informant?

A. Yes.

Q. Where did those buys take place?

A. I -- I think they took place at the same residence where he was arrested that day.

Q. Is that in the city of Eunice?

A. Yes.

Q. Did any of the buys take place outside the city of Eunice?

A. No.

Q. Have you ever used a confidential informant to conduct buys outside of the city of Eunice?

A. No.

Q. Do you have any understanding of what happened to Mr. Dupre after he was arrested?

A. After he was taken to housing or --

Q. Correct.

A. No.

Q. Did you have any involvement in the legal proceedings concerning Mr. Dupre's arrest?

**190**

A. I think I went to a bond revocation hearing.

Q. What can you recall about that hearing?

A. He was asking for his bond to be reduced, I think. I know he went back and forth into the judge's chambers with the judge one, two, three times. I don't know what they were talking about. They would come back out. I was questioned by the judge, Judge Caswell -- questioned by the judge about cell phones that I had recovered during the arrest.

In the end, I was allowed to retain possession of those cell phones. I don't recall if there was a bond reduction. I don't recall. That's about it. That's about all I can recall right now.

Q. What is a bond reduction?

A. Judge sets a bond. Let's say it's $100,000. The lawyer for the individual is going to eventually get his time in court to ask the judge, let's say, "Judge, you know, family can't afford $100,000. We're asking that you reduce it to $20,000." And at that time, the judge makes the determination if the bond stands at 100 or if he's going to reduce it down to 20. That's a bond reduction hearing.

Q. So does a bond reduction increase the likelihood that the individual will be set free?

MS. CASWELL: I object to form. Excuse

**191**

me. Requires speculation.

A. I don't -- I don't know if it increases the probability. It reduces the amount that he'll have to pay to the -- to the courts.

Q. Why were you at this bond hearing?

A. The officer that makes the arrest is required to be at any bond hearing that that individual would -- would be brought before the judge.

Q. And you testified you can only recall one arrest of Mr. Dupre?

A. There may have been a second. I'm not sure.

Q. Can you recall being at a -- at an additional bond hearing for Mr. Dupre?

A. I can't recall that at this time, no.

Q. You referenced two cell phones that were issued. Do you recall that?

A. I said cell phones.

Q. Multiple cell phones?

A. Yeah, uh-huh.

Q. What can you tell me about those cell phones?

A. When we made the arrest, those two cell phones were seized. We then got a warrant from the judge, who approved us, to do what's called a dump on the phone. We dump information. We -- I don't remember what agency done it. It may have been state police. It

**192**

may have been DEA.

The phones were turned over to them with the warrant, a copy of the warrant. They retrieve information off of that phone and either give us a disc or a drive with the information that they retrieve off of that phone to locate evidence or anything that we could find useful in the -- in the case.

Q. Just want to make sure my understanding is correct. So at the hearing, it's your understanding at the hearing, you witnessed the judge return the cell phones to either the DEA or another government agency?

A. No. He returned the cell phones to me.

Q. To you?

A. Yes.

Q. And then did you collect the dump of the information at that time?

A. It was done before that. The -- the warrant was already signed. The dump was done. We had the information, and we were ordered to bring the cell phones to that bond hearing.

Q. So before the bond hearing, the dump of information was completed?

A. Yes.

Q. Was that completed by EPD?

A. No. It was either state police or the DEA.

193

I can't recall.  It would be in the report.

Q.   So you seized the cell phones from Mr. Dupre at the time of the arrest?

A.   Yes.

Q.   EPD held the cell phones?

A.   Uh-huh.

Q.   Then the cell phones were provided to DEA or another government agency?

A.   Uh-huh.

Q.   One of those agencies collected the information on the cell phones?

A.   Uh-huh.  Yes.

Q.   At which time, the cell phones were then returned to who?

A.   We're ordered to bring those cell phones to the bond hearing.  I don't remember what conversation the judge had, but he eventually returned the cell phones back to me.

Q.   And then to clarify, how many cell phones are we talking about?

A.   Two.

Q.   And then what did you do with the cell phones?

A.   I still have those cell phones, to this day, in my possession.

Q.   Are they at EPD?

194

A.   Yes.

Q.   Are they stored somewhere at EPD?

A.   Yes.

Q.   Who has access to those cell phones?

A.   Me.

Q.   Does anyone else?

A.   They're not stored at EPD.  They're stored at CID.

Q.   And CID is a different office --

A.   Yes.

Q.   -- from EPD?

A.   Yes.

Q.   Does anyone else have access to those cell phones?

A.   Lieutenant Young would.  He has a key to my office.  I think Lieutenant Kennedy has a key to my office.

Q.   Why are you continuing to retain those cell phones?

A.   Because I attempted several times to return them to Mr. Dupre, but I was unable to make contact with him to return the cell phones to him.

Q.   Does EPD have a policy regarding -- withdrawn.
     Does EPD consider the Dupre arrest to be an EPD investigation?

195

A.   For the narcotics?

Q.   Correct.

A.   Yes.

Q.   How did the DEA or the government age- -- other government agency that you described become involved in this?

A.   Anytime we get a warrant to dump a phone, the judge that we are requesting it from wants to know what agency or what department is going to dump the phone.  We don't have the technology to do it at EPD, so anytime we do that -- anytime any officer does that, we have to send that phone off to another agency, either state police, who has the technology, the DEA, or another agency.  We've used -- we've used Calcasieu Parish Sheriff's Department before, to do that, too, because we don't have the technology there to do it.

Q.   So you said you've tried to return the phone to Mr. Dupre?

A.   Yes.

Q.   Why have you tried to return the phone to Mr. Dupre?

A.   Because I was told to return the phones to Mr. Dupre whenever we were complete.

Q.   Told by the judge?

A.   Yes.

196

Q.   Is -- withdrawn.
     Do you know where Mr. Dupre is today?

A.   I have no idea.

Q.   Does EPD currently have any open investigations regarding Mr. Dupre?

A.   You mean current, like ongoing?

Q.   Correct.

A.   Not by me.

Q.   So there's no separate basis to withhold these phones other than you simply can't return them --

A.   Correct.

Q.   -- because you can't find him?
     Have you ever reviewed the contents of the phone that the DEA downloaded?

A.   Yes.

Q.   Have you reviewed text messages on the phones?

A.   Yes.

Q.   Have you reviewed text messages on both of the phones?

A.   I -- I think there was text messages on -- on both of them.  I do -- I think so, yes.

Q.   Do you recall -- withdrawn.
     Do you have any understanding of why Mr. Dupre had two cell phones?

A.   No.

197

Q.   Have you reviewed emails on either of the phones?

A.   That, I don't recall.

Q.   Have you reviewed videos on either of the phones?

A.   I don't recall if there was any videos.

Q.   Have you reviewed photos on either of the phones?

A.   I don't recall if there was photos.

Q.   Do you recall reviewing anything on the phones other than text messages?

A.   I know for a fact I -- I -- I saw text messages.  That's all I can verify right now, for -- for sure.

Q.   And forgive me if you answered this already.  But why did you download the contents of the phones?

A.   To solidify the case that I was working on against Mr. Dupre.

Q.   Did the contents of the phones aid the investigation, in your opinion?

A.   I don't -- I don't think they did.

Q.   Did you ever text with Mr. Dupre?

A.   I think I did.

Q.   Do you recall the contents of any of those communications?

198

A.   I don't.

Q.   Do you recall why you may have been texting with him?

A.   Yes.

Q.   And why is that?

A.   He had given me information, the time of the arrest, about interactions that he and Lieutenant Dunn had together.

Q.   What do you recall about those interactions?

A.   He told me that he was paying Lieutenant Dunn money to basically keep him safe, I guess, I think is what he said.  He gave us dollar amounts, and he gave us places that they met.  He gave us the vehicles that Lieutenant Dunn was in at the time that they got together.

Q.   Have you been able to corroborate any of Mr. Dupre's allegations?

A.   No.

Q.   Did you conduct any investigation into Mr. Dupre's allegations?

A.   I conducted -- it's wasn't -- it wasn't an official investigation through the department.  It was more like a note-keeping investigation, gathering facts or gathering information.  Yeah.

Q.   So you said it's not official.  Would you call

199

it an unofficial investigation?

A.   I guess it would be called unofficial.

Q.   Was anyone aware that you were conducting this unofficial investigation into Lieutenant Dunn?

A.   Yes.

Q.   Who was aware?

A.   Lieutenant Young was aware.  State police, DEA was aware.  Chief Fontenot was aware.  I -- I don't -- I don't know if anybody else was.  I don't recall.

Q.   Do you recall any specific communications you had with Lieutenant Young about this unofficial investigation?

A.   Any specific information?

Q.   Communications.

A.   Communication?  Specify.

Q.   Do you recall discussing this unofficial investigation with Lieutenant Young?

A.   Somewhat, yes.

Q.   Do you recall the substance of any of those communications?

A.   What we talked about?

Q.   Correct.

A.   Yes.

Q.   Can you please describe those?

A.   I told him I had information about

200

Lieutenant Dunn with Dupre and one other individual, that -- that he was getting paid.  I -- I think he was -- they said he was getting paid by both of those individuals to keep them safe, in their words.  Basically what -- what the unofficial investigation was about.

Q.   Who was the second individual?

THE WITNESS:  Did they get a copy of the --

MS. CASWELL:  Can't ask me questions.

A.   Do you have a copy of the unofficial report?

BY MR. MARDIAN:

Q.   Are you asking whether we have a copy because you'd like to see the report to refresh your --

A.   I don't need -- no, I -- I don't need to see the report.

Q.   Are you asking because you don't want to disclose the other individual's identity?

A.   Correct.

Q.   Is that because this is another confidential informant?

A.   No.

Q.   Can I ask you why you don't want to disclose this individual's identity?

A.   Maybe for safety reasons.  If you have a copy

## 201

of it, you already know who the other individual is. So if you have a copy, it wouldn't hurt me or anybody else if I gave that name today. And what's your hesitation on taking it that you do have a copy, so the other individual was Jamie Hill.

Q. Who is Jamie Hill?

A. Jamie Hill is a -- another known drug dealer in the Eunice area.

Q. Have you ever spoken with Mr. Hill?

A. No.

Q. What was the basis for the allegation that Mr. Hill was paying Lieutenant Dunn for protection?

A. I got my information -- all of this information from two separate CIs.

Q. Who are those CIs?

A. I'm not going to give those up. And those are not in your report.

MS. CASWELL: And I will interject. We're at -- since the CI issue is pending before the magistrate judge, you know, we're not going to provide identities of CIs unless he orders us to.

MR. MARDIAN: Would you agree to hold the deposition open pending the magistrate's resolution of that issue?

## 202

MS. CASWELL: We'd be willing -- to the extent the magistrate George -- judge orders us to identify CIs, we'd be willing to provide that information. I mean, I think you can ask him your questions about those CIs now. But, I mean, I don't think we need to hold it open just for the identity of CIs that we can provide later.

MR. MARDIAN: Well, we wouldn't be holding it open just for their identity. It's critical to our ability to -- to ask follow-up questions about those communications to understand who they are.

So if you're willing to stipulate that we would hold the deposition open, I think we can reach some sort of agreement. Otherwise, I think it's highly relevant material information that I'm not sure if there's a legal basis to instruct the witness not to answer.

THE WITNESS: Well, I'm not giving up those --

MS. CASWELL: Yeah.

THE WITNESS: -- two names unless the judge tells me I have to.

## 203

MS. CASWELL: We can stipulate -- we can work on a stipulation. I mean, it's going to be very limited to that issue. I mean, we're not going to go -- we're not going to keep -- leave it open for anything, maybe some specific questioning related to that CI.

But quite frankly, if you want to ask him about the CI and what he did and didn't tell him and everything else, I think that's -- you can do that now. But yeah. And we can maybe come up with some limited stipulation to keep it open for a very narrow purpose. But yeah --

MR. MARDIAN: Thank you.

MS. CASWELL: -- we're not -- we're not going to give up CIs unless we're ordered by the court since that's a pending issue.

MR. MARDIAN: Just for clarification, are you instructing him not to answer the question?

MS. CASWELL: I'm instructing him to not identify the CIs, yes.

MR. MARDIAN: And what is the legal basis for that instruction?

MS. CASWELL: Because it is currently

## 204

pending before the judge. He has already questioned the relevancy and whether he was going to require us to provide information about CIs, and that is still pending before the court, and that is the basis.

MR. MARDIAN: Would you provide the information about the CIs if the non-lawyers left the room?

MS. CASWELL: I think this is going to be an issue where I think -- I think we'd need to bring it to the judge. I'm just -- the judge has already questioned whether that's relevant and whether we -- he was going to order us to do that as it was.

He has y'all's information about the CIs you want and what you want, and yeah. I think it's in his court at this point. And yeah, I'm not going to order -- I'm -- I'm not going to order -- or ask my client to testify about the CIs or his identity at this point.

But we can -- it is 3:38, so I think we might be able to get Judge Hannah on the phone if y'all want to address that now.

MR. MARDIAN: Can we take a brief break?

MS. CASWELL: Yeah, sure.

**205**

MR. MARDIAN:  Let's go off the record.

THE VIDEOGRAPHER:  We're off the record at 3:38.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 3:52.

BY MR. MARDIAN:

Q.  Did you speak with anyone during this break, Detective Fontenot?

A.  Yes.

Q.  With whom did you speak?

A.  Chief Fontenot.

Q.  What did you discuss?

A.  We discussed why you-guys would have wanted the names of the informants.  We discussed -- I mean, we discussed how long we would be here.  I told him I had to call my wife, let her know that I was going to be late.  We discussed what the difference was between an -- an investigation within the department and what an internal investigation was.

Q.  Who began the discussion regarding why we would want the names of the confidential informants?

A.  I think I did.

Q.  What did you say?

A.  I couldn't understand why you-guys needed the

**206**

names of the informants.

Q.  What did Chief Fontenot say in response?

A.  He said he didn't understand why either, why it was relevant.

Q.  Was there any further discussion regarding the issue?

A.  No.

Q.  Who began the discussion regarding the distinction between an investigation within the department and an internal investigation?

A.  I think he did.

Q.  What did he say?

A.  We discussed what a -- that you have to get -- you have to get evidence -- if it was ever going to go to an IA, that you have to get evidence to make it a criminal offense in order to take that to the next level, which would have been internal investigation.

Q.  Is this distinction that you were discussing the same official versus unofficial distinction we discussed previously?

A.  Yes.

Q.  And so which type of investigation did you conduct into Lieutenant Dunn?

A.  I guess it would be an un- -- unofficial investigation.

**207**

Q.  And that is to say one that does not involve IA?

A.  Right.

Q.  And the reason is because there wasn't criminal allegations involved?

A.  Well, nothing -- I found nothing to -- to prove that the allegations were true, in the end.

Q.  Okay.  Now we'll return to the original question.  Well, withdrawn.

Did you and Chief Fontenot discuss anything further on that topic?

A.  No.

Q.  Who are the identit- -- what are the identities of the confidential informants with whom you dis- -- discussed allegations that Lieutenant Dunn was committing illegal acts?

MS. CASWELL:  I'm going to object for the same reason.

You don't have to answer as we've already put on the record -- or I'm instructing you not to answer for the same reasons that we put on record.

MR. MARDIAN:  We don't think there's a legal basis for that objection nor do we --

MS. CASWELL:  That's fine.  Then we can

**208**

talk to the magistrate if you want to ask the question.  He's not going to answer it.

MR. MARDIAN:  Understood.  So we'll hold the deposition open.

MS. CASWELL:  For that very limited purpose, I'm fine with, of discussing that CI and things that you can't already ask right now.

MR. MARDIAN:  That's fair.  You can object to us reopening it for any purpose, but we're holding it open for any purpose.

THE WITNESS:  I still don't understand what that means.

BY MR. MARDIAN:

Q.  What -- first, how many CIs did you discuss potential allegations of criminality regarding -- with how many CIs did you discuss allegations of criminality regarding Lieutenant Dunn?

A.  Two.

Q.  I'd like to refer to them as CI A and CI B.  Is that okay?

A.  Okay.

Q.  What did you discuss with CI A?

MS. CASWELL:  Do you want to go with one or two?

**209**

MR. MARDIAN:  Yes.

BY MR. MARDIAN:

Q.    Let's change that to one and two?

A.    Like juvenile one and juvenile two?  Yeah.

Q.    Yeah.  I was thinking Thing One and Thing Two.

A.    Okay.  Okay.

Q.    What did you discuss with CI 1?

A.    Okay.  We'll have to go back a little further. All right.  So I got information from CI 2 that Frank Dupre, who is a close relative of Josh Dupre -- that there was a substantial amount of narcotics in a residence where Frank Dupre was renting a residence from Josh Dupre on Childs Street.  Okay.

When I got this information, I brought this information to Lieutenant Dunn, and I don't remember if he was on shift at the time or if I called him and asked him to come and meet with me.  I don't remember. Anyway, he did come.  We discussed a plan of operation to -- well, we -- we got a search warrant for the residence from a judge.  We discussed a plan of operation to go into this residence and locate these narcotics, if they were there, seize them, and make arrests.

Q.    Okay.

A.    From the time that I contacted him to the

**210**

time that we made contact with the residents, it was approximately two hours.  When we did finally execute, drove to the residence.  We made contact with, I think, four individuals outside of the residence.  We detained them, went inside the residence and only located a very small amount of illegal narcotics.

(Brief interruption.)

A.    At that -- at that time, like I said, we -- we detained the four.  I -- I think there was four.  There could have been five -- four.  We detained those.  We went into the residence, located a very small amount of narcotics.  We located a weapon and more narcotics outside that -- it was later determined that Mr. Dupre, Frank, had thrown to the ground right before we arrived.  Officers left.  We collected the evidence, brought the four detained to the police department to speak to them.

But before I left the scene, I was the last one on the scene.  CI No. 1 came to the scene and asked to talk to me and gave me very detailed information about a conversation that occurred between him and Frank Dupre where Frank Dupre told CI No. 1 that a phone call was made to Mr. Dupre before we arrived letting him know that we were coming to the location.

And at that point, the narcotics were moved

**211**

from inside of the residence and placed inside of a dresser, chest of drawers, and it was placed in the fence line in the rear property -- rear of the property.  And he advised me that the person that called him was Lieutenant Dunn and told Mr. Dupre that we were coming to the residence to do a search warrant for narcotics.  At that time, I was surprised and didn't really think much about it.  That was my dealings with CI No. 1.

Q.    Apologies, just want to confirm.  The CI that told you originally about the large amount of drugs in the house, that was indiv- -- CI 2?

A.    Correct.

Q.    CI 2 tells you about the drugs in the house?

A.    Correct.

Q.    CI 1 tells you about the conversation that CI 1 had with Frank Dupre --

A.    Correct.

Q.    -- implicating Lieutenant Dunn?

A.    Correct.

Q.    Has CI 2 ever implicated Lieutenant Dunn in his conversations with you?

A.    Yes.

Q.    When you went to Lieutenant Dunn about going to this home, did you have the warrant at that time?

**212**

A.    Yes.

Q.    Why was the reason, if you can recall, for -- withdrawn.

After you went with -- to Lieutenant Dunn, you said that two hours passed before you went to the house?

A.    Yes, approximately.

Q.    Approximately.  What took place, to the best of your rellection -- recollection, during those two hours?

A.    At the police department?

Q.    Just -- it's my understanding -- and correct me if this is wrong -- you went to Lieutenant Dunn about going to this house.  At that time, you already had an arrest warrant.

A.    I didn't have an arrest warrant.  I had a search warrant for the residence.

Q.    Excuse me.  Thank you.  Search warrant.

Two hours pass and then you arrive at the home; is that correct?

A.    Correct.

Q.    What took place during that two-hour period?

A.    With -- within the department?

Q.    With you.  What were you doing --

A.    Okay.

**213**

Q. -- during the two-hour period?

A. All right. Me and Lieutenant Dunn discussed -- he was given the location. I believe he pulled up the residence at one point so that we could look at it through maybe Google Earth or whatever it was, made a plan of action of which way we -- we would come in and who would go where and what would we do in this situation and just tactical stuff because I believe at the time, if I remember correct, he was leading the TAC team within the department. He may have -- he did. He called other members of the TAC team to come and assist us.

I was in and out, smoking cigarettes outside. I think I went -- got something to eat at one point. I was anxious. I was ready to do this. At one point, I walked back into the shift commander's office where Lieu- -- Lieutenant Dunn was. He was on the phone with, I think, former detective -- Eunice detective Larson. When I walked in, he said, "Okay. Well, all right then. Bye," and he hung up. I don't know what that conversation was about.

We eventually called the rest of the shift that was on duty that night to come in so that he could brief them on what the plan of action was. I think a couple of them set up in the area around that residence

**214**

that we were going to hit. I think we got into my unit, which was an SUV, three or four of us. I think Lieutenant Dunn was in the vehicle with me.

We drove up to the residence. We walked maybe -- maybe 100 yards in the dark. We arrived at the residence. That's when we saw the four or five residents outside about to enter the trailer. And we executed a take down on them, and that's when we detained them, and you know the rest of it.

Q. Just to place this in time, about when did this all take place?

A. Like date?

Q. Yes.

A. I don't -- I don't recall.

Q. Was it this year?

A. '22? No.

Q. Was it 2021?

A. I -- I don't recall.

Q. Can you --

A. It may be in the notes that you have.

Q. Can you place it in relation to any other events in your life?

A. No.

Q. I believe you testified that after speaking with CI 1 about Lieutenant Dunn, you said it -- you

**215**

didn't think much about it?

A. Correct.

Q. What makes you say that?

A. It was just -- it was hard to believe that that would have taken place.

Q. So maybe I'm just misunderstanding. But when I see "though, I didn't think much about it," that makes me think it's the opposite of something trivial. Was this surprising to you or not?

A. Yes.

Q. Okay. So then, what happens after that?

A. Okay. The following day, CI 2 texts me and asked me if he can call me, if I'm available talk. Yes. At that time, he says -- he says, "There was no drugs in the house, right?"

And I'm like, "No."

"Very, very little, nothing that you told me was in there." And he -- that's when he said, well, Lieutenant Dunn called Frank and Frank took the narcotics that were in the house, placed them in the chest of drawers, took it outside along with somebody else. I don't remember who he said. And they placed it in the back of the property along the fence line where the grass is. He said -- he asked me if -- if I went to the backyard.

**216**

I said "No, I didn't." I said, "Lieutenant Dunn went to the backyard and searched it as we were going into the residence."

And he said, "Well, all the drugs that were in the house were in the backyard where Dunn went and searched."

And CI 1 and CI 2 is telling me the same thing and don't really associate with each other. And that's when I -- I said, well, this might be valid. This might be something to look into. And that's what started the unofficial investigation.

Q. You didn't go in the backyard?

A. No.

Q. Lieutenant Dunn went in the backyard?

A. Yes.

Q. The purpose of this trip to this home was to seize narcotics?

A. Correct.

Q. You didn't find any in the house?

A. We did. We found -- we found very, very few, very. It was maybe paraphernalia.

Q. Who found those?

A. I don't -- I -- I don't remember which officer. I can't recall.

Q. What portion of the property did you search?

**217**

A.   I went to the back door where the four or five individuals were, observed the pistol and a couple of canisters, small canisters of marijuana.  I left one of the officers there to keep an eye on it.  I don't remember which one.  We were about to go into the residence, me and three or four other officers.  I can't remember how many.

Lieutenant Dunn said, "Well, I'm going to check the backyard.  I'm going to check underneath the trailer.  I'm going to check the perimeter."  When we went inside of the residence, I don't -- I don't know how long it took him to do that.  I don't know what he did.  I don't remember if he came in the trailer after he did that, while we were still inside or not.  I don't remember that.

We found a little bit of marijuana.  And I don't remember who -- it wasn't me -- found a little bit of marijuana on the coffee table.  Paraphernalia.  Maybe a rifle or something inside of the residence.  It wasn't much in there.  The CI had sent photographs -- CI 2 had sent photographs, before I went in, of narcotics in the residence.  Photographs of both bedrooms because I asked for a layout before we went in, which is procedural.  We want to know what we're walking into.  I had never been into that residence

**218**

before.

In those photographs, the bedroom on the north side was where the chest of drawers was in the photograph.  There were vape pens.  There were bags of marijuana in these photographs near the chest of drawers and maybe -- maybe a mattress or something against the wall.  I don't remember.

When we went into that bedroom -- that's the first bedroom I went into, that I wanted to go into as soon as we entered -- the chest of drawers was gone.  The narcotics were gone.  The mattress that was leaning up against the wall was gone.  There was absolutely nothing in that bedroom that would -- an hour or two hours before, I had photographs of what was in that bedroom.  None of that was in that bedroom.  The chest of drawer was nowhere in the house, and the mattress was in the other room.

Q.   Did anyone other than Lieutenant Dunn search the backyard?

A.   I'm not aware.  I don't know.  I went into the house whenever he advised he was going to the backyard.

Q.   In the course of your investigation, did you ever -- did you ever seek to determine if anyone other than Lieutenant Dunn was in the backyard?

A.   No.

**219**

Q.   Why not?

A.   Why didn't I find out if someone else was in the backyard with him?

Q.   Correct.

A.   I don't know.

Q.   Was it CI 1 or CI 2 who called you and told you the information about the drugs in the backyard?

A.   The first time I heard about that was from CI 1 the night of the -- the night of the search warrant execution.  Then CI -- you want me to continue?

Q.   Yes, please.

A.   I'm sorry.  And then CI 2 text me the following day and told me -- phone call, told me that the narcotics were placed in the chest of drawer and brought to the backyard.

Q.   So the first that you heard of the drugs being in the backyard was the night of the attempted seizure?

A.   Correct.  After officers had left, after the detained parties -- individuals were brought to the police department, I was about to leave.  CI -- CI 1 walks up and says that before we got there, Josh -- Frank Dupre told CI 1 that the narcotics were placed in the chest of drawer that was in the bedroom and that chest of drawer was brought to the backyard near the fence line and the tall grass area.

**220**

This is CI 1 telling me he had a conversation with Frank Dupre and that Lieutenant Dunn had made a phone call to Frank Dupre before we arrived and that everything was moved to that chest of drawer and placed in the backyard.

Q.   And you had this conversation with CI 1 the night of the attempted seizure?

A.   Yes.

Q.   Did you then immediately go to the backyard and attempt to seize the drugs?

A.   I went to the backyard.

Q.   What did you find?

A.   I didn't find the chest of drawers.

Q.   And how much -- how long after you arrived at the property the first time did you return back to the property?

A.   I never left.  We --

Q.   So you received the phone call and then you went to the backyard --

A.   Yes.

Q.   -- and you didn't find anything?

A.   Yes.

Q.   What did you do with the photos that either of the CIs sent you?

A.   That would have been two department phones

**221**

ago.  I don't know where those photos are now.

Q.   You said department phones.  I thought you conducted department business on your personal phone?

A.   No.

Q.   Department owns your cell phone?

A.   Uh-huh.

Q.   Does it pay for your wireless plan?

A.   Uh-huh.

Q.   You didn't leave the property in between arriving and receiving the phone call from CI 1, correct?  You testified to that?

MS. CASWELL:  I object -- object to form; misstates his testimony.

BY MR. MARDIAN:

Q.   You arrived at the property, go through the house.  Lieutenant Dunn goes to the backyard.  Then you have that conversation with CI 1 that we've been discussing?

A.   Yes.

Q.   Where did you take that -- withdrawn.

Where did that conversation take place?

A.   It took place on the roadway in front of that residence.

Q.   Okay.  From the time that you arrived at the property to the time that you had that conversation

**222**

with CI 1, how much time had elapsed?

A.   Say again.

Q.   From the time that you arrived at the property to the time that you had that conversation with CI 1, how much time had elapsed?

A.   Hour, hour and a half maybe.

Q.   And through that hour and hour and a half, you never went to the backyard?

A.   No.  As soon as he gave me that information, I went to the back.  That's when I went to the backyard. I got out of my vehicle and went to the backyard.

Q.   But before -- the hour and the hour-and-a-half period before you had the conversation with CI 1, you had not gone to backyard?

A.   No.

Q.   And you are not aware of whether or not any additional officers had gone to the backyard?

A.   No.

Q.   The next day, you have the conversation with CI 2?

A.   Yes.

Q.   We talked about that.  What happened next?

A.   I think I told Lieutenant Young about the -- the information that I received from both CI 1 and CI 2.  At that point, I think he told me to contact

**223**

Walter at state police.  Walter --

MR. LOUGHLIN:  I'm sorry.  What state police?

THE WITNESS:  Walter Mire.

MR. LOUGHLIN:  Okay.

A.   I think at -- at that point, I went to the chief's residence and told him the information and told him that Lieutenant Young had advised me to go -- to make contact with the DEA.  I did.  I called Walter and told him what we had.  And I believe he said he was going to come within the next few days to talk with us about it.  I don't remember if he did or not.

BY MR. MARDIAN:

Q.   So when you spoke with Lieutenant Dunn, you told him, in sub and -- sum and substance, what you've told me here today?

A.   No, no.  Not Lieutenant Dunn.

Q.   Sorry.  Who did you talk to?

A.   Lieutenant Young.

Q.   Young.  Lieutenant Young tells you to go to DEA?

A.   Yes.

Q.   You do.  Did he tell you to go to the chief?

A.   No.

Q.   You went --

**224**

A.   Yes, yes.  He said verify it with the chief before you call D- -- DEA, before you call Walter. That's when I went to his residence.

Q.   Why --

A.   Gave him the information that I had.

Q.   Why did you report this to Lieutenant Young?

A.   Because he was my immediate supervisor.

Q.   And Lieutenant Young, among other things, asked you to clear it with the chief before you go to the DEA?

A.   Yes.

Q.   And then you went to the chief's home?

A.   Yes.

Q.   And what did you tell the chief?

A.   Basically exactly what I just told you about the information that I got from CI 1 and CI 2.

Q.   And what did the chief tell you?

A.   To call the DEA and give them the information.

Q.   Did you call the DEA?

A.   Yes.

Q.   With whom did you speak at the DEA?

A.   Walter Mire.

Q.   And what did Walter tell you?

A.   That he was going to contact us within that next day or two.  And like I said, I don't remember if

**225**

he did or not or if he -- if he called us back or -- or met in person. I -- I don't remember that.

Q. But you did have a conversation with him after the fact?

A. I don't remember. After that initial contact? I don't remember if -- if he called or came or if he sent other agents to talk to us.

Q. I'm a little confused. You had a phone call with him. He says he's going to call you back or have a meeting with you?

A. Yes.

Q. Then you don't hear from him again?

A. I don't remember if he came and spoke to us or if he sent other agents to come and speak to us about the situation. I don't remember if it was him, personally, or the other agents.

Q. When did you speak with either him or the other agents?

A. I -- I don't recall.

Q. Which other agents did you speak with?

A. Can I look in my contacts? Bret. Bret -- Bret Theriot, I think that's his name.

Q. And you can't recall when this conversation took place?

A. I can't. I can't be specific. It -- it could

**226**

have been a week, it could have been two weeks later. I don't recall.

Q. Was Lieutenant Young involved in this discussion?

A. I don't recall.

Q. Was Chief Fontenot involved in this discussion?

A. I don't think so, no.

Q. Did this discussion take place in person?

A. I think it did.

Q. But you're not sure?

A. I'm not sure.

Q. It is your testimony under oath that after you had begun an unofficial investigation into potential criminal conduct of one of your colleagues, you reported that information to the drug enforcement agency and then you had a conversation with the DEA, but you do not remember whether that conversation took place over the phone or in person?

A. Correct.

MS. CASWELL: Object --

A. At this time, I --

MS. CASWELL: Let me object to form. Misstates his testimony. Go ahead.

BY MR. MARDIAN:

**227**

Q. Which portion of your testimony did I misstate?

A. Miss what?

Q. Did I misstate any of your testimony?

A. Misstate?

Q. Misstate. Did I incorrectly characterize your testimony, sir?

A. You said -- let's go back on there.

Q. Is it your testimony, under oath, that after you had begun an unofficial investigation into potential crim- -- criminal conduct of one of your colleagues, you reported that information to the drug enforcement agency and then you had a conversation with the DEA, but you cannot recall whether that conversation took place in person or over the phone?

MS. CASWELL: Same objection. You can answer.

A. I reported that information to Lieutenant Young, who advised me to bring that information to the state police but to go up chain of command to the chief before I was able to -- or before I made that phone call. Contacted chief, contacted Walter Mire state police, DEA.

When I say "DEA, state police," Walter Mire is a state trooper, but he is the head of narcotics for

**228**

the Louisiana State Police. He said he would get back with me in a couple of days. And then I stated I don't remember if he came or if he sent Bret over to talk to me. And then I stated I don't remember the timeline between the first time that I talked to Walter and the actual time that I spoke with Bret. I don't remember that timeline.

BY MR. MARDIAN:

Q. And my question was, do you recall whether that conversation with Brent [sic] took place in person or over the phone?

A. And again, I stated I don't remember that.

Q. When you think back to that conversation, do you picture it being in a room with Brent, or do you picture it being on the phone?

A. I don't recall.

Q. You don't recall either how long -- or rather, how much time passed between your initial conversation with Brent and your subsequent conversation with the DEA?

MS. CASWELL: Object to form; asked and answered.

BY MR. MARDIAN:

Q. You can answer.

A. I've met with Bret Theriot on multiple

**229**

occasions, in person and on the phone, about other narcotic cases that we've worked in the city. So I'm telling you I can't remember that far back. I can't remember if Bret came over or if we spoke on the phone about it. I -- I can't remember.

Q. How many of the conversations with Brent concerned potential illegality of one of your colleagues?

A. I don't recall how many.

Q. It could have been others? There could have been others?

A. I don't recall.

Q. Are any other individual -- withdrawn.

Did you suspect that any other employees of EPD are currently or have previously engaged in illegal conduct?

A. I have no idea.

Q. Do you have any to -- reason to believe that any have?

A. Do I have reason to believe that any others have? No.

Q. Have you opened any unofficial investigations into any employees of EPD other than Lieutenant Michael Dunn?

A. Not that I recall, no.

**230**

Q. So then I ask, again, how many of your conversations with Brent involved potential illegal conduct being committed by an employee of EPD other than Lieutenant Dunn?

A. Oh, I get you. Have I talked to Bret about any other wrongdoings in the EPD?

Q. Correct.

A. No. No, I have not, not that I recall.

Q. But nonetheless, you can't recall the specifics of this conversation with Brent?

A. I cannot.

Q. You said a week may have passed --

A. I -- I think it's Bret.

Q. Thank you. You said a week may have passed between when you reached out to Brent -- Bret the first time and when you spoke with him the second time?

MS. CASWELL: Object to form; misstates his testimony.

A. The first time I spoke to the DEA, state police was Walter Mire. That's the very first time I spoke to them.

BY MR. MARDIAN:

Q. Thank you. So a week may have passed after speaking with Walter?

A. Correct.

**231**

Q. Two weeks also may have passed, you said?

A. I -- I -- I don't remember.

Q. You said that you don't remember earlier because this happened a while ago?

A. I said this happened a while back, and also since then, I've spoken to Bret multiple times in person and on the phone about other narcotics dealings that we're doing inside the city. So it -- it's hard for me to remember when I spoke to Bret. I -- I think that's the very first time I met Bret, was in this case, in this little investigation. I think that's the first time I met him.

Q. Okay. So what did you and Bret discuss?

A. I don't remember details, but I'm -- I'm -- I'm sure it's going to be the same thing that I just told you about CI 1's information and CI 2's information.

Q. And what did Bret say to you?

A. I don't remember.

Q. Okay. What did you do next?

MS. CASWELL: Object to form; asks for a narrative and it's overly vague.

BY MR. MARDIAN:

Q. What was the next action that you took with respect to your uninvest- -- unofficial investigation

**232**

of Lieutenant Dunn?

A. I believe I spoke a couple more times to CI 2, yes. And one of those conversations, that's where Jamie Hill's name was brought up. CI 2 advised me that -- I don't know if this is going to give him away or not. CI 2 -- 2 told me that he was -- he was at a residence speaking to Josh Dupre. While he was speaking to Josh Dupre, Jamie Hill drives up.

Josh Dupre is talking to Jamie Hill about Lieutenant Dunn. They start talking about the search warrant of the residence where we tried to get the narcotics with Lieutenant Dunn. Jamie Hill asks Dupre, "Well, did you hook Dunn up?" He was like, "Yeah, man. I got it. I got it." Then that's where Jamie Hill's name comes into this.

Q. Is there any portion of that answer that you adjusted so as to avoid revealing the identity of the CI?

A. I was going to -- I was going to -- I was going to name where they met up, but I didn't.

Q. Where did they meet?

MS. CASWELL: Do -- do you believe that that's actually going to give up --

THE WITNESS: I don't know.

MS. CASWELL: -- the identity?

**233**

THE WITNESS:  I just -- I'm just being very careful right now of -- because of the identities of the CIs.  I don't think it will.

A.  They met up in the same residence where I arrested Josh Dupre.

BY MR. MARDIAN:

Q.  And what is that residence?

MS. CASWELL:  Are you pausing because you're concerned?

THE WITNESS:  Yeah.  I'm trying -- I'm trying --

MS. CASWELL:  No.  Are you concerned or just so you --

THE WITNESS:  No, no.

MS. CASWELL:  Okay.

THE WITNESS:  I'm trying to remember the -- I'm trying to remember the address of the street.

A.  It's on the corner of Fuselier Street -- and I can't remember the -- I can't remember the -- the name of the side street, the adjacent street.

BY MR. MARDIAN:

Q.  So CI 2 is talking to Josh Dupre.  Do you know if this was before or after you arrested Josh Dupre?

A.  This was before.

**234**

Q.  How long before?

A.  I don't know.  I don't recall.

Q.  Was it weeks before?

A.  I don't recall.

Q.  Months before?

A.  I don't recall.

Q.  In pursuit of your investigation, did you ever seek to determine how long before this conversation had taken place?

A.  It's in the paperwork somewhere.

Q.  You recorded, in paperwork, the length of time between when you arrested Mr. Dupre and when this conversation allegedly took place?

A.  No.  But the date I arrested Mr. Dupre is going to be in the paperwork somewhere.

Q.  And the date of this conversation will also be in the --

A.  The date of this conversation between me and CI 2 where he was in the presence of Josh Dupre and Jamie Hill happened approximately two weeks after we hit the house on Childs Street with the search warrant, if that helps.

Q.  Jamie asked Mr. Dupre if Mr. Dupre hooked Dunn up --

A.  Yes.

**235**

Q.  -- is that right?

A.  Yes.  According --

Q.  What --

A.  According to CI 2.

Q.  What do you understand Jamie's question to be?

MS. CASWELL:  Object to form; requires speculation.

BY MR. MARDIAN:

Q.  Did this -- actually, you can answer.

A.  I took it to mean "Did you pay Dunn for helping you out?"

Q.  What did you say to CI 2 after he told you this?

A.  I don't recall.

Q.  Do you recall how long this conversation lasted?

A.  Five minutes, maybe.  I -- I -- I don't recall.  None of that's in the unofficial report?

Q.  I'm trying to understand, sir, your --

A.  Okay.

Q.  What was the next act that you took in the pursuit of this unofficial investigation into Lieutenant Dunn?

A.  I don't -- I don't know what the next step was.  I would have to -- to look at the unofficial

**236**

report paperwork to -- to take you step by step.

Q.  Do you recall any additional conversations you had with CI 2?

A.  Yes.

Q.  What are the -- how many conversations?

THE WITNESS:  Can we take --

A.  How many conversations?  If I were to guess, I'm not -- I'm not -- I'm not positive.  It would have been two to three.

Q.  Do you recall the substance of any of those communications?

A.  The substance would have been narcotics dealings and money swapping.

Q.  Generally?  Or involving Lieutenant Dunn?

A.  Involving but also involving other -- other -- other people.

THE WITNESS:  Can we take a break?

MS. CASWELL:  We can take a --

MR. MARDIAN:  I'd -- I'd -- I'd like to -- yeah, that's fine.

THE VIDEOGRAPHER:  We're off the record at 4:38.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 4:55.

237

BY MR. MARDIAN:

Q.   Detective Fontenot, did you speak with anyone during this break?

A.   Yes.

Q.   With whom did you speak?

A.   Chelsea.

Q.   Did you speak with anyone other than Ms. Caswell?

A.   No.

Q.   Just to clarify, the unofficial investigation that we've been discussing, is that ongoing?

A.   No.

Q.   It came to a resolution?

A.   Yes.

Q.   And what was that resolution?

A.   I didn't find any evidence to prove any criminal activity done by Lieutenant Dunn.

Q.   When did you come to that conclusion?

A.   Probably eight months ago.  Approximately eight to ten months ago.

Q.   And you said you didn't find any evidence to, quote, "prove any criminal activity."  Is there any particular reason why you used that word, "prove"?

A.   Well, as police officers, we have to have probable cause to proceed in an investigation.  And I

238

found no probable cause to proceed.

Q.   Are you still in contact with either CI 1 -- 2 or C1 -- excuse me, withdrawn.

Are you still in contact with either CI 1 or CI 2 today?

A.   Yes.

Q.   Are they still confidential informants?

A.   Yes.

Q.   And that's the reason you don't want to disclose their identities?

A.   Yes.

Q.   Do you generally use confidential informants in your line of work?

A.   Yes.

Q.   Do confidential informants help you to establish probable cause to execute a warrant?

A.   Yes.

Q.   Are there times where you rely on a single CI to execute such a warrant?

A.   Yes.

Q.   Here, you had two confidential informants, correct?

A.   Correct.

Q.   And despite that, you were not able to establish probable cause to continue your

239

investigation?

MS. CASWELL:  I object to form.  Misstates testimony and/or, you know, assumes evidence not in the record.

MR. MARDIAN:  I would ask counsel to refrain from speaking objections.

THE WITNESS:  Could you repeat the question?

MR. MARDIAN:  Can you read the question back, please?

THE REPORTER:  "QUESTION:  And despite that, you were not able to establish probable cause to continue your investigation?"

MS. CASWELL:  Same objection.

A.   I felt that probable cause would not be found to continue.

BY MR. MARDIAN:

Q.   Is that because you couldn't corroborate the information that the confidential informants had provided you?

A.   Correct.

Q.   Yet, you still are in contact with them today; is that correct?

A.   Correct.

Q.   Does Chief Fontenot know the identity of

240

either CI 1 or CI 2?

A.   I don't know if he does or not.

Q.   Do you have any reason to believe that he does?

A.   Not that I -- no.  Not that I can recall, no.

Q.   Did you ever disclose their identities to him?

A.   I don't remember, but I don't think I did.

Q.   Did he ever ask you for the identity of either CI 1 or CI 2?

A.   I don't think he did.

Q.   Did Lieutenant Young ever ask you the identity of CI 1?

A.   Yes.

Q.   Did you provide the identity of CI 1 to Lieutenant Young?

A.   Yes.

Q.   Did Lieutenant Young ever ask you the identity of CI 2?

A.   Yes.

Q.   Did you provide the identity of CI 2 to Lieutenant Young?

A.   Yes.

Q.   Why did you provide the identities of CI 1 and CI 2 to Lieutenant Young?

A.   Because he's my immediate supervisor.  We work

**241**

together on cases sometimes.

Q.   Did you provide the identities of CI 1 or CI 2 to Lieutenant Young in connection with your unofficial investigation of Lieutenant Dunn?

A.   Yes.

Q.   Is that because he asked you for their identities in connection with your unofficial investigation of Lieutenant Dunn?

A.   Yes.

Q.   About when did that conversation take place?

A.   Early on in the investigation.  Maybe the first -- first couple of days.

Q.   You said that you reached your conclusion of the investigation about eight months ago?

A.   Eight to ten months ago --

Q.   So --

A.   -- approximately, yes.

Q.   Approximately October to December of 2021?

A.   Is that eight to ten months back?

Q.   I'm just thinking if we're in --

A.   I -- I don't -- I don't know.

Q.   -- the seventh month, then I'm going back eight to ten.

A.   It -- it may have been before that.  It was before October of '21.

**242**

Q.   How do you know that?

A.   Because in October of '21, I left the department on sick leave to have the knee surgery and I was out for five months, and I -- I'm using that as a reference to -- it was before that.

Q.   Understood.  Thank you.

Do you recall about how long your investigation lasted?

A.   I can't.  Can you tell me when I -- when I started?

Q.   Yeah, I think it -- that's appropriate.

MR. MARDIAN:  I'd like to mark as Plaintiff's Exhibit 6 a document that I'll represent to you was produced by your counsel bearing Bates number City of Eunice_Dunn_000165.

(Plaintiff No. 6 was marked for identification.)

BY MR. MARDIAN:

Q.   Sir, is this a document that you wrote?

A.   Yes, it appears so.

Q.   Do you recall when you wrote this document?

A.   No, I don't.  This was -- I don't.

Q.   You recognize that at certain points of this document, you provide the date?  Do you see that, maybe?

**243**

A.   Yes.  Yes.

Q.   Do you recall the date of the first recorded incident?

A.   The first day I have on the paperwork?

Q.   Correct.

A.   It's 3/27/2020.

Q.   And is that around the time that you opened this investigation?

A.   Are you asking me when did I start writing this document -- or putting this document together?

Q.   Yeah, let's start there.  When did you put this document together?

A.   I don't recall.

Q.   Does this document help you to understand when you opened this investigation?

A.   This document helps me to understand the date that the search warrant was executed.

Q.   And do you recall about how much longer -- withdrawn.

Do you recall how much time elapsed between this original search warrant and when you opened your unofficial investigation?

A.   I -- I don't recall.

Q.   Was it weeks?

A.   I -- I don't recall.

**244**

Q.   I'd like you to turn, sir, to the page with the number 1650 in the lower right-hand corner.  Do you see that the document reads, quote, "On 4/8/2020, this CI called me and asked if there was a sudden shift change that was to take place on 4/10/2020 because J. Dupre had advised the CI that he was getting a," quote, "'big shipment of illegal narcotics delivered to 220 Childs or 151 Childs Street on 4/9/2020 just in time for the Easter weekend'"?

A.   Yes, I see that.

Q.   Why did you write that?

A.   I'm reading the -- what I wrote to try to answer your question.

Q.   Thank you.  I appreciate that.

A.   Okay.  Could you ask the question again?

Q.   Yeah.  I'm just asking you to explain why you wrote this entry.

A.   I'm trying to -- I'm trying to remember.

Q.   Thank you.  I appreciate it.  Let me rephrase.

Do you recall this conversation where the CI told you about a sudden shift -- or where the CI asked you about a sudden shift change?

A.   Yes.

Q.   And does this entry accurately reflect what that CI told you?

**245**

A.   Yes.

Q.   Going back to where I left off, it continues, quote, "I then went to the police department and observed the overtime sign-up sheets that were placed on the dispatch wall.  I observed that Lieutenant Dunn had taken vacation scheduled on 4/9/2020 through 4/11/2020 and that Lieutenant Tony Kennedy had signed up to take his place."

Do you see that?

A.   Yes.

Q.   Did you write that because it's true?

A.   Yes.

Q.   Did you draw any conclusions from this information that the CI provided you?

A.   I'm trying to read and see why this was relevant to anything.  Just this information I have here, I don't -- I don't remember why this was relevant.

Q.   Did you draw any conclusions relating Lieutenant Dunn's planned vacation with the, quote, "big shipment of illegal narcotics" that was expected?

A.   Are you asking me if I thought that Lieutenant Dunn would be involved in this shipment?

Q.   Correct.

A.   The answer would be no.

**246**

Q.   You did not think he was going to be involved?

A.   I did not.

Q.   Did you think anybody else was going to be involved?

A.   I did not.

Q.   Sir, if you please turn to the next page stamped 152 in the bottom -- excuse me, 1652 in the bottom right, do you see the second paragraph that reads, quote, [As read]:  "I then received another call from the initial CI who stated that J. Dupre had mentioned that a shift change at the PD had occurred but that the person who signed up to take Lieutenant Dunn's position was going to look out for him over the weekend.

"The CI advised that whoever was taking Lieutenant Dunn's place was probably also involved in the," quote, "'pay for protection'" along with," quote, "'Dunn.'  I advised the CI that Lieutenant Ken- -- Lieutenant Kennedy was taking Lieutenant Dunn's place that weekend"?

Did you write that, sir, because it's true?

A.   This is what the informant -- the information I was given by the informant, yes.

Q.   Do you recall when the informant provided this information?

**247**

A.   I -- I don't.

Q.   Do you recall whether you suspected Lieutenant Dunn of illegal conduct at the time that the -- the CI provided this information?

A.   This specific information?

Q.   Correct.

A.   I don't recall.  I would have to go back into the notes to determine that, to be able to answer that.

Q.   Notes separate from these notes?

A.   These, the -- here, this.

Q.   Did you believe that Lieutenant Kennedy was involved in this pay for protection along with Lieutenant Dunn?

A.   I don't think I did.

Q.   You believed that Lieutenant Kennedy was not involved in this, quote, "pay for protection" plan with Lieutenant Dunn?

A.   I -- I didn't believe that he was, at the time that I was given this information.

Q.   You said you advised the CI that Lieutenant Kennedy was taking Lieutenant Dunn's place that weekend.

A.   Yes.

Q.   Do you normally disclose to confidential informants the schedule of officers of EPD?

**248**

A.   No.

Q.   Do you know if it's compliant with EPD policy to disclose to nonmembers of EPD the times that officers are or are not working at EPD?

A.   Do I know what?

Q.   Do you know if it's compliant with EPD policy to disclose to members of the public the specific schedules of officers of EPD?

A.   I don't know if it is or if it isn't.

Q.   You've never checked the policies to determine if it violates policy to sharing scheduling information with the public?

A.   No.

Q.   What did you understand the CI to mean when he referred to the, quote, "pay for protection" along with Dunn?

A.   Well, that verbiage would mean that Lieutenant Kennedy -- or they thought Lieutenant Kennedy was getting paid, also, to provide information to Dupre.

Q.   So the CI had told you about a big drop of narcotics and asked you to check the schedule to see who would be working that weekend, correct?

MS. CASWELL:  I object -- object to form; misstating what it says.

**249**

Answer.

A.   Ask your question again.

BY MR. MARDIAN:

Q.   The CI, in sum and substance, notified you to a potential drop of narcotics and told you to check the schedule to see who was working during that drop of narcotics; is that right?

MS. CASWELL:  Same objection.

A.   I don't remember exactly what he asked me.

BY MR. MARDIAN:

Q.   If we turn back to page 1650, you see that it read, quote -- in the last paragraph on that page, "This CI called me and asked if there was a sudden shift change that was to take place on April 10th, 2020, because J. Dupre had advised the CI that he was getting a," quote/unquote, "'big shipment of illegal narcotics delivered to 220 Childs or 151 Childs Street on April 9th, 2020, just in time for the Easter weekend.'"

You wrote that because it's true, correct?

A.   Correct.

Q.   So this CI is telling you about a big shipment of illegal narcotics, correct?

A.   Correct.

Q.   And he's asking you if there was a sudden

**250**

shift change, correct?

A.   Correct.

Q.   And the reason he's asking you is because that sudden shift change may be related to the big shipment of illegal narcotics, correct?

A.   Correct.

Q.   At the end of this paragraph, you said that you checked the schedule and determined that Lieutenant Tony Kennedy was working that weekend, correct?

A.   Correct.

Q.   So based on the information provided this CI, was Lieutenant Kennedy not a suspect of this investigation?

A.   Can you be more specific with --

Q.   Sure.

A.   -- the next question?

Q.   Did the CI provide you any more information about Lieutenant Dunn when you executed the original arrest -- search warrant than the CI provided you this time with respect to the big shipment of illegal narcotics?

A.   I still don't understand what you are trying to ask me.

Q.   What is the difference between the information the CI provided you at this time and the

**251**

information that he provided you in advance of the arrest warrant -- excuse me, search warrant that you executed that began this entire investigation?

MS. CASWELL:  Object to form.  I think it misstates the -- the testimony.

But you can answer, if you understand.

MR. MARDIAN:  I would ask counsel to refrain from speaking objections.

MS. CASWELL:  Sorry.  I -- I'm going to put my objection, and I'm going to give a short basis for the record.

MR. MARDIAN:  You can object to form under the federal rules.  I would ask you not to coach the witness.

MS. CASWELL:  I disagree with your interpretation of the federal rules and the related jurisprudence, but we can disagree.

MR. MARDIAN:  Understood.

BY MR. MARDIAN:

Q.   My question, sir, is this confidential informant provided you advance notice of a potential shipment of illegal drugs, correct?

A.   Potential, correct.

Q.   The informant who identified the potential narcotics at the Dupre house, those were also alleged

**252**

to exist, correct?

A.   Correct.

Q.   This informant then told you to check the calendar because the shift change may have been related to that shipment, correct?

A.   Correct.

Q.   You checked the calendar; you determined Lieutenant Tony Kennedy was working that weekend?

A.   Correct.

Q.   Why did you not then begin an investigation into Lieutenant Tony Kennedy?

A.   I think at the time, if I remember correctly, I wasn't sure if someone was supposed to be taking Lieutenant Kennedy's place and that's what they were talking about or if they were talking about Lieutenant Kennedy himself.

Q.   Did you take any action with respect to Lieutenant Kennedy after you had this conversation with the CI?

A.   I -- I don't recall if I did or not.

Q.   You did not open an informal investigation into Lieutenant Kennedy?

MS. CASWELL:  Object to form, if that was a question.

BY MR. MARDIAN:

**253**

Q.   Is it correct that you did not open an informal investigation to -- into Lieutenant Kennedy?

A.   Correct.

Q.   Is it correct that you had never opened an informal investigation into Lieutenant Kennedy?

A.   Correct.

Q.   Is it correct that you have only ever opened an informal investigation into Lieutenant Dunn?

MS. CASWELL:  Object to form.

A.   Ask again.

BY MR. MARDIAN:

Q.   Is it correct that you have only ever opened an informal investigation into Lieutenant Dunn?

A.   Correct.

Q.   Nonetheless, certain of your confidential informants have implicated other of your colleagues in potential illegal conduct, correct?

A.   Say that again.

Q.   Notwithstanding the fact that Lieutenant Michael Dunn is the only one of your colleagues that you ever -- have ever opened an informal investigation, you have received information from other confidential informants implicating your other colleagues in potential illegal conduct.  Is that correct?

MS. CASWELL:  Object to form.

**254**

A.   There was nothing to back this allegation against Lieutenant Kennedy.  I had nothing to stand on.  Like I did in the beginning of the investigation where -- which I explained to you before -- what each told me.  I had something to stand -- I had something to go with.  Here, I had nothing.

BY MR. MARDIAN:

Q.   But you never investigated Lieutenant Kennedy, did you?

A.   No.

Q.   So how do you know whether you had anything to stand on or not?

A.   I don't know.

Q.   Sir, I'd like to ask you to please turn to the page that ends in Bates stamp 1656.

MS. CASWELL:  The last page.

BY MR. MARDIAN:

Q.   Do you see the third paragraph, second sentence, you wrote, quote, "Dupre then advised the agents that he usually paid Dunn" --

A.   I don't see it.

Q.   Sorry, my apologies.  I'm looking at the third paragraph.  This -- the paragraph begins, quote, "the agents asked Dupre."

A.   Yes, sir.

**255**

Q.   Do you know who the agents are here, to which you're referring?

A.   Let me back up a couple of --

Q.   Of course.  If you want to --

A.   -- paragraphs to --

Q.   Yeah, exactly.

A.   -- try to find out what's going on here.

Okay.  That would be the DEA agents.

Q.   So you wrote in the second sentence, quote, "Dupre then advised the agents that he usually paid," quote/unquote, "'Dunn' $1000,00 for such information, but at that moment, he could only give Lieutenant Dunn $700."

First, sir, do you recall why you put "Dunn" in quotation marks?

A.   (No audible response.)

Q.   Second, sir, is that string of numbers -- did you mean to say $1,000 there?

A.   All right.  To answer the first one, because that's what Dupre was calling him; Dunn.  And the second answer is yes, $1,000.

Q.   So you understood Dupre to be telling you that he paid Dunn $1,000 for information; is that correct?

A.   Correct.

Q.   And is that information about narcotics?

**256**

MS. CASWELL:  I object to form; requires speculation.

A.   Yeah, I don't know.

BY MR. MARDIAN:

Q.   Did you ask Dupre what the information was about?

A.   I think I did.

Q.   What did he say?

A.   If I recall correctly, he said that he would pay Dunn to let him know if we were looking at him or if we were coming for him.

Q.   What did you understand Dupre to mean by you are coming for Dunn?

A.   Not coming for Dunn.

Q.   Coming for Dupre, excuse me.

So you understood him to mean that he was paying Dunn for advance notice of a potential arrest -- of a potential arrest of Dupre?

A.   Correct.

Q.   You continue, quote, "The agent then asked Dupre if he had a phone number for Lieutenant Dunn. Dupre advised that he has since changed phones but advised that he believed that the first three numbers were 831 or 851 from the phone that Lieutenant Dunn would make contact with him."

**257**

Sir, did you write that because it's true?

A.   Yes.

Q.   Did you ever search Lieutenant Dunn's phone records in pursuit of this informal investigation?

A.   No, not that I recall.  No.

Q.   Did you ever search Lieutenant Dunn's bank records pursuant to this informal investigation?

A.   No.

Q.   Did you ever tell Lieutenant Ryan Young about this investigation that you had with Mr. Dupre?

A.   Yes.

Q.   And what was the sum and stub- -- substance of that conversation?

A.   I mean, Lieutenant Young was -- was here.

Q.   Oh, excuse me.  Was -- was Chief Fontenot also here for this conversation?

A.   No.

Q.   Did you ever advise Chief Fontenot about the conversation you had with Mr. Dupre?

A.   I don't recall if I did or not.

Q.   To the best of your recollection, sir, how many times did you discuss your informal investigation regarding Lieutenant Dunn with Chief Fontenot?

A.   I don't recall.

Q.   Do you have any ability to ballpark it?

**258**

A.   No.

Q.   Do you recall any specific conversation with Chief Fontenot about your informal investigation of Lieutenant Dunn other than the one you previously testified regarding that you had at his house?

A.   No.

Q.   Did Chief Fontenot ever ask you the status of your informal investigation of Lieutenant Dunn?

A.   I don't recall.

Q.   Did Lieutenant Ryan Young ever ask you the status of your informal investigation of Lieutenant Dunn?

A.   I don't recall.

Q.   Do you know if Chief Fontenot ever talked with another government agency regarding your informal investigation of Lieutenant Dunn?

A.   I have no idea.

Q.   Do you know if Lieut- -- if Chief Fontenot ever discussed any ill conduct at -- withdrawn.

Do you know if Chief Fontenot ever discussed any allegations of illegal conduct involving Lieutenant Dunn with any other government agency?

MS. CASWELL:  I object to form; requires speculation.

A.   I don't know.

**259**

BY MR. MARDIAN:

Q.   Do you know if Lieutenant Ryan Young ever discussed any conduct implicating -- withdrawn.

Do you know if Lieutenant Ryan Young ever discussed allegations implicating Lieutenant Michael Dunn in illegal conduct with another government agency?

A.   I don't know.

Q.   Did you ever ask Lieutenant Ryan Young if he was separately investigating Lieutenant Michael Dunn?

A.   I don't recall.

Q.   Do you -- did you ever ask Chief Fontenot if he was separately investigating Lieutenant Michael Dunn?

A.   I don't recall.

Q.   Do you have any reason to believe that Lieutenant Ryan Young was separately investigating Lieutenant Michael Dunn?

A.   Not that I can recall, no.

Q.   Do you have any reason to believe that Chief Fontenot was separately investigating Lieutenant Michael Dunn?

A.   Not that I can recall, no.

Q.   Did you ever disclose your informal investigation into Lieutenant Michael Dunn with

**260**

Lieutenant Michael Dunn?

A.   I -- I think I did, briefly.

Q.   Do you recall when?

A.   I don't recall the day, the month, but I think someone called a meeting at the police department.  It may have been chief -- to get Lieutenant Dunn, myself, maybe a couple other officers.  I don't remember who else was in the room with us.  We met in the briefing room.

At that time, I did discuss it briefly, as I said, with Lieutenant Dunn, telling him that I -- I think I told him that I wasn't investigating anymore.  I didn't find any foul play.  I don't remember what verbiage I used.  I don't -- I don't remember.  I basically told him, "Look, I don't believe the allegations against you."

Q.   Is this the first time that you had disclosed those allegations to Lieutenant Dunn?

A.   As far as I can remember, yes.

Q.   You said that Chief Fontenot called this meeting?  Is that the best of your recollection?

A.   I said someone did.  I said I -- I think it may have been Chief Fontenot.

Q.   Did Chief Fontenot speak -- withdrawn.

Did Chief Fontenot attend this meeting?

**261**

A.   I think he did.  I -- I'm not positive, but I think he did.

Q.   Did anyone else attend this meeting?

A.   Again, I said myself, Lieutenant Dunn, and I don't remember who the other -- and I don't remember how many were in there.

Q.   Did Chief Fontenot speak at this meeting?

A.   I don't remember.

Q.   Did anyone else other than yourself speak at this meeting?

A.   I don't remember.

Q.   Do you recall if Lieutenant Dunn spoke at this meeting?

A.   He did, but I don't remember what he said.

Q.   And this meeting was after you had closed your informal investigation?

A.   Yes.

Q.   So it was around October of 2021?

A.   I don't know.

Q.   Would it have been in between when you closed the informal investigation and when you went out for your knee surgery?

A.   Yeah.  I -- I don't remember.

Q.   Do you recall if it was before your knee surgery?

**262**

A.   I don't remember that either now.

Q.   Sir, are you aware of a separate lawsuit that Lieutenant Michael Dunn has filed regarding an incident that occurred at the KC Hall?

A.   Yes.

Q.   What is your understanding of that lawsuit?

A.   Not much.  I heard about it Monday?

MS. CASWELL:  Yep.

A.   Monday when I spoke with Chelsea.

MS. CASWELL:  But we're not going to talk about our conversation.

BY MR. MARDIAN:

Q.   Excuse me.  Is Chessy your legal counsel?

MS. CASWELL:  Chelsea.

MR. MARDIAN:  Excuse me.

THE WITNESS:  I'm sorry.

BY MR. MARDIAN:

Q.   That was first you had heard of that lawsuit?

A.   That's the first I remember hearing of it, yes.

Q.   Do you recall when the first you remember hearing of this lawsuit was?

A.   Which one?

Q.   The -- the one we're discussing today against yourself, the city, and --

**263**

A.   Yes but --

(Brief interpretation.)

A.   Repeat the question.

BY MR. MARDIAN:

Q.   Do you recall when the first time you heard of this lawsuit was?

A.   I -- I think it was maybe a week after we had the meeting with Lieutenant Dunn.

Q.   So a week after you told Lieutenant Dunn that you were not further pursuing your informal investigation --

A.   Yes.

Q.   -- you heard about this lawsuit?

A.   Yes.

Q.   Do you recall, sir, when this lawsuit was filed?

A.   This?  I have no idea.

Q.   But just to confirm, it is your understanding that a week after this lawsuit was filed, you had the meeting with Lieutenant Dunn, Chief Fontenot, and Randy [sic] Young regarding your informal investigation?

A.   Good Lord, man.

MS. CASWELL:  Object to form; misstates testimony.

A.   Okay.  I heard about -- I heard about.  I

**264**

don't know when this was formed, processed.  You're talking about the investigation -- not this investigation --

BY MR. MARDIAN:

Q.   Sorry for any mis- --

A.   -- the investigation?

Q.   Sorry for any misunderstanding.

A.   Okay.  Okay.

Q.   I'm trying to understand when you first heard of this lawsuit --

A.   Okay.

Q.   -- Lieutenant Dunn's lawsuit against the city, yourself, the chief.

A.   Okay.  From what I can remember, I think it was about a week after we had the conversation with Lieutenant Dunn, the meeting with Lieutenant Dunn.

Q.   Okay.  That meeting, just so I'm understanding, is the one you believe occurred around October of 2021?

A.   I did not say that.  I said I don't remember when that one occurred.

Q.   And I apologize if I'm misunderstanding.  That meeting is the meeting we were just talking about where you told Lieutenant Dunn that you weren't further pursuing your investigation?

265

A.   Yes.

Q.   And that was the meeting that took place before your knee surgery?

A.   I -- if you can find out when this lawsuit was presented, then you go back a week from that day, and then that will tell you when we had the meeting with Lieutenant Dunn.  I'm sure he could tell the exact date --

Q.   Okay.

A.   -- the exact hour that we had that meeting.

Q.   I appreciate that.

A.   Which I think you already know the answer to that, but I am telling you once again, I really don't remember.

Q.   I appreciate --

A.   I don't.

Q.   -- that, sir.  I'm -- and I'm not trying to confuse you.

This lawsuit, I'll represent to you, was filed in June of 2021.

A.   Okay.

Q.   If that's the case, does it change your testimony such that you would testify that this meeting occurred around that time?

A.   I -- I don't remember.

266

Q.   Understood.

A.   I'm just telling you I heard about the lawsuit one week -- approximately one week after we had the meeting with Lieutenant Dunn.

Q.   Thank you.  Is this the only written recording of your informal investigation of Lieutenant Michael Dunn?

A.   Yes.

Q.   Did you ever file a critical incident report about your informal investigation of Lieutenant Michael Dunn?

A.   (Witness shakes head.)

Q.   Did Lieutenant Young ever ask you to file a critical incident form?

A.   I don't remember.

Q.   I would just like to confirm because you -- just for the sake of the record.  When I asked if you had filed a critical incident report about your informal investigation, you shook your head.  To clarify for the record, your answer is you -- is no, that you did not file such a report?

A.   I did not.

Q.   And you don't remember Lieutenant Young ever asking you to file one?

A.   I don't.

267

Q.   Do you recall if Chief Fontenot ever asked you to file a critical incident form?

A.   I don't.

Q.   Did you ever discuss this informal investigation with Chief Fontenot via text message?

A.   I don't -- I don't think so.

Q.   Do you ever text with Chief Fontenot?

A.   Yes.

Q.   About work?

A.   Yes.

Q.   Did you ever email with Chief Fontenot about this investigation?

A.   I don't think so.

Q.   Do you ever email with Chief Fontenot about work?

A.   I don't think I've ever emailed him about anything.

Q.   Did you ever text with Lieutenant Ryan Young about this investigation?

A.   I don't remember.

Q.   Do you ever text with Lieutenant Young about work?

A.   Yes.

Q.   Did you ever email Lieutenant Young about this investigation?

268

A.   I don't think I've ever emailed Lieutenant Young about anything.

Q.   Other than the information provided to you by CI 1 and CI 2, did you ever come across any other evidence regarding potential illegal conduct committed by Lieutenant Dunn?

A.   No, I don't think so.

Q.   The entirety of your informal investigation was based on the information that they had provided to you?

A.   Yes.

Q.   Have you been in any further conduct -- excuse me, contact with the Louisiana DEA regarding your informal investigation of Lieutenant Michael Dunn?

A.   Since when?

Q.   Fair question.  Did you ever advise the Louisiana DEA that you had closed your informal investigation of Lieutenant Dunn?

A.   I don't recall.

Q.   And forgive me if I'm misremembering.  Did you disclose your informal investigation to any other government agencies?

A.   It's -- again, state police/DEA.  Yeah, that -- that was it.

Q.   Are -- are they one and the same or two

**269**

different --

A. I -- I really don't understand. I know the -- the DEA agents that I've worked with, they also perform state police duty. So they are actually state police but also work in the DEA. That's the best I can understand and explain it to you.

Q. Just to cover our bases, did you ever disclose to either of them that you had closed your informal investigation?

A. I don't remember.

Q. Do you know if either of them are conducting investigations into Lieutenant Michael Dunn?

A. I have no idea.

Q. When was the last time, if you can recall, you discussed with either agency your informal investigation of Lieutenant Michael Dunn?

A. The last time I would have discussed it, I -- I think, would have been months before we had the meeting with Lieutenant Dunn in the briefing room.

Q. And you haven't heard anything since?

A. Not that I recall.

Q. Remind me, sir, the first individual at the DEA that you spoke with. Not Brent; it was the other one.

A. Walter.

**270**

Q. Walter. What's Wal- -- who -- what's Walter's last name?

A. Mire.

Q. Walter Mire. Do you understand, sir -- withdrawn.

Did you have any prior relationship with Mr. Mire before discussing this informal investigation with him?

A. I don't recall.

Q. And it was -- withdrawn.

MR. MARDIAN: I'm marking as Plaintiff's Exhibit 7 a transcript from a legal proceeding involving Mr. Dupre that is captioned "State of Louisiana versus Joshua Dupre, Criminal Docket No. 19-K-1788-C."

(Plaintiff No. 7 was marked for identification.)

BY MR. MARDIAN:

Q. I will represent to you, sir, that this document was produced by your counsel as shown because it bears Bates stamp City of Eunice_Dunn_0003515.

Sir, do you see that this document is titled "Transcript of Probation Revocation Hearing"?

A. Yes.

Q. And we discussed earlier, sir, do you recall, your attendance at at least one of Mr. Dupre's

**271**

probation revocation hearings?

A. Yes.

Q. Sir, do you understand that Mr. Dupre testified under oath that you had been threatening him?

A. No, I did not.

Q. Are you aware, sir, or have any understanding of whether Mr. Dupre has testified in court under oath that you were seeking -- that you wanted him to fabricate information regarding Lieutenant Michael Dunn?

A. No, I did not.

Q. Sir, if you can, please turn to the document Bates stamped 3522 in the lower right. Sir, do you see at the -- towards the bottom of this page -- in the middle of the page at lines 24 and 25, it -- it reads, "Joshua Dupre called as a witness, having been duly sworn was examined and testified as follows"?

A. Yes.

Q. And then do you see that this is the direct examination of Mr. Dupre?

A. Yes.

Q. And do you understand, sir, that questions here are provided by counsel and the statements that follow the A's are Mr. Dupre's responses?

A. Yes.

**272**

Q. Do you see in line 32 at the bottom of this page, it reads, quote, "Specifically, I believe you are recently arrested on a warrant in regards to a possession with intent to distribute charges? ANSWER: Yes, sir"?

A. Okay. I'm going to have to flip to 23. Yes.

Q. Sir, do you have any understanding of this arrest warrant for Mr. Dupre regarding possession with intent to distribute?

A. Say again.

Q. Do you any understanding of this arrest warrant -- with this arrest warrant issued regarding Mr. Dupre's alleged possession with intent to distribute?

A. Did I get an arrest warrant for him?

Q. Correct.

A. Yes.

Q. So that's the arrest warrant that you executed?

A. Yes.

Q. Sir, if you go to the middle of this page at line 15, do you see that it reads, quote, "And isn't it true -- is it true that you had some recent interactions with the detective on both of these matters?

**273**

"ANSWER: Yes, sir."

Line 19, "Ms. CAILLIER-HARDEN: Mr. Celestine, for clarification, which detective?

Twenty-one, "MR. CELESTINE: I'm sorry?"

Twenty-two, "THE COURT: Victor Fontenot."

Do you see that?

A. Yes.

Q. Do you understand that to mean that when Mr. Dupre -- when the counsel asked Mr. Dupre about his interactions with the detective on these matters, the Court understood that detective to be you?

MS. CASWELL: Object to form; requires speculation.

BY MR. MARDIAN:

Q. Do you have any reason to doubt the veracity of the statement provided by the Court in this legal proceeding?

A. I don't know.

Q. If you go down to line 28, do you see that it reads, "QUESTION: Okay. What specific issues are you having with Detective Victor?

"ANSWER: All right. This is what's going on. My name got drawn in" -- something with officer Dunn. Something about "I'm paying officer Dunn"?

Do you have any understanding of what is being

**274**

discussed in that conversation?

A. I'm sure -- yeah, what we've been discussing for the last hour. Yes.

Q. If you flip the page to the one stamped 3524 in the lower right, do you see at line 19, it says, quote, the defendant, "That's what -- yes, they said I am paying Dunn for information, like to get information --"

"COURT: Okay."

The defendant, "-- about what's going on with the police department, but I ain't paying nobody"?

Do you have any understanding of what is being discussed here?

MS. CASWELL: Object to form; requires speculation.

A. No, I don't.

BY MR. MARDIAN:

Q. Do you see it continues at line 27, "QUESTION: And who approached you with regards to that?

"ANSWER: Uh, Detective Victor. He's threatening me, riding along my house every day. Man, I'm talking about I got text messages in my phone from him telling me he was going to put these new charges on me for me not to get out, that I have a hold on me, that he's coming with new charges. Possession with

**275**

intent is nine-tenths of the law, sir."

Detective Fontenot, do you have any understanding of what's being discussed here?

A. No.

Q. Detective Fontenot, did you ever threaten Mr. Dupre?

A. Not that I recall, no.

Q. Did you ever, quote, "ride along" his house?

A. Did I ride down his street? Yes.

Q. How frequently?

A. I don't recall.

Q. Did you ever tell him that you were coming with new charges against him?

A. I don't recall saying that.

Q. You did in fact, though, arrest him on two different occasions; is that true?

A. I think I did.

Q. Did you ever tell him before the second arrest that you were coming for him with the second arrest?

A. I don't think I said that.

Q. Did you say anything similar in sum and substance?

A. I don't recall.

Q. Sir, if you turn the page to the one that ends 3525 in the lower right, do you see at line 12 --

**276**

A. Hold on. Hold on. Where are we going?

Q. It's 3525 in the lower right.

MS. CASWELL: Flip it to one side so they don't get a --

A. Yes, got it.

MS. CASWELL: Yeah.

BY MR. MARDIAN:

Q. Do you see line 12, it reads, "QUESTION: Wait, hold on. What does the detective -- what does he want you to do? What is he looking for you to do?

"Answer: He really thinks that I got some information that make some information about me paying Dunn money."

Do you have any understanding of what's being discussed there?

A. No.

MS. CASWELL: I object to form; requires speculation.

A. No.

BY MR. MARDIAN:

Q. Do you have any reason to believe that he's discussing your allegations --

MS. CASWELL: Object to form.

BY MR. MARDIAN:

Q. -- of --

**277**

MR. MARDIAN:  Please let me finish the question.

BY MR. MARDIAN:

Q.  Do you have any understanding that he's discussing your allegations regarding Mr. Dupre paying Lieutenant Dunn money?

MS. CASWELL:  Object to form; requires --

A.  I don't know.

MS. CASWELL:  -- speculation.

Let me finish my objection before you answer.

THE WITNESS:  Sorry.

BY MR. MARDIAN:

Q.  Do you think it's mere coincidence that that's what he's saying here?

MS. CASWELL:  Object to form; speculative.

A.  Ask again.

BY MR. MARDIAN:

Q.  Do you think it's mere coincidence that he says here, "He really thinks that I got some information that make some information about me paying Dunn money"?

MS. CASWELL:  Same objection.

**278**

A.  I don't know.

BY MR. MARDIAN:

Q.  Do you see it continues at line 18, quote, "So he threatened me, telling me I need to give him some information on Dunn so that they can rid -- get rid of his ass, his butt, or whatever, something like that"?

Do you have any understanding of what's being discussed here?

A.  No.

Q.  Did you ever say that you wanted to, quote, "get rid of his ass, his butt, or whatever" about Lieutenant Dunn?

A.  I don't recall telling him any of that.

Q.  Do you recall telling him anything similar in sum and substance?

A.  No.

Q.  If you turn the page to the one stamped 3526 in the lower right, I would direct you to line 10.  Do you see that it says, quote, "You know, and the new charges that I got today, right now"?

A.  Okay.  Yes.

Q.  "He told me with his own words that he was going to do this to me to where I don't get out of jail, and he kept my phone."

Do you recall ever saying that to Mr. Dupre?

**279**

A.  No.

Q.  Do you recall saying anything similar in sub- -- sum and substance?

A.  No.

Q.  He continues, "He kept the phone that got the text messages in there because I told him recently -- when he text me the other day, I told him, man, I got all these text messages, and I'm bringing it to Opelousas so they can see that, man.  You threatening me, bra."

Do you have any understanding of what he's referencing here?

A.  I -- I think I remember him telling me that.

Q.  Which part?

A.  About I'm threatening him and he's going to tell the people in Opelousas that I'm threatening him.

Q.  You were in fact texting him; is that correct?

A.  Yes.

Q.  Did any of your texts include threats against Mr. Dupre?

A.  I don't think they did, not on my part.

Q.  Sir, if you please turn to the page ending in 3527 in the lower right, do you see line 10?  "ANSWER: They arrested me because I went off on him, telling him that 'I ain't got no information for you, bra.  You

**280**

need to leave me alone, man.'  And, you know, he charged me with a possession with intent.  I ain't got noth- -- caught with nothing."

Sir, did you charge Mr. Dupre with possession with intent?

A.  I know I did the first time.  I did, yes.

Q.  What did you charge him with the second time?

A.  I don't recall.

Q.  Do you see it continues two lines later, quote, "That's why he picked me up because he wants information on Dunn.  And, you know, I ain't got no information"?

Sir, did you ever tell Mr. Dupre that you want information on Dunn?

A.  Yes.

Q.  What can you recall about that communication?

A.  I told him that I wanted all the information he could give me in the interview when we made the first arrest.  I do remember that.

Q.  Sir, if you please turn to the page that ends in 3529, do you see at line 9, it reads, "THE COURT: Well, in 2020 -- in July of 2020, you were arrested by Detective Fontenot alleging that you sold crack cotain -- cocaine to a confidential informant, then, right?"

**281**

The defendant, "Yes, sir?"

Is that correct, Detective Fontenot?

MS. CASWELL:  Object to form.

MR. MARDIAN:  What is the basis?

MS. CASWELL:  Is -- is what correct?

Are you asking him to tell you if you're reading it correctly?  Are you asking him --

BY MR. MARDIAN:

Q.  I'm asking -- sir, I'm asking you whether the Court's representation of your conduct in that paragraph is correct?

A.  I don't know the date -- I don't know the date of the arrest.  I don't remember the date of the arrest, so I don't know if this is correct.  I can't tell you "yes, it's correct" or "no, it's not."

Q.  Sir, do you see at line 17, it reads, the defendant, "The arrest was for truancy.  They arrest me.  They ain't even bring me to the police station.  They brought me to their station, and they straight went in my head like," quote, "'I don't -- I know you paying Dunn,'" closed quote?

Sir, when you arrested Mr. Dupre, do you remember where you first took him?

A.  What is this truancy he's talking about?

Q.  That's not the question pending, sir.

**282**

A.  Well, I've never -- I don't think I've ever arrested him for truancy, so I don't know where I would have taken him after I arrested him for truancy.

Q.  Understood.  When you arrested him with possession with intent, do you recall where you first took him?

A.  Yes.  We took him to -- we took him to CID.

Q.  Did you ever tell him, quote, "I know you paying Dunn"?

A.  Yes.

THE WITNESS:  Can we take a break?

MR. MARDIAN:  That's fine.

THE VIDEOGRAPHER:  We're off the record at 4:56 -- 5:56.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 6:13.

BY MR. MARDIAN:

Q.  Sir, if you could, please flip to the page that begins -- or excuse me, that has the number 3533 in the lower right.  Do you see that this document is entitled "Transcript of Bond Revocation Hearing Continued From October 8th, 2020"?

A.  Yes.

Q.  And do you see that in the paragraph below

**283**

that title, it ends, quote, "On the 14th day of October 2020"?

A.  Yes.

Q.  Sir, do you know if you attended this hearing?

A.  I don't recall.

Q.  Do you recall attending any of Mr. Dupre's bond revocation hearings?

A.  I do recall -- I believe I attended one, yes.

Q.  Sir, if you please turn to the page that has the number 3535 in the lower right, do you see at the bottom of this page, there is a heading that reads "Detective Victor Fontenot"?

A.  Yes.

Q.  And do you see it says, "Detective Victor Fontenot called as a witness, being duly sworn was examined and testified as follows"?

A.  Yes.

Q.  Sir, do you understand that this is a transcript of the testimony you provided under oath in court on or about October 14th, 2020?

A.  Yes.

Q.  Sir, if you flip the page to the document with the number 3536 in the lower right, do you see towards the top of the page, the first reference to the court in bold that reads, "All right.  Did you seize a phone

**284**

from him at that time?"

A.  Yes.

Q.  And do you see it then reads, "DETECTIVE VICTOR FONTENOT:  Two phones, Your Honor"?

A.  Yes.

Q.  Sir, are -- is it your understanding that you were testifying here that you seized two phones from Mr. Dupre?

A.  Yes.

Q.  Do you see that the Court then states, "All right.  And were they seized pursuant to a warrant?"

A.  Yes.

Q.  And do you see that you replied, "no, sir"?

A.  Yes.

Q.  Do you see a few lines down, it reads, "THE COURT:  No, no"?

A.  Yes.

Q.  "How were they taken in without a warrant is my question?"

A.  Yes.

Q.  Do you see that you reply -- withdrawn.

Do you see that transcript states that you provided no response to this question?

A.  Yes.

Q.  Is your recollection that you provided no

**285**

response to that question?

A.   I don't.

Q.   Do you see that the Court then states, "I didn't sign a warrant for them, and I was on the bench at the time of the arrest"?

A.   Yes.

Q.   Do you see that you replied, "Right, yes, sir"?

A.   Yes.

Q.   Do you see that Court then states, "So under what authority did you take the phones?"

A.   Yes.

Q.   Did you -- do you see that you then did not provide a response?

A.   Yes.

Q.   Sir, do you recall whether you had legal authority to seize Mr. Dupre's cell phones?

A.   I don't recall.

Q.   Sir, do you say -- do you see that the conv- -- that the testimony continues with the Court saying, "I simple need to know"?

A.   Yes.

Q.   And do you see that it continues on the next page with you testifying under oath, "I guess we didn't have authority"?

**286**

A.   Yes.

Q.   Sir, is it your recollection that you did not have legal authority to -- to - -to seize Mr. Dupre's two cell phones?

A.   I don't recall.

Q.   You do not recall if you had to testify in court whether you had legal authority to conduct a seizure of an individual's two cell phones?

A.   I do recall that.

Q.   You do recall that you testified; you just don't recall as an underlying substantive matter whether you had such authority?

A.   Right.

Q.   If you had such authority, would you have testified under oath to the Court and explained that authority to the Court?

A.   I'm sure I would have.

Q.   Does it stand to reason, therefore, that you did not have legal authority to cease Mr. Dupre's phones?

A.   Correct.

Q.   Sir, have you ever -- can you recall any other time where you conducted an illegal and unconstitutional seizure of a private citizens -- citizen's personal effects?

**287**

A.   No.

        MS. CASWELL:  Object to form.

        Let me finish my objection, please.

        THE WITNESS:  Sorry.

        Can you repeat the question?

        MR. MARDIAN:  Can you please read it back?

        THE REPORTER:  "Sir, can you recall any other time where you conducted an illegal and unconstitutional seizure of private citizens' personal effects?"

A.   No, I can't recall.

BY MR. MARDIAN:

Q.   Sir, do you know with -- whether an unconstitutional seizure of an individual's cell phones is compliant with the Eunice PD policy?

A.   I'm sure it's not.

Q.   Do you understand whether it's compliant with Louisiana state law?

A.   It is not.

Q.   Do you understand whether it's compliant with the -- the United States constitution?

A.   It is not.

Q.   So is it your testimony today, sir, that you violated Eunice Police Department policy, Louisiana

**288**

state law, and the United States Constitution when you seized Mr. Dupre's two cell phones?

        MS. CASWELL:  I object to form; misstates his testimony.

A.   I did not, no.

BY MR. MARDIAN:

Q.   You don't understand whether your seizure of Mr. Dupre's phones violates any of those guidelines, statutes, or the United States Constitution?

        MS. CASWELL:  Object to form; requires a legal conclusion.

        Go ahead.

A.   I don't know.

BY MR. MARDIAN:

Q.   Sir, is it possible in your line of work to draw an analysis that considers whether an act is legal or illegal?

A.   Break it down for me.  Simple -- Simple Jack me.

Q.   Sir, when you witness conduct, you sometimes have to make a determination as to whether you have probable cause to effect a -- an arrest, correct?

A.   Correct.

Q.   Sometimes in your line of work, you do have to make legal determinations?

**289**

A.  Yes.

Q.  Therefore, sometimes in your work, you can make legal determinations as to whether or not something complies with the United States Constitution, correct?

A.  Corr- --

MS. CASWELL:  Object to form.

A.  Corr- --

BY MR. MARDIAN:

Q.  You also make legal determinations as to whether something complies with Louisiana state law?

MS. CASWELL:  Object to form.

A.  Correct.

BY MR. MARDIAN:

Q.  And so in this instance, the underlying testimony that you provided to the Court in this bond revocation hearing, evidences that you conducted engaged in conduct that violated Louisiana state law, correct?

MS. CASWELL:  Object to form.

A.  What I don't understand is why he gave the two phones back to me.  Did he illegally give them back to me --

BY MR. MARDIAN:

Q.  Sir --

**290**

A.  -- knowing that he was breaking the law because I broke the law?  So then it comes in the fruit of the poisonous tree.  So the judge violated the state and the U.S. Constitution by giving me the two phones back?

MR. MARDIAN:  I move to strike --

A.  Does it say about -- anything about that in there?

MR. MARDIAN:  I move to strike the response as nonres- -- as nonresponsive.

BY MR. MARDIAN:

Q.  I'll ask my question again.  Sir, based on your testimony in the court -- in bond revocation hearing, do you understand that you engaged in conduct that violated Louisiana state law?

MS. CASWELL:  Object to form.

A.  I guess me and Caswell did.

BY MR. MARDIAN:

Q.  Your testimony is that you violated Louisiana state law?

MS. CASWELL:  Object to form.

A.  I don't know if I violated any laws by taking the phones, I -- I really don't.

BY MR. MARDIAN:

Q.  Sir, did you ever have a conversation with

**291**

anyone else at EPD about this bond revocation hearing?

A.  I don't recall.

Q.  Did you ever have any conversation with anyone else at EPD about the seizure of Mr. Dupre's cell phones?

A.  I don't recall.

Q.  Do you know whether or not Chief Fontenot was ever made aware of your testimony provided on or about October 14th, 2020, in this bond revocation hearing?

MS. CASWELL:  Object to form; speculation.

A.  I -- I don't recall.

BY MR. MARDIAN:

Q.  You never had a conversation with Chief Fontenot about the testimony that you provided under oath and subject to penalty of perjury in this bond revocation hearing?

A.  I don't recall if I did or not.

Q.  Sir, did Chief Fontenot ever ask you about the testimony that you provided at this bond revocation hearing?

A.  I don't recall.

Q.  Did Lieutenant Ryan Young ever ask you about the testimony that you provided at this bond revocation hearing?

**292**

A.  I don't recall that.

Q.  Do you know whether Lieutenant Ryan Young knew that you were testifying at this bond revocation hearing?

A.  I don't recall if he did.

Q.  Do you know if Chief Fontenot knew that you were testifying at this bond revocation hearing?

A.  I don't recall if he did.

Q.  Sir, do you remember providing testimony in this hearing regarding your two arrests of Mr. Dupre?

A.  Re- -- repeat the question.

Q.  Do you remember providing any testimony in this hearing about any arrests that you executed of Mr. Dupre?

A.  In this bond hearing?

Q.  Correct.

A.  I don't -- I don't remember.

Q.  If you can, please turn to the page that ends 3545 in the lower right.

A.  Okay.

Q.  Do you see, about a third of the way down the page, there's a long paragraph that begins "THE COURT"?

A.  Yes.

Q.  Do you see that the transcript reads, "THE COURT:  I find it interesting that in your probable

**293**

cause affidavit associated with the date of offense, September 16th, 2020, and the probable cause affidavit associated with Docket No. 20-M-3686-C in September 29 that you included in your probable cause, that you had made two controlled illegal narcotic purchases from Dupre in recent months and arrest warrants were issued for his arrest in both of the incidents."

Q. Do you have any reason to doubt the veracity of the Court's statement there?

A. No.

Q. Does that re- -- refresh your recollection as to whether you in fact arrested Mr. Dupre, not once but twice?

A. It does not.

Q. So you still cannot recall whether you in fact arrested Mr. Dupre once or twice?

A. It says here that I did, but I can't -- I can't recall if I did or didn't. I'm not saying I didn't. I'm just saying I don't remember.

Q. Understood. Sir, do you recall testifying at a bond revocation hearing of Mr. Dupre's where you argued that he should receive a lower bond?

A. I don't.

Q. Do you see the next sentence from where we were just reading, also transcribing the Court's

**294**

statements, reads, quote, "He had been allowed to bond out with conditions that included no illegal drug activity on his part in light of your testimony that he didn't get his bond revoked and the previous at your request"?

Q. Do you see that?

A. Yes.

Q. Do you understand the "he" in that sentence to be Mr. Dupre?

A. Yes.

Q. And do you understand the "you" in that sentence to be you, Detective Fontenot?

A. Yes.

Q. And so do you have any reason to doubt the veracity of this statement by the Court?

A. No.

Q. Does this refresh your recollection at all as to whether you argued that Mr. Dupre should receive a lower bond?

A. No.

Q. Sir, do you see that this conversation continues on the next page?

A. That would be 46?

Q. Correct, yes.

A. Yes. Okay.

**295**

Q. And in this first full paragraph, do you see the last sentence, again from the Court, that reads, quote, "The only reason he was allowed to bond out was because you asked Judge Meche not to revoke his bonds"?

Q. Do you see that?

A. Yes.

Q. Sir, do you understand the "you" in that sentence to be you, Detective Fontenot?

A. Yes.

Q. And do you understand the "he" to be Mr. Dupre?

A. Yes.

Q. Do you recall at all -- or does this refresh your recollection at all whether you argued that Mr. Dupre should receive a lower bond?

A. Yes.

Q. How so?

A. I remember having a conversation with Judge Meche pertaining to the bond.

Q. And what was the sum and substance of that conversation?

A. I -- I remember asking Judge Meche to lower his bond so that he could bond out.

Q. Why did you ask that?

A. I don't remember at this time.

**296**

Q. Do you generally advocate for such a position in your line of work?

MS. CASWELL: Object to form.

A. Could you ask the question again?

BY MR. MARDIAN:

Q. Do you generally request that individuals be permitted to, as you said, quote, "bond out"?

MS. CASWELL: Same objection.

A. I don't recall.

BY MR. MARDIAN:

Q. Can you recall any other time when you advocated for the individual to, quote, "bond out"?

MS. CASWELL: Object to form.

A. I don't recall.

BY MR. MARDIAN:

Q. Sir, can you please turn back to page 3544?

A. Okay.

Q. Do you see at the top, the transcript reads, quote, "THE COURT: You got him arrested and it -- excuse me, you get him arrest on it, and at your request, his bond in Docket No. 19-M-1788-C isn't revoked. Why do you go and get more CI buys just a few months later?"

Q. Do you see that, sir?

A. Yes, sir.

**297**

Q.   Sir, do you understand the "you" in this sentence to be you, Detective Fontenot?

A.   Yes.

Q.   Do you see, sir, that your response is, quote, "We did that because we were told, and we were proved by CIs.  We were also proven by posting up near Mr. Dupre's residence when we heard that he had continued to distribute illegal narcotics and that he was also distributing illegal narcotics now to underage children"?

A.   I see that.

Q.   Do you have any reason to doubt that you said that, sir?

A.   No.

Q.   Do you recall saying it?

A.   I -- I think I do.

Q.   So you were concerned, sir, that Mr. Dupre was continuing to sell drugs, including to children?

MS. CASWELL:  Object to form if that's even a question.

BY MR. MARDIAN:

Q.   So you were concerned, sir, were you not, that Mr. Dupre was continuing to sell drugs, including to children?

A.   Apparently so.

**298**

Q.   Do you have any reason to doubt the veracity of that statement?

A.   No.

Q.   Do you have any reason to doubt that you made that statement in court?

A.   No.

Q.   And you made that statement in court under penalty of perjury?

A.   Yes.

Q.   Sir, if you were concerned that Mr. Dupre was selling narcotics to children, why did you advocate that he be allowed to, as you say, bond out?

A.   I don't remember.

Q.   Does it strike you as strange, in any manner, that you would ask an individual to bond out so that he could return to the street and continue to sell narcotics to children?

MS. CASWELL:  Object to form.  I think it's misstating this testimony.

But you can answer, if you can.

A.   Ask the question again.

BY MR. MARDIAN:

Q.   Does it strike you as strange, in any manner, that you will -- you would advocate for an individual to bond out so that he can return to the street --

**299**

withdrawn.

Does it strike you as strange, in any manner, that you would ask an individual to bond out if you knew that that individual was selling narcotics to underage children?

A.   Was this the first arrest -- after the first arrest or --

Q.   I am -- I --

A.   According to the court --

Q.   Just for purposes of this, I believe it was aft- -- in between the first and second arrest.  But of course, I -- I ultimately do not know.

A.   Okay.  I don't know.  I don't know when this took place.

Q.   You did -- did you ever observe Mr. Dupre selling drugs to underage children?

A.   No.

Q.   Did your confidential informants tell you that Mr. Dupre was selling drugs to underage children?

A.   Yes.

Q.   Nonetheless, you advocated for Mr. Dupre to bond out?

MS. CASWELL:  Object to form.

A.   Again, when did I ask for him to be able to bond out?

**300**

BY MR. MARDIAN:

Q.   I can't tell you that, sir.

A.   I can't either.  I -- I don't know.  I don't know.

Q.   Do you have any reason to doubt the veracity of any of the statements you made in this revocation hearing?

A.   No.

Q.   Sir, do you ever talk to Chief Fontenot about testimony in court before -- before you provide it?

A.   I don't recall.

Q.   Did you talk to Chief Fontenot about the testimony you provided today before you provided it?

A.   Coming here today?  Can you be more specific?

Q.   Did you talk to Chief Fontenot about what you were going to testify to today in advance of today's deposition?

A.   I don't think so.

Q.   Did you talk to Lieutenant Ryan Young about your testimony today in advance of providing such testimony?

A.   I don't think so.

Q.   Do you ever talk to Lieut- -- to Lieutenant Ryan Young about whether you will advocate that an individual be allowed to bond out?

**301**

A.   Ask again.

Q.   Do you ever talk to Lieutenant Ryan Young in advance of speaking at a bond revocation hearing whether you will advocate that individual be permitted to bond out?

A.   I don't recall if I do or don't.

Q.   Did you ever talk to Lieutenant Ryan Dunn -- Young about the testimony you provided at this revocation hearing before you provided it?

A.   I don't recall.

Q.   Did you talk to Chief Fontenot about the testimony you were planning to provide at this bond revocation hearing before you provided it?

A.   I don't recall.

MR. MARDIAN:  I think I'm basically done, but if we can have a short break, I'll just quickly wrap up.

THE VIDEOGRAPHER:  We're off the record at 7:36.

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record at 6:42.

BY MR. MARDIAN:

Q.   Sir, have you ever confiscated evidence outside of the city of Eunice without the consent of

**302**

the local agency?

A.   Not that I recall.

Q.   Have you ever taken custody of people outside of the city of Eunice?

A.   I don't recall.

Q.   And when you discussed your informal investigation with Lieutenant Dunn and told him that it had concluded, do you recall whether Lieutenant Dunn offered to allow you to search his phone for any incriminating evidence?

A.   I don't recall that.

MR. MARDIAN:  I may have a few additional questions as -- after others ask you questions, but that's all I have for now. I do want to say we sincerely appreciate your time today and your presence here.  Thank you for answering our questions.

THE WITNESS:  Yes, sir.

MR. LOUGHLIN:  We -- you're ready for more questions?

EXAMINATION

BY MR. LOUGHLIN:

Q.   Mr. Fontenot, is there something wrong with your memory?

A.   I don't know.

**303**

Q.   You on any kind of medications today?

A.   No.

Q.   You have any active prescriptions for medication?

A.   Prednisone.  What's it called?  Albuterol, albuterol inhaler, albuterol solution, and some powdered form of Trelegy, I think it's called.

Q.   What was the last one?

A.   Trelegy.

Q.   What is that for?

A.   That's for COPD.

Q.   Is that what the other stuff is for as well?

A.   Yes, sir.  Prednisone --

Q.   Any other medication?  Prednisone, you were saying?

A.   Prednisone was for COVID that I just had two weeks ago.

Q.   All right.  Any other medications?

A.   Not that I can remember.

Q.   You ever suffered a brain injury?

A.   When I was eight years old, I fell and busted my head open.  I don't know if that would have gave me a brain injury or not.

Q.   There seems to be a lot of things you can't recall.  Is there a particular reason why that you can

**304**

tell us about?

A.   Not just here -- not just at work but life in general, I don't recall much.  My wife is always getting on me about that, but I don't.  Every time I said I don't recall, I am being honest; I do not recall.  I do not.

Q.   How long has that been the case with you?

A.   Years.  I don't -- I don't know.

Q.   You have a bad memory; is that accurate to say?

A.   Yeah.

Q.   You're POST certified, right?

A.   Yes, sir.

Q.   Talked about you working outside of the jurisdiction -- the city of Eunice.  Do you hold any commissions from any other law enforcement agencies?

A.   No, sir.

Q.   Nothing from the St. Larry -- Landry Parish sheriff?

A.   No, sir.

Q.   Or any other parish?

A.   No, sir.

Q.   So in other words, when you're not -- when you're outside the city of Eunice, you're a civilian?

A.   I don't know if you would -- I don't know.

**305**

Q.   You can't make an arrest, right, except for maybe a citizen's arrest?

A.   Correct.

Q.   When you work outside the city, you still get paid, though, right?

A.   Correct.

Q.   You're on Facebook, right?

A.   Yes.

Q.   You're a Facebook friend of the Eunice Police Department?

A.   Maybe.

Q.   You're a Facebook friend of Randy Fontenot, right?

A.   I think so, yes.

Q.   We spoke to Donnie Thibodeaux the other day. Have you ever asked him for legal advice?

A.   I spoke to Donnie Thibodeaux?

Q.   No.  We did.  We --

A.   Okay.

Q.   He gave a deposition.

A.   Okay.

Q.   Have you ever asked him for legal advice?

A.   Not that I recall.

Q.   Okay.  I take it with -- with everything else, if you don't recall but somebody else does, you can't

**306**

contradict that person?

MS. CASWELL:  I object to form.

BY MR. LOUGHLIN:

Q.   Is that true?

A.   I don't understand the question.

Q.   Well, let's maybe refer to -- to Exhibit 1, the issue with Joshua Tyler.  You recalled this morning talking about that, right?  The guy with the glass in his mouth?

A.   Yes.

Q.   All right.  You didn't remember the incident at all, right?

A.   No.

Q.   Looking at the offense report, Exhibit 1, that didn't refresh your recollection, right?

A.   No.

Q.   So if Lieutenant Dunn can testify to this incident, you can't contradict a thing Lieutenant Dunn might say, correct?

A.   Correct.

MS. CASWELL:  Object to form.

BY MR. LOUGHLIN:

Q.   Because you don't recall?

A.   Correct.

Q.   Likewise, with everything else you said you

**307**

don't recall, if there's a witness who does recall, you can't contradict that witness, right?

A.   Correct.

Q.   Touched briefly on the -- on the KC Hall lawsuit.  What's your understanding of that lawsuit -- or the one that pertains to the -- the -- an incident at the KC Hall?

A.   I don't know.

Q.   You're aware that Lieutenant Dunn was disciplined for making a Facebook post, right?

MS. CASWELL:  Object to form.

A.   I think I remember a little something about it, yes.

BY MR. LOUGHLIN:

Q.   What do you remember about it?

A.   He was disciplined -- I don't know what the disciplinary action was -- for making some kind of post on Facebook about an incident that happened across the street from his house.  It might have been a shooting or something.  I -- I don't remember.

Q.   Was there ever a time where -- where you knew what the post was about, that Mr. Dunn made?

A.   Say again.

Q.   Did you ever know what Mr. Dunn posted on Facebook, that got him disciplined?

**308**

A.   If I did know, I don't remember.

Q.   Are you aware today whether Mr. Dunn should have been disciplined over that Facebook post?

MS. CASWELL:  Object to form.

A.   Say again.

BY MR. LOUGHLIN:

Q.   Are you aware today -- do you have an opinion whether Lieutenant Dunn should have been disciplined over that Facebook post?

A.   I have no opinion about that.

Q.   Have you ever had an opinion about that?

A.   No, sir.

Q.   Okay.  That's not something you once had an opinion on but you forgot?

A.   No, sir.

Q.   I take it you don't remember ever talking to the chief about Mr. Dunn's Facebook post that got him disciplined.  Right?

A.   I don't recall if I did or not.

Q.   Okay.  Exhibit 5, if we go back to that --

MS. CASWELL:  Do you --

BY MR. LOUGHLIN:

Q.   -- the threats or the comments you made --

MS. CASWELL:  Kear- -- Kear- --

Q.   -- the critical incident report, do you

**309**

remember that?

MS. CASWELL: We don't have the exhibits anymore. Can you give me a second just so we can get them back?

MR. LOUGHLIN: Sure.

MS. CASWELL: Do you -- you said 5?

MR. LOUGHLIN: Five, yeah.

MS. CASWELL: He's got it now.

BY MR. LOUGHLIN:

Q. The second page, the back page with the handwriting. Your testimony was you don't know who wrote that, correct?

A. My testimony was I can't be sure who wrote it, but I do see the numbers 300 on the back of it at the bottom.

Q. 300 refers to Chief Randy Fontenot, correct?

A. Yes.

Q. All right. You never seen Chief Fontenot's handwriting?

A. Not that I recall, no.

Q. Or his signature?

A. No.

Q. On anything?

A. No.

Q. Or his initials?

**310**

A. I don't recall if did --

Q. If it's 300, it's the chief?

A. 300 is the chief.

Q. Based on that, do you believe this to be the chief's handwriting?

A. I don't know.

MS. CASWELL: I object to form.

A. I don't know if it is or not.

BY MR. LOUGHLIN:

Q. Okay. Going back to what you don't remember, you said you don't remember saying "I'm going to break his mother fucking fingers." Right?

A. Right.

Q. If someone else remembers that, you can't dispute it, correct?

A. Correct.

Q. If there's a recording of it, you can't dispute it, correct?

A. Absolutely not.

Q. Likewise, the statement "I'm going to fuck him up when I catch him alone on a call," if someone else says you said that, you can't dispute that. Right?

MS. CASWELL: Object to form.

A. What if they're lying?

BY MR. LOUGHLIN:

**311**

Q. You have no basis to dispute it because you don't remember, correct?

A. Correct. But it still doesn't make it true.

Q. Well, what you admitted was true was you said he was conceived in the cesspool of his mother's womb, right? There's no dispute that's that true --

A. Correct.

Q. -- that you said it?

And when you said that, the chief laughed, right?

A. I don't recall.

Q. You don't recall? If someone else testifies that, you can't dispute it, correct?

A. Correct.

Q. You think saying something like that about a brother officer is -- is appropriate?

A. So we can't joke about brother officers?

Q. I'm asking you the question.

A. Any -- any - anyway, is that what you're saying?

Q. I'm asking you if -- if the term --

A. Is that what you're saying?

Q. If -- pardon?

A. Is that what you're saying?

Q. No. My -- my -- my question is when you say

**312**

that -- that, with respect to Lieutenant Dumb -- Dunn, he was received in the cesspool of his mother's womb, you think that's an appropriate thing to say, joking or not?

A. Could be.

Q. Could be appropriate?

A. Could be.

Q. I take it under this circumstance it was appropriate, right, talking to the chief about critical incident reports?

A. I don't remember.

Q. You don't remember?

A. No.

Q. All right. Again, you can't -- you can't dispute the testimony of anybody who does remember, right?

A. Correct.

Q. About anything --

MS. CASWELL: Object to form.

BY MR. LOUGHLIN:

Q. -- correct?

MS. CASWELL: It misstates testimony.

BY MR. LOUGHLIN:

Q. I think we just covered that. Anything you don't remember but somebody else remembers, you don't

**313**

have an opinion on that; you can't say it's false.
Right?

A. Correct.

Q. You think saying that a brother officer was conceived in the cesspool of his mother's womb might impair the efficiency of the Eunice Police Department?

A. How?

Q. I'm asking you.

A. I'm asking you how?

Q. Well, I'm not being deposed. I'm asking you.

A. I don't know.

Q. All right. It might potentially do that, right?

A. I don't know.

Q. It might be detrimental to the department's morale, correct?

A. I don't know.

Q. Why don't you know? That's not -- that's not a question for your memory. Why don't you know?

A. Ask -- ask your question again.

Q. Saying to -- to fellow officers about another fellow officer that he was conceived in the cesspool of his mother's womb, that has the potential to -- to impair the working relationships among those officers, correct?

**314**

MS. CASWELL: Object to form; speculative.

A. That was a joke.

BY MR. LOUGHLIN:

Q. Okay. Some people might find it not that funny.

A. Some might not.

Q. Do you understand that?

A. Oh, I absolutely understand that.

Q. And people who don't find it funny may -- may not be enthused about working with you. Do you appreciate that?

MS. CASWELL: Object to form; speculative.

Go ahead.

A. What was your question?

BY MR. LOUGHLIN:

Q. People who don't find it a funny joke may not be enthused about working with you, correct?

A. Yeah, I get that too.

Q. Okay. And -- and the morale of the department -- when jokes like that fly around and -- and nothing happens in terms of a consequence from the chief, that may affect morale, mightn't it?

MS. CASWELL: Object to form.

**315**

BY MR. LOUGHLIN:

Q. That's a true statement, isn't it?

A. Yeah. It affected mine, yeah.

Q. Okay. How did it affect yours?

A. Because they do the same shit you're accusing me of doing to me and nothing happens to them.

Q. Who does that? Lieutenant Dunn? Who does the same shit?

A. But I didn't make a big fucking fuss about it and write critical incidences about the bullshit, so nothing gets done. And no, nobody said anything, but the same shit happened to me.

Q. Tell me about it.

A. No. I'm not going to tell you about it.

Q. Why not?

A. Ask your questions.

Q. That was my question. Tell me about it, question mark.

A. I don't -- I don't know.

Q. You don't know?

A. No.

Q. Okay. You -- you forgot between when you said the same shit happens to you and --

MS. CASWELL: Object to form; argumentative. I mean, ask an actual

**316**

question.

A. Are we -- are we going to argue, or are we going to get this over with? Ask your questions, and I will answer it to the best of my ability.

BY MR. LOUGHLIN:

Q. I just asked one, and you didn't answer it.

A. Well, ask it again.

Q. You said the same shit happens to you. I said tell me about it.

A. It's personal. I don't want to talk about it.

Q. It's not personal in this case at all. You're the one who brought it up. Why aren't you going to answer it? That was another question, Mr. Fontenot. Why aren't you going to answer it?

A. Because I'm not a crybaby.

Q. Okay. I don't care if you're a crybaby or not a crybaby. I asked you the question. Why aren't you going to answer the question?

A. What was your question again?

Q. You said the same shit happens to you. That kind of remark happens about you or to you, correct?

A. Correct.

Q. I asked you who's made those remarks?

A. Well, I've heard that people talk about me in my -- my job performance. You know, they've never said

**317**

it to me in my face, but it's gotten back to me, how they feel about me.

Q. Who are those people?

A. That I've heard talk about me?

Q. That you've heard or that you've heard about?

A. That I've heard about, that talk to me? Lieutenant Ivory, Lieutenant Dunn, Cody Miller, a few of them that are not there anymore. Yeah. I --

Q. You talked about your job performance?

A. My character, my job performance, yeah.

Q. Have they said you were conceived in the cesspool of your mother's womb?

A. No, they never -- they never said that I was conceived in the cesspool of my mother's womb. No.

Q. Have they said anything like that?

A. To that degree?

Q. Yeah.

A. Meaning whose opinion?

Q. Well, if in my opinion -- and I think in the opinion of a lot of people in the Western District of Louisiana -- that's an obscene crass thing to say. Do you not agree?

A. An obscene what?

Q. An obscene crass thing to say about someone --

A. I don't know what --

**318**

Q. -- and his mother?

A. -- "crass" means.

Q. "Crass" means untoward. It means vulgar.

A. Okay. It could be. It could be viewed that way, yeah.

Q. Okay. There's not really another way to view it, is there?

MS. CASWELL: Object to form; speculative.

A. I don't know.

BY MR. LOUGHLIN:

Q. Is there another way you view it?

A. No.

Q. Okay. No one has said anything like that about you, as far as you know, right?

A. I don't know.

Q. And as you say, it's effected your morale, comments like that?

A. Yeah. But I rose above it, and I didn't go write critical incident reports about it.

Q. Talked a little bit about the -- the manual that includes the code of conduct in ethics. Do you remember that?

A. Yes.

Q. You received it; you have it. In the manual,

**319**

you're not allowed to associate with criminals at all except as part of your official duties, right?

A. I don't know.

Q. Why don't you know?

A. I didn't read that part.

Q. Did you read the code of conduct in ethics?

A. Where is that located?

Q. It's in the manual.

A. No.

Q. Is there a reason you didn't read that?

A. (Witness shakes head.)

Q. You have a duty to comply with it, right?

A. Yes.

Q. How do you know what you're supposed to comply with without reading it?

A. Don't know.

Q. Did you read the part that says ignorance of the rules doesn't justify departing from the rules?

MS. CASWELL: Object to form; vague. Can we have a time frame of what we're talking about, when or -- he did this or didn't do it?

BY MR. LOUGHLIN:

Q. Have you ever read that provision in the code of conduct in ethics that ignorance of the rules, regulations, and directives is not considered a

**320**

justification for violating those rules? Have you ever read that?

A. I don't think so.

Q. Okay. How do you know -- how do you know how to comply with it, then?

A. I don't know.

Q. You've read the laws that you swore to uphold, haven't you?

A. Yes.

Q. And you swore to uphold the Louisiana Constitution, correct?

A. Correct.

Q. And likewise, the United States Constitution, right?

A. Correct.

Q. All right. I take it in the code of conduct, you're not familiar with the revision that unsatisfactory job performance for -- of an officer includes not being fully apprised of the laws that you enforce?

A. No.

Q. You haven't read that?

A. No.

Q. Talked earlier about whether you'd stay at the Eunice Police Department when a new chief comes in.

**321**

You remember that?

A.   Yes.

Q.   Have you looked for any new law enforcement employment recently, say the last year?

A.   No.

Q.   You have any present intention to do that?

A.   Possibly.

Q.   Is there a particular department or agency you're -- you're -- you're interested in?

A.   No.

Q.   Have you ever applied for a law enforcement job at any time and not gotten hired?

A.   Yes.

Q.   Where?

A.   Jennings Police Department.

Q.   When was that?

A.   Maybe '12, '13.

Q.   2012 or '13?

A.   Yeah, possibly.  In that -- in that time frame.

Q.   Do you know why you weren't hired?

A.   No, I don't.

Q.   Anywhere else?

A.   Not that I remember.

Q.   Why were you applying for Jennings Police

**322**

Department that time?

A.   I think I wanted to go on the road.  I think I wanted to be a patrolman.

Q.   That's when you were a Eunice jailer?

A.   Yes.

Q.   You testified a little bit about these informants, CI 1 and CI 2, and who -- who knows their names or who know their identity?

A.   Yes.

Q.   You say you never told the chief?

A.   I said I don't remember telling the chief.

Q.   Okay.  You may have told the chief, then?

A.   I don't know.

Q.   Okay.  That's a -- then that's a true statement; you may have told the tree -- chief, right?

A.   I don't remember if I told the chief or not.

Q.   If you don't remember, then there's a possibility that you did, correct?

A.   I don't remember.

Q.   Okay.  And therefore, there's a possibility that you did?

A.   And there's a possibility that I didn't.

Q.   Right.  Both of those things are true?

A.   Could be true.

Q.   Okay.  You did tell Ryan Johnson, right?

**323**

A.   No.

Q.   I mean -- pardon?

A.   No.

Q.   I misspoke.  You told your lieutenant, right, Ryan Young -- I mean --

A.   Yes.  Yes, yes.

Q.   Confusing myself.  What about these other agencies?  Do they know the -- the identities of CI 1 and CI 2?

A.   What other agencies?

Q.   You said the state and the DEA.

A.   Oh.  I don't know.  I don't -- I don't know.

Q.   If they had asked you the identities, you would have told them, right?

A.   I'm sure I would have, yes.

Q.   Did you tell your lawyers in this case?

A.   No.

Q.   It'd be impossible to investigate the -- the stories of CI 1 and CI 2 without knowing their identity, correct?

A.   Say again.

Q.   It would be impossible to investigate their stories without knowing who they are, right?

A.   That's a -- that's a fair statement.

Q.   Someone from state police or DEA can't

**324**

investigate anything they said or might have said without first knowing who these people are, right?

        MS. CASWELL:  Object to form;
    speculative.

A.   I don't know.

BY MR. LOUGHLIN:

Q.   These two informants, they -- you say they told you things about Lieutenant Dunn in what?  March of the 2020?  Is that -- is that about right -- you got that first phone call?

A.   I don't remember.

Q.   I take it, you'd defer to the -- your -- your deposition testimony of a little while ago, right?

A.   Say again.

Q.   You would defer to what you said already in this case?

A.   Yes.

Q.   In Exhibit 6, your report that -- that begins "Approximately 1800 hours on 3/27/2020, I, Detective Victor Fontenot, received a phone call."  Right?

A.   Yes.

Q.   That's the first phone call you got?

A.   Yes.

Q.   Okay.  And what about Dupre and Hill?  That -- that was when?  We know when the transcripts were for

**325**

the bond revocation on Dupre, right?  That was in October?

MS. CASWELL:  Object to form.  What are -- what was we asking about?

MR. LOUGHLIN:  I'm -- I'm asking about dates.

MS. CASWELL:  Of what?  Of what with Hill and Dupre?

MR. LOUGHLIN:  The very -- let me break it down this way.

BY MR. LOUGHLIN:

Q.  The very first time, according to you, that you heard that Lieutenant Dunn was a corrupt cop was March of 2020; is that correct?

MS. CASWELL:  Object to form; misstates the document and testimony.

BY MR. LOUGHLIN:

Q.  Well, I'm asking if that's correct.  And if it's false, you can tell me that too.

A.  Ask your question again.

Q.  The very first time you -- you heard anyone claim that Lieutenant Dunn was corrupt was in March of 2020?

MS. CASWELL:  Same objection.

A.  The very first time that I heard anyone say

**326**

that Lieutenant Dunn made a phone call to the residence that we were going to ex- -- execute a search warrant on was 3/27/2020.

BY MR. LOUGHLIN:

Q.  Before that date, have you ever heard anyone claim that Lieutenant Dunn was a corrupt cop, that he was being paid, anything along those lines?

A.  Not that I can remember.

Q.  Okay.  You hadn't heard anything before August 27th, 2019, then, right?

A.  Not that I can remember.

Q.  Okay.  Are you aware of any document that you'd look at to refresh your recollection?

A.  Say again.

Q.  You said, "Not that I can remember."  Is there any document, that you know of, that you could look at to refresh your recollection that you had been told before, say, August 27th, 2019, that Lieutenant Dunn was corrupt in some fashion?

A.  Is there a document that I can look at?

Q.  That you know of, yes.

A.  No.

Q.  Your testimony is you can't remember and you're not aware of some document you can read that would help you to remember?

**327**

A.  Right.

Q.  Okay.  The photographs you said you got from CI 2, you remember talking about that?

A.  Yes.

Q.  The only evidence that they exist or ever existed is your testimony; isn't that true?

MS. CASWELL:  Object to form.

A.  I said I didn't know where they were.  I didn't say they didn't exist.

BY MR. LOUGHLIN:

Q.  You can't -- you can't produce them today, right?

A.  Right.

Q.  And if I send you a request saying would you produce it to me or a subpoena, you won't be able to produce it, will you?

A.  I don't know.

Q.  Who else is -- saw those photographs?

A.  I think I was the only one.

Q.  Okay.

A.  I don't know if Lieutenant Dunn saw them or not.

Q.  So the only evidence you're aware of today that the photographs ever existed and what they showed is your testimony?

**328**

A.  Correct.

Q.  You said CI 1 and CI 2 were still your informants, right?

A.  Right.

Q.  Okay.  When is the last time you sought a warrant for either an arrest or a search based on anything either those two informants told you?

A.  I can't recall.  It's been a -- a year, maybe.

Q.  Okay.  Well, for the last 10 months, I think you -- I think you said before October of 2021 when you were out with a -- with a knee issue, sometime before that, you closed the -- your informal investigation into Lieutenant Dunn.  Right?

A.  Right.

Q.  And certainly by that time, by the time you closed it, you knew those informants had given you bad information about Dunn.  Right?

MS. CASWELL:  I object to form.

A.  I couldn't prove the information reliable.  That's on -- that's on me.  I'm not -- and that doesn't prove that the information wasn't -- wasn't valid.  I just couldn't prove that it was valid.

BY MR. LOUGHLIN:

Q.  You have no evidence that anything they supposedly told you is true, right?

**329**

A.  Right.

Q.  And they're still your confidential informants?

A.  Yes.

Q.  Oh.  You ever shot a dog?

A.  Have I ever shot a dog?

Q.  You ever shot a dog, yeah?

A.  I don't think so.

Q.  The speech that we talked about, you said the joke about -- about being the -- the product of -- I keep forgetting -- conceived in the cesspool of his mother's womb.  That, you admit.  And the other statements, you can't remember.  "I'm going to break his mother fucking fingers.  I'm going to fuck him up when I catch him alone on a call."

Was your speech on that day, when you made those remarks or alleged remarks, protected by the First Amendment in your estimation?

MS. CASWELL:  Object to form; requires a legal conclusion.

A.  I -- I don't know.  What is the First Amendment?

BY MR. LOUGHLIN:

Q.  You're familiar with the United States Constitution?

**330**

A.  Yes.  Which -- which part of the First Amendment are you referring to?

Q.  The freedom of speech clause.

A.  Okay.

Q.  You familiar with that?

A.  Yes.

Q.  That every citizen in this country has -- has the right to the freedom of speech protected by the federal constitution?

A.  Yes.

Q.  And by Louisiana Constitution, for that matter.  Are you aware of that?

A.  Yes.

Q.  All right.  You have any opinion as to whether the statement -- let's just keep it with the one you admit to -- conceived in the cesspool of his mother's womb -- whether that was protected speech, whether you -- whether you had a right to say that?

MS. CASWELL:  Same objection.

A.  I would say yes.

BY MR. LOUGHLIN:

Q.  Why?

A.  I don't know.  I'm not a lawyer.  I -- I -- I don't know.

Q.  Well, I appreciate that.  But you're a law

**331**

enforcement officer, right?

A.  Yeah, yeah.

Q.  And you enforce the law --

A.  Yeah.

Q.  -- correct?  And you don't know?

A.  Well, if I was going to charge somebody, I would first look at the law and understand the law.  The freedom of speech, the First Amendment, I've never had to actually break it down and study it because of charges against somebody that I was going to pursue, no.

Q.  Have you ever been sued before?

A.  Maybe by a car company over a repossessed vehicle, I think, yes.

Q.  What was that -- just give me the -- the 30-second answer.  What -- tell me about that.

A.  Didn't pay the notes.  They came pick it up.  I had to still pay for the vehicle.

Q.  Any other lawsuit?

A.  Not that I remember.

Q.  Never sued for anything you did as a -- as a police officer?

A.  I don't think so.

Q.  Okay.  You've read this particular lawsuit that -- that Mr. Dunn filed?

**332**

A.  Which one?

Q.  The -- the one represented by the Sidley Austin lawyers?

A.  The one we're --

Q.  The second -- the second one, not the Facebook/KC Hall suit.

A.  Okay.  Yes.

Q.  Okay.  I take it you -- you read all the allegations against you and in the suit?

A.  I think I did.

Q.  Do you consider that to be a frivolous lawsuit?

A.  What does "frivolous" mean?

Q.  Meritless, lacking arguable merit, un-serious.

A.  Do I think the allegations --

Q.  Yes.

A.  -- against me are?  I don't know.  I don't know what to think about it.

Q.  Well, you read the allegations.  They're very serious if they're true, aren't they?

MS. CASWELL:  Object to form.

A.  I don't know.

BY MR. LOUGHLIN:

Q.  You don't have an opinion on that?

A.  No.

**333**

Q. You ever going to form an opinion on that?

A. Am I going to what?

Q. Ever form an opinion on that, like at trial, for instance?

A. I still don't understand what you're asking me.

Q. I'll move on.

You said you respect Lieutenant Dunn as a police officer, right?

A. Yes.

Q. Okay. You wouldn't respect him as a police officer if you thought he was corrupt, would you?

A. No.

Q. And a dishonest police officer isn't -- isn't worthy of anybody's respect?

A. Right.

MR. LOUGHLIN: That's all I have. Thank you, Mr. Fontenot.

THE WITNESS: Yes.

MS. CASWELL: All right. I do have a couple quick questions, Victor.

EXAMINATION

BY MS. CASWELL:

Q. I want to go back to one thing. The original counsel had asked you about specifically training.

**334**

Q. Do you participate in annual training related to your employment at EPD?

A. Yes.

Q. Do you participate in regular POST training?

A. Yes.

Q. Can you provide me with some examples of the subjects of that training?

A. Okay. POST -- it's been a long day.

Q. And I don't need all of them. Just some examples, some of the things that that -- that come up.

A. Okay. I can't -- I can't remember if this is -- we do two. We do POST training, and we do what's called TargetSolutions. They both pertain to how do we -- how do we proceed when we go to a domestic abuse case or a person who has been raped or just different -- different things. Each -- each segment is probably at least 30 minutes; some of them are an hour long.

We watch the training, and then we have to answer questions at the end of that training. I don't know. There's a bunch. I just -- I -- I can't remember all of them. The whole training probably takes, if I was to sit down on a computer and do them nonstop during -- during work hours, maybe two to three days to complete all of them.

**335**

Q. And you have to do that annually?

A. We have to do that annually.

Q. And so you were talking about -- what was the name of the second one? The POST training and the --

A. TargetSolutions.

Q. TargetSolutions. And those are both things that you have to do as required by either the state or the department; is that correct?

A. Correct.

Q. And do you have any idea if some of the topics that are covered in the POST training or your other annual training that you just testified about are similar or have any overlap with the EPD's policy manual?

MR. MARDIAN: Objection; form.

A. I don't understand the question.

BY MS. CASWELL:

Q. They asked -- counsel had asked you earlier about doing training on the policy manual; is that correct?

A. Correct.

Q. And you -- did you -- what was your response? Do you recall your response?

A. That he asked me?

Q. No. I think this was probably going back more

**336**

to when Peter was questioning you.

A. Repeat the question again.

Q. I'll reask my first question.

A. Okay.

Q. Do you have any idea if the topics that you -- that are typically covered in your annual training, whatever source that may be, does it ever overlap with the EPD policy manual, from your understanding?

MR. MARDIAN: Objection; form.

BY MS. CASWELL:

Q. You can still answer.

A. I -- I don't recall.

Q. Okay.

A. I'm sorry.

Q. Do you know, on any type of basis, does the chief ever send around policies to the police department?

MR. MARDIAN: Objection; form.

A. I don't recall.

BY MS. CASWELL:

Q. Has the chief ever sent you a revised policy to inform you about changes to policies?

MR. MARDIAN: Objection; form.

A. He has, but I don't remember what they are.

BY MS. CASWELL:

**337**

Q. Okay. That's fine.

MS. CASWELL: That's all my questions.

MR. MARDIAN: I have a few additional.

RE-EXAMINATION

BY MR. MARDIAN:

Q. Detective Fontenot, do you recall this morning when I was asking you questions about training, you couldn't recall whether you had or had not had training?

MS. CASWELL: I object to form.

A. Specify.

BY MR. MARDIAN:

Q. Do you recall our conversation this morning about training at EPD?

A. Yes.

Q. Do you recall testifying when I asked you, you couldn't remember whether you had or did not have training over the past several years at EPD?

MS. CASWELL: Object to the form; misstates his testimony or the question.

A. I remember you asking me that.

BY MR. MARDIAN:

Q. And do you recall responding, in sum and substance, that you could not recall?

MS. CASWELL: Same --

**338**

A. Yes.

MS. CASWELL: -- objection; misstatement

BY MR. MARDIAN:

Q. You do remember that?

A. Yes.

Q. Yet, now, you do remember the training that you had?

A. She was specific. She asked about POST and training that the department and the state required.

Q. So the reason you could remember it now was because, in your words, she was more specific than I was?

A. Yes.

Q. When I asked you if you had had any training, you couldn't recall --

A. Correct.

Q. -- do you understand that?

A. Correct.

Q. So when you understood my question, you didn't understand it to mean that I was asking you if you had any training, including POST or pre-training as we've just spoken. Correct?

A. What kind of training did you ask me if I had?

Q. Any training.

A. Okay.

**339**

MS. CASWELL: Object to form. Could we find the question?

BY MR. MARDIAN:

Q. When I asked you questions about your training this morning and referred to any training, did you not understand that to include this POST and pre-training that Ms. Caswell has just asked you about?

MS. CASWELL: Object to form. I believe it misstates your questions.

A. I didn't tie that into your question this morning.

BY MR. MARDIAN:

Q. Understood. But you did say the reason you were able to answer her questions is because she was more specific. Is that correct?

A. Correct.

Q. Do you understand that she -- her first question to you was, quote, "I want to go back to one thing the original counsel asked you about, specifically training. Do you participate in an annual training related to your employment at EPD?"

Do you recall that?

A. Yes.

Q. Do --

A. "Annual" is what -- what got me, my mind on

**340**

the POST and the TargetSolutions when she said "annually."

Q. Nothing else is what caught your mind; it's the use of her -- her use of the word "annual"?

A. "Annual" is what triggered it, yes.

Q. Did you discuss the training that you've had at EPD with anyone else in the room at any point today?

A. Yes.

Q. Did you discuss whether you've had this training with your counsel?

A. Yes.

Q. Is that what changed your response now?

A. No.

Q. Your counsel did not coach you on that response?

A. No.

MR. MARDIAN: I have nothing further.

THE VIDEOGRAPHER: This concludes the deposition. The time is 7:23.

(This proceeding was concluded at 7:23 p.m. on July 28, 2022.)

341

REPORTER'S CERTIFICATE

I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, Registered Professional Reporter, and as the officer before whom this testimony was taken, do hereby certify that VICTOR FONTENOT, after having been duly sworn by me upon authority of R.S. 37:2554, did testify on the 28th day of July, 2022, in Lafayette, Louisiana, as hereinbefore set forth in the foregoing 340 pages.

I further certify that said testimony was reported by me in the Stenotype reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board and that I have been informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services.

I further certify that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions of the board.

I further certify that I am not an attorney or counsel for any of the parties, that I am neither related to nor employed by any attorney or counsel connected with this action, and that I have no financial interest in the outcome of this matter.

This certificate is valid only for this transcript accompanied by my original signature and original raised seal on this page.

Baton Rouge, Louisiana, this 8th day of August, 2022.

_____
YOLANDA J. PENA, CCR, RPR
CCR NO. 2017002, RPR NO. 907346