IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA


MICHAEL DUNN

vs.

Civ. A. No.
6:21-cv-05135

RANDY FONTENOT, VICTOR
FONTENOT, RYAN YOUNG,
CITY OF EUNICE, AND JOHN
DOE

* * * * * * * * * * * * * * * * * * * * * * * * * * *




VIDEOTAPED DEPOSITION OF
WALTER MIRE

December 19, 2024


Held at Doubletree by Hilton Lafayette
1521 W. Pinhook Road
Lafayette, Louisiana  70503



(Beginning at 11:36 a.m.)




Reported by:

Rita A. DeRouen, CCR, RPR
(CCR #2014018)
(RPR #006908)



EXHIBIT R

Walter Mire                                                    December 19, 2024
                                                              Pages 2 to 5

Page 2

APPEARANCES:

REPRESENTING THE PLAINTIFFS:

SIDLEY AUSTIN, LLP
787 Seventh Avenue
New York, New York  10019
212.839.5300
BY:  JAMES HORNER, ESQ.
jhorner@sidley.com
BY:  ALEXANDRA BIELER, ESQ.
abieler@sidley.com

          - AND -
KEARNEY LOUGHLIN, ATTORNEY AT LAW
602 Boulder Creek Parkway
Lafayette, Louisiana  70508
337.534.8803
BY:  KEARNEY LOUGHLIN, ESQ.
kearney.loughlin@gmail.com
(Via Zoom)

REPRESENTING THE DEFENDANT CITY OF EUNICE:
BECKER & HEBERT, LLC
201 Rue Beauregard
Lafayette, Louisiana  70508
337.233.1987
BY:  JAMES DOHERTY, ESQ.
jdoherty@lawbecker.com

Page 3

APPEARANCES:  (CONTINUED)

REPRESENTING THE DEFENDANT VICTOR FONTENOT:
STAMEY LAW FIRM, LLC
727 Second Street
Natchitoches, Louisiana  71458
318.951.1024
BY:  JOSEPH B. STAMEY, ESQ.
joe@stameylawfirm.com
(Via Zoom)

REPRESENTING THE DEFENDANT RYAN YOUNG:

NEUNER PATE
1001 West Pinhook Road, Suite 200
Lafayette, Louisiana 70503
337.272.0348
BY:  JASON REED, ESQ.
jreed@neunerpate.com

REPRESENTING THE DEFENDANT RANDY FONTENOT:
ERLINGSON BANKS, PLLC
301 Main Street, Suite 2110
Baton Rouge, Louisiana 70801
225.218.4446
BY:  KAITLIN A. WALL, ESQ.
kwall@erlingsonbanks.com

Page 4

APPEARANCES:  (CONTINUED)

Also Present:
    Andy Grover, Videographer
    Lauren Sylvest, Becker & Hebert (Via Zoom)
    Randy Fontenot

Reported by:

Rita A. DeRouen, Certified
Court Reporter No. 2014018
in and for the State of
Louisiana

Page 5

                I N D E X
                                          Page
Stipulation                                 6
Reporter's Page                            56
Reporter's Certification                   57

EXAMINATION
    By Mr. Horner                           8
    By Ms. Wall                            48
                * * * * *
        List of Exhibits

Exhibit #1
    (Eunice Police Department Statement of   50
    Josh Dupre, 7/22/20,
    CityofEunice_Dunn_0000822)



Walter Mire                                                                December 19, 2024
                                                                          Pages 6 to 9

Page 6

STIPULATION

It is stipulated and agreed by and between counsel that the testimony of the witness, WALTER MIRE, is hereby being taken pursuant to Notice under the Federal Rules for all purposes permitted under law.

The witness waives the right to read and sign the deposition. The original is to be delivered to and retained by JAMES HORNER, ESQ., for proper filing with the Clerk of Court.

All objections, except those as to the form of the questions and/or responsiveness of the answers, are reserved until the time of the trial in this cause.

* * *

Rita DeRouen, Certified Court Reporter in and for the State of Louisiana and Registered Professional Reporter, officiated in administering the oath to the witness.

Page 7

THE VIDEOGRAPHER:

We are now on the record. This begins Videotape Number 1 in the deposition of Walter Mire taken in the matter of Michael Dunn vs. Randy Fontenot, et al., being heard before the U.S. District Court for the Western District of Louisiana, Docket Number 1:21-cv-1436.

Today's date is December 19, 2024. The time is 11:36 a.m. This deposition is being taken in Lafayette, Louisiana at the request of Sidley Austin LLP.

My name is Andy Grover; I'm the videographer with Magna Legal Services. The court reporter today is Rita DeRouen. Appearances by counsel will be noted on stenographic record.

Would the court reporter please swear in the witness.

WALTER MIRE, having been first duly sworn, was examined and testified as follows:

//
//

Page 8

EXAMINATION
BY MR. HORNER:

Q. Good morning.

A. Good morning.

Q. Thank you for coming in. My name is James Horner, and I'm an attorney with Sidley Austin LLP. I represent Lieutenant Michael Dunn in an ongoing dispute with the City of Eunice, Randy Fontenot, Victor Fontenot, and Ryan Young.

Can you please state your full name for the record.

A. Walter Mire.

Q. How would you like to be referred to? Sergeant Mire?

A. No. Walter.

Q. Walter's fine? Okay.

Have you ever been deposed before?

A. No, I can't say I have. Not that I remember.

Q. Have you ever given sworn testimony before outside of a deposition?

A. Yes, in court and in administrative hearings.

Q. How many times roughly, if you could estimate?

Page 9

A. 20 to 30 maybe.

Q. You will be testifying under oath today and your answers will be subject to the penalty of perjury.

Do you understand that?

A. I completely understand.

Q. Your statements today have the same effect as though they were given in a court of law.

Do you understand that?

A. I do.

Q. I'm going to ask you a series of questions. If you don't understand a question, please ask for clarification, otherwise I will assume you understood it.

A. Okay.

Q. Please provide verbal questions -- verbal answers to all questions. The court reporter cannot pick up head nods and the like.

A. No problem.

Q. If you would like a break, please ask for one, we're happy to do it. If there's a question pending, you will need to answer the question before taking the break.

Do you understand that?



Walter Mire                                                          December 19, 2024
                                                                      Pages 10 to 13

Page 10

A. That's fine.

Q. It's easier for the court reporter if we don't interrupt each other. So I'd appreciate it if you wait to let me finish a question, and then I'll do my best to also let you --

A. Okay.

Q. -- finish your answers before asking anything else.

Sound good?

A. That's -- that's good.

Q. Is there any reason why you are unable to testify truthfully and completely today?

A. No.

Q. Do you know what this case is about?

A. Kind of.

Q. Could you try to explain your understanding the best you can?

A. I know that Michael Dunn has a lawsuit against the City and some of the officers. I don't know what it's in reference to. I just know that there's a lawsuit and that State Police was named in the lawsuit or -- but no particular officers from State Police were named.

Q. You mean as parties?

A. As parties, yes.

Page 11

Q. Okay. What, if anything, did you do to prepare for today's deposition?

A. Nothing.

Q. Did your -- you didn't review any documents?

A. No.

Q. Did you speak to anyone besides the call earlier about timing and scheduling about today's deposition?

A. No.

Q. And for the record, are you represented by counsel?

A. I am not.

Q. What is your educational background?

A. High school education and police training.

Q. Do you have any professional certifications or licenses?

A. I have some police certifications. I mean, there's quite a few, but I don't know if I can think of them all right now.

Q. Okay. Was -- what was your first job out of high school?

A. I did carpentry work, and then I did some nondestructive testing in the plants in

Page 12

Baton Rouge, and then I became a police officer with Eunice P.D.

Q. What year was that?

A. 1997.

Q. And how long were you -- how long were you employed by the Eunice Police Department?

A. Four years, four months.

Q. And what was your role there?

A. Just patrolman.

Q. The whole time?

A. I was a detective for a short period of time but not long.

Q. And after Eunice Police Department, where did you go next?

A. I got hired with Louisiana State Police.

Q. And what year was that?

A. 2001.

Q. What was your first position with Louisiana State Police?

A. I was a cadet in the academy for six months, and then I went to Troop I in Lafayette. I was assigned patrol in Troop I.

Q. And by the way, would you mind if I refer to Louisiana State Police as LSP?

A. That's fine.

Page 13

Q. How long were you in that position?

A. In patrol, two -- about two years, two and a half years.

Q. And what did you do next?

A. I got transferred to narcotics.

Q. How long were you in that position?

A. I was in that position for nine and a half years.

Q. And is that the position you're still in now?

A. No. I got promoted out of that position into an evidence custodian position. I did that for three years, and then I transferred back to narcotics as the supervisor.

Q. What year did you transfer back to narcotics?

A. 2017.

Q. And is that your current position?

A. No. I'm currently in detectives, I just transferred in September to detectives.

Q. You transferred from narcotics?

A. To detectives, yes.

Q. Thank you.

Aside from that stint you mentioned at Eunice Police Department, have you ever been



Walter Mire                                                           December 19, 2024
                                                                     Pages 14 to 17

Page 14

employed by the Eunice Police Department?

A.  No.

Q.  Have you otherwise been employed by the City of Eunice?

A.  No.

Q.  Switching gears, I'm going to ask you some questions about LSP's policies and procedures.

A.  Sure.

Q.  Does the Louisiana State Police investigate misconduct by local police departments?

A.  Yes.

Q.  Can you give some examples of the types of police misconduct LSP investigates?

A.  Our detective section does -- we do police shootings, so use of force for police shootings.  We do malfeasances in office cases or we'll do -- I'm trying to say this the -- like fraud, if they're embezzling money, stuff like that.

We kind of pick which ones we'll investigate.  We don't do like rights violations or anything like that, no civil stuff or any federal rights violations, we don't do stuff like

Page 15

that.

We'll do batteries.  You know, if during the use of force they committed a battery against the suspect, we'll investigate stuff like that.  We kind of pick the ones we want or sometimes they're assigned by our command.  It just comes down from our chain of command, we have to investigate it.  So we look into that stuff.

Q.  Does anyone else at LSP investigate rights violations?

A.  No.

Q.  And just for clarification, when you say "detectives," is that the same thing as investigations?

A.  Yes, yes.

Q.  I know you mentioned a little bit about this, but how does LSP choose which potential misconducts to investigate?

A.  We just vet them.  We don't -- so you have to understand, during elections, election season, that every sheriff is crooked, every politician that's running is crooked, and they all come to us and say, You need to investigate it, they did this, they doing this, they doing that.  And it's just a -- it's just a game that the

Page 16

opponents are playing against each other.

So we vet the investigations.  If we started a -- we'd have a hundred investigations a week if we don't vet them.  So -- and we just don't have the manpower to do that.  So we vet the investigations ourselves.

Q.  So the complaints tend to pick up around election season?

A.  Oh, absolutely.

Q.  Are there any written LSP policies and procedures that concern how to respond to complaints of misconduct by local police departments?

A.  Yeah.  Well, we have a -- we have a policy in the bureau of investigations in LSP that says how we're going to handle complaints, and it kind of outlines the process.

Q.  It's a written policy?

A.  Yes.

Q.  And how long has that been around?

A.  As long as I've been in the bureau, which is 20 years.

Q.  And you said it lays out a typical process for how to respond to complaints?

A.  Yeah, just how to -- how to investigate

Page 17

it, how to write your reports and stuff like that, how they typically want their reports written and laid out.

Q.  Does LSP work with the local police department when there is a complaint about the misconduct in that department?

A.  Yes.

Q.  Is it typical to notify the local police department when there's a complaint?

A.  Yes.

Q.  And what will LSP tell a local police department?

A.  If a police officer is the suspect in a crime, we'll discuss with the -- we usually discuss -- if it's a larger police department, we'll talk to the internal affairs and the chief or the sheriff and we'll just discuss what we have, what the complaint is, what -- how we expect to move forward, you know, in dealing with the complaint.

Or if it's a serious complaint, we let them know, especially if it's, you know, something violent or something -- you know, just a serious felony, then we kind of have to let them know that, Hey, this guy is accused of that and he's



Walter Mire

Page 18

still out there, you might need to put him on administrative leave or something like that just to -- for public safety purposes.

Q.   Do you typically disclose who made the complaint?

A.   No, no.  I mean, victims have certain rights that we can't disclose.  So if it's -- if it's a serious crime, we probably wouldn't.  Typically they know about it already, you know, the officer knows, the P.D. knows, the sheriff knows, or they're the ones that are coming to us with the complaint.  That happens pretty often.

Q.   So if it's not a victim but the complaint was brought to LSP's attention by another officer, you tell the chief of the local police department that?

A.   Not necessarily.  We look into it, and if it has merit, we'll -- we'll try to investigate it if we believe it has merit.  If we don't believe it has merit, we just don't deal with it.

Q.   If the local police department says that they would prefer to handle a complaint concerning potential misconduct through local or internal channels, does LSP typically defer to that decision?

Page 19

A.   We would sometimes, yes.  We would let them handle it themselves if that's what they chose to do.  Some departments do that, larger departments do that; other departments do if it's just a -- if it -- if we get a complaint and it's more of a -- of a policy violation for that department and not a criminal act, then we're not -- we're not going to investigate it at all.

Q.   Even if the local police department wanted you to, you wouldn't do it?

A.   No.  It has to be some type of crime.

Q.   During your time at LSP, have you ever worked on investigations of local police misconduct?

A.   Yes.

Q.   How many roughly?

A.   I don't know offhand.  I've never been a case agent on one, but I've assisted other agencies.

Q.   Was this in your role in narcotics?

A.   Yeah, I typically -- we have a small narcotics section and a small detectives section, so we rely on each other to help.  So we kind of work across those lines.  So I've been helping with detectives for -- since I've been a

Page 20

supervisor with narcotics.

So since about 2017, I've helped on a lot of detective cases, and the detectives are the ones who would usually do police misconduct.

Q.   You can't put a number on it?

A.   No.

Q.   I'm going to ask some questions that are not specific to investigations of misconduct by local police departments.

As a general matter, does LSP collaborate with local police departments?

A.   Yes.

Q.   What type of things do they collaborate on?

A.   All -- all -- all things.  Community related, criminal.  I mean, we exchange information for intelligence, you know, just to keep up.  If we -- if we -- if State Police is investigating a crime and the suspect lives in a certain city, we'll contact the locals just to get intel from them, Hey, who's this, do you know him, do y'all have information about him.  We work with all agencies all around.

Q.   When someone from LSP is collaborating with a local police department and they observe

Page 21

misconduct or become aware of misconduct by someone in the local police department, is there a policy about how to respond to that?

A.   If we're working together in a particular incident and the conduct is in front of us, we're obligated to stop it and to say something.  If it's a -- if it's just something we heard, you know, Hey, he's -- he did something, well, we'll take it, you know, under advisement really, just kind of, Okay, we'll keep our eye on him, if we don't have any proof or nothing like that.  But we won't just start an investigation.

Q.   But it could lead to be an investigation?

A.   Maybe.  Depends who's telling you, you know, who's telling the story, who's -- does it have any merit at all, is it just somebody mad at somebody else, you know.

Q.   You think someone is just mad at somebody else and --

A.   It happens all the time.  People are petty.  I can tell you that.  That's a fact, you can write that down.  People are petty.  They will cry about everything that doesn't go their way.

Q.   That includes other police officers?



Walter Mire

December 19, 2024
Pages 22 to 25

Page 22

A.   That includes everybody.  You too, me too.

Q.   Have you worked on cases with the Eunice Police Department in your role as LSP?

A.   I have, many times.

Q.   Could you put a number on it?

A.   No.

Q.   Just a lot?

A.   I -- yeah, a lot.  I've done narcotics cases with them; I've helped them with shooting cases; I've helped them -- just intel-driven stuff, federal narcotics cases.  We've done quite a bit in Eunice.

Q.   What's your opinion of Eunice Police Department generally?

A.   I have -- I don't know a bunch of the -- the department itself.  It's a police department.  The people that work there, I don't know a bunch of them because they just younger than I am and they kind of rotate in and out pretty quick.  The ones that have been there a while, I know them.  I don't -- I don't have any issues with them.

Q.   Did you have more of an opinion, say, five years ago when you knew more of the people?

A.   No.

Page 23

Q.   Are you aware of Eunice Police Department's reputation in the law enforcement community generally?

A.   It's good.

Q.   It's just generally good?

A.   Uh-huh.

Q.   Have you ever received complaints about the Eunice Police Department?

A.   No, not that I can remember.  The department in general or --

Q.   The department in general or specific individuals in the department.

A.   I know we handled -- like detectives handled a case where -- and it was one that Michael Dunn brought to us, complained to us, where an officer punched somebody in the lobby that he was arresting -- or punched somebody in the department that he was arresting.  The guy was handcuffed and the officer punched somebody and Michael Dunn brought it to us.

Q.   And what did LSP do after Lieutenant --

A.   We investigated.

Q.   Excuse me, just let me finish.

A.   Oh, I'm sorry.

Q.   It's really more for the court reporter

Page 24

than for us.  I don't mind personally.

A.   That's fine.

Q.   What did LSP do once Michael Dunn brought that to your attention?

A.   We investigated it.  We talked -- we interviewed the officer.  Well, we interviewed the officer and we tried to interview Michael Dunn.  He refused to come in and give us information.  He refused to sit down with us and interview.  And he was the complainant, so we were like, Well -- we didn't understand why he didn't want to tell us because he's the one that complained to us that it happened, but he wouldn't interview us.

We contacted the victim, or the person that was arrested, and he didn't want to cooperate and said he was not a victim, he did not -- he don't want to talk about it, it has nothing to do with him, he was drunk, and he didn't want to be involved with an investigation.  So I think we just closed the case out.

Q.   Who told you Lieutenant Dunn didn't want to talk to you about it?

A.   He did.

Q.   Do you remember that conversation?

A.   It wasn't me in particular, it was my

Page 25

supervisor.

Q.   And who is that?

A.   Lieutenant Brad Guidroz.

Q.   And he didn't say -- he didn't -- strike that.

He didn't tell you why Lieutenant Dunn didn't want to come in?

A.   I don't know.  I don't know why.  He just said that they tried to get him to come in and do an interview and he just refused to come in and give an interview.

Q.   But you don't have any personal knowledge of why?

A.   No, I do not.

Q.   Did you talk with Chief Fontenot about that incident?  And by "that incident," I mean the punching incident separate from Lieutenant Dunn.

A.   I don't know if -- I did not talk to him.  I don't know if he was still the chief at the time.  I don't know if -- the current chief, Kyle LeBouef, may have been the chief when this occurred, but I'm not -- that could be mistaken.  It's been a while and I just didn't...

Q.   Do you remember what year this was roughly?



Walter Mire
December 19, 2024
Pages 26 to 29

Page 26

A. It's within the past couple of years.

Q. As a general matter, do you know Lieutenant Dunn?

A. Yes.

Q. How long have you known him?

A. It's been a while. I've worked with him before on cases and stuff. He was a K-9 handler, so we used him as a K-9 handler. He used to give me intel on some drug dealers in Eunice and we worked the case -- some cases together.

Q. How long have you known him in that capacity roughly?

A. Oh, man. It's hard to put an exact time on it, but years. Because, I mean, he started there, I knew him -- I knew of him when he started there. And then I don't know how long he's been working with Eunice P.D., but I've known him most of the time he's there.

Q. Have you had contact with him outside of work?

A. No.

Q. Would you describe your relationship with Lieutenant Dunn as good?

A. I don't have any issues with him.

Q. Do you remember a drug dealer named

Page 27

Dexter Mayes?

A. I do.

Q. Are you also aware of a drug dealer named Keith Tran?

A. I do.

Q. Do you know if Tran was arrested in May 2019?

A. Yes, he was.

Q. Was LSP involved in that arrest?

A. We were not involved in the arrest. We debriefed him after the arrest.

Q. What do you mean by debrief?

A. We interviewed him after the arrest about where he got the drugs from, and that led us to Dexter Mayes' trailer house. We actually got a search warrant off of Tran's interview and we -- I don't know if it was later that night or the next night, we did a search warrant on Dexter Mayes' house, which was outside of the city limits of Eunice.

Q. And when you say that Tran led you to Dexter Mayes' house, he told you that he bought drugs at that house; is that correct?

A. Yes. He said he bought the drugs that he had in his possession from Dexter Mayes at that

Page 28

house.

Q. Were -- and you said LSP was involved in the arrest of Mayes also in May 2019?

A. Yes.

Q. When I --

A. He was -- Dexter Mayes was stopped by -- by -- HSI was running the case, Homeland Security was running the case, but it was stopped by a criminal patrol unit in Calcasieu Parish, I'm not sure what agency though. And he was transporting meth back from Houston to Eunice.

Q. So those were the agents that actually made the arrest of Mayes?

A. They arrested Mayes because -- and when they were making the traffic stop on Mayes, we were executing our search warrant at his house.

Q. I'm sorry if you might have already said this, but those agents are also LSP?

A. No.

Q. Local police department?

A. No. It was -- I believe it was Calcasieu Parish --

Q. The sheriff?

A. -- sheriff's department that did the actual traffic stop. But the agency that was

Page 29

running the investigation was Homeland Security, HSI.

Q. Does Department of Homeland Security -- you're referring to the federal government?

A. Yes.

Q. Okay.

A. Yeah. I was attached to the Drug Enforcement Administration, DEA, and we were doing -- we had an investigation on Mayes. HSI had intel from a Houston source that Mayes was picking up narcotics in Houston.

We got the information from Eunice P.D., from Tran, that Dexter was selling out of his house in Eunice, which we already knew that because we were investigating him. Tran gave us enough probable cause to get a search warrant for his house.

So when we got the search warrant, they told us that he's coming back from Houston with a load of dope, we're going to stop him, when we stop him, we going to tell y'all, y'all do the search warrant of his house.

Q. Understood. And what was your role personally in this?

A. I was the supervisor for LSP narcotics.



Walter Mire                                                                                    December 19, 2024
                                                                                               Pages 30 to 33

Page 30

Q.   And when you said you were attached to DEA, are you referring to the federal DEA?

A.   Yes.

Q.   So sometimes an LSP narcotics person will be assigned to DEA?  How does that work?

A.   It's a -- it's a -- we call it a task force.  At the time, all of State Police narcotics in Lafayette was attached to DEA as task force agents.  So it was me and three or four guys that worked for me, three or four State Police agents that worked for me that were attached to DEA.

Q.   Around the time of the arrests of Tran and Mayes, did you have a conversation with Lieutenant Dunn?

A.   I -- he came out that night and helped us.

Q.   How did he help you?

A.   He -- we had information that Dexter Mayes had a storage facility, a storage locker, in Eunice, and we called Lieutenant Dunn out to come and run his dog on that storage facility.  And he used his K-9 on the storage facility.  And we got a search warrant for the storage facility that night.

Q.   Besides the storage facility and the

Page 31

K-9, did you discuss anything else with --

A.   I don't remember -- not --

Q.   Excuse me.

A.   I'm sorry.

Q.   No problem.

A.   Go ahead.

Q.   I'll start over.
     Aside from the storage unit and the K-9, did you discuss anything else with Lieutenant Dunn about the case?

A.   He was giving me information, Dunn was giving me information about Dexter because Dexter lived outside of their city limits.  So he was -- he had been feeding me information.
     He had also been telling me about Tran, who lived in -- he lived in a mobile home on the outside of the city limits also.  So I was getting information from him as well on Tran.

Q.   Did he bring a --

A.   But --

Q.   Sorry, go ahead.

A.   But he didn't -- he didn't initiate the contact with us that day with Tran because he -- Tran -- he wasn't -- I don't think he was involved in the arrest of Tran or the stop of -- the

Page 32

traffic stop of Tran.

Q.   Did he ever bring up in connection with the arrest of Tran a controlled narcotics buy that occurred outside of the jurisdiction of Eunice?

A.   No, I don't recall that.

Q.   Would you agree that it's inappropriate for a local police officer to set up a controlled narcotics buy outside of the local police officer's jurisdiction?

MR. REED:
     Object to form.

BY MR. HORNER:

Q.   You can answer.

A.   Yeah, I do agree.  I've actually arrested somebody who was claiming to be a police officer for that very thing.

Q.   Was that person a police officer?

A.   I don't think he was.  The sheriff -- he was a -- he was a rich man pretending to be a police officer, and the sheriff was okay with it.  So...

Q.   But even if someone was a police officer, if they were operating outside their jurisdiction in terms of a controlled buy, that would still be inappropriate?

Page 33

A.   I believe so, yes.

Q.   But Lieutenant Dunn never brought up any incidents of controlled buys happening outside the City of Eunice orchestrated by EPD officers?

A.   No, not that I can remember.

Q.   Have you ever discussed Lieutenant Dunn with Ryan Young?

A.   I've had conversations, yes, with Ryan.

Q.   What were the substance of those conversations?

A.   Just bullshitting, talking.

Q.   About Lieutenant Dunn?

A.   He's brought him up before, yes.

Q.   In what capacity?

A.   Just his opinion of him.

Q.   And what's that?

A.   Ask him.

Q.   You have to -- you can't tell me what he told you?  Strike that.
     You can't tell us what he told you?

MS. WALL:
     Object to the form.

BY MR. HORNER:

Q.   You can answer.

A.   I don't know if I can remember



Walter Mire                                                                    December 19, 2024
                                                                              Pages 34 to 37

Page 34

everything he says.  And, I mean, I would be telling you just bits and pieces of it because I don't -- I don't know.

Q.  What are those bits and pieces?

A.  I don't know, that he's just a crybaby, crying about everything that goes wrong in his life and blaming it on somebody else.  That's just my way of expressing it.

Q.  Have you talked to Chief Fontenot about Lieutenant Dunn?

A.  I don't remember.  I had a call -- I talked to Randy about something, and I'm -- I can't remember the conversation.  And that's when I first got his phone number.  And I remember where I was at in my house talking to him, but I can't remember what we were talking about.

So I don't know if that conversation was about Dunn or not.  And it could have been, but I don't remember.

Q.  And do you roughly remember when that was?

A.  No.  A couple of -- a few years ago, you know.  That's the best number I can put on it, a few years ago.

Q.  Do you recall any instances of

Page 35

Lieutenant Dunn raising potential police misconduct at the Eunice Police Department to you?

A.  No.

Q.  So even though you said everyone in general complains about something or other, including police officers, you don't recall Lieutenant Dunn doing that?

A.  I don't.

Q.  So he hasn't been a crybaby in your interactions with him?

MS. WALL:
Object to the form.

MR. REED:
Object to form.

BY MR. HORNER:

Q.  You can answer.

A.  He doesn't both -- I like him.  I like Dunn.  I don't have any issues with him.  He didn't cry to me.

Q.  Do you know Chief Fontenot?

A.  I do.

Q.  How long have you known him?

A.  A very long time.  He was a detective when I first started with Eunice P.D.

Q.  And have you worked with him as you

Page 36

moved to LSP?

A.  He retired while I was there, I believe. Yeah, while I was working for Eunice P.D., he retired.  So I hadn't -- I'd see him around town and stuff like that.  And then when he became chief, we interacted after he became chief.

Q.  How would you describe your relationship with him?

A.  It's fine.

Q.  Aside from that one phone call you raised, has he ever talked to you about Lieutenant Dunn?

A.  No.

Q.  Has he ever talked to you about this litigation?

A.  Down in the lobby.  I asked him, I said, What -- I don't even know why I'm here.  And he said, Well, it's upstairs, they'll talk to you upstairs.

Q.  Did you talk -- say anything else during that conversation?

A.  No.  Just -- he just asked me if I ate; I said, No, I didn't even eat.  Then --

Q.  That's -- that's the full extent of the conversation?

Page 37

A.  Yeah.  We were just talking about the check that y'all sent with the subpoena.  I'm like, I don't even know if I should cash this check or not, I'm on a duty, do I cash the check, I'm on duty.

Q.  I'll leave that up to you and your department.

Do you know Officer Victor Fontenot?

A.  I do.

Q.  How long have you known him?

A.  Man, these times and dates.  I don't know.  He was -- when he became -- when he got into the narcotics section of Eunice P.D., whenever that was, is when I first heard of him or met him.

Q.  And that's how you've gotten to know him, through narcotics work?

A.  Yes.

Q.  And how would you describe your relationship with him?

A.  It's fine, good.

Q.  Has he ever talked to you about Lieutenant Dunn?

A.  Yes, he has.

Q.  In what way?



Walter Mire                                                    December 19, 2024
                                                              Pages 38 to 41

Page 38

A. He called me and Abner Williamson, who's a State Police agent -- he's a sergeant now for narcotics, but at the time he was an agent. And he was telling us that he had information that Michael Dunn was dirty, like a crooked cop or involved in narcotics trafficking or something like that.

Q. And when was that roughly, if you can remember?

A. Maybe 2019, 2020, in that timeline. But I'm not sure of the date.

Q. And what did you tell him when he said this?

A. He told us that he had an informant that gave him that -- that gave Victor the information and he wanted us to handle it. And we're like, Okay. He wanted us to do it because he didn't want to deal with it. He wanted us to come handle it and investigate it. So we went meet the informant at his office.

Q. And what happened when you met the informant in the office?

A. We -- I didn't. My guys, Abner Williamson and Nathaniel Batiste, interviewed the informant. And it just -- he wasn't -- he didn't

Page 39

give us any information.

Q. So it died because --

A. It died because of that, yeah.

Q. Why do you think the informant -- strike that.

Do you think that the informant actually had told Victor Fontenot this information?

MR. REED:
Object to form.

MS. WALL:
Object to the form.

A. I don't know. He didn't tell us.

BY MR. HORNER:

Q. Do you think it's possible that Victor Fontenot made it up?

MR. REED:
Object to form.

A. I don't know.

BY MR. HORNER:

Q. Has he ever -- strike that.

Has Victor Fontenot ever brought any tips to LSP that didn't pan out later?

A. He had -- he gave us some information on a few people that were selling narcotics in the city, and we actually arrested them. We -- it all

Page 40

worked out and we arrested them. They were tied up in a federal Title 3 wiretap case.

Q. What about instances where it didn't pan out?

A. I mean, we get --

Q. Strike that.

What instances where it didn't pan out besides the one we discussed?

A. I don't think so. I mean, we get information all the time. You know, you get information and it doesn't pan out or you just can't -- you can't act on it or you just don't have enough to act on it or you don't have a way to get into the -- to the -- you know, you don't have an informant or it's just information, just kind of like intel, you know.

Q. In addition to the instance about the CI that didn't pan out, has Officer Victor Fontenot ever brought up Lieutenant Dunn to you?

MS. WALL:
Object to the form.

MR. REED:
I'm sorry, can you repeat the question? I just didn't hear you.

Page 41

BY MR. HORNER:

Q. Let me rephrase.

Aside from the one instance involving the CI, has Officer Victor Fontenot ever brought up Lieutenant Dunn to you?

A. No, not that I can remember. Just that instance.

Q. Has he ever brought up this litigation to you?

A. No.

Q. Can you describe your relationship with Ryan Young?

A. Very good friends. He was the best man in my wedding.

Q. And when did you first meet him?

A. 1998.

Q. And where was that?

A. At Eunice P.D.

Q. And that's how you became friends?

A. Uh-huh.

Q. And then you've stayed in touch even after you went to LSP?

A. Yes.

Q. And you've continued to work together?

A. Yes. We occasionally talk. We hadn't



Walter Mire                                                                December 19, 2024
                                                                          Pages 42 to 45

Page 42

worked together in a while, but if there's some serious crime that happened in Eunice, I'll call him just to get, you know, the information on it just so I have that, so I know -- you know, if somebody gets shot, Hey, who got shot; or if there's a drug bust, Hey, who'd y'all bust or what's it about. But we're friends and sometimes we talk just to talk.

Q. So you continue to have contact with him outside of work?

A. Absolutely, yes.

Q. You mentioned what he's told you about Lieutenant Dunn. Has he ever brought up this litigation to you?

A. He just said that he's suing him, that Dunn is suing him, that's it.

MR. HORNER:
    Do you mind if we take a five-minute break?

THE VIDEOGRAPHER:
    We are off the record. The time is 12:15.

(A break was taken.)

THE VIDEOGRAPHER:
    We are back on the record. The time

Page 43

is 12:23.

BY MR. HORNER:

Q. I want to circle back to the incident with Officer Victor Fontenot and the CI.
    Do you know, was the issue with the CI that he just didn't give any information about Lieutenant Dunn?

A. I wasn't in the room with them. I didn't interview him. I let Abner and Nate interview him. And they -- he would not tell them anything about Dunn. Like he would -- he said nothing -- like he denied any allegations of Dunn being dirty or anything like that.
    So Victor told us that Dunn was dirty and that this informant -- and I'll tell you who the informant is because he's not really an informant, is Josh Dupre, that's who he is. Josh told Victor that he was paying Dunn some money, I don't know how much --

Q. This was according to Victor?

A. According to Victor.
    So we told Victor, Okay, we'll go and will he talk -- we asked Victor, Will Josh talk to us? Victor said yes. We went there. We met with Victor and Josh. And Abner and Nate talked to

Page 44

Josh and asked him questions. They told Victor not to say anything, to -- I don't even know if Victor was in the room. He may have been in the room with them.
    But they just asked Josh about Dunn. And he didn't give them any information about Dunn and, you know, denied the allegations that Victor had brought up.

Q. Have you had any other interactions with Josh Dupre?

A. We had an investigation I think that he was -- he was a party to that investigation and he may have been indicted, I don't remember. Because we indicted a bunch of people, I think 12 people in Eunice, and he may have been one of the people indicted, but I don't remember. I know he was involved in the investigation, but I don't know if he got indicted or not.

Q. So you don't know what happened to him?

A. No.

Q. Did --

A. I don't know him. I never talked to him. I never met him.

Q. Did LSP open a case formally about -- strike that.

Page 45

    Did LSP open a case formally based on Victor Fontenot's accusation?

A. No. We vetted it. And he told us that Josh told him that. We asked Josh, and Josh didn't tell us. So we were like, Well, if he's not going to cooperate, if he's not going to tell us, then we can't do anything with it.

Q. So there's no case number associated with this?

A. No.

Q. Do you think there were any notes of the discussion with Josh Dupre?

A. Maybe. I don't know. I don't have any notes. If they did take notes, that was quite a while ago, so I don't know if they would still exist today.

Q. Were there any -- strike that.
    Would there be any other paperwork related to this whole incident?

A. No.

Q. You said earlier you don't remember Dunn raising issues of controlled buys outside the jurisdiction of Eunice, correct?

A. Correct.

Q. Is it that you don't remember one way or



Walter Mire                                                December 19, 2024
                                                           Pages 46 to 49

Page 46

the other, or are you sure it didn't happen?

A.  I don't remember when he -- I don't remember talking to Dunn about that.

Q.  Just a few finishing questions.

When did you become aware of that lawsuit?  I think we touched on this a little bit, but can you be as specific as you can.

A.  I believe that Ryan told me about it, a lawsuit, and that State Police was mentioned in it but no particular State Police officer.

So Brad Guidroz, who's my lieutenant, went -- or who was my lieutenant, he went to the federal courthouse to get, I guess, a copy of it or a copy of the lawsuit or to find out who with State Police was mentioned, if anybody, and there was no particular name in it for State Police.

And then we sent it to our -- we just let our legal section know, State Police legal section.

Q.  Did you let your legal section know about this deposition?

A.  Yes.

Q.  Why do you think Lieutenant Guidroz went to the courthouse?

MR. REED:

Page 47

Object to form.

A.  He went because -- because of the complaint that Dunn made to State Police about the officer doing the battery on the suspect.  So he wanted to see what -- if anybody with State Police particularly was named to see what it was in reference to.

BY MR. HORNER:

Q.  You said you're good friends with Ryan, correct?

A.  Yes.

Q.  How many times roughly would you say you've discussed this lawsuit with him?

A.  I don't -- like the discussions we've had about it was like, Why he's suing you?  And he's like, I don't know, he's just -- he don't know.  You know, he was complaining about some stuff happening at the police department, so he's naming everybody at the police department in the lawsuit.

And I've asked him, Well, who he's complaining about with State Police?  And he just don't -- he doesn't know.  So, I mean, we've had a conversation or two about it, but nothing in particular.

Page 48

Q.  Aside from the incident -- the punching incident we discussed, are you aware of any other instances where Lieutenant Dunn reported misconduct to LSP or any other agencies?

A.  No.

Q.  Do you have any documents that are relevant to any of the matters we talked about today?

A.  No.

MR. HORNER:

I have no further questions.  Thank you very much for your time.

MS. WALL:

Can we take a break for a second?

THE VIDEOGRAPHER:

Sure.  We are off the record.  The time is 12:30.

(A break was taken.)

THE VIDEOGRAPHER:

We are back on the record.  The time is 12:37.

EXAMINATION

BY MS. WALL:

Q.  Okay.  So just briefly, I wanted to go back to the questions regarding Joshua Dupre and

Page 49

the complaint about Michael Dunn.

I believe you testified earlier that Joshua Dupre denied ever saying anything negative about him and he didn't cooperate?

A.  He didn't tell us anything.  I don't -- like I wasn't in the interview, but what they came back and told me was that, He didn't tell us that Dunn was dirty, you know, he didn't tell us.  Victor says he told -- you know, Josh told Victor, but Josh is not telling us.  So he's not giving us any information, so we can't act on it.

Q.  Okay.  I'm going to show you what --

A.  I see it.

Q.  So can you review that for me.

A.  Yeah.  It looks like a statement from Josh Dupre.  I can't move it up.

MR. HORNER:

Is there a way to mark that?  I mean, I know it's not physically in existence, but just for purposes of the record.

MS. WALL:

Yeah.

THE VIDEOGRAPHER:

Is there a Bates number?  Yeah, a



Walter Mire                                                        December 19, 2024
                                                                  Pages 50 to 53

Page 50

Bates number at the bottom.
    MS. WALL:
        Okay. What exhibit number?
    THE COURT REPORTER:
        1.
    A. Can you scroll back down? I wanted to read it.
    THE COURT REPORTER:
        So this will be Exhibit 1.
        (Exhibit 1 was marked.)
    A. Okay.
BY MS. WALL:
    Q. Can you tell me whether or not the information contained in this exhibit is the information that was told to you by Victor Fontenot?
    A. It is, I think it is, because I remember that he -- so you see this "5.0" right here? That's referring to 5.0 Mustang. And I remember something about Dunn owning a 5.0 Mustang, which I don't know if that's accurate or not. But I guess that's what this is about.
    Q. Okay. And this is the statement from Joshua Dupre?
    A. Uh-huh.

Page 51

    Q. But when questioned about this, he denied the allegations, correct?
    A. I don't know if he denied them. Because when we go to do an interview, we go to them and we ask, Okay, so you're wanting to give us information freely, tell us what you want to tell us. So he just didn't tell us.
        So we didn't -- I don't know if they asked questions. But when we conduct interviews of an informant or of somebody wanting to give information, we don't lead them; we just say, Okay, tell me what you want to tell me, I'm here, tell me. And I think he just didn't say it, like he wouldn't say it when we were in there.
    Q. So I don't recall if you testified about this earlier, but was it Joshua Dupre that came to you guys initially to make the complaint?
    A. No. We got a phone call from Victor, and Victor told us that Joshua was giving information about Dunn. So we went and talked to Joshua.
    Q. Okay. Were you contacted by any attorneys in reference to your testimony today?
    A. No.
    Q. Anything with respect to the subpoena?

Page 52

    A. I -- we forwarded the information to State Police legal just to -- just so they were aware of it. So we -- we -- it was me and my lieutenant, Brad Guidroz, sent the information to State Police legal just to say, Hey, I'm subpoenaed for this, are y'all going to come with us as legal representation.
        And they asked if -- what was the statement of fact, what's this all about. And I just said I didn't know. And they -- and I didn't get any more correspondence from them.
    Q. So you mentioned you received a check?
    A. Yes.
    Q. Who was that from?
    A. It was with the subpoena.
    Q. It was with the subpoena?
    A. Yeah, it was with the subpoena. When they served me with the subpoena, there was a check for $98. I don't know who it's from. It's sitting on the island at my house. I just left it there. I don't know. I -- it's there, I just don't know who it's from.
    Q. You never had any conversations with any attorneys about a fee amount, though, for your deposition?

Page 53

    A. No.
    Q. Was there any description with the check other than a subpoena?
    A. I don't remember. It's attached to the subpoena and the -- I'm trying to remember what's attached to it. I don't know. It's the subpoena and I think the location of where the deposition was going to be and stuff like that. I can't tell you exactly what's in there.
    MS. WALL:
        I think that's all the questions I have.
    MR. REED:
        I'm good.
    THE VIDEOGRAPHER:
        This concludes the --
    THE WITNESS:
        Can I -- I need to give some information. Can I do that?
    MS. WALL:
        Sure.
    MR. HORNER:
        Sure.
    THE WITNESS:
        So you had asked me a question about



Walter Mire

Page 54

Dunn and being involved in any investigation with LSP. He has been in two shootings with the police department, just to let y'all know, and the State Police investigated.

He was involved in two shootings, we investigated both, and he was cleared of -- you know, he just was doing his job at the time. So there's no criminal charges. But so he is involved in those two investigations, both closed.

So I didn't want y'all to go search records and say, Well, oh, here's a report with Dunn's name on it, he didn't tell us about it. He has been involved in those. So I don't think it's relevant to this, but just to let you know.

MR. HORNER:

Okay. Thank you for the clarification.

THE WITNESS:

Okay.

THE VIDEOGRAPHER:

This concludes the deposition. We

Page 55

are off the record. The time is 12:45 p.m.

(END OF TESTIMONY AT 12:45 P.M.)

Page 56

REPORTER'S PAGE

I, RITA A. DEROUEN, Registered Professional Reporter (RPR #6908) and Certified Court Reporter in and for the State of Louisiana, (CCR #2014018), as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any spelling of words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)";

That (sic) denotes when a witness stated word(s) that appears odd or erroneous to show that the word is quoted exactly as it stands.

RITA A. DEROUEN, RPR, CCR

Page 57

REPORTER'S CERTIFICATE

I, Rita A. DeRouen, Registered Professional Reporter (RPR #6908) and Certified Court Reporter (Certificate #2014018) in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that on December 19, 2024, in the above-entitled and numbered cause, the deposition of WALTER MIRE, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 56 pages;

That this testimony was reported by me in stenographic shorthand, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board;

That I have acted in compliance with the prohibition on contractual relationships, as



Walter Mire

December 19, 2024
Page 58

Page 58

defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I am not of Counsel, nor related to any person participating in this cause, and am in no way interested in the outcome of this event.

SIGNED THIS 6TH DAY OF JANUARY, 2025.

RITA A. DEROUEN
Registered Professional Reporter
Certified Court Reporter

