**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| MICHAEL DUNN, | |
| Plaintiff, | Civ. A. No.: 6:21-cv-01535 |
| v. | JUDGE ROBERT R. SUMMERHAYS |
| RANDY FONTENOT, VICTOR FONTENOT, RYAN YOUNG, CITY OF EUNICE, and JOHN DOE, | MAGISTRATE JUDGE DAVID J. AYO |
| Defendants. | |

**PLAINTIFF MICHAEL DUNN'S STATEMENT OF CONTESTED AND
SUPPLEMENTAL FACTS IN OPPOSITION TO DEFENDANTS
RYAN YOUNG AND CITY OF EUNICE'S MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to Federal Rules of Civil Procedure 56 and Local Civil Rule ("Local Rule") 56.2, Plaintiff Michael Dunn ("Lt. Dunn") respectfully submits this Statement of Contested and Supplemental Facts in Opposition to Defendants Ryan Young's ("Lt. Young") and Defendant City of Eunice's (the "City") motions for summary judgment. ECF Nos. 237, 241.

Part I contains Lt. Dunn's Response to the City's Statement of Uncontested Material Facts. ¶¶ 1–11. Part II contains Lt. Dunn's Response to Lt. Young's Statement of Undisputed Material Facts. ¶¶ 12–36. Part III contains Lt. Dunn's Supplemental Statement of Material Facts. ¶¶ 37–91. Any facts that Lt. Dunn does not dispute in Parts I and II are "undisputed" only for purposes of the instant summary judgment motions. In contrast, Lt. Dunn disputes any and all legal conclusions made by Defendants as improper statements pursuant to Local Rule 56.1(2), and any facts that Lt. Dunn does not dispute herein are not admissions of any legal conclusions.

1

## PART I.  LT.  DUNN'S RESPONSES TO THE CITY'S STATEMENT OF UNCONTESTED MATERIAL FACTS

1.      **City Statement of Fact, No. 1:** Dunn has been employed by the Eunice Police Department since 2010, has held the rank of lieutenant with the Eunice Police Department since 2016, and has never been demoted or disciplined.

**Lt. Dunn's Response: Disputed.**

**Lt. Dunn contests the City's statement that he has never been demoted or disciplined. The evidence shows that Lt. Dunn was actually and constructively demoted as part of Chief Fontenot's and the Defendants' retaliation against him.  On June 12, 2020, Randy Fontenot ("Chief Fontenot") disciplined and demoted Lt. Dunn by removing the canine program.  Ex. 1 (Lt. Dunn Tr. 55:6–19, 57:16–58:25); Ex. 2 (Chief Fontenot Tr. 334:6–22).[1]  This demotion caused Lt. Dunn to suffer loss of his title, substantial duties, a position of responsibility, and his dog.  Ex. 1 (Lt. Dunn Tr. 120:5–121:19, 123:11–25, 128:2–130:7, 131:17–133:14).  Chief Fontenot constructively demoted Lt. Dunn by removing him from narcotics duty after learning that Lt. Dunn reported an unlawful arrest to the Louisiana State Police.  Ex. 1 (Lt. Dunn Tr. 198:20–200:12).   Lt. Dunn was likewise constructively demoted when Chief Fontenot, Lt. Young and Officer Fontenot ostracized him in EPD, placed him on administrative leave, initiated baseless and sham investigations into him, and put him in "very dangerous" short-staffed shifts.  *See, e.g.*, Ex. 1 (Lt. Dunn Tr. 347:12–349:6, 141:20–142:5, 231:12–232:16, 264:13–265:6); Ex. 3 (Lt. Young Tr. 116:15–117:18); Ex. 4 (Ofc. Fontenot 198:21–199:9).  None of this should have happened, because Lt. Dunn's service record is "impeccable."  Ex. 5 (Ardoin Tr. 39:23–40:5; 244:21–25).**

---

[1] All exhibits are attached to the accompanying Declaration of Norman M. Hobbie Jr. in Opposition to Defendants Ryan Young's and the City of Eunice's Motions for Summary Judgment ("Hobbie Decl.").

2.    **City Statement of Fact, No. 2:** After Dunn made a Facebook post in August 2019 regarding alleged crime activity near his home in Eunice, then-Chief of Police Randy Fontenot placed Dunn on administrative leave with pay pending an investigation, which leave was reversed by either the City or the Eunice Fire and Police Civil Service Board.

**Lt. Dunn's Response: Undisputed.**

3.    **City Statement of Fact, No. 3:** After the reversal of Dunn's administrative leave with pay, the Board of Aldermen of the City of Eunice removed then-Chief Fontenot's ability to administer discipline.

**Lt. Dunn's Response: Disputed.**

**The Board of Alderman removed Chief Fontenot's authority to _hire and fire_; Chief Fontenot retained his authority to discipline officers under EPD's procedural orders. *See* Ex. 6 at 30 ("Final departmental disciplinary authority and responsibility rest with the Chief of Police."); *see also* Ex. 7 (Thibodeaux Tr. 26:3–19) (To avoid having suspension or demotions overturned, Chief Fontenot "started disciplining people that wouldn't be on paper"); Ex. 8 (Myers Tr. 141:18–142:13) (Chief Fontenot would make "work life as miserable as possible"). And, as explained *infra* ¶¶ 47–49, 57–88, Chief Fontenot repeatedly disciplined Lt. Dunn and other EPD personnel after having his authority to hire and fire removed.**

4.    **City Statement of Fact, No. 4:** During the tenure of Randy Fontenot as Eunice Chief of Police, he eliminated the Eunice Department's K-9 program in 20208 and never reinstated it during his tenure. As of January 6, 2023, the Eunice Police Department still did not have a K-9 program.

3

**Lt. Dunn's Response: Undisputed, however, Lt. Dunn was the sole canine handler from the period June 2017 through June 2020 and the program was eliminated to target Lt. Dunn.  Ex. 1 (Lt. Dunn Tr. 126:14–15, 412:1-3);** *see also* **Ex. 7 (Thibodeaux Tr. 194:5–6, 194:22–197:4) (explaining that, during the first canine program there were two dogs, but when Chief Fontenot terminated the program in June 2020, there was only one dog).**

5.	**City Statement of Fact, No. 5:** Dunn has handled various narcotics issues with the Eunice Police Department as a patrol lieutenant, but he has never been assigned specifically to narcotics duty, and he does not currently have required licenses or certifications from the Louisiana Board of Pharmacy and the DEA to handle narcotics.

**Lt. Dunn's Response: Disputed.**

**Lt. Dunn contests the City's statement that Lt. Dunn has never been assigned to narcotics duty.  From 2016 until 2019, Lt. Dunn served as a lieutenant in the narcotics division—a desirable job that provided additional responsibility, benefits, and pay.  Ex. 9 (Lt. Dunn Cont'd. Tr. 224:18–225:9); Ex. 1 (Lt. Dunn Tr. 198:20–199:23, 407:21–409:23).  In that capacity, he supervised and assisted in the management of narcotics-related investigations.  Ex. 1 (Lt. Dunn Tr. 408:13–409:6).**

6.	**City Statement of Fact, No. 6:** The City is in possession of a written statement from Joshua Dupre stating that he paid Dunn for information.

**Lt. Dunn's Response: Disputed.   The City has presented no evidence during discovery—nor in support of this statement—to show who made the purported statement or how it was obtained.  Moreover, the statement speaks for itself and is directly undermined by Joshua Dupre's October 2020 testimony, which postdates the statement.** *See* **Ex. 10 at 11;** *see also infra* **¶ 76.**

4

7.        **City Statement of Fact, No. 7:** The City did not discipline Dunn because of the written statement of Joshua Dupre that he paid Dunn for information.

**Lt. Dunn's Response: Disputed.**

**With Chief Fontenot's approval, Victor Fontenot used Joshua Dupre's written statement as a pretext to launch an "unofficial" investigation against Lt. Dunn, which Chief Fontenot admitted was in violation of EPD policy.** *See infra* **¶¶ 69–80.  Under the guise of this sham investigation, Defendants smeared Lt. Dunn in the Eunice community and to other law enforcement agencies.** *Id.*  **Indeed, Mr. Dupre testified—under oath and after waiving his Fifth Amendment rights—that Victor Fontenot coerced him to falsely accuse Lt. Dunn in order to implicate Lt. Dunn in crimes he never committed and for which Defendants never uncovered any evidence.** *See infra* **¶ 76.**

8.        **City Statement of Fact, No. 8:** Dunn reported various instances of what he considered to be police misconduct to the Louisiana Attorney General's Office, the FBI, the St. Landry District Attorney's Office, the Louisiana State Police, and the St. Landry Parish Sheriff's Office, but none of those agencies took any action on his reports.

**Lt. Dunn's Response: Disputed in part.  Lt. Dunn reported EPD misconduct to the agencies identified but lacks sufficient knowledge to confirm or deny what steps, if any, those agencies took as a result.  Moreover, the City presents no evidence to support this assertion.**

9.        **City Statement of Fact, No. 9:** The position of Chief of Police of Eunice is an elected position.

**Lt. Dunn's Response: Undisputed.**

10.        **City Statement of Fact, No. 10:** Randy Fontenot did not run for reelection in 2022, and he was replaced by Chief Kyle LeBouef, who remains as Eunice Chief of Police to this day.

**Lt. Dunn's Response: Undisputed.**

11.     **City Statement of Fact, No. 11:** Dunn has made no complaint or objection to any acts, omissions, conduct, or policies of Chief LeBouef since the time that he became Eunice Chief of Police.

**Lt. Dunn's Response: Disputed.  Lt. Dunn continues to face misconduct and harm at EPD to this day.  *See infra* ¶¶ 89–91.**

### PART II.  LT. DUNN'S RESPONSES TO LT. YOUNG'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Lt. Young's statement of uncontested facts is largely devoid of facts and instead presents a series of conclusory statements.[2]  Lt. Young's Statements of Fact (5)–(25) are not facts at all, but legal conclusions that vaguely address the burden of proof for Lt. Dunn's claims.  In addition, Statements of Fact (5)–(24) all begin, "[t]he Plaintiff has failed in his burden to establish," and therefore do not properly assert any facts, because each statement implies a threshold issue rather than presenting or denying anything material.  The totality of these statements include no references to material facts in this matter.  Courts have recognized that where, as here, a moving party asserts legal conclusions and statements "questioning whether [a party] can produce any evidence to support a claim" and fails "to provide any competent summary judgment evidence material to" the claims, "no reasonable trier of fact could find" for the moving party.  *Bennet v. DG La,* LLC, 2025 WL 2997377 at *3–5 (E.D. La. Oct. 24, 2025).

12.     **Lt. Young's Statement of Fact, No. 1:** The lawsuit is brought against the City of Eunice, former Eunice Police Department Officer Victor Fontenot, and Lt. Ryan Young

---

[2] Local Rule 56.1(2) requires the movant to put forth the "material facts that the mover contends are not genuinely disputed."

("Young"), a Lieutenant and Chief of Detectives with Eunice Police Department ("EPD"). Young

is named in his individual capacity.

**Lt. Dunn's Response: Undisputed.**

13.    **Lt. Young's Statement of Fact, No. 2:** The Plaintiff pleads nine causes of action.

Only the following four claims are brought against Young:

(1) Free speech retaliation pursuant to the First Amendment (Count One)

(2) Civil conspiracy in violation of 42 U.S.C. § 1983 (Count Two)

(3) Intentional infliction of emotional distress (Count Six)

(4) Violation of Article 1, Section 7 of the Louisiana Constitution (Count Eight)

**Lt. Dunn's Response: Undisputed.**

14.    **Lt. Young's Statement of Fact, No. 3:** The Plaintiff does not include Young in his

claims for defamation (Count Three), civil conspiracy (Count Four), violation of Louisiana state

whistleblower statute (Count Five), false light invasion of privacy (Count Seven), or municipal

liability in violation of 42 U.S.C. § 1983 (Count Nine).

**Lt. Dunn's Response: Undisputed.**

15.    **Lt. Young's Statement of Fact, No. 4:** This lawsuit arises out of an alleged

conspiracy to retaliate against Michael Dunn ("Plaintiff" or "Lt. Dunn"), a Lieutenant with the

Eunice Police Department in Eunice, Louisiana, due to his reports to state and federal authorities

regarding the alleged conduct of members of the Eunice Police Department.

**Lt. Dunn's Response: Disputed in part.**

**This paragraph purports to summarize Lt. Dunn's Amended Complaint, which**

**speaks for itself and includes multiple causes of action and extensive factual allegations not**

**captured in this summary. In any event, Lt. Dunn does not contest that this lawsuit arose**

7

**from the conspiracy to retaliate against him in his role as a Lieutenant with the EPD. Lt. Dunn also does not contest that this retaliation was brought in response to his reporting of repeated and pervasive misconduct to state and federal authorities. Lt. Dunn also made reports through official internal channels. *Infra* ¶ 52.**

16.    **Lt. Young's Statement of Fact, No. 5:** The Plaintiff has failed in his burden to establish he suffered a recognized harm pursuant to his claim for First Amendment Retaliation.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact. Lt. Dunn disputes Lt. Young's conclusion because the facts establish that Lt. Dunn suffered a recognized harm giving rise to his claim for First Amendment Retaliation, including, for example, that the facts establish Lt. Dunn suffered serious mental and emotional harm, caused by Lt. Young's efforts to accuse Lt. Dunn of corruption and bribery. Ex. 9 (Lt. Dunn Cont'd. Tr. 43:5–10, 192:24– 193:2 194:2–10); *see also infra* ¶¶ 89–91.**

17.    **Lt. Young's Statement of Fact, No. 6:** The Plaintiff has failed in his burden to establish he has suffered an adverse employment action pursuant to First Amendment Retaliation.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact. The facts establish that Lt. Dunn suffered an adverse employment action including, for example, that Lt. Dunn was actually demoted when he was stripped of his canine responsibilities. Ex. 1 (Lt. Dunn Tr. 128:2– 130:7, 198:20–199:23; 407:21–409:23); *see also infra* ¶¶ 58, 65–68.**

18.    **Lt. Young's Statement of Fact, No. 7:** The Plaintiff has failed in his burden to establish Young could have caused any alleged adverse employment actions or decisions.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that Lt. Young caused an adverse employment action and decision.  For example, evidence shows that Lt. Young suggested ending the canine program to Chief Fontenot to make Lt. Dunn quit.  Ex. 3 (Lt. Young Tr. 74:1–78:23); Ex. 7 (Thibodeaux Tr. 143:13–145:8); *see also infra* ¶ 63.**

19.     **Lt. Young's Statement of Fact, No. 8:** The Plaintiff has failed in his burden to establish Young caused alleged adverse employment decisions, even if such adverse employment actions occurred, which is denied.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that (1) that an adverse employment action occurred, *infra* ¶ 58, 65–68, and (2) that Lt. Young caused this adverse employment decision.  *Infra* ¶ 63.**

20.     **Lt. Young's Statement of Fact, No. 9:** The Plaintiff has failed in his burden to establish Young removed Plaintiff from the K-9 program or narcotics investigations, or that he influenced those decisions.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that Lt. Young suggested or recommended that EPD "[take] the dog from Dunn."  Ex. 3 (Lt. Young Tr. 74:1–78:23); *see also infra* ¶ 63.  The canine program and narcotics duties were closely tied, which Lt. Young understood because he once requested narcotics assistance from Lt. Dunn's canine.  Ex. 3 (Lt. Young Tr. 86:20–87:15); *see also* Ex. 7 (Thibodeaux Tr. 194:3–196:17).  Lt. Young also admits that Lt. Dunn was removed from his narcotics duty in 2019.  ECF No. 237 at 24 ("[H]e was removed from the position in May 2019.").  The evidence establishes**

9

**that Lt. Young played a role in stripping Lt. Dunn of his canine duties, effectively removing both employment opportunities.  *Infra* ¶ 63.**

21.    **Lt. Young's Statement of Fact, No. 10:** The Plaintiff has failed in his burden to establish Young caused harm to Plaintiff's reputation, harassed Plaintiff with investigations or harassed Plaintiff with the threat of arrest.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that Lt. Young harassed Lt. Dunn with baseless investigations, official and unofficial, *see, e.g.*, Ex. 3 (Lt. Young Tr. 99:23–101:1, 116:15–20); Ex. 4 (Ofc. Fontenot Tr. 257:9–14); *see also infra* ¶¶ 69–76, 87; and harmed Lt. Dunn's reputation by telling others than Lt. Dunn was a "dirty cop," *see, e.g.*, Ex. 3 (Lt. Young Tr. 145:22–146:1); *see also infra* ¶ 91.  Whether or not this evidence meets the burden on both of these issues is a legal conclusion.**

22.    **Lt. Young's Statement of Fact, No. 11:** The Plaintiff has failed in his burden to establish he had diminished job prospects, and that any such alleged diminishment were caused by Young, as opposed to Plaintiff's own actions.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that Lt. Dunn suffered reputational harm and the impact that of harm in limiting his job prospects. For example Lt. Dunn attests that being labeled as "dirty" has undermined his reputation to such an extent that officers still don't trust him and the relationships he would require for narcotics work have been tarnished.  Ex. 1 (Lt. Dunn Tr. 387:23–388:2); *see also id.* (Lt. Dunn Tr. 258:6–12, 215:16–219:16, 361:12–13); *infra* ¶ 91.**

10

23.     **Lt. Young's Statement of Fact, No. 12:** The Plaintiff has failed in his burden to establish at all times relevant herein Young was Plaintiff's supervisor.

**<u>Lt. Dunn's Response:</u> Disputed.**

**This is a legal conclusion, not a statement of fact.  In any event, this fact is immaterial because Lt. Young need not be Lt. Dunn's supervisor to be liable for a retaliatory adverse employment action; he need only be a causal link in the chain that led to the adverse employment action.  *See Sims v. City of Madisonville*, 894 F.3d 632, 639 (5th Cir. 2018) (finding that officials whose retaliatory conduct is a "link in the causal chain" may be individually liable for their roles in the adverse employment action).  Lt. Dunn presents evidence that he faced an adverse employment action caused by the conduct of Lt. Young. *Infra* ¶ 63.**

24.     **Lt. Young's Statement of Fact, No. 13:** The Plaintiff has failed in his burden to establish Young had the power or authority to make an adverse employment decision for Plaintiff.

**<u>Lt. Dunn's Response:</u> Disputed.**

**This is a legal conclusion, not a statement of fact.  In any event, Lt. Young's position of authority is immaterial because Lt. Dunn need not establish that Lt. Young had formal power to implement an adverse employment action, only that Defendant was a causal link in the chain that led to the adverse employment action.  *See Sims*, 894 F.3d at 639 (finding that officials whose retaliatory conduct is a "link in the causal chain" may be individually liable for their roles in the adverse employment).  Lt. Dunn presents evidence that he faced an adverse employment action caused by the conduct of Lt. Young.  *Infra* ¶ 63.**

25.     **Lt. Young's Statement of Fact, No. 14:** The Plaintiff has failed in his burden to establish Young was permitted to make recommendations for discipline in the course of conducting investigations

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  Moreover, any underlying fact regarding Lt. Young's authority to discipline is immaterial because Lt. Dunn asserts that the investigation itself is harassing, so the allegation is not reliant on the threat of discipline. *Infra* ¶¶ 69–91.**

26.     **Lt. Young's Statement of Fact, No. 15:** The Plaintiff has failed in his burden to establish Young harmed his reputation, defamed him, spread rumors about him, or suggested he was corrupt.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that Lt. Young harmed his reputation, defamed him, spread rumors about him, and suggested that Lt. Dunn was corrupt.  Lt. Young's own testimony shows that he did spread rumors that Lt. Dunn was corrupt.  Ex. 3 (Lt. Young Tr. 145:22–146:1).  Furthermore, the facts support that these actions resulted in harm by ruining his reputation in the community and causing mental and emotional suffering.  Ex. 1 (Lt. Dunn Tr. 387:19–388:2); *see also infra* ¶ 91.**

27.     **Lt. Young's Statement of Fact, No. 16:** The Plaintiff has failed in his burden to establish Young harassed Plaintiff with investigations.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that Lt. Young harassed him with baseless investigations, both official and unofficial.  *Infra* ¶¶ 69, 75–79, 87–88.  Whether this evidence meets the burden is a legal conclusion.**

28.    **Lt. Young's Statement of Fact, No. 17:** The Plaintiff has failed in his burden to establish Young harassed Plaintiff with the threat of arrest.

**Lt. Dunn's Response: Disputed.**

**The facts establish that Lt. Young harassed him with the threat of arrest.  For example, Chief Fontenot bragged to the Mayor of Eunice that he was going to have Lt. Dunn arrested.  Ex. 1 (Lt. Dunn Tr. 141:20–142:5, 386:15–387:1).  Lt. Young was a key, participatory figure in these retaliatory investigations, that worked toward the same objectives, including harassing Lt. Dunn with the threats of arrest.  Ex. 3 (Lt. Young Tr. 60:19–24, 99:23–101:1); *see also infra* ¶ 87.**

29.    **Lt. Young's Statement of Fact, No. 18:** The Plaintiff has failed in his burden to establish Young diminished Plaintiff's job prospects.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that he has been unable to secure equivalent employment outside EPD as a result of the harassment, baseless investigations, and reputational harm.  For example, Lt. Dunn testifies that the Coushatta Police office rescinded a job offer after Lt. Dunn was placed under investigation.  Ex. 1 (Lt. Dunn Tr. 215:16–219:16); *see also infra* ¶ 91.**

30.    **Lt. Young's Statement of Fact, No. 19:** The Plaintiff has failed in his burden to establish Plaintiff's speech precipitated alleged adverse employment actions by Young against Plaintiff.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  Lt. Dunn provides evidence that his speech precipitated Lt. Young's retaliatory and harassing actions in the context of the adverse employment action against Lt. Dunn.  *Infra* ¶ 68–79.**

31.    **Lt. Young's Statement of Fact, No. 20:** The Plaintiff has failed in his burden to establish the existence of a conspiracy involving Young.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that Lt. Young was involved in the conspiracy against him. Lt. Young and Officer Fontenot's shared contempt of Lt. Dunn was widely known both within EPD and in the broader community. *See* Ex. 7 (Thibodeaux Tr. 209:7–17); Ex. 10 at 11.  They were both insulated from punishment for misconduct by Chief Fontenot. Ex. 7 (Thibodeaux Tr. 232:20–24); Ex. 8 (Myers Tr. 123: 24–124:11).  And they indisputably worked together to remove the canine program and initiate the baseless corruption investigation.  Ex. 3 (Lt. Young Tr. 74:1–78:23); Ex. 4 (Ofc. Fontenot Tr. 143:9–12, 199:3–9, 253:7–14, 257:9–14); Ex. 8 (Myers Tr. 111:13–20); *see also infra* ¶¶ 62–63, 68–79.**

32.    **Lt. Young's Statement of Fact, No. 21:** The Plaintiff has failed in his burden to establish there was a deprivation of Plaintiff's civil rights.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that his civil rights were deprived as a result of Lt. Young's actions.  *Infra*  ¶¶ 62–63, 68–79.**

33.    **Lt. Young's Statement of Fact, No. 22:** The Plaintiff has failed in his burden to establish Young intentionally inflicted emotional distress upon Plaintiff.

14

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that Lt. Young intentionally inflicted emotion distress against him.  *Infra* ¶¶62–63, 68–79, 89–91.**

34.     **Lt. Young's Statement of Fact, No. 23:** The Plaintiff has failed in his burden to establish any of Young's conduct was extreme or outrageous.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that Lt. Young's conduct against him was extreme and outrageous.  *Infra* ¶¶ 62–63, 68–79.**

35.     **Lt. Young's Statement of Fact, No. 24:** The Plaintiff has failed in his burden to establish Young had any desire to inflict severe emotional distress upon Plaintiff.

**Lt. Dunn's Response: Disputed.**

**This is a legal conclusion, not a statement of fact.  The facts establish that Lt. Young intentionally inflicted emotional distress against him.  His dislike of Lt. Dunn was widely known in the Department, as observed by Lt. Thibodeaux, who testified that Lt. Young suggested ending the canine program as a way to get rid of Lt. Dunn.  *See* Ex. 7 (Thibodeaux Tr. 52:7–18, 409:21–22); *see also infra* ¶¶ 88.**

36.     **Lt. Young's Statement of Fact, No. 25:** Plaintiff's lawsuit was filed on June 4, 2021, therefore any events occurring before June 4, 2020 are prescribed, which claims include, but are not limited to, Plaintiff's claim associated with Plaintiff's removal from narcotics investigations whereby Plaintiff was removed from that position in May of 2019, more than one year before the filing of this lawsuit.

**Lt. Dunn's Response: Disputed.**

**This is not a fact, but a restatement of the Prescription of Claims argument Lt. Young asserts in Section III(G) of his brief.** *See* **Lt. Young Motion for Summary Judgment, ECF No. 237. This is a legal question appropriate for the Court.**

### PART III.  LT. DUNN'S SUPPLEMENTAL STATEMENT OF FACTS

####    A.    Lt. Dunn's Role at EPD

37.    Dunn has worked at EPD for more than 15 years.  He was promoted to lieutenant in 2016. Ex. 1 (Lt. Dunn Tr. 16:19–18:11).  From 2016 until 2019, Lt. Dunn served as a lieutenant in the narcotics division—a desirable job that provided additional responsibility, benefits, and pay. Ex. 1 (Lt. Dunn Tr. 120:8–13, 198:20–199:23, 407:21–409:23).  In that capacity, he supervised and assisted in the management of narcotics-related investigations.  Ex. 1 (Lt. Dunn Tr. 407:21–409:23); Ex. 2 (Chief Fontenot Tr. 226:20–21).  And from 2016 until 2020, Lt. Dunn was a member of EPD's canine unit.  Ex. 1 (Lt. Dunn Tr. 120:8–13).

38.    Until the events giving rise to this case, Lt. Dunn maintained an "impeccable" record at the department.  Ex. 5 (Ardoin Tr. 39:23–40:5, 244:21–25).

39.    Chief Fontenot was elected as the chief of the EPD in 2015.  *See* Ex. 2 (Chief Fontenot Tr. 25:24–26:2); Ex. 11 (LeBouef Tr. 14:21–23); La. R.S. § 33:381 ("The mayor and chief of police in all municipalities shall be elected at large.").

40.    As elected chief, Chief Fontenot "had the final decision-making authority on imposing discipline" within EPD.  Ex. 12 (City of Eunice Tr. 133:24–134:3) ("Q: In terms of police department policies and procedures, the chief of police, rather than the mayor, is the policymaker for the City of Eunice? A: Yes, the elected chief of police."); *see also id.* (City of Eunice Tr. 74:4–19) ("Randy Fontenot had the final decision-making authority on imposing discipline . . .").

16

**B.    EPD's Written Policies and Custom of Retaliation**

41.    EPD's procedural orders confer final and unfettered discretion on the Chief of Police to discipline EPD officers.  *See* Ex. 6 at 30 ("Final departmental disciplinary authority and responsibility rest with the Chief of Police. Everything involved in this Procedural Order will be directed to the Chief's Office. NO EXCEPTIONS.").

42.    The procedural orders permit the Chief of Police to punish EPD personnel for "conduct unbecoming an officer," which is defined broadly as conduct that (1) "[b]rings the Department into disrepute"; (2) "[r]eflects discredit upon the officer as a member of the Department"; (3) "[i]mpairs the operations or efficiency of the Department"; (4) "[d]etrimentally affects the morale of the Department's personnel"; or (5) "[m]ay reasonably be expected to destroy public respect for Eunice Police Officers and/or confidence in the Eunice Police Department." *Id.* at 13.

43.    The procedural orders require EPD officers to be loyal to the Department.  *See id.* at 14.  The loyalty rules prohibit EPD officers from "publicly criticiz[ing] the Department, its policies, or other members or employees by talking, in writing or other expression where such expression is defamatory, obscene, unlawful, and exhibits a reckless disregard for the truth or tends to undermine the operation of the Eunice Police Department." *Id.*

44.    The procedural orders impose restrictions on EPD's officers' use of social media. *See id.* at 144.  For instance, "adherence to the department's code of conduct is required in the personal use of social media." *Id.* at 145.  The rules prohibit EPD personnel from engaging in speech "that would reasonably be considered reckless or irresponsible." *Id.*

45.    Within EPD, officers fear retaliation from the Chief and other officers.  *See* Ex. 7 (Thibodeaux Tr. 28:2–25, 331:19–22) (testifying that most EPD officers are "afraid" to report misconduct because they fear retaliation); *see also id.* (Thibodeaux Tr. 141:23–142:18) ("right

17

after every time [Lt. Dunn] would [report Chief Fontenot's actions]," Chief Fontenot would retaliate, "usually within a week"); Ex. 2 (Chief Fontenot Tr. 223:2–25).

46.     Chief Fontenot admitted that EPD personnel reporting EPD misconduct "constantly . . . to the mayor, the [city council] and [Eunice] Civil Service Board" was "a problem." Ex. 2 (Chief Fontenot Tr. 223:2–25). Lt. Stephanie Myers testified that she heard Chief Fontenot say that "[a]nybody appealing" his decisions to the Civil Service Board "need[s] to die." Ex. 8 (Myers Tr. 101:7–102:5).

47.     Former EPD Deputy Chief Varden Guillory testified that Chief Fontenot mistreated him because he "did not obey [Chief Fontenot's] orders" that he believed were "illegal." Ex. 13 (V. Guillory Tr. 41:7–9, 209:22–210:2). According to former Deputy Chief Guillory, Chief Fontenot's mistreatment drove him to retire four years earlier than he planned. *Id.* (V. Guillory Tr. 45:5–12). And Chief Fontenot's vindictiveness toward Deputy Chief Guillory lasted even after he retired from EPD: Chief Fontenot opened a baseless investigation into him in his final two weeks, and two days after his retirement, he "was arrested—on a warrant for a case that [Chief Fontenot]" instigated to deprive him of retirement benefits. *See id.* (V. Guillory Tr. 16:17–17:17); *see also id.* (V. Guillory Tr. 24:18–25:8) (investigation was "without just cause").

48.     Lt. Thibodeaux explained that Chief Fontenot demoted him and reassigned him to an unfavorable shift because of his service on the Civil Service Board. Ex. 7 (Thibodeaux Tr. 83:12–84:2). After Lt. Myers reported misconduct, Chief Fontenot stripped her of her duties, denied her appropriate office space, and placed her on leave. Ex. 8 (Myers Tr. 46:17–47:4, 48:14–50:4, 56:14–57:24). Lt. Jeremy Ivory was demoted by Chief Fontenot after he made comments perceived as critical of EPD. Ex. 14 (Lee Tr. 15:24–16:13, 91:6–92:6).

49.    Former EPD Officer Chase Godeaux testified that he also feared retaliation from Chief Fontenot.  Ex. 15 (Godeaux Tr. 20:9–19, 34:19–22).  Officer Godeaux testified that he left EPD specifically because Chief Fontenot had placed Lt. Dunn on administrative leave, "trying to make him out to be something he wasn't, whether it was punishment or anything of that nature." *Id.* (Godeaux Tr. 20:12–19).  Officer Godeaux feared that he "would be next." *Id.*  Both Officer Godeaux and Officer Joshua Corville confirmed that Chief Fontenot regularly used shift changes to punish officers.  *See id.* (Godeaux Tr. 64:8–65:10); Ex. 16 (Courville Tr. 18:9–24).  Lt. Thibodeaux also testified that Chief Fontenot would use investigations to "find something" on disfavored employees in order to justify discipline.  Ex. 7 (Thibodeaux Tr. 92:6–9)

50.    Officers further testified that they feared retaliation for providing truthful testimony in depositions in this case.  Both Lt. Myers and Lt. Thibodeaux testified that they feared that, by supporting Lt. Dunn and telling the truth in this lawsuit, Chief Fontenot would retaliate against them.  Ex. 8 (Myers Tr. 13:24–14:2; 123:8–11) ("Q: You feel like you're being punished [by Chief Fontenot] for being deposed in this litigation? A: Yes."); Ex. 7 (Thibodeaux Tr. 28:12–16) ("I'm really nervous with [Chief Fontenot] being here because I know . . . he's going to retaliate.").

51.    Several officers observed Chief Fontenot favoring certain officers, like Officer Fontenot and Ryan Young.  Ex. 7 (Thibodeaux Tr. 232:20–233:6) ("Q. Who doesn't get punished at the Eunice Police Department" "A. The ones that comply are his favorite." "Q: Like who? A: Lieutenant Young, Victor Fontenot" . . . "Q: So in your opinion, there have been times when Victor Fontenot and  Ryan Young have broken department policy and have not been punished when they should have; is that correct? A: Yes.") ; Ex. 8 (Myers Tr. 123: 24–124:11) ("Q: Do you think that Chief Fontenot permits certain officers to get away with violating department policies? A: Yes. Q: Why did you think he does that with some officers? A: playing favoritism. I don't know").

C.      **Lt. Dunn Reports Misconduct Within and Outside EPD.**

52.     Starting in 2017, Lt. Dunn began observing a troubling pattern of police misconduct within EPD.  Lt. Dunn repeatedly reported the misconduct—occurring at different times and involving different officers—to Chief Fontenot using official internal channels.  Ex. 1 (Lt. Dunn Tr. 391:14–22).

53.     In January 2019, Officer Fontenot attempted to facilitate the escape of a detainee known to be a flight risk.  Ex. 1 (Lt. Dunn Tr. 220:11–221:22).  Lt. Dunn reported Officer Fontenot's conduct by submitting a critical incident report—EPD's internal mechanism for raising official complaints of misconduct.  *Id.*

54.     In May 2019, Lt. Dunn reported that Officer Fontenot forcibly grabbed a restrained suspect by the neck.  Ex. 1 (Lt. Dunn Tr. 158:6–160:15).  Around this period, Lt. Dunn also witnessed another EPD officer use excessive force on  detainees.  *Id.* (Lt. Dunn Tr. 161:9–166:22, 173:2–174:21); Ex. 17 (Tilbury Tr. 125:7–126:9).  Lt. Dunn reported the incidents to Chief Fontenot.  *Id.*(Lt. Dunn Tr. 171:3–174:2).  No investigations followed.  *Id.* (Lt. Dunn Tr. 177:11–18).

55.     In August 2019, Lt. Dunn reported officers, including Officer Fontenot, for mishandling evidence of a rape.  Ex. 1 (Lt. Dunn Tr. 227:14–229:21); Ex. 14 (Lee Tr. 49:22–52:11); Ex. 7 (Thibodeaux Tr. 137:7–139:18).  When EPD refused to take corrective action, Lt. Dunn reported it to the Eunice Civil Service Board, which found the EPD investigation noncompliant with the minimum standards.  *See* Ex. 1 (Lt. Dunn Tr. 232:21–236:18); *see also generally* Ex. 18; La. R.S. 40:2531.

56.     Because EPD did not investigate or resolve any of the reported misconduct, Lt. Dunn brought his concerns to non-EPD authorities, including the mayor, the city council, District Attorney's Office, the Louisiana State Police, the Louisiana Attorney General's Office, Louisiana

20

Lieutenant Governor's Office, the Louisiana Inspector General's Office, St. Landry Parish Sheriff's Office, and the FBI. Ex. 1 (Lt. Dunn Tr. 248:3–249:10); Ex. 19 (S. Fontenot Tr. 349:10–16) (reports to mayor); Ex. 20 (Darbonne Tr. 168:5–20) (reports to Eunice City Marshal); Ex. 21 (Bobby Guidroz Tr. 44:13–21, 50:19–21) (reports to St. Landry Parish Sheriff's Office); Ex. 22 (Schiele Tr. 12:15–17:17); Ex. 23 (Brad Guidroz Tr. 25:8–26:19) (reports to Louisiana State Police); Ex. 24 (Duplechain Tr. 20:12–16) (same). These reports were nearly always made while he was off duty—often anonymously or while he was at home. Ex. 1 (Lt. Dunn Tr. 68:15–71:10).

**D.    Chief Fontenot and Officer Fontenot Launched a Series of Adverse Actions Against Lt. Dunn**

57.    In response to Lt. Dunn's reporting, Chief Fontenot initiated a retaliatory campaign against Lt. Dunn, working with Officer Fontenot and Lt. Young. Thereafter, Lt. Dunn's reporting—followed by Defendants' swift retaliation—became the norm. *See* Ex. 7 (Thibodeaux Tr. 141:23–142:18) ("right after every time [Lt. Dunn] would [report Chief Fontenot's actions]," Chief Fontenot would retaliate, "usually within a week").

58.    In May 2019, Chief Fontenot removed Lt. Dunn from narcotics investigations after learning that Lt. Dunn had reported an unlawful arrest to Louisiana State Police. Ex. 1 (Lt. Dunn Tr. 198:20–200:12); Ex. 3 (Lt. Young Tr. 170:12–15).

59.    In August 2019, while off duty, Lt. Dunn made a Facebook post describing gunshots and multiple cars doing "donuts" and "racing" in his neighborhood, expressing concern for his family's safety. *See* Ex. 1 (Lt. Dunn Tr. 102:13–103:3; 323:23–324:11); *see generally* Ex. 25.

60.    He made the social media post at his home and in an effort "to make the public aware of a problem and danger that affects [his] neighborhood" Ex. 25. In response, Chief Fontenot placed him on administrative leave and initiated an investigation against him for

21

misconduct.  Lt. Dunn appealed Chief Fontenot's decision to the Civil Service Board, which reversed it, finding that Lt. Dunn's rights under the Police Officer's Bill of Rights had been violated.  *See* Ex. 18.  Soon thereafter, the city council stripped Chief Fontenot of his authority to hire, fire, and suspend officers.  Ex. 26 (B. Dupre Tr. 170:2–16).

61.    Chief Fontenot then turned to other means to punish Lt. Dunn, including placing Lt. Dunn on the less desirable night shift; understaffing Lt. Dunn's shift, which put his safety at risk; requiring Lt. Dunn to perform tasks well below his rank; and encouraging fellow officers to verbally smear Lt. Dunn.  Ex. 1 (Lt. Dunn Tr. 263:19–266:9); Ex. 9 (Lt. Dunn Cont'd. 225:15–227:8) (lower ranked officers at EPD circumvent and give orders to Lt. Dunn); Ex. 13 (V. Guillory Tr. 91:1–92:12, 96:16–97:6) (punitive shift changes); Ex. 17 (Tilbury Tr. 178:2–180:21); Ex. 7 (Thibodeaux Tr. 141:23–143:12) (punitive shift change for appealing Chief Fontenot's canine decision); *id.* (Thibodeaux Tr. 191:19–194:25) (describing shift changes as "a form of punishment" to "hurt[ Dunn's] personal life or professional life"); *id.* (Thibodeaux Tr. 223:10–226:7); Ex. 20 (Darbonne Tr. 28:3–21) (short-staffed shifts are "[v]ery, very dangerous").  Chief Fontenot made his intentions clear, telling Lt. Dunn directly that he could either quit or face discipline and investigation.  Ex. 7 (Thibodeaux Tr. 91:3–12, 201:8–202:1).

62.    In late 2019, Officer Fontenot learned that Lt. Dunn reported Officer Fontenot's involvement in the mishandled rape investigation.  With Lt. Dunn's critical incident report in hand, Officer Fontenot exclaimed that (1) Lt. Dunn was "conceived in the cesspool of his mother's womb"; (2) he would "put two [bullets] in his [dog's] head"; (3) he was "going to break [Lt. Dunn's] mother f***ing fingers"; and (4) he was "going to f*** him up when I catch him alone on call."  Ex. 4 (Ofc. Fontenot Tr. 310:10–311:7) (admitting "cesspool" statement); *see also id.* (Ofc. Fontenot Tr. 143:9–25) (admitting "two bullets in its head" statement); Ex. 3 (Lt. Young Tr.

74:1–78:23, 82:2–8); Ex. 8 (Myers Tr. 111:13–20) (confirming Chief Fontenot was present and that Lt. Myers recorded this conversation); *see also* Ex. 17 (Tilbury Tr. 185:5–24); Ex. 7 (Thibodeaux Tr. 45:12–46:3, 262:4–9); Ex. 5 (Ardoin Tr. 115:10–21). A nearby officer, Darren Guillory, chimed in: "[f]*** him" (i.e., Lt. Dunn) "and his wife." Ex. 3 (Lt. Young Tr. 77:22–24); Ex. 4 (Ofc. Fontenot Tr. 127:3–129:5). And when Officer Fontenot claimed he would put two bullets in the head of Lt. Dunn's canine, the then-deputy chief of EPD placed two bullets on a table in front of Officer Fontenot. Ex. 3 (Lt. Young Tr. 78:4–23).

63.    At this same meeting—in the presence of Chief Fontenot—Lt. Young and Officer Fontenot discussed stripping Lt. Dunn from his canine duties as a way to "get rid" of him. (Lt. Young Tr. 74:1–78:23); Ex. 7 (Thibodeaux Tr. 51:25–52:20, 143:13–145:8, 194:3–196:17, 409:8–410:2).

64.    In December 2019, Lt. Dunn filed a report documenting Officer Fontenot's repeated threats of physical violence directed at him and his police canine, in violation of EPD policy. Ex. 1 (Lt. Dunn Tr. 229:22–231:5); (Ofc. Fontenot Tr. 143:9–12) (Report). Chief Fontenot dismissed Officer Fontenot's threats as "blowing off steam" and conducted no investigation because it was behavior that Chief Fontenot "encouraged." Ex. 2 (Chief Fontenot Tr. 174:24–177:14).

65.    On June 12, 2020, after learning that Lt. Dunn had reported EPD misconduct to the St. Landry Parish District Attorney's Office, Chief Fontenot ordered the removal of Lt. Dunn's canine and eliminated the canine program altogether. Ex. 1 (Lt. Dunn Tr. 54:13–55:19, 57:16–58:25); Ex. 2 (Chief Fontenot Tr. 334:6–22). Eliminating the canine program caused a reduction in pay for Lt. Dunn, which would not be restored until he brought a claim to the Civil Service Board. Ex. 1 (Lt. Dunn Tr. 127:3–128:8).

66.     This demotion caused Lt. Dunn to suffer loss of his title, substantial duties, a position of responsibility, and the dog.  Ex. 1 (Lt. Dunn Tr. 120:5–121:19, 123:11–25, 128:2–130:7, 131:17–133:14).  It was not until several years later that Lt. Dunn's canine duties were restored, but EPD has repeatedly prevented Lt. Dunn from joining ongoing narcotics operations as part of his canine duties, despite there being several active matters.  Ex. 1 (Lt. Dunn Tr. 123: 18–25); Ex. 9 (Lt. Dunn Cont'd Tr. 229: 6–13).

67.     It was widely understood within EPD that the removal of the canine program was an adverse action intended to punish Lt. Dunn.  Ex. 7 (Thibodeaux Tr. 26:3–19); Ex. 8 (Myers Tr. 96:2–99:13); Ex. 27 (Larson Tr. 103:12–105:10).  The Civil Service Board "reversed [Chief Fontenot's decision] and made them pay [Lt. Dunn] back pay."  Ex. 7 (Thibodeaux Tr. 197:1–4).

68.     Following Lt. Dunn's removal from canine duties, Lt. Young and Officer Fontenot spread false allegations that Lt. Dunn was collecting bribes in exchange for intelligence.  *See* Ex. 3 (Lt. Young Tr. 30:2–31:24, 109:14–19); Ex. 10 at 11 ("Like Victor [Fontenot], Ryan Young and the Chief, they all beefing with Dunn . . . [Officer Fontenot] threatened me, telling me I need to give him some information on Dunn so that they can get rid of his a**.").  Three days before Lt. Dunn filed his lawsuit, but knowing it was incoming, a group of officers, including Chief Fontenot and Lt. Young, tried to pressured Lt. Dunn into admitting to the corruption allegations.  Ex. 1 (Lt. Dunn Tr. 258:24–259:11).

69.     Lt. Young initially sought to bring these false accusations to outside agencies, Ex. 3 (Lt. Young Tr. 33:9–11), but opted instead to task Officer Fontenot with an "informal" investigation—despite the fact that informal investigations are not permitted under EPD's policies, Ex. 2 (Chief Fontenot Tr. 286:12–287:1), and yet Chief Fontenot and Lt. Young allowed it to continue, Ex. 4 (Ofc. Fontenot Tr. 199:3–200:6, 257:9–14) (admitting Chief Fontenot's and Lt.

Young's awareness); Ex. 2 (Chief Fontenot Tr. 286:16–289:22). That investigation yielded no evidence of any wrongdoing by Lt. Dunn. Ex. 4 (Ofc. Fontenot Tr. 207:4–7); *see also* Ex. 7 (Thibodeaux Tr. 182:6–188:2) (testifying that Officer Fontenot and Lt. Young attempted to build a criminal case against Lt. Dunn without any evidence).

70. Chief Fontenot admitted under oath that conducting an unofficial investigation on another officer would "definitely" violate EPD policy. Ex. 2 (Chief Fontenot Tr. 287:2–10).

71. Officer Fontenot, however, conducted an unofficial investigation into Lt. Dunn, in violation of EPD policy. *See* Ex. 4 (Ofc. Fontenot Tr. 253:7–14) (admitting he conducted an unofficial investigation into Lt. Dunn). This investigation was actively encouraged by Lt. Young. Ex. 3 (Lt. Young Tr. 116:15–117:18).

72. Despite the fact that Chief Fontenot denied that he knew about Officer Fontenot's informal investigation into Lt. Dunn, Officer Fontenot did testify that Chief Fontenot was indeed aware about the informal investigation. Ex. 4 (Ofc. Fontenot Tr. 199:3–9) (declaring that Chief Fontenot knew about the unofficial investigation); *see also* Ex. 2 (Chief Fontenot Tr. 286:16–287:16) ("Q. Do you have any understanding of while -- of whether Officer Fontenot completed his own internal investigation into whether Mr. Dupre was paying off Lieutenant Dunn? A. I don't see how that's possible . . . Q. And it's your testimony that you have no reason to believe that he was doing that? A. I'm not aware that he did it, and I have -- yeah, you're right, I have no reason to believe that he did.").

73. More troubling still, Chief Fontenot claimed ignorance of Officer Fontenot's informal—indeed, policy-violating—investigation into Lt. Dunn, even though he sat in the room when Officer Fontenot admitted under oath that he had conducted precisely such an investigation. *See* Ex. 2 (Chief Fontenot Tr. 256:25) ("I was at Victor's deposition"); *see also id.* (Chief Fontenot

Tr. 171:24–172:1) ("Q. You attended the deposition of Victor Fontenot in this litigation, correct? A. Yes, I did.").

74.    Even though Chief Fontenot knew—either before or after Officer Fontenot's deposition—that Officer Fontenot had violated EPD policies by conducting an informal investigation into Lt. Dunn, Chief Fontenot did not take any corrective action or discipline against Officer Fontenot.  *See* Ex. 2 (Chief Fontenot Tr. 257:9–12) ("Q. Did you take any action with respect to Victor Fontenot after his deposition regarding this transcript?  A. No.").

75.    The informal investigation was a farce; it was nothing more than an attempt to force Lt. Dunn from EPD under the guise of false charges.

76.    That motive behind the informal investigation—which violated EPD policy—was revealed at an October 2020 bond revocation hearing in an unrelated criminal proceeding. There, the defendant Joshua Dupre—under oath and after waiving his Fifth Amendment rights—testified that Officer Fontenot threatened him in order to get him to falsely accuse Lt. Dunn of corruption, selling drugs, and accepting bribes.  Ex. 10 at 11.  As Mr. Dupre explained:

> [T]hey got some altercation going on in the [EPD] right now. Like Victor [Fontenot], Ryan Young, and the Chief [Fontenot], they all beefing with Dunn, and like, I'm in the middle of it, like I'm on Dunn's side. So [Officer Fontenot] threatened me, telling me I need to give him some information on Dunn so they can get rid of his a**, his butt, or whatever, something like that. Man, I ain't got no—I don't know what ya'll talking about. I ain't never paid this man.

*Id.* (emphasis added); Ex. 28 at Resp. 28.

77.    As part of Officer Fontenot's effort to coerce Mr. Dupre into lying about Lt. Dunn, Mr. Dupre testified that, Officer Fontenot was "threatening [Mr. Dupre], riding along [his] house every day," and telling Mr. Dupre that he "was going to put these new charges on [him]."  Ex. 10 at 10–13.

26

78.    In the end, Officer Fontenot did, in fact, arrest Mr. Dupre "because he want[ed] information on [Lt.] Dunn." *See* Ex. 10 at 13; Ex. 29 at Resp. Nos. 27, 31.

79.    Mr. Dupre testified that his phones—which were in the possession of Officer Fontenot and EPD during this litigation yet not produced—contained evidence of Officer Fontenot's exerting pressure on him to lie and falsely incriminate Lt. Dunn. *See* Ex. 10 at 13 ; Ex. Ex. 28 at Resp. No. 48 (admitting EPD possessed Dupre's cell phones at least until March 3, 2023); *see also id.* at Nos. 51–52 (admitting Officer Fontenot corresponded with Mr. Dupre via text message).

80.    The effect of this investigation on Lt. Dunn was devastating, causing him to experience severe depression.  Ex. 9 (Lt. Dunn Cont'd. Tr. 38:12–14; 192:24–193:2; 201:5–7).

81.    In March 2021, Lt. Dunn—who was already placed on a short-staffed night shift— faced further risk when two other EPD personnel on his shift called out sick.  *See* Ex. 30 at 2; *see also* Ex. 20 (Darbonne Tr. 28:3–21) (short-staffing places officers and the public at grave risk).

82.    Severely undermanned, Lt. Dunn sought assistance from other EPD personnel. Few answered, and those who did "declined." *See* Ex. 30; Ex. 7 (Thibodeaux Tr. 209:7–17).  Deputies at the Eunice City Marshal's Office learned of EPD's staffing shortage and volunteered backup because of "concern[s] about . . . officer[] safety." Ex. 20 (Darbonne Tr. 80:17–19).

83.    The Marshal's Office had provided backup to EPD on numerous occasions, indeed, "[p]robably on a daily basis." *Id.* (Darbonne Tr. 20:16–18, 79:2–5); Ex. 9 (Lt. Dunn Cont'd Tr. 64:7–65:9).  Jack Ardoin—who served in both EPD and the Marshal's office—testified that as a deputy marshal, he provided backup to EPD "[j]ust about every day that I was working" and never had to seek approval from Chief Fontenot before doing so.  Ex. 5 (Ardoin Tr. 211:12–212:3).

Marshal Darbonne confirmed that deputies provide backup for EPD and work together with EPD "[a]ll day long." Ex. 20 (Darbonne Tr. 79:6–17).

84. But despite this common practice, the next day after Lt. Dunn asked for backup, Chief Fontenot—"very upset" and "irate"—stormed into Marshal Darbonne's office, complaining that he provided backup to Lt. Dunn's shift. *Id.* (Darbonne Tr. 45:9–46:25).

85. According to Marshal Darbonne, Chief Fontenot's visceral and unusual reaction to much-needed backup was "because it was [Lt]. Dunn that was working that night." *Id.* (Darbonne Tr. 80:7–81:9).

86. Following the confrontation between Chief Fontenot and Marshal Darbonne, Chief Fontenot initiated an investigation into Lt. Dunn. Ex. 5 (Ardoin Tr. 218:25–219:17). In other words, Chief Fontenot "targeted" Lt. Dunn by placing him in a "[v]ery, very dangerous situation"—a short-staffed shift without backup—and then punished him for responsibly accepting assistance from another law enforcement agency. Ex. 20 (Darbonne Tr. 28:3–9, 81:3–9).

87. In addition to Defendants' constant efforts to investigate and endanger Lt. Dunn, Lt. Young also went out of his way to attack his reputation by implying to other officers that he had mental health problems and by improperly publicizing his mental health treatment. Ex. 9 (Lt. Dunn Cont'd Tr. 114:15–16:9) (accusing Lt. Dunn of having mental problems); *see also id.* (Lt. Dunn Cont'd. Tr. 116:2–6) (Chief Fontenot sent Lt. Young to follow Lt. Dunn to see what counselor he was seeing). Chief Fontenot also attempted to have Lt. Dunn arrested for malfeasance for refusing to speak with state police in an investigation. Ex. 1 (Lt. Dunn Tr. 177:19–24). At the time, Lt. Dunn stated that he was willing to work with state police and requested the presence of his counsel for the discussion with state officers. *Id.*

28

88.     The retaliation against Lt. Dunn was relentless, and its objective was unmistakable: Chief Fontenot, Lt. Young, and Officer Fontenot wanted to "get rid of" Lt. Dunn, force him out of EPD, and ultimately silence him.  Ex. 7 (Thibodeaux Tr. 52:7–18, 409:8–410:2); Ex. 8 (Myers Tr. 141:18–142:13); Ex. 27 (Larson Tr. 185:9–19); Ex. 14 (Lee Tr. 39:11–40:1).  As one former EPD officer remarked, "Chief Fontenot told me that he would do whatever it took to remove [Lt.] Dunn and get him to quit or be fired."  Ex. 14 (Lee Tr. 39:1–11).  Lt. Thibodeaux confirmed that "it was more important . . . for Chief Fontenot to punish [Lt. Dunn] . . . than it was for him to protect the city of Eunice."  Ex. 7 (Thibodeaux Tr. 145:20–24).

### E.     Lt. Dunn Continues To Suffer Harm To This Day

89.     Since the Defendants' retaliation began, Lt. Dunn has suffered both professionally and emotionally.  Lt. Dunn testified: "When I found out they were trying to have me arrested on false charges . . . I had a mental breakdown."  Ex. 9 (Lt. Dunn Cont'd. Tr. 38:12–14, 200:25–201:7).  Lt. Dunn testified that he has been receiving treatment from a counselor.  *Id.* (Lt. Dunn Cont'd. Tr. 39:8–16, 192:24–193:2, 195:21–196:4).  Lt. Dunn also testified that he now takes medication as part of his treatment plan.  *Id.* (Lt. Dunn Cont'd. 194:2–10).  Lt. Dunn further confirmed that all of the treatment described above were needed because of the stress he experienced at the department.  *Id.* (Lt. Dunn Cont'd. 43:5–10).

90.     Former Deputy Chief Guillory testified that Chief Fontenot and Officer Fontenot discussed "shutting [Lt. Dunn] up," which former Deputy Chief Guillory understood to mean "killing him."  Ex. 13 (V. Guillory Tr. 132:5–133:12).  Former Deputy Chief Guillory said, "Dunn's safety is at risk because of this.  And it's all behind, you know, him speaking out."  *Id.*; *see also* Ex. 8 (Myers Tr. 101:7–102:5) (Lt. Myers testified that she heard Chief Fontenot say that "[a]nybody appealing" his decisions to the Civil Service Board "need[s] to die").  Defendants' acts harmed and continue to harm Lt. Dunn's reputation, make his working conditions intolerable, and

29

diminish his job prospects within and outside EPD.  *See*  Ex. 1 (Lt. Dunn Tr. 258:6–12) ("Now you're trying to ruin my reputation . . . by claiming I was this dirty cop, with no standing or no evidence   "); *see also id.* (Lt. Dunn Tr. 361:12–13) ("I mean, that damaged my reputation in the community."); *id.* (Lt. Dunn Tr. 387:19–22) ("I've lost—I mean, just inside of the department there's still some officers that don't trust me. Other agencies.· I mean, it damaged my reputation."); *id.* ( Lt. Dunn Tr. 387:19–388:12) (testifying that "I don't even get to work narcotics cases anymore. I mean, some people trust me. Some don't" and that the retaliation has tarnished his reputation and "hindered some of my investigation, or investigatory abilities and relationships of other agencies"); Ex. 9 (Lt. Dunn Cont'd. Tr. 178:23–24) ("I've been ostracized out to a corner.").

91.    Lt. Dunn continues to suffer harm as a result of the ongoing misconduct committed against him.  Ex. 9 (Lt. Dunn Cont'd. Tr. 227:17–24) ("Is it your position that those things you just described are still going on currently today?" . . . Yes"); *see generally* Ex. 31 (affirming ongoing misconduct and harm he "continue[s] to face").  The reputational harm has affected Lt. Dunn's career mobility and employment prospects.  Job opportunities have disappeared because of Defendant's sham investigations.  *See* Ex. 1 (Lt. Dunn Tr. 215:16–219:16) (discussing lost job opportunity).  Left with no choice, Lt. Dunn remains with EPD and continues in his effort to clear his name.  *See* Ex. 9 (Lt. Dunn Cont'd. 233:21–234:3) ("[W]hy you haven't left the department? I'm trying to clear my damn name. I'm trying to have something to say, hey, I didn't do what they said I did, or I'm not a dirty cop, or I'm not this or I'm not that, something.").

Dated: March 17, 2026                              Respectfully submitted,


By: */s/ Norman M. Hobbie Jr.*                     By: */s/ Malcolm C. Lloyd*
Francesca E. Brody (*pro hac vice*)                Malcolm C. Lloyd (LA Bar No. 41573)
Peter J. Mardian (*pro hac vice*)                  Charles Andrew Perry (LA Bar No. 40906)
Cassandra Liu (*pro hac vice*)                     Nora Ahmed (*pro hac vice*)
James R. Horner (*pro hac vice*)                   ACLU Foundation of Louisiana
Yu Kyung Kim (*pro hac vice*)                      1340 Poydras Street, Suite 2160
Norman M. Hobbie Jr. (*pro hac vice*)              New Orleans, Louisiana 70112
Alexandra Bieler (*pro hac vice*)                  Telephone: (504) 522-0628
SIDLEY AUSTIN LLP
787 Seventh Avenue                                 Hector Pagan (*pro hac vice*)
New York, New York 10019                           SIDLEY AUSTIN LLP
Telephone: (212) 839-5300                          60 State Street
Fax:  (212) 839-5599                               Boston, Massachusetts 02109
                                                   Telephone: (617) 223-0300
                                                   Fax: (617) 223-0301

Amit Bhatla (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Fax: (202) 736-8711


*Attorneys for Plaintiff Michael Dunn*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 17, 2026, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ Norman M. Hobbie Jr.</u>
Norman M. Hobbie Jr.
